1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION

3       UNITED STATES OF AMERICA,

4           Petitioner,

5               vs.            CASE NO. 8:08-CR-318-T-27TGW
                              8 DECEMBER 2008
6                             TAMPA, FLORIDA
                              PAGES 1 - 166
7                             VOLUME I

8       CHARLES JACKSON FRIEDLANDER,

9           Defendant.

10      _____/

11                 TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE JAMES D. WHITTEMORE
12                 UNITED STATES DISTRICT JUDGE
                          and a jury
13
        APPEARANCES:
14
        For the Petitioner:  **Amanda C. Kaiser**
15                            United States Attorney's Office
                              Suite 3200
16                            400 N. Tampa Street
                              Tampa, Florida 33602
17
        For the Defendant:   **George E. Tragos**
18                            Tragos & Sartes, PL
                              Suite 800
19                            601 Cleveland Street
                              Clearwater, Florida 33755
20
                             **Peter Anthony Sartes**
21                            Tragos & Sartes, PL
                              Suite 800
22                            601 Cleveland Street
                              Clearwater, Florida 33755
23

24       Proceedings recorded and transcribed by
        computer-aided stenography.
25

```
 1     Court Reporter:          Linda Starr, RPR
                                Official Court Reporter
 2                              801 N. Florida Avenue
                                Suite 13B
 3                              Tampa, Florida 33602

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            COURTROOM SECURITY OFFICER:  All rise.  This
 2      Honorable Court is in session, The Honorable James
 3      D. Whittemore presiding.
 4            Be seated, please.
 5            THE COURT:  Good morning.
 6            MR. TRAGOS:  Good morning, Judge.
 7            MS. KAISER:  Good morning.
 8            THE COURT:  I see there's a pending motion in
 9      limine.  I don't think that should affect jury
10      selection.  Ms. Kaiser?
11            MS. KAISER:  That's correct, Your Honor.
12            THE COURT:  Is that the only pending motion?
13            MR. TRAGOS:  Your Honor, there is a motion
14      under Rule 106.
15            THE COURT:  When was it filed?
16            MR. TRAGOS:  It was filed yesterday, Your
17      Honor.
18            THE COURT:  Well, yesterday was Sunday.
19            MR. TRAGOS:  Correct.
20            THE COURT:  What kind of motion is it?
21            MR. TRAGOS:  It's the one where we discussed
22      with the court of allowing Mr. Batelli to be in the
23      courtroom in case his testimony became necessary
24      with regards to --
25            MR. SARTES:  106.
```

```
 1              THE COURT:  Is that docket 117?

 2              MR. TRAGOS:  It is -- it's 106.

 3              COURTROOM DEPUTY CLERK:  This is 131.

 4              MR. TRAGOS:  Oh, I'm sorry, Your Honor.

 5              MR. SARTES:  106 is the additional e-mails.

 6              MR. TRAGOS:  Didn't we file one for --

 7              MR. SARTES:  We did, we filed it.  It was

 8    filed last week.

 9              MR. TRAGOS:  There was a pending motion last

10    week.

11              THE COURT:  I have 117, which is a motion to

12    allow Mr. Batelli to be in the courtroom.

13              MR. TRAGOS:  Right.  Right.

14              THE COURT:  Any objection from the government?

15              MS. KAISER:  Yes, Your Honor.

16              THE COURT:  What's the objection?

17              MS. KAISER:  Your Honor, the government --

18    it's my understanding the defendant is going to be

19    invoking the rule and so is the government.

20    Mr. Tragos and I had discussed this at the previous

21    hearing.  It's my understanding he's going to --

22    he's going to use his law clerk as a witness in this

23    case, and as such we don't want him in the

24    courtroom.

25              MR. TRAGOS:  Your Honor, the only use he'd be
```

1    made of is if her computer guys -- for instance, how

2    many e-mails are on this FK1.  If they can't answer

3    that, then he would be the one we'd ask how many

4    e-mails are on FK1.

5         He has no original knowledge of any of the

6    evidence in the case or the facts of the case other

7    than extensive knowledge of what the government

8    provided digitally and electronically as discovery

9    in the case.  And that's the only thing he would be

10   doing, is a witness to testify as to how many

11   e-mails or how many photographs or identify an

12   e-mail as an e-mail that was provided by the

13   government.

14        THE COURT:  Is the government witness going to

15   be able to accurately answer that question, or those

16   questions?  Who have we got over here?

17        MR. TRAGOS:  What?  Who have we got over

18   where?

19        THE COURT:  This is Mr. Batelli?

20        MR. TRAGOS:  Yes, Your Honor.  The court said

21   that --

22        THE COURT:  Let's remain seated, okay?  When

23   I'm conducting a hearing -- that's one problem I'm

24   going to have.  You guys have to understand, we're

25   in a courtroom, obviously.  So let's not do anything

1    that distracts me or this jury.  That means sitting

2    in your chair and not getting up.

3         I'm sorry, Mr. Tragos.  I interrupted you.  I

4    apologize.

5         MR. TRAGOS:  Your Honor, he is -- like I said,

6    the question the court asked the government was

7    whether their agent is going to be able to answer

8    the questions.  And the only thing I'm saying is if

9    I say -- if I give them a particular e-mail to

10   identify and the agent may say that -- well, I

11   didn't look for this one, it could be on there,

12   because there's a lot of them, I mean, there's a lot

13   of them.  And Mr. Batelli may be necessary to come

14   and say, yes, this e-mail was provided on what we

15   know as FTK1.

16        THE COURT:  All right.  Ms. Kaiser?

17        MS. KAISER:  Your Honor, the government has no

18   problem with -- if the defendant wants to have their

19   law clerk be a witness in the trial from testifying.

20   But the problem is we're going to invoke the rule

21   and he shouldn't be in here.

22        THE COURT:  Ms. Kaiser, I know that.  I know

23   that.  But this is not substantive evidence.  It's a

24   matter of just identifying a potential e-mail or

25   photograph.

1          MS. KAISER:  I believe that it actually will

2     be substantive evidence.  Based on his description

3     he's going to be discussing the evidence and his

4     review of the forensic evidence in the case.

5          THE COURT:  What is his -- go ahead and bring

6     the panel up.  I'm sorry.  What is his background

7     other than being a law student, Mr. Tragos?

8          MR. TRAGOS:  That's -- he's --

9          THE COURT:  That's it?  He wasn't an agent

10    before going to law school or anything like that?

11         MR. TRAGOS:  No.  No.  He was not an agent.

12    Just a person that's handling -- he's far more

13    technically savvy than anybody else in my office.

14    And the discovery was provided -- the majority of

15    the discovery was provided digitally.

16         THE COURT:  He's not going to be answering any

17    substantive questions about the content of e-mails

18    or any other matters that might have been found on

19    these computers?

20         MR. TRAGOS:  No, Your Honor, just the --

21    what's physically on -- what was provided by the

22    government to us and what was contained in what was

23    provided by the government.

24         THE COURT:  I don't see any harm or prejudice

25    to the government in this regard.  I'm going to

1    allow it.  Motion 117 is granted with the

2    understanding, now, that he is not going to be a

3    substantive witness.  Identifying an e-mail or

4    document or photograph that happens to have been in

5    the government's discovery, whether it exists or not

6    is one thing.  But describing the contents or

7    testifying substantively about any other matters, I

8    am relying on your representation that he will not

9    be asked to do so.

10        MR. TRAGOS:  He will not be asked to do so.

11    Your Honor, on that last motion we filed Sunday,

12    that merely is an advance evidentiary motion.

13    That's not something that needs to be dealt with

14    before jury selection.

15        THE COURT:  All right.  I've got it now, 131.

16        MR. TRAGOS:  Right.  That has nothing -- that

17    really is something that would happen during trial.

18        THE COURT:  All right.

19        MR. TRAGOS:  There are some preliminary

20    matters, but we could do those if the court wishes

21    to at the break after the jury is selected.

22        THE COURT:  We're going to proceed as follows.

23    We'll bring the jury in, they'll be seated left to

24    right, if you look at that first row, and then left

25    to right second row, left to right third row.  I

1    need all these spectators to be on that side of the

2    courtroom, please, if you'll move right now.  The --

3    as far to the wall as you can, please, because we'll

4    need a little bit of space behind the prosecution's

5    table.

6          And then beginning with the row behind the

7    defense -- not inside the bar but the first padded

8    seat row, left to right, and then the far back row

9    left to right -- yeah, everything off that table.

10   Thank you.  And then there should be about four or

11   five jurors in the front row behind Ms. Kaiser.  So

12   it's left to right all the way.

13         I'm going to conduct an introductory voir

14   dire, have each -- well, you guys have picked juries

15   with me before, but each juror identify themselves,

16   their background, what they do for a living, that

17   kind of thing.  And I'm going to allow you to have

18   follow-up voir dire, but I expect you to be

19   efficient.

20         And efficient is what it means.  We're not

21   going to be in here all day long picking a jury.  I

22   expect to have the jury in hand before we break for

23   lunch.  What other housekeeping matters can we

24   address, Mr. Tragos?

25         MR. TRAGOS:  Your Honor, we both have filed

1    some preliminary jury questions.  I do have some

2    objections to some of the questions that were

3    submitted by the prosecution.

4         THE COURT:  Well, since I'm going to let you

5    conduct voir dire, I haven't even looked at your

6    preliminaries.  I didn't know they had been filed.

7    So just understand that when you're conducting voir

8    dire, it is for background and the types of

9    questions that jurors should be and need to be

10   asked.  It is not for the purpose of conditioning

11   these jurors or qualifying them.

12        And just be careful.  If an objection is made

13   to a question that is beyond what I believe to be

14   appropriate voir dire, I will sustain it and you'll

15   be left standing there in front of the jury.  So I

16   don't know what the questions are.  Is there some

17   particular subject matter that you don't want

18   covered, Mr. Tragos?

19        MR. TRAGOS:  Well, Your Honor, in some of the

20   questions as -- or as they are phrased in the

21   prosecution's, they are asking them if they would

22   convict under particular circumstances.  And they're

23   also asking if they were -- had ever been on a jury

24   or if they've ever been arrested or anything like

25   that.  They're asking for the ultimate outcome.  For

1    instance, were you -- if you were arrested, were you

2    convicted of it.

3         THE COURT:  That's a fair question.  Do you

4    want a juror on the panel that's been convicted of a

5    crime not to tell anybody?

6         MR. TRAGOS:  Okay.  Well, what I'm saying is

7    that if it is -- if it's not a felony or it's not

8    something that would disqualify them.  The jury is

9    not going to understand a question about an arrest.

10        THE COURT:  It's still appropriate voir dire

11   for you and Ms. Kaiser.  If you have a juror that's

12   been arrested and has good feelings about that or

13   bad feelings about that, I think y'all should know

14   that.  But don't be asking jurors if they're going

15   to convict somebody, Ms. Kaiser.

16        MS. KAISER:  No, I wouldn't do that, Your

17   Honor.  That's not what --

18        THE COURT:  Or if they're going to acquit

19   somebody.  The question is will they follow the law.

20        MS. KAISER:  Your Honor, I have some

21   objections with Mr. Tragos's voir dire.

22        THE COURT:  Well, I'm sure, and we're going to

23   find out.  Just remember, I grant voir dire in every

24   case unless that privilege is abused.  So I expect

25   you to be efficient and stay within the bounds of

1    what's appropriate.  And I don't think there's going

2    to be any controversy, there shouldn't be.  You guys

3    have tried cases for a long time so this isn't --

4    this case isn't any different than any other case we

5    try on Monday mornings.

6         MR. TRAGOS:  Oh, one other thing, Your Honor.

7    Both Ms. Kaiser and I have spoken, and we believe

8    that this trial probably may -- well, is going to

9    exceed five days.

10        THE COURT:  Well, that's not what you told me

11   at pretrial and in our statuses.  So I'm going to

12   tell this jury this is a one-week trial.  That's

13   what I expect.  Real simple.  I have another trial

14   set for Monday morning.  And if we need to work 12

15   hours a day, we'll work 12 hours a day.  I hope we

16   don't have to, but you're going to be efficient.

17        There's a forfeiture provision in the

18   indictment, Mr. Tragos.  How do you suggest that we

19   handle that?

20        MR. TRAGOS:  Your Honor, it's just that we

21   would bifurcate it.

22        THE COURT:  Ms. Kaiser, any objection?

23        MS. KAISER:  No objection, Your Honor.

24        THE COURT:  All right.  I will ask that both

25   of you simply remind me at the end of the

1     presentation of evidence to address that with the

2     defendant, of course.  He has an important Sixth

3     Amendment right that has to be addressed, and that

4     has to be done in writing, Mr. Tragos.  If he's

5     going to waive a jury trial at that point, that has

6     to be done in writing.  So I'm going to let you talk

7     to him about that.  It may not happen.

8          So we have an agreement that the forfeiture

9     provision would be bifurcated.  I did not see,

10    Ms. Kaiser, and it may be when I left Friday they

11    just weren't filed yet, but I don't have a witness

12    list or an exhibit -- I do have an exhibit list now.

13    Apparently that's been inserted into my trial

14    notebook.

15         COURTROOM DEPUTY CLERK:  Yes, sir.

16         THE COURT:  I've got it.  Please go over the

17    names of your witnesses with the jury so that they

18    hear the names pronounced correctly.

19         MS. KAISER:  Yes, Your Honor.

20         THE COURT:  That's for both sides.  Just make

21    sure that they hear the names.

22         MR. TRAGOS:  Does the court wish the defense

23    to read their witness list?

24         THE COURT:  Well, if you have witnesses, of

25    course.  You can always say these people may be

1    called to testify.

2         MR. TRAGOS:  Okay.  I need to, I guess,

3    retrieve ours because we gave our --

4         MR. SARTES:  No, I got it back.

5         MR. TRAGOS:  Oh, we got it back.  Okay.  One

6    other housekeeping matter, Your Honor.

7    Mr. Friedlander, the court knows from the bond

8    provisions, has a security detail.  He has an ankle

9    bracelet, as well.  The ankle bracelet does not work

10   outside of his residence in Ft. Myers.  It's not

11   working now.  It basically won't work the entire

12   trial.

13        I would ask the court if he would be allowed

14   to -- he be allowed to for sake of comfort and

15   practicality be able to remove the ankle bracelet

16   while he's here.  It doesn't work.

17        THE COURT:  Ms. Kaiser?

18        MS. KAISER:  Your Honor, I think the -- the

19   more appropriate remedy would be to have it --

20   probation here be contacted and have it work, have

21   his monitor work up here and have him designate

22   where he's staying locally.  In case he should

23   decide to take off, they could at least track him.

24        THE COURT:  Well, I would have presumed that

25   would have already been handled.  Mr. Tragos, does

1    pretrial know where he is --

2         MR. TRAGOS:  Yes.

3         THE COURT:  -- and will be this week?

4         MR. TRAGOS:  Yes.

5         THE COURT:  Who is the pretrial officer?

6         MR. TRAGOS:  Mr. Davis in Ft. Myers.  Davis,

7    right?  Yes, Davis.  I'm sorry, David.

8         THE COURT:  David, Mr. David?

9         MR. TRAGOS:  Mr. David in Ft. Myers.  Yes, he

10   knows he's here.  He has come up regularly, Your

11   Honor, to visit me to work on the case.

12        THE COURT:  Let's e-mail Mr. David, Ms. Ohle,

13   and ask him for a contact officer up here and we'll

14   address that at a -- perhaps the noon hour.

15        MR. TRAGOS:  All right.  I think one of the

16   problems is he's staying at a hotel.  I don't know

17   if they can do that at a hotel.

18        THE COURT:  Do what?

19        MR. TRAGOS:  Have the monitor work because you

20   need a telephone -- dedicated telephone line.

21        THE COURT:  Okay.  We'll get a pretrial

22   officer in here at maybe the noon break and we can

23   discuss that.

24        And, you know, I've already addressed

25   unfortunately a law student, but it's always a good

1    learning experience.  Court demeanor and atmosphere

2    is very important, not only to the defendant but the

3    government, but most importantly to the interest of

4    justice.

5        So make sure everyone in here observes the

6    appropriate decorum.  Jurors don't like to be

7    distracted by unnecessary movement.  So if there are

8    paralegals or agents or staff members coming in and

9    out of the courtroom, that is a distraction.  So ask

10   them to please observe these expectations of the

11   court.

12       I don't want anybody in this arena except the

13   people I'm looking at right now.  I presume,

14   Ms. Kaiser, this is your agent.

15       MS. KAISER:  Yes, Your Honor.

16       THE COURT:  I can't quite see him because of

17   the monitor.  Good morning.

18       AGENT HAGEDORN:  Good morning.

19       THE COURT:  And Mr. Friedlander, I can't see

20   you.  That's fine.  I understand you have monitors

21   there.  They're going to stay.  But the six of you

22   are in this arena, meaning inside the bar, nobody

23   else.  So make sure you let your secretaries know if

24   they're delivering things, Mr. Tragos, don't let

25   them walk in and be embarrassed.

1           Ms. Kaiser, I see you have a sentencing this

2     afternoon.  Is that still on?

3           MS. KAISER:  Yes, Your Honor.

4           THE COURT:  How long do you think that might

5     last?

6           MS. KAISER:  Adam Allen indicated he had some

7     issues he's going to address with the court.  I

8     don't think he's going to take too long, but I know

9     he mentioned he was going to address the court with

10    some issues with regard to that sentencing, so

11    probably about 20, 30 minutes.  Your Honor, are we

12    taking testimony today in this case?

13          THE COURT:  Maybe.  That's what I'm looking at

14    now.  I intend to.  I mean, if you guys think you

15    need more than five days and I'm not willing to give

16    it, looks like we'd better make the most of today.

17          What we may want to do -- why don't we move

18    that up to 1:15, that sentencing.  See if Mr. Allen

19    is available, and then the revocation hearing we can

20    push back.

21          COURTROOM DEPUTY CLERK:  What about the other

22    sentencing?

23          THE COURT:  Oh, there's two of them?  I'm

24    sorry.  I just saw one.  That looks like an illegal

25    entry.  Is it?

1           COURTROOM DEPUTY CLERK:  I'll see.  Yes, sir.

2           THE COURT:  It would be best if we can push

3     those -- Mr. Anderson's case to 4 o'clock, final

4     revocation to 4 o'clock.  And then we'll do

5     Ms. Kaiser and Mr. Allen's case at 1:15, if that can

6     be done.

7           Let me make sure the record is very clear.  I

8     know the lawyers understand my comment, but with

9     respect to my proposed voir dire questions, since I

10    am allowing counsel to conduct voir dire, I don't

11    typically review proposed voir dire questions.  I

12    leave it to counsel to ask such questions as they

13    deem appropriate.

14          So I see that on Friday there were proposed

15    voir dire questions filed by the government, and the

16    defendant may have filed them earlier than that.

17          MR. TRAGOS:  We did, Your Honor.

18          THE COURT:  But my comment wasn't intended to

19    suggest that you didn't follow the rules.  You did

20    exactly what the local rules require.  But I think

21    those questions, if asked, should be asked by you.

22    We are ready?

23          COURTROOM SECURITY OFFICER:  Yes, sir, Your

24    Honor.

25          THE COURT:  Mr. Watts, bring in the first

1        juror, please.

2              COURTROOM SECURITY OFFICER:  Jury number 355.

3              COURTROOM DEPUTY CLERK:  Juror 355, Catherine

4        Coogan, C-O-O-G-A-N.  Is that -- did I pronounce

5        that correctly?

6              JUROR:  You did.

7              COURTROOM DEPUTY CLERK:  Okay.  Thanks.

8              COURTROOM SECURITY OFFICER:  Second juror,

9        Juror 286.

10             COURTROOM DEPUTY CLERK:  Juror 286, Christine

11       Hayes, H-A-Y-E-S.  Please come forward.

12             COURTROOM SECURITY OFFICER:  Juror 276.

13             COURTROOM DEPUTY CLERK:  Juror 276.

14             THE COURT:  Second chair there.  Thank you.

15             COURTROOM DEPUTY CLERK:  Teresa Marie Sutton,

16       S-U-T-T-O-N.

17             COURTROOM SECURITY OFFICER:  Juror 230.

18             COURTROOM DEPUTY CLERK:  Juror 230, Harold

19       Peter Runfola.

20             JUROR:  Very good.

21             COURTROOM DEPUTY CLERK:  Is that it?

22             JUROR:  Yes, ma'am.

23             COURTROOM DEPUTY CLERK:  Runfola.  Thank you.

24             THE COURT:  Good morning.

25             COURTROOM SECURITY OFFICER:  Juror 337.

```
 1              COURTROOM DEPUTY CLERK:  Juror 337, Terry

 2      Williams, W-I-L-L-I-A-M-S.

 3              COURTROOM SECURITY OFFICER:  Juror 236.

 4              COURTROOM DEPUTY CLERK:  Juror 236, Pamela

 5      Rehm.  Is that correct?

 6              JUROR:  Yes.

 7              COURTROOM DEPUTY CLERK:  R-E-H-M.  Thank you.

 8              COURTROOM SECURITY OFFICER:  Juror 241.

 9              COURTROOM DEPUTY CLERK:  Juror 241, Nancy

10      Schlereth?

11              JUROR:  Schlereth.

12              COURTROOM DEPUTY CLERK:  Thank you.

13      S-C-H-L-E-R-E-T-H.  Thank you.

14              COURTROOM SECURITY OFFICER:  Juror 295.

15              COURTROOM DEPUTY CLERK:  Juror 295, Shawna

16      Brueck?

17              JUROR:  Breck (phonetically).

18              COURTROOM DEPUTY CLERK:  Breck (phonetically)

19      B-R-U-E-C-K.  Thank you.

20              COURTROOM SECURITY OFFICER:  Juror 409.

21              COURTROOM DEPUTY CLERK:  Juror 409, Robert

22      Masse?

23              JUROR:  Yep.

24              COURTROOM DEPUTY CLERK:  M-A-S-S-E.  Thank

25      you.
```

```
 1              COURTROOM SECURITY OFFICER:  Juror 313.

 2              COURTROOM DEPUTY CLERK:  Juror 313, Larry

 3      Abrams, A-B-R-A-M-S.

 4              COURTROOM SECURITY OFFICER:  Juror 410.

 5              COURTROOM DEPUTY CLERK:  Juror 410, Alisa

 6      Wood, W-O-O-D.

 7              COURTROOM SECURITY OFFICER:  Juror 346.

 8              COURTROOM DEPUTY CLERK:  Juror 346, Regina

 9      Perrin, P-E-R-R-I-N.

10              COURTROOM SECURITY OFFICER:  Juror 290.

11              COURTROOM DEPUTY CLERK:  Juror 290, Bradley

12      Bole, B-O-L-E.

13              COURTROOM SECURITY OFFICER:  Juror 340.

14              COURTROOM DEPUTY CLERK:  Jury 340 Dale Eads,

15      E-A-D-S.  Is that correct, sir?

16              JUROR:  That's correct.

17              COURTROOM DEPUTY CLERK:  Thank you.

18              COURTROOM SECURITY OFFICER:  Juror 352.

19              COURTROOM DEPUTY:  Jury 352, Christopher

20      Hardacre, H-A-R-D-A-C-R-E.

21              COURTROOM SECURITY OFFICER:  Jury 403.

22              COURTROOM DEPUTY CLERK:  Juror 403, Shannon

23      Baldree, B-A-L-D-R -- no, wait a minute.  One more.

24      One more up here we got.

25              COURTROOM SECURITY OFFICER:  Oh, okay.
```

1          COURTROOM DEPUTY CLERK:  Ms. Baldree, come

2     forward over here.

3          COURTROOM SECURITY OFFICER:  Juror 248.

4          COURTROOM DEPUTY CLERK:  Juror 248, Jason

5     Buse?

6          JUROR:  Buse.

7          COURTROOM DEPUTY CLERK:  Buse.  Thank you,

8     sir.  B-U-S-E.

9          COURTROOM SECURITY OFFICER:  Did we get 403?

10         COURTROOM DEPUTY CLERK:  Yes.  That was

11    Ms. Baldree.  Okay.  Thank you.

12         COURTROOM SECURITY OFFICER:  314.

13         COURTROOM DEPUTY:  Juror 314, Warren Leimbach.

14    Is that correct, sir?

15         JUROR:  Correct.

16         COURTROOM DEPUTY CLERK:  L-E-I-M-B-A-C-H.

17    Please be seated.

18         COURTROOM SECURITY OFFICER:  Juror 281.

19         COURTROOM DEPUTY CLERK:  Juror 281, Charles

20    Germain, G-E-R-M-A-I-N.

21         COURTROOM SECURITY OFFICER:  Juror 376.

22         COURTROOM DEPUTY CLERK:  Juror 376, Cary

23    Simmons, S-I-M-M-O-N-S.

24         COURTROOM SECURITY OFFICER:  Juror 372.

25         COURTROOM DEPUTY CLERK:  Juror 372, Eugene

1       Egan, E-G-A-N.

2               COURTROOM SECURITY OFFICER:   Juror 238.

3               COURTROOM DEPUTY CLERK:   Juror 238, William

4       Krupp, K-R-U-P-P.

5               COURTROOM SECURITY OFFICER:   Juror 221.

6               COURTROOM DEPUTY CLERK:   Juror 221, Jeffrey

7       Raab.   Is that correct, sir?

8               JUROR:   Yes.

9               COURTROOM DEPUTY CLERK:   Okay.   Thanks.

10      Please be seated.   R-A-A-B.

11              COURTROOM SECURITY OFFICER:   Juror 325.

12              COURTROOM DEPUTY CLERK:   Juror 325, Randall

13      Kovacevic.   Is that correct?

14              JUROR:   Yes.

15              COURTROOM DEPUTY CLERK:   Thank you.   Please

16      be seated.

17              COURTROOM SECURITY OFFICER:   Juror 394.

18              COURTROOM DEPUTY CLERK:   Juror 394, Bruce

19      Lakin, L-A-K-I-N.

20              COURTROOM SECURITY OFFICER:   Juror 300.

21              COURTROOM DEPUTY CLERK:   Juror 355, Jeffrey

22      Scott, S-C-O-T-T.

23              COURTROOM SECURITY OFFICER:   Juror 306.

24              COURTROOM DEPUTY CLERK:   Juror 306, Garrett

25      Blair, B-L-A-I-R.

1          JUROR:  Correct.

2          COURTROOM DEPUTY CLERK:  Thank you.

3          COURTROOM SECURITY OFFICER:  Juror 331.

4          COURTROOM DEPUTY CLERK:  Juror 331, Therron

5    Brown, B-R-O-W-N.  Thank you.

6          COURTROOM SECURITY OFFICER:  Juror 262.

7          COURTROOM DEPUTY CLERK:  Juror 262, Rich

8    Thompson, T-H-O-M-P-S-O-N.

9          COURTROOM SECURITY OFFICER:  Juror 317.

10         COURTROOM DEPUTY CLERK:  Juror 317, Linda

11   Spence, S-P-E-N-C-E.

12         COURTROOM SECURITY OFFICER:  Juror 373.

13         COURTROOM DEPUTY CLERK:  Juror 373, Elizabeth

14   Pumphrey, P-U-M-P-H-R-E-Y.

15         JUROR:  Correct.

16         COURTROOM DEPUTY CLERK:  Thank you.

17         COURTROOM SECURITY OFFICER:  And Juror 227.

18         COURTROOM DEPUTY CLERK:  Juror 227, Jeremy

19   Couch, C-O-U-C-H.  Thank you.

20         Your Honor, that completes the seating of 32

21   prospective jurors.

22         THE COURT:  Thank you, Madam Clerk.  Good

23   morning, ladies and gentlemen.  I am Judge

24   Whittemore.  We are here to select a jury in a

25   criminal case.

1          I'll start by acknowledging that jury service

2     never comes at a convenient time.  You all had other

3     things to do this week and today, and I'm sure when

4     you received your summons, there was a bit of

5     trepidation.

6          But I also have learned over the years that

7     most, if not all, jurors understand the importance

8     of being available to serve on juries from time to

9     time.  And it's a very small inconvenience compared

10    to some of the liberties that we enjoy as Americans.

11    And I know from experience that if chosen, you will

12    do exactly what we expect of you, and that is simply

13    to come in, listen to the evidence, follow the law

14    and reach a verdict which speaks the truth.

15         Jury service is really a very simple concept.

16    We'll ask you to come in and determine the facts.  I

17    will provide you with the law that you are to follow

18    in reaching your verdict.

19         We ask that you bring your common sense into

20    the courtroom, your collective life experiences, and

21    understand that you'll be serving in essence as a

22    judge, a judge of the facts.  I am the judge of the

23    law, of course.  And you will be sworn to follow the

24    law, whether you agree with the law or not.

25              Judges don't have the right to disobey or not

1    follow the law, as I'm sure you appreciate.  And as

2    jurors, you likewise do not have that prerogative.

3    If laws need to be changed, they are changed in

4    Washington by the Congress, not by Judge Whittemore

5    and not by you.

6         So in that respect our roles in this case, if

7    you are selected, are somewhat similar.  You are to

8    follow the law, you are to find the facts, apply the

9    law to those facts and reach a verdict.

10        You cannot make a mistake.  I can make

11   mistakes, but you can't.  And that's my

12   responsibility, to steer this ship from Point A to

13   Point B, hopefully without hitting a rock.  We just

14   ask that you come in and listen.

15        If you have any special needs in terms of

16   audio equipment, things of that nature, I'll ask

17   that you alert me to that at the appropriate time

18   and we'll be happy to try to enhance that so that

19   you can hear everything and see everything that

20   happens in the courtroom.

21        As you no doubt would understand, what you see

22   and what you hear can equally be important.  As a

23   witness testifies, for example, you might be asked

24   to determine the credibility of that witness.  By

25   watching the witness as the witness testifies, you

1    may see important things, how the witness reacts to

2    a question.

3        What you hear, of course, is important.  You

4    will be allowed to take notes in the trial.  But at

5    the same time, I'll ask you not to doodle so that

6    you don't miss important evidence.  Again, what you

7    see can be as important as what you hear.

8        How many of you, just by a show of hands, have

9    served on a jury before?  Isn't that amazing.

10   There's about six hands up.  Out of all of you, six

11   or seven of you have served as jurors.  Some of you

12   may have been brought into a courtroom and perhaps

13   not selected, so you are familiar with this process.

14       What we're about to do is ask you a lot of

15   questions about your background, what you do for a

16   living.  I'm going to give you some idea what the

17   case is going to be about, what you'll hear.

18       The focus of this process is what we call the

19   voir dire.  It's a French phrase, loosely translated

20   meaning something along the lines of to speak the

21   truth.  And I'm sure if any of you speak French,

22   you're looking at me saying, that's not right, but

23   that's how I understand it, anyway.

24       The questions we pose to you are not intended

25   to unnecessarily pry into your personal lives, but

1    they are personal, and there's a good reason.

2    You're being asked to judge a case, a case that's

3    very important both to the government and to the

4    defendant.  And it may be that you've had a life

5    experience or there's something going on now in your

6    life that might influence you and your ability to be

7    a fair and impartial judge.

8         And I'll use myself as an example.  Assume for

9    a moment that you have an important hearing in front

10   of me this morning, and I've been up all night with

11   the flu.  And you walk in and you see me and I'm

12   white, I'm obviously not feeling well, you would

13   probably have some concerns about my ability to

14   listen and hear the evidence and make a reasoned and

15   sound judgment.

16        Or, for example, as the hearing's about to

17   begin, you find out that I played golf with your

18   lawyer yesterday or, more importantly, your

19   opponent's lawyer.  You'd probably have some reason

20   to think, well, maybe Whittemore is not the judge

21   that should hear my case.

22        What you may not have known is maybe I didn't

23   like that lawyer.  I just happened to have a golf

24   game with him.  It doesn't matter.  It's the

25   appearance of something that might influence my

1        ability to a fair and impartial judge.  And that

2        appearance is more important than anything else

3        because, after all, when all is said and done,

4        whatever decision you reach in the case needs to be

5        based only on the evidence and the law, and not

6        because of something that we haven't brought out or

7        discussed in the voir dire.

8                Fairness and justice is the objective, and

9        it's an equally important objective.  So these

10       questions, while personal, are important to allow

11       the attorneys an opportunity as well as yourselves

12       to consider whether this is a case that you're going

13       to be able to sit and impartially consider.

14               In any criminal case, the subject matter of

15       the trial is typically not very pleasant, whether

16       it's a robbery case or a personal assault, something

17       along those lines.  So jury service is not always a

18       pleasant experience.  But I have learned over more

19       than 18 years of doing this that almost without

20       exception, jurors tell me it's a very positive

21       experience because it reinforces the importance that

22       citizens have in our system.

23               Judges don't make these decisions, juries do.

24       You've read about cases that have been tried, one of

25       note that came up again this past few days.  And

1        some of you may have said, how could that jury have

2        done that.

3            Well, unless you sat in that courtroom and

4        listened to every witness and examined every exhibit

5        and listened to the judge and listened to the

6        lawyers, I don't know that it's fair for any of us

7        to second guess those jurors who, just like you,

8        were called into a courtroom on a Monday morning and

9        told they were on a certain case.

10            So in fairness to those jurors, although it's

11        easy to speculate, second guess, to criticize or

12        even applaud a verdict, it's really not fair unless

13        you had sat in their chair and gone through the most

14        difficult process of making a decision in a case.

15            So you may have come into this courtroom with

16        some preconceived notions about criminal trials,

17        lawyers, judges, and that's understandable.  As

18        Americans, you're entitled to have those thoughts.

19        But as judges, those thoughts have to be set aside.

20        And if you think judges like myself don't have

21        strong feelings and personal feelings about things,

22        you know, you're being naive.  Of course, we do.

23            But as judges, we understand that we have an

24        oath that we are sworn to follow, of course, to set

25        aside those strong feelings or any personal feelings

1      you might have, and to make a decision based on the

2      law and the facts.

3           I'm asked from time to time, how do you make

4      those kinds of decisions.  And I respond, the same

5      way juries do.  Use your common sense and follow the

6      law.  Whatever door it takes you through, so be it,

7      and most of us sleep well at night because we do the

8      best we can, and that's all we can ask you to do.

9           Now, enough with the niceties.  I want you to

10     be comfortable in this process.  I recognize one or

11     more of you, and that's understandable.  In a city

12     like Tampa, we're going to cross paths from time to

13     time whether it be social or business or school.  So

14     it's important to listen.

15          As we ask each of you questions, you may hear

16     a name that you recognize or maybe a voice from high

17     school, I've had that happen, or maybe a coworker.

18     If you hear a name of someone that you think you

19     might know, please raise your hand, alert me and the

20     lawyers so that we can explore that with you.

21          The lawyers will read the names of the

22     witnesses they expect may be testifying or perhaps

23     may be referred to in the evidence.  It's important

24     if you know someone that may be a witness that you

25     alert us to that so that neither you nor the witness

1    are embarrassed or, worse, that a mistrial is caused

2    because suddenly you see your next-door neighbor

3    sitting on the witness stand.

4         So it's important to listen to everything

5    that's being said in the courtroom.  Even though the

6    question has nothing to do with you, it may prompt

7    something.  I think a proper function of the voir

8    dire process is to get you thinking about issues and

9    matters that might influence you and it may

10   resurrect some memories, so to speak.  And we're

11   going to ask that you volunteer those things to us.

12        The lawyers and I are not equipped to ask

13   every single question that should be asked in this

14   courtroom.  We're going to ask a lot of questions.

15   The whole -- the entire process is intended to get

16   you thinking about your experiences and whether

17   you're going to be comfortable as a juror in this

18   case, meaning you're going to be able to sit

19   impartially as a judge.

20        I'm going to formally call the case for trial

21   at this time and have the lawyers introduce

22   themselves and those seated with them at counsel's

23   table.  In the matter of United States of America

24   versus Charles Jackson Friedlander.  For the

25   government?

1          MS. KAISER:  Amanda Kaiser on behalf of the

2     United States.  Good morning, Your Honor.  Seated at

3     counsel table, or standing now, is Special Agent

4     Alex Hagedorn from Immigration and Customers

5     Enforcement.

6          THE COURT:  Thank you.  And for the defense?

7          MR. TRAGOS:  George Tragos on behalf of the

8     defense.  With me at counsel table is my partner,

9     Peter Sartes, law clerk, Tim Batelli, and Charles

10    Friedlander.

11         THE COURT:  All right.  Thank you, counsel.

12    You've met Mr. Watts who will be assisting us as the

13    trial progresses.  If a problem comes up, please let

14    him know.  He will be happy to address it with me

15    and I will, after conferring with counsel, address

16    it, if necessary.

17         Anne Ohle, right in front of me to your left,

18    is our courtroom deputy.  She's in charge of marking

19    the evidence as it's received.  She's also charged

20    with handling my calendar which is a moving target,

21    as you can imagine.  We have hearings scheduled this

22    afternoon that she's busily trying to rearrange so

23    that we can make the most of today and your time.

24    We will try to be efficient with your time because,

25    after all, you are our invited guests.

1          We've talked about this this morning.  We

2     think this trial will last about five days.  I can

3     tell you I cannot give you 100 percent insurance

4     other than I have reminded the lawyers that that's

5     what we expect.  And they're going to move

6     efficiently because it's your time that we're

7     dealing with.

8          It's an important case, however, to the

9     government and to the defendant and we are not in a

10    rush.  We will try this case fairly and efficiently.

11    And if it takes six days, it takes six days.  If it

12    takes four days, it takes four days.  Decisions of

13    this importance are not to be made because of the

14    time it takes.

15         To my left is Linda Starr who is -- she's got

16    the toughest job in the courtroom, I think.  She's

17    taking down everything that's being said in kind of

18    a shorthand format.  If you were to look at what

19    she's typing, you could probably make out bits and

20    pieces of what's being said.  But until she sits

21    down and actually finalizes the transcript, it's

22    very difficult to follow.

23         We don't have the resources to provide

24    transcripts to you during the trial, so we ask that

25    you pay close attention, but also remind you that

1    everything that happens in the courtroom, everything

2    that's said in on the record.  She is taking down

3    every word so that there's an accurate record of

4    what happens.

5         If your voice trails or mine, or any of the

6    witnesses or the lawyers get away from the mics, she

7    has the authority to speak up because she has to

8    take down everything and she has to be able to hear

9    it.  Are you wearing your earphones today?  Yes.

10        These mics are very sensitive.  See?  She'll

11   give me that dirty look.  And we have a portable mic

12   we're going to pass around.  Please make sure that

13   you wait until you have the mic before you answer

14   the questions.  You don't have to stand up, just be

15   comfortable where you are.

16        In any criminal case, there are certain rules

17   of law that apply that come from our Constitution.

18   Now, just because a provision of the Constitution

19   says something does not mean it's not a law.  It is

20   a law.  It's the genesis of our law.  And from the

21   Constitution springs most of our procedural and

22   substantive rights.

23        But in addition, the Congress passes laws

24   prohibiting certain conduct.  And that would be the

25   -- the law for which this defendant is alleged to

1    have violated.  But I want to start first with a

2    short introduction about our constitutional laws or

3    rights.

4         You no doubt have heard about the right

5    against self-incrimination and the right to a jury

6    trial and the right to due process.  These are all

7    rules of law that apply to all of us.  You have no

8    doubt heard if not said, oh, yeah, I've heard about

9    those technicalities.  Call it what you may.  These

10   are important principles of law embodied within our

11   Constitution which I am sworn to follow and you,

12   likewise, would be sworn to follow.  They are not

13   technicalities.  They are important rights that we

14   enjoy as Americans, unique in the world.

15        The government in a criminal case, Ms. Kaiser

16   in this instance as the prosecutor, has the burden

17   of proof.  Before a defendant can be found guilty,

18   the government must prove that defendant's guilt

19   beyond a reasonable doubt.

20        It's a heavy burden.  The burden never shifts

21   to the defendant.  The defendant has no obligation

22   to ask one question, to make one comment, to do

23   anything in this trial.  And if the defendant and

24   counsel decide not to do anything, you cannot hold

25   that against them.  It's not even a subject you can

1    discuss, because the entire burden of proof is on

2    the government in this case.  If the government

3    fails to prove the defendant's guilt beyond a

4    reasonable doubt, the only verdict you can bring

5    under the law is not guilty.  That is the law.

6         If a defendant exercises their right not to

7    testify or produce evidence, you cannot consider

8    that in determining whether the government has

9    proven its case beyond a reasonable doubt because

10   the defendant has no burden.

11        That is a principle of law in our Constitution

12   that comes from the common law of England when

13   trials were one-sided.  And when the founders of our

14   country decided to correct and address some of those

15   unfair principles, they did so in the Constitution

16   and ultimately in the Bill of Rights.

17        So while you might consider them to be

18   technicalities, remember that they are

19   constitutional principles that you are sworn to

20   follow.  If, for example, I pick 12 of you right now

21   and said go deliberate, there's only one verdict

22   under the law that can be brought.  And it would be

23   not guilty, because Ms. Kaiser has not presented the

24   first iota of evidence.  So we start with that

25   principle.

1          If you do not agree with that principle for

2     whatever reason, that's fine.  As an American, you

3     have that right.  But as a juror, as a judge, you do

4     not have that prerogative.  And that's the kind of

5     thing that we want to discuss this morning.

6          Because the government has the burden of

7     proof, Ms. Kaiser will typically go first in

8     addressing you in voir dire, opening statement,

9     presenting of evidence.  And then Mr. Tragos and

10    Mr. Sartes would then follow.  And that's simply

11    consistent with the burden of proof.

12         The lawyers in this case are not witnesses,

13    but what they have to say to you is very important.

14    They have investigated the case and conducted what

15    we call discovery, meaning an exchange of documents

16    and things of that nature, and they have a fairly

17    good idea of what you will hear and not hear.  So

18    they will be able to guide you and assist you in

19    understanding the facts and the law as it should be

20    applied to the facts as you find them.

21         But as you will see, these lawyers will not

22    agree on everything.  And that is the adversary

23    process that makes our system what it is.  It's a

24    test, if you will, a test of the evidence and the

25    law applied to the evidence.  So if the lawyers

1    disagree on something, it's up to you to resolve the

2    facts.

3         If the lawyers disagree on the law, I will

4    resolve that.  For example, you may hear objections

5    or you may hear a lawyer file a motion or make a

6    motion to me for some relief.  I will make rulings

7    on those matters of law that come up during the

8    course of the trial, and whatever my ruling, you are

9    to follow it.

10        For example, if a witness is asked a question

11   and there's an objection and I sustain the

12   objection, the witness will not be permitted to

13   answer the question.  And you will not be allowed to

14   speculate on what the witness might have said.

15        The rules of evidence are somewhat

16   complicated.  Lawyers can generally disagree.  So I

17   will be making those kinds of rulings as this case

18   progresses.  You are never to take issue with the

19   wisdom of those rulings, simply follow them as the

20   instructions that I will give you at the end of the

21   trial indicates.

22        As we go through the selection process and as

23   the case progresses, remember that, as judges, you

24   should assume the appropriate decorum and appearance

25   of a judge.  If you were trying a case in front of

1    me, maybe you had a dispute with someone and I'm up

2    here rolling my eyes and looking at the ceiling and

3    making fun of the lawyers, you would not think that

4    to be very judge-like, and you would be right.

5         We are human beings.  We all react to things.

6    But as judges, we should stay the course, so to

7    speak, and remain neutral in our appearance.  So

8    give the lawyers your undivided attention and listen

9    carefully.  And be mindful of the reactions to

10   evidence and things which might send the wrong

11   message to the parties.

12        For example, you should not and cannot discuss

13   the case among yourselves until you retire to

14   deliberate the verdict after all the evidence has

15   been presented and you've heard my instructions on

16   the law.  It's very hard not to lean over and say,

17   did you hear that?  You can't do it.

18        And during the lunch breaks, you can't discuss

19   the case.  If you're out in the hallway, keep your

20   distance from the lawyers because they're planning

21   and scheduling things about the trial and you may be

22   inadvertently exposed to something and we don't want

23   that to happen.

24        If, for example, you run into one of the

25   lawyers and they ignore you, of course, they're

1     going to ignore you because it may appear if they

2     speak to you that there's some improper

3     communication going on.  They won't say good

4     morning, they won't acknowledge you in the elevator.

5     Please understand they're following a rule to avoid

6     even the appearance of improper contact with you.

7     Please don't hold that against them.

8          In the federal system before an individual can

9     be charged with a crime, a grand jury is convened

10    and the grand jury determines whether there is

11    probable cause to bring a formal accusation against

12    an individual.  That formal accusation is called an

13    indictment.

14         In the State of Florida, the equivalent

15    document is called an information, with a capital I.

16    And that's a document actually brought by the state

17    attorney except in capital cases and other important

18    cases where the grand jury determines whether to

19    bring an indictment.  So they are similar concepts.

20    You have indictments in state court and

21    informations, but in the federal system we have only

22    indictments.

23         A group of jurors just like yourselves were

24    called in on a Monday morning, qualified by the

25    presiding judge and then sat as grand jurors for a

1    period of time, listening to case agents and

2    prosecutors and witnesses, and determining whether

3    to bring indictments in a variety of different

4    subjects.

5         So this case starts off with a piece of paper

6    called an indictment.  And that's all it is is a

7    piece of paper.  It's a formal accusation.  It's not

8    evidence and should not considered by you as

9    evidence in the case.  It simply is the starting

10   point in the trial.  And that's also required by the

11   Constitution.

12        The fact that a grand jury has determined to

13   bring a formal accusation is not evidence.  You will

14   determine what the evidence is in the case and

15   whether the government has met its burden of proof.

16        In this case the grand jury has charged

17   Mr. Friedlander in one count.  I'm going to

18   paraphrase that charge at this time.  Between on or

19   about June 16th of 2008 and on or about July 21st,

20   2008, in Hillsborough County and elsewhere in the

21   Middle District of Florida, Mr. Friedlander did

22   knowingly attempt to persuade, induce, entice and

23   coerce an individual who had not attained the age of

24   18 years to engage in a sexual act for which any

25   person can be charged with a criminal offense by

1        using a facility and means of interstate commerce,

2        that is, a telephone and a computer and a modem with

3        access to the internet via America Online.

4            So you now know what this case is about.

5        You've just heard a reference to America Online.

6        How many of you have America Online accounts?  Show

7        of hands.  I do.  How many?  Raise your hands.  One,

8        two, three, four.  How about Internet Explorer,

9        something like that?

10           All right.  The point being, some of us are

11       familiar with at least something in this case.  And

12       the lawyers need to know to the extent you are an

13       America Online user or some other internet provider

14       user, you have utilized that internet provider to

15       access the internet and, if so, for what purpose;

16       leisure, enjoyment, information, the news.  It's an

17       important part of this trial and that's a subject

18       matter that the lawyers need to ask you about.

19           Now, during this process we don't want anyone

20       unnecessarily embarrassed.  If a question is asked

21       of you and you are reluctant to respond publicly,

22       please alert me.  We will be happy to try to

23       accommodate you.  That doesn't mean come up here

24       every time you're asked a question.  We're talking

25       about subjects that might embarrass you personally.

1       These are hard questions that need to be asked

2       about your background.  We don't expect you to

3       divulge unnecessary details about your lives, but we

4       do ask you to respond with candor and alert the

5       lawyers or me as to any subject that might expose

6       you to embarrassment.

7           At the end of the voir dire process, we will

8       select at a minimum 12 of you to hear this case, 12

9       of you must decide the case.  I will likely have at

10      least two more individuals who will be available.

11      All of you will be jurors, of course, and at the end

12      of the trial when the jury retires to deliberate,

13      only 12 of you will go in to deliberate.  So we call

14      those extra jurors alternates, but who those

15      alternates will be at the end of this trial I can't

16      tell you and neither can the lawyers.

17          So don't assume because you're sitting in the

18      13th or 14th or 15th chair that you're an alternate.

19      That simply is a matter of the numbers.  Obviously,

20      we've got a lot more than 12 people in here.  But as

21      you're about to find out, some of you have reasons

22      you can't serve here this week, and we'll consider

23      that.

24          But let me tell you one thing, share with you,

25      unless you're feeling sick or ill or something's

1    happened over the weekend with your family, there's

2    nothing you can say to get out of jury service.  You

3    can try as you may, but I suspect I've heard it and

4    these lawyers have heard it.  We just ask you to

5    answer the questions and let the lawyers do their

6    job.

7         One thing they can't do, they have no way of

8    hand-picking you.  They have a predetermined number

9    of excuses which they can exercise.  We call those

10   preemptory challenges.  And they can exercise those

11   for pretty much any reason other than your gender or

12   your race or your ethnic heritage or your religious

13   beliefs.  It may be the type of work you do, maybe

14   you have a dispute that's ongoing right now.  Maybe

15   you've had a bad experience in a courtroom, things

16   of that nature.  So listen carefully to their

17   questions.

18        Let me ask globally, I've told you very little

19   about the case but you've heard the names, you've

20   heard the subject matter.  Is there anyone in the

21   prospective panel that knows anything about this

22   case from any source?  All right.  I don't see any

23   hands.

24        As you -- if you are selected, of course, I've

25   told you a couple of times and I'm going to repeat

1    this from time to time, your decision must be based

2    on the evidence presented in this courtroom and the

3    law that I give you and not on what you may learn

4    out there in the world, for example, by watching

5    news accounts of this or any other trial, or by

6    Googling any of us.  I trust most of you know what

7    Googling means.  It's now a verb in our language.

8    Or by doing your own research by asking questions.

9         You are a judge.  You cannot conduct your own

10   independent investigation.  Let the lawyers present

11   the evidence to you in a manner consistent with the

12   rules of evidence and I will provide you with the

13   law.  So you are not to go out there and conduct

14   research.

15        Now, that does not mean you put your head in

16   the sand like an ostrich.  Use your common sense.

17   After all, you will be a judge.  You don't need to

18   be exposed to something that could influence your

19   decision making.

20        After the trial is over, you can do whatever

21   you like, Google all our names and read till your

22   heart's content.  But that's after you've made your

23   decision.

24        You've heard that Ms. Kaiser is an Assistant

25   United States Attorney.  Some of you might have had

```
1    an experience with the U.S. Attorney's Office or

2    some of the agencies that they work with in criminal

3    investigations such as the FBI, the DEA, the ATF,

4    now the Department of Homeland Security.  Those are

5    important experiences which we'll ask you to share

6    with us.

7         Mr. Tragos practices law in Clearwater.  You

8    may have heard his name.  Obviously, we would like

9    to know that, or Mr. Sartes.  We have at least one

10   lawyer on the panel which I'm happy to see because

11   that just reaffirms that lawyers aren't exempt from

12   jury service.  We've had lawyers serve in here.

13   I've had lawyers in state court and federal court.

14   And they're fine jurors.

15        But that lawyer might very well have had a

16   case with Mr. Tragos or Ms. Kaiser, and that

17   probably would be a reason that that juror or

18   perhaps that lawyer might feel, well, maybe this

19   isn't the right case.

20        But I'm glad to see that you'll experience

21   that.  You're going to hear that we have some

22   teachers in here, I think.  We have people coming

23   from as far away as Sarasota, Davenport, Bartow,

24   Dunedin, Lake Wales, Spring Hill, Venice.  I think

25   that's the -- that's the furthest point.
```

1          That's Mr. Lakin; right?

2          JUROR:  Yes, Your Honor.

3          THE COURT:  Where are you?  Back there.  How

4     long did it take you to get here this morning?

5          JUROR:  About an hour and 15, hour and 20

6     minutes.

7          THE COURT:  All right.  It's not an easy

8     drive, and we appreciate it.  If you are selected,

9     you have a couple of options.  You can sometimes

10    stay up here to avoid the drive.

11         But the Middle District of Florida, and you

12    heard it referenced in the indictment, is a large

13    geographic district.  It runs from Jacksonville down

14    through Orlando, across Ocala down through Tampa,

15    all the way to Ft. Myers.  It's one of the larger

16    geographic districts in the country.

17         Of course, we're in the Tampa Division of the

18    Middle District of Florida, which is fairly large,

19    as you've heard.  From Venice, Port Charlotte area,

20    all the way up to Spring Hill all the way out to

21    Polk County and beyond.

22         So some of you are driving a pretty good

23    distance in the morning to get here, and we

24    appreciate that.  And if you are selected, we will

25    give you a schedule which I think will allow you to

1    get here comfortably and safely.

2         MR. TRAGOS:  Your Honor, I'm sorry to

3    interrupt the court, and I apologize.  Is it all

4    right if we move to the other side?

5         THE COURT:  Yes, that's fine.  And I was going

6    to apologize for counsel.  They have their backs

7    turned to everybody.  That's not, obviously,

8    something they like to do, but as we -- you can move

9    around, if you'd like.

10        MR. TRAGOS:  Can we do that now, Your Honor?

11        THE COURT:  Well, wait until I get back there.

12   I'm going to take this box first.

13        MR. TRAGOS:  I just can't see because of the

14   lectern.

15        THE COURT:  That's fine.  Just the setup of

16   the courtroom with this many jurors, they're not

17   being rude with their backs turned.  Please

18   understand that.  I'm sure you do.

19        We're in federal court.  As you walked into

20   the building downstairs, I'm sure you were at least

21   impressed with the foyer.  This isn't the type of

22   courthouse that I grew up practicing law thinking

23   would look like a federal courthouse.  The one two

24   blocks south of here looks like a federal

25   courthouse.

1          The fact that we're in federal court is not

2     evidence.  We're just here.  The federal system runs

3     parallel to the state system.  So in state court,

4     for example, there are individuals just like

5     yourselves sitting in a courtroom just like this,

6     perhaps not quite as nice.  But on the other hand,

7     in Hillsborough County we've got a brand new

8     courthouse so it's actually pretty nice over there.

9          The point is their service is no different

10    than yours.  The fact that you're in a federal

11    courthouse in a federal courtroom in front of a

12    federal judge is not evidence.  This case is not any

13    more important because it's in federal court than a

14    case being tried by Judge Menendez over in

15    Hillsborough County or Judge Demers in Pinellas

16    County.  These are all important trials.

17         So I just simply want to remind you that we

18    are here to apply the law to the facts as you find

19    them, just like jurors would be in the state

20    courthouses around the Middle District of Florida.

21         The federal system, as I said, runs parallel

22    to the state.  You typically see different kinds of

23    cases in state court than you do in federal court,

24    but the laws applicable to this proceeding will be

25    explained to you, and I'll just ask you to follow

1    the law as you hear it explained to you, even though

2    you may have had an experience in state court with

3    similar laws or similar principles.

4         Enough talking.  Let's have you answer some

5    questions.  We're going to start with Ms. Coogan.

6    You happen to be juror number one.  Do we have the

7    microphone ready, Mr. Watts?

8         COURTROOM SECURITY OFFICER:  Yes, sir.

9         THE COURT:  You might be a little bit

10   uncomfortable speaking in public.  We appreciate

11   that.  I will give you a few hints on how we deal

12   with it as lawyers.  Speak a little more slowly than

13   you're accustomed to talking, number one.  Take a

14   breath before you start talking.

15        We're not in a hurry here.  We'd like to hear

16   your name pronounced as you like it to be pronounced

17   and then I'd like you to simply summarize your

18   questionnaire.  Don't give me the identities of any

19   of your children, but if they're adults, tell us

20   what they do for a living.  That would be helpful.

21   So go right ahead.  Good morning.

22   (Whereupon, voir dire was conducted and a jury was

23    impaneled and sworn.)

24        THE COURT:  Thank you, and be seated.  What

25   we've done, ladies and gentlemen, to go ahead and

1      get this case started -- we're going to break for

2      lunch in a moment.  But I've moved some hearings

3      back to the end of the day.  I've moved one up to

4      1:15; again, trying to be efficient with your time.

5           Let me give you some preliminary instructions

6      before we break for lunch.  You know now that you

7      are sworn to be the jury in this case and you will

8      decide the disputed issues of fact.  I will decide

9      any questions of law that arise during the course of

10     the trial.  And before you retire to begin your

11     deliberations, I will read to you the law that you

12     must follow in reaching your verdict.

13          During the course of the trial, you are not

14     permitted to discuss the case among yourselves or

15     with anyone else.  Mum's the word.  Use me as the

16     bad guy, if you will, because undoubtedly when you

17     return back to work or back home or whatever your

18     day requires, you're going to be asked, well, what

19     kind of case is it, who's the judge, who are the

20     lawyers.

21          About the only safe thing to tell them, you

22     can tell them who the judge is so at least they know

23     how to get ahold of you if there's a need.  Anything

24     else that you say might evoke a comment or a

25     statement that might somehow influence you.

1    Remember, you're a judge.  You should not be exposed

2    to anything that could influence your decision

3    making in the case.

4         When we return I'll give you some further

5    instructions regarding your responsibilities and how

6    the court -- the trial will be conducted.  But,

7    again, please don't discuss the case among

8    yourselves or allow it to be discussed.

9         Remember, there may be witnesses in the

10   hallway.  The attorneys are going to be busy.  They

11   may not appreciate that you're nearby, so keep your

12   distance.  If you are even inadvertently exposed to

13   a comment, please bring that to our attention

14   through the courtroom security officer.

15        Now, when you leave the courtroom, first I

16   want you to acquaint yourselves with the jury room

17   so you know where you are.  That's on the north end

18   of the building.  So as you come off the elevator,

19   you're looking toward a condominium building that's

20   constructed, that's toward the Gulf of Mexico.  Turn

21   right, that's heading north, that's my courtroom.

22   You'll see the sign out front.  It's easy to get

23   turned around until you've done this a couple of

24   days.

25        So when you leave the courthouse, you're on

1    Florida Avenue facing west toward the gulf.  There's

2    nothing to the right to eat, that is.  If you go

3    south about four blocks, there's a Catholic church.

4    And next to that is a small place called Secret

5    Garden.  They have sandwiches and a salad bar.

6         If you go west one block and then start going

7    south, you'll see the TECO building.  There's a

8    cafeteria in there with hot food, sandwiches,

9    salads.  And as you walk down Franklin Street,

10   you'll see more and more sandwich-type places.

11   There's quite a few of the them.

12        Let's return at 1:30 by the courtroom clock.

13   Well, that's not going to give you enough time, is

14   it.  1:45 by the courtroom clock.  I have a

15   sentencing hearing I'm going to conduct at 1:15.  We

16   should be finished by 1:45.

17        Does anyone need any enhanced audio for the

18   trial or are you able to hear us okay if we all use

19   the mic?  Okay.  How about visually, any issues or

20   problems, you forget your glasses or anything?

21        All right.  We'll give you some notepads when

22   you return and I'll give you some further

23   instructions.  We're all aware of everything you've

24   said to us this morning.  You don't need to remind

25   us.  We know what your schedules are, your plans.

1       We're going to be efficient with your time and that

2    begins this afternoon when you return.

3            So we'll see you back.  Have an enjoyable

4    lunch, and we'll be in recess.

5            COURTROOM SECURITY OFFICER:  All rise.

6    (Jury out at 12:47 PM.)

7            THE COURT:  Mr. Tragos, will you be giving an

8    opening?

9            MR. TRAGOS:  Yes, Your Honor.

10           THE COURT:  All right.  I mean at the

11   beginning.

12           MR. TRAGOS:  Yes, sir.

13           THE COURT:  All right.  When we come back I'll

14   give them the additional preliminary instructions

15   and go right into opening.  I know we have a motion

16   in limine, but I presume that's not an issue until

17   you begin putting on your defense.

18           MR. TRAGOS:  Yes.

19           THE COURT:  I would just be cautious about

20   alluding to subjects that may be objected to on the

21   government's part.  Any other housekeeping matters

22   we can address before you take off?

23           MR. SARTES:  Can we leave all this stuff here?

24           THE COURT:  That's fine.  I'll tell you what

25   you can do.  If you'll clear your tables just -- the

1    government can put it down at that end and if you

2    guys can just put it on the table behind you.  The

3    sentencing hearing we have at 1:15, they need --

4    they're accustomed to sitting in those chairs, as

5    you know.

6         MR. TRAGOS:  Your Honor, I know the court has

7    a sentencing at what, 4 o'clock, as well?

8         THE COURT:  Yeah, and a revocation.  I'm kind

9    of targeting 4 o'clock.

10        MR. TRAGOS:  Okay.

11        THE COURT:  We'll take care of those matters

12   for scheduling purposes.

13        MS. KAISER:  Your Honor, are we going to be

14   calling witnesses today --

15        THE COURT:  Um-hum.

16        MS. KAISER:  -- or just doing opening

17   statements?  Opening?  Okay.

18        THE COURT:  And witnesses.  Do you have one?

19        MS. KAISER:  Yes.

20        THE COURT:  I'd like to make use of the time,

21   and that way hopefully we can finish this week.

22   I've adjusted my calendar.  I have one hearing

23   tomorrow and that's it.  Other than that, you have

24   the whole week.  I'll see you back there lurking in

25   the background.  I'm just letting the jurors clear.

1          Now, as far as pretrial, we have made contact.

2     They'll come over when I call.  But we need to give

3     the staff a break.  So I assume Mr. Friedlander will

4     be with you guys?

5          MR. TRAGOS:  He'll be with the security detail

6     as well as us.  Right.

7          THE COURT:  Well, make sure -- I don't know

8     how that works.  But we have jurors, so if they see

9     somebody acting strange, that's something to be

10     aware of.  But when we adjourn this afternoon, we'll

11     take up the matter of the electronic monitoring, how

12     to address that and we'll have Jose here at -- give

13     him a heads-up, be available a bit after 4:00 with

14     Mr. David.

15          COURTROOM DEPUTY CLERK:  Did you say 4:00?

16          THE COURT:  Yeah, a little bit after 4:00.

17     And Mr. David is going to appear telephonically.

18     Mr. Montanez is the pretrial service officer here in

19     Tampa that supervises.  Okay.  See you back at 1:45.

20     (Recess was taken from 12:50 PM to 1:52 PM.)

21          COURTROOM SECURITY OFFICER:  All rise.  This

22     Honorable Court is again in session, be seated,

23     please.

24          THE COURT:  Are we ready?

25          MS. KAISER:  Yes, Your Honor.

```
 1              THE COURT:  Bring the jury in, please.

 2              COURTROOM SECURITY OFFICER:  Yes, sir.

 3         (Brief pause.)

 4              COURTROOM SECURITY OFFICER:  Rise for the

 5         jury, please.

 6         (Jury in at 1:53 PM.)

 7              THE COURT:  Thank you, and be seated.

 8              On your chairs are legal pads and hopefully

 9         pens that work.  Please don't put your name on your

10         pad, just put your jury number or some form of

11         numerical identification.

12              Before we get started, I want to go over the

13         dos and don'ts of note-taking.  First of all, you're

14         not required to take notes, by any means.  If you do

15         choose to take notes, however, some words of

16         caution.

17              They should be taken to assist you

18         individually in recalling the evidence and the

19         testimony, and should not be a substitute for your

20         fellow jurors and their recollection of the

21         evidence.  In other words, you should rely on your

22         own notes to assist yourselves in recalling the

23         evidence.

24              If you're so busy taking notes that you're not

25         looking up, you will miss evidence.  So if you're
```

1     doodling, drawing, things of that nature, you may

2     miss important evidence.  You may want to keep track

3     of the day of the week, perhaps the morning session,

4     afternoon session, and at least write down the names

5     of the witnesses, even if you don't take notes.  The

6     sequence of how a case is presented I find helps me

7     recall the evidence.

8          A juror -- excuse me -- an exhibit, whether a

9     piece of paper or something else will be given a

10    number, for example, Government's Exhibit Number 1.

11    You will have all of the exhibits in the jury room

12    for your reference during your deliberations.

13         But you may want to keep track or at least

14    make a notation of a particular exhibit that you

15    feel is something you'd like to look at more

16    closely.  But, again, they will all be in the jury

17    room for your reference.

18         Some of us take notes every day as part of our

19    jobs.  Some of us probably haven't taken notes

20    since -- I used to say high school but I'd better

21    make it sometime in your formal education.  I didn't

22    take many notes in high school.  But, again, if

23    you're not accustomed to taking notes, don't feel

24    that you're obligated to.  Please don't.

25         Some of your jurors will take copious notes.

1    Don't try to write everything down.  If you're used

2    to taking shorthand dictation or something along

3    those lines, don't try to write everything down.

4    You will invariably miss important evidence.

5         Two final statements.  At the end of every

6    workday, your notes will be collected by Mr. Watts

7    and put in my office, my chambers.  In other words,

8    you can't take them home and study them and revise

9    them and edit them.

10        At the end of the trial after you've returned

11   a verdict, they will be shredded in my office.  And

12   those are the rules.  So if you're not in agreement

13   with that process, then please do not take notes.

14   We just can't risk that your private thoughts and

15   notations are somehow out there in the public

16   domain.

17        In a few moments the attorneys will have an

18   opportunity to summarize what they believe the

19   evidence will show and how it relates to the verdict

20   that you will be asked to deliberate.  You should

21   give careful attention to the testimony and the

22   evidence presented because we do not have the

23   facilities to provide you with transcripts.

24        You should not form or express any opinion

25   about the case until you've heard all of the

1    evidence, the closing arguments from the attorneys

2    and my instructions on the law.

3         You should also be mindful that there may or

4    may not be press coverage of this case or other

5    cases in progress.  And you should avoid being

6    exposed to any newspaper articles or television or

7    radio commentary about any trials going on.  The

8    risk, obviously, is that a commentator may write or

9    say something that might affect your decision

10   making.

11        Remember, again, that this case must be

12   decided solely on the evidence presented in this

13   courtroom and on the law that I provide to you and

14   not on outside matters.

15        In ruling on objections or motions made by one

16   or both sides, you are not to be influenced or

17   prejudiced by the number of objections or motions or

18   the manner in which they're made, nor on my rulings.

19        Of course, if I prevent a matter from being

20   considered by you, I will instruct you accordingly.

21   But you should not infer from any ruling I make that

22   I have any opinion on the merits of the case.  You

23   will make the decision in this case.  I will guide

24   you by giving you the law and by making rulings on

25   the objections and evidence as it's presented.

1          In accordance with the government's burden of

2     proof, the government will present its opening

3     statement first.  After opening statements, the

4     government will begin calling witnesses and

5     presenting evidence in support of the charge in the

6     indictment.

7          After the government has presented its

8     evidence, Ms. Kaiser will announce rest, meaning the

9     government has rested its evidence or its

10    presentation, and then the defendant may but is not

11    obligated to present evidence.

12         If the defendant does produce testimony or

13    evidence, the government will then have an

14    opportunity to present what we call rebuttal

15    testimony or evidence.  Remember, again, that the

16    law never imposes on a defendant in a criminal case

17    the burden of calling any witnesses or presenting

18    any evidence.

19         At the conclusion of the evidence, the

20    attorneys will have an opportunity to give their

21    closing arguments to you, after which I will read

22    you the law that you must follow in reaching your

23    verdict.

24         Remember, again that what the lawyers say is

25    not evidence.  But they are familiar with the

1    evidence and they should be able to assist you in

2    summarizing what they expect you'll hear or see in

3    the evidence.  Please give them your close attention

4    in that regard.

5         Ms. Kaiser, you may address the jury.

6         MS. KAISER:  Thank you, Your Honor.  May it

7    please the court, ladies and gentlemen of the jury.

8    My name is Amanda Kaiser.  And together with Special

9    Agent Alex Hagedorn, we're going to prove to you

10   that the defendant, Charles Friedlander, used the

11   computer, a facility of interstate commerce, to

12   arrange a meeting in which he was planning to

13   sexually abuse and physically torture two little

14   boys ages 10 and 11.

15        The evidence in this case will show that back

16   in July of 2008, Corporal Kurt Romanosky from the

17   Pinellas County Sheriff's Office, Crimes Against

18   Children Unit was assigned to investigate child

19   exploitation offenses.  As part of his duties with

20   the Pinellas County Sheriff's Office, Child

21   Exploitation Unit, his job and his duties involved

22   trying to identify and apprehend people who would

23   harm children.

24        People who have a sexual interest in torture

25   or abuse of children, a sexual sadist, can't operate

1       out in the open.  The evidence will show that

2       Corporal Romanosky went online in an undercover

3       capacity and posed as a father who had two little

4       boys, ages 10 and 11, and a stepdaughter, age 14.

5             The evidence will show that Corporal Romanosky

6       represented on a profile, an online profile, that he

7       had these children and that he was interested in

8       outdoor activities.  And later when he chatted with

9       the defendant, he told the defendant that he had a

10      group who was interested in and who engaged in

11      incest and physical and sexual abuse of children.

12            But back in June of this year, Corporal

13      Romanosky logged onto an internet chat site called

14      Strict Parents.  And he named himself Strict Parent,

15      Strict Dad, StricDad7.  And he went on to that chat

16      room and just waited.  And he was approached by the

17      defendant, later identified as Charles Friedlander,

18      who is using the screen name of Captoes.

19            Corporal Romanosky and the defendant engaged

20      in a number of one-on-one internet chats.  They

21      engaged in various e-mails with each other.  They

22      spoke to each other on the phone and had a number of

23      conversations regarding meeting to engage in the

24      sexual and physical abuse of the undercover

25      profile's two little boys, ages 10 and 11.

1          Charles Friedlander, the evidence will show,

2     is actually a 78-year-old, licensed mental health

3     counselor who lives in Ft. Myers, Florida.  He also

4     has a home, multistory home in Virginia.

5          During the time period in approximately June

6     and July of this year, when the defendant and

7     Corporal Romanosky, who was posing undercover, so

8     I'm going to refer to that as his undercover

9     profile, while they were chatting, eventually they

10    decided to meet.

11         And on -- in July of this year, a meeting was

12    scheduled in which they would get together.  And the

13    plan was that Mr. Friedlander was going to follow

14    the undercover profile back to his residence where

15    they would engage in the sexual beating or sexual

16    abuse and torture of his two little boys, ages 10

17    and 11.

18         They had discussions, the evidence will show

19    that the two discussed and Mr. Friedlander advised

20    the undercover profile of the implements that he

21    wanted to use to beat the children prior to any

22    sexual activity taking place.

23         The evidence will show that Mr. Friedlander

24    told the undercover profile that he wanted to bring

25    razor straps, razor crops and a leather riding crop

1    to the meeting.   The evidence will show that

2    Mr. Friedlander told the undercover profile that he

3    wanted the boys stripped naked and tied up prior to

4    the beatings.   The two discussed engaging in oral

5    sex and handling of the children after the beatings.

6         The evidence will show that while

7    Mr. Friedlander attempted to negotiate his

8    permission into the group that the undercover

9    profile had that engaged in incest of their

10   children, he told the undercover officer that he was

11   70 years old, that he had just turned 70 when, in

12   fact, he was actually 78.

13        The undercover profile, Corporal Romanosky,

14   and the defendant made definite plans to meet in

15   St. Petersburg on July 21st of this year.   On that

16   date, the defendant drove from his home in the

17   Ft. Myers area, approximately two and a half hours

18   to St. Petersburg where he met Corporal Romanosky

19   who was still posing undercover as a bad parent who

20   was willing to share his children for sex.

21        The evidence will show that in his vehicle

22   that he brought were the implements that he had

23   discussed, that Mr. Friedlander had discussed using

24   to beat the children prior to the sexual activity.

25        On July 21st the defendant was placed under

1    arrest and was transported back to the Pinellas

2    County Sheriff's Office where he gave an interview.

3    After the defendant was arrested, a search warrant

4    was conducted at his house and a number of items

5    were seized, including two computers.

6          During the course of time that Corporal

7    Romanosky was chatting with Captoes who was later

8    identified as Charles Friedlander, Corporal

9    Romanosky remembered that that name had sounded

10   familiar to him, Captoes.  And the evidence will

11   show that back in 2005, Detective Romanosky, who was

12   acting in an undercover capacity then, also chatted

13   with the defendant who at that time was using the

14   same screen name as Captoes.

15         In this case, you're going to see a number of

16   exhibits and you're going to hear a lot of evidence.

17   My job in an opening statement is to simply tell you

18   what I anticipate the evidence will show and give

19   you an overview of the case so you can have the

20   context in your head when it's presented to you.  My

21   job at this point is not to make arguments.  That

22   comes at the end of the case.

23         But in this case you will get to see and

24   listen to -- you'll hear the chats between the

25   undercover officer and the defendant, Charles

1     Friedlander.  You'll actually see the live internet

2     chats between the two of them.  You'll hear the

3     undercover phone call between the defendant and the

4     undercover officer.  You'll hear the tape of the

5     meeting immediately prior to his arrest between the

6     defendant and the undercover officer in St. Pete.

7          On July 21st this year, they had set up the

8     meeting at a Cracker Barrel.  And Corporal Romanosky

9     will explain to you why he picked that location when

10    he testifies.  You'll also get to hear the

11    defendant's interview at the Pinellas County

12    Sheriff's Office in which he discusses his

13    involvement in this case.

14         You'll also be able to review the chats from

15    2005 in which the same content, the same type of

16    activities were discussed between Mr. Friedlander

17    and the undercover officer.

18         As in most criminal cases, a number of law

19    enforcement officers have a very small part to play.

20    In this case, there's no exception.  The primary

21    witness that you'll hear from or the first witness

22    who I anticipate will probably be the longest one

23    will be Corporal Romanosky, the one who posed

24    undercover in this case.

25         Then you're going to hear from a number of

1    other law enforcement witnesses, who each played a

2    small role in the investigation.  There's a number

3    of officers that participated in search warrants,

4    some that reviewed the physical evidence, that

5    reviewed the computers.  But at the end of the

6    proof, the government will submit the case to you

7    and will ask you to find the defendant guilty of the

8    charges.

9         Now, the court is going to instruct you on the

10   law.  That's not my job here, either.  But just like

11   yelling fire in a crowded theater is against the

12   law, it's also against the law to use a facility of

13   interstate commerce to induce a person who has not

14   attained the age of 18 years to engage in sexual

15   activity.

16        And the court will instruct you that one can

17   induce a person under the age of 18 to engage in

18   sexual activity by arranging for a meeting with the

19   parent of that minor.  So the judge will give you

20   the instructions on the law at the end of the case.

21        But it's for you to know as you're hearing the

22   evidence that the evidence will show that how the

23   defendant induced or caused or created the

24   occurrence of --

25        MR. TRAGOS:  I would object at this time.

1          THE COURT:  Legal argument, please.

2     Sustained.   Rephrase it.

3          MS. KAISER:  Yes.   The evidence will show that

4     in this case the defendant used a facility of

5     interstate commerce to arrange for the sexual

6     activity with the two little boys through

7     communication with his parent, which, as the court

8     will instruct you --

9          THE COURT:  Limit your comments, Ms. Kaiser,

10     please.

11          MS. KAISER:  Yes.  Thank you, Your Honor.

12     Ladies and gentlemen, at the end of the proof in

13     this case, I submit to you that the government will

14     have proven its burden beyond a reasonable doubt and

15     I will come back and ask you to return a verdict of

16     guilty.   Thank you.

17          THE COURT:  Thank you, Ms. Kaiser.

18     Mr. Tragos?

19          MR. TRAGOS:  May it please the court.   Ladies

20     and gentlemen of the jury, all the voir dire, all

21     the questions we asked you, now you've heard a

22     little snippet from the government about what the

23     government thinks the case is, you know why now we

24     asked you all those questions.

25          But the case really needs to be heard from

1    beginning to end.  And you also promised you would

2    do that and not make a judgment call until

3    everything is in evidence, not just what the

4    prosecution decides they want to present to you.

5         Charles Friedlander is the defendant.  He's

6    the gentleman sitting over here.  He was born May

7    28th, 1930.  He's 78 years old.  New York City.  He

8    has one sister.  He grew up in the New York City

9    area in Westchester.  Went to schools, went to camp.

10   When he was 17 years old he went to camp and there

11   he was molested by another boy in the camp.

12        Then he went to college.  And he graduated

13   from William and Mary with a degree in French and

14   English.  He became a teacher from '63 to '67.  He

15   was a guidance counselor from '67 to '86.  He

16   received a master's from George Washington in

17   counseling and a PhD from George Washington in

18   student personnel.  He retired and he went into a

19   private counseling practice.

20        He finally admitted to himself that he was gay

21   when he was in his late twenties or early thirties.

22   He went out with girls but never any physical

23   attraction or physical activity.  In fact, Charles

24   Friedlander is a 78-year-old virgin.  And he is and

25   he will tell you that he is a homosexual.  For years

1    he denied it.  You've got to think back to the

2    generation in which he grew up and realize that in

3    that generation, people didn't admit to being

4    homosexuals.

5         And he finally brought himself around to tell

6    people publicly that he was bisexual, even though

7    that wasn't true.  He is a homosexual and he admits

8    it and that's the only lifestyle he's led.

9         In 1963 until now, his only female friend was

10   a woman named Margaret.  And she's his lady friend.

11   And in that entire time since 1963 to now they have

12   been friends and that's it.  There's been no

13   physical, sexual contact between them.

14        He has a few friends, but generally at 78

15   years old, he's a lonely man.  And we're social

16   beings.  And we know that it's really tough to be

17   78, gay and lonely.  Some of us can only imagine.

18        So he goes to the one place now that

19   technology has developed where you can be anybody,

20   you can say anything and you can develop whatever

21   personality or persona you want.  The prosecutor

22   already admitted that when he's online he says he's

23   70, and we know he's 78.  And you'll hear other

24   things that he talks about in these chats and

25   e-mails.

1          And I'm going to tell you some facts, some

2     facts that you will not hear any contrary evidence

3     on from the prosecution.  And these facts will show

4     you that the -- what you hear and how he acts on the

5     internet, that it's all fantasy.  It's not true.

6     It's merely a way for him to talk to anybody who

7     will talk to him.

8          You lead him in a direction, if you're on the

9     internet talking to him, he'll go in that direction.

10    You lead him in another direction, he'll go in

11    another direction.  He will do anything.  Just keep

12    talking to me, that's all he asks.

13         So then we have a situation where you will

14    see -- and I told you at the very beginning of my

15    opening, the government's only going to give you

16    part of the story.  See if they give you the whole

17    story, and if they don't, ask why they don't give

18    you the whole story.  They will only show you

19    snippets.

20         On his computer are thousands and thousands

21    and thousands of documents, e-mails, hundreds of

22    people, hundreds of e-mail addresses.  And you know

23    what?  Not a single child.  Here's a man they're

24    saying was soliciting children over the internet for

25    sex, and yet --

1           MS. KAISER:  Objection, argumentative.

2           MR. TRAGOS:  -- the facts --

3           THE COURT:  It is.  Rephrase it.  Keep it

4      factual.

5           MR. TRAGOS:  Okay.  The facts will show that

6      not a single child was discovered as his -- as the

7      person he conversed with on the internet.  The facts

8      will show not a single photograph of an 11-year-old,

9      10-year-old, 12-year-old children naked or in some

10     kind of a sexual activity, not a single one of those

11     are on his two computers.

12          The facts will show that when he talks to the

13     detective and tells him that he has torture rooms,

14     that he has a basement in one house or a room in

15     another house where he can set up for torture, the

16     facts will show there is no such basement, there is

17     no such room.  The police went and searched his

18     house.  They found no such room.  Nothing set up to

19     torture children.

20          Torture pictures?  The government is going to

21     show you some torture pictures, things that he

22     got -- that came off the internet.  Not a single

23     child.  They'll show you e-mails off the internet,

24     not a single child.

25          We will present to you an expert on pedophilia

1    and sexual sadism.  He will tell you the criteria

2    for a pedophile or a sexual sadist, and

3    Dr. Friedlander does not satisfy that criteria.

4         Detective Romanosky is a professional.  He is

5    a pro at what he does.  You will find -- and you

6    need to listen and take all of the conversations in

7    context.  Don't just do snippets.

8         Those conversations will show that Detective

9    Romanosky led into everything.  He kept asking

10   Dr. Friedlander, well, more -- you want more.  He

11   kept saying, well, what sexual things do you want?

12   And Dr. Friedlander just kept going.

13        When he came -- when Dr. Friedlander drove up

14   here from St. Petersburg he was asked, are you going

15   to bring all your stuff with you?  Doctor said, yes.

16   Dr. Friedlander was coming up to meet what he

17   thought was a 36-year-old man, and bringing stuff

18   with him was just to keep the conversation going.

19        He never -- when he came up here he never saw

20   a child.  He was never presented to a child.  He

21   never talked to a child.  Nothing.  The only person

22   he ever saw when he drove up here was a 36-year-old.

23   And when you see Detective Romanosky, there is no

24   mistaking him for a child.  That's the only person

25   he ever saw and ever talked to.

1              You will hear how Detective Romanosky is able

2      to weave into conversations, not directly, but just

3      kind of weave and lead conversations in certain

4      directions.  Listen to it.  If you're a lonely

5      person and you want to keep talking to somebody, you

6      respond to the way they're leading.

7              Next, the interview.  Before that interview

8      took place -- and by the way, when I tell you about

9      completeness, make sure they show you everything.

10     She told you that there was a tape recording of the

11     undercover meeting when Dr. Friedlander drove up

12     here.  Detective Romanosky was still playing the

13     36-year-old father.  He meets him and they talk.

14             You will hear a tape of that.  Then she tells

15     you, and you will hear a tape of the interview.

16     Because what Detective Romanosky then does is he

17     arrests him at the scene, which is a Cracker Barrel,

18     arrests him at the Cracker Barrel and drives him

19     back to the sheriff's administration building where

20     they have a discussion that takes place over hours.

21     Hours.

22             If they don't redact the tape and cut out

23     portions of it, you will see how uncomfortable he

24     is.  You will see him just shaking.  You will see

25     him having gastric problems as he's being

1    interviewed and as he sits there for hours with

2    Detective Romanosky.

3         Listen to how Romanosky asks questions.

4    Listen to his responses and then how Romanosky

5    responds.  Listen in particular when they start

6    talking about waiving your right to a lawyer and see

7    how Romanosky dances around that.

8         MS. KAISER:  Your Honor, I'm going to object

9    again.  This is argumentative.

10        THE COURT:  Yes, ma'am.  Sustained.  Keep it

11    factual, please.

12        MR. TRAGOS:  Listen to Detective Romanosky's

13    answers when that question is asked.  And then

14    eventually Dr. Friedlander signs a waiver so he

15    can't have -- so he doesn't have an attorney there

16    while he's being interviewed.

17        Next, listen to this fact.  Here he is,

18    supposedly this guy on the internet, this

19    sophisticated guy, he is using dialup.  He does not

20    have direct internet access other than dialup.

21    Listen to the fact that there are hundreds of people

22    that he talks to, and how those people, not a one of

23    them was discovered to be a child.

24        Listen to the fact that he's never been

25    married, the fact that he's never had children,

1    because what you will hear on the undercover -- the

2    chats that Detective Romanosky has is what they do

3    is he gets Dr. Friedlander to talk about his

4    children and how when his children were eight years

5    old he started disciplining them.  But there are no

6    children.  There never has been a child.  He's never

7    had children.

8         And then he talks about his son who he beats

9    regularly, and he was there living with him.  The

10   only person he's had living with him is a man that

11   was a friend of his that lived with him between the

12   ages of 29 and 39 years old.  He talks about the man

13   still being alive on those chats when you read the

14   chats.  The man's been dead for seven years.  But on

15   the internet, he's still alive for Dr. Friedlander.

16        During the interview -- and you need to listen

17   carefully to the interview.  Over and over again

18   Dr. Friedlander tells the detective he has no

19   interest in sex with children.  He says he prefers

20   40 to 70.  He has no preference for under 18.

21        He only talks -- he only at any time when he

22   talked about this, he's only talked to parents.

23   He's never talked to children because he has no

24   interest in them, yet the detective doesn't stop.

25   He keeps questioning him and questioning him and

1    questioning him.  Again, leading Dr. Friedlander to

2    the inescapable conclusion he must give an answer

3    that the detective wants because he obviously

4    doesn't want the answer he's getting.

5         Then he talks about erectile dysfunction.

6    He's a diabetic.  He is on insulin.  He cannot

7    achieve an erection.  He cannot achieve an orgasm.

8    So why would he want children?

9         Watch his facial expressions when you're

10   watching this.  The facial expressions will show

11   you.  One time he's asked about having oral on a

12   child or a child oral on him.

13        The true -- something you can't hide is when

14   your body reacts.  His facial expression will show

15   you.  He cringes even at the question of oral with a

16   child.  Watch for that expression.

17        So the whole story is very important.  I tell

18   you all these things because you'll see when he's

19   talking in those internet chats, that he's saying

20   things that are totally factually a hundred percent

21   untrue, because it is fantasy.

22        It may be disgusting.  It may turn your

23   stomach, but it's fantasy.  And it has to be real

24   for there to be a crime.  And if you think fantasy

25   is something I just thought up as I'm sitting here,

1       I'm the defense lawyers, you know, defense lawyers

2       have to think of something, no.

3            Listen carefully to the tape and the interview

4       with Detective Romanosky.  Because in that tape he

5       has waived his right to a lawyer.  He is nervous, he

6       has gastric problems, he's just been arrested, taken

7       to the sheriff's office and he tells him it's

8       fantasy.  He tells him that it's fantasy, that it's

9       not real, but that's not the answer Romanosky wants

10      to hear.

11           Now, listen carefully to what the prosecutor

12      told you, because she told you about the undercover

13      meeting at the Cracker Barrel.  She told you that

14      you'll hear an interview at the sheriff's office.

15           What she didn't tell you was there's a tape in

16      between.  There's a tape between the undercover

17      meeting at the Cracker Barrel and the interview.

18      That tape is a tape that Detective Romanosky had

19      going in the car after he arrested him as he drove

20      from the Cracker Barrel to the sheriff's office.

21      She didn't tell you about that.  Now since I'm

22      raising it, she may play it for you, but --

23           MS. KAISER:  Your Honor, I'm going to object.

24      It's argumentative.

25           THE COURT:  That is sustained.  Counsel,

1     refrain from making comments such as that.

2           MR. TRAGOS:   Okay.   But there is another tape.

3     So hold the prosecutor to the burden beyond a

4     reasonable doubt, not a possible doubt, not a

5     probable doubt, but beyond a reasonable doubt.

6           And here's the burden she told you she had.

7     She was going to prove to you that he was planning

8     to sexually abuse and physically torture two boys.

9     He was planning to physically abuse and torture two

10    boys.   That's what she has to prove beyond a

11    reasonable doubt.   And the boys' ages she said?   Ten

12    and 11.

13          Thank you.

14          THE COURT:   Call your first witness, please.

15          MS. KAISER:   The United States calls Corporal

16    Kurt Romanosky.

17          COURTROOM DEPUTY CLERK:   Raise your right

18    hand.

19        GOVERNMENT WITNESS, KURT ROMANOSKY, SWORN

20          THE WITNESS:   I do.

21          COURTROOM DEPUTY CLERK:   Please be seated.

22          Please state your name and spell your last

23    name for the record.

24          THE WITNESS:   My name is Kurt Romanosky.

25    That's spelled R-O-M-A-N-O-S-K-Y.

Romanosky - Direct

```
 1              COURTROOM DEPUTY CLERK:   Thank you.

 2                        DIRECT EXAMINATION

 3    BY MS. KAISER:

 4    Q       Good afternoon, Corporal Romanosky.

 5    A       Good afternoon, ma'am.

 6    Q       Can you please tell the jury where you work.

 7    A       I work at the Pinellas County Sheriff's

 8    Office.  I'm the detective corporal assigned to the

 9    Crimes Against Children Unit.

10    Q       How long have you been so employed?

11    A       I've been with the sheriff's office since May

12    13th of 1991.

13    Q       And what -- what is your current assignment?

14    A       Like I said, I'm the detective corporal

15    assigned to the Crimes Against Children Unit.  I act

16    as not only an investigator, but as -- when the

17    supervisor is off, I take her place.

18    Q       What type of investigations do you conduct?

19    A       Normally our unit is assigned to investigate

20    any violent crime committed against a child, whether

21    that is physical abuse involving serious physical

22    injury, sexual abuse, sexual exploitation, death

23    investigations, things of those nature.

24              One of the specialities I have within the unit

25    is to work computer and internet facilitated crimes
```

Romanosky - Direct

1    against children.

2    Q      What type of training have you had to be able

3    to do that type of work?

4    A      Well, normally uniform deputies, they must --

5    you know, they go through the police academy.  When

6    investigators are transferred to the detective

7    division, they go through a training that's centered

8    around like interview and interrogations, analysis

9    of handwritten statements, things along those lines.

10         When I transferred into the Crimes Against

11   Children Unit in 2001, my training then focused on

12   interviewing children, interviewing offenders of

13   those types of cases.  With a specialty of computer

14   and internet-related crimes, I went to training

15   centered around protecting children online,

16   investigative techniques, undercover techniques,

17   advanced computer forensics so I could speak with my

18   examiners, data recovery and analysis, websites and

19   databases, research, things like that.

20   Q      How long have you been with the sheriff's

21   office?

22   A      Since 1991.

23   Q      How do you go about doing an undercover child

24   exploitation case?

25   A      Well, the first thing you want to do is we

Romanosky - Direct

```
 1    have to set a profile up for our undercover person.

 2    We will set it up.  I've been --

 3         MR. TRAGOS:  Your Honor, I'm going to object

 4    at this time and ask it be restricted specifically

 5    to what was done in this case.

 6         THE COURT:  Overruled.  And I want legal

 7    objections from now on, no speaking objections.  Go

 8    ahead, Ms. Kaiser.

 9    BY MS. KAISER:

10    Q     You can continue.

11    A     Thank you.  When I set up a profile, I've been

12    a mom, I've been a dad, I've been a child, I've been

13    a young girl, I've been a young boy.  But I set up a

14    profile centered around what type of case I'm

15    looking to make on the internet.  In this case I set

16    up a profile of a 36-year-old divorced dad with

17    children.

18         After creating a profile, I then go on to an

19    internet service provider.  In this case it was

20    American Online.  And I go to the chat room

21    sections.  At that point I'll find a chat room that

22    has a name that might be predicated towards the type

23    of activity that I'm looking for, and I'll enter the

24    chat room.

25         Normally within a very short time, I'll
```

1    receive one if not multiple people that have looked

2    at my profile and initiated contact with me.  From

3    that point, I'm -- the investigation may be very

4    short, it may be very long.  But it will consist of

5    instant message chat conversations, sometimes

6    e-mails, sometimes phone calls, with a conversation

7    that ultimately ends up in a violation of Florida

8    statute.

9         Once that violation has taken place, then we

10   will set a meeting, a physical meeting for the

11   offender to show up.  When they show up, we'll take

12   them into custody.  One they're taken into custody,

13   then we proceed with interviewing, search warrants,

14   things of that nature.

15   Q    You had mentioned previously that it depends

16   on the type of investigation you are conducting as

17   to what you pose as; is that correct?

18   A    That's correct.

19   Q    When you said you created an online profile,

20   to what are you referring?

21   A    An online profile is essentially when you go

22   into an internet service provider, you're identified

23   by a screen name.  Your profile is descriptive

24   information about that screen name.  Sometimes it

25   has your location, sometimes people will put their

1    name or a fake name, sometimes people will put their

2    interests, sometimes people will put pictures.  I

3    mean, you can be as creative as you want with a

4    profile.  I try to keep mine pretty simple.

5    Q      When you are conducting an investigation in a

6    chat room, are you talking within a group of people

7    with a subject, are you talking one on one with that

8    individual?

9    A      Well, a chat room -- a way to equate a chat

10   room is almost like an airport lobby.  It's a text

11   box.  There's a lot of conversations taking place

12   between however many people are in that room.

13   Sometimes it will be as few as two people in that

14   room.  Sometimes there will be 30 people in that

15   room.  And it's just people talking back and forth.

16   It's a hodgepodge of different conversations.

17          I don't participate in that chat.  I just

18   enter the chat room and sit there.  I don't say

19   anything in the chat.  I just leave my profile up

20   there where people can see who all is in that chat

21   room, because it's kind of a common practice with

22   people on the internet, they go into the chat room

23   and they start looking at the profiles of the

24   members in the room.

25          If there's somebody there that they would like

Romanosky - Direct

1    to talk to or that kind of piques their interest,

2    they then send that person what's called an instant

3    message.  That instant message, if it's replied to,

4    now becomes a two-way conversation.  It's not

5    actually taking place in the chat room.  It's a

6    two-way conversation between just those two people.

7    Q     When you are contacted by someone, do you take

8    the lead and talk to them?

9    A     There'll always be casual conversation.  As

10   far as the subject matter of what the investigation

11   is going to be about, we teach our investigators

12   from day one, let the person set the pace of the

13   conversation.  It's okay to keep up with them, but

14   let them set the pace of the conversation.  Don't be

15   overly aggressive towards them.  And to be honest,

16   there's really no need to be.

17   Q     Did you have an occasion to investigate the

18   defendant, Charles Friedlander?

19   A     I did.

20   Q     And when did that begin?

21   A     It actually began back in mid June, around the

22   16th of this year.

23   Q     What did you do back in mid June?

24   A     Well, I had logged onto American Online using

25   a profile, like I said, of a 36-year-old dad,

1    divorced dad with children.  And I entered into a

2    chat room called Strict Parents.  This is a chat

3    room that has a lot of conversations.  It's kind of

4    predicated somewhat cryptically of people that are

5    into the physical and sexual abuse of children.

6    Q      And did you encounter the defendant in that

7    chat room?

8    A      I did.  While I was in the chat room, I

9    received an instant message from the defendant.

10   Q      What was his screen name?  What screen name

11   was he using at that point?

12   A      He was using a screen name called Captoes.

13   Q      Were you and he both using the internet and a

14   computer to communicate?

15   A      Yes.  We were using the internet and the

16   internet service provider, America Online, which is

17   located in Dulles, Virginia, I believe.

18   Q      When you first started communicating with the

19   defendant, did you know that it was actually Charles

20   Friedlander that was -- that's who Captoes was?

21   A      No, I did not.  I didn't actually have him

22   identified for a few days.

23   Q      Approximately how many times did you

24   communicate with the defendant during the course of

25   your investigation?

1   A       Instant messages, probably around a dozen.  I

2   think we swapped a couple e-mails.  We had a phone

3   call, and then we had a physical meeting where we

4   communicated there, as well, and then ultimately an

5   interview.

6   Q       Had you ever spoken to the defendant prior to

7   June and July of this year --

8   A       Yes.  After --

9   Q       -- online?

10  A       After receiving the contact in June of this

11  year, there was some familiarity there.  I went back

12  and checked some of my log files of people that I

13  have spoken to in the past, some -- under different

14  screen names.  And I learned that I had actually

15  spoken with Mr. Friedlander back in July of '05

16  where he was using the same screen name.

17  Q       Were you able to confirm that the person who

18  you spoke with back in 2005 that was using the name

19  of Captoes was the same Charles Friedlander?

20  A       Yes.

21  Q       During your chats with the defendant, did he

22  make any representations about himself to you?

23  A       As far as --

24  Q       His age or his appearance or --

25  A       He had told me that he was 70 years old.  He

Romanosky - Direct

1    had some profile information indicating that he was

2    from Ft. Myers in the mid Atlantic, Florida in the

3    mid Atlantic.  He had told me that he was an older

4    gentleman.  I think he said he was a divorced dad,

5    had raised his son alone, he was very strict.

6    Q     Was he being truthful when he told you his

7    age?

8    A     No.  I actually learned that he was actually

9    78 years of age.  And he told me he was 70, which

10   kind of threw me for a loop because one of the

11   things that I do is I try to get information, I try

12   to elicit information during the chat conversation

13   while I'm working on my other desktop using like the

14   Department of Motor Vehicle database and things like

15   that to try to vector in on who I'm actually talking

16   to.

17         He had told me he was 70, so I was running all

18   my searches based on information he gave me for

19   someone who would be like 65 to 70 years, and I

20   wasn't coming up with anything.  It was later on

21   after I expanded my search that I was able to

22   establish he was actually 78.

23   Q     During your work in posing as an undercover

24   doing these type of investigations, do people ever

25   misrepresent facts about themselves to you?

Romanosky - Direct

```
1    A       Most of the time they do.

2    Q       And why do they do that?

3            MR. TRAGOS:  Objection, speculation.

4            THE COURT:  Sustained.

5    BY MS. KAISER:

6    Q       In this case do you have any opinion as to why

7    the defendant would have misrepresented his age to

8    you?

9            MR. TRAGOS:  Objection, speculation.

10           THE COURT:  Sustained.  He can talk in terms

11   of his experience without speculating or giving

12   opinions, Ms. Kaiser.

13   BY MS. KAISER:

14   Q       Based on your experience, why would someone

15   misrepresent their age?

16           MR. TRAGOS:  Objection again, Your Honor.

17   Again, it would be speculation.

18           THE COURT:  I'm going to allow it.  Based on

19   your experience without speculating or giving

20   opinions.

21           THE WITNESS:  My experience has shown that

22   communicating with offenders online that they will

23   lie about information, age, where they live, to

24   avoid detection or to gain acceptance if they think

25   that there's something about them that I may not be
```

1    interested in or might make me go somewhere else,

2    things of that nature.  There's usually a reason for

3    it.

4    Q      What did you and the defendant discuss during

5    your chats?

6    A      During -- from June 16th to the time of the

7    meeting, we discussed both of us having an interest

8    in not only the sexual abuse of children but the

9    sadomasochistic abuse of children.  We discussed

10   actually meeting for the purposes of engaging in

11   that behavior.

12   Q      And what had you told the defendant about who

13   you were and what you had -- what your situation

14   was?

15   A      I told him I had two boys, ages 10 and 11, and

16   I had a 14-year-old stepdaughter.  I had a -- I was

17   with an open-minded partner, which is somebody that

18   would be -- just exactly as it sounds, open-minded

19   to different ideas.

20          I told him that we had friends with common

21   interests that we met with up in Pinellas County for

22   the purposes of acting out on these -- physical and

23   sexual abuse of children.

24   Q      Approximately how many times did you

25   communicate with the defendant?

Romanosky - Direct
93

1    A       Probably -- like I said, approximately about a

2    dozen through instant message, a few e-mails.  We

3    had a telephone chat, ultimately a personal meeting

4    and then an interview.

5    Q       Did you and the defendant ever discuss meeting

6    on a specific date?

7    A       We did.  We discussed meeting on July 21st of

8    this year.

9    Q       And was a meeting actually set up on that

10   date?

11   A       Yes, it was.  We set up a meeting to -- at the

12   Cracker Barrel on 54th Avenue North and the

13   interstate.

14   Q       Did you select that location?

15   A       I did.

16   Q       Why did you select that location?

17   A       That location was selected because I knew that

18   Mr. Friedlander was coming from Ft. Myers.  I didn't

19   want to take him deep into Pinellas County because

20   we have a lot of named streets over there in

21   addition to numbered streets, and they can get kind

22   of confusing.

23           That location is right off the interstate

24   after you come over the Skyway.  You come up to 54th

25   Avenue North.  It's very visible from the

1    interstate.   A lot of tactical considerations as far

2    as it's in the open.   There's a Cracker Barrel and a

3    Holiday Inn, so we can put undercover police cars in

4    there so we can monitor the meetings.

5         It's a lot safer of a location.   It's just

6    generally something easy -- to give him easy access

7    to where I knew he would find it and it's tactically

8    sound.

9    Q    On July 21st, 2008, the date of the meeting,

10   what did you and the defendant discuss was to occur

11   on that date?

12   A    What we discussed to occur was going to be the

13   physical abuse of children.   Mr. Friedlander was

14   bringing some razor straps and an English crop and a

15   heavy German Garrison belt which he was going to use

16   on my two boys.   We also discussed there was some --

17   going to be sexual abuse consisting of oral sex and

18   fondling.

19        MR. TRAGOS:   Objection, Your Honor, to the

20   summary testimony.

21        THE COURT:   Overruled.

22        THE WITNESS:   We had also discussed there was

23   going to be the oral sex and the fondling of the two

24   boys.   Mr. Friedlander was going to work with the

25   two boys while I attended to my stepdaughter.

Romanosky - Direct

1    BY MS. KAISER:

2    Q      Did the defendant state any preference as to

3    how the boys were to be during the meeting or during

4    the session?

5    A      The boys were going to be stripped, bent over

6    a chair or a couch and bound.

7    Q      Meaning tied up?

8    A      Yes.  He said he used a fairly full swing.

9    Q      If the defendant had succeeded in engaging in

10   sexual activity with the boys, would that have been

11   a violation of state law?

12          MR. TRAGOS:  Objection, Your Honor.

13   Speculation and beyond the scope of his expertise.

14          THE COURT:  Overruled.

15          THE WITNESS:  It would have been a violation

16   of the law, being that the boys were ages 10 and 11.

17   Oral sex would constitute a violation of sexual

18   battery upon a child under the age of 12, which

19   would be a capital felony in the State of Florida.

20   BY MS. KAISER:

21   Q      Also, if the defendant had succeeded in

22   engaging in sexually sadistic abuse of the boys,

23   would that also have been a violation of state law?

24   A      Correct.

25          MR. TRAGOS:  Same objection, Your Honor.

1          THE COURT:  Overruled.

2          THE WITNESS:  The sadomasochistic abuse of

3     children falls under the -- not only would it fall

4     under child abuse, but it's also the lewd and

5     lascivious statute, as well.

6          MR. TRAGOS:  Objection, Your Honor, his

7     opinion.

8          THE COURT:  Mr. Tragos, I've overruled the

9     objection three times.  Please answer the question,

10    sir.

11         THE WITNESS:  It would fall under violations

12    of not only child abuse but also under lewd and

13    lascivious statutes in the state of Florida and

14    would also be considered a felony.

15    BY MS. KAISER:

16    Q     Approximately how long did it take for the

17    defendant to drive from his home to the meeting on

18    July 21st?

19    A     The meeting was set for 6:30 PM.  I believe he

20    told me he was going to leave around 4 o'clock.  And

21    that's pretty consistent with Ft. Myers with the

22    interstate.

23    Q     Did the defendant have any of the implements

24    that you and he had discussed when he arrived at the

25    location on July 21st?

Romanosky - Direct

1    A       He did.  He had brought -- it was a red bag

2    inside of the car.  The English riding crop was

3    there.  There was a black leather strap.  There were

4    three -- I believe three razor straps.  They're like

5    real soft leather and they have a piece of hemp or

6    something behind them.  And the heavy -- like an old

7    military belt, a brown, leather, thick belt.

8    Q       After the defendant was arrested, did he agree

9    to speak to you?

10   A       Yes.  We rode back to my office over at the

11   sheriff's office on Ulmerton Road and I conducted an

12   interview with Mr. Friedlander at that time.

13   Q       Now, during the interview of

14   Mr. Friedlander -- have you reviewed the interview

15   since it occurred?

16   A       Yes.

17   Q       And you participated, you conducted it;

18   correct?

19   A       Yes.

20   Q       And did you view the videotape that was made?

21   A       I did.

22   Q       And is that videotape a true and accurate copy

23   and depiction of your interview with

24   Mr. Friedlander?

25   A       That is.

1    Q       Were there times during the interview with

2    Mr. Friedlander when he was by himself in the room?

3    A       Yes.   There would be times where I would have

4    to either leave the room to call another detective

5    who was down in Mr. Friedlander's residence to see

6    what the progress of the search warrant was.   I

7    would give Mr. Friedlander a chance to have a break,

8    have a glass of water.

9            I would have to use the restroom myself,

10   organize documents, look at chats, things like that.

11   So there would be times that I would leave the room

12   for a few minutes.

13   Q       And have you reviewed the entire interview

14   from start to finish of your interview with

15   Mr. Friedlander?

16   A       Yes.

17   Q       During the times that he was by himself, did

18   you ever observe him shaking?

19   A       How do you mean, shaking?

20   Q       Violently shaking like as if he was afraid

21   or --

22   A       No.   No.   He was very cooperative.   We had --

23   actually had a good conversation between the two of

24   us.

25   Q       What was his demeanor during your interview

Romanosky - Direct

1    with him?

2    A    He was calm, probably a little bit -- but

3    probably a little bit nervous, very careful, kind of

4    guarded in what he was saying.

5    Q    Was a search warrant ever conducted upon

6    Mr. Friedlander's residence?

7    A    Yes.  I had to enlist the assistance of the

8    Florida Department of Law Enforcement being that I

9    don't have jurisdiction in Ft. Meyers.  So I

10   coordinated that through Special Agent Steve

11   Uebelacker.

12   Q    Now, Corporal Romanosky, you testified

13   previously that you had first initially started

14   chatting with Mr. Friedlander back in 2005; is that

15   correct?

16   A    That's correct.

17   Q    Were you able to complete your investigation

18   of him at that time, or what happened there?

19   A    The investigation back in 2005 was kind of an

20   incomplete investigation.  I had had a few chats

21   with him during that time.  But there was some --

22   some differences in -- we now have statutes, state

23   statutes in Florida that we didn't have back in

24   2005.  Investigators were using like an attempt-type

25   statute, an attempt at whatever crime was to be

Romanosky - Direct

1    committed type statute.  I had spoken with --

2         MR. TRAGOS:  Objection, Your Honor, as to an

3    opinion on the statutes and the law.

4         THE COURT:  Overruled.

5         THE WITNESS:  I had spoken with our local

6    prosecutor's office about those statutes because

7    they were pretty clear as far as when we were posing

8    as a child, when somebody used an online service to

9    solicit a child, but there really wasn't anything

10   covering soliciting a guardian or a parent to gain

11   access to children.

12        So when people were using the attempt

13   statutes, I talked to our prosecutor's office.  And

14   they were like, well --

15        MR. TRAGOS:  Objection, hearsay.

16        THE COURT:  Sustained.  Don't repeat what

17   others told you.

18        THE WITNESS:  I learned that --

19        MR. TRAGOS:  Objection, Your Honor.  It's

20   still hearsay but another form.

21        THE COURT:  Based on what you heard, what did

22   you do, if anything?

23        THE WITNESS:  I discontinued the

24   investigation, not only because of that but because

25   there was also -- I wasn't as comfortable conducting

1    those types of cases.  I hadn't learned how to keep

2    up my end of the chat conversation as far as what I

3    could say and feel comfortable saying.  So I

4    discontinued the investigation at that point.

5    Q    Since 2005, have you had additional training

6    and how has it changed from 2005 to today?

7    A    Well, I've had a lot of additional training.

8    I've been online -- it gave me three more years of

9    on-the-job training, so to speak, online and

10   communicating with people as an adult.

11         I attended the ICAC undercover techniques

12   course.

13         THE COURT REPORTER:  I'm sorry, what course?

14         THE WITNESS:  The ICAC.  That stands for

15   internet crimes against children.  It's our task

16   force that we're affiliated with.  I attended one of

17   their classes on undercover techniques.

18         We've also gained some new legislation in

19   Florida that not only allowed people using the

20   internet to solicit a minor, but it gave us another

21   tool because it doesn't allow people to use the

22   internet or a computer service to solicit an adult

23   or a parent or a guardian or someone they believe to

24   be a parent or a guardian to gain access to their

25   child.

Romanosky - Direct

1          So we now have some new tools that gave us

2    more ability to work with these kind of offenders.

3          THE COURT REPORTER:  Mr. Witness, will you

4    please slow down.

5          THE WITNESS:  Sorry about that.

6          MS. KAISER:  Your Honor, may I approach the

7    witness?

8          THE COURT:  Yes, ma'am.

9    BY MS. KAISER:

10   Q     Corporal Romanosky, I'm showing you what's

11   been premarked for identification as Government's

12   Exhibit 1, and ask if you could take a look at that,

13   please.  Do you recognize that document?

14   A     Yes.  This is a screen shot of the Captoes

15   user profile.  And I believe this is from the 2005

16   investigation.

17   Q     And if you would also take a look at

18   Government's Exhibits 2, 3, 4, 5, 6, 7 and 8.

19   A     These are the chat conversations between my

20   undercover screen name and Captoes,

21   Mr. Friedlander's screen name, that took place back

22   in July and early August of 2005.

23   Q     All right.  Thank you, sir.  Now, in 2008 when

24   you realized that you had spoken to Captoes before,

25   did you review your files and locate these?

Romanosky - Direct

1    A      Yes, I reviewed them.

2    Q      And were these chats and this profile sheet

3    kept by you in the ordinary course of business as

4    part of your investigation?

5    A      Correct.

6           MS. KAISER:  Your Honor, at this time I'd move

7    for admission of Government's Exhibit 1 through 8

8    into evidence.

9           THE COURT:  Any objection?

10          MR. TRAGOS:  Yes, Your Honor.  May I voir

11   dire?

12          THE COURT:  What's the legal objection,

13   please?

14          MR. TRAGOS:  Your Honor, I just want to see

15   how the evidence is preserved in the chain.

16          THE COURT:  All right.  I'll allow you a brief

17   examination of the witness on authenticity.

18          MR. TRAGOS:  Okay.

19                    VOIR DIRE EXAMINATION

20   BY MR. TRAGOS:

21   Q      Agent, with regards to Exhibit 1 which is the

22   profile, how did you save that?

23   A      That is saved by accessing the member's

24   profile and taking a screen shot or hitting the

25   print screen and then copying that onto a Word Pad

1    document.   The Word Pad document is then saved to a

2    folder with that screen name.

3    Q      And you did that in '05 for Exhibit 1?

4    A      Correct.

5    Q      Okay.  And then the other exhibits, 2 through

6    8, I believe, those exhibits, how did you save

7    those?

8    A      At the conclusion of the chat conversation, I

9    used the edit select all command.  I then hit copy

10   or right click on copy and then open up a Word Pad

11   document and paste the chat from the chat box into a

12   Word Pad document and then save it under the same

13   folder name.

14   Q      And you did that in '05, as well?

15   A      Correct.

16   Q      By folder, are we talking about an electronic

17   digital folder or a piece of paper folder?

18   A      An electronic folder, an electronic directory

19   on an undercover computer.

20   Q      Okay.  And you did this yourself; correct?

21   A      Yes, sir.

22   Q      And did you retrieve them yourself?

23   A      Yes.

24   Q      Okay.

25          MR. TRAGOS:  That's all the questions I have,

1      Your Honor.

2              THE COURT:  Is there any objection to

3      Government's 1 through 8?

4              MR. TRAGOS:  No, Your Honor.

5              THE COURT:  Those exhibits are now received.

6      (Whereupon, Government's Exhibit Numbers 1 through 8

7    are received into evidence.)

8              MS. KAISER:  Your Honor, at this time I'd like

9      to publish the exhibits.  And for the chats I'd like

10     to enlist the assistance of Special Agent Hagedorn

11     to read the part of the defendant.

12             THE COURT:  Dim those lights a little bit,

13     please.

14             MS. KAISER:  But first I'm putting on the

15     overhead Government's Exhibit 1.  Let me see if I

16     can make it a little smaller.

17     BY MS. KAISER:

18     Q      Okay.  Can you see that all right, Corporal

19     Romanosky?

20     A      I can.

21     Q      Okay.  Now, you said previously this is --

22     this is what, this is --

23     A      This is the information input for the user

24     profile Captoes.  And this is from the 19 -- or 2005

25     chats, contact.

1    Q      Okay.  So would this have been something that

2    the defendant had created?

3    A      Yes.

4    Q      Okay.  From his AOL profile?

5    A      Correct.

6    Q      Okay.  And what does he list there as his

7    personal quote?

8    A      Personal quote is mandate, colon, respect,

9    courtesy and obedience.

10   Q      Now, Corporal Romanosky, earlier you testified

11   that typically in an online investigation, you go

12   into a chat room and then you just wait, and you

13   wait to be approached; is that correct?

14   A      That's correct.

15   Q      In 2005 is that the same -- was that your same

16   methodology back in 2005?

17   A      Yes.  The only time that I would actually

18   approach anybody first is if I had received some

19   sort of complaint saying that person was in a chat

20   room trying to make contact with children or

21   something.  I may actually send them a request to

22   see if they'll talk to me.  But other than that,

23   normal practice would be wait for them to initiate

24   contact.

25   Q      Okay.

1          MS. KAISER:  Your Honor, at this time I'd like

2     to publish Government's Exhibit Number 2.

3          THE COURT:  All right.

4          MS. KAISER:  So the record is clear, I

5     apologize, Special Agent Hagedorn is going to read

6     the chats for Captoes and Corporal Romanosky is

7     going to read himself.  Read his own position.  May

8     I approach the witness, Your Honor?

9          THE COURT:  Do you have copies you could put

10    on the ELMO so the jury could follow along?  Do you

11    have extra copies?

12         MS. KAISER:  Yes, Your Honor.  May I approach.

13         THE WITNESS:  I have my copies in my brown

14    foldover.

15         MS. KAISER:  Your Honor, may we have a moment.

16    (Brief pause.)

17         THE WITNESS:  Thank you.

18         MS. KAISER:  All right.

19         THE COURT:  Now, gentlemen, if you'll read

20    slowly for the court reporter, please.

21         CAPTOES:  Yes, sir.  Am an older divorced dad.

22    Raised my son alone.

23         DUNEDINSUPERDAD:  Hey.  Good for you, man.  My

24    ex still in the picture unfortunately.

25         CAPTOES:  I had total custody.  And that is

Romanosky - Direct

1    what he wanted, too.

2          DUNEDINSUPERDAD:  I would love full custody

3    but can't right now because of work.

4          CAPTOES:  Oh, I see.  Do you see your kids

5    often?

6          DUNEDINSUPERDAD:  Every other weekend and some

7    holidays.

8          CAPTOES:  Well, that's something.  What ages

9    are they?

10         DUNEDINSUPERDAD:  Daughter 14, son is 11.

11         CAPTOES:  Good.  Was very strict but loving.

12         DUNEDINSUPERDAD:  That's good.  I'm same way.

13         CAPTOES:  I have a very old razor strop which

14   was and is effective.

15         DUNEDINSUPERDAD:  Yeah.  I can see how that

16   would be.  My kids would definitely respond that

17   that -- to that.

18         CAPTOES:  Never raised a girl but my boy did

19   respond loudly.

20         DUNEDINSUPERDAD:  I'll bet.  Mine would, too.

21         CAPTOES:  He would cry and yell but did not

22   stop.

23         DUNEDINSUPERDAD:  Didn't stop what?

24         CAPTOES:  Did not stop spanking him.

25         DUNEDINSUPERDAD:  Hey, dad's got to do what a

Romanosky - Direct

1    dad's got to do, right?

2           CAPTOES:  Yes.  And he knew that.  Don't know

3    how that would work for you.

4           DUNEDINSUPERDAD:  Would work, I'm sure.  Our

5    boys sound a lot alike.

6           CAPTOES:  You have to be strict with them, I

7    feel.

8           DUNEDINSUPERDAD:  I agree wholeheartedly.  I'm

9    strict with both of them.

10           CAPTOES:  Guess you need to be.  What about

11    your wife?

12           DUNEDINSUPERDAD:  What about her?  Couldn't be

13    strict enough with her, laugh out loud.

14           CAPTOES:  Does your wife say okay to

15    strictness?

16           DUNEDINSUPERDAD:  Oh, yeah.  She all for it.

17    We were strict together.  Just didn't like each

18    other anymore, I guess.

19           CAPTOES:  That is not unusual.  I think dads

20    make better disciplinarians.

21           DUNEDINSUPERDAD:  I agree.  Much better.

22           CAPTOES:  I believe in severe discipline,

23    surely with boys.

24           DUNEDINSUPERDAD:  Yeah.  You have to be severe

25    with boys.  They can be stubborn.

Romanosky - Direct

1           CAPTOES:  Mine was and beating him was the

2    only way through to him.

3           DUNEDINSUPERDAD:  And he's probably better for

4    it.

5           CAPTOES:  He is.  And the strop always hangs

6    on a nail.

7           DUNEDINSUPERDAD:  He still gets it from time

8    to time, huh?

9           CAPTOES:  He's older and away but does get it

10   on occasion.

11          DUNEDINSUPERDAD:  Laugh out loud.  As long as

12   he knows it done out of love.  I have to remind my

13   boy of that.

14          CAPTOES:  One always has to.

15          DUNEDINSUPERDAD:  Indeed.

16          CAPTOES:  He's too young to start

17   masturbating, I guess.

18          DUNEDINSUPERDAD:  No, not really.

19          CAPTOES:  Oh, that can really be something.  I

20   made my boy as --

21          SPECIAL AGENT HAGEDORN:  I can't read past

22   this exhibit mark, the end of that line.  Okay.

23          CAPTOES:  That can really be something.  I

24   made my boy ask for permission.

25          DUNEDINSUPERDAD:  Really.  Sounds like that

Romanosky - Direct

1    worked.   Reward for punishment, right.

2            CAPTOES:   Yes.   He wanted to do it constantly,

3    but I stopped that.

4            DUNEDINSUPERDAD:   Yeah.   Can't have him doing

5    all the time.

6            CAPTOES:   Right.   Demand permission was my

7    thinking.

8            DUNEDINSUPERDAD:   Absolutely.

9            CAPTOES:   If he does it without it, he used to

10   get it hard.

11           DUNEDINSUPERDAD:   There you go.

12   BY MS. KAISER:

13   Q     All right.   Right there.   Corporal Romanosky,

14   in the chats where the defendant says to you that

15   he -- he inquires about whether or not your son is

16   old enough to masturbate; is that correct?

17   A     That's correct.

18   Q     Okay.   And why is he asking you that?

19           MR. TRAGOS:   Objection, Your Honor,

20   speculation.

21           THE COURT:   Sustained.

22   BY MS. KAISER:

23   Q     Did -- were you the one who brought up sexual

24   activity in this chat?

25   A     No.   The reference to masturbation was made by

Rollanosky - Direct

1      Captoes.

2      Q      All right.   Proceed.

3             CAPTOES:   Not that well but it worked.

4             DUNEDINSUPERDAD:   Good deal.   I'm sure mine

5      will need the same motivation.

6             CAPTOES:   I always controlled mine totally.

7             DUNEDINSUPERDAD:   You hafta.

8             CAPTOES:   I would not let him make decisions.

9      They were mine to make.

10            DUNEDINSUPERDAD:   I agree.   Parents sometimes

11     need to do that.

12            CAPTOES:   You will learn that as a divorced

13     dad.

14            DUNEDINSUPERDAD:   That's true.   I'm sure I

15     will.   My wife and I are already well versed in

16     disciplining the kids, though.

17            CAPTOES:   But what happens is the dad handles

18     the boy better as he gets older.

19            DUNEDINSUPERDAD:   Really.   I could see that.

20            CAPTOES:   It ends up with boys want to be with

21     their dads much more.

22            DUNEDINSUPERDAD:   I know mine does.

23            CAPTOES:   And you do more things with them.

24            DUNEDINSUPERDAD:   Really.

25            CAPTOES:   Yes.   I did lots of things with my

Romanosky - Direct

1    boy, I know.  We went camping and fishing.

2           DUNEDINSUPERDAD:  That's cool.  We do the same

3    things.

4           CAPTOES:  That's great.

5           DUNEDINSUPERDAD:  You guys still close?

6           CAPTOES:  Very.

7           DUNEDINSUPERDAD:  That's great.  My son and I

8    are close, as well.

9           CAPTOES:  It's real nice.

10          DUNEDINSUPERDAD:  Yes, it is.

11          CAPTOES:  Though I'm older and hopefully

12   wiser, I am still in his life.

13          DUNEDINSUPERDAD:  Hey, wiser is better.

14          CAPTOES:  I believe he thinks so, too.

15          DUNEDINSUPERDAD:  Cool.

16          CAPTOES:  Hope to talk again with you if you'd

17   like.

18          DUNEDINSUPERDAD:  Absolutely.  We seem to have

19   same values.

20          CAPTOES:  You seem like a nice guy and our

21   values are surely similar.  I am between Ft. Myers

22   and Naples.

23          DUNEDINSUPERDAD:  Cool.  I'm in Dunedin just

24   west of Tampa.

25          CAPTOES:  That's great.  Maybe you all could

Romanosky - Direct

1    come down.  I'm on a lake and have a pool.  Live all

2    alone at this point in time.

3         DUNEDINSUPERDAD:  Sounds like fun.  We may

4    have to do that.  I live with buddy for now.  Still

5    getting on my feet.

6         CAPTOES:  That's fine.  You all can come down.

7    I am Charles.

8         DUNEDINSUPERDAD:  Charles, I'm Mike.  Thanks

9    for the invite.

10        CAPTOES:  Sure.  Talk soon, Mike, I hope.

11        DUNEDINSUPERDAD:  You bet.

12        CAPTOES:  Bye for now.

13        DUNEDINSUPERDAD:  Take care.

14   BY MS. KAISER:

15   Q     All right.  And what was the date that this

16   chat occurred?

17   A     7/12 of '05.

18   Q     And from what time of day till about what time

19   of day?

20   A     From approximately 4:02 PM through 4:58 PM it

21   shows Captoes signing off.

22   Q     What was the date of the next chat that you

23   had with the defendant back in 2005?

24   A     July 13th of 2005.

25   Q     All right.  If you would, please begin.

Romanosky - Direct

1          CAPTOES:  Hi, Mike.  How are you today?

2          DUNEDINSUPERDAD:  Great, thanks.  How are you?

3          CAPTOES:  Fine.  Sat with three kids today

4     while dad was out for two hours.  Laid in on one of

5     them for foul language at age 12.

6          DUNEDINSUPERDAD:  That's good.  Language not

7     likely to be repeated now.

8          CAPTOES:  I hope not.  When his dad came home

9     and I told him the kid got it again and harder.

10          DUNEDINSUPERDAD:  Good for his dad.

11          CAPTOES:  He used a heavy strap and a paddle.

12          DUNEDINSUPERDAD:  Wow.  In private or in front

13     of you?

14          CAPTOES:  In front of me and the other kids.

15          DUNEDINSUPERDAD:  Outstanding.  Great way to

16     make a point.

17          CAPTOES:  I agree.  And the kid was crying and

18     screaming both.

19          DUNEDINSUPERDAD:  I'll bet.  But he knows it

20     was for his own good.

21          CAPTOES:  He had big welts.  And my boy would

22     have, too.

23          DUNEDINSUPERDAD:  Mine, too.  We have a

24     behavior problem at fencing to address, me and him.

25          CAPTOES:  What kind of problem?

Rottanosky - Direct

1          DUNEDINSUPERDAD:  Not doing what he was told

2     to do by the instructor.

3          CAPTOES:  What will you do about it?

4          DUNEDINSUPERDAD:  He will need to learn to

5     respect adults.  Any ideas?

6          CAPTOES:  Take the strap to him.  I would, as

7     you know.

8          DUNEDINSUPERDAD:  I think it will have to come

9     to that.

10          CAPTOES:  If you are around me enough you'll

11     do it often.

12          DUNEDINSUPERDAD:  Yeah.  Sounds like I got a

13     lot to learn as a dad.

14          CAPTOES:  Well, not all dads are like I am.  I

15     know I am strict and demanding and always a yes,

16     sir.

17          DUNEDINSUPERDAD:  That's the way it has to be.

18          CAPTOES:  For me always.  Have worked with a

19     bud or two and two other dads to point out what I

20     do.  One has a daughter, too.

21          DUNEDINSUPERDAD:  Wow.  Sounds like you have

22     valuable advice.

23          CAPTOES:  I did not give advice with her as

24     never raised a daughter.  I know how to handle boys.

25          DUNEDINSUPERDAD:  Yeah.  I'm firmer with my

Romanosky - Direct

1    boy but I have been firm with daughter, too.

2        CAPTOES:  He beats that little girl often as

3    she is a handful.

4        DUNEDINSUPERDAD:  Sometimes required.

5        CAPTOES:  According to him, yes, and he is a

6    big guy.

7        DUNEDINSUPERDAD:  Yeah.  I am, too.  But

8    teenagers can definitely be a handful and require

9    more discipline.

10       CAPTOES:  How right you are.  My boy was

11   disciplined many times a week at times.

12       DUNEDINSUPERDAD:  How did you avoid him being

13   chatty?  That is always a concern despite my telling

14   him to be quiet.

15       CAPTOES:  In what way?  Any disrespect to an

16   elder was pure hell for him.  Too chatty got the

17   strop.

18       DUNEDINSUPERDAD:  That's what I figured.  I

19   have not had that problem yet.  Was just concerned

20   that as he got older may tell others about such

21   regular discipline.

22       CAPTOES:  That's fine.  Many others get it,

23   too, at least among my friends.

24       DUNEDINSUPERDAD:  Yeah.  I'm not concerned

25   about friends.  Just others that may not understand

Romanosky - Direct

1    the importance of regular and strict discipline.

2         CAPTOES:  If they don't, the hell with them.

3    I run my home the way I want to and feel comfortable

4    with that.  You need to feel that way, too, Mike.

5         DUNEDINSUPERDAD:  You're right.  My business

6    with my kids is my business and no one else's.

7         CAPTOES:  Right.  Discipline is up to dad.

8         DUNEDINSUPERDAD:  Exactly.

9         CAPTOES:  I have taken my boy by the collar

10   and dragged him upstairs many a time.

11        DUNEDINSUPERDAD:  Sometimes it needs to be

12   done.

13        CAPTOES:  Oh, yes.  And I have no problem

14   doing it.  And neither should you have such a

15   problem.

16        DUNEDINSUPERDAD:  I definitely do not when it

17   needs to be done.

18        CAPTOES:  And you may have to start doing it

19   more often as I did.

20        DUNEDINSUPERDAD:  I think I might.  He's

21   getting older now.  I must keep control.

22        CAPTOES:  Once you start you will feel more

23   comfortable.

24        DUNEDINSUPERDAD:  I've started long ago.  Just

25   now I feel must be more regular to keep in line.

Romanosky - Direct

1       Both children have been kept in line.

2            CAPTOES:  But now with the divorce, etcetera,

3       you have to be twice as structured and strict.

4            DUNEDINSUPERDAD:  Exactly.

5            CAPTOES:  I still keep the razor strop hung on

6       a nail right close.

7            DUNEDINSUPERDAD:  That's a good thing.

8            CAPTOES:  And if you all came to visit and one

9       of your kids acted up, you could grab it and use it.

10           DUNEDINSUPERDAD:  That would be okay?

11           CAPTOES:  Absolutely.  Or you'd tell me to use

12      it on them.

13           DUNEDINSUPERDAD:  Ah, that's not a bad idea.

14      Let them know that other adults don't appreciate bad

15      behavior, just like dad.

16           CAPTOES:  Exactly.  I have friends with kids

17      that I discipline often.

18           DUNEDINSUPERDAD:  Plus might give me some

19      parenting skills that I do not already possess.

20           CAPTOES:  Sure.  I'd be happy to teach you

21      anytime.

22           DUNEDINSUPERDAD:  Your skills would be

23      appreciated.

24           CAPTOES:  That's what dad buds are for, Mike.

25           DUNEDINSUPERDAD:  Thank you.  This new group

Romanosky - Direct

1    of dad friends is relatively new to me.  Have only

2    one friend in my area.

3          CAPTOES:  Does he have kids?

4          DUNEDINSUPERDAD:  Yes.

5          CAPTOES:  Does he discipline them hard?

6          DUNEDINSUPERDAD:  He keeps them in line.

7          CAPTOES:  How?

8          DUNEDINSUPERDAD:  Along the same lines as us.

9          CAPTOES:  That's good.  Are they your kids'

10   age?

11         DUNEDINSUPERDAD:  Close.  Boy 10, girl 8.

12         CAPTOES:  Well, he needs to start and

13   continue.

14         DUNEDINSUPERDAD:  I don't think that will be a

15   problem.

16         CAPTOES:  Have a few dads that get together.

17   I am the oldest.

18         DUNEDINSUPERDAD:  Really.  Do they all share

19   our interests?

20         CAPTOES:  Yes, they do.

21   BY MS. KAISER:

22   Q     All right.  Right there.  Corporal Romanosky,

23   when -- when the question is asked, do they all

24   share our interests, what did you understand him to

25   mean?

Romanosky - Direct

1          MR. TRAGOS:  Objection, speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  I took that to mean interest in

4    the sadomasochistic or the physical abuse of

5    children.

6    BY MS. KAISER:

7    Q      And in your interview of the defendant, did he

8    ever mention he had a son to you?

9    A      He told me he had what he considered an

10   adopted son that had been in his life for about 10

11   years.

12   Q      Proceed.

13         CAPTOES:  All are divorced.

14         DUNEDINSUPERDAD:  Wow.  Didn't know there were

15   so many of us dads with the same values.

16         CAPTOES:  Many more than you can imagine.

17         DUNEDINSUPERDAD:  I didn't know that.

18         CAPTOES:  Oh, yes.  You will learn, Mike.

19         DUNEDINSUPERDAD:  I hope so.  I thought I

20   might be alone with my set of values.

21         CAPTOES:  No.  Absolutely not.

22         DUNEDINSUPERDAD:  Thank you.  I feel much

23   better about things.

24         CAPTOES:  I'm glad you do.  Guess you'll turn

25   out to be one of us.

1         DUNEDINSUPERDAD:  I think so.

2         CAPTOES:  Some come over and bring the kids.

3    Some don't.

4         DUNEDINSUPERDAD:  That's good.  I think

5    discipline is important enough to see different

6    methods.

7         CAPTOES:  Two of the dads are nudists.

8         DUNEDINSUPERDAD:  That's good.  Kids should

9    not be embarrassed by their bodies.  Mine are still

10   shy about that.

11        CAPTOES:  I wandered around nude at home a

12   good deal and I made my son get used to it.  He

13   finally loved it.

14        DUNEDINSUPERDAD:  I can see that.  I imagine

15   he was curious at that age.

16        CAPTOES:  Very.  Asked many, many questions.

17   For example, I was cut and I chose not to have him

18   cut.  Well, he asked why couldn't -- why he couldn't

19   be like his dad.

20        DUNEDINSUPERDAD:  What did you tell him?

21        CAPTOES:  That I made this choice for him and

22   that was the way it was and was going to be.  I said

23   that I had no choice myself.

24        DUNEDINSUPERDAD:  Good for you.  Was he

25   curious about anything else?

Rottanosky - Direct

1          CAPTOES:  Oh, he'd ask about anything and I

2     had to answer.  Does yours ask anything?  We will

3     all coach each other about how to answer.

4          DUNEDINSUPERDAD:  Not yet.  That's a good

5     idea.

6          CAPTOES:  Well, probably too early for him to

7     start masturbating.  When he does the questions will

8     fly.

9          DUNEDINSUPERDAD:  Because I'm sure my boy will

10    either start asking questions soon or I at least

11    need to explain things to him so he doesn't hear

12    them on the street.

13         CAPTOES:  You are right.  It's better coming

14    from you.

15         DUNEDINSUPERDAD:  I think you're right.  Don't

16    want him to hear from some subject that doesn't know

17    right answer.

18         CAPTOES:  Or the answer he needs to hear from

19    the wrong person.  My son walked in on me once while

20    I was jackin'.

21         DUNEDINSUPERDAD:  How you handle that?

22         CAPTOES:  He asked what I was doing and I told

23    him.  He asked when he could do it.  I said in time.

24         DUNEDINSUPERDAD:  How old was he when you

25    showed him?

1          CAPTOES:  13, I believe.

2          DUNEDINSUPERDAD:  That's not bad age.

3          CAPTOES:  No.  And he needed to be shown and

4     talked to.

5          DUNEDINSUPERDAD:  That is only appropriate way

6     to do it.  Can't just let them go off on their own.

7     It would be a disaster.

8          CAPTOES:  He still had to ask my permission

9     until he was 18.

10          DUNEDINSUPERDAD:  Experience must be shared.

11     Right?

12          CAPTOES:  Certainly.  I discipline him many a

13     time for not asking permission.

14          DUNEDINSUPERDAD:  But of course.

15     BY MS. KAISER:

16     Q     All right.  Right there, to what did you

17     understand the defendant was referring when he said

18     he had a son ask permission every time?

19          MR. TRAGOS:  Objection, speculation.

20          THE COURT:  It's what the witness understood,

21     Ms. Kaiser; correct?

22          MS. KAISER:  That's correct.

23          THE COURT:  Overruled.

24          THE WITNESS:  Ask permission to masturbate.

25     BY MS. KAISER:

Romanosky - Direct

```
 1    Q       Okay.   Proceed.

 2            CAPTOES:  I've talked with lots of dads who

 3    asked about this.

 4            DUNEDINSUPERDAD:  Really.  Glad to hear that.

 5            CAPTOES:  When need to will help you with it.

 6            DUNEDINSUPERDAD:  Great.  That's a big relief.

 7            CAPTOES:  Think you will ever want to try

 8    being nude around your kids?

 9            DUNEDINSUPERDAD:  Of course.  Daughter and I

10    are close.

11            CAPTOES:  Fine.  Has she seen you nude?

12            DUNEDINSUPERDAD:  Yes.

13            CAPTOES:  Does she ask anything?

14            DUNEDINSUPERDAD:  She's been inquisitive for

15    the last few years.

16            CAPTOES:  Do you answer her?

17            DUNEDINSUPERDAD:  Only responsible thing to

18    do.

19            CAPTOES:  Right.  I agree.  My son asked about

20    getting hard and I explained as best I could.

21            DUNEDINSUPERDAD:  Did he understand?

22            CAPTOES:  Not totally but he finally did.

23            DUNEDINSUPERDAD:  That's good.  Sometimes have

24    to keep explaining till they get it right.

25            CAPTOES:  Well, I tried to tell him that at
```

1    times you had no control over what happens.

2         DUNEDINSUPERDAD:  That's true.  Things just

3    happen.

4         CAPTOES:  We had plenty of hygiene lessons

5    with his foreskin.

6         DUNEDINSUPERDAD:  How did you educate him on

7    property hygiene?  Should be properly.  Proper

8    hygiene.  Sorry.  Can't type today.

9         CAPTOES:  We had inspection every Saturday.  I

10   used alcohol if he was not clean enough and that

11   hurt.  He learned.

12        DUNEDINSUPERDAD:  Good idea.

13        CAPTOES:  And if that didn't work we had a

14   heavy session together.

15        DUNEDINSUPERDAD:  What?

16        CAPTOES:  I beat his butt hard.

17        DUNEDINSUPERDAD:  That would do it.

18        CAPTOES:  As I told you, he got it plenty

19   often.

20        DUNEDINSUPERDAD:  As they should.

21        CAPTOES:  I will help you begin to do it

22   often, Mike.

23        DUNEDINSUPERDAD:  Thank you.  Do you mind

24   giving me your first name?

25        CAPTOES:  Sorry.  It's Charles.

1          DUNEDINSUPERDAD:  That's cool.  You may have

2     told me yesterday and I forgot.  I apologize.

3          CAPTOES:  No problem.  You will be

4     disciplining your kids often before you know it.

5          DUNEDINSUPERDAD:  I hope to expand on my

6     current knowledge of discipline.  Plus I like being

7     very close to both my kids.

8          CAPTOES:  That is vital.  But as a dad not as

9     a buddy.

10          DUNEDINSUPERDAD:  Exactly.

11          CAPTOES:  Will be back in a little while.

12     Must do some laundry.

13          DUNEDINSUPERDAD:  Okay.  Talk to you later.

14          CAPTOES:  Bye for now.

15     BY MS. KAISER:

16     Q     All right.  And what was the date of that last

17     chat which is Government's Exhibit 3?

18     A     7/13 of '05.

19     Q     And it lasted from approximately when to when?

20     A     Three o'clock PM through 4:13 PM.  Both signed

21     off at 4:14.

22     Q     Okay.  Now, I don't believe you mentioned it

23     before, but what was the name -- your name -- your

24     profile name was Dunedin Superdad; is that correct?

25     A     That's correct.

Romanosky - Direct

1    Q      Why did you pick that?

2    A      I picked Dunedin so it would automatically

3    have a geographic reference.  So anyone who was

4    online as an offender would -- if they were close to

5    Dunedin would see that and realize I was close to

6    them.  And SuperDad was just something I came up

7    with.

8    Q      Now, during these chats, were you the one that

9    was requesting advice or was the defendant offering

10   it to you?

11          MR. TRAGOS:  Objection to conclusions, Your

12   Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  As you can see from the chat,

15   what's happening is he's making suggestions or he's

16   saying things and I'm just going along.  I'm keeping

17   up my end, sometimes repeating back what he says

18   maybe in different wording, something along those

19   lines.  It's just keeping the pace of the

20   conversation.

21   Q      All right.  And when was the next chat between

22   you and the defendant back in 2005?

23   A      My chat doesn't have the date printed on top.

24   I think we had to look at the file date on that one.

25          MS. KAISER:  May I approach the witness, Your

1          Honor?

2                    THE COURT:  Yes, ma'am.

3                    MR. TRAGOS:  Your Honor, may we have a side

4          bar?

5                    THE COURT:  Yes, sir.  Come up, please.

6          (At side bar, on the record.)

7                    MR. TRAGOS:  Mr. Friedlander needs a comfort

8          break very badly.  I think I told the court that he

9          has diabetes and there are times --

10                   THE COURT:  It's about time, anyway.  Why

11         don't we break till about 3:30.

12         (End of side bar discussion.)

13                   THE COURT:  Let's take a comfort break until

14         3:30.

15                   COURTROOM SECURITY OFFICER:  Rise for the

16         jury, please.  3:30.

17         (Jury out at 3:17 PM.)

18         (Recess was taken at 3:17 until 3:31 PM.)

19         (Back on the record.)

20                   COURTROOM SECURITY OFFICER:  All rise.  This

21         Honorable Court is in session.

22                   THE COURT:  Bring the jury in, please.

23                   COURTROOM SECURITY OFFICER:  Rise for the

24         jury.

25         (Jury in at 3:31 PM.)

1          THE COURT:  Thank you.  Be seated, please.

2     You may resume direct examination.

3          MS. KAISER:  Thank you, Your Honor.  The next

4     exhibit the government wishes to publish is

5     Government's Exhibit 5.

6          THE COURT:  I think there's a question about

7     the date that he needed to review.

8          MS. KAISER:  My apologies.  Government's

9     Exhibit 4.

10    BY MS. KAISER:

11    Q     Corporal Romanosky, what was the next -- since

12    the last exhibit, Government's Exhibit 3, what was

13    the next time that you had chatted with the

14    defendant?

15    A     July 15th of 2005.

16    Q     All right.  I'm publishing to the jury

17    Government's Exhibit Number 4, if you would.

18          CAPTOES:  Hi, Mike.  How are you doing?

19          DUNEDINSUPERDAD:  Great.  How are you?  Long

20    day at work today.  Hot out.

21          CAPTOES:  We have rain and more rain.  Kids

22    coming?

23          DUNEDINSUPERDAD:  Not this weekend,

24    unfortunately.

25          CAPTOES:  Oh.  So you have peace and quite

Romanosky - Direct

1      then.

2              DUNEDINSUPERDAD:  Yeah.  It will be quiet this

3      weekend.  How about you?

4              CAPTOES:  Going to theater tonight and that

5      will be it.  Might have to sit with a friend's kid.

6      He is a handful at 14.

7              DUNEDINSUPERDAD:  Sounds like you'll have a

8      quiet weekend, too.

9              CAPTOES:  Depends on if I have to cope with

10     him.

11             DUNEDINSUPERDAD:  Well, I'm sure he will

12     behave.  If not you may have to give him a reminder.

13             CAPTOES:  I told his dad what I would do, and

14     he backs me totally.

15             DUNEDINSUPERDAD:  It's good to have support

16     like that.

17             CAPTOES:  Oh, yes, or I would not go over

18     there.

19             DUNEDINSUPERDAD:  True.  Have you watched this

20     boy before?

21             CAPTOES:  Yes.  And I beat his butt raw a few

22     times.

23             DUNEDINSUPERDAD:  Well, I'm sure that he now

24     knows where you stand.

25             CAPTOES:  I sure hope so.

1          DUNEDINSUPERDAD:   My ex called me last night

2     and told me that she is having some problems with my

3     daughter mouthing off and such.   Looks like I may

4     have to address that next weekend.

5          CAPTOES:   How old is your daughter?

6          DUNEDINSUPERDAD:   14.

7          CAPTOES:   Well, when I get back and you bring

8     her down to me I will show you what to do.

9          DUNEDINSUPERDAD:   I'm sure you will.   I'm sure

10    that she would likely be more comfortable the first

11    time somewhere up here, though.

12    BY MS. KAISER:

13    Q     All right.   Right there, Corporal Romanosky,

14    when Captoes or the defendant asks, well, when I get

15    back and you bring her down to me I will show you

16    what to do, to what did you understand he was

17    referring?

18    A     Well, I knew he was referring to -- he had

19    requested or made the offer for my undercover

20    profile to come to his residence in Ft. Myers with

21    the children.   When he says, when I get back, I know

22    he had earlier said something about the theater, but

23    I think I missed that.   I don't know what the

24    reference was there, if it was the theater or if it

25    was something else.

Romanosky - Direct

1    Q      During your chats with the defendant, did he

2    ever mention he was going to his residence in

3    Virginia?

4    A      I don't believe he did.

5    Q      Okay.  All right.  Proceed.

6           CAPTOES:  Oh, am sure.  Well, you need to try

7    it first.

8           DUNEDINSUPERDAD:  I have disciplined her

9    before.

10          CAPTOES:  Hard?

11          DUNEDINSUPERDAD:  Of course.

12          CAPTOES:  Good man.  After my own heart.

13          DUNEDINSUPERDAD:  Laugh out loud.  Of course.

14          CAPTOES:  She probably needs it often.

15          DUNEDINSUPERDAD:  Oh, yeah, teenagers do,

16   believe me.  She's been a real handful but we've

17   gotten real close with me keeping her in line.

18          CAPTOES:  That's great.  She probably plays

19   you with sweet talk, too.

20          DUNEDINSUPERDAD:  Yeah, of course.

21          CAPTOES:  Know that daughters can do that with

22   dads.

23          DUNEDINSUPERDAD:  Of course.  But she knows

24   that won't work with me.

25          CAPTOES:  That's good.  My son would not have

Romanosky - Direct

134

1    attempted it, as the strop was always by my chair.

2              DUNEDINSUPERDAD:  Good for you.  Always within

3    reach.

4              CAPTOES:  Yes.  And always would have it

5    there.

6              DUNEDINSUPERDAD:  Charles, I have to go.  I

7    may be on later.

8              CAPTOES:  Good.  Enjoy, Mike.

9              DUNEDINSUPERDAD:  Thank you.

10   BY MS. KAISER:

11   Q    Now, when the defendant in this chat refers to

12   strop, what did you understand that to mean?

13   A    The razor strap.

14   Q    And what is a razor strap?  What is that?

15   A    Well, what I learned from this case and the

16   internet research when it was discussed was it's a

17   strip of leather of varying length backed by a piece

18   of like hemp or some sort of canvas behind it so you

19   have the long strap and then you have the piece of

20   hemp or the piece of canvas, and it's attached at

21   one end by some sort of a clamping device.

22   Q    And what is that used for?

23   A    Actually, I don't know the actual purpose.  I

24   know they're used like in barber shops as a

25   legitimate use.  But I know from what I found in

Romanosky - Direct

1    this case, it can also be used as a striking

2    instrument.

3    Q     Next I'd like to publish Government's Exhibit

4    5.  What is the date of the next chat that you had

5    with the defendant in '05?

6    A     This was July 20th, 2005.

7    Q     All right.  You can proceed.

8          CAPTOES:  Good afternoon.

9          DUNEDINSUPERDAD:  Hey.

10         CAPTOES:  Making your kids behave more these

11   days?

12         DUNEDINSUPERDAD:  I don't get them until this

13   weekend.

14         CAPTOES:  Oh.  You were a bit bothered about

15   them when we last chatted.

16         DUNEDINSUPERDAD:  Nothing I can't take care of

17   this weekend.

18         CAPTOES:  Very good.  They need lots of

19   structure, I'm sure.

20         DUNEDINSUPERDAD:  Yes, they do.

21         CAPTOES:  And you know how I'd handle it.

22         DUNEDINSUPERDAD:  Yes, I do.

23         CAPTOES:  I sat with the son of a friend of

24   mine while he went to visit his mother.  That was an

25   experience.  Doubt that he is sitting easily yet.

Rollanosky - Direct

1          DUNEDINSUPERDAD:  Laugh out loud.  Gave you

2    some trouble, huh?

3          CAPTOES:  Yes, with his mouth and arrogance.

4    The razor strop landed on him many, many times.  And

5    the -- his dad used it, too.

6          DUNEDINSUPERDAD:  I bet.  He was a different

7    person by the time he left.

8          CAPTOES:  His dad sanctioned it.  As I said, I

9    would not sit without it.

10         DUNEDINSUPERDAD:  Good for you.

11         CAPTOES:  And would do it again if needed.

12         DUNEDINSUPERDAD:  Sometimes is.

13         CAPTOES:  It sure worked with my son.

14         DUNEDINSUPERDAD:  You bet.

15         CAPTOES:  And you may be persuaded to use it,

16   too.

17         DUNEDINSUPERDAD:  I agree.

18   BY MS. KAISER:

19   Q     Right there.  When the defendant said to you,

20   and you may be persuaded to use it, too, what did

21   you understand him to mean?

22   A     The razor strap.

23   Q     Okay.  And that you'd be convinced to use it?

24   A     Yeah.

25         MR. TRAGOS:  Objection, leading.

Rohanosky - Direct

1          THE COURT:  Don't lead the witness.

2     Sustained.

3          MS. KAISER:  Proceed.

4          CAPTOES:  So if you need help, let me know.

5          DUNEDINSUPERDAD:  Always interested in help.

6          CAPTOES:  I would be willing.

7          DUNEDINSUPERDAD:  Really?

8          CAPTOES:  Would you like that?

9          DUNEDINSUPERDAD:  Maybe.  What all did you

10    have in mind?  I can't have them getting hurt or

11    anything.  Don't want their mom to get suspicious.

12         THE WITNESS:  Then there was a few minute

13    pause.

14         DUNEDINSUPERDAD:  You still there, Charles?

15         CAPTOES:  Not hurt and no suspicions.  My

16    feeling is that kids need structure.  A little sore

17    butt is not inappropriate.

18         DUNEDINSUPERDAD:  True.

19         CAPTOES:  Some mothers don't believe in

20    discipline.  With those trying would be in vane.

21         DUNEDINSUPERDAD:  Mine does.  Just don't want

22    too much injury, school will report you.  Or heaven

23    forbid, a doctor be needed.

24         CAPTOES:  I agree.  Nothing that rasical.

25    Some dads use paddles, which are more dangerous.

Romanosky - Direct

1          DUNEDINSUPERDAD:   True.

2          CAPTOES:   I would not do that.   Leather is

3     soft and pliable.   But you have to be comfortable.

4          DUNEDINSUPERDAD:   I'm good with it.   You seem

5     decent.   Just wondering how you let boy know it was

6     done out of love is all.

7          CAPTOES:   Well, interesting.   My son knew I

8     loved him loads and there was no question.   At first

9     he asked if I loved him, and I said absolutely.

10          DUNEDINSUPERDAD:   Good for you.

11          CAPTOES:   I always have and always will.

12     Sorry.   Phone rang.

13     BY MS. KAISER:

14     Q     Corporal Romanosky, during your interview of

15     the defendant, did he ever tell you what he did for

16     a living?

17     A     He told me, I believe, that he was a mental

18     health counselor.

19     Q     And during any of your chats in which you

20     discuss beating children, did he ever say to you,

21     this is criminal, we shouldn't discuss this, we

22     shouldn't plan this, anything like that?

23     A     No.

24     Q     I'd like to publish Government's Exhibit

25     Number 6.   What was the next chat -- what was the

Rollanosky - Direct

1    date of the next chat that you had with the

2    defendant back in 2005?

3    A       July 21st.

4    Q       All right.

5            CAPTOES:  Hope I wasn't too assertive

6    yesterday.

7            DUNEDINSUPERDAD:  No, not at all.

8            CAPTOES:  Oh, good.  I guess that is my

9    definite approach coming out.

10           DUNEDINSUPERDAD:  Laugh out loud.  No problem.

11           CAPTOES:  But I found with my son a definite

12   structured dad was a help.

13           DUNEDINSUPERDAD:  I agree.  But I believe that

14   affection is also an important part of the

15   upbringing.

16           CAPTOES:  I am the world's most affection and

17   passionate dad.

18           DUNEDINSUPERDAD:  That's good.

19           CAPTOES:  I still love my son totally.

20           DUNEDINSUPERDAD:  That's great.  I imagine it

21   can be hard to keep that close relationship after

22   they get older.

23           CAPTOES:  It has really stayed the same.

24           DUNEDINSUPERDAD:  That's great.

25           MS. KAISER:  Excuse me.

Romanosky - Direct

1      BY MS. KAISER:

2      Q      Corporal Romanosky, when you put in as

3      DunedinSuperdad, that's great, I imagine it could be

4      hard to keep that close, in parenthesis you put

5      close relationship after they get older, to what

6      were you referring?

7              MR. TRAGOS:  Objection, Your Honor, as to

8      relevance as to what he was referring to without --

9      I don't want to speak, Your Honor, but --

10             THE COURT:  The relevance objection is

11     overruled.  Speak from your own perspective,

12     Mr. Witness, as opposed to what you believed the

13     defendant was -- or the author was referring to.  In

14     other words, what you understood him to mean.

15             MR. TRAGOS:  Objection, Your Honor.  It's

16     Detective Romanosky that's saying is close, not

17     Captoes.  That's the difference.

18             THE COURT:  Well, re-ask the question.

19     Perhaps I missed the context.

20             MS. KAISER:  Okay.

21     BY MS. KAISER:

22     Q      Corporal Romanosky, in these chats you're

23     Dunedinsuperdad; correct?

24     A      That's correct.

25     Q      All right.  And when you have written, that's

1    great, I imagine it can be hard to keep that close

2    relationship after they get older, and you put close

3    in parenthesis, to what were you referring?

4    A      Incest.

5    Q      All right.  Proceed.

6           CAPTOES:  It has really stayed the same.

7           DUNEDINSUPERDAD:  That's great.  Hey, I hate

8    to run but I gotta go give daughter a ride to the

9    mall.

10          CAPTOES:  Okay.  Hope to see you later.

11          DUNEDINSUPERDAD:  Talk to you later.

12   BY MS. KAISER:

13   Q      Corporal Romanosky, why is -- why do you use

14   cryptic terms like putting the word close in

15   parenthesis?  Why didn't you just come out and say,

16   I bet it's hard to keep engaging in sex with your

17   son or your child, something like that, more direct?

18   A      It's been my experience that speaking with

19   subjects online, we don't come out and say those

20   things because there's always a trust issue.

21   They're not going to come out and say this is what

22   I'm into because they don't know if I'm actually a

23   law enforcement officer.

24          So a lot of terms like even in profiles and

25   instant message chats are done cryptically so people

Rollanosky - Direct

1    with the same interest or similar interest

2    understand what they mean.  But if somebody were to

3    just read this chat outright without knowing that,

4    they may not understand what was being said.

5          MS. KAISER:  At this time I'd like to publish

6    Government's Exhibit 7 for the jury.

7          CAPTOES:  Hi, Mike.

8          DUNEDINSUPERDAD:  Hey.  How's it going?

9          CAPTOES:  Fine.  Thanks.

10         DUNEDINSUPERDAD:  That's nice.  You have a

11   good weekend?

12         CAPTOES:  Great.  And you?

13         DUNEDINSUPERDAD:  Was good.  Thanks.

14         CAPTOES:  Have the kids?

15         DUNEDINSUPERDAD:  Yeah.

16         CAPTOES:  Did they behave?

17         DUNEDINSUPERDAD:  Yeah, they behaved, but

18   still had to address some misbehavior from before.

19         CAPTOES:  How did you address it?

20         DUNEDINSUPERDAD:  Hang on a second.

21         CAPTOES:  Okay.

22         DUNEDINSUPERDAD:  Phone.  Back.

23         CAPTOES:  How did you address the bad behavior

24   from before?

25         DUNEDINSUPERDAD:  Had to take matters into my

1    own hands.

2           CAPTOES:  And?

3           DUNEDINSUPERDAD:  Instant compliance.

4           CAPTOES:  Meaning?

5           DUNEDINSUPERDAD:  I'm sure they will behave

6    better now.

7           CAPTOES:  Did you use a belt?

8           DUNEDINSUPERDAD:  Didn't have to.  Hand worked

9    just fine.

10          CAPTOES:  Good.  And that has to occur often.

11          DUNEDINSUPERDAD:  Yes.  Damn.  I have to go.

12   I'll be back later.

13   BY MS. KAISER:

14   Q     All right.  During that chat, Corporal

15   Romanosky, when the defendant said, good, and that

16   has to occur often, what did you understand him to

17   mean?

18   A     The corporal punishment.

19   Q     What was the next date of the chat that you

20   had with him from 2005?

21   A     August 1st, 2005.

22   Q     All right.

23          MS. KAISER:  At this time the government would

24   like to publish Government's Exhibit Number 8, which

25   has been admitted into evidence.

Romanosky - Direct

1              CAPTOES:  Good afternoon.  How are you?

2              DUNEDINSUPERDAD:  Hey.  How's it going.

3              CAPTOES:  Fine.  Had to housesit again and

4       that kid who is a brat.

5              DUNEDINSUPERDAD:  Oh, yeah?  How did it go?

6              CAPTOES:  Very rough.  He still sore.  And his

7       dad gave it to him when he got home.

8              DUNEDINSUPERDAD:  Well, I'm sure it was well

9       deserved.

10             CAPTOES:  It was.  And he was totally welted.

11             DUNEDINSUPERDAD:  This the same kid as before?

12             CAPTOES:  Yes.  But his dad is real big and

13      was twice as hard.

14             DUNEDINSUPERDAD:  Ah.

15             THE WITNESS:  I don't know what I was typing

16      here.  If you would figure he would learned last

17      name.  I think that's supposed to say you would have

18      figured he would have learned last time.

19             CAPTOES:  I would have thought so.  His dad

20      beats him constantly.

21             DUNEDINSUPERDAD:  Stubborn or he enjoys it?

22             CAPTOES:  I think both.  His dad is six-five

23      and weigh 275.

24             DUNEDINSUPERDAD:  Wow.  Big guy.

25             CAPTOES:  He really is but nice.  I've known

Romanosky - Direct

1    him for years.  He started on the kid when he was

2    nine.

3         DUNEDINSUPERDAD:   Wow.  Just got to be careful

4    school doesn't find welts.  They will call HRS.

5         CAPTOES:  Oh, yes.  But he's in a Catholic

6    school which encourages discipline.

7         DUNEDINSUPERDAD:   Yeah.  But state law

8    requires them to report abuse when they suspect it.

9    Trust me.  I've been down that road before.  Tell

10   your friend to be careful is all.

11        CAPTOES:  Oh, he will be.  One would not

12   suspect it to be abuse.  Were you in trouble about

13   that?  I never had a problem.

14        DUNEDINSUPERDAD:   I didn't get into trouble

15   but was investigated.  Just asked a lot of questions

16   but everything was cleared up.  Actually happened

17   while we still married.  Hey, I got to go.  I may be

18   on later.

19   BY MS. KAISER:

20   Q    Back in 2005 you mentioned there was not a

21   state law that prohibited a defendant from chatting

22   with an adult about having sex with their child; is

23   that correct?

24   A    Correct, not specifically governing the use of

25   the online service.

1    Q       And that subsequently changed?

2    A       Yeah.  I think the fall of 2007 is when we got

3    some new statutes.

4    Q       Okay.  Why didn't you proceed with your

5    investigation of Mr. Friedlander back in 2005?

6    A       Well, like I said earlier, I had a lack of

7    legal statutes that I used for other types of cases.

8    There was some confusion as far as, you know, how it

9    would be charged.  And if there was going to be an

10   issue I felt an impossibility since this statute

11   that I would have used didn't specifically address

12   undercover.  I wasn't as proficient as I am now in

13   communicating online.  I wasn't comfortable keeping

14   up my end of the chat.

15           As you noticed, the last few chats were very

16   brief.  I wasn't giving him a whole lot of time.  He

17   hadn't been identified yet so at that point I just

18   discontinued the investigation.  He kept making

19   references to coming to Ft. Myers.  Didn't seem like

20   he was jumping on the chance to come up to Pinellas

21   County to do anything, so I felt I'd just leave him

22   in my log file and discontinue it at that point.

23   Q       Okay.

24           MS. KAISER:  Your Honor, may I approach?

25           THE COURT:  Yes, ma'am.

Romanosky - Direct

1    BY MS. KAISER:

2    Q      Back in the 7/12/005 chat, who made the first

3    contact, you or the defendant?

4            MR. TRAGOS:  Objection.  Asked and answered.

5            THE COURT:  Sustained.

6    BY MS. KAISER:

7    Q      In the July 13th, 2005 chat, who made the

8    first contact?

9    A      Captoes.

10   Q      The defendant?

11   A      Yes.

12   Q      In the 7/15/05 chat, who made the first

13   contact?

14   A      Captoes.

15   Q      In the 7/20/05 chat, who made the first

16   contact?

17   A      The defendant.

18   Q      In the 7/21/05 chat, who made the first

19   contact?

20   A      Captoes, or the defendant.

21   Q      In the 7/25/05 chat, who made the first

22   contact?

23   A      The defendant.

24   Q      And finally in the August 1st, 2005 chat, who

25   made the first contact?

Romanosky - Direct

1   A      The defendant.

2   Q      All right.  Back in 2005 we've established

3   that your profile was DunedinDad; is that correct?

4   A      DunedinSuperDad.

5   Q      DunedinSuperDad.  Did you subsequently change

6   your online profile in 2008 when you began the

7   investigation this year?

8   A      Yeah.  I change them all the time only because

9   I never know when I'm speaking with someone if I've

10  said something that made them suspicious and they

11  may tell someone else, don't talk to this person, so

12  I regularly change them, especially if I'm not

13  having a lot of success at developing targets with

14  them.  So it was different in 2005 than it was here

15  in 2008.

16  Q      When you began your investigation in 2008, did

17  you note what profile the defendant was using in

18  your chats with him this year when you --

19  A      He was using the same profile.

20  Q      Okay.  And did you print out what his online

21  profile was?

22  A      I did.

23  Q      Okay.

24         MS. KAISER:  Your Honor, may I approach the

25  witness?

1          THE COURT:  Yes, ma'am.

2    BY MS. KAISER:

3    Q       Corporal Romanosky, I've got a bunch of

4    documents here, but I'm showing you what's been

5    marked as Government's Exhibits 9 and 10.  If you

6    could please look at those first, I would appreciate

7    it.  Do you recognize those documents?

8    A       I do.  Exhibit 9 is the defendant's profile

9    and Exhibit 10 is my undercover profile from the

10   2008 investigation.

11   Q       And then if you would, sir, please take a look

12   at Government's Exhibits 12 -- I mean, excuse me,

13   11, 12, 13 through 26, 13 through 26.

14   A       I don't see 23.  This appears to be all my

15   online communications consisting of instant message

16   chats and e-mails between myself and the defendant

17   from this year starting in June through July of

18   2008.

19   Q       And did you maintain Government's Exhibits 9

20   through 26 as part of your investigation in this

21   case?

22   A       I did.

23          MS. KAISER:  Your Honor, at this time I'd move

24   for admission of Government's Exhibits 9 through 26

25   into evidence.

Romanosky - Voir Dire

```
1              THE COURT:  Is there any objection?

2              MR. TRAGOS:  One moment, Your Honor.

3      (Brief pause.)

4              MR. TRAGOS:  Your Honor, might I have just a

5      brief voir dire?

6              THE COURT:  Yes, sir.

7                    VOIR DIRE EXAMINATION

8      BY MR. TRAGOS:

9      Q      Deputy Romanosky, just let me clear -- you

10     saved these the same way you did the other ones we

11     talked about?

12     A      Just about.  The only difference is, like I

13     said, a lot of my experiences come from on-the-job

14     training.  After -- after '06 I started using

15     another program called AOL Power Tools which has a

16     backup auto log feature in it.  So if something

17     disrupts the power or there's a problem with the

18     computer, it would do an auto save.

19             So there's one of the chats you see where it

20     says, begin backup save and it's got a few lines,

21     that's what happened when I had -- when Mr. --

22     Captoes had started talking to me, I had exited out

23     of the chat room which created some confusion with

24     the computer and the computer locked up.  Well, the

25     program did what it was supposed to and saved it in
```

Romanosky - Voir Dire

1    a backup save.

2    Q      Okay.  Do you know which one that was?

3    A      It's marked in there.  It says -- I'm not sure

4    exactly what your exhibit count is.  It's the chat

5    on 6/17/2008.

6           MR. TRAGOS:  May I approach the witness, Your

7    Honor?

8           THE COURT:  Yes, sir.

9    BY MR. TRAGOS:

10   Q      Let me show you Exhibit 14 and ask you if

11   that's the exhibit we're talking about?

12   A      Yes, sir.

13   Q      So that was saved by a program that you didn't

14   have back in '05?

15   A      Correct.

16   Q      And you saved all your conversations with

17   Captoes in '08?

18   A      Yes.

19   Q      And all your contact with Captoes in '05, you

20   saved those?

21   A      Correct.

22   Q      And you put them in a file, a digital file?

23   A      Correct.

24   Q      And for these exhibits, you pulled them up

25   yourself directly from that digital file?

1    A      Yes.

2    Q      Okay.

3           MR. TRAGOS:  No objection, Your Honor.

4           THE COURT:  Government's Exhibits 9, 10, 11,

5    12 and 13 through 26 are now received.

6    (Whereupon, Government's Exhibit Numbers 9, 10, 11,

7    12, 13 through 26 are received into evidence.)

8           THE COURT:  We're going to stop at 4:00,

9    Ms. Kaiser, if that helps.

10          MS. KAISER:  Yes.  Thank you, Your Honor.

11   Your Honor, at this time I'd like to publish

12   Government's Exhibit 9 for the jury.

13   BY MS. KAISER:

14   Q      All right.  Corporal Romanosky, could you tell

15   us what Government's Exhibit Number 9 is depicting

16   on the overhead.

17   A      This is the user information that was input

18   for the AOL profile Captoes.

19   Q      Was this the defendant's profile on America

20   Online in 2008?

21   A      That's correct.

22   Q      And what information did he put on his profile

23   about himself?

24   A      Well, he has name, Captoes, location,

25   southwest Florida in mid Atlantic.  Interests are

1    swimming, bike-riding, theater, movies, cooking and

2    shoes.  Favorite gadget, tongue.  Personal quote,

3    tongue those shoes well.  And then it just says

4    member since 6/20 of '98 and page updated 9/5/07.

5    Q      Now, was that the profile sheet of the

6    defendant when you began your investigation of him

7    back in June of this year?

8    A      Yes.

9    Q      I'm showing what's been admitted as

10   Government's Exhibit Number 10.  Can you tell the

11   jury what we're looking at here.

12   A      This is the input user information from my

13   undercover profile at the start of this

14   investigation.

15   Q      And could you please tell the jury what you

16   wrote about yourself on your online profile.

17          MS. KAISER:  And may it please the court, if

18   the lights could be adjusted, it's hard to see.

19          THE COURT:  I don't know if they can be dimmed

20   anymore.  Can you, Madam Clerk?

21          COURTROOM DEPUTY CLERK:  That's as low as we

22   can get.

23          THE COURT:  Can you just hit a contrast

24   button, Ms. Kaiser.

25          MS. KAISER:  I hit the lamp button, Your

1      Honor.

2              THE COURT:  It got lighter is the reason I --

3      there we go.  All right.

4      BY MS. KAISER:

5      Q      Okay.  And what did you tell -- what did you

6      tell the -- what did you put in your online profile

7      that described you?

8      A      My profile says I'm a 36-year-old white male

9      in a relationship with an open-minded female

10     partner.  We have three children between hers and

11     mine.  We enjoy outdoor activities and spending good

12     quality family time together.  We believe in a

13     strict but loving home.  Looking to meet other

14     like-minded individuals or couples to share

15     parenting or disciplining ideas.  Discretion a must.

16     No cyber or phone here.  Serious inquiries only.

17     Q      All right.  When you put, looking to meet

18     other like-minded individuals or couples to share

19     parenting or disciplining ideas, what -- to what

20     were you referring?

21     A      Well, again, this profile was written

22     cryptically.  On the face anyone who doesn't have

23     interest in the physical or sexual abuse of

24     children --

25             MR. TRAGOS:  Your Honor, I'm going to object

Rollanosky - Direct

1        to the answer being non-responsive as to what he --

2                THE COURT:  Overruled.  It's what he intended.

3                THE WITNESS:  The intent of this is so

4        somebody that doesn't have the interest in physical

5        or sexual abuse of children will read this and it

6        looks pretty benign.  Obviously, I'm not going to

7        create a profile that says I'm into incest and

8        sexual abuse of children because that's going to

9        result in that profile being reported probably

10       fairly quickly to law enforcement or the National

11       Center For Missing and Exploited Children.

12               So when I say I'm in a relationship with an

13       open-minded female partner, that's one of the

14       cryptic terms that's used in kind of incestuous

15       relationships or generally open-minded, open to

16       different things.

17       BY MS. KAISER:

18       Q     All right.  Did you put anything else in your

19       profile specifically with reference to any sexual

20       behavior or sexual interest?

21       A     Enjoying outdoor activities is sometimes a

22       reference to nudism.  Spending good quality family

23       time together is sometimes a reference to incest.  A

24       strict but loving home can be a reference to

25       physical abuse.  Looking to meet other like-minded

1    individuals or couples to share parenting or

2    disciplining ideas means we're looking for someone

3    that has the same interests.  Discretion a must,

4    that's self-explanatory.

5        No cyber or phone here.  Many people online

6    will -- what they're looking for is to talk online.

7    And that's what they're getting their release out of

8    sexually is just the chatting.  Or they want to get

9    you on the phone so they can engage in phone sex.

10       So I put that there to avoid those folks

11   coming to me.  Serious inquiries only, that's

12   self-explanatory.

13   Q    In your experience have you chatted with

14   people who were corresponding with you and engaging

15   in some type of fantasy?

16   A    Oh, yeah.  That's why I put that in there.  It

17   doesn't help, but I put that in there, anyway.

18   Several people online -- and you can usually tell

19   that within the first couple minutes of the chat

20   because they get very descriptive.  They just, tell

21   me about this, tell me about that.  They want to

22   know every detail of it.  Well, that's not what

23   we're online for so those conversations are promptly

24   terminated.

25       THE COURT:  Good stopping point?

1          MS. KAISER:  Yes, Your Honor.

2          THE COURT:  Let's take a recess for the

3     afternoon.  We'll resume at 9:00 AM, members of the

4     jury.  Thank you.

5          COURTROOM SECURITY OFFICER:  Rise for the

6     jury, please.

7     (Jury out at 4:02 PM.)

8     (Recess was taken at 4:02 until 5:01 PM.)

9     (Back on the record.)

10          THE COURT:  All right.  With respect to while

11     the defendant is here in Tampa for trial, we have

12     pretrial services here.  I'm looking at the

13     conditions of release from pretrial.  I don't see a

14     reference to -- obviously it's just a

15     recommendation.  But do I understand correctly that

16     Judge Wilson imposed a requirement of electronic

17     monitoring?

18          MR. TRAGOS:  He did, Your Honor.  But that

19     every -- he also allowed the defendant to come up

20     here and meet with his lawyer and all that without

21     electronic monitoring.  I have the two ex FBI

22     agents, our security detail, right outside.  They

23     are with him 24/7.  They're even staying with him.

24     And so I --

25          THE COURT:  What is it you're requesting,

1        then?

2             MR. TRAGOS:  Judge, just that we remove the

3        ankle bracelet while he's here at trial.

4             THE COURT:  In the courthouse or at all times?

5             MR. TRAGOS:  Well, at all times because it

6        doesn't work.  It can't work up here.  And it

7        doesn't need to because they've got these guys with

8        him.

9             THE COURT:  Mr. Montanez --

10            MR. MONTANEZ:  Yes, Your Honor.

11            THE COURT:  I know this isn't your case.  I

12       assume you've spoken with Mr. David.

13            MR. MONTANEZ:  I have, Your Honor.

14            THE COURT:  You've heard the request.  What is

15       your suggestion or recommendation?

16            MR. MONTANEZ:  Your Honor, Mr. Tragos is

17       correct.

18            THE COURT:  Use the mic for me.  Mr. Tragos,

19       if you'll just step aside for a moment.

20            MR. TRAGOS:  Okay.

21            MR. MONTANEZ:  Mr. Tragos is correct.  The

22       ankle bracelet doesn't do anything right now without

23       the other part of the unit which is at his

24       residence.  It's a minor inconvenience to the

25       defendant.  There's no reason to take it off, in our

1    opinion.  It's on him.  It's not doing anything,

2    anyways.  It doesn't hinder him from doing anything

3    else.  All it's going to do is -- it will allow us

4    when he does return home to instantly be able to

5    tell when he's home rather than having to go and

6    reconnect the ankle bracelet.

7         THE COURT:  Well, that would not occur until,

8    perhaps, the weekend.

9         MR. MONTANEZ:  Correct.

10        THE COURT:  Because we're in trial all week.

11        MR. MONTANEZ:  Correct.

12        THE COURT:  Is there any way it can be

13   operational while he's at the hotel?

14        MR. MONTANEZ:  No, sir, Your Honor.  The

15   telephone system would not allow that at the hotel.

16        THE COURT:  What says the government?

17        MS. KAISER:  Your Honor, it would be the

18   government's choice that he have his ankle monitor

19   updated to reflect that he's in Tampa now.  The

20   reason he was ordered to have it in the first place

21   was because the judge wanted to make sure that he

22   wasn't a flight risk, or at least to give a heads-up

23   if he tried to flee.

24        So the fact that he's up here and now in trial

25   I don't think lessens that risk.  And I think that

 1       they should give him an ankle monitor that works in

 2       Tampa rather than just take it off and let him have

 3       no monitor.

 4            THE COURT:  Is there such a thing,

 5       Mr. Montanez?

 6            MR. MONTANEZ:  Your Honor, the ankle bracelet

 7       works with two units.  It's not a matter of it

 8       doesn't work in Tampa.  It's a matter of it uses a

 9       telephone system to dial in and out.  And going

10       through a hotel phone system won't allow that.

11            MR. TRAGOS:  Would it give the court comfort

12       to speak to the two agents that are with him 24/7?

13            THE COURT:  No.

14            MR. TRAGOS:  Okay.

15            THE COURT:  You asked.  No.

16            MR. TRAGOS:  Okay.

17            THE COURT:  So what we've got here is a

18       defendant walking around with an inoperable ankle

19       bracelet while he's here in trial?  That's the

20       bottom line?

21            MR. TRAGOS:  Yes.

22            THE COURT:  Does he check in, Mr. Montanez, to

23       your office or Mr. David's periodically?

24            MR. MONTANEZ:  He checks in with Mr. David

25       weekly, and Mr. David makes periodic home visits to

1    his residence.

2         THE COURT:  Well, while we're in trial, we

3    need something as an alternative.  Everybody can sit

4    down.  You look uncomfortable.  You can stand up if

5    you like but -- accept for the lawyers, y'all need

6    to come forward.  We're going to get moving here in

7    a minute.  So we need an alternative to home

8    monitoring.  He's going to be here -- what hotel,

9    Mr. Tragos?

10        MR. TRAGOS:  At the Embassy Suites, Your

11   Honor.

12        MS. KAISER:  Your Honor, Mr. Hoffer just gave

13   me a good suggestion.  He said that there's a GPS

14   system --

15        THE COURT:  Mr. Hoffer did?

16        MS. KAISER:  He did.  That works with GPS that

17   doesn't use the phone.

18        THE COURT:  You mean the eye in the sky?  Have

19   you got one of those?

20        MR. MONTANEZ:  We do, Your Honor.  We do have

21   GPS.  It would track his movements.  And once he's

22   in the building it tells us he's in the building.

23   We can't tell us what he's doing in the building, in

24   this building, for example, but we could connect him

25   onto a GPS.

1          THE COURT:  How does that physically compare

2     to what he's wearing now?

3          MR. MONTANEZ:  It's a little bigger and a

4     little bulkier.  It's a two part unit.  We can give

5     him one that doesn't require the telephone system.

6     It's got a built-in telephone into it.  He carries

7     it on his belt.  It's about the size of a small CD

8     player and then the ankle bracelet is tethered to

9     that distance-wise.

10         THE COURT:  That would satisfy at least the

11    ability of pretrial to determine his whereabouts

12    physically?

13         MR. MONTANEZ:  We'd be able to tell his

14    whereabouts or at least what building he's in.

15         THE COURT:  Mr. Tragos?

16         MR. TRAGOS:  Your Honor, the only thing about

17    that is I believe it goes off periodically.  Right?

18         THE COURT:  What do you mean, goes off?

19         MR. TRAGOS:  I mean beeps periodically.

20    Doesn't it make some kind of a sound periodically

21    while you've got it on, there's tests that go on or

22    something?

23         MR. MONTANEZ:  That is correct.

24         MR. TRAGOS:  While he was in the courtroom

25    we'd be having beeps and --

1          THE COURT:  I don't want beeps in my

2     courtroom.  But other than that, can we arrange

3     around the court sessions?

4          MR. MONTANEZ:  We sure can.  He'd have to come

5     into the office every morning and in the afternoon

6     and we'd have to disconnect him and reconnect him.

7          THE COURT:  Then that's what we'll do.  So I'm

8     going to modify the conditions of release.  Thank

9     you, Mr. Hoffer.  You'll get extra credit for that.

10         MR. HOFFER:  Mr. Allen gave me the idea, Your

11    Honor, so credit is due him.

12         THE COURT:  He's had experience, I'm sure.  So

13    what we're going to do, I'm going to direct that he

14    go to pretrial this afternoon, accompany -- one of

15    y'all can go with him or his detail or whatever, it

16    doesn't matter to me who goes with him.  But is

17    someone there in Tampa who can make the change out

18    and be in contact with Mr. David to let him be

19    aware?

20         Then he'll be wearing this except while he's

21    attending court during the day.  And I'm not going

22    to make him run down at lunchtime and get it.  So

23    it's in the morning you take it off, in the

24    afternoon it goes back on.  What time are y'all

25    there, Mr. Montanez?

1          MR. MONTANEZ:  We're there -- we'll be there

2      until he gets there, Your Honor.  My one concern

3      is --

4          THE COURT:  I mean in the morning.

5          MR. MONTANEZ:  Oh, 8:30, the building is open

6      at 8:30.

7          THE COURT:  Well, then, he'll have to be here

8      at 8:30 and be here by 9:00.

9          MR. MONTANEZ:  My one concern today, Your

10     Honor, is I'm not sure if we actually have a

11     physical unit there right now.  I can have one

12     tomorrow.

13         THE COURT:  All right.  Go ahead and check.

14     If you have it, fine.  If not, we'll start this

15     process as soon as we adjourn tomorrow afternoon.

16         MR. TRAGOS:  Your Honor, the court in its bond

17     order said that one of the exceptions is if he was

18     visiting his lawyer.

19         THE COURT:  Well, is he going home with you

20     tonight or something?

21         MR. TRAGOS:  Well, I don't think he's going

22     home with me tonight.

23         THE COURT:  Then that's what we're going to

24     do.  He's in the hotel with his detail, in the

25     morning he's at pretrial to get it off.  In the

1    afternoon he has to put it on.  If it can be put on

2    this afternoon, that's my preference.  If it's not

3    because it's not available, we'll start it tomorrow

4    afternoon right after we adjourn.

5         MR. TRAGOS:  No.  What I'm saying, Your Honor,

6    is it's on.  But they'll be monitoring him wherever

7    he is.  And what I'm saying is that -- that it was

8    acceptable before for him to be at my office.  And

9    that may happen during the course of this trial that

10   he's at my office.

11        THE COURT:  He can discuss with someone in the

12   Tampa office about his whereabouts and with his

13   lawyer and addresses.

14        MR. TRAGOS:  Okay.

15        THE COURT:  I'm assuming they're accustomed to

16   doing that.  So all other conditions of the pretrial

17   release remain same.  Thank y'all.  Mr. Tragos, if

18   you'll just check with Mr. -- let me Mr. Montanez

19   call down there and see what they've got.  If they

20   don't have one then he'll be down there tomorrow

21   afternoon.  If they do have one, he needs to go down

22   and get fitted out.  I assume he gets fitted for it.

23   (Hearing adjourned.)

24

25

1                  C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH     )

5         I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8         DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 166 inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 23rd day of February 2009.

19

20

21            _____/s/ Linda Starr_____
              Linda Starr, RPR, Official Court Reporter
22

23

24

25