```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3      UNITED STATES OF AMERICA,

 4          Petitioner,

 5              vs.            CASE NO. 8:08-CR-318-T-27TGW
                               9 DECEMBER 2008
 6                             TAMPA, FLORIDA
                               PAGES 1 - 312
 7                             VOLUME II

 8      CHARLES JACKSON FRIEDLANDER,

 9          Defendant.

10      _____/

11                  TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE JAMES D. WHITTEMORE
12                  UNITED STATES DISTRICT JUDGE
                           and a jury
13
        APPEARANCES:
14
        For the Petitioner:  Amanda C. Kaiser
15                           United States Attorney's Office
                             Suite 3200
16                           400 N. Tampa Street
                             Tampa, Florida 33602
17
        For the Defendant:   George E. Tragos
18                           Tragos & Sartes, PL
                             Suite 800
19                           601 Cleveland Street
                             Clearwater, Florida 33755
20
                             Peter Anthony Sartes
21                           Tragos & Sartes, PL
                             Suite 800
22                           601 Cleveland Street
                             Clearwater, Florida 33755
23

24       Proceedings recorded and transcribed by
        computer-aided stenography.
25
```

```
1      Court Reporter:        Linda Starr, RPR
                              Official Court Reporter
2                             801 N. Florida Avenue
                              Suite 13B
3                             Tampa, Florida 33602

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This
 2    Honorable Court is now in session, The Honorable
 3    James D. Whittemore presiding.
 4              Please be seated.
 5              THE COURT:  Bring the jury in, please.
 6              MR. TRAGOS:  Did the court receive an e-mail
 7    from pretrial services?
 8              THE COURT:  I didn't.  I don't know.  I didn't
 9    look.  Is there a problem?
10              MR. TRAGOS:  Yes.  They were going to e-mail
11    the court with some issues that they discovered.
12              THE COURT:  I haven't heard from them yet.
13    Bring the jury in, please.  No.
14              COURTROOM SECURITY OFFICER:  Rise for the
15    jury, please.
16    (Jury in at 9:05 AM)
17              THE COURT:  Good morning.  Please be seated.
18    We are ready to resume examination of the witness.
19              MS. KAISER:  Yes, Your Honor.
20    BY MS. KAISER:
21    Q     Good morning, Corporal Romanosky.
22    A     Good morning, ma'am.
23    Q     I believe where we left off yesterday --
24    excuse me -- was we had just published your 2008
25    profiles; is that correct?
```

Romanosky - Direct

```
 1    A       That's correct.

 2    Q       All right.  And I believe we were just about

 3    to start publishing what had been admitted as

 4    Government's Exhibits 11 through 26, which were the

 5    chats that you had in 2008; is that correct?

 6    A       Yes.   I believe chats and e-mails, the online

 7    correspondence.

 8    Q       From your 2008 investigation?

 9    A       That is correct.

10    Q       That took place in June and July of this year?

11    A       That's correct.

12    Q       Before we do that, in your discussion with the

13    defendant, did he ever tell you how he accessed the

14    internet?

15    A       He uses AOL --

16            MR. TRAGOS:  Give a date, time and place.

17            THE COURT:  Rephrase it, please.

18    BY MS. KAISER:

19    Q       Did you ever subsequently discuss anything

20    about the computer with the defendant?

21    A       Yes.

22    Q       And on what date did that occur?

23    A       That occurred on July 21st.

24    Q       And did the defendant make any statement as to

25    how he accessed the internet?
```

Romanosky - Direct

```
 1     A       Yes.

 2     Q       What statements did he make?

 3     A       He accessed the internet through AOL on a

 4     dialup connection.

 5     Q       Would that be a modem?

 6     A       We had kind of joked about that because not

 7     many people use those anymore.

 8     Q       All right.

 9             MS. KAISER:  Your Honor, I'd like to publish

10     Government's Exhibit 11.

11             CAPTOES:  FashionedStrict older div old

12     fashioned dad.

13             STRICDAD7:  Hello.

14             CAPTOES:  Good afternoon.

15             STRICDAD7:  Good afternoon.

16             CAPTOES:  My son is now older (as am I).  Ran

17     a very structured household.

18             STRICDAD7:  That's nice.  A structured home is

19     a happy home.

20             CAPTOES:  I feel that way.  I permitted my son

21     to get away with nothing, as that is the way life

22     is.

23             STRICDAD7:  Same here.  That's why kids run

24     amuck today.  No discipline.

25             CAPTOES:  How many children have you all?
```

Romanosky - Direct

6

1          STRICDAD7:  Three.

2          CAPTOES:  How old now?  My son is now 37.

3          STRICDAD7:  Wow.  Much older.  Mine are 10 and

4     11, stepdaughter is 14.

5          CAPTOES:  Okay.  Yes, older, and life was

6     easier then.  I agree that kids who run amuck were

7     never proper -- myself disciplined.  Have no

8     grandkids.

9          STRICDAD7:  That's too bad.  Old gentleman

10    like yourself probably has a lot to teach.

11         CAPTOES:  I think we do, but many of my

12    friends have grandkids who live in too loose of a

13    household.

14         STRICDAD7:  Do they to get those kids in line?

15         CAPTOES:  No.  One friend's grandkids stay

16    with me on occasion and I discipline.  Parents

17    divorced and kids are half with one parent and half

18    with another.  Some parents feel I am too severe.

19         STRICDAD7:  Can't be when it comes to raising

20    them correctly.

21         CAPTOES:  I feel that way.  My house was a

22    corporal punishment one.

23         STRICDAD7:  Oh, definitely.  Society sees

24    corporal punishment as abuse now.  It is sad.

25         CAPTOES:  It is terrible.  I use a razor strop

Romanosky - Direct

1     on my son.

2          STRICDAD7:  Nice.

3          CAPTOES:  And very often.  I raised him

4     totally alone.  Divorced when he was seven.

5          STRICDAD7:  Bad that no mother figure around

6     to assist with discipline, but also nice to have

7     privacy.

8          CAPTOES:  Both probably true.  Of course,

9     never raised a girl.

10         STRICDAD7:  Girls are harder, definitely.

11     More of a free spirit.  Boys will conform with

12     strictness.

13         CAPTOES:  I have been told that.  My son was

14     not a free spirit.  He conformed or got more.

15         STRICDAD7:  Exactly.  Girls you have to be

16     careful.

17         CAPTOES:  Do you have boys?

18         STRICDAD7:  Every boy in the world wanting to

19     look at their butt.  Don't want visible marks for

20     others to see.  Yes, two.  Youngest is 10 and 11.

21         CAPTOES:  Okay.  I started with mine at eight

22     with the belt, then to strop.

23         STRICDAD7:  Very nice.  We started around six

24     with the belt.

25         CAPTOES:  Then by 11 was the razor strop.

```
 1              STRICDAD7:  Strap is an efficient method.

 2              CAPTOES:  His friends were all raised the same

 3      way.  He got it most every day.

 4              STRICDAD7:  We don't practice on their

 5      friends, since society doesn't look at strictness

 6      the way we do.  Ours get it on weekends normally.

 7      Punishment for everything they did during the week.

 8              CAPTOES:  Okay.  His friend's dads were all

 9      friends of mine.  I found it best to do it the same

10      day as the infraction.

11              STRICDAD7:  I agree for very serious

12      fractions.  Other stuff goes on the list and they

13      worry about it all week.

14              CAPTOES:  Very true.  Do you do it every

15      weekend?

16              STRICDAD7:  Mental discipline also effective.

17      Just about.

18              CAPTOES:  You are correct.  Wait till boys

19      reach puberty.

20              STRICDAD7:  True.  I'm sure they will be more

21      of a handful then.

22              CAPTOES:  Oh, yes, for sure.

23              STRICDAD7:  Nothing that can't be handled,

24      though.

25              CAPTOES:  Oh, no.  He got 75 instead of 45.
```

1          STRICDAD7:  Question mark?

2          CAPTOES:  Swats with the strop.

3          STRICDAD7:  Very good.

4          CAPTOES:  I believe in it, and I have given it

5     to him as an adult, too.

6          STRICDAD7:  Adults don't interest me.  Lessons

7     have already been learned by then.

8          CAPTOES:  Yeah, I agree.  But when my boy lies

9     to me, I get furious.  I would do a better job with

10    kids, I'm sure.

11         STRICDAD7:  Kids are more impressionable.

12         CAPTOES:  True.  And they tend to obey me.

13         STRICDAD7:  Very nice.  Probably obvious you

14    are experienced as soon as they meet you.

15         CAPTOES:  Well put.  I believe you are

16    correct.  Am very nice but no nonsense.

17         STRICDAD7:  That's the way you have to be.

18         CAPTOES:  My son was a little afraid of me, I

19    must admit.  Tough.  We were very close.

20         STRICDAD7:  A little afraid is good.

21         CAPTOES:  That was just the way it was.  Is

22    your wife supportive?

23         STRICDAD7:  Yes, very much so.  I have to go.

24    Nice chatting with you.

25         CAPTOES:  Thank you.  With you, too.

1          STRICDAD7:  Add me if you wish.

2          CAPTOES:  I would like to.  Thanks.  Add me if

3     you wish, also.

4          STRICDAD7:  Will do.

5          CAPTOES:  Enjoy the rest of the day.

6          STRICDAD7:  You, too.

7     BY MS. KAISER:

8     Q     All right.  Corporal Romanosky, you testified

9     earlier that this was the very first chat in the

10    2008 investigation?

11    A     That's correct.

12    Q     So had you had any prior dealings with the

13    defendant in 2008?

14    A     No, not in 2008.

15    Q     The last contact would have been from 2005?

16    A     Correct.

17    Q     And this time you have a different screen

18    name?

19    A     Yes.

20    Q     All right.

21          MS. KAISER:  At this time I'd like to publish

22    Government's Exhibit 12.

23          CAPTOES:  Good morning.  Told my son all about

24    you on the phone late last night.

25          STRICDAD7:  Good morning.  Oh, really?  How

Romanosky - Direct

1    did that go?

2         CAPTOES:  Fine.  He was pleased to hear about

3    another dad who was like me.

4         STRICDAD7:  That's nice.  That's --

5         CAPTOES:  He asked me if you were as rough on

6    your boys as I was.  I said hopefully.

7         STRICDAD7:  Laugh out loud.  How rough were

8    you on him?  You told me about the razor strap.

9         MR. TRAGOS:  Excuse me, Your Honor.  I object

10   to him interpreting what's on the paper.

11        THE COURT:  Mr. Tragos, that's the last

12   speaking objection you will make in this courtroom.

13        MR. TRAGOS:  I'm sorry.  I object, Your Honor,

14   to -- without speaking, but I object.  I believe it

15   is not accurately reflecting it.

16        THE COURT:  Overruled.

17        MR. TRAGOS:  Okay.

18        THE WITNESS:  I'm sorry.  Where were we?

19   BY MS. KAISER:

20   Q    I believe under 9:58 where it says laugh out

21   loud, about six lines down.

22        STRICDAD7:  Laugh out loud.  How rough were

23   you on him?  You told me about the razor strap.  Did

24   you have any other instruments of discipline?

25        CAPTOES:  Yes.  A heavy Garrison and crop come

Romanosky - Direct

12

1    to mind.  What do you use?

2         STRICDAD7:  Belts, hairbrush and a few leather

3    straps I purchased at a craft show.  Of course,

4    hands, as well.  I also have a few wooden paddles of

5    different sizes.

6         CAPTOES:  Very effective.  I do best with

7    leather.  Rarely used hands as he got older.  If

8    poor language, cracked him across the mouth.

9         STRICDAD7:  Of course.  We used soap and

10   standing in the corner in front of everyone to solve

11   the language issue, as well.  Embarrassment and

12   humiliation is effective mental discipline.

13        CAPTOES:  Very good.  I fully agree.  I

14   believe most in corporal, however, and humiliation.

15   As he got older, I got tougher.

16        STRICDAD7:  Of course.

17        CAPTOES:  When younger you have to be careful

18   that marks are hidden from obvious view.  After 12,

19   he was really welted.  Are your boys in regular

20   school or home schooled?

21        STRICDAD7:  Home schooled.

22        CAPTOES:  Good.  Mine was, too.  By you or in

23   a group?

24        STRICDAD7:  Myself and my spouse.

25        CAPTOES:  Good.  I was asked about a year ago

Romanosky - Direct

13

1       to open up a home school, but I haven't as of yet.

2       Would be very disciplined and demanding.

3               STRICDAD7:  Very nice.  Good schools are hard

4       to find.

5               CAPTOES:  Well, have to find kids with very

6       strict parents.

7               STRICDAD7:  Of course.

8               CAPTOES:  I will keep my friend's two

9       grandsons this weekend.

10              STRICDAD7:  Very nice.

11              CAPTOES:  He is demanding and strict so I may

12      be, also.

13              STRICDAD7:  That's good to hear.

14              CAPTOES:  Permission for everything.

15              STRICDAD7:  Very good.  How old are they?

16              CAPTOES:  Just 12 and just 14.

17              STRICDAD7:  Very nice.  I'm sure you would

18      have them tearing up in no time if they misbehave.

19              CAPTOES:  Oh, for sure.  Am sure I will tear

20      them up daily.

21              STRICDAD7:  Laugh out loud.  Do you use any

22      special confinement techniques when administering

23      discipline?

24              CAPTOES:  In the basement and sometimes tied.

25              STRICDAD7:  Very nice.

1          CAPTOES:  Do you?

2          STRICDAD7:  Yes.  Have a similar setup.  No

3     basement, however.  Just a room dedicated to

4     lessons.

5          CAPTOES:  No problem.  If I don't use

6     basement, have a special room, too.

7          STRICDAD7:  Very nice.  Are your pupils

8     required to wear any certain attire for lessons?

9          CAPTOES:  They will be totally stripped.

10         STRICDAD7:  Very nice.

11         CAPTOES:  Are yours?

12         STRICDAD7:  If a planned lesson, then

13     stripped.  If an impromptu, pants down and underwear

14     down.

15         CAPTOES:  That is fine.  If I had a school, it

16     would be just boys, I believe, as not a believer in

17     coed in a school situation.  Might have a separate

18     one for girls.

19         STRICDAD7:  Yeah.  I understand completely.

20         CAPTOES:  Are you dressed when it is planned

21     lesson?

22         STRICDAD7:  During lesson, yes.

23         CAPTOES:  Me, too, usually.

24         STRICDAD7:  How do you dress?

25         CAPTOES:  In a pair of boxers and tee shirt,

1     usually.  Otherwise, a shirt with a tie and trousers

2     and dress shoes.

3          STRICDAD7:  Nice.

4          CAPTOES:  How do you dress?

5          STRICDAD7:  Like a reform school dean, dark,

6     intimidating.

7          CAPTOES:  Good.  Well, my regular work dress

8     is coat and tie, dark dress trousers, black shoes.

9     Am big boned, but not fat.

10         STRICDAD7:  Do you still work or are you

11    retired?

12         CAPTOES:  Work a little still.  And you?

13         STRICDAD7:  Still working.

14         CAPTOES:  Good.  Wife work, too?

15         STRICDAD7:  No.

16         CAPTOES:  So she is with them all day?

17         STRICDAD7:  Yes.  Easier to control who has

18    access to them with one of us always being there.

19    Are you still there?

20    BY MS. KAISER:

21    Q     What was the date of this chat, Corporal

22    Romanosky?

23    A     June 17th, 2008.

24    Q     From approximately what time to what time did

25    you chat with the defendant?

1      A      Approximately 9:56 AM to 10:39 AM.

2      Q      Did you have a second chat with the defendant

3      on June 17th of 2008?

4      A      We did.   There was an e-mail in between from

5      Mr. Friedlander.

6      Q      Okay.   I'm publishing what has been admitted

7      as Government's Exhibit 13.   Is this the e-mail to

8      which you're referring?

9      A      Yes.   At the end of the chat conversation you

10     see I say, are you still there, like he was gone, so

11     the e-mail was a reply to that.

12     Q      Okay.   And if you would, please publish this

13     e-mail.

14            CAPTOES:   Sorry about this, but AOL failed.

15     It took 10 minutes to get it fixed.   Did not want

16     you to think I had just up and left.   Hope to chat

17     soon.

18     BY MS. KAISER:

19     Q      And was this an e-mail that the defendant had

20     sent to you?

21     A      Correct.

22     Q      Did you chat with the defendant again on June

23     17th of 2008?

24     A      Yes.

25     Q      I'm publishing what is marked -- what is

1    admitted as Government's Exhibit 14.

2    A      Okay.  I saw that he had been online, so I

3    sent him this.

4          STRICDAD7:  Hey, yeah.  I saw you got

5    booted.

6          THE WITNESS:  Which is a term for when you get

7    kicked off, service terminates or get interrupted.

8    Then I said, damn AOL.  At that point, I had a chat

9    box open, so I closed that so I could talk with

10   Mr. Friedlander.  When I did that, my system locked

11   up.

12         So when I got my system rebooted, it did the

13   backup save for those three lines and we were able

14   to then again start talking.  So I told him the

15   power went out.  I made up an excuse, the power went

16   out.

17   BY MS. KAISER:

18   Q      All right.  So then did you begin chatting

19   with him again at 2:31?

20   A      Correct.  At 2:31 PM I told him:

21         STRICDAD7:  Sorry about that.  Power went out.

22         CAPTOES:  That is okay.  Never a dull moment.

23   So is your wife strict enough with the boys at home?

24         STRICDAD7:  Yes.  Not to the same degree but

25   in her own way.

Romanosky - Direct

1          CAPTOES:  Good.  In her own way.  You and I

2     probably would handle them the same.

3          STRICDAD7:  I'm sure.  She does, too, but has

4     more leniency where I do not.

5          CAPTOES:  I would not have any leniency ever.

6     I should give you one of my razor strops to start

7     with them.

8          STRICDAD7:  That would be great.  Can never

9     have enough tools or techniques.

10          CAPTOES:  Would be great to watch you with

11     them.

12          STRICDAD7:  Do you have friends that have same

13     interest as you?  Realtime friends.

14          CAPTOES:  Oh, yes.  My son's bud's dad and his

15     grandkids.

16          STRICDAD7:  That's good.  Discretion is a

17     must.

18          CAPTOES:  The ones I shall have this weekend.

19     I am extremely discreet.

20          STRICDAD7:  Very good.  I am Michael, by the

21     way.

22          CAPTOES:  And I am Charles.  So good to meet

23     you.

24          STRICDAD7:  Nice to meet you, Charles.

25          CAPTOES:  Where are you all again?

```
 1              STRICDAD7:  Palm Harbor, west of Tampa.

 2              CAPTOES:  Right.  I am between Ft. Myers and

 3      Naples.

 4              STRICDAD7:  You're just a few hours south of

 5      us.

 6              CAPTOES:  Right.  Maybe you can come down, all

 7      of you.

 8              STRICDAD7:  A possibility sometime.  Right now

 9      we prefer to administer lessons at home.

10              CAPTOES:  Okay.

11              STRICDAD7:  We have a few friends that share

12      in our interests that feel comfortable in our

13      setting.

14              CAPTOES:  That's great.

15              STRICDAD7:  Yes.  Discreet friends with our

16      interests very difficult to find.

17              CAPTOES:  Very.  I would love to meet you all

18      if you would like.

19              STRICDAD7:  I would like to meet you, as well.

20      I would have to get approval from the group before

21      allowing you to be present during lessons, however.

22      Everyone has to be comfortable with everything.

23              CAPTOES:  That's fine.  I may be too tough.

24         BY MS. KAISER:

25      Q       Corporal Romanosky, what did you understand
```

1    the defendant meant when he said, that's fine, I may

2    be too tough?

3         MR. TRAGOS:  Objection.

4         THE COURT:  We are asking the witness for his

5    interpretation as opposed to what the witness meant

6    or what the --

7         MS. KAISER:  Correct.

8         THE COURT:  -- author meant?

9         MS. KAISER:  Yes.

10        THE COURT:  Phrase it that way, please.

11   Sustained as to form.

12   BY MS. KAISER:

13   Q    Corporal Romanosky, what did you understand

14   the defendant to mean when he said, that's fine, I

15   may be too tough?

16        MR. TRAGOS:  Objection.

17        THE COURT:  Overruled.

18        THE WITNESS:  Physical.

19   BY MS. KAISER:

20   Q    Could you explain that, please.

21   A    I took that to mean that -- you know, I was

22   telling him that we had a group that was into

23   this -- the lessons, administering the discipline,

24   and that when he told me he may be too tough, I took

25   that to mean that he may be too tough or too

Romanosky - Direct

```
 1    physical for the group, or at least more so than us.

 2    Q     All right.  Proceed.

 3          STRICDAD7:  That's okay.  Can you bring your

 4    friend's grandchildren to the lesson?  Most of our

 5    members bring pupils to the sessions.

 6          CAPTOES:  I may be able to.

 7          STRICDAD7:  Okay.  If you cannot, what lessons

 8    can you offer the group?

 9          CAPTOES:  I could use your kids, I guess.

10          STRICDAD7:  I would be okay with that as long

11    as ground rules are followed.

12          CAPTOES:  Very strictly.

13          STRICDAD7:  Good deal.

14          CAPTOES:  I would be the grandad to all.

15          STRICDAD7:  Nothing wrong with experience.

16    Your age and experience would be only reason allowed

17    without pupils and being single.  I'm sure you

18    understand why.

19          CAPTOES:  Yes, I do.  And I am probably

20    stricter than many.

21          STRICDAD7:  How so?

22          CAPTOES:  I take nothing from my own son and

23    there is no leeway, and my beatings are very

24    intense.

25          MR. TRAGOS:  Objection, 103C.
```

```
 1              THE COURT:  What's the ground, please?

 2              MR. TRAGOS:  Grounds of misstatement.

 3              THE COURT:  Overruled.  You may clear that up

 4      on cross, if necessary.

 5              STRICDAD7:  Beafings?

 6              CAPTOES:  Beatings.  Sorry.

 7              STRICDAD7:  Laugh out loud.  It's okay.

 8      That's what I thought you meant.  Did you show him

 9      that beatings were done out of love afterwards or

10      did it stop at the beatings?  Or was the love part

11      of the beatings?

12              CAPTOES:  No, was very affectionate, always,

13      but beatings were needed in the scheme of things.

14              STRICDAD7:  Of course.  Was affection

15      something else you're looking to do or just the

16      beatings?

17              CAPTOES:  My boy and I are extremely close.

18      Beatings and affection are mixed together.  Though

19      he is still a little afraid of me.

20              STRICDAD7:  Good.  That's respect.

21              CAPTOES:  I feel so, too.

22              STRICDAD7:  You okay with groups watching your

23      lessons?  Small groups?

24              CAPTOES:  Absolutely.  Always.

25              STRICDAD7:  Great.
```

Romanosky - Direct

1          CAPTOES:  I'm a friendly man with all family

2     members.

3          STRICDAD7:  Good to know.  You said before

4     that you preferred discipline with the boys;

5     correct?

6          CAPTOES:  Either one, though I have never

7     raised a girl.

8          STRICDAD7:  Okay.  No problem.  I can make all

9     three available when that time comes.

10          CAPTOES:  Good.  Are most moms and dads in

11     your group or single?

12          STRICDAD7:  We have mainly couples with kids.

13     A few singles have been approved, however.  It's a

14     small group of about five couples and a few singles.

15          CAPTOES:  Either way, that is fine.  Sounds

16     great to me.

17          STRICDAD7:  How much notice do you need?

18          CAPTOES:  A couple of days.  Easy drive for

19     me.

20          STRICDAD7:  Great.  I'll meet with the others

21     soon and see what they have to say.  Do you have a

22     contact number?

23          CAPTOES:  Sure.  Easiest now is cell, which is

24     202-607-6666.  Do you have one for you I might have?

25          STRICDAD7:  Yes.  727-430-0008.  That's my

1       wife's cell number.  Please don't call without

2       checking with me first.  I haven't talked with her

3       about you yet, and don't want her to get caught by

4       surprise.  She'll be fine with it, but if someone

5       she doesn't know calls, it might surprise her.

6            CAPTOES:  Would not do that.  And thanks for

7       letting me know.  Mine you can call at anytime at

8       all as I am alone other than if my son visits.

9            STRICDAD7:  Very good.  Thanks.  Charles, you

10      may have told me and if so I apologize for not

11      remembering, but how old did you say you are?

12           CAPTOES:  I am just 70 last week.  Still say

13      69 as sometimes forget.

14           STRICDAD7:  Laugh out loud.

15      BY MS. KAISER:

16      Q       Excuse me.  Corporal Romanosky, when you're

17      asking the defendant during these chats personal

18      information about himself, what is your purpose in

19      asking those questions?

20      A       I'm trying all during the chats to elicit

21      little bits of information without being too

22      obvious, because I'm trying to use that in

23      identifying him.

24           I'm using my -- I have my undercover computer

25      on my left and I have my work station on my right.

Romanosky - Direct

```
 1      So as he's giving me information, I'm running

 2      searches with each little piece like the phone

 3      numbers and things like that trying to get him

 4      identified.

 5   Q      All right.  Proceed.

 6          STRICDAD7:  Laugh out loud.  Very cool.  Lots

 7      of strict experience, then.

 8          CAPTOES:  Loads.  Michael, the phone.  Be as

 9      quick as I can.

10          STRICDAD7:  No problem.

11          CAPTOES:  Back.  Sorry.

12          STRICDAD7:  No problem.  You okay to talk or

13      do you have to go?

14          CAPTOES:  Fine to talk, Michael.

15          STRICDAD7:  Okay.  I see your profile says

16      southwest Florida in mid Atlantic.  You're not a

17      native, huh?

18          CAPTOES:  No.  I'm a San Francisco native.

19      Then in VA and in FL for 12 years.

20          STRICDAD7:  Wow.  You've moved around.  I've

21      traveled a lot for work.

22          CAPTOES:  I used to a good bit but usually

23      abroad.

24          STRICDAD7:  Traveling can be fun but also a

25      hassle.
```

Romanosky - Direct

1     CAPTOES:  Too much for me now, for sure.  I

2     did quite some a number of years ago with my boy

3     driving.

4          STRICDAD7:  How old is your son now?

5          CAPTOES:  37 now, 38 on 19 June.

6          STRICDAD7:  He running a strict household?

7          CAPTOES:  It is just he.  He supposedly lives

8     by my rules way away.

9          STRICDAD7:  Good for him.  My boys can be a

10    handful.  That 10 to 11 age is tough.

11         CAPTOES:  And 13 and 14 is even worse, but I

12    was tough for sure.

13         STRICDAD7:  Have to be.  They may cry and

14    whine now but they will thank me later.

15         CAPTOES:  Mine thanks me often.  Boys need

16    strict training, I feel.

17         STRICDAD7:  I feel same way.

18         CAPTOES:  This weekend with the 11 and 13 will

19    been enjoyable most of the time.  When I see you,

20    will bring you the razor strop.

21         STRICDAD7:  Very nice.

22         CAPTOES:  Will bring one that I used on my boy

23    often.

24         STRICDAD7:  That will be very nice.  Where did

25    he get his beatings, butt, legs, back?

 1            CAPTOES:  All three, more butt and legs.

 2            STRICDAD7:  How did you handle marks?  Home

 3     schooling wasn't big then.  Fortunately now a lot of

 4     parents home school.

 5            CAPTOES:  I left them right where they were,

 6     put oil and cream on them.  He was home schooled

 7     before it was popular.

 8            STRICDAD7:  Very nice.  You mentioned you were

 9     probably more strict than others in our group.  How

10     so?

11            CAPTOES:  Well, I beat my son daily, hard and

12     long.  Many of the home schooled parents were not so

13     strict.  Though the dads of his two buds were.  Most

14     kids were one parent, usually dads, but there were

15     one or two single moms, too, who I would have to

16     rescue sometimes.

17            STRICDAD7:  Nice.

18            CAPTOES:  They would say their boys were out

19     of control.  When I laid it on them they became more

20     pliable.

21            STRICDAD7:  If group is okay with you coming

22     up, what would your idea of perfect setting be?

23     Laugh out loud.  Just trying to get idea of what you

24     may be wanting to do.  I'm sure I will be asked.

25            CAPTOES:  Well, first I need to get to know

Romanosky - Direct

1    them and what they usually do in their times

2    together.

3              STRICDAD7:  Okay.

4              CAPTOES:  Then I could decide what I could

5    show them or help them with or such to make me part

6    of their group.

7              STRICDAD7:  Okay.

8              CAPTOES:  Maybe the second one I could bring

9    the two boys.  What are the general ages of their

10   kids?

11             STRICDAD7:  Mine are 10 and 11 and 14, girl in

12   parenthesis.  Others range from eight to 15, boys

13   and girls.

14             CAPTOES:  That is very good.  Are most of the

15   kids home schooled, too?

16             STRICDAD7:  All are.  Like I said, small

17   group.

18             CAPTOES:  Good.  I am a believer in marking

19   kids.  My son used to yell and cry but paid little

20   attention.

21             STRICDAD7:  That's how I feel.  Crying and

22   whimpering is just weakness.  Stand there and lay

23   there and take it.

24             CAPTOES:  That was my motto.  And too much

25   yelling meant more punishment.

1           STRICDAD7:  Yes.  Very nice.

2           CAPTOES:  Do you ever use a switch in their

3    crack?

4           STRICDAD7:  No, I never have.

5           CAPTOES:  I have a number of times.  Very

6    effective.

7           STRICDAD7:  Sounds like it.  Sounds exciting.

8           CAPTOES:  Sometimes sent him for the switch.

9    Always sent him for the strop.

10          STRICDAD7:  Yeah.  I've done that, as well.

11   The walk to get it is almost as bad as the beating.

12   Almost.

13          CAPTOES:  Then came the pleading which fell on

14   deaf ears.  How often do you meet with your friends?

15          STRICDAD7:  Once a month, normally.  Let all

16   the marks heal up.

17          CAPTOES:  That's good.  Do all the kids come

18   to the group?

19          STRICDAD7:  Yes, most of the time.  When

20   children are spent they are sent to the other room

21   to reflect.  Then next comes up and parent tells us

22   everything they did wrong over the past month.

23   Adults decide what the punishment will be.  And

24   parents or someone else they designate administers.

25          CAPTOES:  Very good.  Think it should

Romanosky - Direct

1    sometimes be parents to administer and sometimes a

2    designee.

3         STRICDAD7:  Of course.  New parents to the

4    group will sometimes show leniency.  Other adults

5    have to remind them not to.

6         CAPTOES:  I will never show leniency, Michael.

7    I never have.

8         STRICDAD7:  Good for you.  Do you show them

9    love after the beating?

10        CAPTOES:  I do.  Do you?

11        STRICDAD7:  We do.  How do you show that

12   beating was done out of love?

13        CAPTOES:  I told him, I love you.  But a boy

14   needs training from his dad often.  I kiss him, of

15   course.

16        STRICDAD7:  Very nice.  Charles, I hate to do

17   this but I have to run.  Have a 4:20 meeting.

18        CAPTOES:  Go ahead for sure, Michael.

19        STRICDAD7:  I'll log on tomorrow if things are

20   slow enough around here.

21        CAPTOES:  Great.  Look for you then.

22        STRICDAD7:  You bet.  Take care.

23        CAPTOES:  You, too.  Bye for now.

24   BY MS. KAISER:

25   Q    Corporal Romanosky, in the first chat that you

1    had with the defendant on June 17th, 2008, in which

2    he mentioned that he would have a friend's children

3    visit him, how old did he say the children were?

4    A       Twelve and 14, I believe.  Yes, 12 and 14.

5    Q       And then later on the same day he tells you --

6    mentions the children are going to visit him again.

7    And how old does he tell you the second time?

8    A       Eleven and 13.

9    Q       At anytime did you ever set up any

10   surveillance on his home, or had you had him

11   identified at this point?

12   A       No.  He was not identified at this point so I

13   didn't know where his home would be to set up any

14   surveillance.  And in all honestly, I didn't believe

15   there were -- there were any kids.

16   Q       And why didn't you believe that?

17   A       Well, it's been my experience when dealing

18   with people online that subjects having an interest

19   in meeting someone else to either physically and/or

20   sexually abuse children will a lot of times

21   embellish things they may have done in the past or

22   show themselves as having access to kids currently

23   to give what they believe credibility in front of

24   me, kind of street credit, so to speak, so I think

25   that, yeah, we're both -- he's got kids and we're

1     both on the same page here.

2     Q     Did you next speak to the defendant on June

3     18, 2008 in a chat?

4     A     Yes, I did.

5     Q     Approximately what time of day was it?

6     A     The chat started at 2:26 PM.

7     Q     At this time the government would publish

8     Government's Exhibit 15.

9           CAPTOES:  Hello, Michael.

10          THE WITNESS:  Auto response from Stricdad7.  I

11    will be right back.  I had been online but I wasn't

12    doing anything.  I was just online so it kind of

13    kicked it into like a hibernate mode or where it

14    sends out an auto response.  Once I saw that the

15    message had come in, I reply:

16          STRICDAD7:  Hello, Charles.  How are you?

17          CAPTOES:  Fine, thanks.  Just got off the

18    phone with my son.

19          STRICDAD7:  That's nice.

20          CAPTOES:  He was complaining about his job and

21    hoping I would not get angry for him calling.

22          STRICDAD7:  So what happened?

23          CAPTOES:  I told him I would punish him for

24    complaining about something.  He then said, are you

25    sure?  I said yes.

1      STRICDAD7:  Sounds like he is wanting the

2  punishment.

3      CAPTOES:  That was my feeling.

4      STRICDAD7:  Do you find it more enjoyable to

5  administer punishment when they want it or don't

6  want it?

7      CAPTOES:  Both, I'm sure.  I treat them the

8  same way, either way.  Would you?

9      STRICDAD7:  Same here.  Reaction more genuine

10  from those that don't want it, don't you think?

11      CAPTOES:  Probably.  But mine would not want

12  it as severe as he would get it.

13      STRICDAD7:  True.  True.  Do your pupils know

14  that you enjoy administering the beating?

15      CAPTOES:  No.  Should they?

16      STRICDAD7:  Course not.  Not allowed to look.

17      CAPTOES:  Correct.  Punishment's done not that

18  close to hear.

19      STRICDAD7:  Hear?

20      CAPTOES:  If crying and yelling.  When I beat

21  I truly beat.

22      STRICDAD7:  Nice.  So how and when do you

23  release the enjoyment of giving the beating?

24      CAPTOES:  Shortly afterwards.  And you?

25      STRICDAD7:  Sometimes shortly afterwards,

Romanosky - Direct

1      sometimes during.

2              CAPTOES:  Dressed?

3              STRICDAD7:  Yes and no.

4      <u>BY MS. KAISER:</u>

5      Q      Let me interrupt there.  Corporal Romanosky,

6      when you asked the defendant, so how and when do you

7      release the enjoyment of giving the beating, to what

8      were you referring?

9      A      I was referring to ejaculation.

10     Q      Okay.  Proceed.

11             CAPTOES:  Dressed?

12             STRICDAD7:  Sometimes yes and no, sometimes

13     either or.  How about you?

14             CAPTOES:  I usually beat dressed.  If not

15     dressed, it might be during.

16             STRICDAD7:  Them dressed or you dressed?

17             CAPTOES:  I meant if I were dressed or

18     undressed.  They are always strict.  If undressed it

19     might just well occur.

20             STRICDAD7:  True.

21             CAPTOES:  Would you do that, Michael?

22             STRICDAD7:  More than likely.  Did you have

23     your pupils help you out in that department or do

24     you take matters into your own hands?

25             CAPTOES:  With my son he helped.  With one or

Romanosky - Direct

1    two pupils they helped.  Or else just myself.

2         STRICDAD7:  Very nice.

3    BY MS. KAISER:

4    Q     Corporal Romanosky, let me interrupt there.

5    When you asked him if he took matters in his own

6    hands or had some help, to what are you referring?

7    A     I'm referring to if he masturbated to

8    ejaculation or if he had the pupils or the children

9    do it.

10   Q     Okay.  Proceed.

11        CAPTOES:  Did you get help?

12        THE WITNESS:  Hang on.  I lost my place here.

13        MS. KAISER:  It's five lines from the bottom.

14   Sorry about that.

15        STRICDAD7:  Yes, same as you.

16        CAPTOES:  We both seem to be very much alike

17   in our approaches.

18        STRICDAD7:  Yes.  I think people with our

19   interests seem to be mostly consistent with probably

20   just a few personal preferences.

21        CAPTOES:  That is probably very true.  I am in

22   hopes that your group will accept me.

23        STRICDAD7:  I feel confident that they will.

24   Otherwise I would not suggest it.  It is just the

25   trust thing.  They are relying on my trust of you.

1          CAPTOES:  Pleased to hear that.

2          STRICDAD7:  The folks in this group are all

3     professional and have a lot to lose.

4          CAPTOES:  I'm sure that when we meet I will

5     have your confidence.  Am sure and you know I am,

6     too.

7          STRICDAD7:  Yes.

8          CAPTOES:  When one in the group administers

9     punishment are they dressed?

10         STRICDAD7:  Personal preference.  Group

11    respects each other's preferences.  Which would you

12    prefer when you administer?

13         CAPTOES:  That's perfect.  I'd take the cue

14    from you, your advice.

15         STRICDAD7:  Like I said, it's up to personal

16    preference administering that particular punishment.

17    No cues.  That is too structured.

18         CAPTOES:  Right.  It depends on the kid and

19    the decision as to what to administer.

20         STRICDAD7:  Right.  Which of my three are you

21    most interested in?  Boys are 10 and 11, girl is 14.

22         CAPTOES:  Often I am just in boxers, but I can

23    get very aroused quickly.  Only experience is with

24    boys and a girl or two.

25         STRICDAD7:  All three know the drill, so it

```
 1      would be up to you as to which you would enjoy most.

 2              CAPTOES:  Either boy since I know neither.

 3              STRICDAD7:  Okay.  Not a problem.

 4              CAPTOES:  I will enjoy meeting everyone and

 5      hopefully be in with the decision process.

 6              STRICDAD7:  If you're approved you're in on

 7      the decision process.  That's why I'm asking

 8      questions as to what interests you so that I can

 9      pass it onto the group.  That way they have an idea

10      of the agenda for the evening.  Are weeknights a

11      problem for you?

12              CAPTOES:  No, they're fine.  Ask any

13      question -- ask any old questions, Michael.

14      Probably more at ease with boys at first.

15              STRICDAD7:  That's fine.  Would you be

16      bringing your razor strap?

17              CAPTOES:  Absolutely.  And maybe the Garrison

18      belt, too.

19              STRICDAD7:  Very good.  Any other favorite

20      implements that you would like to bring?  Everyone

21      normally brings their own.  It's another of the

22      personal preferences we allow.

23              CAPTOES:  That's good.  I might bring my quirt

24      if I can find it.

25              STRICDAD7:  Quirt?
```

Romanosky - Direct

1        CAPTOES:  That is English type crop but

2    thinner.

3        STRICDAD7:  Never heard it called that.  I've

4    always known them as crops.  See, learn something

5    every day.

6        CAPTOES:  I got it from some very -- from some

7    horsey people in England.

8        STRICDAD7:  Very cool.

9        CAPTOES:  The razor strop is my number one

10    implement.

11        STRICDAD7:  Nice.  Like the paddle and a nice

12    belt.

13        CAPTOES:  Holes in the paddle?

14        STRICDAD7:  Of course.  So you can hear the

15    wind.

16        CAPTOES:  Great.

17        STRICDAD7:  Do you ever take photos of

18    previous sessions?

19        CAPTOES:  Don't have a camera but I'm getting

20    one.  Do you?

21        STRICDAD7:  We have talked about it, but

22    general agreement is no cameras during sessions.  So

23    for now we have to stick to the internet to look at

24    other'S trophies.

25        CAPTOES:  Probably better.

 1          STRICDAD7:  I agree.

 2          CAPTOES:  Do you socialize much with many of

 3     the group members?

 4          STRICDAD7:  A couple of them yes and a couple

 5     of them are mainly online and phone contacts until

 6     sessions so people enjoy the distant type

 7     relationships, which is fine.  We just did good

 8     backgrounds on them before allowing them access.

 9          CAPTOES:  I enjoy close ones, as well.

10          STRICDAD7:  Those are my favorites, as well.

11          CAPTOES:  I would have felt so.

12          STRICDAD7:  Well, I am going to run.  Have a

13     late afternoon meeting to attend.  Nice talking with

14     you, Charles.

15          CAPTOES:  Saw here, Michael.  Very soon again.

16     I -- trust me.

17          STRICDAD7:  Very good.  If things go well

18     after your first couple of sessions, would you be

19     willing to host a session?

20          CAPTOES:  Certainly.  Have a good place to do

21     it.

22          STRICDAD7:  Is it large enough?

23          CAPTOES:  Oh, yes.  It is 3000 feet under air

24     and roomy.

25          STRICDAD7:  Very nice.

1          CAPTOES:  Would they mind the drive?

2          STRICDAD7:  Not at all.

3          CAPTOES:  Okay.  You, your wife and kids could

4     even stay over.

5          STRICDAD7:  That's a possibility.  We'll see

6     how things go up here first.

7          CAPTOES:  You'd be more than welcome.

8          STRICDAD7:  Thank you.

9          CAPTOES:  Have three bedrooms.

10         STRICDAD7:  Very nice.  Next meeting will be

11    in around two weeks.  Would that timeframe work for

12    you?

13         CAPTOES:  I will be gone over the 4th of July

14    from the 30th on till the 6th.  Three weeks would be

15    perfect.

16         STRICDAD7:  Okay.  I'll see what I can do.

17    Others may have plans for the 4th, as well, so that

18    might even be better.  Where is area code 202 from

19    the phone number you gave me?

20         CAPTOES:  That is in DC where I have a little

21    pied-a-terre serie, tiny.  It is my cell phone.

22    Southwest Florida, at least where I am, has only a

23    limited cell range.

24         STRICDAD7:  Okay.  I am okay with it.  Others

25    may question the out of area number, and coming from

1    DC gives folks the jitters.  In parenthesis, feds,

2    laugh out loud.

3           CAPTOES:  I have one in Florida but it is

4    never sure to work.  It is 239-561-1400.

5           STRICDAD7:  Laugh out loud.  Okay.  Like I

6    said, I'm okay with it.

7           CAPTOES:  They can use that one, too.  The

8    other one can be for you.

9           STRICDAD7:  From what all we've talked about

10   on here I am quite certain you're good to go.

11          CAPTOES:  Had a lot of experience, I have to

12   say, and am a decent gentleman.

13          STRICDAD7:  I can tell.  You're good people.

14          CAPTOES:  Thanks.  And most anxious to know

15   you much better.

16          STRICDAD7:  Same here.  I'd better run.  Got

17   meeting and shouldn't be late.  Of course, I'm the

18   boss so if I am late, that's tough.  Laugh out loud.

19   Take care, Charles.

20          CAPTOES:  You also, Michael.

21   BY MS. KAISER:

22   Q     Did you next speak with the defendant on June

23   19th, 2008?

24   A     Yes.

25   Q     At this time the government would like to

Romanosky - Direct

1    publish Government's Exhibit 16.

2         CAPTOES:  Hi, Michael.

3         STRICDAD7:  Hello, Charles.

4         CAPTOES:  Had to finish oiling the three razor

5    strops and Garrison belt.  Need to keep them supple.

6         STRICDAD7:  Laugh out loud.  Of course.

7         CAPTOES:  I should be in the Tampa area on Sun

8    6 July if you would like to meet for lunch.

9         STRICDAD7:  That may be doable, if I'm in

10   town.  May be taking the family out of town for the

11   4th weekend.

12        CAPTOES:  Oh, no problem.  I will be on my way

13   home.

14        STRICDAD7:  You have plans that weekend, huh.

15   Very good.

16        THE WITNESS:  And we had a little

17   interruption.  I think my computer froze up again so

18   I had to reset it and come back on.

19        STRICDAD7:  Sorry.  Got booted.

20        CAPTOES:  Or t.  Thought so.  Just coming back

21   from Daytona with family and going home.

22        STRICDAD7:  Very good.

23        CAPTOES:  Eager to meet everyone, especially

24   you.

25        STRICDAD7:  I am eager to meet you, as well.

Romanosky - Direct

1    You said you are between Ft. Myers and Naples;

2    correct?

3         CAPTOES:   In the country about six miles from

4    Interstate 75.

5         STRICDAD7:   I have to meet a new client maybe

6    next week in Sanibel Island.   If you were close I

7    thought I might drop by and say hello.

8         CAPTOES:   Would be great.   But I will be in

9    Charleston, South Carolina making a speech there and

10   in Charlotte, North Carolina.   Damn.   You could have

11   come over.   Will you go back there again soon, too?

12   You can always drop by any time.

13        STRICDAD7:   Don't know.   My secretary keeps my

14   schedule.   She knows better than I do.   Laugh out

15   loud.   What town are you?   I am not real familiar

16   with that area but have Goggle maps.

17        CAPTOES:   No town.   It is unincorporated Lee

18   County.   You get off at exit 131 and go east and a

19   little north.   I have not mastered computer maps.

20        STRICDAD7:   Laugh out loud.   That doesn't

21   sound too bad.   What are you speaking on in the

22   Carolinas?   If I am as active as you are at 70, I

23   will consider myself very lucky.

24        CAPTOES:   It is quite easy.   Am in a gigantic

25   community of 5800 acres.   Speaking about divorce and

Case 8:08-cr-00318-JDW-TGW   Document 241   Filed 03/20/09   Page 44 of 312 PageID 1302
Romanosky - Direct
44

```
 1    custody problems.  I'm fairly active and I'm sure

 2    you will be, too.

 3         STRICDAD7:  I hope so.

 4         CAPTOES:  You sound very active.

 5         STRICDAD7:  Yes.  Very much so.  Work keeps me

 6    busy.  Except for my afternoon chats on here I don't

 7    slow down much.

 8         CAPTOES:  I glad you are doing that, Michael.

 9         STRICDAD7:  I am looking at Google maps.  Are

10    you in Lehigh Acres?  That's not too far from

11    Sanibel.

12         CAPTOES:  God, no, not that far.  I am off

13    Daniels Parkway and Gateway.

14         STRICDAD7:  I see you now.  Golf community,

15    huh.  Do you play?  I've played golf a few times

16    with clients.  I'm not very good but it was nice to

17    get away for half a day.

18         CAPTOES:  Don't play anymore.  I never liked

19    it.  I did play tennis.

20         STRICDAD7:  Tennis is fun.

21         CAPTOES:  Now only bike ride and swim.  Swim

22    twice a day.

23         STRICDAD7:  Swimming is definitely good for

24    you.

25         CAPTOES:  For sure.  And my own pool,
```

1    parenthesis, which your kids would love, I'm sure.

2           STRICDAD7:  I'm sure.  They love the water,

3    that is for sure.

4           CAPTOES:  Good to hear.  I love it, too.

5           STRICDAD7:  Be right back.  Phone.

6           CAPTOES:  Me, too.  Back as soon as I can.

7           STRICDAD7:  Back.

8           THE WITNESS:  And then he signed off at 3:18.

9    BY MS. KAISER:

10   Q      Did you subsequently get an e-mail from the

11   defendant on June 19th?

12   A      Well, I did, but I had sent him one first.  I

13   had things that I was doing.  I couldn't wait around

14   for him to come back.  So I sent him an e-mail at

15   3:42 PM.

16   Q      Publishing Government's Exhibit 17.  Is this

17   the e-mail to which you were just referring?

18   A      Yes.

19   Q      Okay.  If you could publish that.

20   A      It says, Charles, I apologize.  I had to go

21   and could not wait for your return as I have an

22   employee issue to deal with.  I will talk with you

23   later today or tomorrow.  Michael.

24   Q      Did he respond to this e-mail?

25   A      Yes, at 3:55 PM.

Romanosky - Direct

1    Q       Publishing Government's Exhibit 18.  Is this a

2    response?

3    A       Yes.

4    Q       Okay.

5            CAPTOES:  Michael, came back but had trouble

6    getting AOL to connect.  Eager to talk with you per

7    usual, Charles.

8    BY MS. KAISER:

9    Q       Next I'm publishing Government's Exhibit 19.

10   On what date was this chat, Corporal Romanosky?

11   A       This was on June 19th at 4:15 PM.

12   Q       Okay.  You may proceed.

13   A       I sent Mr. Friedlander a message.  I said:

14           STRICDAD7:  You made it back.

15           CAPTOES:  Yes, I did.  Damn AOL, too.

16           STRICDAD7:  Laugh out loud.  I understand

17   completely.  I get booted at least once a day.

18           CAPTOES:  Am not looking forward to the

19   speeches as I really don't enjoy doing them.  They

20   are needed, I feel.

21           STRICDAD7:  Yes.  They can be the most

22   pleasurable topic to speak on.

23           CAPTOES:  No.  But I do some testifying on

24   this at times.

25           STRICDAD7:  Really?  That is interesting.  Are

Romanosky - Direct

1    you an expert in custody issues and divorce

2    proceedings?

3         CAPTOES:  Am supposed to be.  There is no easy

4    solution at times.

5         STRICDAD7:  There never is.  I own a company

6    that supplies offshore power boat teams and some

7    vehicle racing teams with equipment on a large

8    scale, not your Friday and Saturday night locals.

9         CAPTOES:  Very interesting, though know little

10   about it.

11        STRICDAD7:  It's a lot of fun.  I get to go to

12   events -- a lot of events and get to travel from

13   time to time.  With the internet I can do most of my

14   meetings and sales right from the office now so that

15   cut back on travel.

16        CAPTOES:  That can always be fun.  Have been

17   to Sanibel before?

18        STRICDAD7:  Yes, a while back.  Captiva Island

19   was nice, Plantation Inn.

20        CAPTOES:  I love Captiva.  The hurricane made

21   a mess there and the hotels have declined.  There's

22   a great eatery for lunch called Bubble Room.  Take

23   people there fairly often.

24        STRICDAD7:  Hum.  Have never been there.  I go

25   to Boca Raton from time to time.  A lot of my

1    clients practice offshore there and I can drop ship

2    things right to them.

3         CAPTOES:  Very convenient.  Have been to Boca

4    a few times, but often go to the east coast.

5         STRICDAD7:  Yes.  Me, too.  Daytona, Ormond

6    Beach, St. Augustine are all very nice.

7         CAPTOES:  I basically prefer the west cost as

8    it is quieter.  Am not big on going out that much.

9         STRICDAD7:  I can understand that.  Nothing

10   beats the peace and quiet of home.

11        CAPTOES:  That is way I feel.  And that is why

12   I'd like you all to come to mine.  I designed it for

13   me.

14        STRICDAD7:  Sure.  I understand.  And I am

15   sure that can be arranged.  For your first session,

16   however, I think everyone would be more at ease in a

17   known location.  After everyone gets to know you

18   then there wouldn't be an issue.  There is always

19   that first bit of nervousness when someone new joins

20   the group.

21        CAPTOES:  I can well understand.

22        STRICDAD7:  Are you able to travel here?

23        CAPTOES:  If I am home, of course.

24        STRICDAD7:  Of course.  Let me know your

25   schedule for the next few weeks.  We will be having

1      a gathering very soon.

2           CAPTOES:  I am free from the 6th of July on.

3      Get back from Daytona then.  After that nothing

4      really unless someone stops by.

5           STRICDAD7:  Okay.  We can shoot for the week

6      following the 6th.  I will have the approval for you

7      to come by then.  I've already spoken with a couple

8      members and they were okay with it.

9           CAPTOES:  Very nice.  Thank you.  Doing these

10     speeches always gets me anxious and doubt that I

11     will accept many more invites.  Am fairly quiet and

12     somewhat shy, so giving speeches is not my thing.

13          STRICDAD7:  I'm with you there.  Just imagine

14     everyone naked.  No, wait, don't do that.  Laugh out

15     loud.

16          CAPTOES:  Never know the variety who might be

17     at one of these.  In a small comfortable group I am

18     fine.

19          STRICDAD7:  True.  It's definitely a small

20     group.  Friends like ours are difficult to find and

21     hard to trust.

22          CAPTOES:  Well, I think one gets a gut feeling

23     regarding the trust issue.  It is either there or it

24     isn't.  I basically am a trusting guy.

25          STRICDAD7:  Same here.  I have a good feeling

1    about you.

2              CAPTOES:  And I have an implicit trust of you,

3    Michael, implicit.

4              STRICDAD7:  Thank you, Charles.  That means a

5    lot.

6              CAPTOES:  I think our interests and goals seem

7    to dovetail in a number of important areas.

8              STRICDAD7:  Indeed.  Charles, I enjoy our

9    chats but I'm afraid I must go.  Need to go home and

10   make sure everyone's chores were done.

11             CAPTOES:  I would fully concur with that.  We

12   shall chat sure, am sure.

13             STRICDAD7:  I am sure.  Have a good night.

14             CAPTOES:  You, also.

15   BY MS. KAISER:

16   Q    Did you next chat with the defendant on June

17   20th, 2008?

18   A    I did, starting at 3:25 PM.

19   Q    All right.  I'm now publishing Government's

20   Exhibit 20.

21             CAPTOES:  Good afternoon, Michael.

22             STRICDAD7:  Hello, Charles.  How are you?

23             CAPTOES:  Fine, thanks.  And you?  Have those

24   two boys this weekend.

25             STRICDAD7:  I am doing well, thanks.  Yes, my

Romanosky - Direct

 1    boys are with me.

 2          CAPTOES:  And I have my son's friend's boys

 3    this weekend as granddad is going away.

 4          STRICDAD7:  Very nice.  How old are they?

 5          CAPTOES:  Just 12 and 14 today or tomorrow.

 6          STRICDAD7:  Very nice.

 7          CAPTOES:  A handful.  Their dad is very

 8    absentee.  Their granddad raises them.

 9          STRICDAD7:  Does he let them walk all over

10    him?

11          CAPTOES:  Not the granddad.  He is much like I

12    am.  Says no one else can handle them when he is not

13    there except your trucky.

14          STRICDAD7:  Laugh out loud.  I'm sure they

15    will behave for you.

16          CAPTOES:  They usually do.  I keep them on

17    occasion.  Strict rules and no leniency.

18          STRICDAD7:  Of course.

19          CAPTOES:  They seem to thrive on that with me.

20          STRICDAD7:  That means you're doing it right.

21          CAPTOES:  I believe so.  Their granddad runs a

22    strict house but his son does not.  The granddad

23    feels that strict discipline is mandatory.

24          STRICDAD7:  I agree with him.  If they get out

25    of line they need a backhand across the mouth.

 1            CAPTOES:  They get that from me for sure and
 2     then later the razor strop.
 3            STRICDAD7:  Of course.
 4            CAPTOES:  They stayed with me about six weeks
 5     or so and were very sore when they went home.
 6            STRICDAD7:  I'll bet.  Good for you.  I'll bet
 7     you enjoyed that six weeks.
 8            CAPTOES:  It was six weeks ago but only for
 9     two weeks.  I enjoyed it very much.  And they did
10     fairly well.
11            STRICDAD7:  That's good.
12            CAPTOES:  Now we will see how they do for
13     these three nights.
14            STRICDAD7:  I am sure that they will behave or
15     they will get more of the same.
16            CAPTOES:  The 12-year-old probably will.  The
17     older tests continually.
18            STRICDAD7:  Well, I am sure it's nothing you
19     can't handle.
20            CAPTOES:  I can and do handle him with no
21     problem but yelling and crying.
22            STRICDAD7:  Hopefully not loud enough that the
23     neighbors hear.
24            CAPTOES:  They can hear nothing, as you will
25     see.

Romanosky - Direct

53

```
 1              STRICDAD7:  Very good.  We have an 11-year-old

 2      that like to yell and cry a lot.

 3              CAPTOES:  Does he still?

 4              STRICDAD7:  Only if allowed.

 5              CAPTOES:  If he yells too much, he is stopped

 6      in his tracks.

 7              STRICDAD7:  Of course.

 8              CAPTOES:  With one or two backhands after one

 9      warning.

10              STRICDAD7:  Exactly.  Or they even make items

11      to help with silence.

12              CAPTOES:  I have used a gag on occasion.

13              STRICDAD7:  Exactly.  Who did you use gag on,

14      friend's kid or son?

15              CAPTOES:  Both.

16              STRICDAD7:  Nice.

17              CAPTOES:  Son hated it more than these two.

18              STRICDAD7:  Do these two enjoy their

19      discipline or is it that they are just used to it?

20              CAPTOES:  The 12-year-old is used to it.  The

21      older fights all the way.

22              STRICDAD7:  Well, his is of that age.

23              CAPTOES:  Correct.  But that doesn't make me

24      any less determined.

25              STRICDAD7:  Of course not.  Would make me more
```

Romanosky - Direct

1    determined to gain immediate compliance.

2         CAPTOES:  You sound exactly like me.  He gets

3    more and harder.

4         STRICDAD7:  Exactly.  Are you bigger than him?

5         CAPTOES:  Yes.  My son was bigger than I but I

6    am strong.  These two are shorter and thinner.

7         STRICDAD7:  I am sure you will break his will

8    without too much difficulty then.

9         CAPTOES:  Oh, I will for sure.  It is closer

10   now.  I have made up my mind to do it.  The older

11   will always be more compliant.

12        STRICDAD7:  Very good.  Do you do any fun

13   things with them?

14        CAPTOES:  Explain, please.

15        STRICDAD7:  Show them that you enjoy

16   administering discipline?

17        CAPTOES:  Not sure that I know quite what to

18   do in that area.

19        STRICDAD7:  Well, it would be difficult with

20   them not being around all the time.

21        CAPTOES:  They like me.  And we do horse

22   around some.  They say they want to live with me.

23   Why?  Who knows.

24        STRICDAD7:  Laugh out loud.  Because kids like

25   discipline and structure.  They may not act like it

1    during harsh punishment, but they know it is good

2    for them.  Wouldn't you agree?

3         CAPTOES:  Yes.  I believe so.  My son knew he

4    needed to keep him on my wave length, in

5    parenthesis, his words.  He needed assurance that

6    loved him and so do these two boys.  Their granddad

7    never says that to them.

8         STRICDAD7:  That's too bad.

9         CAPTOES:  I have suggested that to him.  I am

10   fond of them.

11        STRICDAD7:  Sounds like it.  Charles, I hate

12   to cut this short but I need to go.  I am leaving

13   the office early today.

14        CAPTOES:  Very good.  Don't blame you.  They

15   come at 6:00.  Enjoy the weekend.

16        STRICDAD7:  You, too.  I may be coming in this

17   weekend to make sure some orders get out.  Do you go

18   online over the weekend?

19        CAPTOES:  Yes, I do.  So I shall look for you.

20        STRICDAD7:  Yes.  I will probably come in

21   Sunday.  I'll talk to you then.

22        CAPTOES:  Great.  Look forward to it per

23   usual.

24   BY MS. KAISER:

25   Q    Corporal Romanosky, it seems like in most of

Romanosky - Direct

```
1      these chats that you tell the defendant that you

2      have to leave.  Why is that?  Why don't you just

3      keep chatting with him?

4      A     It would go on.  It would just keep going on

5      like that.  And, honestly, it's not pleasant to do

6      these kinds of chats.  I keep up my end with it.  I

7      try to set the pace with him.  But when it gets

8      close to the end of the day, I don't want the chat

9      to keep going on and on and, frankly, I just need a

10     break to get away from it.

11     Q     Okay.  Did you next chat with the defendant on

12     June 24th of 2008?

13     A     Yes.

14     Q     I'm publishing Government's Exhibit 21.

15           CAPTOES:  Good afternoon, Michael.

16           THE WITNESS:  Auto response from StrictDad7.

17     I'm away from my computer right now.  I reply at

18     1:34, three minutes later.

19           STRICDAD7:  Hello, Charles.

20           CAPTOES:  How are you?

21           STRICDAD7:  Good.  And you?

22           CAPTOES:  Fine.  Thanks.  Still hoping I get

23     cleared to join you all.

24           STRICDAD7:  I've talked with everyone but one

25     and you are in so far.  The last person is out of
```

Romanosky - Direct

 1    town right now.

 2          CAPTOES:  Great.  Hope he/she says yes, too.

 3          STRICDAD7:  I'm sure.  Hey, I would love to

 4    chat but I need to run.  Had my weekend order get

 5    messed up so it's chaos around here.

 6          CAPTOES:  Of course.  Come back when you can.

 7          STRICDAD7:  Will do.  Thanks.  Great hearing

 8    from you.

 9          CAPTOES:  Thanks.  Hope the mess gets

10    straightened out.

11          STRICDAD7:  It will.  Just takes a lot of work

12    to fix.

13          CAPTOES:  Never dull, I'm sure.  Will be on

14    today.

15          STRICDAD7:  Okay.  Talk to you later.

16    BY MS. KAISER:

17    Q     Corporal Romanosky, when the defendant had

18    written to you, fine, thanks, still hoping I get

19    cleared to join you all, what did you understand

20    that to mean?

21    A     I understood this to be a reference to his

22    coming up and meeting with my undercover profile and

23    my undercover profile's fictitious friends that

24    share these interests.

25    Q     Was the next communication that you had with

Romanosky - Direct

1      the defendant by an e-mail?

2      A      Yes.

3      Q      And was that on June 27, 2008?

4      A      Yes.  The defendant had sent my undercover

5      profile an e-mail at 12:46 PM.

6             MS. KAISER:  At this time, Your Honor, the

7      government would request permission to publish

8      Exhibit 22.

9             CAPTOES:  Michael, hadn't seen you online and

10     hope that all is okay with you.  Drop me a line if

11     you wish to, Charles.

12     BY MS. KAISER:

13     Q      Did you respond to this mail?

14     A      Yes, but not for three days.

15     Q      When did you respond to that e-mail from the

16     defendant?

17     A      On June 30th at 3:48 PM.

18     Q      At this time the government would publish

19     Government's Exhibit 23.  Is this the e-mail to

20     which you are referring?

21     A      Yes.

22     Q      Okay.  If you would please publish it.

23             STRICDAD7:  Charles, good to hear from you.

24     Things have been a little hectic around the office.

25     One of my clients was supposed to receive a rather

Romanosky - Direct

59

1    large and expensive order which was all messed up.

2    I had to fly out of town to correct the problem as

3    this client is very important to us.  I am back home

4    now and looking forward to the upcoming holiday.  I

5    have spoken with everyone in the group and everyone

6    is okay with you attending the next gathering.

7    Looking forward to our next chat to discuss the

8    agenda, Michael.

9    BY MS. KAISER:

10   Q      After this e-mail, what communication did you

11   have with the defendant?

12   A      My next communication wasn't until July 7th.

13   Q      Why did you -- do you recall why there was a

14   gap there?

15   A      I might have been -- well, we had the holiday

16   weekend, the July 4th weekend.  And prior to that I

17   think I was -- did I go to Daytona?  I might have

18   been out of town for one day.  I know -- these

19   online cases always -- you have to keep in mind that

20   I'm also working live victim cases where I actually

21   have physical or sexual abuse cases that I'm

22   working.  So these come in, you know, if I can get

23   on in the afternoon or in between working other

24   investigations.

25   Q      Okay.  Now publishing Government's Exhibit 24.

Romanosky - Direct

1    Was this the next chat you had with the defendant on

2    July 7th of 2008?

3    A      That is correct.

4           CAPTOES:  Good afternoon, Michael.

5           STRICDAD7:  Hello, Charles.  How are you?

6           CAPTOES:  Fine.  Thanks.  So nice to be home.

7           STRICDAD7:  Yes.  Travel is fun but nice to

8    get home.

9           CAPTOES:  You are so right.  Looking forward

10   to being with you all.

11          STRICDAD7:  Yes.  Did you get my e-mail?

12   Everyone is okay with you coming to the next

13   gathering.

14          CAPTOES:  Yes, I did.  Thank you.  Am looking

15   forward to it.

16          STRICDAD7:  What is your schedule like during

17   the week of 17th through 23rd?

18          CAPTOES:  Fine, I'm sure.

19          THE WITNESS:  Just before that, trying to put

20   something together for that week, then fine, I'm

21   sure.

22          STRICDAD7:  Very good.  I will be out of town

23   next week.  That was my original plan.

24          CAPTOES:  Either is fine.  The week of the

25   26th would have been bad, but 17 to 23 is great.

1      Boys behaving well these days?

2          STRICDAD7:  They were pretty good this

3      weekend.  We were down in Sarasota for the offshore

4      grand prix.  Few behavioral slipups I noted,

5      however.

6          CAPTOES:  Am sure you took care of those

7      easily.

8          STRICDAD7:  Yes, of course.  But also noted on

9      my list for the meeting.

10          CAPTOES:  Very good.  Both boys or just one?

11          STRICDAD7:  Which would you prefer?

12          CAPTOES:  Will defer to you for the first

13      time.

14          STRICDAD7:  Question mark?  I'm sorry.  I

15      thought you were looking to instruct.

16          CAPTOES:  I am.  But also need to get my feet

17      wet with the group in all phases.

18          STRICDAD7:  Understandable.  We can have

19      someone go first with their own child but I don't

20      think group will be okay with someone coming to just

21      watch all evening.

22          CAPTOES:  Don't want to watch much.  Will

23      surely instruct totally.  Thought I would want to

24      work with boy -- with both of your boys or just one.

25          STRICDAD7:  I am sure I will have a list of

Romanosky - Direct

1    misbehavings for both by then.  How will you want

2    them positioned and dressed?

3         CAPTOES:  That will be perfect.  I have some

4    thoughts already.  Did spend the day with a friend

5    of my son.  His dad and his two sons.

6         STRICDAD7:  Very nice.  How did that go?

7         CAPTOES:  Very well.  Actually it was for

8    about a 24-hour period.  The boys, in parenthesis,

9    the younger one more so had been continually

10   misbehaving.  The granddad and I took over with my

11   razor strops and some backhands, as well.  The boys

12   straightened up quite quickly.

13        STRICDAD7:  Very nice.  Will you be bringing

14   the razor strap or other favorite tools with you to

15   our gathering?

16        CAPTOES:  Yes, I shall.  A heavy wide belt and

17   the razor strop.  Do you usually discipline your

18   boys bare?

19        STRICDAD7:  Both clothed and bare.  Which

20   would you prefer?

21        CAPTOES:  Would prefer bare myself.  Find it

22   more effective.

23        STRICDAD7:  Of course.  Plus the slap of the

24   strap is nice, right?

25        CAPTOES:  Yes.  It also brings immediate

Romanosky - Direct

```
 1      attention.

 2             STRICDAD7:  Oh, yes.  How do you want them

 3      positioned for your instruction?

 4             CAPTOES:  Probably bent over a chair or a

 5      couch.  Want them totally exposed.

 6             STRICDAD7:  Bound to the chair or couch or

 7      just bent over?

 8             CAPTOES:  Probably bound.  Use a fairly full

 9      swing.

10             STRICDAD7:  Nice.  You understand no permanent

11      marks, though, correct?

12             CAPTOES:  Never do leave anything permanent,

13      of course.

14             STRICDAD7:  Anything that will heal is fine.

15      BY MS. KAISER:

16      Q      Corporal Romanosky, right there where the

17      defendant says, probably bent over a chair or couch,

18      want them totally exposed, what did you understand

19      him to mean at that point?

20             MR. TRAGOS:  Objection, Your Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  I understood the defendant to

23      mean that he wanted my two boys either together or

24      one at a time bent over a chair or a couch and

25      stripped so that he could administer the physical
```

Romanosky - Direct

1    punishment.

2    BY MS. KAISER:

3    Q        And when you say stripped, do you mean

4    stripped naked?

5    A        Yes.

6    Q        And when the defendant said, probably bound as

7    use a fairly full swing, what did you understand the

8    defendant to mean?

9    A        Tied, restrained.

10   Q        Okay.  And when he said, as use a fairly full

11   swing, what did you understand that to mean?

12   A        Well, that it was going to be -- he wasn't

13   going to be just slightly smacking.  There was going

14   to be fairly full swings, full swings of the hand or

15   the arm.

16   Q        All right.  You may proceed.

17            CAPTOES:  That is the only way I do it.  If it

18   heals in two or three days that is fine.

19            STRICDAD7:  Very good.  Definitely on same --

20            MR. TRAGOS:  Could we have a moment?  Where

21   are we?  Excuse me, Your Honor.  Could we have just

22   a moment.

23            THE COURT:  No.  Let's start over at the

24   bottom of page two with the continuation, please.

25            STRICDAD7:  Very good.  Definitely on same

1    page, then.

2         CAPTOES:  Will you have disciplined for the

3    infractions prior to the meeting, also?

4         STRICDAD7:  Also, you must use care to make

5    sure areas that are hit can be covered by clothing.

6    No black eyes or that sort of thing.  No.  I think

7    I'll let it build up until then, compile one heck of

8    a list by then.  Laugh out loud.

9         CAPTOES:  No worry.  No black eyes.  Will do a

10   backhand or so if warranted.

11        STRICDAD7:  That's fine.  Nothing they won't

12   have had before.

13        CAPTOES:  Correct.  Mine might be a little

14   harder.  I really am not sure.  I hope also possibly

15   to discipline them in between.

16        STRICDAD7:  Harder is great.  I am looking

17   forward to observing your technique.  In quotes and

18   question mark, in between?

19        CAPTOES:   In between the group meetings.

20        STRICDAD7:  That would be great.  Sometimes

21   can't wait for the meetings for serious rule

22   violations.

23   BY MS. KAISER:

24   Q    Let me interrupt right there.  Corporal

25   Romanosky, when the defendant said to you, excuse

1     me, that I hope to possibly discipline them in

2     between, and you asked him -- and he said in between

3     the group meetings, what did you understand him to

4     mean?

5     A      I understood him to mean that he wanted to

6     have contact with me in between the normal sessions

7     that this -- that my undercover profile's fictitious

8     group arranged, that he wanted more of a -- more of

9     a relationship with himself and my undercover

10    profile.

11    Q      Okay.  All right.  Proceed.

12    A      I'm sorry.  Where were we?

13           AGENT HAGEDORN:  In between the group

14    meetings.

15           STRICDAD7:  That would be great.  Sometimes

16    can't wait for the meetings for serious rule

17    violations.

18           CAPTOES:  That is what I was thinking.  I feel

19    serious infractions need to be taken care of at once

20    and later with the group, as well.

21           STRICDAD7:  Of course, as reinforcement.  Were

22    you looking to use them for anything else besides

23    your demonstration of proper discipline?  If so,

24    it's okay.  Just want to know for myself since I

25    will be working with stepdaughter that night.

Romanosky - Direct

```
 1              CAPTOES:  That will surely be a possibility.

 2              STRICDAD7:  Nice.  My 14-year-old stepdaughter

 3       has been talking back to her mother lately.  I can

 4       see that the frequency of her involvement in the

 5       group needs to increase.  I've been working with the

 6       boys mostly and her behavior is starting to suffer.

 7              CAPTOES:  Will you use her only for

 8       demonstration or for something else, too?

 9              STRICDAD7:  Both, of course.  I've neglected

10       both things with her since I've been so focused on

11       the boys.  Since you will be there to work with the

12       two boys, I can focus some quality attention to her.

13              CAPTOES:  That will be very good.  I will

14       totally focus on the boys.

15              STRICDAD7:  Very good.

16              CAPTOES:  Is your stepdaughter often a rule

17       breaker?

18              STRICDAD7:  She wasn't when getting regular

19       discipline.  Now that she's a few years older, the

20       boys -- she's testing the rules more.  Regular

21       attention will bring her right back.

22              CAPTOES:  That's good.  Are the boys 11 and

23       12?

24              STRICDAD7:  Ten and 11.

25              CAPTOES:  Have you disciplined them since the
```

1      last group meeting?

2           STRICDAD7:  Just a little informal, nothing

3      major.  Like to save formal for the meetings since

4      that gives the heal time.

5           CAPTOES:  Correct.  Are the boys big or small

6      for their age?

7           STRICDAD7:  Average.

8           CAPTOES:  That's fine.  Have you been a bit

9      rough with them at the meetings?

10          STRICDAD7:  At times.

11          CAPTOES:  Good.  I might do much the same.

12          STRICDAD7:  Very good.  Ground rules are

13     simple.  No permanent injury or marks, and no

14     healing injury in place where clothing won't cover.

15     Other than that it's up to you for discipline or

16     other.  Do you want the others to watch a few or

17     complete privacy?

18          CAPTOES:  They could surely watch some, and

19     some privacy, or just with you.

20          STRICDAD7:  Okay.  Won't be a problem.

21          CAPTOES:  Do you prefer privacy or some

22     watching?

23          STRICDAD7:  Either.  I am close enough with

24     everyone in the group that it doesn't matter now.

25     When some new people join they want smaller audience

1    at first, which is fine.  Some people prefer larger

2    audience -- large audience.  We respect everyone's

3    preference as long as ground rules are followed.

4         CAPTOES:  I agree totally.  Were the boys

5    usually used for demonstration or other things, as

6    well?  I will want and hope to do more.

7         STRICDAD7:  More?  They have been used for

8    demonstration and more, in quotes.  Just want to

9    make sure we're talking about the same thing.  I

10   trust you so I have no problem telling you that they

11   have been used for more.

12        CAPTOES:  That is fine.  And you may surely

13   trust me.

14        STRICDAD7:  I do completely.  I know it's

15   difficult to say on here because we've never

16   actually met in person.  But were you referring to

17   more as sexual things with them?

18        CAPTOES:  If that has ever been introduced.

19        STRICDAD7:  Yes.  With the boys and

20   stepdaughter.  And others in group are on same page,

21   as well.  That and disciplining seem to go hand in

22   hand, I found.

23        CAPTOES:  That's fine.  I was wondering about

24   both.  Pleased that all are on the same page.  I

25   feel they absolutely do go hand in hand.

1          STRICDAD7:  Absolutely.  Were you looking to

2     do some things with the boys following or during

3     their discipline?

4          CAPTOES:  Probably following, at least this

5     first time.

6          STRICDAD7:  Very nice.

7          CAPTOES:  You are welcome to be there, of

8     course, too.

9          STRICDAD7:  That would be a nice sight.  I

10    would be there.

11         CAPTOES:  That would be fine with me.

12         STRICDAD7:  Very good.  What would you like to

13    do with them?  Just trying to get a visualization

14    for myself.

15         CAPTOES:  Have to cogitate about that as don't

16    know what they have done.

17         STRICDAD7:  They've experienced a lot for 10

18    and 11.  I would imagine everything that you are

19    interested in doing with them -- interested.  Sorry

20    for the typing.  Was visualizing.

21         CAPTOES:  No problem.  I would do all that

22    they were capable of handling from oral on.

23         STRICDAD7:  I'm sure you won't be

24    disappointed.  Handling and oral they know well.

25         CAPTOES:  Have they progressed from there?

Romanosky - Direct

1          STRICDAD7:  Yes, a few times.

2          CAPTOES:  Good.  We will get to know each

3     other am sure.  And even easier with you being there

4     the first time.

5          STRICDAD7:  Yes.  That's what I was thinking.

6     I'm sure after the discipline you administer they

7     will prefer the other.  Phone.  Be right back.

8          CAPTOES:  Okay.

9          STRICDAD7:  Back.  Sorry.  Secretary was away

10    from her desk.

11         CAPTOES:  No problem.  I think the boys and I

12    should do well together.

13         STRICDAD7:  I agree.  How does the 21st look

14    for you?  It is a Monday.

15         CAPTOES:  Sounds fine.  Would you like to meet

16    me before, like for lunch somewhere?

17         STRICDAD7:  Great.  I just heard from the last

18    two group members that it is best date for them.  We

19    can meet Monday near the house and talk for a few.

20    If we are both okay with everything, then you can

21    ride with me or follow me back to the house.  You

22    and I would just meet an hour or so earlier than the

23    time I give to everyone else.  If you would like to

24    meet for lunch prior to that it would have to be

25    soon since I am out of town all next week screening

1       new engine builders.

2               CAPTOES:  That is perfect.

3               STRICDAD7:  Okay.  Great.  We will meet before

4       the group on Monday, then go back to the house from

5       there.

6               CAPTOES:  That is fine.  Think we will do

7       nicely together, Michael.

8               STRICDAD7:  I agree completely.  Charles, I

9       hate to run, but I need to make a few calls before I

10      leave here for the day.  It has been great talking

11      with you.

12              CAPTOES:  You, topo.  We will continue

13      tomorrow if you're available.

14              STRICDAD7:  I'll be here.

15              CAPTOES:  Great.  Believe our friendship may

16      well extend beyond the meetings, Michael.

17              STRICDAD7:  I think you are right.  Good

18      night, Charles.

19      BY MS. KAISER:

20      Q       Corporal Romanosky, when the defendant told

21      you, I would do all that they were capable of

22      handling from oral on, what did you understand him

23      to mean?

24      A       I took that to mean from oral sex possibly

25      leading into maybe even as far as like anal

Romanosky - Direct

73

1       intercourse or something along those lines.

2       Q       When was your next communication with the

3       defendant?

4       A       I next spoke with him online on July 9, 2008.

5       Q       Okay.  Now publishing Government's Exhibit 25.

6       Is that the chat you're referring to?

7       A       Yes, it is.

8       Q       Okay.  Proceed.

9               CAPTOES:  Good afternoon, Michael.

10              STRICDAD7:  Hello, Charles.  You changed your

11      font, I see.

12              CAPTOES:  This is my laptop.  The desktop

13      stopped working.  Now fixed so will attach it

14      tonight.

15              STRICDAD7:  I hate it when that happens.

16      That's the only problem with computers.  You put all

17      your data on there and the damn thing stops working.

18              CAPTOES:  I know.  At least I had this five

19      year old laptop.

20              STRICDAD7:  Laugh out loud.  Hey, if it made

21      it five years, it owes you nothing.

22              CAPTOES:  You are totally correct.  Looking

23      forward to the 21st.

24              STRICDAD7:  Same here.

25              CAPTOES:  Oiled my two razor strops and

Romanosky - Direct

74

1        Garrison belt this morning.

2              STRICDAD7:  Nice.  Getting them ready, huh?

3              CAPTOES:  Exactly.  They will find their mark

4        well.

5              STRICDAD7:  Will be a nice demonstration I'm

6        sure.

7              CAPTOES:  Will try my best.  It should work

8        well.  May be quite a few tears.

9              STRICDAD7:  Tears are indicator that things

10       are being done right.

11             CAPTOES:  I agree.  And maybe some yells, too.

12             STRICDAD7:  That's fine.  House is well

13       insulated.

14             CAPTOES:  Will it be at your house?

15             STRICDAD7:  Yes.

16             CAPTOES:  Nice.  If all goes well, I can host

17       along the way.

18             STRICDAD7:  That would be great.

19             CAPTOES:  Does everyone dress pretty casually?

20             STRICDAD7:  Yes, no dress code.  Personal

21       preferences are respected.

22             CAPTOES:  Fine.  Everyone wear clothes,

23       usually?

24             STRICDAD7:  To some degree.  It's whatever

25       your preference is.

 1              CAPTOES:  Fine with me.

 2              STRICDAD7:  Do you have a preference for

 3      yourself?

 4              CAPTOES:  Not really.  As the evening goes on

 5      may well shed some.  What about you?

 6              STRICDAD7:  Usually dress authoritative, but

 7      will see.

 8              CAPTOES:  Don't have many authoritative

 9      clothes.  Can't get into my AF uniform.

10              STRICDAD7:  I normally wear black pants, black

11      shirt, black sport coat on some cases.

12              CAPTOES:  Have sport jacket, trousers, shirt

13      and tie.

14              STRICDAD7:  Wear whatever you're comfortable

15      in.  I may even go casual for this meeting.  Might

16      help you relax more if you're casual, as well.

17              CAPTOES:  Probably so.  Appreciate your

18      thoughtfulness.

19              STRICDAD7:  No problem.

20              CAPTOES:  Looking forward to getting the boys

21      later, too.

22              STRICDAD7:  I am sure.  I'm excited about

23      that, as well.

24              CAPTOES:  Good.  And with both of us there.

25      More progress.

Romanosky - Direct

1          STRICDAD7:  Exactly.

2          CAPTOES:  Have been thinking about that a bit.

3          STRICDAD7:  Really?  Anything in particular

4     come to mind?

5          CAPTOES:  Well, trying to decide what they can

6     handle, Michael.

7          STRICDAD7:  They will be fine with whatever

8     you choose.

9          CAPTOES:  Need to see their size, of course.

10          STRICDAD7:  True.  Average size for their

11    ages.  Not small but not big.

12          CAPTOES:  Fine.  Am a fairly big guy.

13          STRICDAD7:  As am I.

14          CAPTOES:  That's good to hear.  Eager to see

15    you with your stepdaughter.

16          STRICDAD7:  Yes.  I've been so focused on the

17    boys I've neglected her.  It shows since she smarts

18    off every now and then.  That will surely be

19    corrected that night.

20          CAPTOES:  I am pleased to hear that.  That

21    type of behavior needs stringent correction.

22          STRICDAD7:  Yes, it does.  It is completely

23    unacceptable.

24          CAPTOES:  She may be a pretty sore girl and

25    have lots to think about.

Romanosky - Direct

1          STRICDAD7:  You're right.

2          CAPTOES:  You had said the boys have a fair

3     list of errors, too?

4          STRICDAD7:  Yes.  And it will surely grow by

5     the 21st.

6          CAPTOES:  Right.  The group's decision will be

7     well carried out.

8          STRICDAD7:  Of course.  I cannot wait to see

9     the razor strap you've talked about.  That is

10    definitely old school.

11         CAPTOES:  True.  And I am fairly old school

12    myself.  They can cover a lot of territory.

13         STRICDAD7:  I am sure.  Do you drink coffee?

14         CAPTOES:  Really only decaf, decaf or soda.

15    Or water.

16         STRICDAD7:  Okay.  Just thinking of a place to

17    meet before we go to the house.  There are a couple

18    of coffee shops nearby.

19         CAPTOES:  That's perfect.  Can have decaf or a

20    soda.

21         STRICDAD7:  Great.  I first thought we could

22    meet at a restaurant, but too many distractions.

23    Would rather have place with less audience.

24         CAPTOES:  Afterwards, too, the two of us will

25    have time with the boys?

 1          STRICDAD7:  Of course.

 2          CAPTOES:  Agress at a coffee shop will be

 3     fine.  Agree.

 4          STRICDAD7:  I'll talk with you more before

 5     then, anyway.  I'll be in a blue Dodge mini van,

 6     just FYI.  Newer.

 7          CAPTOES:  Oh, sure.  I will drive a silver

 8     Lexus 2001.

 9          STRICDAD7:  Very nice.  I used to use

10     Suburbans and Tahoes for the business.  But with gas

11     prices being what they are, had to find other styles

12     of vehicles for everyone.

13          CAPTOES:  I like the old Lexus.  Runs well

14     and uses reg gas as does my little '93 red truck.

15          STRICDAD7:  Everyone has to have a truck at

16     their disposal.  I have a full size truck for

17     hauling and towing.

18          CAPTOES:  Mine is five on the floor.  Would

19     enjoy a big truck some of the time.

20          STRICDAD7:  I need it from time to time.  Have

21     towed client's offshore racing boats for them when

22     they were in a pinch.

23          CAPTOES:  Then you need it.  My brother-in-law

24     uses his Volvo to tow his small boat for fishing.

25          STRICDAD7:  Laugh out loud.  That has to be a

Romanosky - Direct

1    sight.

2          CAPTOES:  It truly is.

3          STRICDAD7:  Charles, I'm going to run.  Need

4    to make a few calls before I call it a day.

5          CAPTOES:  Sure.  Talk soon.  You get back from

6    bus trip this week from Friday?

7          STRICDAD7:  Correct.  I will have my laptop so

8    will be able to stay in touch during the week, also.

9    I will be in meetings during the day but I'll be

10   online at night.  I'm hoping to land two very large

11   clients that are in the championship runnings next

12   week.  Would be very good for business.

13         CAPTOES:  I hope you are successful.

14         STRICDAD7:  Thank you.  We do very well now

15   but these are top shelf clients that get word out to

16   all the people in the sport that matter.  Would

17   bring us into the championship rank level which is

18   limited to very few parts suppliers and

19   distributors.

20         CAPTOES:  That would be fantastic.

21         STRICDAD7:  Yes.  I'm excited.  Well, I'll

22   talk to you soon.

23         CAPTOES:  Very good.  Have a good evening.

24         STRICDAD7:  You, too.

25         CAPTOES:  Thanks.

 1      BY MS. KAISER:

 2      Q      When did you next talk to the defendant,

 3      Corporal Romanosky?

 4      A      On July 14th of this year.

 5      Q      Publishing Government's Exhibit 26.  Is this

 6      the chat in which you were talking to him on the

 7      14th?

 8      A      Yes, it is.

 9      Q      Okay.  At this time I'd like to publish

10      Government's Exhibit 26.

11             CAPTOES:  Good evening, Michael.

12             STRICDAD7:  Hello, Charles.  How are you this

13      evening?

14             CAPTOES:  Not bad.  Thanks.  Fell and bruised

15      my leg.  Otherwise in good shape.

16             STRICDAD7:  I'm sorry to hear that.  Are you

17      okay?

18             CAPTOES:  Oh sure.  Wet tiles.

19             STRICDAD7:  That will do it.  Must be careful.

20             CAPTOES:  Have been cogitating about Monday

21      and have derciderd to wear dress shirt and tie and

22      gray trousers.  That is fairly authoritarian for me.

23             STRICDAD7:  That is fine.  Very good.

24             CAPTOES:  I think probably your black outfit

25      sounds great to me.

1          STRICDAD7:  Yes.  It is intimidating.

2          CAPTOES:  Which is good since the boys will

3     need some of that both during and after.

4          STRICDAD7:  Of course.

5          CAPTOES:  I will wear black socks and black

6     dress shoes.

7          STRICDAD7:  That will be great.

8          CAPTOES:  And look forward to meeting

9     everyone.

10         STRICDAD7:  As they are you.

11         CAPTOES:  I will re-mink oil the instruments

12    on Saturday so they will be dry and ready.

13         STRICDAD7:  Very nice.  Prized possessions for

14    sure.

15         CAPTOES:  Oh, yes.  And they do a great job.

16    Do you know what you will use on your stepdaughter?

17         STRICDAD7:  A paddle.  Oak with leather

18    wrapped handle.  Drilled for aerodynamics.

19         CAPTOES:  That is excellent.

20         STRICDAD7:  Glad you like.

21         CAPTOES:  I will probably bring four or five

22    things.

23         STRICDAD7:  Very cool.  I can't wait to a

24    collection from such an experienced person.  What

25    else will you bring besides your razor strap and

Romanosky - Direct

1        Garrison belt?

2              CAPTOES:  A smaller heavy double belt with

3        holes, a second razor strop and a heavy German belt.

4              STRICDAD7:  Very nice.  All experienced

5        implements, I presume?

6              CAPTOES:  You are welcome to use any of these,

7        too.  Oh, I have used them many times and they don't

8        appear new at all.

9              STRICDAD7:  Very, very nice.  I am sure that

10       they will still deliver their message.

11             CAPTOES:  Loud and clear.  This may be a

12       little different experience for the boys.

13             STRICDAD7:  How so?

14             CAPTOES:  Well, the razor strop is heavy and

15       stungun implement made of seasoned leather.  The

16       Garrison is a heavy piece of leather.

17             STRICDAD7:  Yes, you're right.  They have

18       never had a razor strap before or other such effect

19       vintage implements.

20             CAPTOES:  They have done well for years and

21       are excellent reminders of things gone wrong.

22             STRICDAD7:  True.

23             CAPTOES:  You are welcome to borrow the razor

24       strop if you like.

25             STRICDAD7:  Why, thank you.  I may take you up

Romanosky - Direct

1    on that.  How many lashes do you intend to give each

2    boy?

3         CAPTOES:  I have to see them.  Could be 15 on

4    each cheek.  Is that appropriate, do you feel?  I

5    often go 20, 25.

6         STRICDAD7:  Of course.  I will trust your

7    judgment, or when they have had enough, if that is

8    what it takes.

9         CAPTOES:  Am sure 15V is appropriate and will

10   see how they react.

11        STRICDAD7:  Okay.

12        CAPTOES:  Older boys would get more, of

13   course.

14        STRICDAD7:  Of course.

15        CAPTOES:  As they grow we will increase.

16        STRICDAD7:  Of course.  What is your favorite

17   age for using the strap on boys?

18        CAPTOES:  From nine or 10 up.  I like to start

19   young with less ands.

20        STRICDAD7:  Very nice.

21        CAPTOES:  In the mid teens, really lay it on.

22        STRICDAD7:  Nice.  How about for sexual acts?

23        CAPTOES:  It really depends on the size of the

24   boys.  Always five to 10 to begin and often use a

25   switch, too, with the sexual.

Romanosky - Direct

1        STRICDAD7:  Five to 10 to begin sexual or use

2     the switch at five to 10?

3        CAPTOES:  No.  Start the sexual play and use a

4     combo of strop and switch to go forward.

5        STRICDAD7:  Very nice.  Kind of introduction

6     to both.

7        CAPTOES:  Yes.  Will strip both boys later on,

8     of course.

9        STRICDAD7:  You mean mine or just generally?

10        CAPTOES:  In general.

11        STRICDAD7:  Okay.  I understand.  I had

12     thought you had said you wanted my boys stripped and

13     bound over a chair or couch for Monday.  I want to

14     make sure I didn't misunderstand you.

15        CAPTOES:  That is true.  And want them to stay

16     that way for later, too, if okay with you.

17        STRICDAD7:  I am fine with that.  They are

18     yours for the night.  You do as you please.

19        CAPTOES:  Perfect.  And you will, of course,

20     join me?

21        STRICDAD7:  If you wish.  Or I will just watch

22     and enjoy, whichever you prefer.

23        CAPTOES:  Your call.  Either or both.

24        STRICDAD7:  Will see how things go.

25        CAPTOES:  Of course.

```
 1              STRICDAD7:  Charles, I'm going to run.  I am

 2     accompanying my perspective clients to a jazz club

 3     in Orlando tonight.  I will be in touch later on

 4     this week.

 5              CAPTOES:  That's fine.  Enjoy.

 6              STRICDAD7:  Thank you much.  Have a good

 7     evening.

 8              CAPTOES:  Thanks.  Look forward to our next.

 9              STRICDAD7:  Same here.

10     BY MS. KAISER:

11     Q     Corporal Romanosky, on June 16th, 2008, who

12     initiated the chat that you and the defendant had?

13     A     On June 16th, we didn't have any online

14     contact.  On June 16th I conducted a controlled

15     phone call from my undercover profile to the

16     defendant.

17     Q     I'm sorry, Corporal Romanosky.  I'm digressing

18     from our old chats instead of moving forward.  Not

19     in July but in June, which is Government's Exhibit

20     11 from the instant message chats from June 16th.

21     A     June 16th?

22     Q     Um-hum.

23     A     Oh, I'm sorry.  I'm with you now.

24              MR. TRAGOS:  Is there an exhibit number?

25              MS. KAISER:  Government's Exhibit 11.
```

Romanosky - Direct

1              THE WITNESS:  And I'm sorry, ma'am.  Could you

2       repeat your question.

3       BY MS. KAISER:

4       Q       Yes.  For Government's Exhibit 11, which is

5       the instant message chat on June 16th of 2008?

6       A       Correct.

7       Q       Who initiated that chat?

8       A       That was initiated by the defendant.

9       Q       And for the chat that you had on June 17th,

10      2008, which is Government's Exhibit 11, who

11      initiated that chat?

12              MR. TRAGOS:  Objection.  Asked and answered.

13              THE COURT:  Overruled.

14              THE WITNESS:  The defendant.

15      BY MS. KAISER:

16      Q       On the chat you had with the defendant on June

17      18th, 2008, Government's Exhibit 15, who initiated

18      that chat?

19      A       The defendant.

20      Q       On June 19th, Government's Exhibit 16, who

21      initiated that chat?

22      A       The defendant.

23      Q       On June 20th, 2008, Government's Exhibit 20,

24      who initiated that chat?

25      A       The defendant.

Romanosky - Direct

1    Q      On June 24th, Government's Exhibit 21, who

2    initiated that chat?

3    A      The defendant.

4    Q      On June 7th, 2008, Government's Exhibit 24,

5    who initiated that chat?

6    A      July 7th?

7    Q      Yes, July 7th.

8    A      The defendant.

9    Q      On July 9th, 2008, Government's Exhibit 25,

10   who initiated the chat?

11   A      The defendant.

12   Q      On July 14th, 2008, Government's Exhibit 26,

13   who initiated that chat?

14   A      The defendant.

15   Q      Corporal Romanosky, why weren't you the one to

16   initiate most of these chats?

17   A      We teach people when they're going through the

18   classes to learn how to do this, you want to let

19   people initiate contact with you.  And as I

20   testified earlier yesterday, if we get a complaint

21   from somebody about a particular person on the

22   internet making contact with kids, then that would

23   be an occasion where we might initiate contact with

24   them.

25          But undercover cases, I would say 99 percent

Romanosky - Direct

1    of the time the defendant will initiate contact with

2    us.  It's not hard on the internet.  You don't have

3    to be online very long for someone to initiate

4    contact with you.

5    Q     And why is that?  Why do you wait and have the

6    defendants or subjects contact you?

7    A     Well, I don't want anyone to look at it later

8    on and think that, you know, we were singling

9    somebody out or we were picking on somebody and

10    initiating contact with them to set up some

11    scenario.  We don't have to.  You just go in a chat

12    room and wait.  It doesn't take very long.

13          THE COURT:  Why don't we take a midmorning

14    comfort break at this time, 15 minutes.

15          COURTROOM SECURITY OFFICER:  Rise for the

16    jury, please.

17    (Jury out at 10:29 AM.)

18    (Recess was taken at 10:29 until 10:47 AM.)

19    (Back on the record.)

20          COURTROOM SECURITY OFFICER:  All rise.  This

21    Honorable Court is in session.

22          MR. TRAGOS:  Your Honor, could I put something

23    on the record?

24          THE COURT:  Use the mic.

25          MR. TRAGOS:  May I put something on the record

Romanosky - Direct

1        before the jury comes in?

2               THE COURT:  Hurry.

3               MR. TRAGOS:  I would just like to put a

4        particular objection on the record and clarify it.

5        My objection is when he says what he thought a

6        particular item meant or a description of what he

7        interpreted it to mean or what he interpreted it to

8        say, I'm going to object to that because it's what

9        is in his mind I believe is irrelevant and highly

10       prejudicial as opposed to only really what's

11       relevant is what's in my client's mind.

12              THE COURT:  All right.  The objection is

13       noted.  It's overruled.

14              MR. TRAGOS:  Okay.

15              THE COURT:  As long as the questions are posed

16       as to what this witness understood as opposed to him

17       speculating about what the author intended, that's

18       fair.  You can cross-examine on it.

19              Bring the jury in, please.

20              COURTROOM SECURITY OFFICER:  Yes, sir.

21              THE COURT:  We're going to go until a quarter

22       till noon, so it's just shy of an hour for time, you

23       know, planning purposes.

24              MS. KAISER:  Yes, Your Honor.

25              THE COURT:  And the GPS matter, Ms. Ohle is

Romanosky - Direct

1       going to work on that and get that resolved.

2               COURTROOM SECURITY OFFICER:  Rise for the

3       jury, please.

4       (Jury in at 10:48 AM.)

5               THE COURT:  Thank you.  Be seated.  You may

6       resume direct examination.

7               MS. KAISER:  Thank you.

8       BY MS. KAISER:

9       Q       Corporal Romanosky, did you ever have any

10      conversations with the defendant on the telephone?

11      A       Yes.  On July 16th I made a controlled call

12      from my undercover profile to the defendant.

13              MS. KAISER:  Your Honor, may I approach the

14      witness?

15              THE COURT:  Yes, ma'am.

16      BY MS. KAISER:

17      Q       Corporal Romanosky, I'm showing you what's

18      been marked for identification as Government's

19      Exhibit 27, and ask you if you recognize it.

20      A       Yes.  This is a CD with the controlled call

21      information.

22      Q       Okay.  Was the tape recording equipment

23      operating on that date?

24      A       Yes.

25      Q       And did the tape recording equipment make a

Romanosky - Direct

1    complete copy of your phone conversation with

2    Mr. Friedlander?

3    A      It did.

4    Q      Have you subsequently listened to the

5    undercover call?

6    A      I have.

7    Q      And did you do that after you met

8    Mr. Friedlander and became familiar with his voice?

9    A      Yes.

10   Q      Did you identify who the speakers were on this

11   call?

12   A      Pre-fixed the tape, indicating my name and who

13   I was calling.

14   Q      Has the recording been altered in any way?

15   A      No.

16          MS. KAISER:  Your Honor, at this time I'd move

17   for admission of Government's Exhibit 27 into

18   evidence?

19          MR. TRAGOS:  May I voir dire, Your Honor?

20          THE COURT:  No, sir.  What's the legal

21   objection?

22          MR. TRAGOS:  The objection, Your Honor, is

23   that she talks about tape recordings.

24          THE COURT:  Legal objection, please.  Is this

25   a recording of the telephone call, sir?

Romanosky - Direct

```
1              THE WITNESS:  Yes, sir.

2              THE COURT:  The objection is overruled.

3     Exhibit 27 will be received.

4     (Whereupon, Government's Exhibit Number 27 is

5     received into evidence.)

6              MS. KAISER:  Your Honor, at this time I

7     request permission to publish it to the jury.

8              THE COURT:  You may.

9              MS. KAISER:  Your Honor, the call is

10    approximately 30 minutes in length, 40 minutes in

11    length.  May I be seated while it plays?

12             THE COURT:  Yes, ma'am.

13             MS. KAISER:  Thank you.

14             CORPORAL ROMANOSKY:  Today's date is

15    Wednesday, July 16th, 2008.  The time is 2100 hours.

16    This is in reference to Pinellas County Sheriff's

17    Office Case Number SO08184046.  My name is Corporal

18    Kurt Romanosky with the Pinellas County Sheriff's

19    Office Crimes Against Children Unit.  I'm going to

20    be making a phone call to Charles Jackson

21    Friedlander at phone number 202-607-6666.  The

22    subject is known as the AOL user Captoes.  This call

23    is being made in preparation for a meeting on

24    Monday, July 21st.

25             THE DEFENDANT:  Hello.
```

          1          CORPORAL ROMANOSKY:  Hello.  May I speak to

          2     Charles, please.

          3          THE DEFENDANT:  (Unintelligible).

          4          CORPORAL ROMANOSKY:  How you doing, Charles?

          5     This is Michael.

          6          THE DEFENDANT:  That's what I thought.  How

          7     are you?

          8          CORPORAL ROMANOSKY:  I'm doing very well, sir.

          9     I apologize (unintelligible), but it's been kind of

         10     a (unintelligible).

         11          THE DEFENDANT:  That's fine.  That is no

         12     problem whatsoever.  Glad you called.

         13          CORPORAL ROMANOSKY:  Yes.  I'm fixing -- I'm

         14     over here in Orlando.  I'm fixing to take my

         15     prospective clients out here again and we're running

         16     a little behind, so I figured I'd give you a call

         17     before it got too much later.

         18          THE DEFENDANT:  That's fine.  That's fine.

         19     Well, the time is drawing nigh.

         20          CORPORAL ROMANOSKY:  Yes, it is.  How are you

         21     feeling?  I know you said you fell on that wet tile.

         22          THE DEFENDANT:  I did.  And, well, it was pure

         23     hell for about 48 hours.  It's still annoying but, I

         24     mean, I'm walking and doing everything like that.

         25     There is -- there is still a lot of redness and it

1     was a tearing of a muscle.

2          CORPORAL ROMANOSKY:  Wow.  Did you have to go

3     to the doctor?

4          THE DEFENDANT:  Well, I went to my internist

5     and I said I think I know what it is.  And he said,

6     yeah, that's exactly what it is.  And he said, do

7     you want me to give you pain medicine?  And I said,

8     no.  Yeah.  I'm not taking any pain -- I don't like

9     that.  And so it seems to -- I wrapped it in a Four

10    Ace bandage.

11         CORPORAL ROMANOSKY:  That's a good idea.

12         THE DEFENDANT:  Yeah.  And -- that was my

13    idea.  And putting some ice on it occasionally and

14    staying off it some.

15         CORPORAL ROMANOSKY:  Good for you.  I'm glad

16    you're feeling better.

17         THE DEFENDANT:  Yeah, oh, yeah.  It's much,

18    much better.  You know, it's truly now at the

19    annoying stage.  It doesn't impede me at all.

20         CORPORAL ROMANOSKY:  That's good.

21         THE DEFENDANT:  No, not a bit.

22         CORPORAL ROMANOSKY:  Can't have that.

23         THE DEFENDANT:  No.

24         CORPORAL ROMANOSKY:  How are you -- how are

25    you looking for Monday?  Things still in line for

1    you?

2          THE DEFENDANT:  Oh, absolutely.

3          CORPORAL ROMANOSKY:  Okay.

4          THE DEFENDANT:  Absolutely.

5          CORPORAL ROMANOSKY:  Very good.

6          THE DEFENDANT:  How is that with you, good?

7          CORPORAL ROMANOSKY:  Oh, that's fine.

8    Everything is set up.  I think what -- what I'm

9    actually going to have you do is I have a meeting

10   later in the afternoon.  It's actually going to be

11   down toward the south part of the county.  So it may

12   work out good.  I'll just have you meet me down

13   there and you can follow me back to the house from

14   there.  That way I don't have to worry about you

15   getting lost.

16         THE DEFENDANT:  Oh, no.  That's fine.

17   (Unintelligible).

18         CORPORAL ROMANOSKY:  The county we live in is

19   very -- all the streets -- there's numbered streets

20   but up where I live there's a lot of named streets.

21   Really, unless you know where you're going, it's

22   pretty easy to get turned around so --

23         THE DEFENDANT:  What county is that?

24         CORPORAL ROMANOSKY:  It's Pinellas County.

25         THE DEFENDANT:  (Unintelligible) in Pinellas.

1          CORPORAL ROMANOSKY:  I'm actually in Pinellas.

2     I work all over the place, but I live --

3          THE DEFENDANT:  Right.

4          CORPORAL ROMANOSKY:  -- in Pinellas County

5     so --

6          THE DEFENDANT:  No.  That's fine.

7          CORPORAL ROMANOSKY:  Are you familiar with --

8     are you familiar with Pinellas County at all?

9          THE DEFENDANT:  Somewhat, yes.

10         CORPORAL ROMANOSKY:  Okay.  Well, it's really

11    (unintelligible).  I was thinking the best place,

12    probably the easiest place to meet you because I'm

13    going to be down towards St. Petersburg anyway is

14    that you --

15         THE DEFENDANT:  Right.

16         CORPORAL ROMANOSKY:  You come over the Skyway.

17         THE DEFENDANT:  Yeah.  I like the Skyway

18    Bridge.

19         CORPORAL ROMANOSKY:  Yeah.  Me, too.  If you

20    come over the Skyway and you just bear right, stay

21    right, take 275 north toward Tampa where it only

22    goes --

23         THE DEFENDANT:  Right.

24         CORPORAL ROMANOSKY:  -- one direction,

25    actually.  You can't get lost.  Stay on 275.  You're

1      going to be on --

2           THE DEFENDANT:  Right.

3           CORPORAL ROMANOSKY:  (Unintelligible) probably

4      10, 12 miles.

5           THE DEFENDANT:  Right.

6           CORPORAL ROMANOSKY:  It's up around exit 26, I

7      think it's 26A or B or something.  If you get off

8      there, there's a Cracker Barrel right there at that

9      exit.  Meet me at the Cracker Barrel.

10          THE DEFENDANT:  And it's 26A or B?

11          CORPORAL ROMANOSKY:  Yeah.

12          THE DEFENDANT:  Is that the north -- is that

13     on the north side of it more or south?

14          CORPORAL ROMANOSKY:  The north side of what?

15          THE DEFENDANT:  Do you know what I mean?  In

16     other words, do you get -- the numbers, what I

17     remember, once you cross the Skyway you get -- the

18     numbers go -- get smaller on the streets.

19          CORPORAL ROMANOSKY:  Well, actually -- yeah.

20     What's going to happen is as soon as you come over

21     the Skyway and you get off on 275, that's exactly

22     what's going to happen.

23          THE DEFENDANT:  Yeah.

24          CORPORAL ROMANOSKY:  You're right.  You're

25     going to see like 54th Avenue South and --

```
 1            THE DEFENDANT:  Correct.

 2            CORPORAL ROMANOSKY:  (Unintelligible) and

 3     you'll get 22nd Avenue South.  And then it's going

 4     to start going back up.  You'll start getting 5th

 5     Avenue North, 26 South.

 6            THE DEFENDANT:  Right.

 7            CORPORAL ROMANOSKY:  Where you're going to get

 8     off is 54th Avenue North.

 9            THE DEFENDANT:  Oh, okay.  I know where

10     it's -- (unintelligible).

11            CORPORAL ROMANOSKY:  It's about 10 or 12 miles

12     north of the Skyway toll plaza.

13            THE DEFENDANT:  Right.

14            CORPORAL ROMANOSKY:  Yeah.  You can't miss it.

15            THE DEFENDANT:  Especially 4th Avenue.

16            CORPORAL ROMANOSKY:  Yeah.

17            THE DEFENDANT:  I know where that is.  And

18     there's a Cracker Barrel.

19            CORPORAL ROMANOSKY:  There's a Cracker Barrel,

20     yeah.  There's like a hotel there, a Cracker Barrel.

21     I've had a few of my out-of-town clients stay there

22     before because it was close to zip back over the

23     Skyway to go to the -- some of the boat events so --

24            THE DEFENDANT:  Right.

25            CORPORAL ROMANOSKY:  The Cracker Barrel is
```

1    like right next to a -- I think it's a Holiday Inn

2    or -- is it a Holiday Inn?

3          THE DEFENDANT:  That's fine.

4          CORPORAL ROMANOSKY:  Yeah.  So just meet me in

5    that parking lot there.  I'll park like in the back

6    parking lot.  I'm in a blue van.

7          THE DEFENDANT:  Well, I'm going to be in a

8    silver Lexus.

9          CORPORAL ROMANOSKY:  Oh, very nice.

10         THE DEFENDANT:  It's an old one.

11         CORPORAL ROMANOSKY:  Still.

12         THE DEFENDANT:  (Unintelligible).  It's, let

13   me see, seven years old.

14         CORPORAL ROMANOSKY:  I'm sure it's been well

15   cared for.

16         THE DEFENDANT:  Well, except one little part

17   when I was at a hospital meeting and it was very

18   hard to get out so there's a little mess, not much,

19   on the front.

20         CORPORAL ROMANOSKY:  Uh-huh.

21         THE DEFENDANT:  But I've only got about 40,000

22   miles on it.

23         CORPORAL ROMANOSKY:  That's fantastic.

24         THE DEFENDANT:  So it's, you know, I mean, I

25   have 180 on the truck, but --

1          CORPORAL ROMANOSKY:  You have 180,000 miles on

2     your truck?

3          THE DEFENDANT:  Yes.

4          CORPORAL ROMANOSKY:  Wow.  They don't even

5     make cars that will do 180,000 anymore.

6          THE DEFENDANT:  Yeah.  Mine is a 1993.

7          CORPORAL ROMANOSKY:  Yeah.  I think now they

8     make 'em so you've got to buy a new one after about

9     100,000.

10          THE DEFENDANT:  Oh, really.  No.  Mine is a

11     Mazda.  It's an extended cab, but not much.  And

12     it's just a little four cylinder thing.

13          CORPORAL ROMANOSKY:  Yeah.  Well, you know, we

14     used to use -- I told you before, we used to use

15     Suburbans and Tahoes for our business.

16          THE DEFENDANT:  Right.

17          CORPORAL ROMANOSKY:  You know, we deal with

18     some pretty high end clientele.  And you want to

19     have a really nice vehicle and all that.  But to be

20     honest with you, I mean, I have some of my salesmen

21     who travel all over the state, you know, going to

22     meet clients and everything.  I can't afford the gas

23     in these things (unintelligible).

24          THE DEFENDANT:  It's terrible.  It's crazy.

25          CORPORAL ROMANOSKY:  Yeah.  These things are

1    getting 10, 12 miles to the gallon.  And, yeah, they

2    may look nice but they're ridiculous.  So I went out

3    and I bought small SUVs.  I bought myself a van

4    because I haul some equipment every now and then if

5    it's -- in a pinch, so --

6         THE DEFENDANT:  (Unintelligible).

7         CORPORAL ROMANOSKY:  I bought myself a nice

8    little mini van so --

9         THE DEFENDANT:  Whatever -- whatever works.

10   We're talking about the Lexus -- what do you call

11   it, it's a SUV but it's a small one.  They call it a

12   crossover or something.

13        CORPORAL ROMANOSKY:  Oh, yeah.

14        THE DEFENDANT:  But, you know, I

15   (unintelligible) to pay 50 grand for that.  That was

16   nuts because I wouldn't need it.

17        CORPORAL ROMANOSKY:  Yeah.  Yeah.

18        THE DEFENDANT:  (Unintelligible) and, you

19   know, it's -- for me, you know, the Lexus is fine.

20   It works well.  And I've had one now for 11 years.

21        CORPORAL ROMANOSKY:  Wow.

22        THE DEFENDANT:  And like it.  I used to drive

23   a Mercedes but it got too crazy for me so -- it was

24   a diesel and I used to like it when I lived abroad,

25   but (unintelligible).  It would really choke me, you

Romanosky - Direct

1    know.

2             CORPORAL ROMANOSKY:  Oh, yeah.

3             THE DEFENDANT:  (Unintelligible).

4             CORPORAL ROMANOSKY:  I tell you, I hope I have

5    as much skip in my step as you do at 70.  You sound

6    very chipper.

7             THE DEFENDANT:  Yeah.  I -- well, I'm in

8    pretty good shape.

9             CORPORAL ROMANOSKY:  Uh-huh.

10            THE DEFENDANT:  At least I feel so, let's put

11   it that way.  You know, I -- I swim every day.

12            CORPORAL ROMANOSKY:  Good for you.

13            THE DEFENDANT:  I try to if the weather isn't

14   bad.

15            CORPORAL ROMANOSKY:  Um-hum.

16            THE DEFENDANT:  And, you know, and I am, you

17   know, fairly strong, I believe.

18            CORPORAL ROMANOSKY:  Outstanding.

19            THE DEFENDANT:  You know.  Only time will

20   tell.

21            CORPORAL ROMANOSKY:  Yes.  Very much so.

22            THE DEFENDANT:  Do the boys know that a

23   different person is going to be around?

24            CORPORAL ROMANOSKY:  Oh, yeah.  Yeah.

25            THE DEFENDANT:  Right.

1           CORPORAL ROMANOSKY:  Well, I mean, they're

2    kind of used to the setup that we have things set

3    up.  They're, you know --

4           THE DEFENDANT:  Right.

5           CORPORAL ROMANOSKY:  It doesn't happen very

6    often but occasionally somebody new will come in,

7    you know, so they're --

8           THE DEFENDANT:  Right.

9           CORPORAL ROMANOSKY:  -- very used to seeing an

10   occasional new face.  And to be honest with you,

11   it's not up to them.

12          THE DEFENDANT:  No, of course not.

13          CORPORAL ROMANOSKY:  You know.

14          THE DEFENDANT:  Of course not.  No.  Uh-uh.

15   Certainly not.  So -- so let me ask you a question.

16   Will we each ourselves try to get a

17   (unintelligible)?

18          CORPORAL ROMANOSKY:  However you want to do

19   it.

20          THE DEFENDANT:  Right.

21          CORPORAL ROMANOSKY:  I mean, obviously, they

22   can't -- they won't do it themselves but, you know,

23   we can --

24          THE DEFENDANT:  No, no.  Right.

25          CORPORAL ROMANOSKY:  We can do that.

Romanosky - Direct

1        THE DEFENDANT:  Yeah.  Because I think that

2   really is going to have to -- I think it was a good

3   suggestion of yours, actually.

4        CORPORAL ROMANOSKY:  Well, that's what I

5   wanted to ask you, to be honest.  It's kind of hard

6   to -- as you know, it's -- when you talk to somebody

7   online, you've got to be careful who you're speaking

8   to because of the subject matter.

9        THE DEFENDANT:  Oh, yeah.  I know your --

10  right.  I would have called you but I didn't want to

11  do that.

12       CORPORAL ROMANOSKY:  I'm sorry?

13       THE DEFENDANT:  I said I would have called you

14  but I know this is your wife's -- your wife's cell

15  phone (unintelligible).

16       CORPORAL ROMANOSKY:  Her phone gets better

17  reception than mine.  Mine is kind of not really

18  working real well.  I tell you, this Orlando -- I

19  think Disney, you know, controls the air waves over

20  here because --

21       THE DEFENDANT:  (Unintelligible) really.

22       CORPORAL ROMANOSKY:  I have been dropping

23  calls and -- like crazy.  I think they want you to

24  use their phones so they can charge you.

25       THE DEFENDANT:  I'm sure.  I'm sure.

Romanosky - Direct

1              CORPORAL ROMANOSKY:  So it's almost comical.

2       So if I lose you, I'll have to call you back because

3       I've already dropped (unintelligible).

4              THE DEFENDANT:  Oh, don't worry about it.  Oh,

5       no, don't worry.  Probably be -- (unintelligible).

6              CORPORAL ROMANOSKY:  I was trying to just get

7       an idea of, you know, how you did things and what

8       you might be wanting to -- wanting to do or see or

9       what.

10             THE DEFENDANT:  Right.  Do I sound like what

11      you thought I would (unintelligible) or what?

12             CORPORAL ROMANOSKY:  What's that, now?

13             THE DEFENDANT:  I said, do I sound like

14      someone you thought I would or what?  I don't know.

15             CORPORAL ROMANOSKY:  Yeah.  Yeah.  Absolutely.

16             THE DEFENDANT:  Good.  Good.

17             CORPORAL ROMANOSKY:  You definitely have a

18      chipper voice.  I hope I'm --

19             THE DEFENDANT:  Oh, yeah.

20             CORPORAL ROMANOSKY:  I can pull that off at 70

21      so --

22             THE DEFENDANT:  Oh, yeah, yeah.  People tell

23      me that I -- but I don't give a damn, by the way,

24      anyway -- that I don't look 70.  But I don't do any

25      (unintelligible), you know.

Romanosky - Direct

```
 1              CORPORAL ROMANOSKY:  Uh-huh.

 2              THE DEFENDANT:  To do anything much.  My hair

 3       is white.

 4              CORPORAL ROMANOSKY:  You just have the gift of

 5       longevity in your genes.

 6              THE DEFENDANT:  Well, my dad died two years

 7       ago at 102.

 8              CORPORAL ROMANOSKY:  Are you serious.  Wow.

 9              THE DEFENDANT:  Yeah.  And he was an

10       alcoholic.

11              CORPORAL ROMANOSKY:  No kidding.

12              THE DEFENDANT:  So you never know, you know.

13       No.  Uh-uh.  No.  So it's, you know, fine for me

14       anyway.

15              CORPORAL ROMANOSKY:  Outstanding.

16              THE DEFENDANT:  I do pretty well.

17              CORPORAL ROMANOSKY:  Yeah, sounds like it.

18              THE DEFENDANT:  Oh, yeah.  Oh, yeah.  And, you

19       know, I'm looking to get to know everybody anyway so

20       it makes it easier.

21              CORPORAL ROMANOSKY:  Of course.  Absolutely.

22              THE DEFENDANT:  You know.  And so -- and, you

23       know, you can get to know the boys as people, too.

24              CORPORAL ROMANOSKY:  Uh-huh.

25              THE DEFENDANT:  You know.
```

```
 1              CORPORAL ROMANOSKY:  Well, that will develop,

 2      you know, as time goes.  They'll get --

 3              THE DEFENDANT:  Oh, sure.  Absolutely.

 4              CORPORAL ROMANOSKY:  I'm sure their first

 5      impression of you, they probably won't be very

 6      happy.  But again, like I said, that's not -- that's

 7      their problem, not ours.

 8              THE DEFENDANT:  Right.  Right.  I mean, you

 9      know, I'm just very direct.

10              CORPORAL ROMANOSKY:  Uh-huh.

11              THE DEFENDANT:  And definite.  And --

12              CORPORAL ROMANOSKY:  Absolutely.

13              THE DEFENDANT:  But I'm sure you are, too.

14              CORPORAL ROMANOSKY:  Of course.

15              THE DEFENDANT:  Yeah.  So, you know, it's --

16      (unintelligible) with your stepdaughter.

17              CORPORAL ROMANOSKY:  Yes.  Like I told you

18      before, she's been a -- she's been slipping a little

19      bit because I haven't been giving her as much

20      attention as I used to, you know.  She gets a little

21      bit older in her teens and some of that's starting

22      to go.

23              THE DEFENDANT:  Right.

24              CORPORAL ROMANOSKY:  So we're going to have to

25      bring that back around.
```

Romanosky - Direct

1              THE DEFENDANT:  Right.  I think that will

2     work.

3              CORPORAL ROMANOSKY:  Yes.

4              THE DEFENDANT:  The idea, anyway, for sure.

5     And the boys probably are pretty good, anyway.

6              CORPORAL ROMANOSKY:  Well, yeah.  I mean,

7     they're still -- they're still boys, I mean.

8              THE DEFENDANT:  Oh, yeah.

9              CORPORAL ROMANOSKY:  When I'm home there with

10    them and everything, things are a little bit, you

11    know, they're a little better in line.  But

12    obviously when they're with their mom, she's tough

13    but not as tough and, you know, so every once in a

14    while I get a bad report or something like that and

15    it's something you have to handle.

16             THE DEFENDANT:  Right.  Oh, that's true.

17    That's true.  And I'm sure you do.

18             CORPORAL ROMANOSKY:  Uh-huh.  Of course.

19             THE DEFENDANT:  Yeah.  And, no, I think it

20    will be -- it will be -- work well.

21             CORPORAL ROMANOSKY:  Uh-huh.

22             THE DEFENDANT:  And then afterwards, you know,

23    we'll see how everything goes.

24             CORPORAL ROMANOSKY:  Absolutely.

25             THE DEFENDANT:  You know.  So, you know,

Romanosky - Direct

1     it's -- it will be good for me to see, you know,

2     what -- how big they are, how little they are, you

3     know.  It's just -- you never know.

4              CORPORAL ROMANOSKY:  Yeah.  I mean --

5              THE DEFENDANT:  (Unintelligible) yeah.

6              CORPORAL ROMANOSKY:  They're average size.

7     They're not -- I don't, you know, I guess you could

8     say my stock, you know, there's no little scrawny

9     kids.  That's for sure.  They're not real big but --

10             THE DEFENDANT:  Right.

11             CORPORAL ROMANOSKY:  They're average.

12             THE DEFENDANT:  Right.  No.  That's fine.

13    That's fine, you know.  And yeah.  We'll see how

14    they are going to react to everything.

15             CORPORAL ROMANOSKY:  Uh-huh.

16             THE DEFENDANT:  You know, see what -- what

17    will go on later.

18             CORPORAL ROMANOSKY:  Of course.

19             THE DEFENDANT:  You know.

20             CORPORAL ROMANOSKY:  Of course.  Like I said,

21    it's whatever, you know, they -- they have been down

22    the road so it's whatever you're comfortable with,

23    you know.  I want you to have an enjoyable time, I

24    want you to -- whatever you -- however you want to

25    push things or however you want to take things, to

1    that extent that's, you know, kind of throw that in

2    your arena.  They're yours for the evening.

3         THE DEFENDANT:  Right.

4         CORPORAL ROMANOSKY:  So you do whatever you

5    feel comfortable doing.

6         THE DEFENDANT:  Oh, sure.  Oh, yeah.  And I'll

7    see how they react, also.

8         CORPORAL ROMANOSKY:  Right.

9         THE DEFENDANT:  You know, because it's a

10   little different --

11        CORPORAL ROMANOSKY:  Uh-huh.

12        THE DEFENDANT:  -- than you, you know.

13        CORPORAL ROMANOSKY:  Oh, absolutely.

14        THE DEFENDANT:  And, you know.

15        CORPORAL ROMANOSKY:  I mean, I could be honest

16   with you, they probably will be a little surprised

17   if you use the crop thing like you were talking

18   about.

19        THE DEFENDANT:  Right.

20        CORPORAL ROMANOSKY:  That will probably be a

21   little bit of a surprise but, you know, hey.

22        THE DEFENDANT:  Right.  Well, I'm sure they'll

23   be able to handle that.

24        CORPORAL ROMANOSKY:  Uh-huh.

25        THE DEFENDANT:  You know.  Yes, it will be a

Romanosky - Direct

1      little bit of a surprise.

2            CORPORAL ROMANOSKY:  Right.

3            THE DEFENDANT:  As will the razor strop,

4      probably.

5            CORPORAL ROMANOSKY:  Yes.  Well, I mean, like

6      I say, we just have the simple ground rules that we

7      spoke of.

8            THE DEFENDANT:  Oh, yeah.  Well, I --

9      (unintelligible).

10           CORPORAL ROMANOSKY:  You know, I think you

11     were -- you were looking at -- what were you going

12     to keep it as far as, you know, the number of times?

13     You were talking what, 15 or something each cheek?

14           THE DEFENDANT:  15.  Yes.  Yes.

15           CORPORAL ROMANOSKY:  If things are going --

16     (unintelligible) you have to go more, that's

17     probably acceptable, as well.

18           THE DEFENDANT:  Right.  Yeah.  Not -- not that

19     much but just see how their reactions are, too.

20           CORPORAL ROMANOSKY:  A razor strap isn't

21     something that I've ever utilized with them so much.

22     I mean, what kind of -- what kind of marks or

23     injuries does it leave?

24           THE DEFENDANT:  There are no -- no.  There are

25     no injuries.

Romanosky - Direct

1              CORPORAL ROMANOSKY:  Okay.

2              THE DEFENDANT:  That's the one thing with --

3      with it.

4              CORPORAL ROMANOSKY:  Uh-huh.

5              THE DEFENDANT:  No.  There could be injuries

6      with wood.

7              CORPORAL ROMANOSKY:  Right.

8              THE DEFENDANT:  But you have to be really --

9      injuries with leather, it's supple.

10             CORPORAL ROMANOSKY:  Right.

11             THE DEFENDANT:  And that's why I have them so

12     well oiled.

13             CORPORAL ROMANOSKY:  Okay.

14             THE DEFENDANT:  With mink oil.  Yeah.  Because

15     it keeps them -- I don't want to say soft, but soft

16     to a point, you know.  And, no, there will be no

17     injuries (unintelligible) anyway, no.  There can be

18     small welts.

19             CORPORAL ROMANOSKY:  Okay.

20             THE DEFENDANT:  Which could last about two

21     days, maybe.

22             CORPORAL ROMANOSKY:  Okay.  That's fine.

23     How --

24             THE DEFENDANT:  Yeah.

25             CORPORAL ROMANOSKY:  When you say small welts,

Romanosky - Direct

1       how -- what kind of -- what's small?

2               THE DEFENDANT:  Well, I mean, you know, it

3       depends on each person's skin.

4               CORPORAL ROMANOSKY:  Right.

5               THE DEFENDANT:  But oh, probably maybe the

6       size -- a little bigger than a silver dollar.

7               CORPORAL ROMANOSKY:  Okay.

8               THE DEFENDANT:  You know, not huge things at

9       all.

10              CORPORAL ROMANOSKY:  Right.

11              THE DEFENDANT:  They will be red.

12              CORPORAL ROMANOSKY:  Okay.

13              THE DEFENDANT:  Oh, yeah.  For that there's no

14      question about.

15              CORPORAL ROMANOSKY:  Okay.

16              THE DEFENDANT:  And it will sting.

17              CORPORAL ROMANOSKY:  Uh-huh.

18              THE DEFENDANT:  And it will hurt.

19              CORPORAL ROMANOSKY:  Uh-huh.  Okay.

20              THE DEFENDANT:  But it's not a lasting sting.

21              CORPORAL ROMANOSKY:  Good.

22              THE DEFENDANT:  You know.  And the crop gives

23      them a little bit more sting.

24              CORPORAL ROMANOSKY:  Right.

25              THE DEFENDANT:  But no weight, really.

Romanosky - Direct

1          CORPORAL ROMANOSKY:  Right.

2          THE DEFENDANT:  No.  It just -- you know, it

3     -- it depends on how their skin reacts.

4          CORPORAL ROMANOSKY:  Okay.

5          THE DEFENDANT:  You know.  One is 10 and one

6     is 11?

7          CORPORAL ROMANOSKY:  Yes.

8          THE DEFENDANT:  How old are -- yeah.

9          CORPORAL ROMANOSKY:  Ten and 11.

10         THE DEFENDANT:  Okay.  Right.

11         CORPORAL ROMANOSKY:  They're actually about 14

12    months apart.  But one is 10, one is 11 right now.

13    My stepdaughter --

14         THE DEFENDANT:  Right.

15         CORPORAL ROMANOSKY:  She's -- she'll be 15

16    here coming up so 14 now so --

17         THE DEFENDANT:  Oh, my.

18         CORPORAL ROMANOSKY:  Yeah.  Rough age.

19         THE DEFENDANT:  Well, it can be --

20         CORPORAL ROMANOSKY:  Girls are definitely

21    different than boys.

22         THE DEFENDANT:  Oh, completely.  I mean, I

23    have friends who have girls and it's a completely

24    different thing.

25         CORPORAL ROMANOSKY:  Right.

Romanosky - Direct

1          THE DEFENDANT:  And I've never raised a girl

2     so I would have no idea.

3          CORPORAL ROMANOSKY:  Right.

4          THE DEFENDANT:  You know.  And I know how I

5     always act and boys adjust to it.

6          CORPORAL ROMANOSKY:  Right.

7          THE DEFENDANT:  A girl, you know, I just have

8     absolutely no idea.

9          CORPORAL ROMANOSKY:  Well, you know, to be

10    honest with you, maybe you can, you know, understand

11    me saying that what I -- my experience, I mean,

12    obviously is much more limited than yours.  But I

13    found that people usually have a preference, as

14    well, too, so --

15         THE DEFENDANT:  Well, I think my thought is

16    that I have a preference because certainly I know

17    what -- you know, I have experience with --

18         CORPORAL ROMANOSKY:  Right.

19         THE DEFENDANT:  -- much more with boys than

20    with girls.  A little bit with girls but really

21    extremely little.

22         CORPORAL ROMANOSKY:  Uh-huh.

23         THE DEFENDANT:  And, you know, I don't quite

24    understand what makes them tick totally, either.

25         CORPORAL ROMANOSKY:  Right.

Romanosky - Direct

1          THE DEFENDANT:  I know -- I know what makes a

2    boy tick.  Whether I like it or not at the time is

3    another point.

4          CORPORAL ROMANOSKY:  Ha, ha, ha, ha.

5          THE DEFENDANT:  But, you know, even with my

6    own son, I put up with nothing.

7          CORPORAL ROMANOSKY:  Uh-huh.

8          THE DEFENDANT:  Absolutely nothing.  You know,

9    I just think that if you let them go hey wire --

10         CORPORAL ROMANOSKY:  Uh-huh.

11         THE DEFENDANT:  -- it can be terr -- it can be

12   hell.

13         CORPORAL ROMANOSKY:  Right.

14         THE DEFENDANT:  And as far as I'm concerned

15   that was not permissible.

16         CORPORAL ROMANOSKY:  Right.

17         THE DEFENDANT:  And it was fine, you know.  I

18   mean, there were problems.  We had some traumas, of

19   course, when he borrowed the car when I didn't know

20   it.

21         CORPORAL ROMANOSKY:  Oh, boy.

22         THE DEFENDANT:  Oh, you can't imagine.  Oh.  I

23   think he may be sore after 20 years.  Really, it was

24   inexcusable.  I mean, I wouldn't have that.

25         CORPORAL ROMANOSKY:  Sure.

```
1              THE DEFENDANT:  We had certain rules.  We had

2    curfew times and we had, you know, everything else.

3    He had to ask permission for everything.

4              CORPORAL ROMANOSKY:  Uh-huh.

5              THE DEFENDANT:  That he did.  And he was

6    usually very good about it.

7              CORPORAL ROMANOSKY:  Right.

8              THE DEFENDANT:  But sometimes --

9              CORPORAL ROMANOSKY:  Well, the boys have a

10   tendency -- the boys have a tendency -- boys will be

11   boys, you know.  They have a tendency --

12             THE DEFENDANT:  Right.

13             CORPORAL ROMANOSKY:  They behave.  I run a

14   pretty structured household.

15             THE DEFENDANT:  Yeah.

16             CORPORAL ROMANOSKY:  And they behave for the

17   most part.  But every once in a while manners will

18   slip up or, you know, there'll be minor infractions

19   that need to be dealt with.  So it's just, you know,

20   today's, you know, day.  And society today doesn't

21   look at -- they kind of frown upon what we do,

22   unfortunately, you know, especially what we're

23   talking about here.  Some people would say, you

24   know, it's mentally legal but wrong.  But, you know,

25   that's -- that's their opinion, not ours.
```

 1            THE DEFENDANT:  Right.  Right.  And it's been

 2      done for years.

 3            CORPORAL ROMANOSKY:  I agree.

 4            THE DEFENDANT:  And everybody has survived.

 5            CORPORAL ROMANOSKY:  Uh-huh.

 6            THE DEFENDANT:  And I think better.

 7            CORPORAL ROMANOSKY:  Right.

 8            THE DEFENDANT:  You know, because I -- you

 9      know, with my son it was always, yes, sir, no, sir.

10            CORPORAL ROMANOSKY:  Uh-huh.

11            THE DEFENDANT:  But never anything else.

12            CORPORAL ROMANOSKY:  Right.

13            THE DEFENDANT:  Now, whether everybody else

14      does that or not, that's up to them.

15            CORPORAL ROMANOSKY:  Uh-hu.

16            THE DEFENDANT:  But I felt that I -- I was

17      very, very structured with respect, integrity and

18      obedience.

19            CORPORAL ROMANOSKY:  Uh-huh.

20            THE DEFENDANT:  That was it, I mean, you know,

21      without delineating everything.  And he really was.

22      He would slip.  Oh, yeah, sure.  But, you know,

23      there were consequences.

24            CORPORAL ROMANOSKY:  Of course.

25            THE DEFENDANT:  And he knew it.  There was

Romanosky - Direct

1     never anything secret about anything.  And, you

2     know, and so I still won't put up with things.

3              CORPORAL ROMANOSKY:  Uh-huh.

4              THE DEFENDANT:  From him (unintelligible).

5              CORPORAL ROMANOSKY:  How old is he now?

6              THE DEFENDANT:  He was just 39.

7              CORPORAL ROMANOSKY:  Wow.  I bet the respect

8     factor is still there, though, isn't it.

9              THE DEFENDANT:  Oh, absolutely.  Absolutely.

10    And he felt it about two years ago, I think it was

11    about two years ago, I'm losing my time, when he

12    told me a bold face lie.

13             CORPORAL ROMANOSKY:  Uh-huh.

14             THE DEFENDANT:  Now, that he can't do at any

15    time.

16             CORPORAL ROMANOSKY:  Uh-huh.

17             THE DEFENDANT:  And I told him, I said, you

18    know, you have crossed the line, young man.

19             CORPORAL ROMANOSKY:  Uh-huh.

20             THE DEFENDANT:  And I don't care whether you

21    live under my roof or not.  Anytime you are around

22    me, rules are there.

23             CORPORAL ROMANOSKY:  Uh-huh.

24             THE DEFENDANT:  And I used the razor strap at

25    39.

Romanosky - Direct

1        CORPORAL ROMANOSKY:  (Unintelligible).

2        THE DEFENDANT:  Well, I mean, I just was not

3    going to have this.

4        CORPORAL ROMANOSKY:  Uh-huh.

5        THE DEFENDANT:  You know.  And he told me

6    something kidding or something like that.  That's a

7    different story.  But this was an absolute bold face

8    lie.

9        CORPORAL ROMANOSKY:  Uh-huh.

10        THE DEFENDANT:  And I just wouldn't.  And he

11    got a hundred.

12        CORPORAL ROMANOSKY:  Wow.

13        THE DEFENDANT:  50 on each cheek.

14        CORPORAL ROMANOSKY:  Uh-huh.

15        THE DEFENDANT:  And the next day he came to me

16    and he said, you know, I have to tell you this.  I

17    don't want to but I -- I said, oh, what?  And he

18    said, I deserved it.

19        CORPORAL ROMANOSKY:  Uh-huh.

20        THE DEFENDANT:  I said, you really did.  And

21    he said, I can tell you one thing.  I said, what's

22    that?  He said, never again.  I said, okay.  That's

23    fine.  And it's finished.

24        CORPORAL ROMANOSKY:  Uh-huh.

25        THE DEFENDANT:  I'm not bringing it up and

Romanosky - Direct

1    (unintelligible) hashing over something.

2         CORPORAL ROMANOSKY:  Right.

3         THE DEFENDANT:  It's done.  I'm not going to

4    bring it up to you and -- but, you know, that's the

5    way it is.  But I will not put up with that, as you

6    know.  So, you know, he -- he understood it.  And I

7    think that one of the problems with kids today is,

8    you know, that when they think they're 18 and get

9    older.

10        CORPORAL ROMANOSKY:  Uh-huh.

11        THE DEFENDANT:  And don't deserve anything

12   like this.  That's too bad.

13        CORPORAL ROMANOSKY:  Right.

14        THE DEFENDANT:  As far as I'm concerned, it

15   continues appropriately.

16        CORPORAL ROMANOSKY:  Sure.

17        THE DEFENDANT:  You know.  You know, have your

18   boys had much sexual experience or what?

19        CORPORAL ROMANOSKY:  Yes.  With -- I started

20   with them probably around eight.

21        THE DEFENDANT:  Okay.

22        CORPORAL ROMANOSKY:  They've -- they've had

23   some experience.  They should be fine.

24        THE DEFENDANT:  Okay.

25        CORPORAL ROMANOSKY:  The crop -- like I said,

Romanosky - Direct

1        the crop thing may surprise them a little bit but,

2        you know, that's -- they'll adapt.  But, yeah, they

3        should be fine.  What -- was there anything sexual

4        you were looking to do?

5              THE DEFENDANT:  I wasn't sure.

6              CORPORAL ROMANOSKY:  Uh-huh.

7              THE DEFENDANT:  Because I -- you know, I don't

8        know them.  You know, absolutely no idea.  You know.

9        You mean with the sexual thing?

10             CORPORAL ROMANOSKY:  Yes.

11             THE DEFENDANT:  Yeah.  Well, I presume oral.

12             CORPORAL ROMANOSKY:  Okay.  Yeah.  That --

13       that -- that won't be a problem.

14             THE DEFENDANT:  Right.  And I didn't know what

15       other experiences they've had.

16             CORPORAL ROMANOSKY:  Mainly --

17             THE DEFENDANT:  (Unintelligible).

18             CORPORAL ROMANOSKY:  Well, mainly the oral,

19       for sure, handling, things like that.

20             THE DEFENDANT:  Right.

21             CORPORAL ROMANOSKY:  I don't know that I would

22       push the threshold with any kind of, you know,

23       insertion of anything.

24             THE DEFENDANT:  No.

25             CORPORAL ROMANOSKY:  At this point.

1          THE DEFENDANT:  No.  I don't think so.

2          CORPORAL ROMANOSKY:  The other things are

3     fine.  I mean, I'll leave that to your discretion,

4     whichever you --

5          THE DEFENDANT:  Right, right.  No.  I --

6          CORPORAL ROMANOSKY:  Whichever you want to do.

7     Were you wanting to do things with both boys or just

8     the older or younger or --

9          THE DEFENDANT:  Well, you know, I was

10    wondering.  Do you have any thoughts about that?

11    Since I don't know either of them, you know --

12         CORPORAL ROMANOSKY:  Well, they're both about

13    the same age.

14         THE DEFENDANT:  Right.

15         CORPORAL ROMANOSKY:  The -- one is a little

16    more outgoing, the older one is a little more

17    outgoing than the younger one but, you know, again,

18    I look at it this way.  These lessons or these

19    sessions are not -- you know, it's not about what

20    they want.  It's about what you know has to be done.

21         THE DEFENDANT:  What I want.  Oh, yeah.

22         CORPORAL ROMANOSKY:  Absolutely.  And I want

23    to make sure that, you know -- I know you know that.

24         THE DEFENDANT:  Oh, sure.

25         CORPORAL ROMANOSKY:  And then we'll make sure

1    they understand that.

2         THE DEFENDANT:  Sure.  Yeah.  I mean -- and

3    I'm sure you've at least introduced them to things,

4    anyway.

5         CORPORAL ROMANOSKY:  Oh, of course.  Yeah.

6         THE DEFENDANT:  Yeah.

7         CORPORAL ROMANOSKY:  We started about eight

8    years old.

9         THE DEFENDANT:  Yeah.

10        CORPORAL ROMANOSKY:  When we started that

11   so --

12        THE DEFENDANT:  No.  Well, that's fine, you

13   know.  I think oral, handling, you know, and -- and

14   make sure that they do things well.

15        CORPORAL ROMANOSKY:  Yes.  Yes.

16        THE DEFENDANT:  That I'm going to be --

17        CORPORAL ROMANOSKY:  That should be fine.

18        THE DEFENDANT:  Yeah.  And, you know, they

19   will -- they will slowly get used to it.

20        CORPORAL ROMANOSKY:  Uh-huh.  Charles, I have

21   to tell you, you'll definitely be the elder, the

22   oldest member of our group.

23        THE DEFENDANT:  Oh, I'm sure.

24        CORPORAL ROMANOSKY:  And to be honest with

25   you, not to get too personal or anything, but I was

1      just -- I'm happy to hear at -- you know, at 70

2      years old that things still work like that.  I was a

3      little worried about that, you know, for later in

4      life but, you know, that certainly is good to hear.

5          THE DEFENDANT:  Yes.  Well, you know, I'm a

6      diabetic.  I got it when I was 50.

7          CORPORAL ROMANOSKY:  Uh-huh.

8          THE DEFENDANT:  Okay.  I've had it for 20

9      years.  And, you know, you sort of have to be a

10     little careful but, I mean, not really.

11         CORPORAL ROMANOSKY:  Right.

12         THE DEFENDANT:  And I'm not saying that I

13     tickle myself or, you know, I do anything like that.

14         CORPORAL ROMANOSKY:  (Unintelligible).

15         THE DEFENDANT:  Well, I mean, you know, I -- I

16     do get exercise and that's significant.  Now, not

17     enough.

18         CORPORAL ROMANOSKY:  Yeah.  Do you have to use

19     Viagra or Cialis or something?

20         THE DEFENDANT:  No.  I've never used any of

21     them.

22         CORPORAL ROMANOSKY:  No kidding.  Anything

23     herbal or natural supplements?

24         THE DEFENDANT:  I've never used any of that.

25     Now, I may -- you know, I have -- I get samples of

1    everything God created.

2          CORPORAL ROMANOSKY:  Uh-huh.

3          THE DEFENDANT:  Now, I would never take

4    Cialis.  Never.  Because they don't really know

5    enough about it.

6          CORPORAL ROMANOSKY:  Uh-huh.

7          THE DEFENDANT:  And, you know, you can have

8    these -- these hours and hours long erections and it

9    can really raise hell with you, so I would not abuse

10   that.  I have Levitra and Viagra.

11         CORPORAL ROMANOSKY:  Uh-huh.

12         THE DEFENDANT:  You know, samples of it.  And

13   I've never taken it.  I'm being very honest with

14   you.

15         CORPORAL ROMANOSKY:  Uh-huh.

16         THE DEFENDANT:  I don't know.  I don't know

17   how I'd react.

18         CORPORAL ROMANOSKY:  Right.

19         THE DEFENDANT:  You know.  I can't say I can

20   perform perfectly every time at the drop of a hat.

21         CORPORAL ROMANOSKY:  Right.

22         THE DEFENDANT:  That would be a lie.

23         CORPORAL ROMANOSKY:  Uh-huh.

24         THE DEFENDANT:  But I seem to be able to hold

25   my own.

1              CORPORAL ROMANOSKY:  Right.  Well, I would

2       think that --

3              THE DEFENDANT:  You know.

4              CORPORAL ROMANOSKY:  -- with a session this

5       intense that, you know, maintaining an erection

6       probably won't be a problem so --

7              THE DEFENDANT:  No.  No.  No.  No.  No.  I can

8       get them, you know, anyway, at the drop of a hat but

9       there's no timing things for me, you know.  I don't

10      know.  Yeah.  I would presume I would.

11             CORPORAL ROMANOSKY:  Uh-huh.

12             THE DEFENDANT:  And, you know, it doesn't

13      bother me at all.

14             CORPORAL ROMANOSKY:  Right.

15             THE DEFENDANT:  Not a bit, you know.  And it

16      certainly won't bother anybody there.

17             CORPORAL ROMANOSKY:  Uh-huh.  No.  No.

18             THE DEFENDANT:  I wouldn't -- no.  No.  Do

19      most people dress -- how do they do it?  Usually --

20      I mean, I know what I'm going to wear because you

21      can wear your black outfit.

22             CORPORAL ROMANOSKY:  Right.

23             THE DEFENDANT:  You know, I --

24             CORPORAL ROMANOSKY:  It's not -- sometimes I

25      wear like a long-sleeve black shirt and black pants.

1    Just something that's dark and authoritative, kind

2    of a power color, that sort of thing.

3         THE DEFENDANT:  Right.

4         CORPORAL ROMANOSKY:  You know, we have people

5    that dress casually.  We have people that, you know,

6    dress less than casually.  We have people that like,

7    you know, being partially dressed or some folks that

8    have been -- in the past that have been completely

9    undressed.  You know, we run -- depends on what

10   we're doing here.  You know, everyone is --

11        THE DEFENDANT:  You have to.

12        CORPORAL ROMANOSKY:  -- onboard with the same

13   type of mentality, I guess you could say.

14        THE DEFENDANT:  Yeah.

15        CORPORAL ROMANOSKY:  We're very open.  It's

16   what the -- you know, it's an uninhibited type

17   group.

18        THE DEFENDANT:  Sure.

19        CORPORAL ROMANOSKY:  I mean, it really is.  I

20   (unintelligible).

21        THE DEFENDANT:  What are the ages?  What's the

22   age range about?

23        CORPORAL ROMANOSKY:  Of the parent?

24        THE DEFENDANT:  No.  Of the kid.

25        CORPORAL ROMANOSKY:  We've had as young --

Romanosky - Direct

1     we've had as young as -- people have started about

2     four or five.

3              THE DEFENDANT:  Oh, really.

4              CORPORAL ROMANOSKY:  And we've had all the way

5     up into the teens.

6              THE DEFENDANT:  Right.

7              CORPORAL ROMANOSKY:  So, I mean, 14, 15 is

8     probably getting about the oldest.

9              THE DEFENDANT:  Right.  Right.  And now

10    they're what, about seven or eight, the youngest

11    ones?

12             CORPORAL ROMANOSKY:  Yes.

13             THE DEFENDANT:  Right.

14             CORPORAL ROMANOSKY:  Well, they're no longer

15    in the group.  They moved.  So, you know, it's no

16    longer financially -- they're not able to, you know,

17    fly them back down here to participate any longer

18    so --

19             THE DEFENDANT:  Right.  Oh, I see.  How many

20    do you have, about?

21             CORPORAL ROMANOSKY:  Oh, it depends.  Depends

22    on --

23             THE DEFENDANT:  Oh.

24             CORPORAL ROMANOSKY:  -- who's going to be

25    available.

Romanosky - Direct

1          THE DEFENDANT:  Right.

2          CORPORAL ROMANOSKY:  There's probably --

3          THE DEFENDANT:  About six or eight?

4          CORPORAL ROMANOSKY:  I think we're up to

5    around 10.

6          THE DEFENDANT:  Oh, okay.  That's fine.

7          CORPORAL ROMANOSKY:  Ten families but not all

8    of them are there at any given time.  It's normally

9    five or six families at the most usually is who

10   shows up.

11         THE DEFENDANT:  Right.  That's fine.

12         CORPORAL ROMANOSKY:  Good.

13         THE DEFENDANT:  That's good.

14         CORPORAL ROMANOSKY:  Yeah, you know, adults,

15   everyone -- they're all -- everyone in the group

16   is -- I can tell that -- from our chats that you're

17   an educated individual.

18         THE DEFENDANT:  Yeah.

19         CORPORAL ROMANOSKY:  And everyone in our group

20   probably falls in line with that.  They're

21   professional people, you know.  Professional

22   people --

23         THE DEFENDANT:  More women?

24         CORPORAL ROMANOSKY:  -- need more discretion

25   than -- (unintelligible).

1          THE DEFENDANT:  Hopefully, yes.  Of course.

2     Yeah.  You got to learn that somewhere along the

3     way.

4          CORPORAL ROMANOSKY:  Right.

5          THE DEFENDANT:  Are there more women than men

6     or men than women?  How do we -- (unintelligible).

7          CORPORAL ROMANOSKY:  It's equal.

8          THE DEFENDANT:  Right.

9          CORPORAL ROMANOSKY:  They're about equal,

10    because to be honest with you, you're one of the

11    first single people that have been allowed to

12    attend.

13         THE DEFENDANT:  You know, well, I'm sort of

14    half single, I guess you call it, because, you know,

15    I have a son and I was married.

16         CORPORAL ROMANOSKY:  But our normal practice,

17    you know, that people meet -- that someone meets off

18    the internet or something like that, normally single

19    people won't be allowed to attend.

20         THE DEFENDANT:  Right.

21         CORPORAL ROMANOSKY:  (Unintelligible) so many

22    people out there with no kids and never been married

23    and --

24         THE DEFENDANT:  Right.  No.  I think --

25    (unintelligible).

Romanosky - Direct

1           CORPORAL ROMANOSKY:  (Unintelligible).

2           THE DEFENDANT:  Well, I think you have to have

3      gone through it to realize what really goes on.

4           CORPORAL ROMANOSKY:  Oh, yeah, absolutely.

5      But, you know, I'm sure you've talked to some people

6      online.  There's some -- you know.

7           THE DEFENDANT:  (Unintelligible).

8           CORPORAL ROMANOSKY:  A lot of people would

9      consider what we're doing, you know, sick and

10     illegal and everything else.  But I'm sure you've

11     talked to some people online that there are some

12     sickos out there.

13          THE DEFENDANT:  Oh, there really -- I mean,

14     it's beyond anything I really knew.  And they're

15     absolute pathological liars, as well.

16          CORPORAL ROMANOSKY:  Absolutely.

17          THE DEFENDANT:  I don't know whether they

18     believe what they say or not.  I've never quite

19     decided that.  But you know, it would --

20          CORPORAL ROMANOSKY:  (Unintelligible) person

21     to person.

22          THE DEFENDANT:  Yeah.  Yeah.  I mean, you

23     know, it's -- and they're like here today and gone

24     tomorrow.

25          CORPORAL ROMANOSKY:  Yeah.  Absolutely.

Romanosky - Direct

1          THE DEFENDANT:  You know, and it's -- it's

2     really -- it's really why.  I mean, it's really an

3     experience.

4          CORPORAL ROMANOSKY:  Right.  (Unintelligible)

5     took so long for us to actually invite somebody.

6     That's why I feel --

7          THE DEFENDANT:  Oh, yeah.

8          CORPORAL ROMANOSKY:  (Unintelligible) before

9     we even get close to asking them to come.

10         THE DEFENDANT:  Well, yeah.  I'm one of these

11    people who may be considered a little stodgy but,

12    you know, because of my age.

13         CORPORAL ROMANOSKY:  Uh-huh.

14         THE DEFENDANT:  But, you know, I -- at least

15    if I say I'm going to be somewhere, I'm going to be

16    there.

17         CORPORAL ROMANOSKY:  Right.

18         THE DEFENDANT:  And if I say I'm going to do

19    such a thing, I'm going to do it.

20         CORPORAL ROMANOSKY:  Uh-huh.

21         THE DEFENDANT:  You know.  That never is a

22    question.

23         CORPORAL ROMANOSKY:  Right.

24         THE DEFENDANT:  You know.  And --

25         CORPORAL ROMANOSKY:  Can I ask you a question?

```
 1              THE DEFENDANT:  You can always ask me --

 2              CORPORAL ROMANOSKY:  Do you wear any kind of

 3         rings or anything?  I know you talked about, you

 4         know, if there's any crying or whimpering, you

 5         talked about backhands and things like that.  I just

 6         want to make sure there's not going to be

 7         (unintelligible).

 8              THE DEFENDANT:  No.  I don't wear anything on

 9         my fingers.

10              CORPORAL ROMANOSKY:  Okay.  I want to make

11         sure (unintelligible).

12              THE DEFENDANT:  I wear a watch.

13              CORPORAL ROMANOSKY:  Okay.  No scratches.

14              THE DEFENDANT:  Oh, no.

15              CORPORAL ROMANOSKY:  Okay.

16              THE DEFENDANT:  Oh, no.  No, no, no, no, no.

17         Uh-uh.  No.  Can you hold one second?

18              CORPORAL ROMANOSKY:  Sure.

19              THE DEFENDANT:  (Unintelligible).

20              CORPORAL ROMANOSKY:  All right.

21              THE DEFENDANT:  I wear a watch.

22              CORPORAL ROMANOSKY:  Uh-huh.

23              THE DEFENDANT:  You know, but that's about it.

24              CORPORAL ROMANOSKY:  Okay.  I was just

25         concerned.  I want to make sure there's no cuts or
```

1     scratches --

2          THE DEFENDANT:  Oh, no.

3          CORPORAL ROMANOSKY:  -- to their face or

4     anything.  That's (unintelligible).  We home school

5     them.  We keep them home.  But, you know, we have to

6     also -- we take them -- we give them a lot, too, you

7     know, so they understand, you know.

8     (Unintelligible).

9          THE DEFENDANT:  Hold on one more second.  This

10    is crazy.  Sorry.  The first one was my

11    brother-in-law the second one is my sister.  No.

12    (Unintelligible).

13         CORPORAL ROMANOSKY:  We give them a lot so --

14         THE DEFENDANT:  Oh, yeah.

15         CORPORAL ROMANOSKY:  You know, we take them

16    out in public, in public places or to Disney and

17    stuff like that.  I don't -- you know, people ask

18    questions if there's black eyes or scratches and

19    things like that.

20         THE DEFENDANT:  No.  From my point, you know,

21    having had a child, although he's an adult now,

22    nobody ever would see anything.

23         CORPORAL ROMANOSKY:  Good.

24         THE DEFENDANT:  He would look like everybody

25    else, you know.  He did have a broken nose.  I had

Romanosky - Direct

1    nothing to do with it.  He played football.

2            CORPORAL ROMANOSKY:  Uh-huh.

3            THE DEFENDANT:  And, you know, that's what he

4    had.  There's nothing I could do about it.

5            CORPORAL ROMANOSKY:  Oh, yeah.  That kind of

6    stuff happens, you know.

7            THE DEFENDANT:  Yeah.  Oh, yes.  I mean, he

8    was very proud.  But, no.  As far as I'm concerned,

9    there's nothing visual.

10           CORPORAL ROMANOSKY:  Okay.

11           THE DEFENDANT:  Ever.  You can absolutely

12   depend on that.

13           CORPORAL ROMANOSKY:  Very good.

14           THE DEFENDANT:  You know.  Oh, no.  You know,

15   maybe put through a little more along the way.

16   That's -- that's the way it will be.

17           CORPORAL ROMANOSKY:  Yeah.

18           THE DEFENDANT:  That will be your decision and

19   my decision.

20           CORPORAL ROMANOSKY:  Uh-huh.  I'm sorry.  As

21   far as?

22           THE DEFENDANT:  As far as, you know, if I want

23   to do more with them in one way or more with them --

24   one of them in another way.  As long as everything

25   is copacetic, that's fine.

1          CORPORAL ROMANOSKY:  You mean physically or

2     sexually?

3          THE DEFENDANT:  Both.

4          CORPORAL ROMANOSKY:  Oh, yeah.  Well,

5     absolutely.

6          THE DEFENDANT:  Both.  Yeah.

7          CORPORAL ROMANOSKY:  I'm sure what we're

8     talking about that, you know, everything goes good,

9     of course, I -- you seem like a very personable

10    gentleman to me.

11         THE DEFENDANT:  Yeah.

12         CORPORAL ROMANOSKY:  So as time progresses,

13    yeah.  I mean, I'm -- we're obviously very open to

14    see -- to seeing things we can learn from you and

15    things that you want to do.  This is definitely, you

16    know, a give and take, you know.

17         THE DEFENDANT:  Oh, absolutely.  Yeah.  I

18    agree.

19         CORPORAL ROMANOSKY:  Good friends like ours

20    are hard to find.

21         THE DEFENDANT:  I think that's true.  And, you

22    know, from my point of view, friends are important.

23    They're not just commodities.

24         CORPORAL ROMANOSKY:  Sure.  Especially with

25    this interest.

1            THE DEFENDANT:  Yeah.  And, you know, if I

2     think -- yeah.  I want them to get to know me.

3            CORPORAL ROMANOSKY:  Uh-huh.

4            THE DEFENDANT:  As a person.

5            CORPORAL ROMANOSKY:  Sure.

6            THE DEFENDANT:  As well.  You know, that --

7     that to me is very, very important.

8            CORPORAL ROMANOSKY:  Uh-huh.

9            THE DEFENDANT:  You know, you know --

10           CORPORAL ROMANOSKY:  Have you ever been a

11    member of any groups like this in the past?

12           THE DEFENDANT:  Only a very, very loose one of

13    -- well, no.  Well, yes and no.  I could tell you

14    what it was.  My son had two friends.

15           CORPORAL ROMANOSKY:  Uh-huh.

16           THE DEFENDANT:  (Unintelligible) but, I mean,

17    he had two friends who -- whose dads did exactly the

18    same thing as I did.

19           CORPORAL ROMANOSKY:  Uh-huh.

20           THE DEFENDANT:  And we would get together

21    usually once every two weeks.

22           CORPORAL ROMANOSKY:  Oh, wow.

23           THE DEFENDANT:  And we would change off.

24           CORPORAL ROMANOSKY:  Uh-huh.

25           THE DEFENDANT:  Our kids, you know, for

Romanosky - Direct

1        punishments and that sort of thing.

2              CORPORAL ROMANOSKY:  This was when your son

3        was younger, then?

4              THE DEFENDANT:  Oh, yes.

5              CORPORAL ROMANOSKY:  Okay.  I thought that was

6        something that was still pretty current.  So I was

7        like, maybe it would be something we could

8        actually -- (unintelligible).

9              THE DEFENDANT:  Well -- well, no.  It isn't

10       really.  It is in a way with one of my son's

11       friend's kids.

12             CORPORAL ROMANOSKY:  Uh-huh.

13             THE DEFENDANT:  So he -- his kid is real -- I

14       was going to say a friend of mine.  They're still

15       friendly.  But he is absent an awful lot.

16             CORPORAL ROMANOSKY:  Okay.

17             THE DEFENDANT:  He travels a lot.  So his dad

18       takes over.

19             CORPORAL ROMANOSKY:  Uh-huh.

20             THE DEFENDANT:  And then I come over every

21       little while.

22             CORPORAL ROMANOSKY:  Right.

23             THE DEFENDANT:  So that's sort of what it is.

24       I don't know whether you call that a group or not.

25       (Unintelligible).  It is in a way.

1          CORPORAL ROMANOSKY:  Well, just knowing you

2     have friends with that interest is close enough.

3          THE DEFENDANT:  Yeah.  Oh, yeah.  Oh, yeah.

4     And -- and, you know, sometimes, not often, but

5     occasionally the kids are left with me.

6          CORPORAL ROMANOSKY:  Uh-huh.

7          THE DEFENDANT:  So it's completely up to me.

8     It's -- you know, they live -- they -- the

9     grandfather of the father and the kids all live in

10    one house.

11         CORPORAL ROMANOSKY:  Uh-huh.

12         THE DEFENDANT:  So for the most part the

13    grandfather brings up these kids, you know, with a

14    lot of -- traveling a lot and everything like that.

15    So (unintelligible) --

16         CORPORAL ROMANOSKY:  Do they know what you do

17    with them or --

18         THE DEFENDANT:  Oh, yeah.

19         CORPORAL ROMANOSKY:  Oh, really.

20         THE DEFENDANT:  Oh, yeah.  Yeah.  They do it.

21         CORPORAL ROMANOSKY:  Oh, good for them.

22         THE DEFENDANT:  The grandfather is hell on

23    wheels.

24         CORPORAL ROMANOSKY:  Good for him.  Do you

25    guys do anything other than physical with them or

1          just pretty much physical with them?

2                  THE DEFENDANT:  Both.  We do both.

3                  CORPORAL ROMANOSKY:  Outstanding.

4                  THE DEFENDANT:  Yeah.  And the grandfather did

5          it with his son.

6                  CORPORAL ROMANOSKY:  Uh-huh.

7                  THE DEFENDANT:  And the other gentleman that

8          has no kids did it with his son, but there are no

9          kids from that one.

10                 CORPORAL ROMANOSKY:  Right.

11                 THE DEFENDANT:  And we still know each other,

12         you know, we're still friendly.  Let's put it that

13         way.

14                 CORPORAL ROMANOSKY:  Uh-huh.

15                 THE DEFENDANT:  I don't have a lot of use for

16         the guy who's the father of the kids.

17                 CORPORAL ROMANOSKY:  Right.

18                 THE DEFENDANT:  I think he -- you know, I told

19         my son, you know, he really isn't worth the powder

20         to blow him to hell.

21                 CORPORAL ROMANOSKY:  Right.

22                 THE DEFENDANT:  He said, oh, but he's my

23         friend.  So I said, you're right, and that's more

24         important.

25                 CORPORAL ROMANOSKY:  Yeah.

1          THE DEFENDANT:  You know, I don't mess with

2    them.  Oh, yeah.  The -- the grandfather is really

3    something.

4          CORPORAL ROMANOSKY:  Uh-huh.

5          THE DEFENDANT:  He's a big guy and he's very

6    bright, very nice.  But all of a sudden, you know,

7    he can go off.  Not easily, no, but, I mean, he can

8    just sort of lose his temper.

9          CORPORAL ROMANOSKY:  Right.

10         THE DEFENDANT:  Yeah.  I don't really lose my

11   temper that much.

12         CORPORAL ROMANOSKY:  Uh-huh.

13         THE DEFENDANT:  I mean, I don't yell and

14   scream and do all that stuff, ever.

15         CORPORAL ROMANOSKY:  Uh-huh.

16         THE DEFENDANT:  I mean, when I used to say to

17   my son, young man, get upstairs, get in your room,

18   get ready, I'm coming, that's as much as I -- you

19   know.

20         CORPORAL ROMANOSKY:  Yeah.  And the walk up

21   there was probably just as effective as what they

22   were going to get later.

23         THE DEFENDANT:  Oh, yeah.  Oh, yeah.  Yes.

24   And -- and I said -- and he knows.  I said, no, you

25   know, get the razor strop out of the closest.

1        CORPORAL ROMANOSKY:  Uh-huh.  All right.  Now,

2    you said you're going to bring your razor straps?

3        THE DEFENDANT:  Yes, I am.

4        CORPORAL ROMANOSKY:  Outstanding.

5    (Unintelligible).

6        THE DEFENDANT:  I am.  And as I said, you're

7    welcome to borrow something if you want.

8        CORPORAL ROMANOSKY:  Oh, great.  Well, you're

9    going to bring you said two straps.

10       THE DEFENDANT:  I'm bringing two straps, a

11   Garrison belt and a German leather belt and a crop.

12       CORPORAL ROMANOSKY:  Very nice.  Very nice.

13   Well, you know, if it's okay with you, I might -- I

14   might take you up and borrow one of the straps.

15       THE DEFENDANT:  Right.

16       CORPORAL ROMANOSKY:  I'm curious to see how

17   they work and what -- you know, what kind of mark

18   they leave and, you know --

19       THE DEFENDANT:  Right.

20       CORPORAL ROMANOSKY:  If need be, I'll keep one

21   and keep it oiled up.

22       THE DEFENDANT:  Yeah.  No, that's -- that's

23   fine.  And I may bring a very small 12-inch strap, I

24   don't know, with holes in it.

25       CORPORAL ROMANOSKY:  Uh-huh.  Wow.

```
1              THE DEFENDANT:  I'm not sure because that's

2       sort of sticky (unintelligible).  But the -- you

3       know, as you know, the razor strops are two

4       thicknesses.

5              CORPORAL ROMANOSKY:  Right.

6              THE DEFENDANT:  The leather --

7              CORPORAL ROMANOSKY:  I've seen them before but

8       I've never seen them work.

9              THE DEFENDANT:  Yeah.  They're a strip of

10      hemp.

11             CORPORAL ROMANOSKY:  Uh-huh.

12             THE DEFENDANT:  And a strip of leather.

13             CORPORAL ROMANOSKY:  Huh.

14             THE DEFENDANT:  Held together by some sort of

15      a fancy-ish looking clamp.  Another -- both of

16      these -- one is about 80 years old and one is about

17      90 years old.

18             CORPORAL ROMANOSKY:  Wow.  They're still in --

19      they're still in good shape, anyway.

20             THE DEFENDANT:  Well, you keep them oiled.

21             CORPORAL ROMANOSKY:  Right.

22             THE DEFENDANT:  If you don't keep them oiled,

23      I don't know what would happen.

24             CORPORAL ROMANOSKY:  Hum.  Probably like

25      leather, they would dry up and start cracking.
```

1    THE DEFENDANT:  Right.  Right.  Right.  And

2    they're a little sort of -- well, they're not

3    cracked, they're sort of more creased.

4    CORPORAL ROMANOSKY:  Right.  Can you hold on a

5    second?

6    THE DEFENDANT:  Sure.

7    CORPORAL ROMANOSKY:  (Unintelligible) hang on

8    a second.  Hello.  Where are you guys?  I'm down

9    here.  Yeah.  Just come on down.  It's about 20 till

10   10:00.  Yeah.  I know they're open till 2:00.  All

11   right.  See you in a few.  I'm wining and dining

12   some prospective clients that are enjoying going out

13   to these -- these jazz clubs and stuff on my dime.

14   THE DEFENDANT:  My God, well, listen.

15   CORPORAL ROMANOSKY:  It's part of the business

16   though, I mean.

17   THE DEFENDANT:  Oh, absolutely.

18   CORPORAL ROMANOSKY:  I deal with people that

19   are -- they have a whole lot more money than I do

20   and they throw -- I mean, these are people that will

21   drop a lot of money just on dinner and so, you know,

22   I'm trying to take them out and show them a good

23   time and stuff, but trying to keep up with them,

24   I'll tell you, geez.  They like to have a good time.

25   THE DEFENDANT:  Well --

1          CORPORAL ROMANOSKY:  That's for sure.  It will

2     pay off in the --

3          THE DEFENDANT:  Oh, sure.

4          CORPORAL ROMANOSKY:  If I can earn their

5     business, it will definitely pay off.

6          THE DEFENDANT:  Oh, no, you got to do -- you

7     got to play the game.

8          CORPORAL ROMANOSKY:  Absolutely.  Absolutely.

9     So.  Did I hear you say earlier one of your

10    patients -- are you a doctor or something?

11         THE DEFENDANT:  Yes.

12         CORPORAL ROMANOSKY:  Wow.

13         THE DEFENDANT:  Oh, didn't I tell you?  I

14    thought I did.

15         CORPORAL ROMANOSKY:  (Unintelligible) I

16    thought you said before you like testified or

17    something at child custody hearings or something?

18         THE DEFENDANT:  Yeah, you know, but I'm also a

19    doctor.

20         CORPORAL ROMANOSKY:  Like an MD or

21    psychologist or --

22         THE DEFENDANT:  I have two degrees.

23         CORPORAL ROMANOSKY:  Uh-huh.

24         THE DEFENDANT:  I have an MD and a PhD.  I

25    don't use my MD because it doesn't do any good.  I

1    don't get paid for it.

2           CORPORAL ROMANOSKY:  Uh-huh.

3           THE DEFENDANT:  And I -- (unintelligible) oh,

4    yeah.  Oh, yeah.  And I testify for divorce and

5    custody.

6           CORPORAL ROMANOSKY:  Wow.  That's enough right

7    there to keep you busy so --

8           THE DEFENDANT:  Oh, it's plenty.  Yeah.  Yeah.

9    But on the other hand, (unintelligible) careful as a

10   doctor.

11          CORPORAL ROMANOSKY:  Uh-huh.

12          THE DEFENDANT:  You know, to -- because there

13   is no -- as you say, do you wear rings or do you

14   wear the next thing, I'm very careful about marks.

15          CORPORAL ROMANOSKY:  Right.

16          THE DEFENDANT:  My own son, too, you know.  I

17   mean, it's -- there are certain things that are okay

18   and certain things that aren't.

19          CORPORAL ROMANOSKY:  Yes.  I agree.

20          THE DEFENDANT:  And, you know, and I -- you

21   know, the grandfather, I've made all those rules

22   very clear to him, too.

23          CORPORAL ROMANOSKY:  Uh-huh.

24          THE DEFENDANT:  You know, I mean, whenever I'm

25   involved in something, those rules are kept.

1          CORPORAL ROMANOSKY:  Right.

2          THE DEFENDANT:  If I'm not involved in it,

3     there's not a darn thing I can do.

4          CORPORAL ROMANOSKY:  Well, I can assure you

5     everyone that -- everyone that's a part of our group

6     is onboard with that because everyone knows if

7     somebody gets carried away, if they're leaving

8     bruises or --

9          THE DEFENDANT:  You can't.

10         CORPORAL ROMANOSKY:  -- marks or something,

11    then people ask questions and, you know, we don't --

12         THE DEFENDANT:  Right.

13         CORPORAL ROMANOSKY:  -- want that happening

14    either so.

15         THE DEFENDANT:  No.  No.  And I don't drink.

16    And I don't smoke.

17         CORPORAL ROMANOSKY:  Very good.

18         THE DEFENDANT:  I don't do drugs.

19         CORPORAL ROMANOSKY:  You'll get along with

20    everybody just fine.  Charles, I hate to cut you off

21    but I think (unintelligible) coming downstairs.

22         THE DEFENDANT:  (Unintelligible).

23         CORPORAL ROMANOSKY:  Tell you what, I will

24    be -- what I'll probably do, do you remember --

25         THE DEFENDANT:  Yeah.

1           CORPORAL ROMANOSKY:  Do you still have the

2     directions?  Just 275 north and the Skyway?

3           THE DEFENDANT:  Yeah.  26A or B.

4           CORPORAL ROMANOSKY:  Yeah.  10 or 12 miles to

5     exit 26A or B, the Cracker Barrel.  I'll probably

6     call you.

7           THE DEFENDANT:  Right.

8           CORPORAL ROMANOSKY:  I'll probably call you on

9     Monday just to --

10          THE DEFENDANT:  That's great.

11          CORPORAL ROMANOSKY:  -- make sure everything's

12    good to go, let you know what time (unintelligible)

13    I'll be down there.

14          THE DEFENDANT:  That's fine.

15          CORPORAL ROMANOSKY:  But I'm thinking probably

16    6:30 or so.

17          THE DEFENDANT:  Any time that's easiest for

18    you.

19          CORPORAL ROMANOSKY:  Okay.  Yeah.  I have a

20    late meeting.  I should be done with that and then

21    I'll just zip over and wait for you.

22          THE DEFENDANT:  Okay.  Great.  Wonderful.

23          CORPORAL ROMANOSKY:  Good talking to you.

24    I'll probably be online -- probably if I -- probably

25    not tonight because I know these guys are going to

Romanosky - Direct

1    stay up till 2:00, so maybe -- (unintelligible) get

2    online.

3         THE DEFENDANT:  Okay.  Great.  And call me any

4    time that's easy for you.

5         CORPORAL ROMANOSKY:  All right, Charles.  Good

6    talking with you.

7         THE DEFENDANT:  Right.  Good talking to you,

8    Michael.  Thanks a lot.

9         CORPORAL ROMANOSKY:  Bye-Bye.

10        THE DEFENDANT:  Bye, now.

11   BY MS. KAISER:

12   Q    Corporal Romanosky, during your investigation

13   of the defendant, had you made plans to interview

14   the defendant's son?

15   A    No.  I didn't know who he was at that time.

16   Q    Okay.  At any point during your investigation,

17   did you discuss his son with Mr. Friedlander?

18   A    During the interview after he arrived for the

19   meeting, we went back to my office and I spoke with

20   him.  It was during the interview that we

21   discussed -- he claimed he had a -- what he

22   considered an adopted son that was in his life for

23   about 10 years.

24   Q    Did you ever try to interview the adopted son?

25   A    No.  We could not.

```
1    Q      And why is that?

2    A      Mr. Friedlander had advised that he committed

3    suicide.

4    Q      After this undercover phone call that you had

5    made with the defendant on July 16th, did you have

6    any other communications with him prior to his

7    arrest on July 21st?

8    A      Yes.  I had online correspondence on the 21st

9    in the morning.

10          MS. KAISER:  Your Honor, may I approach the

11   witness?

12          THE COURT:  Yes, ma'am.

13   BY MS. KAISER:

14   Q      Corporal Friedlander (sic) I'm showing you

15   what's been marked for identification as

16   Government's Exhibit 28.  Do you recognize that

17   document?

18   A      I do.  This is the instant message chat from

19   the morning of the 21st.

20   Q      And did you also maintain this chat in your

21   case file as part of your investigation?

22   A      I did.

23          MS. KAISER:  Your Honor, at this time I'd move

24   for admission of Government's Exhibit 28 into

25   evidence.
```

Romanosky - Direct

1           THE COURT:  Is there any objection?

2           MR. TRAGOS:  No, Your Honor.

3           THE COURT:  Government's 28 is received.

4       (Whereupon, Government's Exhibit Number 28 is

5     received into evidence.)

6           MS. KAISER:  Your Honor, should I wait to

7     publish this until after?

8           THE COURT:  No.  Go ahead.

9           MS. KAISER:  All right.  All right.  Please

10     publish Government's Exhibit 28.

11           CAPTOES:  Good morning, Michael.

12           STRICDAD7:  Well, good morning, Charles.

13     Didn't expect to see you on this early.

14           CAPTOES:  Just decided to as thought you might

15     be on.

16           STRICDAD7:  Yes.  I am taking care of some

17     paperwork before heading out to my meetings this

18     afternoon.

19           CAPTOES:  Yes.  That's mandatory.  Did the

20     Orlando conference turn out well for you?

21           STRICDAD7:  Yes.  Two new clients.

22           CAPTOES:  Excellent.  I'm getting ready for

23     later.  I have a meeting at 1:30.

24           STRICDAD7:  Very good.  6:30 still good for

25     you?

1          CAPTOES:  Perfect.  What time do most people

2     arrive?

3          STRICDAD7:  By seven-ish.  It will take us

4     about 30 to 45 to get to my house from the Cracker

5     Barrel.  The traffic is horrible up here.

6          CAPTOES:  Can imagine.  Will grab a bite on

7     the way up.

8          STRICDAD7:  Good idea.  I will probably grab a

9     bite before my last meeting.

10          CAPTOES:  Excellent.  Eager to meet everyone,

11     most of all you.

12          STRICDAD7:  Same here.

13          CAPTOES:  Will be in striped, long sleeve

14     shirt, tie and charcoal trousers and black dress

15     shoes.

16          STRICDAD7:  Okay.  I'll in blue dress slacks

17     and a greenish tannish polo shirt.  I'll be in my

18     work vehicle, a blue mini van.  I'll park in an open

19     part of the Cracker Barrel parking lot so you can

20     see me.  If you get there first, please do the same

21     so I am not looking all over for you.  It's a

22     Cracker Barrel so it's always busy.

23          CAPTOES:  Will do.  It is a silver 2001 Lexus.

24          STRICDAD7:  Very good.

25          CAPTOES:  Eager to work with the boys later,

1       too.

2               STRICDAD7:  Of course.  I am eager, as well.

3       They been pestering me for a dog all weekend,

4       despite my telling them no.

5               CAPTOES:  That certainly needs to be on your

6       list.

7               STRICDAD7:  Oh, yes, it is.  Dogs are great

8       but you know who would end up caring for it.  Plus

9       makes it harder to get away for long weekends.

10              CAPTOES:  Oh, yes.  And none of that.  Do you

11      all take many long weekends?

12              STRICDAD7:  Usually for work-related things,

13      sometimes camping or for fun.  Do you have any pets?

14              CAPTOES:  I used to.  But too confining, also.

15              STRICDAD7:  Thank you.  My point exactly.

16              CAPTOES:  Right.  And they need to be informed

17      to stop nagging about it.

18              STRICDAD7:  Exactly.  Charles, I have a call.

19      Will you be on long?

20              CAPTOES:  Oh, I shall stay on.

21              STRICDAD7:  Okay.  Be back in 10 to 15.

22              CAPTOES:  Great.

23              STRICDAD7:  Back.

24              CAPTOES:  Here, also.

25              STRICDAD7:  Do you still have the directions

Romanosky - Direct

```
 1        to the Cracker Barrel?

 2             CAPTOES:  Yes.  275 to exit 26A, B.  54th

 3        Avenue North.  Do I take A or B from the south?

 4             STRICDAD7:  I believe it is A, 54th Avenue

 5        North.

 6             CAPTOES:  Fine, but vital.

 7             STRICDAD7:  There is a 54th Avenue South right

 8        after you get off the Skyway but you don't want that

 9        one.  Go to 54th Avenue North, exit 26A.  Cracker

10        Barrel is visible from I-275.

11             CAPTOES:  Great.  Or as visible as possible.

12        They usually never hide.

13             STRICDAD7:  Of course not.  Got to pull in the

14        hungry travelers.

15             CAPTOES:  Always.  I know people who swear by

16        them.  Have only been to one once.

17             STRICDAD7:  I've been to several.  Food is

18        good but don't know why people are so crazy for

19        them.

20             CAPTOES:  I don't know, either, except it is

21        visible and non-fast food.

22             STRICDAD7:  True.  You still bringing the

23        straps, belts and crop?

24             CAPTOES:  Yes, for sure.

25             STRICDAD7:  Very nice.  Can't wait to see
```

Romanosky - Direct

1       them.  Have a few paddles to show you at the house

2       that are well made.

3             CAPTOES:  Look forward to seeing them.  You

4       are welcome to borrow any you like.

5             STRICDAD7:  Thank you.  I may take you up on

6       that.  Same goes for the paddles if you like to try

7       on your friend's grandkids.

8             CAPTOES:  Thanks.  Appreciate that.  They came

9       over yesterday for a few hours.

10            STRICDAD7:  Nice.  Any problems?

11            CAPTOES:  Yes.  He dropped them over and he

12      was tired.  I can see why.

13            STRICDAD7:  Laugh out loud.  I'm sure you

14      remedied that.

15            CAPTOES:  Oh, yes.  The younger is more

16      difficult.

17            STRICDAD7:  How old?

18            CAPTOES:  About 12.5, other is 14 plus.

19            STRICDAD7:  Nice ages.  You administer any

20      beatings?

21            CAPTOES:  Yes, I did.  More with the younger.

22            STRICDAD7:  Nice.  You wear him out?

23            CAPTOES:  I sure did.  Screaming and crying

24      with reason.

25            STRICDAD7:  Very nice.  Anything happen with

Romanosky - Direct

1    him, and then, anything else?  Sorry.  Can't type.

2    It's Monday.

3         CAPTOES:  Some, yes.

4         STRICDAD7:  Very nice.  With the older one?

5         CAPTOES:  With the older one.

6         STRICDAD7:  Some there, as well.

7         CAPTOES:  Yes.  New granddad would take care

8    of that at home, also.

9         STRICDAD7:  Very nice.

10        CAPTOES:  At six feet five and 240 pounds.

11        STRICDAD7:  Wow.  Big guy.

12        CAPTOES:  Very.  But usually quite mild except

13   with them.

14        STRICDAD7:  Nice.  Charles, unfortunately I

15   must go.  Have an 11:30 meeting I must attend.  I

16   will see you tonight.  If you get lost or need

17   directions, please call.

18        CAPTOES:  Yes.  Very eager.

19        STRICDAD7:  Me, too.  Take care and I will see

20   you later.

21        CAPTOES:  Enjoy your meetings.

22        STRICDAD7:  I may be online later if schedule

23   permits.  What time are you leaving to get up here

24   by 6:30?

25        CAPTOES:  About four.

```
1              STRICDAD7:  Very good.  I'll talk to you

2        later.

3              CAPTOES:  Or give a ring.

4              STRICDAD7:  Okay.  Sounds great.  Talk to you

5        later.

6              CAPTOES:  Right.  Bye.

7              THE COURT:  We're going to take a break at

8        this time for lunch, members of the jury.  We'll be

9        back at 1:15 by the courtroom clock.

10             COURTROOM SECURITY OFFICER:  Rise for the

11       jury, please.

12       (Jury out at 11:48 AM.)

13       (Recess was taken at 11:48 AM until 1:18 PM.)

14       (Back on the record.)

15             COURTROOM SECURITY OFFICER:  All rise.  This

16       Honorable Court is in session.

17             THE COURT:  Bring the jury in, please.

18             MR. TRAGOS:  Your Honor, if I might, there is

19       an evidentiary issue I'd like to cover with the

20       court that I think is going to happen this afternoon

21       that might take some argument.

22             THE COURT:  Well, why don't we wait till it

23       happens instead of anticipating.

24             MR. TRAGOS:  Well, okay.

25             THE COURT:  I mean, is it inflammatory or
```

1    something?

2          MR. TRAGOS:  Well, Your Honor, it's whether or

3    not an edited tape is going to be played or not.

4          THE COURT:  Well, we can take that up when

5    it's ready.  We're in the middle of direct

6    examination.  Let's get as far as we can.

7          MR. TRAGOS:  Okay.

8          THE COURT:  Bring the jury in.

9          COURTROOM SECURITY OFFICER:  Rise for the

10   jury, please.

11   (Jury in at 1:19 PM.)

12         THE COURT:  Thank you.  Be seated.  You may

13   resume direct examination, Ms. Kaiser.

14         MS. KAISER:  Thank you, Your Honor.

15   BY MS. KAISER:

16   Q      Before the break, Corporal Romanosky, we

17   listened to an undercover phone call that you had

18   done with the defendant; is that correct?

19   A      That's correct.

20   Q      And I believe that was from July 16th of 2008?

21   A      That's correct.

22   Q      And during that phone call, he made a

23   statement to you -- you had asked him what he had

24   planned to do at the meeting with you, and he

25   responded, I presume oral.  What did you understand

Romanosky - Direct

1      that to mean?

2      A      I understood that comment to mean oral sex.

3      Q      And in that conversation when the defendant

4      said, I can't perform perfectly every time, what did

5      you understand him to mean?

6      A      I took that to mean that the defendant was

7      talking about the ability to sexually perform, get

8      an erection on some occasions but not others.

9      Q      Immediately prior to the break we also

10     reviewed the last instant message chat you had prior

11     to meeting with him on July 21st; is that correct?

12     A      That's correct.

13     Q      Okay.  On July 21st, 2008, did you actually

14     meet the defendant, Charles Friedlander?

15     A      I did.  I met him at about 6:30 PM at the

16     Cracker Barrel located at 54th Avenue North and

17     Interstate 275.

18     Q      Was that the place you had planned to meet?

19     A      Yes.  Actually, where we actually met is in

20     front of the Holiday Inn which is next door to the

21     Cracker Barrel, but that was the same place.

22     Q      When you initially met the defendant at the

23     Cracker Barrel, were you wearing any type of

24     recording device?

25     A      I was.  I was wearing -- I knew there was

Romanosky - Direct

1    going to be some dialogue prior to the arrest units

2    coming in, so I wore a body mic so that our

3    conversation would be recorded.

4         MS. KAISER:  Your Honor, may I approach the

5    witness?

6         THE COURT:  Yes, ma'am.

7    BY MS. KAISER:

8    Q    Consider Friedlander -- excuse me.  Corporal

9    Romanosky, I'm showing you what's been marked as

10   Government's Exhibits 30A which consists of two

11   discs.  One is a small one and one is a large one.

12   Do you recognize those items?

13   A    I do.

14   Q    And could you tell the jury what they are.

15   A    This -- the small disc is -- this is original

16   recording of the tape -- the -- from the body mic,

17   the dialogue that took place over the body mic.  And

18   the CD is the same information except in CD form

19   where we can play it with regular computers.

20   Q    All right.  And was the recording equipment

21   working properly on July 21st, 2008?

22   A    Yes.  The recording equipment was operated by

23   our tactical unit.

24   Q    And have you listened to the recording to make

25   sure that it's true and accurate?

1       A       I have.  And it's a true and accurate copy.

2       You have to listen close because we use a very good

3       body mic which is probably better for indoors than

4       outdoors because it pulls in everything, passing

5       cars, ambient noise, things like that.  But it is a

6       true and accurate copy.

7       Q       Corporal Romanosky, I'm showing you what's

8       been marked for identification as Government's

9       Exhibit 30B, and ask if you recognize that document.

10      A       I do.

11      Q       And what is it?

12      A       This is a transcription of the intelligible

13      items from the body mic.

14      Q       And have you reviewed that transcript and

15      compared the transcript to the audio that's

16      contained in Government's Exhibit 30A?

17      A       I have.

18      Q       And does it accurately depict the speakers?

19      A       It does.

20      Q       Does it accurately depict the content of the

21      undercover meeting that you had on July 21st, 2008?

22      A       It does.

23              MS. KAISER:  Your Honor, at this time I'd move

24      for admission of Government's Exhibits 30A and 30B

25      into evidence.

1          THE COURT:  As to 30A, Mr. Tragos, any

2     objection?

3          MR. TRAGOS:  No objection to 30A.

4          THE COURT:  All right.  30B is the transcript.

5     You're offering that as an aid to the jury?

6          MS. KAISER:  Yes, Your Honor.

7          THE COURT:  Rather than substantive evidence.

8          MS. KAISER:  I'm offering it as substantive

9     evidence, as well, Your Honor.

10          THE COURT:  It's not coming in as substantive

11     evidence.  That's why I'm suggesting it's an aid to

12     the jury.  Is that right?

13          MS. KAISER:  Yes, Your Honor.

14          THE COURT:  Mr. Tragos, with that

15     understanding, any objection to the --

16          MR. TRAGOS:  No, Your Honor, but we would ask

17     for an instruction from the court.

18          THE COURT:  I will give that.  All right.

19     Government's Exhibit 30A, members of the jury, is

20     received.  That's the disc/CD.  Government's Exhibit

21     30B will be received as an aid to assist you in

22     following the recording itself.

23     (Whereupon, Government's Exhibit Numbers 30A and 30B

24     are received into evidence.)

25          THE COURT:  The recording itself is the

1    evidence.  The transcript should be used by you only

2    to assist you in following the conversation, who's

3    saying what.  But I think you've already heard the

4    witness say that there may be portions of the

5    recording which may be difficult to follow, and this

6    transcript should assist you.  But again, the

7    evidence is the recording, that is, the words

8    spoken.  Do you have copies or are you going to

9    display it?

10        MS. KAISER:  I have copies for the jury, Your

11   Honor.

12        THE COURT:  As you follow along, members of

13   the jury, please try not to get ahead of the audio

14   recording itself.

15        MS. KAISER:  Your Honor, at this time the

16   government would like to publish Government's

17   Exhibit 30.

18        THE COURT:  Yes, ma'am.

19   BY MS. KAISER:

20   Q    Before I start the recording, Corporal

21   Romanosky, just so the jury is clear, this was a

22   body mic that you were wearing on July 21st?

23   A    Yes.

24   Q    And this was at the Cracker Barrel when you

25   met the defendant?

1       A       That's correct.

2       Q       Okay.

3               CORPORAL ROMANOSKY:  Okay.  Today's date is

4       Monday, July 21st, 2008.  The time is 1800 hours.

5       This is going to be in reference to Case Number

6       SO08184046.  This will be a controlled meeting

7       between myself, Corporal Kurt Romanosky of the

8       Pinellas County Sheriff's Office and AOL user

9       Captoes, later identified as Charles Jackson

10      Friedlander.  Okay.

11              Okay.  Eastbound on 54th Avenue.  Passing

12      over the interstate.  I'm coming up to 22nd Street

13      north side.  Okay.  I think I see him with the

14      handicapped tag there.  I'm going to make a circle

15      and look like I'm looking for him.  Okay.  There he

16      is.  All right.  Let's circle back.  I'm going to

17      pull on his driver's side.  And I think that's our

18      guy right there.  He's on the phone.

19              Charles?

20              THE DEFENDANT:  How are you?

21              CORPORAL ROMANOSKY:  How you doing?  Michael.

22      God, nice to meet you in person.  I feel like I know

23      you.

24              THE DEFENDANT:  Thanks.  Thank you.  I was

25      hoping that this would be far enough away.  I didn't

1    know whether --

2         CORPORAL ROMANOSKY:  Well, this place -- I

3    know the Cracker Barrel's always crazy.  I thought,

4    I figured you were probably up by the Cracker Barrel

5    or something.

6         THE DEFENDANT:  Well, that's what you said.

7         CORPORAL ROMANOSKY:  I actually got here

8    early, so --

9         THE DEFENDANT:  Oh, I did too.  I mean, I made

10   it so quick.

11        CORPORAL ROMANOSKY:  Traffic wasn't too bad.

12        THE DEFENDANT:  Not a thing.

13        CORPORAL ROMANOSKY:  Hopefully my directions

14   were accurate.  (Unintelligible).

15        THE DEFENDANT:  In fact I got off and had a

16   bite at -- I got off at 34th Street South, which I

17   knew.

18        CORPORAL ROMANOSKY:  Oh, yeah.

19        THE DEFENDANT:  I thought I'd go up 19 and

20   stop where I wanted to stop.

21        CORPORAL ROMANOSKY:  Where'd you go?

22        THE DEFENDANT:  It wanted to go to Grill and

23   Chill.  Have you ever heard of them?

24        CORPORAL ROMANOSKY:    No.

25        THE DEFENDANT:  That's the new Dairy Queen.

1          (Unintelligible).

2               CORPORAL ROMANOSKY:  No, not much down there.

3     Matter fact, I -- I probably would have told you

4     probably not a good idea to get off in that part of

5     town.

6               THE DEFENDANT:  It's all right.  I know that

7     part slightly.

8               CORPORAL ROMANOSKY:  To the left isn't bad

9     because you get out towards Tierra Verde and the

10    islands.  But if you go right you're in a place you

11    don't want to be.

12              THE DEFENDANT:  No.  I just stayed right along

13    19.  And then I kept heading north.

14    (Unintelligible).  And --

15              CORPORAL ROMANOSKY:  (Unintelligible).

16              THE DEFENDANT:  And so, you know, I --

17              CORPORAL ROMANOSKY:  I just had a value meal

18    on the way over so --

19              THE DEFENDANT:  Where?

20              CORPORAL ROMANOSKY:  I had a value meal at

21    McDonald's, got the 99 cent menu so --

22              THE DEFENDANT:  (Unintelligible).

23              CORPORAL ROMANOSKY:  It's been crazy today.  I

24    walked in and it'S like -- you know how Mondays are,

25    you walk in and there's just numerous things to get

1    done.  And I had all these meetings today.  I was

2    like I can't wait for the day to get over with so we

3    can meet and all that stuff.

4         THE DEFENDANT:  It's crazy.

5         CORPORAL ROMANOSKY:  Very good.  Did you bring

6    the belts and stuff?  I'm dying to see them.

7         THE DEFENDANT:  Oh.

8         CORPORAL ROMANOSKY:  I love your car.

9         THE DEFENDANT:  Oh, thank you.  It's old.

10        CORPORAL ROMANOSKY:  Old?  It's brand new.

11        THE DEFENDANT:  It's seven years old.

12        CORPORAL ROMANOSKY:  Oh, it's just probably

13   not costing you a bunch of money in payments every

14   month.

15        THE DEFENDANT:  And I love it.

16   (Unintelligible).

17        CORPORAL ROMANOSKY:  (Unintelligible).

18        THE DEFENDANT:  Here is the crop.

19        CORPORAL ROMANOSKY:  Oh, wow.

20        THE DEFENDANT:  Yeah.  It's a pretty lethal

21   thing.

22        CORPORAL ROMANOSKY:  Yeah, it sure is.  Holy

23   cow.

24        THE DEFENDANT:  Yeah.

25        CORPORAL ROMANOSKY:  Holy cow.  That's cool

1    looking, though.  Very effective.

2         THE DEFENDANT:  Very effective.  Very good.

3    Now we have this one.

4         CORPORAL ROMANOSKY:  Nice.  Now these are like

5    something you'd see on the barbers and stuff like

6    that with the razor?  What do they do?  They keep

7    them sharp or just -- (unintelligible).

8         THE DEFENDANT:  No, no, no, no, no.  You see,

9    it's first this.

10        CORPORAL ROMANOSKY:  Right.

11        THE DEFENDANT:  Then this.

12        CORPORAL ROMANOSKY:  Right.

13        THE DEFENDANT:  Then (unintelligible).  I

14    shave usually with a straight razor.

15        CORPORAL ROMANOSKY:  Uh-huh.

16        THE DEFENDANT:  So.

17        CORPORAL ROMANOSKY:  Cool.

18        THE DEFENDANT:  Oh, yeah.

19        CORPORAL ROMANOSKY:  Wow.  You've got to have

20    a steady hand for that one.

21        THE DEFENDANT:  Now, this is the oldest one.

22    This is nearly a hundred years old.

23        CORPORAL ROMANOSKY:  Holy cow.

24        THE DEFENDANT:  It's very soft.

25        CORPORAL ROMANOSKY:  Wow, that is soft.

1        That's something else.  Awesome.

2              THE DEFENDANT:  And then this one, which is

3        only about 50 years old.  (Unintelligible).

4              CORPORAL ROMANOSKY:  Where did you find these?

5              THE DEFENDANT:  They're from the family.

6              CORPORAL ROMANOSKY:  Ah.

7              THE DEFENDANT:  I never found them.  I sold

8        them, yeah, but I didn't buy them.  And this is,

9        this is the Garrison belt.

10             CORPORAL ROMANOSKY:  Wow.  It's like an old

11       military style belt.

12             THE DEFENDANT:  It is.  No.

13             CORPORAL ROMANOSKY:  Oh, is that what you were

14       saying?  You said German, old German.

15             THE DEFENDANT:  Yeah.

16             CORPORAL ROMANOSKY:  Like an old German

17       military (unintelligible) infantry.  Oh, cool.

18             THE DEFENDANT:  And then this is the small

19       one.

20             CORPORAL ROMANOSKY:  Wow.  Wow.  You come well

21       equipped.  That's for sure.

22             THE DEFENDANT:  Did you feel it would be like

23       that or you didn't know?

24             CORPORAL ROMANOSKY:  Well, I -- you know, I

25       looked up at Google and stuff because I'm not

1    like -- like I said, I've never seen one of those

2    used and I was like, wow, that's kind of cool.  Like

3    I've never actually seen one.  Especially an antique

4    one like that.

5         THE DEFENDANT:  They're (unintelligible).  I

6    don't know whether they make them anymore or not.

7    They may.

8         CORPORAL ROMANOSKY:  Uh-huh.  Well, I think

9    they still do but they're --

10        THE DEFENDANT:  But they're --

11        CORPORAL ROMANOSKY:  A modernized version.

12        THE DEFENDANT:  Yeah.  And they'd be very

13   stiff and old and horrible.  (Unintelligible).

14        CORPORAL ROMANOSKY:  Very good.  Very cool.

15   My house is about 30 or 45 minutes from here.

16        THE DEFENDANT:  Okay.

17        CORPORAL ROMANOSKY:  If you just want to

18   follow me that'd be the best way to do it.

19        THE DEFENDANT:  That's the only way I'll get

20   there.

21        CORPORAL ROMANOSKY:  Yeah.  What we're going

22   to do is we'll just end up going back out to 19 and

23   we'll go north.  We're going to go north up about 15

24   miles, so --

25        THE DEFENDANT:  On 19?

172

```
1              CORPORAL ROMANOSKY:  On 19.  We're going to

2       get off on Tampa Road, which is, like I said, it's

3       about 25 minutes from there.

4              THE DEFENDANT:  (Unintelligible).

5              CORPORAL ROMANOSKY:  I actually live in Palm

6       Harbor.

7              THE DEFENDANT:  Oh.

8              CORPORAL ROMANOSKY:  But I do work from there.

9              THE DEFENDANT:  Oh.

10             CORPORAL ROMANOSKY:  But I do work.  My work

11      takes me everywhere.  I go, you know, St. Pete.  I

12      go over here.  I go Hillsborough County.  I go all

13      kinds of places.

14             THE DEFENDANT:  Yeah.  I've been up to Palm

15      Harbor once.  I do a lot of work with the Sheriff's

16      Boy's Ranch.

17             CORPORAL ROMANOSKY:  Oh, no kidding.

18             THE DEFENDANT:  Yeah.

19             CORPORAL ROMANOSKY:  That's a good cause.

20             THE DEFENDANT:  (Unintelligible) in Palm

21      Harbor.  But it's co-ed.

22             CORPORAL ROMANOSKY:  Uh-huh.  Yeah.

23             THE DEFENDANT:  And they're always wanting to

24      know if (unintelligible) the head of it, if I have

25      (unintelligible) --
```

1           CORPORAL ROMANOSKY:  Wow.

2           THE DEFENDANT:  But, oh, yeah.

3           CORPORAL ROMANOSKY:  I get flyers from them a

4     lot.  They send stuff out in the mail wanting

5     donations and stuff.

6           THE DEFENDANT:  Yeah.  I support them and I

7     have forever.

8           CORPORAL ROMANOSKY:  Oh, no kidding.

9           THE DEFENDANT:  And they're very nice people.

10          CORPORAL ROMANOSKY:  Oh, too -- too bad you

11    couldn't go over and help them out with some

12    troubled youths.

13          THE DEFENDANT:  Oh, it's not for delinquents.

14          CORPORAL ROMANOSKY:  Uh-huh.

15          THE DEFENDANT:  Even though most people think

16    it is.  No.  It's for usually abandonment, or that

17    they live with their grandparents and their

18    grandparents die.

19          CORPORAL ROMANOSKY:  Wow.

20          THE DEFENDANT:  Oh, it's a mess.

21          CORPORAL ROMANOSKY:  Sounds like it's a real

22    train wreck.  Well, do you want to follow me?

23          THE DEFENDANT:  Sure.

24          CORPORAL ROMANOSKY:  Just follow the blue van.

25    I have my phones if you get separated in traffic.

1          THE DEFENDANT:  All right.

2          CORPORAL ROMANOSKY:  Good deal.  Let's go do

3    it.

4          THE DEFENDANT:  Very good.

5          MS. KAISER:  Your Honor, may I approach the

6    witness.

7          THE COURT:  Yes, ma'am.

8    <u>BY MS. KAISER:</u>

9    Q     Corporal Romanosky, I'm showing you what's

10   been marked for identification as Government's

11   Exhibits 32, 33, 34, 35A, B, C and 35D, and ask you

12   to take look at those items.

13   A     Yes, ma'am.

14   Q     Do you recognize them?

15   A     I do.

16   Q     What are they?

17   A     These are the items that the defendant brought

18   to the meeting with my undercover profile.  These

19   are the items that he showed me while we were having

20   that brief dialogue just prior to his arrest.

21   Q     Can you identify for the record what

22   Government's Exhibit 33 is?

23   A     This is what I take to be an English -- the

24   riding crop.  I think the chat referred to it as a

25   quirt.  This is the Garrison belt or heavy -- like a

Romanosky - Direct

```
1    uniform belt.

2    Q       And is that Government's Exhibit Number --

3    A       This is 34.

4    Q       Okay.

5    A       Try to get these in order.  This is a razor

6    strap, has the back clamp on the one end, as is this

7    smaller version.

8            MS. KAISER:  Let the record reflect the

9    witness previously identified Government's Exhibit

10   35A and the last one was Government's Exhibit 35B.

11   BY MS. KAISER:

12   Q       And as far as Government's Exhibit 35C?

13   A       Again, another example of the razor strap and

14   this one, Exhibit 35F, is a black leather strap with

15   holes.

16   Q       During the undercover tape that we had just

17   listened to prior to the defendant's arrest, there's

18   a reference -- the defendant sounds like he's trying

19   to show you things.  Can you explain to the jury

20   what was occurring on the tape at that point?

21   A       Well, I was actually standing outside the

22   passenger door.  We had walked around to the

23   passenger side of his vehicle.  He opened up the

24   passenger side door and this red bag was inside the

25   car like on the seat and it had these items.  And he
```

Rollanosky - Direct

1    was removing the items and showing them to me.

2          At the conclusion of him showing me all the

3    items, I made the visual cue for the arrest team,

4    which was, okay, let's go do this.  As I walked away

5    I took my sunglasses off which was the visual cue in

6    case the mic was dead, that they knew.  Everything

7    had gone the way it was supposed to go and that was

8    the signal for the arrest.

9          MS. KAISER:  Your Honor, at this time I'd move

10   for admission of Government's Exhibits 32, 33, 34

11   and 35A through D into evidence.

12         THE COURT:  32 is the bag?

13         MS. KAISER:  32 is the bag.

14         THE COURT:  Is there any objection?

15         MR. TRAGOS:  No, Your Honor.

16         THE COURT:  Exhibits 32, 33, 34, 35A, B, C and

17   D are now received.

18   (Whereupon, Government's Exhibit Numbers 32, 33, 34,

19   35A, B, C and D are received into evidence.)

20   BY MS. KAISER:

21   Q     After the defendant was placed under arrest,

22   what happened?

23   A     After the defendant was placed under arrest he

24   was -- we put him in -- secured him in my vehicle,

25   the blue mini van, and I told him we were going to

1    take a ride back to my office, that way we could

2    discuss what had happened.

3    Q        Was anyone with you and the defendant at that

4    point?

5    A        Yeah.  My vehicle was an uncaged vehicle and

6    our policy requires if transporting in an uncaged

7    vehicle, there has to be at least two people in

8    there.  So the tac sergeant or incoming tac sergeant

9    rode back with me to the office.

10   Q        What was his name?

11   A        Sergeant Vaughn.  Sergeant Kerrin was retiring

12   and that was -- he was still at the scene, but

13   Sergeant Vaughn rode back with me.

14   Q        Approximately how long a drive is it from the

15   Cracker Barrel where the defendant was arrested and

16   your office?

17   A        Roughly 30 minutes or so.  If you're familiar

18   with Pinellas County, it's a lot of traffic

19   mainly -- not so much distance, but from 54th Avenue

20   and the interstate all the way back to Ulmerton Road

21   and sum boulevard.

22   Q        During the transport from the Cracker Barrel

23   back to your office, did you or Sergeant Vaughn

24   attempt to interview the defendant?

25   A        No.  That's not the purpose of the transport.

Romanosky - Direct

1      The purpose of the transport is to -- really kind of

2      the first stage of an interview.  It's where you

3      start working on rapport building.   In this case it

4      wasn't as hard of rapport because the defendant and

5      I had been communicating online.   So even though I

6      wasn't the person that he thought I was, we still

7      had been communicating, we still knew somewhat about

8      each other, so to speak, so -- but that would be the

9      purpose of it, just to kind of start developing that

10     rapport prior to the interview.

11          MS. KAISER:   Your Honor, may I approach the

12     witness?

13          THE COURT:   Yes, ma'am.

14     BY MS. KAISER:

15     Q     Corporal Romanosky, I'm showing you what's

16     been marked as Government's Exhibit 31A and 31B.  Do

17     you recognize those?

18     A     These are photographs of the defendant's

19     vehicle, the vehicle that he drove to the meeting

20     location.

21     Q     And do they fairly and accurately depict the

22     scene at the time of his arrest?

23     A     They do.  I was actually parked -- my vehicle

24     was parked on the driver side of his.  And I

25     recognize the tag.  It's a personalized license

Romanosky - Direct

1    plate.

2              MS. KAISER:  Your Honor, at this time I'd move

3    for admission of Government's Exhibits 31A and B

4    into evidence?

5              MR. TRAGOS:  No objection.

6              THE COURT:  31A and B are received.  Thank

7    you.

8    (Whereupon, Government's Exhibit Numbers 31A and B

9    received into evidence.)

10             MS. KAISER:  Your Honor, at this time I'd like

11   to publish them, Your Honor.

12             THE COURT:  All right.  Dim the lights, Anne,

13   please.

14   BY MS. KAISER:

15   Q    All right.  What are we looking at here?

16   A    This is the defendant's vehicle that he drove

17   to the meeting location, a photograph of defendant's

18   vehicle.  And on the driver side the space

19   immediately next to him is where I had parked my

20   vehicle.  The road that's in front of him is like an

21   access road I believe right off of 54th Avenue

22   coming into the Cracker Barrel and Holiday Inn

23   parking lot.

24   Q    And what does Government's Exhibit 31B depict?

25   A    This is the defendant's personalized license

Romanosky - Direct

1    plate.

2    Q       And had the defendant ever discussed the use

3    of the word Shrinq with you.

4    A       Later on in the interview he advised it was

5    one of his screen names.

6    Q       Did any other law enforcement assist in the

7    investigation or search of the vehicle at the time

8    of Mr. Friedlander's arrest?

9    A       Yes.  Because I -- after the arrest,

10   obviously, I'm going to be busy as the case agent

11   with the interview of the defendant, I had requested

12   members from my unit perform various investigative

13   functions.  I had requested Detective Kelly Lyons

14   and Detective Jeff Capra coordinate the impound of

15   the vehicle.

16       We had our forensic techniques come out for

17   photographs and take photographs of things they

18   found in the vehicle.  I had requested Detective

19   Corrozza from our unit to actually travel to

20   Ft. Myers to meet up with Special Agent Steve

21   Uebelacker and his crew from the Florida Department

22   of Law Enforcement to execute the search warrant at

23   Mr. Friedlander's residence.

24       MS. KAISER:  Your Honor, the government has a

25   witness that has --

Romanosky - Direct

1          THE COURT:  Side bar, please.

2    (At side bar, on the record.)

3          THE COURT:  Thank you.  Yes, ma'am.

4          MS. KAISER:  Your Honor, I have a very brief

5    witness who just took pictures and inventoried the

6    vehicle, and there's a few objects that this --

7    Corporal Romanosky cannot bring into evidence that

8    she needs to do, but she's got child care issues in

9    the morning.

10         Since Corporal Romanosky is -- is going to be

11   another few hours with the interview, would it be

12   all right if he steps down and I put her on just to

13   get the other items in and then put Corporal

14   Romanosky back on to complete his testimony?

15         MR. TRAGOS:  No objection.

16         THE COURT:  All right.  I'll explain that to

17   the jury that we're accommodating the witness

18   because of her schedule.  Is that fair?

19         MS. KAISER:  That's fine.  Thank you.

20   (End of side bar discussion.)

21         THE COURT:  All right.  Corporal, you may step

22   down.  We're going to take a witness out of turn to

23   accommodate the witness's schedule.  And I think

24   you'll see that the testimony will relate to this

25   witness's testimony.

Lyons - Direct

```
 1              MS. KAISER:  The United States calls Kelly

 2      Lyons.

 3              GOVERNMENT WITNESS, KELLY LYONS, SWORN

 4              COURTROOM DEPUTY CLERK:  Raise your right

 5      hand.

 6              THE WITNESS:  Yes, ma'am.

 7              COURTROOM DEPUTY CLERK:  Please be seated.

 8              Please state your name and spell your last

 9      name for the record.

10              THE WITNESS:  Kelly Lyons, L-Y-O-N-S.

11              COURTROOM DEPUTY CLERK:  Pull that microphone

12      down.

13                       DIRECT EXAMINATION

14      BY MS. KAISER:

15      Q       Could you please tell the jury where you work.

16      A       Pinellas County Sheriff's Office.

17      Q       And how are you so employed?

18      A       I work as a detective in our Crimes Against

19      Children Unit.

20      Q       How long have you been so employed?

21      A       Ten years.

22      Q       Did you participate in the investigation of

23      Charles Friedlander on July 21st, 2008?

24      A       I did.

25      Q       And what roles did you play that day?
```

1    A      I was to complete the inventory of the vehicle

2    that he was driving.

3    Q      And did you, in fact, do that?

4    A      Yes, I did.

5    Q      Okay.  Where did you complete the inventory of

6    the vehicle?

7    A      In the parking lot of the location where he

8    was to be met with Corporal Romanosky.

9    Q      Was that the Cracker Barrel?

10   A      Yes, ma'am.

11   Q      When you arrived at the scene, can you explain

12   to the jury what, if anything, you did.

13   A      I parked my car, an unmarked vehicle in a

14   parking space and waited for Corporal Romanosky to

15   make contact with the subject and then give us the

16   code word to do the takedown or complete the

17   takedown.

18   Q      After Mr. Friedlander was arrested, what, if

19   anything, did you do?

20   A      I had forensics respond to photograph the

21   vehicle, and then I completed an inventory of the

22   vehicle prior to having it impounded.

23          MS. KAISER:  Your Honor, may I approach the

24   witness?

25          THE COURT:  Yes, ma'am.

Lyons - Direct

1    BY MS. KAISER:

2    Q        Detective, I'm showing you what's been marked

3    for identification as Government's Exhibit 31C,

4    through 31K.  If you would, please take a look at

5    those documents.

6    A        Yes, ma'am.

7    Q        Do you recognize them?

8    A        I do.

9    Q        What are they?

10   A        They're the items that were inside the vehicle

11   when we were inventorying it.

12   Q        Do those photos fairly and accurately depict

13   the defendant's vehicle on July 21st?

14   A        They do.

15            MS. KAISER:  Your Honor, at this time I'd move

16   for admission of Government's Exhibit 31C through

17   31K into evidence.

18            THE COURT:  Is there any objection?

19            MR. TRAGOS:  Could I have a moment, Your

20   Honor?

21            THE COURT:  Yes, sir.

22   (Brief pause.)

23            MR. TRAGOS:  No objection.

24            THE COURT:  Government's Exhibits 31C through

25   31K are received.

1      (Whereupon, Government's Exhibit Numbers 31C through

2      31K are received into evidence.)

3           MS. KAISER:  Thank you.

4      BY MS. KAISER:

5      Q     I'm showing you what's also been marked as

6      Government's Exhibit 36, and ask you to take a look

7      at that.  Do you recognize that?

8      A     I do.

9      Q     What is Government's Exhibit 36?

10     A     It's an Vesicare bag with some plastic -- or

11     some latex gloves inside of it.

12     Q     And where was that located?

13     A     It was located on the front seat of the

14     vehicle.

15     Q     And could you please show the --

16          MS. KAISER:  Your Honor, at this time I'd move

17     for admission of Government's Exhibit 36 into

18     evidence.

19          THE COURT:  Any objection?

20          MR. TRAGOS:  No objection.

21          THE COURT:  36 is received.

22     (Whereupon, Government's Exhibit Number 36 is

23     received into evidence.)

24     BY MS. KAISER:

25     Q     Can you please show the jury the contents of

Lyons - Direct

1    the bag.  And were those gloves located you said in

2    the -- inside that bag?

3    A    Yes.

4    Q    And where in the vehicle was it?

5    A    I believe they were on the front seat of the

6    car.

7    Q    I'm also showing you what's been marked as

8    Government's Exhibit 30, and ask if you recognize

9    that.

10   A    I do.

11   Q    What is that?

12   A    It's the camera that was located inside the

13   vehicle.

14        MR. TRAGOS:  I'm sorry.  Exhibit 30?

15        MS. KAISER:  I'm sorry, Exhibit 100.

16        THE COURT:  100?

17        MS. KAISER:  I apologize.  Exhibit 100.

18   BY MS. KAISER:

19   Q    I'm sorry.  What is that?

20   A    It's a digital camera that looks like it was

21   found inside the vehicle.

22        MS. KAISER:  At this time I'd move for

23   admission of Government's Exhibit 100 into evidence.

24        THE COURT:  I presume that's a camera case

25   that the camera was found in?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  It just wasn't identified.  Any

 3      objection?

 4              MR. TRAGOS:  May I examine it, Your Honor?

 5              THE COURT:  Yes, sir.

 6      (Brief pause.)

 7              MR. TRAGOS:  No objection.

 8              THE COURT:  Government's Exhibit Number 100 is

 9      received.

10      (Whereupon, Government's Exhibit Number 100 is

11      received into evidence.)

12              MS. KAISER:  Your Honor, at this time I'd like

13      to publish Government's Exhibits 31C through K.

14              THE COURT:  All right.  If you get a glare,

15      Ms. Kaiser, I've seen lawyers use a legal pad to

16      block out the ceiling light glare over the

17      projector.  It might help.  No, up above.  There you

18      go.

19              MS. KAISER:  Thank you.

20      BY MS. KAISER:

21      Q       All right.  Detective, what is depicted in

22      Government's Exhibit 31C?

23      A       It's the vehicle that I inventoried.  This is

24      the front seat looking in from the driver's side and

25      what was located on the front seat of the vehicle.
```

1    Q      All right.  And the red bag, is that the --

2    A      Yes.

3    Q      Okay.  And Government's Exhibit 31D, what are

4    we looking at here?

5    A      We're looking at it from the passenger's side

6    view into the vehicle.

7    Q      And where was the bag with the gloves?

8    A      I believe it was actually sitting on the seat.

9    Q      Is this just a close-up picture of the same

10   thing we just saw in 31D?

11   A      Yes, ma'am.

12   Q      Government's Exhibit 31F, what are we looking

13   at here?

14   A      You're looking at the various items that were

15   inside the red bag, which includes the Garrison belt

16   and it looks like the Vesicare bag.

17   Q      And inside the Vesicare bag was the latex

18   gloves?

19   A      Yes, ma'am.

20   Q      And what is depicted in Government's Exhibit

21   31G?

22   A      Those would be the three gloves that I showed

23   that were inside the Vesicare bag that was located

24   inside the red bag on the seat.

25   Q      And Government's Exhibit 31H?

Lyons - Direct

1    A       You're looking at the back seat view of the

2    vehicle from the driver's side and two bags located

3    in the car.

4    Q       And Government's Exhibit 31I?

5    A       The contents of one of the bags which would

6    have been -- which appears to be shoes.

7    Q       Government's Exhibit 31J?

8    A       That's the trunk of the vehicle.

9    Q       And finally Government's Exhibit 31K?

10   A       Some of the contents that was in the trunk of

11   the vehicle.

12   Q       Now, Detective, when you go out to inventory a

13   vehicle, is it your job to make a notation of

14   everything that's in there?

15   A       Yes, ma'am.

16   Q       Okay.  And is that what you did in this case?

17   A       Yes, I did.

18           MS. KAISER:  Your Honor, may I approach?

19           THE COURT:  Yes, ma'am.

20   BY MS. KAISER:

21   Q       Detective, I'm showing you what's been marked

22   for identification as Government's Exhibit 59.  Do

23   you recognize that document?

24   A       I do.

25   Q       And what is that?

Lyons - Direct

1      A      It's a -- looks like a notepad note with a

2      phone number and a possible address written on it.

3      Q      And where was that located?

4      A      It was located on the front seat of the

5      vehicle.

6              MS. KAISER:  At this time, Your Honor, I'd

7      move for admission of Government's Exhibit Number 59

8      into evidence.

9              THE COURT:  Any objection?

10             MR. TRAGOS:  May I voir dire for a moment,

11     Your Honor?

12             THE COURT:  Yes, sir.

13                     VOIR DIRE EXAMINATION

14     BY MR. TRAGOS:

15     Q      Did you take that item from the vehicle?

16     A      I did.

17     Q      Okay.  And did you bag it in plastic?

18     A      I did.

19             MR. TRAGOS:  Okay.  That's all the questions I

20     have.  No objection.

21             THE COURT:  59 is received.

22     (Whereupon, Government's Exhibit Number 59 is

23      received into evidence.)

24             MS. KAISER:  Your Honor, may I have a moment?

25             THE COURT:  Yes, ma'am.

Lyons - Cross

1    (Brief pause.)

2         MS. KAISER:  Thank you.  I have no further

3    questions.

4         THE COURT:  Cross-examination, Mr. Tragos.

5         MR. TRAGOS:  Thank you.

6                    CROSS-EXAMINATION

7    BY MR. TRAGOS:

8    Q     Deputy Lyons, did you seize all of the items

9    that are photographed?

10   A     I believe so.

11   Q     Okay.  You didn't have -- another detective

12   didn't do that or forensic person?

13   A     We -- as a team, we did it.

14   Q     Okay.  You and who else was there?

15   A     Detective Capra and a forensic science

16   specialist was there.

17   Q     What was that person's name?

18   A     I believe it was CSI Hook.

19   Q     Okay.  When you take an inventory, you write

20   down what you seize?

21   A     I do.

22   Q     Now, we have some bags here that are in the

23   photographs.  Did you inventory what was in those

24   bags?

25   A     I believe so, yes.

Lyons - Cross

1    Q      Okay.  Did you do a report?

2    A      I did.

3    Q      Okay.  How many reports did you do?

4    A      One.

5    Q      Okay.  And when you did that inventory, is

6    that part of your report?

7    A      I don't believe so.  Only a partial part of it

8    is.

9    Q      Where is the rest of it?

10   A      It would be on the inventory log for the tow

11   record, the impound form.

12   Q      Okay.  Is that something you fill out?

13   A      I do.

14          MR. TRAGOS:  May I approach the witness, Your

15   Honor.

16          THE COURT:  Yes, sir.

17          THE WITNESS:  Thank you, sir.

18   BY MR. TRAGOS:

19   Q      Is that the form you're talking about?

20   A      Yes, sir.

21   Q      Do you have a copy of this with you or do you

22   need to refresh your recollection with it?

23   A      Please.  I don't have one with me.

24          MR. TRAGOS:  Your Honor, may she refresh her

25   recollection with it?

Lyons - Cross

1          THE COURT:  Yes, sir.

2     BY MR. TRAGOS:

3     Q      Please read what is listed on that form that

4     you seized from the vehicle.

5          MS. KAISER:  Objection, foundation for the

6     document.

7          MR. TRAGOS:  Your Honor, she said she's

8     refreshing.  Sorry.

9          THE COURT:  Then she should not read from it.

10    After having refreshed your memory, could you please

11    just respond to the next question.

12    BY MR. TRAGOS:

13    Q      Can you tell us, ma'am, what you remember now

14    what was seized from the vehicle.

15    A      The items necessarily on this weren't seized.

16    Only partial items were taken from the vehicle, not

17    everything.

18    Q      All right.  I want to know what was contained

19    in the vehicle when you took possession of it.

20    A      What was actually inside the vehicle?

21    Q      Correct.  You took these photographs; correct?

22    A      No, I did not.

23    Q      You were present when they were taken?

24    A      Partially.

25    Q      Well, you identified these photographs as

Lyons - Cross

1       being accurate depictions.

2       A       Right.

3       Q       Are they accurate depictions?

4       A       They are.

5       Q       Okay.  And there are bags in these

6       photographs; correct?

7       A       Yes, sir.

8       Q       And these bags have things inside of them?

9       A       Yes, sir.

10      Q       Okay.  Can you tell us what inside the bags.

11      A       An overview of what's inside the bags, yes.  I

12      can't give you specifics as to what's inside each

13      bag.

14      Q       Is there a good record anywhere of what's

15      inside the bags?

16      A       Probably from my memory is what I could give

17      you.

18      Q       So you didn't actually write down or make any

19      notes or reports with reference to what is in --

20      specifically in the bags?

21      A       I think it was a general report of what was in

22      this there.

23      Q       Okay.  Can you -- let's start with the red

24      bag.  What was in the red bag?

25      A       The red bag had the Vesicare bag, the Garrison

Lyons - Cross

1    belts and the horse whip.

2    Q       The blue bag?

3    A       I don't recall by color of the bag, but I can

4    tell you in general what was in each bag if I saw

5    another picture of it.

6            MR. TRAGOS:  May I, Your Honor?

7            THE COURT:  Yes, sir.

8    BY MR. TRAGOS:

9    Q       Is that the picture that you're --

10   A       Yes, sir.

11   Q       Okay.  So what was in the blue bag?

12   A       I believe there was a yellow shirt in the blue

13   bag.

14   Q       Okay.  Like a pullover shirt, a button-down?

15   A       I'm not positive of what type of shirt.  I

16   remember it being possibly a yellow shirt.

17   Q       Okay.  And then there is a -- kind of a tan

18   plastic bag?

19   A       Yes, sir.

20   Q       What was in that bag?

21   A       It appeared to be salad addressing of some

22   type or some sort of dressing.

23   Q       Honey mustard dressing?

24   A       Possibly.

25   Q       Okay.  In the back seat, this Marriott bag?

1    A        There was shoes.

2    Q        Shoes.  What -- let me see if I can get a

3    picture of the shoes here.  Are those the shoes?

4    A        Yes, sir.

5    Q        And in this plastic bag?

6    A        I believe it also contained shoes.

7    Q        Are you aware of anything else that was in

8    that car?

9    A        Other than what we've talked about?

10   Q        Yes.

11   A        There was a tie that was located in the car.

12   There might have been another shirt.  There was a

13   water bottle.  There was a phone charger.  That was

14   a first aid bag.  There was jumper cables inside the

15   vehicle, a map inside the vehicle, sunglasses inside

16   the vehicle, various cassette tapes inside the

17   vehicle.

18   Q        How many bottles of this salad dressing was

19   there?

20   A        I think there was five.

21   Q        Any bumper stickers or anything such as that

22   on the car?

23   A        I don't recall.

24   Q        Okay.  Was there any kind of a club or

25   anything like that in the car?

Lyons - Cross

1    A       There was.

2    Q       Okay.  What kind of club was that?

3    A       The type that went on a steering wheel to

4    secure your vehicle.

5    Q       Okay.  The -- was it a cell phone, is that

6    what was in the car?

7    A       I believe it was a cell phone charger.  I

8    don't recall if there was a phone or not.

9    Q       Okay.  Do you recall anything else that was in

10   that automobile when you took possession of it?

11   A       Not off the top of my head I don't.

12   Q       Okay.  Now, with regard to the camera, Exhibit

13   100, what did you do with that camera?

14   A       I looked through the camera to see if there

15   was anything of value on it.

16   Q       Was there?

17   A       Not that I recall.

18   Q       Okay.  Were there any pictures at all?

19   A       I don't recall.

20   Q       Did you even see if it worked?

21   A       We did.

22   Q       Did it work?

23   A       It did.

24   Q       Okay.  But you don't recall if there were any

25   pictures?

1    A      I don't recall.  We had to put batteries in

2    it.  The batteries in it were dead or there were not

3    any.

4    Q      Oh, the batteries were dead that were in the

5    camera?

6    A      I believe so.

7           MR. TRAGOS:  That's all the questions I have,

8    Your Honor.

9           THE COURT:  Any redirect?

10          MS. KAISER:  No, Your Honor.

11          THE COURT:  Thank you, ma'am.  You may step

12   down.  Please watch your step.

13          Anybody need a short comfort break before we

14   resume the corporal's testimony?  All right.  We'll

15   target about a quarter till 3:00 for a comfort break

16   unless you alert me otherwise.

17   (Brief pause.)

18          MS. KAISER:  Your Honor, may I approach the

19   witness?

20          THE COURT:  Yes, ma'am.

21   BY MS. KAISER:

22   Q      Corporal Romanosky, I'm showing you what's

23   admitted as Government's Exhibit 59, and ask if you

24   could take a look at that document.

25   A      Okay.

Romanosky - Direct

1    Q       Do you recognize any of the information on

2    there?  Does it have any relevance to you?

3    A       Yes.  Printed is my undercover cell phone

4    number, or at least it was at that time,

5    727-430-0008.  And written underneath that is 54th

6    Avenue North, which was the cross street off the

7    interstate that -- where the meeting was to take

8    place.

9    Q       And this was the paper that was found in the

10   defendant's vehicle; is that correct?

11   A       Yeah.  I later learned it was.

12           MR. TRAGOS:  Objection, hearsay.

13           THE COURT:  Overruled.

14           MS. KAISER:  Your Honor, at this time I'd like

15   to publish Government's Exhibit 59.

16           THE COURT:  You may.

17   BY MS. KAISER:

18   Q       So Corporal Romanosky, you're saying this is

19   the location; is that correct?

20   A       Yes, ma'am.  That's the cross street off of

21   the interstate and 54th Avenue North.

22   Q       And that right there is the undercover phone

23   number you had given to Mr. Friedlander?

24   A       That's correct.

25   Q       After you took Mr. Friedlander back to your

1    office, did he -- did you read him his rights?

2    A     Yes, ma'am, I did.

3    Q     And what did you advise him?

4    A     Of his *Miranda* rights.  We have a printed form

5    that covers all the different constitutional rights,

6    right to remain silent, right to an attorney, right

7    to stop questioning at any time.

8    Q     Did the defendant indicate that he understood

9    his rights?

10   A     He did.

11   Q     What was his demeanor at that time?

12   A     He was calm.  I mean, he was still a little

13   nervous, but he was calm.

14   Q     Did he appear to be under the influence of any

15   drugs or alcohol?

16   A     No, he did not.

17   Q     Did you make any promises -- in exchange for

18   his statement, did you make any promises to the

19   defendant?

20   A     No.

21   Q     At any time did he ask for an attorney?

22   A     No.

23         MS. KAISER:  Your Honor, may I approach the

24   witness?

25         THE COURT:  Yes, ma'am.

1       BY MS. KAISER:

2       Q      Corporal Romanosky, I'm showing you what's

3       been marked for identification as Government's

4       Exhibit 38, and ask if you recognize that form.

5       A      I do.  This form is the Pinellas County

6       Sheriff's Office Rights Advisement Form.  It has the

7       date and time of the interview, the case number, my

8       name, the defendant's name, his response to each of

9       the questions and both of our signatures.

10             MS. KAISER:  Your Honor, at this time I'd move

11      for admission of Government's Exhibit 38 into

12      evidence.

13             MR. TRAGOS:  No objection.

14             THE COURT:  38 is received.  Thank you.

15      (Whereupon, Government's Exhibit Number 38 is

16       received into evidence.)

17      BY MS. KAISER:

18      Q      Next, Corporal Romanosky, I'm showing you

19      what's been marked for identification as

20      Government's Exhibit Number 40, and ask you to take

21      a look at that, please.

22      A      This is the Pinellas County Sheriff's Office

23      consent to search, waiver of search warrant for

24      computer and/or related accessories.  This has the

25      defendant's name, it has his address.  It discusses

Romanosky - Direct

1    some items that we wanted his consent to search.  It

2    talks about his giving his consent and acknowledging

3    anything that may be found in the search could be

4    used against him at a matter of which he's accused.

5        And it also says he understands it's a time

6    consuming process.  And on the back is his

7    signature, my signature, the date.  I've indicated

8    that the video was on.  And for -- it asks for an

9    inventory of what items we're discussing to be

10   searched.  It just says, for details, refer to the

11   property master window because at that time I didn't

12   have the serial numbers and brands of the computers

13   from the search warrant yet.

14       MS. KAISER:  Your Honor, at this time I'd move

15   for admission of Government's Exhibit 40 into

16   evidence.

17       THE COURT:  Any objection to 40?

18       MR. TRAGOS:  No, Your Honor.

19       THE COURT:  Government's 40 is received.

20   (Whereupon, Government's Exhibit Number 40 is

21    received into evidence.)

22       MS. KAISER:  Your Honor, request permission to

23    publish.

24       THE COURT:  Yes, ma'am.

25       MS. KAISER:  Thank you.

1     BY MS. KAISER:

2     Q      All right.  Putting on the overhead

3     Government's Exhibit 39, can you explain to the jury

4     what's involved.  When you begin an interview of a

5     subject, what are the questions that you go through

6     before you interview them?

7     A      Are you referring to the rights advisement

8     form?

9     Q      Yes.

10    A      Okay.  These are constitutional rights, the

11    *Miranda* waiver.  Would you like me to go through

12    each one?

13    Q      Yes.

14    A      Okay.  The form starts off with date and time.

15    It has my name as the investigator, our case number

16    for the sheriff's office.  It says I am Corporal K.

17    Romanosky of the Pinellas County Sheriff's Office.

18    First is, please state your name, age and address.

19    Charles Jackson Friedlander, 78, 12040 Mahogany Isle

20    Lane, Ft. Myers, Florida.

21          The next question is do you understand you

22    have right to remain silent.  The reply is yes.  The

23    next question is do you understand anything you say

24    can and will be used against you in a court of law.

25    The reply is yes.

Romanosky - Direct

1          The next question is do you understand that

2     you have the right to speak to a lawyer and have him

3     or her present with you while you're being

4     questioned.  The answer is yes.  The next question

5     is do you understand that if you cannot afford it's

6     a hire a lawyer, one will be appointed to represent

7     you before questioning, if you wish.  The answer is

8     yes.

9          The next question is do you understand that

10    you can decide at any time to exercise these rights

11    and not answer any questions or make any statements.

12    The answer is yes.  The next question is do you

13    understand each of these rights I have just

14    explained to you.  The answer is yes.

15         And then the last question is having these

16    rights in mind, do you wish to talk to us now.  And

17    the answer is yes.  And then I sign as a witness and

18    the signature next to mine is the defendant's.

19    Q     All right.  And where did the defendant sign

20    this form?

21    A     Right under -- right above signature.

22    Q     Where in your office?

23    A     Actually, where I was speaking with the

24    defendant was we have an interview room that's used

25    by our unit.  It's down -- actually down the hall a

1    little bit from the office.  It's right next to an

2    elevator.

3    Q      And I'm putting on the overhead Government's

4    Exhibit Number 40; is that correct?

5    A      That's correct.

6    Q      And this is the consent to search the

7    computers that you had discussed previously?

8    A      That is correct.

9    Q      And does the defendant sign this form?

10   A      Yes.  It's actually on page two.

11   Q      Is that the defendant's signature at the top?

12   A      Yes.  And I have witness on video.  We

13   actually go through it on video.

14          MS. KAISER:  Your Honor, may I approach the

15   witness?

16          THE COURT:  Yes, ma'am.

17   BY MS. KAISER:

18   Q      Corporal Romanosky, I'm showing you what's

19   been marked for identification as Government's

20   Exhibit 39A, B and C.  Do you recognize those?

21   A      39A is -- this is the DVD of the suspect

22   interview.  39B is -- this is a copy or this is the

23   redacted --

24   Q      Redacted.

25   A      This is a redacted version, the times that I

Romanosky - Direct

1    was actually out of the room and no statements were

2    being made.  And 39C is a paper that talks about --

3    shows some statements that were made.  I presume

4    these were the statements that were made while I was

5    out of the room.

6    Q      And Corporal Romanosky, for the defendant's

7    interview, were there -- I believe you testified

8    yesterday there was periods of time when you were

9    not in the room; is that correct?

10   A      Yeah, that's correct.  There was times when he

11   was being allowed to have a break, given some water.

12   I had to leave the room to make a phone call to

13   Detective Carrozza down in Ft. Myers to find out how

14   things were going down there, keep my supervisor

15   updated as to what was going on, use the restroom,

16   things like that.  So there were some periods that I

17   would leave the room and leave the defendant in the

18   room by himself.

19   Q      And have you viewed the interview DVD that's

20   marked Government's Exhibit 39A?

21   A      Yes.

22   Q      And is that a complete copy of the interview

23   that you had with the defendant?

24   A      That's correct.

25   Q      All right.  And is Government's Exhibit 39B

1    the same interview, only with the times you were not

2    in the room --

3         MR. TRAGOS:  Object to leading.

4         THE COURT:  Sustained.

5    BY MS. KAISER:

6    Q    What is Government's Exhibit Number 39B?

7    A    39B is the -- is a DVD of the defendant's

8    interview with the clips of -- taken out of when I

9    actually left the room and left him in the room by

10   himself.

11   Q    Was the recording equipment working properly

12   on July 21st, 2008?

13   A    It was.

14   Q    And have you reviewed -- you said you reviewed

15   the interview?

16   A    That's correct.

17   Q    Okay.  Did the interview tape fairly and

18   accurately depict the interview that you had with

19   the defendant, Charles Friedlander?

20   A    The DVD recording did, yes.

21        MS. KAISER:  Your Honor, at this time I'd move

22   for admission of Government's Exhibit 39A, 39B and

23   39C into evidence.

24        THE COURT:  Any objection to 39A?

25        MR. TRAGOS:  Yes, Your Honor.

Romanosky - Direct

1          THE COURT:  Grounds?

2          MR. TRAGOS:  May we have a side bar?

3          THE COURT:  Legal grounds, please.

4          MR. TRAGOS:  Your Honor, we've -- the motions

5     which we previously filed in this matter, we would

6     like to renew those objections to 39A.

7          THE COURT:  Those motions are deemed renewed.

8     The objections are overruled.  39A is received.

9     (Whereupon, Government's Exhibit Number 39A is

10    received into evidence.)

11         THE COURT:  39B?  Same objections, I take it?

12         MR. TRAGOS:  Same objections plus, Your Honor,

13    we have an additional 106 objection.

14         THE COURT:  That objection is overruled.  39B

15    is received.

16    (Whereupon, Government's Exhibit Number 39B is

17    received into evidence.)

18         MR. TRAGOS:  May we have a side bar?

19         THE COURT:  39C, I'm sorry.  What was that?

20    It's a piece of paper, I know that, but --

21         MS. KAISER:  It's a very short --

22         THE COURT:  No. Let him tell me.

23         THE WITNESS:  39C is some statements made by

24    the defendant while I was out of the room.  They're

25    kind of like just --

```
 1            THE COURT:  Well, how was that prepared?

 2            THE WITNESS:  This was not prepared by our

 3       office.  It was prepared by the government.

 4       BY MS. KAISER:

 5       Q       Does the transcript fairly and accurately

 6       depict what's depicted on the DVD?

 7       A       Yes.

 8            MR. TRAGOS:  Your Honor, may I have a side bar

 9       with the court?

10            THE COURT:  In a moment, as soon as I figure

11       out what we've got here.  39C is a transcript?

12            MS. KAISER:  A very brief --

13            THE COURT:  Ma'am, you are not the witness.

14            THE WITNESS:  Just some very brief statements

15       that the defendant made while I was out of the room.

16            THE COURT:  Excerpts?

17            THE WITNESS:  Yes, sir, excerpts.

18            THE COURT:  And you've compared that to the

19       actual audio DVD -- I know it's got video, too, but

20       the actual audio portion of the DVD?

21            THE WITNESS:  Yes, sir.  I recognize these

22       statements.  These are very noteworthy statements.

23            THE COURT:  And they're accurate?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  All right.  Let me see counsel at
```

Romanosky - Direct

1          side bar, please.

2          (At side bar, on the record.)

3               THE COURT:  You want to cross-examine

4          Ms. Kaiser?  She keeps wanting to testify.  What is

5          the objection?  I assume you have one to 39C.  No

6          sense in --

7               MR. TRAGOS:  Here's -- Your Honor --

8               THE COURT:  I started to say this going

9          through on the floor.  I don't know what the

10         objection will be, but go ahead.

11              MR. TRAGOS:  Okay.  Your Honor, 106 requires

12         that if a writing, report or statement is sought to

13         be introduced, that the entire -- that the other

14         party can ask for the entire recording to be

15         introduced, rather than just portions of it.

16              THE COURT:  It will be introduced.

17              MR. TRAGOS:  Okay.  But she is not going to

18         play --

19              THE COURT:  The rule doesn't require that it

20         be played.

21              MR. TRAGOS:  But, Your Honor --

22              THE COURT:  It requires that it be made

23         available and introduced; correct?

24              MR. TRAGOS:  Your Honor, but she's doing it.

25              THE COURT:  Tell me whether I'm right or not.

1    Am I correct?

2              MR. TRAGOS:  Yes, except for C.

3              THE COURT:  Well, C might be a different

4    matter.  Let's talk about 39A and B.  We've got the

5    complete DVD interview which is in evidence now, a

6    redacted version which he says is accurate, redacted

7    only for those portions when he wasn't present in

8    the room.  So we're talking now about 39C.

9              MR. TRAGOS:  Okay.  Can we go back to?  B.

10             THE COURT:  It's in evidence.  You can make

11   your record.

12             MR. TRAGOS:  Okay.  Well, Your Honor, I think

13   that the court has to look at fairness, and

14   that's what 106 talks about.  And to play for the

15   jury now only a portion of A that she wants --

16             THE COURT:  I don't know what she's going to

17   play, Mr. Tragos.

18             MR. TRAGOS:  Well, she's testified to the jury

19   what she's going to play, that the redacted version

20   is a version that says he -- while Detective

21   Romanosky was out of the room.  However, they are

22   going to try to put in out of context now, C, which

23   is statements he made while the detective was out of

24   the room.  And it's unfair --

25             MS. KAISER:  Your Honor, they're on the tape.

1           THE COURT:  Don't interrupt, please.

2           MR. TRAGOS:  It seems unfair, to me, at least,

3      for them to not play that part of the tape but

4      introduce the statements.

5           THE COURT:  What is the time difference

6      between the entire DVD and the redacted version,

7      roughly.

8           MS. KAISER:  About 45 minutes to an hour.

9           THE COURT:  So there were extended periods

10     where he was left alone in the room?

11          MS. KAISER:  Yes.

12          THE COURT:  And these statements reflect

13     statements made by him in the room?

14          MS. KAISER:  Yes.

15          MR. TRAGOS:  And it's taking them out of

16     context because he's sitting there, he's showing

17     reaction, showing emotion, all that stuff, and

18     they're just going to put these words in but only --

19     but play part of the tape.

20          THE COURT:  Well, I think that you are correct

21     on 39C.  The statements on a piece of paper are not

22     coming in by themselves.  If they're offered to

23     assist the jury in following what is said in the

24     actual audio version of the redacted version, that's

25     one thing, Ms. Kaiser.  But you just can't put a

Romanosky - Direct

1    piece of paper in that somebody wrote down.

2         MS. KAISER:  Your Honor, I never suggested I

3    was going to do that.  It is on the tape.

4         THE COURT:  You offered to introduce 39C, and

5    he's just confirmed he didn't even write these

6    things down, someone else did.

7         MS. KAISER:  Just as an aid.  I see.  So I'll

8    withdraw my request to admit Government's Exhibit

9    39C and just use --

10        THE COURT:  That's withdrawn?

11        MS. KAISER:  That's withdrawn.  I'll just use

12   it as an aid for the jury.

13        MR. TRAGOS:  But, Your Honor, if she's not

14   going to play that part of the tape, how can it be

15   an aid to the jury?

16        THE COURT:  You're right.  It cannot be

17   displayed to the jury --

18        MS. KAISER:  Your Honor --

19        THE COURT:  I'm not going to argue with you,

20   but that's the law.

21        MS. KAISER:  Your Honor --

22        THE COURT:  An admission of transcripts, they

23   are not admissible as substantive evidence.  They

24   are only admissible as aids.  So if you're not going

25   to play the redacted version, it doesn't assist the

Romanosky - Direct

```
 1        jury.

 2            MS. KAISER:  Your Honor, *United States versus*

 3        *Cruz* is an Eleventh Circuit case that says

 4        transcripts are admissible as substantive evidence

 5        but --

 6            THE COURT:  That may be in the circumstances

 7        of that case.  But you're not going to put a

 8        selected version of a document into evidence that's

 9        not before the jury in the context in which it was

10        made, Ms. Kaiser.

11            MS. KAISER:  Your Honor -- Your Honor, may I

12        please respond?

13            THE COURT:  Respond to what?  That's my

14        ruling.

15            MS. KAISER:  I didn't --

16            THE COURT:  So either you put the redacted

17        version in or you don't put it in.

18            MS. KAISER:  Your Honor, please, if I may

19        please make a record.  The government has never

20        intended to put Government's Exhibit 39C in in and

21        of itself.  Those words are on the redacted portion

22        of the tape.  The government has that on the

23        redacted portion of the tape.  So I'm not trying to

24        put this piece of paper in and not show what he

25        said.
```

1           THE COURT:  Let me understand, then.  I

2    misunderstood.  39B, the redacted version, includes

3    clips taken when the corporal was not in the room.

4           MS. KAISER:  Correct.

5           THE COURT:  And you're going to play that.

6           MS. KAISER:  Correct.

7           THE COURT:  Who prepared the 39C?

8           MS. KAISER:  The government.

9           THE COURT:  Well, that's a big word.

10          MS. KAISER:  I did.

11          THE COURT:  So all you've taken is statements

12   made by the defendant and written them out on a

13   piece of paper as opposed to an entire transcript of

14   whatever he said by himself?

15          MS. KAISER:  Correct.  Because what he said by

16   himself is -- is very hard to hear at the very

17   beginning.  But it's very important, it's a clear

18   admission.  The rest of the tape is audible.  When

19   Corporal Romanosky is in the room, it's loud enough

20   for people to hear.  But the very beginning, the

21   first few things he says when he's sitting there by

22   himself is very difficult to hear.

23          THE COURT:  Does 39C, does it purport to

24   include everything that's said during these redacted

25   times?

Romanosky - Direct

1            MS. KAISER:  No.  It's from a very brief time

2       at the very beginning of the tape.

3            THE COURT:  So it's not a transcript at all,

4       it's selected statements.

5            MS. KAISER:  It's just all in one -- all in

6       one time period of about ten seconds.  It's not just

7       different areas of the tape.  It's all in one area

8       of the tape from, like -- it's about eight seconds

9       in length.  That's all it is.

10           THE COURT:  Tell me what it is in your view,

11      Mr. Tragos.

12           MR. TRAGOS:  Well, Your Honor, I really

13      honestly -- I tell you, I don't know which parts she

14      selected.  I have not seen C.  It may be in the book

15      but -- but --

16           THE COURT:  Let me see just it.  Just grab it

17      for me, please.

18           MR. TRAGOS:  We haven't seen it.

19           MS. KAISER:  It's in your book.

20           MR. TRAGOS:  Go get the book.

21           THE COURT:  So these three statements are the

22      only thing he says during this roughly eight

23      second -- looks like 40 seconds.  But that's

24      incidental, whatever period of time this is.  These

25      three statements are all he said?

Rottanosky - Direct

1          MS. KAISER:  Correct.  Correct.

2          THE COURT:  And this is over a period of, you

3     said, about eight seconds.

4          MS. KAISER:  The time is on there, Your Honor.

5          THE COURT:  Well, it says zero zero to zero

6     point 40.

7          MS. KAISER:  About 40 seconds.

8          THE COURT:  So 40 seconds.  So the camera is

9     on for 40 seconds, and this is all he said.

10         MS. KAISER:  Yes, Your Honor.

11         MR. TRAGOS:  I've not seen this, Your Honor.

12         THE COURT:  You've had discovery.

13         MR. TRAGOS:  No.  She did not provide this to

14    us.

15         MS. KAISER:  He has had the interview.

16         MR. TRAGOS:  I have had the interview.  C has

17    not been provided to us.

18         THE COURT:  It's four lines.  It is what it

19    is.

20         MR. TRAGOS:  Your Honor, the problem again

21    with this, same problem we had before.  They're

22    going to -- he's in there, he's sitting in this

23    room.  They're --

24         THE COURT:  They can put on whatever they want

25    to put on as long as the foundation is established,

Rollanosky - Direct

1       Mr. Tragos.  I can't require them to put on evidence

2    that you want in.

3            MR. TRAGOS:  But, Your Honor, to put on an

4    incomplete showing of an interview where they're

5    going to take -- they're going to stop it, play it,

6    start it, that's, I think, improper and that's what

7    they're going to do.

8            THE COURT:  That's what cross-examination is

9    all about.  What do you purport to present to the

10   jury?  What are you going to publish?

11           MS. KAISER:  I was going to publish the

12   redacted version, just not to waste everybody's

13   time, because there's a long time where he's just

14   sitting there biting his nails or just sitting

15   there --

16           THE COURT:  How long is 39B, roughly?

17           MS. KAISER:  About two hours.

18           THE COURT:  The redacted version is two hours

19   long?

20           MS. KAISER:  Correct.  I mean, if the court

21   wants, I'll be happy to play 39A.  I don't really

22   care.  I'm just trying to -- trying to save the

23   time.

24           THE COURT:  It's your case, not mine.

25   Mr. Tragos can't make you put on what you don't want

1    to put on.  He can surely cross-examine on this.

2          MR. TRAGOS:  Your Honor, it just seems like

3    for an efficient use of the court's time, rather

4    than me having to play the whole thing again or a

5    portion again to show the parts that they left

6    out --

7          THE COURT:  I don't disagree, but I can't

8    require the government to do what you want me to

9    tell me to do.

10         MR. TRAGOS:  Okay.

11         THE COURT:  I'm not going to.  If the DVD has

12   been properly authenticated, and it has, and they

13   want to play selected versions and it's available to

14   you, I don't see what the problem is.  I am

15   concerned about 39C, the context in which it is been

16   prepared, from what Ms. Kaiser says is -- is 40

17   seconds off of 39B.  What are you going to do, stop

18   39B at some point and then hand them the transcripts

19   and say follow along?

20         MS. KAISER:  It's at the very beginning of the

21   tape.  So I'm just going to hand them the transcript

22   and just hit play.

23         MR. TRAGOS:  Does 39B show by time, you have a

24   stop and then --

25         THE COURT:  A timeline?

1          MR. TRAGOS:  Right.  So when they're seeing a

2     redacted version, are they going to know when

3     they're looking at it that this much time is being

4     left out?

5          THE COURT:  I haven't seen it.

6          MS. KAISER:  No.

7          MR. TRAGOS:  Your Honor, then it's going to be

8     misleading to the jury.

9          MS. KAISER:  What is the requirement?  There's

10    no requirement that we have to play the whole entire

11    interview.  We never --

12         THE COURT:  Y'all want to have a discussion

13    somewhere else?

14         MS. KAISER:  No.

15         THE COURT:  Thank you.  The objections are

16    overruled.  But the first thing you'll do is put on

17    that portion of the redacted version and 39C which

18    assists the jury.  And if it's fair and it's in

19    context, there is no problem.  If it's not, then

20    Mr. Tragos is going to have a field day on

21    cross-examination.  But I am not going to direct the

22    government how to present its case.

23         The objections I understand.  I don't see that

24    as being objections going to admissibility.  It may

25    go to the weight, which can be argued to the jury.

1      That's to me a fair argument.  So let's play --

2      we've got to break at a quarter till 3:00, as I told

3      the jury, so we've got about 10 minutes.  So play

4      those portions that you can.

5          MS. KAISER:  Okay.

6      (End of side bar discussion.)

7          THE COURT:  Thank you, members of the jury.

8          MR. TRAGOS:  Your Honor, I apologize.  There

9      was one other thing, Your Honor.

10         THE COURT:  All right.  Come on up.

11     (At side bar, on the record.)

12         MR. TRAGOS:  During our hearings, there was an

13     instruction the court gave that -- there was an

14     instruction the court gave that during the playing

15     of this, that there were certain false statements

16     made by the -- by the witness.  And the court,

17     although denied my motion, said that it had to be

18     explained as investigative techniques.

19         I just want to make sure to remind Ms. Kaiser

20     that she needs to point out that those statements

21     are investigative techniques and not provided for

22     the truth of what the detective is saying.

23         THE COURT:  At some point, right?

24         MS. KAISER:  Your Honor, may I respond to what

25     Mr. Tragos just said, please?  He just made a

1    reference to the -- there being false statements.

2         THE COURT:  He's talking about the corporal

3    making comments, statements to the defendant during

4    the course of the interview; correct?

5         MR. TRAGOS:  Right.

6         MS. KAISER:  But at the same time, my

7    understanding from the court is I'm not to go into

8    Neil Spector's investigation.  Okay?

9         THE COURT:  That's right.

10         MS. KAISER:  So, you know, I don't know how

11    without opening up the door, I can't instruct the

12    witness to lie to help Mr. Tragos's case.

13         MR. TRAGOS:  Your Honor, he says in his -- we

14    went through this at the hearings.  And when I

15    wanted to get it redacted --

16         THE COURT:  When did all this come up?

17         MR. TRAGOS:  It's going to come up right now.

18    I mean, she's playing the tape.

19         THE COURT:  Let's give the jury a break now.

20    (End of side bar discussion.)

21         THE COURT:  Let's go ahead and take your

22    comfort break.  I hate to have you sitting there

23    while we're discussing important matters, so please

24    be comfortable in the jury room for about 15

25    minutes.

Romanosky - Direct

1          COURTROOM SECURITY OFFICER:  Rise for the

2     jury, please.

3     (Jury out at 2:35 PM.)

4          MR. TRAGOS:  Your Honor, can Mr. Friedlander

5     be excused, as well?

6          THE COURT:  All right.

7          MR. TRAGOS:  Can Mr. Friedlander be excused,

8     Your Honor?

9          THE COURT:  It's his trial, Mr. Tragos.  He

10    has a constitutional right to be present.

11         MR. TRAGOS:  I think he wishes to go --

12         THE COURT:  Well, the record will reflect he's

13    knowingly and voluntarily leaving the courtroom

14    during what I expect to be important legal argument.

15    That's his choice.

16         All right.  As I understand it, then, this

17    DVD, the redacted version, will delve into the

18    subject matter of -- the was Port St. Lucie or St.

19    Lucie County investigation?

20         MR. TRAGOS:  No.  What he says --

21         MS. KAISER:  No, Your Honor.

22         THE COURT:  Let me ask the government, please.

23    Ms. Kaiser?

24         MS. KAISER:  No, Your Honor.  It doesn't go

25    into the substance of the investigation at all.

```
1    What happens is Corporal Romanosky just

2    references -- he says, I've been talking to other

3    law enforcement about your activities, something

4    along those lines.  That is the tool that he uses to

5    elicit information to see what else any subject he's

6    interviewing, you know, will confess to doing other

7    things online.  At the previous hearing --

8         THE COURT:  And that statement by him you

9    believe to be accurate?  In other words, he had

10   talked to someone else; correct?

11        MS. KAISER:  Yes.  If he -- if Mr. Tragos asks

12   him if he was lying, then the answer is no because

13   he actually had talked to someone else.  But he

14   doesn't specifically reference the Port St. Lucie

15   investigation during the interview.

16        And, Your Honor, I was going to wait till the

17   end of the day to revisit this, but based on

18   Mr. Tragos' opening statement yesterday, he may have

19   already opened the door to the information in the

20   Port St. Lucie case.  Mr. Tragos argued to the jury

21   that --

22        THE COURT:  All right.  Number one, you're

23   getting into matters that are not before me.  Number

24   two, he's not a witness.  He doesn't open the door

25   by his opening statement.  Let's revisit that at
```

1    some other time.  Right now I have to deal with 39A,

2    B and C.

3         When we had the *Daubert* hearing back on

4    November 17th, at the conclusion of that hearing

5    with respect to the defendant's motion in limine,

6    docket number 71, I granted that motion in part.  My

7    notes reflect that I indicated there would be no

8    reference to the Port St. Lucie investigation.  I

9    don't have a transcript of the hearing, but those

10   are my notes and I'm comfortable that that's the

11   gist of what I ordered.

12        Are you comfortable, Ms. Kaiser, that that

13   portion of 39B that you are about to publish does

14   not reference Port St. Lucie investigation?

15        MS. KAISER:  Yes, Your Honor.

16        THE COURT:  What does it reference?

17        MR. TRAGOS:  It -- are you speaking to me or

18   Ms. Kaiser?

19        THE COURT:  Ms. Kaiser.  It's her exhibit.

20        MS. KAISER:  In the interview, the

21   defendant -- Corporal Romanosky is asking him

22   essentially, you know, what else he's done online.

23   And he says, you know, I've talked to other -- other

24   law enforcement officers, you know, and, you know,

25   tell me -- tell me, basically, what else you've

1        done.

2            And the defendant, you know, responds

3        basically about his different people that he's

4        chatted with about having sex with children.  So

5        that is a tool or a technique that Corporal

6        Romanosky uses in interviewing subjects to see what

7        they will admit to doing.  And it's not referencing

8        any particular investigation at all.

9            THE COURT:  You told me at the hearing that

10       the detective would describe this as a ruse.

11           MS. KAISER:  Yes.  What I said was --

12           THE COURT:  Well, that's what I wrote down so

13       I have a feeling that's exactly what you said

14       because I don't normally write the word ruse down.

15           MS. KAISER:  What -- I explained it, as well,

16       though.  What I said was it's a technique used to

17       gather information.  But Mr. Tragos wanted to go a

18       step further and have the court order the defendant

19       to admit that he lied, but he didn't lie so that's

20       how it came up.

21           THE COURT:  So the reference to the reports

22       from other agencies and an investigation or

23       investigations of other agencies, those are the

24       words, essentially, of -- of the corporal or

25       detective or both?

1            THE WITNESS:  Both.

2            THE COURT:  All right.  I don't want to

3      mislabel you.

4            THE WITNESS:  Either or.

5            THE COURT:  Those are essentially his words

6      used to the defendant, references to reports and

7      investigations or investigations of other agencies?

8            MS. KAISER:  Yes.  That's correct.

9            THE COURT:  He doesn't mention any specifics?

10            MS. KAISER:  Correct.

11            THE COURT:  And you're going to have him

12      describe this as a predicate, as his way of -- well,

13      you said ruse, but technique, now you're using the

14      word technique?  You're going to have him tell us

15      that?

16            MS. KAISER:  Yes.

17            THE COURT:  What's the problem with that,

18      Mr. Tragos?

19            MR. TRAGOS:  Well, Your Honor, that's

20      different, I think, than what she said before.  I

21      don't have any problem.  I just want to make sure

22      that it was explained that these things -- that

23      these things were just -- he said this as part of an

24      investigative technique, because he refers to

25      multiple investigations throughout the state, which

Romanosky - Direct

1    there weren't.  But it was an investigative

2    technique, which is why the court let it in without

3    it being redacted.

4         THE COURT:  You think he's going to use the

5    word multiple?

6         MR. TRAGOS:  That's what's used on the tape.

7    Yes.

8         THE COURT:  Is that accurate?

9         MS. KAISER:  Yes.

10        MR. TRAGOS:  And there's not multiple.

11        THE COURT:  All right.  So if the witness

12   describes that as his investigative technique and

13   that's all that he says about it, you're comfortable

14   that that doesn't put you in a prejudicial position,

15   more -- unduly prejudicial position?

16        MR. TRAGOS:  If it's properly described.  The

17   court said it very abbreviated-ly.

18        THE COURT:  You realize if you cross-examine

19   him on it, that's on thin ice.

20        MR. TRAGOS:  That's why I want to make sure --

21   right.  I want to make sure that -- because she said

22   at the hearing, that's why the court let it in, that

23   she would make it clear that to make any statements

24   was just an investigative technique used to get the

25   defendant to talk.

1          MS. KAISER:  But I have advised the witness,

2     though, that the court did also order at the *Daubert*

3     hear that Mr. -- if Mr. Tragos were to go into it

4     and he's asked a direct question, are you lying

5     about that, then he can't --

6          THE COURT:  Well, I think Mr. Tragos

7     understands that.

8          MR. TRAGOS:  I do.

9          THE COURT:  And the witness needs to

10    understand that.  If he doesn't go that direction,

11    let's not open up a can of worms.  The risk we run

12    here, everybody, is you can't put on evidence

13    indirectly of essentially, as I would hear it,

14    404(b) type evidence indirectly.  So we're not going

15    down that road.  That's not the government's

16    intention; correct?

17         MS. KAISER:  Correct.

18         THE COURT:  All right.

19         MR. TRAGOS:  And I just want to make the

20    record clear for the appellate court that I'm not

21    waiving my prior objection to having that redacted

22    totally.

23         THE COURT:  No one is suggesting that.

24         MR. TRAGOS:  Well, you know, the appellate

25    courts --

1          THE COURT:  But at some point we have to end

2     the talk and move on.

3          MR. TRAGOS:  The court knows the appellate

4     courts interpret things sometimes.

5          THE COURT:  I can't control what they do.

6          MR. TRAGOS:  I can't, either.

7          THE COURT:  They have their job, I have mine,

8     and I hope we're all on the same page.  And I'm sure

9     we are.  All right.  Y'all need a short comfort

10    break.  Please take a short one, five minutes, and

11    let's get back to it.

12         MR. TRAGOS:  What time do we break today?

13         THE COURT:  I've got a hearing at 4:00, but it

14    depends on where we are in the testimony.  I'll try

15    to make that at a point, or Ms. Kaiser, sometime

16    after 4:00, if -- just break it at a point that's a

17    good stopping point.

18         MS. KAISER:  Yes, Your Honor.

19         MR. TRAGOS:  The tape is two hours.

20         THE COURT:  I know.  That's my point.  Just

21    pick a point where maybe the subject matter changes

22    or there's a pause or -- I'll rely on you.

23         MS. KAISER:  Yes, sir.

24         THE COURT:  All right.  We'll be in short

25    recess.  Watch your step.

```
1      (Recess was taken at 2:44 until 2:55.)

2      (Back on the record.)

3              THE COURT:  Bring the jury in, please.

4              COURTROOM SECURITY OFFICER:  Yes, sir.

5              THE COURT:  Thank you.  Be seated.

6      Ms. Kaiser, you may resume direct examination.

7              MS. KAISER:  Thank you.

8      BY MS. KAISER:

9      Q       Corporal Romanosky, in the beginning of the

10     interview with the defendant, is he sitting in a

11     room by himself?

12     A       Yes.

13     Q       Does he make any statements when he's by

14     himself?

15     A       Yes.

16     Q       And are those statements difficult to hear?

17     A       No.

18     Q       In the very beginning of the tape, is it

19     somewhat hard to hear his initial statements?

20             MR. TRAGOS:  Objection, Your Honor.  Asked and

21     answered.

22             THE COURT:  Sustained.

23     BY MS. KAISER:

24     Q       Detective Romanosky, you testified earlier

25     that there was an initial interview -- the interview
```

Romanosky - Direct

1    of the defendant and then there was a redacted copy

2    made; is that correct?

3    A      That's correct.

4    Q      On the redacted copy, how does that differ

5    from the full version?

6    A      Well, the redactions were, like I said

7    earlier, the times that I left the room to go make

8    phone calls, confer with supervisor, you know,

9    Mr. Friedlander was in the room by himself.

10   Q      Were the times that Mr. Friedlander was in the

11   room by himself when he made statements left on the

12   redacted version of the tape?

13   A      Yeah.  I believe they were.

14          MS. KAISER:  Your Honor, at this time I'd

15   request permission to publish Government's Exhibit

16   39.

17          THE COURT:  B, you mean?

18          MS. KAISER:  39B.

19          THE COURT:  You may do so.

20          MS. KAISER:  And, Your Honor, at this time I'd

21   like to hand out Government's Exhibit 39C as a

22   demonstrative aid to the jury.

23          THE COURT:  And you may.  Members of the jury,

24   once again, this document is available to you to

25   assist you in following along as the words are

1    spoken.  The evidence comes from the audio version

2    of the DVD.  So if there's a difference between what

3    you see written and what you hear, what you hear is

4    what controls.

5         MS. KAISER:  Your Honor, may I proceed?

6         THE COURT:  Yes.

7         MS. KAISER:  Thank you.

8    (Recording played)

9         THE DEFENDANT:  No, no, no.  Hum-um.  I

10   shouldn't have done it.  Should not have done it.

11   Hell, I shouldn't have done it.  I shouldn't have

12   done it.  It was stupid.

13        UNIDENTIFIED SPEAKER: (Unintelligible).

14        THE DEFENDANT:  No.  Hum-um.  Hum-um.  No.

15   No.  Whew.

16        CORPORAL ROMANOSKY:  Okay, Charles.

17        THE DEFENDANT:  Did you get my --

18   (unintelligible).

19        CORPORAL ROMANOSKY:  It's in the other room.

20        THE DEFENDANT:  (Unintelligible).

21        CORPORAL ROMANOSKY:  Okay.  Well, if you have

22   a problem, a sincere problem, please let me know.

23        THE DEFENDANT:  (Unintelligible).

24        CORPORAL ROMANOSKY:  There's a couple things I

25   need to go over with you, some paperwork.  We've had

1    a chance to talk a little bit on the way -- on the

2    way back.  Like I said, I wanted to come back to my

3    office so we could talk a little bit more.

4         THE DEFENDANT:  This is your office?

5         CORPORAL ROMANOSKY:  The building.  I refer to

6    the building as my office.

7         THE DEFENDANT:  Oh, okay.

8         CORPORAL ROMANOSKY:  What I want to talk to

9    you about is the nature of our online contacts, some

10   of the things that we talked about.

11        THE DEFENDANT:  Okay.

12        CORPORAL ROMANOSKY:  Some of the interests

13   that I feel you have.  And I know it's embarrassing.

14        THE DEFENDANT:  No.

15        CORPORAL ROMANOSKY:  I'm not here to judge

16   you, as embarrassing as it may seem.

17        THE DEFENDANT:  Right.

18        CORPORAL ROMANOSKY:  Absolutely.  Please.  I

19   just want to make sure we get -- we can get to the

20   truth and that you're honest and cooperative with

21   me.  Okay?

22        THE DEFENDANT:  I think I have been.

23        CORPORAL ROMANOSKY:  You seem like a real nice

24   guy.  And to be honest with you, you're an

25   intelligent man, I know you're educated.  You know,

Romanosky - Direct

1    before (unintelligible) I already have copies of all

2    the chats.  Everything we've talked about --

3          THE DEFENDANT:  (Unintelligible).

4          CORPORAL ROMANOSKY:  Essentially what I want

5    to get into here was just kind of why everything is

6    happening; okay?  But before we get into that, I do

7    have to advise you of your rights.  Okay?

8          THE DEFENDANT:  Okay.

9          CORPORAL ROMANOSKY:  No one has ever done that

10   with you before; have they?

11         THE DEFENDANT:  No.

12         CORPORAL ROMANOSKY:  Okay.

13         THE DEFENDANT:  You mean the *Miranda* thing?

14         CORPORAL ROMANOSKY:  Your *Miranda* rights.

15   They're all on paper here.  We can review them

16   together.

17         THE DEFENDANT:  Okay.

18         CORPORAL ROMANOSKY:  Make sure that there's

19   going --

20         THE DEFENDANT:  Could I see them?

21         CORPORAL ROMANOSKY:  Absolutely.  We're going

22   to review them together.

23         THE DEFENDANT:  Oh, oh, oh.

24         CORPORAL ROMANOSKY:  Okay.  What this is

25   here -- I'm going to read them upside down, so

Romanosky - Direct

1    forgive me if I miss a word.  Today's date, time is

2    7:02 when I printed the form out.  I'm corporal Kurt

3    Romanosky.  I'm with the Pinellas County Sheriff's

4    Office.  The case number is 08184046.  And, again,

5    it says I am Corporal Kurt Romanosky with the

6    Pinellas County Sheriff's Office.

7          THE DEFENDANT:  Um-hum.

8          CORPORAL ROMANOSKY:  Please state your name,

9    age and address.

10          THE DEFENDANT:  Right.

11          CORPORAL ROMANOSKY:  You see that I put in

12    here Charles Jackson Friedlander, 78, 12040 Mahogany

13    Isle Lane, Ft. Myers, Florida; is that correct?

14          THE DEFENDANT:  Yes.

15          CORPORAL ROMANOSKY:  Okay.  You understand

16    that you have the right to remain silent?

17          THE DEFENDANT:  Yes.  Should I write yes?

18          CORPORAL ROMANOSKY:  Yes, if you would.  Do

19    you understand that anything you say can and will be

20    used against you in a court of law?

21          THE DEFENDANT:  Yes.

22          CORPORAL ROMANOSKY:  Okay.  Do you understand

23    that you have the right to speak to a lawyer and

24    have him or her present with you while you're being

25    questioned?

1          THE DEFENDANT:  Yes.

2          CORPORAL ROMANOSKY:  Do you understand that if

3     you cannot afford to hire a lawyer, one will be

4     appointed to represent you for questioning, if you

5     wish?

6          THE DEFENDANT:  Yes.

7          CORPORAL ROMANOSKY:  Do you understand that

8     you can decide at any time to exercise these rights

9     and not answer any questions or make any statements?

10         THE DEFENDANT:  Yes.

11         CORPORAL ROMANOSKY:  Do you understand each of

12     these rights I have explained to you?

13         THE DEFENDANT:  Yes.

14         CORPORAL ROMANOSKY:  Having these rights in

15     mind, do you wish to talk with me now?

16         THE DEFENDANT:  I don't have any choice, being

17     truthful.

18         CORPORAL ROMANOSKY:  Well, you do.  You don't

19     have to -- you don't have to give a statement.  You

20     don't have to answer any questions.  You don't have

21     to do any of that.  You can say, I don't want to

22     talk to you, you can say, I want a lawyer, you can

23     do either of those options.

24         THE DEFENDANT:  Well --

25         CORPORAL ROMANOSKY:  (Unintelligible).

1          THE DEFENDANT:  What does one do?  I mean, you

2      know, I'm completely knew with this.

3          CORPORAL ROMANOSKY:  Well --

4          THE DEFENDANT:  (Unintelligible).

5          CORPORAL ROMANOSKY:  I can't advise you on

6      what you --

7          THE DEFENDANT:  I know.

8          CORPORAL ROMANOSKY:  You're an adult.  You're

9      an educated man.  You have to decide, I'm at a

10     juncture right now, what decision do I make.  I'm

11     offering you the opportunity -- you can't come back

12     to this point again right now where you and I sit

13     down and talk.  I'm offering you the opportunity to

14     provide me with your side of the story.

15         THE DEFENDANT:  Will that be held against me?

16         CORPORAL ROMANOSKY:  Well, we're talk --

17     obviously, I'm asking you very pointed questions.

18     I'm a deputy sheriff.  I mean, if I'm asking you,

19     you know, things about our online contact and all

20     that, obviously, it's case related.  It's not just

21     between you and I.  It's part of the official case

22     file but --

23         THE DEFENDANT:  What do you, you know

24     (unintelligible) --

25         CORPORAL ROMANOSKY:  Well, just like I said.

Romanosky - Direct

1    I can -- I can take this in front of the state

2    attorney, I can take this in front of a judge, I can

3    take this in front of a jury showing all the chats,

4    profiles, there's some more stuff we have to talk

5    about.  I can lay all of that out in front of them

6    and show them what happened, when it happened, where

7    I was, where you were.  I can -- that's the easy

8    part.

9            THE DEFENDANT:  Um-hum.

10           CORPORAL ROMANOSKY:  I would rather go sit

11   down with the state attorney's office.  I would

12   rather, when this gets to a courtroom, if it ever

13   goes to a courtroom, that we understand why things

14   have taken place -- that's okay -- that we

15   understand why things happened.

16           THE DEFENDANT:  Okay.

17           CORPORAL ROMANOSKY:  I think that's the most

18   important.

19           THE DEFENDANT:  Okay.  Okay.  So what do I put

20   here?

21           CORPORAL ROMANOSKY:  If you wish to speak with

22   me, then you would put yes.  If you don't wish to

23   speak with me --

24           THE DEFENDANT:  I do wish to speak with you.

25           CORPORAL ROMANOSKY:  Then the answer would be

Romanosky - Direct

 1      yes.  What I'd like you to do is sign right there

 2      where it says signature.

 3              THE DEFENDANT:  Okay.  I'm sorry.

 4              CORPORAL ROMANOSKY:  Well, I know you've got a

 5      PhD.  That's how -- that's how people with --

 6      doctors and stuff sign so -- I'm going to sign here

 7      that I witnessed your signature.  Okay.

 8              THE DEFENDANT:  Sit back here.

 9              CORPORAL ROMANOSKY:  Absolutely.  Be

10      comfortable.  Charles, how long -- how long have you

11      been using AOL?

12              THE DEFENDANT:  That's a good question.

13              CORPORAL ROMANOSKY:  Approximation, obviously.

14              THE DEFENDANT:  It's the only thing I have.

15              CORPORAL ROMANOSKY:  Do you access the

16      internet through dialup to AOL?

17              THE DEFENDANT:  Yeah.

18              CORPORAL ROMANOSKY:  Okay.

19              THE DEFENDANT:  That's all.  So --

20              CORPORAL ROMANOSKY:  How long have you been

21      doing that?  Greater than 10 years?

22              THE DEFENDANT:  No.

23              CORPORAL ROMANOSKY:  More than five?

24              THE DEFENDANT:  Yes.  I would say --

25              CORPORAL ROMANOSKY:  Somewhere between five

1     and ten?

2             THE DEFENDANT:  -- between five and ten.  I

3     can't honestly tell you.

4             CORPORAL ROMANOSKY:  Well, and to be honest

5     with you, I have used AOL both professionally and

6     personally --

7             THE DEFENDANT:  Um-hum.

8             CORPORAL ROMANOSKY:  -- in the past.  And

9     I've -- I didn't keep a log of when I signed up,

10    either, so --

11            THE DEFENDANT:  No.

12            CORPORAL ROMANOSKY:  It's understandable.  On

13    AOL, what are your screen names?

14            THE DEFENDANT:  Captoes.

15            CORPORAL ROMANOSKY:  Um-hum.

16            THE DEFENDANT:  Shrinq, with a Q,

17    S-H-R-I-N-Q.

18            CORPORAL ROMANOSKY:  Okay.

19            THE DEFENDANT:  And I believe I have Shrinq2,

20    also, because --

21            CORPORAL ROMANOSKY:  Spell that the same way?

22            THE DEFENDANT:  Yes.

23            CORPORAL ROMANOSKY:  Okay.

24            THE DEFENDANT:  With a 2 on the end of it.

25    Okay.  Wait a minute.  So I'm not telling you

1      anything untrue.  Shrinq, Shrinq2, which I don't

2      ever use.  I guess, I mean, I can't --

3           CORPORAL ROMANOSKY:  Are there any that you've

4      had in the past that you no longer use that come to

5      mind?

6           THE DEFENDANT:  Oh, no.  I can't remember that

7      far.  No.

8           CORPORAL ROMANOSKY:  Do you get e-mail on

9      Captoes?

10          THE DEFENDANT:  Yes.

11          CORPORAL ROMANOSKY:  Do you get e-mails?  Do

12     you receive e-mails on Shrinq?

13          THE DEFENDANT:  Yes.

14          CORPORAL ROMANOSKY:  Okay.

15          THE DEFENDANT:  Usually for business things.

16          CORPORAL ROMANOSKY:  So Shrinq you use for

17     business?

18          THE DEFENDANT:  Business or they're trying to

19     sell me something.

20          CORPORAL ROMANOSKY:  Okay.  So business or

21     solicitors.

22          THE DEFENDANT:  Solicitors, yeah.  But I don't

23     know who they are.

24          CORPORAL ROMANOSKY:  I have (unintelligible)

25     there's an e-mail, send you alerts (unintelligible).

1          THE DEFENDANT:  Yeah.  Exactly.  That's --

2          CORPORAL ROMANOSKY:  You don't use Shrinq2 at

3     all?

4          THE DEFENDANT:  No.  No.  But I got

5     something -- I occasionally get an e-mail in there

6     that I don't even know what it is, you know, a

7     solicitation.

8          CORPORAL ROMANOSKY:  Yeah.  They're good about

9     that.  And how Captoes is personal?

10         THE DEFENDANT:  Yes.  Well, yeah, I was going

11    to say yes.  Yes.

12         CORPORAL ROMANOSKY:  Do you use any of the --

13    what I call web based e-mail clients or e-mails that

14    you go through like Yahoo or Goggle mail or --

15         THE DEFENDANT:  Well, I don't use e-mail from

16    Yahoo.

17         CORPORAL ROMANOSKY:  Do you use their instant

18    message service?

19         THE DEFENDANT:  Yes.

20         CORPORAL ROMANOSKY:  Okay.  What was your

21    screen name on Yahoo?

22         THE DEFENDANT:  Captoes2.  That's all.

23         CORPORAL ROMANOSKY:  Okay.  Any others?

24         THE DEFENDANT:  I don't use MSN.

25         CORPORAL ROMANOSKY:  Or Google or MySpace?  Do

1      you use any --

2              THE DEFENDANT:  No.  I have -- I have done

3      www.google.com if I have to look up like a telephone

4      number, something like that.

5              CORPORAL ROMANOSKY:  But you don't use their

6      free e-mail or anything like that?

7              THE DEFENDANT:  No.  And you know that.

8              CORPORAL ROMANOSKY:  Well, I'd like to -- I

9      mean, there could be things I don't -- I haven't

10     found out.  I do a lot of internet research before

11     we sit down and talk, but a lot of times --

12             THE DEFENDANT:  (Unintelligible) yeah.

13             CORPORAL ROMANOSKY:  The internet is a big

14     place.

15             THE DEFENDANT:  It's scary.

16             CORPORAL ROMANOSKY:  So you use AOL for their

17     chat services and e-mail; is that correct?

18             THE DEFENDANT:  Yes.

19             CORPORAL ROMANOSKY:  And you use Yahoo for

20     instant messages?

21             THE DEFENDANT:  Yes.  No mail because I don't

22     think I have that.

23             CORPORAL ROMANOSKY:  It comes free.

24             THE DEFENDANT:  Okay.

25             CORPORAL ROMANOSKY:  Most people don't.  Do

1    you ever notice every once in a while when you go to

2    look at someone's profile or something and it go to

3    check your own profile at Yahoo and it says would

4    you like to automatically be signed in?

5         THE DEFENDANT:  You know, I've never looked at

6    my profile.

7         CORPORAL ROMANOSKY:  Oh, no kidding.

8    (Unintelligible) when you do that, it asks you if

9    you want to automatically be signed in.  That's what

10   it's referring to.  It wants to sign you into your

11   Yahoo account where you (unintelligible) accounts

12   and all that.

13        THE DEFENDANT:  No.

14        CORPORAL ROMANOSKY:  How long have you had

15   Captoes2 at Yahoo for chat?

16        THE DEFENDANT:  From Yahoo?  You got me.

17   Somebody suggested I do it so that's why I got it.

18   I don't like to use it very much because it's too

19   confusing for me.  (Unintelligible) you the truth.

20        CORPORAL ROMANOSKY:  (Unintelligible).

21        THE DEFENDANT:  I would say about four years.

22        CORPORAL ROMANOSKY:  Okay.  How often do you

23   chat on Yahoo?

24        THE DEFENDANT:  Not often.

25        CORPORAL ROMANOSKY:  Once a month?  More than

Romanosky - Direct

1       that?

2              THE DEFENDANT:  I don't usually go to it.

3       Somebody does -- you know, sends me something.  I'm

4       trying to think if I ever go -- practically very,

5       very rarely.

6              CORPORAL ROMANOSKY:  Would you use it once a

7       month or less than that?

8              THE DEFENDANT:  I'm trying to think.  You mean

9       to one person, for example, or --

10             CORPORAL ROMANOSKY:  Right.  Like you and I

11      were talking on AOL (unintelligible).

12             THE DEFENDANT:  Okay.  I use it once a month.

13             CORPORAL ROMANOSKY:  Okay.  How often do you

14      chat on AOL using Captoes?

15             THE DEFENDANT:  How often?

16             CORPORAL ROMANOSKY:  Daily?

17             THE DEFENDANT:  Daily.  Yes.

18             CORPORAL ROMANOSKY:  How about do you chat

19      using Shrinq or Shrinq2 at all?

20             THE DEFENDANT:  Only if I have to send

21      something to somebody, you know, or -- no.

22             CORPORAL ROMANOSKY:  And you said you accessed

23      the internet -- this was on the ride over -- you

24      told me you access the internet through dialup?

25             THE DEFENDANT:  Only thing I have.

1          CORPORAL ROMANOSKY:  One of the troopers,

2     didn't think there was anyone left.

3          THE DEFENDANT:  One of the troopers?

4          CORPORAL ROMANOSKY:  I say that because not

5     many people use dialup anymore.

6          THE DEFENDANT:  Oh.

7          CORPORAL ROMANOSKY:  Only the diehards and the

8     troopers would still do that.

9          THE DEFENDANT:  No.  (Unintelligible).

10          CORPORAL ROMANOSKY:  On a scale of one to ten,

11     with one being you basically know how to turn the

12     computer on and access AOL and check your e-mail --

13          THE DEFENDANT:  I do.

14          CORPORAL ROMANOSKY:  And ten being someone who

15     can write programs, where would you put yourself

16     from one to ten?

17          THE DEFENDANT:  Two or three, maybe.  Two,

18     probably.  I don't know how to do anything much.  I

19     can sign on.

20          CORPORAL ROMANOSKY:  Okay.

21          THE DEFENDANT:  I can sign off.

22          CORPORAL ROMANOSKY:  Just AOL?

23          THE DEFENDANT:  Yeah.  No, I have nothing

24     else.

25          CORPORAL ROMANOSKY:  Well, you use Google, you

Romanosky - Direct

1    say you go to google.com and type in phone numbers

2    and (unintelligible) --

3           THE DEFENDANT:  Well, if I wanted --

4           CORPORAL ROMANOSKY:  -- internet searching.

5           THE DEFENDANT:  Not internet searching,

6    really.  Just sort of -- I don't know.  Like, I

7    wanted to find something or other, I forget what it

8    was, so I put in -- oh, it's for hospitals.

9           CORPORAL ROMANOSKY:  Uh-huh.

10          THE DEFENDANT:  Yeah.  I put in the name of a

11   hospital.  If I wanted to know something about --

12   oh, what do you call that?

13          CORPORAL ROMANOSKY:  Searching the web.  That

14   would be an internet searching.

15          THE DEFENDANT:  Oh, okay.

16          CORPORAL ROMANOSKY:  So you do that on a

17   limited basis, I take it?

18          THE DEFENDANT:  Oh, practically never.

19   (Unintelligible), but I can't, which may sound

20   funny.

21          CORPORAL ROMANOSKY:  Do you use any file

22   sharing programs like Line Wire or Bear Share or

23   things to download music or (unintelligible)?

24          THE DEFENDANT:  No.  I don't download.  Does

25   that sound funny?

1           CORPORAL ROMANOSKY:  No.  Some people --

2           THE DEFENDANT:  (Unintelligible).

3           CORPORAL ROMANOSKY:  -- got into that, then

4   they stopped when they realized all the viruses they

5   were getting.

6           THE DEFENDANT:  No.

7           CORPORAL ROMANOSKY:  Do you use any kind of

8   file encryption or anything?

9           THE DEFENDANT:  What's that?

10          CORPORAL ROMANOSKY:  To (unintelligible) files

11  (unintelligible) are not real, passwords, things

12  like that.  You're in the mental health field.  I

13  didn't know if they used any programs to --

14          THE DEFENDANT:  No.

15          CORPORAL ROMANOSKY:  For customer or client

16  documents.

17          THE DEFENDANT:  No.  (Unintelligible).

18          CORPORAL ROMANOSKY:  (Unintelligible).  On

19  your desktop computer or your laptop computer, do

20  you have any client sensitive information on there,

21  like lists, mail lists, anything like that?

22          THE DEFENDANT:  No.  (Unintelligible) not to

23  do that.  (Unintelligible).

24          CORPORAL ROMANOSKY:  I can imagine that.  Do

25  you have any works to be published on your laptop or

1    your desktop?

2          THE DEFENDANT:  No.  Nothing like that.

3          CORPORAL ROMANOSKY:  I just want to make sure

4    you weren't writing a book on mental health or

5    something (unintelligible).

6          THE DEFENDANT:  No.  No.  No.  No, truly not.

7          CORPORAL ROMANOSKY:  All right.  When you go

8    into AOL and you use the chat function, what kind of

9    chat rooms do you go in?  What are some of the names

10   of the chat rooms that you frequent?

11         THE DEFENDANT:  Strict Parents, which is where

12   I think I found you. (Unintelligible).

13         CORPORAL ROMANOSKY:  Correct.

14         THE DEFENDANT:  Okay.  Fathers Chatting.

15         CORPORAL ROMANOSKY:  Uh-huh.

16         THE DEFENDANT:  It's hard for me to remember

17   some of these things.  Men for Men Unusual.

18         CORPORAL ROMANOSKY:  M for M?

19         THE DEFENDANT:  I think that's what it is.

20   Yeah.  And Unusual M for M.

21         CORPORAL ROMANOSKY:  Okay.

22         THE DEFENDANT:  I'm trying to think.

23   (Unintelligible).

24         CORPORAL ROMANOSKY:  (Unintelligible).

25         THE DEFENDANT:  (Unintelligible).

Romanosky - Direct

1          CORPORAL ROMANOSKY:  How about if I throw a

2      couple of names out here --

3          THE DEFENDANT:  Fine.  And I'll tell you --

4      I'll tell you.

5          CORPORAL ROMANOSKY:  Open Minded Parents?

6          THE DEFENDANT:  Yes.  I virtually never used

7      it, though.

8          CORPORAL ROMANOSKY:  Open Minded Moms or Open

9      Minded Dads?

10         THE DEFENDANT:  Didn't know they had those.

11         CORPORAL ROMANOSKY:  Male for Males Started

12     Early?

13         THE DEFENDANT:  Yes.  (Unintelligible).

14         CORPORAL ROMANOSKY:  Unfortunately.  Did you

15     go into any other rooms that were predicated for

16     like bondage, sadomasochism, anything like that?

17         THE DEFENDANT:  No.

18         CORPORAL ROMANOSKY:  Tell me about Strict

19     Parents.  Why do you go onto Strict Parents?  What

20     are you looking for in that room?

21         THE DEFENDANT:  Well, I don't know what I'm

22     looking for, really.  This really comes out more for

23     my work.  I find that an awful lot of kids are let

24     go and --

25         CORPORAL ROMANOSKY:  You find that a lot of

1          kids go in that room?

2                    THE DEFENDANT:  No, no.  A lot of -- a lot

3          of -- (unintelligible) because parents aren't there,

4          parents are separated, so it's (unintelligible)

5          divorce.  And those that are hemmed in more.

6                    CORPORAL ROMANOSKY:  Um-hum.

7                    THE DEFENDANT:  At least they seem to

8          know where -- you know, there's this old saying,

9          where are your kids, if you know where your kids

10         are.  So that -- I felt that the more structured

11         households, the less problems with kids.  And I was

12         interested in that because I believe in structure.

13                   CORPORAL ROMANOSKY:  Um-hum.

14                   THE DEFENDANT:  I would say --

15                   CORPORAL ROMANOSKY:  Do you have any children?

16                   THE DEFENDANT:  No.

17                   CORPORAL ROMANOSKY:  You have no children?

18                   THE DEFENDANT:  Well, I had sort of an adopted

19         child, yes, who died.

20                   CORPORAL ROMANOSKY:  How old?

21                   THE DEFENDANT:  (Unintelligible).

22                   CORPORAL ROMANOSKY:  What did he die from,

23         primarily?

24                   THE DEFENDANT:  He committed suicide.

25                   CORPORAL ROMANOSKY:  Um-hum.  How long ago was

1        that?

2               THE DEFENDANT:  Seven years.

3               CORPORAL ROMANOSKY:  How long -- how long was

4        he under your -- when did you adopt him?

5               THE DEFENDANT:  I never legally did it because

6        I didn't want to have to support his mother who was

7        a mess.  His sister, who was not real sister and who

8        had been married five times and was in and out of

9        hospitals, okay.  So about ten years.

10              CORPORAL ROMANOSKY:  And from what age to what

11       age do you think that would have been for him?

12              THE DEFENDANT:  29 to 39, about, you know.

13              CORPORAL ROMANOSKY:  Are you married?

14              THE DEFENDANT:  No.

15              CORPORAL ROMANOSKY:  Have you ever been

16       married?

17              THE DEFENDANT:  No.  I sort of had a

18       relationship with his mother, but she died.

19              CORPORAL ROMANOSKY:  His mother passed away?

20              THE DEFENDANT:  Yeah.  And she had sort of --

21       well, I don't know the whole story but he was sort

22       of left on his and she was pursuing her own career.

23       So he sort of did everything I told him.

24              CORPORAL ROMANOSKY:  Um-hum.

25              THE DEFENDANT:  (Unintelligible).  I'm sorry.

1        CORPORAL ROMANOSKY:  That's okay.  Don't be

2    sorry.  What would your -- what would you consider

3    your sexual orientation?  Would you say

4    heterosexual, homosexual, bisexual?

5        THE DEFENDANT:  I would say bisexual.

6        CORPORAL ROMANOSKY:  And where does your

7    preference lie?  Where does your interest lie?  What

8    age bracket?

9        THE DEFENDANT:  For anybody, basically?

10        CORPORAL ROMANOSKY:  Um-hum.

11        THE DEFENDANT:  Probably from 40 to 70.

12        CORPORAL ROMANOSKY:  Okay.

13        THE DEFENDANT:  I have a lady friend.

14        CORPORAL ROMANOSKY:  Okay.

15        THE DEFENDANT:  I don't know if I'm supposed

16    to say that.

17        CORPORAL ROMANOSKY:  That's all right.  You

18    can say whatever -- we're just having a -- we having

19    a conversation.

20        THE DEFENDANT:  Right.  A *Miranda*

21    (unintelligible).

22        CORPORAL ROMANOSKY:  Well, (unintelligible)

23    something we have to go through before we --

24        THE DEFENDANT:  Right.

25        CORPORAL ROMANOSKY:  Before we actually talk

1     about this right now.

2          THE DEFENDANT:  I'm trying to --

3          CORPORAL ROMANOSKY:  You don't see any

4     spotlights in here.

5          THE DEFENDANT:  No, no, no.

6          CORPORAL ROMANOSKY:  It's not like NYPD Blue

7     where they're kicking the chair out from

8     underneath -- (unintelligible).

9          THE DEFENDANT:  Oh, no, no.

10         CORPORAL ROMANOSKY:  As you can see, it's far

11    different from what TV and all that portrays.  I

12    like to look at this as, yeah, we have to -- we have

13    to go through *Miranda* so that you know we are

14    talking about case-related information.

15         THE DEFENDANT:  Right.

16         CORPORAL ROMANOSKY:  But it's a conversation.

17    It's, you know -- the whole time I've chatted with

18    you, there were some things that obviously I had

19    concern about, that's why we're here.  And it did

20    qualify as a violation of some Florida statutes,

21    but --

22         THE DEFENDANT:  Oh, does it?  Oh.

23         CORPORAL ROMANOSKY:  You still seem like a

24    nice man to me.  From talking to you, you seem like

25    you're a nice guy.  That's why I wanted to -- you

1    know, that's why we're having a conversation.  Do

2    you -- have you at any time or do you have any kind

3    of preference for under 18?

4           THE DEFENDANT:  No.

5           CORPORAL ROMANOSKY:  No boys, no girls?

6           THE DEFENDANT:  No.  No.

7           CORPORAL ROMANOSKY:  Have you ever portrayed

8    online that you have that interest?

9           THE DEFENDANT:  Well, that's an interesting

10   question because you know the answer.  I've

11   portrayed it to you.  Do I -- would I portray it to

12   a child?

13          CORPORAL ROMANOSKY:  I'm talking about others.

14          THE DEFENDANT:  Yes.  Probably two others.

15          CORPORAL ROMANOSKY:  Okay.  Would you know

16   where those folks were located geographically?

17          THE DEFENDANT:  No.  Is that (unintelligible)?

18   Their parents, I believe.

19          CORPORAL ROMANOSKY:  Their parents?

20          THE DEFENDANT:  Yeah.

21          CORPORAL ROMANOSKY:  Have you ever talked,

22   other than -- other than myself, I know you and I

23   have talked.

24          THE DEFENDANT:  Yes.

25          CORPORAL ROMANOSKY:  -- about tonight's

1   meeting, which was basically to administer physical

2   and --

3            THE DEFENDANT:  Right.

4            CORPORAL ROMANOSKY:  -- sexual abuse upon --

5            THE DEFENDANT:  Well, I think that --

6            CORPORAL ROMANOSKY:  -- two boys and a girl.

7            THE DEFENDANT:  Well, you know, but the sexual

8   abuse thing, when I got here, I was simply going to

9   say anyway no because I -- I don't want to say I'm

10  impotent.

11           CORPORAL ROMANOSKY:  Um-hum.

12           THE DEFENDANT:  But if you know anything about

13  diabetes, I have erectile dysfunction.

14           CORPORAL ROMANOSKY:  Oh.

15           THE DEFENDANT:  And to be very crude about it,

16  nothing can happen.

17           CORPORAL ROMANOSKY:  Is there an excitement if

18  you talk about it at some point or --

19           THE DEFENDANT:  (Unintelligible).

20           CORPORAL ROMANOSKY:  This will probably happen

21  over the (unintelligible)excuse me.  Corporal

22  Romanosky.  The warranty on my van is about ready to

23  expire.

24           THE DEFENDANT:  Was that one of those --

25           CORPORAL ROMANOSKY:  I took it in for service

1    one time and they asked for a contact number when it

2    was done, and now -- (unintelligible).  Okay.  You

3    said you have erectile dysfunction because of the

4    diabetes.  You're impotent.  You can't get an

5    erection at all, is that what you're telling me?

6         THE DEFENDANT:  Well, I can maybe in an

7    emergency sometime, but you'd never know it.

8         CORPORAL ROMANOSKY:  Is there any excitement

9    in talking about it, though?

10        THE DEFENDANT:  Truthfully?

11        CORPORAL ROMANOSKY:  Um-hum.

12        THE DEFENDANT:  I sometimes say it, but it

13   doesn't work.

14        CORPORAL ROMANOSKY:  The other folks that you

15   talked to --

16        THE DEFENDANT:  Yes, sir.

17        CORPORAL ROMANOSKY:  You said there had been

18   approximately two others.

19        THE DEFENDANT:  Two others.

20        CORPORAL ROMANOSKY:  Was the conversation

21   about physical and sexual abuse of children with

22   those other people?

23        THE DEFENDANT:  One is a very crazy guy.

24   There was no physical abuse mentioned.

25        CORPORAL ROMANOSKY:  So one was sexual abuse

Romanosky - Direct

1    only you talked about with him?

2         THE DEFENDANT:  Well, he did.  I didn't open

3    my mouth, really, very much.  He -- he's off the

4    wall.

5         CORPORAL ROMANOSKY:  Okay.

6         THE DEFENDANT:  The other person, it was

7    probably both.

8         CORPORAL ROMANOSKY:  Okay.

9         THE DEFENDANT:  Though he was the one

10   promoting it.  You know what I mean.

11   (Unintelligible).

12        CORPORAL ROMANOSKY:  Okay.  Where did you meet

13   those individuals?  Was they in those chat rooms

14   that we talked about before?

15        THE DEFENDANT:  The one, the crazy one, I

16   don't remember.

17        CORPORAL ROMANOSKY:  Okay.

18        THE DEFENDANT:  The other one, it must have

19   been somewhere, but I really don't remember which it

20   was.  Let's say Fathers Chatting.

21        CORPORAL ROMANOSKY:  Okay.

22        THE DEFENDANT:  I think that would probably be

23   the most logical.  (Unintelligible).

24        CORPORAL ROMANOSKY:  Do you have -- in all

25   honesty here, I mean --

Romanosky - Direct

1          THE DEFENDANT:  Sure.

2          CORPORAL ROMANOSKY:  Do you have a sexual

3    interest or do you receive some sort of lascivious

4    gratification by talking about physical abuse of

5    children?

6          THE DEFENDANT:  No.

7          CORPORAL ROMANOSKY:  Okay.  Well, why -- why

8    talk so much about using razor straps and Garrison

9    belts and --

10         THE DEFENDANT:  Well, okay.

11         CORPORAL ROMANOSKY:  Crops and stuff on kids?

12         THE DEFENDANT:  Well, crops, not really.

13   Somebody else brought that one up to me.  Razor

14   strap, I don't know.  Because so many people these

15   days --

16         CORPORAL ROMANOSKY:  Um-hum.

17         THE DEFENDANT:  -- are using paddles.

18         CORPORAL ROMANOSKY:  Um-hum.

19         THE DEFENDANT:  And I have made very clear to

20   everybody I've spoken to that paddles are dangerous.

21         CORPORAL ROMANOSKY:  Um-hum.

22         THE DEFENDANT:  Physically (unintelligible),

23   that sort of thing.

24         CORPORAL ROMANOSKY:  Um-hum.

25         THE DEFENDANT:  And I don't want anybody to

1    use that.  I made that very clear to you, I mean, I

2    think.  I -- I -- there are too many injury things

3    going on.

4         CORPORAL ROMANOSKY:  Well, why -- why do

5    you -- you seem -- in chatting with me, you seem as

6    if there's some degree of enjoyment in talking about

7    administering lashings with the razor strap or a

8    belt.  It's not just --

9         THE DEFENDANT:  No.

10        CORPORAL ROMANOSKY:  You know, I mean, I would

11   understand corporal punishment to a degree, but some

12   of the chat conversations we had where you talked

13   about -- I know you said with your son --

14        THE DEFENDANT:  Yeah.

15        CORPORAL ROMANOSKY:  You were talking about

16   administering, you know, up to 75 lashes and that --

17        THE DEFENDANT:  (Unintelligible).

18        CORPORAL ROMANOSKY:  That's stretching beyond

19   what corporal punishment is.

20        THE DEFENDANT:  Well, no.  That's really

21   strictly, what do you call it, fantasy?  Is that --

22        CORPORAL ROMANOSKY:  Is it, though, Charles?

23   I mean, what's the odds are that --

24        THE DEFENDANT:  Yeah.  (Unintelligible) --

25        CORPORAL ROMANOSKY:  You came up here

Romanosky - Direct

1    tonight -- in all honesty, you came up here tonight

2    to meet with me thinking that I was a dad and that

3    we were going back to my house --

4         THE DEFENDANT:  Yeah.

5         CORPORAL ROMANOSKY:  -- so you could

6    physically beat a 10-year-old and an 11-year-old

7    boy --

8         THE DEFENDANT:  Well, but --

9         CORPORAL ROMANOSKY:  Well, hang on.  Let me

10   finish.  And whether or not after that there would

11   have been sexual abuse, there was talk that there

12   was going to be.

13        THE DEFENDANT:  There definitely was talk.

14   But when I arrived, I was going to say to you,

15   listen, there's -- there's none of that whatsoever.

16   I'm not even capable.  So, you know, I can't even

17   masturbate.

18        CORPORAL ROMANOSKY:  I watched a guy on a

19   video on a webcam -- and he had diabetes to the

20   point that he was a double amputee, I watched him,

21   okay -- this man took insulin all the time, he had

22   all kinds of stuff amputated off of him, I watched

23   him masturbating and had an 8-year-old girl perform

24   oral sex on him on a webcam.  Okay?  I know it's not

25   impossible.

1          THE DEFENDANT:  Well, let me tell you

2     something.  There are an awful lot of people who

3     have diabetes who don't have anything.  There are an

4     awful -- I think I would have had -- I have BPH.  I

5     don't know whether you know what that is or not.

6     (Unintelligible).  It's called benign prostatic

7     hypertrophy.

8          CORPORAL ROMANOSKY:  Um-hum.

9          THE DEFENDANT:  It isn't cancer.

10    (Unintelligible).  Well, I was in the New England

11    Journal of Medicine, I don't know, years and years

12    ago when I was about 15 because my mother took me to

13    my -- to her, whatever -- pediatrician, anyway, whom

14    I didn't know.  And I was having a discharge at 15.

15    So she was very concerned.  And I guess so was I, in

16    all honesty, because I was -- and she -- she

17    explained to the doctor and what have you.  And he

18    looked at me and he said, young man, you have

19    gonorrhea.  Now, I was a very protected child.  I

20    had never heard the words gonorrhea.  My mother was

21    furious.  This was during the war, so everything was

22    screwy, okay?  And so she said, I'm leaving.  And

23    she made an appointment with me to a urologist.  And

24    she told the urologist when we walked in the room,

25    his pediatrician said he has gonorrhea.  And I

1    remember the urologist saying, no.  He wouldn't even

2    know what it was.  And he asked me, do you know what

3    gonorrhea is.  And I said, no.  I've never heard of

4    it before, which was true.

5        CORPORAL ROMANOSKY:  Um-hum.

6        THE DEFENDANT:  And so, anyway, they took

7    tests.  And it was from the prostate.  And, you

8    know, from the prostate for a 15-year-old, he just

9    couldn't understand it.  And he did whatever, he did

10   everything.  And he said you have urethritis caused

11   by a prostate problem.  I don't think they knew

12   exactly what things were back then.

13       CORPORAL ROMANOSKY:  Um-hum.

14       THE DEFENDANT:  And so throughout my life, I

15   have to go every 90 days -- don't laugh -- for --

16   excuse me, I'm sorry -- for a prostate massage.

17       CORPORAL ROMANOSKY:  Um-hum.

18       THE DEFENDANT:  Otherwise, I can't urinate.

19       CORPORAL ROMANOSKY:  Wow.

20       THE DEFENDANT:  Or if I can, I go and in about

21   10 minutes, I have to go again.

22       CORPORAL ROMANOSKY:  Um-hum.

23       THE DEFENDANT:  So now I have them.  I had one

24   last Friday.  What's today?  Monday.  Yeah, Friday.

25   And I was having a little trouble with urinating and

1       not -- not finishing apparently, you know.  So I had

2       got that and then afterwards they had me urinate,

3       and I emptied completely, so this worked.

4              CORPORAL ROMANOSKY:  Um-hum.

5              THE DEFENDANT:  But I think a lot of my

6       erectile dysfunction is from that, too.  We don't

7       know where one begins and the other ends.  But

8       that's what I've been advised, you know, that it can

9       be from diabetes.  And some benign prostatic

10      hypertrophy, if it doesn't -- (unintelligible).

11             CORPORAL ROMANOSKY:  So what's your purpose,

12      then, for --

13             THE DEFENDANT:  (Unintelligible).

14             CORPORAL ROMANOSKY:  -- for going into chat

15      rooms and talking about using these implements on --

16      on children or even talking about sexual abuse?  I

17      mean, as a mental health counselor, I think you even

18      fall under the mandatory reporter where if somebody

19      else was talking about sexual abuse, you'd be

20      obligated by law to report that.

21             THE DEFENDANT:  Yeah.

22             CORPORAL ROMANOSKY:  Yet, you will go into

23      chat rooms and engage subjects to discuss sexual

24      abuse and physical abuse of children.

25             THE DEFENDANT:  Yeah.

Romanosky - Direct

1            CORPORAL ROMANOSKY:  What's the --

2       (unintelligible).

3            THE DEFENDANT:  And I'm --

4            CORPORAL ROMANOSKY:  I'm trying to figure out

5       what you get out of that.

6            THE DEFENDANT:  Yeah.  I'm trying to figure

7       out, too.

8            CORPORAL ROMANOSKY:  (Unintelligible).

9            THE DEFENDANT:  That's right.

10           CORPORAL ROMANOSKY:  Do you feel that it's

11      possible, you know, you're -- you're a mental health

12      counselor.

13           THE DEFENDANT:  Sure.

14           CORPORAL ROMANOSKY:  But analyze yourself

15      here.  Do you think there's --

16           THE DEFENDANT:  I've been analyzed.  Yeah.

17           CORPORAL ROMANOSKY:  Do you think there's --

18      do you think there's some sort of lascivious

19      interest that makes you do this and talk like this?

20      And I'm going to be honest with you, Charles.

21           THE DEFENDANT:  Yeah.

22           CORPORAL ROMANOSKY:  I'm going to be a

23      straight shooter.  I'm not the only undercover

24      you've spoken with.  Okay?

25           THE DEFENDANT:  I don't think --

1          CORPORAL ROMANOSKY:  We all communicate just

2      like --

3          THE DEFENDANT:  (Unintelligible).

4          CORPORAL ROMANOSKY:  (Unintelligible)

5      communicate.

6          THE DEFENDANT:  I believe --

7          CORPORAL ROMANOSKY:  There's a lot more people

8      that have already called me that you've talked to.

9          THE DEFENDANT:  I'm sure.

10         CORPORAL ROMANOSKY:  From chat rooms, more

11     than just two.  I'll tell you that right now.

12         THE DEFENDANT:  I only really know of two.

13         CORPORAL ROMANOSKY:  There's more than two.

14     And you actually even talked to me a couple of years

15     back under a different -- when I was using a

16     different profile.

17         THE DEFENDANT:  I don't know.

18         CORPORAL ROMANOSKY:  So -- and we talked about

19     much of the same thing so --

20         THE DEFENDANT:  Oh, I will do the same thing

21     all the way along.

22         CORPORAL ROMANOSKY:  Well, that's what I'm

23     trying to find out.  Why -- let's diagnose you here.

24     Let's analyze you.

25         THE DEFENDANT:  Yeah.

Romanosky - Direct

1           CORPORAL ROMANOSKY:  Why would you talk

2     about --

3           THE DEFENDANT:  I guess --

4           CORPORAL ROMANOSKY:  -- wanting to do this?

5           THE DEFENDANT:  Well, the sexual thing, I

6     don't really know because I -- maybe I feel that I

7     can't do anything.

8           CORPORAL ROMANOSKY:  Um-hum.

9           THE DEFENDANT:  And I'm trying to get myself

10    to be able to do something, I mean, just --

11          CORPORAL ROMANOSKY:  Does the physical have an

12    appealing interest to you?  Do you want to

13    administer the lashings and --

14          THE DEFENDANT:  I don't get any -- I mean, in

15    other words, probably -- probably I'd rather do it

16    to a -- if I did it to anybody, to an adult.  No, I

17    mean.  Do you know what I mean?

18          CORPORAL ROMANOSKY:  When we spoke, you were

19    pretty age specific.  You said you like to start

20    from about five to eight, and by 11 you were on the

21    razor strap.  And we talked about --

22          THE DEFENDANT:  Right.

23          CORPORAL ROMANOSKY:  What age do you like to

24    start the sexual stuff, and you were still --

25          THE DEFENDANT:  11, 12, 13.

1          CORPORAL ROMANOSKY:  But still, that's still

2     young.   That's prepubescent.

3          THE DEFENDANT:  You're absolutely right.   But

4     my actual -- how would you say interest?

5          CORPORAL ROMANOSKY:  Um-hum.

6          THE DEFENDANT:  Would be much more with an

7     adult.   And the -- what I have found mostly on the

8     internet is it's very hard -- everybody you start

9     talking to about an adult ends up with someone

10    younger.   And --

11         CORPORAL ROMANOSKY:  But you're in rooms like

12    Fathers Chatting, Strict Dads, Strict Parents, yeah,

13    I'll give you that.   But if you're in rooms like the

14    Bonfire or --

15         THE DEFENDANT:  I have never --

16         CORPORAL ROMANOSKY:  Florida, Ft. Myers, then

17    you more likely encounter people who -- adults.

18         THE DEFENDANT:  Right.

19         CORPORAL ROMANOSKY:  I mean, there's hundreds

20    of chat rooms out there with the (unintelligible)

21    titles, and you (unintelligible) with titles like

22    this, you know what you're getting into when you go

23    into those rooms.

24         THE DEFENDANT:  Fathers Chatting, I didn't

25    know what I would be getting.

Romanosky - Direct

1        CORPORAL ROMANOSKY:  How long did it take

2   before you figured it out?  Anyone who -- I can

3   teach any new detective to chat, and within a day

4   they'll tell me that's (unintelligible).

5        THE DEFENDANT:  No.  I would say two to three

6   days because I got at times everybody wanting to --

7   or I see it all the time, with daughters --

8        CORPORAL ROMANOSKY:  Um-hum.

9        THE DEFENDANT:  You know, continually.

10        CORPORAL ROMANOSKY:  Um-hum.  Dads and

11   daughters?

12        THE DEFENDANT:  Dads and daughters, yeah.

13        CORPORAL ROMANOSKY:  So those names are

14   pretty -- I'll give you a couple of days, two or

15   three days, you know what those rooms are all about.

16   Why do you go in there again?  Why do you continue

17   chatting when you go in those rooms?

18   (Unintelligible) the things that you're talking

19   about.

20        THE DEFENDANT:  I guess because I find it

21   easy.  I'm sorry.

22        CORPORAL ROMANOSKY:  That's okay.

23        THE DEFENDANT:  I'm sorry.  Embarrassed.

24        CORPORAL ROMANOSKY:  Don't be embarrassed.

25   It's a body function.

1          THE DEFENDANT:  I'm trying to -- yeah.  I

2     don't get excited because I can't.  Okay?  That I

3     can tell you.  You can do anything to me and it

4     doesn't work.

5          CORPORAL ROMANOSKY:  But I've been told,

6     though, that the training we go to --

7          THE DEFENDANT:  Yeah.

8          CORPORAL ROMANOSKY:  We talked about in

9     talking to people about stuff like this and learning

10    about some of those disabilities --

11         THE DEFENDANT:  Yes.

12         CORPORAL ROMANOSKY:  That the impulse and the

13    interest and the drive is still there.  Although the

14    physical thing can't happen, the interests are still

15    there.

16         THE DEFENDANT:  My interests really, to be

17    very candid with you, with anything sexual at this

18    point in my life, honestly is a --

19         CORPORAL ROMANOSKY:  Because too many people

20    are telling me that you talked about sexual abuse --

21    sexual activities with kids.  So needless to

22    say (unintelligible) --

23         THE DEFENDANT:  All I can tell you, I don't

24    believe that any of those people will tell you that

25    I started the conversation like that.

1           CORPORAL ROMANOSKY:  But we all know in the

2      chat rooms when you and I talk that people don't

3      just come out -- because they're afraid that they're

4      talking to me, they won't just come out and say,

5      hey, I want to have sex with your kids.  I have two

6      kids and we want to have sex with them.  We know

7      that doesn't happen.  You and I both know that the

8      first couple of chats are very cryptic in what we

9      say and the things we say.  I mean, let's be honest

10     with each other.

11          THE DEFENDANT:  I just want to

12     (unintelligible) cryptic.  Maybe they were.  I don't

13     remember.

14          CORPORAL ROMANOSKY:  Well -- and some of the

15     terms you use are commonly -- back and forth.

16     That's how these things -- you know as well as I do,

17     that's how these things happen.  We don't come out

18     because there's a -- we don't trust at first.

19          THE DEFENDANT:  Right.

20          CORPORAL ROMANOSKY:  I have to trust you, you

21     have to trust me.

22          THE DEFENDANT:  Right.

23          CORPORAL ROMANOSKY:  Right?

24          THE DEFENDANT:  Correct.

25          CORPORAL ROMANOSKY:  So, obviously, you're not

1    going to come out and say, hey, if you have kids,

2    I'm up for this.

3         THE DEFENDANT:  Oh, no.  No.

4         CORPORAL ROMANOSKY:  We're going to develop

5    that trust.

6         THE DEFENDANT:  Correct.

7         CORPORAL ROMANOSKY:  Which is what happened

8    since what, mid June since we started talking.

9         THE DEFENDANT:  Whenever it was, yeah.

10        CORPORAL ROMANOSKY:  If I would have said that

11   first day, the first day you made contact with me,

12   hey, I've got two boys, 10 and 11, that, you know,

13   if you want to come over and beat them up with some

14   implements and you want to have sexual activity --

15        THE DEFENDANT:  Right.

16        CORPORAL ROMANOSKY:  -- you would have said,

17   get away from me, because you probably would have

18   thought I was a cop or I was some nut.

19        THE DEFENDANT:  Yeah.  That would be even

20   more.  I actually --

21        CORPORAL ROMANOSKY:  But as the trust

22   develops --

23        THE DEFENDANT:  Yeah.  As the trust develops.

24   So I guess -- and your question was again?  I'm not

25   trying to --

Romanosky - Direct

1          CORPORAL ROMANOSKY:  Well, my question was

2      essentially why you --

3          THE DEFENDANT:  Why am I doing it.  Yeah.

4          CORPORAL ROMANOSKY:  Why are you doing it?

5      Why are you going in the chat rooms talking about

6      these things with all these other folks?  And I

7      know -- like I say, I have a few case files being

8      sent over to me from different parts of Florida.

9          THE DEFENDANT:  I haven't been to different

10     parts of Florida.

11         CORPORAL ROMANOSKY:  Well, but -- right.  But

12     the people that you're chatting with that were in

13     other parts of Florida.

14         THE DEFENDANT:  Oh, yeah, you're right.

15         CORPORAL ROMANOSKY:  At this point, I'm not

16     going to make those screen names available to you

17     because I have to make sure what we're going to do

18     with their cases.  But at some point during this

19     lead process, you'll be given some discovery or

20     disclosure of what those other screen names were

21     because they'll be part of my case file.

22         THE DEFENDANT:  I can guess -- like I say, I

23     can guess one, and that would be really all.  The

24     rest -- I don't know, honestly.  I mean, I'd tell

25     you if I did.

Romanosky - Direct

1          CORPORAL ROMANOSKY:  In all honesty, is this

2     something that -- is this the first time that you

3     ever acted out on this interest?

4          THE DEFENDANT:  Yes, sir.  Yes, sir.

5          CORPORAL ROMANOSKY:  Have you never met any

6     other parents?  I'm not going to get phone calls

7     saying that you've met other parents at these --

8          THE DEFENDANT:  I have never met anybody.

9          CORPORAL ROMANOSKY:  To your understanding,

10    what were you coming for tonight?

11         THE DEFENDANT:  You know, it was funny.  I

12    didn't know what I was going to come for because I

13    was sort of leery.  So I said, this guy -- and I

14    trust people so, you know, is wanting me to come and

15    he really seems like he's in the boat business.  I

16    don't know anything about boats.  And, you know,

17    it's such a group I'd never heard of before, by the

18    way.  Never.  And I thought to myself,

19    (unintelligible), something is wrong here.  I'd

20    never -- you know, I'd never been -- never heard of

21    that.  But he seems so honest and so interested,

22    I'll make it -- an attempt.  And then when I started

23    to go, because of the (unintelligible), no, I'm not

24    going to do it.  And I started twice, and I thought,

25    you know --

Romanosky - Direct

1          CORPORAL ROMANOSKY:  What's that?

2          THE DEFENDANT:  (Unintelligible).  And then I

3     said, but he's so nice and such an honest character

4     and what have you, I'm going to do it.  I have no

5     idea what I'm really getting into, no idea.  And I

6     thought, (unintelligible), you know.  And then I

7     thought, no, he seems very intent.  And to be

8     honest, I had no suspicions, if you want the truth,

9     because if I had had suspicions, I wouldn't have

10    come.

11         CORPORAL ROMANOSKY:  Sure.  I understand that.

12         THE DEFENDANT:  You did -- you did a great

13    job.

14         CORPORAL ROMANOSKY:  Well, the scary thing --

15    the scary thing is, Charles, is that there are --

16    unfortunately, there are parents out there that

17    bring their children up for this sort of thing.

18    Okay?  In this case --

19         THE DEFENDANT:  Now, that I didn't know.

20         CORPORAL ROMANOSKY:  You didn't know?  In this

21    case you were talking -- you were thinking I was one

22    of those parents but --

23         THE DEFENDANT:  Yeah.

24         CORPORAL ROMANOSKY:  Unfortunately, we've

25    worked cases on the other side of it where we've

1    gone out to the parent's house (unintelligible) and

2    learned that these are the activities that took

3    place.

4         THE DEFENDANT:  Oh, right.

5         CORPORAL ROMANOSKY:  So one thing I obviously

6    have a concern about is if you wouldn't have met me

7    tonight or you would not have met some of my

8    associates when they came on out when we first met

9    there, you might have been a real parent, what would

10   you have done if you had gone back to the house?

11   You had the belts, you had the razor straps, you had

12   that crop.

13        THE DEFENDANT:  Right.

14        CORPORAL ROMANOSKY:  What would you have done

15   if that opportunity would have presented itself to

16   you tonight, if it would have been a real -- in

17   fact, a real parent?  When you would have gotten to

18   the house and the kids were -- had been bound, bent

19   over a chair or a couch --

20        THE DEFENDANT:  (Unintelligible).

21        CORPORAL ROMANOSKY:  What would you have done?

22        THE DEFENDANT:  You want to know the truth?  I

23   really don't.  The whole thing didn't -- in

24   retrospect.

25        CORPORAL ROMANOSKY:  Um-hum.

1      THE DEFENDANT:  I wondered what was real

2  (unintelligible).

3      CORPORAL ROMANOSKY:  Well, there had to be

4  some part of you that hoped this activity was going

5  to be real.

6      THE DEFENDANT:  Well, not the sexual part, no,

7  because (unintelligible).

8      CORPORAL ROMANOSKY:  Okay.  Well, we'll take

9  out the sexual part.  Some part of you had to hope

10 that it was going to be a real possibility that you

11 could act on this, the physical part.

12     THE DEFENDANT:  Yes, I'm sure I thought that.

13     CORPORAL ROMANOSKY:  Um-hum.

14     THE DEFENDANT:  But I still -- I never

15 entertained or imagined a group situation.  No,

16 never.  I'd never heard of that.  And I thought -- I

17 mean, I really -- I didn't understand it.  Okay.

18 But I thought --

19     CORPORAL ROMANOSKY:  Is it possible you were

20 looking towards this group to valid your own

21 interest?  Maybe you, Charles Friedlander, the

22 mental health counselor, the PhD, you don't want to

23 admit to yourself that you have these feelings or

24 these impulses to want to do these things, but if

25 there's other people out there that have these same

1     interests, maybe that validates some of my behavior

2     and say, hmm, (unintelligible) maybe it's not so bad

3     because there's other people with the same

4     interests.  Does that make any sense to you?  I

5     mean, is that a possibility?

6          THE DEFENDANT:  It could.  It could.  Right.

7     I don't know.  I mean, I'm trying to think.  That's

8     a possibility.  However, you know, for me, because

9     you've been checking up on me, this is the first

10    time that I -- I was very -- I didn't know, I mean,

11    you know.  I was having to make special plans for my

12    food, you know what I mean?

13         CORPORAL ROMANOSKY:  I'm sorry.  Special plans

14    for your food?

15         THE DEFENDANT:  I had to be sure I had food

16    before -- (unintelligible) you know.

17         CORPORAL ROMANOSKY:  Right.

18         THE DEFENDANT:  Could I trouble you for

19    another (unintelligible)?

20         CORPORAL ROMANOSKY:  Absolutely.  Absolutely.

21    Let me get you --

22         THE DEFENDANT:  (Unintelligible).

23         CORPORAL ROMANOSKY:  No, I understand.  I want

24    to make sure you're comfortable.

25         THE DEFENDANT:  I mean, it's just --

1           CORPORAL ROMANOSKY:  Let me -- I'll just step

2      out for just a second and get you some more water.

3      I'll be right back.  Do you need to use the bathroom

4      or anything or --

5           THE DEFENDANT:  No, I'm fine.

6           CORPORAL ROMANOSKY:  I'll be right back.

7           THE DEFENDANT:  I did that on the way, or very

8      close.

9           CORPORAL ROMANOSKY:  Okay.  I'll be right

10     back.

11          THE DEFENDANT:  No.

12          CORPORAL ROMANOSKY:  There you go.

13          THE DEFENDANT:  (Unintelligible).

14          CORPORAL ROMANOSKY:  No, don't worry about it.

15     Okay.  Let's talk about your screen name for a

16     minute, Captoes?

17          THE DEFENDANT:  Yes, sir.

18          CORPORAL ROMANOSKY:  In your profile, it talks

19     about an interest in, like, shoes?

20          THE DEFENDANT:  Right.  I collect them like

21     Imelda Marcos.

22          CORPORAL ROMANOSKY:  Um-hum.

23          THE DEFENDANT:  I mostly wear capped toes but

24     not always.  That's it.

25          CORPORAL ROMANOSKY:  Okay.

Romanosky - Direct

1          THE DEFENDANT:  There's no --

2          CORPORAL ROMANOSKY:  One part says, tongue

3     those shoes?

4          THE DEFENDANT:  Yes.  That means I really like

5     spit-shined shoes.

6          CORPORAL ROMANOSKY:  Okay.

7          THE DEFENDANT:  But sometimes you can't.

8     Excuse me.  It's coming out all ends.

9          CORPORAL ROMANOSKY:  You mentioned on the way

10    in that you work with the Florida Sheriff's Youth

11    Ranch?

12         THE DEFENDANT:  Just for -- I contribute money

13    to them and then I've offered to -- they have some

14    language problems.

15         CORPORAL ROMANOSKY:  Um-hum.

16         THE DEFENDANT:  Okay.  I speak three

17    languages.

18         CORPORAL ROMANOSKY:  Oh, really?

19         THE DEFENDANT:  Yeah.

20         CORPORAL ROMANOSKY:  Which languages do you

21    speak?

22         THE DEFENDANT:  French, Spanish and German.

23         CORPORAL ROMANOSKY:  Very good.

24         THE DEFENDANT:  Yeah.  So they were talking to

25    me that they even had some Creole people from Haiti,

Romanosky - Direct

1    and that they were having to have people learn more

2    languages because they weren't only getting

3    Americans.

4         CORPORAL ROMANOSKY:  Um-hum.

5         THE DEFENDANT:  So I offered to teach

6    languages, to a point, I mean, you know.

7         CORPORAL ROMANOSKY:  And you speak Spanish,

8    French --

9         THE DEFENDANT:  And German.

10        CORPORAL ROMANOSKY:  Wow.

11        THE DEFENDANT:  But German wouldn't help at

12   all.  French would and Spanish would so --

13        CORPORAL ROMANOSKY:  Have they ever taken you

14   up on your offer?

15        THE DEFENDANT:  Well, I've spoken to them and,

16   no, they haven't yet.  I think they'd rather -- I

17   think they (unintelligible) coming into this

18   business with (unintelligible).  I don't mean the

19   Sheriff's Boys Ranch.  I mean, you know, having to

20   know what the language is.  It's not -- I don't

21   think it's occurred for a long time.  See, they

22   don't have -- Florida Sheriff's Boys Ranch is not

23   for kids in trouble.

24        CORPORAL ROMANOSKY:  Um-hum.

25        THE DEFENDANT:  It's mostly for abandoned kids

1    and that sort of thing.  And they're referred by --

2    some by sheriffs, some by school counselors, I mean,

3    there's a bunch of different things.  And a lot of

4    them have -- (unintelligible).

5        CORPORAL ROMANOSKY:  I'm sorry.  Just played a

6    little rough when I was younger.

7        THE DEFENDANT:  Okay.  They -- and now, for

8    example, they had two Russian kids.  Well, I don't

9    speak Russian, and they were not successful and they

10   had to leave them.  Now they've gotten I think two

11   Creole ones or (unintelligible).  But then if they

12   found a third one who knew enough English to, you

13   know --

14       CORPORAL ROMANOSKY:  Do you ever instruct any

15   of the kids there?  Do you ever -- (unintelligible).

16       THE DEFENDANT:  No.  No.  I've never done

17   that.

18       CORPORAL ROMANOSKY:  No (unintelligible).

19       THE DEFENDANT:  No.

20       CORPORAL ROMANOSKY:  Which one have you mainly

21   worked with, up here or down there?

22       THE DEFENDANT:  No.  It's only up in up there.

23       CORPORAL ROMANOSKY:  Up in where?

24       THE DEFENDANT:  Live Oaks.

25       CORPORAL ROMANOSKY:  Live Oaks?

1          THE DEFENDANT:  Yeah.

2          CORPORAL ROMANOSKY:  So you've had no contact

3     with anyone over here in Safety Harbor, the one here

4     in Pinellas County?

5          THE DEFENDANT:  No.  I only learned about that

6     one because it was co-ed.  I think that was Pinellas

7     County.  Is Palm Harbor, is that Pinellas County?

8          CORPORAL ROMANOSKY:  Safety Harbor.

9          THE DEFENDANT:  Safety Harbor.  Yeah, I only

10    learned about that one.  And they have a girl's one

11    in Bartow, but I don't even know exactly where

12    Bartow is.  But they have a small one in Bradenton.

13    I've never been to any of these.  I mean, you know,

14    other than the main one.  And at the main one I've

15    only dealt with the adults.

16         CORPORAL ROMANOSKY:  Who's your contact there?

17    Do you know a name?

18         THE DEFENDANT:  Should I plead the fifth there

19    or what?  In other words -- well, I mean, I don't

20    know.  I would prefer they not be involved in this.

21    (Unintelligible).

22         CORPORAL ROMANOSKY:  If you're asking me if

23    I'm going to call them, the answer would be no.

24    But, I mean, (unintelligible) dealing with at Live

25    Oak up there.

1        THE DEFENDANT:  Oh, Roger Bruchard, he's the

2   head of it.  You know him?

3        CORPORAL ROMANOSKY:  I'm trying to think if I

4   do.

5        THE DEFENDANT:  He's not a sheriff.

6        CORPORAL ROMANOSKY:  No.  But that -- people

7   think that that organization is directly tied to

8   every sheriff's agency, and that's not true.

9   It's -- it's actually a private organization.

10        THE DEFENDANT:  Oh, yeah.  But that's who it

11   is, Roger Bruchard.  He -- I don't know if they're

12   called CEOs or -- I have no idea.

13        CORPORAL ROMANOSKY:  But you've had no

14   interaction with any of the children at the camps.

15   Everything you're doing is volunteering to provide

16   language instruction to --

17        THE DEFENDANT:  I do them both

18   (unintelligible)the counselors, how they -- you

19   know, if they have somebody who's acting out.

20        CORPORAL ROMANOSKY:  Um-hum.

21        THE DEFENDANT:  That sort of thing.  No, it's

22   strictly business, is that what you call it.  No.

23        CORPORAL ROMANOSKY:  When you were younger,

24   were you physically abused or sexually abused at

25   home?

Romanosky - Direct

```
 1          THE DEFENDANT:  Not to my knowledge, no.

 2          CORPORAL ROMANOSKY:  Okay.

 3          THE DEFENDANT:  I have to say not to my

 4     knowledge because I think I, like a lot of kids, my

 5     father was an alcoholic.

 6          CORPORAL ROMANOSKY:  Um-hum.

 7          THE DEFENDANT:  So I don't really remember a

 8     whole lot of -- except that he didn't want much to

 9     do with us.

10          CORPORAL ROMANOSKY:  Um-hum.

11          THE DEFENDANT:  Except to raise hell.

12          CORPORAL ROMANOSKY:  How far back do you

13     remember (unintelligible).

14          THE DEFENDANT:  Used to go for

15     (unintelligible).

16          CORPORAL ROMANOSKY:  Do you remember grade

17     school or anything like that?

18          THE DEFENDANT:  I remember one or two

19     teachers.  Do I remember anything that happened

20     there?  No.

21          CORPORAL ROMANOSKY:  I mean at home, do you

22     remember any of your home life when you were in

23     grade school?  Anything -- any significant events or

24     anything?

25          THE DEFENDANT:  Well, in a way, I guess.  I
```

1    was -- I was reared by a nanny.  Okay?  So there was

2    very little interaction with family.

3         CORPORAL ROMANOSKY:  Okay.  What did your

4    father do for a living?

5         THE DEFENDANT:  He was a stockbroker and a

6    banker.

7         CORPORAL ROMANOSKY:  But not, to your

8    knowledge, there was no sexual abuse at home?

9         THE DEFENDANT:  I really don't believe so.

10   You know, somebody asked me about -- I have a

11   sister.  And somebody asked me did that happen with

12   her, because she's very difficult, and I -- we were

13   really kept so apart that I don't really -- and I

14   never had much to do with my parents, period, if

15   that sounds strange.

16        CORPORAL ROMANOSKY:  Other than your son that

17   you said was not a legal adoption --

18        THE DEFENDANT:  No.

19        CORPORAL ROMANOSKY:  But kind of an adoption.

20        THE DEFENDANT:  Yeah.

21        CORPORAL ROMANOSKY:  How long was he in your

22   life?  You said about ten years?

23        THE DEFENDANT:  Yes, sir.

24        CORPORAL ROMANOSKY:  From the time he was 29

25   to the time he was 39?

1                THE DEFENDANT:  Yes.

2                CORPORAL ROMANOSKY:  Okay.  Have you -- have

3       you adopted or had any legal custody of any children

4       under 18?

5                THE DEFENDANT:  No, sir.

6                CORPORAL ROMANOSKY:  One of the things that we

7       had talked about during our chats was you told me

8       that you had a friend whose grandkids would be

9       dropped over to your house from time to time?

10               THE DEFENDANT:  Right.

11               CORPORAL ROMANOSKY:  What was that all about?

12               THE DEFENDANT:  It was a lot of crap.

13               CORPORAL ROMANOSKY:  Okay.  So there's no

14      children that frequent your residence or anything?

15               THE DEFENDANT:  No.  I -- I -- this sounds

16      strange, and I don't mean to say it this way, but

17      when my cousins were going to come over and visit --

18               CORPORAL ROMANOSKY:  Um-hum.

19               THE DEFENDANT:  I said, please don't bring

20      kids.

21               CORPORAL ROMANOSKY:  Um-hum.  For what

22      purpose?

23               THE DEFENDANT:  You mean, did I say that?

24               CORPORAL ROMANOSKY:  Yeah.  Why did you tell

25      them to not bring their kids?  You just didn't want

1    kids around?

2         THE DEFENDANT:  Well, it just drives me crazy.

3    You know, they were one year old and two year old

4    (unintelligible).

5         CORPORAL ROMANOSKY:  (Unintelligible).

6         THE DEFENDANT:  And, you know, I would have

7    had to proof my house and all of that.  No.  I --

8    (unintelligible).

9         CORPORAL ROMANOSKY:  So there are no teenagers

10   that come over?

11        THE DEFENDANT:  No.  I've never had any kids.

12        CORPORAL ROMANOSKY:  So all that you were

13   telling me about, you know, how you'd discipline

14   them when they'd come over -- (unintelligible).

15        THE DEFENDANT:  Was a whole lot of crap.

16        CORPORAL ROMANOSKY:  So none of that was true?

17        THE DEFENDANT:  No, sir.

18        CORPORAL ROMANOSKY:  Do you have any room at

19   the house designated for giving punishment lessons

20   or --

21        THE DEFENDANT:  No.

22        CORPORAL ROMANOSKY:  Any basement at the

23   house?

24        THE DEFENDANT:  No.  You know how Florida

25   houses are.

Romanosky - Direct

1          CORPORAL ROMANOSKY:   True.   These are water

2     tables -- (unintelligible).

3          THE DEFENDANT:   Yeah.   Right.   They wouldn't

4     work.

5          CORPORAL ROMANOSKY:   But some of the -- I know

6     some of the homes (unintelligible) are built up a

7     little bit so they can technically have a basement.

8     It's like half underground.

9          THE DEFENDANT:   Yeah.   I've seen these places

10    out in Captiva, you know, that are built up high,

11    But there was nothing underneath.

12         CORPORAL ROMANOSKY:   Other than the items you

13    brought tonight, the razor straps, the belt, the

14    English crop, are there any other devices like that

15    at your house right now?

16         THE DEFENDANT:   Yes.

17         CORPORAL ROMANOSKY:   What's all there?

18         THE DEFENDANT:   A couple of dildos, or isn't

19    that the same thing?

20         CORPORAL ROMANOSKY:   Okay.

21         THE DEFENDANT:   Is that the same thing?

22         CORPORAL ROMANOSKY:   As what?

23         THE DEFENDANT:   I mean, is that what you

24    meant?

25         CORPORAL ROMANOSKY:   Yeah.

Romanosky - Direct

1           THE DEFENDANT:  Oh.  Oh.  Oh.

2           CORPORAL ROMANOSKY:  Sexual items or any

3      items --

4           THE DEFENDANT:  Okay.

5           CORPORAL ROMANOSKY:  -- used for sadomasochism

6      or --

7           THE DEFENDANT:  No.  I have -- I have two

8      whips which were my son's when he did roping and

9      stuff or, you know, calves, I don't know.  I wasn't

10      involved in that.  Other than that, I'm trying to

11      think if there was anything.

12           CORPORAL ROMANOSKY:  Are the dildos and the

13      whips stored together?

14           THE DEFENDANT:  Yes.

15           CORPORAL ROMANOSKY:  So it would be safe to

16      say that the whips have -- you can use them for

17      sexual play, as well?

18           THE DEFENDANT:  No.  These were not that.

19      These were --

20           CORPORAL ROMANOSKY:  Why would they be stored

21      with the dildos?

22           THE DEFENDANT:  Well, I just throw things into

23      places.  I don't --

24           CORPORAL ROMANOSKY:  Where are they at?  Where

25      are those things at?

Romanosky - Direct

1          THE DEFENDANT:  They're in a little suitcase.

2          CORPORAL ROMANOSKY:  Okay.  And where's the

3    suitcase?

4          THE DEFENDANT:  In a closet.

5          CORPORAL ROMANOSKY:  Okay.  So the dildos and

6    the whips will be stored in the same suitcase in the

7    same closet?

8          THE DEFENDANT:  Well, I don't use any of them.

9          CORPORAL ROMANOSKY:  Why do you have them?

10          THE DEFENDANT:  Well, the dildos I thought

11    maybe I would use it, you know, maybe if my

12    girlfriend, lady friend wanted to do -- use the

13    dildo or something.  But I've never used them.

14    They're unused.

15          CORPORAL ROMANOSKY:  U-hum.

16          THE DEFENDANT:  So --

17          CORPORAL ROMANOSKY:  What about the whips,

18    though?

19          THE DEFENDANT:  I've never used --

20          CORPORAL ROMANOSKY:  And understand, Charles,

21    I'm not here to judge you.

22          THE DEFENDANT:  I know.  I know.

23          CORPORAL ROMANOSKY:  It's not fair for me to

24    say what's normal and what's not.

25          THE DEFENDANT:  No.

1           CORPORAL ROMANOSKY:  I'm just trying to figure

2      out --

3           THE DEFENDANT:  Randy -- Randy used them but,

4      I mean, he used them with cows and with roping and

5      stuff like that, which he did.  I didn't get

6      involved in any of that stuff.

7           CORPORAL ROMANOSKY:  Does your lady friend

8      have any enjoyment as far as --

9           THE DEFENDANT:  No.  No.

10          CORPORAL ROMANOSKY:  -- any of that stuff?

11          THE DEFENDANT:  No.

12          CORPORAL ROMANOSKY:  Well, I mean, you see

13     where I'm going with it.

14          THE DEFENDANT:  Yeah.  No.  My lady friend --

15     my lady friend is Miss Priss.

16          CORPORAL ROMANOSKY:  Um-hum.  But you see

17     where I'm going, though.

18          THE DEFENDANT:  Yes.  I see that --

19          CORPORAL ROMANOSKY:  We're in a chat room

20     talking about physical abuse of children.

21          THE DEFENDANT:  Right.  Right.

22          CORPORAL ROMANOSKY:  Sexual abuse of children.

23          THE DEFENDANT:  Right.

24          CORPORAL ROMANOSKY:  And at your house you

25     have dildos and whips in the same bag in the

Romanosky - Direct

1    bedroom.

2         THE DEFENDANT:  Well, you know, I'm -- if

3    you'll look in my -- I just pile anything anywhere,

4    you know.  I'll put them in a drawer.  Those were

5    wherever Randy had those at the time.  I don't even

6    know whether I had any dildos (unintelligible), I

7    forget, really, how long I've had these things

8    (unintelligible).

9         CORPORAL ROMANOSKY:  Um-hum.

10        THE DEFENDANT:  I think it's one dildo, maybe

11   two, but I think it's one.

12        CORPORAL ROMANOSKY:  Do you have any images of

13   child pornography at the house?

14        THE DEFENDANT:  No, sir.

15        CORPORAL ROMANOSKY:  On any CDs or any VHS

16   tapes or floppy discs or --

17        THE DEFENDANT:  I don't own any of that stuff.

18        CORPORAL ROMANOSKY:  Do you have VCR tapes or

19   anything at the house?

20        THE DEFENDANT:  I have some VCR tapes of

21   shows, I think.

22        CORPORAL ROMANOSKY:  Any of them pornographic?

23        THE DEFENDANT:  Oh, no.  There'll be shows.

24        CORPORAL ROMANOSKY:  Any child porn?  Any

25   child pornography?

1          THE DEFENDANT:  No.  I've never even seen any,

2     if you want the truth of the matter.  No, I do not

3     have any.

4          CORPORAL ROMANOSKY:  Okay.  Have you ever

5     visited any websites or anything centered around

6     bondage, sadomasochism, anything like that?

7          THE DEFENDANT:  No.  No.

8          CORPORAL ROMANOSKY:  Now, we talked a little

9     bit about a possible interest or some sort of an

10    interest in the physical abuse, using the Garrison

11    belts and the straps.

12         THE DEFENDANT:  Um-hum.

13         CORPORAL ROMANOSKY:  And the possibility of

14    talking to other people on the internet and maybe

15    even acting out, coming up here to meet with who you

16    thought had the same interests as maybe some sort of

17    validation for your own interest.  Would that be a

18    safe assumption?  Would that be a good assumption?

19         THE DEFENDANT:  I'm trying to tell you the

20    truth, okay?  That's why I'm hesitating.

21    (Unintelligible).

22         CORPORAL ROMANOSKY:  I just -- yeah.  That's

23    what I'm after, I'm after the truth.  I know you're

24    an intelligent man.  I know if I was in your

25    position, I would be thinking what can I say at this

Romanosky - Direct

1    point to minimize the damage or minimize the impact

2    this is going to have in the justice system.  I can

3    tell you this.  We need to be honest and frank with

4    each other because if that's what -- what you are

5    trying to do --

6          THE DEFENDANT:  No.

7          CORPORAL ROMANOSKY:  -- is trying to minimize

8    any impact, the chats are going to speak for

9    themselves.

10         THE DEFENDANT:  Oh, thank God.  Yeah.

11         CORPORAL ROMANOSKY:  All that's going to do is

12   make you look worse, make you look like you're

13   trying to hide from.  The best thing at this point,

14   if we're here and we're talking about it, let's just

15   get into it.

16         THE DEFENDANT:  Well, one of the things, I

17   don't know.  I mean, you know, I do know and I'm

18   being perfectly frank that I have the erectile

19   dysfunction and I can't do anything sexually with

20   anybody.

21         CORPORAL ROMANOSKY:  You can't make

22   penetration with anyone sexually with your penis.

23         THE DEFENDANT:  That's what I meant.

24         CORPORAL ROMANOSKY:  That does not prevent you

25   from fondling, from masturbating another, from

1    performing oral sex on another.  There's a lot of

2    sexual acts with fingers, there's a lot of sexual

3    acts that can take place even though you have

4    erectile dysfunction.  And I think there's enough

5    doctors that know that having erectile dysfunction

6    doesn't take away from the urge, doesn't take away

7    from the sexual interest, it just prohibits the

8    physical --

9           THE DEFENDANT:  Right.

10          CORPORAL ROMANOSKY:  -- things from happening.

11   So let's not kid each other.

12          THE DEFENDANT:  No.  I'm not trying to kid.

13          CORPORAL ROMANOSKY:  In all honesty here --

14          THE DEFENDANT:  No.

15          CORPORAL ROMANOSKY:  -- for me to have talked

16   to other detectives in the State of Florida --

17          THE DEFENDANT:  No.

18          CORPORAL ROMANOSKY:  For them to call me about

19   your screen names saying I have investigated this

20   person, also, and chatted with this person and they

21   had expressed a sexual interest in my child, as

22   well, in a round-about way in our chats here, we got

23   to that, as well, okay?  Because the first time you

24   and I talked, you were right on that.  So I knew

25   that's where you were going.  When I -- when you

1      initiated contact with this profile, I knew that's

2      where you were going.  So for me --

3              THE DEFENDANT:  Yeah.

4              CORPORAL ROMANOSKY:  -- to hear that you

5      have -- you can't -- you may have a little bit of an

6      interest in the physical abuse but you have no

7      interest at all in the sexual abuse of children --

8              THE DEFENDANT:  Well, I don't know.

9              CORPORAL ROMANOSKY:  -- I don't buy it.  I

10     really don't.

11             THE DEFENDANT:  Okay.  I don't have sexual --

12     I don't have sexual interest truthfully in anything.

13     I mean, I -- I -- how do you say this?  I don't see

14     how you can have the interest without being able to

15     do it.

16             CORPORAL ROMANOSKY:  Well, I think a lot of

17     people would like to answer that question, but they

18     know it's possible to have the interest and the

19     impulse and just maybe not the physical ability to

20     see it all the way through.  Maybe that would

21     increase the -- the interest or the impulses because

22     when they stop is when you have that release.

23             THE DEFENDANT:  Right.

24             CORPORAL ROMANOSKY:  But if you don't have

25     that release, there's really nothing to stop them.

Romanosky - Direct

```
 1              THE DEFENDANT:  There's no release.  No.

 2              CORPORAL ROMANOSKY:  So there would be nothing

 3      to really -- it's not like you can look at

 4      pornography, even adult pornography and get that

 5      release, so the impulse and interest are still going

 6      to be there.

 7              THE DEFENDANT:  I'm sure that I have to have

 8      some interest or it wouldn't occur.  As far -- but,

 9      I mean, in the sexual thing, it's very hard still

10      for me to imagine something that I can't do.  You

11      know what I mean?  I can't --

12              CORPORAL ROMANOSKY:  Could you masturbate a

13      child?

14              THE DEFENDANT:  I never have.

15              CORPORAL ROMANOSKY:  I know you haven't, but

16      could you?

17              THE DEFENDANT:  You mean, would I have the

18      capability of doing that?

19              CORPORAL ROMANOSKY:  Do you have the physical

20      capability of doing that?

21              THE DEFENDANT:  Oh, I'm sure.  We all do.

22      Yeah.

23              CORPORAL ROMANOSKY:  Do you have the physical

24      capability of performing oral sex on a child?

25              THE DEFENDANT:  I -- I --
```

1        CORPORAL ROMANOSKY:   Do you have the physical

2    capability --

3        THE DEFENDANT:   I have the physical

4    capability.   Absolutely.

5        CORPORAL ROMANOSKY:   What are the two things

6    that we talked about, any sexual activity that might

7    have taken place after the beatings tonight?

8        THE DEFENDANT:   Right.

9        CORPORAL ROMANOSKY:   What were the two things

10   we talked about?

11       THE DEFENDANT:   Not penetration.

12       CORPORAL ROMANOSKY:   Not penetration.   What

13   were the two things we talked about?

14       THE DEFENDANT:   We talked about oral.

15       CORPORAL ROMANOSKY:   And what else did we talk

16   about?

17       THE DEFENDANT:   But that was --

18       CORPORAL ROMANOSKY:   What did the boys have

19   experience in.   And I asked you, what do you think

20   you might be doing.   You said oral and what else?

21   Handling.

22       THE DEFENDANT:   Did I say handling?

23       CORPORAL ROMANOSKY:   Um-hum.

24       THE DEFENDANT:   Oh, okay.   But I felt that

25   they would be doing that to me.

1       CORPORAL ROMANOSKY:  Well, either --

2       THE DEFENDANT:  No.  I mean, I --

3       CORPORAL ROMANOSKY:  (Unintelligible) at that

4   point, I mean, it could be oral sex, it could go

5   back and forth.

6       THE DEFENDANT:  Well, yeah.  I wasn't --

7       CORPORAL ROMANOSKY:  I wasn't going to be that

8   specific with you and say, well, you know, you want

9   to make this -- I might be provoking some suspicion

10  then if I'm asking you to draw me a schematic.

11      THE DEFENDANT:  Yeah.  But when -- I mean,

12  when I think of these things, it isn't I being the

13  active person, ever.

14      CORPORAL ROMANOSKY:  Um-hum.  It's you being

15  the recipient.

16      THE DEFENDANT:  The recipient.  Yes.  Yes, it

17  is, not the acting.

18      CORPORAL ROMANOSKY:  How long have you had

19  the -- some sort of interest in that, do you think?

20      THE DEFENDANT:  Now, you asked something and I

21  remembered something, okay?

22      CORPORAL ROMANOSKY:  We can go back to that.

23      THE DEFENDANT:  No, no, no, no, no.  I mean,

24  but it has to do with it so -- I had somebody when I

25  was at camp -- I don't know how old I was.  16,

1      maybe?

2              CORPORAL ROMANOSKY:  Um-hum.

3              THE DEFENDANT:  Who attacked me and performed

4      oral sex on me.  It was the first time.

5              CORPORAL ROMANOSKY:  Was it a counselor or --

6              THE DEFENDANT:  No.

7              CORPORAL ROMANOSKY:  Just another camper?

8              THE DEFENDANT:  It was another camper.

9              CORPORAL ROMANOSKY:  How old were they?

10             THE DEFENDANT:  A little bit older than I.

11     You know, I remember this, I remember it happening.

12     And I remember being very frightened.

13             CORPORAL ROMANOSKY:  Um-hum.

14             THE DEFENDANT:  And he performed oral sex.

15     Can I tell you what happened?  No, I don't remember.

16             CORPORAL ROMANOSKY:  You remember that part.

17             THE DEFENDANT:  I remember that part.  Yeah.

18             CORPORAL ROMANOSKY:  Do you think that might

19     have kindled something that later on in life --

20             THE DEFENDANT:  Yeah.  That's why I brought it

21     up.  I think it may have.  I mean, I didn't -- I

22     didn't think about it before.  And he did it and he

23     tried it again and I said -- you know, I said no.

24     But he stopped, you know, there was not anything

25     like that.  And -- but that probably was a

1    beginning.

2         CORPORAL ROMANOSKY:  So we're going back to --

3    you said you were 16, so that's quite a long time.

4    Have your interests always been centered around --

5    as far as that genre of kids, has it always been

6    centered on boys or girls or either?

7         THE DEFENDANT:  I think probably more boys.

8    That's the way it would appear to me.  I had

9    interest in girls, but I didn't --

10        CORPORAL ROMANOSKY:  Predominately boys?

11        THE DEFENDANT:  I think it would be

12   predominately boys.  But my real interest -- I mean,

13   this is what amazes me about me, too -- my real

14   interest is more people who are older.

15        CORPORAL ROMANOSKY:  Um-hum.

16        THE DEFENDANT:  It is not -- I mean, you know,

17   if I were to -- if I were to think of a

18   preference --

19        CORPORAL ROMANOSKY:  If I call -- if I call

20   AOL, okay?

21        THE DEFENDANT:  Sure.

22        CORPORAL ROMANOSKY:  And we have AOL send me a

23   listing of all the chat rooms that you've been in --

24        THE DEFENDANT:  Um-hum.

25        CORPORAL ROMANOSKY:  -- within the last 90

1        days, however -- depending on how far we go back,

2        maybe up to six months.

3                THE DEFENDANT:  Yeah.

4                CORPORAL ROMANOSKY:  How many are going to be

5        predicated towards adults or people your own age?

6                THE DEFENDANT:  More.

7                CORPORAL ROMANOSKY:  More than the ones that

8        are predicated towards young and --

9                THE DEFENDANT:  Oh, yes.  Oh, my god, yes.

10               CORPORAL ROMANOSKY:  Which ones -- which ones

11       do you go to for adults, looking for adults?

12               THE DEFENDANT:  Okay.  If I'm going for

13       adults, I would go Men for Men in Ft. Myers.  Let's

14       just say Men for Men (unintelligible).  Men for Men

15       in -- (unintelligible).  I'm just trying to think of

16       the unusual ones I told you about.

17               CORPORAL ROMANOSKY:  What kind of stuff do you

18       talk about in the unusual ones?

19               THE DEFENDANT:  Usually --

20               CORPORAL ROMANOSKY:  (Unintelligible) unusual.

21               THE DEFENDANT:  Yeah.  Practically nothing at

22       all because nobody pays any attention.  So, I mean,

23       you know.

24               CORPORAL ROMANOSKY:  Why do you think that is?

25               THE DEFENDANT:  Well, I'm older, you know.

Romanosky - Direct

1          CORPORAL ROMANOSKY:  Well, there are guys

2     older looking for someone, too, I would think.

3          THE DEFENDANT:  Well, most of the time I get

4     these -- these -- what you call it, IMs.

5          CORPORAL ROMANOSKY:  Um-hum.

6          THE DEFENDANT:  And they want to know my age.

7     And the minute I say 70 -- (unintelligible) you

8     don't even get an answer.

9          CORPORAL ROMANOSKY:  So I think -- would it be

10    a safe assumption that -- are you saying, obviously,

11    there's some interest, though, but you're telling me

12    your predominate interest is more towards older?

13         THE DEFENDANT:  Yes.  Yes.  And you won't --

14         CORPORAL ROMANOSKY:  With some interest in

15    children while you're in those rooms, talking about

16    it or making comment about it.

17         THE DEFENDANT:  I think talking about it and

18    maybe making comment, but basically if you were to

19    look at my history or my -- I don't know the words

20    you might use, but you would find it with adults.

21    Men for Older Men.

22         CORPORAL ROMANOSKY:  Um-hum.

23         THE DEFENDANT:  Over 60, Man for Man.  Okay.

24    That's what it is.  Those two are in there.  I'm

25    just trying to think of -- you know, it's hard when

1       you sit and try to think of something.

2               CORPORAL ROMANOSKY:  (Unintelligible).

3               THE DEFENDANT:  Right.  Exactly.  And I'm

4       trying to be honest about where it could be.  On

5       occasion, Naples, Men for Men Naples.

6               CORPORAL ROMANOSKY:  Now, I think we kind of

7       at least broached on the subject of there had to be

8       some sort of interest there as far as sexual

9       activity with kids, whether that's a predominate

10      interest or not, at least some sort of interest is

11      why you're at least going in these rooms and talking

12      to people about it.

13              THE DEFENDANT:  Yes.

14              CORPORAL ROMANOSKY:  Would it be the same, you

15      think, as far as physical abuse not only children

16      but -- not only children, but with adults, using

17      those implements on both children and adults?

18              THE DEFENDANT:  I think it would be more

19      interest in adults than children.  I -- I -- I'm not

20      a real child oriented person.  I know this sounds

21      funny to say.

22              CORPORAL ROMANOSKY:  Well, but in the chats,

23      though, I mean, in the chats, you're very specific

24      about the age that you like.

25              THE DEFENDANT:  Well --

1        CORPORAL ROMANOSKY:  When you talk about your

2   friends, you're very specific about boys at 11, 12,

3   13 area or 14, 15, you know, how many lashes, the

4   backhand, you're very descriptive as far as --

5        THE DEFENDANT:  I -- I --

6        CORPORAL ROMANOSKY:  I can tell that's where

7   your interest lies because every time we talked,

8   you're right there, I mean.

9        THE DEFENDANT:  Yeah.

10       CORPORAL ROMANOSKY:  You're not branching out

11  and saying I like to do that to 20, 21 year olds.

12  Are there any adults at this party that are going to

13  be -- that will let me do this.  It's always, bam,

14  we're right here.

15       THE DEFENDANT:  Well, yeah.  And -- and --

16  but, in -- in --

17       CORPORAL ROMANOSKY:  In our previous chats,

18  the same way.  I told you my sons were, I think --

19       THE DEFENDANT:  11 and 12.

20       CORPORAL ROMANOSKY:  Previously, this was a

21  couple of years ago, and you were the same thing on

22  then.  And each time you told me you had grand --

23  that a friend's grandkids were going to come over,

24  always the same age.

25       THE DEFENDANT:  Right.

1          CORPORAL ROMANOSKY:  Same description.  So I

2     know, whether you want to admit to me or not --

3          THE DEFENDANT:  Well, (unintelligible).

4          CORPORAL ROMANOSKY:  (Unintelligible).  And

5     that's where it's at.

6          THE DEFENDANT:  I know.  I mean, I don't deny

7     this at all.  I'm not denying it.  I'm trying to see

8     how I've never acted on anything.  You see what I

9     mean?  Yes, I -- I'm sure I have said -- and I --

10    you know, and I hear more crap on those things than

11    anything you can imagine.  But I -- I have never,

12    never acted upon anything.  And, really, I was very

13    leery --

14         CORPORAL ROMANOSKY:  Again, let's go back to

15    what would have happened if I had been a real parent

16    tonight and (unintelligible).  You told me yourself

17    you don't know what would have happened.

18         THE DEFENDANT:  I don't.  I don't know.

19         CORPORAL ROMANOSKY:  Does that -- does that

20    scare you at all, though?

21         THE DEFENDANT:  Well, I don't --

22         CORPORAL ROMANOSKY:  It ought to scare the

23    heck out of you because there's no --

24         THE DEFENDANT:  (Unintelligible).

25         CORPORAL ROMANOSKY:  (Unintelligible) wouldn't

1    have gone through with it.

2            THE DEFENDANT:  I -- I -- you know, I -- if I

3    can say to you I wouldn't have, you can say to me,

4    then, why did you do it, why did you think about it.

5    You know, I can't tell you, I mean, I -- I -- you

6    know, I only say that I have never done this.  Okay.

7    So if I have never done it, then the question could

8    be perfectly logically why did you talk about it.

9            CORPORAL ROMANOSKY:  Um-hum.

10           THE DEFENDANT:  Because that -- I mean, that

11   would be (unintelligible) .

12           CORPORAL ROMANOSKY:  I mean, we can go back

13   and forth.  Obviously, I don't know that --

14   realistically, I don't know that you can dispel in

15   my mind that there wouldn't have been real kids and

16   a real parent that would allow you to do this that

17   would have these interests --

18           THE DEFENDANT:  How would I --

19           CORPORAL ROMANOSKY:  That it wouldn't have

20   happened.

21           THE DEFENDANT:  I don't know.  I -- I --

22           CORPORAL ROMANOSKY:  And on the other side,

23   you can say, well, how do you know that it would

24   have happened, I might have backed out.  But that's

25   not what the chats, conversations suggest.

Romanosky - Direct

```
 1              THE DEFENDANT:  Right.

 2              CORPORAL ROMANOSKY:  The chats and the

 3    conversations say that the interest is there.  You

 4    came for a meeting with the implements to do it.

 5              THE DEFENDANT:  Okay.  Now --

 6    (End of recording.)

 7              THE COURT:  We will break for the afternoon,

 8    ladies and gentlemen.  I've got a hearing I've got

 9    to attend to.  Let's resume at 9 o'clock in the

10    morning.  Please have a safe evening.

11              COURTROOM SECURITY OFFICER:  Rise for the

12    jury, please.

13              THE COURT:  Very quickly because I have a

14    hearing.  As I understand it, we now have an order

15    that allows GPS units to be stored downstairs.  Do

16    you have that yet, Mr. Tragos?  Not the order, the

17    unit.

18              MR. SARTES:  We have the unit already.

19              THE COURT:  You're ready to put it on when he

20    leaves?

21              MR. SARTES:  It's actually in our locker

22    downstairs.

23              THE COURT:  Very good.  We'll see you in the

24    morning.  Watch your step, Mr. Witness.

25              MR. TRAGOS:  Nine o'clock?
```

1                THE COURT:   Nine o'clock.

2         (Hearing adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH   )

5          I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 311, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 7th day of March 2009.

19

20

21          _____/s/ Linda Starr_____
                 Linda Starr, RPR, Official Court Reporter
22

23

24

25