```
 1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3        UNITED STATES OF AMERICA,

 4            Petitioner,

 5               vs.             CASE NO. 8:08-CR-318-T-27TGW
                                 10 DECEMBER 2008
 6                               TAMPA, FLORIDA
                                 PAGES 1 - 268
 7                               VOLUME III

 8        CHARLES JACKSON FRIEDLANDER,

 9            Defendant.

10        _____/

11                 TRANSCRIPT OF TRIAL PROCEEDINGS
                BEFORE THE HONORABLE JAMES D. WHITTEMORE
12                  UNITED STATES DISTRICT JUDGE
                            and a jury
13        APPEARANCES:

14
          For the Petitioner:  Amanda C. Kaiser
15                             United States Attorney's Office
                               Suite 3200
16                             400 N. Tampa Street
                               Tampa, Florida 33602
17
          For the Defendant:  George E. Tragos
18                            Tragos & Sartes, PL
                              Suite 800
19                            601 Cleveland Street
                              Clearwater, Florida 33755
20
                              Peter Anthony Sartes
21                            Tragos & Sartes, PL
                              Suite 800
22                            601 Cleveland Street
                              Clearwater, Florida 33755
23

24         Proceedings recorded and transcribed by
          computer-aided stenography.
25
```

```
 1      Court Reporter:           Linda Starr, RPR
                                  Official Court Reporter
 2                                801 N. Florida Avenue
                                  Suite 13B
 3                                Tampa, Florida 33602

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          COURTROOM SECURITY OFFICER:  All rise.  This

2     Honorable Court is in session, The Honorable James

3     D. Whittemore presiding.

4          Be seated, please.

5          THE COURT:  Good morning.  Bring the jury in.

6     Let's wait just a second, please.  Yes, sir.

7     (Brief pause.)

8          THE COURT:  Good morning.  Are we ready?

9     We're ready.  Bring the jury in, please.

10         MR. TRAGOS:  Your Honor, the court reporter

11    requested that she receive a copy of the tapes that

12    were made in order for her to transcribe it.  And we

13    have no objection to that.

14         MS. KAISER:  That's fine, Your Honor.  We'll

15    make her a copy.

16         THE COURT:  She indicated to me yesterday that

17    she was having a very difficult time hearing and

18    following it.  So we have one of two remedies.

19    Either, one, a stipulation that the tapes can be the

20    evidence in lieu of a transcript, or as you just

21    said, she can type it from the tapes.  I don't think

22    it matters either way for purposes of the record.

23    The tapes are in evidence.

24         She's having a very difficult time, and we all

25    are, hearing certain aspects of it.  So for purposes

1     of today, can we at least let her be at ease knowing

2     that she'll have access to the tapes?

3          MR. TRAGOS:  Yes, Your Honor.

4          MS. KAISER:  Yes, Your Honor.

5          THE COURT:  If you need a quick comfort break,

6     you just need to raise your hand.  Actually, I don't

7     have a problem if one of you steps out momentarily.

8     We don't want to interrupt the tape.

9          MS. KAISER:  Yes.  Thank you, Your Honor.

10         THE COURT:  All right.  Bring the jury in,

11    please.  Everything work out this morning,

12    Mr. Tragos, on the GPS thing?

13         MR. TRAGOS:  I'm sorry, Your Honor?

14         THE COURT:  Is that working smoothly with the

15    GPS deal?

16         MR. TRAGOS:  Yes, it is, Your Honor.  Thank

17    you.

18         THE COURT:  All right.

19         COURTROOM SECURITY OFFICER:  Rise for the

20    jury, please.

21         THE COURT:  Good morning.  Please be seated.

22         I apologize to everyone.  My daughter's bus

23    was late this morning.  Everybody was here ready to

24    go except me.  But I wanted to let you know, it was

25    one of those happenings we don't have a lot of

1    control over.

2          We are ready to proceed with the playing of

3    the video.

4          MS. KAISER:  Yes.  Thank you, Your Honor.

5    (Video playing.)

6          THE DEFENDANT:  Okay.  Now, let me ask you

7    this.  Supposing I hadn't come here, supposing I

8    said I just couldn't it.  What would have then been

9    the case?

10          DETECTIVE ROMANOSKY:  We would have come and

11    arrested you on a warrant.

12          THE DEFENDANT:  Oh, really.

13          DETECTIVE ROMANOSKY:  In the State of Florida,

14    it's unlawful to use an online service like AOL to

15    speak to a child or a parent or guardian of a child

16    that you reasonably -- is legit to engage in this

17    sort of behavior, or attempt to engage in this sort

18    of behavior.

19          THE DEFENDANT:  I -- I see.  Okay.

20          DETECTIVE ROMANOSKY:  So we would have

21    (unintelligible.)

22          THE DEFENDANT:  Okay.  I mean, I didn't know.

23          DETECTIVE ROMANOSKY:  There had been enough

24    concern and, honestly, it wouldn't have been too

25    much longer because I was concerned when you were

1    mentioning you had friends' grandkids coming over.

2           THE DEFENDANT:  Um-hum.

3           DETECTIVE ROMANOSKY:  In the back of my mind,

4    I was thinking you might just be saying this so that

5    we would -- it's okay -- so that we will trust him

6    more and think that he has the same interests.  Or

7    it could be legit.  I as a law enforcement officer

8    can't take that chance very long.  If I start

9    thinking this is legit, I have to act on it.

10          THE DEFENDANT:  Right.  Right.

11          DETECTIVE ROMANOSKY:  So we would have been

12   talking probably within this weekend.

13          THE DEFENDANT:  Right.  Okay.

14          DETECTIVE ROMANOSKY:  So that's

15   (unintelligible) that.

16          THE DEFENDANT:  Okay.  I just didn't know.

17   You know, I'm trying to be as candid as I can be.

18          DETECTIVE ROMANOSKY:  Well, I appreciate it.

19          THE DEFENDANT:  You probably think I'm not,

20   but --

21          DETECTIVE ROMANOSKY:  Well, to be honest with

22   you, I know you're a very educated man and I know

23   you know how this (unintelligible).  Obviously if I

24   were in your position, I would probably be doing the

25   same type of thing.  You want to be truthful and be

1     cooperative, which I believe you are.

2          THE DEFENDANT:  Exactly.

3          DETECTIVE ROMANOSKY:  But I also believe that

4     you're also being careful.  And honestly, I'm not

5     going to fault you for that because you're trying

6     to -- you're trying to give me statements that

7     probably have the least impact.

8          THE DEFENDANT:  I'm trying to give you an

9     honest statement when I know the answers.  If I

10    don't know the answers, I'm not going to say I would

11    have done this or I wouldn't have done this.  I

12    can't -- I can't do that because I don't know.  I

13    really don't.

14         DETECTIVE ROMANOSKY:  Okay.  One of the things

15    I wanted to go over with you here --

16         THE DEFENDANT:  Did I do something wrong?

17         DETECTIVE ROMANOSKY:  No, no, no.  This is --

18    obviously, I have detectives at your house right

19    now.  They're going to be taking possession of your

20    computers.  In all honesty, I know they've already

21    taken possession of the dildos and the whips.

22         THE DEFENDANT:  Okay.

23         DETECTIVE ROMANOSKY:  Because at this point on

24    face value they appear they could possibly be

25    related, or at least along the same lines as this

```
1       type of investigation.  Since they are going to be

2       taking the computers from the home, I'd like to have

3       those computers sent off to the Florida Department

4       of Law Enforcement and have them forensically

5       analyzed to confirm what you told me, to confirm

6       that you're not downloading (unintelligible) child

7       pornography, look at your buddy lists on AOL from

8       your computer standpoint, look at any chats that may

9       be hidden in the computer that you don't know about

10      that are in data files and backup files and

11      unallocated data areas where the computers throw

12      stuff at random.

13              THE DEFENDANT:  I don't know where anything --

14      you know, I mean --

15              DETECTIVE ROMANOSKY:  Well, basically what I'm

16      asking for, would that be -- would you give me your

17      consent to do that?

18              THE DEFENDANT:  Yes, I would.

19              DETECTIVE ROMANOSKY:  Okay.  I'm going to

20      review this with you.

21              THE DEFENDANT:  Okay.

22              DETECTIVE ROMANOSKY:  Is there anyone you can

23      think of that you're actively communicating with

24      online on a regular basis like you were talking to

25      me that has expressed a desire to meet with you or
```

1      has offered up their children?

2           THE DEFENDANT:  You mean that has

3      physically --

4           DETECTIVE ROMANOSKY:  Yeah.  Is there anyone

5      that you're talking to online that says, hey, I have

6      kids.  If you want to meet with me, 200 bucks an

7      hour or --

8           THE DEFENDANT:  No.

9           DETECTIVE ROMANOSKY:  Would you have any

10     objection to me going on -- logging on as you to see

11     if anyone would make contact with me based on the

12     prior chats you might have had with them?  I guess

13     what I'm asking is would you have any objection if I

14     were to log on and assume your screen name?

15          THE DEFENDANT:  I don't (unintelligible).

16          DETECTIVE ROMANOSKY:  Well, then, just to

17     see -- you know, I'm looking to see if anyone is

18     going to make contact with me and say, hey, are you

19     still interested in abusing my kids.  If so, here's

20     my name and number or here's my -- here's my number

21     and something that I might be able to develop other

22     investigations on.

23           THE DEFENDANT:  Hum.  That's an interesting

24     question.  There are the two people that I told you

25     about, remember?

1          DETECTIVE ROMANOSKY:  Um-hum.  Do you still

2     have contact with them?

3          THE DEFENDANT:  Occasionally with one

4     (unintelligible).  You never know.  I mean, he can

5     disappear and (unintelligible).  He asked me last if

6     I was a cop.  Why I wouldn't send him a nude

7     picture, and I said I don't have any such things.

8          DETECTIVE ROMANOSKY:  That's a whole different

9     kind of trust to send someone that kind of picture.

10          THE DEFENDANT:  Well, I said, you know, I

11     don't have such a thing.  Well, how come?  Can't you

12     get one?  And I said, no.  That was true.  The other

13     one --

14          DETECTIVE ROMANOSKY:  I'm sorry?

15          THE DEFENDANT:  The other one I don't know.

16     I -- yeah, you might get an answer from him and to

17     be honest with you sitting here, he probably is

18     (unintelligible).

19          DETECTIVE ROMANOSKY:  Think so?  What's his

20     screen name?  Do you know where he's at, where he

21     claims to be?

22          THE DEFENDANT:  Somewhere outside of Orlando,

23     but I don't know where.

24          DETECTIVE ROMANOSKY:  (Unintelligible).

25          THE DEFENDANT:  No, no, no, no, no.  But now,

1     I mean, now I would be suspicious of everybody so,

2     you know.

3          DETECTIVE ROMANOSKY:  Let me ask you the

4     million dollar question.  Should this opportunity

5     ever present itself again, is it something you would

6     act out on?

7          THE DEFENDANT:  No.  Would I guarantee you?

8     Yes.  Would I put it in blood?  Yes.

9          DETECTIVE ROMANOSKY:  There's no need to do

10    that.

11          THE DEFENDANT:  I mean, no, I would not.  You

12    have as completely, I can honestly tell you,

13    squelched anything I have.  I don't want anybody at

14    any age.  How's that?  I wouldn't.

15          DETECTIVE ROMANOSKY:  Your Yahoo is Captoes2?

16          THE DEFENDANT:  With the number two on it,

17    yes.

18          DETECTIVE ROMANOSKY:  Is there any unique

19    spelling to Captoes, C-A-P-T-O-E-S?  Is it capital C

20    always?

21          THE DEFENDANT:  Yes.

22          DETECTIVE ROMANOSKY:  What is your password

23    for your AOL account (unintelligible) at AOL?

24          THE DEFENDANT:  (Unintelligible).

25          DETECTIVE ROMANOSKY:  If you won't let me log

1   on as you, absolutely.

2          THE DEFENDANT:  Tell me something, okay?

3          DETECTIVE ROMANOSKY:  Um-hum.

4          THE DEFENDANT:  How would I know what you were

5   going to say or something?  You know, I mean, I

6   don't -- you know --

7          DETECTIVE ROMANOSKY:  Oh, you mean as far as

8   if I logged on as you, how do you know I'd be

9   authentic?

10          THE DEFENDANT:  Yeah.  What, you know --

11          DETECTIVE ROMANOSKY:  Believe it or not, most

12   of the time we just convince people of that, that's

13   all.

14          THE DEFENDANT:  Oh.  You're good at that.

15   Yeah.

16          DETECTIVE ROMANOSKY:  Unfortunately I --

17   unfortunately, yeah, I guess I am good at it.

18   Unfortunately, I have to do this a lot.

19          THE DEFENDANT:  As Captoes2 I don't think

20   you'll find practically anybody.

21          DETECTIVE ROMANOSKY:  Okay.

22          THE DEFENDANT:  You could certainly do that.

23   I would prefer you not use the Shring one, though.

24          DETECTIVE ROMANOSKY:  No, no.  That's a

25   business one.

1              THE DEFENDANT:  That's a business one and I --

2       yeah.  Okay.

3              DETECTIVE ROMANOSKY:  Captoes is the one we

4       had correspondence with (unintelligible) --

5              THE DEFENDANT:  Yeah.  That's the other one,

6       yes.

7              DETECTIVE ROMANOSKY:  So that would be the one

8       I would want to use.

9              THE DEFENDANT:  Yeah.  Let me ask you this.

10      What would you do if you were I with giving you

11      permission to do this?  I mean, I'm just very leery

12      at everything now, so --

13             DETECTIVE ROMANOSKY:  I'll be very honest.  If

14      there's a lot of other people that you've talked to

15      about meeting and there's other folks, then I would

16      probably not give it to me because I wouldn't

17      want -- if I were you, I wouldn't want me to

18      discover those -- those people.

19             THE DEFENDANT:  Well, yeah.

20             DETECTIVE ROMANOSKY:  If you've just chatted

21      with people as you say you've just chatted, and not

22      very many, then I wouldn't think there would be too

23      much of an issue on it because there shouldn't be

24      anyone beating down the door --

25             THE DEFENDANT:  Oh, nobody's beating down my

1    door.

2         DETECTIVE ROMANOSKY:  You know, to say, hey, I

3    thought you were coming tomorrow.

4         THE DEFENDANT:  No.  No.  I have never made an

5    appointment because for the most part I don't even

6    know where they are.

7         DETECTIVE ROMANOSKY:  Right.  Well, to be

8    honest with you, I would like to -- to log into

9    those accounts and see what comes out of it.  If

10   nothing comes out of it, then I'm only going to try

11   it for a couple of days.  To be honest with you,

12   once I -- once we leave here, I'm going to be

13   sending something to AOL, anyway, and they're going

14   to shut your account down.

15        THE DEFENDANT:  Oh, they are.

16         DETECTIVE ROMANOSKY:  Yeah.  They're going to

17   preserve it.  I'll send a preservation letter.

18   They're going to lock it up.  So when I do this I

19   have to do this fast because I want to see if

20   there's anything there that's worth -- worth

21   developing.  And if there's not, then it will be

22   shut down, anyway.  Like I said, all -- it's

23   something I'm going to do fairly recent, or fairly

24   soon so, you know, I want to establish if there's

25   anything else (unintelligible).

```
 1              THE DEFENDANT:  Oh --

 2              DETECTIVE ROMANOSKY:  That I can develop from

 3      your screen name, not so much as far as looking to

 4      make additional cases against you, but to develop on

 5      any additional people you were talking to.  I just

 6      want to use you kind of as a springboard for other

 7      investigations.

 8              THE DEFENDANT:  Oh, I see.

 9              DETECTIVE ROMANOSKY:  I mean, in this case

10      here, we are where we are, it is what it is, so

11      let's stop it where we're at.

12              THE DEFENDANT:  Right.

13              DETECTIVE ROMANOSKY:  Anything I develop off

14      your screen name, obviously I'm using your screen

15      name as a springboard to other investigations.  If

16      there are other people that are doing this, then I

17      need to know about it.

18              THE DEFENDANT:  I have to think.  I'm not

19      trying to protect people because I don't know even

20      whom I'm protecting because there's nobody whom I've

21      seen.

22              DETECTIVE ROMANOSKY:  Right.

23              THE DEFENDANT:  You know.  This will not

24      better my case or worsen my case?

25              DETECTIVE ROMANOSKY:  No.
```

```
1              THE DEFENDANT:  Really?

2              DETECTIVE ROMANOSKY:  No.  No.  It definitely

3    won't -- it definitely won't worsen.  Obviously, if

4    there's additional people I can develop from that,

5    certainly I will let people know that you were

6    cooperative enough to let me -- to do that.  But in

7    all honesty, no, it won't change -- it won't change

8    this case.

9              THE DEFENDANT:  (Unintelligible).

10             DETECTIVE ROMANOSKY:  Yeah.  We are -- we have

11   what we have at this point.  While you're thinking

12   about that, let me go over the consent to search for

13   you with the computers as far as having the

14   computers analyzed.

15             THE DEFENDANT:  Don't you think that's

16   appropriate?

17             DETECTIVE ROMANOSKY:  What's that?

18             THE DEFENDANT:  Don't you think that's

19   appropriate?

20             DETECTIVE ROMANOSKY:  What's that?

21             THE DEFENDANT:  That I should let you do this.

22             DETECTIVE ROMANOSKY:  That's up to you.  I

23   mean, I can't -- like I said, that's a legal

24   decision I can't make.  You're obviously, you know,

25   an educated adult.  You understand that whether
```

1    you're going to give me consent or not to have your

2    computers forensically analyzed.

3         THE DEFENDANT:  Tell me what forensically

4    analyzed means.

5         DETECTIVE ROMANOSKY:  Basically what it means

6    is they're going to take your computer and they're

7    going to make a complete duplicate copy, a -- what's

8    called a bit for bit forensic copy.  It's an exact

9    copy of your entire hard drive.  And then we're

10   going to look at that hard drive.  We're going to be

11   looking for the chats that you and I had.  We're

12   going to be seeing -- making sure those were on --

13   which computer they were on, seeing if they were

14   stored, what kind of, you know, files they were

15   stored.

16        THE DEFENDANT:  And, of course, I don't know.

17        DETECTIVE ROMANOSKY:  I'm going to use that to

18   corroborate what you told me about not downloading

19   child pornography.

20        THE DEFENDANT:  I don't know how to do --

21        DETECTIVE ROMANOSKY:  (Unintelligible), child

22   pornography on there, then that corroborates what

23   you told me.  If I find child pornography on there,

24   then I'll know you weren't completely candid with me

25   and we're going to have to talk again.  But --

```
 1              THE DEFENDANT:  Yeah.  No.

 2              DETECTIVE ROMANOSKY:  That's what I'm looking

 3       to do.  I'm looking to have them forensically

 4       copied.  I'm looking through them specifically for

 5       our chats and for downloading child pornography or

 6       trading child pornography.

 7              THE DEFENDANT:  So would you --

 8              DETECTIVE ROMANOSKY:  I can't advise you on

 9       what I would do in your situation.  I cannot give

10       legal advice.

11              THE DEFENDANT:  I don't want you to give legal

12       advice.

13              DETECTIVE ROMANOSKY:  That's one of the things

14       I can't do.  That's like someone coming to you

15       telling you about their marital problems and say,

16       you think I should divorce her.

17              THE DEFENDANT:  They do that all the time.

18              DETECTIVE ROMANOSKY:  You're not going to --

19       you're not -- you don't dare tell them, yeah, I

20       think you should or, no, I don't think you

21       shouldn't.

22              THE DEFENDANT:  No.

23              DETECTIVE ROMANOSKY:  But these are your

24       options (unintelligible).

25              THE DEFENDANT:  Okay.  Let me ask you this.
```

1      If I'm putting you on the spot, tell me.  If I said

2      yes, you could do it, and there was no child

3      pornography --

4      (Phone ringing.)

5           DETECTIVE ROMANOSKY:  Corporal Romanosky.

6      Hey, how you doing.  Yeah, we're in the interview

7      right now.  All right.  Bye.

8           I'm sorry.  Now, what were you saying?

9           THE DEFENDANT:  If they found there was no

10     child pornography, because I don't even know how to

11     do it; okay?

12          DETECTIVE ROMANOSKY:  All right.

13          THE DEFENDANT:  Would that help the situation

14     any?

15          DETECTIVE ROMANOSKY:  Well, it would show that

16     you were being honest with me in relation that

17     you're not downloading (unintelligible) or child

18     pornography.

19          THE DEFENDANT:  No.  Because I don't know how.

20     Yeah.

21          DETECTIVE ROMANOSKY:  If you were downloading

22     child pornography, it certainly would not be good

23     for you.  But if anything, what it would show is

24     that you were --

25          THE DEFENDANT:  Honest.

1          DETECTIVE ROMANOSKY:   -- cooperating with me

2     and you were honest and (unintelligible).   The other

3     reason, like I said, that I would want to look at

4     your computers was to recover the chats that you and

5     I had.   I have a copy, but I want the copy from your

6     computer, as well.

7          THE DEFENDANT:   Yeah.   (Unintelligible) the

8     same as yours.

9          DETECTIVE ROMANOSKY:   Absolutely.

10         THE DEFENDANT:   No.   I don't --

11         DETECTIVE ROMANOSKY:   Those are the things

12    that I'm looking for.

13         THE DEFENDANT:   Okay.   There's really nothing

14    else that they would --

15         DETECTIVE ROMANOSKY:   No, I mean, there's not.

16    We're not going to go into your financial documents

17    or anything like that.

18          THE DEFENDANT:   That doesn't bother me.

19         DETECTIVE ROMANOSKY:   Absolutely no.   We could

20    care less about that.   Usually what we're looking

21    for is movie files, video files, (unintelligible)

22    files, text files, things like that.   We're not

23    (unintelligible) spreadsheets, things like that.

24    That's not our concern.   Now, if you're laundering a

25    bunch of money or something --

1            THE DEFENDANT:  Oh, no.  No.

2            DETECTIVE ROMANOSKY:  (Unintelligible).  Let's

3    go through this.  This says, I, Charles Jackson

4    Friedlander, hereby voluntarily give my full consent

5    to Pinellas County Sheriff's Office or any other law

6    enforcement agency they so deem necessary, which

7    would be the Florida Department of Law Enforcement,

8    they have forensic analysts, to conduct a complete

9    search of my computer hardware -- follow me through

10   this, it gets a little technical here -- hardware,

11   software and data, including but not limited to

12   central processing units, hard discs, hard drives,

13   floppy disc drives, tape drives, CD ROM drives,

14   modems, scanning devices -- what this says here is

15   we're going to look at your computer --

16   (unintelligible) hard discs are inside your

17   computer, that's what stores all the memory; hard

18   drives is the same thing, that's the internal memory

19   of the computer; floppy disc drives are like the

20   little floppy things (unintelligible) if those were

21   recovered, then I would ask to look at those; tape

22   drives (unintelligible).  This form is just designed

23   to be all inclusive, that's why (unintelligible), CD

24   ROM drives, if you had CDs, like DVDs or CDs,

25   (unintelligible), commercially made or privately

1     made --

2          THE DEFENDANT:  No, no.  I don't even know how

3     to do that.

4          DETECTIVE ROMANOSKY:  Modems is what your

5     computer accesses the internet with.  Some modems

6     have the capability of storing some data in them.

7          THE DEFENDANT:  Oh, the modem is the one that

8     (unintelligible).

9          DETECTIVE ROMANOSKY:  Scanning devices if you

10    had a scanner.

11         THE DEFENDANT:  I don't have one.

12         DETECTIVE ROMANOSKY:  Magnetic tapes.

13         THE DEFENDANT:  Don't know what that is.

14         DETECTIVE ROMANOSKY:  Cassette tapes, those

15    are old school.  VCR tapes.

16         THE DEFENDANT:  No, I don't have any.

17         DETECTIVE ROMANOSKY:  Floppy discs, USB memory

18    storages, the little thumb drive people see

19    (unintelligible) put the stuff back and forth on

20    them.

21         THE DEFENDANT:  Don't have them.

22         DETECTIVE ROMANOSKY:  Or any other form of

23    computer memory storage specified below used to

24    store or record data found together or separately

25    from one another located at your home address.

1          THE DEFENDANT:  Um-hum.

2          DETECTIVE ROMANOSKY:  You're giving this

3     consent freely and voluntarily without compulsion,

4     threat or promise of any kind.  I understand my

5     constitutional right to refuse a search of said

6     computer, hardware, and it's going to list all these

7     things again, nothing's added there.

8          THE DEFENDANT:  Um-hum.

9          DETECTIVE ROMANOSKY:  And I'll let you read

10    through that as we go through this.  So you

11    understand that you have the right to refuse to

12    consent of that search without a search warrant and

13    it is your intent to fully and completely waive such

14    right by this consent.  I understand that anything

15    may be found -- anything that may be found through a

16    search of this computer hardware, and it's going to

17    list all those things again, can and will be used

18    against me at trial (unintelligible) which I may be

19    accused, meaning if you have a bunch of child

20    pornography on there, you'll be criminally charged

21    with it.  The data that's found in that computer as

22    far as corroborating these chats, I'm going to say I

23    have those chats if they're recovered, if your

24    computer didn't save it, your login feature wasn't

25    on and they don't recover them then obviously we

1    can't use them.  But if we recover them, I'm going

2    to say here are the same chats that I have, they

3    were on his computer.

4         THE DEFENDANT:  Is that bad?

5         DETECTIVE ROMANOSKY:  Well, it's corroborative

6    to my case.  It's not good or bad at that point.

7    (Unintelligible) you've already kind of admitted

8    we've been chatting.

9         THE DEFENDANT:  Right.

10        DETECTIVE ROMANOSKY:  We've talked about it.

11        THE DEFENDANT:  Right.

12        DETECTIVE ROMANOSKY:  At this point it's kind

13   of moot.  If you had said, I never chatted with

14   you --

15        THE DEFENDANT:  Oh, no.

16        DETECTIVE ROMANOSKY:  I have no idea what

17   you're talking about.

18        THE DEFENDANT: (Unintelligible).

19        DETECTIVE ROMANOSKY:  And then I'm asking

20   (unintelligible) well, I'm going to find that to

21   prove that you're lying to me, then you might think,

22   well, I don't know if I want to do this.  Okay?

23        THE DEFENDANT:  No.

24        DETECTIVE ROMANOSKY:  Understand that

25   conducting a search of the computer hardware, and it

1      lists all those things again, is a time-consuming

2      and lengthy documentation process.   That means I'm

3      not going to have it done (unintelligible).

4           THE DEFENDANT:   No.   No.

5           DETECTIVE ROMANOSKY:   It will take a while.

6      Okay?

7           THE DEFENDANT:   Um-hum.

8           DETECTIVE ROMANOSKY:   That's page one.   And

9      page two is just the signature page.

10          THE DEFENDANT:   Um-hum.

11          DETECTIVE ROMANOSKY:   If you'd like to read

12     through that laundry list of things again, please

13     (unintelligible) understand what it says.

14          THE DEFENDANT:   I know what it says.   I really

15     do.   Now, I don't have most of those things so I

16     don't even know what they are.

17          DETECTIVE ROMANOSKY:   A lot of them won't be

18     applicable.

19          THE DEFENDANT:   And I wouldn't know how to

20     download.

21          DETECTIVE ROMANOSKY:   Right.

22          THE DEFENDANT:   Now, someone once sent me

23     about a 15-second thing.   (Unintelligible) it was

24     some -- I forget what it was.

25          DETECTIVE ROMANOSKY:   A 15-second thing?

1          THE DEFENDANT:  I think it's 15.  They sent

2    me --

3          DETECTIVE ROMANOSKY:  Oh, someone sent you an

4    e-mail with an attachment?

5          THE DEFENDANT:  Yeah.

6          DETECTIVE ROMANOSKY:  And it had, what, a

7    pornographic video on there?

8          THE DEFENDANT:  It was about 15 seconds.

9          DETECTIVE ROMANOSKY:  Was there a child in

10   there?

11         THE DEFENDANT:  No.

12         DETECTIVE ROMANOSKY:  (Unintelligible).

13         THE DEFENDANT:  There are no children.  I

14   mean --

15         DETECTIVE ROMANOSKY:  I mean, in all honesty,

16   most of the computers I go through, I find a large

17   quantity of pornography.  Some of it, none of it's

18   children, you know, it's all adults and it still

19   takes us weeks to go through it.  (Unintelligible).

20   So the adult stuff I could care less about.  The

21   only things that -- images and videos that I would

22   have any interest in at all pertaining to this case

23   obviously would be children, an attempt to identify

24   children or, you know, it's against the law to have

25   child pornography or any videos --

1              THE DEFENDANT:  I don't have --

2              DETECTIVE ROMANOSKY:  Any pictures of bondage,

3      sadomasochism, things like that.

4              THE DEFENDANT:  I don't have anything like

5      that.

6              DETECTIVE ROMANOSKY:  There you have it.  I

7      mean, if that's -- if that's the case --

8              THE DEFENDANT:  No, it is the case.

9              DETECTIVE ROMANOSKY:  That's what we're

10     looking for.

11             THE DEFENDANT:  No.

12             DETECTIVE ROMANOSKY:  I just need your

13     signature at the bottom.  (Unintelligible) saw you

14     signing (unintelligible).

15             THE DEFENDANT:  I've tried to be cooperative.

16             DETECTIVE ROMANOSKY:  I agree.  I think you

17     have been cooperative with me.  Okay.  And lastly is

18     your permission or your consent for me to logon as

19     you.  If you're not comfortable with it, then don't

20     do it.  This has to be something that you're

21     comfortable.

22             THE DEFENDANT:  I'm really -- I'm really not.

23             DETECTIVE ROMANOSKY:  Okay.  Is there a

24     reason?  Anything (unintelligible) that you're

25     concerned about?

1          THE DEFENDANT:  It has nothing to do with

2     children.  It doesn't.  You know, there are

3     certain -- (unintelligible).

4          DETECTIVE ROMANOSKY:  Need some more water?

5          THE DEFENDANT:  That's fine.  Thank you.  Just

6     a minute.  You know, there are certain things you

7     sort of consider sacrosanct, you know what I mean.

8          DETECTIVE ROMANOSKY:  Um-hum.

9          THE DEFENDANT:  It's not that I think you're

10    going to discover anything, no.

11         DETECTIVE ROMANOSKY:  Um-hum.

12         THE DEFENDANT:  I guess it's sort of -- I

13    guess I sort of considered that sort of thing being

14    violated.

15         DETECTIVE ROMANOSKY:  Um-hum.

16         THE DEFENDANT:  Now, I would hate for somebody

17    to log in as me and not be me.

18         DETECTIVE ROMANOSKY:  Um-hum.  Okay.  Like I

19    said, if you're not comfortable --

20         THE DEFENDANT:  Have you ever had anybody say

21    no?

22         DETECTIVE ROMANOSKY:  Oh, yeah.  All the time.

23         THE DEFENDANT:  Oh, you do.  Okay.

24         DETECTIVE ROMANOSKY:  And it's on a case by

25    case basis.

1              THE DEFENDANT:  Oh, okay.

2              DETECTIVE ROMANOSKY:  It's, you know --

3              THE DEFENDANT:  No.  I would feel

4      uncomfortable.  I mean, if you wanted me to log in

5      and you wanted to be there and (unintelligible).

6      But I think for somebody to assume your identity to

7      me is a --

8              DETECTIVE ROMANOSKY:  That's understandable.

9      (Unintelligible).

10             THE DEFENDANT:  Yeah.  I mean, it's not --

11     it's not you personally.

12             DETECTIVE ROMANOSKY:  That's all right.  I

13     mean, no explanation necessary.  Do you need some

14     more water, Charles?  Do you need to use the

15     bathroom or anything like that?

16             THE DEFENDANT:  I never know when I'm going to

17     do it.  This is my problem.

18             DETECTIVE ROMANOSKY:  That's why I'm asking.

19     If you don't think you have to, I'll be back in a

20     few minutes, anyway.  We can try, you know, at a

21     later time.  I'll get you some more water.

22             THE DEFENDANT:  I'll try the bathroom.

23             DETECTIVE ROMANOSKY:  Okay.

24             THE DEFENDANT:  May I?

25             DETECTIVE ROMANOSKY:  Yeah, absolutely.  Why

 1      don't you come along with me and I'll walk you over

 2      there.

 3              THE DEFENDANT:  Should I take my water with me

 4      because I may need some more water.

 5              DETECTIVE ROMANOSKY:  Why don't you leave that

 6      here.  I'll (unintelligible), because that's in a

 7      secure part of the building.  (Unintelligible).

 8      Just where the water fountain is, it's beyond our

 9      secure area, so I'll walk you -- (unintelligible).

10      Need a hand?

11              THE DEFENDANT:  I'm fine.  I've got it.  Thank

12      you.

13              DETECTIVE ROMANOSKY:  We're going to make a

14      left.  We're going to make a right.

15              UNIDENTIFIED SPEAKER:  Do you want some more

16      water.

17              THE DEFENDANT:  Oh, yeah.  (Unintelligible).

18      Would you mind?

19              UNIDENTIFIED SPEAKER:  Sure.  Just have a seat

20      and I'll be right back.

21              UNIDENTIFIED SPEAKER:  (Unintelligible).

22              DETECTIVE ROMANOSKY:  Did you get some more

23      water?

24              THE DEFENDANT:  He did.

25              DETECTIVE ROMANOSKY:  Good deal.  I just

1    talked to the detective down in -- by your house.

2         THE DEFENDANT:  What did they think?

3         DETECTIVE ROMANOSKY:  Well, there's a couple

4    questions they had for me.  Where are the keys to

5    the pickup?

6         THE DEFENDANT:  I have them.

7         DETECTIVE ROMANOSKY:  You have the keys to the

8    pickup?  There's no other ones at the house?

9         THE DEFENDANT:  I don't believe so.

10        DETECTIVE ROMANOSKY:  Is there anyplace they

11   might be I could tell them to look there?

12        THE DEFENDANT:  I always use these so --

13        DETECTIVE ROMANOSKY:  In you bedroom, I guess,

14   they found a Polaroid photograph of a naked teenager

15   with a tattoo on him (unintelligible).

16        THE DEFENDANT:  Who is that?  I don't even

17   know I had --

18        DETECTIVE ROMANOSKY:  That's what I'm asking.

19        THE DEFENDANT:  I don't (unintelligible).  A

20   Polaroid?

21        DETECTIVE ROMANOSKY:  A Polaroid photograph of

22   a naked teen with a tattoo on his back.

23        THE DEFENDANT:  I have no idea.  I really

24   don't.

25        DETECTIVE ROMANOSKY:  Okay.  If you do, now

1       would be the time.

2               THE DEFENDANT:  I don't -- it's nobody that

3       I --

4               DETECTIVE ROMANOSKY:  Doesn't sound familiar?

5               THE DEFENDANT:  No.

6               DETECTIVE ROMANOSKY:  Someone give it to you,

7       mail it to you?  Anyone maybe you met in the past

8       (unintelligible) a picture?

9               THE DEFENDANT:  No.  No.  (Unintelligible).

10      No.  Truly.

11              DETECTIVE ROMANOSKY:  They found some keys

12      that look like safety deposit box keys.

13              THE DEFENDANT:  They could be.

14              DETECTIVE ROMANOSKY:  Where would the safe

15      deposit box be?

16              THE DEFENDANT:  In the bank.

17              DETECTIVE ROMANOSKY:  Which bank?

18              THE DEFENDANT:  Bank of America.  But I don't

19      think I had -- did they look in my desk drawer, do

20      you think?  That's probably where they --

21              DETECTIVE ROMANOSKY:  It doesn't say.  It

22      says -- (unintelligible) in the bedroom, but I could

23      be wrong.  Safety deposit box keys is all it says.

24              THE DEFENDANT:  Yeah.  If -- the only way it

25      would be a safety deposit box would be in an

1        envelope that says the safety deposit box.

2             DETECTIVE ROMANOSKY:  What kind of things do

3        you keep in there?

4             THE DEFENDANT:  I haven't been in a long time.

5        Mostly will and -- truthfully, I have a -- I think

6        you might think are pornographic.  They're very --

7        they're very famous.  I don't know where I have

8        them, to be truthful with you.  They're worth about

9        probably $20,000 each.

10            DETECTIVE ROMANOSKY:  Wow.

11            THE DEFENDANT:  No.  They're -- they're art

12       photographs done by a very famous photographer that

13       I have gotten from a friend of mine.  It was given

14       to me years and years ago who's dead.

15            DETECTIVE ROMANOSKY:  Um-hum.

16            THE DEFENDANT:  They're by a man named Von

17       Luden.  They were done in the 1890's.

18            DETECTIVE ROMANOSKY:  What do they depict?

19            THE DEFENDANT:  Oh, they just are -- he was --

20       he had a (unintelligible).

21            DETECTIVE ROMANOSKY:  Um-hum.

22            THE DEFENDANT:  Oh, they're just individual

23       pictures.  They're not all teenagers or anything.  I

24       don't know how old they are.

25            DETECTIVE ROMANOSKY:  Are they like nude

1        pictures or something?

2              THE DEFENDANT:  They're nude but they're

3        posed, you know what I mean, with garlands and --

4        it's 1890 stuff.

5              DETECTIVE ROMANOSKY:  Right.  So you can't

6        tell the age of people that are (unintelligible) in

7        the pictures?

8              THE DEFENDANT:  No.

9              DETECTIVE ROMANOSKY:  Anything else you can

10       think of that might be in there?

11             THE DEFENDANT:  No.  The rest would be, you

12       know, sort of -- I mean, they're documents and

13       stuff, you know, like -- like for stocks stuff.

14             DETECTIVE ROMANOSKY:  Financial type of

15       things?

16             THE DEFENDANT:  Well, financial and -- I'm

17       trying to think what kind of things would be in

18       there.  They're not -- it's a very -- you know, it's

19       that thick.  So there's nothing pornographic.

20       There's nothing -- it's mostly textual stuff with --

21       my family trees may be in there.  I'm not sure, I

22       mean, you know.

23             DETECTIVE ROMANOSKY:  We talked about the

24       dildos a little bit.  Those were, you said, for your

25       lady friend?

```
 1              THE DEFENDANT:  Well, I don't know what they

 2      were for.  I thought maybe if I had that in mind.

 3      Yes.

 4              DETECTIVE ROMANOSKY:  Have they been used

 5      before?

 6              THE DEFENDANT:  No.

 7              DETECTIVE ROMANOSKY:  So they've never been

 8      used?

 9              THE DEFENDANT:  NO.

10              DETECTIVE ROMANOSKY:  How about the condoms?

11      They found condoms and K-Y jelly.

12              THE DEFENDANT:  Oh, I always keep those.

13              DETECTIVE ROMANOSKY:  For?

14              THE DEFENDANT:  I don't know.  Well, yeah,

15      sometimes if I think I'm going to be able -- the K-Y

16      or something if I can masturbate.  But it doesn't

17      work.

18              DETECTIVE ROMANOSKY:  How about the condoms?

19      What would you have those for?

20              THE DEFENDANT:  If I happen to want to have

21      sex with this woman.

22              DETECTIVE ROMANOSKY:  And the (unintelligible)

23      prescription or is it just (unintelligible) Levitra?

24              THE DEFENDANT:  I have Levitra that my

25      urologist gave me to maybe see if I can ejaculate.
```

1               DETECTIVE ROMANOSKY:  Does it work?

2               THE DEFENDANT:  I haven't tried it yet.  I

3       don't have the nerve.  I'm always afraid of drugs.

4       Okay, you know.

5               DETECTIVE ROMANOSKY:  You never know what the

6       side effects will be.

7               THE DEFENDANT:  Well, yeah.  You see

8       (unintelligible), which he should have known before

9       he gave me the prescription for it.  There is -- if

10      you're taking Hytrin for prostate, it says you're

11      not supposed to take (unintelligible).  If you take

12      it, you're supposed to take half the dose or you

13      could get a bad reaction, you could faint.  Well,

14      when I read that, I don't want to do anything like

15      that.

16              DETECTIVE ROMANOSKY:  Right.  Okay, Charles.

17              THE DEFENDANT:  But that bothers me with the

18      Polaroid thing.  I -- I --

19              DETECTIVE ROMANOSKY:  It doesn't sound like

20      anything maybe --

21              THE DEFENDANT:  No.

22              DETECTIVE ROMANOSKY:  -- in the past someone

23      sent you or mailed you or maybe it was a guy friend

24      that you met down there somewhere that snapped a

25      Polaroid (unintelligible)?

1                    THE DEFENDANT:  No.

2                    DETECTIVE ROMANOSKY:  Do you own a Polaroid

3       camera?

4                    THE DEFENDANT:  It's -- I found it, finally.

5       And it is seven years old, or more.  And I had a

6       thing of film that was -- expired in 2001.

7                    DETECTIVE ROMANOSKY:  Anyone visiting or

8       any --

9                    THE DEFENDANT:  No.  I didn't even find it.

10                   DETECTIVE ROMANOSKY:  Right.

11                   THE DEFENDANT:  Until I was trying to clean

12      out the closet.

13                   DETECTIVE ROMANOSKY:  Well, in all honesty,

14      you know, the investigators down there in Ft. Myers,

15      they're going to continue to look into that picture

16      to see if they can get the person identified.

17                   THE DEFENDANT:  I don't know.

18                   DETECTIVE ROMANOSKY:  That's why I say, now is

19      the time to -- somebody that you know who it is.

20                   THE DEFENDANT:  No.

21                   DETECTIVE ROMANOSKY:  Or that you've met

22      or something -- (unintelligible).

23                   THE DEFENDANT:  No.  And I don't have --

24                   DETECTIVE ROMANOSKY:  Even if they're 18,

25      (unintelligible).

1          THE DEFENDANT:  No.  I wish -- could I see it

2     and maybe I would be --

3          DETECTIVE ROMANOSKY:  I don't have it here.

4          THE DEFENDANT:  Oh.  If I was able to tell --

5     I never -- I don't take Polaroid pictures, really.

6          DETECTIVE ROMANOSKY:  Um-hum.

7          THE DEFENDANT:  And --

8          DETECTIVE ROMANOSKY:  (Unintelligible)

9     something from the past, maybe, when Polaroids were

10    popular.

11         THE DEFENDANT:  Yeah.  They're not now.  If

12    you want the truth, I don't know.  If I -- if they

13    would show it to me I might be able -- I might, I

14    don't know, but I don't -- I don't have those sort

15    of things.  I really don't.

16         DETECTIVE ROMANOSKY:  Okay.  Well, let me see

17    if I can maybe get them to somehow get it up to me.

18    Maybe they can take a picture and e-mail it to me or

19    something and I can print it out and show you.

20         THE DEFENDANT:  Yeah.  I don't have --

21         DETECTIVE ROMANOSKY:  (Unintelligible).  You

22    want any water?

23         THE DEFENDANT:  It will be okay for now.

24         DETECTIVE ROMANOSKY:  Okay.  I'll be right

25    back.

1           THE DEFENDANT:  No, I -- no.  I cut myself.

2           DETECTIVE ROMANOSKY:  How did you do that?

3           THE DEFENDANT:  With my mouth.

4           DETECTIVE ROMANOSKY:  Okay.  You need to wash

5     your hands?

6           THE DEFENDANT:  Can I wash them?

7           DETECTIVE ROMANOSKY:  Yeah.

8           THE DEFENDANT:  (Unintelligible).

9           DETECTIVE ROMANOSKY:  Uh-huh.

10    (Unintelligible) anymore questions.

11          THE DEFENDANT:  Did they get the picture?

12          DETECTIVE ROMANOSKY:  They can't send it to me

13    but I'll -- (unintelligible)at a later time.  How

14    much do you weigh?

15          THE DEFENDANT:  Right now?

16          DETECTIVE ROMANOSKY:  Um-hum.

17          THE DEFENDANT:  About 198.

18          DETECTIVE ROMANOSKY:  What color eyes do you

19    have?  Brown?

20          THE DEFENDANT:  Brown.

21          DETECTIVE ROMANOSKY:  Do you have any scars,

22    marks or tattoos, birthmarks, surgical scars?

23          THE DEFENDANT:  Well, I have an appendectomy

24    scar.  And I have, you know, occasionally a scar

25    from where the thing didn't heal too well as a

```
1        diabetic.

2             DETECTIVE ROMANOSKY:  No tattoos, birthmarks?

3             THE DEFENDANT:  No, no tattoos.

4        (Unintelligible) birthmarks.

5             DETECTIVE ROMANOSKY:  Are you a US citizen?

6             THE DEFENDANT:  Yes.

7             DETECTIVE ROMANOSKY:  What's your phone number

8        down there on (unintelligible)?

9             THE DEFENDANT:  239-561-1515.

10            DETECTIVE ROMANOSKY:  And your cell phone

11       number again?

12            THE DEFENDANT:  202-607 -- don't laugh --

13       6666.  Everybody (unintelligible).

14            DETECTIVE ROMANOSKY:  Do you still go back up

15       north every now and then or --

16            THE DEFENDANT:  Yeah, most of the time.

17            DETECTIVE ROMANOSKY:  Okay.  Give me a couple

18       more minutes, I'll be right back.  More water?

19            THE DEFENDANT:  Oh, I would love some, if you

20       don't mind.

21            DETECTIVE ROMANOSKY:  Sure.  Yeah, no problem.

22            THE DEFENDANT:  (Unintelligible).

23            DETECTIVE ROMANOSKY:  Yes and no.

24            THE DEFENDANT:  Uh-uh.  Uh-uh.  I think it

25       stopped.
```

1          UNIDENTIFIED SPEAKER:  Are you all right?

2          THE DEFENDANT:  Yeah.  Oh, yeah.  It stopped.

3     Thank you very much, sir.  Um, Sir?

4          DETECTIVE ROMANOSKY:  Did the bleeding stop?

5          THE DEFENDANT:  Yeah, it did.  But I do have

6     to do one thing in a minute.

7          DETECTIVE ROMANOSKY:  Bathroom?  Okay.  Let me

8     just review this paperwork with you.

9          THE DEFENDANT:  Okay.

10         DETECTIVE ROMANOSKY:  This is regarding your

11    vehicle.  Okay?  You're being charged with two

12    felonies.  You're being charged with using an online

13    service to lure, entice a person believed to be a

14    parent, guardian or custodian of a child to engage

15    in unlawful activity (unintelligible) physical and

16    sexual abuse.  And you're being charged with

17    traveling to meet a minor, travel anywhere within

18    the state or from another state for the purposes of

19    meeting a minor to engage in any unlawful act,

20    separate offense.  Okay?

21         THE DEFENDANT:  (Unintelligible).

22         DETECTIVE ROMANOSKY:  Well, you did, quite

23    clearly.  You came up here with the --

24         THE DEFENDANT:  Oh, yeah.  Oh, I see.  I

25    thought you meant if I did it again or something.

1          DETECTIVE ROMANOSKY:  Right.  No.  Those are

2     for what happened on this case.

3          THE DEFENDANT:  Okay.

4          DETECTIVE ROMANOSKY:  Okay.  For what happened

5     (unintelligible).  Being that you used your vehicle

6     to travel up here from Ft. Myers.

7          THE DEFENDANT:  (Unintelligible).

8          DETECTIVE ROMANOSKY:  And you carried items

9     with you for the purpose of the meeting tonight.

10          THE DEFENDANT:  Yeah.

11          DETECTIVE ROMANOSKY:  The vehicle is being

12     seized under the Contraband Forfeiture Act.  So your

13     vehicle is being seized by the sheriff's office.

14          THE DEFENDANT:  What does that mean?

15          DETECTIVE ROMANOSKY:  What that means is we're

16     taking your vehicle.  The sheriff's office is taking

17     your vehicle.  Okay.  Is the vehicle paid off?

18          THE DEFENDANT:  Yeah.

19          DETECTIVE ROMANOSKY:  Okay.  You have a right

20     to contest that seizure of the vehicle.  And it's

21     all explained on the form.  I'm just going to go

22     over it with you real quick.  This is the case

23     number.

24          THE DEFENDANT:  Yeah.

25          DETECTIVE ROMANOSKY:  This is today's date.

1        This is to you.

2              THE DEFENDANT:   Um-hum.

3              DETECTIVE ROMANOSKY:   Your address.   This is

4     regarding 2001 silver Lexus and the VIN number.

5              THE DEFENDANT:   (Unintelligible).

6              DETECTIVE ROMANOSKY:   This is to advise you

7     that on July 21st, 2008, the Pinellas County

8     Sheriff's Office seized the above referenced

9     property for a violation of the Florida Contraband

10    Forfeiture Act.   You used the vehicle in commission

11    of a felony.   You are notified that you are entitled

12    by law to request an adversarial preliminary hearing

13    to determine whether there is probable cause to

14    believe the property was used in violation of the

15    act, which means you can contest the seizure is what

16    that's saying.

17         Please note that the adversarial hearing is

18    not mandatory and you need not request the hearing

19    to later contest the action taken against the

20    property described herein.   Okay.   Meaning you don't

21    have to.   If you don't want to contest this here,

22    you certainly don't have to.   Each claimant will be

23    given the opportunity to appear in court for a final

24    disposition of this matter, meaning anyone who has a

25    vested interest in the vehicle has the right to

1        appear and --

2             THE DEFENDANT:  (Unintelligible).

3             DETECTIVE ROMANOSKY:  (Unintelligible).   If

4        you desire such a hearing, you must make a request

5        in writing by certified mail, return receipt

6        requested to Pinellas County Sheriff's Office,

7        general counsel's office at the address listed below

8        within 15 days of receiving this notice.  You have

9        15 days to give a written notice saying you want a

10       hearing to contest the seizure.  This request must

11       be accompanied by a copy of this notice.  The

12       seizing agency will notify you of the time, date and

13       place of that hearing.  I am certifying that I am

14       providing you a copy of this notice.

15            THE DEFENDANT:  You did.

16            DETECTIVE ROMANOSKY:  I'm going to give you a

17       copy of this, on the 21st day of July 2008.

18            THE DEFENDANT:  Correct.

19            DETECTIVE ROMANOSKY:  And that's my signature

20       there.  What this is saying right here, you don't

21       have to agree with the seizure.  You're just saying

22       that I have received the foregoing notice apprising

23       me of my right to post-seizure adversarial hearing,

24       and I need you to sign for me right by the X.

25       (Unintelligible) copy of this.  (Unintelligible).

1    Okay.  Understand it's not personal.  It's what I

2    have to do.

3         THE DEFENDANT:  (Unintelligible).

4         DETECTIVE ROMANOSKY:  (Unintelligible).  And

5    I'll be back here in just a sec.  Get you a ride

6    detail (unintelligible).

7         THE DEFENDANT:  Could I --

8         DETECTIVE ROMANOSKY:  Use the bathroom?

9    (Unintelligible).

10        THE DEFENDANT:  Do I leave this here?

11        DETECTIVE ROMANOSKY:  Yeah.  We'll be right

12   back.  No problem.

13        THE DEFENDANT:  (Unintelligible).

14        DETECTIVE ROMANOSKY:  Well, make sure.  You

15   don't want to stir it up again.

16        THE DEFENDANT:  No.  I shouldn't have done

17   this.  (Unintelligible).

18        DETECTIVE ROMANOSKY:  Okay.  Mr. Friedlander,

19   I've got you a ride here.  This deputy's a real nice

20   deputy.  He's going to take you out to Pinellas

21   County jail so we can get the booking process

22   started.

23        THE DEFENDANT:  Am I going to jail?

24        DETECTIVE ROMANOSKY:  Well, it's just for the

25   initial booking process.  Calm down.  Calm down.

1     It's like -- it's like the lobby of the Holiday Inn.

2     It doesn't -- trust me.  It's not like -- was what

3     we did in here like what you saw on TV?

4          THE DEFENDANT:  No.

5          DETECTIVE ROMANOSKY:  It's the same way.

6     You're going to go out there.  They're going to ask

7     you some questions.  They're going to get your name

8     and stuff like that.  You're going to see a

9     screening nurse.  The screening nurse is going to

10    ask you about your medical history, and that's the

11    time to talk to her about the diabetes.  You're

12    going to be afforded the opportunity to use the

13    phone so you can call some people if you want to

14    make arrangements for any bond so they can get you

15    out.

16         THE DEFENDANT:  Now, how do I -- I don't know

17    how to do --

18         DETECTIVE ROMANOSKY:  Well, I'll explain it to

19    you.  Okay?  What's going to happen is you're going

20    to go out to the jail, okay, and they're going to

21    take the two charging documents that I came in here

22    and filled out.  They're going to set a bond.  That

23    bond hypothetically might be 10,000, it might be

24    20,000.  Okay.  The jail is going to require you

25    give them 10, 20, whatever the bond is either in

 1     cash or you call a bondsmen.  And there's a whole

 2     list of bondsmen you can call.

 3            THE DEFENDANT:  I don't carry $10,000 cash.

 4            DETECTIVE ROMANOSKY:  No.  Hear me out,

 5     Charles.

 6            THE DEFENDANT:  Okay.

 7            DETECTIVE ROMANOSKY:  You can call a bondsman

 8     and say, my name is Charles Friedlander.  These are

 9     my charges.  I want you to bond me out.  They're

10     going to require probably 10 percent of whatever the

11     bond is and they're going to post a surety bond for

12     you to get out.  Okay.  There's plenty of people in

13     there to tell you this again.  Okay.  Once you leave

14     me doesn't mean that no one's going to --

15     (unintelligible).

16            MS. KAISER:  May I proceed, Your Honor?

17            THE COURT:  Yes, ma'am.

18                    FURTHER DIRECT EXAMINATION

19     BY MS. KAISER:

20     Q      Corporal Romanosky, good morning again.

21     A      Good morning.

22     Q      At any time during your interview with the

23     defendant, did he ever say he didn't feel well?

24     A      No.

25     Q      Did he ever sweat profusely?

1     A       No.

2     Q       How was his skin color?

3     A       He looked fine.  He didn't appear to be in any

4     distress.

5     Q       Did he ever appear disoriented?

6     A       No.

7     Q       With the exception of passing gas and biting

8     his cuticle, did he ever appear to be in any other

9     kind of physical distress whatsoever?

10    A       No.

11    Q       Did he ever say he was hungry?

12    A       No.

13    Q       Did he ever tell you that he needed his

14    insulin?

15    A       No.  And I had made -- made that known at the

16    very beginning of the interview, that if he needed

17    insulin or had a problem or had a sincere request,

18    to let me know.

19    Q       Did he ever mention to you when he had last

20    eaten?

21    A       During the meeting he told me he had had a

22    bite on the way up.  He had stopped at a little

23    restaurant in South St. Pete.

24    Q       Did the defendant ever tell you when he took

25    his insulin?

1    A     Yes.  On the ride back to -- on the ride back

2    to the office, I think we discussed that he had

3    taken his insulin or he didn't need to take it for a

4    little while, or something along those lines.

5    Q     Previously I had asked you if the defendant

6    had engaged in sexual activity, would that have been

7    a violation of state law.  I just want to get a

8    little more specific.

9          If at the meeting with your undercover profile

10   the defendant had performed oral sex on the boys,

11   would that have been a violation of state law?

12   A     Absolutely.

13   Q     If at the meeting the defendant had one or

14   both of the boys perform oral sex on him, would that

15   have been a violation of state law?

16   A     Absolutely.

17   Q     What state law would that have been a

18   violation of?

19   A     Being that the boys were 10 and 11 years of

20   age, it would have been a violation of Florida State

21   Statute Chapter 794, which is sexual battery, and

22   subsection four on a child under the age of 12.  It

23   would be a capital felony in the State of Florida.

24   Q     During -- excuse me.  During interviews of

25   subjects, do you sometimes lead them to believe that

1       you have a certain basis of knowledge in order to

2       get them to share more information with you or to

3       fess up to the entirety of their criminal behavior?

4       A       Absolutely.

5       Q       During this particular interview, you told the

6       defendant that you were in contact with a number of

7       other members of law enforcement who were also

8       investigating him.  Is that an example of that

9       interviewing technique that you use with subjects to

10      glean more information?

11      A       Absolutely.

12      Q       Is it fair to say that to your knowledge there

13      was not a number of other law enforcement officers

14      investigating the defendant?

15      A       That's correct.

16      Q       During his interview, the defendant had

17      mentioned some other chat rooms that he went into.

18      Do you recall what those were?

19      A       Male to male -- male for male started early,

20      father's chatting.  Those are the ones that stand

21      out.

22      Q       Based on your work in child exploitation

23      cases, are you familiar with either of those chat

24      rooms?

25      A       Yes.  Both of those are actually chat rooms

1      that I have gone in, as well, with my undercover

2      profile.

3      Q     Let's start with father's chatting.  What type

4      of chat room is that?

5      A     Father's chatting is along the lines of strict

6      parents.  It doesn't necessarily always include the

7      sadomasochism.  Sometimes that one seems to be more

8      predicated towards just sexual abuse.

9           Male for male started early, the word early is

10     kind of the term there to show young.  So it's also

11     along the lines of sexual abuse.

12     Q     On the interview you had asked -- or during

13     the interview you had asked the defendant if you

14     could take over his screen name, Captoes.  And what

15     was the purpose of doing that?  Why would you ask

16     him if you could take over his online profile?

17     A     That's kind of a standard interview question.

18     What I do is if I can get permission from the

19     defendant in a case to assume their screen name, if

20     they are communicating with other people having the

21     same interest or that might be involved in the

22     physical or sexual abuse of children, if I log on as

23     the defendant and they've had communications, I

24     might be able to develop another case and develop

25     another suspect, use one case as a springboard to

1        the next.

2        Q      During your interview of the defendant, you

3        had asked him about a Polaroid picture of a naked

4        teen.  Do you know -- to your knowledge, did law

5        enforcement ever identify the person depicted in

6        that picture?

7        A      I don't know for sure.  I don't believe they

8        did.

9        Q      I believe it was yesterday I had asked you why

10       in the chats with the defendant you were always the

11       first one to end them.  Do you recall that?

12       A      Yes.

13       Q      And I believe that you said at least part of

14       the reason was that the topic was somewhat --

15              MR. TRAGOS:  Objection, leading, asked and

16       answered.

17              THE COURT:  Sustained.  Just ask a question,

18       please.

19       BY MS. KAISER:

20       Q      My question to you, Detective Romanosky, is

21       why do you do these type of cases.

22       A      I do these kind of cases --

23              MR. TRAGOS:  Objection, irrelevant.

24              THE COURT:  Sustained as to the form.

25       BY MS. KAISER:

1    Q       Corporal Romanosky, why do you act -- perform

2    proactive investigations in chat rooms as an

3    undercover officer?

4    A       Because there are people looking to use the

5    internet to find children to physically and sexually

6    abuse, and these cases need to be worked.

7            MS. KAISER:  I have no further questions.

8    Pass the witness.

9            THE COURT:  Cross-examination, Mr. Tragos.

10           MR. TRAGOS:  Your Honor, may we have a side

11   bar?

12           THE COURT:  Yes, sir.

13   (At side bar, on the record.)

14           THE COURT:  Yes, sir.

15           MR. TRAGOS:  There are a couple of issues that

16   are going to arise.  One is I want to play the tape

17   of the ride from the arrest to the SAB.  The

18   officer testified about statements made by my client

19   during that ride.  Plus, he testified that he does

20   that in order to build a rapport, what he said is,

21   they're to build a rapport for the interview.  And I

22   understand that the prosecution will object to me

23   playing that tape.

24           MS. KAISER:  May I respond?

25           THE COURT:  Will you?

1          MS. KAISER:  I do object, Your Honor.  It's

2     hearsay.

3          THE COURT:  I don't think so.

4          MS. KAISER:  It's hearsay, Your Honor.

5          THE COURT:  It's been testified to.  You

6     opened the door.  It may be hearsay, but it's not

7     offered for the truth of the matter; correct,

8     Mr. Tragos?

9          MR. TRAGOS:  Yes, Your Honor.

10          THE COURT:  This evidence is probative and

11     relevant.  You can't have your cake and eat it, too,

12     Ms. Kaiser.  He's elaborated.  He's testified to the

13     conversations.  It's evidence.  It's coming in.

14          MR. TRAGOS:  Secondly, Your Honor, the only

15     tape that would be -- Ms. Kaiser has marked it as an

16     exhibit, a government exhibit, and I've asked her if

17     I could use that exhibit since it's the one that

18     he's familiar -- the officer is familiar with.

19     She's told me she does not wish me to have that.

20          THE COURT:  Is it evidence?

21          MR. TRAGOS:  She hasn't put it in evidence

22     yet.

23          THE COURT:  Which is it?  I'm sorry.

24          MR. TRAGOS:  It's the original of the tape

25     that the officer can identify as being the tape of

1        the conversation.

2              THE COURT:  All the discovery is available to

3        you.  You can use it.  What's the problem,

4        Ms. Kaiser?

5              MS. KAISER:  Your Honor, if I may just digress

6        on the issue of whether or not it's hearsay.  The

7        defendant --

8              THE COURT:  No.  I've already determined that.

9        The question is he wants to use the tape, the

10       original tape.  That is discoverable evidence.  Why

11       can't he use that?

12             MS. KAISER:  Well, it's not typically the

13       government's --

14             THE COURT:  Is it discoverable?  Yes or no?

15             MS. KAISER:  It was given to him in discovery.

16             THE COURT:  All right, then.  It is available

17       for him to use as evidence in the trial.

18             MS. KAISER:  He wants to use the government's

19       copy, that's fine.  But it definitely is hearsay.

20       It's an out-of-court statement.

21             THE COURT:  It's not offered for the truth of

22       the matter by the defendant.

23             MR. TRAGOS:  The other thing is, Your Honor,

24       there's another exhibit, Exhibit 64, which is the

25       picture they talked about --

Romanosky - Direct

1          THE COURT:  I am correct, Mr. Tragos; correct?

2          MR. TRAGOS:  Yes.  That 64, which is the

3     Polaroid of the -- that they have been talking

4     about, the teenage Polaroid, I wish to show that to

5     the detective.

6          THE COURT:  Put it in evidence.

7          MR. TRAGOS:  Okay.

8          THE COURT:  If he can authenticate it, that's

9     fine.

10         MR. TRAGOS:  I need to get the government to

11    provide that photo.

12         THE COURT:  It's also evidence seized from the

13    defendant.  It's discoverable.  It should be in your

14    possession, or at least an authentic copy.  Is it?

15         MR. TRAGOS:  Well, they've given me a copy.  I

16    want to show them the original.

17         MS. KAISER:  This witness can't authenticate

18    that picture.

19         THE COURT:  I don't know if he can, but he's

20    entitled to access to the original evidence.  And if

21    I hear much more about the government withholding

22    original evidence, we're going to have a very

23    serious hearing.  They're entitled to it,

24    Ms. Kaiser, period.

25         MS. KAISER:  The government is not withholding

Romanosky - Direct

 1          any evidence from the defendant.

 2                THE COURT:  Then make it available to him.

 3          The original evidence is available to this

 4          defendant.

 5                MS. KAISER:  Absolutely.  It always has been.

 6                THE COURT:  If they put it in evidence or not,

 7          I don't know.

 8                MS. KAISER:  The government has always made

 9          the original evidence available with the exception

10          of the hearsay tape which the government considers

11          hearsay.

12                THE COURT:  You still have to provide it.

13          It's not your determination about whether it's

14          hearsay.  That's mine.

15                MS. KAISER:  Yes, Your Honor.  I understand

16          that.  But the defendant -- the witness on the stand

17          has nothing to do with this Polaroid picture.  I'll

18          be happy to give it to him.

19                THE COURT:  That's his problem.  Whether he

20          gets it in evidence, I don't know.

21                MS. KAISER:  Yes, Your Honor.

22                THE COURT:  But he's entitled to it.  You

23          can't tie his hands.  You let me do the tying, if

24          necessary, under the rules of evidence.  So make

25          sure the original exhibit and the original tape are

1    available to Mr. Tragos for purposes of meaningful

2    cross-examination.

3          MS. KAISER:  Yes, Your Honor.

4          THE COURT:  All right.

5    (End of side bar discussion.)

6          THE COURT:  All right.  Go right ahead,

7    Mr. Tragos.  Cross-examination.

8          MR. TRAGOS:  May it please the court.

9                    CROSS-EXAMINATION

10   BY MR. TRAGOS:

11   Q     Let me kind of start, Detective, kind of with

12   the end here.  They talked about a Polaroid picture,

13   Exhibit 64.

14         MR. TRAGOS:  May I approach, Your Honor?

15         THE COURT:  Yes, sir.

16   BY MR. TRAGOS:

17   Q     Detective, would you please take a look at

18   Exhibit 64.

19   A     Yes, sir.

20   Q     Okay.  When you were talking about a Polaroid

21   picture of a teenager with Mr. Friedlander on that

22   tape, is that the Polaroid picture that you were

23   speaking of?

24   A     Yes, I believe it was.  These were the only

25   Polaroids taken from Mr. Friedlander's residence.

1          MR. TRAGOS:  Your Honor, at this time the

2    defense would move Exhibit 64 into evidence.

3          MS. KAISER:  Objection, foundation.

4          THE COURT:  Sustained.

5    BY MR. TRAGOS:

6    Q     Okay.  But those were the pictures you were

7    talking about?

8    A     These were -- these pictures were taken from

9    Mr. Friedlander's residence.  Detective Carrozza

10   brought them back to Pinellas County.  I had the

11   opportunity to see them when I met him out at

12   property and evidence.  And I had talked to

13   Detective Carrozza and he had told me about two

14   Polaroid pictures.

15         So he told me about two Polaroid pictures and

16   these were the ones that came up from

17   Mr. Friedlander's residence.  I can only assume

18   these were the two he was speaking of.

19   Q     Also while we were listening to that tape,

20   there were certain breaks in the tape.  I noticed

21   that -- that wasn't the complete tape; correct?

22   A     That was the redacted version.

23   Q     Okay.  What does redacted typically mean?

24   A     Meaning the -- the portions of that tape that

25   were taken out were the times that I had left the

1     room for some extended periods.

2     Q      Well, I noticed that in some of the tape you

3     weren't in the room.

4     A      Detective -- yeah.  There was a time when

5     Detective Capra came in to bring him some water.

6     There was a time where Sergeant Campbell had come in

7     to bring him some water.

8     Q      There was a time when he was sitting there by

9     himself.

10    A      That could have been right before someone came

11    in so they wanted to get that part back in.  I

12    didn't do the redactions, sir.

13    Q      Who did?

14    A      I believe the Immigration and Customs

15    Enforcement did.

16    Q      So even the -- even when you weren't in the

17    room, I noticed there were some statements saying,

18    no -- Mr. Friedlander saying, no.  Do you remember

19    that?

20    A      Yes.

21    Q      You weren't in the room then; were you?

22    A      No.

23    Q      So even though you weren't in the room, they

24    didn't actually take out all the parts where you

25    weren't in the room, just certain parts when you

1    weren't in the room?

2    A      Yeah.  The periods that showed no activity,

3    they left -- they didn't want anything on the

4    redacted version that hadn't been said and

5    Mr. Friedlander had made statements, so those things

6    needed to be left on, just the periods where there

7    was no activity.

8    Q      Okay.  And before this interview took place, I

9    believe you testified that -- well, there was a --

10   you have a ride from when he was arrested at the

11   Cracker Barrel to the Sheriff's Administration

12   Building; is that correct?

13   A      Yes, sir.

14   Q      And I believe you testified that on that ride

15   one of the things that you try to do is to develop a

16   rapport; is that right?

17   A      That's correct.

18   Q      And how important is that?

19   A      Well, it's very important to an interview.  I

20   want -- I want a subject that I'm speaking with

21   during an interview to feel comfortable with me.  As

22   I also testified earlier, it was a little easier

23   with Mr. Friedlander because, although I was an

24   undercover profile, we had kind of already been

25   talking for a while, so it was a little easier to

Romanosky - Cross

1      develop that rapport.

2      Q       Okay.

3              MR. TRAGOS:  Your Honor, could we have a break

4      at this point?

5              THE COURT:  Need a comfort break?  Let's take

6      one, 15 minutes.

7              MR. TRAGOS:  Okay.

8              COURTROOM SECURITY OFFICER:  Rise for the

9      jury, please.

10     (Jury out at 10:11 AM.)

11     (Recess was taken from 10:11 to 10:27 AM.)

12     (Back on the record.)

13             COURTROOM SECURITY OFFICER:  All rise.  This

14     Honorable Court is again in session.

15             THE COURT:  Bring the jury in, please.

16             COURTROOM SECURITY OFFICER:  Rise for the

17     jury, please.

18     (Jury in at 10:28 AM.)

19             THE COURT:  Thank you, and be seated, please.

20     You may resume cross-examination, Mr. Tragos.

21             MR. TRAGOS:  Thank you, Your Honor.

22     BY MR. TRAGOS:

23     Q       Detective, I believe when we left, we were

24     speaking about the -- I guess the rapport you gain

25     with a subject.  And that ride from the arrest to

Romanosky - Cross

63

1    the sheriff's administration building -- by the way,

2    about how long was that ride?

3    A      Roughly 30 minutes.

4    Q      Okay.  That's time you used to gain that

5    rapport?

6    A      Correct.

7    Q      Also, you talked about you also gained some

8    information from him during that conversation?

9    A      Yes.  I think we spoke about his diabetes.

10   Q      Okay.

11          MR. TRAGOS:  May I approach, Your Honor, the

12   witness?

13          THE COURT:  Yes, sir.

14   BY MR. TRAGOS:

15   Q      I ask you what's been marked as Defense

16   Exhibit 38, ask you to please look at it.  Do you

17   recognize that exhibit?

18   A      Yes, sir.

19   Q      And how do you recognize it?

20   A      That is a CD recording or an audio recording

21   that I made.  It's a -- the disc from the audio

22   recording of the transport back from the arrest

23   location to my office.

24   Q      And you have verified it, you've listened to

25   it and this is the recording?

Romanosky - Cross

```
 1      A      I have.

 2             MR. TRAGOS:  Your Honor, at this time we move

 3      Defense Exhibit 38 in evidence.

 4             THE COURT:  Any objection?

 5             MS. KAISER:  No objection.

 6             THE COURT:  Exhibit 38 is received.

 7             MR. TRAGOS:  May I publish it, Your Honor?

 8             THE COURT:  Yes, sir.

 9             DETECTIVE ROMANOSKY:  Other than -- other than

10      me being a deputy sheriff, I'm still the same guy

11      you've been talking to; okay?  So I'm not going to

12      be mean to you.  I'm a nice guy.

13             UNIDENTIFIED SPEAKER:  Make sure we got the

14      right things, pal.  Here's the black --

15      (unintelligible).

16             THE DEFENDANT:  I can't see.

17             UNIDENTIFIED SPEAKER:  That's all right.

18             THE DEFENDANT:  Yeah.  No, not the green one.

19      It's black.  It's (unintelligible).

20             UNIDENTIFIED SPEAKER:  Okay.

21             THE DEFENDANT:  And a phone and a black thing

22      that's zippered.  It's sort of I think folded on the

23      floor.

24             DETECTIVE ROMANOSKY:  (Unintelligible) we had

25      a meeting like this, but you seem like a nice guy.
```

```
1        I just have some --
2               THE DEFENDANT:  I don't think you'll find
3        anything.
4               DETECTIVE ROMANOSKY:  Well, I have to look at
5        them, anyhow, just because we've chatted back and
6        forth.
7               THE DEFENDANT:  Right.  I don't have --
8               DETECTIVE ROMANOSKY:  If you never saved --
9        even if you've never saved them yourself, the
10       computer may still automatically log those chats.
11       You won't see it.  It will be hidden in the program
12       files so deep you would never find it.
13              THE DEFENDANT:  Oh.  The --
14              DETECTIVE ROMANOSKY:  Laptop.
15              THE DEFENDANT:  Laptop, it's seven years old
16       and it doesn't work half the time.  Funny.
17              DETECTIVE ROMANOSKY:  What's that?
18              THE DEFENDANT:  It's funny.  They're going
19       through all my stuff.
20              DETECTIVE ROMANOSKY:  Well, they're going to
21       have to.  We have to -- we have to do a complete --
22              THE DEFENDANT:  (Unintelligible).
23              DETECTIVE ROMANOSKY:  Oh, well, that stuff.
24       No.  What we're going to do is just open your wallet
25       and make sure there's no dope or something like that
```

1    in there, no razor blades, that kind of stuff.

2    Charles, let me tell you.  You've been in your

3    business a long time, I've been doing this a long

4    time, you never know what people will have on them.

5    I've had people who've had little like plastic

6    baggies with cocaine and a razor blade to cut it up.

7    I've had people, you know, in the middle of an

8    interview, they, oh, do you mind if I get my ID out.

9    They take out their ID -- got enough air?  Make sure

10   to get you some.  It's kind of warm out today.  I'm

11   sorry.

12          THE DEFENDANT:  (Unintelligible).

13          DETECTIVE ROMANOSKY:  I'm sorry?

14   (Unintelligible).  Reference 14.  There really isn't

15   a signal here.

16          UNIDENTIFIED SPEAKER:  (Unintelligible).

17          DETECTIVE ROMANOSKY:  Yes.

18          UNIDENTIFIED SPEAKER:  Sir, there's cash in

19   here.  I want to just keep this in your sight.  So

20   the detective will probably keep it in his custody.

21          DETECTIVE ROMANOSKY:  18406.

22          UNIDENTIFIED SPEAKER:  I want to be able to

23   keep it up here in front.  That's your insulin.  Got

24   it.  And I've got your phone.  But I want to keep

25   this in your eyesight.

Romanosky - Cross

```
 1                THE DEFENDANT:  Okay.  This, I'm on call so --

 2                UNIDENTIFIED SPEAKER:  All right.  I'll leave

 3       that up there with you and so when it rings he

 4       can -- all right.  Watch your leg.

 5                DETECTIVE ROMANOSKY:  Who are you on call for?

 6                THE DEFENDANT:  Anybody.

 7                DETECTIVE ROMANOSKY:  Patients?

 8                THE DEFENDANT:  Yeah.

 9                DETECTIVE ROMANOSKY:  Oh, okay.  There's not a

10       whole lot of room in here.

11                UNIDENTIFIED SPEAKER:  That's okay.

12                DETECTIVE ROMANOSKY:  Sure.  I'm going to try

13       to give you the most air.

14                THE DEFENDANT:  Oh, no.

15                DETECTIVE ROMANOSKY:  Okay.  Driver's license.

16                THE DEFENDANT:  Can I have that?

17                DETECTIVE ROMANOSKY:  Well, I'll give that

18       back to you.

19                THE DEFENDANT:  You may know it or not, this

20       is the very first time I've ever had a problem.  I

21       don't know whether you can believe it or not.

22                DETECTIVE ROMANOSKY:  Well, obviously I

23       checked your history to find out if you had any

24       prior arrests or anything so --

25                THE DEFENDANT:  No, really not.  Do I have to
```

1    keep these on?

2         DETECTIVE ROMANOSKY:  Well, just until we get

3    to my office.  We have a --

4         THE DEFENDANT:  I mean, I'm not dishonest.

5         DETECTIVE ROMANOSKY:  I understand, but it's

6    our company policy.  We've had people get hurt in

7    the past so we just --

8         THE DEFENDANT:  I have to -- if I start

9    sweating or anything, we'll have to grab these.

10        DETECTIVE ROMANOSKY:  All right.  Did you take

11   your insulin before you ate?

12        THE DEFENDANT:  No.  I take it in the evening.

13        DETECTIVE ROMANOSKY:  Oh, you don't take it

14   like before meals or anything?

15        THE DEFENDANT:  No, no.  However, if I get a

16   problem I have to do it.

17        DETECTIVE ROMANOSKY:  Oh, okay.  What time in

18   the evening do you take it?

19        THE DEFENDANT:  After dinner.  You know,

20   it's -- (unintelligible) unless you feel funny.

21        DETECTIVE ROMANOSKY:  How long have you had

22   diabetes?

23        THE DEFENDANT:  20 something years.

24   (Unintelligible).

25        DETECTIVE ROMANOSKY:  No.  But I've had family

1    members that have it.  That's a tough one.  Every

2    time, you know, you get an injury, it makes it

3    harder to heal and all that.

4         THE DEFENDANT:  I know.  That's why this is a

5    problem.

6         DETECTIVE ROMANOSKY:  What is?

7         THE DEFENDANT:  My leg.

8         DETECTIVE ROMANOSKY:  Oh, really?  What

9    happened to your leg?

10        THE DEFENDANT:  I fell.

11        DETECTIVE ROMANOSKY:  Ah, not good.

12        THE DEFENDANT:  No.

13        DETECTIVE ROMANOSKY:  Is that from when you

14   were telling me on the chat the other night that you

15   fell, you slipped on the tile?  Is it already

16   starting to give you a problem healing?

17        THE DEFENDANT:  Well, you don't know yet.

18        DETECTIVE ROMANOSKY:  Um-hum.

19        THE DEFENDANT:  You know, what happens is this

20   gets lighter purple, then it goes further down and

21   gets darker.  You don't know.

22        DETECTIVE ROMANOSKY:  Hum.  There's nothing

23   that (unintelligible).  That's for sure.

24        THE DEFENDANT:  No.

25        DETECTIVE ROMANOSKY:  I will tell you,

1          Charles, I know -- I know your actual age is 78, not

2          70, but you look good for 78.  I never would have --

3          you know, like my perception of 78, I would have

4          thought you would be limited to traveling and all

5          that.  You definitely have the longevity gene in

6          your family.

7                  THE DEFENDANT:  That I do.

8                  DETECTIVE ROMANOSKY:  Did you tell me your dad

9          lived to be 108?

10                 THE DEFENDANT:  No, 102.

11                 DETECTIVE ROMANOSKY:  102.  Wow.  That's got

12         to be some kind record.

13                 THE DEFENDANT:  Oh, no.  His business partner

14         was 105 two weeks ago.

15                 DETECTIVE ROMANOSKY:  His business partner?

16                 THE DEFENDANT:  Um-hum.

17                 DETECTIVE ROMANOSKY:  He wasn't still in

18         business at that age, though, was he?

19                 THE DEFENDANT:  Oh, no.  No, No.

20                 DETECTIVE ROMANOSKY:  That was

21         (unintelligible) years ago.

22                 THE DEFENDANT:  No.  They weren't even

23         friendly.

24                 DETECTIVE ROMANOSKY:  No kidding.  At the end

25         or even while they were doing business together?

Romanosky - Cross

1          THE DEFENDANT:  You know, I really don't know.

2    I know near the end.

3          DETECTIVE ROMANOSKY:  Uh-huh.  Did your dad

4    live with you before he passed?

5          THE DEFENDANT:  No.  No.  He lived in assisted

6    living at a nursing home.  He had a stroke.

7          DETECTIVE ROMANOSKY:  Hum.  What do they call

8    them, rehab centers or something?

9          THE DEFENDANT:  No, no, no, no, no.  He -- he

10   couldn't do anything for himself.

11         DETECTIVE ROMANOSKY:  Right.

12         THE DEFENDANT:  So it was in an actual nursing

13   home.  Is this St. Petersburg or no?

14         DETECTIVE ROMANOSKY:  Right now it's

15   technically considered St. Petersburg,

16   unincorporated area.

17         THE DEFENDANT:  Oh, I see.

18         DETECTIVE ROMANOSKY:  But my office is

19   actually in Largo, just north of here.  We'll be

20   there in about 15 minutes.  So what all do you do

21   with the Boy's Ranch?

22         THE DEFENDANT:  Oh, I just give advice, you

23   know.  I don't -- I go to the people who work with

24   the people.

25         DETECTIVE ROMANOSKY:  Oh.  You don't actually

 1      work with the kids?

 2              THE DEFENDANT:  Oh, no.

 3              DETECTIVE ROMANOSKY:  You work with the --

 4      like the counselors?

 5              THE DEFENDANT:  Yeah, whenever the -- I don't

 6      do very little of that, you know, but I -- I do it

 7      free because it seems like a good organization.

 8      Maybe not.

 9              DETECTIVE ROMANOSKY:  Are they like teen

10      counselors that you work with or are they actually

11      adults?

12              THE DEFENDANT:  Oh, no, they're old.

13              DETECTIVE ROMANOSKY:  Uh-huh.

14              THE DEFENDANT:  So --

15              DETECTIVE ROMANOSKY:  I'd offer you one but

16      it's sugar so --

17              THE DEFENDANT:  That's all right.  I don't

18      know what it is.

19              DETECTIVE ROMANOSKY:  It's a breath mint.

20              THE DEFENDANT:  You could try.

21              DETECTIVE ROMANOSKY:  I'd better not.

22              THE DEFENDANT:  No, it won't hurt me.  I

23      just -- it's pretty bad now so that's why.

24              DETECTIVE ROMANOSKY:  What is?

25              THE DEFENDANT:  My breath.  I could take one

1    if you wouldn't mind, or would you rather not?

2         DETECTIVE ROMANOSKY:  I'd prefer -- not

3    knowing how it's going to affect the diabetes.  It's

4    all sugar so --

5         THE DEFENDANT:  No.  I have in my satchel some

6    gun.

7         DETECTIVE ROMANOSKY:  Okay.

8         THE DEFENDANT:  Some sugarless gum.

9         DETECTIVE ROMANOSKY:  You don't use the

10   glucose tablets?

11        UNIDENTIFIED SPEAKER:  I have a friend that's

12   got diabetes and he --

13        THE DEFENDANT:  I have them with me but the

14   glucose tablets are only when you feel faint.

15        DETECTIVE ROMANOSKY:  Right.

16        THE DEFENDANT:  Oh, yeah, I carry those,

17   needless to say.

18        UNIDENTIFIED SPEAKER:  He uses the pump.  He

19   says --

20        THE DEFENDANT:  He probably has it worse than

21   I do.  I can say that.

22        UNIDENTIFIED SPEAKER:  Yes.  He's -- he didn't

23   develop it until he was about 17.

24        DETECTIVE ROMANOSKY:  Wow.

25        UNIDENTIFIED SPEAKER:  He got it early.

1          THE DEFENDANT:  Well, that's what we call JD,

2     juvenile diabetes, which is much more serious.

3          DETECTIVE ROMANOSKY:  Right.

4          THE DEFENDANT:  Mine is not.

5          DETECTIVE ROMANOSKY:  Juvenile is more severe?

6          THE DEFENDANT:  Oh, much.

7          DETECTIVE ROMANOSKY:  Because they're not

8     going to grow out of it, are they?

9          THE DEFENDANT:  No, they can't.  They can't.

10    And they're on the kind of insulin you talked to me

11    about.

12         DETECTIVE ROMANOSKY:  No kidding.  Cool enough

13    for you?

14         THE DEFENDANT:  In a way, yes.

15         DETECTIVE ROMANOSKY:  Well, it's just so hot

16    out.  Most of the time because the sun is starting

17    to go down a little bit.  That's one thing about

18    this van, it doesn't have rear air in it.  There's

19    so much room in here it's gotta try to cool.  During

20    the heat of the day it takes forever to get this

21    thing cool.

22         THE DEFENDANT:  Could you reach a piece of gum

23    for me?

24         UNIDENTIFIED SPEAKER:  I can.  Is it in the --

25         THE DEFENDANT:  In here, in this part.  Right

Romanosky - Cross

1    there.  It's sugarless.  Yeah.  Yeah.  You have to

2    pull the little --

3              UNIDENTIFIED SPEAKER:  This one?

4              THE DEFENDANT:  Oh, yeah, yeah.  That's fine.

5    Okay.  Will they give me back the computer or do

6    they keep it or what?

7              DETECTIVE ROMANOSKY:  Well, it will be

8    determined at the end of the case disposition.

9    After everything is over with and they look at any

10   property that's in evidence and they make -- make a

11   determination of what's going to happen with it.

12             THE DEFENDANT:  You want the truth?

13             DETECTIVE ROMANOSKY:  Uh-huh.

14             THE DEFENDANT:  It doesn't make any

15   difference.

16             DETECTIVE ROMANOSKY:  How do you mean?

17             THE DEFENDANT:  I don't care whether I ever

18   see it again.

19             DETECTIVE ROMANOSKY:  Okay.  Well, seven years

20   old may be time for a new one.

21             THE DEFENDANT:  Well, the other one doesn't

22   work so that's why I --

23             DETECTIVE ROMANOSKY:  Well, it's definitely

24   time for a new one, then.

25             THE DEFENDANT:  Yeah.  No.  But this one, it

1    works a third of the time.

2          DETECTIVE ROMANOSKY:  How do you access the

3    internet at home?  Do you have dialup or --

4          THE DEFENDANT:  Yeah.

5          DETECTIVE ROMANOSKY:  Do you?  Probably one of

6    the few troopers still using dialup, are you.

7    Nothing wrong with that.  Tried and true.  It works.

8    Makes file transfer a little bit hard if you're

9    trying to download something but --

10         THE DEFENDANT:  I don't download.  You know,

11   why don't you get broadband or --

12         DETECTIVE ROMANOSKY:  Yeah, cable.

13         THE DEFENDANT:  I said, it doesn't make any

14   difference to me.  I don't do anything.  I mean, you

15   can see people laugh at me.  But they won't have to

16   laugh anymore because I don't want one.

17         DETECTIVE ROMANOSKY:  Don't you need one for

18   your business to a certain degree, though?

19         THE DEFENDANT:  A little bit.  A little bit,

20   but I can hire a service.

21         DETECTIVE ROMANOSKY:  Oh, that maintains like

22   an e-mail or something like that?

23         THE DEFENDANT:  Well, I don't get e-mails.

24   They really do your billing and stuff.

25         DETECTIVE ROMANOSKY:  You told me you have an

1    MD and a PhD?

2         THE DEFENDANT:  Yeah.  But I've never used the

3    MD, so what the hell, excuse my French.  And I use

4    my PhD, yes.

5         DETECTIVE ROMANOSKY:  Because you do

6    psychology?

7         THE DEFENDANT:  Well, yeah.  Insurance

8    companies don't pay for anything more than that.

9         DETECTIVE ROMANOSKY:  Oh, really.

10        THE DEFENDANT:  No, unless you wanted to

11   dispense meds.  If you dispense meds, you cost so

12   much in the malpractice.

13        DETECTIVE ROMANOSKY:  Right.  Oh, yeah, I can

14   bet.  Seems like everyone wants to sue for something

15   these days.

16        THE DEFENDANT:  Yes.  I never have been.

17        DETECTIVE ROMANOSKY:  Do you have any

18   specialty as far as your -- are you -- what actually

19   is your title?  Are you a mental health counselor?

20   Do you need a license in the State of Florida for a

21   mental health counselor?

22        THE DEFENDANT:  Yeah.

23        DETECTIVE ROMANOSKY:  So is that what your

24   actual title is or do you go by psychologist or --

25        THE DEFENDANT:  Well, I have a degree in

1    psychology, but the State of Florida doesn't -- if

2    you haven't graduated from a school in the State of

3    Florida, they don't want you.  It's similar to

4    California, so I'm told.

5        DETECTIVE ROMANOSKY:  So what's your

6    specialty, though?  I mean, do you --

7        THE DEFENDANT:  I talk with the most part with

8    people who are getting divorced.

9        DETECTIVE ROMANOSKY:  Um-hum.

10       THE DEFENDANT:  People who are in marital

11   difficulty, you know.

12       DETECTIVE ROMANOSKY:  So like family

13   counseling?

14       THE DEFENDANT:  Well, I don't do too much with

15   family.

16       DETECTIVE ROMANOSKY:  Um-hum.

17       THE DEFENDANT:  It's parents who, you know,

18   their own thing, you know.  But I've been seriously

19   looking for something else.  It's too much.

20       DETECTIVE ROMANOSKY:  I can imagine.  I mean,

21   it's time to enjoy your retirement years.

22       THE DEFENDANT:  Well, yeah.  Both computers

23   are in my den, one right next to the other.

24       DETECTIVE ROMANOSKY:  Very good.

25       THE DEFENDANT:  One doesn't work.

1          DETECTIVE ROMANOSKY:  Okay.  I'm sure they'll

2     collect it, anyway.  Even though it may not work for

3     you -- it may not work for you, but we'll make it

4     work.

5          THE DEFENDANT:  Well, that's fine.  I can't.

6     The laptop does work.

7          DETECTIVE ROMANOSKY:  Okay.

8          THE DEFENDANT:  It may be --

9          DETECTIVE ROMANOSKY:  I was just asking the

10    question before about like dogs and -- because those

11    guys are -- you know, they have to go in your house.

12    They don't know what's in there.  They have to make

13    sure they weren't going to encounter any big guard

14    dog or something.

15         THE DEFENDANT:  I don't know how they're going

16    to get in.  Do you?

17         DETECTIVE ROMANOSKY:  I don't know.  They may

18    call a locksmith or something like that, you know.

19    We do this a lot so we'll find a way in.  They'll do

20    it so they can secure it when they leave properly so

21    -- so you live in a golf course community down

22    there, huh?

23         THE DEFENDANT:  Well, more or less but I'm not

24    on a golf course.

25         DETECTIVE ROMANOSKY:  You don't play?

Romanosky - Cross

1             THE DEFENDANT:  (Unintelligible).

2             DETECTIVE ROMANOSKY:  Oh, really?

3             THE DEFENDANT:  I can't see anymore.

4             DETECTIVE ROMANOSKY:  It's still nice down

5     there, the trees and -- they don't clear everything

6     off like they do in most neighborhoods.

7             THE DEFENDANT:  Well, they did, really.  My --

8     where I live was a cow pasture.

9             DETECTIVE ROMANOSKY:  Oh, no kidding.  Still a

10    few of them down there.

11            THE DEFENDANT:  Oh, yeah.  And there were no

12    trees.

13            DETECTIVE ROMANOSKY:  Um-hum.

14            THE DEFENDANT:  So I put up trees.

15    (Unintelligible) water.

16            DETECTIVE ROMANOSKY:  I can get you some.

17    We're almost to my office.  I'll get you some water.

18            THE DEFENDANT:  Do you mind?

19            DETECTIVE ROMANOSKY:  No.  I'll get you some

20    water.  I promise.

21            THE DEFENDANT:  (Unintelligible).

22            DETECTIVE ROMANOSKY:  What's that?

23            THE DEFENDANT:  (Unintelligible).

24            DETECTIVE ROMANOSKY:  No.  We'll get you some

25    water.

1          THE DEFENDANT:  That's one of the things about

2     diabetes.

3          DETECTIVE ROMANOSKY:  You're always thirsty or

4     something, right?

5          THE DEFENDANT:  Well, lots of the time, yeah.

6     I drink 12 to 14 glasses of water a day.

7          DETECTIVE ROMANOSKY:  It's good for you.

8          THE DEFENDANT:  That's how I survive.

9     (Unintelligible).

10         DETECTIVE ROMANOSKY:  Yes, they will.  It's a

11    combination of several different roads, but

12    technically it's alternate 19.

13         THE DEFENDANT:  Oh.

14         DETECTIVE ROMANOSKY:  It will weave its way

15    north.  So where do you have to give your injections

16    when you use the insulin?

17         THE DEFENDANT:  In my tummy.

18         DETECTIVE ROMANOSKY:  Wow.

19         THE DEFENDANT:  I can do it in my arm.

20         DETECTIVE ROMANOSKY:  Oh, can you.

21         THE DEFENDANT:  It's best in your tummy or

22    your leg.

23         DETECTIVE ROMANOSKY:  Is there a reason why?

24    Absorb faster or --

25         THE DEFENDANT:  Do I know the truth?  No, I

Romanosky - Cross

1    don't know.

2         DETECTIVE ROMANOSKY:  It's just what they

3    teach you, right?

4         THE DEFENDANT:  Yeah, exactly.  If I have to

5    give it to people, which sometimes I do because they

6    can't, they'll do it usually in their leg.  Women

7    prefer it in their leg.

8         DETECTIVE ROMANOSKY:  Really?

9         THE DEFENDANT:  You have to do it way up, I

10   mean, you know.  You don't -- (unintelligible).

11   That might be why.  You have to have your alcohol,

12   your needles (unintelligible).  What is very nice

13   now, Medicare supplies you with some of it.

14        DETECTIVE ROMANOSKY:  Oh, no kidding.  That

15   helps.

16        THE DEFENDANT:  Not your -- not your needles

17   or that.  They do insulin.

18        DETECTIVE ROMANOSKY:  That helps some,

19   prescription medications.

20        THE DEFENDANT:  Oh, yeah.  See, you don't only

21   take that, you take pills.

22        DETECTIVE ROMANOSKY:  Wow.

23        THE DEFENDANT:  I mean, it's a -- it's a --

24   (unintelligible).

25        DETECTIVE ROMANOSKY:  I've known a couple

Romanosky - Cross

1    diabetics.  It's the same thing.  They have to give

2    injections in the stomach.  I never understood why.

3         THE DEFENDANT:  Did it ever bother you to do

4    it?

5         DETECTIVE ROMANOSKY:  No, I didn't have to.

6    Oh, watch them?

7         THE DEFENDANT:  Oh, oh.  You didn't have to do

8    it.

9         DETECTIVE ROMANOSKY:  Oh, no, no, no.  I had

10   relatives, they would have to do that before --

11   usually before meals.

12        THE DEFENDANT:  Yeah.  Well, you have a couple

13   different kinds of diabetics.  Some have to have it

14   before meals and take a specific pill right

15   afterwards.  I don't know how the --

16   (unintelligible).  I've never been up in here.

17        DETECTIVE ROMANOSKY:  Oh, no?  Well, this

18   isn't too bad up here.  Actually, it's a lot of

19   elderly people in this area.

20        THE DEFENDANT:  Yeah.  I know someone who's in

21   a -- two women who are in a nursing home in Palm

22   Harbor.

23        DETECTIVE ROMANOSKY:  There's a lot of those

24   in Palm Harbor.

25        THE DEFENDANT:  Oh, are there?  They think

Romanosky - Cross

1    they've found heaven.

2              DETECTIVE ROMANOSKY:  Well, Palm Harbor is

3    nice.  I think it's -- the north county is a little

4    quieter.  We have a pretty big little campus here,

5    huh?

6              THE DEFENDANT:  Looks like it to me, yeah.

7              DETECTIVE ROMANOSKY:  We're a pretty large

8    agency.  There's the ramp there.  Save stress on the

9    hip.  Walk up the ramp.  There we go.  I don't want

10   you to walk up the stairs.  We'll take the ramp.

11             THE DEFENDANT:  I can't see it.

12   (End of recording.)

13   BY MR. TRAGOS:

14   Q      Detective, there was another voice on this

15   tape.  Who else was in the car with you?

16   A      That was Sergeant Charles Vaughn.

17   Q      Okay.  And where was the microphone?

18   A      In my visor.  It's a little digital recorder.

19   Q      Okay.  And you informed Mr. Friedlander that

20   it was being recorded?

21   A      No.

22   Q      Oh, okay.  And is this a common technique of

23   yours to record the drive?

24   A      I do now.  Past experience has shown that

25   sometimes defense counsel will say that we mentally

1    beat them up on the way back to the office so

2    they'll be more inclined to confess when we get

3    that.  So I just show that that doesn't happen.

4    Q       How about that they sometimes make

5    incriminating statements in that ride?

6    A       Yeah, sure.  Sometimes they make a spontaneous

7    statement because, keep in mind, what's just

8    happened, they've just been approached and arrested,

9    and now they're sitting in a car and we're driving

10   back.

11          There's some school of thought that

12   investigators will do the interview right there on

13   scene in the car because you have the emotional

14   factor.  I don't choose to do that.  I prefer to go

15   to another location.

16   Q       But you've had situations where that's

17   happened; haven't you?

18   A       Oh, sure.

19   Q       And, fortunately, you taped it?

20   A       Um-hum.

21   Q       And then he said something about do I have to

22   keep these on.  What was he talking about?

23   A       He was handcuffed in the front.  We're

24   permitted -- all prisoners during transport are

25   required to be handcuffed per our general order.

1    When -- because of things like physical disabilities

2    or age, the arresting officer has the discretion to

3    move those handcuffs from behind and in the front.

4    We did that in Mr. Friedlander's case.

5    Q      Okay.  You told him that when you got to the

6    SAB you'd be taking those off?

7    A      Yes, and we did.  When he was in the interview

8    room, he was uncuffed.

9    Q      Okay.  The interview room, let's talk about

10   that for a second.

11   A      Sure.

12   Q      Can you describe it?

13   A      It's -- actually, it's an interview room

14   that's used by the Crimes Against Children Unit.

15   It's about an average size room.  It's got a -- like

16   a patio table and patio chairs.  There's a lot of

17   like stuffed animals and kid things in there because

18   our community also utilizes this room to interview

19   child victims.

20        It is just -- it's our unit's interview room

21   so we use it for not only child victims but also for

22   offenders, as well.  And we have all our recording

23   equipment set up.

24   Q      Okay.  Let me ask you about the setup of the

25   recording equipment.  Is there a -- can you see a

1    camera when you're sitting in the room?

2    A    You can't see the camera.  You can kind of

3    figure it's there.  There's a big two-way mirror

4    that's positioned right across from where we have

5    the defendant positioned.  It's about the size of a

6    stereo speaker, I guess.

7    Q    You can't see the camera through the mirror,

8    though?

9    A    No.

10   Q    And the recording equipment, is it in the room

11   or out of the room?

12   A    The recording equipment is out of the room.

13   It's down the hall in our office which -- well, at

14   the time we were just around the corner so it would

15   have been there.

16   Q    And the handcuffs, were they removed -- do you

17   turn a tape on before you remove those handcuffs,

18   after you remove them, how does it work?

19   A    Normally the tape will get turned on after the

20   handcuffs are removed because we will walk right up

21   to the interview room, we'll walk the defendant or

22   the suspect in there at that time, remove the

23   handcuffs and normally the case agent will go around

24   and turn the equipment on.

25        In this case, I don't know if -- I don't think

1    I turned it on, might have been Detective Capra or

2    Sergeant Campbell that actually turned it on.  And

3    they would have just been alerted that we had

4    arrived.

5    Q    Okay.  The point that was -- I guess you

6    played -- that the government played for you here

7    today in the redacted, there was some time before

8    that that he was sitting alone in the room, correct,

9    that wasn't played for the jury?

10   A    There was times that he was sitting alone by

11   himself where they was no activity taking place.

12   Q    All right.  And some of that happened before

13   you even started your interview?

14   A    It's quite possible.

15   Q    Well, let me see.

16        MR. TRAGOS:  Your Honor, if we could play the

17   beginning of what's in evidence as Exhibit 39A, with

18   the court's permission.

19        THE COURT:  You may, sure.

20        MR. TRAGOS:  Okay.

21        THE COURT:  It's in evidence.

22   (Recording playing.)

23        MR. TRAGOS:  Just freeze it there, please.

24   BY MR. TRAGOS:

25   Q    So this is where the tape actually begins;

Romanosky - Cross

1      correct?

2      A      Yes.

3      Q      Okay.  And the handcuffs have been taken off?

4      A      Correct.

5      Q      The recording equipment has been turned on?

6      A      Correct.

7      Q      And he's been left alone in the room?

8      A      Correct.  I was probably gathering paperwork

9      up, case file, things like that.

10     Q      Okay.  Go ahead.

11     (Recording playing.)

12            THE DEFENDANT:  No.  No.  No.  No.  Hum-um.

13     Should not have done it.  I shouldn't have done it.

14     Should not.  It was stupid.

15            UNIDENTIFIED SPEAKER:  Here you go.

16            THE DEFENDANT:  Thank you, ma'am.

17            UNIDENTIFIED SPEAKER:  Sure.

18     (End of recording.)

19     BY MR. TRAGOS:

20     Q      Detective, at this point, was anybody

21     observing Mr. Friedlander?

22     A      I wasn't watching the video.  I'm sure either

23     Sergeant Campbell or Detective Capra was in the

24     room.  Whether they were sitting there watching the

25     monitor, I don't -- sometimes we'll leave the

1    monitor on in the room so they can hear if there's a

2    problem.

3    Q      At this point had Charles Friedlander come in

4    contact with any children?

5    A      Not that I know of reference this case.

6    Q      Okay.  And at this point had -- well, you said

7    contact with any children reference this case.  Are

8    you aware of him having any sexual contact with any

9    children reference any case?

10   A      No.

11   Q      Okay.  And are you aware -- at this point in

12   time with reference to your case, he hadn't done

13   anything with any children; had he?

14   A      No, he had not.

15   Q      Okay.  During the course of your interview

16   here at the sheriff's office, you asked

17   Mr. Friedlander -- or Mr. Friedlander asked you if

18   this information could be held against him.  Do you

19   remember that question?

20   A      Yes.

21   Q      And why didn't you just tell him yes instead

22   of telling him, well, you know, I am a deputy

23   sheriff and, you know -- why didn't you just say,

24   yes, it can be used against you?

25   A      Well, I answered his question.

1    Q      You talk about dialup for a second.  When was

2    the last time you used dial up?

3    A      2004.

4    Q      Okay.  And in your investigations, when was

5    the -- how often do you, I guess, come across people

6    that are using dialup?

7    A      A lot -- back in 2004 there were still quite a

8    few people using it.  Actually, even earlier than

9    that.  In early child pornography investigations, a

10   lot of people were using dialup.  Not recently,

11   though, not in the last few years.  Pretty much

12   everything is broadband now.

13   Q      Okay.  So dialup is pretty old fashioned;

14   isn't it?

15   A      Oh, yeah.

16   Q      Now, during the course of his interview with

17   you --

18          MR. TRAGOS:  Madam Clerk, you want to -- could

19   you just, I guess, close that because that's kind of

20   distracting.  Thank you.  Okay.  Thank you.  Thank

21   you.

22   BY MR. TRAGOS:

23   Q      During the course of your interview with him,

24   he told you he had no children; correct?

25   A      He told me had had an adopt -- what he

1    considered an adopted son in his life for about 10

2    years.

3    Q      Are you telling me that in that interview he

4    never said he had no children?

5    A      No.  He did say I have no children, but then

6    later on he talked about the adopted child.

7    Q      Well, that's my question.

8    A      Might have been right around the same time.

9    Q      Did he tell you he had no children?

10   A      Yes.  I believe he said, I have no children,

11   then later on --

12   Q      Okay.  Then later on he tells you about

13   somebody that -- but he didn't really adopt him;

14   right?

15   A      No.  I mean, it sounded like the person was an

16   adult already.  He just considered him an adopted

17   son.

18   Q      And he said that he was with him from the age

19   of 29, he started?

20   A      Right, for around 10 years.

21   Q      Okay.  And so do you have any evidence that he

22   had -- ever had an eight-year-old son?

23   A      No, I do not.

24   Q      An 11-year-old son?

25   A      No.

1    Q      Okay.  He also told you in that interview that

2    his age -- the bracket that he prefers is 40 to 70.

3    Do you remember that?

4    A      That's correct.

5    Q      He also told you that he had no preferences

6    for under 18.  Do you remember that?

7    A      Correct.

8    Q      He also told you that there was no room in his

9    houses for -- no punishing rooms.  Remember that?

10   A      Yes.

11   Q      Remember the conversation you had where you

12   talked about he had a basement designed for it and

13   he had a room designed for it?  Remember that?

14   A      Correct.

15   Q      Okay.  And he told you he no punishing rooms

16   in this statement?

17   A      Correct.

18   Q      Correct?  Okay.  However, when you -- you

19   requested a search be done of his residence, you

20   specifically told the officers to look for

21   designated punishing rooms; didn't you?

22   A      That's correct.

23   Q      Do you know if they found any?

24   A      They found -- in a bedroom they found some

25   things designed to be used in sadomasochism type

Romanosky - Cross

1    behavior, but they didn't find a dungeon, per se.

2    Q       They found things in a suitcase in a closest;

3    correct?

4    A       Correct.

5    Q       So there was no room designed for this; was

6    there?

7    A       No.  But it could be a room associated with

8    it, a room that's always used for it, just maybe not

9    built to be designed for it.

10   Q       You're the case agent; right?

11   A       That's correct.

12   Q       Did you get ahold of -- let's see.  Did you

13   have in your possession whips from the house?

14   A       Yes.

15   Q       Dildos?

16   A       Yes.

17   Q       Did you have in your possession these razor

18   straps the government's introduced and the other

19   belts and things like that?

20   A       Yes.

21   Q       Did you have in your possession the penis

22   pumps?  Did you ever get those?

23   A       No.  I don't think they took those.

24   Q       Okay.  And so all these things that you had in

25   your possession, did you ever send them away to see

1    if there was any evidence of any human tissue on any

2    of them like blood, some type of DNA, skin, hair,

3    any of that?

4    A      No.

5    Q      Never tested for any of it?

6    A      No, sir.

7    Q      And when Mr. Friedlander told you he had never

8    done anything like this, wouldn't finding tissue and

9    hair and DNA samples and blood on all these things,

10   wouldn't that have made a difference to you?

11   A      I think if looking at them, seeing something

12   obvious, that might have warranted sending them

13   away.  But if you look at them, you don't see

14   anything obvious.  I don't know -- I'm not a DNA

15   expert to know how long skin cells or something

16   would stay on there, especially after they had been

17   handled by Mr. Friedlander and then myself.

18   Q      You're not aware that sometimes items that

19   have microscopic human tissue on them are sent away

20   20 years later and the DNA and the record is found

21   on them?

22   A      But that's normally like semen and blood, not

23   skin and -- not skin and -- skin follicles or things

24   like that.

25   Q      So you're saying that -- but blood,

1    microscopic particles of blood could have been on

2    here and you didn't even bother sending it away for

3    testing; did you?

4    A      I didn't see anything visible that warranted

5    testing.

6    Q      Tell me how the search of the house occurred.

7    What did you do -- what did you do to put that in

8    motion?

9    A      What I did was I had contacted Special Agent

10   Steven Uebelacker with the Florida Department of Law

11   Enforcement.

12   Q      Excuse me.  When did you contact him?

13   A      That would have been in between the week of

14   like 7/14.  I think I contacted him on this the

15   15th, around July 15th, 16th, somewhere around

16   there.

17   Q      Okay.  So around July -- between July 14 -- do

18   you have any way of knowing when you contacted him?

19   A      Sure.  If I could refer to my report, I think

20   it indicates --

21   Q      I have no objection.  Go ahead.

22   A      Thank you, sir.  Well, I don't have a specific

23   date indicated.  I know it was during the -- the

24   week of 7/13, because I was over in an undercover

25   operations training class in Orlando.  And I had

Romanosky - Cross

 1      spoken with one of my former instructors.  In

 2      conducting these cases, there was one of the

 3      instructors there.

 4           And I had told him about this case and told

 5      him I needed a Ft. Myers contact because it looked

 6      like we had a pending meeting.  So I want to say it

 7      would have been around the 14th or the 15th because

 8      it was before the -- it was before the controlled

 9      phone call, and that took place on the 16th.

10      Q     Okay.  And you contacted -- so who was the

11      contact?

12      A     Special Agent Steve Uebelacker.

13      Q     Okay.  And you contacted him and you asked him

14      to assist you?

15      A     Correct.

16      Q     Correct?  And what did you want him to do?

17      A     Well, at that point I told him that we had a

18      meeting that was pending.  I advised him that when

19      the defendant showed up for the meeting that I

20      wanted a search warrant served at the residence to

21      recover the computers and any items that might be

22      related to the case.  I told him that I would send

23      him my probable cause, that way he could prepare the

24      search warrant affidavit.

25      Q     And did you do that?

Romanosky - Cross

1    A      Yes.

2    Q      When did you send them the probable cause?

3    A      Same week.

4    Q      Okay.  And so he just kind of held off until

5    you called and told him it was a go?

6    A      Correct.  Well, I think he prepared the search

7    warrant affidavit and the search warrant.  And

8    actually he had the search warrant signed on the

9    21st when it looked like Mr. Friedlander was going

10   to arrive.

11   Q      Did you have any contact with him on the 21st?

12   A      With?

13   Q      Was it Uebelacker, is that --

14   A      Uebelacker?

15   Q      Yes.

16   A      Yes.  I think I talked to him by phone.  I had

17   also -- I know Detective Carrozza was speaking with

18   him, as well, because I had requested Detective

19   Carrozza to go down to Ft. Myers to be the PCSO

20   representative there and take possession of anything

21   that was recovered from the residence.

22   Q      Okay.  And so did you at some point call and

23   tell him, okay, go search the residence?

24   A      Yeah.  Right after Mr. Friedlander was taken

25   into custody, we called Ft. Myers and let them know

1    he was in custody and proceed with the search

2    warrant.

3    Q      Okay.  When did you know Captoes' name?

4    A      On June 19th.

5    Q      Okay.  And let me ask you, this is AOL that

6    we're dealing with; correct?

7    A      Correct.

8    Q      And have you dealt with AOL before?

9    A      Correct.

10   Q      And how do you go about getting information

11   about a screen name from AOL?

12   A      Information about a screen name is obtained

13   through a subpoena.  I request a subpoena be issued

14   by our state attorney's office.  They then prepare

15   it in legal format and they send that information to

16   AOL.  AOL assigns it to one of their compliance

17   investigators who prepares the information, sends it

18   back to the state attorney's office who then

19   forwards the information to me.

20   Q      Okay.  And how long does that process usually

21   take?

22   A      Depends.  Sometimes around 30 days.

23   Q      Okay.  Ever have a rush situation?

24   A      AOL will release information if there's a

25   threat of death or great bodily harm.

Romanosky - Cross

1    Q       Okay.  Or sexual abuse?

2    A       If there's an imminent threat, they will.

3    Q       Okay.  And that gives you an address?

4    A       That would give us any contact information

5    such as account holder's name, their address, screen

6    names attached to that account, billing information,

7    things along those lines.

8    Q       Okay.  If you have a phone number -- in this

9    case you received a phone number; correct?

10   A       Correct.

11   Q       Actually, you received two phone numbers?

12   A       Correct.

13   Q       If you have a phone number, how do you access

14   or get the information as to whose phone number it

15   is?

16   A       Well, first thing I can do is I have some

17   databases available to me.  A lot of phone numbers

18   that are like in the general directory will come up

19   through public records databases.  I have some law

20   enforcement databases that will sometimes produce a

21   name from a cell phone number or, worse case

22   scenario, I can -- I write another subpoena to

23   the -- to the holder of the cell company or the

24   local phone number.

25   Q       Did you search your databases for this -- for

1    the phone numbers you received from Charles

2    Friedlander?

3    A       I did.  The first one was a cell phone number

4    that came back to a DC area, came back to like H

5    Street and 8th, I think.  And the second one just

6    came back Charles Jackson, Ft. Myers.

7    Q       Okay.  And how quickly, again, was that --

8    were you able to do that?

9    A       I was able to run those quickly.  But,

10   unfortunately, neither one of them gave me

11   information to confirm his identity.  That wasn't

12   done until later on during the chat on 6/19 when I

13   was able to get him to start giving me information

14   about where he lived geographically and started

15   comparing that with searchings through like the

16   Department of Motor Vehicles database.

17   Q       Okay.  Now, in 2005, did you subpoena the

18   Captoes records from AOL?

19   A       No, sir.

20   Q       Okay.  Now, eventually you did receive a lot

21   of information from AOL, is that correct, on this

22   case?

23   A       That's correct.

24   Q       What did you receive from AOL in this case?

25   A       We received all the subscriber information

1    that I previously mentioned.  We also -- it was a

2    search warrant, so we received content information,

3    as well, as far as incoming e-mails, I think things

4    that were in the saved items, buddy list

5    information, who all was on his buddy list.

6    Q      Okay.  And an address book, as well?

7    A      Yes.  That would be part of an AOL account.

8    Q      Do you have any idea how many pages of buddy

9    lists or address books you received?

10   A      I don't, only because all the analysis of the

11   AOL data, e-mails, things like that was performed by

12   Immigration and Customs.

13   Q      Did you ever take a look at any of the screen

14   names that were contained in the buddy list or in

15   the address books?

16   A      Briefly.

17   Q      How about off -- when the computers were

18   analyzed, did you ever take a look at that

19   information with regards to screen names that were

20   on the computer?

21   A      No.  All the analysis was done by Immigration

22   and Customs.  I briefly looked at -- you know, they

23   gave me the results and I kind of briefly looked

24   through them.  But I know the agents with the

25   Department of Homeland Security were looking through

Romanosky - Cross

1      that.

2      Q      So you didn't bother to see if any of the

3      screen names that were discovered either from AOL or

4      the two computers, if any of those screen names were

5      children?

6      A      Well, I know -- I know my screen name was on

7      there from I think the '05 case and the '07 case,

8      but no children.

9      Q      Okay.  And because one of the things you told

10     Charles Friedlander was that you were going to look

11     at his buddy list and check out the data files

12     and so -- but you didn't do that.

13     A      No, I didn't.  All the analysis was conducted

14     by the -- Immigration and Customs Enforcement.

15     Q      Okay.  Do you have any idea how many e-mails

16     were on Charles Friedlander's computer?

17     A      I know there were several.

18     Q      Several thousand?

19     A      I can't give you the number, in all honesty.

20     I know there was a lot.

21     Q      Okay.  One of the things that was looked for

22     when they seize these, they look for -- because you

23     mentioned it in the interview several times, that

24     they were going to look for child pornography;

25     correct?

1    A       Correct.

2    Q       And no child pornography was found; was there?

3    A       Not to my knowledge.

4    Q       How many times do you tell individuals that

5    you're investigating that they seem like nice guys?

6    A       A lot.

7    Q       It happens very frequently?

8    A       Very frequently.

9    Q       Okay.  This is part of the techniques, again,

10   that you use?

11   A       Correct.  I mean, I've never found it ever to

12   be beneficial to be mean or nasty to somebody in any

13   investigation.  I don't take it personally.

14   Q       Well, in fact, even though you had just --

15   well, let's go into that.  You arrested Charles

16   Friedlander.  What did you arrest him for?

17   A       He was arrested for one count of certain use

18   of computer services prohibited and one count of

19   traveling to meet a minor.

20   Q       Under state law?

21   A       Yes, sir.

22   Q       And, in fact, those cases have been dropped;

23   is that correct?

24   A       Well, when the case was adopted federally they

25   dropped them statewide.

1    Q      And who brought it over so that the -- it

2    could be adopted federally?

3    A      I did.

4    Q      Okay.  And, in fact, there are certain

5    benefits -- well, what's the penalty in state court

6    for that crime?

7           MS. KAISER:  Objection, Your Honor.

8           THE COURT:  Sustained.  The jury will

9    disregard the question.

10   BY MR. TRAGOS:

11   Q      You spoke to Charles Friedlander about

12   enjoying his retirement; right?

13   A      Correct.  I told him this was supposed to be

14   the time he was spending enjoying his retirement

15   years.

16   Q      Okay.  And you told him that in the drive

17   after you arrested him?

18   A      Yes.

19   Q      Why did you change it -- why did you have it

20   dropped in state court and bring it to federal

21   court?

22          MS. KAISER:  Objection, Your Honor.

23          THE COURT:  Sustained.  And the jury will

24   disregard that question.

25   BY MR. TRAGOS:

1    Q      On July 25th, 2005, when you ended your

2    conversations at that time with Captoes, did Captoes

3    try to contact you again?

4    A      I don't have anything in my archive showing he

5    did.  If he did -- when you're online sometimes

6    somebody will send you an instant message and

7    there's what's called an IM catcher.  So people that

8    are sending you instant messages, it starts logging

9    that you have this list of people.

10         Well, when I'm online, I receive numerous

11   people sending me instant messages after reading my

12   profile.  If his name was on there -- and I

13   obviously don't answer everybody because if I'm

14   talking to somebody at the conclusion of that chat

15   conversation, I would save it and then just exit

16   AOL.

17         I'm not going to go through and answer

18   everyone on that list because that list keeps

19   growing and growing.  So it's possible that he did

20   and I just didn't acknowledge him.

21   Q      So you don't have any record of him ever

22   contacting you after July 25th, 2005?

23   A      No, sir.  I emptied everything out of my

24   archives and printed it out for the government.

25   Q      Excuse me.  Actually, the last thing would be

Romanosky - Cross

1       August 1st, 2005; correct?

2   A       Yeah, roughly, somewhere around there.

3   Q       Now, he told you about his use of a razor

4   strop; is that correct?

5   A       Correct.

6   Q       Okay.  And you then actually made the first

7   inquiry about whether he had anything else; right?

8   A       That's correct.

9   Q       And on several occasions he told you in

10  advance of children that were coming to visit his

11  home?

12  A       Correct.  He claimed he was having friends'

13  grandkids coming over to visit him, and then back in

14  '05 he would say he was housesitting for someone who

15  had a kid or his friend's kids were coming over.

16  Q       And he would describe how he was going to

17  discipline them.  And then after that weekend, he

18  would tell you how he did discipline them; right?

19  A       Correct.

20  Q       You also brought up -- well, let me ask.  Is

21  affection, showing affection, in your mind, is that

22  some kind of a key word?

23  A       Yes.  The terms, are you affectionate or are

24  you close, are sometimes associated with sexual

25  abuse.

Rollanosky - Cross

1    Q      Okay.  How about love?

2    A      Yes.

3    Q      Okay.  You, in fact, were the first one to

4    bring up the word love; weren't you?

5    A      Which chat?  I'd have to look at the exact

6    chat, but it's quite possible.  He had already

7    expressed in the other chats an interest in sexual

8    abuse, so I might have been probing around.

9    Q      Okay.  Well, let me ask you.  Let's start

10   with -- do you have copies of the chats there in

11   front of you?

12   A      Yes, sir, I do.

13   Q      Okay.  Let's start with June 17th, 2008.  Can

14   you find that chat, sir.

15   A      Sure.  Which one?  There's a couple from that

16   day.

17   Q      Okay.  This would be 2:30 PM.

18   A      Okay.  Let me get to that.  Okay.  I'm with

19   you.

20   Q      And you see there where you say --

21          MR. TRAGOS:  Well, Your Honor, may I use the

22   overhead?

23          THE COURT:  Yes, sir.  Do we need a light,

24   Anne.  Did the bulb go out or something?

25   BY MR. TRAGOS:

```
 1    Q      Okay.  I'm showing you Exhibit 14.  Actually,

 2    look at the second page.  See the line Stricdad?

 3    That was you; correct?

 4    A      Correct.

 5    Q      Did you show him that beatings were done out

 6    of love afterwards?

 7    A      Correct.

 8    Q      Okay.  Sir, could you show me before this

 9    conversation where that topic was brought up.

10    A      Back in 2005.

11    Q      Oh, okay.  So you're going back to -- so not

12    in these conversations in 2008?

13    A      Yeah.  We had already discussed back in 2005

14    how he used to make his son ask for permission to

15    masturbate and -- not to mention that the discussion

16    of even sadomasochistic abuse of children is

17    lascivious in nature on its own.

18    Q      Okay.  Let's go back to 2005, then.  Show me

19    in 2005 where he had -- where he was talking about

20    having sex with children.

21    A      He was talking about making them ask for

22    permission to masturbate and giving excessive lashes

23    with the razor strap.

24    Q      Okay.  But not him actually having sex with a

25    child?
```

1    A      Well, that sadomasochistic abuse is sexual.

2    It's not corporal punishment.  It's for sexual

3    purposes.

4    Q      Okay.  Did he ever say that he ever sexually

5    touched or had a child touch him in any way in 2005?

6    A      By those words, no.

7    Q      So in 2008 when he was discussing items with

8    you, you were the first one to bring up love?

9    A      Correct.  I had recalled the other discussions

10   from '05 and wanted to see if we were still on the

11   same wave length there.

12   Q      And then in that same conversation -- do you

13   still have that before you?

14   A      Yes, sir, I do.

15   Q      You brought up again the word love at the

16   bottom of the next to the last page.  Do you see

17   that?

18   A      Sure.  Let me get to that.  Yes.  I say, do

19   you show them love after the beating.

20   Q      Okay.  And his response was, I do.  Do you?

21   And you said, we do.  How do you show that beatings

22   was done out of love?  And what is Captoes'

23   response?

24   A      I told him I love you, but a boy needs

25   training from his dad often.  I kiss him, of course.

Rollanosky - Cross

1    Q       That's the end of his comment about that;

2    correct?

3    A       Correct.

4    Q       Now, several times he tells you about

5    arousals, right, having an erection during these

6    conversations?

7    A       Correct.

8    Q       He also on multiple times, according to you,

9    indicates that he has ejaculations; correct?

10   A       Correct.

11   Q       Okay.  How many times did he tell you he oiled

12   his razor straps?

13   A       Quite a few.  I don't have an exact number.

14   Q       He told you that over and over again; didn't

15   he?

16   A       Correct.

17   Q       Okay.  And he also told you that he hung the

18   razor strap on a nail?

19   A       Correct.

20   Q       Did he tell you where that nail was?

21   A       I think there was a reference at one point by

22   a chair, but I don't recall.  I don't think he ever

23   said where exactly that nail was.

24   Q       Okay.  You also testified that the two

25   profiles, that they were the same profiles; correct?

Romanosky - Cross

1    A      The -- which profiles?

2    Q       '05 and the '08 profile for Captoes.

3    A      They were slightly different.  They were both

4    Captoes, but they had slightly different information

5    in them.

6    Q      Well, what was the different information they

7    had?

8    A      Back in '05 -- want me to read it?

9    Q      Yes.  The difference.  Right.

10   A      '05 he just was Captoes, mid Atlantic and

11   southwest Florida.  Hobbies and interests are

12   swimming, bike riding, cooking, shoes, spending time

13   with meaningful people.  Personal quote, mandate

14   respect, courtesy and obedience.

15          In '08, the name was the same, the location

16   was the same.  Cut out meaningful people, added

17   favorite gadget, tongue, and personal quote, tongue

18   those shoes well.

19   Q      So it went from discipline to tonguing shoes?

20   A      Correct.

21   Q      Okay.

22   A      I think I just broke the chair.

23   Q      Are you okay?

24   A      I'm fine.

25   Q      Okay.

Rollanosky - Cross

```
 1      A       I don't know about this chair but --

 2      Q       And he told you that his son -- basically,

 3      first of all, you know that the son died seven years

 4      earlier; correct?

 5      A       He told me that he had committed suicide.

 6      Q       You've seen documentation to that, as well;

 7      correct?

 8      A       Yeah.  From the Lee County Sheriff's Office, I

 9      think it was.

10      Q       It was about seven years earlier; correct?

11      A       Correct.  But I didn't know that until after

12      he had already been arrested, though.

13      Q       I understand that.

14      A       Okay.

15      Q       But you verified that the son committed

16      suicide seven years before your conversations?

17      A       Correct.  Roughly.

18      Q       And in his conversations he's telling you

19      about his son's birthday coming up and he beats his

20      son now as an adult, all that, he still told you

21      about that; right?

22      A       That's correct.

23      Q       Okay.  In your telephone conversations with

24      him -- by the way, that telephone call, that

25      undercover telephone call, did you tape it or was it
```

Rollanosky - Cross

1     done digitally?

2     A      It was done digitally on a digital recorder.

3     Q      So it wasn't taped, it was a digital recorder?

4     A      No.  I think people refer to the word tape

5     just like interchangeable.  It was a digital

6     recording.

7     Q      Okay.  In that -- in that conversation,

8     Mr. Friedlander told you he gets erections at the

9     drop of a hat; correct?

10    A      Correct.

11    Q      And in the interview here he told you he had

12    erectile dysfunction?

13    A      That's correct.

14    Q      Okay.  When you had him come up here to visit

15    in St. Petersburg, you specifically requested him to

16    bring up his favorite tools.

17    A      Well, he had kind of mentioned earlier on,

18    though, that he would bring a razor strap and loan

19    it to me if I liked, so I just kind of expounded on

20    that.

21    Q      On July 7th, Exhibit 24, do you have that

22    before you?

23    A      I do.

24    Q      Okay.  On that date, Captoes wanted to meet

25    you for lunch somewhere; correct?

Rotiañosky - Cross

1    A        Correct.  I know he had talked about it around

2    the 4th of July holiday, meeting on the 6th coming

3    back from Daytona, as well.  But I told him that we

4    might have family plans and we were going to be out

5    of town.

6    Q        Okay.  But he wanted to meet you for lunch;

7    right?

8    A        Yeah.  Right around the 4th of July weekend.

9    Q        He also wanted to be your friend; didn't he?

10   A        We had a -- we had a good relationship online.

11   We were friendly with each other.

12   Q        In fact, he wanted the friendship to last for

13   a while; didn't he?

14   A        Yes.

15   Q        Did he also want you to -- did you also tell

16   him that you didn't really want to meet for lunch or

17   dinner, but you wanted to meet at a coffee shop?

18   A        Correct.

19   Q        And have coffee with him.

20   A        I had contemplated using a restaurant for

21   lunch.  But the problem that you all heard with the

22   mic as far as bringing in ambient noise, in a

23   restaurant it's even worse.  You get the overhead

24   music they're playing, you get the registers, the

25   people around you.  So I had decided that wasn't a

1     good idea.

2          I also had decided not to use the 4th of July

3     weekend because bringing in all the tac teams and

4     everything to do an undercover meeting like that

5     would have been a -- not real -- not real cost

6     effective for the agency.

7     Q     This case has had some newspaper coverage;

8     correct?

9     A     Correct.  I think the Tampa Tribune has been

10    doing some stuff on it.

11    Q     And when the arrest happened, the St. Pete

12    Times did an article, too?

13    A     Correct.

14    Q     In your interview with Charles Friedlander,

15    you told him, you know, I don't want a bunch of

16    parents calling me.  You need to tell me now, a

17    bunch of parents calling me telling me that, you

18    know, you've molested their children.  Remember that

19    conversation?

20    A     Um-hum.

21    Q     Has any parent called you, made any allegation

22    that Charles Friedlander ever molested their child?

23    A     No, they haven't.

24    Q     Do you know who Deputy Kist is?

25    A     Yes.

Rollanosky - Cross

1    Q       And how do you know Deputy Kist?

2    A       Deputy Kist is a female deputy that works for

3    the sheriff's office.  Her and I have worked these

4    kinds of cases for the past four years.  Deputy

5    Kist's involvement has been acting as my decoy for

6    cases where I'm posing online as a child.  She has a

7    very youthful appearance.

8    Q       And you actually have her meet the subjects of

9    your investigation?

10   A       That's correct.  It gives them somebody to

11   approach from a photo.

12   Q       Okay.  All right.  And because these people

13   expect to meet underage children?

14   A       Correct.

15   Q       And she poses as an underage child?

16   A       Correct.

17   Q       And, in fact, she even gets on the telephone

18   at times and talks to, in an undercover capacity,

19   the subject of your investigation telling that

20   person that she is an underage child?

21   A       That is correct.

22   Q       That did not happen in this case; correct?

23   A       No.  Mr. Friedlander had indicated more of an

24   interest in boys.  And if you'll notice in the chats

25   that I had put out there, that I had a stepdaughter

Romanosky - Cross

1    who was 14.  That way if he would have been one of

2    the offenders that I've dealt with that wanted a

3    picture for some proof or he had wanted a phone

4    call, I would have been able to do that.  I can't do

5    that with younger children, for obvious reasons.

6    Q      So you couldn't have someone pose as a child

7    and speak to Dr. Friedlander in an undercover

8    capacity on the telephone?

9    A      Not as a 10- or 11-year-old boy.  That would

10   be too difficult to pull off.

11   Q      How about did -- how about having him come

12   have a contact or at least seeing an 11- or

13   12-year-old boy, did you have --

14   A      I don't have an 11- or 12-year-old boy.  I

15   mean, what I've done in the past is when people ask

16   for validation of a younger child, I just tell them,

17   look, my oldest keeps her picture on MySpace, so

18   that's no big deal.  But I respect the privacy of my

19   younger children and I don't have a picture to send

20   them and won't send a picture like that so --

21   Q      Now, you said that you -- you also said that

22   you have -- you go to AOL and you get the chat rooms

23   for the last 90 days?

24   A      I'm sorry?

25   Q      Online you talk about subpoenaing AOL and you

1    get his chat room list, Charles Friedlander's chat

2    room list for the last 90 days.

3            MS. KAISER:  Objection, foundation.

4            MR. TRAGOS:  He said that on the tape.  I'm

5    sorry.

6            THE COURT:  You want to withdraw that

7    response?

8            MR. TRAGOS:  I do.

9            THE COURT:  Thank you very much.  I'll

10   overrule the objection.

11           MR. TRAGOS:  Thank you, Your Honor.

12   BY MR. TRAGOS:

13   Q     Do you remember that on the tape when you

14   talked about that?

15   A     I do.  Chat room information wouldn't come

16   from a subpoena.  That would be pursuant to a search

17   warrant because it's content, and that would be in

18   the data that you would have to review pursuant to

19   the AOL search warrant.  I think there's some sort

20   of listing showing what chat rooms are visited, some

21   sort of link.

22   Q     And a search warrant was issued in this case;

23   correct?

24   A     That's correct.

25   Q     And, therefore, the chat room information was

1       requested?

2       A       That would have been part of the search

3       warrant.   They give you everything you ask for.

4       Q       Okay.   You made a statement on the tape that

5       Charles Friedlander would have been arrested even if

6       he hadn't driven up here.

7       A       Yes.

8       Q       How long was Charles Friedlander totally in

9       that interview room?

10      A       I think the videotape captures most if it.   It

11      would have been a few minutes that probably weren't

12      on video before it was started.   And then when the

13      deputy came in at the very end, that would have been

14      the time we had him stand up.   They would have put a

15      belt on him or they might have handcuffed him in

16      front and then he would have been escorted outside

17      the room.   So maybe a couple minutes before, a

18      couple minutes after.

19      Q       You don't have like the times documented that

20      he was in that room?

21      A       No.

22      Q       What time was he arrested?

23      A       The arrest was just before 6:30, right around

24      6:30.

25      Q       What time did he get to the county jail?

1    A      I don't know right offhand, sir.

2    Q      What time did he leave the SAB?

3    A      I don't know right offhand.

4    Q      And your reports don't reflect that?

5    A      No, not the exact time he left.  There would

6    be a booking time showing what time he got to the

7    jail, but that's after all the paperwork is

8    processed, so that's probably not real accurate.

9    You'd have to go to the booking video for that.

10   Q      You said on the tape to Charles Friedlander

11   that you had checked his records when he told you

12   that he hadn't been in trouble before; correct?

13   A      That's correct.

14   Q      Is that true?

15   A      Yeah.  Actually, once I had Charles Jackson

16   Friedlander on 6/19 of 2008, I ran an FCIC criminal

17   history check and checked our local database,

18   checked the Pinellas County justice database.

19   Q      Okay.  So you did do that?

20   A      Yes.

21   Q      Okay.  The interview that you -- this video

22   interview that you did of him, did you have it

23   transcribed?

24   A      No, sir.

25   Q      Take a look at your report, page 7, 2008.  I

1       guess this was a supplement.

2       A       Probably supplement number three.

3       Q       Do you see I guess on the second page, the

4       interview is further being transcribed for review?

5       A       Yes.  I'm familiar with that statement.  But

6       the case was turned over from the local courts to

7       the federal courts prior to having that

8       transcription requested.  And I knew that they --

9       that that was going to be done, so there was no

10      reason to have it done by our clerks and then the

11      clerks over here.

12      Q       So did someone tell you not to have it

13      transcribed?

14      A       No.  I was never specifically told not to have

15      it transcribed, but just to save efforts, no reason

16      to have it done twice.

17      Q       Well, have you ever seen a transcript of that

18      interview?

19      A       I'm sorry?

20      Q       Have you ever seen a transcript of that

21      interview?

22      A       No.

23      Q       The cellular phone, Charles Friedlander's

24      cellular phone, what happened to that?

25      A       All the phones and the computers and the CDs

Romanosky - Cross

123

1    were transferred from the sheriff's office custody

2    to Immigration and Customs.

3    Q      So you didn't do anything with the cellular

4    phone?

5    A      No.

6    Q      Didn't make a copy of what names or anything,

7    phone numbers that were on it?

8    A      No.  I don't believe we did.

9    Q      Didn't check out any of the people to see if

10   any of them were children?

11   A      No.  All the analysis wasn't done by our

12   agency.

13   Q      Did you do any checking with the Florida

14   Sheriff's Boy's Ranch?

15   A      No.  I haven't had contact with anybody from

16   the Boy's Ranch.

17   Q      Okay.  Have you out of your -- out of this

18   investigation developed any other suspects?

19   A      No.

20   Q      You may have answered this.  I apologize if I

21   asked you.  But the other chat rooms that he was in,

22   did that information go to you or did that go to the

23   ICE agents?

24   A      That would go to the ICE agents.  I just

25   briefly reviewed that information.

1    Q        Okay.

2            MR. TRAGOS:  Have a moment, Your Honor?

3            THE COURT:  Yes, sir.

4    (Brief pause.)

5            MR. TRAGOS:  That's all the questions I have,

6    Your Honor.

7            THE COURT:  Why don't we break for lunch at

8    this time.  We'll resume redirect after lunch.

9    Let's return at 1:15 by the courtroom clock.

10           COURTROOM SECURITY OFFICER:  Rise for the

11   jury, please.

12   (Jury out at 11:57 AM.)

13           THE COURT:  Ms. Kaiser, let me get a feel for

14   what you believe the schedule to be, considering

15   you're about to redirect the agent.

16           MS. KAISER:  Your Honor, after my redirect, I

17   have three agents, all of which may not be necessary

18   for the search warrant.  And then I have a witness

19   from AOL and then ICE forensic witnesses, as well as

20   the special agent who -- Special Agent Hagedorn.

21           THE COURT:  Do you have a sense that you'll be

22   able to rest by the end of the day, assuming normal

23   cross-examination?

24           MS. KAISER:  I would think so, Your Honor.  I

25   would think so.

1          THE COURT:  It will be close, in any event.

2          MS. KAISER:  It will be close.

3          THE COURT:  Mr. Tragos, you just want to be on

4     notice, then, whatever your intentions are

5     defense-wise, looks like tomorrow morning if you are

6     going to present any defense, you need to be ready

7     to go.

8          MR. TRAGOS:  Yes, Your Honor.

9          MS. KAISER:  Your Honor, are we going till

10    5 o'clock today?

11         THE COURT:  I prefer not to.  We've got to

12    keep in mind the court reporter and staff, but we

13    can go till 4:30, for sure.

14         MS. KAISER:  Four o'clock is fine.  It just

15    makes a difference whether I'm going to --

16         THE COURT:  Well, I'd like to get you -- the

17    government's case in chief finished today, if we

18    can.  So I'll --

19         MS. KAISER:  If we didn't, it would be very

20    brief in the morning.

21         THE COURT:  Well, as I said, I'd like to get

22    the government's case in chief finished today and

23    take up any motions.  I know we have a *Daubert*

24    issue, perhaps, one of the listed witnesses.  But,

25    again, this gives Mr. Tragos some time to reflect on

1    what he intends to do and at the end of the day he

2    can bring me up to speed on that.

3         MS. KAISER:  Yes, Your Honor.

4         THE COURT:  Assuming, Mr. Tragos -- and,

5    again, I'm not asking you to commit to anything nor

6    divulge any strategies.  But assuming the government

7    rests this afternoon and we can take up any motions

8    that are made, what do you think time-wise the rest

9    of the trial will require?

10        MR. TRAGOS:  I would think that we would -- at

11   least two days before closing.  It doesn't include

12   closing.  One of the unknowns, Your Honor, is the --

13   how long, and I didn't -- I couldn't necessarily

14   know exactly what the prosecution was talking about

15   when they were talking about what witnesses.  But

16   the computer analysis, those kinds of things, that's

17   a fairly lengthy issue.  That will take a lot of

18   time.

19        I don't know if the government is going to put

20   it on in their case or if we're going to end up

21   putting it on in our case.  But one or the other, it

22   will be -- there will be an analysis of that.

23   There's a -- there's a probability that the

24   defendant will testify, and I think his testimony

25   would probably be lengthy.

1          THE COURT:  All right.  Well, I just wanted to

2     get a sense for where we are.  Go have lunch and we

3     will resume at 1:15.  Thank you.

4     (Recess was taken at 12:00 until 1:16 PM.)

5     (Back on the record.)

6          COURTROOM SECURITY OFFICER:  All Rise.  This

7     Honorable Court is now in session.  Be seated,

8     please.

9          MR. TRAGOS:  Your Honor, out of the presence

10    of the jury, I would like to make sure that I've

11    received all *Jencks* material with reference to this

12    witness.  And that's why I'm making that request.

13         THE COURT:  You're making a request for *Jencks*

14    Act material, which is proper.

15         MR. TRAGOS:  Yes.

16         THE COURT:  Ms. Kaiser?

17         MS. KAISER:  I gave him all the *Jencks* the day

18    of trial, plus he had received the reports of this

19    witness prior to trial in discovery.

20         THE COURT:  All right.

21         MR. TRAGOS:  Okay.  Thank you, Your Honor.

22         THE COURT:  All right.  Bring the jury in.

23         COURTROOM SECURITY OFFICER:  Yes, sir.

24         THE COURT:  By the way, no one invoked the

25    rule.  You talked about it but you didn't.  I don't

1    know if it's important, but we did discuss it

2    casually.

3            MS. KAISER:  The government would like to

4    invoke the rule.

5            THE COURT:  Well, is there anybody in here

6    who's going to testify other than --  no?

7            MR. TRAGOS:  Other than Mr. Batelli, no.

8            THE COURT:  Well, we've already talked about

9    him.

10           MR. TRAGOS:  Right.

11           THE COURT:  And the agent.  All right.  Well,

12   the rule has been invoked.  I thought you may have

13   thought you did, but I didn't perceive it as a

14   request, just a discussion.

15           COURTROOM SECURITY OFFICER:  Rise for the

16   jury, please.

17   (Jury in at 1:18 PM.)

18           THE COURT:  Thank you.  Be seated, please.

19   You may resume cross-examination Mr. Tragos.  I'm

20   sorry, redirect, Ms. Kaiser.

21           MS. KAISER:  Thank you, Your Honor.

22                   REDIRECT EXAMINATION

23   BY MS. KAISER:

24   Q     Corporal Romanosky, in your chat with the

25   defendant prior to his arrest, did he ever mention

1      erectile dysfunction to you?

2      A       No, ma'am.

3      Q       Previously when I had shown you the DVD or the

4      CD of the undercover phone call that you had, did I

5      mistakenly refer to it as a tape?

6      A       Yes, ma'am.  But I took that to mean like an

7      interchangeable term, a recording.

8      Q       Okay.  Was it, in fact, a digital recording?

9      A       Yes.

10     Q       And not a cassette tape?

11     A       That is correct.

12     Q       Mr. Tragos asked you on cross-examination

13     about whether or not you and the defendant were

14     supposed to be friends; is that correct?

15     A       That's correct.

16     Q       What was supposed to be the basis of your

17     friendship with the defendant?

18     A       The basis --

19             MR. TRAGOS:  Your Honor, objection, form of

20     the question and speculation.

21             THE COURT:  Overruled.

22             MR. TRAGOS:  Okay.

23             THE WITNESS:  The basis of the friendship was

24     our common interest, my undercover profile and

25     Mr. Friedlander's common interest of physical and

1       sexual abuse of children.

2       Q       Thank you.

3               MS. KAISER:  No further questions.

4               THE COURT:  Thank you, sir.  You may step

5       down.  Please call your next witness.

6               MR. TRAGOS:  Your Honor, may he still be

7       available for the call of the court?

8               THE COURT:  I suspect he will be.

9               MR. TRAGOS:  Thank you, Your Honor.

10              THE COURT:  Call your next witness, please.

11              MS. KAISER:  The United States calls Brad

12      Carrozza.

13              GOVERNMENT WITNESS, BRAD CARROZZA, SWORN

14              COURTROOM DEPUTY CLERK:  Sir, raise your right

15      hand.

16              THE WITNESS:  I do.

17              COURTROOM DEPUTY CLERK:  Please be seated.

18              Please state your name and spell your last

19      name for the record.

20              THE WITNESS:  Brad Carrozza, C-A-R-R-O-Z-Z-A.

21                      DIRECT EXAMINATION

22      BY MS. KAISER:

23      Q       Good afternoon, Detective.

24      A       Good afternoon.

25      Q       Can you please tell the jury where you work.

Carrozza - Direct

```
 1    A      I'm a detective with the Pinellas County

 2    Sheriff's Office.

 3    Q      And how long have you been so employed?

 4    A      Just over four years.

 5    Q      What is your position with Pinellas County

 6    Sheriff's Office?

 7    A      Currently I'm assigned to the Crimes Against

 8    Children Unit as a detective.

 9    Q      Did you participate in the search of the

10    defendant Charles Friedlander's residence?

11    A      Yes, I did.

12    Q      When did that occur?

13    A      July 21st, 2008.

14    Q      And could you tell the jury where the search

15    was conducted.

16    A      It was conducted at 12040 Mahogany Isle Lane

17    in Ft. Myers.

18    Q      Was anyone at the search site with you?

19    A      Yes, there were, three FDLE agents.

20    Q      And what were their names?

21    A      Special Agent Uebelacker, Special Agent Monk

22    and Special Agent Supervisor Rose.

23    Q      What were your duties with respect to the

24    search of the defendant's residence?

25    A      I was assigned to search the suspect's office,
```

1       also transport all the items found during the search

2       warrant back to Pinellas County.

3       Q       Did you, in fact, do that?

4       A       Yes, I did.

5               MS. KAISER:  Your Honor, may I approach the

6       witness?

7               THE COURT:  Yes, ma'am.

8       BY MS. KAISER:

9       Q       Detective, I'm showing you what's been

10      premarked for identification as Government's

11      Exhibits 41 through 53, and ask if you could just

12      take a look at those.

13      A       I'm familiar with all those photos.

14      Q       What are those documents?

15      A       These are photos that were taken during the

16      search warrant by FDLE agents.

17      Q       And do these photos fairly and accurately

18      depict what was located in the defendant's residence

19      on the date of they search?

20      A       Yes, they do.

21              MS. KAISER:  Your Honor, at this time I'd move

22      for admission of Government's Exhibit 41 through 53

23      into evidence.

24              THE COURT:  Is there any objection?

25              MR. TRAGOS:  Your Honor, may I voir dire?

Carrozza - Direct

```
 1              THE COURT:  Yes, sir.

 2                    VOIR DIRE EXAMINATION

 3     BY MR. TRAGOS:

 4     Q     Detective, were you present when the photos

 5     were taken?

 6     A     I was at the residence.  Yes, sir.

 7     Q     So you saw them take these photos?

 8     A     I can't say that I saw them take every photo,

 9     but I saw each of those exhibits.

10     Q     And can you say that this photo accurately

11     depicts the way you saw it?

12     A     Yeah.

13     Q     Okay.

14     A     Yes, sir.

15     Q     Okay.

16              MR. TRAGOS:  No objection.

17              THE COURT:  All right.  Exhibits 41 through 53

18     are now received.

19              MS. KAISER:  Thank you.

20     (Whereupon, Government's Exhibit Number 41 through

21     53 are received into evidence.)

22              MS. KAISER:  May I publish these exhibits,

23     Your Honor?

24              THE COURT:  Yes, ma'am.

25     BY MS. KAISER:
```

Carrozza - Direct

1    Q      All right.  Detective Carrozza, can you tell

2    the jury what we're looking at here in Government's

3    Exhibit 41.

4    A      Yes.  This is a picture of the suspect's

5    office, the west wall.

6    Q      During this search, what were you assigned to

7    search, if anything?

8    A      I was assigned to search his office.

9    Q      And so was this your room of responsibility

10   during the search?

11   A      Yes, it was.

12   Q      All right.  And I'm showing you Government's

13   Exhibit 42 on the overhead.

14   A      Yes.

15   Q      Can you tell the jury what Government's

16   Exhibit 42 depicts.

17   A      Yes.  It's a notepad that was found on the

18   west wall of the suspect's office.  It was on top of

19   the desk, just a little north of the monitor for the

20   desktop computer.  It depicts several online screen

21   names, first names, states and phone numbers.

22   Q      Does this list depict Detective Romanosky's

23   screen name?

24   A      Yes, it does.  Approximately halfway down the

25   paper, there is the username Stricdad7, which was

1      the username that Corporal Romanosky used.  The name

2      Michael, which is also the name -- the first name

3      that Corporal Romanosky used, along with Corporal

4      Romanosky's undercover's phone number.

5      Q     All right.  Government's Exhibit 43, could you

6      tell the jury what that depicts.

7      A     That depicts the Gateway computer tower which

8      was found also in the suspect's office underneath

9      the desk that we previously saw slightly north of

10     center.

11     Q     Government's Exhibit 44, can you tell the jury

12     what that depicts.

13     A     Yes.  That was the rear of the computer tower

14     that we previously just saw.  It depicts the

15     social -- I mean, the serial number on the back of

16     the tower.

17     Q     You mentioned previously that part of your

18     duties was to take the evidence back to St. Pete; is

19     that correct?

20     A     Yes, ma'am.

21     Q     And did you, in fact, take the evidence that

22     was gathered at the scene back to your office in

23     St. Petersburg?

24     A     To be exact, it's actually in Clearwater that

25     we took -- Pinellas County, but, yes, I did.

1    Q       Including this computer?

2    A       Yes, ma'am.

3            MS. KAISER:  Your Honor, may I approach the

4    witness?

5            THE COURT:  Yes, ma'am.

6    BY MS. KAISER:

7    Q       Detective Carrozza, I'm handing you what's

8    been marked for identification as Government's

9    Exhibit 54, and ask if you recognize this object.

10   A       Yes, I do.  It's the computer tower.  It

11   appears to be the one that I took from the scene.

12   And after reviewing the crime scene photos, it

13   provides the same serial number as the computer

14   taken from the same.

15           MS. KAISER:  Your Honor, I'd move for

16   admission of Government's Exhibit 54 into evidence.

17           THE COURT:  Is there any objection?

18           MR. TRAGOS:  No, Your Honor.

19           THE COURT:  54 is received.

20   (Whereupon, Government's Exhibit Number 54 is

21   received into evidence.)

22           COURTROOM DEPUTY CLERK:  Mr. Kaiser, can you

23   set that on the floor right by the table.  Thank

24   you.

25   BY MS. KAISER:

1    Q      I'm showing you what's been marked for

2    identification as Government's Exhibit 55, and ask

3    if you recognize that object.

4    A      Yes.  This appears to be the laptop that was

5    found in the suspect's office on top of the desk.

6    Q      Is that the lap -- did you take that laptop

7    back to your office in Clearwater?

8    A      This appears to be the same laptop.  Without

9    verifying the serial numbers or the identification

10   numbers, I cannot say for sure.

11   Q      Do you have a report on which you wrote the

12   serial numbers?

13   A      Yes, I do.

14   Q      And do you have that with you today?

15   A      Yes, I do.

16   Q      Would it refresh your recollection to refer to

17   your report?

18   A      Yes, it would.

19          MS. KAISER:  Your Honor, may he refer?

20          THE COURT:  Yes.

21          THE WITNESS:  The identification number on my

22   report and on the back of this computer are the

23   same.

24          MS. KAISER:  Your Honor, at this time the

25   government moves for admission of Government's

Carrozza - Direct

138

1    Exhibit 55 into evidence.

2              THE COURT:  Is there any objection?

3              MR. TRAGOS:  No.

4              THE COURT:  55 is received.

5    BY MS. KAISER:

6    Q     I'm putting on the overhead Government's

7    Exhibit Number 45.  Can you tell the jury what we're

8    looking at here.

9    A     This is a sample package of Levitra.

10   Q     Where was that found in the residence?

11   A     It was found in the suspect's bedroom.

12   Q     Putting on the overhead Government's Exhibit

13   46.  Can you tell the jury what that depicts.

14   A     Appears to be that same package of Levitra,

15   opened.

16   Q     Are there any tablets missing?

17   A     Yes.  There's one tablet missing.

18   Q     Putting on the overhead Government's Exhibit

19   47.  Can you tell the jury what this is.

20   A     This is a device that's commonly known as a

21   penis pump.

22   Q     Where was this located?

23   A     This was located in the suspect's office.

24   Q     Government's Exhibit 48, what does that

25   depict?

1    A     This depicts additional images of the device

2    commonly known as a penis pump.

3    Q     And Government's Exhibit 49?

4    A     Again, additional pictures of the device

5    that's commonly known as a penis pump.

6    Q     Government's Exhibit 50, can you tell the jury

7    what's depicted in the shot.

8    A     This is a white suitcase that's opened which

9    was found in the -- a closet in the suspect's

10   residence close to the suspect's bedroom that I

11   referred to as the master closet.  This depicts

12   multiple whips, paddles, a device commonly known as

13   a butt plug, and other devices that are commonly

14   used in sexual or sadomasochist type interest.

15   Q     And Government's Exhibit 51, can you explain

16   to the jury what they're looking at here.

17   A     Yes.  This is some of the items also found in

18   that previous picture which were removed from the

19   suitcase only for -- to see exactly what was in

20   there.  It appears to be multiple whips, a butt plug

21   and handcuffs.

22   Q     Government's Exhibit 52, what does that

23   depict?

24   A     Depicts, again, additional pictures of the

25   items found inside that same suitcase, multiple

1    whips, belts, handcuffs, paddles, a device commonly

2    known as a dildo, the butt plug.

3    Q      Finally, Government's Exhibit 53, what does

4    that depict?

5    A      This depicts a dildo that was located in the

6    suspect's suitcase that we previously saw.

7           MS. KAISER:  May I approach the witness, Your

8    Honor?

9           THE COURT:  Yes, ma'am.

10   BY MS. KAISER:

11   Q      Detective Carrozza, I'm showing you what's

12   been premarked for identification as Government's

13   Exhibits 56 and 56A.  Do you recognize those

14   documents?

15   A      Yes, I do.

16   Q      What is Government's Exhibit 56?

17   A      56 was the notepad that we previously saw on

18   the projector that has multiple names, screen names

19   and phone numbers on it which has corporal --

20          MR. TRAGOS:  I'm sorry.  What was that number?

21          THE COURT:  56.

22          MR. TRAGOS:  Wasn't there also a 56A?

23          MS. KAISER:  We haven't gotten to it yet.

24          THE COURT:  56.  We're just talking about 56

25   marked for identification.

1          MR. TRAGOS:  Just 56.  Okay.

2          THE COURT:  Continue.

3          THE WITNESS:  Okay.  That depicts the Office

4    Depot notepad which depicts Corporal Romanosky's

5    screen name, his UC name that he was using for this

6    investigation, along with his UC telephone number

7    that he was using for this investigation.

8    Q     And where was Government's 56 found in the

9    residence?

10   A     It was found on the suspect's desk, the same

11   desk that the laptop computer was found just north

12   of the laptop computer.

13   Q     And who found Government's Exhibit 56?

14   A     I did.

15         MS. KAISER:  Your Honor, at this time I'd move

16   for admission of Government's Exhibit 56 into

17   evidence.

18         THE COURT:  Any objection to 56?

19         MR. TRAGOS:  May I see it, Your Honor?

20         THE COURT:  Sure.

21         MR. TRAGOS:  No objection.

22         THE COURT:  56 is received.

23   (Whereupon, Government's Exhibit Number 56 is

24   received into evidence.)

25   BY MS. KAISER:

1     Q     All right.  Detective Carrozza, if you would

2     take a look at Government's Exhibit 56A.  Do you

3     recognize that document?

4     A     Yes, I do.

5     Q     What is that document?

6     A     It's a home phone pad that the page that it's

7     marked to is a pad that I found underneath --

8     partially underneath the suspect's laptop computer

9     which is also found on top of the desk.  The notes

10    in the message gives the name of the meet location,

11    Cracker Barrel, as well as directions to the

12    location that he was supposed to meet Corporal

13    Romanosky.

14         MS. KAISER:  Your Honor, at this time I'd move

15    for admission of Government's Exhibit 56A into

16    evidence.

17         MR. TRAGOS:  No objection.

18         THE COURT:  56A is received.

19    (Whereupon, Government's Exhibit Number 56A is

20     received into evidence.)

21         MS. KAISER:  Your Honor, at this time I

22     request permission to publish 56.

23         THE COURT:  Yes, ma'am.

24    BY MS. KAISER:

25    Q     All right.  So Government's Exhibit 56 is the

1    notepad that you found by the computer?

2    A      Yes, just north of the laptop computer.

3    Q      And is this the actual item of which we had a

4    picture of earlier?

5    A      Yes, it is.

6    Q      And the writing that's in the message area

7    refers to what?

8    A      The location of the Cracker Barrel which the

9    suspect was scheduled to meet Corporal Romanosky on

10   the 21st.

11         MS. KAISER:  I have no further questions.

12   Pass the witness.

13         THE COURT:  Cross-examination.

14                   CROSS-EXAMINATION

15   BY MR. TRAGOS:

16   Q      Mr. Carrozza, let me ask you to take a look,

17   if you would, at Defendant's Composite Exhibit 9.

18   A      Okay.

19   Q      Do you recognize those pictures?

20   A      Yes, sir, I do.

21   Q      And do you recognize those as being the

22   pictures -- some more pictures taken by FDLE at

23   Charles Friedlander's home --

24   A      Yes, sir.

25   Q      -- on the day of the search?

Carrozza - Cross

1    A       Yes, sir.

2    Q       Okay.

3            MR. TRAGOS:  Your Honor, we'd move Defendant's

4    Exhibit 9 into evidence.

5            THE COURT:  Any objection?

6            MS. KAISER:  No objection, Your Honor.

7            THE COURT:  Exhibit 9 for the defendant is

8    received.

9    (Whereupon, Defendant's Exhibit Number 9 is received

10   into evidence.)

11           MR. TRAGOS:  Publish, Your Honor?

12           THE COURT:  Yeah.  Just for the record, how

13   many photographs do we have?  That's a composite

14   exhibit.  And are they marked A through some

15   other --

16           MR. TRAGOS:  There's 13 pictures and it's A

17   through M.

18           THE COURT:  A through M.  All right.  Thank

19   you.

20   BY MR. TRAGOS:

21   Q       First let me show you 9A.  And what is that a

22   picture of?

23   A       That is a picture of the defendant's kitchen

24   area.

25   Q       See if I can -- okay.  9B?

1      A       There's a glare on the photo, but it appears

2      to be a living room area --

3      Q       Well --

4      A       -- at the defendant's home.

5      Q       That works better.   9C, can you see that?

6      A       Yeah.   It appears to be the living room at the

7      defendant's home.   I mean -- not the living room,

8      sorry, the dining room of the defendant's home.

9      Q       Okay.   D?

10     A       I'm unable to --

11     Q       See if I can help that but I can't.   Okay.

12     Let me --

13     A       I recognize the kitchen area by the statue

14     that was on -- in the defendant's home, but I cannot

15     tell you what angle this is from.

16     Q       E?

17     A       This picture, I could not tell you where that

18     was at.   I did not go through the entire home.   And

19     these were pictures taken by FDLE.

20     Q       F?

21     A       Again, I'm not certain if that is the master

22     bedroom or -- there was other bedrooms in the home.

23     Q       G?

24     A       This appears to be the entrance to another

25     bedroom in the home.

1    Q       H?

2    A       This was one of the defendant's closets.

3    Q       Where was this closet?

4    A       I believe this was the closet directly north

5    of the master bedroom, but I'm not certain of that.

6    Q       J?

7    A       Appears to be another closet.  That closet I

8    could not identify where it was located.

9    Q       K?

10   A       This was the defendant's master bathroom which

11   was located one room -- next door to the room that I

12   searched, the office that I searched.

13   Q       Was that the master bath?

14   A       What I consider to be the master bathroom,

15   which was the largest.

16   Q       That was J.  K?

17   A       On the left side of this image was an entrance

18   to the office that I searched.

19   Q       L?

20   A       This was the desk that I referred to earlier

21   inside the defendant's office.

22   Q       M?

23   A       This was also in the defendant's office.  This

24   is on the opposite wall of the desk.  It was a low

25   cabinetry piece that had multiple books and

Carrozza - Cross

1    cabinets.

2    Q        Was there a picture taken of the white

3    suitcase while it was still in the closet?

4    A        I do not recall seeing one.

5    Q        Have you reviewed the photographs of this --

6    of this search?

7    A        Yes, multiple times.

8    Q        When was the last time?

9    A        The last time would probably be this past

10   weekend.

11   Q        And you don't remember seeing a picture that

12   depicts that white suitcase you talked about

13   actually sitting in a closet in the house?

14   A        I don't believe so.  And you'd have to talk to

15   the FDLE agent who found that.  But I believe the

16   reason was initially all they saw was a white

17   suitcase.  They took it down.  And when they took it

18   down and opened it is when they figured out what was

19   inside.

20   Q        Did you identify any of these rooms as having

21   anything that you would call the room designed for

22   punishment or --

23   A        In my experience there's no definite room that

24   that could be.  That could be used in any room.

25   Q        You didn't see a room that you saw that looked

Carrozza - Cross

1     like it was designated for that?

2     A      Your stereotypical dungeon area, no, I did not

3     see anything like that.

4     Q      There is such a thing, though; isn't there?

5     A      Yes, there is.

6     Q      Let me ask you to take a look at Exhibit 56.

7     Now, you identified that exhibit as a notepad that

8     was found on the desk; correct?

9     A      Correct.

10    Q      Okay.  And it contains names and phone

11    numbers; correct?

12    A      As well as what appears to be online

13    usernames.

14    Q      Okay.  And when you seized this you went --

15    well, all this -- actually, all the stuff that was

16    seized at the house you took possession of; right?

17    A      Yes, sir.

18    Q      And you came back and what did you do with it?

19    A      I drove directly to the Pinellas County

20    Sheriff's Office property and evidence section where

21    all the items were placed into our evidence, our

22    property and evidence.

23    Q      Physically how does that happen?

24    A      You have multiple bags, depending on what type

25    of bag you need.  You fill out the information

1       pertaining to the case on the bag.  After you fill

2       out that information, you place the evidence inside

3       the bag, seal it and provide it to the property

4       clerk.

5       Q       And then what does the property clerk -- in

6       your view, what does the property clerk do?

7       A       I couldn't tell you exactly what they've done.

8       I've never watched them.  But they organize the

9       property in a secure area that is easy to find at a

10      later date.

11      Q       Do you seal the bags?

12      A       Yes, sir.

13      Q       Okay.  Now, the prosecutor showed you a

14      picture of Levitra, Exhibit 45.

15      A       Correct.

16      Q       Do you remember that?  Where was that found?

17      A       Somewhere in the suspect's bedroom.  I was not

18      the one who actually found that or the one

19      designated to search that room so I could not give

20      an exact location.

21      Q       So you don't know where it was found?

22      A       By -- when it was found I saw it on the -- on

23      a nightstand in the defendant's bedroom, but I do

24      not know exactly where it was found.

25      Q       Okay.  Now, Exhibits 47, 48, and 49, let me

Carrozza - Cross

1    get those for you.  Now, you referred to this as

2    a -- I'm sorry.  How did you refer to it?

3    A     It's a device that's commonly referred as to

4    a -- or what appears to be a penis pump.

5    Q     Is that also known as a vacuum erection

6    device?

7    A     It could be.

8    Q     Okay.  And what is the use of that?

9          MS. KAISER:  Objection, speculation.

10         THE COURT:  Overruled.

11   BY MR. TRAGOS:

12   Q     What is the use of that?

13         THE COURT:  If you know.

14         THE WITNESS:  As far as -- you know, I've

15   never actually owned one or used one, but from my --

16   to my knowledge being told from other people it's to

17   assist in getting an erection.

18   BY MR. TRAGOS:

19   Q     Okay.  Ask you to take a look at Exhibit 52.

20   Here we have a myriad of items that you've

21   identified --

22   A     Correct.

23   Q     -- giving them their common names?

24   A     Correct.

25   Q     Is there anything in that group that's

Carrozza - Cross

1    illegal?

2    A      Not in the contents they're in now.

3    Q      Okay.  You can use something in an illegal

4    way?

5    A      Correct.

6    Q      But the items themselves are not illegal;

7    correct?

8    A      Not to have in someone's home.  They're not

9    common, not illegal.

10   Q      Deputy, aside from these computers, the two

11   computers you seized, did you also seize a media

12   card?

13   A      There was a media seized -- yeah, a media card

14   seized.  Yes, sir.

15   Q      What is a media card?

16   A      It's a device used to hold storage from --

17   digital storage from a computer or from other

18   digital-type imaging.  I believe this one was found

19   inside a camera.

20   Q      Okay.  And did you also turn that into

21   property?

22   A      Yes, sir.

23   Q      Did you also seize some CDRs?

24   A      Yes, multiple.

25   Q      How many did you seize?

Carrozza - Cross

1    A      Without referring to my notes in my report --

2    Q      If it would help you to recollect, please do

3    so.

4    A      Appears to be eight, and included in that is

5    also DVDRs.

6    Q      Okay.  The CDRs which you seized and brought

7    back to property, they had -- some of them at least

8    had titles on them?

9    A      Yes, they did.

10   Q      And one of them was -- I guess this is

11   Imation?

12   A      Imation would be the brand of CDR that it was.

13   Q      Okay.  There was no title on that one, then?

14   A      According to my report, no, there was no title

15   on it.

16   Q      Then you seized a CD entitled Harry Connick,

17   Jr.?

18   A      Yes, sir.

19   Q      Napster Music?

20   A      Yes, sir.

21   Q      Photo-Wise?

22   A      Yes, sir.  There was additional writing on

23   that CDR, but yes.

24   Q      Corel 8?

25   A      Yes, sir.

1    Q      Prof copy backup?

2    A      Correct.

3    Q      Then a Sony CD case.  Any other CDs that were

4    seized?

5    A      I'm sorry.  Did you say the one that says AOL

6    11-02?

7    Q      Okay.  Which is that?  I did not.

8    A      That was an additional one that I listed in my

9    report.

10   Q      Okay.  Any others?

11   A      And referred to the Sony case there was also

12   a -- there was two -- there's a DVD -- two DVDRs

13   inside that case.

14   Q      Okay.  And the Apa Tech camera, you also

15   seized an Apa Tech camera?

16   A      That was items that were found by FDLE.

17   Q      Okay.  But did you bring those to the

18   sheriff's office?

19   A      Yeah.

20   Q      So they were placed in your possession at the

21   scene?

22   A      Yes, sir.

23   Q      Let me show you what's been marked as

24   Government's Exhibit 64.  I ask you if you recognize

25   that -- those two exhibits.

Carrozza - Cross

1    A      Yes, I do.  The two Polaroid pictures that

2    were found inside a drawer in the desk of

3    Mr. Friedlander's office.

4    Q      Did you make any phone calls and speak to

5    Detective Romanosky during the search?

6    A      Yes, I did.

7    Q      And did you tell him that you found those two

8    photographs?

9    A      I believe so.  It's not -- I didn't write it

10   in my report.  I did talk to him.  I believe that

11   was one of the conversations that we had.

12          MR. TRAGOS:  At this time, Your Honor, the

13   defense would move Exhibit 64 into evidence.

14          THE COURT:  Would that be Defendant's 64 or --

15          MR. TRAGOS:  Well, it's initially identified

16   as Government's 64, but the government is moving it

17   into evidence.

18          THE COURT:  Any objection?

19          MS. KAISER:  No objection, Your Honor.

20          THE COURT:  Well, let's call it Government's

21   64 just to remain consistent.  There's two

22   photographs?  Are they marked A and B?

23          THE WITNESS:  One and two, Your Honor.

24          THE COURT:  One and two.  All right.  64-1 and

25   2 are received.  Thank you.

1    (Whereupon, Government's Exhibit Number 64-1 and 2

2    were received into evidence.)

3           MR. TRAGOS:  Publish them, Your Honor?

4           THE COURT:  Yes, sir.

5    BY MR. TRAGOS:

6    Q       Are these the only Polaroids found at the

7    house?

8    A       I can't say for sure.  They're the only

9    Polaroids.  They were not the only photos found but

10   they were the only photos collected.

11   Q       Did you leave any photographs of nudes at the

12   house?

13   A       It depends on what your definition of

14   photograph is.  There were pictures of naked people

15   left at the house.  They were on VHS covers and

16   stuff like that.

17   Q       Adult type?

18   A       Yes.

19   Q       Sexually explicit?

20   A       Yes.  There was no -- other than those photos,

21   there were none that appeared to be close to the age

22   of 18.

23   Q       In fact, you were on the lookout for that type

24   of material so you could seize it; correct?

25   A       Yes, sir.

Carfozza - Cross

```
 1      Q       And the only photos that were seized were

 2      these two Polaroids, Exhibit 64-1 and 2?

 3      A       Physical photographs, yes.  I can't vouch for

 4      anything that may have been on -- you know, any

 5      digital evidence that was collected.

 6      Q       Okay.  But physical photos, things that you

 7      could see while you were there?

 8      A       Correct.

 9      Q       Now, the Levitra, you didn't seize that; did

10      you?

11      A       No.  No, we did not.

12      Q       The penis pump, you didn't seize that, either;

13      did you?

14      A       No.  They weren't under the terms of the

15      search warrant.

16      Q       They were not included in what you were

17      allowed to seize?

18      A       Correct.

19      Q       The Fuji film MX1200 digital media card, did

20      you ever view what was on it?

21      A       No, I did not.

22      Q       That wasn't part of your responsibility?

23      A       No.  No, sir.

24      Q       How long -- first of all, how did you get into

25      the house?
```

Carrozza - Cross

1    A       FDLE Agents Uebelacker and Monk made access

2    into the house.

3    Q       Were you there?

4    A       I was not there when they actually entered.  I

5    was at the scene, but I was not at the door when

6    they entered into the house.

7    Q       So you don't know how they gained access?

8    A       No, I do not, not exactly.

9    Q       How many agents altogether were there?

10   A       There were three.

11   Q       You and the two you just named, Monk and --

12   A       Uebelacker.

13   Q       Uebelacker?

14   A       And then we had Special Agent Supervisor Rose.

15   Q       So four of you altogether were there?

16   A       Correct.

17   Q       How long did the search take?

18   A       I could not provide an exact time.  It was, I

19   believe, close to -- we started at 1500 hours and it

20   was close if not into 7/22/08 when we -- when we

21   finished.

22   Q       All right.  During the course of your search,

23   did you do a thorough search?

24   A       I can speak only for myself checking the

25   office, and I believe that I did.

Carfozza - Cross

1    Q      Okay.  Did you see the other people do

2    searches?

3    A      They were searching.  I did not -- I was not

4    watching their search but they were searching.

5    Q      Did you look in drawers?

6    A      In the office I did look in drawers.

7    Q      Did you look through closets?

8    A      Yes.  In the office I did.

9    Q      Okay.  When I say you, I meant you.

10   A      Yes.

11   Q      Okay.  Did you look on top of the credenza,

12   top of the desk, things like that?

13   A      Yes.  Yes, I did.

14   Q      Okay.  And did -- at some point did all of the

15   four of you kind of get together and everybody hand

16   you what they found?

17   A      Basically we all kept track of our own items

18   that we found during the search.  After we had

19   completed the search, we brought all our items into

20   the dining room area where I believe it was Special

21   Agent Uebelacker, but I could not say for sure who

22   inventoried all the items.

23          This search was an FDLE search because it was

24   not in the county of Pinellas County so we did not

25   have jurisdiction over the search.  So policy is

1      that they have to inventory everything and then

2      transfer the property to myself and the Pinellas

3      County Sheriff's Office.

4          So after we obtained our own items, we met in

5      that location so they could inventory the -- the

6      basics of what was found during the search.

7      Q      So Uebelacker did the initial inventory?

8      A      I believe so, but I'm not certain.

9      Q      Then after -- well, you're not certain.  Well,

10     somebody at FDLE did an initial inventory; right?

11     A      Yes.

12     Q      Before you did?

13     A      Before I -- before I did at the property and

14     evidence section of Pinellas County Sheriff's Office

15     or --

16     Q      Well, when did you do your inventory of what

17     was seized?

18     A      I did a -- basically a look-over inventory

19     while I was on scene.  I think I jotted some notes

20     down of what was there.  Everything that was given

21     to me I placed into the back seat of my car after

22     confirming that my -- the back seat of my car, there

23     was nothing in it.  I drove back to the sheriff's

24     office, the property and evidence section, and then

25     did a more detailed search inventory.

1    Q      Well, in fact, didn't Uebelacker have to -- is

2    it Uebelacker, is that it?

3    A      I'm not sure exactly how you pronounce it, but

4    it's close to that.

5    Q      Didn't he actually have to sign the items over

6    to you?

7    A      I do have a property inventory that they did,

8    if you want me to review that real quick.

9    Q      If it refreshes your recollection.

10   A      Yes, sir.  Yes.  It was Special Agent

11   Uebelacker and he did sign items over to me.

12   Q      Okay.  And you have a copy of that receipt

13   form?

14   A      Yes, I do.

15   Q      Okay.  Would you please just take a look at it

16   and tell me if there -- if everything that he signed

17   over to you corresponds to everything you turned

18   over to the property department.

19   A      The only thing that stands out is where he

20   talks about the white case containing several items.

21   It was more of an overview of what was inside and

22   not detailed as to each item.

23   Q      Okay.  Did you do a report in this case?

24   A      Yes, I did.

25   Q      Just one?

1     A       I believe so, yes.

2     Q       Did you take any notes?

3     A       Yes, I did.

4     Q       And did you take notes during the course of

5     the search?

6     A       Yes, I did.

7     Q       Do you have those with you?

8     A       No, I do not.

9     Q       Where are they?

10    A       After taking the notes and writing my report,

11    I look at my notes and my report to make sure

12    everything that needs to be in there from my notes

13    is in the report, and then I discarded the notes.

14    Q       So the notes are gone?  You destroyed them?

15    A       Yes, sir.

16    Q       When did you destroy them?

17    A       It would have been sometime after I reviewed

18    the -- my final report.  I could not tell you the

19    exact date.

20    Q       Okay.  Have you before today -- and before I

21    get -- except for pictures, have you had any other

22    contact with the physical evidence that you seized

23    at the residence?

24    A       I briefly looked over everything to confirm

25    everything was true and correct with the U.S.

Carrozza - Cross

1       Attorney's Office.

2       Q       When was that?

3       A       On Friday.

4       Q       Okay.  So you actually looked at the phys --

5       you went through the physical evidence, the --

6       A       Not all of it, but several items.

7       Q       Okay.  And who was it -- when you turn over

8       the property, who is the case agent or who is the

9       one responsible for the case at that time?

10      A       At which time?  I'm sorry.

11      Q       At the time you seized the items, who was the

12      case agent, the one responsible for the progress of

13      the case?

14      A       Corporal Romanosky.

15      Q       Okay.  When did you know you were going down

16      to Ft. Myers to do this search?

17      A       I can't recall if it was a day or two prior to

18      the actual search or the day of.

19      Q       Let me make sure I understand something else

20      you said before.  The two Polaroid photographs?

21      A       Yes, sir.

22      Q       Where were they found?

23      A       They were found in the office inside a drawer

24      on the -- of the desk.

25      Q       Okay.  And you found them?

1    A     Yes, sir.

2    Q     Okay.  You also said that the Photo-wise CDR

3    had some additional writing on it?

4    A     I believe it was that one.  One second.  Yes.

5    There was 2-3-01 also handwritten on it.

6    Q     Okay.  Okay.

7          MR. TRAGOS:  Have a moment, Your Honor?

8          THE COURT:  Yes, sir.

9    (Brief pause.)

10   BY MR. TRAGOS:

11   Q     Now, I know you seized one camera; is that

12   correct?

13   A     Yes.  Well, there was also another device and

14   I think it was -- called a PenCam Trio that was also

15   seized that I found in the office.

16   Q     Sorry, maybe I just can't find that.  Where is

17   that on the receipt form?

18   A     My apologies.  I apparently missed that when I

19   was confirming all the items on the receipt form.

20   It does not appear to be here.

21   Q     So where are you getting that information?

22   A     Which information would that be?

23   Q     About the PenCam Trio that's not on the

24   receipt.

25   A     It was in my report, and I recall finding it

1     myself.

2     Q      Okay.  So we have the PenCam Trio?

3     A      That's what was written on it, a PenCam Trio.

4     Q      That's a camera?

5     A      It appeared to be.

6     Q      Then we have the Apa Tech camera?

7     A      Correct.

8     Q      Any other cameras in the house?

9     A      I think there was a -- there were disposal

10    cameras, also.

11    Q      Did you seize those?

12    A      It is not on my report or in the form that

13    FDLE filled out, so I could not -- my recollection?

14    I believe we did, but I cannot be certain of that.

15    Q      So we don't know what happened, then, to

16    the -- those cameras?

17    A      Like I said, it's -- no.  I'm not even a

18    hundred percent sure.  I recall them being there,

19    but I cannot be a hundred percent sure.

20    Q      When you went over this on Friday to make sure

21    everything was right, did you notice that the

22    portable disposal cameras were missing?

23    A      To be honest with you, that was one of the

24    things that we never even looked over.

25    Q      Let me show you Exhibit 9, Defense Exhibit 9G.

1    There appears to be a camera in that picture.  And

2    you've already identified these as pictures of the

3    house?

4    A      Correct.

5    Q      Tell me which camera that was.

6    A      You have to talk to the special agent that

7    searched that room for -- definitely, but I believe

8    that's the camera that the digital media card was

9    found inside.

10   Q      So the camera wasn't seized, just the digital

11   media card?

12   A      Correct.  There was no information on the

13   camera itself that would have provided any possible

14   information.  All the data was on the card.

15   Q      Aside from the items you found in that white

16   suitcase, any other whips, chains, handcuffs, butt

17   plugs, anything else found anywhere else in the

18   house?

19   A      I believe all the items that were found were

20   found in that white suitcase.  But again, that

21   was -- I did not find any in the office area.

22   You'll have to confirm that with the FDLE agents.

23   Q      Okay.  And -- well, did you see, for instance,

24   any toy trains, any little kid's toys in the house?

25   A      Not that I can recall.

Carrozza - Redirect

1       MR. TRAGOS:  That's all the questions I have.

2       THE COURT:  Redirect?

3       MS. KAISER:  Yes, Your Honor.

4                   REDIRECT EXAMINATION

5   BY MS. KAISER:

6   Q     I put on the overhead what was admitted as

7   Government's Exhibit 64.  Why did law enforcement,

8   FDLE, seize this picture in the defendant's

9   residence on the date of the search?

10  A     Initially when I found it -- and still to this

11  day I cannot confirm who the subject was -- to me in

12  my experience, the subject could have easily been

13  someone in their upper teens, possibly under the age

14  of 18.

15  Q     Why didn't FDLE seize the Levitra or the penis

16  pumps?

17      MR. TRAGOS:  Objection.  Asked and answered.

18      THE COURT:  It's been covered.

19      MS. KAISER:  I have no further questions.

20      THE COURT:  Thank you, sir.  You may step

21  down.  Please watch your step.

22      THE WITNESS:  There's several exhibits here

23  still.

24      THE COURT:  Just leave them right there.

25  That's fine.

Monk - Direct

1          Call your next witness, please.

2          MS. KAISER:  The United States calls Gregory

3     Monk.

4          GOVERNMENT WITNESS, GREGORY MONK, SWORN

5          COURTROOM DEPUTY CLERK:  Raise your right

6     hand.

7          THE WITNESS:  I do.

8          COURTROOM DEPUTY CLERK:  Please be seated.

9          Please state your name and spell your last

10    name for the record.

11         THE WITNESS:  Special Agent Greg Monk,

12    M-O-N-K.

13                   DIRECT EXAMINATION

14    BY MS. KAISER:

15    Q     Good afternoon, Detective Monk.  Can you

16    please tell the jury where you work.

17    A     I work at the Florida Department of Law

18    Enforcement in Ft. Myers, Florida.

19    Q     And what's your position?  You're actually a

20    special agent; correct?

21    A     Yes, ma'am.

22    Q     And how long have you been a special agent

23    with FDLE?

24    A     Since January 2007, about two years.

25    Q     Where is your office located?

Monk - Direct

1    A       Off of Terminal Drive in Ft. Myers.

2    Q       Did you have an occasion, Special Agent Monk,

3    to participate in the search of the defendant's

4    residence in Ft. Myers?

5    A       I did.

6    Q       When did that take place?

7    A       That took place on July 21st, 2008.

8    Q       And what were your responsibilities during the

9    search of the defendant's residence?

10   A       I assisted with the entry to the residence and

11   then assisted with the search and collection of

12   evidence.

13   Q       And specifically what were you tasked to do

14   inside the residence?

15   A       I was tasked with searching throughout the

16   house various locations for potential evidence.

17           MS. KAISER:   Your Honor, may I approach the

18   witness?

19           THE COURT:   Yes, ma'am.

20   BY MS. KAISER:

21   Q       Agent Monk, I'm showing you what's been marked

22   as Government's Exhibit 57, and ask if you recognize

23   that.

24   A       I do.

25   Q       What is that?

1    A       That is a suitcase or some sort of container

2    that was seized from the defendant's closet.

3    Q       And who located that inside the defendant's

4    residence?

5    A       I did.

6    Q       I'm also showing you what's been marked as

7    Government's Exhibit 58.  It's a collective exhibit.

8    Can you please take a look at that.

9    A       Yes, ma'am.

10   Q       And what is Government's Exhibit 58?

11   A       Those items are consistent with what was found

12   inside that suitcase.

13   Q       All right.  And could you describe for the

14   jury what items were found.

15   A       Looks like assorted sex toys, handcuffs,

16   various whips and leather restraint devices.

17           MS. KAISER:  Your Honor, at this time I'd move

18   for admission of Government's Exhibits 57 and 58

19   into evidence.

20           MR. TRAGOS:  May I examine them a minute, Your

21   Honor.

22           THE COURT:  Yes, sir.  Let me just clarify.

23   57 is the suitcase?

24           MS. KAISER:  Yes, Your Honor.

25           THE COURT:  Thank you.  Is there any objection

1      to 57?

2              MR. TRAGOS:  Yes, sir.

3              THE COURT:  What's the objection?  Legal

4      grounds, please.

5              MR. TRAGOS:  Inadmissible evidence is a

6      portion of it.

7              THE COURT:  That objection is overruled.  Is

8      there any objection to 58?  That's the box of items;

9      is that right, Mr. Witness?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  58.  Thank you.

12             MR. TRAGOS:  Same objection, Your Honor,

13     inadmissible writing.

14             THE COURT:  Well, lay a foundation for any

15     handwriting, Ms. -- Madam Prosecutor.  The items

16     themselves, there's no objection?

17             MR. TRAGOS:  I don't object to the items

18     themselves.

19             THE COURT:  That's what I understood.  Thank

20     you.  Ms. Kaiser, lay a foundation for any

21     handwriting, then, if you can.

22             MS. KAISER:  Yes, sir.

23     BY MS. KAISER:

24     Q      Agent Monk, some of -- some of this evidence

25     is contained in evidence bags; is that correct?

1    A      Yes, ma'am.

2    Q      And could you please tell the jury, what is

3    the writing that is contained on the evidence bags?

4    A      That looks like Detective Carrozza's writing.

5           MR. TRAGOS:  Objection, predicate.

6           THE COURT:  Overruled.

7    BY MS. KAISER:

8    Q      What -- how would you describe this label?

9    A      This label is the Pinellas County Sheriff's

10   Office property evidence label.

11   Q      And is that filled out as part of an inventory

12   when they place --

13          MR. TRAGOS:  Objection, leading.

14          THE COURT:  Sustained.

15   BY MS. KAISER:

16   Q      Why did -- why is this type of label used?

17   A      This would just be for the specifics of

18   labeling the evidence post collection for purposes

19   of inventory.

20   Q      As part of Government's Exhibit 58, I'm also

21   handing you this bag.  If you would please take a

22   look at it.

23   A      Okay.

24   Q      And what is Government's Exhibit 58?

25   A      It looks like various -- again, restraints and

1       leather devices.

2       Q       Was that also found during the search of the

3       defendant's residence?

4       A       I would surmise so.  Yes.

5               MS. KAISER:  Your Honor, move for admission of

6       Government's Exhibit 58 into evidence.

7               THE COURT:  Is there any objection?

8               MR. TRAGOS:  Yes, Your Honor.  As to 57 and

9       58, the same objection as to the writing.

10              THE COURT:  Well, let me ask you Mr. -- Agent

11      Monk.  Without telling me what the handwriting is,

12      can you generally describe it?  Are they initials?

13      Are there notations, any descriptive commentary on

14      these evidence tags?

15              THE WITNESS:  Looks like it has a case number,

16      the name of the case agent as well as the -- who

17      collected the evidence.  It has the defendant's name

18      on there, last, first, middle, date of birth.

19              THE COURT:  Dates, I take it?

20              THE WITNESS:  I'm sorry?

21              THE COURT:  Is there a date on there?

22              THE WITNESS:  A date is on there, 7/21/2008.

23              THE COURT:  Any commentary, any descriptive

24      language, anything that's content?

25              THE WITNESS:  With respect to the offense

1    type, it says travelling to meet a minor.  The

2    description, item 50, quantity, three dildos and,

3    quantity, one handcuffs.

4        THE COURT:  I will overrule the objection.  Of

5    course, ladies and gentlemen, I think the purpose of

6    these tags has been explained by the witness.  The

7    evidence is the content of the bags, not the

8    description on the identification tags.  You may

9    proceed.

10   (Whereupon, Government's Exhibit Numbers 57 and 58

11   are received into evidence.)

12       MS. KAISER:  Your Honor, should I have the

13   witness do the same for Government's Exhibit 58?

14       THE COURT:  If -- unless there's any

15   commentary beyond what's been described Mr. Monk, or

16   Agent Monk, just alert me to that, please.

17   Otherwise, you may go forward.

18       THE WITNESS:  No, sir.  It'S consistent

19   with -- it says five collars, three leather, two

20   nylon, one leather belt with harness and one pair of

21   spurs.

22       MS. KAISER:  Your Honor, may I publish these

23   to the jury?

24       THE COURT:  You may.

25   BY MS. KAISER:

Monk - Direct

1    Q      Agent Monk, before I do that, would you please

2    take a look at Government's Exhibit 58 and tell the

3    jury whether or not they appear to be in new

4    condition.

5    A      To me they do not appear to be in new

6    condition.

7            THE COURT:  However you want to handle it.

8    Just the bag itself?  They're intact?

9            MS. KAISER:  Yes, sir.

10           THE COURT:  How do you want to do this,

11    Ms. Kaiser?  Do you want --

12           MS. KAISER:  I'm just going to hold it up.

13           THE COURT:  Hold it up.  All right.  Members

14    of the jury, these items of evidence will be

15    available to you during the jury room -- or in the

16    jury room during your deliberations.  If the bags

17    are sealed -- which I presume they are, Ms. Kaiser?

18           MS. KAISER:  Yes, Your Honor.  Some of the

19    exhibits are in this box.  The individual ones are

20    Collective Exhibit Government 58 and then -- this is

21    also 58 but this one is sealed.

22           THE COURT:  If it's sealed, it should remain

23    sealed.

24           MS. KAISER:  Your Honor, may I have a moment?

25           THE COURT:  Yes, ma'am.

1    (Brief pause.)

2            MS. KAISER:  Pass the witness.  Thank you.

3            THE COURT:  Cross-examination.

4                    CROSS-EXAMINATION

5    BY MR. TRAGOS:

6    Q      Agent Monk, how long have been an FDLE agent?

7    A      For two -- just under two years, sir.

8    Q      And what did you do before that?

9    A      I was an analyst with FDLE, as well.

10   Q      How long were you an analyst?

11   A      Since August of 2004.

12   Q      And did you do a report in this case?

13   A      I did not.

14   Q      Did you review any documents or any reports

15   prior to your testimony?

16   A      I did.

17   Q      What did you review?

18   A      I reviewed a report by Special Agent

19   Uebelacker and our property receipt form from that

20   night.

21           MR. TRAGOS:  May I approach the witness, Your

22   Honor?

23           THE COURT:  Yes, sir.

24   BY MR. TRAGOS:

25   Q      Is this what you're talking about?

Monk - Cross

```
 1      A      Yes, sir.

 2      Q      Did you review any other documents?

 3      A      No, sir.

 4      Q      Did you take any notes that night?

 5      A      No, sir.

 6      Q      Did you do any searching that night?

 7      A      Yes, sir.

 8      Q      What did you search?

 9      A      I searched virtually every room in the house,

10   to my recollection.  I was in the back room with the

11   other agents, I was in the garage, the bathroom at

12   one point and the bedroom.

13      Q      And did you do a thorough search?

14      A      To my belief, yes.

15      Q      Look in drawers?

16      A      Yes, sir.

17      Q      Closets?

18      A      Yes, sir.

19      Q      Now, this -- are you the one that found this

20   white bag?

21      A      Yes, sir.

22      Q      Where was it?

23      A      It was in the closet of the -- what I would

24   call the master bedroom.

25      Q      Where was it in that closet?
```

Monk - Cross

1    A      To my recollection it was either on the floor

2    or low on shelving in the closet.

3    Q      And you had FDLE photographers there; correct?

4    A      Yes, sir.

5    Q      Did they take a picture of it in the closest?

6    A      To my recollection -- I don't know if they

7    took one in the closet.  I know they photographed

8    the picture -- the case.

9    Q      But you don't know if they took one in the

10   closet?

11   A      Not to my recollection, no.

12   Q      Have you reviewed the photographs from that

13   night?

14   A      No, sir.

15   Q      Have you ever worked in any cases that

16   involved bodily fluids?

17   A      Not that come to mind immediately.

18   Q      No blood, semen, anything like that?

19   A      Not that come to mind immediately.

20   Q      Have you been trained in that area?

21   A      No, sir.

22   Q      And did you -- these items that were seized,

23   do you know if they were ever tested for any bodily

24   fluids?

25   A      Not to my knowledge, no.

Monk - Cross

1    Q      Have you been trained in the appearance of new

2    or used dildos?

3    A      No, sir.

4    Q      You just testified that these dildos looked

5    used to you.

6    A      From my perspective, that's what they

7    appeared.

8    Q      So you can tell -- so they've been inserted

9    into bodily cavities of people?

10   A      I can't tell that, no, sir.

11   Q      So what are you telling me, they're just

12   dirty?

13   A      To my eye they look -- I believe her question

14   was do these look new or older to you.

15   Q      Oh, okay.  So you can't tell if they have

16   actually been used pursuant to the function for

17   which they were designed?

18   A      No, sir.

19   Q      Okay.

20          MR. TRAGOS:  Your Honor, may I publish Exhibit

21   57 to the jury?

22          THE COURT:  Yes, sir.

23   BY MR. TRAGOS:

24   Q      With regard to Exhibit 57, is that new or old?

25   A      To my eyeball it looks old.

Monk - Cross

1   Q       Real old?

2   A       I wouldn't classify it as new.

3   Q       Okay.  Does FDLE have a laboratory?

4   A       Yes, sir.

5   Q       Does that laboratory test things for bodily

6   fluids?

7   A       Yes, sir.

8   Q       Have you been to the laboratory?

9   A       Yes, sir.  Well, let me -- let me take that

10  back.  I've not been in the laboratory.  I work at

11  the building with the laboratory but, no, sir, I

12  have not been through the lab there.

13  Q       You know it exists?

14  A       Yes, sir.

15  Q       Were any of these items sent to the FDLE

16  laboratory, to your knowledge, for any testing to

17  find out if they had any semen, vaginal juice --

18          MS. KAISER:  Objection, asked and answered.

19  Q       -- blood, anything like --

20          MR. TRAGOS:  I don't think I asked it.

21  Well --

22          THE COURT:  Mr. Tragos?

23          MR. TRAGOS:  I'm sorry, Your Honor.  I stopped

24  myself.

25          THE COURT:  I'm going to allow it.  Overruled.

1       Go ahead.

2              MR. TRAGOS:   Okay.

3       BY MR. TRAGOS:

4       Q       To your knowledge, was any of this stuff taken

5       to the FDLE laboratory for any analysis to found out

6       if there were any remnants of semen, blood, hair,

7       human tissue, any bodily fluid?

8       A       No, sir.

9       Q       Does the FDLE lab do lab work for the Florida

10      Department of Law Enforcement as well as any other

11      law enforcement agency in the state who requests it?

12      A       Yes, sir.

13      Q       How did you gain entrance to the home?

14      A       We approached the home.  I took a position at

15      the back of the residence.  Special Agent Uebelacker

16      and Special Agent Supervisor Rose entered through

17      the front door.

18      Q       By the way, I think the prosecutor asked you

19      if you had a special designation as a special agent?

20      A       Yes, sir.

21      Q       Are there any such -- anything other than

22      agents who are special in the FDLE?

23      A       Our supervisors are titled special agent

24      supervisors.  Up the chain of command from that is

25      the ASACS, assistant to the special agent in charge,

1    and above that is the SAC, the special agent in

2    charge.

3    Q       But all agents are special agents; aren't

4    they?

5    A       Yes, sir.

6    Q       Okay.  What did you seize besides this white

7    suitcase or what did you find?

8    A       To my recollection that's the only thing I

9    actually seized that night.

10   Q       No CDs, no media cards, nothing like that?

11   A       Not that I remember.  That's the only one that

12   sticks out in my mind.

13   Q       Did the house have a basement?

14   A       No, sir.

15   Q       Did you notice anything that looked like a

16   dungeon or a room equipped to be a dungeon?

17   A       No, sir.

18   Q       Let me ask you to look at Composite Exhibit 9.

19   A       Yes, sir.

20   Q       Do those pictures accurately reflect what the

21   house looked like on the day of the search?

22   A       They do.

23   Q       Did you see any children's toys in the house?

24   A       Not that I recall.

25   Q       Did you see any child pornography in the

1      house?

2      A      No, sir.

3             MR. TRAGOS:  No other questions, Your Honor.

4             THE COURT:  Redirect?

5             MS. KAISER:  No, Your Honor.

6             THE COURT:  Thank you, sir.  You may step

7      down.  Please watch your step.

8             Does anybody need a comfort break on the jury?

9      Yeah?  Let's take our 15-minute comfort break at

10     this time.

11            COURTROOM SECURITY OFFICER:  Rise for the

12     jury, please.

13     (Jury out at 2:40 PM.)

14     (Recess was taken at 2:40 until 2:45 PM.)

15     (Back on the record.)

16            COURTROOM SECURITY OFFICER:  All rise.  This

17     Honorable Court is again in session.

18            MR. TRAGOS:  Your Honor?

19            THE COURT:  From now on, no more housekeeping.

20     We want the jurors in here so we can hear evidence.

21            MR. TRAGOS:  I understand.  But I think it

22     will go -- it's faster --

23            THE COURT:  Only if you promise.

24            MR. TRAGOS:  Oh, yeah, I think it is.

25            THE COURT:  Because every single time somebody

1          says, Your Honor --

2                    MR. TRAGOS:  It's two minutes.

3                    THE COURT:  What is it?

4                    MR. TRAGOS:  So the court will know,

5          Ms. Kaiser and I have come to an agreement on --

6          believe it or not -- on when her expert computer

7          person is testifying, my expert can be in the back

8          of the room listening, and when hers testifies --

9          mine testifies, her expert can be in the back of the

10         room listening.

11                   THE COURT:  All right.  That's fine.  Very

12         good.  Thank you.  Bring the jury in, please.

13                   COURTROOM SECURITY OFFICER:  Rise for the

14         jury, please.

15         (Jury in at 2:57 PM.)

16                   THE COURT:  Thank you.  Be seated.  You may

17         call your next witness, please.

18                   MS. KAISER:  United States calls Larry Marone.

19              GOVERNMENT WITNESS, LAWRENCE MARONE, SWORN

20                   COURTROOM DEPUTY CLERK:  Sir, please raise

21         your right hand.

22                   THE WITNESS:  Yes.

23                   COURTROOM DEPUTY CLERK:  Please be seated.

24                   Please state your name and spell your last

25         name for the record.

1          THE WITNESS:  Lawrence Marone, M-A-R-O-N-E.

2                    DIRECT EXAMINATION

3     BY MS. KAISER:

4     Q     Good afternoon, Mr. Marone.

5     A     Good afternoon.

6     Q     Can you please tell the jury where you work.

7     A     I work for Florida Urology Physicians in

8     Ft. Myers, Florida.

9     Q     And how long have you been so employed?

10    A     Approximately four years.

11    Q     And what are your duties there?

12    A     I am the practice administrator.

13    Q     Do you -- is it part of your duties as the

14    office administrator to act as a custodian of

15    records for the office?

16    A     Yes, ma'am.

17          MS. KAISER:  Your Honor, may I approach the

18    witness?

19          THE COURT:  Yes, ma'am.

20    BY MS. KAISER:

21    Q     Mr. Marone, I just handed you what's been

22    premarked for identification as Government's Exhibit

23    Number 60.  Do you recognize those documents?

24    A     Yes, ma'am.

25    Q     And what are they?

Malone - Direct

1    A      These are the physician notes for

2    Mr. Friedlander.

3    Q      And are those records kept in the ordinary

4    course of business?

5    A      Yes, they are.

6    Q      Are they prepared in the ordinary course of

7    business by --

8           MR. TRAGOS:  Objection, leading.

9           THE COURT:  Overruled.

10   BY MS. KAISER:

11   Q      By a person with knowledge at the time they're

12   created?

13   A      Yes.

14   Q      Are those true and correct copies of

15   Mr. Friedlander's medical records?

16   A      Yes, they are.

17          MS. KAISER:  Your Honor, at this time I would

18   move for admission of Government's Exhibit 60 into

19   evidence.

20          THE COURT:  Any objection?

21          MR. TRAGOS:  May I voir dire, Your Honor?

22          THE COURT:  Strictly on his role as custodian,

23   you may.

24          MR. TRAGOS:  Yes, sir.

25                    VOIR DIRE EXAMINATION

1    BY MR. TRAGOS:

2    Q        Is this his total file?

3    A        It is not his total file.

4    Q        Okay.  How did you -- well, who actually did

5    the entries?

6    A        The physician.

7    Q        Did you make the decision about what -- what

8    part of his file you were going to bring or not

9    bring?

10   A        It was based upon the request of specific

11   dates.

12   Q        Okay.  So this is the total file for what

13   period?

14   A        January 2006 to present.

15   Q        How long have you been the custodian of

16   records?

17   A        I've been with the practice almost four years.

18   Q        Okay.  Have you been the custodian of records

19   for that time?

20   A        Yes.

21   Q        Who's the doctor that made these entries?

22   A        Dr. Stephen Harrison.

23   Q        Now, I notice these are typed.  Are there

24   handwritten entries?

25   A        Yes, there are.

Malone - Voir Dire

1    Q      And how are -- who typed -- and so they are

2    then transcribed?

3    A      It's a combination of handwritten progress

4    notes and detail notes and then a transcribed

5    dictation that summarizes, normally.

6    Q      Okay.  So this is not the complete set from

7    this period?

8    A      That I don't know.

9    Q      Well, did the file contain handwritten

10   entries, as well?

11   A      Yes.

12   Q      Did you bring those with you?

13   A      Yes.

14   Q      Okay.  Could I see those?

15   A      Sure.

16          MR. TRAGOS:  Court's permission.

17          THE COURT:  Yes, sir.

18          THE WITNESS:  These are chronological notes so

19   these would be the handwritten and then the

20   transcribed.

21          MR. TRAGOS:  Have a moment, Your Honor?

22          THE COURT:  Yes, sir.

23   (Brief pause.)

24          MR. TRAGOS:  Your Honor, we would have no

25   objection if the complete record is admitted.

Marone - Direct

1           THE COURT:  Do you have any objection to

2     Government's Exhibit 60?

3           MR. TRAGOS:  Yes, Your Honor.

4           THE COURT:  What is the objection?

5           MR. TRAGOS:  Incomplete.

6           THE COURT:  That objection is overruled.

7     Government's 60 is received.

8     (Whereupon, Government's Exhibit Number 60 is

9     received into evidence.)

10          MS. KAISER:  Thank you, Your Honor.  May I

11    publish them, Your Honor?

12          THE COURT:  You may.

13          MR. TRAGOS:  I think that might be --

14    BY MS. KAISER:

15    Q     Mr. Marone, are you able to see that?

16    A     Yes.

17    Q     Can you please publish this to the jury by

18    reading what the date of this record is.

19    A     July 18th, 2008.

20    Q     And can you please read for the jury the

21    doctor's notes.

22    A     Dr. Friedlander comes in today for follow-up

23    of his chronic prostatitis.  He's requesting

24    prostatic massage again.  This was done in the

25    office at his request.  He's still on Hytrin for his

1    BPH symptoms and he will continue that as is.

2         Dr. Friedlander raised the issue of erectile

3    dysfunction at this visit.  He has difficulty both

4    obtaining and maintaining erectile rigidity and is

5    interested in pursuing medical therapy.  He has

6    never tried Levitra, and since he is a diabetic, I

7    think that the best place to start.  Samples of the

8    20 milligram dose as well as a prescription were

9    provided.  Proper use and potential side effects

10   were reviewed.  I will see him back on an as-needed

11   basis at this point.

12   Q    And, sir, if you can identify this office note

13   for the jury, and please read what it says.

14   A    This is dated October 10, 2007.

15   Dr. Friedlander comes in today for a flare of

16   nonbacterial prostatitis and is requesting prostatic

17   massage.  He has perineal discomfort and some

18   frequency and urgency.  At the patient's request

19   prostatic massage was performed.

20        The patient is also requesting a trial of ED

21   therapy and all of the agents were reviewed.  He's

22   interested in Viagra and Levitra, and samples were

23   provided.  Potential side effects were reviewed, as

24   well.  He will continue with Hytrin and Celebrex as

25   is and will follow up on an as-needed basis.

1           MS. KAISER:  No further questions.  Thank you.

2           THE COURT:  Cross-examination.

3                      CROSS-EXAMINATION

4    BY MR. TRAGOS:

5    Q       Are you a doctor?

6    A       No, I'm not.

7    Q       Oh, okay.  Before you -- are you the manager

8    of the practice?

9    A       Correct, the administrator.

10   Q       Administrator for the practice.  How many

11   doctors are in the practice?

12   A       Six.

13   Q       Do you -- what did you do before that?

14   A       I've been an administrator for 16 years.

15   Q       Okay.  So basically any of the medical

16   diagnoses, prescriptions, any of that stuff that's

17   in these, you're not qualified to tell us about

18   that?

19   A       Correct.

20   Q       Okay.

21           MR. TRAGOS:  That's all the questions I have.

22           THE COURT:  Thank you, sir.  You may step

23   down.  Watch your step, please.

24           Call your next witness.

25           MS. KAISER:  United States calls Special Agent

1       Patty Kelly.

2               GOVERNMENT WITNESS, PATRICIA KELLY, SWORN

3               COURTROOM DEPUTY CLERK:  Raise your right

4       hand.

5               THE WITNESS:  Yes, I do.

6               COURTROOM DEPUTY CLERK:  Please be seated.

7               Please state your name and spell your last

8       name for the record.

9               THE WITNESS:  Patricia Kelly, K-E-L-L-Y.

10                      DIRECT EXAMINATION

11      BY MS. KAISER:

12      Q       Good afternoon, Special Agent Kelly.

13      A       Good afternoon.

14      Q       Could you please tell the jury where you work.

15      A       I'm a special agent for Immigration and

16      Customs Enforcement.

17      Q       How long have you been so employed?

18      A       Since April of 2001.

19      Q       What are your duties as special agent with

20      ICE?

21      A       I'm a criminal investigator assigned to the

22      Cyber Crimes Unit where I conduct forensic

23      examinations on computers.

24      Q       What training have you had to enable you to be

25      a forensic computer analyst?

 1    A      I went -- I attended a two-month training on

 2    basic evidence -- computer evidence training

 3    course -- evidence recovery.

 4           MS. KAISER:  Your Honor, may I approach the

 5    witness?

 6           THE COURT:  Yes, ma'am.

 7    BY MS. KAISER:

 8    Q      Special Agent Kelly, could you please take a

 9    look at Government's Exhibit 54.

10    A      Yes.

11    Q      Okay.

12    A      Serial number.  Okay.

13    Q      Um-hum.  Did you do any forensic work with

14    respect to Government's Exhibit 54?

15    A      Yes, I did.

16    Q      I'm showing you what's been admitted as

17    Government's Exhibit 55.  Did you do any forensic

18    work with respect to Government's Exhibit 55?

19    A      Yes, I did.

20    Q      All right.  What I just showed you was a

21    laptop and a desktop; is that correct?

22    A      That's correct.

23    Q      Okay.  What were you asked to do with respect

24    to the laptop computer?

25           MR. TRAGOS:  Your Honor, I'm sorry.  Could we

Kelly - Direct

1    identify those by exhibit number.

2        THE COURT:  They're in evidence.  The laptop

3    is Exhibit 55; is that correct?  There should be a

4    tag on it.

5        MS. KAISER:  Yes, Your Honor.

6    BY MS. KAISER:

7    Q      With respect to the laptop, Government's

8    Exhibit 55, what were you asked to do?

9    A      Alex brought them to me and Dave was going --

10   he's up next for the examination, David Grawunder.

11   So I took the initiative to image the computers and

12   document and preserve -- take pictures of them and

13   remove the hard drives and make a copy of them.

14   Q      All right.  Let's back up for a minute.  You

15   mentioned a person by the name of Alex.  Are you

16   referring to Special Agent Alex Hagedorn?

17   A      Yes.

18   Q      All right.  And what is his position?

19   A      He's a special agent with Immigration and

20   Customs Enforcement.

21   Q      All right.  And what, if anything, were you

22   asked specifically to do with the electronic --

23   Government's Exhibits 54 and 55?

24   A      I was asked to view them to see if there were

25   any pictures of child pornography on them.

Kelly - Direct

1    Q     Could you please tell the jury what you did

2    with respect to those two exhibits.

3    A     When I first get the computer, I take pictures

4    of the computers and then I take them apart and I

5    remove the hard drive.  And then I make a copy of

6    the hard drive, and that's what I did.

7    Q     Do you know where the two computers were

8    manufactured in this case?

9    A     The hard drives themselves have a tag on them

10   that say where they're manufactured.  And the laptop

11   computer was manufactured in Thailand and the

12   desktop hard drive was manufactured in Malaysia.

13   Q     Now, you mentioned that you made a mirror

14   image of the hard drives.  Can you explain that

15   process to the jury.

16   A     Yes.  In order to not change anything on the

17   original evidence, we connect it to a forensic piece

18   of equipment, and it's called a write blocker.  It

19   prevents the forensic computer from writing onto the

20   evidence.  So I connected it to the write blocker

21   and then used the forensic software called FTK,

22   which stands for forensic tool kit, to make the

23   image.

24   Q     All right.  And when you use the word write

25   blocker, is that W-R-I-T-E?

1    A      Yes.

2    Q      Okay.  So what's the purpose of that step?

3    A      It's -- it prevents my computer from writing,

4    because every time you turn on your computer, the

5    operating system will start changing -- it will make

6    log files or change dates, nothing that's going to

7    ruin your evidence, but it will make changes to it.

8    So you don't want that to happen.  You want a

9    forensically sound piece of evidence.

10   Q      And why does law enforcement do that?  Why do

11   you do that with the computers?  Why do you apply

12   this write blocker?

13   A      Because you want it to remain exactly the same

14   as the way he used it.

15   Q      And when you say he, are you referring to the

16   defendant?

17   A      Yes, I am.  Sorry.

18   Q      Once you made the mirror images, are -- let me

19   ask you this.  Are the mirror images of the hard

20   drive exact duplicates of the defendant's hard

21   drive?

22   A      Yes, they are.

23   Q      What, if anything, did you do with the mirror

24   images of the hard drives that you made for the

25   laptop and the desktop, Government's Exhibits 54 and

Kelly - Cross

1    55?

2    A       I just gave them to Special Agent David

3    Grawunder to conduct the examination.

4           MS. KAISER:  Pass the witness.

5           THE COURT:  Cross-examination.

6                     CROSS-EXAMINATION

7    BY MR. TRAGOS:

8    Q       Ms. Kelly, do you do -- by the way, Special

9    Agent, is -- are all the investigative agents in ICE

10   called special agents?

11   A       Yes, they are.

12   Q       Okay.  Did you do any report?

13   A       Yes, I did.

14   Q       And how many reports did you do?

15   A       Two.

16   Q       And are they identified or numbered some way?

17   A       Yes, they are.

18   Q       How are they numbered?

19   A       Report number two and report number three.

20          MR. TRAGOS:  May I approach the witness, Your

21   Honor?

22          THE COURT:  Yes, sir.

23          THE WITNESS:  Report number two and three.

24   This is of the imaging, this is --

25          MR. TRAGOS:  At this time, Your Honor, I'd

1    like to request *Jencks* material.

2          THE COURT:  So noted.  Ms. Kaiser, that has

3    been complied with?

4          MS. KAISER:  Yes, Your Honor.

5          THE COURT:  Members of the jury, that simply

6    is the -- a request by Mr. Tragos for copies of any

7    statements made by the witness during the course of

8    the investigation which have been reduced to

9    writing.  It's required under the -- under Title 18.

10   And that is to be provided.  Thank you.

11   BY MR. TRAGOS:

12   Q     Aside from those two reports, did you take any

13   notes of your activities?

14   A     Yes, I did.

15   Q     Do you have those notes with you?

16   A     Yes, I do.

17         MR. TRAGOS:  Your Honor, may I have a copy of

18   her handwritten notes?

19         THE COURT:  Can we make that arrangement?  You

20   don't have copies with you now?

21         MR. TRAGOS:  I do not.

22         THE COURT:  In other words, your handwritten

23   notes were reduced to writing and typed up?

24         THE WITNESS:  My original handwritten notes, I

25   have those, and then it was put into a report.

1          THE COURT:  So your report is the typewritten

2     version of your handwritten notes?

3          THE WITNESS:  Yes.

4     BY MR. TRAGOS:

5     Q     Did you compare your handwritten notes to the

6     report to see that everything is included?

7     A     Have I done that or did I?

8     Q     Have you done that?

9     A     I think the only thing that I did not include

10    was the countries and where it was manufactured.

11    Everything else I think looks to be included.

12    Q     Do your notes state that you reviewed items

13    contained in customs form 6051R?

14    A     Yes.

15    Q     Okay.  Do I have that, 6051R?

16         MS. KAISER:  Your Honor, may we approach at

17    side bar?

18         THE COURT:  You may.

19    (At side bar, on the record.)

20         MS. KAISER:  He's been given -- Mr. Tragos has

21    been given all the reports.  And I think it's --

22         THE COURT:  I'm not going to have any more

23    requests in the presence of the jury, Mr. Tragos.

24    There's a time to do it, it's outside the presence

25    of the jury at side bar when the witness has

1    completed testimony.

2         MR. TRAGOS:  Your Honor --

3         THE COURT:  No more.

4         MR. TRAGOS:  Can I ask her something else?

5         THE COURT:  You know the rules.  You've been

6    practicing law as long as I have.

7         MR. TRAGOS:  Your Honor, since we're at side

8    bar --

9         THE COURT:  And the next time it's asked and

10   there's been compliance, I'm going to instruct the

11   jury that the government has complied with all

12   requirements so there's no inference drawn from your

13   question.

14        MR. TRAGOS:  I do not believe I have customs

15   form 6051R, which is a list of the items.

16        THE COURT:  How long have you had her report?

17        MR. TRAGOS:  If you look at it, Your Honor --

18        THE COURT:  I don't need to look it.

19        MS. KAISER:  That is not the only copy that

20   you have, Mr. Tragos, and please don't tell the

21   court that that is because you have signed copies of

22   the reports which you've had for months.

23        MR. TRAGOS:  I had the report for a while,

24   yes, but I cannot find it.

25        MS. KAISER:  And that's not the only copy of

1      the report you have.

2           THE COURT:  Guys, do other judges let you do

3      this?  Am I the only judge that doesn't tolerate

4      lawyers talking to each other in front of the jury

5      and in front of me?  Am I?  I don't think I am.  So

6      why you do it in this courtroom in this trial is

7      beyond me.

8           But there's going to be a contempt citation

9      issued to the next person that does it.  The next

10     speaking objection, the next response that's not

11     invited by the court, there will be a hearing at the

12     end of the day.  Is that clear to everybody?

13          MR. TRAGOS:  Yes.

14          MS. KAISER:  Yes.

15          THE COURT:  Either you conduct yourselves with

16     the civility and the professionalism that we expect,

17     that our rules require, or you're going to suffer

18     the consequences.  Plain and simple.

19          Have you requested discovery, Mr. Tragos?

20          MR. TRAGOS:  Yes.

21          THE COURT:  Have you complied with that

22     request, Ms. Kaiser?

23          MS. KAISER:  Yes, Your Honor.

24          THE COURT:  Has the *Jencks* Act been complied

25     with?

Kelly - Cross

1          MS. KAISER:  Yes, Your Honor.

2          THE COURT:  Then what else can we talk about

3     other than to suggest to this jury that there's not

4     been compliance, which troubles me, Mr. Tragos.

5     Have you got everything that you are entitled to

6     have?

7          MR. TRAGOS:  Your Honor, there's no way for me

8     to know if I have.  But if the prosecutor says they

9     have, what can I say.

10         THE COURT:  Well, if you ask a witness for

11    something and you don't have it, you bring it up to

12    me at side bar, not in the front of the jury.  What

13    is it specifically that you're asking for, some

14    form, ICE form?

15         MR. TRAGOS:  Right.  ICE form 6051R, and I

16    don't believe I've seen it.

17         THE COURT:  Has that been provided,

18    Ms. Kaiser, in discovery?

19         MS. KAISER:  Your Honor, without seeing the

20    form, I'm not sure what 6051R is off the top of my

21    head.  So I'd have to look at my discovery produced

22    files, I'd have to see the document to confirm that

23    he's actually been given it.

24         MR. TRAGOS:  Your Honor, could I just ask the

25    witness for it since she has it with her?  We can

Kelly - Cross

1          probably solve it.

2               THE COURT:  I don't mind if you ask the

3          witness if she has it.  If she doesn't, that's the

4          end of it.

5               MR. TRAGOS:  Okay.

6               THE COURT:  Now, if you think you've been not

7          provided something that's covered under Rule 16,

8          that's another matter.

9               MR. TRAGOS:  Okay.

10              THE COURT:  Rule 16 is fairly broad.  And I'm

11         being told by Ms. Kaiser that she's complied with it

12         and the *Jencks* Act.

13              MR. TRAGOS:  Is the court saying I'm not

14         entitled -- I got the feeling the court was saying

15         before that I wouldn't be entitled to her

16         handwritten notes.

17              THE COURT:  I don't know where you got that

18         feeling.

19              MR. TRAGOS:  Oh, I'm sorry.  I would like her

20         handwritten notes.

21              THE COURT:  Then you should get a copy of her

22         handwritten notes.  But do not make that request in

23         front of the jury.

24              MR. TRAGOS:  I would request her handwritten

25         notes.

1          THE COURT:  Ms. Kaiser, do you have copies?

2          MS. KAISER:  I believe he has been given all

3     of her handwritten notes.  I'll confirm that with

4     Special Agent Hagedorn, but to my knowledge he's

5     been given all her handwritten notes.

6          THE COURT:  Is it your understanding that he's

7     entitled to that in addition to the typewritten

8     memorialization of those handwritten notes?

9          MS. KAISER:  Yes, Your Honor.

10          THE COURT:  All right.  Then check with your

11     agent.  If he has not, then let's get copies made

12     and furnished to Mr. Tragos before he finishes his

13     cross-examination.

14          MS. KAISER:  Yes, Your Honor.

15          THE COURT:  Okay.  Thank you.

16     (End of side bar discussion.)

17          THE COURT:  You may proceed.

18     BY MR. TRAGOS:

19     Q     Do you have a copy of the form 6051R with you?

20     A     No, I do not.

21     Q     Okay.  Do you know what is contained on that

22     form?

23     A     Yes.  It's a chain of custody.

24     Q     Okay.  And when you receive -- tell me how you

25     received these computers.

Kelly - Cross

1    A       Special Agent Alex Hagedorn brought them to me

2    and I signed for them on the 651R on July 29th.

3    Q       And, now, you made a mirror image, you said;

4    correct?

5    A       An image, yes.

6    Q       Is that different than a mirror image?

7    A       It's just the verbiage.  It's not a mirror

8    but --

9    Q       Can you explain the difference?

10   A       A mirror -- we refer to a mirror or a clone as

11   an exact -- it's an exact copy, and I can give it to

12   him -- I can put it in his computer and boot up his

13   computer and it will be exactly what he did, but it

14   will change.  An image is a forensically sound copy.

15   Q       Okay.

16   A       That's the terminology that we were trained

17   with.  It's not -- we don't refer to it as a mirror

18   image, just as an image.

19   Q       Did you provide any images or mirror images to

20   any other third parties in this case?

21   A       No.

22   Q       After you made your -- do you want me to use

23   the term images?

24   A       Yes, please.

25   Q       After you made your images, did you do any

Kelly - Cross

1    analysis of the computers?

2    A     I did not.

3    Q     Did you do any other work on these computers

4    other than make the images?

5    A     No, I did not.

6    Q     Do you aid anyone else in doing that work?

7    A     On the images, no.  I mean, on the hard

8    drives, no.

9    Q     On anything else in this case.

10   A     Yes.  I previewed a memory card, a pen camera

11   and some CDs.

12   Q     Do you have a record of the CDs you reviewed?

13   A     Do I have --

14   Q     In other words, do you have a record to say

15   which CDs you reviewed?

16   A     I have which line item number it was.  There

17   were five CDs and I just referred to them as the

18   line item number that I signed for on the chain of

19   custody, which is line item number five.  It was

20   eight -- I'm sorry, it was eight compact discs.

21   Q     Okay.  Do you recall if any of them have

22   handwriting on the discs?

23   A     I do not recall.  I'd have to look at them

24   again.

25   Q     Do your notes have any information on that?

1      A      Let me look.  Yes.

2      Q      Okay.  So your notes do reflect -- so your

3      notes are different than your report?

4      A      In this report, yes.  When you asked me on the

5      other one I was referring to the images.  I did not

6      review this one yet.

7      Q      Okay.  Did you make a separate report for

8      the -- for your review of the other media?

9      A      Yes, I did.

10     Q      Okay.  And you have your handwritten reports

11     there with you?

12     A      Yes.

13     Q      Okay.  Do your handwritten reports reflect

14     what was written on the CDs you reviewed?

15     A      Yes.

16     Q      Okay.  Could you please tell us what was

17     written on the CDs you reviewed.

18     A      One said Photo-Wise, one had Corel 8.  The

19     other one had Harry Connick, Jr. music CD.  One said

20     Napster music CD.  There were two wedding movie DVDs

21     and one was backup files.  And that was an unlabeled

22     one.  I just wrote that that was backup files when I

23     viewed it.

24     Q      Do you have something that said prof copy

25     backup?

Kelly - Cross

1    A      I did not write that down.  Oh, I think that

2    might have been the floppy, line item six was a

3    floppy disc and that said AOL.

4    Q      That said AOL org folder; didn't it?

5    A      Yes.

6    Q      Okay.  I'm talking about CDR prof copy backup.

7    A      No, I didn't see anything written on it.

8    Q      And then you also I believe said that you

9    reviewed some other types of media?

10   A      Yes.  A pen camera and a memory card.

11   Q      Okay.  What -- let's start with the memory

12   card.  What did you find on the memory card?

13   A      There was no data on the memory card.

14   Q      Okay.  The pen camera, what did you find on

15   there?

16   A      The pen camera, we did not have the

17   proprietary cable for it so I could not look at it.

18   And research on the computer showed that the pen

19   camera did not contain any internal memory so --

20   Q      So it wouldn't have anything?

21   A      Exactly.

22   Q      Okay.  Okay.  Let's go with the CDR Corel 8.

23   A      If there's no -- I'm looking for child

24   pornography photographs on all of this.  If there's

25   nothing on there, then I don't document anything

Kelly - Cross

1     that's on there.   The only thing I found of interest

2     was on one CD that I referred to the case agent for

3     his review.

4     Q       And what was that?

5     A       It was a zip file labeled caning, caning one.

6     Q       Okay.   And did you look at it?

7     A       Yes, I looked at the images.

8     Q       Any child pornography on it?

9     A       No.

10    Q       Was there any child pornography on any of

11    this?

12    A       No.

13    Q       Did, in fact, the Harry Connick, Jr. CD

14    contain music from Harry Connick, Jr.?

15    A       Most likely.   I don't recall but --

16    Q       Okay.

17            MR. TRAGOS:   Your Honor, may I take a look at

18    her notes?

19            THE COURT:   Yes, sir.

20            MR. TRAGOS:   Thank you.

21    (Brief pause.)

22    BY MR. TRAGOS:

23    Q       When you look at this data, are you able to

24    tell in any way the time that this data was

25    downloaded or saved?

Kelly - Cross

1    A      Which data are you referring to?

2    Q      In any of these items.

3    A      I did not look at that data because I did not

4    find any child pornography so I would not do that.

5    Q      All right.  On one of the discs there your

6    notes reflect -- it was the floppy disc?

7    A      Yes.

8    Q      Your notes reflect the date there.  What is

9    that date?  It looks like a date.

10   A      That was the date that was written on the

11   outside of the floppy.

12   Q      And what date was that?

13   A      November 2002.

14   Q      Okay.  And on that disc did you take a look at

15   what was on there?

16   A      I opened it and I saw a few things, but it

17   really wasn't legible.  I just referred it to the

18   case agent.

19   Q      What does not legible mean?

20   A      Well, the computer converted -- I didn't have

21   the computer to open it, so it was like a bunch of

22   gobbledygook.  I couldn't read most of it but I

23   could get some -- some words out of it, and that's

24   when I saw those accounts, the AOL.com.

25   Q      What accounts did you see?

1     A       Captoes at AOL.com and Shrinq at AOL.com.

2     Q       Did you note that -- although you didn't read

3     it, apparently you have a notation there that there

4     were e-mails.

5     A       It was in an e-mail format.

6     Q       Okay.

7     A       But like I said, it wasn't legible so --

8     Q       Were you given any other media or data-saving

9     type items to take a look at other than the ones

10    you've testified to so far?

11    A       No.

12    Q       Did you notice when you did any of the work

13    that you did, any of these items having bad sectors?

14    A       Yes.

15    Q       And how did you know that had bad sectors?

16    A       The software itself tells you that there are

17    bad sectors that cannot be read, and it will zero

18    out all the contents in that sector so that way you

19    can have your image without the data in those

20    sectors.

21    Q       So even though the sector is bad, you could

22    still get the image?

23    A       Correct.

24    Q       How many bad sectors did you find on either of

25    these?  If you could refer to the laptop as Exhibit

Kelly - Cross

```
 1        55.

 2        A       Um-hum.  Two sectors.

 3        Q       On the laptop, Exhibit 55?

 4        A       Yes.

 5        Q       What is a bad sector?  Does it cause any

 6        operating problems on a computer?

 7        A       The sector?

 8        Q       Yes.

 9        A       It could.  I don't know if it does or not.

10        Q       How many sectors were on the laptop?

11        A       I'd have to -- it was a 30 gigabyte and

12        there's 512 bytes in every sector.  So I'd have to

13        do the math.

14        Q       So it would be 512 times 30, is that what

15        you're saying?

16        A       No.  It's 30 gigabytes.  So you'd have to --

17        that's 30 million divided by -- actually, it's 30

18        billion divided by 512 to come out with how many --

19        Q       How many sectors there are?

20        A       How many sectors there are.

21        Q       Did the software tell you anything else about

22        either of these computers other than the bad sectors

23        on Exhibit 55?

24        A       No.

25        Q       After you finished making the image?
```

1    A       Um-hum.

2    Q       Then what did you do?

3    A       I -- I stored the images for Special Agent

4    Dave Grawunder.

5    Q       And then what -- do you know what happened

6    after that?

7    A       He did -- he conducted the examination.  I

8    actually opened the cases in the forensic tool kit.

9    It will open a case and index everything, and then

10   that's when I gave it to him and he did the actual

11   examination.

12   Q       The forensic tool kit?

13   A       It's the software that we use and it indexes

14   everything on that drive into graphics and e-mails

15   into sections so that you can review it that way.

16   Q       Do you have that with you?

17   A       No.  That's actually what the case -- it's --

18   Dave Grawunder has all that evidence.

19   Q       Oh.

20   A       He worked on that.  All I do is push a button

21   and it indexes it for you and then he's the one that

22   did the examination.

23   Q       Okay.

24           MR. TRAGOS:  One moment, Your Honor?

25           THE COURT:  Yes, sir.

1    (Brief pause.)

2    BY MR. TRAGOS:

3    Q      When you provide -- or when you do a mirror

4    image, does that also contain the erased files or

5    the deleted files?

6    A      Yes, it does.

7           MR. TRAGOS:  That's all the questions I have.

8           THE COURT:  Redirect?

9           MS. KAISER:  No, Your Honor.

10          THE COURT:  Thank you, ma'am.  You may step

11   down.

12          Call your next witness, please.

13          MS. KAISER:  The United States calls Special

14   Agent Dave Grawunder.

15          THE COURT:  While he's coming in, let me see

16   counsel up here, please.

17   (At side bar, on the record.)

18          THE COURT:  Did you get the notes?

19          MR. TRAGOS:  Excuse me?

20          THE COURT:  Did you get the handwritten notes?

21          MR. TRAGOS:  I did not.

22          THE COURT:  Do you have copies?

23          MS. KAISER:  Your Honor, I've confirmed that

24   he did get the handwritten notes.  They're in his --

25   I made a complete copy of the *Jencks*.  It was

1    produced to him the morning of trial.  I didn't wait

2    till after the witness testified.  I actually handed

3    him all the *Jencks*.

4          THE COURT:  Including the handwritten notes?

5          MS. KAISER:  Including the handwritten notes

6    Monday morning, and a copy of her handwritten notes

7    are in our *Jencks* folder.  We kept a complete copy

8    of it, so I can point it out to him.

9          THE COURT:  In any event, you've had access to

10   them during the cross-examination?

11         MR. TRAGOS:  Yes, I have.

12         THE COURT:  How about this next witness, do

13   you have *Jencks* Act material?

14         MS. KAISER:  Yes.  And that was produced, as

15   well, on Monday.

16         THE COURT:  Are you satisfied that you have

17   it?

18         MR. TRAGOS:  I do have *Jencks* material for

19   this witness.  I can't say I have it all, but I have

20   what I have.

21         THE COURT:  You made the request?

22         MR. TRAGOS:  Right.

23         THE COURT:  Have you complied, Ms. Kaiser?

24         MS. KAISER:  Yes, Your Honor.

25         THE COURT:  All right.  Very good.  Thank you.

1      (End of side bar discussion.)

2            THE COURT:  Come forward, please.

3         GOVERNMENT WITNESS, DAVID GRAWUNDER, SWORN

4            COURTROOM DEPUTY CLERK:  Raise your right

5      hand.

6            THE WITNESS:  I do.

7            COURTROOM DEPUTY CLERK:  Please be seated.

8            Please state your name and spell your last

9      name for the record.

10           THE WITNESS:  David Grawunder,

11     G-R-A-W-U-N-D-E-R.

12                     DIRECT EXAMINATION

13     BY MS. KAISER:

14     Q      Good afternoon, Special Agent.

15     A      Good afternoon.

16     Q      Could you please tell the jury where you work.

17     A      I'm a special act with the Department of

18     Homeland Security, Immigration and Customs

19     Enforcement in Tampa, Florida.

20     Q      How long have you been so employed?

21     A      I've been with ICE for almost six years.

22     Prior to that I was a federal agent with another

23     agency for a total of 12 and a half years.

24     Q      What are your current duties with Immigration

25     and Customs Enforcement?

1      A     I'm a computer forensic agent in our digital

2      forensic lab.

3      Q     How long have you been a forensic agent?

4      A     Since the Spring of 2005, so almost four

5      years.

6      Q     What type of specialized training did you have

7      for that assignment?

8      A     I received an A-plus certification from our

9      headquarters cyber crimes center in Fairfax,

10     Virginia.  I attended a preliminary computer

11     evidence recovery training in the Federal Law

12     Enforcement Training Center in Georgia, a basic

13     computer evidence recovery training course also in

14     Georgia, and yearly or twice yearly training since.

15     Q     Did you have an occasion to conduct a forensic

16     examination of the defendant's computers in this

17     case?

18     A     Yes, ma'am, I did.

19     Q     How many computers did you analyze?

20     A     Two.

21     Q     What types of computers were they?

22     A     The first one was Exhibit 1.  It was a Dell

23     laptop computer.  The second was a tower computer

24     that sits on a desktop.

25     Q     Where did your analysis take place?

1    A      I'm sorry.

2    Q      Where did the analysis take place?

3    A      When did it take place?  It started in August

4    of this year.

5    Q      Where?

6    A      Oh, I'm sorry.  Here in Tampa, Florida, in our

7    lab.

8           MS. KAISER:  Your Honor, may I approach the

9    witness?

10          THE COURT:  Yes, ma'am.

11          MS. KAISER:  Never mind.

12   BY MS. KAISER:

13   Q      Special Agent Grawunder, when you conducted

14   the forensic examination, did you work off of mirror

15   images?

16   A      Yes.  I used a computer forensically sound

17   image of the original hard drive.

18   Q      And who had prepared that?

19   A      Special Agent Patricia Kelly.  She works in my

20   office with me.

21   Q      What prompted your review of the mirror image

22   of the defendant's hard drives?

23   A      I was approached by the case agent in this

24   investigation, and we discussed the details of the

25   case and talked about things that may possibly be

1        found evidentiary on the two computers.

2        Q       And when you said you talked to the case

3        agent, to whom are you referring?

4        A       Special Agent Alex Hagedorn with ICE.

5        Q       How did you determine what the scope of your

6        analysis of the hard drives would be?

7        A       Reviewed the search warrant.  And in

8        discussion with Alex, he gave me the details of the

9        case and he asked me to find things that he thought

10       were relevant to this investigation to include

11       undercover chats, graphics, e-mails, etcetera.

12       Q       What specifically did Agent Hagedorn ask you

13       to look for on the defendant's computer?

14       A       He specifically asked me to pull all the

15       e-mail messages, any chat items, graphical images

16       relating to items of a sexual nature, information

17       about the user's AOL e-mail account, and that's

18       about it.

19       Q       Did he give you specific search terms?

20       A       Yes, he did.

21       Q       Was one of the search terms disciplined?

22       A       Yes.

23       Q       And M for M started early?

24       A       Yes.

25       Q       Father's chatting?

Grawunder - Direct

1    A      Yes.

2    Q      Mahogany Isle Lane?

3    A      Yes.

4    Q      Stricdad7?

5    A      Yes.

6    Q      Strict parents?

7    A      Yes.

8    Q      Dunedindad?

9    A      Yes.

10   Q      Did Agent Hagedorn also ask you to look to see

11   whether or not the defendant had any buddy lists?

12   A      Yes, he did.

13   Q      Did he ask you to analyze or look to see

14   whether or not he had any favorites saved on his

15   computer?

16   A      Yes.

17   Q      Did your review of the mirror image of the

18   laptop and the desktop encompass the entirety of the

19   computers, the hard drives?

20   A      My review encomp -- yes.  My review

21   encompassed the entire image of both devices, and

22   then the information I gave him was the summary of

23   that information.

24   Q      In what format did you give him the

25   information that he had requested?

1    A       When we conduct our forensic examination using

2    the forensic software, we create bookmarks or items

3    that we believe may be evidentiary.   Those bookmarks

4    are then used to create an electronic report that's

5    placed on a CD in the format of Internet Explorer so

6    the report can be browsed, links can be clicked on,

7    and then the evidence item can be seen all in the

8    same pane.   And then we write a report of

9    investigation that explains that electronic report.

10   Q      Can you explain to the jury what the FTK

11   report or what the FTK software entails.

12   A       FTK is an acronym for forensic tool kit.   It's

13   made by a software company.   And that software

14   company has the -- uses their software to examine a

15   forensic image.   Within the forensic image is

16   contained an exact copy of everything on the

17   defendant's computer.

18       The one distinguishing thing about the program

19   FTK is that it can pull -- identify all the file

20   types by their header information such as if it's a

21   jpg picture, a DOC Word document, an XLS

22   spreadsheet.   And it allows us to view all those in

23   different files and containers so we can look at

24   them individually or in a tree structure by their

25   file pass and where they were originally stored on

1    the defendant's hard drive.

2         It also allows us to sort by things such as

3    time and date, the actual file path of the file

4    names or, in the case of e-mails, the to and from

5    and if there was attachments.

6         MS. KAISER:  Your Honor, may I approach the

7    witness?

8         THE COURT:  Yes, ma'am.

9    BY MS. KAISER:

10   Q     Special Agent, I'm showing you what's been

11   marked for identification as Government's Exhibits

12   54A and 55A.  Do you recognize those?

13   A     Yes.

14   Q     What are they?

15   A     These are the FTK CD ROMS that I created for

16   the case agent.

17   Q     Once you prepared these, what did you do with

18   them?

19   A     I gave them to the case agent.

20   Q     Did you find evidence of the defendant's AOL

21   address book on his computer?

22   A     Yes, I did.

23        MS. KAISER:  Your Honor, may I approach the

24   witness?

25        THE COURT:  Yes, ma'am.

Grawunder - Direct

```
 1    BY MS. KAISER:

 2    Q       I'm showing you what's been marked for

 3    identification as Government's Exhibit 61, and ask

 4    you to take a look at that, please.

 5    A       Okay.

 6    Q       Do you recognize that document?

 7    A       Yes.  I recognize this as a printout of the

 8    AOL address book.

 9    Q       I'm sorry.  Go ahead.

10    A       It came from Exhibit 1, which was the laptop.

11            MS. KAISER:  Your Honor, at this time I'd

12    moved for admission of Government's Exhibit 61 into

13    evidence.

14            MR. TRAGOS:  May I see it, Your Honor?

15            THE COURT:  Yes.  Any objection?

16            MR. TRAGOS:  May I see it?

17            THE COURT:  Yes.

18    (Brief pause.)

19            MR. TRAGOS:  May I voir dire, Your Honor?

20            THE COURT:  Yes.  On its admissibility.

21            MR. TRAGOS:  Yes.

22                        VOIR DIRE EXAMINATION

23    BY MR. TRAGOS:

24    Q       What is this file called?

25    A       The AOL address book.
```

Grawunder - Direct

```
1    Q      Okay.  This was off the computer?

2    A      Yes.

3    Q      Okay.

4           MR. TRAGOS:  No objection.

5           THE COURT:  61 is now received.

6    (Whereupon, Government's Exhibit Number 61 is

7    received into evidence.)

8    BY MS. KAISER:

9    Q      When searching on the defendant's computers,

10   did you see any evidence of his chat with the

11   undercover who was posing as StricDad7?

12   A      Yes, I did.

13          MS. KAISER:  Your Honor, may I approach?

14          THE COURT:  Yes, ma'am.

15   BY MS. KAISER:

16   Q      Agent, I'm showing you what's been marked as

17   Government's Exhibits 62 and 63, and ask if you

18   could take a look at those.

19   A      Okay.

20   Q      Do you recognize those documents?

21   A      Yes, I do.

22   Q      What are they?

23   A      Exhibit 62 is a list of AOL e-mail folders.

24   These e-mail folders were found on Exhibit 1 in the

25   path documents and settings, owner, desktop, AOL
```

1    saved, PFCC, C underscore America Online, 9.0A,

2    organize cash, under the Captoes new mail.

3    Q     Is the information contained on Government

4    Exhibit 62 information you pulled off the

5    defendant's hard drive?

6    A     Yes, it is.

7    Q     And from which computer is that pulled from?

8    A     It was the laptop computer which we identified

9    as Exhibit 1.

10   Q     And, also, if you would please take a look at

11   Government's Exhibit Number 63.

12   A     Yes.

13   Q     What is that document?

14   A     63 is a carved chat between user IDs Captoes

15   and StricDad7.  It was found in the page file of the

16   Exhibit 1, the Dell laptop.

17         MS. KAISER:  Your Honor, at this time I'd move

18   for admission of Government's Exhibits 62 and 63

19   into evidence.

20         MR. TRAGOS:  May I see them, Your Honor?

21         THE COURT:  Yes, sir.

22   (Brief pause.)

23         MR. TRAGOS:  No objection.

24         THE COURT:  62 and 63 are now received.

25   (Whereupon, Government's Exhibit Numbers 62 and 63

Grawunder - Direct

1    were received into evidence.)

2            MS. KAISER:  Your Honor, may I publish them?

3            THE COURT:  You may.

4    BY MS. KAISER:

5    Q       Special Agent Grawunder, can you explain what

6    a carved search is.

7    A       During a carved search -- and in this

8    particular instance, the chats were not found in

9    their native format on the computers, so I had to

10   conduct a keyword search to find those chats.

11           The chats that -- in this exhibit resided in a

12   page file.  The page file is a file that's used by

13   the Microsoft operating system to essentially expand

14   the memory of the computer.  If there's not enough

15   RAM on the computer to do all the processes, the

16   operating system will write some of that information

17   to a file it creates called a page file.

18           And in that page file it essentially tricks

19   the operating system into thinking it has more --

20   the computer has more RAM than it does.  Contained

21   in the page file is files from all different types

22   of software, the operating system.  It's just a big

23   file full of stuff basically that the operating

24   system is putting in there temporarily.

25           In this case this chat still remained in that

 1      page file where it had been written at one time.

 2      And to get it into a usable format, we have to carve

 3      that data out and put it into a text or an HTML file

 4      so that it's viewable and readable by someone who

 5      would have the interest.

 6      Q      Now, Government's Exhibit 63 which I have on

 7      the overhead as well as Government's Exhibit 62 and

 8      61 all have a date at the bottom.  Is that the date

 9      it was printed off of an FTK disc?

10      A      Yes.  That's the date that that screen was

11      printed.  That's --

12      Q      So this is not -- this is a date internal for

13      law enforcement; is that correct?

14      A      Correct.

15      Q      And that date has nothing to do with the

16      defendant; is that correct?

17      A      Correct.

18      Q      What is the header at the bottom?  Aside from

19      that date, what does the bottom tell you?

20      A      That is the path of where that carved chat

21      resided on the CD that I created for the case agent.

22      So E is the optical drive that the CD was in, then

23      there's the case name.  Then the export folder is

24      where the file was exported to when it was -- when

25      the CD was created.  And then the carved chat.one

1       is the file name that I created for it when I carved

2       that chat out of the page file.

3       Q       Putting on the overhead Government 62, can you

4       tell the jury what we're looking at here.

5       A       This is a file properties list from the FTK

6       report.  The top name 12 is the bookmark number that

7       I titled search term seven.  And then the name of

8       the search term, StricDad7.  And then each one of

9       those blocks of information beneath that is a

10      different file that had a hit for that term.

11      Q       So would this -- is this evidence of e-mails

12      or anything with respect to StricDad7?

13      A       Yes.  This is not an e-mail message.  All it

14      is is a folder that was created detailing that there

15      was some type of communication with StrictDad.  The

16      communication did not have a subject line and the

17      date was on 6/17/2008.  And at the top where it says

18      full path, that was the original path where it was

19      found on the defendant's hard drive.

20              MS. KAISER:  Your Honor, may I approach?

21              THE COURT:  Yes.

22      BY MS. KAISER:

23      Q       Special Agent, I'm showing you what's been

24      premarked for identification as Government's

25      Exhibits 97 and 99, and ask you if you could take a

Grawunder - Direct

1        look at those documents.

2        A        Okay.

3        Q        When you were conducting your analysis of the

4        defendant's computers, did you locate any images

5        which would indicate the defendant had an interest

6        in sadistic or masochistic conduct?

7        A        Yes, I did.

8        Q        Have you reviewed those exhibits that I just

9        handed you?

10       A        Yes.

11       Q        And what are those exhibits?

12       A        These are graphic -- what we call graphic

13       images or pictures that were found on the hard drive

14       of Exhibits 1 and 2.

15       Q        Starting with Government's Exhibits 97 -- and

16       I handed you 97-1 through 97-20.  Where did those

17       images come from, which computer?

18       A        All of these images appear to have come from

19       Exhibit 1, the laptop.

20       Q        And that is for Government's Exhibits 97-1

21       through 97-20?

22       A        Yes, ma'am.

23       Q        And if you would take a look, please, at

24       Government's Exhibit 99.

25       A        Yes.

Grawunder - Direct

1    Q       Where did those images come from?

2    A       These three images came from Exhibit 2, the

3    desktop.

4            MS. KAISER:  Your Honor, at this time I'd move

5    for admission of Government's Exhibit 97-1 through

6    20 and 99 into evidence.

7            THE COURT:  Is 99 a composite exhibit?

8            MS. KAISER:  Yes, Your Honor.  My apologies.

9    Let me ask some follow-up.

10   BY MS. KAISER:

11   Q       Special Agent, for Government's Exhibit 99, is

12   that marked Government's Exhibit 99-1 through 99-3?

13   A       Yes.

14   Q       All right.

15           MS. KAISER:  At this time, Your Honor, I'd

16   move for admission of Government's Exhibits 97-1

17   through 20 and 99-1 through 99-3 into evidence.

18           THE COURT:  Any objection?

19           MR. TRAGOS:  Can I see the items, Your Honor.

20           THE COURT:  You may.

21   (Brief pause.)

22           MR. TRAGOS:  No objection.

23           THE COURT:  97-1 through 20 and 99-1 through

24   9 are now received.

25   (Whereupon, Government's Exhibit Numbers 97-1

Grawunder - Direct

1    through 97-20 and 99-1 through 99-3 are received into

2    evidence.)

3         MS. KAISER:  Your Honor, may I publish them to

4    the jury?

5         THE COURT:  You may.  One through three, I

6    apologize.  99-1 through 3.  So just give us the

7    number and the sub number, please.

8         MS. KAISER:  Yes, Your Honor.  Did you admit

9    97?

10        THE COURT:  Yes.  97-1 through 20 and 99-1

11   through 3.

12        MS. KAISER:  Yes.  Thank you.

13   BY MS. KAISER:

14   Q    Where was this photo located?

15   A    Exhibit 1, the laptop, partition one, no name,

16   NTFS, documents and settings, owner, desktop,

17   Charles Jackson, desktop, AOL saved, PFC American

18   Online 8.0, organize, Captoes, Captoes mail,

19   incoming saved mail, message 0642.

20        MR. TRAGOS:  Your Honor, I'd like to renew my

21   prior objections.

22        THE COURT:  Overruled.  If I've ruled on them

23   they are deemed ruled on.

24   BY MS. KAISER:

25   Q    That was Government's Exhibit 97-1; is that

Grawunder - Direct

1    correct?

2    A      Yes.

3    Q      And you noted that one was in his saved mail

4    folder; is that correct?

5    A      Yes.

6    Q      And if you would, describe what's depicted

7    for the record.  I'm putting on the overhead

8    Government's Exhibit 97-2.

9    A      It appears to be a man standing with his back

10   to the camera nude and another man appears to be

11   about to strike him with a -- some type of long

12   object like a leather belt or something.

13   Q      Government's Exhibit 97-3?

14   A      Depicts a man, looks like he's kneeling on the

15   floor leaning over and his back side appears to be

16   bruised red.

17   Q      And is he naked?

18   A      Yes, he is.

19   Q      Where was that image located on the

20   defendant's computer?

21   A      Appears to be the same path as the other one,

22   Captoes, incoming saved mail, message 2106.

23   Q      What is the very last indication on the file

24   path?  What is that?

25   A      I'm sorry, the file name?

Grawunder - Direct

1    Q      Yes.

2    A      MySpankAss.jpg is the name of the actual

3    picture.

4    Q      Government's Exhibit 97-4, can you describe

5    that for the jury.

6    A      Depicts a man laying naked on a couch with his

7    underwear around his knees and his hands and feet

8    are bound together and he has a -- some type of

9    device in his mouth.

10   Q      Where was this image located on the

11   defendant's computer?

12   A      Similar path, America Online, incoming saved

13   mail, message 0672.  And the file name on that one

14   is DAX295.jpg.  Just as -- may I make a note on that

15   one?

16   Q      Yes.

17   A      The bracket number, the 35844 surrounding the

18   file name is a unique -- yes, ma'am -- a unique

19   identifier that FTK put in there probably -- not

20   probably, but every file is given a different unique

21   item identifier.  And that's the one that happened

22   to be assigned to this one.  It just got attached to

23   the file name to guarantee its uniqueness so it

24   wouldn't be confused with another file of a similar

25   name.

1    Q       And why does the FTK program do that?

2    A       So every item -- every item is indexed when we

3    start a case, and that enhances searching, it

4    enhances putting the files with similar files.  And

5    again, it -- if a file has the same name but it's in

6    a different path, it keeps the two files from being

7    confused.

8    Q       Government's Exhibit 97-5.

9    A       Depicts a nude man.  Looks like he's laying on

10   a table with tape over his mouth and his legs are

11   bound.  Similar path, America Online, incoming saved

12   mail, message 0708.  That one the file name appears

13   to be 027.jpg.

14   Q       Exhibit 97-6?

15   A       Depicts -- appears to be a man laying facedown

16   on a sheet on the floor.  His hands and feet are

17   bound to something above him and his shirt -- and

18   partially removed.

19   Q       And the file path for that?

20   A       America Online, organize mail, incoming saved

21   mail.

22   Q       Government's Exhibit 97-7?

23   A       That depicts a man lying on some type of

24   table.  He's bound like a mummy accept for his

25   genitalia which is exposed and various straps are

Grawunder - Direct

1    attached to him.

2    Q        And what's the file path on that exhibit?

3    A        America Online, incoming saved mail, message

4    0205.   The file name on that one is MEbondage5.jpg.

5    Q        Government's Exhibit 97-8.

6    A        It appears to depict a nude male bending over

7    at the waist, appears to be wearing a jockstrap and

8    his backside is bruised red.

9    Q        97-9.

10   A        Depicts a man laying on a bed.  He does not

11   have any pants on.  His genitalia are exposed and

12   his arms appear to be restrained to the frame of the

13   bed.

14   Q        Was that image in the saved folder, as well?

15   A        Incoming saved mail, yes.

16   Q        Exhibit 97-10?

17   A        Depicts a man laying on his back on a bed,

18   shirt and pants have been removed.  And his -- it

19   appears his hands are behind his back and there's

20   restraints tied between his genitalia and his

21   ankles.

22   Q        Are his hands behind his back or above his

23   head?

24   A        I can't actually tell.  From my picture it

25   looks like they're behind his back, but I can't see.

Grawunder - Direct

```
1    Q      Was that also in the saved -- incoming saved
2    mail?
3    A      Yes, it was.
4    Q      97-11?
5    A      Depicts a nude man with his back to the
6    camera.  His legs and arms and appears his head are
7    restrained.
8    Q      97-12?
9    A      Depicts a man with no pants and his shirt's
10   unbuttoned with a blindfold around his eyes and his
11   arms are behind his back and he's sitting on a
12   chair.
13   Q      97-13?
14   A      Depicts a nude man laying down on a towel and
15   his genitalia and back side are bruised red.
16   Q      97-14?
17   A      Depicts a nude man laying on a bed and his
18   arms and legs appear to be restrained as well as
19   a -- some type of gag over his mouth.
20   Q      97-15?
21   A      That depicts a man in what appears to be
22   leather chaps with his genitalia exposed and open
23   shirt.  He's restrained to a chair, and behind him
24   is a man dressed in a uniform whose genitalia are
25   exposed and he's holding a gun to his head and
```

Grawunder - Direct

1      covering his mouth with his other hand.

2      Q        And 97-16.

3      A        Depicts a man with his shirt removed and his

4      pants undone.  His genitalia are exposed and tied to

5      his legs and chest.  And a shirtless man standing

6      behind him holding his hand over his mouth.

7      Q        97-17.

8      A        Depicts the side of what appears to be a man's

9      rear and hip area with scars on it.

10     Q        97-18.

11     A        Depicts a man kneeling on what appears to be a

12     bed with no pants, and his back side appears to be

13     bruised red.

14     Q        97-19?

15     A        Depicts a man sitting and he's nude.

16     Genitalia are exposed.  It appears his wrists are

17     restrained to his ankles.

18     Q        And 97-20?

19     A        That's a man undressed, laying on a rug, duct

20     tape over his mouth, ropes restraining his hands and

21     his ankles.

22     Q        Government's Exhibit 99-1?

23     A        That depicts a man who appears to be outside.

24     He's nude and he has restraints on him.

25     Q        Government's Exhibit 99-2.

1    A       Shirtless man who's restrained between two

2    pieces of wood and there's dark lines indicating

3    bruises across his back.

4    Q       99-3.

5    A       Depicts a man bent over with a bruised

6    backside.

7    Q       Agent, did you find any e-mails of the

8    defendant which demonstrated or showed any interest

9    in sadistic or masochistic activities?

10   A       Yes.

11          MS. KAISER:  Your Honor, may I approach the

12   witness?

13          THE COURT:  Yes, ma'am.

14   BY MS. KAISER:

15   Q       I'm showing you what's been premarked for

16   identification as Government's Exhibits 94, 95, 96

17   and 98, and ask if you can take a look at those

18   documents, please.  Government's Exhibit 94 that

19   you're looking at is a composite exhibit, 94A

20   through I.  Government's Exhibit 95 is a composite

21   exhibit, 95-1 through 95G, A through G, 95-20, A

22   through G.  Government's Exhibit 96 is a composite

23   exhibit, 96A and 96B.  Government's Exhibit 98 is a

24   composite exhibit, 98-1 through 98-5.

25   A       Okay.

1    Q       Have you completed your review?

2    A       Yes.

3    Q       What are Government's Exhibits 96, the entire

4    Composite Exhibits 96, 95, 94 and 98?

5    A       They are e-mails from both the defendant'

6    computers.

7            MS. KAISER:  Your Honor, at this time I'd move

8    for admission of Government's Exhibit 94, 95, 96 and

9    98, and all their subparts into evidence.

10           THE COURT:  Let's take them one at a time.

11   Government's Exhibit 94, any objection?

12           MR. TRAGOS:  One second, Your Honor.

13   (Brief pause.)

14           MR. TRAGOS:  No objection to Exhibit 94.

15           THE COURT:  94 is received.

16   (Whereupon, Government's Exhibit Number 94 is

17   received into evidence.)

18           THE COURT:  Then we have Government's Exhibit

19   95 subpart 1 through 20; is that correct?

20           MS. KAISER:  Subpart 1 through 20 and then 20

21   is A through G.

22           THE COURT:  A through G.

23           MS. KAISER:  Yes, Your Honor.

24           MR. TRAGOS:  Your Honor, can we have a side

25   bar?

```
1              THE COURT:  As to 95?

2              MR. TRAGOS:  Yes.

3              THE COURT:  Just a moment.  What about as to

4     96A and B?

5              MR. TRAGOS:  The side bar concerns all the

6     rest of the exhibits.

7              THE COURT:  All right.  Come forward, please.

8     (At side bar, on the record.)

9              THE COURT:  All right.  As to 95.

10             MR. TRAGOS:  Your Honor, the defense filed a

11    motion at the beginning of trial with reference to

12    Rule 106 as to completeness of her only putting in

13    like one e-mail out of context as opposed to the

14    entire string of e-mails for the whole conversation.

15    She -- 94 we did not object to because she has put

16    in all the greatscottadad e-mails.  But these other

17    ones she has picked and chosen and not put in the

18    entire string of the entire conversation.

19             THE COURT:  Do you have any authority that

20    requires the government to put on all e-mails in a

21    chain?

22             MR. TRAGOS:  Your Honor, Rule 106 requires

23    that if they only put on a portion of a writing or a

24    recording, and that that portion does not fully

25    explain or show the entire context of the
```

1    conversation, then they are required to put in the

2    entire context of the conversation and not just the

3    snippet.

4         THE COURT:  Response.

5         MS. KAISER:  Your Honor, Rule 106 only

6    contemplates putting in part of one document, not a

7    series of documents.  The defendant is incorrect in

8    his interpretation of Rule 106.  The government is

9    putting in the entire e-mail.  We're not just

10   picking a sentence from the e-mail.  We're putting

11   on the entire e-mail, so 106 is complied with.

12        THE COURT:  I'm sorry to interrupt.  But the

13   motions in limine filed pretrial are deemed renewed

14   by both sides.  To the extent there's an adverse

15   ruling, you don't need to renew that.  I know that's

16   what you -- I presume that's what you were doing

17   before.

18        MR. TRAGOS:  Yes.

19        THE COURT:  All right.  Government's

20   contention on 95-1 through 20 is sustained.  I will

21   overrule the objection.  95 will be received.  As to

22   96A and B, same objection or same argument?

23        MR. TRAGOS:  Yes, Your Honor.

24        THE COURT:  Likewise, these are two separate

25   e-mails, Ms. Kaiser?

1          MS. KAISER:  They're all separate e-mails.

2     Yes.

3          THE COURT:  I'm sorry.

4          MS. KAISER:  With respect to 95?

5          THE COURT:  No, 96A and B.

6          MS. KAISER:  They're separate e-mails, I

7     believe.

8          THE COURT:  And then 98-1 through 5 are five

9     separate e-mails?

10          MS. KAISER:  Correct, Your Honor.

11          THE COURT:  Same objection, Mr. Tragos?

12          MR. TRAGOS:  Yes, Your Honor.

13          THE COURT:  I'm going to overrule those

14     objections.  Anything else?

15          MR. TRAGOS:  Yes, Your Honor.  I'm sorry.  Go

16     ahead.

17          MS. KAISER:  Please.  Mine's not related to

18     this issue.

19          MR. TRAGOS:  Your Honor, during

20     cross-examination then I plan on putting in the

21     string of e-mails.  And I just want to let the court

22     know that that came before and after because as the

23     court will see when she -- my guess is she'll have

24     the agent read each one of them.  As the agent reads

25     them, the court will see it's in mid conversation.

1    And in this electronic age, several e-mails could be

2    one conversation.

3         THE COURT:  Any objection to that anticipated

4    cross-examination?

5         MS. KAISER:  Yes, Your Honor.  It would be

6    hearsay.  The defendant cannot put in his own

7    writings.

8         THE COURT:  Well, then, I'm going to sustain

9    his objection.  You can't put one document in and

10   leave it out of context if additional documents put

11   it in context.  That's not fair to the defendant.

12        MS. KAISER:  Then I will not object to his use

13   of hearsay on that basis.

14        THE COURT:  I don't know that it's hearsay.  I

15   don't know that it's being offered for the truth of

16   the matter.  Those are just e-mails that went back

17   and forth; is that right?

18        MR. TRAGOS:  Yes.

19        MS. KAISER:  Yes.

20        THE COURT:  Well, these e-mails are between

21   the defendant and who?

22        MS. KAISER:  Various people that he's chatted

23   with online.

24        THE COURT:  So the e-mails that you are

25   putting in are his own e-mails as opposed to e-mails

1      from other people?

2          MS. KAISER:  Some are the e-mails back and

3      forth between the two parties.  Primarily they're

4      his own, but some we put a series in that shows the

5      give and take between two parties.

6          THE COURT:  Let me just take 95, for example.

7      Would these be a series of e-mails in one setting,

8      such as the one like we've seen earlier where

9      there's a continuous conversation over the span of

10     several minutes?

11         MS. KAISER:  Can I retrieve the exhibit so I

12     don't misspeak?

13         THE COURT:  Sure.

14         MS. KAISER:  Thank you.

15         MR. TRAGOS:  Your Honor, this is --

16     (End of side bar discussion.)

17         THE COURT:  I know.  It's late in the day.

18     She doesn't let me control audio anymore.  I'm going

19     to let you guys go home.  We've got some discussion

20     and we're not going to make much productive use.

21     It's getting late in the day.  Let's return at 9:00

22     AM.

23         I will tell you that earlier conversations

24     with counsel indicated that we should conclude the

25     evidentiary presentation this week.  I'm optimistic

1       that we will, and it looks like perhaps arguments

2       Monday morning.  I'll let you do the planning.  I

3       know one of you has a prepaid vacation.  We haven't

4       forgotten.

5             So with that, let's recess for the day.

6       Please don't discuss the case or allow it to be

7       discussed in your presence and be safe and we'll see

8       you in the morning.

9             COURTROOM SECURITY OFFICER:  All rise.

10      (Jury out at 4:23 PM.)

11            MR. TRAGOS:  Your Honor, side bar.

12      (At side bar, on the record.)

13            THE COURT:  Why do you want a side bar?

14            MR. TRAGOS:  Instead of having that lady come

15      back tomorrow, why --

16            THE COURT:  Which lady?

17            MR. TRAGOS:  The one that's got the prepaid

18      vacation.

19            THE COURT:  I'll handle that on Friday.

20            MR. TRAGOS:  Okay.

21      (End of side bar discussion.)

22            THE COURT:  You're talking about the juror,

23      Mr. Tragos?

24            MR. TRAGOS:  Yes, Your Honor.

25            THE COURT:  All right.  We'll address that

1      Friday, if need be.

2           MR. TRAGOS:  Okay.

3           THE COURT:  Well, I wasn't overly impressed

4      with the defendant's Rule 106 argument.  But when

5      this rule was enacted, if you will, I'm not sure

6      e-mails even existed.

7           In the context of modern technology, there may

8      very well be a valid argument, Ms. Kaiser, under

9      Rule 106 when there is a -- and this is where we

10     left off at side bar -- where there's a continuous

11     exchange via e-mail or, for that matter, instant

12     messaging, between two people that span several

13     minutes or, you know, up to 30 minutes to an hour.

14     If it's a continuous conversation back and forth,

15     each e-mail and each instant message, of course, can

16     be considered a single document.

17          Now, my question to you with respect to 95-1

18     through 20 and then subparts A through G of 20 was

19     whether these e-mails, or whatever they are, I

20     assume they're e-mails, was a continuous

21     conversation in a singular setting between two

22     individuals.  And you wanted to look at the exhibits

23     to confirm what they were.

24          MR. TRAGOS:  Your Honor, I can provide the

25     court with an example.

1          THE COURT:  Why don't we let Ms. Kaiser answer

2     my question, please.  It's her exhibit.

3          MR. TRAGOS:  Okay.

4          MS. KAISER:  Exhibit 94 is --

5          THE COURT:  Well, 94 is in.  It's 95 we're

6     talking about.

7          MS. KAISER:  Okay.

8          THE COURT:  How many law students we got back

9     there in the back?  I know we have one.  He's

10    talking.  Two more back there?  No?  That's fine.

11    You're the agents?

12         MR. TRAGOS:  These are the nephews of the

13    defendant, Your Honor.

14         THE COURT:  Okay.  That's fine.  I thought

15    maybe they were law students.

16         UNIDENTIFIED SPEAKER:  Take that as a

17    compliment.

18         THE COURT:  I'm not suggesting it's a

19    compliment or not.  It's not uncommon to have law

20    students come in the back of the courtroom.  I

21    usually try to acknowledge them if I have a chance.

22         MS. KAISER:  95 is a collection of e-mails not

23    necessarily between -- not necessarily showing the

24    back and forth between each of the parties.  There's

25    a number -- for example, the last -- 95G -- 95-20 A

1      through G is all one person.   But 95-1 through 95-19

2      are give and take between the defendant and

3      different people, not necessarily the same person.

4      Some of them are.   There's a few from the same

5      people but there's a number from different ones.

6           THE COURT:   Is this in a chat room?

7           MS. KAISER:   No.   These are e-mails, not

8      chats.

9           THE COURT:   So he's talking to different

10     people in essentially one setting?

11          MS. KAISER:   Correct.   Correct.   One --

12          THE COURT:   From a time standpoint, he's

13     sitting at a computer and he's talking to more than

14     one person?

15          MS. KAISER:   No.   No.   It's just like he sends

16     one e-mail to one person.   That's what these are.

17     These are e-mails.   So it's like he sat down and

18     wrote a letter and then hit send to one particular

19     person.

20          THE COURT:   Well, I'm a little confused, then.

21     If we're talking about 95-1 through 20, how many of

22     those are authored by this defendant?

23          MS. KAISER:   18, 18 are written by the

24     defendant.

25          THE COURT:   All right.   And the remaining two

```
1      are responses to him from unknown people?

2           MS. KAISER:  Correct.

3           THE COURT:  And then within 20 you've got A

4      through G.  How many of those are authored by the

5      defendant?

6           MS. KAISER:  All of them.  A through G are all

7      written by the defendant.

8           THE COURT:  All right.  With the exception of

9      two of these e-mails, each of these documents or

10     e-mails are authored by this defendant, and that's

11     all the government wants to put in; correct?

12          MS. KAISER:  Your Honor, will you restate

13     that, please.  I want to make sure I understand.

14          THE COURT:  With the exception of two e-mails

15     in Exhibit 95, all of them are authored by this

16     defendant, and that is the extent of what the

17     government intends to produce with respect to

18     Exhibit 95; is that right?

19          MS. KAISER:  There's -- of the ones the

20     defendant didn't author, they have his -- his

21     original e-mail below, so it's in there.  So of the

22     ones that show from someone else, the correspondence

23     that the defendant wrote is below it.

24          THE COURT:  Right.  So two individuals

25     responded to the defendant.
```

1          MS. KAISER:  Correct.  And his -- his writings

2     to them are included.

3          THE COURT:  All right.  Now, what is it about

4     those exhibits, Mr. Tragos, which is unfairly

5     incomplete?

6          MR. TRAGOS:  Your Honor, may I use the

7     overhead?

8          THE COURT:  Just tell me.  It's 4:32.

9          MR. TRAGOS:  Here is one of the ones.  This is

10    number -- this is 95-5.

11         THE COURT:  You're not listening.  Just tell

12    me.  I trust you.

13         MR. TRAGOS:  It starts right in the middle,

14    thanks for yours.  In other words, it's a response

15    to somebody asking a question.  We have the e-mail

16    right before this one that he is saying, thanks for

17    yours, and he goes on to talk about questions he was

18    asked by this other person.  And that's just an

19    example.  And it goes on between the two of them

20    back and forth, back and forth, just like a regular

21    conversation would go on.

22         And -- and for the government to be able just

23    to put in a portion of the conversation without it

24    being placed into context is the problem we have

25    because when you start off by saying, thanks for

1     yours, then, obviously, there is something he's

2     responding to.

3          THE COURT:  What -- in this instance, what is

4     he responding to?  In the substance.  Just tell me.

5          MR. TRAGOS:  He's responding to an e-mail from

6     David talking to him about how he saw him on

7     Guyspank, how he sent him a picture and how he lives

8     in Portland and just all sorts -- and wants to be

9     mentored.

10          THE COURT:  So David sent all this to the

11    defendant?

12          MR. TRAGOS:  Right.

13          THE COURT:  And the defendant's response in

14    Exhibit 95 is, thanks, essentially?

15          MR. TRAGOS:  Right.  And yes, of course, I'm

16    interested.

17          THE COURT:  And you object to that coming in,

18    Ms. Kaiser?

19          MS. KAISER:  Well, I wasn't going to put it

20    in.

21          THE COURT:  Well, I know, but he wants to.

22    That's why we're talking about this.

23          MS. KAISER:  Right.  If he --

24          THE COURT:  He was asking, in fairness, before

25    I get up there and do this and hear an objection,

1    he's letting you know he wants to put these other

2    e-mails in to put it in context.  So the question I

3    have is do you have an objection to that procedure.

4         MS. KAISER:  No.  If he wants to put them in, I

5    don't care.

6         MR. TRAGOS:  Okay.  And, Your Honor, the two

7    of them go on talking.  That isn't the end of it.

8    And that's why I'm saying that it's unfair not to

9    put in the entire conversation.

10        THE COURT:  I just need -- I think he's just

11   asking whether or not there's going to be an

12   objection.

13        MS. KAISER:  If he wants to put in all the

14   defendant's e-mail correspondence, correspondence

15   that we haven't listed between the parties for the

16   exhibits that we have, that's fine with me.

17        THE COURT:  Well --

18        MS. KAISER:  I think it's hearsay, but I would

19   agree.  If he wants to use it, that's fine.

20        THE COURT:  Well, I have to -- even though at

21   side bar I wasn't impressed.  After reading Rule 106

22   and looking at -- I have to look at it in a more

23   contemporary setting.

24        And I think in fairness to this defendant, if

25   the government is going to put in an e-mail, albeit

1    authored by the defendant which is clearly

2    admissible as an admission or statement against

3    interest, the defendant, in fairness, ought to be

4    able to put on the other conversations, to the

5    extent it puts his comments in context.

6         In other words, in this electronic age, I'm

7    not sure that each e-mail stands on its own as a

8    writing.  We have related writings and they're not

9    really writings, they're electronic transmissions.

10   Now, that does not mean, Mr. Tragos, that you get to

11   go so far beyond the subject matter of the

12   government's evidence that it becomes problematic.

13   Now, how far are you going?

14        MR. TRAGOS:  It doesn't go beyond the subject

15   matter because the reason the government gets to put

16   it in, because of the court's prior ruling --

17        THE COURT:  Right.

18        MR. TRAGOS:  -- was because it deals with

19   bondage and strops and all that stuff.  The chain of

20   conversation deals with that between --

21        THE COURT:  How much longer, then -- I mean,

22   longer in terms of time, but how many more e-mails

23   are you going to present?

24        MR. TRAGOS:  Not all -- for instance, this is

25   95-5.  The first four that she's putting in, there

1    really isn't the chain.  So we're not -- there's

2    none there.  But on five there are certain ones

3    where there is a chain.  For instance, in this

4    one --

5         THE COURT:  So where it's a response to

6    something or --

7         MR. TRAGOS:  A response and then back -- back

8    and forth.  Yes.  This one, Your Honor, there's one,

9    two, looks like there's only like three or four.

10   And, Your Honor, in this one when she says, you

11   know, something about yours, the government hasn't

12   put it in but we plan on putting in -- we have the

13   photographs that he sent to doctor -- to Charles

14   Friedlander that Dr. Friedlander responded to.

15   Now --

16        THE COURT:  That he thanks him for?

17        MR. TRAGOS:  Yes.

18        THE COURT:  This is from David in Portland,

19   supposedly?

20        MR. TRAGOS:  Yes.  This is David in Portland.

21   To show, first of all --

22        THE COURT:  They're attachments, then?

23        MR. TRAGOS:  Yes.

24        THE COURT:  All right.  How about 96A and B?

25   What have we got with respect to A and B of 96,

1        Ms. Kaiser?

2             MS. KAISER:  We have -- this is two e-mails

3        from the defendant to Mark.

4             THE COURT:  Authored by this defendant to

5        someone else?

6             MS. KAISER:  Yes, Your Honor.

7             THE COURT:  In response to something or simply

8        unsolicited e-mails?

9             MS. KAISER:  It looks like -- from the context

10       it looks like it would be in response to something.

11            THE COURT:  And it has -- the subject matter

12       is what, generally?  Adult activities, along the

13       lines that we addressed in the motion in limine?

14            MS. KAISER:  Yes, Your Honor.

15            THE COURT:  All right.  Mr. Tragos, what have

16       you got in response?

17            MR. TRAGOS:  If I'm looking at the right one,

18       Your Honor, 96A?

19            MS. KAISER:  Um-hum.

20            MR. TRAGOS:  Okay.  96A says, thanks so much

21       for -- this is where it starts.  Thanks so much

22       for --

23            THE COURT:  So you want to put in the context

24       of what was sent to him?

25            MR. TRAGOS:  Right.  And again, the back and

1    forth between the two of them which deals with

2    sadomasochistic issues and domination.

3         THE COURT:  All right.  And how about 98-1

4    through 5, Ms. Kaiser?

5         MS. KAISER:  Three -- three of the five are

6    authored by the defendant to three different people,

7    and the last two are from someone to the defendant,

8    but it has the defendant's e-mail to him first.

9         THE COURT:  It's a response to the defendant?

10         MS. KAISER:  Yes, Your Honor.

11         THE COURT:  What do you intend to do with

12    these, Mr. Tragos?

13         MR. TRAGOS:  Your Honor, I'm trying to keep

14    these straight.  We're on 98 now?

15         MS. KAISER:  Yes, 98-4 and 98-5.

16         MR. TRAGOS:  Your Honor, again, there's a

17    chain here that shows the context in which this was

18    sent.  These are important, Your Honor, for a couple

19    of reasons.  One is to show, number one, that these

20    are adults that are conversing.  There are things

21    that go in there that show that these are adults.

22    And, again, it's back and forth.  Charles, are you

23    in Florida?  They just go back and forth between

24    these people.  I don't see how she can just pull out

25    one of the chain and show it to the jury.

```
 1          THE COURT:  Well, once again, in the context

 2    of electronic communications -- and I'm sure there's

 3    lots of cases out there, none of which have been

 4    cited to me, I did not anticipate this, of course,

 5    dealing with this, I'm sure I'm not the first judge

 6    to consider Rule 106 in this context, it seems to me

 7    that in fairness, although the government under the

 8    rule could be required to put it all in, I don't see

 9    the distinction between the defendant putting it in

10    as Mr. Tragos intends to.

11          I am fairly confident that none of this is

12    offered for the truth of the matter.  It's simply

13    what is being said back and forth.  It puts in

14    context the statements.  I think it's relevant to

15    the government's contention that this indicates

16    interest by this defendant in this type of activity

17    and why he was discussing it with respect to

18    children.

19          But at the same time, Mr. Tragos should be

20    able to bring out in cross-examination that it

21    was -- these comments were made in the context of

22    adult situations, ostensibly consenting adults.  So

23    I'm going to allow him to do what he has indicated

24    he would like to do on cross-examination.  But I

25    certainly would invite both of you to bring any
```

1    authority you may have by way of case law that could

2    guide me in this respect.

3         That way we don't have, as you indicated, the

4    Eleventh Circuit looking at this wondering what

5    Whittemore is doing.  If you don't give me case law

6    and I don't know this issue is going to come up, I

7    don't know to go do any research myself.  So I will

8    direct that you do some research, find me some

9    authority, even if it's dicta or a district court

10   decision, anything that might give me some

11   assistance.

12        MR. TRAGOS:  Your Honor, the motion we filed,

13   106, we --

14        THE COURT:  Yeah, I know.  You filed that

15   motion about the adult context, not whether Rule

16   106 -- in the context of e-mails.

17        MR. TRAGOS:  No, no.  The court might be

18   looking at the wrong motion, then.

19        THE COURT:  Well, just bring me the cases in

20   the morning.  That would help.  I'd like to look at

21   them to make sure I'm correct.  If I'm not correct,

22   I expect you to correct me, even though as an

23   officer of the court I think you have that duty.

24   Okay?

25        MR. TRAGOS:  Okay.

1          THE COURT:  What else?  You got this witness.

2     Who else you got, Ms. Kaiser?

3          MS. KAISER:  Special Agent Hagedorn.

4          THE COURT:  Is that your last witness?

5          MS. KAISER:  I believe so.  I'm sorry.  No, I

6     have another witness for AOL.

7          THE COURT:  Who will do what?

8          MS. KAISER:  Just explain a little bit about

9     AOL and how some of the other documentary evidence

10    that we're putting in, it helps explain that.

11         THE COURT:  I suspect that will be brief

12    testimony, then.

13         MS. KAISER:  Yes, Your Honor.

14         THE COURT:  All right.  Have you decided yet,

15    Mr. Tragos, what you're going to do other than what

16    you mentioned earlier in terms of time?

17         MR. TRAGOS:  Your Honor, I still -- that's

18    pretty much the same.

19         THE COURT:  What's your sequence in terms of

20    witnesses?

21         MR. TRAGOS:  Well, I have eliminated one

22    witness.  But my guess is that Dr. Friedlander may

23    be our first witness.  Again, I know the court won't

24    hold me to this, but currently that's my thinking

25    that he will be our first witness.  After that

1    Dr. Berlin because he has to definitely get out

2    Thursday night.  He has rounds to do at Johns

3    Hopkins on Friday.

4         So it will be Dr. Friedlander, Dr. Berlin.  On

5    Friday we have several witnesses, Dr. DiMarco, the

6    endocrinologist, will testify on Friday.  And then

7    we have four civilian witnesses, Your Honor, who are

8    acquaintances of Dr. Friedlander's.  And then we

9    have our computer experts.

10        THE COURT:  And your motion in limine,

11   Ms. Kaiser, is directed to which witness, DiMarco?

12        MS. KAISER:  DiMarco, Your Honor.  And also

13   perhaps --

14        THE COURT:  I'm sorry?

15        MS. KAISER:  And also the computer experts if

16   they want to testify about fantasy chat rooms.

17        THE COURT:  Well, I think my ruling on the

18   motion in limine is pretty clear.  I don't know of

19   anybody who's an expert in that.  Even if they claim

20   to be an expert, this jury needs help in

21   understanding what fantasy is.  So let's not plow

22   the same ground over and over again.

23        MR. TRAGOS:  I think I filed a response to her

24   motion saying that I would not ask them about

25   fantasy chat rooms.

```
1            THE COURT:  What about DiMarco?  What's the

2    main concern the government has?  You've got a

3    motion that's been filed and I've read it, but that

4    was Sunday night.

5            MS. KAISER:  If DiMarco is going to take the

6    stand and opine that perhaps the defendant had low

7    blood sugar or somehow he was confused or in any way

8    try to attack his competency, we consider that a

9    backdoor way of entering into some mental health

10   issue where there really is none.

11           THE COURT:  You're just concerned that he's

12   going to touch upon some mental competency or mental

13   illness subject matter?

14           MS. KAISER:  Correct, Your Honor.

15           THE COURT:  Or diagnose without having the

16   information and the examination?

17           MS. KAISER:  Exactly.  The United States

18   doesn't believe that the fact that the defendant has

19   diabetes is at all relevant to the charges.

20           THE COURT:  Then why have we heard four hours

21   about it?

22           MR. TRAGOS:  Exactly.

23           THE COURT:  Okay.  I don't know.  If it's not

24   relevant, we sure have been hearing a lot of stuff

25   about diabetes.  Mr. Tragos, what do you intend to
```

1    do with Dr. DiMarco?  He's an endocrinologist;

2    correct?

3         MR. TRAGOS:  Yes.  He's board certified and

4    he's an assistant professor at the University of

5    South Florida.

6         THE COURT:  What is he going to tell us?

7         MR. TRAGOS:  He's going to tell us that,

8    number one, how diabetes is related to erectile

9    dysfunction.

10        THE COURT:  All right.  Stop there.  That

11   seems to me to be a fair subject.  Ms. Kaiser, do

12   you agree or disagree?  Since it came up in the

13   context of the interview of the defendant --

14        MS. KAISER:  I don't think it's relevant, Your

15   Honor.  Just because it came up in the interview

16   doesn't mean it's necessarily relevant.

17        THE COURT:  All right.

18        MS. KAISER:  It doesn't go to a defense

19   because we've already established that there had to

20   be no contact.  It doesn't matter if he has erectile

21   dysfunction or not.

22        THE COURT:  It may go to intent.  I don't

23   know.  It's been brought up and I don't think it's

24   irrelevant.  Whether it's compelling or believable

25   or material to the jury's decision, I don't know.

1    But it -- we've already got evidence.  So next

2    subject matter.

3        MR. TRAGOS:  He will testify generally, Your

4    Honor, to the -- to a diabetic's need for food and

5    insulin.  He will not testify that at the time of

6    the interview he was impacted in any way by his

7    diabetes.  He is merely going to testify as to the

8    need for a diabetic to have food and insulin.

9        THE COURT:  And this is premised, I presume,

10   on the defendant testifying to lay an evidentiary

11   foundation for the relevance of this?

12       MR. TRAGOS:  Well, if the -- I believe that --

13   I'm not sure, but the medical records the government

14   introduced earlier already deal with the fact that

15   he is a diabetic.

16       THE COURT:  Well, the fact he is a diabetic is

17   one thing.  But drawing an inference from that

18   condition to a suggestion that he was in any way

19   impacted mentally or physically by that condition is

20   quite another.

21       MR. TRAGOS:  He will be testifying.  But I do

22   understand the court and I understand there's not --

23       THE COURT:  I'm not sure even if he does

24   testify the foundation is going to be there.

25       MR. TRAGOS:  Right.

1          THE COURT:  So be on guard and be aware that

2     there is an objection.  That was the main thrust of

3     the motion, as I read it, Ms. Kaiser, correct?

4          MS. KAISER:  Yes, Your Honor.

5          THE COURT:  Primary.

6          MS. KAISER:  Yes.

7          THE COURT:  What else we got with Dr. DiMarco?

8     Diabetic, he has erectile dysfunction that might be

9     related.

10          MR. TRAGOS:  That's it.

11          THE COURT:  That's it?

12          MR. TRAGOS:  Yeah.

13          THE COURT:  Well, I think the first subject is

14     relevant in light of the testimony that -- and

15     evidence we're heard so far.  The second subject may

16     or may not be.  I have some concerns about that.

17     What I'll do is I'll deny the government's motion in

18     limine which, Madam Clerk, is Docket Number --

19          COURTROOM DEPUTY CLERK:  110.

20          THE COURT:  It was just filed.  Is that it,

21     Ms. Kaiser, 110?  You may not have the docket

22     numbers.

23          MS. KAISER:  I don't know, Your Honor.

24          THE COURT:  It's the one related to

25     Dr. DiMarco.  I thought I had it but I don't see it.

1        COURTROOM DEPUTY CLERK:  Yes, sir, it's 110.

2        THE COURT:  110.  All right.  I'm going to

3    deny the motion to the extent the government seeks

4    to prohibit the defendant's introducing evidence

5    concerning -- through this doctor, of course --

6    concerning the relationship between diabetes and

7    erectile dysfunction.

8        I will grant it to the extent that the

9    government objects to the defendant putting on

10   evidence that this defendant at the time he was

11   interviewed was in any way impacted or affected by

12   his diabetic condition; and, thirdly, grant it to

13   the extent that the government objects to the

14   defendant presenting evidence through Dr. DiMarco

15   that a diabetic is affected by lack of food or

16   nourishment or insulin, unless there is an

17   evidentiary foundation upon which that expert could

18   give an opinion.  Otherwise, it's irrelevant.

19       So in that respect, Mr. Tragos, approach the

20   bench if you think you have an evidentiary

21   foundation which would make that testimony relevant.

22   At this juncture, I will say there is not a

23   sufficient foundation in the evidence for any

24   testimony, that is, to make that testimony relevant.

25   He's not opining as to -- you don't intend to have

1       him opine as to Mr. Friedlander's particular

2       condition on that day of the interview --

3               MR. TRAGOS:  No.

4               THE COURT:  -- in any event.

5               MR. TRAGOS:  No.

6               THE COURT:  Okay.  What else we got for

7       housekeeping?

8               MR. TRAGOS:  Your Honor, the only other thing

9       I'll bring to the court's attention, since the

10      government has put on those medical records, I will

11      be showing those to Dr. DiMarco and there may be an

12      additional issue that he may wish to testify to.  I

13      may come to the court about -- about those medical

14      records.  And he's also board certified in internal

15      medicine, as well.

16              THE COURT:  All right.  Are you board

17      certified in what you do?

18              MR. TRAGOS:  Yeah, I am.

19              THE COURT:  They all are.

20              MS. KAISER:  Your Honor, I have a housekeeping

21      matter.

22              THE COURT:  Okay.

23              MS. KAISER:  I noticed in the presentation of

24      Government's Exhibits 97 and 99, that on the file

25      path page that we printed out to show where the

1        items came from, at the very bottom there's a strip

2        which the jury wasn't shown because I just focused

3        on the top part so I never published it, but it has

4        the FTK information as to -- as to where that image

5        was on the FTK report.  And I just noticed it.  And

6        I know the defense, if they had seen it, would most

7        likely have an objection, I wouldn't blame them.

8               But, for example, it says sexual items,

9        bestiality and adult pornography image at the very

10       end of the strip.

11              THE COURT:  That would have been something

12       that the agent characterized the file as in a title?

13              MS. KAISER:  Yes.  On the FTK discs they

14       create different headings and then they put the

15       evidence that they find under those headings.

16              THE COURT:  So what, are you proposing that

17       you redact that?

18              MS. KAISER:  Yes, Your Honor.

19              THE COURT:  Any objection?

20              MR. TRAGOS:  No objection.

21              THE COURT:  Just show Mr. Tragos what you're

22       going to redact.  Go ahead and get that done and

23       bring it back to me.

24              MR. TRAGOS:  I think I know what she's talk --

25       is the FTK disc themselves in evidence?

1          MS. KAISER:  No.

2          THE COURT:  They were not moved.  54A and 55A

3     are not in evidence.

4          MS. KAISER:  Correct.

5          THE COURT:  They were identified but not in

6     evidence.

7          MS. KAISER:  Yes, Your Honor.

8          THE COURT:  All right, anything else?

9          COURTROOM DEPUTY CLERK:  Is 54 and 55 in?

10          THE COURT:  54A is not in, 55A is not in, but

11     I think there is a 54.  Let me double-check.  There

12     is a 54 which is the computer tower, the Gateway,

13     and 55 is the laptop.  All right.  Have a good

14     evening.  We'll see you in the morning at 9:00 AM.

15          MS. KAISER:  Thank you, Your Honor.

16     (Hearing adjourned.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF FLORIDA            )

 4     COUNTY OF HILLSBOROUGH      )

 5         I, Linda Starr, RPR, Official Court Reporter for

 6     the United States District Court, Middle District,

 7     Tampa Division,

 8         DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 268, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 28th day of February 2009.

19

20

21              /s/ Linda Starr
                Linda Starr, RPR, Official Court Reporter
22

23

24

25
```