```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION


 3        UNITED STATES OF AMERICA,


 4            Petitioner,


 5               vs.          CASE NO. 8:08-CR-318-T-27TGW
                              11 DECEMBER 2008
 6                            TAMPA, FLORIDA
                              PAGES 1 - 229
 7                            VOLUME IV


 8


          CHARLES JACKSON FRIEDLANDER,
 9
              Defendant.
10
          _____/
11
                      TRANSCRIPT OF TRIAL PROCEEDINGS
12            BEFORE THE HONORABLE JAMES D. WHITTEMORE
                      UNITED STATES DISTRICT JUDGE
13                         and a jury


14        APPEARANCES:


15        For the Petitioner:  Amanda C. Kaiser
                               United States Attorney's Office
16                             Suite 3200
                               400 N. Tampa Street
17                             Tampa, Florida 33602


18        For the Defendant:   George E. Tragos
                               Tragos & Sartes, PL
19                             Suite 800
                               601 Cleveland Street
20                             Clearwater, Florida 33755


21                             Peter Anthony Sartes
                               Tragos & Sartes, PL
22                             Suite 800
                               601 Cleveland Street
23                             Clearwater, Florida 33755


24         Proceedings recorded and transcribed by
          computer-aided stenography.
25
```

```
 1     Court Reporter:          Linda Starr, RPR
                                Official Court Reporter
 2                              801 N. Florida Avenue
                                Suite 13B
 3                              Tampa, Florida 33602

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             COURTROOM SECURITY OFFICER:  All rise.  This

2      Honorable Court is in session, The Honorable James

3      D. Whittemore presiding.

4             Be seated, please.

5             THE COURT:  Bring them in, please.

6             COURTROOM SECURITY OFFICER:  Rise for the

7      jury, please.

8             THE COURT:  Good morning.  Please be seated.

9      Ms. Kaiser, you may resume examination.

10            MS. KAISER:  Thank you, Your Honor.  Your

11     Honor, when we last left off, the government had

12     moved for admission of Government's Exhibits 94, 95,

13     96 and 98 into evidence.  I believe 94 may have

14     already been admitted.

15            THE COURT:  94 is received.  95, 1 through 20,

16     those are received.  96A and B are received.  And 98

17     1 through 5 are received.

18     (Whereupon, Government's Exhibit Numbers 94, 95, 1

19     through 20; 96A and B; and 98 1 through 5 are

20     received into evidence.)

21            MS. KAISER:  Thank you, Your Honor.

22     BY MS. KAISER:

23     Q      Good morning, Agent Grawunder.

24     A      Good morning.

25     Q      Yesterday we had published to the jury some

1    photos that were on the defendant's computer.   Is

2    that correct?

3    A       Yes.

4    Q       Were those photos that we published a sample

5    of the photos that were on his computer?

6    A       Yes.

7    Q       That was not the entirety of the pictures on

8    his computer; is that correct?

9    A       That's correct.

10   Q       Do you know approximately how many photos were

11   on the defendant's computer?

12   A       I'd have to look at my notes.

13   Q       That's fine.   Would that refresh your

14   recollection?

15   A       Yes, it would.   Exhibit 1, the laptop, had

16   approximately -- or actually exactly 12,963

17   graphics.   Exhibit 2, the desktop, had 16,927

18   graphic files.   That includes pictures, items from

19   the internet and pictures and icons that would be

20   included on the operating system.

21         MR. TRAGOS:   Objection, Your Honor, as to the

22   distinctions between Exhibits 1 and 2.   I believe

23   that's an incorrect exhibit number.

24         THE COURT:   Overruled.   You can correct that

25   on cross.

1    <u>BY MS. KAISER:</u>

2    Q      Agent, those -- those numbers that you just

3    mentioned aren't necessarily all pornographic

4    pictures, by any -- by any means; correct?

5    A      That's correct.

6    Q      So that's including -- does the computer

7    calculate how many images there are, whether or not

8    it's just a picture from a website, as well?

9    A      Yes, it does.

10   Q      Yesterday you testified that one of the things

11   that Agent Hagedorn had asked you to do was look at

12   the defendant's e-mails; is that correct?

13   A      Yes, it is.

14   Q      And that was what we had just admitted as

15   Government's Exhibits 94 through 98; is that

16   correct?

17   A      Yes.

18   Q      During your search of the defendant's

19   computers, were you able to locate any buddy lists?

20   A      Yes, I did.

21   Q      Did those buddy lists contain the name of the

22   undercover agent Romanosky, StricDad7?

23   A      Yes.

24          MS. KAISER:  Your Honor, may I approach the

25   witness?

1          THE COURT:  Yes, ma'am.

2     BY MS. KAISER:

3     Q      Agent, I'm showing you what's been marked for

4     identification as Government's Exhibit 102, and ask

5     you if you recognize that document.

6     A      Yes, I do.

7     Q      And what is that document?

8     A      This is the buddy list from AOL.

9     Q      And where did that buddy list from AOL come

10    from?

11    A      Documents and settings, owner, desktop, AOL

12    saved PFC, C underscore America Online, 9.0A

13    organize, Captoes.  And the file extension is BAG

14    for the buddy list.

15    Q      Which of the defendant's computers did that

16    come from?

17    A      It actually appears to be a couple of buddy

18    lists here.  They all came from the laptop.

19         MS. KAISER:  Your Honor, at this time I'd move

20    for admission of Government's Exhibit 102 into

21    evidence.

22         THE COURT:  Any objection.

23         MR. TRAGOS:  No objection.

24         THE COURT:  102 is received.

25    (Whereupon, Government's Exhibit Number 102 is

1    received into evidence.)

2    BY MS. KAISER:

3    Q     Did Special Agent Hagedorn ask you if you

4    could find any information on the defendant's

5    computers regarding DunedinSuperDad?

6    A     Yes, he did.

7    Q     And were you able to find any information

8    regarding DunedinSuperDad on the defendant's

9    computer?

10   A     Yes.

11         MS. KAISER:  May I approach the witness.

12         THE COURT:  We just dimmed those.  Is that a

13   bit more comfortable?  These halogens get a little

14   hot.

15   BY MS. KAISER:

16   Q     Agent, I'm showing you what's been premarked

17   for identification as Government's Exhibit 103.  Do

18   you recognize that document?

19   A     Yes, I do.

20   Q     And what is that?

21   A     This is a section of text that was carved from

22   the laptop.  And just like the carved text we

23   discussed earlier, this one came from drive free

24   space, which is a blank area of the hard drive that

25   the operating system currently isn't using.  It's

1    where deleted files are stored.  And from some of

2    the text in this carved section of chat, it appears

3    the term DunedinSuperDad showed up in a member

4    directory dot AOL dot com profile.

5    Q      Was DunedinSuperDad the profile of Kurt

6    Romanosky from 2005?

7           MR. TRAGOS:  Objection.

8           THE COURT:  Grounds?

9           MR. TRAGOS:  Basis for his knowledge,

10   predicate.

11          THE COURT:  If you know.  Overruled.

12          THE WITNESS:  I don't know the time of when he

13   was using that.

14   BY MS. KAISER:

15   Q      All right.  Are you aware that

16   Corporal Romanosky used DunedinSuperDad?

17          MR. TRAGOS:  Objection, leading.

18          THE COURT:  Sustained.

19   BY MS. KAISER:

20   Q      When you performed your analysis of

21   defendant's computers, did Agent Hagedorn ask you to

22   look to see if he had any favorites saved, AOL

23   favorites saved on his computer?

24   A      Yes.

25   Q      Were you able to locate any AOL favorites?

1    A       Yes.

2    Q       Agent, I'm showing you what has been marked

3    for identification as Government's Exhibit 104, and

4    ask if you'll take a look at that document, please.

5    A       Okay.

6    Q       What is that document?

7    A       This is an FTK list of 1429 files that are in

8    the American Online organized favorite places folder

9    from the defendant's computer.

10   Q       And which of the defendant's computers did

11   that come from?

12   A       Exhibit -- my Exhibit 2, which is the desktop.

13           MS. KAISER:   Your Honor, at this time I'd move

14   for admission of Government's Exhibit 104 into

15   evidence.

16           THE COURT:   Any objection?

17           MR. TRAGOS:   No objection.

18           THE COURT:   104 is received.

19   (Whereupon, Government's Exhibit Number 104 is

20   received into evidence.)

21   BY MS. KAISER:

22   Q       Did Agent Hagedorn ask you to look for any

23   address books on the defendant's computers?

24   A       Yes.

25   Q       Were you able to locate any address books?

1     A     Yes.

2           MS. KAISER:  Your Honor, may I approach?

3           THE COURT:  Yes, ma'am.

4     BY MS. KAISER:

5     Q     Agent, I'm showing you what's been premarked

6     for identification as Government's Exhibit 106.

7     What is that document?

8     A     It's an AOL address book.

9     Q     And where did that come from?

10    A     The desktop, documents and settings, owner dot

11    Charles, desktop, AOL saved PFC, C underscore

12    America Online 9.0a, organize, from the profile

13    Captoes.

14          MS. KAISER:  Your Honor, at this time I'd move

15    for admission of Government's Exhibit 106 into

16    evidence.

17          THE COURT:  Any objection?

18          MR. TRAGOS:  No objection.

19          THE COURT:  106 is received.

20    (Whereupon, Government's Exhibit Number 106 is

21     received into evidence.)

22    BY MS. KAISER:

23    Q     Did Agent Hagedorn ask you if you could find

24    any evidence of Detective Romanosky's profile

25    StricDad7 on the desktop?

1      A      Yes.

2      Q      Were you able to find any evidence in any

3      e-mail folders of StricDad7 on the defendant's

4      desktop computer?

5      A      Yes.

6      Q      I'm showing you what's been marked for

7      identification as Government's 105, and ask you if

8      you recognize those documents.

9      A      Yes, I do.

10     Q      What are they?

11     A      It's an AOL e-mail folder indicating an

12     electronic communication between StricDad7 on

13     6/19/2008 and 6/30/2008.

14     Q      And from what computer did those come from?

15     A      The desktop.

16     Q      Would that be the defendant's desktop?

17     A      Yes.

18            MS. KAISER:  Your Honor, at this time I'd move

19     for admission of Government's Exhibit 105 into

20     evidence.

21            MR. TRAGOS:  No objection.

22            THE COURT:  105 is received.

23     (Whereupon, Government's Exhibit Number 105 is

24      received into evidence.)

25     BY MS. KAISER:

Grawunder - Direct

12

```
 1    Q       Did Agent Hagedorn also ask you to look for a

 2    buddy list on the defendant's desktop to see if it

 3    had the profile of the undercover officer Corporal

 4    Romanosky?

 5    A       Yes.

 6    Q       Were you able to find any buddy lists?

 7    A       Yes.

 8    Q       I'm showing you what's been marked for

 9    identification as Government's Exhibit 107 and ask

10    you if you recognize that document.

11    A       Yes, I do.

12    Q       What is that document?

13    A       This is an AOL buddy list.  It comes from the

14    desktop computer of the defendant.  It was found in

15    the documents and settings, owner dot Charles,

16    desktop, AOL saved PFC, C underscore America Online

17    9.0B, organize, Captoes file path.

18            MS. KAISER:  Your Honor, at this time I'd move

19    for admission of Government's 107 into evidence.

20            THE COURT:  Is there any objection?

21            MR. TRAGOS:  No objection.

22            THE COURT:  107 is now received.

23    (Whereupon, Government's Exhibit Number 107 is

24    received into evidence.)

25    BY MS. KAISER:
```

Grawunder - Direct

1    Q      Did Special Agent Hagedorn ask you if you

2    could find any information about the 2005 profile of

3    Corporal Romanosky, DunedinDad, on the desktop?

4    A      Yes.

5    Q      I'm showing you what's been marked as

6    Government's 109, and ask if you recognize that

7    document.

8    A      Yes, I do.

9    Q      What is that?

10   A      This is a carved section of the defendant's

11   desktop that include the text for DunedinSuperDad.

12   It came from the drive free space of the hard drive

13   which is, again, an area that's not currently being

14   used by the operating system but it is known to

15   store deleted files.

16         MS. KAISER:  Your Honor, at this time I'd move

17   for admission of Government's 109 into evidence.

18         THE COURT?  Any objection.

19         MR. TRAGOS:  May I have a moment, Your Honor?

20         THE COURT:  Yes, sir.

21   (Brief pause.)

22         MR. TRAGOS:  No objection.

23         THE COURT:  109 is received.

24   (Whereupon, Government's Exhibit Number 109 is

25     received into evidence.)

1     BY MS. KAISER:

2     Q     Did Agent Hagedorn ask you to look for any

3     information regarding the 2005 profile of

4     Corporal Romanosky, DunedinDad, on the laptop?

5     A     Yes.

6     Q     I'm showing you what's been marked as

7     Government's Exhibit 111.  Do you recognize that

8     document?

9     A     Yes, I do.

10    Q     What is it?

11    A     Just as in the last exhibit, this is a carved

12    section of text from the laptop computer containing

13    the term DunedinSuperDad.  And again, this appears

14    to have come from a member directory dot AOL dot com

15    profile.

16          MR. TRAGOS:  I'm sorry.  Was that Exhibit 107?

17          MS. KAISER:  111.

18          MR. TRAGOS:  Oh, 111.  I'm sorry.

19          MS. KAISER:  Your Honor, at this time I'd move

20    for admission of Government's exhibit 111 into

21    evidence.

22          THE COURT:  Is there any objection?

23          MR. TRAGOS:  No objection.

24          THE COURT:  111 is now received.

25    (Whereupon, Government's Exhibit Number 111 is

1    received into evidence.)

2         MS. KAISER:  Your Honor, may I have a moment?

3         THE COURT:  Yes, ma'am.

4    (Brief pause.)

5    BY MS. KAISER:

6    Q     Was a complete clone or copy of the

7    defendant's hard drives produced to the defense in

8    this case?

9    A     Yes.

10   Q     Is that Immigration and Custom Enforcement's

11   regular practice to provide a clone to every

12   defendant?

13        MR. TRAGOS:  Objection, Your Honor,

14   irrelevant.

15        THE COURT:  I'm going to allow it.  Overruled.

16        THE WITNESS:  Our normal procedure is to

17   provide a copy of the evidence in the same format

18   that we use, which is a separate hard drive that's

19   been wiped and then the image -- a forensic image

20   has been placed onto it so it's a forensically sound

21   piece of evidence and it's not bootable and it's not

22   in an exact -- it is an exact copy of the contents

23   of the hard drive, but it -- a mirror or clone is --

24   is an exact copy to the extent it can be placed in

25   the defendant's machine and booted exactly like his

1    was.  But that allows the operating system to make

2    changes to the evidence.

3         The copy that we use, the evidence files are

4    broken up into chunks called E01 files where the

5    evidence is contained within those files and it's

6    not bootable and it's not able to be changed.  And

7    that's the format we usually provide to defense.

8    BY MS. KAISER:

9    Q    Why don't you normally just give them a clone

10   copy?

11   A    The problem with a clone copy is it can be --

12   if it's plugged into a computer without a -- some

13   type of write block, the evidence will automatically

14   be changed by the operating system.  If it's

15   attached via a USB to be browsed, the operating

16   system will write files to that evidence and

17   potentially change it.

18   Q    When you performed your analysis and did your

19   FTK report, was that intended to be all exclusive of

20   all the information on the computer or just a select

21   amount?

22   A    It's -- no.  It's a select amount.  It's a

23   summary of the information that's contained.

24   Q    And how did you determine what you were going

25   to look for?

1    A       Through conversations with the case agent.

2            MS. KAISER:  I have no further questions.

3    Pass the witness.

4            THE COURT:  Cross-examination.

5                     CROSS-EXAMINATION

6    BY MR. TRAGOS:

7    Q       To go back, the clone that you provided to the

8    defense, that was an exact copy of the material that

9    you used to do your research, as well; is that

10   correct?

11   A       Yes, sir.  That's correct.

12   Q       So you gave the defense the same thing you

13   had?

14   A       No, sir, that's not technically correct.  It

15   is the same information, it's just in a different

16   format.

17   Q       Well, you had the computer; right?

18   A       Yes.

19   Q       And you -- that -- what you did is you made a

20   total copy of the hard drive on the computer; right?

21   A       Correct.

22   Q       And you gave it to the defense; correct?

23   A       Correct.

24   Q       So that's exactly what you also possessed?

25   A       Correct.

Grawunder - Cross

```
 1    Q       So you and the defense, then, were on equal

 2    footing?

 3    A       The only difference is the format that we use

 4    is only viewable with the forensic software that we

 5    have available to us.

 6    Q       I'm not talking about the format, I'm talking

 7    about the evidence.

 8    A       Yes.

 9    Q       The defense then got the same evidence that

10    you had?

11    A       Yes.

12    Q       And all those things you talked about with

13    regards to the clone, those are also things you

14    could do?

15    A       Yes.

16    Q       I'd ask you to take a look at 104.  What is

17    that?

18    A       This is a list of the AOL favorites.

19    Q       And what are AOL favorites?

20    A       They are a list of places that have been

21    visited or marked as favorites within the AOL

22    software.

23    Q       How many of them are there?

24    A       1429.

25    Q       And did you determine that any of those were
```

Grawunder - Cross

1      child pornography sites that were visited?

2      A      No.

3      Q      So none of them were?

4      A      Not that -- I did not personally review this

5      entire list.  It was given to the case agent.  But

6      from what I had reviewed, I do not know of any child

7      pornography sites at all.

8      Q      Of the how many, 1400 and something?

9      A      That's correct.

10     Q      Okay.  By the way, on Exhib it 104, you say

11     you did a sampling to see if there were any child

12     pornography sites?

13     A      I just viewed them visually to see if anything

14     stuck out.

15     Q      Okay.  And I think you reviewed Exhibit 106?

16     A      Yes, sir.

17     Q      What is 106?

18     A      An AOL address book.

19     Q      How many entries are there?

20     A      I cannot tell from this, they're not numbered.

21     But there are 100 pages with approximately 12 per

22     page.

23     Q      So approximately 1200 --

24     A      Yes, sir.  That's correct.

25     Q      -- entries.  And what is an address book?

1       A       An address book is a list of contacts used to

2       communicate online.

3       Q       In other words, people that the owner of that

4       computer would be talking to --

5       A       Yes, sir.

6       Q       -- on e-mailing, that kind of thing; correct?

7       A       Yes, and vice versa.

8       Q       And vice versa.  That he would get e-mails

9       from?

10      A       Yes, sir.

11      Q       There's 1200 of them there?

12      A       Yes, sir.

13      Q       What time period -- do you know what time

14      period that covers?

15      A       I do not.  Because this file is continually

16      updated from AOL and through different versions of

17      AOL, I do not know the exact timeframe.

18      Q       Did you in any way attempt to make contact

19      with or find out who the people in the address book

20      were?

21      A       I did not.

22      Q       Did you request a subpoena from AOL or did you

23      request from AOL any of the identities of those

24      people?

25      A       No, I did not.

1    Q       You have before you Exhibit 102.  What is

2    that?

3    A       This is the buddy list from AOL.

4    Q       And what is a buddy list?

5    A       It's a list of user online profiles used to

6    communicate online.

7    Q       And those, again, are people that either

8    communicated to Captoes or Captoes communicated

9    with; correct?

10   A       Yes.

11   Q       And how many people are on that list?

12   A       This first one has over 70.

13   Q       The first what?

14   A       There are several of these buddy lists.  They

15   were found in different paths and different versions

16   of the software, and they all appear to be

17   approximately the same size.

18   Q       How many pages do you have there?

19   A       The first one is three pages.  The second one

20   is three pages.

21   Q       Okay.  Go ahead.

22   A       The next one is three pages.  They all appear

23   to be about three pages long.

24   Q       And are 70 just the first page or are 70 for

25   three pages?

1     A       Three pages.

2     Q       Okay.  All these other items, buddy lists,

3     address books -- by the way, how many address books

4     did you find?

5     A       I believe one.

6     Q       Okay.  In which computer was that?

7     A       I believe it was the desktop.

8     Q       Okay.  How many buddy lists did you find?

9     A       I don't recall.

10    Q       Now, you also testified to carving out;

11    correct?

12    A       Yes, sir.

13    Q       Now, tell me, explain carving out.

14    A       When we conduct searches for specific terms,

15    some of the hits will be in traditional viewable

16    files.  Some will be hits in areas of the hard drive

17    that are not a traditional file.  They've either

18    been -- usually those areas are files that have been

19    deleted and they're no longer viewable by the

20    operator, but they still can be seen with our

21    software.

22            And it's also information that's found in

23    system files that's used by the operating system to

24    do things like communicate over the internet or

25    create temporary files.  And so we carve data out of

1    those areas to make them viewable for the case

2    agent.

3    Q      So these are items that the person who was

4    operating the computer actually deleted?

5    A      They could be.  More than likely that's where

6    they came from.  Or as an example, from the page

7    file from yesterday, it's a file that the operating

8    system was using.

9    Q      So this is a file that the user had no control

10   over?

11   A      Correct.

12   Q      Let me show you Exhibit 111.  Is that a carved

13   file?

14   A      Yes, sir, it is.

15   Q      And that's what a carved file looks like?

16   A      Yes.

17   Q      And what is -- let's see.  You found -- in

18   that top row there, I see kind of at the end there,

19   it looks like a Dunedin, S, and then the next row

20   SuperDad?

21   A      Yes, sir.

22   Q      That's what you were looking for; right?

23   A      Yes, sir.

24   Q      Included in all of these when you carve these

25   files out like this there's other information, too,

1    right?

2    A      Yes, sir.

3    Q      And the information doesn't have to relate to

4    each other; does it?

5    A      Correct.

6    Q      Because in those carved files, they're just

7    randomly put in there by the system?

8    A      It's not quite random, but it is intermixed

9    with other information either ahead of it or before

10   it.

11   Q      So when we see like DunedinSuperDad there,

12   what's right before it or right after it could be

13   something related to totally -- something totally

14   unrelated to DunedinSuperDad?

15   A      Yes, it could be.

16   Q      Because that's the way -- when you either

17   delete or the system takes over something, that's

18   the way they do it?

19   A      Yes, that's correct.

20   Q      This is not anything that the user has any

21   control over?

22   A      No, it's not.

23   Q      But you have special software?

24   A      Yes.

25   Q      Let me show you 109.  Is this also a carved

Grawunder - Cross

1      item?

2      A      Yes, it is.

3      Q      And again, like before, this is nothing that

4      was saved by -- no action had to be taken or no

5      control, I guess, by the user of the computer with

6      reference to this information?

7      A      Correct.  What -- this is a snapshot in time

8      of something that existed on the computer at some

9      time.  And a lot of the unfamiliar characters and

10     squares in there, a lot of times that's formatting

11     for something like an HTML web page that -- since

12     this is not an HTML document, it doesn't show like

13     it would if it was the original document.

14     Q      Okay.  This is not an HTML web page?

15     A      That's correct.

16     Q      This just has, again, information -- well, let

17     me ask.  The computer places it in here randomly?

18     A      No.  There's -- there's specific reasoning why

19     those characters are there.  And those characters

20     don't mean anything to us.  But in its original

21     format, the computer would have interpreted those --

22     the best example of where it appears this came from

23     was an HTML web page.  It would have interpreted

24     those as maybe a line or tabs or some type of other

25     formatting.

1    Q       So to us looking at this it's meaningless?

2    A       It's not meaningless because it shows these --

3    that these file -- or that these buddy names were on

4    this computer at some time.

5    Q       Right.  But it doesn't show any information

6    about them?

7    A       Correct.

8    Q       Let me show you also which -- which I assume

9    is also part of Exhibit 109.

10   A       Yes, sir.  That's the file properties of that

11   exhibit.

12   Q       Now, is this something off the computer?

13   A       This is information from my forensic software.

14   It is -- in addition to actually showing the file,

15   it shows the properties of the file.

16   Q       This is not something that's on the computer?

17   A       It's in the computer in a format that's not

18   viewable.  Between myself and the operating system,

19   we pulled this information out such as the path is

20   where the file was found, the extension is a TXT,

21   which I created.  I named it a TXT so it would be

22   viewable.  And then on this particular file, the

23   created, modified, accessed and other information is

24   not available because of the type of file it is.

25   Q       Okay.  But this particular -- this exact

Grawunder - Cross

 1      document in this form, is this on the computer?

 2      A       No, it's not.

 3      Q       So this is something that was created by you

 4      using some special software?

 5      A       Yes, sir.

 6      Q       And when you say item number 171382, what does

 7      that mean?

 8      A       That's a unique number assigned by the

 9      forensic software to distinguish this file from

10      other files.

11      Q       So that's nothing that comes from the

12      computer, then?

13      A       No.

14      Q       That's strictly a number assigned by the

15      software?

16      A       Yes, sir.

17      Q       These files that you pulled off, can you tell

18      when those files were created?

19      A       Yes.

20      Q       The carved-out files?

21      A       No.

22      Q       So the carved-out files, there's no way to

23      tell how long they have been there or when they're

24      created or anything?

25      A       Yes, sir.  That's correct.

1    Q      I'll ask you to take a look at Exhibit 95.

2    A      Yes, sir.

3    Q      Now, are you able to tell on those -- those

4    are e-mails; correct?

5    A      Yes, sir, they are.

6    Q      Are you able to tell on those e-mails when

7    they were created?

8    A      Yes.

9    Q      What time?

10   A      The date.

11   Q      Why not the time?

12   A      The AOL software -- the view I have of the

13   software does not keep track of the time, just the

14   date.

15   Q      Please look at 95-6.

16   A      Yes, sir.

17   Q      Do you see the time?

18   A      Yes.

19   Q      Did you just tell me the view you have doesn't

20   include the time?

21   A      The view on some of the e-mails does not

22   include the time.

23   Q      What -- then what makes the difference between

24   when an e-mail would include a time and not include

25   a time?

```
 1      A       My understanding is that's a setting within

 2      America Online.

 3      Q       That they will include times on some and not

 4      others?

 5      A       I also believe that part of the one -- some of

 6      the ones that tell the time are incoming and the

 7      ones that are outgoing from Captoes do not have the

 8      time.  But, for example, on 95-6 that is an incoming

 9      e-mail from allarr55.

10      Q       Well, take a look down below, then.  You have

11      the other side of that conversation and you've got

12      the time.

13      A       Yes, sir.  That's a -- well, it was a reply to

14      his e-mail.  And in the reply section of that e-mail

15      the time is included.  Another issue that comes to

16      play --

17      Q       Excuse me.

18      A       I'm sorry.

19              THE COURT:  He can fully explain his answer.

20              MR. TRAGOS:  I just want to know what he's --

21      BY MR. TRAGOS:

22      Q       Are you answering the question?

23      A       It's related to the times.

24              THE COURT:  Go ahead, sir.  Did you finish

25      your answer?
```

```
 1              THE WITNESS:  Yes, sir.  I'm finished.

 2              THE COURT:  All right.

 3    BY MR. TRAGOS:

 4    Q       If you would, sir, take a look at 95-5.

 5    A       Yes, sir.

 6    Q       Now, do you see that e-mail from

 7    dwportland1977?

 8    A       Yes, sir.

 9    Q       Now, that isn't the entire conversation, is

10    it, between the two of them?

11    A       I cannot tell from this, but there could be

12    additional e-mails to and from these two people.

13              MR. TRAGOS:  May I approach the witness?

14              THE COURT:  Yes, sir.

15    BY MR. TRAGOS:

16    Q       I ask you to take a look at Defendant's

17    Composite Exhibit 20.

18    A       Yes, sir.

19    Q       Now, sir, do you recognize what those are?

20    A       Yes.

21    Q       What are they?

22    A       They appear to be additional e-mails between

23    dwportland1977 and Captoes.

24    Q       And do you see Exhibit 95-5 in that series?

25    A       Yes, sir.
```

1      Q      And do you recognize the format in which

2      they're in?

3      A      Yes.

4      Q      Is it the same format as you introduced

5      through the prosecutor in 95-5?

6      A      Yes.

7             MR. TRAGOS:  Your Honor, at this time we'd

8      move into evidence Exhibit 20.

9             THE COURT:  Is there any objection?

10            MS. KAISER:  No objection, Your Honor.

11            THE COURT:  Defendant's Composite Exhibit 20

12     is received.

13     (Whereupon, Defendant's Composite Exhibit Number 20

14     is received into evidence.)

15     BY MR. TRAGOS:

16     Q      All right.  Now, this starts out, thanks for

17     yours.  Do you see that?

18     A      Yes, sir.

19     Q      I'd like you to take a look at Exhibit 20-1.

20     Do you see that on July 34d, '06 at 3:56 PM, Captoes

21     writes to dwportland, and telling him that he saw

22     him on a website called Guy Spank and looking for

23     other guys to connect with.  Do you see that?

24     A      Yes, sir.  But I -- unless I misunderstood,

25     this is from dwportland to Captoes.

1    Q      Oh, excuse me.  From dwportland?

2    A      Yes, sir.

3    Q      So dwportland is then contacting Captoes?

4    A      Yes, sir.  That's correct.

5    Q      And dwportland is telling Captoes he saw him

6    on Guy Spank, which is a website?

7    A      Yes, sir.

8    Q      All right.  Now, then, the next day, on the

9    4thh, Captoes now is writing to dwportland; right?

10   A      Yes.

11   Q      Saying thanks for yours, yes, I'm interested

12   and the rest of that; correct?

13   A      Correct.

14   Q      Okay.  Now, when you look at an e-mail

15   sometimes there are attachments to that e-mail;

16   aren't there?

17   A      Yes, sir.

18   Q      Like photographs and things?

19   A      Yes, sir.

20   Q      Let me let you take a look at Exhibit 20,

21   pages seven and eight.  Do you see that?

22   A      Yes, sir.

23   Q      Now, that attachment, what does that identify?

24   A      A zip file.

25   Q      And what is in that zip file?

```
 1      A       I don't know.

 2      Q       What is IMG mean?

 3      A       That's -- usually that's an image.  But since

 4      that's the name of the file, it could be anything.

 5              MR. TRAGOS:  May I display to the jury, Your

 6      Honor, it's in evidence, pages 10 and 11 of Exhibit

 7      20.

 8      (Brief pause.)

 9      BY MR. TRAGOS:

10      Q       Sir, would you take a look at Exhibit 95-6.

11      A       Yes, sir.

12      Q       Now, this is an e-mail; correct?

13      A       Yes.

14      Q       And it is dated July 21st, 2006.  And it is --

15      A       I believe that's June 21st.

16      Q       I'm sorry.  June 21st, 2006.

17      A       Yes, sir.

18      Q       It is from allarr55 to Captoes?

19      A       Yes, sir.

20      Q       And then let me ask you, at the bottom we see

21      something else in kind of a different print.

22      Explain what that is.

23      A       The AOL header information, that's information

24      about the e-mail that is used by the internet and

25      America Online to communicate between different
```

1        e-mail addresses.

2        Q       You went too far down.  I'm talking about just

3        the part that says Sean.

4        A       Oh, yes, sir.  That appears to be the -- a

5        previous message from Captoes to Sean.

6        Q       And the way these things are, Sean, you would

7        assume, is allarr55; correct.

8        A       Yes, sir.  Yes, sir.

9        Q       And that the top, this section here, is an

10       answer to this?

11       A       Yes, sir.

12       Q       So this one here came first?

13       A       Yes, sir.

14       Q       If you would take a look at Exhibit 21,

15       Defendant's Exhibit 21 for identification.

16       A       Yes, sir.

17       Q       And do you recognize what those are?

18       A       Yes, sir.  They're e-mails.

19       Q       Do you find Exhibit 95-6 in that set of

20       e-mails?

21       A       Yes, sir.

22       Q       And on the back is a number.  What number is

23       that?

24       A       It's pages six and seven.

25       Q       Okay.  Of Exhibit 21?

1    A       Yes, sir.

2    Q       And do you recognize those e-mails as being

3    e-mails -- by the way, is string a term you're

4    familiar with?

5    A       String?

6    Q       Right, string of e-mails.

7    A       Yes, sir.

8    Q       Okay.  Do you recognize those e-mails as being

9    to and from or between allarr55 and Captoes?

10   A       Yes, sir, I do.

11   Q       Okay.

12           MR. TRAGOS:  At this time, Your Honor, we

13   would move Exhibit 21 into evidence.

14           MS. KAISER:  No objection, Your Honor.

15           THE COURT:  Exhibit 21 is received.

16   (Whereupon, Defendant's Exhibit Number 21 is

17   received into evidence.)

18   BY MR. TRAGOS:

19   Q       When you were -- by the way, when you were

20   doing your search and you pulled out specific

21   e-mails that are contained in Government's Exhibit

22   95, were you asked to put them in context, in other

23   words, put the string in, e-mails before, e-mails

24   after, that kind of thing?

25   A       Initially I was asked to place every e-mail

Grawunder - Cross

1      from both computers into my forensic report, with

2      the exception of exact duplicates and blank e-mails.

3      Q      So these strings, then, were actually in your

4      report?

5      A      Yes, sir.

6      Q      And that report was furnished to the

7      government; correct?

8      A      Yes, sir.

9      Q      Now, sir, take a look at page one of Exhibit

10     21.  You wrote me on sdaddys.com, that's the way it

11     begins; correct?

12     A      Yes.

13     Q      And this is from allarr55 to Captoes?

14     A      Yes.

15     Q      All right.  And in here all -- well, allarr55

16     says that he's slutboy55?

17     A      Yes.

18     Q      And he appears to write some prose.  This was

19     at June 16th, 2006, at 6:21?

20     A      Yes, sir.

21     Q      And the signature which occurs on page three

22     of that e-mail, he signs it slut boy?

23     A      Yes.

24     Q      And then we have all55 on June 17th, 2006 at

25     7:20 -- or 7:30 AM writing Captoes; is that correct?

```
 1      A       Yes, sir.

 2      Q       And he tells him, I am happy to hear that you

 3      are a very verbal master.

 4      A       Yes.

 5      Q       Do you see that?

 6      A       Yes.

 7      Q       Page six, another e-mail, and it is from

 8      allarr to Captoes in response -- and this is 95 --

 9      it's also the same one as 95-6; correct, Exhibit

10      95-6?

11      A       Yes, sir.

12      Q       Okay.  And Captoes tells him that he's about

13      two and a half hour drive, two and a half hour drive

14      from Tampa?

15      A       Yes.

16      Q       And then on July 13th, Captoes writes to

17      allarr saying, did you ever come to Florida's west

18      coast.  I am here just outside of Naples.

19      A       Yes.

20      Q       And that's -- that's July 13th, and the

21      alleged -- the arrangements for the visit were on

22      June 21st; correct?

23      A       Yes, sir.  That appears correct.

24      Q       Now, why do not all of the e-mails appear if

25      you do a search of the computer?  Why does that
```

1    happen that you don't find them all?

2    A      I'm not sure I understand.

3    Q      Well, let's say -- where were these found?

4    A      Where were those found?

5    Q      Yes.

6    A      In the AOL folders on the hard drive.

7    Q      Why wouldn't all of the e-mails between two

8    people be found in that AOL folder?

9    A      If they'd been deleted or if they resided on

10   AOL's online storage system.

11   Q      And so AOL does not keep all the e-mails on

12   their online storage system?

13   A      I'm not an expert with AOL, but most -- if

14   I'm -- for most e-mail providers, they only keep

15   e-mails for a certain length of time to conserve

16   their server space.

17   Q      And in this case, AOL's information was

18   subpoenaed for Captoes; correct?

19   A      I don't know.

20   Q      Oh, you didn't?  I thought you did review

21   that.

22   A      No.  I did not subpoena anyone in this case.

23   Q      Did you see AOL information?

24   A      No.  No, sir.

25   Q      They never showed you anything from AOL?

```
 1      A      No, sir.  I do believe I saw that there was a

 2     disc from AOL and -- but I did not review the

 3     information on that disc.

 4      Q      Now, sir, do you still have Exhibit 95 in

 5     front of you?

 6      A      Yes, sir.

 7      Q      Now, sir, take a look at Exhibits 95-8, 10,

 8     11, 12 and 13.

 9      A      Yes, sir.

10      Q      Those appear to be from -- they appear to be a

11     conversation between Captoes and the same person?

12      A      Yes.  Absalom2 at hotmail.com.

13      Q      I ask you to take a look at Defense Exhibit

14     22.  And ask you if you would to see if within

15     Exhibit 22 those e-mails are contained from Exhibit

16     95.

17      A      Yes, they are.

18            MR. TRAGOS:  Your Honor, at this time the

19     defendant would move Exhibit 22 into evidence.

20            MS. KAISER:  No objection, Your Honor.

21            THE COURT:  22 is received.

22     (Whereupon, Defendant's Exhibit Number 22 is

23      received into evidence.)

24     BY MR. TRAGOS:

25      Q      Agent, if you would when we -- I'm going to go
```

1    through 22, Exhibit 22.  As I do, when we come to

2    one that is part of Exhibit 95, would you please let

3    me know.  Those are the ones that I gave you in

4    95-8, 10, 11, 12 and 13.  Okay?

5    A    Yes, sir.

6    Q    Okay.  The first one that we have a record of

7    is January 1st, 2005; correct?

8    A    Correct.

9    Q    And on that one, the sender is Absalom, the

10   receiver is Captoes.  Hi, Charles.  Just checking

11   the e-mail -- checking to see if the e-mail is

12   correct before sending a longer letter -- go

13   slower -- and photo.  Just a rely and say okay, best

14   wishes, John; is that correct?

15   A    Yes.

16   Q    And we have the response, your note arrived,

17   all is okay; correct?

18   A    Yes, sir.

19   Q    Then from Absalom to Captoes there's an

20   attachment there.  At desk dot JPG.  Do you see

21   that?

22   A    Yes, sir.

23   Q    So when someone -- explain that.  When someone

24   sends an attachment, how does that work?

25   A    In this case it appears that someone sent a

1       picture titled at desk to Captoes, the user name

2       Absalom2.  And attached to this e-mail with the text

3       below where it notes the attachment.

4       Q       And why is it that in searching the computer

5       information that you've provided that someone is not

6       able to find that attachment?  Why would that be?

7       A       Well, it can be a couple of reasons -- a

8       couple of ways that can happen.  An attachment can

9       be attached to an e-mail as a traditional attachment

10      where it's essentially a second page.  It can also

11      be an imbedded picture that's within the e-mail or

12      it can be a link to an e-mail.

13              The -- and then reasons -- and so that would

14      affect how it would be downloaded onto the person's

15      computer from the e-mail provider.

16      Q       Does the computer -- in each of these cases

17      when you get an e-mail like this, if it's imbedded

18      in the e-mail or it's an attachment, the operator --

19      in all cases the operator can do something for it to

20      be on the computer or is it automatic?

21      A       No.  The operator has to do something for it

22      to be on the computer.

23      Q       So if I open up an e-mail and imbedded in the

24      e-mail is a picture, the computer doesn't

25      automatically save the picture somewhere?

1      A      It depends on the software that's providing

2      the e-mail service.

3      Q      How about AOL?

4      A      I don't know for sure how AOL operates.

5      Q      So it can be -- so it's possible that the

6      computer operation internally, without the operator

7      doing anything, would save the picture?

8      A      I'm not sure in AOL's case exactly how it

9      works so I can't specifically answer that question.

10     Q      I wasn't talking AOL.  I was saying was it a

11     possibility that exists.

12     A      Most e-mail software that I am aware of, it

13     prompts the user to do something to open the

14     attachment.  There are some that if the picture is

15     actually imbedded within the e-mail as you -- it

16     will appear just below the text.  So it is

17     downloaded onto the computer when the message is

18     open.

19     Q      I know you -- are you aware that the -- I

20     guess the -- what word does AOL use to save a

21     picture?  Do they use the word save, download?  What

22     do they use?

23     A      I don't know.  The -- the e-mail -- when the

24     e-mail and the attachments are downloaded onto a

25     person's computer, they go into a folder that I

1    believe is called incoming saved.

2    Q       Are you familiar with a temp file?

3    A       Yes.

4    Q       What is a temp file.

5    A       A temp file is an operating system file that

6    is used to temporarily store data.

7    Q       When this e-mail comes in and if there's a

8    picture imbedded in it, that goes to the temp file

9    automatically; doesn't it?

10   A       I don't know the answer to that question.

11   Q       Microsoft doesn't save it to a temp file?

12   A       I don't know how specifically that's going to

13   operate partly because this e-mail system is

14   operating within AOL.

15   Q       Let's say you go to a web page and there are

16   pictures on a web page.  Do they not go

17   automatically to a temp file?

18   A       Yes, they do.

19   Q       So you're saying that that operates

20   differently than the e-mails operate?

21   A       I cannot say because I am not an expert in AOL

22   and how their -- AOL is a combination of online

23   e-mail and e-mail that's saved on the person's hard

24   drive so it operates in two different worlds.  And

25   I'm not an expert in AOL so I can't testify to

1    exactly how those are accomplished.

2    Q        You say you found about 26, 27,000 graphic

3    images on these two computers?

4    A        I don't remember the number, but that sounds

5    about right.

6    Q        And can you tell whether or not those images

7    came from e-mails or web sites or where they came

8    from?

9    A        Yes, I can.

10    Q        Tell us then, sir, the images that were

11    introduced into evidence by the government,

12    Exhibit --

13             THE COURT:  97.

14             MR. TRAGOS:  Thank you, Your Honor.

15             THE COURT:  Perhaps 99.  I don't know which

16    one you're referring to.

17    BY MR. TRAGOS:

18    Q        Exhibit 97, the whippings and various things

19    done to men.

20    A        Yes, sir.

21    Q        Where did they come from?

22    A        Most of these appear to come from the incoming

23    saved mail folder.  Here's one that comes from

24    America Online 7.0 download folder.  Another one

25    from America Online 7.0 download folder.  This one

Grawunder - Cross

1      is from owner, my documents, my pictures.  But it

2      appears other than those three or so, the remaining

3      all come from the incoming saved mail AOL folder.

4      Q      People sent those images to that computer?

5      A      Yes, sir.

6      Q      You talked about AOL 7 on there.

7      A      Yes.

8      Q      How old is AOL 7?

9      A      I don't know.  I know the -- I believe the

10     current version is nine something.

11     Q      So if they were sent to the computer, they had

12     to be an attachment to an e-mail or imbedded in the

13     e-mail?

14     A      Or a link that was on the internet.

15     Q      So it should show up when you saved the

16     picture that you went to a link?

17     A      It would save it in a temporary internet file

18     which it appears that none of those specific

19     pictures are.

20     Q      So none of these were saved in a temporary

21     internet file?

22     A      Correct.

23     Q      And none of those came from any type of a web

24     site?

25     A      The two or three that were in the download

1    folders, I cannot say where those came from.  They

2    were downloaded from AOL.  And the one that was in

3    the my documents, I cannot say where that came from

4    originally.

5    Q      What is that?

6    A      I believe that that is -- can you move it up a

7    little bit.

8    Q      This way?

9    A      Actually where it starts beneath the message.

10   Q      Does that help?

11   A      It actually would be page one, or the bottom

12   of page one.  Okay.  What I believe that to be is

13   the -- the way that a computer reads an attachment

14   is not how we see a picture.  It's a series of

15   characters that are then interpreted as a photo.

16   And I believe that's that type of code to indicate

17   that that was a picture that was attached to that

18   e-mail.

19   Q      Was your software able to break that code?

20   A      No.  Usually what happens when it looks like

21   that is the file header of the attachment has been

22   corrupted so the operating system and my software

23   cannot tell what -- for sure what type of file it

24   is.  And since there is information missing, it

25   cannot be viewed in its original or proper format.

1    Q      On January 15th, we see this is an e-mail from

2    Absalom to Captoes; correct?

3    A      Yes, sir.

4    Q      January 15th.  And if you look into the body,

5    you'll see where it starts here, I had a 23-year

6    relationship with a man 40 years my senior who died

7    seven years ago.

8    A      Yes, sir.

9    Q      Okay.  And down here if you look, I am an

10   ordained priest of the Church of England but work at

11   the University of London?

12   A      Yes, sir.

13   Q      Here we have a January 7th, 2006 e-mail from

14   Absalom to Captoes where he says, dear sir, your boy

15   is still in Brisbane and having a great time.  See

16   that?

17   A      Yes.

18   Q      And then here, hugs and licks from your

19   naughty boy touring the world?

20   A      Yes.

21   Q      Now, sir, if you look at Government Exhibit

22   95-9 and 95-20 A through G.  Do you see those, sir?

23   A      Yes.

24   Q      I ask you to look at Defense Exhibit 23.  Do

25   you see who those are to and from in Exhibit 23?

 1      A      Yes.

 2      Q      Who are they to?  Well, who are the two

 3      players in that one?

 4      A      They are between pj_mass at Yahoo.Com and

 5      Captoes at AOL.com.

 6      Q      And the items identified in 95, who are they

 7      between?

 8      A      PJ_mass and Captoes.

 9             MR. TRAGOS:  Your Honor, we move Exhibit 23 --

10      is that 23?  I'm sorry.  I've lost track.  23 into

11      evidence.

12             MS. KAISER:  No objection, Your Honor.

13             THE COURT:  23 is received.

14      (Whereupon, Defendant's Exhibit Number 23 is

15       received into evidence.)

16      BY MR. TRAGOS:

17      Q      Sir, here we have an e-mail, subject spanking

18      from pj_mass to Captoes.

19      A      Yes.

20      Q      And it starts out, hello, and thanks for

21      sending a message on Silver Daddies.  Are you

22      familiar with Silver Daddies?

23      A      Only from this case.

24      Q      On January 13th, 2006, pj_mass refers to

25      Captoes as hi, dad.  Do you see that, sir?

1    A      Yes.

2    Q      And he tells him, I'm in my thirties and have

3    been interested in this type of traditional spanking

4    for as long as I can remember.

5    A      Yes.

6    Q      Here on January 13th, same day, thanks for

7    your prompt reply.  Discipline of my boy is for his

8    own benefit.

9    A      That's correct.

10   Q      Then we have a message from -- this is page

11   12 -- from pj_mass to Captoes.  And what I'd like to

12   have you take a look at, do you see at the bottom

13   here where it's says, dear PJ?

14   A      Yes.

15   Q      And he says, call me, and gives a phone

16   number.

17   A      Yes.

18   Q      And he -- and the signature on that is dad?

19   A      Yes.

20   Q      Now, is this bottom part an e-mail from

21   Captoes to PJ?

22   A      Yes.

23   Q      All right.  And then the top part -- by the

24   way, there's no date or time on this one; is there?

25   A      I do not see one, no.

Grawunder - Cross

1    Q       And the top part -- this is a reply from PJ to

2    Captoes; correct?

3    A       Yes.

4    Q       Again, January 17th of '06, we again have --

5    basically, this actually contains two e-mails;

6    doesn't it?

7    A       Yes.

8    Q       The bottom one is from dad to PJ?

9    A       Yes, sir.

10   Q       The top one is from PJ to dad?

11   A       Yes, sir.

12   Q       Here we have from PJ to Captoes; correct?

13   A       Yes.

14   Q       January 30th.

15   A       Yes.

16   Q       And we have a -- this is in the -- the first

17   part is in response to dad writing to PJ; right?

18   A       Correct.

19   Q       And what dad says to PJ is, you are right.

20   Boys need a dad's strict guidance no matter what

21   their age.

22   A       Yes.

23   Q       Again, on January 30th.  First dad writes PJ.

24   This dad uses razor strops and straps only as did

25   some in Victorian times.

1      A       That's correct.

2      Q       Then PJ writes back, I have never had a razor

3      strop dad and worry about welting.  When you say

4      strop, is that like a belt a dad would wear with a

5      suit?

6      A       That's correct.

7      Q       Again, we have an e-mail containing two

8      e-mails, where dad is answering that and dad says to

9      PJ, a little wider than a suit one.  And then PJ

10     says to dad, will you use it with me over your knee;

11     correct?

12     A       Correct.

13     Q       Response, over the knee and across the bed,

14     both, or OTK and across the bed, both?

15     A       Correct.

16     Q       Now, let me just if I could clarify with you.

17     We're seeing this thing kind of roll.  Here we're

18     seeing a repeat of just the prior e-mail on the

19     bottom there?

20     A       Yes, sir.

21     Q       Is that the way it works when you kind of keep

22     replaying to e-mails?

23     A       Yes.

24     Q       Okay.  So there's PJ's again from the previous

25     one.  And then we have -- excuse me, dad's again.

```
 1      Then we have PJ replying, it gives me butterflies

 2      thinking of standing before you, undo my belt and

 3      bare my bottom after lecturing me and then being

 4      guided over your knee and positioned for the

 5      inevitable discipline; correct?

 6      A      Correct.

 7             THE COURT:  Why don't we take our midmorning

 8      break at this time, 15 minutes.

 9             COURTROOM SECURITY OFFICER:  Rise for the

10      jury, please.

11      (Jury out at 10:30 AM.)

12      (Recess was taken at 10:30 until 10:48 AM.)

13             COURTROOM SECURITY OFFICER:  All rise.  This

14      Honorable Court is again in session.

15             THE COURT:  Bring the jury in, please.

16             COURTROOM SECURITY OFFICER:  Rise for the

17      jury, please.

18      (Jury in at 10:48 AM.)

19             THE COURT:  Thank you, and be seated.  You may

20      resume examination of the witness.

21             MR. TRAGOS:  Thank you, Your Honor.

22      BY MR. TRAGOS:

23      Q      Agent, I believe we were just going to move to

24      another exhibit.  Would you please look at 95-14.

25      A      Yes, sir, I see that.
```

1    Q     Here we have the government's exhibit, thanks

2    for yours.  I'm a very strict dad.  Like man who

3    administers corporal punishment only.  I never use

4    wood, only leather.  I usually do it across the bed

5    or over a chair.  By the way, this is July of '05;

6    correct?

7    A     Yes.

8    Q     OTK never can be hard enough.  I am 70,

9    five-ten, 185 pounds, full head of silver hair.  I

10   surely feel boys should yell or cry when being

11   disciplined.  Do it for a purpose to correct poor

12   behavior and language.  Does it -- does this fit in

13   with your needs?  Charles.

14         Now, this is from Captoes to Kenboost;

15   correct?

16   A     Kenbost.  B-O-S-T.  Yes, sir.

17   Q     Let me ask you to take a look at Defendant's

18   Exhibit 24.

19   A     Yes.

20   Q     And is it -- and is it between the same

21   parties, Kenbost and Captoes?

22   A     Yes, sir.

23         MR. TRAGOS:  Your Honor, at this time we'd

24   move Exhibit 24 into evidence.

25         MS. KAISER:  No objection.

```
 1            THE COURT:  24 is received.

 2       (Whereupon, Defendant's Exhibit Number 24 is

 3    received into evidence.)

 4    BY MR. TRAGOS:

 5    Q       Just to refresh our recollections, you

 6    provided all of the -- these e-mails to the

 7    prosecution; correct?

 8    A       To the case agent.  Yes, sir.

 9    Q       To the case agent.  Right.  Let me show you --

10    again, re-checking the date, show you an e-mail

11    dated June 24th between Kenbost and Captoes.  This

12    is from Kenbost.

13    A       Yes, sir.

14    Q       Hi.  I'm a 52-year-old little boy.  Six feet,

15    190 pounds who needs real daddy spanking from a real

16    daddy.  Thanks, Ken.  Is that what it says?

17    A       Yes.

18    Q       So Kenbost there is describing himself as 52

19    years old?

20    A       Yes.  That's what it appears.

21    Q       And this e-mail is not contained in Exhibit

22    95, correct, Government's Exhibit 95.

23    A       I do not believe so.

24    Q       Then on June 30th, we have another one of

25    those e-mails that show the first e-mail on the
```

1      bottom and the answer on top; correct?

2      A      Correct.

3      Q      And so it starts out with, Kenny, which I

4      might -- by the way, it looks like to Kenbost;

5      correct?

6      A      Yes.

7      Q      Thanks for your e-mails.  Will be traveling

8      from July 3rd to the 13th, then back in DC.  Will be

9      in Boston first week or so of August.  Tell me about

10     you.  This is a real dad and spanks hard, Charles.

11     A      Yes, sir.

12     Q      Then the other part, this is the reply from

13     Kenbost to Charles; correct?

14     A      Yes.

15     Q      And that is a repeat of the prior e-mail that

16     was read; correct?  Wait, I'll put that up for you.

17     Compare the two.  Actually, it's not a repeat; is

18     it?

19     A      It's -- no.  Some of the text is similar, but

20     there's additional text in the second e-mail.

21     Q      So he -- but he's still saying he's 52 years

22     old, 190 pounds and a little boy.

23     A      Correct.

24     Q      Now, sir, if you look at Government's Exhibit

25     95-15 and 16.

```
 1      A       Yes, sir.

 2      Q       Let me ask you, in that exhibit, by the way,

 3      government's exhibit, we have this page again, and I

 4      just want to emphasize, this is something that is

 5      created by the software you were using; correct?

 6      A       Yes.

 7      Q       This does -- the information.  But the

 8      items -- the way it looks here, this page does not

 9      appear on the computer, the defendant's computer?

10      A       Correct.

11      Q       Let me ask you to take a look at Exhibit 25,

12      government's -- excuse me, Defense Exhibit 25.  And

13      ask you, sir, if you see within those e-mails the --

14      Government's Exhibits 15 and 16.

15      A       Yes, I do.

16      Q       And are all those e-mails between the same two

17      parties, Captoes and Sincereperson41?

18      A       Yes, sir, they are.

19              MR. TRAGOS:  Your Honor, at this time the

20      defense would move Exhibit 25 into evidence.

21              THE COURT:  Any objection?

22              MS. KAISER:  May I see them, Your Honor?

23              THE COURT:  Yes, ma'am.

24      (Brief pause.)

25              MS. KAISER:  No objection, Your Honor.
```

```
 1              THE COURT:  25 is received.

 2      (Whereupon, Defendant's Exhibit Number 25 is

 3   received into evidence.)

 4   BY MR. TRAGOS:

 5   Q      Now, the first e-mail in the exhibit is dated

 6   April 9th, 2005.

 7   A      Yes.

 8   Q      And it's from Sincereperson41 to Captoes.

 9   Haven't heard back from you for a while.  I have no

10   problem that you are 71.  Mature men are usually

11   more experienced.  Is that right?

12   A      That's what it says, yes.

13   Q      Then the next e-mail is a copy of Government's

14   Exhibit 20 -- excuse me, 95-16.  In there he says,

15   I'm sorry, he has house guests, very tight structure

16   who will be disciplined if the structure is not

17   perfectly kept; correct?

18   A      Yes.

19   Q      Then the next e-mail on April 19th, 2005,

20   says, sorry, sir.  This is from, by the way,

21   Sincereperson41 to Captoes; right?

22   A      Correct.

23   Q      Sorry, sir.  I didn't go online for a couple

24   of days.  Just picked up your message.  I am also

25   looking for a tightly structured living environment,
```

1    one where the boy, quote, end quote, is trained in

2    an exacting manner for precise performance of

3    duties.

4    A      Yes.  That's correct.

5    Q      And now after that one, the government

6    introduced this one as 95 -- excuse me, 95-15.

7    Thanks for your e-mail.  My living environment is so

8    totally structured that there will be little wiggle

9    room.  My boy will be so totally trained that his

10   performance will always be precise.  He will be very

11   heavily disciplined at all times and only by me.  He

12   will make no decisions at all.

13   A      That's correct.

14   Q      And following Government's Exhibit 95-16, we

15   have this e-mail.  Sir, I certainly do expect --

16   excuse me.  Sir, I certainly do not expect any

17   wiggle room, unless you ask me to wiggle part of

18   myself for your delight.  I enjoy strict training

19   since it leaves no doubt as to expectations.  I also

20   appreciate that you -- that only you discipline the

21   quote, boy, end quote.  It also therefore no doubt

22   who has to be pleased.

23   A      That's correct.

24   Q      April 20th.  Thanks.  I thought yesterday's

25   reply didn't go.  Actually, I think a strict

1    disciplinarian is easier to serve.  While he may be

2    more demanding of a boy and it may be more painful,

3    at least he knows with exacting detail what is

4    expected of him with each instruction.  The

5    important part is the training given the man of the

6    house training the boy as to how he should stand or

7    kneel, how to domestically serve him, how to

8    personally serve him.  Actually it's the rigid

9    training by an experienced man is what I enjoy.

10   A       Yes.  That's what it says.

11   Q       Without reading the entire e-mail, he also

12   refers to him as a boy again, correct?  Discipline

13   my boy, do you see that?

14   A       Yes.

15   Q       April 20th, from Sincereperson41 to Captoes.

16   I am thankful that you liked what you heard in my

17   last reply.  As I said, I strangely enjoy being

18   trained as a houseboy.  Is important that the man

19   sees himself as the -- quote, the, end quote, man of

20   the house.  That he consistently expects the boy to

21   perform as trained, that deviation from instructions

22   is permitted.  From past experiences I have a lot of

23   respect for a man with a razor strop in his hand or

24   hanging on a wall hook.  Respect is generated by the

25   boy knowing that bad behavior is dealt with by the

1      absolute certainty of discipline.

2      A      That's correct.  Except for I believe you left

3      that no decision.

4      Q      I'm sorry?

5      A      In the fourth line, that -- or no deviation

6      from instructions.

7      Q      That's why I stopped.  I didn't read it right.

8      A      Yes, sir.

9      Q      Thank you.  April 21st, yes.  Disrespect and

10     disobedience can't and never will be tolerated.  If

11     it occurred more than once, I would no doubt whip

12     train the boy.  His dress must also be inspected

13     each day, pants pressed, shoes shined, etcetera.  He

14     will wear only boxers and usually socks with

15     garters.  He will always be available to the man of

16     the house on a 24/7 basis but will usually sleep

17     with the man of the house.

18     A      That's correct.

19     Q      And skipping to April 24th.  Dress code would

20     be -- this is from Captoes to Sincereperson41.

21     Dress code would be conventional dress.  Shirt,

22     coat, tie, boxers, dark shoes, black or brown,

23     shined, dress shoes.  The implements would be laid

24     out on a table for the boy to see, hold, examine and

25     ask any short questions.  The boy would along the

1    way undress to be inspected by the man of the house.

2    A    Yes.

3    Q    Now, sir, if you look at 95-17, Government's

4    95-17.

5    A    Okay.

6    Q    Now, this is Government's 95-17.  And this is

7    from Captoes to Nautical1971.

8    A    Yes, sir.

9    Q    And it starts out, was great talking with you

10   on the phone this afternoon.  Certainly looking

11   forward to your visit this Wednesday evening.

12   Definitely feel we shall have a most enjoyable time

13   together.  Here are the directions.  And then he

14   gives the directions; correct?

15   A    Correct.

16   Q    What was the date of 95-19?

17   A    95-17, sir?

18   Q    I'm sorry, 95-17.

19   A    October 15th, 2004.

20   Q    So here we have an e-mail of October 15th,

21   2004.  And it is from Captoes to nautical dad -- I

22   mean, Nautical1971.  And he says, I received your

23   Silver Daddy's request for a pic.  I'm enclosing a

24   poor one.

25   A    Yes, sir.

1    Q     Now, I guess it looks like there was a pic

2    there.  Is that -- to you does that look that way?

3    A     Yes.

4    Q     And then down below if you could explain that.

5    A     Again, that appears to be the formatting for a

6    picture.

7    Q     Then we have another e-mail October, 15th

8    2004.  This is from Nautical1971 to Captoes.  Excuse

9    me.  You look good to me.  I live in Ft. Lauderdale.

10   I would like to know you better.  Hugs, Chris.

11   A     Yes.

12   Q     Now, attached to this we have these things.

13   What is that?

14   A     Those appear to be attachments that were

15   originally with the e-mail.

16   Q     These photographs?

17   A     It appears so by their file extension.

18   Q     And that's the jpg?

19   A     Yes, sir.

20   Q     Same day, from Captoes to Nautical1971.

21   Thanks.  I live bet Ft. Myers and Naples.  Ever get

22   over this way?  I get to Lauderdale on occasion.

23   A     Yes.  That's what it says.

24   Q     And Nautical's reply.  Hi, Charles.  Yes, I do

25   get over your way.  It would be nice to meet.  Also,

1       I already sent you pictures.  I put them directly in

2       the e-mail I sent you, smooch.

3       A       Yes.

4       Q       Then the same day.  I have a few -- this is

5       from Nautical to Captoes.  I have a few X-rated pics

6       I will send you, if you like.  I would like OT meet

7       you.  Hugs, Chris.

8       A       Yes.

9       Q       Same day Captoes replied, would enjoy them.

10      Sorry I have none.  Please come over.  Hugs,

11      Charles.

12      A       Yes.

13      Q       Then Nautical to Captoes, same day.  What do

14      you enjoy sexually?  Are you retired?

15      A       Yes.

16      Q       Captoes to Nautical, enjoy anything safe.  I

17      am mostly retired doctor.

18      A       Yes.

19      Q       Nautical to Captoes, be right back.  I have to

20      get into the shower.  I have to go to class at 1:00

21      PM.  I am a student.

22      A       That's correct.

23      Q       From Nautical to Captoes.  Nice.  I'm in

24      school for biotechnology premed.

25      A       Correct.

1    Q       Then again we have an e-mail from Nautical to

2    Captoes and we have a bunch of attachments.

3    A       Yes.   The one exception I would take to that

4    is what that is is a couple of attachments repeated

5    several times.

6    Q       Okay.

7    A       But, yes, there are a couple of attachments on

8    there.

9    Q       Again on the 15th, Captoes says, thanks --

10   excuse me.   Nautical says thanks to Captoes?

11   A       Yes, sir.

12   Q       Then Captoes tells Nautical, wonderful

13   pictures?

14   A       Correct.

15   Q       Still on the 15th?

16   A       Correct.

17   Q       Captoes says to nautical, the photos are

18   great.   Please do come over.   Again, still the 15th?

19   A       Yes.

20   Q       Nautical says to Captoes, I don't have your

21   phone number.   I do not have your phone number,

22   hugs, Chris.

23   A       Yes.

24   Q       Then Captoes to Nautical.   My number is -- and

25   he gives him the phone number; correct?

Grawunder - Cross

```
 1      A       Correct.

 2      Q       Gives him a phone number?

 3      A       Correct.

 4      Q       Then we have -- I believe this is Captoes to

 5      Nautical.   This is Government's Exhibit -- finally

 6      this is Government's Exhibit 95-17; right?

 7      A       Yes.  It appears so.

 8      Q       Then Captoes again.  This is on the -- those

 9      e-mails that we covered up until 95-17 all occurred

10      on the same day, October 15th?

11      A       Yes, sir.

12      Q       Okay.  Then we have October 19th.  We need to

13      talk about tomorrow, Wednesday evening.  Can you

14      call me or drop me a line?  Can you call me or drop

15      a line to me, please.

16      A       Correct.

17      Q       Then, hey, Charles.  Thanks for the message.

18      I can call you but I'm going to cancel for tomorrow.

19      I have come down with a cold and I don't feel well

20      at all.  I will have to reschedule the trip for

21      either next week or another time that will be good

22      for us.  Sorry to do this at the last minute but I

23      don't want to drive out there not feeling good.

24      Hugs, Chris.

25      A       Correct.
```

```
 1    Q       Then Captoes to Nautical Dad -- Nautical1971.

 2    Can we schedule for next Thursday?  And that's on

 3    the 19th?

 4    A       Yes, sir.

 5    Q       Okay.  Nautical1971 to Captoes.  Dear Charles,

 6    I'm getting ready to run over to Walgreen's.  Let

 7    talk about it another day.  I'm going to bed when I

 8    get back.  I will look for you either tomorrow or

 9    the next day.  Smooch, Chris?

10    A       Yes.

11    Q       And the last e-mail, October 19th.  Can you

12    call me now and let's plan?

13    A       Correct.

14    Q       From Captoes to Nautical?

15    A       Yes, sir.

16    Q       I ask you to look at Government's Exhibit

17    95-18.

18    A       Okay.

19    Q       And I ask you to take a look at Defendant's

20    Exhibit 27.

21            MR. TRAGOS:  Your Honor, did I put Exhibit 26

22    into evidence?

23            THE COURT:  Not yet.

24            MR. TRAGOS:  I would like to move Exhibit 26

25    into evidence.
```

1          THE COURT:  Is there any objection?

2          MS. KAISER:  What's Exhibit 26.

3          MR. TRAGOS:  The one I was just asking him

4     about.

5          MS. KAISER:  Can I see a copy?

6          THE COURT:  25 was the last exhibit received;

7     correct, Madam Clerk?

8          COURTROOM DEPUTY CLERK:  Yes, Your Honor.

9          MS. KAISER:  No objection, Your Honor.

10          THE COURT:  26 is now received.

11     (Whereupon, Defendant's Exhibit Number 26 is

12     received into evidence.)

13     BY MR. TRAGOS:

14     Q     I believe you have 27 in front of you?

15     A     Yes, I do.

16     Q     Sir, would you like to take a look at 27 and

17     see if contained within that string of e-mails is

18     Exhibit 95-18, Government's Exhibit 95-18.

19     A     The text from Government's 95-18 is enclosed

20     on page two of Defense Exhibit 27.  It's a little

21     bit different, but it appears to be the same text.

22     It's just, as we discussed earlier, at the bottom of

23     a reply message.

24          MR. TRAGOS:  Your Honor, we move Exhibit 27

25     into evidence?

1          THE COURT:  Any objection?

2          MS. KAISER:  Your Honor, I'm waiting to

3     receive a copy of the defense exhibits.  I haven't

4     seen them.

5          THE COURT:  Any objection to 27?

6          MS. KAISER:  No objection.

7          THE COURT:  Exhibit 27 will be received.

8     (Whereupon, Defendant's Exhibit Number 27 is

9     received into evidence.)

10    BY MR. TRAGOS:

11    Q     By the way, Government's Exhibit 95, these are

12    e-mails that you pulled off of the computers that

13    are in evidence; correct?

14    A     Correct.

15    Q     Now, Exhibit 27 starts out on January 24th of

16    '06.  And it's a message from PSMnow to Captoes,

17    January 24th, '06.  Sir, I saw your posting on Guy

18    Spank.  Would you be interested in exchanging e-mail

19    with a 45-year-old nonsmoking MWM.  I'm five-five,

20    158 pounds and have very limited experience.

21    Discretion is an absolute must.  I'm looking for a

22    quick one-time thing.

23    A     It actually says I'm not looking for a quick

24    one-time thing.

25    Q     I'm sorry.

1      A      But, yes, essentially that's correct.

2      Q      I read so many.  Okay.  I'm not looking for a

3      quick one-time thing.  Then on the 25th -- let me

4      just explain what you were just talking about just a

5      minute ago.  This is what the government introduced,

6      correct, 95-18?

7      A      Yes, sir, it is.

8      Q      The defendant in Exhibit 27 has showed you

9      this e-mail; correct?

10     A      Correct.

11     Q      And at the bottom of this e-mail is the text

12     from Government's Exhibit 95-18?

13     A      Yes, sir.

14     Q      And the top which, again, you explained, this

15     is kind of a -- this is where you just kind of click

16     reply?

17     A      Yes, sir.

18     Q      Can you explain what that -- explain that,

19     when this happens?

20     A      Most e-mail software gives you the opportunity

21     when you rely to a message that has been sent to you

22     to include the sender's original message.  And that

23     appears what happens to have been here.  It included

24     just the one previous communication.

25     Q      And Government's Exhibit 95 did not include

1      page one of Defense Exhibit 27 where the

2      defendant -- or, excuse me, where psmnow gives his

3      age, correct?  95 doesn't include this e-mail?

4      A      Correct.

5             MR. TRAGOS:  Your Honor, we would move Exhibit

6      27 into evidence.

7             MS. KAISER:  No objection.

8             THE COURT:  27 is already in evidence.

9             MR. TRAGOS:  That's what I thought.

10     BY MR. TRAGOS:

11     Q      Government's Exhibit 95-19, would you take a

12     look at that, sir.

13     A      Yes.

14     Q      This is Exhibit 95-19?

15     A      Yes.

16     Q      Let me show you Defendant's Exhibit 28.

17     A      Yes, sir.

18     Q      Do you find defendant's exhibit -- I mean,

19     Government's Exhibit 95-19 in there?

20     A      Yes, I do.

21     Q      Do you find that the individuals that are

22     conversing in Exhibit 28 are the same individuals

23     that are conversing in Government's 95-19?

24     A      Yes.

25             MR. TRAGOS:  At this time, Your Honor, we'd

Grawunder - Cross

1        move Defendant's Exhibit 28 into evidence.

2                MS. KAISER:  No objection, Your Honor.

3                THE COURT:  28 is received.

4        (Whereupon, Defendant's Exhibit Number 28 is

5     received into evidence.)

6     BY MR. TRAGOS:

7     Q        December 29th, 2002.  This is from Ghslim61,

8     G-H-S-L-I-M 61; correct?

9     A        Yes, that's correct.

10    Q        And what is contained in that e-mail?

11    A        It appears there was an attachment entitled

12    gregtest.jpg.

13    Q        Then we have another e-mail from Ghslim61 to

14    Captoes.

15    A        Yes.

16    Q        Cold outside.  Good for being over your

17    n-k-e-e.  Say my prayers.  Hugs to you?

18    A        Yes, essentially.

19    Q        Then we have from Ghslim61 to Captoes, another

20    e-mail and it's apparently a picture entitled Greg's

21    butt?

22    A        Correct.

23                MR. TRAGOS:  If I may display to the jury the

24    photo.

25    BY MR. TRAGOS:

```
 1    Q      Then we come to January 8th.  And that is

 2    Government's Exhibit 95-19; correct?

 3    A      Correct.

 4    Q      Then we have another message from Ghslim61,

 5    January 24th, 2003, which contains a photograph

 6    called Greg's Rome?

 7    A      Correct.

 8    Q      Then we have a February e-mail from Captoes --

 9    excuse me, from Captoes to Ghslim; correct?

10    A      Correct.

11    Q      And it says, Greg, what's happened to my boy's

12    IM?  Beautiful here.  I am doing little.  Are you

13    behaving?  Hugs, dad?

14    A      Correct.

15    Q      Then we have another photo from Ghslim to

16    Captoes.  There's an attachment called

17    MA0001-TS25(1); correct?

18    A      If I could see the top.  Yes.  From Ghslim to

19    Captoes.

20    Q      Then Ghslim sends Captoes another photograph;

21    correct?

22    A      That's what it appears, yes.

23    Q      Then Ghslim sends Captoes another photograph?

24    A      Correct.

25    Q      Then we have April '08 from Ghslim to Captoes.
```

1      Morning, dad.  Want to say you have a nice one --

2      want say you have a nice day.  Three days have son

3      on your lap, hug you.  This will be good for me.

4      Get away for a weekend.  We are going have a lot of

5      fun.  I love you, dad, XOXOXO.

6      A      Correct.

7      Q      Then another e-mail, the last, from Ghslim to

8      Captoes.  I think about you more ways than one.  I

9      think I be good for you, dad.  You think am in love

10     with you, dad.  I think I am in love with you, dad.

11     Hope you are doing okay.  Really sorry.  Call you

12     tonight.  Love, your son, Greg.  Hugs to you.

13     A      Correct.

14     Q      Now, sir, if you'll take a look at Exhibit 96

15     A and B.

16     A      Sir, could you mean 95-20 A and B or is it a

17     different --

18     Q      No.  It's a different -- I'm sorry.  You don't

19     have 96.  I apologize.  Give me 95 back.

20     A      I've reviewed them.

21     Q      Okay.  Now, sir, I ask you to take a look at

22     Defense Exhibit 29.  Tell me if you find the text of

23     those messages contained within Defense Exhibit 29.

24     A      Yes.

25     Q      And are those e-mails between the same two

1    parties as the government's exhibits?

2    A       Yes.

3            MR. TRAGOS:   At this time, Your Honor, we

4    would move Defense Exhibit 29 into evidence.

5            MS. KAISER:   No objection, Your Honor.

6            THE COURT:   29 is received.   Thank you.

7    (Whereupon, Defense Exhibit Number 29 is received

8    into evidence.)

9    BY MR. TRAGOS:

10   Q       The two government exhibits, 95A and -- excuse

11   me, 96A and 96B.   Those are both on January 9th,

12   2006; correct?

13   A       Correct.

14   Q       And this is a copy of 96A; correct?

15   A       Correct.

16   Q       And this is a copy of 96B?

17   A       Correct.

18   Q       Let me show you page one of Defense Exhibit

19   30.   That's dated January 5th, 2006; correct?

20   A       Correct.

21   Q       That's four days before the government's

22   exhibits?

23   A       Correct.

24   Q       Dear sir.   Thanks for your notes.   I hope this

25   e-mail is working well, now.   I instantly knew the

1      notes were from you when I read your e-mail address,

2      Captoes.  So fitting for you, sir.  I enjoy talking

3      with you -- I enjoy talking with you on the phone

4      sometimes, too.  No privacy tonight but hopefully

5      one evening soon.  I will look forward to your

6      letter very much, mark.

7      A      Yes.

8      Q      Now, at the bottom it's got to Mark from Dad.

9      Tried to send you an e-mail but a problem.  This is

10     a test.

11     A      Correct.

12     Q      So what Mark wrote is in reply to the e-mail

13     that's at the bottom?

14     A      Yes.  That's what it appears.

15     Q      Then we have from Captoes to Captoes.  Why is

16     that?  Do you know why that would happen?  Want to

17     see the rest of it?

18     A      I'm not exactly sure what's going on there.

19     He may have been sending it to another e-mail

20     address because up at the back at the top, if you

21     could move it down.  It says from Captoes but then

22     it has Markofm at direcway.com.  I'm not real sure

23     what that is.

24     Q      Okay.  Then we have a from Mark to Captoes;

25     correct?

1    A       Correct.

2    Q       Hello, dad.  Just wanted to send you a

3    greeting today, sir.  Looking forward to your

4    letter.  Still drooling over your pic, sir, Mark.

5    A       Correct.

6    Q       Let me ask you, at the bottom here we have

7    this AOL header information.  What is that?

8    A       That is information that AOL uses to

9    communicate over the internet with its own servers,

10   with its users and with users who are using other

11   e-mail systems.

12   Q       Is that something that the person who's typing

13   the e-mail has any input in?

14   A       No.  Some of that -- the information in this

15   header, some of the information is taken out.  A

16   user can choose to show the header information.

17   Q       But he cannot -- he does not manipulate it?

18   A       Correct.

19   Q       He can't amend it or anything like that?

20   A       Correct.

21   Q       Here is a January 8th, 2006 from Markofm to

22   Captoes; correct?

23   A       Correct.

24   Q       Hello, dad.  Thanks for the quick response to

25   my note to you.  It was nice hearing from you.  I

1     have one photo scanned on another disc that I can

2     send you.  The disc is not here at the moment but

3     downstairs in a box.  I'll get it later and send the

4     pic on to you.  I think you might already have it,

5     however, but I will send it for sure.  I have so

6     many good memories of you, dad, so many.  Here are

7     just a few.

8          I recall the very first time I saw you at the

9     first cabin we stayed in.  I forgot the name of the

10    park.  It began with a D as I recall near Lexington.

11    The minute we got inside you hugged me and over your

12    shoulder -- hugged me and over your shoulder I saw

13    all of your implements which you had already told me

14    about.  Lying on the couch, just waiting and ready,

15    including the triple strop.  I had never seen

16    anything like that before that moment nor have I

17    since.  Is that what it says there, sir?

18    A     Yes.

19    Q     And it continues on with different bullet

20    points?

21    A     Yes.

22    Q     Let me ask you to take a look at page 12.  And

23    it is an e-mail from Markofm to Captoes; correct?

24    A     Correct.

25    Q     This is a reply specifically to the e-mail --

1       Government's Exhibit 95A; correct?  No, excuse me,

2       95B.

3       A       B, yes.

4       Q       95B be.

5       A       Yes.   96B.

6       Q       Excuse me?

7       A       96B.

8       Q       96B?

9       A       Yes, sir.

10      Q       So 96B as introduced by the government

11      actually had a reply?

12      A       Correct.

13      Q       And this reply says, by the way, this -- wow,

14      what a memory.  You hit it all right on the head

15      perfectly.  Your chronology is exactly as you wrote

16      it.  See that?

17      A       Yes.

18      Q       That e-mail I showed you just prior, that had

19      a chronology on it; didn't it?

20      A       Yes.

21      Q       Then here it says, yes, sir.  I guess I do

22      have pretty good memory of all these things.  I did

23      not realize that I even recalled them in the correct

24      chronological order, but I guess I did.  I do have

25      deep affection and even deeper respect for you, sir.

Grawunder - Cross

1    Talk to your later, Mark.

2    A     Yes.

3    Q     Sir, if you would, take a look at what I'm

4    going to give you as 98-1.  I'll ask you to take a

5    look at that, please.

6    A     I reviewed it.

7    Q     Then if you would, sir, take a look at

8    Defendant's Exhibit 30.

9    A     Yes.

10   Q     Is Government's Exhibit 98-1 contained in

11   Defense Exhibit 30?

12   A     98-1, yes.

13   Q     Are the parties which are talking in Defense

14   Exhibit 30 the same parties that are talking in

15   98-1?

16   A     Yes.

17         MR. TRAGOS:  At this time the defense would

18   move Exhibit 30 into evidence.

19         THE COURT:  Is there any objection?

20         MS. KAISER:  No objection, Your Honor.

21         THE COURT:  30 is received.

22   (Whereupon, Defendant's Exhibit Number 30 is

23   received into evidence.)

24   BY MR. TRAGOS:

25   Q     Now, 98-1, the first e-mail is an e-mail dated

1      April 7th, 2008?

2      A      Correct.

3      Q      Between Mdlearner and -- from Mdlearner to

4      Shrinq, S-H-R-I-N-Q?

5      A      Yes.

6      Q      Is that one of the e-mail names that you were

7      told to search for?

8      A      Yes.

9      Q      And this one reads, Charles, are you in

10     Florida or here at this point in the year?  Would

11     like to get together for lunch and a hot dessert

12     afterwards, Jim.

13     A      Yes.  Essentially that's what it says.

14     Q      Then on the 8th, Shrinq writes to Mdlearner,

15     Jim, I'm in FL.  Will be back about the 17th.  Where

16     are you living these days?  Charles.

17     A      Correct.

18     Q      And then we have an e-mail from Mdlearner to

19     Shrinq.  Dear Charles.  I'm living in Calmea Street

20     backing on to Rock Creek Park in an old Tudor 1930's

21     house.  Too many bedrooms and baths, too many stairs

22     but it does have a certain charm.  Am thinking

23     though about moving back into the town of CH Chase

24     as I do have a fair number of friends there.  When I

25     get together in person we can each other up in our

Grawunder - Cross

1    lives.  Are you still in the discipline spirit these

2    days and, if so, have you had many targets lately?

3    Mine has grown a tad regrettably.  All best, Jim.

4    A      Yes.

5    Q      Now, that's -- again, that's a reply to the

6    earlier e-mail to Shrinq, and you can tell that

7    because the earlier e-mail is down at the bottom?

8    A      That's correct.

9    Q      Okay.  Then that is Government's Exhibit 98-1

10   correct?

11   A      I don't have it in front of me.

12   Q      I have it.

13   A      That's correct.

14   Q      Now, sir, if you would look at Government's

15   95-7.

16   A      I've reviewed it.

17   Q      Now, sir, I ask you to look at Defense Exhibit

18   39.

19   A      I've reviewed it.

20   Q      Do you find the government's exhibit contained

21   therein?

22   A      Yes, I do.

23   Q      And are the parties that are talking in that

24   string of e-mails the same parties that are in the

25   government's exhibit?

```
 1      A      Yes, they are, with one exception of some of

 2   these e-mails appear to have been sent to a Yahoo

 3   group, men into classic-style shoes at Yahoo groups

 4   dot com.

 5      Q      Are these the same parties involved?

 6      A      Yes.

 7      Q      You can tell that from looking at the e-mails?

 8      A      Yes.

 9             MR. TRAGOS:  At this time, Your Honor, we

10   would move Exhibit 39 into evidence.

11             MS. KAISER:  No objection.

12             THE COURT:  39 is received.

13   (Whereupon, Defendant's Exhibit Number 39 is

14    received into evidence.)

15   BY MR. TRAGOS:

16      Q      Let me show you Government's 95-7.  Do you see

17   that, sir?

18      A      Yes.

19      Q      And this is an e-mail from Shoe6 to Captoes.

20      A      Correct.

21      Q      And it's a reply to an e-mail from Captoes to

22   Shoe6; correct?

23      A      Yes.

24      Q      And in the first e-mail it goes, Tom, wanted

25   to tell you how very much I enjoyed meeting you.
```

1        The time went all too fast.  We must do it again

2        soon but longer, and it's signed Chip.

3        A       Correct.

4        Q       The reply says, Chip, I finally got my e-mail

5        working again and now I'm able to respond to your

6        message from last week.  I enjoyed meeting you, as

7        well.  And it would be great to spend some time

8        hanging out with you.  I have to be honest and tell

9        you that I did not experience the chemistry that

10       would lead to a physical encounter.  But I really

11       did enjoy our afternoon together.  I hope there will

12       be more.

13       A       Correct.

14       Q       Now, that is -- again, that's Government

15       Exhibit 95-7?

16       A       Yes, it is.

17       Q       Now, I'm going to page one of the defense

18       exhibit in that string of e-mails.  This is -- by

19       the way, what's the date on Government's 95-7?

20       A       4/9/2006.

21       Q       Okay.  On 3/25/2006, this is Shoe6 writing to

22       men into classic something, classical-style shoes at

23       Yahoo group dot com?

24       A       Correct.

25       Q       And what he says is, hi, guys.  I've just

Grawunder - Cross

```
 1    moved to south Florida.  Between Miami and

 2    Ft. Lauderdale.  Do you know what GWM stands for?

 3    A      I believe gay white male.

 4    Q      Okay.  50 years with a major shoe fetish here.

 5    If you are in south Florida and want to get

 6    acquainted, give me a shout at Shoe6 at Yahoo.Com.

 7    A      Correct.

 8    Q      Then we have Captoes writing to Shoe6;

 9    correct?

10    A      Correct.

11    Q      I live a bit away, parenthesis, outside of

12    Naples, end parenthesis, but have a major shoe

13    fetish with over a hundred pairs of dress shoes, 11

14    to 11 and a half?

15    A      Correct.

16    Q      Chip.  And then Chip replied; correct?

17    A      Correct.

18    Q      Thanks for responding to my postings.  Tell me

19    more and you about you like to do with these shoes.

20    I wear nine and a half dash ten myself.

21    A      Correct.

22    Q      Chip -- or that should be Tom?

23    A      Tom.  That's correct.

24    Q      And then this is from Captoes, same day,

25    Captoes to Shoe6.  Tom, thanks for your reply.
```

Grawunder - Cross

```
 1      Remember -- excuse me.  Altogether I probably have

 2      140 pair of dress shoes.  Many I've had for years

 3      and years.  Love to cum on them and in them and have

 4      a boy keep them well tongue-shined.  What about you?

 5      Where are you?  Chip.

 6      A       Correct.

 7      Q       Now, that was on March 26, those were;

 8      correct?

 9      A       I don't recall.

10      Q       Okay.  I'll show you one.

11      A       Yes.  March 26th.

12      Q       Then the government's e-mail they put in

13      evidence is April 9th, 2006; correct?

14      A       Yes, sir.

15      Q       Sir, if you would look at Government's Exhibit

16      98-3.

17      A       Yes.

18      Q       Now, sir, if you'd look at Defense Exhibit 31.

19      A       I've reviewed it.

20      Q       Do you find Government's Exhibit 98-3

21      contained within Defense Exhibit 31?

22      A       Yes, I do, page four.

23      Q       And are the people who are conversing within

24      Defense Exhibit 31 the same people that are

25      conversing in Government's Exhibit 98-3?
```

1    A      Yes, they are.

2           MR. TRAGOS:  Your Honor, at this time we'd

3    move Exhibit 31 into evidence.

4           MS. KAISER:  No objection, Your Honor.

5           THE COURT:  31 is received.

6    (Whereupon, Defendant's Exhibit Number 31 is

7    received into evidence.)

8    BY MR. TRAGOS:

9    Q      Defense -- excuse me.  Government's Exhibit

10   98-3 is an e-mail from Captoes to JJ1515 on

11   3/19/2008; correct?

12   A      Correct.

13   Q      Juha, the time is drawing very close and I am

14   excited.  Can you give me the flight number, date

15   and time of arrival.

16   A      Correct.

17   Q      Correct?  What's the date of that e-mail,

18   98-3?

19   A      3/19/2008.

20   Q      Okay.  In January of 2008, Captoes writes to

21   Juha, thanks for yours.  Was a bit worried when I

22   did not hear from you.  Glad all is well, though,

23   sometimes hectic.  I'm in Florida now and go back

24   north on the 31st.  I will return about 15 March for

25   a month or five weeks.  Can you visit then?  All

1    remains the same here.  Weather erratic, but for the

2    most part warm.  Just bought a new car which I'm

3    enjoying.  Look forward to hearing from you.  Love

4    and hugs, Charles.

5    A    That's correct.

6    Q    What was the date on the e-mail from the

7    government's exhibit?

8    A    3/19/08.

9    Q    Here's a 3/20/08 from JJ to Captoes.  Hello,

10   Charles.  Hope you are well and good.  I am very

11   much looking forward to visiting.  Just in case,

12   could you please send your address to me again.  I

13   know I have at home somewhere, but it will be good

14   to see you again.  It will be good to see you again.

15   Hugs and love, Juha.  And then the bottom where it

16   looks like flight schedules?

17   A    That's correct.

18   Q    Then on 4/7 this is from JJ to Captoes;

19   correct?

20   A    Correct.

21   Q    Hello, Charles.  I hope you are well and good.

22   Thank you for a lovely week.  Had a nice pleasant

23   week in your lovely company.  Back to the cold hard

24   brutality of routine today.  And it was very busy,

25   too.  Suffering from jet lag.  It seems harder to

```
1       come this way.  And then -- that's in there,

2       correct, what I just read, the beginning of it?

3       A      Yes, sir.

4       Q      Now, sir, if you'll look at 98-4.

5       A      Yes, sir.

6       Q      Government's 98-4.  Now, if you'll look at

7       Defense Exhibit 32.  Is Government's Exhibit 98-4

8       contained in Defense Exhibit 32?

9       A      Yes, on page two.

10      Q      All right.  Are the speakers and the

11      conversations in Defense Exhibit 32 the same as in

12      98-4?

13      A      Yes, sir, they are.

14             MR. TRAGOS:  At this time, Your Honor, we

15      would move Defense Exhibit 32 into evidence.

16             MS. KAISER:  No objection, Your Honor.

17             THE COURT:  32 is received.

18      (Whereupon, Defense Exhibit Number 32 is received

19      into evidence.)

20             THE COURT:  Let's take our lunch break,

21      Mr. Tragos.  It's 12 o'clock.  We'll be back at

22      1:15.

23             COURTROOM SECURITY OFFICER:  Rise for the

24      jury, please.

25      (Jury out at 11:59 AM.)
```

1    (Recess was taken at 11:59 until 1:20.)

2    (Back on the record.)

3         COURTROOM SECURITY OFFICER:  All rise.  This

4    Honorable Court is in session.

5         THE COURT:  Bring the jury in, please.

6         COURTROOM SECURITY OFFICER:  Rise for the

7    jury, please.

8    (Jury in at 1:20 PM.)

9         THE COURT:  Thank you, and be seated.  You may

10   resume cross-examination, Mr. Tragos.

11        MR. TRAGOS:  May it please the court.

12   BY MR. TRAGOS:

13   Q    Sir, would you please look at Government's

14   Exhibit 94A.

15   A    I have 98.

16   Q    I'm sorry.  98, 98-4.

17   A    Yes, sir.

18   Q    I ask you to look at Defense Exhibit 32.

19   A    I've reviewed it.

20   Q    Do you find Government's Exhibit 98-4

21   contained in Defendant's Exhibit 32?

22   A    Yes, it's page two.

23   Q    Are the other e-mails contained therein from

24   the same parties having a discussion?

25   A    Yes.

Grawunder - Cross

1    Q     And is there also a photograph or a copy of a

2    photograph in there?

3    A     Yes, sir, there is.

4    Q     And can you identify that photograph as being

5    part of the e-mails from those same parties?

6    A     Yes.

7          MR. TRAGOS:  At this time the defense would

8    move Exhibit 32 into evidence.

9          MS. KAISER:  No objection.

10         THE COURT:  32 is received.

11   (Whereupon, Defense Exhibit Number 32 is received

12   into evidence.)

13   BY MR. TRAGOS:

14   Q     Now, this is Government's Exhibit 98-4.  And

15   it is a January 13th, 2008 e-mail from Obedientdad

16   to Captoes.

17   A     I can't see the top on my screen.

18   Q     Sorry.

19   A     Yes.

20   Q     And it says he's 40 years old, 5'11', 200

21   pounds?

22   A     Yes.

23   Q     Now, does that blank spot there indicate that

24   there was a picture?

25   A     Yes.

1    Q     And can you find on this e-mail an identifier

2    for the picture?

3    A     Yes.

4    Q     And what is that identifier?

5    A     ME percent 20007 dot jpg.

6    Q     Do you see this picture?

7    A     Yes.

8    Q     And do you see an identifier for the picture?

9    A     Yes.

10   Q     Is this picture the picture that was contained

11   within the e-mail of Government's Exhibit 98-4?

12   A     It appears that it is.

13   Q     Now, sir, do you see this e-mail dated January

14   13th, 2008?

15   A     Yes.

16   Q     From Obedientdad to Captoes?

17   A     Yes.

18   Q     Stating, very nice.  Smiley face.  I have

19   tongue polished a master's shoes before.  I've even

20   sucked off a master with him cumming on the floor.

21   He then stepped in the cum puddle and fed me his cum

22   by having me lick it off the sole of his shoe.

23   A     Yes.  With the exception of I believe you said

24   master and it says man.  But, yes, that's

25   representative of what it says.

1    Q      I want to show you an e-mail that is in

2    exhibit -- Defense Exhibit 20.  This is from

3    dwportland to Captoes dated July 4th, 2006; correct?

4    A      Correct.

5    Q      See there where it says, I'm attracted to role

6    play dad son or any other authority figure who would

7    discipline me?

8    A      Yes.

9    Q      And this is from absalom to Captoes, March

10   23rd, 2006?

11   A      Correct.

12   Q      And do you see where it says, it is hard to

13   believe that we really have only met for a cup of

14   coffee?

15   A      Yes.

16   Q      Now, from Defense Exhibit 23, pages nine and

17   ten.  The bottom e-mail is from Captoes to pj_mass;

18   correct?

19   A      Yes.

20   Q      And in that one Captoes is saying to pj_mass,

21   thought we might meet for dinner; correct?

22   A      Yes, that's correct.

23   Q      Okay.  I show you what's been marked as

24   Defense Exhibit 3.  Do you recognize that?

25   A      Yes.

Grawunder - Cross

1    Q       Okay.  And how do you recognize that?

2    A       I received this as a list of e-mails from the

3    defense.

4    Q       You received those from the defense?

5    A       No.  I received this from the case agent and I

6    was advised this was a list of e-mails that was

7    prepared by the defense counsel.

8    Q       And did you do anything with that list when

9    you got it?

10   A       Yes.  I was asked to review both the laptop

11   and the desktop and print every e-mail from and to

12   the e-mail addresses on this list.

13   Q       And did you do that?

14   A       I did.

15   Q       Did you do a report on that?

16   A       No, sir.

17   Q       And my question is with regard to that summary

18   chart, is it accurate to say that that is a sampling

19   of the e-mail addresses that are contained on these

20   computers from e-mails?

21   A       Yes.

22   Q       That, in fact, there's even more than what's

23   on that chart?

24   A       Yes, I believe there are.

25           MR. TRAGOS:  Your Honor, at this time we would

Grawunder - Cross

```
 1    move Defense Exhibit 3 into evidence.

 2            THE COURT:  Any objection?

 3            MS. KAISER:  Objection to foundation.

 4            THE COURT:  Sustained.

 5    BY MR. TRAGOS:

 6    Q       Did you yourself check the e-mails on the

 7    computer to see -- to see whether or not the e-mails

 8    that are on the computer match the information that

 9    is on the summary chart?

10    A       Yes.  If I may see that.

11    Q       Sure.

12    A       I believe --

13            THE COURT:  It's not in evidence so do not

14    describe the content, please.

15    BY MR. TRAGOS:

16    Q       Did you verify the information?

17    A       Yes.

18    Q       And was the information accurate?

19    A       As I recall, except for one item.  It was

20    listed as the -- what I believe the true name of the

21    person and not the e-mail address.

22    Q       Okay.  But it still corresponded?

23    A       Yes.  And that -- the name that was on this

24    list did correspond to an e-mail address that was on

25    the computers.
```

1    Q       And of the large volume of e-mail we're

2    talking about, how many e-mails were there on these

3    computers?

4    A       I don't remember exactly.  I have it in my

5    notes.

6    Q       Okay.  Can you tell us.

7    A       Sure.  The laptop contained 6730 e-mail

8    messages.  The desktop contained 2184.

9           MR. TRAGOS:  Your Honor, at this time we would

10   move the summary chart into evidence as Exhibit 3.

11          THE COURT:  Is there any objection?

12          MS. KAISER:  Same objection, Your Honor.

13          THE COURT:  Sustained.

14          MR. TRAGOS:  Your Honor, could we have a side

15   bar?

16          THE COURT:  No, sir.  Let's move on, please.

17   BY MR. TRAGOS:

18   Q       How many e-mail addresses would you estimate

19   were on the thousands of e-mails that you saw?

20   A       I honestly have no idea.  I would -- if I

21   would guess, it would probably be over a hundred.

22   Q       Okay.  And were you -- were you ever asked to

23   check out -- to try to identify through AOL any of

24   these e-mail addresses as a person who they were?

25   A       Through AOL, no, sir.

1    Q      Any other databank -- database you used?

2    A      Do you mean who the owner of those e-mail

3    address was?

4    Q      Right.

5    A      No.  I did not do that.

6    Q      What time period was covered by the e-mail

7    addresses that you saw on the computers?

8    A      I don't recall, but I believe I have that in

9    one of my reports.

10   Q      Okay.  Do you have that with you?

11   A      Yes, I do.

12   Q      Okay.

13          MR. TRAGOS:  With the court's permission, if

14   he could check that.

15          THE COURT:  Yes, sir.

16          THE WITNESS:  Of the e-mails on the laptop,

17   they ranged in dates from March 13th, 2001 to July

18   21st, 2008; and the desktop, the messages that had

19   dates ranged from March 20th, 2007 to July 7th,

20   2008.

21   BY MR. TRAGOS:

22   Q      Aside from the laptop and the desktop, did you

23   look at any other media with regard to this case?

24   A      No, sir.

25   Q      Did you look at any CDRs?

```
 1     A      No, sir.

 2     Q      What are CDRs?

 3     A      It's a compact disc that's recordable.

 4     Q      Did you look at any cameras?

 5     A      No, sir.

 6     Q      Floppy discs?

 7     A      No, sir.

 8     Q      Any camera media cards?

 9     A      No, sir.

10     Q      How many files -- total files were on these

11     computers?

12     A      I believe the laptop had over a hundred

13     thousand and the desktop had just under 200,000

14     files.  I have the exact numbers in my notes.

15     Q      Go ahead.

16     A      Okay.  The laptop contained 109,968.  The

17     desktop contained 170,505.

18     Q      Of those files how many of them did you -- or

19     how many of them did you put into the FTK file?

20     A      I don't have any idea.

21     Q      You don't know how many files are in there?

22     A      No, I don't.

23     Q      Was it all of them?

24     A      No.

25     Q      On some of your reports there was an item
```

 1    called last logon time.  Do you know what that is?

 2    A      Yes.

 3    Q      What is that?

 4    A      That's the last date and time that a user

 5    logged onto the computer.

 6    Q      And some of your reports say never.  What does

 7    that mean?

 8    A      That means that that account was not used.

 9    Q      Sometimes in your report the word false comes

10    up.  What does that mean?

11    A      Which report?

12    Q      Account disabled, false.

13    A      May I see the report you're looking at?

14    Q      Sure.

15           MR. TRAGOS:  May I approach the witness, Your

16    Honor?

17           THE COURT:  Yes, sir.

18           THE WITNESS:  This document is a registry

19    report.  And some of the values for information that

20    is contained in the registry indicate true or false,

21    and that's usually a -- to indicate yes for true or

22    no for false.

23    BY MR. TRAGOS:

24    Q      False doesn't mean that there's necessarily

25    anything false in it?

```
 1     A      No.  It's just like an on or an off.

 2            MR. TRAGOS:  May I have a moment, Your Honor.

 3     (Brief pause.)

 4     BY MR. TRAGOS:

 5     Q      Are you aware of the FTK report being -- its

 6     inaccuracy being raised or challenged?

 7     A      No, I don't.  In court, you mean?  I do not.

 8     Q      No.  I'm talking about generally in the

 9     industry.

10     A      No.

11     Q      You're not aware of the fact that it is -- the

12     true or false for the logons is inaccurate on

13     various occasions for the FTK?

14     A      I do know that on occasion the password

15     setting has -- if that's true or false, whether

16     there's a password for certain logons is sometimes

17     incorrect in FTK and that's a known issue with FTK.

18     Q      Any other known issues with FTK?

19     A      Not that I know of.

20     (Brief pause.)

21            MR. TRAGOS:  That's all the questions I have,

22     Your Honor.

23            THE COURT:  Redirect?

24            MS. KAISER:  No questions, Your Honor.

25            THE COURT:  Thank you, sir.  You may step
```

 1      down.  Please watch your step.

 2              Call your next witness.

 3              MS. KAISER:  The United States calls Don

 4      Colcolough.

 5              MR. TRAGOS:  I'm sorry.  Your Honor, could we

 6      approach?

 7              THE COURT:  Yes, sir.

 8      (At side bar, on the record.)

 9              MR. TRAGOS:  Your Honor, I was wondering if I

10      could call a witness out of order.

11              THE COURT:  Proceed with the government's

12      case.

13              MR. TRAGOS:  Your Honor, Dr. Berlin --

14              THE COURT:  Mr. Tragos, you just took two

15      hours cross-examining this man putting on your

16      defense case.  The government's case is going to go

17      forward so we can get it finished.  And that's the

18      way we're going to handle it.

19      (End of side bar discussion.)

20              THE COURT:  I'm sorry.  Call your next witness

21      again, please.

22              MS. KAISER:  United States calls Don

23      Colcolough.

24          GOVERNMENT WITNESS, DON COLCOLOUGH, SWORN

25              COURTROOM DEPUTY CLERK:  Raise your right

 1     hand.

 2                THE WITNESS:  Yes.

 3                COURTROOM DEPUTY CLERK:  Please be seated.

 4                Please state your name and spell your last

 5     name for the record.

 6                THE WITNESS:  My name is Don Paul Colcolough.

 7     Last name is spelled C-O-L another C-O-L-O-U-G-H,

 8     pronounced (phonetically) Cocalee.

 9                         DIRECT EXAMINATION

10     BY MS. KAISER:

11     Q      Good afternoon, Mr. Colcolough.

12     A      Good afternoon.

13     Q      Could you please tell the jury where you work.

14     A      Yes.  I work at America Online, Incorporated.

15     Q      What is your position with America Online?

16     A      My position is the director of investigations

17     and global security.

18     Q      What are your duties in that position, sir?

19     A      My role is to oversee all of the

20     investigations that deal with uses and abuses of the

21     America Online owned networks, and in particular the

22     ones that are of interest by law enforcement

23     agencies.

24     Q      Is it part of your duties also to act as a

25     custodian of records for America Online?

1        A       Yes, it is.

2                MS. KAISER:   Your Honor, may I approach the

3        witness?

4                THE COURT:   Yes, ma'am.

5        BY MS. KAISER:

6        Q       Mr. Colcolough, I'm showing you what's been

7        premarked for identification as Government's Exhibit

8        29.  Do you recognize that document?

9        A       I do, yes.

10       Q       Could you please tell us what that is.

11       A       This a hard copy printout of a record that we

12       keep that deals with customer information from a

13       system we call Eagle.  It's simply a system we have

14       as a database that allows us to access customer

15       information, names, addresses, the screen names,

16       e-mail addresses and credit card information of our

17       users at America Online.

18       Q       Is that -- are those records kept in the

19       ordinary course of business?

20       A       Yes, they are.

21       Q       Are they prepared at or about the time by a

22       person with knowledge of the information contained

23       therein?

24       A       Yes.

25       Q       Are they true and accurate copies of your

1    report?

2    A      Yes, they are.

3    Q      And they are maintained in the ordinary course

4    of your business?

5    A      Yes.

6           MS. KAISER:  Your Honor, at this time I'd move

7    for admission of Government's Exhibit 29 into

8    evidence.

9           THE COURT:  Any objection?

10          MR. TRAGOS:  Yes, Your Honor.  Could I see the

11   exhibits?

12   (Brief pause.)

13          MR. TRAGOS:  Objection, relevance.

14          THE COURT:  That objection is overruled.

15   Government's Exhibit 29 is now received.

16          MS. KAISER:  Your Honor, may I publish it for

17   the jury?

18          THE COURT:  Yes, ma'am.

19   BY MS. KAISER:

20   Q      Mr. Colcolough, I'm putting on the overhead

21   what's been admitted as Government's Exhibit 29.

22   And if you would, could you please tell the jury

23   what we're looking at here.

24   A      Yes.  This is information from one of our

25   customer accounts that uses America Online.  It

1      lists the screen names that this particular account

2      created and used.  And it's an individual account

3      that was created and used by Charles Jackson and he

4      is the owner.

5      Q      And what are these -- what I'm pointing out

6      with the pen, can you see that on the screen?

7      A      Yes, I can.

8      Q      What are these right here that I'm pointing

9      to?

10     A      Well, the first input next to the bullet is

11     the actual screen name.  For example, Shrinq,

12     S-H-R-I-N-Q is the screen name.  Our system thinks

13     in terms of a numerical ID.  Our users think in

14     terms of an alphanumerical ID, like a screen name.

15     So Shrinq, which is a screen name on this account,

16     we know as the account screen name ID number which

17     is 0813984510.

18     Q      And would these screen names be used by the

19     person when they log in?

20     A      Yes.

21     Q      And is this Document 29 subscriber information

22     for Mr. Friedlander?

23     A      Could you show me the bottom part of this.

24     Q      Yes.  Did AOL know him as Dr. Charles Jackson?

25     A      Yes.  The owner of this account is Dr. Charles

1    Jackson.

2    Q      And does the front page also contain his

3    address and contact information?

4    A      Yes, it does.

5    Q      And on pages -- just for example, on page --

6    just on page 20, what is that -- what does that

7    show?

8    A      That is what's called the detailed billing

9    summary.  It shows the dates and times and charges

10   for each screen name that accessed the America

11   Online service.  For example, the one at the very

12   bottom, screen name, Captoes, logged into the AOL

13   service on May 7, 2008 at 22:57 and 41 seconds.  And

14   then the subsequent time and date next to it is the

15   time with the logout.  That's simply the login

16   history of each and every screen name for this

17   particular count.

18   Q      And about how far back do those records go?

19   A      At any one point in time it goes back for six

20   months.

21   Q      At the bottom of page 62 on Government's

22   Exhibit Number 29, could you tell the jury what this

23   is that I'm pointing to at the bottom of the screen.

24          MR. TRAGOS:  What page is that?

25          MS. KAISER:  Page 62 -- or 66 of Government's

Colccfough - Direct

1        Exhibit 29.

2               THE WITNESS:  Yes, I can tell.  Do you mean

3        where it says file or where it says buddy list?

4        BY MS. KAISER:

5        Q      Buddy list.

6        A      Yes.  Each and every screen name on America

7        Online can potentially have what is called a buddy

8        list.  A buddy list is a feature that we give our

9        members the ability to add their friends and family

10       screen names so they can monitor and see when their

11       friends and family are online at the same time they

12       are when they log in.

13              For example, if you're online and you have

14       your mother's screen name on your buddy list and

15       then she's online, you'll get a notification on your

16       buddy list.  What this is is a listing for the

17       screen name Captoes of all of that particular screen

18       name's buddy list contents.

19       Q      Okay.  And does that continue on page 63?

20       A      Yes, it does.

21       Q      And is StricDad7 located on this buddy list?

22       A      Yes, it is.

23       Q      Looking at page 64 of 66 of Government's

24       Exhibit 29, can you tell the jury what we're looking

25       at here.

1     A     Yes.  This is a caption of Captoes' screen

2     name, what's called member profile.  Each and every

3     member screen name on America Online has -- can have

4     its own individual profile where you can type in

5     information or select categories where you can tell

6     our membership a little bit about yourself in a

7     profile that can be viewed.

8          In other words, if you have a screen name, I

9     can take a look at your profile.  And if you've

10     filled it out, I can tell a little bit about you,

11     your hobbies, your, you know, location, your marital

12     status, things of interest that you may want others

13     to know about you.  This is an example of screen

14     name Captoes' member profile at the time we produced

15     this document.

16     Q     And looking at page 66 of the same exhibit, is

17     this part of the continuation of the user's profile?

18     A     Yes, it is.

19     Q     And in his about me, does he also have tongue

20     those shoes well and tongue as his favorite gadget?

21     A     Yes.

22     Q     Can you tell the jury, please, what the AOL

23     address book is.

24     A     Yes.  Each and every screen name on America

25     Online comes with the ability to create and build

1      and maintain an AOL address book.  It's simply a way

2      you can keep and -- always keep different e-mail

3      addresses that you would like to continue an e-mail

4      dialogue with.

5             When you open a piece of e-mail or when you

6      create an e-mail form, there's a little button you

7      can click called address book.  It will present to

8      you all of the e-mail addresses that you've placed

9      in this particular area of AOL.

10     Q     All right.  And can you describe for the jury

11     what the AOL favorites are.

12     A     Yes.  When you're online on America Online,

13     and a lot of other internet service providers have

14     this, they have a very easy way for you to remember

15     places that you've been either on AOL or out on the

16     internet such as worldwide websites where you can

17     bookmark or save them to an easy place to return to.

18            On the AOL application, there's a button

19     called favorites.  On every place you go online

20     using AOL, there's a little heart in the upper

21     right-hand corner of each and every window.  And

22     that heart can be simply dragged and dropped into

23     your favorite places where it will then remember

24     that place so you can return there easily by simply

25     clicking on that button called favorites, and then

1    double clicking on the particular favorite place you

2    would like to return to.

3    Q      What is -- what is a town square within AOL?

4    A      Town square is a meeting place for electronic

5    chat rooms.  America Online has about 30,000

6    different chat rooms in any 24 period, and the

7    general category for all chat rooms is called the

8    town square.

9    Q      If there was a chat room called fathers

10   chatting, what would that be considered?

11   A      That would be considered a member-created room

12   most likely in a category called special interests

13   within the town square chat area of America Online.

14   Q      If two people are talking in Florida via

15   America Online, say, in a chat room, how would that

16   communication get between those two people?  Like

17   when you're on the computer and you're chatting with

18   someone and you type your message and hit return or

19   hit send, what happens to that information?

20   A      Well, there's three kinds of sends.  First of

21   all, it could be an e-mail, it could be an instant

22   message or it could be a chat room.  Those are all

23   communication devices on America Online.

24          But if two people are in Florida and they were

25   communicating realtime like in a chat room or in an

1        instant message, the actual communication would go

2        from one of those users' computers through a series

3        of networks and ultimately to America Online in the

4        Commonwealth of Virginia, ultimately back to Florida

5        to the intended recipient.

6        Q      All right.  And how do e-mails travel?

7        A      The same -- same way.

8        Q      So they have to go out of state and then back

9        to Florida to the other user?

10       A      Correct.  We -- we call these communication

11       controllers.  All of our communication controllers

12       exist in the State of Virginia.  So if you're

13       instant messaging or e-mailing or chatting using our

14       chat rooms in town square, all of those

15       communications first have to go to Virginia and

16       ultimately to the intended recipient, wherever they

17       may be.

18       Q      Does AOL have very many dialup users?

19       A      Yes, we still currently do.

20       Q      Do you know approximately how many of your

21       users use dialup?

22       A      Anywhere between eight to nine million.

23       Q      And why is that?  Why do people still use

24       dialup?

25       A      For a number of reasons.  The predominant

Colcelough - Direct

1    reason is there's still not a lot of high speed

2    connectivity infrastructure in rural areas.  If

3    people in the rural areas would like to have a high

4    speed connection, they're really relegated to two

5    choices.  One is dialup, and AOL affords that, or

6    satellite, and there's some dependencies there if

7    you want to connect to the internet via satellite.

8         Satellite is much more expensive so people

9    like to dial up from anywhere between 11 to 19

10   dollars a month using a dialup service, and AOL is

11   one of those.

12   Q     How long does -- how does AOL store e-mail

13   communications?

14   A     A number of different ways.  It depends on

15   where you want to store this.  It could be either

16   stored or our network for a period of time or stored

17   on your computer virtually forever.

18   Q     If it was only on the AOL servers and not on

19   the person's computer, how long would that that

20   stay?

21   A     Sent mail and new nail is kept on our service

22   for 28 days.  Old mail is kept for between seven

23   days and 28 days, depending on a number of things.

24        MS. KAISER:  Your Honor, may I have a moment.

25        THE COURT:  Yes, ma'am.

1      (Brief pause.)

2            MS. KAISER:  I have nothing further.  Pass the

3      witness.

4            THE COURT:  Cross-examination.

5                         CROSS-EXAMINATION

6      BY MR. TRAGOS:

7      Q      Cocalaw (phonetically)?

8      A      Cocaclee (phonetically).

9      Q      Cocaclee (phonetically)?

10     A      Um-hum.

11     Q      Okay.  Mr. Colcolough, do you have Exhibit 29

12     there in front of you?

13     A      I do not.

14     Q      Oh, you do not?

15     A      I do not.

16     Q      Okay.

17           THE COURT:  Ms. Kaiser, do you have -- you got

18     it, Mr. Tragos?  Thank you.

19     Q      Let me ask you to take a look at that.  And

20     Mr. Colcolough, how often do you testify in a year?

21     A      Oh, 40 or 50 times, quite often.

22     Q      Now, sir, here we have, I guess, the front

23     page of Exhibit 29.  And you printed this October

24     30th of '08; is that correct?

25     A      I didn't print this.  One of our compliance

Colcorough - Cross

1    paralegals pointed this.

2    Q      Did they print it under your supervision?

3    A      Actually we probably didn't print this.  This

4    was probably produced by one of our compliance

5    paralegals in our legal department as an electronic

6    CD that we furnished to law enforcement pursuant to

7    a search warrant.  They probably, upon receiving

8    that CD, printed this out.

9    Q      You're just presuming that this is it or do

10   you know for a fact that this is the records from

11   the company?

12   A      I've compared the actual information here with

13   the electronic information before I came.

14   Q      All right.  So this -- you know that this is

15   accurate?

16   A      Yes.

17   Q      Okay.  Now, October 30th, 2008 when you

18   printed it, I see here that it says this is an

19   active account; is that correct?

20   A      Correct.

21   Q      So someone could go online right now, Captoes

22   and --

23   A      I believe when I checked earlier this week

24   this account is still active so yes.

25   Q      So no one has shut it down or put a freeze on

1    it or anything?

2    A      That's correct.

3    Q      And the person who has his account has had it

4    since 1998?

5    A      Yes.

6    Q      Now, here we have in August -- I'm sorry, July

7    21st, 2008; correct?

8    A      Correct.

9    Q      Okay.  And if you could, sir, tell me the

10   first time that this person was using this account

11   on July 21st, 2008.

12   A      I would need to take a look at the document

13   prior to this because we go in reverse order.  I

14   just want to make sure that -- it could be even

15   before 10:19 and 24 seconds.

16   Q      So this is not a complete billing information?

17   A      I believe this -- the page after this would

18   have a -- possibly a July 21st, '08 and that could

19   be the first login.  I'm not sure.

20   Q      Okay.  Let me show you the page before it,

21   then.

22   A      Okay.  That's fine.

23   Q      Does that answer your question?

24   A      Yes, it does.  If you go back to the first

25   page.

1    Q      Okay.  So let's talk about the 21st of July

2    2008.  How long was this person -- well, let's

3    start, when did this person first sign onto the

4    internet?

5    A      Well, they first logged into the America

6    Online service on July 21st, '08 at 10:19 and 24

7    seconds Eastern Daylight Time.

8    Q      Okay.  Now, let's go -- let me ask you a

9    question here.  We've got a Seerax, a Captoes and a

10   Shrinq; correct?

11   A      You mean we have three screen names and those

12   are the screen names?

13   Q      Right.  Those are the three screen names?

14   A      Correct.

15   Q      Those don't necessarily need to be the same

16   person; do they?

17   A      No.

18   Q      And, in fact, how many people can work and be

19   on one AOL account?

20   A      Well, you can have up to seven screen names at

21   any one point in time.  However, you can have

22   hundreds of screen names, but only seven at a time.

23   If you want to create an eighth screen name, one of

24   them has to go.

25   Q      Let's concentrate on Captoes.  When did

1        Captoes first sign onto this account on the 21st?

2    A        9:33 and 51 seconds Eastern Daylight Time.

3    Q        And on that session when did Captoes sign off?

4    A        At 12:27 and 23 seconds Eastern Daylight Time.

5    Q        And when did Captoes sign on again?

6    A        You mean after that?

7    Q        Yes.

8    A        At 12:36 and 45 seconds Captoes logged in?

9    Q        When did he log off?

10   A        At 15 -- 12 and 55 seconds Eastern Daylight

11   Time.

12   Q        And in nonmilitary time, what time is 1512?

13   A        That would be 3:12 and 55 seconds.

14   Q        PM?

15   A        PM, in the afternoon.

16   Q        And how many hours was Captoes -- or how much

17   time was Captoes on AOL -- logged onto AOL that day?

18   You can be approximate.

19   A        Approximately -- let's see.  That would be

20   three hours plus -- about five hours.

21   Q        If you would, sir, look at eight -- excuse me,

22   I guess July 8th -- no, July 17th, 2008.

23   A        Okay.

24   Q        And do you see that?

25   A        I do.

1    Q      Did you see the page before?

2    A      No, I don't.  Unless you have questions about

3    that particular day before.

4    Q      Well, let's go ahead and do that, make sure

5    you have it all.  July 17th.

6    A      Okay.

7    Q      And so when was he online or logged into AOL

8    on July 17th, 2008?  When did he start?

9    A      Could you move that down just one more click.

10   Good.  So the first login on --

11   Q      For Captoes.

12   A      -- Captoes that encompassed the 17th would

13   have started the day before because it extended from

14   7:00 PM that night till past midnight 25 minutes.

15   Where you see 7/16/08 at 7:38 and 29 seconds PM and

16   that --

17          THE COURT:  Go ahead and just for the jury's

18   help, you can touch the screen where ' pointing to.

19   It will leave a mark.

20          THE WITNESS:  Oh, perfect.  Thank you.

21          THE COURT:  It should, anyway.  There you go.

22          THE WITNESS:  Well, those two dots I put with

23   my finger show the versus first login on Captoes

24   that encompassed -- I'm sorry.  The login above that

25   started at 7/16/08 at 7:38 and 29 seconds.  That

Colcolough - Cross

1    encompassed July 17th, '08 at 25 minutes past

2    midnight.

3    BY MR. TRAGOS:

4    Q      And approximately how much time is that?

5    A      Five hours.

6    Q      Then he logged on again on the 17th; correct?

7    A      Correct.

8    Q      What time did he log on?

9    A      At 5:46 AM.

10   Q      And till when?

11   A      Logged off at 7:04 AM.

12   Q      And then he logged on again?

13   A      At 8:29 AM.

14   Q      He logged off again?

15   A      9:15 AM.

16   Q      And did he log on again?

17   A      Yes.  At 9:23 AM.

18   Q      Then when did he log off again?

19   A      At 2:06 PM.

20   Q      On the 17th, and excluding the time that it

21   rolled over from the 16th to the 17th, on the 17th,

22   how many hours did he spend on AOL?

23   A      I believe there's more logins on the next page

24   but --

25   Q      Let me see.  Correct.

1          THE COURT:  No, no.  Mr. Tragos, you'll have

2     to clear it.  You got it?  Thank you.  Or Anne --

3     did Anne got it.  Okay.

4          MR. TRAGOS:  Okay.

5     BY MR. TRAGOS:

6     Q     Okay.  How much other time did he spend on

7     AOL.

8     A     There's another login on the 17th at 2:31:24

9     seconds Eastern Daylight Time and logged off at

10    10:43 and 17 seconds.

11    Q     So how much time did he spend on AOL that day?

12    A     A lot.

13    Q     If you would go to page 62 -- well, here's

14    page 62 of 66.  And the bottom of that page the

15    prosecutor asked you about recent buddies?

16    A     Yes.

17    Q     Are these people that were added to the buddy

18    list?

19    A     Yes.

20    Q     Okay.  So during this period -- what period,

21    by the way, did you print out this information from,

22    from when to when?

23    A     I nor anybody at AOL didn't print this out.

24    Q     All right.  What period did you give the

25    government information on?

Colcolough - Cross

1      A      I believe it was sometime in August of '08.

2      Q      Okay.  Well, I'm saying you started the

3   billing information -- or actually, it ended on

4   August, was it?  Excuse me, July 21st of '08;

5   correct?

6      A      Correct.

7      Q      And --

8      A      I believe.

9      Q      Let me show you the first page, then.  July

10  21st, '08.

11     A      Yes.

12     Q      That's the last bit of information that you

13  provided?

14     A      Correct.

15     Q      And the oldest information you provided would

16  have been when?

17     A      On September 20th, '07.

18     Q      The dates that you provided information to the

19  government, why did you provide that information?

20     A      The information in this exhibit?

21     Q      Yes.

22     A      We received a search warrant on this account.

23     Q      And when you receive a search warrant, what do

24  you provide to the government?

25     A      It depends on what the search warrant is

Colcolough - Cross

1      asking.

2      Q      In this case.

3      A      If it's a generic search warrant that asks

4      for -- and I don't have a copy of the search

5      warrant.  Our compliance people do.  If it's a

6      generic search warrant given to us by a federal

7      agency, we provide all the subscriber information,

8      as much of the detailed billing summaries that we

9      have on hand, a list of e-mails, buddy lists,

10     address books, profiles and any account histories

11     that deal with this particular account; account

12     histories meaning issues that are administrative or

13     billing or any sort of violations of our terms of

14     service, or any phone calls that come into our call

15     center that we make notes of.

16     Q      How long do you all save e-mails?

17     A      Our traditional e-mail retention is 28 days on

18     new and sent mail.  That depends currently simply

19     because we now offer our members the ability to save

20     mail on our network for a lot longer.  But the

21     default is 28 days.

22     Q      How long do you save instant messages?

23     A      We don't.

24     Q      How long do you save -- I guess if they

25     have -- search for a website, I don't know what you

1     would call that, how long do you save that

2     information?

3     A     Well, we don't save searches.  However, we

4     save IP addresses that may relate to a member going

5     out to a website.  In other words, if there's a case

6     or a matter that says, here's an AOL member, for

7     example, that went to Yahoo.com.  Yahoo.com may have

8     an IP address that points to AOL.

9          If, indeed, that's the case, we would save an

10    IP address that says this screen name went to

11    Yahoo.com with this IP address that AOL owns for a

12    period of time.

13    Q     Let's say we're talking about a website as an

14    example to makeup, Silverdaddys.  Silverdaddys.  And

15    let's say the member went and said, you know,

16    www.silverdaddys.com on AOL.

17    A     Um-hum.

18    Q     Would there be a record of that?

19    A     Well, there would be a related record.  It's

20    somewhat complicated because we don't own

21    silverdaddys.com.  What would have to happen is law

22    enforcement would have an IP address from

23    Silverdaddys.com saying who owns this IP address.

24    And you could look up who owns an IP address and it

25    would point to AOL.  And for a period of time that

1    person can say, who -- what screen name used this IP

2    address?  It went to Silverdaddys.com.  We would be

3    able to tell you it was this screen name which

4    points to an AOL account held by a user who we do

5    know.  But that sort of retention period is only

6    small.  It's about five days.

7    Q    But you could go back to the -- let's say the

8    Silverdaddys website and gain an IP address from

9    them, you're saying?

10   A    Well, we couldn't.  Let's say law enforcement

11   could.

12   Q    Law enforcement could.

13   A    Let's say there's a case of some sort of

14   investigation on Silverdaddys.com.  And

15   Silverdaddys.com says we don't know who went to our

16   site, but here's an IP address.  That IP address

17   could be easily learned in terms of who owns that IP

18   address and you could go to a website that are

19   called who is and say, who owns this IP address.

20   And basically it would say America Online.

21       Then that law enforcement agency could

22   subpoena America Online saying, at this date at this

23   time this IP address was used by somebody who used

24   your service.  Who was it?  And if we had the

25   information which we do keep for a period of time we

1        could furnish that.

2        Q      Let me show you exhibits page -- the bottom of

3        page 62, page 63, page 64.  Now, there's a lot of

4        AOL screen names on there; correct?

5        A      Yes.

6        Q      And does law enforcement through legal means,

7        subpoenas or search warrants, have access to the

8        information on all those names?

9        A      When you say access to those names, you

10       mean --

11       Q      If a federal agency calls you up and said, I

12       want to know who underyourheel is, do they have the

13       ability to get that information from AOL?

14       A      If they give us a grand jury subpoena or

15       subpoena or search warrant they could understand

16       more information about the account that has that

17       screen name, yes.

18       Q      Did they provide you with any other subpoenas

19       or search warrants with reference to any of the

20       names contained in the buddy list?

21       A      I don't know.  And simply, we receive

22       thousands of subpoenas each and every month.  I

23       don't know -- and they don't tell us what's related

24       to a case or what's not.  That's really out of our

25       sphere of knowledge.

1      Q      Were you asked to bring any with you today

2      other than this?

3      A      No, I don't.  I didn't bring any records.  I

4      depended on -- simply looking at the records it

5      matched what I've already looked at in my office.

6      Q      When someone gets an e-mail from AOL, through

7      AOL, okay, they use the AOL service, and there is a

8      photograph either as an attachment or imbedded in

9      the e-mail, when someone looks at -- some sees the

10     paragraph, is there a prompt menu that AOL pops up

11     when they're doing that?

12     A      Yes, there is.  I believe I know what you're

13     talking about.

14     Q      And what are the options on that menu?

15     A      If you're talking about the warning popup that

16     says, there is either a file imbedded or attached to

17     this e-mail that may be harmful, click here if you'd

18     like to proceed or put a checkmark and click here if

19     you'd like to never see this popup again, it's

20     simply a warning because it could be an attachment

21     of a virus or a trojan horse or a worm that's

22     harmful to your computer.

23            If it's a picture file that's imbedded or a

24     link in the e-mail to a website or an attached

25     picture file that could be objectionable, we like to

1       forewarn our members as to that particular

2       possibility.

3       Q       If you click you want to proceed, then the

4       picture comes up?

5       A       Correct.

6       Q       And when the picture comes up, is there

7       another screen that pops up?

8       A       It depends on if it's an attachment or an

9       imbedded image.

10      Q       Let's say it's an attachment.  Start with

11      that.

12      A       Well, what pops up after you click, okay,

13      let's see the e-mail, you're presented with the

14      e-mail.  And at that time bottom there's a -- if

15      it's an attachment, there's a button you can push

16      called download.  Which you can click on that.  It

17      starts the process of doing a number of things.

18              First, it's asking you a question, where would

19      you like to download this to on your computer, and

20      that may be the second popup screen you're talking

21      about.  What that is is simply a directory that

22      looks into your computer and asks the question,

23      where would you like to download this file to.

24              You can search around your computer for a

25      particular file or folder that you would like it

1     downloaded to, and then click save.  And that starts

2     the process of downloading the picture to your hard

3     drive and presenting to you on your monitor that

4     image file.

5     Q     Okay.  Let's start at the beginning of that.

6     All right.  A button comes up that says download.

7     A     Well, your e-mail comes up and in the bottom

8     left-hand corner there's a button called download.

9     Q     You click download.  Then it asks you

10    whether you want to save it?

11    A     Correct.

12    Q     And you don't actually have to pick a file, do

13    you, it can go to a default file on that?

14    A     You mean a default folder.

15    Q     Right.

16    A     Yes.  There's a default location.

17    Q     Right.  So you don't actually even have to

18    select a folder, it could be selected for you by

19    this software?

20    A     Well, the software originally declares your

21    AOL download directory as your default location for

22    these downloads.

23    Q     And then you click save and it's saved

24    somewhere?

25    A     Well, it's -- it starts the download process.

Colcolough - Cross

```
1      And if you're dialup, it's about 30 seconds to a

2      minute long.  And as it's downloading the file from

3      our network to your computer, it also is rendering

4      that image on your monitors, so two things are

5      happening.

6      Q      Okay.  Do your e-mail messages always contain

7      the date and the time?

8      A      Yes.

9      Q      And one of the things you talked about dialup

10     was if you're out in some rural areas, you don't

11     have access to high speed internet?

12     A      Well, you could, or you could just not opt to

13     have a service that gives you high speed.

14     Q      Well, it's -- okay.  I'm sorry.  I thought I

15     understood you to say that there were rural areas --

16     when the prosecutor asked you about who would have

17     dialup, I thought you said there were some rural

18     areas where other things aren't available.

19     A      Well, they could be not available.  There's

20     always satellite high speed connection from really

21     virtually anywhere in the US.  But rural areas that

22     don't opt for that, they can always have dialup

23     connections.

24     Q      Is Ft. Myers a rural area, Ft. Myers, Florida?

25     A      I would say no.  I've been there before.  I
```

Colcolough - Cross

1    wouldn't say it's a rural area.

2    Q     Would you say they have high speed?

3    A     Yes, I would imagine.

4          MR. TRAGOS:  A moment, Your Honor.

5    (Brief pause.)

6    BY MR. TRAGOS:

7    Q     I know you don't save instant messages.  How

8    about chats; does AOL save chat information?

9    A     No.  We don't.  Any realtime communications

10   like instant messages and chats we don't save.  It's

11   too voluminous.

12   Q     Okay.  You estimated that about eight million

13   users use dialup?

14   A     Currently.

15   Q     How many users do you have total?

16   A     Well, that depends on what service you're

17   talking about.  AOL, the AOL free service, the AOL

18   web based service, the AOL instant messaging service

19   or really -- compared to what?

20   Q     Well, compared to the eight million.

21   A     We have 123 million AOL instant messenger

22   users.  That's a separate account -- I mean, stand

23   alone account you may have as a service.  We have

24   the AOL high speed network.  We probably have eight

25   to ten million users there.  We have eight million

1    dialup users.  So there's a -- compared to eight

2    million dialup, it depends on the service we have.

3    We own and operate a lot of networks.

4    Q     All right.  How many people subscribe to any

5    AOL service at all that's other than dialup?

6    A     Over a hundred million.

7    Q     Okay.

8          MR. TRAGOS:  That's all I have.

9          THE COURT:  Redirect?

10         MS. KAISER:  No questions.

11         THE COURT:  Thank you, sir.  You may step

12   down.  Please watch your step.

13         THE WITNESS:  You're welcome.

14         THE COURT:  Call your next witness, please.

15         MS. KAISER:  The United States calls Special

16   Agent Alex Hagedorn.

17       GOVERNMENT WITNESS, ALEX HAGEDORN, SWORN

18         COURTROOM DEPUTY CLERK:  Raise your right

19   hand.

20         THE WITNESS:  I do.

21         COURTROOM DEPUTY CLERK:  Please be seated.

22         Please state your name and spell your last

23   name for the record.

24         THE WITNESS:  My name is Alex Hagedorn,

25   H-A-G-E-D-O-R-N.

1                          <u>DIRECT EXAMINATION</u>

2      Q      Good afternoon, Agent Hagedorn.

3      A      Good afternoon.

4      Q      Can you please tell the jury where you work.

5      A      I'm a special agent for Immigration and

6      Customers Enforcement here in Tampa.

7      Q      And what are your duties as a special agent in

8      Tampa?

9      A      I'm assigned to the general investigations

10     group which includes cyber crimes and child

11     exploitation crimes.

12     Q      How long have you been so employed?

13     A      Approximately six years.

14     Q      What type of training have you had to be a

15     special agent with Immigration and Customs

16     Enforcement?

17     A      Approximately 20 weeks in Glynco in Georgia.

18     The FLETC Law Enforcement Training Center.

19     Q      Did you have an occasion in this case to

20     participate in the investigation of Charles

21     Friedlander?

22     A      I did.

23     Q      What role did you play in the investigation?

24     A      I was the ICE case agent.

25     Q      Did you review any computer evidence in this

1      case?

2      A      Yes, I did.

3      Q      What did your review entail?

4      A      I asked the computer forensic agent, David

5      Grawunder, to prepare a forensic report based on the

6      two computers that were seized from the defendant.

7      And then I reviewed those discs that he created

8      which included e-mails, pictures, user activity on

9      the America Online service.

10     Q      What was the purpose of your review of the

11     defendant's e-mails on his computer?

12     A      I was looking for evidence of sadistic sex or

13     meeting people online.  I was looking for any

14     potential child pornography or communication with

15     children.

16     Q      Did you see any child pornography on the

17     defendant's computer?

18     A      I did not.

19            MS. KAISER:  Your Honor, may I approach?

20            THE COURT:  Yes, ma'am.

21     (Brief pause.)

22     BY MS. KAISER:

23     Q      Agent Hagedorn, who is Seerax?

24     A      I believe that is Eric Suggs, the occupant of

25     the defendant's Washington, DC address.

1    Q       Is that the person to whom you were just

2    referring or is that the profile name of the person

3    you were just referring to?

4    A       Yes, ma'am.  The first three lines there.

5    Q       All right.  And in your review of the

6    defendant's computer, did you see any e-mails

7    written by Seerax?

8    A       I did.

9    Q       Who were they signed by?

10   A       Eric or Eric Suggs.

11   Q       Did you review the defendant's AOL favorites

12   in this case?

13   A       Yes, I did.

14   Q       Did you see any AOL favorites indicating any

15   interest in sadistic or sadomasochistic abuse?

16   A       I did.

17   Q       What items did you see on the AOL favorites

18   that indicated such?

19   A       May I refer to my notes?

20   Q       Yes, you may.

21           MR. TRAGOS:  I would object, Your Honor.

22   Improper predicate and foundation.

23           THE COURT:  Overruled.

24           THE WITNESS:  On pages 51 and 53 -- well 51,

25   52.  The Atlanta Corporal Punishment Club, there

1    were several entries for that.  64 and 65, bondage

2    gear sex toys, bondage toys, BDSM toys, bondage

3    equipment, several entries for that.  Pages 89 and

4    90, Daddy Swap.Com, trade your favorite daddies,

5    older men, senior, silver fox picture.  94 and 95,

6    e-stem urethral insert, extreme restraints; 120,

7    121.  Gay and lesbian father son, 125, 126.  Gay and

8    lesbian gay fathers, 128, 129.  Gay and lesbian M to

9    M started early.  And then 129 to 130, M for M

10   learned early.

11        190, 191, Jimka's archives of M/M spanking

12   stories.  212, 213, MMSA Story, Guide to the

13   Disciplinary Spanking of Adolescent Boys.  222, 223,

14   KnobsCan.com, scanned pictures of mail genitalia,

15   flaccid and funny.  225, older smoothies chat.  233,

16   234, Petlust complete catalog.  236, 237, Public

17   Home Bear Sucker FOTKI.com, Can.Icom.  251, Shoe

18   Damage Report and Porno Central, Style Forum.

19   Q        Agent Hagedorn, if you would for the duration,

20   just read the ones that were specific to

21   sadomasochistic abuse.

22   A        Okay.  261, 262, slaves BDSM.com.  266, 267,

23   spanking central, adult mail, mail discipline,

24   punishment spanking, caning pad.  267, 268, special

25   interests, father's chatting.  273, 275, special

1    interests, open-minded parent.

2            275, 276, special interests, pain and shame.

3    278, 279, special interests, stern parents.  313,

4    316, at the bottom there, Town Square Boots M4M.

5    401, Uncle Jan's M/M Spanking Site.  And 435, 437,

6    Guyspank.com, the free place to find guys into

7    spanking.

8    Q       Agent Hagedorn, did you ever see any indirect

9    evidence that the defendant had chatted with any

10   minors online?

11   A       Yes.

12           MR. TRAGOS:  Objection, form of the question.

13           THE COURT:  I'm going to sustain the objection

14   and strike the answer and direct the jury to

15   disregard it.  Rephrase it, please.

16   BY MS. KAISER:

17   Q       In your review of the defendant's e-mails, did

18   you ever see any evidence of the defendant chatting

19   with any minors?

20   A       Yes.

21   Q       And could you please explain.

22   A       There were a series of e-mails with a screen

23   name on AOL titled greatscottadad, which indicate

24   that --

25           MR. TRAGOS:  Objection, Your Honor,

1    interpretation.

2            THE COURT:  Sustained.  Let's reference it if

3    you have it, please.

4            MS. KAISER:  At this time, Your Honor, I'd

5    like to publish what's been admitted as Government's

6    Exhibits 94.

7            THE COURT:  You may.

8    BY MS. KAISER:

9    Q      Agent Hagedorn, I will read the first part and

10   if you would, you can read Captoes' response.

11   A      Yes, ma'am.

12           Hello.  Saw your name in father's chatting and

13   thought I'd say hello.  I tried to contact you

14   months ago after I chatted with Cade online.  He had

15   skipped school with some buds.  Was quite a chat.

16   Q      And that was from Captoes to greatscottaddad?

17   A      Yes.

18   Q      On July 17th?

19   A      Yes.

20   Q      Of '08?

21   A      Correct.  The same date.  I told him I was

22   working in Atlanta and that I thought he should be

23   in school.  He said he and his buds were examining

24   their shit logs and went into minute detail.  He

25   said I should see them.  Then he talked about how he

1    didn't like his sister.  All sorts of other junk I

2    don't remember.  I told him if I were there they

3    would all be in deep trouble.

4        Same date.  Had I known just where he was, I

5    would have gone there myself and then gotten you.  I

6    told him I was a strict dad and I knew what to do.

7    Q    From greatscottadad to Captoes:  Did the chat

8    turn you on?  I can't imagine him and his buddies

9    doing that.  Damn, that is a turn on.

10   A    Same date.  Truthfully, it did.  Wanted to go

11   there and work them all over.  Did not know how to

12   get ahold of you, either.  Not much point in your

13   doing much now.  If I were to see him, I'd take care

14   of it for you.

15   Q    From greatscottadad.  Did he give you any

16   impression that he'd let his old man watch him and

17   his buddies do that sort of thing even in secret?

18   I'd like to -- I'd lie to watch them in action.

19   A    Same date.  He more or less invited me but

20   didn't tell me where he was.  I would like to talk

21   with you more about them and get to know you, if

22   you'd like.  He also mentioned jackin off.

23       MS. KAISER:  Your Honor, at this time I'd like

24   to publish what was left unpublished from

25   government's exhibit 95.

1          THE COURT:  You may.

2     BY MS. KAISER:

3     Q      Agent, if you would, would you just please

4     read the e-mails as I put them up on the overhead.

5     Is Government's Exhibit 95-4 from Captoes to

6     mat845NY.

7     A      Am a divorced older man who raised my son

8     alone.  Used Garrison belt and razor strop

9     extensively.

10    Q      Agent, on Government's Exhibit 95-8, what name

11    does Captoes sign his e-mail?  What name does he put

12    in his e-mail to absalom?

13    A      Charles, Dr. Charles Jackson.

14    Q      So he leaves off the Friedlander; is that

15    correct?

16    A      Yes, ma'am.

17    Q      And then Government's Exhibit 95-9.  Just read

18    his part, please.

19    A      PJ, this dad used razor strops and straps

20    only, as did some in Victorian times.  Dad.

21    Q      Government's Exhibit 95-11, would you just

22    read the bottom part from Captoes to absalom.

23    A      Dear John.  Sorry for my delay.  But have had

24    a good bit to do business wise.  You do sound as if

25    you are enjoying yourself and that is good to hear.

1     I do want to start training you for me.  And also

2     how much love we will have as well as heavy

3     discipline.  It will be very deep, intense and

4     often.  My boy needs a very structured heavy

5     disciplined existence.  The razor strop will be part

6     of our way of life.  Keep on enjoying yourself, with

7     lots of love and licks, Charles.

8     Q     Is it fair to say that the defendant

9     references the razor strap in numerous e-mails?

10    A     Yes, it is.

11          THE COURT:  We're going to take a comfort

12    break.  15 minutes.

13          COURTROOM SECURITY OFFICER:  Rise for the

14    jury, please.

15    (Jury out at 2:48 PM.)

16    (Recess was taken at 2:48 until 3:03 PM.)

17    (Back on the record.)

18          COURTROOM SECURITY OFFICER:  All rise.  This

19    Honorable Court is in session.

20          THE COURT:  Ready?  Where's the witness?  All

21    right.  What is it Mr. Tragos?

22          MR. TRAGOS:  Your Honor, I would like to plead

23    to the court in regards to Dr. Berlin.

24          THE COURT:  I've already denied your request.

25    I'm not going to revisit it.

Hagedorn - Direct

1          MR. TRAGOS:  I'd like to make a record as to

2     why he has to leave.

3          THE COURT:  The record is you spent two hours

4     and 46 minutes cross-examining the witness;

5     unnecessarily, in my view.  You could have done it

6     much shorter.  You could have called the witness as

7     part of the case.  You have put the prosecution

8     behind schedule.  Plain and simple.  I'm not going

9     to have their case interrupted.  I don't know.  How

10    many more witnesses do you have, Ms. Kaiser, or is

11    this it?

12         MS. KAISER:  This is going to be it.

13         THE COURT:  All right.  Well, how much longer

14    have you got with the witness?

15         MS. KAISER:  Not long.

16         THE COURT:  Twenty minutes, half hour?

17         MS. KAISER:  I'd say 20 minutes.

18         THE COURT:  That might be an appropriate time,

19    Mr. Tragos.  If you want to accommodate your

20    witness, then you surely do that if the government's

21    prepared to rest after this witness.  But I'm going

22    to allow her to put on her case without further

23    interruptions.

24         MR. TRAGOS:  Would I be able to do it before

25    my cross?

1          THE COURT:  I don't know.  You know, when the

2     case drags on longer than it should have and you

3     knew ahead of time you had this witness problem, you

4     could have avoided it by shortening your

5     cross-examination or calling the witness as part of

6     your case.  There was a strenuous objection by

7     Ms. Kaiser concerning all these exhibits that you

8     went through exhaustively.  You had a right to do

9     that, but you took up valuable time.

10          Bring the jury in, please.

11          COURTROOM SECURITY OFFICER:  Yes, sir.

12     (Brief pause.)

13          COURTROOM SECURITY OFFICER:  Rise for the

14     jury, please.

15     (Jury in at 3:06 PM.)

16          THE COURT:  Thank you, and be seated.  You may

17     resume direct examination.

18          MS. KAISER:  Thank you, Your Honor.

19     BY MS. KAISER:

20     Q     Agent Hagedorn, did you review the defendant's

21     online address books in this case?

22     A     I did.

23     Q     And in either of those address books did you

24     see evidence of his communication with

25     Corporal Romanosky?

1    A      I did.

2    Q      What was that?

3    A      His screen name, StricDad7.

4    Q      And was that on either or both address books

5    from the desktop and the laptop or one or the other?

6    A      I believe it was on both.

7    Q      Do you know what page the reference to

8    StricDad7 is in the address books?

9    A      92.  Yes, that's it.

10   Q      Is that the one I'm pointing to right now?

11   A      Yes.

12   Q      Okay.  And the address book for the laptop, do

13   you know on what page the reference to Corporal

14   Romanosky's internet profile is?

15   A      I am sorry, I do not.

16   Q      Okay.  As part of your work on this case, did

17   you review the defendant's interview with

18   Corporal Romanosky?

19   A      Yes.

20   Q      Based on your examination of the computer

21   evidence in this case, did you determine whether or

22   not the defendant made any false statements during

23   the interview?

24          MR. TRAGOS:  Objection.

25          THE COURT:  Sustained as to the form.

Hagedorn - Direct

143

1    BY MS. KAISER:

2    Q     In reviewing the computer evidence did you

3    find anything inconsistent with the statements that

4    the defendant made during the interview with

5    Corporal Romanosky?

6             MR. TRAGOS:  Objection.

7             THE COURT:  Overruled.

8             THE WITNESS:  Yes.

9    BY MS. KAISER:

10   Q     Could you please explain.

11   A     In the interview the defendant stated that he

12   had no interest in sexual activity, did not visit

13   bondage and sadomasochistic websites or possess any

14   type of pornography associated with those websites.

15   On the forensics, the laptop and the desktop

16   computers belonging to the defendant, those items,

17   those pornography images were present in large

18   quantity.

19   Q     In your reviewing the computer evidence, did

20   you identify any naked pictures of the defendant?

21   A     Yes, I did.  At least -- at least a dozen, I

22   believe.

23   Q     How many houses does the defendant own?

24   A     Two.  One here in Fort -- one in Ft. Myers and

25   one in Washington, DC.

Hagedorn - Direct

1    Q      Does the home in Washington, DC have a

2    basement?

3    A      Yes.

4           MR. TRAGOS:  Objection, predicate.

5           THE COURT:  Lay a foundation, please.

6    BY MS. KAISER:

7    Q      Agent Hagedorn, have you ever seen any

8    pictures of the defendant's residence in DC?

9    A      Yes.

10   Q      And how do you know that that residence has a

11   basement?

12          MR. TRAGOS:  Objection, Your Honor.  Again,

13   the foundation.

14          THE COURT:  Well, that's what she's attempting

15   to lay.  I'll overrule the objection.

16          THE WITNESS:  Through pictures of the

17   residence it's clear that the residence has --

18          MR. TRAGOS:  Objection, nonresponsive.

19          THE COURT:  Well, you answered the question,

20   through the pictures; correct?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Ask your next question.

23          MS. KAISER:  Your Honor, may I have a moment?

24          THE COURT:  Yes, ma'am.

25   (Brief pause.)

1     BY MS. KAISER:

2     Q      Agent Hagedorn, have you sent out any

3     additional leads based on your review of any of the

4     computer evidence in this case?

5     A      Not at this time, no.

6     Q      Have you issued any subpoenas?

7     A      Yes.

8            MS. KAISER:  I have no further questions.

9     Pass the witness.

10           THE COURT:  Cross-examination.

11                       CROSS-EXAMINATION

12    BY MR. TRAGOS:

13    Q      Agent, who is greatscottadad?

14    A      His name is Andrew Burley.  I'm not sure of

15    the pronunciation of the last name.

16    Q      Have you interviewed him?

17    A      I have not.

18    Q      And have you issued subpoenas with reference

19    to him?

20    A      Yes, I have.

21    Q      Have you -- was he subpoenaed for this trial?

22    A      He was not.

23    Q      What -- well, have you gained documentary

24    information about him?

25    A      Yes.

1          MR. TRAGOS:  Side bar, Your Honor?

2          THE COURT:  Yes, sir.

3     (At side bar, on the record.)

4          THE COURT:  Yes, sir.

5          MR. TRAGOS:  Your Honor, I have not been

6     provided with -- I have not been provided with any

7     of the information they have about -- that they

8     received on greatscottadad.

9          THE COURT:  And what is it you are referring

10    to specifically?

11         MR. TRAGOS:  I don't know.  He just said that

12    they issued a subpoena about him that he has

13    information about him.

14         THE COURT:  That would be the individual, not

15    the screen name.

16         MR. TRAGOS:  Right, the individual.  They have

17    information, documentary information about

18    greatscottadad.  She just -- she ended her questions

19    about the fact she issued subpoenas.

20         THE COURT:  Do you believe it to be *Giglio* or

21    *Brady* or something like that?

22         MR. TRAGOS:  Your Honor, I believe it to be

23    Rule 16, first off.  Secondly, I don't know whether

24    or not this reflects whether he does or does not

25    have any children, whether he has a child or does

1        not have a child named Cade, any of that.

2              THE COURT:  Ms. Kaiser?

3              MS. KAISER:  Your Honor, I haven't seen myself

4        any response on the subpoenas issued for

5        greatscottadad, so I don't have them, either.  And

6        it's an ongoing criminal investigation so it

7        wouldn't be discoverable anyway in this case.  We're

8        not calling greatscottadad.  And so's not --

9              THE COURT:  I'm sorry.  This is the person

10       that lives in the house up in Washington?

11             MR. TRAGOS:  No.  This is the person --

12       remember, they just read a thing about a son named

13       Cade.  I was just online or -- about Cade, but

14       there's no e-mails from Cade.  All it is is talking

15       to greatscottadad.  And that's the one e-mail that

16       she said, do you know any e-mails that refer to

17       children, and this is the one e-mail that refers to

18       a child.  And they have information about whether

19       this child does or doesn't exist, anything about

20       this man, and they haven't turned it over to us.

21             MS. KAISER:  That's not true.  May I respond,

22       Your Honor?

23             THE COURT:  Yes.

24             MS. KAISER:  No.  We have no information about

25       whether or not Cade does or does not exist.  I think

1    the only thing would have been subpoenaed would have

2    been his AOL records.  So at this point it's a brand

3    new investigation.  They haven't developed any

4    information about whether Cade exists or whether

5    he's a child or -- we don't have that information.

6         MR. TRAGOS:  I would just like to note that

7    the prosecutor said she hasn't seen the documents,

8    she's doesn't even know what it is.

9         THE COURT:  Well, the government is charged

10   with knowledge of the information within the care

11   and custody of the agent; are you not, Ms. Kaiser?

12        MS. KAISER:  I am indeed, Your Honor.

13        THE COURT:  All right.  So --

14        MS. KAISER:  I don't know if he's received any

15   information on greatscottadad.

16        MR. TRAGOS:  He said he did.

17        MS. KAISER:  He knows who he is but I don't

18   think he knows --

19        THE COURT:  Well, at this juncture I don't

20   know that there's a good faith basis for requiring

21   the government to produce anything.  But, obviously,

22   there is a good faith basis for the government to

23   inquire, make inquiry of the agent as to whether

24   there's information which could fall under either

25   *Giglio* or *Brady* or, for that matter, Rule 16.  It

1      doesn't sound like Rule 16.   The government

2      prosecutor isn't even aware of it.

3            MS. KAISER:   May I inquire now?

4            THE COURT:   Well, I think we should do that on

5      the record in a voir dire setting to clear it up

6      outside the jury's presence.

7            Now, you know, Mr. Tragos, I want to make it

8      very clear to you.   I'm not sympathetic with your

9      time constraints or restraints with your witnesses.

10     This trial has been scheduled for quite sometime.   I

11     do understand the witness is a physician with

12     rounds.

13           If you think there's going to a problem in

14     terms of having him be here, I would assume your

15     partner can discuss with him whether those rounds

16     can be postponed or covered by another physician.

17           MR. TRAGOS:   I have done that, Your Honor.

18     They cannot.   We will --

19           THE COURT:   Then you need to curtail your

20     cross-examination and recall this witness so the

21     government can rest and we can get that witness on

22     today.   It's very simple.   There's time to do that

23     and --

24           MR. TRAGOS:   Well, can I cross-examine him

25     after Dr. Berlin?

1          THE COURT:  You call him back as your witness.

2     He will be an adverse witness, I suspect.  So in a

3     sense, yes.

4          MR. TRAGOS:  Your Honor, because of that, I

5     have to that today, then.  As an adverse witness,

6     I'll call him in my case, then.

7          THE COURT:  Do you have any objection to that,

8     Ms. Kaiser?

9          MS. KAISER:  I think he should cross-examine

10    him now.  I don't see how he can call him as a

11    witness.  He hasn't been subpoenaed by the defense.

12         THE COURT:  He can call the agent as a witness

13    if I direct the witness show up and testify.  If you

14    want a subpoena issued, Mr. Tragos, I'll authorize

15    it.  We're not getting bogged down in that.  We're

16    trial to accommodate both the defendant's interest

17    and the government's.

18         MS. KAISER:  That's fine.

19         THE COURT:  I'm not trying to browbeat you,

20    but that's not a reason to not call a witness.  I'll

21    let you think about that.  In the meantime, we've

22    got to do a short voir dire on whether this

23    information he obtained, whatever it might be, is

24    discoverable.

25         MR. TRAGOS:  As long as we have the jury out,

1       I would ask that I also be able to inquire about

2       whether he has any other information.

3               THE COURT:  Well, I think you can make that

4       inquiry.

5       (End of side bar discussion.)

6               THE COURT:  Members of the jury, I apologize.

7       We're going to have to take a short break and let

8       you be in the jury room, relax in there.  It

9       shouldn't take that -- very long, but some inquiry

10      needs to be made outside your presence.  So if

11      you'll pardon us and give us a few minutes, please.

12              COURTROOM SECURITY OFFICER:  Rise for the

13      jury, please.

14      (Jury out at 3:19 PM.)

15              THE COURT:  All right.  We're on voir dire of

16      the witness, Mr. Tragos.

17                       VOIR DIRE EXAMINATION

18      BY MR. TRAGOS:

19      Q       Sir, what documentary evidence do you have

20      with reference to greatscottadad.

21      A       An AOL subpoena response.

22      Q       Did -- is that like this where they give you

23      all this information?

24      A       This was -- this was hard copy.  This faxed to

25      me.  I don't have an electronic disc like the search

1     warrant.

2     Q      When was it faxed to you?

3     A      November 6th.

4     Q      And does it indicate whether or not

5     greatscottadad has any children?

6     A      It doesn't.

7     Q      Have you made any inquiry as of that?

8     A      As to his children?  No.

9     Q      What else have you inquired about?

10    A      I've tried to locate him.  The address that I

11    got from the AOL subpoena response lists an address

12    in Atlanta for him, as is referenced in the e-mails.

13    Q      Do you have any other responses to any other

14    subpoenas?

15    A      No.  The --

16    Q      Go ahead.

17    A      I'm sorry.  The information that I've got from

18    AOL, the telephone number is disconnected and he

19    does not reside at the address, though the screen

20    name has not been deleted.  There are, as of the

21    time that I received the subpoena, still logins to

22    that screen name.

23           In my subpoena language I did not specifically

24    request IP address information, so I can't find out

25    where that person logged into until I send out a

Hagedorn - Voir Dire

1      subsequent subpoena, which I've not done.

2      Q      What other subpoenas are out?  Tell me how

3      many.

4      A      No.  I haven't submitted that -- that second

5      subpoena for the IP address.

6      Q      The prosecutor said you had -- asked you a

7      question about you had issued subpoenas in this

8      case.

9      A      I have.

10     Q      How many have you issued?

11     A      Administrative that ICE has issued or trial

12     subpoenas?

13     Q      Ice has issued, I guess, as to screen name.

14     A      This one.

15     Q      This is the only one that has the screen name

16     in this case, no other subpoenas?

17     A      Correct.

18     Q      What were you talking about when the

19     prosecutor asked you about that, about have you

20     issued subpoenas in this case?

21     A      We've issued the trial subpoenas and we've

22     issued the administrative ICE subpoena to determine

23     the user identity of some of these screen names.

24     Q      So you have done -- have you received that

25     information yet?

Hagedorn - Voir Dire

1    A       Yes, from AOL.

2    Q       So you have the user identification of these

3    screen names from AOL?

4    A       Of 12, yes.

5    Q       Of 12 of them?

6    A       Including greatscottadad.

7    Q       Okay.  And when did you receive those?

8    A       The same date.

9    Q       November 6th?

10   A       Yes.

11   Q       And have you attempted to contact those

12   people?

13   A       No, I have not.

14   Q       Okay.

15          MR. TRAGOS:  Your Honor, I would just request

16   if I could receive copies of the information.

17          THE COURT:  Under what theory?

18          MR. TRAGOS:  Your Honor, they have documentary

19   information that -- who the identities of these

20   people are.  It's possible that those people could

21   be witnesses.  I would not have that information.

22          THE COURT:  Well, is this a Rule 16 request?

23          MR. TRAGOS:  Yes, Your Honor.

24          THE COURT:  Well, I don't believe it would be

25   covered under Rule 16.  It's not material to the

1   preparation of the defense.  We don't know that it

2   is.  These are possible witnesses.  That doesn't

3   meet that threshold.  It's surely not anything the

4   government intends to use in its case in chief and

5   doesn't belong to or was obtained -- was not

6   obtained by -- from the defendant.  Excuse me.  So

7   the only possible basis would be if it's material to

8   the defense.

9   BY MR. TRAGOS:

10  Q     Did you find out whether any of these people

11  were children?

12  A     No.

13  Q     Are they all adults?

14  A     As to my knowledge yes.

15        THE COURT:  Ms. Kaiser?

16        MS. KAISER:  Your Honor, I don't think it's

17  discoverable.  We're not presenting any information

18  on those witnesses in our case in chief.  And I

19  didn't even know we had any of them identified so it

20  wasn't produced.

21        THE COURT:  How is it material to the defense,

22  Mr. Tragos?

23        MR. TRAGOS:  Your Honor --

24        THE COURT:  Meaning the identities of these 12

25  people.

1          MR. TRAGOS:  Because, Your Honor, one is that

2    he answered the question they're all adults, but the

3    fact is that before this I didn't even know he had

4    any information about any of these screen names.

5          THE COURT:  Well, you had the screen names;

6    did you not?

7          MR. TRAGOS:  I did.

8          THE COURT:  How long have you had that; since

9    you got discovery from Ms. Kaiser?

10          MR. TRAGOS:  Yes, sir.

11          THE COURT:  Well, I'm not suggesting that you

12    should have pursued this avenue, but obviously you

13    had the opportunity to attempt to obtain this

14    information from AOL through a trial subpoena or

15    otherwise; correct?

16          MR. TRAGOS:  I do, Your Honor.  I did, yes.

17          THE COURT:  Again, I'm not suggesting that

18    that would have been something a reasonable lawyer

19    would pursue.

20          MR. TRAGOS:  Right.

21          THE COURT:  But my point is that if it was

22    available to the defendant, the fact that the agent

23    learned of it or obtained the information on

24    November 6th, roughly a month before trial, I don't

25    know that it makes it material.

1            MR. TRAGOS:  Well, Your Honor, I don't see any

2       prejudice or harm to it being disclosed to the

3       defense at this time.  And I don't see where the

4       timing, since the defense has just discovered that

5       they have this --

6            THE COURT:  Would it compromise in any way any

7       ongoing investigation, agent?

8            THE WITNESS:  I do intend to send a lead out

9       to greatscottadad following the trial.  We haven't

10      found out where he lives yet.  It looked like he was

11      in Atlanta based on some law enforcement databases

12      that we have.  He may have moved to Maryland.

13           THE COURT:  What about the other 11 users?

14           THE WITNESS:  No.  I don't believe there will

15      be any -- any further inquiry into them.

16           THE COURT:  Well, Ms. Kaiser, any harm in

17      directing that they name -- these user IDs be

18      furnished to Mr. Tragos at a time -- I would think

19      the agent would have to do that after he gets off

20      the stand.

21           MS. KAISER:  No.  I can't see any reason not

22      to.

23           THE COURT:  All right.  Well, I'll grant the

24      request that the information be made available to

25      you, Mr. Tragos, we're not going to interrupt the

1    trial for her to do it, however.  I think you've now

2    learned enough to effectively make your points.

3         MR. TRAGOS:  Your Honor, as the court said,

4    what I'd like to do is I would like to recall the

5    agent in the defense case in order for us to put

6    Dr. Berlin on.

7         THE COURT:  That's entirely up to you.  If

8    you'd like to do that, just find a good stopping

9    point.  And then I suspect you're going to rest,

10   Ms. Kaiser?

11        MS. KAISER:  Well, I'm going to rest before he

12   calls Dr. Berlin.  I just want to make sure that --

13        THE COURT:  Well, I know.

14        MS. KAISER:  Yes.

15        THE COURT:  Once he's finished with this

16   witness, and assuming he wants to call him back,

17   you're going to rest?

18        MS. KAISER:  Yes, Your Honor.

19        THE COURT:  And you just need to double-check

20   your exhibits and things?

21        MS. KAISER:  Yes.

22        THE COURT:  All right.  If that is how we go,

23   is there any objection to my reserving on

24   jurisdiction, that is, on any motions the defendant

25   may have?

1          MS. KAISER:  No, Your Honor.

2          THE COURT:  So we can expedite the

3    presentation.  Now, keep in mind, Mr. Tragos, when

4    you call him, assuming that you are, we don't have

5    any evidence from the defendant so your inquiry as

6    we discussed at the conclusion of the motion in

7    limine hearing is dependent in some respects on --

8          MR. TRAGOS:  Actually, very little because the

9    court said he could not testify specific /HREU as to

10   Dr. Friedlander.  So, therefore, everything he's

11   going to testify to is going to be basically just as

12   an expert about these conditions.

13         THE COURT:  All right.  I just wanted to

14   remind you of those discussions.

15         MR. TRAGOS:  I know.  I understand the court's

16   ruling from before.

17         THE COURT:  All right.

18         MS. KAISER:  I just want to make sure I'm

19   going to have enough time to cross-examine

20   Dr. Berlin.  Are we going to go until we're done

21   today?

22         THE COURT:  I think both of you understand

23   we'll have to be very efficient with Dr. Berlin to

24   get this session in by the end of the day.  Yes.  I

25   don't think his testimony is going to be unduly

1        long, Mr. Tragos, is it?

2              MR. TRAGOS:  No, Your Honor, it's not.  Like I

3        say, I'm finished.  This is a good point for me to

4        stop.

5              THE COURT:  Why don't you ask a couple

6        follow-ups just for continuity's sake.

7              MR. TRAGOS:  I don't want to waste time.

8              THE COURT:  All right.

9              MR. TRAGOS:  But I will if the court wants me

10       to.

11             THE COURT:  Well, they might draw an inference

12       because they were sent out that's something wrong,

13       and it's not.  We're simply changing our schedule.

14       All right.  Bring the jury in, please.

15             COURTROOM SECURITY OFFICER:  Yes, sir.

16       (Brief pause.)

17             COURTROOM SECURITY OFFICER:  Rise for the

18       jury, please.

19       (Jury in at 3:30 PM.)

20             THE COURT:  Thank you, members of the jury.  I

21       appreciate your indulgence.  Mr. Tragos.

22       BY MR. TRAGOS:

23       Q     Agent, you testified with reference to Exhibit

24       104 about -- I think you named -- how many websites

25       did you tell the prosecutor that you thought were

1       sadomasochistic?

2       A       Approximately 20.

3       Q       Okay.  How many websites are in 104?

4       A       There are 1429 entries.  Websites here could

5       be referenced multiple times within the file count.

6       Q       Including in that are Craig's List; right?

7       A       Yes.

8       Q       Find hotels, discount hotels?

9       A       What page?

10      Q       Page 152, example.

11      A       Yes, sir.

12      Q       Hotwire?

13      A       Yes, sir.

14      Q       Long distance phone service, page 199?

15      A       Yes, sir.

16      Q       Page 304, Titanic Voyage to Eternity?

17      A       Yes.

18      Q       Washington Post, four -- page 407?

19      A       Yes.  I see two entries for that.

20      Q       And Welcome to Camp David, page 413.  These

21      are examples of other things that are contained in

22      there besides the 20 you talked about; right?

23      A       Yes, sir.

24              MR. TRAGOS:  At this time, Your Honor, we

25      would cease our cross-examination and reserve the

1       right to recall him in the defense case.

2              THE COURT:  All right.  Redirect?

3              MS. KAISER:  No, Your Honor.

4              THE COURT:  Thank you, sir.  You may step

5       down.  Please watch your step.

6              Ms. Kaiser?

7              MS. KAISER:  Your Honor, may I have a moment

8       to confer with Special Agent Hagedorn.

9              THE COURT:  Yes, sir -- yes, ma'am.  Excuse

10      me.

11      (Brief pause.)

12             THE COURT:  Ms. Kaiser?

13             MS. KAISER:  Your Honor, the United States

14      rests.

15             THE COURT:  Mr. Tragos?

16             MR. TRAGOS:  Your Honor, the defense would

17      call Mr. Fred Berlin.

18             COURTROOM DEPUTY CLERK:  Raise your right

19      hand.

20              DEFENSE WITNESS, FRED BERLIN, SWORN

21             THE WITNESS:  I do.

22             COURTROOM DEPUTY CLERK:  Please be seated.

23                      DIRECT EXAMINATION

24      BY MR. TRAGOS:

25      Q       State your name, please.  Excuse me.

Berlin - Direct

1    A       My name is Fred Berlin, B-E-R-L-I-N.

2    Q       Could you briefly summarize for the jury your

3    professional training and certifications.

4    A       I have both a PhD degree, which is in

5    psychology, I have an MD degree, a medical degree.

6    Beyond my basic medical training I did specialty

7    training in psychiatry.  And I am certified as a

8    psychiatrist by the American Board of Psychiatry and

9    Neurology.

10   Q       Do you hold any professional positions?

11   A       Yes, several.  I'll keep it brief.  My

12   academic appointment is as an associate professor at

13   the Johns Hopkins University School of Medicine.

14   I'm also an attending physician at the Johns Hopkins

15   Hospital.

16          I'm the founder of the Johns Hopkins Sexual

17   Disorders Clinic, and the director of the National

18   Institute For the Study, Prevention and Treatment of

19   Sexual Trauma.  That's a clinic that grew out of the

20   original smaller Hopkins Clinic.

21   Q       How do you spend the majority of your

22   professional time?

23   A       I have three major areas of responsibility.

24   One is clinical care.  I take care of a variety of

25   sorts of -- people who have a variety of sorts of

1      psychiatric conditions.  But my particular area of

2      expertise has to do with sexual disorders,

3      conditions such as pedophilia, sexual sadism.  So

4      I'm also involved with diagnosing and treating those

5      conditions clinically.

6           Secondly, I'm involved in teaching; teaching,

7      for example, doctors in trying how to diagnose and

8      treat those sorts of disorders.  And my third

9      responsibility is research, and I've published a

10     number of research papers.

11     Q     As a consequence of your work, have you been

12     asked to give any lectures or participate in any

13     professional conferences?

14     A     Yes.  I've been an invited participant at a

15     White House Conference on Child Sexual Abuse.  I've

16     also been asked to address the subcommittees of the

17     United States Senate on that same issue.

18          I've been invited to address colleges of

19     judges in several states.  I've been invited to

20     participate in educational symposia sponsored both

21     by the Federal Bureau of Investigation and by the

22     United States Department of Justice.

23     Q     Do you have or does your clinic have any

24     special relationship with the Department of Justice?

25     A     Well, the Department of Justice has designated

1    the clinic as something they refer to as a national

2    resource site.

3    Q      What does that mean?

4    A      Well, I guess you'd have to talk with them to

5    know exactly why they selected my -- the program

6    that I direct.  But they've designated certain

7    programs around the country that they feel have done

8    outstanding work in this area.

9           They've asked me as a result of that to do

10   some teaching for them, instructing probation

11   officers, for example, how to supervise people who

12   are on probation because of a sexual disorder.  So

13   I'm certainly proud of the distinction, but they

14   would know better than I why they decided to award

15   that to us.

16   Q      You mentioned that you have certain

17   professional publications.  Could you briefly tell

18   us what that entails and also what peer reviews

19   you've done.

20   A      Well, I'll start with the latter.  A peer

21   review is when an individual is asked professionally

22   to review, for example, an article that's been

23   submitted to a journal to see if it's up to scratch,

24   if it really is of sufficient quality to be

25   published.  I've done that in journals such as the

1     Journal of the American Medical Association, the

2     Journal of the American Psychiatric Association.

3          As far as publishing myself, I've published in

4     a variety of topics; again, in various journals

5     including the ones I just mentioned, JAMA, which is

6     the Journal of the American Medical Association.

7     I've published in the Journal of the American

8     Academy of Psychiatry.  And the law publications

9     have been on topics such as sadism, pedophilia.  I

10    don't know how much detail you want, but that would

11    be a brief response.

12    Q     Have you been a member of any professional

13    organizations or committees?

14    A     Many.  But most are not relevant to the issues

15    at hand here, so I won't even talk about that.

16         The one that I think would be of some

17    relevance is the psychiatric profession has

18    something that's called the Diagnostic and

19    Statistical Manual of Mental Disorders.  It is a

20    textbook that spells out for the medical and mental

21    health community the nature of various psychiatric

22    disorders.

23         Because of my experience with the -- in the

24    field of sexual disorders, I was invited to be a

25    member of the subcommittee on the paraphilias, which

1     in layman's terms means sexual disorders for the

2     Third Revision of the Diagnostic and Statistical

3     Manual of Mental Disorders.

4     Q       And do you have a copy of that book with you?

5     A       Yes.  You'd asked me to bring it and I brought

6     it with me.

7     Q       How authoritative is this book within your

8     profession?

9     A       Well, it's considered to be the official book

10    in terms of what would be recognized by the

11    profession as a psychiatric disorder.

12    Q       Okay.  You've asked -- you've come here today

13    and been asked to testify as an expert.  I ask you,

14    have you ever testified as an expert before in

15    Florida or federal courts?

16    A       The answer is I have testified before.  I have

17    done so in Florida, I have done so in federal court.

18    Q       Okay.  You are an expert.  Do you choose who

19    you testify for?

20    A       No.  I have no control over that.  If somebody

21    asks me, I'm willing to take a look.  I tell anyone

22    that asks me, I'll call it as I see it.  But I have

23    no way of influencing who it is that will or won't

24    ask me to testify as an expert.

25    Q       Okay.  Dr. Berlin, is sexual sadism listed in

1    for -- we'll call at the DSM?

2    A     Yes.  DSM is shorthand for the diagnostic

3    manual.  And the answer to your question is that it

4    is listed in that manual.

5    Q     Okay.

6          MR. TRAGOS:  Your Honor, if I may, I have a --

7    the words in a page in that manual about the DSM I

8    would like to as an aid show the jury while he

9    testifies.

10         THE COURT:  Have him identify it, please.

11         MR. TRAGOS:  Okay.

12   BY MR. TRAGOS:

13   Q     Let me show you what will be marked as Defense

14   Exhibit Number 40.  I'll ask if you recognize that,

15   sir.

16   A     Yes.  This looks like a verbatim

17   representation of the diagnostic criteria for sexual

18   sadism as it would be appear in the DSM.

19         MR. TRAGOS:  May I display it to the jury,

20   Your Honor?

21         THE COURT:  Any objection?

22         MS. KAISER:  No objection, Your Honor.

23         THE COURT:  Yes, sir, you may.

24   BY MR. TRAGOS:

25   Q     Okay.  Dr. Berlin, how does the DSM categorize

1       or explain or expound upon sexual sadism?  What does

2       it say about it?

3       A       Well, I guess I can start by indicating what

4       it is and then how this is used in relationship to

5       that.  In layman's terms, sexual sadism is a

6       psychiatric disorder in which the person experiences

7       intense, recurrent urges about being involved in

8       acts that cause another human being either suffering

9       or pain.  It's a disorder that usually comes on

10      rather early in life and once present tends to be

11      chronic.  So that's the nature of the condition.

12          Now, what are these diagnostic criteria all

13      about?  Given that it's been well documented that

14      sexual sadism exists, these are intended to give the

15      clinician some guidelines about how to go -- with

16      respect to how to go about recognizing the condition

17      and also how to distinguish it from other conditions

18      that may look similar.

19          And so if I can run through it, I'll try to

20      explain it again as clearly as I can and as briefly

21      as I can.  First of all, as I already mentioned, the

22      core element of sexual sadism is that an individual

23      experiences recurrent and intense sexual urges about

24      engaging in acts that involve the suffering or

25      degradation of another person.  And those acts are

1    very arousing for them in a sexual way.  Now,

2    there's a couple of things that need to be explained

3    further, and I'm still looking under criteria A.

4         When people have intense, recurrent urges,

5    they're going to ordinarily think a lot about the

6    things that they're experiencing those urges for.

7    And so you'll notice they talk about sexually

8    arousing fantasies.  That's simply another way of

9    saying that when people have strong urges about

10   engaging in these behaviors that they are also going

11   to be thinking a lot about doing those sorts of

12   acts.  That's why the phrase arousing fantasies is

13   also put in there.

14   Q    What is arousing?

15   A    That means sexually arousing, that the person

16   is -- is turned on, to use everyday language, by the

17   idea of someone else suffering or being in pain.

18   What most of us -- our sexual makeup is not such

19   that we're walking around having recurrent urges and

20   recurrent thoughts about someone else suffering, and

21   most of us enjoy sex in a loving, caring gentle way.

22   We're not sexually excited by the suffering and pain

23   of the partner to whom we're -- with whom we're

24   being intimate.

25        So the first point is that these people are

1       very different from the norm in terms of their

2       sexual makeup.  I also want to point out that in

3       there, not only does it talk about recurrent

4       sexually arousing fantasies and urges -- I'm still

5       looking at the top under criteria A -- it also says,

6       or behaviors.  Now, I want to make sure that I

7       explain why that's in there because clearly the

8       fundamental issue is the urges and frequent thinking

9       about these behaviors.

10          There have been some debates in the DSM about

11      whether behaviors should be under criteria A.  But

12      the decision was made that there are situations, for

13      example, where you clearly can see someone is a

14      sexual sadist.  A man has repeatedly sexually

15      assaulted a woman.  He's tortured her, he's

16      brutalized her, he's clearly getting off, if I can

17      put it that way, in her suffering.

18          And so we didn't want a situation to exist in

19      which someone could say they're not a sexual sadist

20      because they're denying the fantasies and the urges.

21      And so this business of including behaviors in

22      criteria A was to keep the person who, obviously,

23      because of their repeated sadistic acts has a

24      disorder from claiming that that's not really there

25      because they don't want to talk about the fantasies

Berlin - Direct

1       and urges.

2           The other thing that's important, and I'm

3       still on criteria A, and is extremely essential here

4       is that when it talks about acts -- and I wouldn't

5       underline it but I'll just call it to everyone's

6       attention, it says real, not simulated.

7           Now, why is that so important in the DSM?

8       It's important because in diagnosing the condition,

9       it needs to be distinguished from other kinds of

10      behaviors, other situations that might at first

11      blush look like they're an example of sexual sadism

12      but aren't.  And if I can give you an analogy that I

13      think would be easier for the jury to understand and

14      then I'll bring it right back to make sure it's

15      clearly on topic.

16          There are people in life who, unfortunately,

17      go about wanting to kill other people.  There's the

18      Adolph Hitlers of the world.  They really exist.

19      But there's also people who enjoy simulating killing

20      other people.  They play war games.  They go out

21      with their buddies and they shoot paint cans at each

22      other.  They talk about killing people.  They may

23      collect military sorts of materials and have scenes

24      that they look at involving people being dead.

25          So this is not real situations of people who

Berlin - Direct

1    want to kill, even though at first blush it may seem

2    that way; these are people who are just simulating

3    or make-believing and wouldn't want to be seen as

4    dangerous even though they're engaging in all this

5    simulated behavior.

6         Now, that's the analogy that has to be

7    appreciated here.  There are people, it's very

8    clear, who engage in make-believe behavior who can

9    look very much like sexual sadism.  They may talk

10   about torturing somebody but they've never really

11   tortured the person.  The person may not really even

12   exist.

13        They may go to clubs in which they actually

14   pay money in order to go through the motions of

15   being whipped or, in some cases, being the person

16   whipping.  But, again, it's -- it's -- it's not

17   real.  There's always a code that if it hurts too

18   much, we're going to stop.

19        So I don't want to belabor the point.  But

20   what is important to appreciate is that it is well

21   documented that many people engage in activities

22   that are make-believe or simulated that at first

23   blush look as though it's sexual sadism.  That's not

24   going to qualify for the diagnosis.  We have to

25   separate those people out.

Berlin - Direct

1           Now, to just finish up, and I'll answer more

2     if you'd like, I'm trying to be brief.  But what

3     about criteria two?

4     Q       You're talking about B?

5     A       Yeah, B, I'm sorry.  It says, the person has

6     acted on the sexual urges with a non-consenting

7     person or the sexual urges or fantasies cause marked

8     distress or interpersonal difficulty.  Now, why is

9     that in there?

10          Well, first of all, if a person hasn't been

11    distressed by having these fantasies and urges and

12    they're having intense, recurrent fantasies and

13    urges of that sort, there's a very high likelihood

14    they would have acted on them.

15          However, it is clear that there are a sub

16    group of people who do have the intense, recurrent

17    sexual fantasies and urges of a sadistic nature who

18    are very distressed by it and who want help, not

19    because they've acted, they've been fighting these

20    urges and haven't acted on it, but they come to see

21    clinicians, they come to see doctors like myself not

22    because of the behavior, but because of the struggle

23    associated with trying to resist the urges and the

24    distress over having this kind of a sexual makeup.

25    So criteria B has been included to capture people

Berlin - Direct

1   who have not acted but are so distressed in their

2   struggle to stop that they come in seeking help

3   clinically.

4   Q       Let me ask you, early on you said that sexual

5   sadism usually comes on early in life?

6   A       Yes.   The DSM indicates that -- and it's in

7   the DSM, so let me get that on the record.

8   Q       Okay.

9   A       But to think about it in a common sense way,

10  we're talking about someone's sexual makeup.   And so

11  it could be the same as asking me, in terms of my

12  sexual makeup, at what age do I become aware of the

13  fact that I'm attracted to females and when do I

14  start acting on that.

15          I'm not going to first discover that in --

16  in -- in late age.   I'm going to know fairly on in

17  life that I have these attractions and in having

18  those attractions it's likely that certainly by

19  middle age I would have acted on them.

20          It's the same thing here.   People's sexual

21  makeups don't just change out of the blue.   Someone

22  that's been heterosexual their entire life and

23  involved with adults doesn't ordinarily become gay

24  when they're 60 years old and so on.   So the point

25  is we're talking about sexual makeup.   It's usually

1    an awareness that people have by late adolescence or

2    early adulthood, and most people will have acted on

3    their particular sexual makeup somewhere in --

4    within that timeframe.

5    Q      Anything else with regard to sexual sadism

6    that you believe the DSM -- or that would be helpful

7    to explain what it is or what it isn't?

8    A      Well, I mean, there's a lot that's in there,

9    and I don't want to give a lecture.  But the real

10   key point is the word real, that we're trying to

11   identify people who really do have these urges,

12   these fantasies who act on them, who are a danger to

13   others and we're trying to distinguish others who

14   are just into make-believe and not confuse the two.

15   I suppose for the purposes here today, that's the

16   key point.

17          MR. TRAGOS:  At this time, Your Honor, the

18   defense would move Exhibit 40 into evidence.

19          THE COURT:  Objection?

20          MS. KAISER:  No, Your Honor.

21          THE COURT:  Well, Rule 803.18 prohibits the

22   introduction into evidence of such a document.  I'm

23   not going to allow it, notwithstanding the lack of

24   objection.  It may be referred to and read to the

25   jury as it has, but it will not be received as an

1    exhibit.

2    BY MR. TRAGOS:

3    Q      I ask you to look at Exhibit 41.  Could you

4    tell us what that is, sir.

5    A      Okay.  Now, we talked about the diagnostic

6    criteria for sexual sadism.  You're now showing me a

7    copy of the diagnostic criteria for pedophilia.

8           Again, I don't know if this is Xeroxed from

9    the manual, but it's certainly a word-for-word

10   representation of what is in the DSM as the

11   criteria -- diagnostic criteria for pedophilia.

12   Q      Dr. Berlin, does the DSM list pedophilia, like

13   sexual sadism, as a psychiatric disorder?

14   A      Yes.  And, again, I don't think it takes a

15   mental health expert to appreciate that there is

16   something terribly different or wrong about the

17   person who's having recurrent fantasies and urges

18   about engaging in sex with very young children.  So

19   I think most people would recognize that there's

20   something disordered about the sexuality of an

21   individual who presents in that fashion, and

22   certainly the DSM recognizes that, as well.

23   Q      What criteria do you use in order to evaluate

24   whether or not someone is or is not a pedophile?

25   A      Well, again, they're listed there.  I can

1    answer any questions you want, obviously, or that

2    the government has.  But just to try to stick to

3    what I think are the essentials, again, we have

4    diagnostic criteria A.

5         And so I didn't comment before, I guess I

6    should put why there's something in there about over

7    a period of at least six months.  If someone had a

8    fleeting thought about being sexual with a child

9    that passed and it didn't come back, that's not

10   something that's going to qualify as part of a

11   diagnosis.  So there's a timeframe put in there to

12   try to make it clear that there's a chronicity, that

13   this is something sustained over time.

14        Again, you'll see that one of the key issues

15   is that the person has intense, recurrent, sexual

16   urges and, again, in this case the key is that these

17   are urges about engaging in activity with a

18   prepubescent child.

19        Most of us in growing up go through puberty

20   around the age of 13, more or less, and so we're

21   talking about adults who are having recurrent urges

22   to have sex with children who have not yet attained

23   puberty.

24        The second category B, or second diagnostic

25   criteria B, you can read it there but just to draw

Berlin - Direct

1    it out, one would need to show that the person has

2    acted on these sexual urges or that the sexual urges

3    or fantasies cause marked distress or interpersonal

4    difficulty.

5         Again, unfortunately, if someone's having

6    intense, recurrent, sexual fantasies and urges about

7    being with a particular kind of partner and they're

8    not distressed or disturbed by having them,

9    unfortunately all too often they will have acted on

10   them.

11        But in terms of criteria B, we do see

12   clinically sometimes individuals who have the strong

13   urges and fantasies, they've not acted on them so

14   they wouldn't just on that basis have qualified for

15   having a disorder.  But because they're struggling

16   with them, they're -- they're troubled by them,

17   they're worried they may act on them, there is a

18   role for psychiatry to play and, therefore, that

19   would be the one instance where if you haven't acted

20   on it but you're distressed, you're worried, you're

21   wanting help, you could qualify for a diagnosis of

22   pedophilia.

23   Q      Do they give you -- does the DSM give you any

24   criteria or any -- any pattern of things to look for

25   with regards to whether or not someone is or is not

Berlin - Direct

1       a pedophile?

2       A       Well, it does both for pedophilia and what we

3       talked about earlier with sadism, as well.  With

4       pedophilia, you would expect to see some evidence

5       that the person is really interested in being sexual

6       with a child.  If they've taken pictures of

7       themselves in sexual activity, if it's someone with

8       pedophilia, the pictures are often of them with a

9       child.

10              If this is a case of sadism that comes back to

11      that, if they've taken pictures of themselves being

12      involved in sexual activity with a partner, then one

13      might expect to find that these pictures will show

14      them actually striking the partner or doing

15      something sadistic for that partner.

16              Again, to put it in a common sense way, if

17      someone is heterosexual and you're looking at the

18      kind of pornography that they might have, or

19      sexually explicit material, you're not going to be

20      surprised if they have Playboy or Hustler or things

21      of that nature.

22              Conversely, if someone has pedophilia and may

23      not be very much interested in adults but has

24      recurrent cravings for children, the kind of

25      pornography that you're likely to find would be

1    child pornography.  So I don't know how much detail

2    you want, but I'm trying to get across the concepts

3    of how people would need to think about this, and

4    hopefully I've explained that concept for you.

5    Q    So it -- so you're talking about a situation

6    where there would be I guess a long line of items

7    that you could point to and say, aha, that's

8    interest in a child, that's interest in a child,

9    that's interested in a child?

10   A    Well, it can be past criminal record.  When we

11   evaluate people, we look at that.  If somebody comes

12   in at a particular age and they've previously been

13   involved two or three names in a documented way with

14   children, well, there they've repeatedly acted on

15   those urges.

16        If somebody -- to come back to the sadism --

17   has actually struck somebody else for sexual

18   pleasure and that can be documented, that could be

19   an example of sexual sadism.  If they're just

20   looking at someone else who's taking pictures of

21   someone else striking someone else, that may be

22   about make-believe and fantasy, so that would not

23   necessarily be supportive.

24        So, again, I can give you as many details as

25   you want.  But the concept is we're trying to make a

1       distinction between someone in sadism who is really

2       wanting to behave in that way and in pedophilia

3       who's really wanting to have sex with a child from

4       people who may in some make-believe way express

5       interest and then come down on which side in a given

6       instance we feel the evidence most supports.

7       Q       Does the DSM comment about the sorts of

8       behavior that persons who have pedophilia typically

9       engage in with children?

10      A       Yes.  It gives examples.  And, again, it's no

11      different than asking about the kinds of behaviors

12      that a heterosexual person will engage in with a

13      partner.  There can be a spectrum.  There can be

14      fondling, there can be oral sex, there can be actual

15      intercourse.

16              Again, I don't want to unnecessarily get into

17      the explicits but, clearly, people with pedophilia

18      behave in sexual ways with children in the same way

19      that a heterosexual person behaves with a person of

20      the opposite gender or a homosexual person behaves

21      with an adult of the same gender.

22      Q       Does pedophilia normally develop at a

23      particular age?

24      A       Yes.  Again, in terms of what I said earlier,

25      people are usually aware of that quite young.  It

1    would be very unusual to see it developing in

2    midlife.  I might just for completion, I mean, there

3    can always be exceptions.

4        We see people, for example, who are elderly

5    who have Alzheimer's disease who are becoming

6    demented and that causes changes in them sexually,

7    they may become sexually disinhibited or they may

8    become interested in a child in a sexual way.

9        So there are situations in which people could

10   develop an interest in becoming sexual with a child

11   that have to do with things other than pedophilia.

12   But again, one would have to talk about what those

13   are and show that the relationship exists.

14   Q    Okay.  So without something intervening like

15   Alzheimer's or something like that, you would expect

16   that pedophilia would develop at a younger age?

17   A    Yes.  I wouldn't expect -- I'm just trying to

18   put this in a way that I hope a jury can understand

19   it -- I wouldn't expect to meet an adult who says to

20   me -- heterosexual adult, to keep it simple -- you

21   know, at sixty I first became aware of the fact that

22   I'm attracted to women.  And similarly, I don't

23   expect to see someone with pedophilia who's going to

24   say and where it's going to be the case that at

25   sixty, he or she began for the first time in their

1        life to be attracted sexually to kids.  I suppose

2        anything is possible.  But in real life, that tends

3        not to be the way it works.

4                MR. TRAGOS:  May I have a moment, Your Honor?

5                THE COURT:  Yes, sir.

6        (Brief pause.)

7                MR. TRAGOS:  That's all the questions I have,

8        Your Honor.

9                THE COURT:  Cross-examination.

10               MS. KAISER:  Thank you, Your Honor.

11                           CROSS-EXAMINATION

12       BY MS. KAISER:

13       Q       Good afternoon, Dr. Berlin.

14       A       Hi.  How are you.

15       Q       Good.

16       A       Good.

17       Q       You testified that you've testified -- you

18       testified previously that you have testified in the

19       past in federal court and in Florida; is that

20       correct?

21       A       That's my recollection.  Yes.

22       Q       And you've also testified nationally?

23       A       Yes, I have.  I mean, I've done that --

24       testified in a variety of states, if that's what you

25       mean by nationally.

1    Q      And a large portion of your testimony in court

2    has been on the side of the defense; is that fair to

3    say?

4    A      Yes.  I've never refused to testify for the

5    prosecution.  But as I said earlier, I have no

6    control over who asks me and most of the time, for

7    whatever reason, it's been the defense.

8    Q      Well, let's talk about that, sir.  How much

9    did you charge the defense for your services in this

10   case?

11   A      Well, I have a sliding scale, and the top of

12   that scale would be as much as $6000 a day or $450

13   dollars an hour.  I often slide it lower.  In this

14   case, however, I was not asked to do so nor did I

15   volunteer to do so.

16   Q      So what was the total amount of your charges

17   for your services in this case, sir?

18   A      I'm not sure at this point.  First of all, the

19   money doesn't go directly to me.  I can expand on

20   that, if you'd like.  But I would guess it's

21   probably in the neighborhood of about $30,000

22   Q      Okay.  So $30,000 for your testimony and the

23   work that you've done on this case?

24   A      Well, let me cover, not my testimony because

25   I'm going to testify as I see it.  So I'm not being

1    paid to testify in a particular fashion.  But it is

2    for the time that I've spent working on the case.

3    Q     But $30,000 is the fee that you've charged the

4    defendant in this case?

5    A     Yes.  Again, it's not a personal fee.  I can

6    explain that if you'd like, but that is the fee.

7    Q     Well, sure.

8    A     Well, I want to -- when I said salary, the

9    fees go into a general fund to support the work of

10   the clinic.  We have many, many people who come for

11   treatment every week at a reduced fee.  We have

12   people coming for therapy at five dollars for a

13   90-hour -- 90-minute therapy session.  So the money

14   goes into a general fund that supports the work of

15   the clinic.

16         Now, to be completely transparent because I

17   don't want to mislead anybody, as a director of the

18   clinic, I could access that money if I wanted to.

19   But the fact of the matter is I rarely do that.  In

20   fact, over the course of the last couple of years, I

21   more often held my salary when things are difficult

22   to make sure others get paid rather than using it to

23   increase my salary.  So it does not go directly to

24   me.  I want to make that clear.

25   Q     Well, Dr. Berlin, you would agree that most

Berlin - Cross

1    governments couldn't afford to pay $30,000 per case

2    for services?

3    A    Well, first of all, I have no control over how

4    much time would be involved.  But I've been asked by

5    the prosecutors in a federal case to testify.  I did

6    that in a case in -- in Washington DC.  They didn't

7    ask me to reduce my fee.  It was at the same level

8    and they paid the total amount.  So I'm not

9    discriminating in terms of this.  If there are poor

10   people, that's where I would be more likely to look

11   at it who can't afford services.  I feel very

12   strongly that people who have less means should not

13   have a lesser ability to have someone come into

14   court and talk.  So there I will ordinarily reduce

15   it.  But in the few cases where the prosecution has

16   asked me, they've paid the same fee that we're

17   talking about here.

18   Q    Sir, when you testified on direct examination

19   that you don't choose who you testify for, you can't

20   control who asks you, that certainly limits -- your

21   fees certainly limit who can ask you; isn't that a

22   fair thing to say?

23   A    No, ma'am, because we do talk about having a

24   sliding fee scale.  So, no, I don't think that's

25   true.  I'm not just trying to be self-serving here.

1       I don't think that people who are poor should get

2       any less medical care than people who aren't, which

3       is why much of the money in this case will go to

4       support people getting treatment who couldn't

5       otherwise afford to do so.

6       Q       So, essentially, if someone has the money

7       you'll bill them?

8       A       Yes, including the government.

9       Q       Okay.  Let's talk a little bit about these

10      charts.  Did you copy these from the DSM for use in

11      this trial?

12      A       I made some copies for myself.  I don't know

13      whether the copies that are here were made by the

14      attorney or copies that I had made.  But I did make

15      some copies to be able to look at when I was

16      preparing for this.

17      Q       Do you have a copy of the DSM book that you

18      had mentioned?

19      A       Yes.  I had mentioned earlier that I brought

20      that with me.

21      Q       And --

22      A       It's right here, if you want that to be shown.

23      Q       And what DSM book is that, what --

24      A       It's DSM 4TR.  Just to explain, I mentioned

25      earlier there have been various revisions over time.

1    DSM4 is the fourth revision and TR means text

2    revision.  There have been some changes in the text

3    since the DSM4 and that's why this is DSM4TR.  I

4    hope I'm not losing you on that.

5         MS. KAISER:  Your Honor, may I approach the

6    witness?

7         THE COURT:  Yes, ma'am.

8    BY MS. KAISER:

9    Q    May I see your book, sir?

10   A    Yes, ma'am.

11   Q    Do you know when the book was published, sir?

12   A    It would say there.  I'm not sure what the

13   date of publication is, but it should be indicated

14   in the front.  Thank you.

15   Q    Sir, if you would take a look and see when

16   that book was published.

17   A    Okay.  This is copyrighted, let's see, 2000.

18   Let me see if there's anything later than that.

19   Unless I'm missing something, I think this was in

20   2000.  We're here if you want to see it.

21   Q    All right.

22   A    Okay.

23   Q    So copyright 2000; is that correct?

24   A    That's correct.

25   Q    All right.  Well, you know, sir, that the

Berlin - Cross

1    diagnostic criteria had changed since 2000; correct?

2    A    Well, the diagnostic criteria as listed I

3    believe are what they are currently.  Again, if it's

4    different, I'll be glad to stand corrected.

5    Q    Who prepared these charts?  They're not copied

6    from the book, so who prepared these?

7    A    Well, again, I had my book and I gave a copy

8    from my book to the attorney.  Whether he's given

9    you the copy that I gave him or whether he's

10   prepared it, I just don't know the answer to that.

11   Q    Well, sir, are you aware that the diagnostic

12   criteria for sexual sadism changed since 2000?

13   A    Well, there have been some changes and some

14   changes back.  My belief is that the criteria are

15   the same.  If they're not, again, I'll stand

16   corrected.

17   Q    Sir, do you recognize the book that I'm

18   holding?

19        MS. KAISER:  May I approach the witness?

20        THE COURT:  Yes, ma'am.

21        THE WITNESS:  Yes.  This is DSM4TM.

22   BY MS. KAISER:

23   Q    And when was this book published?

24   A    Well, again, I'll have to check.  Let's see.

25   Copyright 1994, I believe.  It says, correspondence

1    regarding this to be directed to Division of

2    Publications, 2005.  So I presume that's it.  Again,

3    there are various printings.  They go up to January

4    1995.  Copyright here is 1994.  But going by what it

5    says here, I presume this was actually put out in

6    2005, although that's a little bit unclear.

7    Q     So this is a more recent book?

8    A     If that's from 2005, that would be more

9    recent.  That's correct.  Again, I'm not sure if

10   there's others that have come out since then, just

11   to make that clear.

12         MS. KAISER:  Your Honor, may I publish the

13   revised version?

14         THE COURT:  You may.

15         MR. TRAGOS:  Your Honor -- where is it?  We

16   have an objection, Your Honor.  I don't know the

17   rule to cite, but she hasn't asked him if he

18   recognizes that as an authority.  I'm sorry, but I

19   can't --

20         THE COURT:  I thought he'd answered that.

21         MR. TRAGOS:  I don't think he said --

22         THE COURT:  I'm not going to debate it,

23   Mr. Tragos.  Why don't you lay some foundation,

24   Ms. Kaiser.  It may be repetitive but --

25         MS. KAISER:  Yes, Your Honor.

1          THE COURT:  You're now exhibiting to the

2     witness --

3     BY MS. KAISER:

4     Q     Dr. Berlin, I'm showing you the Diagnostic and

5     Statistical Manual of Mental Disorders, 4th Edition

6     DSM-IV-TM.  Do you recognize this book?

7     A     Yes, I do.

8     Q     Is this a more recent edition of the same book

9     that you mentioned earlier?

10    A     It would appear to be.  Yes.

11    Q     Do you have any doubts that this is the DSM?

12    A     No.  I don't think you're trying to trick me.

13    I have no doubts whatsoever.

14    Q     And this book was published approximately five

15    years after the book that you were looking at?

16    A     Well, again, if I'm reading that correctly,

17    that's the case.

18    Q     Well, Dr. Berlin, why didn't you bring the

19    most recent copy of the --

20    A     Well, I -- I --

21    Q     -- the manual?

22    A     I'm sorry.  I didn't mean to interrupt you.

23    Q     That's okay.  Why didn't you --

24    A     I brought what I had.  But the DSM has not

25    been -- in terms of updated other than in revisions

1      of the text has not changed.  The next DSM five

2      hasn't come out yet, so that's why I didn't bring

3      it.

4              However, if there's something different here

5      that's critical, I'm going to acknowledge that to

6      you.  I'll be glad to answer your questions based on

7      this.

8      Q     Sir, why -- if you knew you were coming here

9      from -- all the way from Johns Hopkins to testify on

10     two topics, why wouldn't you compare the definitions

11     of sexual sadism from 2005 to the most recent book

12     to make sure that they were accurate?

13     A     I brought the book I had.  To the best of my

14     belief, there's been no significant changes.  If

15     you're going to point out to me that there have

16     been, I'll be glad to comment on that.  So far in

17     looking at this, since you've put it up there, I

18     don't see anything that's standing out at me that

19     looks different in terms of those criteria.

20     Q     Dr. Berlin, you're not telling this jury you

21     didn't have a copy of --

22             MR. TRAGOS:  Objection, Your Honor,

23     argumentative.

24             THE COURT:  Sustained.

25     BY MS. KAISER:

1    Q      Dr. Berlin, did you have access to a more

2    recent copy of the DSM?

3    A      I could have taken the time to see if I could

4    get a more recent copy.  It's my belief and I

5    suspect that it will be substantiated here that what

6    was critical for today's purposes is basically the

7    same.  So I had no reason to do it.  If I had known,

8    frankly, that you were going to feel it was terribly

9    important, I would have taken the time to do it.

10   Q      Well, sir, you think it's important to be

11   accurate; correct?

12   A      That I absolutely think is important.

13   Q      All right.  So look at -- look at the second

14   criteria for sexual sadism.  Okay.  Why don't you

15   read that -- read that, if you can.  Can you see

16   that?

17   A      Yes, I can read it.  The fantasies, sexual

18   urges or behaviors cause clinically significant

19   distress or impairment in social, occupational or

20   other important areas of functioning.

21   Q      Now, could that encompass being arrested?

22   A      That's not an intended comment, no.  The

23   wording I'll acknowledge is slightly different.  The

24   intent, the theme, what it is meant to represent is

25   essentially the same.  What it would -- if you want

1    me to answer that, sexual sadism could cause

2    impairment if the person couldn't function in terms

3    of a normal relationship with an adult peer.  If the

4    person had sexual sadism was leaving work in order

5    to go out, then -- and this happens,

6    unfortunately -- and sexually assaults somebody and

7    couldn't get their work done, that would be causing

8    impairment.

9         But to say that if somebody gets arrested

10   that's -- that's significant social impairment tied

11   to a mental disorder, my goodness, then every person

12   who gets arrested is somehow impaired.  And to say

13   that that's a current relationship to mental

14   functioning, to me -- mental dysfunction would make

15   no sense at all.

16   Q     Dr. Berlin, for the definition of sexual

17   sadism where it says the fantasies, sexual urges or

18   behaviors caused clinically significant distress or

19   impairment in social, occupational or other

20   important areas --

21   A     Well, again, if I may.  I just want to compare

22   it to the way it was here earlier.  The first part

23   about -- to compare, it's still in there about the

24   person having significant distress, if you want to

25   put it up.  The words in here are, caused marked

1    distress or interpersonal difficulty.  I'm reading

2    from the version that I have.  There's marked

3    distress or interpersonal difficulty.

4         I'm not sure how different that is from

5    clinically significant distress or impairment in

6    social occupational or other important areas of

7    functioning.  Again, there was no meeting of the

8    committees of the DSM to change any of this.  The

9    wording is somewhat different, but the essence of

10   what it's all about, in my judgment, is precisely

11   the same.

12   Q     Dr. Berlin, would you agree with me that if

13   someone's arrested based on their behaviors, that

14   would qualify as an impairment in social,

15   occupational or other important areas?

16   A      No.  I would agree that that qualifies for

17   them being prosecuted as a criminal.  But the

18   diagnosis of having any of the sexual disorders is

19   in no way whatsoever contingent upon whether or not

20   someone has committed a criminal act.

21        If we did that -- and this has become an

22   important issue, lots of people who have committed

23   rapes are trying to claim at the time of their

24   arrest that they have sadism or sexual disorder, and

25   that would be a tremendous perversion of the intent

1    of the DSM in the first place.

2    Q       Hypothetically, Dr. Berlin, if somebody had

3    began arrested 20 times for rape, would you consider

4    that to be behaviors that cause clinically

5    significant distress --

6            MR. TRAGOS:  Objection as to form.

7            THE COURT:  Overruled.

8    BY MS. KAISER:

9    Q       -- or impairment in social, occupational or

10   other important areas of functioning?

11   A       I mentioned earlier, if a person has

12   repeatedly been arrested in a way that shows their

13   behavior to have been sexually sadistic -- and I

14   covered that earlier -- not because of the arrest,

15   but because there's documentation that they have

16   repeatedly engaged in behavior of a sadistic

17   fashion, even if they denied the fantasies and

18   urges, they would qualify them for the diagnosis.

19   But it isn't the repeated arrest that would do it,

20   it would be that the arrest had ultimately led to

21   the documentation that they had repeatedly behaved

22   in a sexually sadistic fashion.

23   Q       So it would be the behaviors that would have

24   caused the impairment; correct?

25   A       The type of impairment we're talking about is

1    psychological impairment or the extension of that as

2    represented in, for example, the workplace.  I

3    talked about that.  It -- it wouldn't make any sense

4    to link impairment, in my judgment, to being

5    arrested.

6         How are you going to distinguish the person of

7    sound mind who simply misbehaves in a clinical

8    fashion -- I'm sorry, in a criminal fashion from the

9    person who's not of sound mind but driven to act

10   because of some sort of psychopathology, how can we

11   distinguish those two, which I would argue is an

12   important distinction, if we simply looked at

13   whether they were arrested or not.

14        The person who repeatedly assaulted women in a

15   sadistic way who's not been arrested would also

16   qualify for a diagnosis of sexual sadism.  So

17   whether they're arrested or not is really beside the

18   point.

19   Q    Well, I guess my question to you, sir, really

20   had to do with wouldn't an arrest impair their

21   social functioning or functioning?

22   A    Well, again, let me give you this, then.  You

23   could do that.  I think it's a stretch.  But I want

24   to remind you that the point of these criteria are

25   to assist clinicians in diagnosing a mental

1   disorder, whether or not it is actually present.

2   They're not simply intended to be used for the

3   purposes of sort of an academic debate.

4        So could I think of hypothetical situations in

5   which I might want to say the person is impaired and

6   I want to use the fact that they have been arrested

7   as evidence of that.  But I can tell you in practice

8   I don't know of anybody who links the diagnosis of

9   sexual sadism or pedophilia into whether they have

10  or have not been arrested, because there are many

11  people who engage in sex with children, for example,

12  who don't have pedophilia, and the fact that you've

13  been arrested is not going to be a basis of evidence

14  for that being a mental disorder.

15  Q    I'm sorry, sir.  Did you say there was a

16  number of people who engage in sex with children

17  that don't have pedophilia?

18  A    Yes.  I touched on that before.  One would

19  have to know -- there would have to be some

20  understanding if it's not pedophilia, what led them

21  to do it.  I gave an example of someone who's old

22  and develops Alzheimer's disease and begins to get

23  involved with a child, we may realize that's not due

24  to pedophilia, but we could still understand how

25  this behavior makes sense to us because of the

1    Alzheimer's disease.

2    Q      But that --

3    A      I'm sorry, I didn't mean to interrupt, but I

4    wasn't quite finished.  I've seen examples of people

5    following traumatic brain injury -- and we presented

6    a teaching thing on this recently who, because of

7    their brain injury either becomes sexually

8    disinhibited or approached children sexually.

9           In that case, it's clear they're approaching a

10   child sexually, it's not because they have

11   pedophilia but we have some clear alternative

12   understanding to help us appreciate why it is

13   they're doing so.  And I am finished at this point.

14   Q      Thank you.  All right, sir.  Well, let's go

15   ahead and compare the manuals and we'll just see how

16   they're different.

17          In the one that you presented to the jury

18   earlier for the diagnostic criteria for sexual

19   sadism, it said -- under subsection B, it said the

20   person has acted on these sexual urges with a

21   nonconsenting person, or the sexual urges are

22   fantasies caused marked distress or -- I guess that

23   should be or -- interpersonal difficulty.

24   A      Yes.

25   Q      So apparently there's a typo there, whoever

1        typed this up; correct?

2        A       That's correct.

3        Q       So it's not copied from the book?

4        A       No.  There is a typo there and, again, I

5        didn't pick that up.

6        Q       But then in the more recent copy of the DSM

7        under subsection B, it says, the fantasies, sexual

8        urges or behaviors caused clinically significant

9        distress or impairment in social, occupational or

10       other important areas of functioning; is that

11       correct?

12       A       That's correct.

13       Q       All right.  So there's no requirement now that

14       a person has acted on these sexual urges with a

15       nonconsenting person?

16       A       No, not a nonconsenting person.  But there's

17       clearly still a requirement that this be real and

18       not simulated or made up, so that issue certainly

19       has not changed.

20       Q       So the DSM -- the DSM's changed, right, and

21       so --

22       A       Yeah.  Again, these are text revisions so

23       they're -- that's the whole point.  They're --

24       they've changed the words, but there's been no

25       meetings of any subcommittee to change the essence.

1          So I take your point that in the version you

2     have and the version I have, they're presented

3     somewhat differently.  But there is nothing there

4     that changes the fact that the person would have to

5     engage in real behaviors of a sadistic nature which

6     is the point which often would involve a

7     nonconsenting person.  If people are just agreeing

8     to do this as make-believe, then that's a whole

9     separate matter.

10    Q     Well, they're vastly different; correct?

11    A     Not in my mind.  The words are different but

12    the meaning is not different.

13    Q     Well, let's look at them again.

14    A     Okay.

15    Q     In your definition, all right, it says --

16          MR. TRAGOS:  I'm going to object as

17    argumentative and repetitive.

18          THE COURT:  Rephrase it, please.

19    BY MS. KAISER:

20    Q     All right.  In --

21    A     And it would help if you could keep them both

22    there so we could all compare them simultaneously.

23    If would just be useful.  If you don't want to, I'll

24    just look at my own version.  I mean, it doesn't

25    matter.

1    Q    There's only so much room on the --

2    A    All right.  Fair -- fair enough.

3    Q    But in your version, Dr. Berlin, it says the

4    person has acted on these sexual urges with a

5    nonconsenting person; correct?

6    A    That's correct.

7    Q    All right.  And the most recent one doesn't

8    require action on a nonconsenting person at all?

9    A    Not on criteria B.  That's correct.

10   Q    In fact, criteria B encompasses fantasies?

11   A    Well, again, I don't want it to be taken out

12   of context.  The fantasies, urges can cause

13   clinically significant distress.  So we talked about

14   that, that's essentially the same, or impairment in

15   social, occupational or other important areas of

16   functioning.

17        So I'm simply going to agree with you that

18   there's nothing about a nonconsenting person.  I'll

19   just concede that fact.

20   Q    And there's nothing about actions, right, it

21   could still be fantasies, under subsection two

22   now --

23   A    Well, you --

24   Q    -- it's fantasies, as well?

25   A    Sorry.  I didn't mean to interrupt you.

Berlin - Cross

1       Except keep in mind you have to have both criteria A

2       and B.  And so it cannot qualify for the diagnosis

3       just because they've rephrased what's in B.  You

4       still have to have what's in A.

5            And so, yes, the wording has changed, but the

6       essence of it that there has to be real, not

7       simulated, not fantasy but real behavior of a

8       sadistic nature hasn't changed.  It's presented in a

9       somewhat different fashion.  But given you have to

10      have both A and B, the essence of what it's all

11      about has not changed.

12      Q     Let's look at the definitions for pedophilia

13      that you presented to the jury.  All right.  This is

14      what you had mentioned was the diagnostic criteria

15      for pedophilia; is that correct?

16      A     That's correct.

17      Q     All right.  Were you aware, sir, that these

18      had changed, as well?

19      A     Well, again, there's been no changing of the

20      essence of this by committees meeting and agreeing.

21      I take your point and I think I should have been

22      aware, so it's a shortcoming on my part that the way

23      in which it's phrased has changed.  And I apologize

24      for that.  I should have known that.

25      Q     Well, it's changed -- it's changed vastly; has

1    it not?

2    A      Well, again, we can -- we'll see.  I don't

3    think the essence of what pedophilia is all about

4    has changed.

5    Q      Well, in your -- in your definition, it

6    includes the person has acted on these sexual urges

7    or the sexual urges or fantasies caused marked

8    distress or interpersonal difficulty; correct?

9    A      That's correct.

10   Q      And this is from 2000, the definition?

11   A      That would have, yes.

12   Q      So from the 2005 book, all right, subsection B

13   doesn't require that the person has acted on the

14   sexual urges.  Do you see that, Dr. Berlin?

15   A      Yes, I see that.

16   Q      So you would agree with me that the diagnostic

17   criteria doesn't require for a person to act on the

18   sexual urges; correct?

19   A      Let me look at it carefully because if you're

20   right, I'm going to concede it, but let me make sure

21   I read that.

22          All right.  Well, again, I'm going to go in

23   criteria A, and I'm not trying to be argumentative.

24   It says over a period of at least six months,

25   recurrent, intense sexual arousing fantasies, sexual

1    urges or behaviors involving sexual activity with a

2    prepubescent child or children.

3            My belief is that that's what the essence of

4    pedophilia is about, that the behaviors are

5    involving sexual activity.

6    Q      All right.  But it also encompasses fantasies;

7    correct?

8    A      Yes.  But, again, you can't take -- it has to

9    be both criteria that are met.  It's always involved

10   fantasies.  Criteria B is now saying that fantasies,

11   sexual urges or behavior cause clinically

12   significant distress or impairment.  So it's trying

13   to summarize what it is that can be caused by

14   those -- by those fantasies, urges or behaviors.

15           But that doesn't mean that you ignore category

16   A.  That still is there.  And so we're talking about

17   the individual behaviors involving -- and I'm just

18   reading word for word -- behaviors involving sexual

19   activity with a prepubescent child or children.

20   That has not changed.

21   Q      But the word fancy also is in there; correct?

22   Do you see that?

23   A      It was always in there.  Fantasies has been in

24   there from the beginning.  It's always been in

25   there.

1    Q     So you don't need to have a person acting out;

2    correct?

3    A     No, that's not correct.  The over -- let me

4    just read it.  And, again, I don't mean to seem

5    argumentative, but let me go slowly.  Over a period

6    of at least six months, recurrent, intense, sexually

7    arousing fantasies, sexual urges or behaviors

8    involving sexual activity with a prepubescent child

9    or children.

10         Now, I can see where it could become confusing

11   because one could take fantasies and urges out of

12   context, but they are not meant to be taken out of

13   context.  They're fantasies and urges involving

14   sexual activity with a prepubescent child or

15   children.  They're linked to the behavior.  They're

16   not meant to be taken out of context.

17   Q     Well, Dr. Berlin, I don't find it confusing.

18   What I'm saying, though, it doesn't say and here,

19   right, it says or.  It says fantasies, urges --

20   A     Or behaviors involving sexual activity.  So

21   let me take behaviors out.  It would be recurrent,

22   intense, sexually arousing fantasies involving

23   sexual activity with a prepubescent child or

24   children, urges involving sex with a prepubescent

25   child or children or behaviors.

1          If the person is simply fantasizing -- okay.

2     I think your point.  I think that does change the

3     meaning.  I don't think that was intended, by the

4     way.  But I think according to this as I read it

5     carefully one could read that as meaning something

6     different.  I'll take that point.

7     Q     Well, Dr. Berlin, even in your old version

8     from 2000 it had the word or.  So that didn't

9     change; correct?  Let's look at your -- let's look

10    at your one from before.  Yours from before didn't

11    require behavior, either.

12    A     Yes.  But, again -- but you have to have all

13    the criteria.  So criteria B which has to be there

14    in addition to criteria A says that the person has

15    to have acted on the fantasies or -- and, again, I

16    explained why it was put in there.  It was put in

17    there for making the diagnosis for someone who's

18    distressed but hasn't acted.

19         Now, again, it's not just an academic

20    exercise.  That was the point, that the intent is to

21    recognize that there can be people distressed by

22    fantasies and urges and you could make the diagnosis

23    based on that.

24         But I will concede, and I hadn't recognized

25    that, that although I don't think this was intended,

1       you could read this later version as saying that the

2       fantasies alone without the distress might qualify.

3       I don't think that was the intention there, but that

4       would be one way of reading it.

5       Q       Sir --

6       A       I'm sorry.  For completion, the discussions in

7       the DSM were not to make private fantasies and

8       urges -- not to make if somebody has fantasies and

9       thoughts, if they're not hurting anyone, if they're

10      not being distressed that that was seen as not being

11      the business of psychiatry, that if someone has

12      these kinds of thought, they're not acting on them,

13      they're not hurting anybody, then why should we be

14      involved.

15              I do take your point.  And I think it's an

16      oversight on my part and I should not have had that

17      oversight that you could, perhaps, read this to mean

18      that simply having private fantasies that you've

19      never acted on, you're not distressed by, you might

20      be able to take that as saying that that's

21      pedophilia.  So it is in that sense confusing, but I

22      can tell you that that's not the intent.  To say

23      that someone who thinks about these things and who

24      never acts on them, is not distressed by them is

25      somehow the same animal as the person that we're

1    worried about who has these intense desires is at

2    high risk of acting on them or has acted on them I

3    think is making a leap that was never intended.

4    Q       Dr. Berlin, I just want to clear up any

5    confusion.  What I'm saying is the diagnostic

6    criteria for pedophilia in the DSM-IV in the more

7    recent book or the one that's more recent than

8    yours, right, encompasses fantasies, urges or

9    behaviors that cause clinically significant distress

10   or impairment in social, occupational or other

11   important areas of functioning.  Do you agree with

12   that?

13   A       Yes.  I'm agreeing.  Just so I'm clear --

14           MR. TRAGOS:  Your Honor, I'm --

15   A       -- this was a text revision that was not made

16   by the people who are on the committees in terms of

17   these conditions.  It was never intended to change

18   the meaning of the condition.

19           So as I said, that may be a fault on the part

20   of psychiatry.  It's certainly a fault of mine not

21   to have been cognizant of this.  But I can tell you

22   that the intent of what this is all about is to

23   identify people who have intense urges and fantasies

24   who are either distressed by it so we can treat that

25   distress clinically or who are at risk of acting.

1          To say that because someone has private

2    thoughts and urges, they're not at risk of acting,

3    they're not distressed by it, that makes them a

4    psychiatric patient, that makes it a psychiatric

5    condition would do a tremendous injustice to what

6    psychology is all about.

7          Most of us would probably have some fantasies

8    and desires that we're not distressed by, we're not

9    acting, we're not hurting anybody, to say that these

10   private thoughts are now psychopathology was

11   certainly never the intent of the DSM.  That I can

12   say firmly.

13   Q     Right.  But that's not what this says, right,

14   it says --

15   A     I agree.  It's not well thought out.

16         MR. TRAGOS:  I object, Your Honor.

17         THE COURT:  Just a moment.  All right.  Time

18   out.  Let's move on.

19   BY MS. KAISER:

20   Q     Dr. Berlin, you would agree with me that this

21   book does not say that?

22   A     I'm going to --

23         THE COURT:  Ms. Kaiser, I just directed that

24   you move on.

25         MS. KAISER:  Yes, Your Honor.

1          THE COURT:  Thank you.

2          MR. TRAGOS:  Your Honor, my I take a look at

3     the exhibit if she's finished with it.

4          THE COURT:  Have you finished with your fourth

5     edition, I think it was?

6          MS. KAISER:  Yes, Your Honor.

7          THE COURT:  The red book?

8          MS. KAISER:  Yes, Your Honor.

9          THE COURT:  Yes, sir.  Go ahead.

10     BY MS. KAISER:

11     Q     Most of your testimony in courts involves

12     testifying for the defense in civil commitments for

13     sex offenders; isn't that correct?

14     A      No.  I don't think that's the bulk of what

15     I've done.  Again, if I have to break it down,

16     probably the -- the most of the testimony has to

17     be -- has to do with at a sentencing hearing and if

18     somebody has, for example, pedophilia, whatever,

19     providing information to the court about the nature

20     of the disorder, inability to treatment, things of

21     that nature, that's probably the more frequent type

22     of testimony that I've given.

23          MS. KAISER:  I have nothing further.

24          THE COURT:  Redirect?

25          MR. TRAGOS:  Just a moment, Your Honor.

1        (Brief pause.)

2                        REDIRECT EXAMINATION

3       BY MR. TRAGOS:

4       Q       When she showed you these things, you talked

5       about it never came before the committee, the

6       committee makes these decisions --

7       A       That's right.

8       Q       Who is the committee?

9       A       Well, again, there are different members of

10      the committee.  As I mentioned, I was a member of

11      that committee for the third revision.  But when

12      the -- when we go from DSM one to two to three to

13      four, what is supposed to happen -- and, again, I

14      apologize both for my ignorance and what's happened

15      here, but what is supposed to happen is a committee

16      of experts makes a decision about what constitute

17      the diagnostic criteria.

18              These later revisions, which is why I didn't

19      pay as much attention as I should have, were

20      intended to be revisions of the text.  It may phrase

21      things somewhat differently but were not intended to

22      change the meaning because there have been no

23      meetings of committees to decide whether the meaning

24      should be changed.

25              So I'm not quite sure who revised the text in

1     terms of what they've written there, but this was

2     certainly not changes that were made by committee

3     members who would ordinarily determine the

4     diagnostic criteria.

5     Q     Let me ask you to look at the DSM-IV-TM that

6     the prosecutor showed you.  I'll put it over here.

7     Under the pedophilia section, see where it says the

8     disorder usually begins in adolescence?

9     A     Yeah.

10    Q     Although some individuals report that they did

11    not become aroused by children until middle age?

12    A     Yes.  I think I commented upon that earlier.

13    Q     Okay.  The beginning paragraphs that are

14    before these -- this thing that says pedophilia and

15    they give you a paragraph before they actually give

16    you the criteria?

17    A     Yes.

18    Q     Is that supposed to explain what they're

19    talking about?

20    A     It's supposed to expand and give a better

21    appreciation of what it's all about.  Yes.

22    Q     Take a minute under 303.2 of the DSM-IV that

23    the prosecutor has produced, and in those

24    explanations, do they not always talk about actions

25    rather than just thoughts?

1    A       Well, let me read it because I don't want to

2    say something that's incorrect.

3    Q       Read the examples.

4    A       I'm sorry.  Out loud or do you want me to read

5    it --

6    Q       I think just read it to yourself would be

7    fine.

8    A       Okay.

9    (Brief pause.)

10   A       Yes.  So all of this is talking about the

11   paraphilic focus of pedophilia, it involves sexual

12   activity with a prepubescent child.  Now, again, to

13   not mislead, it still would be possible if someone

14   is fantasizing about pedophilia and distressed by it

15   to diagnose it.  So it doesn't say anything here

16   that you couldn't do that where they hadn't acted.

17          But the bulk of the discussion here is talking

18   about the kinds of behaviors that these people

19   typically engage in.  But, again, I don't want to

20   mislead.  It could be possible for someone to have

21   pedophilia and not act.  As I said earlier, the

22   intention, though, is that it in some way be

23   distressing or suffering or causing suffering.

24          MR. TRAGOS:  Your Honor, could we have a side

25   bar for a moment?

1          THE COURT:  Yes, sir.

2     (At side bar, on the record.)

3          MR. TRAGOS:  Your Honor, the prosecutor spent

4     quite a bit of time an emphasis on how he got paid

5     for his work.  I think that it is fair for me to ask

6     him what work he did in this case in order to earn

7     that fee, including reviewing the evidence in the

8     case, in viewing Dr. Friedlander, various other

9     items that he billed for.

10          THE COURT:  I think that's fair, as long as

11     you don't ask questions about what opinions he has.

12          MR. TRAGOS:  I won't do that.

13          THE COURT:  Do you have any objection to

14     covering the work product that justified the

15     $30,000?

16          MS. KAISER:  No.  No, Your Honor, I don't.

17     (End of side bar discussion.)

18          THE COURT:  You may proceed.  Thank you,

19     counsel.

20     BY MR. TRAGOS:

21     Q     Doctor, your being here today, you didn't just

22     spend your time and bill for looking at the DSM; did

23     you?

24     A     No, I did not.

25     Q     Did you look at the evidence in this case?

1    A      Yes.  I did look at the evidence in this case.

2    Q      What did you look at in this case, generally?

3    A      Well, I mean, it's called the discovery.  It's

4    basically the same evidence that the government

5    would have.  So it looks at things like

6    conversations that have taken place, it looks at

7    information having to do with the allegations that

8    are made at the time of an arrest.

9           It -- I looked at pictures that existed on

10   Dr. Friedlander's computer.  I looked at pictures

11   that were on his camera.  Basically the totality of

12   what the government had at its disposal is what I

13   had looked at.

14   Q      Did you see any child pornography in those

15   pictures?

16   A      No.  There was absolutely no child

17   pornography.  There was one picture, I believe, of a

18   God child that he was holding, a fully dressed baby

19   looking very happy, nothing pornographic about it.

20   There was one picture that had a couple of what

21   looked like boys, maybe 12, 13 sitting in front of a

22   computer.  They didn't have their shirt on but,

23   again, nothing pornographic about it.  But -- so I

24   want to be complete here.  But the answer is no.

25   There was not a single instance that I saw of child

1    pornography.

2    Q      Okay.  Did you also have an opportunity to

3    speak to and examine Dr. Friedlander?

4    A      Yes, I did.

5    Q      How much time did you spend with him?

6    A      Approximately four hours.

7    Q      Okay.  And how much did you spend looking at

8    all the discovery in this case?

9    A      Oh, my goodness.  Hours and hours.  I mean, I

10   didn't know you were going to ask that, but it's

11   probably 30 or 40 hours.  I mean, there was just

12   volumes of this material.

13          MR. TRAGOS:  Okay.  That's all the questions I

14   have, Your Honor.

15          THE COURT:  Any follow-up on that line?

16          MS. KAISER:  No, Your Honor.

17          THE COURT:  Thank you, sir.  You may step

18   down.  Please watch you step.

19          THE WITNESS:  Thank you.

20          THE COURT:  We will recess for the afternoon,

21   ladies and gentlemen.  It's almost a quarter till

22   5:00.  I am still aware of one of your vacation

23   plans.  Let's see how far we get tomorrow.  I'll

24   speak with the lawyers some more after you leave

25   here today and alert you late morning as to what I

1      think our schedule is.

2           Please remember not to form or express any

3      opinions about the case.  Don't allow it to be

4      discussed among yourselves or in your presence.  Be

5      careful.  Have a good evening.

6           COURTROOM SECURITY OFFICER:  Rise for the

7      jury, please.

8      (Jury out at 4:44 PM.)

9           THE COURT:  All right.  We reserve on any

10     motions that the defendant may have at the

11     conclusion of the government's case.  Mr. Tragos,

12     anything?

13          MR. TRAGOS:  If the court will just give me a

14     moment then to organize on that.  Does the court

15     have an inclination of allowing that tomorrow

16     morning?

17          THE COURT:  No.

18          MR. TRAGOS:  Okay.  Your Honor, the defendant

19     would move for a judgment of acquittal in this

20     matter.  Before doing that, though, I would like to

21     renew my prior motions with regard to redacting

22     certain evidence or eliminating certain evidence

23     from coming into this case.

24          THE COURT:  Those motions are deemed renewed.

25     Same ruling.

1        MR. TRAGOS:  Okay.  With regard to the

2    indictment, Your Honor, I believe that there is no

3    evidence that the defendant knowingly attempted to

4    persuade, induce, entice or coerce an individual who

5    had not attained the age of 18 years to engage in a

6    sexual act for which a person can be charged with a

7    criminal offense.

8        I believe that it is not -- I renew my

9    objection to the fact that the officer -- the court

10   allowed the officer to testify about Florida

11   statutes and what crimes and what statutes would be

12   violated by certain hypothetical conduct that was

13   presented by the prosecutor in this case.

14       So with regards to sexual offenses that it

15   could be charged, I don't believe that that has been

16   sufficiently proven by the testimony of the deputy

17   sheriff.  Secondly, Your Honor, I don't believe that

18   he engaged a person under the age of 18 to engage in

19   a sexual act, and that he did not knowingly persuade

20   a person, knowingly and all the other words, induce,

21   entice a person to attain the age -- who had not

22   attained the age of 18.

23       I would also add, Your Honor, that he never

24   did have any contact with, speak to or in any way

25   know that he was dealing with anyone that was under

1    the age of 18.   The officer did say that he was 36

2    when conversing with the defendant.   One minute.   I

3    believe under Rule 29A that the evidence is

4    insufficient to sustain a conviction that a

5    reasonable mind could not fairly find the defendant

6    guilty beyond a reasonable doubt under the current

7    state of evidence.   I guess that's it.   That covers

8    it.

9         THE COURT:   All right.   Thank you.   Response,

10   Ms. Kaiser?

11        MS. KAISER:   Yes, Your Honor.   The United

12   States has proven all of the elements in this case

13   sufficient such as it should go to the jury.

14   Corporal Romanosky testified regarding all the chats

15   that he had with the defendant.

16        As the court's aware, under -- in the Eleventh

17   Circuit, the word induce also can mean to procure or

18   to cause or to stimulate the occurrence of a

19   meeting.   And in the Eleventh Circuit it's

20   sufficient for a subject to communicate with a

21   parent to schedule a meeting for sex.

22        Corporal Romanosky testified that the meeting

23   that he and the defendant were to have was to get

24   together to administer physical punishment in terms

25   of whippings and then to have -- engage in sex with

1    two minor boys, ages 10 and 11.  The defendant drove

2    from his Ft. Myers residence and brought with him

3    the implements that he was going to use to abuse the

4    boys.

5         Corporal Romanosky testified that he had

6    communicated with the defendant using a facility of

7    interstate commerce, a computer.  Don Colcolough

8    also testified that the communications between the

9    parties moved in interstate commerce.

10        However, even previously Corporal Romanosky

11   testified that they used the internet, which also

12   encompasses interstate commerce.  The defendant

13   acted knowingly and willfully.  And Corporal

14   Romanosky testified that had the acts occurred, they

15   would have been violations of laws under the State

16   of Florida.  So, therefore, the defendant's motion

17   should be denied.

18        THE COURT:  Taking the evidence and viewing it

19   in the light most favorable to the government, and

20   accepting all reasonable inferences that tend to

21   support the government's case, I find that the

22   motion under Rule 29C should be and is hereby

23   denied.

24        Now, schedule-wise, Mr. Tragos, what do you

25   think time-wise we are going to require tomorrow?

1        I'd like to let the jury know perhaps at the break.

2              MR. TRAGOS:  I am sure, Your Honor, that we

3        will -- the defense case will take up the entire

4        day.

5              THE COURT:  Finish by close of business

6        tomorrow?

7              MR. TRAGOS:  It is possible.  I'm not sure but

8        it's possible.

9              THE COURT:  All right.

10             MR. TRAGOS:  The defendant's testimony

11       obviously will be long.  And we've got about seven

12       witnesses, so it's possible.  But I'm not --

13             THE COURT:  I understand you have reputation

14       or character witnesses coming in.

15             MR. TRAGOS:  Yes.

16             THE COURT:  How many?

17             MR. TRAGOS:  Three -- no.  Well, they are

18       different but there are four.

19             THE COURT:  Well, be mindful of limitations on

20       cumulative testimony.

21             MR. TRAGOS:  Yes.

22             THE COURT:  Three is usually the magic number.

23             MR. TRAGOS:  Excuse me?

24             THE COURT:  Three is usually the magic number,

25       as you know.

1          MR. TRAGOS:  Yes.  But each of them also has

2     factual testimony as well as the character.  That's

3     why they're different.

4          THE COURT:  All right.  What else can we

5     address before we adjourn?  Did he get his manual

6     back, by the way, the witness?

7          MR. TRAGOS:  Yes, he did.

8          THE COURT:  All right.

9          MR. TRAGOS:  Your Honor, I know -- I think I

10    understood what the court told the jury.  But is the

11    court -- does it know what the court's plan is going

12    to be?

13         THE COURT:  About what?

14         MR. TRAGOS:  About what we will do after

15    Friday.

16         THE COURT:  We'll finish the trial, I guess.

17    Is that what you're asking?

18         MR. TRAGOS:  Well, I was just wondering if we

19    going to -- because, again --

20         THE COURT:  Are you going to work on Saturday,

21    is that your question?

22         MR. TRAGOS:  Judge, if you want me to work on

23    Saturday, I'm here.

24         THE COURT:  Is that what you're asking?

25         MR. TRAGOS:  No.  I'd rather do it Monday, but

1    I'll do it --

2        THE COURT:  I have a jury to pick Monday and

3    I'm very interested in where you're going to be

4    toward the latter part of the day so we can give

5    those lawyers a heads-up.  If we're going to argue

6    this case Monday and I have time to pick a jury in

7    that case, I'd like to do that.

8        MR. TRAGOS:  Okay.  So is the court --

9        THE COURT:  And have that jury come back after

10    this jury goes out to begin deliberations.

11        MR. TRAGOS:  So is the court's idea thinking

12    now that we will go on Monday if we're not finished

13    Friday?  Because I've got some judges I have to deal

14    with on Monday.

15        THE COURT:  That is not my concern,

16    Mr. Tragos.  You know that.

17        MR. TRAGOS:  Oh, I know that.  It's mine.

18        THE COURT:  I think you'd better make plans if

19    you think you have conflicts on Monday because you

20    will be here if we don't finish tomorrow.

21        MR. TRAGOS:  Okay.

22        THE COURT:  I had hoped we could finish this

23    trial tomorrow, and perhaps we will.  But I don't

24    see it being argued tomorrow.

25        MR. TRAGOS:  No.  I don't, either.  So you

1     think it would be wise of me to tell those judges I

2     won't be --

3         THE COURT:  Are they state court judges or

4     federal court judges?

5         MR. TRAGOS:  State, state court.

6         THE COURT:  I think it might be wise to have

7     your partner cover those hearings.

8         MR. TRAGOS:  Okay.

9         THE COURT:  You do whatever you need to.  But

10    if we haven't finished Friday, we're going to go

11    Monday, if that's your question.

12        MR. TRAGOS:  Okay.  That's my question.

13        THE COURT:  I don't think that would be much

14    of a surprise?  Did you think we were going to come

15    back a week from now?

16        MR. TRAGOS:  No, Saturday.  I thought we might

17    be here Saturday.

18        THE COURT:  Ms. Kaiser, what can I help you

19    with.

20        MS. KAISER:  I just want to know, are we

21    definitely not hearing closings tomorrow?

22        THE COURT:  There is nothing definite in this

23    trial.  Lots of things can change with Mr. Tragos

24    and his client.  And I don't want to presuppose

25    thinking.  Those are important decisions.

 1          MS. KAISER:  Okay.

 2          THE COURT:  I will only say that if your case

 3     is considerably shorter than you expect, Mr. Tragos,

 4     yes, we will have a charge conference and argue this

 5     case.

 6          MS. KAISER:  Okay.  Fine.

 7          THE COURT:  But I don't want to assume that,

 8     by any means.  That's an area I'm not going to tread

 9     upon.  But I would like to know first thing in the

10     morning.

11          By the way, neither of you brought me any case

12     law this morning.  Does that mean there's not any?

13     Am I the first Article III judge to consider

14     internet e-mails in a fairness context?

15          MR. SARTES:  Judge, since I've been doing this

16     research in ungodly hours of the night, there seem

17     to be a lot of cases that discuss e-mails generally

18     and allows the string of e-mails to be admitted into

19     evidence.  The -- I don't think I've seen anything

20     other than cases that the government is presenting

21     the evidence in their case in chief.

22          THE COURT:  So no real discussion about

23     whether a string of e-mails falls within 106.

24          MR. SARTES:  That is correct.  And I actually

25     did that particular search.  I tried to corroborate

1    106 and e-mails in the same context.

2         THE COURT:  All right.  Did you find anything,

3    Ms. Kaiser?

4         MS. KAISER:  No, Your Honor.

5         THE COURT:  Did you look?

6         MS. KAISER:  I did.  I did.

7         THE COURT:  I think it's interesting.  I'm

8    sure there will be some case law.  I don't see any

9    harm in this case.  But I think for future

10   reference, that's an interesting issue.

11        MS. KAISER:  I agree.

12        THE COURT:  All right.  Have a good evening.

13   We'll see you in the morning at 9:00 AM.

14   (Hearing adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3        STATE OF FLORIDA             )

4        COUNTY OF HILLSBOROUGH       )

5            I, Linda Starr, RPR, Official Court Reporter for

6        the United States District Court, Middle District,

7        Tampa Division,

8            DO HEREBY CERTIFY, that I was authorized to and

9        did, through use of Computer Aided Transcription,

10       report in machine shorthand the proceedings and

11       evidence in the above-styled cause, as stated in the

12       caption hereto, and that the foregoing pages,

13       numbered 1 through 229 inclusive, constitute a true

14       and correct transcription of my machine shorthand

15       report of said proceedings and evidence.

16           IN WITNESS WHEREOF, I have hereunto set my hand in

17       the City of Tampa, County of Hillsborough, State of

18       Florida, this 28th day of February 2009.

19

20

21              _____/s/ Linda Starr_____
                Linda Starr, RPR, Official Court Reporter
22

23

24

25