```
 1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION


 3       UNITED STATES OF AMERICA,


 4           Petitioner,


 5               vs.          CASE NO. 8:08-CR-318-T-27TGW
                              12 DECEMBER 2008
 6                            TAMPA, FLORIDA
                              PAGES 1 - 263
 7                            VOLUME V


 8

         CHARLES JACKSON FRIEDLANDER,
 9
             Defendant.
10

         _____/
11
                        TRANSCRIPT OF JURY TRIAL
12             BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
13                        and a jury


14       APPEARANCES:


15       For the Petitioner:  Amanda C. Kaiser
                              United States Attorney's Office
16                            Suite 3200
                              400 N. Tampa Street
17                            Tampa, Florida 33602


18       For the Defendant:   George E. Tragos
                              Tragos & Sartes, PL
19                            Suite 800
                              601 Cleveland Street
20                            Clearwater, Florida 33755


21                            Peter Anthony Sartes
                              Tragos & Sartes, PL
22                            Suite 800
                              601 Cleveland Street
23                            Clearwater, Florida 33755


24       Proceedings recorded and transcribed by computer-aided
         stenography.

25
```

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This

 2   Honorable Court is in session, The Honorable James

 3   D. Whittemore presiding.

 4              Be seated, please.

 5              THE COURT:  Good morning.

 6              MS. KAISER:  Your Honor, the government is --

 7   the government is concerned that the defendant may

 8   seek to introduce improper character evidence in

 9   this case.  I've asked them what character --

10              THE COURT:  You know, there's a rule that I

11   think Mr. Tragos is familiar with.  And that's kind

12   of why I asked yesterday.  So what do you think the

13   problem might be?

14              MS. KAISER:  Well, I asked him this morning

15   what particular character trait they were going to

16   seek testimony regarding, and the response I got is

17   they have witnesses that have known Mr. Friedlander

18   throughout their life.

19              But pretty much this isn't a fraud case or a

20   white collar case.  The only character trait that

21   really could possibly be at issue is his character

22   for the treatment of children or hostility toward

23   children.

24              THE COURT:  Really?  What if he testifies?

25              MS. KAISER:  Yes, Your Honor.
```

1          THE COURT:  Truthfulness, law abiding-ness.

2          MS. KAISER:  It's the character for the

3     underlying offense the character witness is

4     permitted.

5          THE COURT:  Have you got some case law on that

6     or is it just an opinion?  It's kind of an academic

7     discussion without case law.  I know I'm not the

8     only judge that requires case law.

9          MS. KAISER:  No, Your Honor.  But it --

10          THE COURT:  I know.  But you're making an

11     argument and I don't think you're right.  And if

12     you've got case law that says you're right, I need

13     to hear it.  Because the rule specifically provides

14     that a defendant may put on character evidence, but

15     it has to relate to a specific trait.  And it

16     usually arises when he testifies.  Right,

17     Mr. Tragos?

18          MR. TRAGOS:  Yes, Your Honor.

19          THE COURT:  It's not character for being a

20     wonderful person.  It has to go to something like

21     credibility or law abiding-ness or --

22          MR. TRAGOS:  Nonviolence.

23          THE COURT:  Well, I hope you're not getting

24     into that, but that's your business, because then we

25     have to define violence and -- what is it, 6-0 --

1            MR. TRAGOS:  406, Your Honor.

2            THE COURT:  406?

3            MR. TRAGOS:  405.

4            THE COURT:  405, methods of proving character.

5            MS. KAISER:  Before you get to that, under

6      404(a) it says, evidence of a person's character or

7      trait of character is not admissible for the purpose

8      of proving action and conformity therewith on a

9      particular occasion with the exception of a

10     pertinent character trait of the accused offered by

11     the --

12            THE COURT:  Tell you what.  And I'm cutting

13     you off because I'm not going to sit here and

14     esoterically discuss matters of law.  If you have

15     case law, I will consider it.  Until we get to that

16     point, we're just filling up the record with

17     meaningless discussion.

18            Now, Mr. Tragos, I do want to know what your

19     intention is this morning.

20            MR. TRAGOS:  Your Honor, our intentions are to

21     first call Charles Friedlander.

22            THE COURT:  All right.

23            MR. TRAGOS:  And if the court wants to make an

24     inquiry with reference to that --

25            THE COURT:  If he's going to testify, he's

1        going to testify.

2              MR. TRAGOS:  Okay.  I didn't know if it's this

3        court's habit to make an inquiry of the --

4              THE COURT:  Only if they don't testify.

5              MR. TRAGOS:  Okay.  And we have Dr. DiMarco

6        and we have possibly Tim Batelli.  And then there'll

7        be the fact witnesses or some fact witnesses mixed

8        with character witnesses, the same individual.

9              THE COURT:  Is that it?  Four possible?

10             MR. TRAGOS:  And -- no, no.  The fact is --

11       there's Dr. Charles Friedlander, DiMarco, four

12       character witnesses and Agent Hagedorn.

13             THE COURT:  There will be three character

14       witnesses.

15             MR. TRAGOS:  If --

16             THE COURT:  There will be three character

17       witnesses.

18             MR. TRAGOS:  Okay.  I'll let the court --

19             THE COURT:  That's it.

20             MR. TRAGOS:  I would ask the court to hear the

21       testimony before it rules.

22             THE COURT:  No.  There will be three character

23       witnesses.

24             MR. TRAGOS:  Okay.

25             THE COURT:  And if you have a fact witness who

1    might be the fourth witness, that's fine, but not

2    four character witnesses.

3         MR. TRAGOS:  Okay.

4         THE COURT:  That's unduly cumulative and --

5    and that's it.  Three is enough.

6         MR. TRAGOS:  Okay.  And Agent Hagedorn.  There

7    will still be four witnesses even though three

8    character, but there will be four witnesses.

9         THE COURT:  Are we still missing a juror?

10        COURTROOM SECURITY OFFICER:  Yes, sir.

11        THE COURT:  All right.  Counsel, I intend to

12   go forward.  It's 9:15.  We can't waste time waiting

13   on people.  This is the juror who wanted the excuse,

14   anyway.  She has not been excused, but I see no

15   reason to wait, not knowing whether she's late, not

16   coming.  Mr. Tragos, your thoughts, opinions,

17   objections?

18        MR. TRAGOS:  I -- I don't have any problem

19   with that, Judge.  I think she's going to be gone,

20   anyway, so --

21        THE COURT:  Ms. Kaiser?

22        MS. KAISER:  That's fine.

23        THE COURT:  Well, if we go forward without her

24   she's -- she's excused, so we'll have 12 jurors.

25        MR. TRAGOS:  We have no objection, Your Honor.

1          MS. KAISER:  I'd prefer we just wait and give

2     her a few minutes in case this case drags out until

3     Monday.  If there's anything that happens with any

4     of the other jurors, then we'd have to declare a

5     mistrial.

6          MR. TRAGOS:  If it drags out till Monday,

7     she's gone, anyway.

8          THE COURT:  Well, not necessarily.

9          MR. TRAGOS:  No, that's true.  I thought the

10    court said she was.

11         COURTROOM DEPUTY CLERK:  I have a message from

12    her, Judge.

13    (Discussion was held off the record.)

14    (Back on the record.)

15         THE COURT:  The juror who is Ms. Baldree,

16    juror number six; is that right?

17         COURTROOM DEPUTY CLERK:  Yes, sir.

18         THE COURT:  She's the one with the issue for

19    next week.  She's actually sick.  She left a voice

20    mail with Anne that she's vomiting.  She went up and

21    got gas this morning, and she's still sick, so I

22    don't have any reason to disbelieve her,

23    particularly since I acknowledged that we were aware

24    and sensitive to her plans for next week.

25         So unless there's objection, I intend to go

1    ahead and go forward with the 12 we have.  All

2    right.  Hearing none, let's bring them in, please.

3              COURTROOM SECURITY OFFICER:  All rise.

4    (Jury in at 9:17 AM.)

5              THE COURT:  Good morning.  Please be seated.

6    Your pads will be out here in just a moment.  Your

7    fell juror, Ms. Baldree, is sick.  She called and

8    left a voice mail with my clerk.  We likely would

9    have excused her at the end of the day, in any

10   event, because she had that vacation.

11             So we're going to proceed with the 12 of you,

12   and we are ready to go as soon as your notepads are

13   in here.  We were waiting for her, actually.  I

14   apologize for the delay, but I was expecting her to

15   show up, and Anne just checked her voice mail.

16             Check those things before you get started.

17   These little Bic pens, they're sometimes not

18   cooperative.  Official government issue, of course.

19   Let's see if I can help out in a pinch.  One, two,

20   how many do we need?  Four.  Here, I've got pens up

21   here.  That's fine.

22             All right.  Mr. Tragos?

23             MR. SARTES:  If the court will allow me.

24             THE COURT:  Yes, sir.

25             MR. SARTES:  Thank you, Your Honor.  The

Friedlander - Direct

9

```
 1      defense calls Charles Jackson Friedlander.

 2        THE DEFENDANT, CHARLES JACKSON FRIEDLANDER, SWORN

 3             COURTROOM DEPUTY CLERK:  Raise your right

 4      hand.

 5             THE DEFENDANT:  I do.

 6             COURTROOM DEPUTY CLERK:  Please be seated.

 7             Please state your name and spell your last

 8      name for the record.

 9             THE DEFENDANT:  Charles Jackson Friedlander,

10      spelled F-R-I -- excuse me -- I-E-D-L-A-N-D-E-R.

11                       DIRECT EXAMINATION

12      BY MR. SARTES:

13      Q     Good morning, sir.

14      A     Good morning.

15      Q     What is your birth date?

16      A     May 28th, 1930.

17      Q     And how old does that make you today?

18      A     78.

19      Q     And where are -- where were you born?

20      A     I was born in New York City.

21      Q     Okay.  And let's talk about your family a

22      little bit.  Did you have both parents?

23      A     I'm sorry?

24      Q     Did you have both parents growing up?

25      A     Yes, I did.
```

1     Q      Do you have any siblings?

2     A      One.

3     Q      And who is that sibling?

4     A      It's my sister, Mary.

5     Q      Okay.  Tell us about your mother.

6            MS. KAISER:  Objection, relevance.

7            THE COURT:  Overruled.

8     BY MR. SARTES:

9     Q      Go ahead, sir.

10    A      My mother was born in 1908 and died in 1993 of

11    a stroke and Alzheimer's.  My father was born in

12    1904, died in 2006 at the age of 102.

13    Q      During your childhood years, tell me about

14    what your father did for a living.

15    A      Excuse me.  My father was a stockbroker and a

16    banker.

17    Q      And your mother, sir?

18    A      A housewife.  And since it was during the war

19    that I grew up, she did volunteer work for the war

20    effort, as we called it.

21    Q      Were you close to your parents?

22    A      I didn't know my parents that well, as I was

23    raised the first I believe it's seven years by a

24    nanny.  Otherwise, I knew my mother probably a bit

25    better.  My father was an imbiber heavily of

1     alcohol.

2     Q       Did you go to grade school?

3     A       Yes, I did.

4     Q       Where did you go to grade school, sir?

5     A       Oh, I went to a small private school in New

6     York for grades one, two, three and -- three.  I was

7     permitted to go to a public school which I really

8     wanted to go to in the fourth grade.  And then the

9     fifth and sixth grade I went to a school a bit away

10    in Riverdale.

11    Q       Now, did you have a lot of friends during your

12    grade school years?

13    A       I had a number of friends during my first

14    three grades, yes.  In the fourth grade I had a

15    different group of friends because they were

16    strictly from the neighborhood.  In the fifth and

17    sixth grade when I changed schools, which I

18    preferred not to do, I had no friends, which was --

19    made life fairly difficult.

20    Q       Let's talk about -- let's go on a little bit,

21    let's talk about high school.  Did you attend high

22    school?

23    A       Yes, I did attend high school, and graduated

24    in 1948.

25    Q       And where did you go to high school, sir?

1    A      I went to the Fieldstone school in Riverdale,

2    New York, which was a combination of what we would

3    call now middle school and high school.  It was

4    all -- it was altogether.  It was an ethical culture

5    school which was sort of like a unitarian kind of

6    school.  It was -- it wasn't heavily religious, but

7    their big thrust was ethics and ethical and that

8    sort of thing.  Yes, I did.

9    Q      Let me ask, did you have a lot of friends

10   during your high school years?

11   A      I had practically none.  The school had an

12   awful lot of very wealthy people whose families

13   became wealthy during the war.  They made clothes

14   for the Army and the Navy and that sort of thing

15   and had -- I was one of those who did not have that

16   much money, and so I had one friend, actually, who

17   was in the same boat as I was.

18   Q      Let me ask you, sir, during these high school

19   years, did you have any relationships, dating

20   relationships?

21   A      Not really.  I had -- we had to go then -- I

22   don't think they do it anymore -- I had to go to

23   school to learn how to dance because you had to --

24   you had to know how to dance if you were going to

25   have a date.

Friedlander - Direct

1           And I learned how to dance and learned how to

2      act and do all that sort of thing.  And I went out

3      very perfunctorily with a number of -- of girls.

4      Yes, I -- I had no physical attraction to them,

5      necessarily, but I did go out on dates.

6      Q      You said you had no physical attraction to

7      them.  Then why did go out on dates with them?

8      A      Well, back then you -- there were certain

9      things that your family required of you.  Therefore,

10     one of them was you go out on a date and you go to

11     the movies and you can go home, come -- she can come

12     to your house or you can go to her house and listen

13     to the radio or play a board game.

14     Q      Who were these girls, generally speaking?

15     A      They were girls that I had met at the dancing

16     school.

17     Q      Now, did you attend college?

18     A      Yes, I did.  I have a -- I started off at

19     Bradley University in Peoria, Illinois, and was

20     there for my freshman and sophomore year, at the end

21     of which my father came to me and said you may not

22     go back because the school does not have a Phi Beta

23     Kappa chapter -- and I wasn't that interested in

24     that because I was never going to make it -- and you

25     have to change.  You have to go to a school that has

1    a Phi Beta Kappa chapter, and your mother will help

2    you do that.

3         I knew I couldn't get in on my own because

4    they referred to your high school grades, and my

5    high school grades were not very good except in

6    foreign languages.  So I spent my junior and senior

7    year at Washington and Lee University in Virginia,

8    an all male school at which I was not very happy.

9    Q    Let me just ask, and I'm going to focus on

10   this what we would consider undergraduate period?

11   A    Yes.

12   Q    Okay.  Now, did you have a lot of friends

13   during that period of time at those two schools?

14   A    I had a lot of -- I had a number of friends at

15   Bradley, yes, and -- and liked the school very much.

16   I had no friends at Washington and Lee.  I was not

17   sort of the southern gentlemanly type of person and,

18   therefore, that ruled me out as far as much social

19   life was concerned.

20   Q    Now, let me ask you.  During that

21   undergraduate period of time, did you have any --

22   any interpersonal relationships?  Again, any dating?

23   A    A little bit.  I had some plutonic women

24   friends at Bradley.  At Washington and Lee, no, I

25   had no one.  And the closest school, really, if you

Friedlander - Direct

1    wanted to -- for the people who wanted to go out on

2    date was 50 miles.

3    Q     Now, let me ask you, any sexual relationships

4    during your high school and undergraduate years?

5    A     No, sir.

6    Q     Let me just fast-forward for a moment.  Sir,

7    what is your sexual orientation as we sit here

8    today?

9    A     I'm gay.

10   Q     Now, at what point did you realize your

11   sexuality?

12   A     About when I was 29, 30 or 31.

13   Q     Okay.  So you hadn't yet realized it during

14   your college years.

15   A     No.

16   Q     Were you aware that you were gay at that time?

17   A     Well, in those times you didn't talk about

18   what you were, and everything was just -- you went

19   along in a straight line.  That's not, you know,

20   anything.  And you just -- you didn't discuss

21   things, or I didn't.

22          And I guess I would say no, I wasn't -- did I

23   feel I was different?  Only in the way that I was

24   not interested in girls and a lot of the people were

25   always going out on dates and so, therefore, that

1    would, I think, be about it.

2    Q      Did you graduate from Washington and Lee?

3    A      Yes, sir, I did, in 1953.

4    Q      And what is your degree in, sir?

5    A      In education an French.

6    Q      What did you do after you graduated college?

7    A      Well, I wasn't really prepared to do a lot, so

8    I went on the -- on a training program, on a retail

9    store training program, which was something a lot of

10   people did at that time when you weren't sure

11   exactly what you wanted to do.  So I did that at

12   Thalheimer's, which was a department store in

13   Richmond, Virginia.

14   Q      And were you employed with Thalheimer's?

15   A      I'm sorry?

16   Q      Were you employed by Thalheimer's?

17   A      Yes, I was.

18   Q      And how long were you employed by

19   Thalheimer's?

20   A      Just slightly over a year.

21   Q      And what happened after that year at

22   Thalheimer's?

23   A      Well, I decided I wanted to move on.  And I

24   then went and got a job in a resident buying office

25   is what it was called then.  That was in 1954.  And

```
 1      I was in the resident buying office at -- for a

 2      California sort of specialty store, I guess you'd

 3      call it, in Beverly hills is where -- they were all

 4      over California.  But I was a buying office for

 5      Southern California, and then after that was

 6      transferred at -- in about a year to being a buyer

 7      at I. Magnin in Beverly Hills.  Excuse me.

 8      Q       How long were you with I. Magnin?

 9      A       I was at I -- in the buying office for a year.

10      And about a year and three quarters in -- in Beverly

11      Hills.

12      Q       Why did you leave I. Magnin?

13      A       I left I. Magnin because I wanted to come back

14      east and I wanted to open my own store.

15      Q       And did you do that, sir?

16      A       Yes, I did.

17      Q       And what was the name that store?

18      A       Charles Jackson, Limited.

19      Q       And what type of store was this?

20      A       It was a store for men.  The most dressy thing

21      that we had were sport jackets and otherwise

22      sweaters, shirts, ties and that sort of situation.

23      It was very, very, very small.

24      Q       Why did you call it Charles Jackson, Limited?

25      A       Well, those were my first two names.  I'm
```

```
 1    named for my great grandfather.  And you had to

 2    think of something and so I called it that.

 3    Q      How long did you operate Charles Jackson,

 4    Limited?

 5    A      Four years.

 6    Q      Why did you close it?

 7    A      I decided, actually, that I was not really cut

 8    out to deal with the public and all of its problems

 9    and all the business and tax stuff that I would have

10    had to have done and did do for four years.  So I

11    decided that I would change professions or

12    occupations, whatever, you know, they might want to

13    a call it.

14    Q      So what did you do after you closed Charles

15    Jackson?

16    A      I became a teacher.

17    Q      And where did you teach?

18    A      I taught at Loudoun Valley High School in

19    suburban Washington D.C., in Virginia, however.

20    Q      And what was your position there?

21    A      There I taught French.  And they didn't have

22    anybody to teach one English course so I also taught

23    English for a year or for -- no, I guess I taught

24    English for three years, just one class.

25    Q      What -- you say that was a high school?
```

1      A      I'm sorry?

2      Q      You say this was a high school?

3      A      Yes, a high school.  At that time it was

4      eighth through twelfth.

5      Q      Did you have any contact with students?

6      A      Just on a daily basis.  They came into the

7      classroom and I taught them and -- yes, I did.

8      Q      Did you ever have any issues at the school?

9      A      No, not at all.

10     Q      How long were you at Loudoun Valley?

11     A      I was at Loudoun Valley teaching for six

12     years, and then going to school at night to -- as

13     such specialize in guidance.  So for four years I

14     taught French and that one class in English, and

15     then spent two years as a guidance counselor.  And

16     at that time, then, I -- I also finished my master's

17     degree at George Washington University.

18     Q      What is your -- I'm sorry.  Continue.

19     A      With a major in counseling, or a specialty in

20     counseling.

21     Q      You were at Loudoun Valley High School for how

22     long total?

23     A      Six years.

24     Q      What -- what happened after that sixth year at

25     Loudoun Valley?

1        A       I was asked by the new principle of Broad Run

2        High School to head their guidance department and be

3        their guidance director, set up the department, be

4        responsible for it.   And there were three other

5        guidance counselors under me.

6        Q       And how long did you stay at -- what was the

7        name of that school again?

8        A       Broad Run High School.

9        Q       How long did you stay at Broad Run High

10       School?

11       A       I stayed there from 1969 through 1986.

12       Q       In those years, sir, what positions did you

13       hold at the school?

14       A       I was director of guidance, and the director

15       would have a slightly lower load.   The average load

16       was 350 students per counselor.   I had 300 as the

17       director.

18       Q       Did you have any contact with students at

19       Broad Run?

20       A       Continually.   I had to help them plan their

21       programs, help them in their senior year get into

22       college, advise them.   And they could come to me

23       with any problems that they might have or any of

24       their parents, as well, connected with school --

25       with school situations.

1            I also organized a program since there were

2    none in the whole of the Commonwealth of Virginia at

3    the time where students who had been in mental

4    hospitals and were coming caught, I organized a

5    transition situation.  And all people from the

6    county who got -- who were in that particular

7    position coming out of mental hospitals came to my

8    school, the school that -- where I was at, and I had

9    to plan special programs for them at -- do some

10   group work with them once a day just about.  Yeah.

11   Q      Dr. Friedlander, let me ask you, did you ever

12   have any problems during those years at Broad Run?

13   A      No.  No.  I got an award as the teacher of the

14   year in the school.

15   Q      In those years that you were teaching --

16   A      Yes.

17   Q      -- did you have any -- a lot of friends during

18   those years?

19   A      Not many, but a few, yes, I did.

20   Q      Any romantic relationships?

21   A      No.  I had a woman friend whom I met since we

22   started school together, teaching together, put it

23   that way.  And I did see her in a plutonic

24   relationship but a close plutonic relationship.

25   Q      Anything sexual?

1    A      No, nothing whatsoever.

2    Q      What was her name?

3    A      Margaret.

4    Q      Last name, too?

5    A      Vaughan, with an A.

6    Q      At some point now in this time period while

7    you're teaching --

8    A      Yes.

9    Q      -- how has your sexuality -- had you

10   identified your sexuality at this point?

11   A      I identified it, yes.  I didn't do very much

12   with it whatsoever.  I was -- I don't want to call

13   myself a loner because I wasn't a loner, but I was

14   not actively social.  I guess I should call it that.

15   Q      Why not?  Why weren't you actively social?

16   A      Well, I've always had a problem with self

17   esteem.  And I never really felt that I could

18   connect and -- and be accepted by people either who

19   had more money than I did or was -- was better at

20   doing things.  I think that was really the reason.

21   Q      Let me ask you, since you've told us your

22   sexual orientation, at this time period in the

23   sixties through 1986, I think you told us --

24   A      Yeah.

25   Q      -- have you identified that you're gay at this

Friedlander - Direct

1    point?

2    A       Probably in the sixties one -- the word in the

3    fifties or -- in the fifties and very early sixties,

4    that word wasn't really used.  And so I guess I

5    identified with myself but I wasn't openly anything,

6    no, if that's what you meant.

7    Q       Did you have any romantic relationships with

8    any men during this time period?

9    A       No, sir.

10   Q       After 1986 at Broad Run, what -- did you do

11   anything else?

12   A       Yes.  I went into private practice.  I got

13   my -- I received my PhD from George Washington

14   University in student personnel, which was more or

15   less the same as -- as counseling.  But George

16   Washington had lost its accreditation in that

17   particular -- in the psychology area, so they sort

18   of were given another degree, and you took slightly

19   different courses.  So I opened my own practice of

20   psychotherapy and counseling with adults only.

21   Q       And now did you hold a license of some sort?

22   A       Yes.  I was called a licensed professional

23   counselor in the Commonwealth of Virginia.

24   Q       So where did you live during this time period

25   that you were in private practice?

Friedlander - Direct

1    A      I lived in Washington, D.C.

2    Q      Okay.  Did you own a house?

3    A      Yes, sir.

4    Q      Now, how long were you in private practice?

5    A      From 1986 to 2008.

6    Q      Now, what was the focus of your practice?

7    A      It was marital problems and my patients were

8    both men and women separately and together,

9    depending on the particular situation, marital

10   problems, divorce, incompatibility and/or problems

11   with their kids, runaway -- some of them had kids

12   who had run away.  It was just a myriad of things

13   that -- that -- it was more or less a general kind

14   of practice.

15   Q      Now, let me ask you, during those years from

16   1986 to 2008 --

17   A      Yes.

18   Q      -- did you have a lot of friends in that time

19   period of your life?

20   A      No.  I had a few.  Two from Loudoun Valley

21   and -- I probably had three or four friends

22   altogether, yes.

23   Q      Any romantic relationships?

24   A      No romantic relationships whatsoever.  And

25   still friendly with Margaret who was still in the

Friedlander - Direct

1      picture, that is.

2      Q      Sir, at this point let me just ask the direct

3      question.

4      A      Yes, sir.

5      Q      Have you ever had sexual intercourse?

6      A      I'm sorry.  I didn't hear you.

7      Q      Have you ever had sexual intercourse?

8      A      Never.

9      Q      Have you ever had in your lifetime any sexual

10     contact with anyone?

11     A      Yes.  Oh, yes.  Absolutely.

12     Q      Would it have been heterosexual contact?

13     A      No, it was not.  It was homosexual contact.

14     Q      And when are these contacts happening?  When

15     did you have this contact?

16     A      Oh, during the period -- during, let's say,

17     from -- let me see, from probably the early eighties

18     through till today.

19     Q      Okay.  What are the age ranges of the

20     individuals that you've had sexual contact with?

21     A      The youngest might have been 30.

22     Q      And the oldest?

23     A      Eighty.

24     Q      Dr. Friedlander?

25     A      Yes, sir.

1    Q      Do you know what the internet is?

2    A      Yes, sir.

3    Q      When did you discover the internet?

4    A      In about 1998.

5    Q      Okay.  And how -- tell us the circumstances

6    around you identifying the internet.

7    A      Well, seems like everybody but myself knew all

8    about the internet, and -- and I did not have a

9    computer.  So -- and people I knew said you had to

10   buy -- you must buy a computer, it's -- you know,

11   it's a great means of communication.  And, of

12   course, I was pleased to try nearly anything that

13   had the word communication because it would be --

14   you know, might make me a little more sociable and

15   make life a little easier for me.

16   Q      Let me ask you, you said to be more social.

17   Did you go to bars?

18   A      I'm sorry.

19   Q      Did you go to bars?

20   A      No.

21   Q      Retirement community?  Ever been to a

22   retirement community?

23   A      No.

24   Q      Well, do you go out?

25   A      I would go out with a few friends, yes, most

1    of whom had computers.  And so they induced me to

2    have a -- to have a computer and -- and to attach

3    myself to the internet or connect to the internet.

4    I was completely green and had -- the only thing I

5    could do was type a bit.  I think that would

6    probably explain it.

7    Q     Do you know how you accessed the internet?

8    A     On a dialup connection.

9    Q     Okay.  And do you know what service provider

10   that you used?

11   A     AOL is the only one I knew.

12   Q     Okay.  Do you still use the same internet

13   provider?

14   A     Yes, sir.

15   Q     Okay.  Have you ever changed internet

16   providers?

17   A     No.

18   Q     So you started with AOL?

19   A     Yes, I did.

20   Q     Now, let me ask you, what effect, if any, did

21   the internet have on your sexuality?

22   A     Well, I can sort of say that it opened new

23   doors.  I had to be told more or less how to do it,

24   where to do it and -- and -- and that it would

25   afford and it did afford my meeting or my ability to

Friedlander - Direct

```
 1    meet new people.  I didn't meet very many through

 2    there, but I did attempt it.

 3    Q      Okay.  Did you talk on the internet with other

 4    people?

 5    A      In the -- in an instant message, yes, and a

 6    bit on -- through the e-mail.  Yes.

 7    Q      Dr. Friedlander, what is your, I guess, topic

 8    of interest when it comes to the internet?

 9    A      Could you explain your --

10    Q      Sure.  I guess my question to you is what --

11    what is it that you were seeking on the internet?

12    A      I was seeking acceptance.  I was seeking a way

13    to at least communicate with people.  I -- I think

14    that's really what my point was.  And if something

15    were to develop, it -- it had the ability of

16    developing.

17    Q      What sorts of internet sites were you

18    visiting?

19    A      I was usually told which ones, you know, I

20    would find people at.  I -- would you like the names

21    of the --

22    Q      If you can remember any, yes.

23    A      Yes.  Men for Men Unusual, Unusual Men for

24    Men.  Open Parents, I think that was the name of it.

25    Strict Parents.  I can't quite remember any others.
```

Friedlander - Direct

1    Q      Let me ask you, it's been testified to earlier

2    in this trial that there were some places called --

3    let me just ask if you know, are you aware of Guy

4    Spank?

5    A      Yes.

6    Q      Did you frequent that website?

7    A      I put an advert in there.  I did very little

8    with it.  I mostly with the advert would answer when

9    somebody sent me a communication.

10   Q      How about an internet site called Silver

11   Daddies?

12   A      Yes.  That I was a member of and posted a very

13   blind advert.  I would not put a picture on there.

14   It was for people -- older people, I gathered, sort

15   of with hair the color of mine or maybe a little bit

16   darker.  Yes.

17   Q      Let me ask you, is there a sexual orientation

18   that these websites that you were frequenting relate

19   to?

20   A      Guy Spank, I don't believe so.  Silver Daddies

21   was for gay men, older men.

22   Q      What about the ones that you discussed, Men

23   for Men and all of those?

24   A      Men for Men ran the gamut.  Strict Parents --

25   could you repeat your question.

Friedlander - Direct

```
 1    Q     I'm wanting to know is -- are the internet

 2    sites that you were visiting --

 3    A     Yes.

 4    Q     -- did they have a particular sexual

 5    orientation?

 6    A     No, not -- those, yes.  The others would,

 7    again, run the gamut.  A lot of them ended up with

 8    gay chatter, yes.

 9    Q     Okay.  Did you engage in gay chatter?

10    A     Some, yes.  Absolutely.

11          MR. SARTES:  Your Honor, if I may approach.

12          THE COURT:  Yes, sir.

13          MR. SARTES:  Thank you.

14    BY MR. SARTES:

15    Q     Dr. Friedlander, I'm going to snow you what's

16    been previously marked as Government's Exhibit

17    Number 1.

18    A     Okay.  Yes.

19    Q     Take a moment to look at that, sir.

20    A     Yes, sir.

21    Q     That's been previously identified as your

22    profile.

23    A     That is true.

24    Q     Is this your profile, sir?

25    A     Yes, sir.
```

Friedlander - Direct

```
 1   Q      Okay.  And the name on that is Captoes?

 2   A      Yes, sir.

 3   Q      All right.  Who produced this profile?

 4   A      I did.

 5   Q      Okay.  And have you ever changed this profile?

 6   A      Yes.  I changed it about -- I'm not quite

 7   sure, but maybe a year or two ago.

 8   Q      Let me then show you what's been previously

 9   marked as Government's Exhibit Number 9.

10   A      I created that.  I don't remember when.

11   Q      Okay.  You did create this?

12   A      Yes, I did.

13   Q      Now, are these two profiles different?

14   A      Yes.

15   Q      I'm going to try to put them side by side for

16   you.  This isn't going to work.

17   A      Yes.  Well --

18   Q      I guess not.

19   A      Well, I can tell you how they're different.

20   Q      Please tell me how they're different.

21   A      Yes.  The -- on the first -- the second one,

22   the first two or three lines, namely my name, my

23   location and my interest are pretty much the same.

24   I guess I'm a male Imelda Marcos.  I collect shoes.

25   And not for any reason, because I just enjoy it, I
```

1    guess I would probably have to say.

2        And two people that I met -- not physically

3    but that I corresponded with on the internet said,

4    you know, your -- you do a very nice profile, but

5    it's boring.  You have to do something to it.  Well,

6    I said, I have no idea what to do.  I said it -- the

7    other one explains the way I am.  Well, you've got

8    to say something about something.

9        So I thought what could I do.  I collect

10   shoes.  I like them very well shined, spit shined.

11   I just don't like wearing scuffed things.  And so my

12   favorite gadget, I thought that could be tongue

13   because the saliva comes from your tongue and you

14   could spit-shine the shoes.

15       And then I have had a fantasy, I guess you'd

16   call it, of somebody tonguing my shoes to make them

17   shiny.  And so I put the gadget is tongue and the --

18   and a personal quote to go with it.

19   Q    And you use the term Captoes; correct?

20   A    Yes, sir.

21   Q    And that is the name on your profile here, on

22   both of these?

23   A    Yes.  That's correct.

24   Q    Tell us, what does Captoes mean?

25   A    Captoes simply means the kind of shoes that I

 1    wear for dress-up, you know, or business nearly

 2    every day.

 3    Q      Why do you pick Captoes as your -- well,

 4    screen name?

 5    A      Well, I thought you were supposed to put

 6    something that you had some interest in or that was

 7    appropriate or what have you, and I chose that.

 8    Q      Do you have any other profiles?

 9    A      Yes, I do.

10    Q      And what is that?

11    A      I use -- there is one that I use for work and

12    business and that sort of situation, which is

13    Shrinq, S-H-R-I-N-Q.  And I took the Q because

14    S-H-R-I-N-K was taken already.  And I thought, well,

15    we'll find something with the same name, you know,

16    so -- sounding the same.  So I chose S-H-R-I-N-Q.

17    Also, I have Captoes2 for whatever.

18           I -- for Silver Daddies I use Captoes, and

19    then I lost Silver Daddies the way you can lose

20    things on AOL and you couldn't go back and use the

21    same one, so I chose Captoes2.

22    Q      I'm going to show you, sir, what's been marked

23    previously as Government's Exhibit Number 29.  There

24    is a -- do you see on this document there is a --

25    A      Seerax.

Friedlander - Direct

 1    Q        Yeah, Seerax.

 2    A        Yes.

 3    Q        Is that you, sir?

 4    A        No.  That is -- I live in a very tiny 15 foot

 5    wide, 58 foot deep house built in 1881 which has a

 6    separate basement apartment in it.  I mean, that's

 7    the way it was built.  And so I rent out the

 8    basement apartment to a gentleman who now is a

 9    triple stroke patient.  And that's -- he has used my

10    computer, now he has his own.  So -- and he took the

11    name Seerax.

12    Q        Dr. Friedlander, let me ask you this.

13    A        Yes, sir.

14    Q        Who is Charles Jackson Friedlander?  Just tell

15    us about you.  Who are you?

16    A        I'm a 78-year-old man with diabetes and

17    hypertension.  And I'm quite quiet, I think

18    friendly, warm, empathic, lonely gentleman.

19    Q        Are you Captoes?

20    A        Yes, I -- I -- I am Captoes' different person.

21    Q        What do you mean by that?

22    A        Well, Captoes is I guess what I really wish I

23    was or could be, maybe.  That's -- Captoes and

24    Charles Friedlander come -- emanate, I guess, from

25    the same brain, but truly we have nothing in common

Friedlander - Direct

1    except that we're both human beings.

2    Q      Let me ask you, who is Captoes?

3    A      Captoes is a 70-year-old formerly --

4    sometimes it was 69 years old and then sometimes 70

5    year-old man, bisexual, divorced with one son, a bit

6    macho, a bit -- a bit assertive, 99 and 9/10ths

7    percent things that I'm not.  If that's not a

8    complete explanation --

9    Q      If there's anything more, please feel free.

10   A      I try to on the computer be Captoes.  It -- I

11   am none of these things in real life.  None.  You

12   know, you can -- you can call it a fantasy, which it

13   is.  You can call it a wannabe or what-have-you.

14   Q      Dr. Friedlander, let me ask you, have you ever

15   been married?

16   A      No, sir.

17   Q      Do you have any children?

18   A      No, sir.

19   Q      In Captoes persona, now --

20   A      Yes.

21   Q      -- is Captoes married?

22   A      Divorced.

23   Q      Okay.

24   A      Formerly married.

25   Q      Does Captoes have children?

1     A      One.  Yes.

2     Q      Okay.  And does that child -- how old is that

3     child?

4     A      At the time 37 is what I remember.

5     Q      Okay.  Does that child have a name?

6     A      Yes.

7     Q      What is that child's name?

8     A      Randy.

9     Q      Is Randy prefaced on something real?

10    A      Yes.  I have two homes, one in Florida and

11    one -- the little one, tiny one in Washington.  When

12    I -- I had known a lady, not just -- just know her.

13    And she was a divorced lady, had a son who was

14    moving all around Florida going from job to job and

15    not succeeding really in anything, although he was

16    really very bright.

17           And I met him.  At the time he was 29 and

18    floundering and she was worrying.  And so I met him

19    and he was as she described it.  And he got it

20    really right from her, I can say.  And he had a

21    sister who had mental problems and was married five

22    times, at least that's what he thought, at least

23    five.

24           And so I said, listen, I -- I don't know

25    whether you can get a job down in the area, but if

1    you'd like to come and watch my house for me when

2    I'm not there, I'll give you free room and board.

3    We'd be at total different ends of the house and

4    you -- and he had a motorcycle.  I said, if your

5    motorcycle would fit in the garage, you're welcome

6    to have it.

7          It did fit in the garage.  His -- his

8    orientation was completely different from mine.  He

9    -- he loved the motorcycle more than anything else.

10   And he -- he -- his profession was being a mechanic.

11   So he worked on the motorcycle all the time.  When

12   he wasn't working, he got a job as a mechanic and

13   then lost it and then got another one.  And he

14   committed suicide in 2001.

15   Q    Dr. Friedlander, where did Randy commit

16   suicide?

17   A    I was told -- since I wasn't there, I was in

18   Washington -- in my garage.

19   Q    How did you find out that something had

20   happened to Randy?

21   A    I was coming down to Florida, and he was to

22   meet me at the plane, because I live very close to

23   the airport.  And I was coming down at a time where

24   he wasn't working so he could meet me.

25          We do not have any public transport other than

1    a 20 or 25 dollar taxi.  And so I -- I think I was

2    coming on a Friday late in the day.  And about two

3    or three days before, I tried to call him.  I didn't

4    get -- about three days.  I didn't get any answer.

5    I don't know how many times I tried to call him.  He

6    had his own telephone.  And there was, you know --

7    the answering machine was on but there was no -- no

8    human being.

9         And after two days of this, maybe, I forget

10   really whether it was two or three, I called the

11   police.  And I said, the young man who watches my

12   house, I'm concerned because I can't get hold of

13   him.  Would you please go to my house and

14   investigate, tell me if there -- if there's anything

15   wrong.

16        I didn't get a call but -- excuse me -- came

17   down on the plane, and was met by two of my

18   neighbors, one across the street and one next door.

19   And I said, hello, how are you?  We have something

20   to tell you.  And I said, what is that?  And I

21   cringe when I think about it even now.

22        And they said, there is a problem.  You won't

23   be able to go home.  You'll have to come to one of

24   their houses.  I said, what is wrong?  And there was

25   lot of hesitation, and they said Randy has killed

1    himself.

2         Well, I felt I was going to pass out.  I mean,

3    it just -- nothing like that had ever happened to

4    anything or anybody I knew.  And so they -- they

5    didn't tell -- I went to their house, the people

6    across the street, and there was right near me --

7    around my whole house there was yellow tape and you

8    couldn't go there.

9         So I went to these people's house where a

10   number of my neighbors were assembled.  And they

11   told me that he had killed himself with carbon

12   monoxide poisoning.  And, you know, he was always a

13   fairly troubled kind of person, but that was not in

14   the cards.

15   Q    Dr. Friedlander, I don't know if I asked this

16   but I'll ask again if I didn't.

17   A    Yes, sir.

18   Q    Captoes, is Captoes gay?

19   A    No.

20   Q    What sexual orientation is Captoes?

21   A    He's bisexual, according to what I say.  Yes.

22   Q    Okay.  Let me show you what I've previously

23   marked -- I'll do this one at a time -- as

24   government's exhibits -- actually, defendant's

25   exhibits --

```
 1              MR. TRAGOS:   Yellow is defense.

 2     BY MR. SARTES:

 3     Q       Let me make sure I clarify this for the

 4     record.  The government has placed into evidence a

 5     page or two of some exhibits and the defendant

 6     completed those exhibits yesterday.  So I'm going to

 7     reference this as the defendant's exhibits since

 8     those defense exhibits encompass the government

 9     exhibit.

10     A       Okay.

11     Q       Do you remember what's -- just go to what's

12     been marked Defendant's Exhibit Number 25.  Sincere

13     Person 41 at Hotmail.Com.  Do you see that, sir?

14     A       Yes, I do.

15     Q       Okay.  Do you remember chatting with Sincere

16     Person 41?

17     A       No.

18     Q       Okay.  Well, the to line here says Captoes.

19     A       Yes.

20     Q       Would that have been you chatting?

21     A       Yes, it was, I'm sure.

22     Q       So I guess there -- is there any issue that

23     this is a conversation between you and somebody

24     named Sincere Person 41?

25     A       No, there's no question.
```

Friedlander - Direct

1    Q      Have you met this person?

2    A      No.

3    Q      Okay.  Let's go to page -- well, I'm not

4    certain what page it is, message 1107.  And it says,

5    sorry, sir.  I didn't go online for a couple of

6    days.  Just picked up your message.  I am looking

7    for a tightly structured living environment, one

8    where the, in quotes, boy, is trained in an exacting

9    manner for precise performance of his duties.

10   A      Yes.

11   Q      Would you have engaged in a conversation like

12   this?

13   A      I obviously wrote it, yes.

14   Q      Okay.  Did you write this or did --

15   A      No.

16   Q      -- Sincere Person?

17   A      No.  Excuse me.  Sincere Person probably

18   answering something that I had -- that we had talked

19   about before.

20   Q      Now, let me show you the next page which is a

21   message that's marked 0523.  And this is from

22   Captoes to Sincere Person.  You don't see that.  Let

23   me drop it down a little bit.

24   A      Thank you.

25   Q      Okay.  Do you see that, sir?

Friedlander - Direct

1   A       Yes, I do.

2   Q       And it says, thanks for your e-mail.   My

3   living environment will be so totally structured

4   that there will be little wiggle room.   My boy will

5   be so totally trained that his performance will

6   always be precise.   He will be very healthy --

7   healthily disciplined at all times and only by me.

8   He will make no decisions at all.

9   A       I wrote that.

10  Q       Why did you respond in this way?

11  A       Well, because he was somebody to talk to.

12  Q       I guess -- let me ask you.   Why didn't you

13  just talk about cars?

14  A       If I would see the original -- the totally

15  original thing, I might know exactly why I did it.

16  But he seemed to be receptive to anything I said;

17  therefore, I was going to be -- continue on and be

18  receptive to anything he said.

19  Q       Do you have an interest in discipline and

20  structure?

21  A       Yes, I do.

22  Q       Now, without belaboring Exhibit Number 25, you

23  actually do have a rather lengthy conversation with

24  this person.

25  A       Okay.

```
 1    Q      And the conversation --

 2    A      Yes.

 3    Q      -- please correct me if I'm wrong, sir, is

 4    relatively sexual in nature.

 5    A      That could be.  And I may not have added this

 6    before, but Captoes is a fairly sexual person.

 7    Q      Okay.  Let me now show you what's been marked

 8    as Defendant's Exhibit Number 20.  Let me show you

 9    the first page of that.

10    A      Yes, sir.

11    Q      Do you recognize that document?

12    A      Yes.

13    Q      DWPortland1977 at Gmail.com?

14    A      Yes, sir.

15    Q      Do you remember having this chat with this

16    individual?

17    A      Yes.

18    Q      Okay.  And he says Captoes, so it's from him

19    to Captoes.  You're Captoes; correct?

20    A      Correct.

21    Q      Okay.  I have just discovered the Guy Spank

22    website, and am primarily looking for other guys to

23    connect with.  Maybe a mentoring thing.  I have

24    never explored spanking for the sake of spanking.

25    Seems like not much is available here in Portland,
```

1    and I like the idea of being spanked by someone

2    older than me.  Have pictures I can send if you

3    respond to this.  Do you see that?

4    A       Yes, I do.

5    Q       And the date on that is 7/3 of 2006.

6    A       Correct.

7    Q       The next page is from Captoes to DW Portland.

8    And it says:  Thanks for yours.  Yes, of course, I

9    am interested.  I am in south -- SW Florida and at

10   times in Washington D.C.  Am much older and very

11   experienced.  My main implement is usually leather.

12   Why do you tell him that?

13   A       He seemed to be interested in -- in my ad,

14   which I don't honestly remember what it said.  And

15   it probably -- it may have even said leather.  I

16   don't know.

17   Q       Let me go to the document in Exhibit 20 marked

18   message 0124.  Again, that's from -- I'm trying to

19   get this thing so it actually -- see what we're

20   talking about here.

21   A       Yes, sir.

22   Q       Okay.  Again, from DWPortland1977 at Gmail.com

23   to Captoes.  Do you see that?

24   A       Yes, I do.

25   Q       7/4/2006.

Friedlander - Direct

1    A      Correct.

2    Q      It says -- let's see.  Again, without

3    belaboring this, I found your profile while

4    searching the Washington D.C. listings for a fellow

5    I have e-mailed with off another website.  I

6    contacted you because I am attracted to discipline

7    role play with an older man, and the spanking seems

8    to fit in with this.

9           Sir, what do you perceive he meant by this?

10   A      I presumed that he was interested in role

11   playing, more or less of a -- of a father/son

12   relationship since I'm older.

13   Q      When you say father/son, are you this person's

14   father?

15   A      Well, theoretically, yes, the way he speaks.

16   Q      Well, let me ask it this way.  Do you have

17   children?

18   A      No.

19   Q      Is this man your child?

20   A      Well, he was -- is very little younger than I

21   am.

22   Q      So when you say father/son relationship, I

23   guess I'm trying to determine what it is -- tell the

24   jury what it is you mean by that.

25   A      Well, an awful lot of people on these things,

1      excuse me, are looking for a parental figure, either

2      for real or for role play, and you really, 99

3      percent of the time, don't know.  And I have met so

4      few that that's the way it appears to me.  And an

5      awful lot of the time they refer to themselves as

6      boys, and they're from 40 up.

7      Q      Let me show you the second page of this

8      e-mail.  It seems -- right here, let me see where I

9      am here.  Writing all this, I wish I was connected

10     with a hot guy to put me OTK.  What does OTK?

11     A      Over the knee.

12     Q      Okay.  Right now and spank my ass.  Do you see

13     that?

14     A      Yes, sir.

15     Q      Did you ever put this man over your knee and

16     spank him?

17     A      I've never seen him.

18     Q      Let's go back to message 0051, again, in

19     Exhibit 20.  And it says here, thank you for your

20     excellent e-mail and the photo.  Do you see that?

21     A      Yes.

22     Q      And that is from Captoes to DW Portland;

23     right?

24     A      Yes.

25     Q      Sir, let me ask you, is that a photo that he

Friedlander - Direct

1      sent you?

2      A      Yes.

3      Q      Is that the other photo that he sent you?

4      A      Yes, sir.

5            MR. SARTES:  If I may have one moment, Your

6      Honor?

7            THE COURT:  Yes, sir.

8      (Brief pause.)

9            THE COURT:  Let's take a comfort break for 15

10     minutes.

11           COURTROOM SECURITY OFFICER:  All rise.

12     (Recess was taken at 10:20 AM until 10:36 AM.)

13     (Back on the record.)

14           COURTROOM SECURITY OFFICER:  All rise.

15     Court's again in session, be seated.

16           THE COURT:  Bring them in.

17           COURTROOM SECURITY OFFICER:  Yes, sir.  All

18     rise.

19     (Jury in at 10:37 AM.)

20           THE COURT:  Thank you.  Be seated.  You may

21     resume direct examination, Mr. Sartes.

22           MR. SARTES:  Thank you, Your Honor.

23     BY MR. SARTES:

24     Q      Dr. Friedlander, let me show you what's been

25     marked Defendant's Exhibit Number 24.  And I'm

1    referring to the first page, which is message 1019.

2    Okay.  And it says, hi -- well, it's from Ken Bost

3    at MSN.com.  Do you see that, sir?

4    A     Yes, sir.

5    Q     And it's to Captoes?

6    A     Yes, sir.

7    Q     It's to you; correct?

8    A     Yes.

9    Q     Okay.  Hi.  I'm a 52-year-old little boy, six

10   feet, 190, who needs real daddy spankings from a

11   real daddy.  Are you -- sir, tell me how old you

12   think this man is.

13   A     Fifty-two.  I don't know him, of course.

14   Q     Okay.  Tell me how big do you believe this man

15   is, sir?

16   A     Well, he claims he's six feet, 190.

17   Q     Sir, let me just ask you, do you think that

18   this is a little boy?

19   A     No.  No.

20   Q     Dr. Friedlander, let me show you what's been

21   previously marked as Defendant's Exhibit Number 32.

22   A     Yes.

23   Q     Let me put that aside so you can see it.  And

24   again, this is deleted message 76.  And it's from

25   Obedient Lad.  Do see that?  No, you don't see it.

1    A      Yes, I do.

2    Q      There we go.  And it's to Captoes?

3    A      Correct.

4    Q      Okay.  Again, that's you being Captoes?

5    A      Yes.

6    Q      It says, very nice, smiley face.  I have

7    tongue polished a master's shoes before.  I have

8    even sucked off a man with him cumming on the floor.

9    He then stepped in the cum puddle and fed me his cum

10   by having me lick it off the sole of his shoe.  And

11   then there's a message below.  Do you see that, sir?

12   A      Yes, I do.

13   Q      Am an older div dad who likes to have his

14   shoes and boots worshipped well.  Do you see that?

15   A      Yes, I do.

16   Q      Why are you engaging this man in this

17   conversation?

18   A      He's someone to talk to.  He is sort of -- I

19   don't know which comes first of these two so -- but

20   I seem to be sort of answering his desires.

21   Q      And then he answers you back up here; correct?

22   Do you see the dates here?  What is that date, sir?

23   A      1/13.

24   Q      And what is the time?

25   A      12:56.  Yes.

Friedlander - Direct

1    Q      And what is this one with this date?

2    A      1/13 and 1:03, so I guess I am answering him.

3    I don't know where it's from.

4    Q      I think --

5    A      I mean -- excuse me.  I'm --

6    Q      This is you here, correct, from Captoes?

7    A      Yes.  Yes.  Correct.

8    Q      This is Obedient Lad?

9    A      Right.

10   Q      Okay.  So you're engaging him in this

11   conversation.

12   A      Yes, I am.

13   Q      This is deleted message 70, again, in

14   Defendant's Exhibit Number 32.  It says here, here

15   is my pic, sir.  I'm 40, five feet 11, 200 pounds.

16   A      Yeah.

17   Q      There's an attachment that appears.  Do you

18   see that, sir?

19   A      Yes.

20   Q      Have you met this man?

21   A      No.

22   Q      Okay.  Did this man have sex with your shoes?

23   A      I've never met him.  I have no idea what he

24   does or has or --

25   Q      Does he appear to be a little boy?

1       A       No.

2       Q       Sir, let me now show you what's been marked as

3       Defendant's Exhibit Number 39.

4       A       Okay.

5       Q       And it is -- the subject line is men into

6       classic style shoes.  I'm sorry.  For the record, it

7       is message number 0358, from Shoe_Sex at AOL.com.

8       Are you Shoe_Sex at AOL.com, sir?

9       A       No.

10      Q       Okay.  And it is to men into classic style

11      shoes at Yahoogroups.com.

12      A       Correct.

13      Q       Were you part of that group, sir?

14      A       Yes.

15      Q       And it says, hi, guys.  I have just moved to

16      South Florida between Miami and Ft. Lauderdale.

17      GWM.  What do you think GWM refers to?

18      A       Gay white male.

19      Q       50 YW.  What do you think that means?

20      A       50 years old.

21      Q       With a major shoe fetish here.  If you are in

22      south central Florida and want to get acquainted,

23      give me a shout.  Do you see that?

24      A       Yes, I do.

25      Q       Have you met this man?

```
 1      A       No, I never have.

 2      Q       Do you believe that he's a little boy?

 3      A       No, I don't.

 4      Q       Dr. Friedlander, let me show you what's been

 5      previously marked as Defendant's Exhibit Number 23.

 6      Subject, spanking.  And for the record, it is

 7      message number 0559 from PJmass at Yahoo.com.  Do

 8      you see that, sir?

 9      A       Yes.  Yes, I do.

10      Q       To Captoes at AOL.com.

11      A       That's I.

12      Q       He says, hello and thanks for sending me a

13      message on Silver Daddies.  What kind of leather do

14      you spank with?  I love a father or grandfather

15      using a very traditional suit trouser belt.  I'm in

16      Boston but get to DC sometimes.  Can you tell me

17      more about you.  Thanks again for writing, PJ.

18              Do you remember this person, sir?

19      A       Not personally, no.  But I -- I obviously

20      corresponded with him.

21      Q       And what is again in Defendant's Exhibit 23

22      message 0558, from PJmass to Captoes.  Again, not to

23      belabor this, but do you see where my pencil is

24      pointing, sir?

25      A       Yes.
```

Friedlander - Direct

1    Q      Do you follow along right there?

2    A      Yes.

3    Q      I am in my thirties and have been interested

4    in this type of traditional spanking for as long as

5    I can remember.  I have always thought of friend's

6    fathers and grandfathers and dads on TV spanking me.

7    Do you see that?

8    A      Yes, I do.

9    Q      Do you think that PJmass is a little boy?

10   A      No, I don't.  And he goes on and says that

11   he's in his thirties.

12   Q      Have you met PJmass?

13   A      No.

14   Q      Have you -- so let me just ask this backwards.

15   Have you ever spanked PJmass?

16   A      No.

17   Q      Then why do you talk about it with him?

18   A      I don't know.  I don't remember whether it was

19   I who brought it up.  I believe it was he.  So he

20   was somebody to talk to.  He seemed amiable and I

21   not only seemed but was, I'm sure, lonely.

22   Q      Okay.  Let me show you what's been previously

23   marked as Defendant's Exhibit Number 26.  Let me

24   show you the first page of that.  It's message 0749.

25   From Captoes, that's you?

1    A    Yes.

2    Q    To Nautical1971; correct?

3    A    Correct.

4    Q    Okay.  Do you know Nautical1971?

5    A    Personally, no.

6    Q    It says, received your Silver Daddies request

7    for a pic.  I'm enclosing a poor one.  Did you send

8    this man a photo?

9    A    Apparently, yes.

10   Q    And again, to avoid belaboring this --

11   A    Yes, sir.

12   Q    -- message number 1483 which is, again, in

13   Defendant's Exhibit Number 26, from Nautical1971 to

14   Captoes.  Nice.  I'm in school for biotechnology

15   premed.

16   A    Yes.

17   Q    Do you remember having this conversation with

18   this individual?

19   A    No, but I'm sure I did.

20   Q    Do you believe that Nautical1971 is a little

21   boy?

22   A    No.

23   Q    Dr. Friedlander, let me show you what's been

24   marked Defendant's Exhibit Number 28 from GHslim61

25   to Captoes.  Do you see that?

Friedlander - Direct

 1   A     Yes, I do.

 2   Q     Looks like there's -- well, if you can see

 3   this portion right here?

 4   A     Yes, sir.

 5   Q     What does that appear to be to you?

 6   A     A photo.

 7   Q     Okay.  You're under the impression this man

 8   may have sent you a photo?

 9   A     It's very possible.  I don't know completely.

10   Q     Okay.  Let me ask you this.  And I'm referring

11   to message number 0245 in that same exhibit.  From

12   GHslim61 to Captoes.  I just want to say hi to you,

13   dad.  Hugs to you.  Are you this man's father?

14   A     No, not that I know of.

15   Q     Could you be his father?

16   A     Maybe age-wise, yes, but --

17   Q     Again, in that exhibit, message 0204, again,

18   in Defendant's Exhibit Number 28, there's an

19   attachment here.  Do you see that?

20   A     Yes, I do see that.

21   Q     From GHslim to Captoes.  Greg Rome -- Greg

22   Rome.jpg.  Did he send you a photo?

23   A     Yes.  I'm sure he did.

24   Q     Does that photo look familiar?

25   A     Not -- I don't know the person but, yes.

Friedlander - Direct

1    Q      Let me ask it more clearly.

2    A      Okay.

3    Q      You don't know this person?

4    A      No, not at all.

5    Q      Do you recall the photograph?

6    A      Not actually, no, but I'm sure I received it

7    if it came.

8    Q      Okay.  Is this a little boy?

9    A      No.  It certainly isn't.

10   Q      Did you meet that person?

11   A      I'm sorry?

12   Q      Have you ever met that person?

13   A      No.

14   Q      Let me show you, Dr. Friedlander, what's been

15   marked as Defendant's Exhibit Number 21 from

16   Allarr55 to Captoes.  Do you see that?

17   A      Yes.  Would you mind moving it just over a

18   little.  I can't quite see the beginning of it.

19   Q      Yes, sir, I will.

20   A      Thank you.

21   Q      Is that better?

22   A      Yeah, that's fine.  Thank you.

23   Q      Do you see that e-mail?

24   A      Pardon me?

25   Q      Where it says -- he says, hi.  You wrote to me

1    on SDaddies.com?

2    A      Yes.

3    Q      Do you know what that is?

4    A      Silver Daddies.  Yes, I do.

5    Q      I'm on that site as Slut Boy 55.  Do you see

6    that?

7    A      Yes.

8    Q      Okay.  Let me take your attention to this.  Do

9    you see the pencil?

10   A      Yes.

11   Q      Looking more for something ongoing than a one

12   time fling, but that can be hard to predict.  I love

13   being ordered around while nude and love being

14   dominated and love during sexual situations to be

15   treated and addressed as a slut.

16          Do you engage him in this conversation?

17   A      Do I engage him?

18   Q      Do you respond to this man?

19   A      I believe so.

20   Q      Okay.  Let me just take you to the message in

21   that same Exhibit Number 21, message number 51,

22   where it says, again, from Allarr55 to Captoes.

23   A      Yes.

24   Q      Once again, that's you he's sending this to?

25   A      Yes.

Friedlander - Direct

1    Q      Okay.  Good to hear from you.  I am happy to

2    hear that you are a very verbal master.  Would love

3    to hear or see an example of it.  Glad also you're

4    into spanking my bottom and playing with my nipples.

5    Do you see that?

6    A      Yes, I do.

7    Q      Sir, Dr. Friedlander?

8    A      Yes, sir.

9    Q      Have you ever spanked this man's bottom?

10   A      No.

11   Q      Have you ever played with his nipples?

12   A      No.  I've never seen him.

13   Q      Then why do you talk about it with him?

14   A      Because he wrote me and I was answering him

15   again as just somebody to talk to, certainly older

16   because that's really what Silver Daddies is about.

17   Q      Now, sir, let me ask you, Dr. Friedlander.

18   A      Yes, sir.

19   Q      Have you actually ever met anybody from the

20   internet?

21   A      Yes.

22   Q      Let me show you what's been previously marked

23   as Defendant's Exhibit Number 22.

24   A      Okay.

25   Q      Do you see that, sir?

Friedlander - Direct

1    A    Yes, I do.

2    Q    Subject, JJ47 of Silver Daddies to Captoes.

3    A    Yes.

4    Q    Hi, Charles.  Just checking the e-mail is

5    correct before sending a longer letter and photo.

6    Just hit reply to say okay.  Best wishes, John.

7    A    Yes.

8    Q    I'm sorry, I misspoke.  Let me just clarify it

9    for the record.  The subject line was JJ47 of Silver

10   Daddies.  The from is Absalom2 at Hotmail.com.  Do

11   you see that?

12   A    Yes.

13   Q    Who is -- do you Absalom2 at Hotmail.com?

14   A    Yes.

15   Q    Okay.  Who is he?

16   A    He is in real life a 70 -- a 70-plus-year-old

17   retired Anglican or Episcopalian priest from

18   England.

19   Q    And I'm going to refer you to that same

20   exhibit, message number 1324.  Do you see that in

21   front of you?

22   A    Yes.

23   Q    Hello, Charles.  A very happy new year.  I

24   hope you saw something in my Silver Daddies profile

25   that attracted you.  I am 50 and have always been

1    attracted to older traditional gentlemen.  I'm a

2    semiretired academic and I can do my research from

3    anywhere in the world and frequently do.  Traveling

4    five dash seven times a year.  Financially

5    independent.  I am not exactly rich but I don't --

6    son't have to work.  I have a wide range of orients

7    interest from the high brow to the low brow.  Not

8    quite sure where sex come into that scale.

9         Is the conversation -- do you remember this

10   conversation with this person?

11   A    Vaguely, yes.

12   Q    Okay.  Did you ever respond to him?

13   A    I'm sure I did.

14   Q    Let me show you what's been marked again in

15   Defendant's Exhibit 22, message number 0629.  Thanks

16   for your -- from Captoes?

17   A    Yes.

18   Q    Is that you?

19   A    Yes.

20   Q    Okay.  To Absalom2.  Thanks for your e-mail.

21   Am a 71-year-old mostly retired doctor.  Let me just

22   ask you, Dr. Friedlander, we call you doctor.  Are

23   you a medical doctor?

24   A    No, I'm a PhD.

25   Q    Okay.  We still refer to yourself as doctor?

1      A      You can refer to me any way at all, you know.

2      I'm not picky about it.

3      Q      And it says, again, not to belabor this,

4      fairly quiet to myself kind of man.  Love theater

5      and some opera and am a genealogist, in quotes,

6      strictly a hobby.  I am warm and friendly but also

7      have my structured side, to.  You tell him you've

8      been in Britain.

9      A      Yes.

10     Q      And you speak French, Spanish and German?

11     A      I do.  Pardon me.

12     Q      Sir, did you ever meet this person?

13     A      Yes, I did.

14     Q      Where did you meet this person?

15     A      I met him in Washington, D.C.  It was my first

16     time in a Starbucks, and I think his, too, but I'm

17     not sure.  And we had -- I had tea, he had coffee,

18     for an hour and a half and we talked.

19     Q      Did you have sex with him?

20     A      No, sir.

21     Q      Did you beat him?

22     A      No, sir.

23     Q      Well, you talked about having sex with him, or

24     there was that discussion; was there not?

25     A      Yes, there was.

1    Q       Dr. Friedlander, let me show you -- I'm sorry.

2    Dr. Friedlander, let me show you what's been

3    previously marked as Defendant's Exhibit 30, message

4    0001 from Shrinq, spelled S-H-R-I-N-Q to MDlearner.

5    Do you see that, sir?

6    A       Yes.

7    Q       Who is Shrinq?

8    A       It is I.  And he used that because I've known

9    him for probably 30 years professionally, actually,

10   is where I met him.

11   Q       And from you to he.  And it says, Jim, have

12   disciplined a few.  And yours growing a little is

13   fine.  Would you like -- would like to see you.

14           Why do you say, have disciplined a few and

15   yours growing a little is fine?

16   A       I have no idea with that person but -- I don't

17   know, really.

18           MR. SARTES:  May I have a moment, Your Honor.

19           THE COURT:  Yes, sir.

20   (Brief pause.)

21   BY MR. SARTES:

22   Q       Let me show you, sir, again in that same

23   exhibit, Defendant's Exhibit Number 30, message

24   number 10.  From MDlearner to Shrinq?

25   A       Um-hum.

1     Q      Dear Charles, am living on Calmea Street

2     backing onto Rock Creek Park in an old Tudor 1930's

3     house.  Again, not to belabor, are you still in the

4     discipline spirit these days and, if so, have you

5     had many targets lately?  Mine has grown a tad,

6     regrettably.

7            I'm going to ask you, sir, again, do you know

8     why you responded to him, disciplined a few and

9     yours growing a little is fine?

10    A      I don't know what mine has grown a tad

11    regrettably, I don't know what that means.

12    Q      This is MDlearner to you.

13    A      Yes.

14    Q      He says, are you still in the discipline

15    spirit these days and, if so, have you had many

16    targets lately.  Mine has grown a tad regrettably.

17    Do you see him saying that you?

18    A      Yes, I do.

19    Q      You respond, again message one, from Shrinq to

20    MDlearner.  Have disciplined a few and yours growing

21    a little is fine.

22    A      I have no idea what the yours growing is.

23    We -- we have talked about discipline.  When you --

24    when you go to his house you go either for tea or he

25    plays the piano I think in a church, too.  And we've

```
 1      talked about discipline.  He goes -- he is in a

 2      partnership of 24 years.

 3      Q     A business partnership?

 4      A     No, a personal relationship.

 5      Q     Let me just clarify, sir.  Is this a sexual

 6      relationship?

 7      A     Between he and his partner?

 8      Q     Yes.

 9      A     I don't know.

10      Q     Do you have a sexual relationship with this

11      person?

12      A     No.

13      Q     Do you know him?

14      A     Yes.

15      Q     And you've met him?

16      A     Yes.

17      Q     Have you disciplined him?

18      A     No.

19      Q     Has he disciplined you?

20      A     No.

21      Q     How old is this person?

22      A     Let's see.  I'm 78.  He may be 60.

23      Q     Sir, let me show you what's been marked

24      Defendant's Exhibit Number 31.  It's from Captoes to

25      JJ1515.  Do you see that, sir?
```

```
 1     A       Yes.

 2     Q       Is that J-U-H-A, how do you say that?

 3     A       Youha (phonetically).

 4     Q       Do you know this person?

 5     A       Very well.

 6     Q       How do you know him?

 7     A       I met him years ago.  We're, I guess you'd

 8     call it, plutonic friends.  He is a six-foot-eight

 9     basketball player originally from Finland now living

10     in Dublin.  And he comes to visit me every year for

11     a week.

12     Q       So let me show you then -- well, it says love

13     and hugs, Charles?

14     A       Yeah.  Sure.

15     Q       Have you -- are you sexually involved with

16     this person?

17     A       No.

18     Q       Let me show you -- which is message 45 in that

19     same exhibit, let me show you the bottom of that.

20     It seems to be an itinerary of sort.  Do you see

21     that?

22     A       Yes.

23     Q       Did he come visit you?

24     A       Yes, he did.

25     Q       Did you beat him?
```

Friedlander - Direct

```
1       A       No.

2       Q       Sir, let me show you what's been marked as

3    Defendant's Exhibit Number 27.  Do you see that?

4       A       Yes, I do.

5       Q       Subject, Guy Spank post.  Do you know what

6    that means?

7       A       I presume it's the -- it's the advert that I

8    put on that website.

9       Q       From PSM Now at Hotmail.com to Captoes.  It

10   says, sir, I saw your posting in Guy Spank.  Would

11   you be interested in exchanging e-mail with a 45

12   year old non-smoking W -- I'm sorry, MWM.  Do you

13   know what MWM means?

14      A       Yes, I do.

15      Q       What does that mean?

16      A       Married white male.

17      Q       I'm five feet five inches, 158 pounds and have

18   very limited experience.  Discretion is an absolute

19   must.  I am not looking for a quick one-time thing.

20   Do you know this man?

21      A       No, I do not.

22      Q       Do you think that he's a child?

23      A       No.

24      Q       And we have what's on message number 0486 in

25   that same exhibit.  I'll take you down, I'll focus
```

Friedlander - Direct

1    your attention from Captoes to PSM Now.  Do you know

2    what PSM means?

3    A     No.

4    Q     James, thanks for your e-mail.  Am DIV five

5    foot ten.  What does DIV mean?

6    A     Divorced.

7    Q     Five foot ten.  Are you five foot ten?

8    A     Yes, I am.

9    Q     A hundred 85 pound strict, old-fashioned dad

10   type man, and very discreet.  I discipline with

11   leather only.  Did you say that to him?

12   A     I'm sure I did.

13   Q     Why did you tell him you're discreet?

14   A     I think he said discretion -- I don't remember

15   right now.  If I can go back.

16   Q     Okay.  I'll take you back.

17   A     Yes, there it is.

18   Q     Let me just for the record indicate this is

19   message 0490.

20   A     Yes.  He mentions discretion.  I picked up

21   from what he said.

22   Q     Okay.  Did you discipline this person?

23   A     I have no idea who he is.

24   Q     Well, you talked about it.

25   A     I'm sorry?

1    Q      You talked about it.  You talked about

2    discipline.

3    A      Yes.

4    Q      I'm going to show you, Dr. Friedlander, what's

5    been marked Defendant's Exhibit Number 29.  Mark of

6    M at direc -- that's D-I-R-E-C, way, W-A-Y dot com

7    to Captoes at AOL.com.  Do you see that?

8    A      Yes, I do.

9    Q      Do you know this person?

10   A      Slightly, yes.

11   Q      Okay.  Let me just ask you.  Have you ever met

12   this person?

13   A      Yes.

14   Q      Okay.  Who is this person?

15   A      His name is Mark.

16   Q      Do you know what Mark does for a living?

17   A      Yes.

18   Q      What does Mark do for a living?

19   A      He's a Catholic priest.  I don't know whether

20   to call him a rural one or not.  He only does parish

21   work in very rural Appalachia.

22   Q      Let me show you what is in that same exhibit,

23   29, message 0633.  Dear Dad.  Thanks for the note.

24   Let me take this back for a minute so we can

25   confirm.  From -- it says Captoes, but in

1      parenthesis Mark of M at Direcway.com to Captoes.

2      A      Yes.  I guess he meant to put Mark.  It was

3      from Mark rather than from myself.

4      Q      And it says, Dear Dad.  Thanks for the note,

5      sir, and the wonderful pics.  You look great as

6      always.  Cute godson.  I can tell the one pic -- and

7      it cuts off -- be at your front door in D.C.  Will

8      try to write more later, hugs and respect and

9      admiration, Mark.

10     A      Um-hum.

11     Q      Did you send him some pictures?

12     A      Yes.

13     Q      Are you this man's father?

14     A      No, I'm not.

15     Q      But he calls you dad.

16     A      Yes.  He has always wanted a father figure.

17     Q      Have you -- you said you met this person?

18     A      Yes, I have.

19     Q      And where did you meet this person?

20     A      I actually met him twice.

21     Q      That being said, let me ask you, how long have

22     you known him?

23     A      I don't know him now.  I knew him at the time,

24     probably a couple of years.

25     Q      How long did you chat with him before you met

1    him?

2    A       Many months.

3    Q       And where was the first place you met him?

4    A       We met on a -- he lived in rural Kentucky

5    and, of course, I was in Washington.  So we met

6    about halfway in Southern Virginia on a street

7    corner, actually, where there was a Catholic church.

8    Q       How long was that encounter for?

9    A       Maybe 15 minutes, maybe 30 minutes.

10   Q       At that first meeting did you beat him?

11   A       No.

12   Q       Did you have sex with him?

13   A       No.

14   Q       You met him again?

15   A       Yes, I did.

16   Q       How much after the first meeting did you --

17   did you -- was the second meeting?

18   A       I'm not really sure.  I would say somewhere --

19   I lost track of him completely, then we corresponded

20   again and I met him again.  I would say maybe a year

21   or two.

22   Q       So it's a year or two after you initially --

23   A       Yes.

24   Q       -- physically met him?

25   A       Yes.

1    Q       Okay.

2    A       He disappeared and in the end he had -- was

3    involved in a kidney transplant.

4    Q       How old is this person?

5    A       At the time he was 58.

6    Q       Have you ever had a sexual relationship with

7    this person?

8    A       Once, yes.

9    Q       Okay.  And where was that?

10   A       It was the second time we met at a -- this

11   time we met a little closer to myself in a state

12   park in mid-southern Virginia.

13   Q       What are Mark's interest; do you know?

14   A       I know some.  I don't --

15   Q       Please share with the jury.

16   A       Mark sent me a smoking jacket.  For those of

17   you who I'm sure are younger, a smoking jacket is --

18   you wear it sort of over your shirt instead of a

19   sport coat.  It's an at-home thing.  They were very

20   popular years and years ago.  And he sent me a blue

21   brocade one with satin lapels, and it ties like a

22   bathrobe.

23          And it was obviously -- you couldn't find them

24   anymore.  It was obviously a secondhand one but in

25   beautiful condition.  And on our second meeting, he

Friedlander - Direct

1    wanted me to put on -- to bring and put on this

2    smoking jacket, and wanted to imagine me as his

3    father or grandfather, as the case -- would have

4    been father in this case.  Yes.

5          And so we went there.  And he had fantasies, I

6    believe, of -- of my disciplining him which did not

7    happen, though I think he imagined it.  And he

8    performed oral sex on me.  That was it.

9    Q     Dr. Friedlander, let me show you again in

10   Defendant's Exhibit Number 29, message 0604.

11   A     Yes.

12   Q     From Mark of M at Direcway.com to Captoes.

13   Again, Captoes is you; correct?

14   A     Yes, absolutely.

15   Q     Hello, Dad.  Thanks for the quick response to

16   my note to you.  It was nice hearing from you.

17   Again, not to belabor this, I recall the very first

18   time I saw you at the first cabin we stayed in at --

19   I forget the name of the park.

20         Is that the first place you met him?

21   A     No.  I met him on that street corner in -- I

22   think it was Whitfield, Virginia, but I'm not

23   positive.

24   Q     I recall going into Lexington with you and you

25   showing me some of your old stomping ground.  Did

Friedlander - Direct

1      that happen?

2      A      Yes.   That was the time that we met in the --

3      at the cabin because Lexington is where Washington

4      and Lee University is, and I was showing him the

5      university and we had dinner.

6      Q      So that part is true?

7      A      That's true.

8      Q      Okay.   I recall the first time you strapped

9      me.   I believe you used your military belt.   Did you

10     strap this man?

11     A      No, sir.

12     Q      I definitely recall you were wearing the

13     beautiful blue silk robe which you had brought along

14     with you.   Is there a blue silk robe?

15     A      That's the smoking jacket.

16     Q      Do you bring it with you?

17     A      Yes.   He had asked me to bring it with me.

18     Q      So is that part true?

19     A      That is true.

20     Q      I recall the first time I saw your cock, Dad,

21     and realized just how similar it was to mine, though

22     larger.   Did he say that?

23     A      Did he -- he said it in here.

24     Q      Yes.   Is it true?

25     A      I don't remember completely.   I mean, it could

Friedlander - Direct

1    well be true, yes.  Sure.

2    Q    I recall the evening in the second cabin the

3    second time we got together, when after coming home

4    from dinner you simply handed me your ascot and I

5    knew what to do.  Is that true?

6    A    If he says so, yes.  I don't really remember.

7    Q    I also -- plus, I -- you sitting on the couch

8    with me next to you servicing one of your shoes.

9    A    That is true.

10   Q    Okay.  I remember fondly using my tongue on

11   your beautiful shoes both there on the couch and

12   later that evening we lay in bed together.  Are

13   those true things?

14   A    I'm not sure of that.

15   Q    I recall later that evening as I was lying

16   naked on the bed you approached, fully dressed in

17   your dress slacks, Captoes shoes, ascot and smoking

18   jacket carrying the bull whip which I had given you.

19   Did he give you a bull whip?

20   A    No.

21   Q    I recall us lying together in bed and you

22   telling me how a friend of yours regularly uses a

23   bull whip on his boy and how you intend to do the

24   same thing at times.

25   A    No.

Friedlander - Direct

1    Q      You didn't do that?

2    A      No, I did not.

3    Q      Did you discuss it with him?

4    A      I'm honest -- no, I didn't, because I don't

5    know such a person.

6    Q      I recall you talking about your new house in

7    Florida.

8    A      Yes.

9    Q      Is that true?

10   A      Could you tell me the date?

11   Q      Well, this e-mail is --

12   A      Yes.

13   Q      January 8, 2006.

14   A      Yes.

15   Q      I recall us talking about a custom-designed

16   spanking bench.  Is that true?  Do you have a

17   custom-designed spanking bench?

18   A      No, I don't.  I don't even know what that

19   would be.

20          MS. KAISER:  Excuse me.  What exhibit was

21   that, please?

22          MR. SARTES:  Sorry.  That is Government's

23   Exhibit Number -- I'm sorry, Defendant's Exhibit

24   Number 29, and I'm reading from message 0604.

25   BY MR. SARTES:

```
 1    Q      Your response, sir, message -- again, same

 2    Exhibit 29, message 0599.  See the second portion of

 3    this right here?  See where -- oh, you don't see.

 4    A      Yes.

 5    Q      Okay.  Dear Mark, wow, what a memory.  You hit

 6    it all right on the head perfectly.  Did you say

 7    that to him?

 8    A      If it's here, I said it.

 9    Q      But didn't you just tell us a moment before

10    that not all those things were true?

11    A      Yes.

12    Q      So, then, why did you tell him that they were

13    all true?

14    A      I have no idea.

15    Q      Your chronology is factually as you wrote it.

16    Is his chronology exactly the way he wrote it?

17    A      No.

18    Q      Then why do you tell him it is?

19    A      I don't really know.

20    Q      Where is Mark of M today; do you know?

21    A      I have no idea.

22    Q      Did you talk to him lately?

23    A      No, not in years, a number of years, probably

24    a year or two.

25    Q      Since you've spoken to him?
```

Friedlander - Direct

```
 1      A      Yes.  And that was during the time when he was

 2      having a -- his recovery from his kidney -- I guess

 3      it was transplant.  I'm not quite sure.

 4      Q      Dr. Friedlander, let me show you what's

 5      previously been marked as Government's Exhibit 56.

 6      A      Okay.

 7             MR. SARTES:  Madam Courtroom Deputy, is there

 8      any way I can zoom this in or out a little bit?

 9             MR. TRAGOS:  You have the control there, too,

10      Peter.

11             THE WITNESS:  I see that.

12             MR. SARTES:  There we go.

13             COURTROOM DEPUTY CLERK:  Is that better?

14             MR. SARTES:  I can't get it to actually do

15      anything.

16             COURTROOM DEPUTY CLERK:  Just keep holding it.

17             MR. SARTES:  No.

18             COURTROOM DEPUTY:  Do you want it in further?

19      Is that what you want?

20             MR. SARTES:  No.  I'm trying to zoom out.

21             COURTROOM DEPUTY:  Okay.  I see.

22             MR. SARTES:  So I can get the whole exhibit in

23      one shot as opposed to me going back and forth.

24             COURTROOM DEPUTY CLERK:  Will that help?

25             MR. SARTES:  That will do it.  Thank you.
```

Friedlander - Direct

1    BY MR. SARTES:

2    Q      All right.  One more time.  Dr. Friedlander,

3    I'm showing you Government's Exhibit 56.  Do you see

4    that?

5    A      Yes, I do.

6    Q      What is that?

7    A      That is a list that I made, I can't give you a

8    date, I don't know, of people with whom I have

9    chatted.  Do I know any of them?  Maybe.  But I

10   don't know.  I haven't gone through them.

11   Q      This is yours?

12   A      Yes.  Oh, absolutely.

13   Q      And just so we can avoid having to come back

14   to this, do you see right here what it says?

15   A      Yes.

16   Q      What does that say, sir?

17   A      StricDad7.  Do you want me to read the rest of

18   it?

19   Q      Please.

20   A      Michael, Florida, phone number 727-430-0008.

21   Q      Okay.  And again, just for consistency, is

22   that the person that you met online as Michael?

23   A      Yes, that was.

24   Q      Which we now know is Detective Romanosky?

25   A      Correct.  Excuse me.

1    Q      Okay.  Dr. Friedlander, at some point do you

2    recall having a conversation --

3    A      Yes, sir.

4    Q      -- with an individual that I guess -- with the

5    user name DunedinSuperdad?

6    A      Yes.

7    Q      Do you remember DunedinSuperdad?

8    A      I have never met him, no.

9    Q      Are you aware at this point from the trial

10   you've learned that DunedinSuperdad is

11   Detective Romanosky?

12   A      Yes.  I learned it.

13   Q      Did you chat with him?

14   A      Yes, I did.  Pardon me.

15   Q      Let me show you what's marked as Government's

16   Exhibit Number 2.

17          MR. SARTES:  Madam Courtroom Deputy, I'm going

18   to ask if we can zoom it back out.

19   BY MR. SARTES:

20   Q      Do you see that, sir?

21   A      Yes, I do.

22   Q      First line, Captoes, I am chat 7/12/2005.

23   A      Yes.

24   Q      It says first contact, but Captoes.  Am an

25   older divorced dad, raising my son alone.  Did you

Friedlander - Direct

1       say that to DunedinSuperdad?

2       A       Yes, I did.

3       Q       Why did you tell him you're an older divorced

4       dad raising your son alone?

5       A       I must be answering something.  I don't know

6       what.

7       Q       Is it true?

8       A       No.  It is not true at all.  That is Captoes,

9       not myself.

10      Q       You asked -- here.  Well, that's something.

11      What ages are they?  DunedinSuperdad:  Daughter 14,

12      son is 11.

13      A       Right.

14      Q       Why did you ask him how old his children were?

15      A       He had children, somewhere I know that, and I

16      was just wondering.

17      Q       Captoes:  I have a very old razor strop which

18      was and is effective.

19      A       Yes.

20      Q       Do you own a razor strop?

21      A       Yes, I do.

22      Q       Okay.

23      A       I use my razor strop, by the way.  I guess

24      some of you may know, if you have an age, I often

25      shave with a straight razor, and that's the way you

Friedlander - Direct

81

1    have to sharpen them.

2    Q     And the strop always hangs on a nail.  Do you

3    have a nail in your house that you hang the strop?

4    A     No, I don't.

5    Q     You're having this discussion with this

6    individual about beatings; correct?

7    A     Yes.

8    Q     And he's telling you that he has some younger

9    children.

10   A     Correct.

11   Q     Okay.  And you continue this conversation with

12   this man.

13   A     Yes.

14   Q     Let me show you -- 4:24 is the time.  Captoes:

15   He's too young to start masturbating, I guess.  Did

16   you say that?

17   A     If it's down here I did.

18   Q     Why did you say that?

19   A     Well, you know, I don't have any children of

20   my own.  I don't know what chronology is from that

21   point of view, and I just asked.

22   Q     Again, without belaboring this because we've

23   seen this now a couple of times, did you discuss

24   with this man --

25   A     Yes.

Friedlander - Direct

1    Q      -- in government's exhibit -- what's been

2    marked as Government's Exhibit 2 through 8 the

3    beating of this man's minor children?

4    A      I -- I -- not that I was going to or not that

5    I had done it.

6    Q      Let me ask this question again.

7    A      Okay.

8    Q      Make sure you understood it.  Did you engage

9    in this discussion with DunedinSuperdad?

10   A      Yes.

11   Q      Okay.  In this discussion --

12   A      Yes.

13   Q      First of all, did you ever meet

14   DunedinSuperdad?

15   A      No.

16   Q      Did you ever beat his children?

17   A      No.

18   Q      Why are you talking about it, then?

19   A      Because part of the -- of the -- of the whole

20   discussion that I had with him was about that.

21   Q      If you'll permit me, sir, don't you think this

22   is kind of a strange topic?

23   A      It is, but it's my fantasy.  I presumed it was

24   his fantasy, and not real.

25   Q      At some point, sir, do you remember -- I'm

1      going to show you what's been marked as Government's

2      Exhibit Number 10.  Do you remember seeing a profile

3      for a person who described themselves as StricDad?

4      A       Yes, I do.  It's sort of hard to see but --

5              MR. SARTES:  I guess holding the folder works

6      for the other lawyers but not for this one.

7              COURTROOM DEPUTY CLERK:  From the top.

8              MR. SARTES:  From the top?

9              COURTROOM DEPUTY CLERK:  Yes.

10             MR. SARTES:  It may be easier for me to read

11     it.

12     BY MR. SARTES:

13     Q       36-year-old white male in a relationship with

14     an open-minded female partner.  We have three

15     children between hers and mine.  Enjoy outdoor

16     activities and spending good quality family time

17     together.  We believe in a strict but loving home.

18     Looking to meet other like-minded individuals or

19     couples to share parenting or disciplining ideas.

20     Discretion is a must.  No cyber or phone here.

21     Serious inquiries only.  Okay?

22     A       Yes.

23     Q       What do you think enjoy outdoor activities

24     means?

25     A       Bicycle riding, and if there are kids and

1      there are, maybe baseball or horseshoes or

2      something.

3      Q      Do you think that it means nudist or being

4      nude outside?

5      A      No.

6      Q      Spending good quality family time together.

7      What do you think that means?

8      A      That they go to the beach or they go to maybe

9      a cabin that they have.  I don't really know.  But

10     something in that way.

11     Q      Does it mean incest to you?

12     A      No.  Absolutely not.

13     Q      We believe in a strict but loving home.

14     A      Okay.

15     Q      What does that mean to you?

16     A      That means that -- just what it says.  That

17     it's -- though they -- they have definite limits on

18     their children, they love their children, too.

19     Q      When we say love children, do you mean

20     incestuously?

21     A      No, not at all.

22     Q      Looking to meet other like-minded individuals

23     or couples to share parenting or disciplining ideas.

24     What does that mean to you, sir?

25     A      Well, that means that they're looking to -- he

Friedlander - Direct

1     or they, I don't know -- looking to meet other

2     individuals or parents -- couples, according to him,

3     and that they can discuss things, they're open to

4     discuss things with others.

5     Q     Okay.  Disciplining ideas.

6     A     How they discipline their children, whether

7     they give them corner time or time out.

8     Q     What about discretion a must?

9     A     That would mean that the -- he doesn't want to

10    advertise his feelings or her feelings.

11    Q     No cyber or phone here.

12    A     That's -- I know what it means, but --

13    Q     Let me stop you.

14    A     Yes.

15    Q     What do you think it means?  I don't want you

16    to tell me what you believe it means since you've

17    heard it testified to.

18    A     Yes.

19    Q     What did you think it meant at the time?

20    A     At the time I just thought it meant that he

21    didn't want it advertised around.

22    Q     Serious inquiries only.

23    A     I guess that means that he just doesn't want

24    to have chats about anything or -- or phone

25    conversations about just any old thing.

Friedlander - Direct

1    Q      Did this profile interest you?

2    A      Yes, it did.

3    Q      And why, sir, did it interest you?

4    A      That he was or he had -- well, what I actually

5    thought when I saw this, that he was probably or

6    hopefully maybe a substantial man with a family and

7    just wanted to discuss whatever he or they wanted to

8    discuss.  And since I had some interest, just -- not

9    in children, I'm not interested in them at all, I

10   mean, I don't hate them but -- I thought he was

11   just, you know, out to -- one of two things; either

12   that the whole thing was just a ruse or a fantasy or

13   that he really wanted to discuss some things.

14   Q      Sir, let me ask you, are you telling me that

15   you don't -- that you believe that some things on

16   the internet may not be true?

17   A      Not only do I believe it, I think everybody

18   believes it because after what you read in the

19   newspaper and what you feel, anyway, and some of the

20   things that you find on the internet are just

21   bizarre, and truly bizarre, you know that.

22   Q      Dr. Friedlander?

23   A      Yes.

24   Q      Have you ever made things up on the internet?

25   A      Have I?

Friedlander - Direct

1    Q      Yes.

2    A      Absolutely.

3    Q      Let me show you what's been marked --

4    A      Captoes.

5    Q      What do you mean by Captoes?

6    A      Captoes is not real.

7    Q      Government's Exhibit 11.

8    A      Yes.

9    Q      I'm going to take you down to the time mark

10   3:52.

11   A      Okay.

12   Q      Captoes:  How old now?  Question mark.  My son

13   is now 37.  Why do you tell him that your son is now

14   37?

15   A      To -- that's the persona that's on -- that

16   Captoes -- Captoes is or --

17   Q      Does Charles Jackson Friedlander have a son?

18   A      No, sir.

19   Q      SO is that SON 37?

20   A      Captoes' son may be but mine is -- doesn't

21   exist.

22   Q      Captoes has a son?

23   A      Yes.

24   Q      Named Randy?

25   A      Yes.

Friedlander - Direct

```
 1     Q       Is Randy 37?

 2     A       That's what I have purported.  Yes.

 3     Q       Let's talk about the real Randy for a second.

 4     On June 16th, 2008, when this e-mail is written, is

 5     Randy alive --

 6     A       No.

 7     Q       -- or deceased?

 8     A       Deceased.

 9     Q       Let me then start from the beginning.  From

10     Captoes.  3:46 PM.  Fashioned strict older d-i-v,

11     divorced, old fashioned dad.  Why do you tell

12     StricDad7 -- why do you say that to him?

13     A       That is the persona of Captoes2.

14     Q       Do you see here, StricDad7 at 3:53 PM?

15     A       Yes, I do.

16     Q       Mine are 10, 11 step d-a-u -- what did you

17     think d-a-u meant?

18     A       Daughter.

19     Q       Is 14.

20     A       Okay.

21     Q       Okay.  What is he telling you here?

22     A       The ages of -- ostensibly the ages of his

23     children and stepdaughter.

24     Q       Okay.  Let's just read this chain for a

25     moment.  Some parents feel I am too severe says you.
```

Friedlander - Direct

```
 1    StricDad7:  Can't be when it comes to raising them

 2    correctly.  Captoes:  I feel that way.  My house is

 3    a corporal punishment one.  Why do you tell him

 4    that?

 5    A      Because that's the persona of Captoes2's

 6    Captoes2.

 7    Q      Strictdad7:  Oh, definitely.  Society sees

 8    corporal punishment as abuse now.  It is sad.

 9    Captoes:  It's terrible.  I used a razor strop on my

10    son.  Why do you tell him it's terrible?

11    A      Let me just see what I'm saying here.

12    Q      Let me just ask you just for a point of order.

13    Can you see this?

14    A      I see this one a little better.  My eyes are

15    not great.  I'm sorry.

16         MR. SARTES:  Madam Courtroom Deputy, can we

17    just zoom in a little more?  I apologize for that.

18         THE WITNESS:  Yeah.  I see fine now.

19    BY MR. SARTES:

20    Q      Here we are again.  Society sees corporal

21    punishment as abuse now.  It's sad.  Then Captoes,

22    your response, it is terrible.  Do you see it?

23    A      Yes.  Oh, yes, I do.

24    Q      Why do you say it is terrible?

25    A      Well, I think that it -- that -- I guess maybe
```

Friedlander - Direct

1    this is where Charles Friedlander or -- or Captoes2

2    says, you know, you should be able to do what you

3    want, Captoes2 feels.

4    Q       I used a razor strop on my son.  Did you do

5    that?

6    A       No, sir, I don't have a son and never have

7    had.

8    Q       Again, so not to belabor this, never raised a

9    girl, let's just go on to another page.

10         What's been previously marked Government's

11   Exhibit Number 12, let me show that to you.  Do you

12   see that, sir?

13   A       Yes.

14   Q       Captoes at 10:19:  I will keep my friend's two

15   grandsons this weekend.  His response, StricDad7

16   very nice.  Captoes:  He is demanding and strict so

17   I may be, also.  StricDad7:  That's good to hear.

18   Captoes:  Permission for everything.  StricDad7:

19   Very good.  How old are they?  Captoes:  Just 12 and

20   just 14.

21         Do you, sir, have a friend who lets you take

22   his grandsons on the weekends?

23   A       No.  I have no friends with grandsons, that I

24   know of.

25   Q       Why did you pick the ages 12 and 14?

Friedlander - Direct

1    A       Because that seemed to be very close to the

2    ages that StricDad said his -- two of his children

3    were, about that.

4    Q       Okay.  Why does it matter if you have kids

5    that are close to the same age as Stricdad7's?

6    A       I guess I as Captoes thought that everything

7    would be more -- he'd feel more comfortable that

8    way.

9    Q       Let me take you down to line 102.  StricDad7:

10   Do you use any special confinement techniques when

11   administering discipline?  Captoes:  In the basement

12   and sometimes tied.

13   A       Right.

14   Q       Why do you tell this -- why do you respond in

15   the basement and sometimes tied?

16   A       I made it up, completely.  I mean, the

17   Captoes -- it was Captoes2 talking but, I mean, I

18   had made up that part for that.

19   Q       Why did you say -- why did you tell him,

20   basement and sometimes tied?

21   A       That part -- I probably felt when I made

22   Captoes2 up that could be a part of it all.

23   Q       Do you have a basement in any of the homes

24   that you own?

25   A       Yes.  I have one in Washington, which I rent

Friedlander - Direct

1     out.

2     Q     Do you beat anyone in that basement?

3     A     No.  I don't go down there.

4     Q     Have you tied anybody up?

5     A     No.

6     Q     But you say you did.

7     A     Captoes2 said that.

8     Q     Sir, let me go on to what's been marked as --

9     hold on a second -- the second page to Government's

10    Exhibit 12.  Let's just make sure we're on the same

11    page.  Dr. Friedlander, do you remember having this

12    conversation with StricDad7?

13    A     I may not remember the exact things but, yes,

14    I had such.

15    Q     StricDad7:  Are your pupils required to wear

16    any certain attire for lessons?  Do you see that?

17    A     I don't know where you are.  I'm sorry.

18    Q     Okay.  Better?

19    A     Yeah.  I can see it now.

20    Q     Do you see that?

21    A     Yeah.

22    Q     Are your pupiles required to wear any certain

23    attire for lessons?  Captoes' response:  They will

24    be totally stripped.

25    A     Um-hum.

Friedlander - Direct

1    Q      Why did you tell StricDad7 that they will be

2    totally stripped?

3    A      I guess that may be the way Captoes2 -- I had

4    thought about that, but I don't -- what -- but --

5    but pupils, I don't know where that comes from.

6    Q      Well, do you see that StricDad said that?

7    A      Yes, I do.

8    Q      And you respond in due course in this

9    conversation.

10   A      Absolutely.  But I didn't have any pupils.

11   Q      Why do you continue to discuss or have this

12   conversation with this man that is now starting to

13   talk about the beating, the corporal punishment of

14   his children?

15   A      Right.  I thought it was a -- I thought it was

16   like my Captoes2.

17   Q      What do you mean by that, sir?

18   A      I thought it was a fantasy or a ruse.  I don't

19   know what words to use.

20   Q      Let me show you what's been previously marked

21   as Government's Exhibit Number 14.

22   A      Okay.

23   Q      Do you see that exhibit, sir?

24   A      Yes, I do.

25   Q      Okay.  And this is still you speaking with

Friedlander - Direct

1       StricDad; correct?

2       A       Yes.

3       Q       Now, it's got the date here of June 17 of '08?

4       A       Correct.

5       Q       We're on the same page.  Okay.  StricDad7 at

6       2:36.  See that here?  He says, discretion is a

7       must.  Captoes responds:  The ones I shall have this

8       weekend I am extremely discreet.

9               Why do you tell this man in bold print that

10      you are extremely discreet?

11      A       Because he had said in his profile, discretion

12      is a must.

13      Q       So --

14      A       I was just, I guess, picking that up, or

15      Captoes2 was picking that up as part of continuing

16      or being able to even continue the conversation.

17      Q       The next page on -- still on Government's

18      Exhibit Number 14, page two.  Top.  That's okay.

19      Can you bring your friend's grandchildren to the

20      lesson, says StricDad.  Most of our members bring

21      pupils to sessions.  Captoes responds:  I may be

22      able to.

23      A       Okay.

24      Q       Are you going to bring your friend's

25      grandchildren to the lesson?

Friedlander - Direct

1    A       They don't exist.

2    Q       Then why did you tell him you might be able

3    to?

4    A       Because this is the whole continuation of --

5    to continue a chat or a discussion or whatever you

6    may want to call it.

7    Q       Continue down a little bit.  StricDad7:  Okay.

8    If you cannot, what lessons can you offer the group?

9    Captoes:  I could use your kids, I guess.

10          Why do you tell him that you guess you could

11   use his kids?

12   A       Well, I don't know whether I could -- first of

13   all, I had no interest in doing this whole thing.

14   So I guess I thought, well, I don't have any kids of

15   my own.  I guess if I was carrying the fantasy

16   continuing, I would have to say how could I do this.

17   Q       If you have no interest in this --

18   A       Yes.

19   Q       -- why are you on the internet chatting about

20   it?

21   A       I'm trying to answer that truthfully.  I

22   wanted to continue the conversation.  Whatever -- I

23   get to think of myself as a lonely man wanting to

24   continue a conversation about anything with any --

25   not quite anybody, I don't want to say.

Friedlander - Direct

```
 1    Q       Let me ask you this.  StricDad7 at 2:54.

 2    A       Okay.

 3    Q       And again, I'm trying to just -- as opposed to

 4    reading this line by line --

 5    A       Oh, sure.

 6    Q       -- some of these things.

 7    A       That's no problem.

 8    Q       StricDad7:  Did you show him that beatings

 9    were done out of love afterwards or did it stop at

10    the beatings or was the love part during beatings?

11    Captoes:  No.  Was very affectionate always.  But

12    beatings were needed in the scheme of things.

13           What did you believe that StricDad7 meant when

14    he asked you about did you show love after the

15    beatings?

16    A       I thought, well, you know, maybe you kiss your

17    child and say, listen, it's all right.  It wasn't, I

18    guess, a big deal.

19    Q       Were you talking about incest?

20    A       Would never have entered my mind.

21    Q       Were you contemplating this was having sex

22    with his children?

23    A       No, sir.

24    Q       You -- do you remember we talked about

25    Government's Exhibit Number 10?
```

```
 1     A       I don't know what it is.

 2     Q       Which -- do you remember -- this is StricDad's

 3     profile?

 4     A       Yes.

 5     Q       Do you remember it said, no cyber or phone

 6     here.  Serious inquiries only?

 7     A       Correct.

 8     Q       Do you remember him saying that?

 9     A       I remember that in the -- in the -- in the

10     profile, yes.

11     Q       Okay.  Sir, Captoes 3:07, do you see me -- let

12     me make sure it's on the center of the page.  Do you

13     see where I am?

14     A       Yes, I do.

15     Q       202-607-6666.  What is that, sir?

16     A       That was my cellphone.

17     Q       Why did you give him your cellphone?

18     A       Because I didn't want to give him my home

19     phone.

20     Q       Why did you give him a phone number,

21     regardless?

22     A       He -- he had asked me if I had a contact

23     number.  I wasn't going to give him my home

24     telephone number, but I would give him my cellphone

25     number.
```

Friedlander - Direct

1    Q      Why did you give him your cellphone number?

2    A      You mean why -- sort of why did I give him any

3    number at all?

4    Q      Yeah.  Why did you give him any number at all?

5    A      Well, I guess I wanted to continue the whole

6    thing.

7    Q      I'm now on page three of Government's Exhibit

8    Number 14.

9    A      Okay.

10   Q      StricDad7 at 3:34.  You're not a native, huh?

11   Captoes:  No. Am a San Francisco native.

12          Are you from San Francisco?

13   A      No.

14   Q      Why did you tell him that you were a San

15   Francisco native?

16   A      I thought he would think probably as Captoes,

17   that I was more sort of liberal and -- and -- and

18   sophisticated and -- I don't know what else, but

19   that --

20   Q      StricDad7.  3:38.  Do you see where I am?

21   A      Yes, I do.

22   Q      How old your son now?  Captoes:  37 now, 38 on

23   June 19th.  You don't have a son, do you, sir?

24   A      No, sir.

25   Q      Why are you telling him your son is going to

Friedlander - Direct

1    be 38 on June 19th?

2    A        Because the young man who watched my house,

3    his birthday was June 19th.

4    Q        Why are you telling -- why don't you tell him

5    you don't have a son?

6    A        Then it would be all over, because I had

7    already told him that I had a son.

8    Q        What do you mean by, it would be all over?

9    A        The conversation would -- would have to cease

10   and I would be losing a possible, you know,

11   conversation person.

12   Q        Do you spend a lot of time on the internet

13   sir?

14   A        Much too much.  I'm very -- as I think I've

15   said, I'm a very lonely person and I don't know

16   really anybody except maybe my neighbors and a

17   few -- and one or two other people, you know,

18   professional situation.  And when you are home

19   alone, you know, can't even talk to Randy who's now

20   gone, I can't talk to anybody, so I depend for

21   communication and such, you know, and I go and did

22   spend ludicrous amount of times on the internet.

23   Q        Dr. Friedlander?

24   A        Yes, sir.

25   Q        Let me show you again what was marked

Friedlander - Direct

100

1       previously as Government's Exhibit 29.

2       A       Okay.

3       Q       Let me shift to this exhibit for a moment.  Do

4       you remember this -- the gentleman from AOL

5       testified to this yesterday?

6       A       Oh, yes, I do.

7       Q       Do you remember that?

8       A       Yes, I do.

9       Q       Were you surprised when you saw how much time

10      you had spent on the internet?

11      A       Absolutely.  Both surprised and horrified,

12      yeah.  I -- yes.

13      Q       Let me get back to Exhibit Number 14.  I am on

14      the third page of that exhibit; okay?

15      A       Yes.

16      Q       StricDad7, 3:45.  Where did he get his

17      beatings, StricDad says.  Butt, legs, back?  Captoes

18      responds:  All three.  More butt and legs.

19              Why do you say all three?

20      A       To be accepted.

21      Q       But why are you -- why don't you pick one?

22      Why did you tell him all three of them?

23      A       Because then I -- if I only said one, I might

24      have been afraid that if I didn't do sort of the

25      same thing he would, I would be out.

1    Q      Same exhibit, page four.

2    A      Um-hum.

3    Q      StricDad7, 4:09.  He says:  Of course, new

4    parents to the group will sometimes show leniency.

5    Other adults have to remind them not to.  Captoes:

6    I will never show leniency, Michael.

7           Why do you tell him that you will never show

8    leniency?

9    A      That as a single person -- this is Captoes2 --

10   this isn't myself, okay -- that I would, you know,

11   be the macho character that I had purported myself

12   more or less to be.

13   Q      Dr. Friedlander, at some point --

14   A      Yes.

15   Q      -- this conversation with Michael turns

16   sexual.

17   A      Yes.

18   Q      And we discussed -- and you heard it, it's

19   sexual and it starts talking about the sex with

20   children.  Do you remember that?

21   A      Yes, sir.

22   Q      Sir, why are you having a discussion on the

23   internet with an individual who is now talking about

24   having sex with his children?

25   A      You'd like to know why I'm doing that?

1    Q      Yes, sir.  Why are you talking with this man

2    about having sex with his children?

3    A      You know, I truly felt that this was just not

4    true, that it was a fantasy, and that he was acting

5    out his fantasy, and I was, sort of, in my -- in my

6    brain.

7    Q      Again, I'm going to ask you, this is -- let's

8    just honest.  This is unorthodox conversation here.

9    A      I'll grant you.

10   Q      We're not talking about pruning begonias.

11   A      No.  But probably I would talk to him about

12   pruning begonias, too, which I know nothing about.

13   I guess it's very hard to realize that somebody can

14   be so lonely and so needy at any time and will

15   discuss absolutely everything.

16   Q      Let me show you what's been marked

17   Government's Exhibit Number 16.  And again for

18   record purposes, these are all a chain of these

19   instant message chats; correct?

20   A      Yes.

21   Q      Excuse me.  This is the actual exhibit.  There

22   we go.  StrictDad7, 2:37 PM:  I have to meet a new

23   client maybe next week in Sanibel Island.  Do you

24   know nowhere Sanibel Island is, Dr. Friedlander?

25   A      Yes, I do.

Friedlander - Direct

1    Q      Is it close to you?

2    A      Yes.

3    Q      How close?

4    A      Ten miles.

5    Q      Okay.  StricDad7, again, continuous.  If you

6    were close I thought I might drop by and say hello.

7    You respond:  Would be great, but I will be in

8    Charleston, South Carolina, making a speech there

9    and in Charlotte, North Carolina.  Damn.  You could

10   have come over.

11          Did you go to North or South Carolina, sir?

12   A      Nope.

13   Q      Why did you tell StricDad7 that you weren't

14   going to be home?

15   A      I could have simply said, look, I'm not going

16   to be home, but I wanted to say that I wasn't even

17   going to be anywhere near.  I didn't want to meet.

18   Q      You didn't want to meet this person?

19   A      I don't believe so, as I thought about it, no.

20   Otherwise, why couldn't I have said I would be

21   available.

22   Q      But you eventually did meet this person.

23   A      Yes, I did.  And I also presumed that I didn't

24   want to meet anybody on my home turf.

25   Q      Please explain that, sir.

1    A      If I were meeting somebody, of which I met

2    three or four people, it's -- it's virtually never

3    on my home turf.  It's in more of a public place,

4    because I don't really know who I'm meeting, what

5    I'm meeting or anything else.  You know, it's --

6    it's safer, let's put it that way.

7          MR. SARTES:  Your Honor, may I have one

8    moment, please.

9          THE COURT:  Yes, sir.

10   (Brief pause.)

11   BY MR. SARTES:

12   Q      Dr. Friedlander, let me digress for a moment.

13   A      Okay.

14   Q      Let me go back to the chats with

15   DunedinSuperdad.

16   A      Okay.

17   Q      That's Government's Exhibit Number 6.

18   Captoes:  Hope it wasn't too assertive yesterday,

19   you say.  DunedinSuperdad:  No, not at all.

20   Captoes:  I guess that is my definite -- I think

21   it's a definite approach coming out.

22   DunedinSuperdad:  LOL.

23         What does LOL mean?

24   A      I found out along the way but didn't know it

25   either, laugh out loud.

Friedlander - Direct

1    Q     No problem.  Captoes:  But I found with my son

2    a definite structured dad was a help.

3    DunedinSuperdad:  I agree.  But I believe that

4    affection is also an important part up the bringing.

5    Captoes:  I am the world's most affectionate and

6    passionate dad.

7          Do you see that, sir?

8    A     I do.

9    Q     Why are you responding to this man that

10   affection is an -- I'm sorry -- you're the world's

11   most affectionate and passionate dad?

12   A     Okay.

13   Q     Why are you telling him this?

14   A     He is saying to me that I am simply, I

15   presume, following -- being a follower here and sort

16   of picking up his statement.

17   Q     Okay.  At this point you know that

18   DunedinSuperdad and StricDad are the same person;

19   correct?  You know that now?

20   A     Yeah.  Now, yes.

21   Q     At the time did you know that?

22   A     No.

23   Q     Did you meet DunedinSuperdad?

24   A     No.

25   Q     At some point Detective Romanosky tells us

Friedlander - Direct

1    that he cut off communication with you.

2    A     Yes.

3    Q     Did you ever try to go out and find him to

4    continue that conversation?

5    A     No.

6    Q     Why not?  Why didn't you go try to find out

7    where he went?

8    A     I really wasn't interested, I presume.  I -- I

9    don't remember back that far, really, but that's my

10   assumption.

11   Q     Let me get to this -- Government's Exhibit

12   Number 24.  Again, not to belabor the process.

13   A     Okay.

14   Q     At some point the conversation changes, sir,

15   from beatings, is that correct, Dr. Friedlander?

16   A     I -- I don't --

17   Q     Well, without looking at the exhibit, I was

18   just asking.  Do you recall that this conversation

19   changed from just beatings; correct?

20   A     Yes, I do.

21         MR. SARTES:  If I may have a moment, Your

22   Honor.

23         THE COURT:  Yes, sir.

24   (Brief pause.)

25   BY MR. SARTES:

1    Q      Let me take you, sir, to page three.

2           THE COURT:  Well, let's stop at this point.

3    We'll stop for lunch until 1:15.

4           COURTROOM SECURITY OFFICER:  Rise for the

5    jury, please.

6    (Jury out at 12:00 PM.)

7    (Recess was taken at 12:00 PM until 1:17 PM.)

8    (Back on the record.)

9           THE COURT:  Bring the jury in.

10          COURTROOM SECURITY OFFICER:  Rise for the

11   jury, please.

12   (Jury in at 1:18 PM.)

13          THE COURT:  Thank you.  Be seated.  You may

14   resume direct examination.

15          MR. SARTES:  Thank you, Your Honor.

16   BY MR. SARTES:

17   Q      Good afternoon, Dr. Friedlander.

18   A      Good afternoon.

19   Q      Let me resume.  I'm going to show you what's

20   been marked Government's Exhibit 19.  Do you see

21   that, sir?

22   A      Yes.

23   Q      Sir -- and, again, we're talking about

24   StricDad7 and your conversation with him; correct?

25   A      Correct.

Friedlander - Direct

1    Q      I'm going to go to page two of Government's

2    Exhibit 19.  And it says here --

3    A      Yes.

4    Q      Strict -- here we go -- StricDad7:  Just

5    imagine everyone naked.  No, wait, don't do that.

6    LOL.  Captoes:  Never know the variety who might be

7    at these.  In a small comfortable group I am fine.

8    StricDad7:  True.  It's definitely a small group.

9    Friends like ours are difficult to find and hard to

10   trust.  Captoes:  Well, I think one gets a gut

11   feeling regarding the trust issue.  It is either

12   there or it isn't.  I am -- I basically am a

13   trusting guy.  StricDad7:  Same here.  I have a good

14   feeling about you.  Captoes:  And I have an implicit

15   trust of you, Michael.  Implicit.  StrictDad7:

16   Thank you, Charles.  That means a lot.  Captoes:  I

17   think our interests and goals seem to dovetail in a

18   number of important areas.

19          Do you see that, sir?

20   A      Yes, I do.

21   Q      What do you mean, your interests dovetail in a

22   number of important areas?

23   A      As in -- pardon me -- as in the profile, we

24   had some interest in the word -- this is Captoes

25   talking -- in the word strict, in enjoying the

Friedlander - Direct

1     outdoors, and I guess in some of the discussions

2     that we're ensuing.

3     Q       Sir, do your interests in beating children

4     dovetail with his?

5     A       Not at all.

6     Q       Do you have children -- an interest in beating

7     children?

8     A       I'm sorry.

9     Q       Do you have interests in the beating of

10    children?

11    A       I do not.

12    Q       Then why did you say -- why do you continue

13    this conversation?

14    A       It is all the same thing, as I've said.  The

15    fantasies seem to dovetail.  Not totally, no.  But

16    he -- he -- he will continue with me and it's an

17    acceptance that I have some need for.

18    Q       Let me ask you, sir.  I'm going to refer to

19    Government's Exhibit Number 20.

20    A       Okay.

21    Q       What's been previously marked as that.  Do you

22    see that Government's Exhibit 20?

23    A       Yes.

24    Q       Okay.  I'm going to take you to 3:43,

25    StricDad7:  Exactly.  Or they even make items to

Friedlander - Direct
110

1    help with silence.  Captoes:  I have used a gag on

2    occasion.  StricDad7:  Exactly.  StricDad7:  Who did

3    you use a gag on, friends' kids or son?  Captoes:

4    Both.

5         Sir --

6    A    Yes, sir.

7    Q    -- have you ever used a gag on anyone?

8    A    No, I have never.

9    Q    Why did you discuss this?  Why did you bring

10   up a gag?  Do you see where I'm referencing, sir,

11   3:44?

12   A    Yes, I do.

13   Q    I have used a gag on occasion.

14   A    Yes.

15   Q    Why did you reference that?

16   A    I believe somewhere Michael -- StricDad,

17   excuse me, must have mentioned that.  I forget where

18   in the thing, but it -- I do recall that somewhere.

19   Q    And when he asks you, who do you use a gag on,

20   and I'm here at 3:45 --

21   A    Yes.

22   Q    Friends' kids or son, you say both.  Do you

23   see that?

24   A    Right.  Yes.

25   Q    Why do you say both?

1      A      Well, again, an acceptance kind of thing.  I

2      have no -- I don't know -- I don't have friends who

3      have kids nor do I have a son.

4      Q      Let me jump ahead, sir, to what's been

5      previously marked Government's Exhibit Number 24.

6      Let me show you that.  Do you see that, sir?

7      A      Yes, I do.

8      Q      All right.  Let me focus your attention on

9      2:06, StricDad says:  Very nice.  Will you be

10     bringing the razor strap or other favorite tools

11     with you to our gathering?  Captoes:  Yes, I shall.

12     A heavy wide belt and the razor strop.  Do you

13     usually discipline your boys bare, you say.

14     StricDad7 responds:  Both clothed and bare.  Which

15     would you prefer?  Captoes:  Would prefer bare

16     myself, find it more effective.  StricDad7:  Of

17     course.  Plus the slap of the strap is nice, right?

18     Captoes:  Yes.  It else brings immediate attention.

19     StricDad7:  Oh, yes.  StricDad7 continues:  How do

20     you want them positioned for your instruction?

21     Captoes:  Probably bent over a chair or a couch.

22     Want them totally exposed.  StricDad7:  Bound to a

23     chair or couch or just bent over?  Captoes:

24     Probably bound as use a fairly full swing.

25          Do you see that section, sir?

1    A      Yes, I do.

2    Q      Why do you respond when he asks you if you're

3    going to be bringing your razor strap or other

4    favorite tools?  Why do you tell him that you have a

5    heavy built and razor straps?

6    A      I believe I had told him that in either a

7    telephone conversation or somewhere in our chats, I

8    believe.

9    Q      When StricDad7 asks you would -- which would

10   you prefer, both clothed or bare, why did you say to

11   him you would prefer bare?

12   A      I had -- I believe I had mentioned -- I had

13   mentioned to him somewhere in this whole thing that

14   when I disciplined my son, it was bare.

15   Q      Why, sir -- and I'm back down to 2:11,

16   StricDad7:  Bound to a chair or couch or just bent

17   over?

18          Why do you reply with probably bound?

19   A      Somewhere in our chats he -- he -- I believe

20   he said bound or it was some way tied to a chair.

21   And I was thinking that this was what he preferred.

22   Q      All right.  Dr. Friedlander --

23   A      Yes.

24   Q      -- same exhibit, Exhibit Number 24.

25   A      Excuse me.

Friedlander - Direct

113

1    Q      On the third page of 24.  StricDad7, do you

2    see that there?

3    A      Yes, I do.

4    Q      2:47 PM.  But were you referring to more as

5    sexual things with them?  Captoes:  If that has ever

6    been introduced.  StricDad7:  Yes, with the boys and

7    stepdaughter.

8           At this point do you see what StricDad7 has

9    asked you?  He's asked you if more means sexual

10   things.  Do you see that?

11   A      Yes, I do.

12   Q      And your response -- you respond to him;

13   correct?

14   A      Are you meaning the line that says if that has

15   ever been introduced?

16   Q      No.  I mean generally speaking, you don't end

17   this conversation when he's asked you about sexual

18   things with children.

19   A      I'm not understanding your question with this

20   here.

21   Q      What I'm saying is, do you see StricDad7 here

22   says, were you referring to more as sexual things.

23   First of all, were you referring to the word more

24   that he's talking about at --

25   A      Oh, I don't see anything above so --

Friedlander - Direct

1    Q      Well, let's talk about sexual things.

2    A      Yes.  Okay.

3    Q      He brings up sexual things; right?

4    A      Yes.

5    Q      Why do you continue the conversation with him

6    at this point?

7    A      For exactly the same reason as I have always

8    said, strictly to be accepted or, as you pointed

9    out, would it be the same as clipping begonias just

10   to simply keep things going.

11   Q      But, again, now, at this point, this is really

12   an unorthodox conversation; wouldn't you agree?

13   A      It's unorthodox, but not in a fantasy.

14   Q      Do you believe that you were going to go and

15   have sex with this man's children?

16   A      Absolutely not.

17   Q      Do you believe that he was having sex with his

18   children?

19   A      No.

20   Q      Do you believe that he was beating his

21   children?

22   A      No.

23   Q      Did you have an intention of going to meet him

24   to beat his children?

25   A      No.

Friedlander - Direct

1    Q      Dr. Friedlander --

2    A      Yes, sir.

3    Q      -- I'm at the same exhibit, Government's

4    Exhibit 24, and I'm on the last page of that

5    exhibit.

6    A      Yes.

7    Q      Captoes, 3:08.  Do you see that?  Let me bring

8    this down so you can see it.  Do you see that?

9    A      Yes.

10   Q      Well, let me start above.  StricDad7:  How

11   does the 21st look for you?  It's a Monday.

12   Captoes:  Sounds fine.  Would you like to meet me

13   for -- like for lunch somewhere?

14          You asked this man if he'd like to meet for

15   lunch.  Do you see that?

16   A      Yes.

17   Q      Why do you want to have lunch with this man?

18   A      Well -- pardon me.  He seemed like a perfectly

19   okay, upstanding businessman.  I was just going to

20   strictly have lunch and then leave.

21   Q      But he's talking about beating and sex with

22   children.

23   A      But he's also talking about in his profile

24   other things.

25   Q      Dr. Friedlander, let me direct your attention

Friedlander - Direct

1    to what has been previously marked Government's

2    Exhibit 25.  Do you see that, sir?

3    A     Yes.

4    Q     Let me focus your attention on line 3:48.

5    StricDad7:  Usually dress authoritative but will

6    see.

7    A     Yes.

8    Q     Captoes' response:  Don't have many

9    authoritative clothes.  Can't get into my AF

10   uniform.

11         What is AF, sir?

12   A     Air Force.

13   Q     Were you in the Air Force?

14   A     No.

15   Q     So why are you telling him that you can't get

16   into your Air Force uniform?

17   A     Just as something to say, that -- that I don't

18   have anything authoritative.  And then I thought to

19   myself, well, maybe he'd consider a uniform and

20   maybe he'd think I was in the Air Force, so I

21   thought I'll say Air Force uniform.

22   Q     I'm going to take you to page two of that

23   exhibit.  Okay?

24   A     Yes.

25   Q     StricDad7 at 4:30.

Friedlander - Direct

1    A      Um-hum.

2    Q      I cannot wait to see the --

3    A      Could you bring it down a little bit.

4    Q      I'm sorry.  Is that better?

5    A      Yes, fine.  Thank you.

6    Q      I cannot wait to see the razor strap you've

7    talked about.  That is a d-e-f old school.  Captoes:

8    True.  And I am fairly old school myself.  They can

9    cover a lot of territory.  StricDad:  I am sure.

10   StricDad again:  Do you drink coffee?  Captoes:

11   Really only dwca.  What did you mean here?

12   A      Decaf.

13   Q      Okay.  Captoes again:  Decaf or soda or water.

14   StricDad7:  Okay.  Just thinking of a place to meet

15   before we go to the house.  He continues:  There are

16   a couple of coffee shops nearby.  Your response:

17   That's perfect.  Can have decaf or a soda.  Great.

18          The conversation a moment ago was about lunch.

19   Do you remember that?

20   A      Yes, I do.

21   Q      Now you're talking about coffee.

22   A      Correct.  He didn't seem to -- I thought he

23   probably couldn't make it for lunch and we would

24   have coffee instead, you know, maybe an hour later

25   or something or -- I didn't know whether he actually

Friedlander - Direct

1    ate much lunch, I had no idea.  But it was going to

2    be, excuse me, in a public place.

3    Q     Let me take you on that same exact page at

4    StricDad7, 4:11:  I need it from time to time.  Have

5    towed client's offshore racing boats for them when

6    they were in a pinch.  Your response:  Then you need

7    it.  My brother-in-law uses his Volvo to tow his

8    small boat for fishing.

9          What does that mean?

10   A     I was trying to say that -- I guess I was

11   mirror imaging or whatever you may call it in lay

12   terms -- that this would, I guess, prove a

13   commonality or a -- going along with his image.  I

14   don't know what you -- how you would put it.  In

15   other words, he is in the boat business.  I wanted

16   to be sure that I knew something vaguely about

17   boats.

18   Q     Dr. Friedlander, let me refer you now to

19   Government's Exhibit Number 26.  I'm going to go to

20   the second page of that.  Again, not to belabor this

21   point, Captoes at 9:31.

22   A     Yes.

23   Q     StricDad7, 9:30:  Of course.  What is your

24   favorite age for using the strops on boys?  Captoes:

25   From nine or ten up.  I like to start young with

1    less and -- StricDad interrupts:  Very nice.

2    Captoes:  In the mid teens really lay it on.

3    StricDad7:  Nice.  StricDad7 again:  How about for

4    sexual acts?  It really depends on the size of the

5    boys.

6         Again, he brings up sex.  Do you see that?

7    A    I do.

8    Q    And do you agree with me that it's sex in the

9    context of children?

10   A    Yes.

11   Q    And then he says, StricDad7, do you see me?

12   Five dash ten to begin sexual, question mark?  Or

13   use a switch at five or ten?  Captoes:  No.  Start

14   the sexual play and use a combo of strop and switch

15   to go forward.

16        Do you see that, sir?

17   A    I do.

18   Q    Why have you responded to StricDad7 with five

19   or ten to start sex with young boys?

20   A    I'm strictly going along with the whole

21   business of -- the whole thing at this point really

22   has reached such a total fantasy.

23   Q    I'm not going to belabor these anymore.

24   Dr. Friedlander, let me just ask you directly.

25   A    Um-hum.  Yes, sir.

Friedlander - Direct

1    Q      Let me put these back.  At some point you and

2    StricDad7 --

3    A      Yes.

4    Q      -- agree to meet?

5    A      You're correct.

6    Q      And you drove from Ft. Myers area --

7    A      Yes.

8    Q      -- to Pinellas County?

9    A      St. Petersburg, yes.

10    Q      Okay.  To meet him?

11    A      Yes.  Correct.

12    Q      And in your car you brought a number of things

13    with you?

14    A      Correct.

15    Q      Let me just --

16           MR. SARTES:  If I may, Your Honor.

17           THE COURT:  Yes, sir.

18    BY MR. SARTES:

19    Q      You brought what has been marked Government's

20    Exhibits 33, 34, 35A, B, C and D.

21    A      Yes.

22    Q      You brought these things with you?

23    A      Yes.

24    Q      You see what I'm talking about here?

25    A      Yes, I do.

Friedlander - Direct

1    Q      A belt and --

2    A      The crop.

3    Q      You brought these things?

4    A      I did.

5    Q      Why did you bring these things, sir?

6    A      He had expressed an interest in seeing them.

7    Q      Was your intention to beat his children with

8    them?

9    A      No, it was not.

10   Q      Let me ask you, sir.

11   A      Yes, sir.

12   Q      Government's Exhibit 100.  Do you see that?

13   A      Absolutely.

14   Q      That's the camera; correct?

15   A      Yes.

16   Q      Sir, why did you bring a camera with you?

17   A      In -- in 2001 I was in a very serious one car

18   accident, namely my own fault, when I hit a tree

19   going 25 miles an hour.  I was very badly -- the car

20   was badly injured, I was injured some when a key and

21   the air bag did some damage to my body.

22          When the police interviewed me, I guess you

23   call it, they said, well, why don't you carry a

24   camera in the car?  And with them also was an

25   adjuster from my insurance company.  He said, you

Friedlander - Direct

1    really ought to carry a camera so that if anything

2    happens to you -- I guess maybe because of my age or

3    something, I don't know why he chose that time -- he

4    said, you should have a camera in the car so that

5    you could record any damage for the car or damage to

6    you or something to that effect.

7         I had never had a camera in the car before

8    that.  I bought a camera, I had it in the car, but

9    virtually have never used it since.

10   Q    One of the witnesses that the government

11   called identified that camera and indicated the

12   batteries were dead or didn't work.

13   A    I'm sure that's possible.  I had never checked

14   it since.

15   Q    Let me show you what's been marked as

16   Government's Exhibit Number 36.

17        MR. SARTES:  Your Honor, may I approach the

18   witness?

19        THE COURT:  Yes, sir.

20        THE WITNESS:  Yes.

21   BY MR. SARTES:

22   Q    What are these?  What were these?

23   A    They're latex gloves for which I use when I'm

24   dressed like this, or maybe not quite so dressy, to

25   pump gas.  That -- originally I drove diesel cars

Friedlander - Direct

1     for years because it was less expensive to fill the

2     tank.  But when you get diesel fuel on you and on

3     your hands, the smell is terrible and they sort

4     of -- it's sort of a mess.

5            So it was -- the person at the dealership

6     said, why don't you carry gloves with you.  You can

7     get latex gloves and they're not expensive and you

8     can throw them away each time you use it.  I carried

9     them in the car since, either three or four.

10    Q     Let's get to the meeting.

11    A     Excuse me?

12    Q     Let's get to the meeting when you met

13    StricDad7.

14    A     Correct.

15    Q     You were in the parking lot of the

16    Cracker Barrel.  What's what Detective Romanosky

17    indicated.

18    A     Yes.

19    Q     Okay.  And at some point he indicates he came

20    up to you?

21    A     Yes.

22    Q     Okay.  What did you do?

23    A     I did not get out of the car.

24    Q     Why didn't you get out of the car?

25    A     I -- the gentleman seemed very different

Friedlander - Direct

124

1     looking in -- when I saw him than when what I

2     imagined he would look like.  I did not want to

3     extend my hand.

4     Q      You -- there is an audiotape that we heard

5     earlier; correct?

6     A      Yes, sir.

7     Q      Do you remember the audiotape?

8     A      Yes, I do.

9     Q      And in that audiotape, it appears as if you

10    are showing or discussing Government's Exhibits 34,

11    35 and -- I'm sorry, 33, 34 and 35.  It looks like

12    you're describing these things.

13    A      He -- he opened -- it was on the -- I believe

14    it was on the floor, though some pictures -- I don't

15    know.  But they were on the floor in a bag.  And he

16    came around to the passenger's side and I believe I

17    either -- I did either roll down the window or --

18    this car was electric -- or opened the door for him

19    to see these.

20    Q      The driver's side door?

21    A      No, no, the passenger's side door.  He was on

22    that side after talking to me.

23    Q      At this point --

24    A      I believe, yeah.

25    Q      -- have you -- do you -- are you interested in

1       beating his children?

2       A      No.

3       Q      Are you interested in having sex with his

4       children?

5       A      No.

6       Q      Why are you then still there having this

7       discussion with him?

8       A      Well, he was standing there asking me and I

9       was going to answer him.  And then I pointed them

10      out.  Yeah.

11      Q      At some point in the conversation, he

12      indicates that, okay, it's time for you to follow me

13      home.  Do you remember that?

14      A      Yes.  And I became extremely frightened and

15      agitated.

16      Q      Why is that, sir?

17      A      I just -- I -- it all became too real.

18      Q      Then what were you going to do when you

19      followed him home?

20      A      I was not going to follow him home.  He said

21      follow me, which was just out of the parking lot

22      because I didn't know quite how to get out of the

23      parking lot.  We got out of the parking lot.  He was

24      going to turn one way and I was going to go and -- I

25      was going to go a little bit further and turn left

1     instead of right.  And I would have fled home.

2     Q     After you were arrested, let me just give you

3     temporarily when I'm talking about.

4     A     Okay.

5     Q     You were taken to the sheriff's office.  Do

6     you remember that?

7     A     Yes, I do.

8     Q     And there was that interview that we saw

9     earlier?

10    A     Correct.

11    Q     So you know what I'm talking about time-wise?

12    A     Yes.  Yes.  Yes.

13    Q     At that time --

14    A     Yes.

15    Q     -- there was discussion about searching your

16    computers and searching your house?

17    A     Yes.

18    Q     Do you -- you authorized that; do you remember

19    that?

20    A     I do.

21    Q     And, now, let me show you here what are marked

22    Government's Exhibits 54 and 55.  Do you see this

23    down here, sir?

24    A     Yes, I do.

25    Q     And do you see this up here?

Friedlander - Direct

1    A      I do.

2    Q      And do you recognize those?

3    A      Yes.  That's my Dell laptop and that's my

4    Gateway computer.

5    Q      Okay.  Are these the computers that you used

6    to chat online with?

7    A      Yes, they are.

8    Q      They also discuss with you that there were

9    some things in your house.  Do you remember that?

10   A      Yes, I do.

11   Q      Do you remember this suitcase coming up?

12   A      Yes.  That belonged to Randy.

13   Q      Okay.  Let's talk -- there's a box here with

14   exhibits -- labeled Government's Exhibit 58, I

15   believe it is a composite and -- do you know what

16   these are?

17   A      More or less, yeah, not what each one is used

18   for.

19   Q      Give me a general description of what these

20   things are.

21   A      There's a paddle, there are I believe two

22   whips, I can't quite see but --

23          MR. SARTES:  May I approach, Your Honor, to

24   give him a better view?

25          THE COURT:  Yes, sir.

Friedlander - Direct

1                MR. SARTES:  Thank you, sir.

2                THE WITNESS:  Yes.

3     BY MR. SARTES:

4     Q        Okay.  What else is in here?

5     A        A belt, another paddle and I think it's two

6     dildos.  I'm not quite sure of the number.

7     Q        Do you know what these things are?

8     A        Yes, I know now.

9     Q        Do you know where these things were stored in

10    your house?

11    A        In a closet.

12    Q        Were they just laying around the closet?

13    A        No.  They were in the white suitcase, I guess

14    you call it.

15    Q        So you were aware that those were in there?

16    A        Yes.

17    Q        Are they yours?

18    A        No.

19    Q        Who's are they?

20    A        They were Randy's.

21    Q        Why -- did you know what they were after Randy

22    passed away?

23    A        Yes.  But I didn't know what to do with them.

24    Q        Why didn't you just throw them away?

25    A        I don't know.  I guess for the same reason I

Friedlander - Direct

1    didn't throw a lot of his -- excuse me -- stuff

2    away.  I didn't keep them for any reason.

3    Q    During the interview --

4    A    Yes.

5    Q    -- you told Detective Romanosky that you had

6    these dildos to -- for your lady friend.  Sir, to

7    whom were you referring?

8    A    I was referring and -- to Margaret.

9    Q    Do you use these implements with Margaret?

10   A    No, I do not.

11   Q    Why did you tell that to Detective Romanosky?

12   A    Because with Detective Romanosky I was really

13   Captoes.

14   Q    He asked you your sexual orientation.  Do you

15   remember that?

16   A    Yes.  And -- I do remember that.

17   Q    What did you tell him?

18   A    Bisexual.

19   Q    Why did you tell him bisexual?

20   A    I guess I was -- I guess I was sort of still

21   in the Captoes way.  And I was frightened,

22   embarrassed, and any other word we can think of.

23   Q    Do you remember telling Detective Romanosky

24   you had an MD and a PhD?

25   A    Yes.

Friedlander - Direct

1      Q      Do you have an MD?

2      A      I do not.

3      Q      Sir, why did you tell him that?

4      A      I guess to ingratiate him or elevate my

5      persona, my actual persona.

6      Q      Detective Romanosky also asked you what your

7      preferred sexual bracket -- age bracket was, how old

8      your interests are sexually.

9      A      Yes.  I said either between 40 and 70 or 40

10     and 80, and I don't know which.

11     Q      But you came up to Pinellas County after

12     talking to this man about sex with his kids.

13     A      Yes.  That's correct.

14     Q      How do you explain that?

15     A      I can't explain that except one was -- first

16     of all, one was Captoes and one is myself with a 40

17     to 70 or 80, I don't remember.

18     Q      Dr. Friedlander, have you ever spoken to a

19     minor on the internet?

20     A      No, ma'am -- no, sir.  Sorry.

21     Q      Have you ever -- let me ask you this.  Have

22     you ever talked about having sex with other people

23     that involved children on the internet?

24     A      Yes.

25     Q      Boys or girls?

Friedlander - Direct

1    A      One of each, two different people.

2    Q      They're two different people?

3    A      Yes.

4    Q      Did you meet those individuals?

5    A      No, sir.

6    Q      Did you have sex with their children?

7    A      No.  I never saw them or their children or

8    anybody else.

9    Q      Sir, do you have a room in your house for

10   punishment?

11   A      No.

12   Q      Is your basement in Washington D.C., Virginia

13   area, set up as a --

14   A      It is rented as an apartment.

15   Q      Have you ever told anyone -- first of all, let

16   me back up.

17          Can you sustain an erection, sir?

18   A      I'm sorry.  I didn't hear you.

19   Q      Can you sustain an erection?

20   A      I can't sustain one, I can't get one for

21   diabetic reasons and the fact that I have something

22   called BPH, which is benign prostatic hypertrophy,

23   which is not prostate cancer.  It's a no cancer

24   situation, where one's prostate gets enlarged and I

25   have to go and have it -- not to be too graphic --

Friedlander - Direct

1    attended to by a urologist to reduce the size of the

2    prostate for urinating purposes.

3    Q     Have you ever told anyone that you can sustain

4    an erection at the drop of a hat?

5    A     No.  Well, I may have during -- in my persona

6    as Captoes.  I don't know.  But I -- well, anybody I

7    know knows I can't.

8    Q     What I'm asking is have you ever told anybody

9    that you can have an erection on the internet?

10   A     That I can have an erection?

11   Q     That you can, yes, that you are able.

12   A     Yes.

13   Q     Have you -- do you remember telling

14   Detective Romanosky that you can sustain an erection

15   in an emergency?

16   A     Yes, I have.  I mean, yes, I did.

17   Q     What does that mean?  How do you sustain an

18   erection in an emergency?

19   A     That's a very good question.  I don't know.

20   It just doesn't work.

21   Q     Have you ever talked to anyone on the internet

22   and told them that you were not interested in fancy?

23   A     Yes.  In reply to one -- to someone who said I

24   am only interested in real, no fantasy.

25   Q     Were you serious?

Friedlander - Direct

1      A      I'm sorry?

2      Q      Were you serious about being real, you wanted

3      it real?

4      A      No.

5      Q      Then why did you say it?

6      A      Because, again, it was to be accepted by

7      somebody who made that very clear that that was a --

8      a mandate.

9      Q      How many people do you believe you've chatted

10     with over the years on the internet?

11     A      Just chatted?

12     Q      Just chatted.

13     A      I really don't know.  Someone -- one of the

14     gentleman who spoke yesterday I think said something

15     like 1200.

16     Q      Does that number surprise you?

17     A      I was floored, completely.  I never thought

18     that it went that far, no more than did I think that

19     I talked that much on the computer.

20     Q      How many of these individuals you've chatted

21     with online over the years have you met physically?

22     A      Four, I believe.  Maybe it's three.  Maybe

23     it's four.  I'm not positive.

24     Q      Can you tell us who they are?

25     A      Yes.

Friedlander - Direct

1      Q      Please do so.

2      A      Mark, who you asked me about this morning.

3   John, who is Absalom2, I think.  I forget what the

4   number was.  My friend, William Hayden, and I'm not

5   sure if there's a fourth or not.

6      Q      Did you meet Detective Romanosky?

7      A      Oh, yes, Detective Romanosky.  Excuse me.

8      Q      Who's Bill Hayden, William Hayden?

9      A      Who is he?

10     Q      Who is he?

11     A      A very -- someone who has become a very close

12   friend of mine now for five years duration.  He is a

13   CPA.  He's 44 years old, very upstanding gentleman.

14          MR. SARTES:  Your Honor, may I ask the

15   assistance of Madam Courtroom Deputy for the exhibit

16   number to the photographs the government introduced?

17   I think it's 50 something.

18          MS. KAISER:  97 and 99.

19          THE COURT:  97, 99.

20          MR. SARTES:  I'm having an issue locating

21   them.

22          MR. TRAGOS:  They're in a folder.

23          MR. SARTES:  Thank you, Your Honor.

24   BY MR. SARTES:

25     Q      Dr. Friedlander --

1      A      Sir?

2      Q      -- let me start off by showing you Exhibit 64,

3      Government's Exhibit 64.  Do you see that, sir?

4      A      Yes.

5      Q      Who is that?

6      A      I have absolutely no idea.

7      Q      You heard that these photos were found in your

8      home.

9      A      You're absolutely right.

10     Q      But you don't know who this person is?

11     A      No.

12     Q      By the way, is that person a child?

13     A      No.

14     Q      Again, without belaboring the point, I show

15     you some of these photos in Government's Composite

16     Exhibit 97.  Do you kind of get an idea about which

17     photos I'm talking about, sir?

18     A      Yes.

19     Q      Are these your photos, sir?

20     A      They were sent to me.

21     Q      After you --

22     A      Through the internet.

23     Q      Did you save those pictures, sir?

24     A      I apparently did.

25     Q      Sir, were any of those photos depicting

1     children?

2     A      No.

3            MR. SARTES:   If I may have a moment, Your

4     Honor.

5     (Brief pause.)

6     BY MR. SARTES:

7     Q      Dr. Friedlander --

8     A      Yes.

9     Q      -- when you were speaking to

10    Detective Romanosky, he asked you about downloading

11    photos, I think it was getting at -- finding out

12    what was on your computer.  Do you remember that

13    conversation?

14    A      Yes, I do.

15    Q      Do you remember that you told him that you

16    didn't download?

17    A      I did tell him that.  And I guess I didn't

18    understand what downloading was.  I don't know much

19    about computers.  And at times I guess things were

20    saved and I had no idea.  At other times if I push

21    save, I thought that was just saving -- it sort of

22    came from out of the blue.

23    Q      So let's just clarify.  Do you and have you

24    saved images and things on the --

25    A      Yes, I have.

1          MR. SARTES:  Thank you, Your Honor.  I have

2     nothing further for this witness.

3          THE COURT:  Cross-examination.

4          MS. KAISER:  Your Honor, may I have a moment.

5     (Brief pause.)

6                    CROSS-EXAMINATION

7     BY MS. KAISER:

8     Q     Good afternoon, Mr. Friedlander.

9     A     Good afternoon, Ms. Kaiser.

10    Q     You testified on direct examination that you

11    had no intention of doing anything when you traveled

12    two and a half hours from Ft. Myers to

13    St. Petersburg; is that correct?

14    A     I guess the time was one hour and a half.

15    Q     An hour and a half.  Excuse me.

16    A     Yes, ma'am.

17         MS. KAISER:  Your Honor, may I approach?

18         THE COURT:  Yes, ma'am.

19    BY MS. KAISER:

20    Q     Do you recognize Government's Exhibit 34,

21    Mr. Friedlander?

22    A     Yes.  It is a belt I wear with my white blue

23    jeans.

24    Q     Okay.  And you -- you packed this -- this belt

25    when you -- before you drove up from Ft. Myers?

Friedlander - Cross

1      A      Yes, ma'am.  Yes, ma'am.

2      Q      Okay.  And what is Government's 33?

3      A      It's known in England as a quirt.

4      Q      And did you pack this in your car on July 21st

5      when you came up to meet Detective Romanosky?

6      A      I removed it from the trunk of the car where I

7      carry it always and put it in the red bag.  Yes,

8      ma'am.

9      Q      And you packed your car; correct?

10     A      Yes, ma'am.  Oh, yes.

11     Q      And these -- Government Exhibits 35A, B, C and

12     D, these are all things that you packed; correct?

13     A      Yes, ma'am.

14     Q      All right.  So this wasn't your online

15     profile, Captoes, this was you?

16     A      Well, I am Captoes and I am Charles Jackson

17     Friedlander.  I packed those for Captoes, but

18     Charles Jackson Friedlander did put them in the bag.

19     Yes.

20     Q      Well, let's talk about that, sir, because you

21     keep referring to Captoes like it's somebody besides

22     you.  But you're Captoes; correct?

23     A      I created Captoes.  Correct.

24     Q      And so Captoes didn't drive up from -- from

25     Ft. Myers, it was you?

Friedlander - Cross

1    A       Absolutely.  I drove up.

2    Q       Right.  So certainly you packed the car?

3    A       Yes.

4    Q       All right.  You sat at the computer; correct?

5    A       I sat at the computer?

6    Q       At your house when you were chatting with

7    Corporal Romanosky.

8    A       Oh, yes.  Absolutely, yes.

9    Q       All right.  And the information that you put

10   in those chats came from you?

11   A       Yes.  Absolutely.

12   Q       So there's not a separate person?

13   A       I think -- I think we're dealing with

14   semantics.  I don't quite understand that.

15   Q       Well --

16   A       In other words, I became or I created the

17   persona of Captoes.  I did it.

18   Q       All right.  But it was you sitting there

19   typing at the computer?

20   A       Absolutely.

21   Q       And gas was kind of expensive back in July;

22   wasn't it?  Back in July of this year gas was pretty

23   expensive; wasn't it?

24   A       You said gas.  I didn't understand the word.

25   Excuse me.  Yes.

Friedlander - Cross

140

1    Q     About four dollars a gallon; wasn't it?

2    A     Whatever you say.  I don't really remember.

3    Q     So you spent a lot of money to drive up here

4    to meet Corporal Romanosky who you thought shared

5    your interests; fair enough?

6    A     But in all honesty, I have family, for

7    example, in Sarasota who I will drive up to see and

8    that sort of thing.  So driving from Ft. Myers,

9    which is way down in the middle of nowhere so -- to

10   anywhere a bit up north, you have to drive.  Nothing

11   is close.

12   Q     But you -- you had to spend gas money at least

13   to drive from Ft. Myers to come meet StricDad;

14   correct?

15   A     You're completely correct.

16   Q     But you're the one who got in the car?

17   A     Yes, ma'am.

18   Q     And you packed all the implements that you

19   discussed on the chats with Detective Romanosky?

20   A     Yes.  Yes.  Other than the quirt which sits

21   always in the --

22         THE COURT:  Sir, you're going to have to wait

23   for her to finish her question.

24         THE WITNESS:  All right.

25         THE COURT:  The court reporter can't take it

1    when you're both talking.

2         THE WITNESS:   Okay.   Sorry.

3    BY MS. KAISER:

4    Q     You can proceed.

5    A     I took the quirt from the back of the car

6    where I keep it, probably for odd reasons, it's a

7    protection thing, and I put it in the red bag.   Yes,

8    correct.

9    Q     So the quirt that you had mentioned in chats

10   with Detective Romanosky as an implement of torture

11   of children, you're now saying is for your

12   protection?

13        MR. SARTES:   I object, Your Honor, to the form

14   of that question.

15        THE COURT:   Overruled.

16        THE WITNESS:   Yes.   I have been stuck in -- in

17   -- in places not that far from where I live that

18   were dangerous, and people advised me to carry

19   something in the car, as I also carry a urinal there

20   for my personal needs.   So I -- it sits in the trunk

21   of the car.   Correct.

22   BY MS. KAISER:

23   Q     So, sir, was it just a coincidence, then, that

24   you mentioned bringing a quirt to beat children, and

25   now you're telling us that it's for personal

Friedlander _ Cross

1     protection?  That's just a coincidence?

2     A       I don't quite understand what you mean.

3             MS. KAISER:  May I approach, Your Honor?

4             THE COURT:  Yes, ma'am.

5     BY MS. KAISER:

6     Q       Do you remember referencing this device,

7     Government's Exhibit 33, in chats with Detective

8     Romanosky?

9     A       Yes, I do.

10    Q       Okay.  And did you not say that you were going

11    to use this in the beating of the children?

12    A       Yes.  You're correct.

13    Q       So -- so it's just a coincidence that you were

14    just going to use something to beat children with

15    that you carry with you for your own personal

16    protection?

17    A       Yes.  I -- I -- yes.

18    Q       So this stays in the car all the time?

19    A       Yes, ma'am, in the trunk.

20    Q       In the trunk.  Well --

21    A       That doesn't.

22    Q       This does not?

23    A       No.

24    Q       So the razor strops you had to separately get?

25    A       Yes.  Yes, ma'am.

Friedlander - Cross

1    Q      So you're not claiming that these are for your

2    protection?

3    A      No, no, no.  Just strictly that.

4    Q      And these razor strops, these weren't for your

5    protection?

6    A      No.

7    Q      But the quirt, that was?

8    A      Yes, ma'am.

9    Q      You testified you met four people on the

10   internet; is that correct?

11   A      That's correct.

12   Q      How many times have you driven two hour -- an

13   hour and a half to meet other people?

14   A      Never.

15   Q      So this is the first time in your fantasy,

16   right -- that's your word, correct, you've called

17   this all a fantasy?

18   A      Yes.

19   Q      Right.  That was your testimony on direct

20   examination; correct?

21   A      Right.  But are you saying that -- that the

22   four people I met, they were not in fantasy.

23   Q      Correct.

24   A      They were real.

25   Q      Correct.

Friedlander - Cross

1    A       Okay.

2    Q       But is this the first time you've driven an

3    hour and a half --

4    A       Yes, ma'am.

5    Q       -- with implements of torture that you had

6    discussed on the internet?

7    A       It is the first time.  You're correct.

8    Q       All right.  So you weren't just -- you weren't

9    just thinking about it, you actually got in the car;

10   correct?

11   A       Yes, ma'am.

12   Q       And you actually drove an hour and a half?

13   A       I did.

14   Q       All right.  And you also talked on the phone

15   about this behavior, as well; correct?

16   A       Yes.  With Detective Romanosky.

17   Q       Correct.  And in that phone conversation, you

18   asked who's going to bound the children; correct?

19   A       I don't remember.  But if it's in the -- in

20   the text, I -- I would have to say yes.

21   Q       Okay.  Now, sir, you asked, are you going to

22   bind the children or am I, basically.  Do you recall

23   that?

24   A       If it is what I said, I said it.  I can't

25   always remember everything.  At 78, sometimes you

Friedlander - Cross

1      forget.  I'm sorry.

2      Q      As a licensed mental health counselor --

3      A      Yes.

4      Q      -- don't you have some affirmative obligation

5      to report suspected abuse of children?

6      A      You do in an office setting, yes.

7      Q      But -- so is it your testimony that the reason

8      you didn't report any of this is because it was --

9      it happened outside the office?

10     A      Well, you can hear all sorts of things.

11     Unless you have definite proof that this is being

12     acted upon, at least this is my understanding, then

13     anything else could be hearsay.

14     Q      So it's okay for you to talk and -- and have

15     lengthy decisions about sexually abusing, tying up

16     and binding little children ages ten and eleven

17     because it didn't happen in your office; is that

18     your testimony?

19     A      I'm -- I'm a little lost in that thing.  I'm

20     sorry.  I --

21     Q      Is it your testimony that you don't have any

22     duty to report the torture or sexual abuse of

23     children because it didn't happen in your office?

24     A      If I am sure and can prove that this is being

25     done, you are correct.

1    Q      Okay.  And you don't see any problem with

2    discussing at length the sexual torture and physical

3    torture of little children?

4    A      If something can -- if -- if -- if -- if it is

5    done, it can be proven to be done, I would agree

6    with you.  Otherwise, the chats on the internet are

7    so way out even that I haven't been involved in, you

8    can -- I would presume you could say anything to

9    anybody about anything.  That's my thought.

10   Q      So it didn't bother you in the least having

11   these conversations in which you actively

12   participated --

13   A      I did --

14   Q      -- in discussing the physical and sexual abuse

15   of children?

16   A      Ms. Kaiser, I knew full well that this was a

17   fantasy, so I saw no problem, obviously, in -- in

18   admitting a fantasy from me.

19   Q      Well, let's talk some more about the fantasy.

20   A      Sure.

21          MS. KAISER:  May I approach, Your Honor?

22          THE COURT:  Yes, ma'am.

23   BY MS. KAISER:

24   Q      This whip, whose whip was this?

25   A      That was the gentleman who watched my house.

1       That was Randy's.  Just about anything you find in

2       there will be.  That's, I guess --

3       Q       And this whip?

4       A       That's the same thing.  Yeah.

5       Q       So even though we have chats where you

6       reference -- or the person you were with at the

7       cabin references you buying a new whip --

8       A       Yes.

9       Q       -- that's just a coincidence?

10      A       I -- what he was mentioning to me, I don't

11      believe I mentioned that to him.  Correct me if I am

12      wrong.  He did say to me, I can remember when you

13      whipped me or used a whip on me or -- or some

14      verbiage like that.  I believe that was he saying

15      that to me.  Yes, you would -- you know, I -- that's

16      correct.  Yeah.

17      Q       And this whip, this whip?

18      A       Yes.

19      Q       Is this your whip?

20      A       No.

21      Q       This one is not yours, either?

22      A       No.  None of the stuff in there, if you'll

23      excuse the expression.

24      Q       So my question to you, sir, is it just a

25      coincidence that Randy just happened to be into the

1    very same things that you're interested in?

2    A      Randy was not necessarily -- I don't know what

3    Randy was into.  I have no idea and was not

4    interested in quizzing him.  He went on these long

5    motorcycle trips that I have nothing to do with.  I

6    don't know how to ride a motorcycle.  What he did or

7    what he didn't do or what he had or what he didn't

8    have I -- I was not involved with.

9          MS. KAISER:  Your Honor, may I approach?

10         THE COURT:  Yes, ma'am.

11   (Brief pause.)

12   BY MS. KAISER:

13   Q      So Dr. Friedlander, it's just a coincidence,

14   however, that in that one e-mail that we saw earlier

15   in which the man was at the cabin with you -- I

16   believe you testified his name was Mark; is that

17   correct?

18   A      That's correct.

19   Q      And you had sex with him on the second time

20   you had met him?

21   A      I -- oral sex was practiced on me, yes,

22   correct.

23   Q      Okay.  And in that e-mail where he recounts

24   your meeting --

25   A      Absolutely.

Friedlander _ Cross

149

```
1    Q       -- he said -- he said, and you had brought a
2    second whip.
3    A       Whatever he said, yes.
4    Q       Okay.  But that -- that wasn't true?
5    A       No, that was not true.  A number of the things
6    in that e-mail were not true.
7    Q       That suitcase which you claimed to be Randy's;
8    correct?
9    A       Yes.
10   Q       All right.  That wasn't your -- your things?
11   A       No, ma'am.
12   Q       All right.  So why didn't you get rid of that?
13   A       Probably for the same reason I didn't get rid
14   of a lot of stuff that I still have in my house.  It
15   was just there.  An awful lot of the time I never
16   even noticed it.  There is, for example, that I
17   discovered about six months ago a leather jacket of
18   his which has been hanging there ever -- not in a
19   closet in the room that I use, but it's still
20   hanging there.
21          I don't -- it is of no use to me.  He was much
22   bigger than I was, anyway.  I have his whole tool
23   box, but it's a huge thing which is his I have not
24   gotten rid of.  I have a jack for a -- a motorcycle
25   I haven't gotten rid of.  There's just lots of stuff
```

1    that I probably should.  Loads of CD recordings of

2    the Zeppelin and all sorts of stuff that I don't

3    even know what it is.

4         MS. KAISER:  May I approach, Your Honor?

5         THE COURT:  Yes, ma'am.

6    BY MS. KAISER:

7    Q    Okay.  When Corporal Romanosky told you that

8    they had found whips and handcuffs and dildos --

9    A    Yes, ma'am.

10   Q    -- right, that are in Government's Exhibit 58?

11   A    You're correct.

12   Q    All right.  Why didn't you tell Corporal

13   Romanosky that -- or why did you tell Corporal

14   Romanosky that those were for your lady friend?

15   A    One was.

16   Q    One of these was for your lady friend?

17   A    Well, theoretically I had told him, yes.

18   Q    Okay.  So -- so these are obviously used;

19   would you agree?

20   A    I guess so.  Not by me.

21   Q    Okay.  But you told Corporal Romanosky these

22   were brand new --

23   A    I did.

24   Q    -- during your interview?

25   A    No.  I have not used them.

1    Q      Okay.  So -- so why -- why did you tell

2    Corporal Romanosky, then, that these were for Miss

3    Priss?

4          MR. SARTES:  Objection, Your Honor,

5    mischaracterization.

6          THE COURT:  The objection is overruled.

7          THE WITNESS:  I'm sorry.  I'm just thinking of

8    what to say.  Would you mind repeating your

9    question.  Just not -- you don't have to come here,

10   just right from there.  That I told Corporal

11   Romanosky, and I forgot the rest of what you said.

12   Sorry.

13   BY MS. KAISER:

14   Q      I was asking you why did you tell him it was

15   for Miss Priss.

16   A      Look, I also said that I was bisexual.

17   Q      So you lied during the interview with Corporal

18   Romanosky?

19   A      That I was bisexual?  You're one hundred

20   percent right.

21   Q      So you testified on direct examination that

22   you never get an erection; is that correct?

23   A      That is absolutely correct.

24   Q      Okay.  So why do you have condoms at your

25   house?

Friedlander - Cross

1    A      I've always kept them.  I have no -- no -- I

2    have no answer for that.

3    Q      Okay.  You testified on direct examination

4    that you thought maybe you'd come up and have lunch

5    with Detective Romanosky, correct, with StricDad7

6    who you knew as Michael?

7    A      Yes, correct.

8    Q      And you said that you thought he was a fine,

9    upstanding man.  He seemed to be a fine, upstanding

10   man was your words on direct examination.  Do you

11   remember that?

12   A      Yes, I do.

13   Q      Well, Dr. Friedlander, don't you think someone

14   that wanted to meet in person and go back to their

15   house and engage in the physical and sexual abuse

16   and torture of two little children wouldn't be a

17   fine, upstanding individual?

18   A      When I went to meet him I was going to -- he

19   had said to me in a part that we apparently is -- I

20   don't know whether it's going to be brought up or

21   not -- that he also was interested in meeting me to

22   see if we got along and were sort of -- I have to

23   paraphrase it -- the same wave length.  That was

24   definitely his utterance to me.

25           I would go up there, I would meet him like I

Friedlander - Cross

1    would meet anybody else and see what this person was

2    like.  It never occurred.

3    Q      What never occurred?

4    A      The lunch, the meeting, the sitting down over

5    coffee, none of that ever -- so that we could see --

6    he could see for me whether we were on the same wave

7    length, I would see for him if we were on the same

8    wave length.  Yes, that was his -- he uttered that.

9    Q      When you -- when you drove up --

10   A      Yes, ma'am.

11   Q      -- you had just eaten before you -- before you

12   went to the Cracker Barrel; correct?

13   A      No.  I had -- as you know I'm a diabetic, and

14   often when I think I need it, sort of like a quick

15   fix, if I may use that word, I stop for a milkshake

16   at Arby's or the Dairy Queen.  At Arby's it's a

17   Jamoca shake, at the -- at the Dairy Queen it's a

18   coffee milkshake, as sort of on uplift, as sort of a

19   -- like a sugar rush for a better word.  That's all

20   I had.

21   Q      So in your interview with

22   Detective Romanosky --

23   A      Yes.

24   Q      -- when you said you had just eaten lunch,

25   that was a lie?

Friedlander - Cross

```
 1    A       No.  I had eaten lunch before coming up,

 2    before I left my house.  Then when I was riding up,

 3    I had the what-you-ma-call-it, the milkshake.

 4    Q       Dr. Friedlander --

 5    A       Yes, ma'am.

 6    Q       -- when StricDad7 asks, how do you want them

 7    positioned for your instruction, you respond,

 8    probably bent over a chair, couch, want them totally

 9    exposed; correct?

10    A       Um-hum.  Yes.

11    Q       And then it goes on, bound to chair or couch

12    or just bent over, you say probably bound as use a

13    fairly full swing; correct?

14    A       You're absolutely correct.

15    Q       And your counsel asked you why you had said

16    that; correct?

17    A       Yes.  Um-hum.

18    Q       Why didn't you stop and say, bind children?

19    What are you talking about?  That's terrible.  What,

20    are you insane?  Why would you want to bind a child?

21    A       I believe he suggested the word bound.  I --

22    he -- I wouldn't normally bind, although I did say

23    it I think here in answer to a -- his what you call

24    example to me or what have you.  And you're asking

25    me why would I do -- why would I do binding, is that
```

1    what you're asking me?

2    Q      Dr. Friedlander --

3    A      Yes, ma'am.

4    Q      -- when he asked you what position you want

5    the children, you say probably bound, why in the

6    world wouldn't you say, bind children, that's a

7    horrific idea?  What are you talking about?  Why

8    isn't that your response?

9    A      Because I was going along with a whole program

10   that he was talking about.

11   Q      So why didn't you tell him binding children is

12   a terrible thing, I would never -- never have a part

13   of that?

14   A      I really can't answer that question.  I don't

15   know.

16   Q      You mentioned on direct examination that when

17   you were discussing this sexual and physical abuse

18   of children, it was just like -- it was the same as

19   stripping begonias, it's just something that you

20   were chatting about; is that correct?

21   A      You are correct.

22   Q      Okay.  So do you not see a difference, sir,

23   between talking about plants and talking about the

24   sexual and physical abuse of little children?

25   A      But in the connotation that my direct examiner

Friedlander - Cross

1    used, I -- I explained, I feel, clearly to him that

2    I would absolutely talk about begonias or I would

3    talk about binding children or talk about doing

4    something with a light bulb.  All I was wanting to

5    do was to keep the conversation going, whatever was

6    involved, at least this was a contact.

7    Q      So it didn't matter to you that they're

8    talking about brutal, horrific crimes?

9    A      This was all a fantasy, ma'am, I felt with

10   both of us.

11   Q      But the fantasy in which you got in your car

12   and drove an hour and a half with the implements

13   that you discussed?

14   A      Yes.

15   Q      Well, let's just talk about that.  You say you

16   were very lonely.  Is that -- is that -- was that

17   your testimony?

18   A      Correct.  Yes, it is.

19   Q      And that's why you continued to chat with

20   Corporal Romanosky?

21   A      Yes.  Corporal Romanosky and -- I forget the

22   number, a thousand other people.  Not necessarily

23   about the same thing, no.  No.  But that I spend all

24   these hours on the computer talking.

25   Q      So in 2005 you were asked on direct

Friedlander - Cross

1    examination when Dunedindad, who was Corporal

2    Romanosky --

3    A       Yes.

4    Q       -- stopped chatting with you --

5    A       Yes.

6    Q       -- why you didn't try to contact him again.

7    Do you recall your response?

8    A       No.  But you can remind me about it.  I

9    don't --

10   Q       Well, why did you -- why did you stop -- why

11   didn't you try to contact him again?

12   A       I was not interested.  I mean, I wasn't

13   about -- this man -- I don't really know, I mean.

14   Would you mind telling me what I responded so I

15   can --

16   Q       I believe you said something to the effect

17   that you just didn't care to.

18   A       I would say that again.

19   Q       All right.

20   A       Yes.

21   Q       So Dr. Friedlander, that's a little

22   inconsistent --

23   A       No, it isn't inconsistent at all.

24   Q       -- to hear you're very, very lonely, but this

25   person that you've been communicating with stops

1    contacting you and you just move right on to someone

2    else.

3    A      It was a very, very short period of time that

4    I talked with the first gentleman in 2005.  This was

5    not a lengthy -- for months and months and months

6    and months and months, I don't believe.

7    Q      So when you discussed gagging the children --

8    A      Yes, ma'am.

9    Q      -- why in the world didn't you stop then and

10   say, gag a child, are you crazy?  That's a terrible

11   thing.

12   A      You're -- you're correct in your statement

13   that it is a terrible thing.  But I was keeping this

14   conversation -- it's the same thing -- it applies

15   the same way to the question that you asked me

16   before.  Yes, ma'am.

17   Q      Sir, you said -- you said earlier that the

18   reason that you kept talking to him --

19   A      Yes, ma'am.

20   Q      -- was you said that you felt that you were --

21   your interests dovetailed precisely.

22   A      Yes.  Our interests dovetail.

23   Q      Correct.

24   A      Yeah.  I think that was the way I put it.

25   Q      All right.  And so your interest, then, is the

1    physical and sexual abuse of children.

2    A      We were both -- I was continuing the

3    conversation with him, and I felt this was fantasy.

4    I also felt that his was fantasy.  Yes, that's

5    correct.

6    Q      So you fantasize about beating and having sex

7    with children?

8    A      Well, not just sort of sitting here, no.  But

9    you mean in the persona that I created.

10   Q      Which is you?

11   A      Which is an appendage of me, yes, that's

12   correct.

13   Q      It's you; correct?  So there's not a separate

14   person.  You keep wanting to refer to it as if it's

15   some other person, but it's all you.

16   A      Well, it all is me but -- yes.  I mean, there

17   was a play written about a man and he thought there

18   was a little rabbit next to him.  Yes.  But mine was

19   something that was created by me.  Yes, ma'am.

20   Q      Well, you're not thinking there's little

21   rabbit sitting next to you; correct?

22   A      No.  But I know that I have created this

23   persona which can be as such like the rabbit.

24   Q      So in all the hours of interview with Corporal

25   Romanosky --

1    A     Yes, ma'am.

2    Q     -- why -- why didn't you respond to him, why

3    didn't you say, hey, this -- I wasn't going to do

4    this, this is -- this is terrible?  You saw the

5    interview; correct?

6    A     Oh, yes.  Oh, yes.  I absolutely did.

7    Q     Okay.

8    A     You mean when I was talking with him in the

9    interview?

10   Q     Yes.

11   A     Oh, I see.  I didn't -- I thought you meant

12   this other thing.  I don't remember.  In what

13   context, may I ask, are you asking me this, because

14   we're switching now to the interview because so I

15   don't know.

16   Q     Well, why in the world during your interview

17   with him didn't you say, I think the sexual abuse

18   and torture of children is a horrific crime, I would

19   have no part of that?

20   A     I don't think that the whole interview was --

21   was like that.  First of all, I was -- I was a

22   prisoner, as such, or I was taken prisoner.  I was

23   sitting in a room completely and absolutely

24   petrified.  I had never in my 78 years been arrested

25   or -- except for the one speeding ticket that I

1    had -- been involved in anything like this.  I had

2    no idea what I was supposed to say or did -- didn't

3    or anything else, truthfully.

4    Q      Well, you knew that that was your chance to

5    tell law enforcement --

6    A      Um-hum.

7    Q      -- what had happened; correct?

8           MR. SARTES:  Your Honor, I object to that.

9    That assumes facts.

10          THE COURT:  Overruled.

11          THE WITNESS:  When I was in there being

12   interviewed, I -- I really am trying to think about

13   it, if you'll excuse me.  I didn't think I was

14   supposed to explain my case at all.  I was being

15   quizzed and I was trying to answer whatever he asked

16   me, not -- I mean, I said I was bisexual and I'm

17   not.  But, I mean, I was just petrified.  That's the

18   only word I can use.

19   Q      Did he bring you water when you asked for it?

20   A      Someone else did, yes.

21   Q      And did you have the breaks that you needed?

22   A      Yes, but -- and common courtesy was definitely

23   extended to me.

24   Q      And he spoke to you in a very calm voice,

25   correct, he never raised his voice with you?

1   A      Never.

2   Q      And you seem very relaxed on the tape;

3   correct?

4   A      Well, I don't -- I was I guess trying to be as

5   relaxed as I could be but I wasn't relaxed at all.

6   Q      So the reason you didn't tell him that you

7   would never have beaten or had sex with children is

8   because you just didn't think of it?

9   A      I don't really remember what I thought about.

10  I was just too scared to even function well.   I

11  mean, I -- he asked me if I wanted a lawyer, he read

12  me the *Miranda* rights.   But one of the questions was

13  if you need a lawyer -- I didn't know a lawyer.   I

14  didn't know anything, so I said no to just about

15  everything because I was -- I just -- I mean, I'm

16  getting the feeling myself.   I just was petrified.

17  I didn't know what to do.   I didn't know what to ask

18  for, I didn't know anything else.   The only thing I

19  asked for was water.

20  Q      So when Corporal Romanosky was asking you why

21  you were chatting extensively about having sex and

22  beating little children, why didn't you respond to

23  him the way you're responding today?

24  A      I have no idea.   All I can tell you was

25  exactly as I have been telling you.   I can't put

Friedlander - Cross

1      myself in exactly that position.  I'm sorry.

2      Q      Let's talk about what you responded to

3      Corporal Romanosky during your interviewing.

4      A      Certainly, if you'd like.

5      Q      Corporal Romanosky -- you told him you had

6      erectile dysfunction; correct?

7      A      That I do.

8      Q      And, in fact, you told him you had no interest

9      in anything sexual; correct?

10     A      Yes.

11     Q      But that wasn't true; was it?

12     A      No.  The word interest would be wrong.  The

13     word feeling would be correct.

14     Q      Corporal Romanosky asked you during the

15     interview --

16     A      Yes, ma'am.

17     Q      -- and you responded, I have no sexual

18     interest in anything.

19     A      And I equated that to erectile dysfunction,

20     and that is the case, that I have no interest -- I

21     can talk about sex like I guess anybody can, but

22     I -- I had no feeling about it.  I had no -- no -- I

23     don't know how to equate this.

24            When you can't do something even whether you

25     want to, didn't want to, whatever, and you don't

1    have -- you literally don't have any feeling,

2    physical feeling about it, you know what I mean, it

3    isn't that my thoughts couldn't ever be there but

4    they could never be realized.

5    Q    So the fact that you have spent hours and

6    hours chatting and e-mailing various people on the

7    internet about engaging in various sexual practices

8    with them --

9    A    Not always, ma'am.  But I discussed everything

10   from genealogy on up to as you just said, to -- to

11   -- to --

12   Q    To shoe fetishes; correct?

13   A    Yes, that's correct.

14   Q    Right.  To having sex and spanking?

15   A    Yes.  But not -- most of my talks were not

16   that but in doing things with other adults, yes.

17   Q    So -- so you wrote extensively, correct, about

18   I've got a razor strap, I'm into discipline, I'm the

19   strict parent; correct?

20   A    Yes.

21   Q    All right.  So you do have sexual interest?

22   A    Interest verbally, yes.  Interest with a

23   feeling, no.

24   Q    So you just -- you just post as in Guy Spank

25   and Silver Daddies --

1      A      Yeah.

2      Q      -- and all these places, but you have no

3      interest in anything actually physically happening?

4      A      Well, it can't.

5      Q      Okay.  So you have no interest in anything

6      physically happening?

7             MR. SARTES:  Your Honor, asked and answered.

8             THE COURT:  No, sir.  He has not answered.

9      Overruled.

10            THE WITNESS:  Well --

11            THE COURT:  Answer the question, sir.

12            THE WITNESS:  Yes.  I'm trying.  I have no

13     physical feeling.  You can have physical interest

14     but there's no -- you can never practice it.

15     BY MS. KAISER:

16     Q      Well, you have physical interest; correct?

17     A      I guess I would have to say I have physical

18     interest but no way of -- of -- of practicing it.

19     Yes.

20     Q      Well, didn't you practice it at the cabin with

21     that one e-mail that we saw?  Hadn't you practiced

22     sex with that individual at the cabin?

23     A      I had -- I -- yes, except there was nothing

24     that happened.  And I told you I cannot get an

25     erection.  I can't do it.

Friedlander - Cross

1   Q     But you testified that you had oral sex;

2   correct?

3   A     Yes.  But you do not have to have an erection

4   to have oral sex.  No, absolutely not.  You can

5   be -- I mean, I -- I haven't had -- I hate to say

6   this, but I haven't had an erection in so long that

7   it -- you know.

8   Q     What had you discussed having in terms of sex

9   with the 10-year-old and 11-year-old with

10  Detective Romanosky?

11  A     The only thing that we had mentioned -- and

12  this was again in fantasy -- was oral, having oral

13  sex done on me.  That was mentioned in the Captoes.

14  Yes.

15  Q     And during your interview with Corporal

16  Romanosky --

17  A     Yes, ma'am.

18  Q     -- when he asked you, why are you talking

19  about it and are you physically capable of

20  performing oral sex on a child --

21  A     Well, I'd be capable of performing oral

22  section, I guess, on anybody.  That wouldn't -- that

23  doesn't involve an erection.

24  Q     And he asked you if you're physically capable

25  of masturbating a child; correct?

1    A       Same thing.  I'm not -- I'm technically

2    capable, yes.

3    Q       And he asked you if you were physically

4    capable of performing oral sex on a child; correct?

5    A       Yes.  On an -- on an adult or a child.

6    Q       And then you responded to Detective Romanosky,

7    huh, but I thought they were going to do that to me;

8    correct?

9    A       Not exactly.  He said, I believe, would you --

10   what would happen or how would something.  And I

11   said, the only way I would have even thought about

12   that was having oral sex performed on me.  I would

13   be the passive person with whomever it would be.

14   Q       In response to Corporal Romanosky when he said

15   to you, are you physically capable of masturbating a

16   child, you agreed; correct?

17   A       Yes.  As with anybody.

18   Q       And when he asked you if you were physically

19   capable of performing oral sex on a child, your

20   response was --

21   A       I had to -- yes.

22   Q       Please let me finish, sir.

23   A       I'm sorry.

24   Q       Your response was, I thought they we're going

25   to do that to me.  Isn't that -- wasn't that your

Friedlander - Cross

```
 1       response?

 2       A       That was my response.

 3       Q       So you didn't say, heck, it was all a fantasy,

 4       Detective Romanosky, I don't know -- this is all

 5       just a big misunderstanding; your response was, the

 6       children were going to perform oral sex on me?

 7       A       No.  I did not think of saying -- saying to

 8       him anything about the word fantasy or anything

 9       else.  I was just simply answering his exact

10       question to me.

11       Q       So you didn't think to say that it was a

12       fantasy until you came to court today?

13       A       No.  I've known it was fantasy.  I didn't know

14       what I was saying in that interview.  I was just

15       scared to death and answering his questions.

16       Absolutely.

17       Q       So you didn't know that by telling a deputy

18       sheriff from Pinellas County that you were going to

19       have the children perform oral sex on you that that

20       would be an admission against your interest?

21       A       I don't know what admission against my

22       interest is.

23       Q       That would be something that you'd say that's

24       not good for your case.

25       A       I didn't even think about that.  No.
```

Friedlander - Cross

1          THE COURT:  Let's take a comfort break, 15

2     minutes.

3          COURTROOM SECURITY OFFICER:  Rise for the

4     jury, please.

5     (Jury out at 2:40 PM.)

6     (Recess was taken at 2:40 PM until 2:57 PM.)

7     (Back on the record.)

8          COURTROOM SECURITY OFFICER:  All rise.

9          THE COURT:  Bring the jury in, please.

10          COURTROOM SECURITY OFFICER:  Rise for the

11     jury, please.

12     (Jury in at 2:58 PM.)

13          THE COURT:  Thank you and be seated.  You may

14     resume cross-examination.

15          MS. KAISER:  Thank you, Your Honor.

16     BY MS. KAISER:

17     Q     Dr. Friedlander, you have an interest in

18     incest; correct?

19     A     I'm sorry.

20     Q     You have an interest in incest; correct?

21     A     Totally incorrect.

22     Q     Okay.  Well, you admit that you have a number

23     of e-mails that you sign dad.

24     A     Yes, I do.  And some of the people write to

25     me, dear dad.

Friedlander - Cross

1    Q      We've seen this e-mail quite a lot.   This is

2    from Defense Exhibit 29, pages nine and ten; right?

3    This was the individual by the name of Mark that you

4    said you had sex with on the second meeting, is that

5    correct, engaged in sexual activity with?

6    A      Yes, ma'am.

7    Q      Okay.   All right.   And you see how he starts

8    his e-mail to you, hello, dad?

9    A      Yes.   I -- I can --

10   Q      And when he writes, I recall the first time I

11   saw your cock, dad, right?   And realized just how

12   similar it was to mine though larger; correct?

13   A      Yes, ma'am.

14   Q      And then when you respond to him you write,

15   Dear Mark, my love and affection, dad; correct?

16   A      Yes.   You're completely correct.

17   Q      So your -- your -- in these e-mails --

18   A      Yes, ma'am.

19   Q      -- acting as a father figure; correct?

20   A      Yes, ma'am.

21   Q      Okay.   And you had sex with this person?

22   A      I had sexual activity with him, yes.   He

23   performed oral sex on me.   Correct.

24   Q      Well, Dr. Friedlander, doesn't that mean that

25   you have some interest in incest, then?

Friedlander - Cross

1    A       No, ma'am, absolutely not, not semantically or

2    any other way.

3    Q       Okay.  Well, would you agree it's a little

4    strange for someone to say, I recall you sitting on

5    my face, dad?

6    A       No.

7    Q       You don't find that strange?

8    A       I find that he said it strange.  However, I

9    thought you were asking about the word dad.

10   Q       Well, do you think it's normal for someone

11   that you've engaged in sexual activity with to be

12   calling you dad?

13           MR. SARTES:  I object, Your Honor, form of

14   that question.

15           THE COURT:  That is not a legal objection and

16   I will overrule it.

17           THE WITNESS:  No.  When you -- when you reach

18   the ripe old age of 78, anyway, maybe even before, I

19   have people call me grandpa, I have people call me

20   uncle, I would have people call me dad, you know.  I

21   don't even think about it.

22           However, in a number of the cases in -- on the

23   internet and as was pointed out this morning, I want

24   you as my dad or grandfather or I forget what the

25   other words were, they will call you dad.  I don't

Friedlander - Cross

1    ask them to call me dad.

2    BY MS. KAISER:

3    Q     Well, as a licensed mental health counselor,

4    Dr. Friedlander --

5    A     Yes, ma'am.

6    Q     -- why wouldn't you say to them, it's really

7    not appropriate for you to call me dad if we're

8    engaging in sexual activity together?

9    A     I don't think like that.  I think if somebody

10   wants to call me anything they want that's not

11   profanity, it's perfectly fine.  I would not think

12   of the word incest in this way at all.

13   Q     So you don't see anything wrong with having

14   someone you're having sex with or sexual activity

15   with call you dad?

16   A     No.  I see absolutely no problem with that at

17   all, as long as I'm not related.

18   Q     And you call yourself dad quite a bit in your

19   various e-mails; correct?

20   A     For the most part when I'm referred to in

21   their communication to me.  Yes.

22   Q     So it's only when they call you dad first?

23   A     Well, I don't say to them, call me dad.

24   Q     So you're just accommodating them; correct?

25   A     As such, yes.

Friedlander – Cross

1    Q      So essentially you're just being nice to play

2    along; would that be fair to say?

3    A      I guess that would be.  Yes.

4    Q      So instead of saying it's completely sick and

5    twisted to say dad, we just had sexual activity --

6           MR. SARTES:  Objection, Your Honor, ambiguous

7    and argumentative.

8           THE COURT:  Overruled.

9           THE WITNESS:  I see --

10          THE COURT:  Wait a minute.  Just wait for the

11   question, please.

12          THE WITNESS:  I thought you asked me a

13   question.

14   BY MS. KAISER:

15   Q      So instead of -- when they say to you, dad,

16   and they're recounting the sexual activity they had

17   with you, you don see anything that's sick and

18   twisted about that?  You don't tell them, don't call

19   me dad, or that's not appropriate?

20   A      No.  There is no formal relationship at all.

21   Q      So it's okay if they call you dad?

22   A      Yes, ma'am.  They can call me anything they

23   please as long as it isn't profanity.

24   Q      So -- and you'd agree that a father and son

25   having sex would be incest?

Friedlander - Cross

1    A      If are part of the same blood family, I would

2    absolutely concur with you.

3    Q      What if it's an adopted son?

4    A      If it is an adopt -- if it is a legally

5    adopted son, I would concur with you.

6    Q      What if it's a person you have in your home

7    that you call son but the papers haven't been

8    signed?

9    A      I would not -- as long as it is not a

10   formalized situation, it's as if I -- I was living

11   with someone and calling them my wife, for example,

12   in a heterosexual thing, and there -- it was purely

13   that they lived there.

14   Q      So you don't see anything incestuous about

15   having sex with a person that you refer to as your

16   son?

17   A      It's the same thing as calling me dad.  I can

18   call him son and there is no -- I don't -- in answer

19   to your question, no, I don't see anything wrong if

20   there is no blood or formal adoptive situation.

21   Correct.

22   Q      Okay.  You said in the e-mail that you were

23   shown on direct examination where you said yours

24   growing a little is fine.  Now, you don't recall

25   what you were referring to?

1    A      No, I really don't.

2    Q      So you weren't referring to his penis?

3    A      No, ma'am.

4    Q      Okay.  Now, even though in your chats with

5    Detective Romanosky --

6    A      Yes, ma'am.

7    Q      -- if 2005 you said you made your son ask

8    permission to masturbate; isn't that correct?

9    A      If it was in there, I said it.

10   Q      Okay.

11   A      I don't completely remember if -- and I'm

12   being truthful.

13   Q      So you don't remember the 2005 chats that

14   we've looked at?

15   A      I remember them as chats, but I don't remember

16   each thing, no, being honest with you.  But as long

17   as it's there, I will -- yes.

18   Q      Well, you've had -- you've had an interest in

19   beating people and engaging in sexual relations with

20   children since at least 2005; correct?

21   A      I have assumed the fantasy, yes.  Correct.

22   Q      So when did that actually start?  If it didn't

23   start in 2005, when did that start?

24   A      I don't remember.  It may have been 2005.  I

25   don't remember.

Friedlander - Cross

1      Q       When Detective Romanosky asked you in your

2      interview why you were chatting about the sexual

3      abuse and torture of children --

4      A       Yes, ma'am.

5      Q       -- and he asked you, he said, why do you do

6      that, you must have some interest, didn't you tell

7      him, well, I must some interest or I wouldn't do it?

8      A       I don't remember what I said.  If you'd like

9      the -- honestly.  Did you say I did say that?  I

10     don't -- I don't remember.

11     Q       So you don't recall saying that?

12     A       I'm not saying I didn't say it.  I don't

13     recall saying it.

14     Q       So you admit that you have an interest in the

15     sexual abuse and torture of children?

16     A       No, I do not admit that at all.  What -- I

17     believe you're -- no.  I do not.

18     Q       Okay.

19             MS. KAISER:  Your Honor, may we approach.

20             THE COURT:  Yes, ma'am.

21     (At side bar, on the record.)

22             THE COURT:  Yes, ma'am.

23             MS. KAISER:  Your Honor, I'm about to go into

24     a line of questioning, and I just wanted to advise

25     the court before I did.  I believe this defendant

1   has more than opened the door to the information

2   regarding the Port St. Lucie investigation on direct

3   examination by Mr. Sartes.  He has said he has no

4   sexual interest in children whatsoever.  And he has

5   additionally told me right now that he has no

6   interest in sexual activity with children.

7        He has put his character at issue.  He's taken

8   the stand.  We now believe he has opened the door.

9   And I'm about to ask him about the other people that

10  he has discussed having sex with their children.

11       THE COURT:  What -- well, he has

12  unquestionably denied ever having spoken with

13  children.  He's hedged on whether or not he spoke

14  with people about having sex with children.  But

15  what is it you want to ask him?  Do you have

16  extrinsic proof that he has?

17       MS. KAISER:  Yes, I do, Your Honor.

18       THE COURT:  What is the -- proffer to me what

19  it is you want to get into, then, about Port St.

20  Lucie.  Is this the handicapped child?

21       MS. KAISER:  Yes.  She's represented as being

22  slow, mentally slow.  I'm going to ask him --

23  question him about that and we're going to present

24  that in our rebuttal case.  But I'm going to

25  question him about his discussions with Traveling

Friedlander - Cross

1      Dad, which is the profile of the person for

2      Detective Neal Spector.  But when he was on direct

3      exam, he said he had no sexual interest in children

4      whatsoever, so he's clearly put that at issue and

5      the government has --

6              THE COURT:  Mr. Sartes, response.

7              MR. SARTES:  Yes, Your Honor.

8              THE COURT:  She has appropriately approached

9      the bench because that was a subject of a motion in

10     limine.

11             MR. SARTES:  Your Honor, I asked

12     Dr. Friedlander whether he had spoken to other

13     people regarding sex with children.  He admitted to

14     that.  I asked him if he had spoken to other people

15     about sex with children, boys and girls.  He

16     admitted to that.

17             I asked him if he has any sexual interest in

18     children.  He denies that and that is inconsistent

19     with his chats.  His chats -- the issue is his

20     fantasy.  He has spoken about fantasizing about

21     these things.  He admits to having the conversation

22     with -- about other children -- about children with

23     other people, boys and girls, but he hasn't said

24     anything that's inconsistent with what's in the Port

25     St. Lucie chat.

1          THE COURT:  That exchange occurred in what

2     year, Ms. Kaiser?

3          MS. KAISER:  2008, Your Honor, between

4     February of this year and June of this year.

5          THE COURT:  When a defendant takes the stand

6     and essentially denies conduct which is not only

7     documented but fairly strong, he subjects himself,

8     in this instance, to thorough cross-examination and

9     impeachment.

10         He has denied having an interest in sexual

11    contact with children; yet I'm aware, based on the

12    hearing we had back on the 17th of November, as I

13    recall, that he had similar e-mail exchanges with an

14    undercover law enforcement officer in Port St.

15    Lucie.

16         I was concerned about the relevance of that as

17    well as the reference to the mental aspects of the

18    supposed child.  I guess it's an alleged child.  It

19    seems to me that this defendant has indeed opened

20    the door to thorough cross-examination.

21         But I caution you, Ms. Kaiser, do not dwell on

22    the mental aspects of this alleged child.  That

23    is -- is highly inflammatory.  The subject here is

24    sex with children, not whether they are mentally

25    stable or slow, as you put it.  Okay?

Friedlander - Cross

1        MS. KAISER:  Yes, Your Honor.

2        MR. SARTES:  Your Honor, if I may just clarify

3    so I understand.  She is allowed to ask him if he's

4    ever chatted with someone else?

5        THE COURT:  I'm not going to tell her what she

6    can and can't ask.  This is the subject matter of

7    cross-examination and it involves conduct which I

8    initially prohibited.

9        MR. TRAGOS:  For record purposes, Your

10   Honor --

11       THE COURT:  Well, for record purposes, if you

12   interrupt me again, Mr. Tragos, you are going to go

13   sit down.  I was in the middle of trying to explain

14   to Mr. Sartes my ruling.  But since that's not

15   important to you, I will not do so any further.

16       Ms. Kaiser, you may examine the witness.

17       MS. KAISER:  Thank you, Your Honor.

18   (End of side bar discussion.)

19       THE COURT:  You may proceed.

20       MS. KAISER:  Thank you, Your Honor.

21   BY MS. KAISER:

22   Q    On direct examination you testified that the

23   person that you described as Randy was just some

24   person who watched your house; is that correct?

25   A    Yes, ma'am.

Friedlander - Cross

1    Q     Okay.  But Dr. Friedlander, during your

2    interview with Corporal Romanosky you referred to

3    him as your son.

4    A     I think I said -- yes, correct.

5    Q     Okay.  So when you're interviewed by law

6    enforcement he was your son, and today he's just

7    somebody that watched your house; correct?

8    A     He's always been someone who watched my house.

9    Why I said he was my son is probably the same reason

10   I said I was bisexual.  Neither are valid.

11   Q     Okay.  Well, Corporal Romanosky wasn't the

12   only person that you referred to Randy as your son,

13   though; correct?

14   A     I really don't remember.

15   Q     Well, you've told a number of other people

16   that you -- that Randy was your son.

17   A     Whom have I told that to, may I ask?

18   Q     Do you agree, sir, that you've referred to

19   other people that Randy was your son?

20   A     I definitely did on the -- on the Captoes

21   thing, yes.

22   Q     We've admitted records from your urologist;

23   correct?

24   A     Yes.

25   Q     Dr. Steven Harrison?

1    A      Yes, you're correct.

2    Q      Correct?

3    A      Yes.  Um-hum.

4    Q      And you've told Dr. Harrison that Randy was

5    your son?

6    A      I told Dr. Harrison that?  I don't believe so.

7    Q      All right.  So your testimony is you've never

8    told Dr. Harrison or referred to Dr. Harrison that

9    Randy was your son, you never told Dr. Harrison

10   Randy was your son?

11   A      I wouldn't imagine that I had, no.  I don't

12   think I've ever talked to Dr. Harrison about

13   anything about me.

14   Q      And you've never led him to believe you had a

15   son named Randy?

16   A      No.  He knows I've never been married.

17   Q      You mentioned on direct examination that you

18   had learned about Randy's demise when you were met

19   by neighbors at the airport; correct?

20   A      No.  I learned of Randy's demise when I called

21   the police because I could not get hold of him on

22   the telephone I believe it was for two days, maybe

23   three.  I was unsure.

24   Q      So it wasn't when you got off the plane and

25   were met with neighbors that you first learned that;

Friedlander - Cross

1      correct?

2      A      Let me get it straight in my mind a minute.  I

3      called and I never knew that he was not alive until

4      I arrived at the airport.  That is -- is correct.  I

5      was concerned there was something wrong when I

6      couldn't get hold of him and he was not at the

7      airport.

8      Q      Well, Dr. Friedlander, didn't you -- hadn't

9      you already called the police and hadn't they

10     already checked on him and called you?

11     A      No.  No, ma'am.

12     Q      What -- what is your understanding of the

13     term, significant other?

14     A      Significant other?

15            MR. SARTES:  Your Honor, could we object for a

16     moment.

17            THE COURT:  Overruled.

18            THE WITNESS:  Significant other can be all

19     sorts of terms.  I've heard it for the most part

20     where either two men live in the same house, two

21     women live in the same house or a man and a woman

22     live in the same house and they use that term.

23            I don't know whether it -- it's assumed a

24     thousand different meanings, but I was aware that

25     either I or someone else, and I don't know, had used

Friedlander - Cross

1    that term.  Yes.  Yes, ma'am.  Yes.

2    BY MS. KAISER:

3    Q     So I'm just unclear.  What is your

4    understanding of the term significant other?

5    A     Significant other can mean, as I said, someone

6    living in the house with you, somebody who -- a man

7    and a woman who live in the same house for X, Y or Z

8    reason, two men who live in the same house, two

9    women who in live in the same house.  In other

10   words, it's more a cohabitational thing, yes.

11   Q     Were you and Randy engaged in a sexual

12   relationship?

13   A     No.

14   Q     Isn't it the case that the police listed you

15   as the significant other on the death investigation

16   report?

17   A     Yes.  That's when I first saw that, just when

18   I saw -- yes, you're correct.

19   Q     On direct examination you testified about who

20   Seerax was.  Who is Seerax?

21   A     Seerax is a gentleman, a triple stroke patient

22   who -- to whom I rent my basement apartment.

23   Q     And his name is Mr. Suggs?

24   A     Eric Suggs.

25   Q     Okay.  I believe on direct examination you

1    testified that he used your computers; correct?

2    A      Until he bought his own, yes.

3    Q      Okay.  But do you mean to say that he used

4    your AOL account?

5    A      He did use my AOL account, correct, because he

6    didn't have one.

7    Q      Okay.  So he lives up north; correct?

8    A      Yes, ma'am.

9    Q      So he doesn't live with you and he didn't use

10   these computers; correct?

11   A      He certainly didn't use this one.  This one I

12   transport back and forth.  I don't believe he used

13   this.  On the other hand, the material -- there

14   could be some material from here.  He's on my -- he

15   was on my AOL account.  Yes.

16   Q      And he has his own computer up north?

17   A      Yes, he does.

18   Q      Okay.  Dr. Friedlander --

19   A      Yes, ma'am.

20   Q      -- why did you post an advertisement on Guy

21   Spank?

22   A      I was given that by somebody whom I met in the

23   chat room or on some -- on the computer, we'll put

24   it that way, who suggested that I do that.

25   Q      So you're interested in whipping people;

Friedlander _ Cross

1        correct?

2        A       I'm interested in discipline, not necessarily

3        whipping people.

4        Q       Okay.  But you solicit other people that you

5        can beat on the internet; would that be fair to say?

6        A       I didn't understand you.

7        Q       You solicit other people that you can beat on

8        the internet?

9        A       Well, I just -- maybe you consider I solicit

10       other people, not for specific things.  Guy Spank is

11       a website.  You never know what you're going to find

12       there.

13       Q       So all of the various e-mails that we have

14       that you wrote to various people --

15       A       Yes, ma'am.

16       Q       -- telling them that you had a razor strop --

17       A       Yes.

18       Q       -- George Wilhorn glasses, when I spank -- I

19       spank you that it will hurt and you may cry, all

20       this talk about smacking and spanking --

21       A       Yes.

22       Q       -- you discuss why?

23       A       I'm sorry.

24       Q       Why do you discuss that?  Why do you keep

25       telling people that you have razor strops?

Friedlander – Cross

1    A      Usually that has been brought up in the

2    conversation way before that and you never know from

3    where.

4    Q      So the reason you talk repeatedly about razor

5    straps and implements of torture is because it was

6    brought up someplace else?

7    A      It's usually brought up in a conversation.

8    Q      Well, let's just look at one.

9    A      Okay.  Fine.

10   Q      Government's Exhibit 95-3 from Captoes to CP

11   Needed.  What is -- do you know what CP stands for?

12   A      Corporal punishment.

13   Q      Okay.  And you write, I am an SWFL, right,

14   southwest Florida, and am a disciplinarian who uses

15   a razor strop; correct?

16   A      I'm sure that's true, yes.

17   Q      Well --

18   A      I mean -- okay.  It got taken away.  I

19   couldn't read it very well on the thing but --

20   Q      Let's look at again, Dr. Friedlander.

21   A      Yeah.

22   Q      I want to make sure you can see it.

23   A      Yes.

24   Q      Okay.  So you're mentioning your razor strop?

25   A      I presume that was from something that -- that

Friedlander - Cross

1    there was something before, do you know what I mean?

2    Q      So you think there was a previous question, do

3    you have any implements, and you respond, I have a

4    razor strop?

5    A      No.  There must have been conversation with

6    that person before.  I don't believe I would have

7    mentioned that at the beginning.

8    Q      Well, let's look at this one with -- with --

9    Government's Exhibit 95-4.  Am a divorced older man

10   who raised my son alone, used Garrison belt and

11   razor strop extensively.

12   A      I -- I would imagine that there was a --

13   something that precipitated this.  I wouldn't have

14   just said it, somebody that had never --

15   Q      So Dr. Friedlander, is it your testimony that

16   Matt A45NY --

17   A      I don't know --

18   Q      -- had written to you previously and said,

19   what implements of torture do you have?

20   A      No, ma'am.  I -- that isn't what I would

21   have -- would imagine he would say.  I don't know

22   what he said before.  He may have said, dear Captoes

23   or what have you, I am into discipline.  What do you

24   use.  Yes.  That -- that could well have been said.

25   Q      So you agree then, sir, that you're interested

Friedlander – Cross

1      in beating other people; correct?

2      A      No.  I think -- no.  I mean, I think we're

3      arriving at something in the -- in an inappropriate

4      way, from my point of view.  I think if you want me

5      to say I'm interested, to a point, of course, in

6      discipline, you would be correct.

7      Q      Well, sir, we're not talking about children

8      being disciplined, we're talking about --

9      A      Adults.

10     Q      Adults, correct?

11     A      Yes, ma'am.

12     Q      And so when you say you're into discipline,

13     you're into beating them; correct?

14     A      Not necessarily beating them.  I mean, you can

15     be interested in discipline without doing a thing.

16     Q      Well, Government's Exhibit 95-5, you say my

17     main implement is usually leather.  What did you

18     mean by that?

19     A      This particular man, DW Portland, was brought

20     up in the direct examination of me this morning.  He

21     went into every kind of question that you can

22     imagine on a long e-mail, and then with a picture.

23     So I presume that I was asking him -- I was

24     answering him in something that was in that long

25     e-mail.  Yes.

Friedlander _ Cross

1    Q      Dr. Friedlander, my question to you was why

2    did you write, my main implement is usually leather?

3    A      Because he may have said I -- what do you use

4    or what do you believe in or what does something --

5    for disciplining.  I use -- or something is used on

6    me, a paddle.  I would have said to him, no, I would

7    use leather.

8    Q      Okay.  So you think that before this e-mail --

9    A      There was --

10   Q      -- he must have asked you whether or not you

11   used a paddle versus a belt?

12   A      He asked me something concerning this in this

13   long e-mail, or he told me what he wanted.  I don't

14   remember which.  But DW Portland, we went over this

15   morning with this long e-mail.  I only remember it

16   to be long.  I don't remember what was in it.

17   Q      95-9.  Do you see where it says, this dad uses

18   raise strops and straps only as did some in

19   Victorian times dad.  You wrote that; correct?

20   A      Yes, I did.

21   Q      So why were you referencing razor strops and

22   straps again to PJ?

23   A      I don't -- because PJ probably -- it's the

24   same idea with DJ Portland, or whatever his name

25   was.  I don't know this man at all.  He must have

Friedlander - Cross

1     written me something to do with this and I answered.

2     Q      Well, Dr. Friedlander, let me ask you this.

3     How many people write to you and ask you how many

4     implements of abuse you have?

5     A      They don't ask me something like that.

6     Q      How many write to you and ask you how many

7     different pieces of equipment do you have to spank

8     or discipline people?

9     A      Nobody.

10    Q      Well, I'm confused.  I'm confused because --

11    A      Okay.  Let me try and enlighten you on this.

12    Q      Please.

13    A      When you get an e-mail or -- in this case an

14    e-mail, there's usually a large preliminary bit, for

15    example, that they ask you questions, and these

16    questions need an answer.  I answer -- they don't

17    quite ask them like this, they don't ask specific

18    things.

19          They may say, you know, what do you use or do

20    you use or why do you -- well, why, no, but what you

21    use, etcetera, etcetera.  It's much more an answer

22    to a question.

23    Q      Dr. Friedlander, you're interested in sadistic

24    sex; correct?

25    A      No.  And I'd like to know where you are -- no.

Friedlander - Cross

1    Absolutely not.

2    Q      Well --

3    A      No.  I am not interested in sadistic sex.  I

4    don't even know actually what sadistic sex is.

5    Q      Well.  That would involve beating another

6    person for sexual enjoyment.

7    A      No.  I mean --

8    Q      You understand what I mean; correct?

9    A      Ma'am?

10   Q      You understand what I mean; correct?

11   A      I understand.  My answer is no.

12   Q      Well, let's look at Government's Exhibit

13   95-12.  Okay.  You say, I do want to start training

14   you for me and also how much love we will have as

15   well as heavy discipline.  It will be very deep,

16   intense and often.  My boy needs a very structured,

17   heavily disciplined existence.  The razor strop will

18   be part of our way of life?

19   A      Yes.

20   Q      Keep on enjoying yourself, with lots of love

21   and licks, Charles.

22   A      Yes.  This is from the gentleman that we spoke

23   about this morning who is the Anglican priest or --

24   yes.  I corresponded with him in great detail about

25   stuff that he was asking me or telling me about.

1    Yes.  And there were lengthy things because as well

2    we're also interested in opera, theater, and a

3    number of other things.

4    Q      And you write, and also I want to start

5    training you for me and also how much love we will

6    have as well as heavy discipline.  So in your mind,

7    sir, isn't it true that discipline and love and sex

8    go hand in hand?

9    A      No.

10   Q      So you're not interested in beating people?

11   A      The way you have put it, no, you're correct.

12   Q      Well, you have an advertisement on Guy Spank.

13   A      So -- yes.

14   Q      Okay.  And that advertisement is for people to

15   spank; correct?

16   A      Can be, yes, not always.

17   Q      Well, yours was, wasn't it?  Your

18   advertisement was.

19   A      I don't know what it said, if you want the

20   honest thing.  I completely forget since it was so

21   long ago and I don't believe the site exists

22   anymore.

23   Q      So could that be why so many people -- that

24   you're writing to so many people telling them about

25   all the implements that you have?

Friedlander - Cross

1    A       The implements in -- my reason for stating the

2    implements I have, again, are when I am asked

3    specific things.  I don't just go and say things

4    like this, no.

5    Q       You went to -- excuse me -- chat room Fathers

6    Chatting; correct?

7    A       You are correct.

8    Q       You went to Strict Parents?

9    A       You are correct.

10   Q       Open Parents or Open-Minded Parents?

11   A       You are correct.

12   Q       Why -- you go to these websites to talk about

13   children; correct?

14   A       No.

15   Q       So the fact that you went to those websites

16   and talked about sexually abusing and physically

17   abusing children is just a coincidence?

18   A       I did not in -- in open-minded parents discuss

19   that.  I didn't -- I'm trying to think of the other

20   ones that you said.  Open-Minded Parents I remember.

21   Q       Strict Parents?

22   A       And there was another one.

23   Q       Fathers Chatting?

24   A       Fathers Chatting.  Fathers Chatting, you don't

25   discuss that at all, at least I never have with

Friedlander _ Cross

1    anything -- anybody on Fathers Chatting.  No.

2    Q    So which of the chat rooms did you go into to

3    talk about sexually abusing children?

4         MR. SARTES:  Objection, Your Honor.

5         THE COURT:  Legal grounds?

6         MR. SARTES:  It's argumentative.

7         THE COURT:  Overruled.

8         THE WITNESS:  Could you repeat your question.

9    BY MS. KAISER:

10   Q    Which of the chat rooms did you go into to

11   talk about sexually abusing children?

12   A    None.

13   Q    So you've never done that?

14   A    I have never gone into a chat room to discuss

15   that specifically, no.

16   Q    But once you were there, it just came up?

17   A    Well, it didn't come up that much, no.  I

18   mean, if you're using StricDad as a strict -- as a

19   specific example, that's what evolved.  But it

20   wasn't for -- it wasn't for torturing or

21   disciplining children inappropriately or what have

22   you except in the fantasies that the detective and I

23   discussed this.  I have no idea whether he has

24   children or not.

25   Q    So when you would go into Fathers Chatting and

Friedlander - Cross

```
1      Strict Parents and Open-Minded Parents, you went

2      into those chat rooms to talk about children;

3      correct?

4      A      No, I did not.  Fathers Chatting, no.

5      Open-Minded --

6      Q      So it was just coincidental, then, that you

7      ended up talking about sexually abusing children?

8      A      Yeah, because Fathers Chatting is not

9      necessarily to do with -- with abusing children, no.

10     Q      So it's just a coincidence?

11     A      Yes.  It could be a coincidence in anyplace.

12     You're perfectly correct.

13     Q      So it's just a coincidence, though, that you

14     ended up talking about sexually abusing children?

15     A      I did not do that in Fathers Chatting.

16     Q      Did you do it in Strict Parents?

17     A      No, I did not do it there.  I had developed

18     this fantasy before, as -- as -- as you had pointed

19     out to me, in 2005.  You said maybe you did it

20     before, and I said I don't know.  But I did not go

21     into these chat rooms as a -- as a -- as a means of

22     doing that, no.

23     Q      Why did you lie to Detective Romanosky about

24     your age?

25     A      About my age?
```

Friedlander - Cross

```
 1    Q       Yes.

 2    A       What did I say to Roman -- what did I told --

 3    you mean when, in the interview?

 4    Q       When you were online and chatting with

 5    Detective Romanosky, you said you were --

 6    A       That I -- I --

 7    Q       -- 70 years old; correct?

 8    A       I said I was 69 or 70, I forget which it

 9    really was.  I said that all the way through for

10    Captoes.

11    Q       And that's because you were afraid he wouldn't

12    talk to you if he knew your real age; correct?

13    A       That was part of it, yes.

14    Q       On direct examination you said that you had

15    problems with self esteem and that's why you got

16    into this type of behavior; correct?

17    A       No, I did not say that.  I did not say that

18    that was why I got into this type of behavior.  I

19    said I was lonely, my self esteem was low and I was

20    using the internet as a -- a vehicle for finding

21    people.  Yes, that's correct.  That would be

22    correct.

23    Q       When the interview first started --

24    A       Yes.

25    Q       -- you're sitting by yourself; correct?
```

1    A      Absolutely.  Tapping my fingers.

2    Q      Correct.

3    A      Yes.

4    Q      And you say, no, no, I shouldn't have done it,

5    I shouldn't have done it, it was stupid, I shouldn't

6    have done it.

7    A      Yes.

8    Q      Isn't that correct?

9    A      You're, completely correct.

10   Q      All right.  And that's when you thought no one

11   was watching; correct?

12   A      I didn't know whether anyone was watching or

13   not.  It didn't make any difference to me.  I was

14   all alone in a room and I was thinking to myself and

15   I do talk out loud to myself, which may or not be

16   inappropriate, that -- I was just saying, what --

17   you know, I had just been arrested.  I had handcuffs

18   put on me the first time in my life, this, that and

19   the next thing.  I -- I -- you know, I -- that's all

20   I could think of.

21   Q      And the reason you didn't say it was a fantasy

22   to Detective Romanosky is because you were nervous?

23   A      I was nervous.  I was upset.  I never

24   thought -- I strictly answered his questions.  That

25   was about it.

Friedlander - Cross

1    Q      So when you were talking to him before you met

2    him --

3    A      Yes.

4    Q      -- and you said -- he asked you what you

5    wanted to do with the children and you said, well, I

6    presume oral, to what were you referring?

7    A      Well, as Captoes I was referring probably

8    to -- I think he had a prelude to this.  And he

9    said, now, what would you do -- there were a whole

10   lot of different things.  He wanted some sort of an

11   answer.  That was definite.  So I gave him an

12   answer.  I did not segue into that particular

13   element of -- element.  There was a segue into the

14   thing.  He asked me a question, I believe.

15   Q      Dr. Friedlander, when he asked you what you

16   wanted to do at the meeting, and you say, I presume

17   oral, that was just a segue?

18   A      There were -- there were a series of sentences

19   or -- I don't know what to call it, yes, sentences,

20   where I was asked specifically to give some answer.

21   I was asked by him.  I didn't just sort of go into

22   it.

23   Q      So what did you mean when you said, I presume

24   oral?

25   A      I don't know what the previous things were

1       that -- that we had talked about.

2       Q       So you don't -- you can't tell me what you

3       meant by, I presume oral?

4       A       Not unless I have some sort of something to go

5       by, no.

6       Q       So you weren't referring to oral sex?

7       A       I don't know what I was referring to because I

8       don't know what facet of this thing we were in.

9       Q       Well, he asked you what you wanted to do at

10      the meeting with the children, aside from

11      discipline, what else you had in mind.

12      A       There were a whole --

13      Q       And you said, I presume oral.

14      A       No.  There were -- I beg your pardon.  There

15      were a whole lot of -- of discourses before to --

16      for me to give any sort of answer, so I don't know

17      because it would be out of context to say something

18      like that.

19      Q       So you have no idea sitting here today when

20      you said --

21              THE COURT:  Ms. Kaiser.

22              MS. KAISER:  Yes, sir.

23              THE COURT:  We've gone through this three or

24      four times.  Pull out the transcript of the e-mails.

25      Let's get to the bottom of it.

Friedlander - Cross
201

1          MS. KAISER:  It was on a phone call, Your

2    Honor.

3          THE COURT:  I'm sorry?

4          MS. KAISER:  That was a phone call, Your

5    Honor.

6          THE COURT:  Then play it.

7          MS. KAISER:  Okay.  I'll move on.

8    BY MS. KAISER:

9    Q     You mentioned on direct examination that that

10   suitcase and its context belonged to Randy; correct?

11   A     Yes, ma'am.

12   Q     And you said that you hadn't gotten rid of it

13   just as you hadn't gotten rid of numerous other

14   things?

15   A     You're correct.

16   Q     Could you have put that in the dumpster?

17   A     Don't have one.

18   Q     Could you have put it out by the street and

19   had the trash men come and take it?

20   A     Well, I'm sure I could have, yes.

21   Q     This isn't the first time you discussed

22   wanting to have sex with somebody's children;

23   correct?

24   A     No, that's not correct.  I mean, I have not

25   discussed having sex with children with anyone else.

Friedlander - Cross

1    Q      You --

2    A      No, I'm not telling you the truth.   Excuse me.

3    Yes, I have.

4    Q      Well, starting back in February of this year,

5    you had lengthy chats with another detective about

6    having sex with his child; correct?

7    A      Yes.   He brought that up completely.   I did

8    not do it.

9    Q      So there's another separate detective out

10   there aside from Corporal Romanosky that you are

11   corresponding with about trying to have sex with his

12   daughter; correct?

13   A      Having sex?   No.   That was not discussed till

14   way along in the conversation.

15   Q      You discussed having sex with his daughter;

16   correct?

17   A      I don't believe the word that I was going to

18   have sex with her.   He gave me all sorts of things

19   that he wanted me to do and, of course, that was

20   total and absolute fantasy because I have nothing

21   ever, ever, ever to do with sex with females.

22   Q      How old did you believe that child was,

23   Dr. Friedlander?

24   A      He told me.

25   Q      Did he tell you he had an 11-year-old little

Friedlander - Cross

1    girl?

2    A       I was going to say 12, but yes.

3    Q       So 11 years old?

4    A       Yes, whatever that was.  I don't actually

5    remember her age.

6    Q       And you told him that you wanted to engage in

7    sexual activity with her, as well; correct?

8    A       No, I did not say it that way at all.  He led

9    me along.

10   Q       Like Corporal Romanosky did?

11   A       A little bit differently.

12   Q       Okay.  But you agreed that you wanted to have

13   sex with his 11-year-old daughter; correct?

14   A       No.  I never agreed that I wanted to have sex

15   with her.  Again, we're in the fantasy of Captoes,

16   but -- not even as me personally.  It was very

17   evident.  His -- his -- his words to me, Ms. Kaiser,

18   were, now, look, I don't want anybody gay.  Remember

19   that?  I don't want anybody -- I forget the other

20   word.  There were two or three definites that he

21   made very clear about.

22           I would not have fallen in in reality to -- to

23   either of those categories for which he was

24   ostensibly searching.  That I also knew was complete

25   fantasy on his part, as well, or I felt.  I can't

Friedlander - Cross

1      say I know because I --

2      Q      Well, what was the screen name of the person

3      that you were talking about having sex with his

4      11-year-old daughter?

5      A      Hum, if you told me I'd say yes or no, but I

6      can't remember it right off the top of my head.

7      Q      Does Travelling Dad sound familiar?

8      A      If you have it, yes, that's it.

9      Q      In fact, he sent you a picture of an

10     11-year-old little girl; correct?

11     A      Yes, he did.

12     Q      And it was clear she was 11 years old?

13     A      I didn't think she was even -- you couldn't

14     tell.  She was a little girl sitting with a teddy

15     bear or something.  I don't know what age I would

16     have known.  I don't happen to know really, except

17     for my grandniece, any little girls.

18     Q      And you told Travelling Dad that she was very

19     cute and petite; correct?

20     A      I probably did, yes.

21     Q      And you indicated that you wanted to engage in

22     sexual activity with her; correct?

23     A      No.  He was pushing this greatly.

24     Q      You told Travelling Dad that you had sex with

25     a 10-year-old; correct?

1    A     I don't know what I had told him.  I

2    absolutely do not remember.

3    Q     Well, you bragged on the phone to him that you

4    had had sex with a 10-year-old; correct?

5    A     I do not know.

6    Q     You told Travelling Dad on the phone that you

7    were experienced with both boys and girls; correct?

8    A     I do not know.

9    Q     You asked him if he shared her often; didn't

10   you?

11   A     I may have.  I do not remember everything

12   about this.  I can't tell you.  Hum-um.

13   Q     You actually sent a picture of yourself to

14   Travelling Dad; didn't you?

15   A     Yes, I did, one that was about 12 years old.

16   Q     And you asked him to show it to his

17   11-year-old daughter; correct?

18   A     No.  He said he wanted to show it to her

19   because she would want to see it.

20   Q     You told Travelling Dad that you'd have to be

21   careful because of your size and her size, correct,

22   and that you had a big penis and it might hurt the

23   child when you entered her; correct?

24   A     I can't tell you I remember telling him these

25   things, but it would not be -- I might not be

Friedlander - Cross

1    telling the truth, so I'm not going to say I

2    remember everything.  No.

3    Q     You asked if you could kiss her; correct?

4    A     I may have.  I may not have.  I don't honestly

5    remember.

6    Q     You asked if you could lick her; correct?

7    A     Ms. Kaiser, I don't remember.  I can't tell

8    you.

9    Q     Do you remember telling Travelling Dad that

10   you loved licking?

11   A     I can't remember.  I honestly can't.

12   Q     Would it refresh your recollection to see your

13   chats?

14   A     Well, if I said it and it was in there, I

15   would just simply say, yes, I said it.

16   Q     Did you tell Wayne who was Travelling Dad that

17   you get hard very easily?

18   A     It's the same -- it's the same thing.  And we

19   all know sitting in this room that I -- that I

20   can't.  So I -- what -- anything that I said to him

21   was -- was something that I -- first of all, I would

22   have no interest in children at all.  But doubly,

23   triply, and especially not even adults, with a

24   female.

25         So whatever I might say -- and he wanted

Friedlander - Cross

1    somebody who was absolutely straight.  And as I say,

2    there were two or three things that he demanded

3    or -- and he even asked me, I believe, I'm not sure,

4    whether I were any of these things.

5    Q    Did you ask if she would enjoy sitting on your

6    lap?

7    A    As I say, I can't remember it but I might have

8    asked him that, because my little grandniece, I

9    forget how old, nine, I think she is, has sat on my

10   lap and I've read to her.

11   Q    Did you say that you wanted to go down to her

12   little pussy?

13   A    I don't know.  I don't usually use those

14   terms.

15   Q    Did you ask him, will she mind a hard cock?

16   A    I don't know.  I have no idea.

17   Q    In your correspondence with Travelling Dad --

18   A    Yes, ma'am.

19   Q    -- did you understand that he was engaging in

20   incest with his daughter?

21   A    I had no idea whether he -- he sent me this

22   picture.  Who she was, I don't know.  I -- I thought

23   that was -- the whole thing was a complete and

24   absolute fantasy, from my point of view, and I

25   didn't know who the man was.  I don't know.

Friedlander - Cross

1   Q      So you saw a picture of a child and you sent

2   the child a picture of you; correct?

3   A      No.  I sent specifically the father who must

4   have asked me a number of times, I believe, why

5   don't you have a picture of yourself or something

6   like that.  So I sent one that was either 10 or 12

7   years old, which was a true one of me at 10 or 12

8   years before.  Yes.

9   Q      Did you talk about wanting to have multiple

10  meetings with Travelling Dad and his 11-year-old

11  daughter for sex?

12  A      No.  I -- I don't remember saying that I was

13  going to have meetings with him to -- to have sex

14  with his daughter.  No.  I'm sure I didn't do that,

15  or I don't believe I did, I should say.

16  Q      Did you say, I want her to feel comfortable

17  with my cock?

18  A      I have no recollection of things like this.  I

19  don't say I did say or I didn't say, but I do

20  remember that I did not fill his bill at all.

21  Q      Did you discuss with Travelling Dad how large

22  your penis was when erect?

23  A      I have no idea.

24         MR. SARTES:  Your Honor, I object.

25         THE COURT:  Legal grounds, please.

1        MR. SARTES:  Improper impeachment.

2        THE COURT:  Improper what?  I'm sorry.

3        MR. SARTES:  Improper impeachment.

4        THE COURT:  Overruled.  But, Ms. Kaiser, it's

5   getting a bit repetitious.  We need to move on,

6   please.

7        MS. KAISER:  Yes, Your Honor.

8   BY MS. KAISER:

9   Q        So Dr. Friedlander --

10  A        Yes, ma'am.

11  Q        -- you have some interest in sexually abusing

12  children; correct?

13  A        No, I do not.

14  Q        You had lengthy phone calls with Travelling

15  Dad, Detective Spector, about sexually abusing his

16  11-year-old daughter; correct?

17  A        Incorrect.

18       MS. KAISER:  Your Honor, may I have a moment?

19       THE COURT:  Yes, ma'am.

20  (Brief pause.)

21       MS. KAISER:  I have no further questions.

22       THE COURT:  Redirect?

23       MR. SARTES:  Yes, Your Honor.

24

25

1                        REDIRECT EXAMINATION

2       BY MR. SARTES:

3       Q       Dr. Friedlander --

4       A       Yes, sir.

5       Q       -- how long have you had diabetes?

6       A       Since I was 50, 28 years.

7               MR. SARTES:  If I may approach the evidence,

8       Your Honor?

9               THE COURT:  Yes, sir.

10      BY MR. SARTES:

11      Q       The exhibits that have been marked

12      Government's Exhibits 35A, B and C, what are these?

13      A       These are razor strops.

14              THE COURT:  You need to use the mic, sir.

15      You're getting a little -- it bends.

16              THE WITNESS:  I'm sorry.  Razor strops.

17              THE COURT:  Well, that's more than you need.

18              THE WITNESS:  Okay.  Sorry.

19              THE COURT:  Just bend it toward the evidence

20      table.

21              THE WITNESS:  Oh, okay.

22              THE COURT:  And you can be comfortable in your

23      chair.

24              THE WITNESS:  Okay.  Thank you.

25      BY MR. SARTES:

Friedlander - Redirect

1    Q      Where did you get those razor strops, sir?

2    A      The -- some have been in the family because

3    different members of the family have used razors for

4    shaving, you know.  One I believe I got I believe

5    off the internet, you know, like I Ebay or something

6    like that.

7    Q      Have you ever used these razor strops for the

8    purpose of shaving?

9    A      Oh, yes.

10   Q      Have you ever used these razor strops to

11   actually physically beat someone?

12   A      No, sir.

13   Q      Ms. Kaiser asked you if you had ever driven

14   more than an hour and a half to meet people that

15   you've chatted with on the internet.

16   A      That's correct.

17   Q      Let me ask you a different question.  Have you

18   traveled to meet people that you met on the

19   internet?

20   A      Yes.

21   Q      More than an hour?

22   A      Not by car, no.

23   Q      How about by plane or by train?

24   A      By train -- I don't fly so by train, yes.

25   Q      Dr. Friedlander --

Friedlander - Redirect

```
1    A       Yes, sir.

2    Q       -- let me show you what's been marked as

3    Defendant's Exhibit 29.

4    A       Yes, sir.

5    Q       Specifically the page, message 0604.  Do you

6    see that, sir?

7    A       Yes.  Yes.

8    Q       Do you see it?

9    A       Yes.  I'm looking right here.

10   Q       Okay.  I'll direct your attention down to the

11   third paragraph from the bottom.  I recall us lying

12   together in bed and you telling me how a friend of

13   yours regularly uses a bullwhip on his boy.  Was

14   that you speaking, sir?

15   A       I don't quite know what you mean.

16   Q       This statement that's been made here.

17   A       Yes, sir.

18   Q       Are you making that statement or is someone

19   else making that statement?

20   A       Could I see it again?  I just --

21   Q       Yes.  This is -- third from the bottom is what

22   I'm reading right here.

23   A       No, I didn't say that.

24   Q       Okay.  Do you recall this -- and, again, as

25   Exhibit 29, being part of a chat between you and
```

Friedlander - Redirect

1    Mark?

2    A      I guess so because I was -- I mean, it must

3    have been.  I'm trying to see if I said something

4    here.  I don't see that I said it.  I -- so a chat,

5    maybe, one way.

6    Q      Okay.  Well, I guess at the top of the page it

7    says from Mark of M at Direcway.com.

8    A      Yes.

9    Q      That's not you?

10   A      Oh, no.

11   Q      But it's to Captoes.  Do you see that?

12   A      Yes.

13   Q      So you did receive this e-mail?

14   A      Oh, I definitely received it.  Oh, yes.

15   Q      Sir, let me show you what's previously been

16   marked Government's Exhibit Number 15.  Do you see

17   that?

18   A      Yes.

19          MR. SARTES:  May I have a moment?

20          THE COURT:  Yes, sir.

21   (Brief pause.)

22   BY MR. SARTES:

23   Q      Okay.  Sir, let me take you down to here, two

24   and 37.

25   A      Yes.

Friedlander - Redirect

214

1    Q      StricDad7, do you see where I am?

2    A      Yes, sir.

3    Q      Okay.  So how and when do you release the

4    enjoyment of giving the beating?  Captoes:  Shortly

5    afterwards.

6           What did you understand, releasing the

7    enjoyment of giving the beating to mean?

8    A      I probably had no idea what that meant, and I

9    still don't.

10   Q      Did you equate that to ejaculation?

11   A      No.

12   Q      Let me take you down to -- again, same

13   document, Exhibit 15.

14   A      Yes.

15   Q      StricDad7 at 2:43.

16   A      Okay.  Yes.

17   Q      More than likely, StricDad7 again, do you have

18   your pupil help you out in that department?

19   StricDad7:  Or did you take matters into your own

20   hands.

21          What does he mean by that?

22   A      I have no idea.  What matters am I taking into

23   my own hands?  I don't know.

24   Q      Did you take that to mean masturbation?

25   A      No.

Friedlander - Redirect

1    Q    Ms. Kaiser asked a number of questions

2    regarding incest.  Let me just ask you the direct

3    question, sir.

4    A    Yes.

5    Q    Have you ever been involved in an incestuous

6    relationship?

7    A    Never.

8    Q    Have you had sex with any of your family

9    members?

10   A    No, I have not.

11   Q    Have you had sex with anyone to whom you are

12   the actual blood relative to?

13   A    No, sir.

14   Q    Have you had sex with anybody that is related

15   to you by either consanguinity or affinity?

16   A    I'm afraid I don't know what you mean.  I'm

17   sorry.

18   Q    Have you had sex with anybody to whom some --

19   have you ever been married?

20   A    No, sir.

21   Q    Have you ever had sex with someone you were

22   married's family?

23   A    No.

24   Q    Okay.  Have you actually adopted a child?

25   A    No.

Friedlander - Redirect

1    Q        Did you actually adopt Randy?

2    A        No.

3    Q        How old, sir, was Randy when you met him?

4    A        Twenty-nine.

5    Q        Do you have children?

6    A        No, sir.

7    Q        Have you ever had sex with any children?

8    A        No, sir.

9    Q        Ms. Kaiser asked you if you had been on Guy

10   Spank.

11   A        Yes, sir.

12   Q        Do you deny being on Guy Spank?

13   A        No, I don't deny it.

14   Q        Is the name indicative, sir, of what is

15   discussed on this website?

16   A        Yes, it is.

17   Q        Sir, let me show you what's been marked as

18   Defendant's Exhibit Number 20.

19   A        Okay.

20   Q        Do you see that, sir?

21   A        Yes.

22   Q        Okay.  And that is, subject, Guy Spank.com;

23   correct?

24   A        Yes.

25   Q        I'm referring, for the record, to message 0135

1      from DW Portland; correct?

2      A      Yes.

3      Q      To Captoes?

4      A      Yes.

5      Q      Which is your persona?

6      A      Correct.

7      Q      Captoes:  I have just discovered the Guy Spank

8      website and am primarily looking for other guys to

9      connect with.  Maybe a mentoring thing.  Have never

10     explored spanking for the sake of spanking.

11            Did you write this, sir?

12     A      No.

13     Q      This was -- was this sent to you?

14     A      Yes, it was sent to me.

15     Q      Now, you don't deny responding to that e-mail?

16     A      No, I don't deny it.

17     Q      Do you deny having any sexual conversations at

18     all?  Let me rephrase that.  Have you had sexual

19     conversations on the internet?

20     A      Yes, I have.

21     Q      Okay.  And you were aware that the

22     conversation was of a sexual nature?

23     A      Yes, I was.

24     Q      And you participated in those conversations

25     knowingly?

Friedlander - Redirect

```
 1     A       With adults, yes.

 2     Q       Ms. Kaiser asked you if you were into beating.

 3     A       Yes, sir.

 4     Q       And you indicated that you were into

 5     discipline?

 6     A       Yes.

 7     Q       Do you fantasize about beatings and

 8     discipline?

 9     A       Do I fantasize about -- I fantasize about

10     discipline at times, yes.

11     Q       This Travelling Dad individual, have you met

12     him?

13     A       No, sir.

14     Q       Have you met his daughter?

15     A       No, sir.

16     Q       Did you beat his daughter?

17     A       No, sir.  I never saw her.

18     Q       Did you have sex with his daughter?

19     A       No, sir.

20     Q       Was it real to you?

21     A       No, not at all.

22     Q       The conversations --

23     A       Yes, sir.

24     Q       -- that surround StricDad7, do you remember

25     those?
```

```
 1    A       Yes.

 2    Q       Do you deny having those conversations?

 3    A       No, I -- I don't deny it.

 4    Q       You brought Government's Exhibits --

 5    A       Whatever.

 6    Q       -- 33, 34 and 35A, B and C with you to the

 7    meeting with the person you believed to be StricDad.

 8    A       These?

 9    Q       I'm sorry.

10    A       Yeah.  Just show me one.  Yes.

11    Q       Do you deny bringing those?

12    A       I don't deny it.

13    Q       Why, sir, did you bring them?

14    A       He had asked to see --

15    Q       Did you intend to use them?

16    A       No, sir.

17    Q       Have you ever used them for the purpose of

18    beating or torturing a child?

19    A       No.

20    Q       Have you ever used them for the purpose of

21    beating or torturing an adult?

22    A       No.

23            MR. SARTES:  If I may have one moment, Your

24    Honor.

25            THE COURT:  Yes, sir.
```

1      (Brief pause.)

2             MR. SARTES:  Nothing further, sir.  Thank you.

3             THE COURT:  Thank you, sir.  You may step

4      down.  Watch your step.

5             Call your next witness, if any.

6             MR. TRAGOS:  Call Paul DiMarco.

7      (Brief pause.)

8             MR. TRAGOS:  Apparently he's temporarily

9      indisposed.

10            THE COURT:  Got another witness?

11            MR. TRAGOS:  Your Honor, he's the --

12            THE COURT:  I know who he is.

13            MR. TRAGOS:  He's right here.

14            THE COURT:  All right.  Bring him up.

15             DEFENSE WITNESS, PAUL DIMARCO, SWORN

16            COURTROOM DEPUTY CLERK:  Raise your right

17      hand.

18            THE WITNESS:  Yes, I do.

19            COURTROOM DEPUTY CLERK:  Please be seated.

20            Please state your name and spell your last

21      name for the record.

22            THE WITNESS:  My name is Paul DiMarco.  That's

23      D-I-M-A-R-C-O.

24                          DIRECT EXAMINATION

25      BY MR. TRAGOS:

DiMarco - Direct

```
1    Q      State your name, please.

2    A      Again, Paul -- Paul DiMarco.

3    Q      And your occupation?

4    A      I'm a physician.

5    Q      And how long have you been a physician?

6    A      Twenty-two years.

7    Q      Are you board certified?

8    A      Yes, I am.

9    Q      And what are you board certified in?

10   A      I'm board certified in internal medicine and

11   I'm board certified in endocrinology metabolism and

12   diabetes.

13   Q      And would you please tell us briefly your

14   educational background.

15   A      I graduated from Temple University, the New

16   Jersey Medical School.  Did my residency at New

17   Jersey Medical School in New York.  I did my

18   fellowship at the University of South Florida in

19   Tampa, and remain on staff at the Veteran's Hospital

20   in the med school as an associate clinical professor

21   of medicine.

22   Q      Okay.  And what do you teach at the --

23   A      I teach endocrinology, diabetes at the med

24   school.

25   Q      Okay.  Are you familiar with the relationship
```

1       between diabetes and erectile dysfunction?

2       A       Yes, I am.

3       Q       Would you please explain that.

4       A       Most people -- men with diabetes over years

5       develop nerve damage, numbness in the legs, pains.

6       And the act of getting an erection is actually

7       neuropathy, that is, you know need your nerve system

8       to be intact or it will not -- you will not get an

9       erection.  And diabetics, if they -- long term, 20,

10      30 years worth of diabetes, invariably most men

11      become impotent, that is, they cannot get an

12      erection.

13      Q       In your practice how frequent is the fact of

14      long-term diabetes in older men not being able to

15      achieve an erection?

16      A       It's virtually 90 percent of men if they live

17      long enough and have diabetes, they -- they become

18      impotent.

19      Q       Let me show you Exhibits 47, 48 and 49 from

20      the government.  Are you familiar with this device?

21      A       Yes, I am.

22      Q       Okay.  And why are you familiar with it?

23      A       This is a vacuum erection device fairly

24      commonly used in male diabetic to achieve an

25      erection.

DiMarco - Direct

1      Q      How does it work?

2      A      Very simply.  You put a tube over your penis.

3      See on that one --

4             THE COURT:  You can actually touch -- I'm

5      sorry, Doctor.  The screen in front of you, you can

6      actually --

7             THE WITNESS:  Oh, okay.  I'm sorry.

8             THE COURT:  And you can make a mark on

9      whatever you're referring to.

10            THE WITNESS:  The -- basically a tube is

11     placed over your penis.  You then use the device to

12     create a vacuum.  And that, of course, makes the

13     penis enlarge and engorge.  And at the base of the

14     penis is, for lack of a better term, a ring or a

15     piece of Velcro.  You then pull the tube off and you

16     have an actual erection.

17     Q      Is this the only way that you're aware of of

18     someone that has erectile dysfunction from diabetes

19     to have an erection?

20     A      If they've been a diabetic for a long times,

21     yes.  That or a surgical procedure.

22     Q      Okay.  And let me show you Government Exhibit

23     45 and Government Exhibit 46.

24     A      Okay.

25     Q      Are you familiar with this?

DiMarco - Direct

1    A      Yes, I am.

2    Q      What is that?

3    A      Levitra is a medication used to cause an

4    erection in males.  It's very similar to Viagra.

5    Q      Okay.

6    A      It's one of the other ones.

7    Q      Is there a relationship between how this works

8    and someone who is a diabetic with erectile

9    dysfunction?

10   A      As a rule of thumb in long-standing diabetics,

11   these medications do not work, period.

12   Q      Why is that?

13   A      The problem in people with diabetes is the

14   nerve damage is so bad, and usually there's other

15   medical problems there, that the success rate of

16   this type of medication is under five percent.

17   Q      With regard to diabetes, again, long-term

18   diabetes in older individuals, what is the necessity

19   for them to eat at certain periods?

20   A      If they're a diabetic on insulin, which is the

21   injection, if they don't eat on a regular basis,

22   they'll have a very low sugar leading to all sorts

23   of problems.

24   Q      What kind of problems?

25   A      Well, the inability to concentrate, blurred

1    vision, sweats, feeling of anxiety, impending doom;

2    in a logical extension, they fall over with seizures

3    if it's severe enough, coma.

4    Q      They can have one or all of these?

5    A      Correct.  It's a spectrum.

6    Q      Okay.  And someone that stops -- who's

7    diabetic and stops to have a milkshake, is that a

8    common thing to do to get their blood sugar

9    balanced?

10   A      They should -- they should have something, a

11   snack of some type.  Correct.

12   Q      Okay.  Tell me, what does insulin do versus

13   what eating does in a diabetic.

14   A      Insulin basically lowers your sugar, and all

15   food in general tends to raise -- all foods, liquids

16   tends to raise your sugar.  So insulin is dropping

17   it and food is lowering -- raising it, and you're

18   trying to balance the two.

19   Q      Okay.  In the course of your work here, have

20   you had the opportunity to review medical records?

21   A      Yes, I have.

22   Q      Okay.  You have medical records of Charles

23   Friedlander?

24   A      That's correct.

25   Q      And have you yourself had an opportunity to

DiMarco - Cross

1    examine him?

2    A        Yes, I have.

3    Q        And test him for diabetes, things like that?

4    A        Correct.

5    Q        Okay.

6             MR. TRAGOS:   That's all the questions I have,

7    Your Honor.

8    BY MR. TRAGOS:

9    Q        Oh, is he a diabetic?

10   A        Yes, he is.

11   Q        Okay.

12            MR. TRAGOS:   That's all the questions I have.

13            THE COURT:   Cross-examination.

14            MS. KAISER:   Thank you.

15                      CROSS-EXAMINATION

16   BY MS. KAISER:

17   Q        Good afternoon, Dr. DiMarco.

18   A        Good afternoon.

19   Q        Did you review the defendant's urology records

20   with Dr. Harrison?

21   A        I have some of them, yes.   I have some records

22   from the urologist I saw.

23   Q        And did you see in those records where the

24   defendant had repeatedly requested prescriptions for

25   Levitra?

1    A      I couldn't tell you if it was Levitra or not

2    because I think the doctor referred to it as Levitra

3    or other samples.

4    Q      And are you aware that he had been receiving

5    Viagra even before '07 from his urologist?

6    A      No.  I'm not aware of that.

7    Q      All right.  But are you aware in at least 2007

8    he was getting Levitra?

9    A      Yes.

10   Q      Okay.  And then he asked for it again three

11   days -- or, excuse me, strike that -- on July --

12          MS. KAISER:  Your Honor, may I approach?

13          THE COURT:  Yes, ma'am.

14   (Brief pause.)

15   BY MS. KAISER:

16   Q      On July 18th of 2008, he was again asking for

17   Levitra.  Are you aware of that?

18   A      Yes.

19   Q      And then back in October of 2007, putting on

20   the overhead Government's Exhibit 60, he had been

21   given -- he had been given Viagra and Levitra;

22   correct?

23   A      Yes.

24   Q      Okay.  So then he was asking for it again in

25   July?

1    A     Of 2008?

2    Q     Correct.

3    A     Yes, he was.

4          MS. KAISER:  I have no further questions.

5    Thank you.

6          THE COURT:  Any redirect?

7          MR. TRAGOS:  No, Your Honor.

8          THE COURT:  Thank you, sir.  You may step

9    down.  Please watch your step.

10         Call your next witness.

11         MR. TRAGOS:  Call Bill Steinhart.

12      DEFENSE WITNESS, WILLIAM H. STEINHART, SWORN

13         COURTROOM DEPUTY CLERK:  Raise your right

14   hand.

15         THE WITNESS:  I do.

16         COURTROOM DEPUTY CLERK:  Please be seated.

17         Please state your name and spell your last

18   name for the record.

19         THE WITNESS:  William H. Steinhart,

20   S-T-E-I-N-H-A-R-T.

21                   DIRECT EXAMINATION

22   BY MR. TRAGOS:

23   Q     Okay.  Mr. Steinhart, where do you live?

24   A     In West Orange, New Jersey.

25   Q     And are you married?

Steinhart - Direct

1    A       Yes, I am.

2    Q       Do you have any children?

3    A       Yes.

4    Q       How many children do you have?

5    A       Two children.

6    Q       How old are they?

7    A       My son is 14 and my daughter is 17.

8    Q       And are you employed?

9    A       Yes, I am.

10   Q       What is your occupation?

11   A       I'm a commercial real estate appraiser.

12   Q       Okay.  Do you know Charles Jackson

13   Friedlander?

14   A       Yes, I do.

15   Q       How do you know him?

16   A       Charles is a cousin of mine.  He is my

17   mother's first cousin.

18   Q       Okay.  How long have you known him?

19   A       My whole life.

20   Q       Okay.  How often do you have contact with him,

21   either by telephone or in person?

22   A       Telephone contact would be anywhere from once

23   every two weeks to once every six weeks.  Personal

24   contact, we probably see each other may be a little

25   more than once a year.

Steinhart - Direct

1    Q       Okay.  Do you have an opinion, sir, as to his

2    truthfulness?

3    A       Absolutely.  He's a truthful person.

4    Q       And do you have opinion as to his law-abiding

5    nature?

6    A       He -- I've never seen anything or heard

7    anything or had any reason to believe that he wasn't

8    anything but absolutely law abiding.

9    Q       Okay.  Now, you're aware of the facts of this

10   case; correct?

11   A       Yes, I am.

12   Q       Does that in any way change your opinion?

13   A       No, they do -- it does not.

14   Q       Okay.  And, sir, in your conversations with

15   him and dealing with him, have you ever known him to

16   have a violent nature?

17   A       Never, not even close.

18   Q       Okay.  And do you also feel -- do you think if

19   you're characterizing him -- it's not really a --

20   character trait might be a bad word, but do you feel

21   that he has a lonely existence?

22   A       Only recently in the last year or two in

23   Florida.  When he's residing at his other residence,

24   he seems a lot more active and involved in things.

25   Q       Now, you have two children.  Would you have

Steinhart - Cross

1    any hesitation in having Charles Friedlander have

2    contact with your children?

3    A      None whatsoever.  It would be fine.

4           MR. TRAGOS:  That's all the questions I have,

5    Your Honor.

6           THE COURT:  Cross-examination.

7                    CROSS-EXAMINATION

8    BY MS. KAISER:

9    Q      You say, Mr. Steinhart, that this is your

10   cousin?

11   A      Yes.

12   Q      Do you see him at family gatherings?

13   A      There haven't been many in the last few years,

14   but periodically over the years it was -- there were

15   family gatherings, yes.

16   Q      You love your cousin.

17   A      Oh, yes.

18   Q      You don't want to see him in any trouble?

19   A      I wouldn't want to see anybody I cared for in

20   any trouble.

21          MS. KAISER:  No further questions.

22          THE COURT:  Any redirect?

23          MR. TRAGOS:  No, Your Honor.

24          THE COURT:  Thank you, sir.  You may step

25   down.  Please watch your step.

1          THE WITNESS:  Thank you.

2          THE COURT:  Call your next witness, please.

3          MR. TRAGOS:  Call Margaret Vaughan.

4          MS. KAISER:  Your Honor, may we approach?

5          THE COURT:  Yes, ma'am.

6     (At side bar, on the record.)

7          MS. KAISER:  Your Honor, I believe the

8     question is do you consider him an honest person is

9     improper witness bolstering, it's improper character

10    evidence.  He can ask if he's law abiding, he can

11    ask if he's a peaceful person, but he can't ask if

12    he's a truthful person.  It's improper character

13    evidence.

14         THE COURT:  You didn't object.

15         MS. KAISER:  It came out too quick.

16         THE COURT:  It wasn't like you didn't

17    anticipate it.  Actually, the question was posed

18    properly, and I do find for this record that your

19    cross-examination did challenge the credibility and

20    truthfulness of the defendant, effectively, I might

21    add, as opposed to simply pointing out

22    inconsistencies in his testimony.  His credibility

23    was severely tested by a thorough cross-examination.

24    And that, as I understand the case law, excuse me --

25    well, I'll put it on the record later.  But I have

1    done some research since no one else did, and it's

2    clear to me, when the defendant's credibility has

3    been effectively challenged, his reputation,

4    character for truthfulness maybe presented through

5    the opinion testimony of those who have a sufficient

6    knowledge of the defendant or his reputation in the

7    community.  So if that's an objection, I have to

8    overrule it.

9         MR. TRAGOS:  Your Honor, since that has been

10   so effectively challenged in cross, am I still

11   limited to three?

12        THE COURT:  It depends if they are able to, as

13   this witness, sufficiently get across the points

14   you're trying to make then, yes, I think you'd

15   probably still be limited.  It's not official but

16   that's just, as you know, the customary.  But so far

17   you're going pretty well.

18        MR. TRAGOS:  Thank you.

19   (End of side bar discussion.)

20        THE COURT:  Thank you.  Come forward, please,

21   and be sworn.

22      GOVERNMENT WITNESS, MARGARET VAUGHAN, SWORN

23        COURTROOM DEPUTY CLERK:  Raise your right

24   hand.

25             THE WITNESS:  I do.

1          COURTROOM DEPUTY CLERK:  Please be seated.

2          Please state your name and spell your last

3     name for the record.

4          THE WITNESS:  I am Margaret Westbrook Vaughan,

5     V, as in Virginia, A-U-G-H-A-N.

6                     DIRECT EXAMINATION

7     BY MR. TRAGOS:

8     Q     Ms. Vaughan, where do you -- I'm sorry.  Where

9     do you live?

10    A     I live at 181 West K Street in Purcellville,

11    Virginia, with a mailing address of P. O. Box 581

12    Purcellville, Virginia.  And Purcellville, Virginia

13    is about 45 miles west of Washington D C.

14    Q     Are you currently employed?

15    A     No.  I'm a retired math teacher.

16    Q     Okay.  And do you know Charles Jackson

17    Friedlander?

18    A     Yes.

19    Q     How do you know him?

20    A     I met him in 1963 in August, as we both were

21    new employees at Loudoun Valley High School in

22    Purcellville, Virginia.  He was employed as a French

23    teacher, I as a math teacher.

24    Q     Since 1963 what kind of a friendship have you

25    maintained with him?

Vaughan - Direct

1    A      We've had a wonderful plutonic friendship over

2    the years.  He was at the Loudoun Valley High School

3    for six years, four as a French teacher, two as a

4    guidance counselor.  Then when they opened a new

5    high school closer to his home in Georgetown, he

6    transferred there and was a guidance counselor for

7    another 17 years.

8    Q      Okay.  And you maintained your relationship

9    with him?

10   A      Yes.

11   Q      Okay.  Now, you said plutonic.  You've never

12   had a physical relationship with him?

13   A      That's correct.  It's only been a plutonic

14   one.

15   Q      How often do you have contact with him either

16   through the telephone or face to face?

17   A      At least -- with the telephone, at least once

18   a week.  Over the years we often met for lunch or

19   dinner three or four times a year.

20   Q      Okay.  And during this period of time, is

21   there a -- I guess a group of individuals that have

22   maintained a relationship with you and with Charles

23   Friedlander?

24   A      Yes.  Over the years the classes of the

25   sixties have often had reunions, and Charles would

Vaughan - Direct

1    come out to the reunions and he was the most popular

2    person there.  Both the men and women that he taught

3    were anxious to talk with him, bring him up to date

4    as to family, children, grandchildren, careers, what

5    have you.

6    Q     How recently have you had contact with persons

7    from that group about Charles Jackson Friedlander?

8    A     Certainly since July I've received phone

9    calls, e-mails of concerns from former students as

10   well as colleagues that we worked with at Loudoun

11   Valley, as well as colleagues of the other high

12   school, which is Broad Run in Ashburn, Virginia.

13   Q     Are you aware of his reputation within that

14   community for truthfulness?

15   A     Absolutely.  He's been truthful.  He has

16   worked so much with so many families, so many

17   students over the years at both high schools, and

18   continues to stay in touch with many of them.

19   Q     Okay.  How about his reputation in that group

20   for being a law-abiding citizen?

21   A     Excellent.  They very much respect him.

22   Q     Okay.  Have -- how about his reputation for

23   whether he's violent or nonviolent?

24   A     Certainly nonviolent.  All of us have found

25   him to be a very caring individual.

1    Q       Okay.   In the recent years here down in

2    Florida, have you found him to become lonelier?

3    A       Yes.   Several years ago over lunch when he was

4    living in the D.C. area in that period of time, as

5    he often spent time in D.C. and part here in

6    Florida, he shared with me he was getting

7    increasingly lonely in this area, and we discussed

8    why.   He was talking about the lack of neighbors

9    staying in the neighborhood, lack of friends being

10   in this area.

11          And I had encouraged him to spend more time in

12   the D.C. area.   He had more activities up there, had

13   neighbors that lived there full-time as well as more

14   activities that he was doing in the community.

15          MR. TRAGOS:   That's all the questions I have,

16   Your Honor.

17          THE COURT:   Cross-examination.

18                     CROSS-EXAMINATION

19   BY MS. KAISER:

20   Q       Good afternoon, Ms. Vaughan.

21   A       Good afternoon.

22   Q       Did the defendant ever discuss his internet

23   usage with you?

24   A       Yes.   I was aware he was using the internet.

25   Q       Were you aware that he was a member of such

Vaughan - Cross

1       websites such as GuySpank.com?

2       A       No.

3       Q       Were you --

4       A       We never discussed any sites that he was

5       using.

6       Q       Did you -- were you aware of any interest that

7       he had in sadomasochistic sex?

8       A       No, no.

9       Q       Ever discuss anything like that with him?

10      A       Absolutely not.

11      Q       Did you ever discuss his interest in spanking

12      other people?

13      A       Absolutely not.

14      Q       Did you ever discuss his interest in having

15      sex with children?

16      A       Absolutely not.  He would be the last person I

17      would think that would even be considering that.

18      Q       Do you ever have any discussions with him

19      about his desire to beat or engage in physical

20      discipline --

21      A       Absolutely --

22      Q       -- of other adults?

23      A       Absolutely not.  Absolutely not.

24              MS. KAISER:  Thank you.  I have no further

25      questions.

Vaughan - Redirect

1              THE WITNESS:  Thank you.

2              THE COURT:  Any redirect?

3              MR. TRAGOS:  Yes, Your Honor.

4    Q     Ma'am, is it -- the prosecutor has asked you

5    those questions.  When you said absolutely not, did

6    you absolutely -- are you absolutely positive that

7    he would never sexually assault a child?

8    A     Absolutely.  He has spent too many years

9    working with young people and their families.

10   Q     Are you absolutely positive that he wouldn't

11   beat a child?

12   A     Absolutely.  Absolutely positive.

13   Q     Okay.  Now, back -- and maybe it's not back

14   far enough, but back in the sixties were -- was

15   corporal punishment allowed in the schools?

16   A     I do not know what the county policy was at

17   that time.  I never heard of any being used in the

18   schools that were at.  And certainly, there was no

19   time I ever heard of any teacher, any parent even

20   requesting it, any parent complaining.  That -- to

21   my knowledge, that was not done at all.  But I do

22   not know what the county policy was in 1963.

23   Q     Did you ever hear of Charles Jackson

24   Friedlander beating or spanking a child?

25   A     Absolutely not.

Vaughan - Redirect

1    Q      Now, you're saying that when you go back to

2    these reunions he's the most popular teacher there?

3    A      Yes.  By both the women and the men students

4    that he had.

5    Q      His -- has he ever been married?

6    A      No.

7    Q      Ever had any children, that you know of?

8    A      No.

9           MR. TRAGOS:  That's all the questions I have,

10   Your Honor.

11          THE COURT:  Thank you, ma'am.  You may step

12   down.  Please watch your step.  Mr. Tragos, call

13   your next witness, please.

14          MR. TRAGOS:  Your Honor could we approach for

15   a moment.

16          THE COURT:  All right.

17   (At side bar, on the record.)

18          MR. TRAGOS:  I just want to see where we are

19   time-wise.

20          THE COURT:  I asked you to call your next

21   witness.

22          MR. TRAGOS:  I have a long one and a short

23   one.

24          THE COURT:  All right.  You let me worry about

25   the time.

1          MR. TRAGOS:  Okay.

2     (End of side bar discussion.)

3          MR. TRAGOS:  Bill Hayden, please.

4          COURTROOM DEPUTY CLERK:  Raise your right

5     hand.

6          THE WITNESS:  I do.

7          COURTROOM DEPUTY CLERK:  Please be seated.

8                    DIRECT EXAMINATION

9     BY MR. TRAGOS:

10    Q     State your name, please.

11    A     My name is Bill Hayden.

12         COURTROOM DEPUTY CLERK:  Spell your last name

13    for the record.

14         THE WITNESS:  H-A-Y-D-E-N.

15         COURTROOM DEPUTY CLERK:  Thank you.

16    BY MR. TRAGOS:

17    Q     Mr. Hayden, where do you live?

18    A     I reside in Chicago, Illinois.

19    Q     And how long have you resided there?

20    A     I'm 44 years old, and I have lived in the area

21    my entire life.

22    Q     Okay.  Are you employed, sir?

23    A     Yes, I am.

24    Q     What is your occupation?

25    A     I'm an accountant for the Commonwealth Edison

1    Company, which is the electric utility in Northern

2    Illinois.

3    Q      And how long have you worked for them?

4    A      I've been employed with them for 18 years.

5    Q      Okay.  And you say you're an accountant.  Are

6    you a certified public accountant?

7    A      Yes, I am.

8    Q      Briefly tell us your educational background.

9    A      I have an undergraduate degree from the

10   University of Illinois at Chicago in accounting, and

11   I have an MBA with a concentration in systems from

12   DePaul University in Chicago.

13   Q      Okay.  Do you know Charles Jackson

14   Friedlander?

15   A      Yes, I do.

16   Q      And how do you know him?

17   A      Charles and I met on the internet

18   approximately five years ago.

19   Q      Okay.  Sir, what is your sexual persuasion?

20   A      I am gay.

21   Q      All right.  And how did you meet on the

22   Internet?

23   A      Charles and I met through a website called

24   Apollo Network.com, which is a gay social site, a

25   dating site.

1    Q    Okay.  And tell us, I guess initially, how you

2    corresponded with each other and give us an idea of

3    how -- how y'all got together.

4    A    Initially Charles had contacted me through the

5    site.  He was the initiator.  We had exchanged

6    e-mails, started talking on the phone.  The initial

7    e-mail came in in December of 2003, and led to phone

8    conversations, upon which I agreed to meet him by

9    flying down to Ft. Myers, which was Martin Luther

10   King weekend in January of 2004.

11   Q    In your initial contact with him, did you get

12   an idea of what it is you were looking for?

13   A    Yes.  I was looking for friendship,

14   companionship.  My sexual orientation being gay, I'm

15   also basically only interested in people, and have

16   only always been interested in people much older

17   than myself.

18   Q    Okay.  And did he write you in response to

19   that?

20   A    Yes.  We communicated back and forth.

21   Q    Was there something about his response to you

22   that you found particularly enticing?

23   A    I remember the key word, a couple key words.

24   He -- I remember in his initial response one term

25   was multilingual, and the other one was highly

1    principled.

2    Q    Okay.  And you didn't -- when you initially

3    made contact with him, you didn't indicate that you

4    had any interest in spanking or discipline or

5    anything like that; did you?

6    A    No.  I have no interest in that whatsoever.

7    Q    Okay.  And when he responded to you, he didn't

8    say anything about that; did he?

9    A    No.  That was never discussed.

10   Q    Okay.  And so you actually met?

11   A    Yes.  I agreed to fly down and meet Charles on

12   Martin Luther King weekend, which is January of

13   2004.

14   Q    And how long did you -- where did you come to?

15   A    I flew to Ft. Myers.  It was the Saturday

16   before Martin Luther King weekend, and I flew home

17   the following Tuesday.

18   Q    Okay.  So how long did you stay here?

19   A    Saturday evening, Sunday, Monday and left the

20   following Tuesday.

21   Q    Okay.

22   A    Three days.

23   Q    Aside from this meeting, did you also have

24   other meetings with him?

25   A    Yes.  Our relationship continued for about --

1    basically approximately 14 or 15 months in an

2    intimate capacity, and we usually met -- or we met

3    basically every month.

4    Q      Okay.  And where did you meet?

5    A      It was various locations.  I would travel to

6    Florida.  I traveled to Washington, D.C. to meet

7    him.  He traveled to Chicago a couple times.  At the

8    time my job required me to go to Philadelphia on

9    occasion, so we met in Philadelphia a couple times,

10   New York City and Boston, also once.

11   Q      Okay.  When you came down for the first to

12   Ft. Myers, were you -- were you and Charles

13   Friedlander intimate on that visit?

14   A      Yes, we were.

15   Q      During the 14 or 15 months that you were with

16   him -- by the way, you're still friends; correct?

17   A      Yes.  We have -- our relationship is no -- was

18   no longer intimate after 14 or 15 months.  We've

19   remained close friends to this day.  We speak daily.

20   Q      Every day?

21   A      You could probably count on one hand the

22   number of days that we don't speak in a year, so

23   it's every day.

24   Q      During the 14 or 15 months when you were

25   intimate, did Charles Friedlander ever achieve an

1      erection?

2      A      No, he did not.

3      Q      Did Charles Friedlander ever have an orgasm?

4      A      No, he did not.

5      Q      Okay.  And tell us, then, if he -- was the

6      intimacy more affection as opposed -- and I don't

7      mean to degrade it, so I apologize if I use the

8      word -- but more an affectionate as opposed to the

9      animalistic, just having sex kind?

10     A      Our relationship was by far more affectionate.

11     My -- my desire sexually is -- primarily the need is

12     to -- for attention or affection from an older man.

13     I do -- I did achieve orgasms with him, but that was

14     not what the primary physical activity.  It was

15     mostly sleeping close, talking, things of that

16     nature.

17     Q      Did you attempt to try to -- did you try to

18     have him get an erection?

19     A      Yes, I did.

20     Q      Okay.  Always unsuccessful?

21     A      Always.

22     Q      And from what period did you stop being

23     intimate?  When was that?

24     A      That would have been approximately -- it was

25     February or March of 2005.

1    Q      Okay.  And during this -- during this period

2    of time, did you -- did you -- when you were

3    together, I guess, were you always at some point

4    intimate during that 14 or 15 months?

5    A      During that 14 or 15 months, yes.  Every time

6    we were together, we slept in the same bed and we

7    were always intimate in a physical and affectionate

8    way.

9    Q      Okay.  What is your screen name?

10   A      My screen name?

11   Q      Yes.

12   A      I have three AOL account screen names.

13   Q      Okay.  What are they?

14   A      One is OBCHCG, the second one is A38Chicago,

15   CHGO4over60 and the last one is Seniorseek38.

16   Q      Do you ever have any discussions with him --

17   have you ever had any discussion with him about him

18   being lonely?

19   A      Yes.  Especially when he's down in Florida,

20   there's always a discussion of him -- he goes down

21   there several times a year.  The first week or so he

22   usually unwinds, and then he -- he becomes very

23   lonely down there.  He feels isolated, and he brings

24   that up every time he's down there with me on the

25   phone.

1    Q      Has he -- is there really anything in

2    particular that stands out in your mind about his --

3    about him helping somebody in your family?

4    A      Charles became involved when I had first met

5    him -- I have a niece who is -- now I believe she's

6    33, who worked for the U.S. State Department.  And

7    she's lived in Korea and also Tunisia and Africa.

8    And she had met a guy, a chiropractor who had lived

9    outside of the Washington, D.C. area and she

10   became -- they were to get married, and she became

11   pregnant.

12         She's -- so she became pregnant.  She was --

13   the guy left her, took off.  She was living in

14   Tunisia in Africa, pregnant in a Muslim country.  So

15   she came home to my sister's in Indiana and had the

16   baby.

17         So she went from all -- living all over the

18   world to living at home in Indiana with a baby.  And

19   this was an extremely difficult situation for her

20   and my family.  Charles volunteered.  He had stepped

21   in.  He -- with his background as a psychologist, he

22   had spent a lot of time counseling her.

23         He also made the effort, since the gentleman

24   that got her pregnant was not willing to take a

25   paternity test and was not willing to pay child

1    support, Charles worked on that for several months,

2    worked with people that he knew in the State of

3    Virginia, made contacts, got her -- got him to --

4    forced him, basically, to have a paternity test,

5    forced him to go to court.

6          Charles went to court with my niece, and she

7    now is receiving child support and is -- still

8    speaks -- my niece still calls him on a regular

9    basis and talks with him for guidance, advice, and

10   she cares about him very deeply.

11   Q    When you were with him for that 14 or 15

12   months, would he be, I guess, described as fatherly?

13   A    Charles is very fatherly to me.  And I view

14   him now as kind of a cross between a parent -- I

15   view him basically as a third parent, and I view him

16   as a best friend.  We're extremely close.

17   Q    When you were intimate with him, did you

18   consider that you were committing incest?

19   A    No, I did not.

20   Q    In the gay community, the term boy, could you

21   explain what that means, B-O-Y.

22   A    Yeah.  Boy -- boy is a very common term in the

23   gay community.  It describes an adult.  And the best

24   way that I can describe that is -- you know, like in

25   Chicago we have China Town, we have a Greek Town, we

Hayden - Direct

1       also have a Boys Town.  And Boys Town is the area

2       where -- it's North Halston Street in Chicago where

3       you have a bunch of restaurants, bars, community

4       center, a big resale shop, a very upscale area

5       that's a few blocks away from Wrigley Field in

6       Chicago.

7       Q       So it refers to adult males?

8       A       Yes.  It's a -- in my opinion, definitely,

9       it's an adult male.

10      Q       Okay.  By the way, when you were working for

11      Commonwealth Edison, what size budget were you

12      particularly working with?

13      A       In my current position I oversee the

14      calculation of something called a raid base, which

15      is how a utility -- which is used in filings to --

16      with the Illinois Commerce Commission to receive

17      revenue increases.  And my job before that, which

18      was about a year and a half ago, I was

19      responsible -- I led a group and we managed a 400

20      million dollar annual budget for -- for various

21      senior VPs and VPs in the customer operations area,

22      which is like the call center, meter reading, credit

23      and collections.

24      Q       Okay.

25              MR. TRAGOS:  May I have a moment, Your

1      Honor.

2           THE COURT:  Yes, sir.

3      (Brief pause.)

4      BY MR. TRAGOS:

5      Q     Mr. Hayden, did you talk to Charles

6      Friedlander on July 21st, 2008?

7      A     Yes.  On July 21st, 2008, Charles had

8      contacted me mid to late afternoon on my phone at my

9      work for a brief discussion.  He told me that he was

10     traveling north in the state of Florida.  He had

11     mentioned the town.  It didn't register with me.

12     I'm not familiar -- I'm familiar with most of the

13     geography in Florida, but the town didn't register.

14     And it was approximately two hours north of his

15     residence where he was driving.  He had told me that

16     he was going to meet a friend for dinner.

17     Q     Okay.  And were you expecting to hear from him

18     again?

19     A     Yeah.  I never heard from him that night.  But

20     I tried on July -- on the next day, which was a

21     Tuesday, I tried to call him.  The first call was at

22     8 o'clock in the morning.  I got his answering

23     machine, and then I tried his cellphone right away

24     and got the voicemail.

25           And then I tried to contact him several -- six

1    or seven times over the next six or seven hours.  I

2    became very worried and concerned because we

3    communicate all the time.  And it's very -- it

4    wouldn't be like him at all not to let me know that

5    he's okay.

6    Q     Are you aware of Dr. Friedlander's -- I guess

7    because of his -- his age, that being gay is

8    something that he wasn't comfortable with?

9    A     That's basically something that Charles and I

10   do have in common.  I am -- I have always been very

11   uncomfortable being gay, have been rather closeted

12   in the city of Chicago and the area.  And, likewise,

13   Charles and I had shared some discussions of not

14   being comfortable.

15   Q     Was there a time when he also didn't even want

16   you to admit that y'all had met on the internet?

17   A     Yes.  There was a -- in relation when he was

18   initially arrested that in regards to the bond

19   hearing he and I had had a conversation and he was

20   in I believe it was Pinellas County jail.  And he

21   had asked me if I would come down to Pinellas County

22   or to Tampa to testify in the bond hearing.

23         In that conversation, I had -- I had asked him

24   when we had discussed calling you, Mr. Tragos, if I

25   should tell him where we met.  And Charles hedged on

1     that and then basically was against it.  And I just

2     said, well, I will talk to your attorney.

3           The next steps for that was I -- first time I

4     called Mr. Tragos, I disclosed all the facts and

5     everything that I knew.  And Mr. Tragos had told me,

6     that's fine, just tell the truth and you'll be fine,

7     which I did.

8     Q     You did testify at the bond hearing, as well?

9     A     Yes.  I did testifying in the bond hearing.

10    Q     Okay.

11          MR. TRAGOS:  That's all the questions I have,

12    Your Honor.

13          THE COURT:  Cross-examination.

14          MS. KAISER:  Thank you.

15                       CROSS-EXAMINATION

16    BY MS. KAISER:

17    Q     Good afternoon, Mr. Hayden.

18    A     Good afternoon.

19    Q     In your -- in your sexual relationship with

20    Mr. Friedlander, did you ever get -- engage in

21    sadomasochistic sex?

22    A     No, never.

23    Q     Did you and Mr. Friedlander ever discuss his

24    interest in spanking other people?

25    A     No, we did not.

1    Q      Did you know that Mr. Friedlander had put an

2    ad on GuySpank.com?

3    A      I was not aware of that.

4    Q      Were you aware that he was soliciting people

5    on the internet to -- to spank?

6    A      No.  I was not aware of it until I saw some of

7    the discovery in this case.

8    Q      How often have you seen Mr. Friedlander in the

9    last few years?

10   A      Charles and I would see -- we would see each

11   other in person, he would come to Chicago or once in

12   a while I would come down to Florida.  Or my niece

13   also lived in D.C. for a while, and I would stay

14   with her.  I'd probably see him three or four times

15   a year.

16   Q      Did he -- you and he ever discuss all of the

17   implements that he used to whip other people?

18   A      No, we did not.

19          MR. TRAGOS:  Object, Your Honor.  Facts not in

20   evidence.

21          THE COURT:  Well, rephrase that.  Sustained.

22   BY MS. KAISER:

23   Q      Did you and Dr. Friedlander ever discuss razor

24   strops?

25   A      No, we did not.

Hayden - Cross

```
 1    Q      Did you ever discuss quirts?

 2    A      No.  I don't even know what -- what that is.

 3           MS. KAISER:  Your Honor, may I approach?

 4    BY MS. KAISER:

 5    Q      I'm showing you what's marked as Government's

 6    Exhibit 33.  Have you ever seen this before?

 7    A      No, I have not.

 8    Q      I'm showing you what's been admitted as

 9    Government's Exhibit 35.  Do you recognize these?

10    A      No, I do not.

11    Q      Did Mr. Friedlander ever show you -- these to

12    you when you visited?

13    A      No, he did not.

14    Q      Did you ever engage in any activities with

15    Mr. Friedlander using these?

16    A      No, we did not.

17    Q      Would you be surprised to know that Mr.

18    Friedlander mentioned those implements extensively

19    in e-mail chats?

20    A      Yes.  That would be very surprising to me.

21    Q      Would it be surprising to you to learn that he

22    engaged in numerous chats regarding sexually abusing

23    and torturing children?

24    A      That would be very surprising to me.

25           MS. KAISER:  I have no more questions.
```

Hayden - Cross

1              THE COURT:  Redirect?

2                     REDIRECT EXAMINATION

3     BY MR. TRAGOS:

4     Q     Mr. Hayden, you know the real Charles

5     Friedlander, correct, the real person?

6     A     Yes, very well.

7     Q     Face to face; right?

8     A     Yes.

9     Q     And you all don't -- well, you were at his

10    house, right, in Ft. Myers; right?

11    A     I'm sorry?

12    Q     You were at his house in Ft. Myers?

13    A     Yes.  I have been at his house in Ft. Myers.

14    Q     Did you ever see these things hanging on a

15    nail in that house?

16    A     No.  I have never seen those.

17    Q     Did you ever see a room at that house

18    dedicated to corporal punishment?

19    A     No, I have not.

20    Q     Have you ever been to his home in Washington,

21    D.C.?

22    A     Yes I have.

23    Q     And is there a basement there?

24    A     His home in Washington, D.C. is three levels

25    of which he lives in the top two levels and the

1    bottom level is an apartment.

2    Q      A rental apartment?

3    A      Yes.

4    Q      What is your attitude toward pain and

5    discipline as part of your relationship?

6    A      That doesn't exist as part of our

7    relationship.  Never has.

8    Q      Have you ever delved into that?

9    A      No, I have not.

10   Q      And if -- and if Charles Jackson Friedlander

11   had wanted to delve into that with you, what would

12   your response have been?

13   A      I would have said no.  That's -- that would

14   have made me very uncomfortable.

15   Q      In all your travels with him going around and

16   all your contact with him, has he ever, ever

17   indicated that he had an interest with you or any

18   other person to actually beat them?

19   A      Absolutely not.

20   Q      Did he ever indicate to you that he had any

21   interest in actually having sex with a child?

22   A      No, absolutely not.

23          MR. TRAGOS:  No other questions.

24          THE COURT:  Thank you, sir.  You may step

25   down.  Watch your step, please.

1           THE WITNESS:  Thank you.

2           THE COURT:  We will recess for the afternoon.

3      Members of the jury, I wanted to use the most of the

4      day.  Obviously we had a witness or two from out of

5      town, and I know it's late.  I apologize.

6           I am pretty confident this will be in your

7      hands sometime Monday.  But at the same time, I want

8      to remind you again, there's rush to justice.  It's

9      simply a matter of ensuring that all witnesses have

10     been heard.

11          So have a safe weekend.  Remember not to

12     discuss the case among yourselves or allow it to be

13     discussed in your presence.  We will resume at 9:00

14     AM on Monday.

15          COURTROOM SECURITY OFFICER:  Rise for the

16     jury, please.

17     (Jury out at 5:00 PM.)

18          THE COURT:  How much more you got, Mr. Tragos?

19          MR. TRAGOS:  Your Honor, two short witnesses.

20          THE COURT:  Do you anticipate any rebuttal,

21     Ms. Kaiser?

22          MS. KAISER:  I do, Your Honor.  I'm going to

23     put Detective Spector on.

24          THE COURT:  That's at this point the only

25     witness you expect?

1          MS. KAISER:  There may be just one other, but

2     he would be very brief, like five minutes at the

3     most.

4          THE COURT:  All right.  Do I understand then

5     correctly that you have one substantive disagreement

6     on jury instructions and it has to do with the

7     elements of the charged offense?

8          MR. SARTES:  Actually, Your Honor, that would

9     be correct.  We have one substantive disagreement.

10    The only thing we have not talked about and we

11    probably should is we have not included jury

12    instructions for character.  And I would suggest at

13    this point we need some, and they should probably be

14    the standards.

15         THE COURT:  Well, there's a pattern on that

16    so --

17         MR. SARTES:  Understood.  So, yes, there is

18    one substantive disagreement on the elements

19    necessary.

20         THE COURT:  All right.  So bring the pattern

21    or at least, obviously, we can just pull it in if

22    there's no deviation from the pattern.  We can

23    incorporate it into the packet.  So we have to talk

24    about that one instruction, right?

25         MS. KAISER:  Offense instruction, yes.

1          THE COURT:  It would seem to me that we could

2     do that at the lunch break, and you guys should

3     finish your presentation before lunch.  Should.

4     Should is a big word today.  It's been a long day.

5     So anticipate that.  I don't want any delays in

6     getting this case argued and to this jury.  I want

7     it in their hands early afternoon Monday so that

8     they're not pressed by the time of day or anything

9     of that nature.

10          MR. SARTES:  Your Honor, if I may?

11          THE COURT:  You may.

12          MR. SARTES:  A point of housekeeping.  The

13    actual pattern jury instruction, the Eleventh

14    Circuit standard, the details in and of itself as

15    they're contained are not the issue.  The government

16    wants to add something.  So just for Madam Courtroom

17    Deputy's time period, if she has that actual

18    standard ready, that's not going to be at issue.

19    It's the additions the government wants to make.

20          MS. KAISER:  Well, that's not -- that's not

21    correct.  Are you talking about the offense

22    instruction?

23          MR. SARTES:  Yes.

24          MS. KAISER:  The offense instruction is

25    incorrect as it's written.

1          THE COURT:  Not -- I understand that.  But

2     you're talking about the pattern character defense

3     instruction?

4          MR. TRAGOS:  No.

5          MR. SARTES:  The pattern jury instruction for

6     this offense as it is listed in the Eleventh Circuit

7     book.

8          THE COURT:  If the government wants something,

9     yeah, that's a substantive disagreement.  I

10    understand.

11         MR. SARTES:  The actual elements of it I have

12    no issue with.

13         MR. TRAGOS:  Your Honor, at some point,

14    though, I don't know if the court wants to do it now

15    or Monday, we would like to be heard on whether or

16    not it's appropriate rebuttal for her to put on the

17    Travelling Dad --

18         THE COURT:  I think it's probably going to be

19    since he apparently doesn't recall anything about

20    that, and she's entitled to demonstrate that.  So

21    I'll surely hear your argument, but let's wait until

22    you rest and see if she intends to do that.

23         MR. TRAGOS:  Okay.

24         THE COURT:  In other words, I'd rather not get

25    into an advisory situation.  You guys have trapped

1      me into that a few times.  And sometimes it's

2      productive, sometimes it's not.  Have a safe weekend

3      and get some rest.

4            Were you able to clear up your conflicts for

5      Monday?

6            MR. TRAGOS:  I think so.  I think so.  I think

7      that I may have somebody cover it for me.

8            THE COURT:  All right.  Very good, then.

9      We'll see you Monday morning at 9 o'clock.

10     (Hearing adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA            )

4      COUNTY OF HILLSBOROUGH   )

5          I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 263, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 11th day of March 2009.

19

20

21             _____/s/ Linda Starr_____
                Linda Starr, RPR, Official Court Reporter
22

23

24

25