```
 1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION


 3      UNITED STATES OF AMERICA,


 4          Petitioner,


 5              vs.          CASE NO. 8:08-CR-318-T-27TGW
                             15 DECEMBER 2008
 6                           TAMPA, FLORIDA
                             PAGES 1 - 242
 7                           VOLUME VI


 8

        CHARLES JACKSON FRIEDLANDER,
 9
            Defendant.
10

        _____/
11
                    TRANSCRIPT OF TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
13                        and a jury

14      APPEARANCES:

15      For the Petitioner:  Amanda C. Kaiser
                             United States Attorney's Office
16                           Suite 3200
                             400 N. Tampa Street
17                           Tampa, Florida 33602

18      For the Defendant:   George E. Tragos
                             Tragos & Sartes, PL
19                           Suite 800
                             601 Cleveland Street
20                           Clearwater, Florida 33755

21                           Peter Anthony Sartes
                             Tragos & Sartes, PL
22                           Suite 800
                             601 Cleveland Street
23                           Clearwater, Florida 33755

24
         Proceedings recorded and transcribed by
25      computer-aided stenography.
```

```
 1      Court Reporter:        Linda Starr, RPR
                               Official Court Reporter
 2                             801 N. Florida Avenue
                               Suite 13B
 3                             Tampa, Florida 33602

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          COURTROOM SECURITY OFFICER:  All rise.  This

2     Honorable Court is in session, The Honorable James

3     D. Whittemore presiding.

4          Be seated, please.

5          THE COURT:  Good morning.  Are we ready?

6     Apparently not.

7          MR. SARTES:  Good morning, Judge.

8          MS. KAISER:  Good morning, your Honor.

9          MR. SARTES:  Very quickly two things, if the

10    court will allow me.

11         THE COURT:  Go ahead.

12         MR. SARTES:  Number one.  Just to put the

13    court on notice, the objections to the jury

14    instructions, just so the court knows the numbers,

15    are Government's 12, 14 and the last line and a half

16    of 18.

17         THE COURT:  All right.  Thank you.

18         MR. SARTES:  And, Your Honor, the defendant

19    has some friends and family that are in the hallway

20    that have already testified.  Would the court have

21    an objection to allowing them to now sit in the

22    courtroom and observe the rest of the trial?

23         THE COURT:  Ms. Kaiser?

24         MS. KAISER:  The government has invoked the

25    rule and --

1          THE COURT:  Is that an objection?

2          MS. KAISER:  Yes.

3          THE COURT:  All right.  Does that mean you're

4    going to call these witnesses.

5          MS. KAISER:  It depends on what the rest of

6    the testimony shows.  It's unlikely, but I'd like to

7    wait until the proof is over.

8          THE COURT:  All right.  Well, the rule is

9    still in effect, then.  Are we ready to proceed?

10         MR. SARTES:  Thank you, Your Honor.  Yes.

11         THE COURT:  Bring the jury in, please.

12         COURTROOM SECURITY OFFICER:  Yes, sir.  Rise

13   for the jury, please.

14   (Jury in at 9:07 AM.)

15         THE COURT:  Well, good morning.  Please be

16   seated.  We are ready to resume testimony.

17   Mr. Tragos?

18         MR. TRAGOS:  Your Honor, the defense would

19   call Paul Kaufman.

20          DEFENSE WITNESS, PAUL KAUFMAN, SWORN

21         COURTROOM SECURITY OFFICER:  Face the clerk.

22         COURTROOM DEPUTY CLERK:  Raise your right

23   hand.

24         THE WITNESS:  I do.

25         COURTROOM DEPUTY CLERK:  Please be seated.

1    Please state your name and spell your last name for

2    the record.

3              THE WITNESS:  Paul Kaufman, K-A-U-F-M-A-N.

4              COURTROOM DEPUTY CLERK:  Pull that microphone

5    down just a little bit.

6              THE WITNESS:  Yes.  I'm sorry.  Paul Kaufman,

7    K-A-U-F-M-A-N.

8              COURTROOM DEPUTY CLERK:  Thank you.

9                      DIRECT EXAMINATION

10   BY MR. TRAGOS:

11   Q     Sir, what is your relationship to Charles

12   Jackson Friedlander?

13   A     He's my brother-in-law.  I'm married to his

14   younger sister.

15   Q     Okay.  When did you meet him?

16   A     Probably in 1951 when I first started to go

17   out with his sister.

18   Q     What's your educational background?

19   A     Well, I'm a graduate of the New Rochelle High

20   School in New Rochelle, New York.  I attended

21   Harvard College for three years, and I'm a graduate

22   of the Boston University School of Medicine.

23   Q     Okay.  Why did you only attend Harvard College

24   for three years?

25   A     Well, it was during the Korean War.  And I

1       figured if I was going to be a physician, I might as

2       well get started.  So I was lucky enough to get

3       accepted.

4       Q       So you didn't have to -- back then you didn't

5       have to finish Harvard in order to get into medical

6       school?

7       A       In those days you could do that.

8       Q       Okay.  And what is your current position?

9       A       I'm an associate professor of psychiatry at

10      the Boston University School of Medicine.  And I

11      teach.  I've retired from seeing patients for a

12      couple of years.

13      Q       Okay.  And you hold -- you are a psychiatrist?

14      A       I am a psychiatrist.  Yes.

15      Q       And your -- because of that you also hold a

16      medical degree; correct?

17      A       I have a medical degree, yes.

18      Q       And first off, with regards to Charles Jackson

19      Friedlander, to your knowledge has he ever been

20      married?

21      A       No.

22      Q       Okay.  Does he have any children?

23      A       No.

24      Q       And what is your opinion of his truthfulness?

25      A       He's truthful.

Kaufman - Cross

1    Q      Okay.  You have children; don't you?

2    A      I have two boys.

3    Q      Okay.  In the courtroom last week there were

4    two gentlemen that were sitting in the back here.

5    Are those your two sons?

6    A      Those are my two sons.  They're quite devoted

7    to Charles.

8    Q      Did you ever have a concern with regard to

9    having those sons when they were growing up in

10   contact with Charles Friedlander?

11   A      No.

12   Q      Okay.  What is your opinion of his law-abiding

13   nature?

14   A      His law-abiding nature?  He's a law-abiding

15   citizen.  Yes.

16   Q      Okay.  Have you ever seen him --

17   A      I've never had any reason to question that.

18          MR. TRAGOS:  No further questions, Your Honor.

19          THE COURT:  Cross-examination.

20                     CROSS-EXAMINATION

21   BY MS. KAISER:

22   Q      Good morning, sir.

23   A      Good morning.

24   Q      How many years have you known the defendant?

25   A      Let's see.  I've been married 53, so I

Kaufman - Cross

8

1    would -- 57.

2    Q      And you consider him family?

3    A      Yes, I do.

4    Q      And you love him?

5    A      I'm very fond of him.  I do love him.  Yes.

6    Q      You don't want to see him get in any trouble;

7    do you?

8    A      No, I don't.

9    Q      Did he ever discuss any of his internet usage

10   with you?

11   A      No, none.  Beyond personal e-mails with me

12   back and forth.

13   Q      All right.

14          MS. KAISER:  I have no further questions.

15          THE COURT:  Anything further, Mr. Tragos?

16          MR. TRAGOS:  Yes, Your Honor.

17                      REDIRECT EXAMINATION

18   BY MR. TRAGOS:

19   Q      Sir, does your brother-in-law like to talk?

20   A      That's almost an understatement, I would say.

21   Q      Okay.  What -- could you explain that?

22   A      Well, Charles is a very affiliative person.

23   He loves to know about people and talk to them and

24   find out about them.  He's quite well known in the

25   family.  If you go out to dinner, he knows the

Kaufman - Redirect

1        waitress's entire life history by the end of the

2        meal, that kind of thing.  He -- he talks a lot.

3    Q       Okay.  How often do you have contact with him

4        either by telephone or in person?

5    A       Over the last number of years probably every

6        week.

7    Q       Okay.

8            MR. TRAGOS:  That's all the questions I have,

9        Your Honor.

10           THE COURT:  Thank you, sir.  You may step

11       down.  Please watch your step.  Call your next

12       witness, please.

13           MR. TRAGOS:  At this time the defendant rests.

14           THE COURT:  All right.  Thank you.

15       Ms. Kaiser?

16           MS. KAISER:  Your Honor, at this time the

17       United States calls Detective Neil Spector.

18           MR. TRAGOS:  Your Honor, is the court going to

19       wait for motions?

20           THE COURT:  Yes.

21           MR. TRAGOS:  Okay.

22           THE COURT:  Thank you.

23           GOVERNMENT WITNESS, NEIL SPECTOR, SWORN

24           COURTROOM DEPUTY CLERK:  Raise your right

25       hand.

1          THE WITNESS:  I do.

2          COURTROOM DEPUTY CLERK:  Please be seated.

3          Please state your name and spell your last

4    name for the record.

5          THE WITNESS:  Detective Neil Spector,

6    S-P-E-C-T-O-R.

7                    DIRECT EXAMINATION

8    BY MS. KAISER:

9    Q     Good morning, Detective Spector.

10   A     Good morning.

11   Q     Would you please tell the jury where you work.

12   A     Certainly.  I'm a detective with the St. Lucie

13   Sheriff's Office.  It's in Ft. Pierce, Florida.

14   Q     How long have you been so employed?

15   A     Twenty-one years.

16   Q     What's your position with the Port St. Lucie

17   Sheriff's Office?

18   A     It's the St. Lucie County Sheriff's Office.

19   My position is a detective in the criminal

20   investigations division.

21   Q     Do you have any special area that you conduct

22   investigations?

23   A     I do.

24   Q     And what is that?

25   A     I'm currently assigned to Crimes Against

1      Persons Unit, which relates to homicides, sex abuse,

2      child sexual abuse cases, robberies.  And I also

3      am -- I specialize in internet child exploitation

4      investigations.

5      Q      What type of training have you had for your

6      position?

7      A      I've received approximately 160 hours of

8      training through the Department of Justice in

9      various internet child exploitation investigations,

10     including in the investigations of child

11     pornography.

12     Q      Do you ever conduct any undercover

13     investigations?

14     A      I do.

15     Q      How do you in general go about going an

16     undercover child exploitation investigation?

17     A      Depending on the persona you're doing, the

18     majority will either -- the undercover officer will

19     either go online as a teenager or as an adult, going

20     into specific related chat rooms and various

21     internet service providers such as Yahoo, America

22     Online, MSN and such.

23     Q      Did you have an occasion to investigate the

24     defendant, Charles Friedlander?

25            MR. TRAGOS:  At this time, Your Honor, I ask

1        for a -- request a side bar.

2            THE COURT:  You may.  Come forward, please.

3        (At side bar, on the record.)

4            MR. TRAGOS:  At this time we'd like to pose an

5        objection with reference to the admissibility.  I'd

6        like to pose an objection with reference to the

7        admissibility of this evidence as 404(b) or any

8        other type of evidence.

9            First off, Your Honor, we would like to ask

10       under what rule the government is seeking to

11       introduce this, because the court did make the

12       comment that one of the reasons the court felt that

13       it couldn't be introduced is because my client could

14       not remember saying some of the things that the

15       prosecutor was asking about.  And if that's the --

16       if that's the purpose of calling this, then his

17       testimony would be limited to those as

18       inconsistent -- primary inconsistent statements.

19           If it is totally 404(b), then, Your Honor, we

20       would pose an objection that this does not qualify

21       as 404(b), in that the evidence is -- goes to

22       intent, that intent is always an issue, and that

23       this should have been presented -- and the

24       government did try to present it -- during their

25       chase in chief.  At that time the court ruled that

1       the prejudicial value was outweighed by the

2       probative value because of the -- the -- the -- what

3       was interjected by the agent was the fact that this

4       was a slow or retarded little girl that was -- he

5       was offering up.

6            The -- therefore, we would object to it being

7       rebuttal since if it did not qualify as evidence in

8       the beginning, then it would not qualify under

9       404(b) now as rebuttal.  In the case in chief I'm

10      talking about when I say beginning.

11           And I don't know what the government has done,

12      if they are going to put this in, to redact or

13      instruct this witness as to whether or not -- as to

14      how he should avoid saying anything about the mental

15      condition of the alleged fictitious victim in this

16      case.

17           There is an undercover tape recording and I

18      don't know -- or video or digital recording, and I

19      don't know how the government plans on putting that

20      into evidence.  But if they do plan on putting it

21      into evidence, has the portion been redacted which

22      mentions the child's mental condition.

23           So there's another -- I know I've said a lot,

24      but I just wish to raise those issues for the

25      court's consideration.

1          THE COURT:  Response.

2          MS. KAISER:  The defendant in this case took

3     the stand and denied any sexual interest in

4     children.  He said he had no sexual interest in

5     children whatsoever.

6          This is proper rebuttal evidence to show that

7     he does, indeed, have a sexual interest in children.

8     The government originally had wanted to present this

9     in its case in chief as 404(b) evidence, and the

10    court ruled that, while it was closely related in

11    time, that unless the defendant opened the door that

12    the government would have to wait to see if that

13    happened before it could present this evidence.

14         Because the defendant took the stand and

15    basically denied his sexual interest in children,

16    this evidence is directly in rebuttal to his

17    assertions on the stand, and it's permissible.

18         MR. TRAGOS:  May I respond, Your Honor.

19         THE COURT:  Briefly.

20         MR. TRAGOS:  Yes, Your Honor.  The defendant

21    did not deny making these statements and did not

22    deny having these -- in fact, admitted on the stand

23    that he did conversations with other people, he did

24    speak about sexual things regarding children to

25    other people.

1          The only thing he could is he couldn't

2     remember specific statements given by the

3     prosecutor, but he never denied the conversations

4     happened and what the conversation topic was.

5          THE COURT:   The objection is overruled.   This

6     was subject to a motion in limine pretrial, and we

7     had an extensive argument at that time.   And I

8     granted that motion with the understanding that,

9     depending on what occurred in the defense case, the

10    court would revisit it which, of course, we have,

11    because the defendant denied having an interest in

12    children.

13         Mr. Tragos is correct, he did admit discussing

14    it but he denied having an interest.   The

15    defendant's testimony is subject to credibility

16    determination by the jury.   He purported to deny

17    or -- not deny, but not remember significant aspects

18    of what I'm about to hear, I'm sure, through this

19    witness's testimony.

20         His denials were, in the court's judgment, not

21    truthful or credible.   And that, in addition to his

22    denial of any interest in children and considering

23    the fact that this is closely related in time, very,

24    very similar conduct, makes it probative and

25    outweighs any prejudice.

1          I do understand from our discussion Friday,

2     however, that the government will not bring in the

3     mental status of the alleged child.  Is that

4     correct, Ms. Kaiser?

5          MS. KAISER:  No, Your Honor.  That was --

6          THE COURT:  That's not correct?

7          MS. KAISER:  No, Your Honor.  We did not

8     discuss --

9          THE COURT:  You are not going to bring it out;

10    correct.

11         MS. KAISER:  No, Your Honor.  That's not

12    correct.  That's not correct.  We did not --

13         THE COURT:  Well, I'm ordering that you not

14    bring it out.  I said that Friday.  We are going to

15    avoid any reference to the mental status of this

16    child.  It's highly, highly prejudicial.

17         MS. KAISER:  Your Honor, the court did not

18    order the government to redact any -- any tapes nor

19    did it.

20         THE COURT:  I'm doing it now.  I understood

21    Friday that you confirmed you would not get into

22    that.  It was unnecessary.

23         MS. KAISER:  Your Honor -- Your Honor, that

24    was --

25         THE COURT:  I'm not going to argue with you.

1    If you want to get into it, you're not going to.

2    I'm prohibiting you from putting on any evidence of

3    the mental status of this child.  Under 404(b), it's

4    highly, highly prejudicial.  It outweighs any

5    probative value, and it's not coming in.

6         If you want to put it in without reference to

7    that, you are granted leave to do that over the

8    objection of Mr. Tragos.  Those are the parameters.

9         MS. KAISER:  Your Honor, if I may.

10        THE COURT:  I'm not arguing with you.  That's

11    it.  You can take it -- if you don't want to abide

12    by that rule, then the witness can be dismissed.

13        MS. KAISER:  No.  It's just a question of

14    logistics at this point, Your Honor, because what I

15    had understood the court's ruling before was not to

16    inquire on cross-examination of the defendant about

17    the mental status in cross-examination, but it

18    had -- the court's ruling had nothing to do with the

19    prospective evidence of the government's rebuttal

20    case.

21        THE COURT:  Well, you are mistaken.

22        MS. KAISER:  So at this point, Your Honor, we

23    can go forward and present the evidence.  But the

24    government would need some time to identify where on

25    the tape recording there's reference to her mental

1    status so it can redact same.  But that was not in

2    the court's ruling on Friday.  The only court's

3    ruling regarding the child's mental --

4        THE COURT:  Well, if necessary, I'll have the

5    transcript made, because I distinctly recall telling

6    you we're not getting into the mental status of this

7    child.

8        MS. KAISER:  That was in the context of the

9    cross-examination of the defendant.  It was not in

10   the context of presenting this rebuttal evidence.

11       THE COURT:  Well, it's in the context of the

12   evidence in this case.  We are ready to go forward.

13   I am fed up with the delays and extensive

14   examination of these witnesses, unnecessarily, in my

15   judgment.  I've granted you great liberty, both

16   sides.

17       This case has gone beyond the time limits it

18   should have.  Either you put on your witness and

19   your evidence or withdraw him.  Real simple.  If

20   you can put it on and redact it as it's being

21   played, that's fine.  I don't have any idea to what

22   extent it's discussed.

23       But the mental status of this child will not

24   be in evidence before this jury.  How are you going

25   to present i?  Is it an audio recording?

1          MS. KAISER:  There's two audio recordings and

2     then there's written chats.

3          THE COURT:  Is it in both?

4          MS. KAISER:  I believe it is in both, but I

5     would need a minute to look at the evidence to

6     determine where exactly because, you know, as the

7     government stated previously, there was no intent to

8     disregard the court's order.  But I understood the

9     court's order to only have to deal with the

10    cross-examination of the defendant.

11         THE COURT:  Mr. Witness, would you come up

12    here, please.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  You said that three times,

15    Ms. Kaiser.  You are mistaken.  If you

16    misunderstood, I'm sorry, but it's not coming out.

17         MS. KAISER:  Yes, Your Honor.

18         THE COURT:  The mental status of this alleged

19    child victim will not be mentioned to this jury.

20    And I want to make sure you understand that.  Do

21    you?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  All right.  So if you get remotely

24    close, please don't say anything about the mental

25    status of the child.  The age, relationship with you

```
 1      as the undercover is fine.  But the mental status I

 2      have determined not to be admissible in the case.

 3      Okay.  Any questions about that?

 4           THE WITNESS:  Judge, if I'm not mistaken, are

 5      any of those mentioned in the phone calls?

 6           MS. KAISER:  Yes.

 7           THE COURT:  Okay.

 8           MS. KAISER:  They are.

 9           THE WITNESS:  Okay.

10           THE COURT:  So how do you want to go?  How do

11      you want to proceed, Ms. Kaiser?

12           MS. KAISER:  Your Honor, I'd just ask for a

13      brief recess so the government could possibly

14      identify and try to stop the tape at the appropriate

15      time so the jury doesn't hear anything that the

16      court wishes it doesn't.

17           THE COURT:  Well, I'll give you five minutes

18      to do that.

19      (End of side bar discussion.)

20           THE COURT:  Members of the jury, it's going to

21      take about five minutes to resolve this issue, so

22      I'm going to let you relax in the jury room, please.

23           COURTROOM SECURITY OFFICER:  Rise for the

24      jury, please.

25      (Jury out at 9:26 AM.)
```

1        (Recess was taken at 9:26 until 9:35 am.)

2             MS. KAISER:  Your Honor, we can proceed.

3             MR. TRAGOS:  If the court please, I want to

4        make sure --

5             THE COURT:  We weren't on the record.

6        Ms. Kaiser, have you been able to identify those

7        portions in the transcripts and/or e-mails --

8             MS. KAISER:  We --

9             THE COURT:  -- that you can easily redact?

10            MS. KAISER:  There's no references in the

11       chats that we're going to present.  And we can't

12       redact the phone calls, so we just won't play them.

13            THE COURT:  All right.  Mr. Tragos?

14            MR. TRAGOS:  Okay.  Your Honor, the -- I just

15       wanted to make sure that I did say up there that I

16       do object to this evidence coming in.  I'm not sure

17       if I used the word object.  The appellate court --

18            THE COURT:  If you didn't, it was implicit.  I

19       think you did.

20            MR. TRAGOS:  All right.

21            THE COURT:  Let me ask in an abundance of

22       caution, is the government offering this in addition

23       to rebuttal to the defendant's testimony under

24       404(b)?

25            MS. KAISER:  Yes, Your Honor.

1          THE COURT:  I would assume, therefore,

2     Mr. Tragos, without waiving your objection, you

3     would want me to instruct the jury of the limited

4     admissibility of this evidence?

5          MR. TRAGOS:  Yes, Your Honor.

6          THE COURT:  All right.  I would propose, then,

7     to instruct as follows.  Listen carefully.  You are

8     about to hear testimony that the defendant

9     previously committed a crime similar to the one

10    charged here.  I instruct you that the testimony is

11    being admitted only for the limited purpose of being

12    considered by you on the question of defendant's

13    intent.

14         MR. TRAGOS:  We would object to that

15    instruction, Your Honor, the very beginning when the

16    court says a crime.  We would say that that should

17    be amended to --

18         THE COURT:  Conduct?

19         MR. TRAGOS:  Conduct, correct.

20         THE COURT:  I don't have a problem with that.

21    Ms. Kaiser?  I don't know that it is a crime, but it

22    is conduct.

23         MS. KAISER:  Yes.

24         THE COURT:  All right.  So we'll substitute

25    the word crime for conduct.  In these discussions,

1      are there discussions about meeting with the

2      undercover and the child?

3              MS. KAISER:  In the chats?

4              THE COURT:  Yes.

5              MS. KAISER:  Yes.  But nothing definite.

6              THE COURT:  All right.  To the extent the

7      government, then, offers it under 404(b), let me

8      make a determination under the *Beechum* analysis, and

9      that's B-E-E-C-H-U-M, I believe.  This evidence goes

10     to the defendant's intent.  I believe from the

11     proffers I've heard in the pretrial discussions and

12     today, that the evidence is sufficiently established

13     to enable the jury to find by a preponderance of the

14     evidence that the defendant indeed engaged in the

15     conduct about to be described.

16             With the exception of the mental status of the

17     child, I find that the probative value of the

18     evidence is not substantially outweighed by undue or

19     unfair prejudice.  And I find expressly and

20     specifically that evidence of the mental status of

21     the child is highly prejudicial and outweighs

22     probative value and, therefore, have precluded any

23     reference to that in the presentation of the

24     evidence.

25             Anything else before we bring the jury in?

```
 1              MS. KAISER:  No, Your Honor.

 2              THE COURT:  Mr. Tragos?

 3              MR. TRAGOS:  No, Your Honor.

 4              THE COURT:  Does the witness have any

 5      questions about the court ruling?

 6              THE WITNESS:  No, Your Honor.

 7              THE COURT:  All right.  If you are asked a

 8      question and you're concerned about the response,

 9      please just alert the court.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  All right.  Bring the jury in,

12      please.

13              COURTROOM SECURITY OFFICER:  Yes, sir.

14              THE COURT:  Ms. Kaiser, do you have a copy of

15      the Murrell decision handy?  That's the case dealing

16      with the intent issue.  You can bring it up later.

17      Don't worry.

18              COURTROOM SECURITY OFFICER:  Rise for the

19      jury, please.

20      (Jury in at 9:40 AM.)

21              THE COURT:  Thank you, and be seated.  We're

22      ready to proceed.  Thank you for indulging us.

23              Ms. Kaiser, you may resume direct examination.

24      BY MS. KAISER:

25      Q      When we last left off, Detective Spector, I
```

1       had asked if you had conducted an investigation of

2       the defendant, Charles Friedlander.

3       A       Yes, I did.

4       Q       And how did that come about?

5       A       I was in an America Online chat room back in

6       February of 2007, I believe, or 2008, rather, in a

7       chat room called Family Fun.  And I received an

8       instant message.

9       Q       And did you communicate with the defendant?

10      A       I did.

11      Q       Over what period of time did you engage in

12      communication with the defendant?

13      A       From February to about mid June, I believe.

14      Q       At some point did you stop your investigation

15      of the defendant?

16      A       I did.

17      Q       And why?

18      A       I was contacted by another law enforcement

19      officer in the State of Florida who told me he had

20      also an ongoing investigation.

21      Q       Was it Corporal Romanosky?

22      A       Yes, it was.

23      Q       When you were communicating with the

24      defendant, did you have instant message chats with

25      him?

1    A      I did.

2    Q      Did you also have e-mails?

3    A      I did.

4    Q      Did you ever speak to him on the phone?

5    A      I did.

6    Q      And how long were your phone conversations?

7    A      The first one was approximately nine minutes

8    and the second one was approximately 35 minutes.

9    Q      Did you ever exchange pictures with the

10   defendant?

11   A      I did.

12   Q      And could you explain that?

13   A      Certainly.  My undercover persona on this

14   particular investigation was a father with two

15   children, a daughter, age 11, and a son, age 12.  I

16   sent the defendant through e-mail a picture -- or

17   two pictures of my portrayed daughter, and then he

18   had sent me, I believe, one picture of himself.

19   Q      And what was your undercover persona?  What

20   did you represent to him and what type of

21   information did you and Mr. Friedlander discuss?

22   A      I portrayed to him that, again, I was a father

23   with a daughter, age 11, and a son, age 12.  And we

24   discussed incest, trading images.

25           MS. KAISER:  Your Honor, may I approach the

1       witness?

2            THE COURT:   You may.

3       BY MS. KAISER:

4       Q      Detective Spector, I'm showing you what's been

5       marked for identification as Government's Exhibits

6       67, 69, 70, 72, 73, 76, 77, 78, 79, 80, 81, 82, 83,

7       and 84, and ask if you could take a look at those,

8       please.

9       A      Certainly.

10      Q      Do you recognize those documents?

11      A      I do.

12      Q      What are they?

13      A      Those are the instant messages and e-mails

14      that I had with the defendant by the screen name

15      Captoes.

16      Q      And did you maintain those chats in the

17      ordinary course of business?

18      A      I did.

19      Q      Are those a complete record of your chats with

20      the defendant?

21      A      They are.

22      Q      And did you maintain them as part of your

23      investigation of him?

24      A      I did.

25           MS. KAISER:   Your Honor, at this time I'd move

1    for admission of Government's Exhibits 67, 69, 70,

2    72, 73, 76, 77, 78, 79, 80, 81, 82, 83 and 84 into

3    evidence.

4         THE COURT:  Subject to the previous

5    objections, Mr. Tragos, anything beyond that?

6         MR. TRAGOS:  Could I have one second, Your

7    Honor, to --

8         THE COURT:  Yes, sir.

9         MR. TRAGOS:  -- go through the exhibit list a

10   minute.

11   (Brief pause.)

12        MR. TRAGOS:  No objection, Your Honor, as long

13   as they comply with the court's rulings.

14        THE COURT:  All right.  Exhibits 67, 69, 70,

15   72, 73, 76 through 84 are now received.

16   (Whereupon, Government's Exhibit Number 67, 69, 70,

17   72, 73, 76 through 84 are received into evidence.)

18        THE COURT:  Members of the jury, you will

19   recall that I explained the charge in the

20   indictment.  Remember that this defendant is on

21   trial only for the charge that the specific offense

22   charged in the indictment.

23        You are about to hear testimony and evidence

24   that the defendant previously engaged in conduct

25   similar to the one charged in the indictment.  I

1      instruct you that this testimony and evidence is

2      being presented only for the limited purpose of

3      being considered by you on the question of the

4      defendant's intent to engage in the conduct alleged

5      in the indictment.  You may proceed.

6              MS. KAISER:  Thank you, Your Honor.

7      BY MS. KAISER:

8      Q      Detective, I'm showing you what's been marked

9      as Government's Exhibit 92 and 93, as well as 75,

10     and ask if you could take a look at those documents.

11     A      I have.

12     Q      What is document number 75?

13     A      75 is an e-mail I received from Captoes, and

14     it appears to be a picture of the defendant.

15     Q      And for Government's Exhibits 92 and 93, if

16     you could take a look at those, as well.

17     A      That -- those are photographs I sent the

18     defendant through e-mail.

19     Q      And did you maintain these records as part of

20     your investigation, as well?

21     A      I did.

22             MS. KAISER:  Your Honor, at this time I'd move

23     for admission of Government's Exhibit 75, 92 and 93

24     into evidence.

25             THE COURT:  Any objection?

 1          MR. TRAGOS:  Without waiving my prior

 2     objections, Your Honor, no objection.

 3          THE COURT:  75, 92 and 93 are now received.

 4     Thank you.

 5     (Whereupon, Government's Exhibit Numbers 75, 92 and

 6     93 are received into evidence.)

 7     BY MS. KAISER:

 8     Q     Now, Detective Spector, I noted that the last

 9     chat, Government's Exhibit 84, stopped on 3/12/2008;

10     is that correct?

11     A     Yes, ma'am.

12     Q     Did you continue to chat with the defendant

13     through June of 2008?

14     A     I did.

15          MS. KAISER:  Your Honor, at this time the

16     government wishes to publish the previously admitted

17     exhibits.

18          THE COURT:  All right.  You may.  Is the

19     machine warmed up?

20          COURTROOM DEPUTY CLERK:  Yes, sir.

21     BY MS. KAISER:

22     Q     Detective Spector, I'm going to ask if you

23     would -- do you have a copy of your chats with you,

24     sir?

25     A     I do not.

1    Q      Okay.  If you would -- we're going to go ahead

2    and publish these, and if you would read your part,

3    we're going to have it up on the overhead, if you

4    could see that and Special Agent Hagedorn will read

5    the part of Captoes; okay?

6    A      That's fine.

7    Q      All right.  On this first chat, Detective

8    Spector, can you see that all right?

9    A      I can.  Thank you.

10   Q      Okay.  I can zoom it in a little bit, if it

11   helps.

12   A      That's perfect, counsel.

13   Q      Is that good?  Can you see that, Detective?

14   A      I can, up to 7:04 PM.

15   Q      Okay.  I'll slide it as we go.

16   A      Okay.

17   Q      And this chat was from 2/12/08; is that

18   correct?

19   A      That's correct.

20   Q      All right.  And who made the first contact?

21          MR. TRAGOS:  I'm sorry.  Could we identify it

22   by exhibit number?

23          MS. KAISER:  It's Exhibit 67.

24          MR. TRAGOS:  Okay.  Thank you.

25          THE WITNESS:  It's the defendant's screen

1      name.

2      BY MS. KAISER:

3      Q       Okay.  And he contacted you first?

4      A       That's correct.

5      Q       All right.  Okay.  If you would, proceed.

6              CAPTOES:  Much older Dic Dad.  Other side of

7      state.  Div.

8              TRAVLNDADFL:  Interests.

9              CAPTOES:  Varied.  Older son, no grand kids.

10             TRAVLNDADFL:  Okay.  I'm Wayne, 40.  In Port

11     St. Lucie.

12             CAPTOES:  Am Charles, 69, Ft. Myers.

13             TRAVLNDADFL:  Okay.  Hi.  What you into,

14     Charles?

15             CAPTOES:  All ages.  Strict older dad.  And

16     you, Wayne?

17             TRAVLNDADFL:  Sorry.  Into young.

18             CAPTOES:  I am, yes.

19             TRAVLNDADFL:  That's what I'm into.

20             CAPTOES:  Me, too, when possible.

21             TRAVLNDADFL:  Really.  What ages you like?

22             CAPTOES:  Most any age.  And you?

23             TRAVLNDADFL:  Preteen.

24             CAPTOES:  What do you like to do?  Like it all

25     here.

1           TRAVLNDADFL:  I'm sorry.  Not into fantasy

2      chat.  Very real here.

3           CAPTOES:  I am not into fantasy anything.

4      Only real.  How old are yours at home?

5           TRAVLNDADFL:  Daughter 11 son 12.  Home now.

6           CAPTOES:  With both?

7           TRAVLNDADFL:  What do you mean?

8           CAPTOES:  Sure would enjoy being home with

9      those ages.

10          TRAVLNDADFL:  Cool.

11          CAPTOES:  Are they small for their ages or

12     average?

13          TRAVLNDADFL:  Small.

14          CAPTOES:  Am five 10 and 185 pound.

15          TRAVLNDADFL:  Okay.

16          CAPTOES:  And you?  You all should come over

17     and visit sometime.

18          TRAVLNDADFL:  For.

19          CAPTOES:  Lots of good fun.

20          TRAVLNDADFL:  If you're serious, you would

21     have to come here first.  Perhaps talk on phone.

22          CAPTOES:  Fine.

23          TRAVLNDADFL:  Want me to call you now?

24          CAPTOES:  Phone ringing.  Back in a few, okay?

25          TRAVLNDADFL:  Okay.  Take care.

1          CAPTOES:  Sorry.  People talk lots.  Want to

2     call?

3          TRAVLNDADFL:  On phone.  Give me a few.

4          CAPTOES:  Sure.

5          TRAVLNDADFL:  I'm back.  I'm back.  Hi.

6          CAPTOES:  Good.  Want to talk about your kids?

7          TRAVLNDADFL:  What are you looking for?

8          CAPTOES:  Enjoying them.

9          TRAVLNDADFL:  Such as?

10          CAPTOES:  Finding out what you like me to do.

11     What do you do, also?

12          TRAVLNDADFL:  I'm very open, very real.  If

13     you're serious, I might be.

14          CAPTOES:  I am serious.  Need to know what

15     they have done and what your limits are.

16          TRAVLNDADFL:  Number?  Guess you changed mind.

17     Bye.

18          CAPTOES:  Am traveling now up north with

19     sleet.  Number is 202-607-6666.

20          TRAVLNDADFL:  Thought you were in Florida.

21          CAPTOES:  I normally but traveling for work

22     for 10 days.

23          TRAVLNDADFL:  Do you have collections, too?

24          CAPTOES:  Collections?

25          TRAVLNDADFL:  Vids.

1          CAPTOES:  No.

2          TRAVLNDADFL:  Ringing.

3    BY MS. KAISER:

4    Q     Next publishing Government's Exhibit 69.

5          CAPTOES:  Good morning.  We chatted a few days

6    ago.

7          TRAVLNDADFL:  Hi.  How are you?

8          CAPTOES:  Fine thanks.  And you?  How are

9    kids, too?

10         TRAVLNDADFL:  All is good.

11         CAPTOES:  Good.  Enjoyed our chat.  I will

12   come over first and then you all can come over to

13   me.

14         TRAVLNDADFL:  Sounds good.  Where are you?

15         CAPTOES:  Bet Naples and Ft. Myers.  And you

16   are on the east coast, I believe.

17         TRAVLNDADFL:  Yeah.  You back in Florida yet?

18         CAPTOES:  No.  Two or three more weeks of

19   travel.  How old are your kids again?

20         TRAVLNDADFL:  Daughter, 11; son, 12.  All home

21   now.

22         CAPTOES:  Good.  All gong well with you and

23   them?

24         TRAVLNDADFL:  All is good.

25         CAPTOES:  Thinking much about what we talked

1    about?

2          TRAVLNDADFL:  Well, honestly, no.  When you're

3    serious, I will.

4          CAPTOES:  I am totally serious and hope you

5    are.

6          TRAVLNDADFL:  I am, and real.  So where are

7    you now?

8          CAPTOES:  Am in VA.  Going to NY and Boston.

9    Have you started anything at all with her yet?

10          TRAVLNDADFL:  Wow, how come?

11          CAPTOES:  How come traveling?  For work.

12          TRAVLNDADFL:  Can I ask what you do?  I'm in

13    real estate.

14          CAPTOES:  Medical, meetings, etcetera.

15          TRAVLNDADFL:  Cool.  So you're staying at

16    hotel?

17          CAPTOES:  Some and some with family.

18          TRAVLNDADFL:  Very cool.  And today?

19          CAPTOES:  Have you started anything with her

20    yet?

21          TRAVLNDADFL:  I have.

22          CAPTOES:  Exactly what so we can both work

23    together?  Are you including him in anything?

24          TRAVLNDADFL:  BRB, phone.

25          CAPTOES:  Computer froze.  Missed your last

1       IM.

2               TRAVLNDADFL:  On phone with work.

3               CAPTOES:  Will wait, if okay with you.

4               TRAVLNDADFL:  Okay.  You there?

5               CAPTOES:  Yes.  Missed your last IM just

6       before I was frozen.  Asked what you had done with

7       her and whether you were including him in anything.

8               TRAVLNDADFL:  Oh, listen, if you want to talk,

9       we should.

10              CAPTOES:  I do.

11              TRAVLNDADFL:  We haven't talked on phone yet;

12      right?

13              CAPTOES:  No, we have not, I don't believe.

14              TRAVLNDADFL:  Well when you're ready, I can

15      call you.

16              CAPTOES:  Okay.  Have cell with me.

17      202-607-6666.

18              TRAVLNDADFL:  Okay.  Give me a few.

19              CAPTOES:  Will rush in the shower.  Make it

20      10, okay?

21              TRAVLNDADFL:  Sure.  Take your time.

22              CAPTOES:  Will say okay when ready.  About a

23      minute or two?

24              TRAVLNDADFL:  Sure.  You there?

25      BY MS. KAISER:

1    Q       Next publishing Government's Exhibit Number

2    70.  Detective Spector, what are -- what are we

3    looking at here in Government's Exhibit 70?

4    A       An e-mail from Captoes on Saturday, February

5    16th, 2008.

6    Q       All right.

7    A       The e-mail states or writes:  Waited for phone

8    but had left computer.  Home after 4 today.  Please

9    call.  202-607-6666.

10   Q       Publishing Government's Exhibit 72.  What are

11   we looking at here?

12   A       Another e-mail on February 18th.  Wayne, was

13   in meetings tell 5:00 or so.  Called you but no

14   answer.  Can you call me tomorrow between 8 and 10

15   in the morning or after 2 PM?  Thanks, Charles.

16   Q       Putting on the overhead Government's Exhibit

17   75.  Can you see that?

18   A       I can.

19   Q       What is Government's Exhibit 75?

20   A       It is a picture of the defendant standing

21   behind a car.

22   Q       And how did you get this?

23   A       From the defendant via electronic mail.

24   Q       And is this the e-mail that he sent to you?

25   A       It is.

1    Q      And that's Government's Exhibit 75.  What was

2    the date that he sent you his picture?

3    A      February 20th, 2008.

4    Q      Government's Exhibit 76, what are we looking

5    at here?

6    A      Another e-mail sent from the defendant on

7    February 20th.  It says, Wayne, I look three years

8    older now and I am.  Look the same except hair is

9    grayer.  You can see all of me in the photo.  Like

10   to hear her comments, Charles.

11   Q      Publishing Government's Exhibit 92.  Could you

12   tell the jury what this is.

13   A      It's a photograph I e-mailed to the defendant

14   on February 20th, 2008.  It's a photograph of a

15   sheriff's deputy when she was 12 years -- or, I'm

16   sorry, 11 years old.  And that was my portrayed

17   persona as my daughter.

18   Q      And also Government's Exhibit 93.

19   A      Same persona, same child, sent to the

20   defendant on February 20th, 2008.

21   Q      All right.  Next publishing Government's

22   Exhibit 77.

23          CAPTOES:  Hey, Wayne.  Great chat yesterday.

24          TRAVLNDADFL:  Hey, Charles.  How are ya.

25          CAPTOES:  Fine, thanks.  Really feel we need

1      to and should meet.

2              TRAVLNDADFL:  I'm honestly a little hesitant.

3              CAPTOES:  Okay.  Not if you don't want to.

4              TRAVLNDADFL:  I do, just want to make sure

5      you're legit.  I don't need trouble.

6              CAPTOES:  Wayne, don't know what to do to

7      convince you.

8              TRAVLNDADFL:  I'm just concerned that since

9      you're a medical person this might be something

10     more.  This is my life we're talking about.  I want

11     to believe in your interest.

12             CAPTOES:  Well, can't help my profession.

13     Don't I have as much to lose?

14             TRAVLNDADFL:  I guess you have a point.  And

15     if you weren't a medical professional, you wouldn't

16     tell me that, I'm sure.  I don't see you as the liar

17     type.

18             CAPTOES:  I am not.  Never even thought about

19     that.

20             TRAVLNDADFL:  Okay.  You never asked for a pic

21     of my little one.

22             CAPTOES:  I know.  I did not know if that

23     might bother you.  Am ultra careful myself.  Sure

24     I'd like to see one.

25             TRAVLNDADFL:  Mail.  Do you have any or of

1    yourself?

2          CAPTOES:  Can trade you one of me for one of

3    you, if you'd like.

4          TRAVLNDADFL:  I'm sorry.  Don't have any of

5    me.  I have several of Susie.

6          CAPTOES:  I only have -- I have only poor one.

7          TRAVLNDADFL:  Did you get her pic?

8          CAPTOES:  Slow downloading.

9          TRAVLNDADFL:  Really?  Okay.  Would love to

10   see yours, as well, if that's possible.  I can at

11   least show her.

12         CAPTOES:  Very cute and petite, petite.

13         TRAVLNDADFL:  Like I told you.

14         CAPTOES:  Looking for it now.  Am not good

15   with computer.

16         TRAVLNDADFL:  Okay.  Let me know.

17         CAPTOES:  It would be good if she did see me

18   and get her reaction.

19         TRAVLNDADFL:  I will show her this afternoon.

20         CAPTOES:  Are you going to do much with her

21   this afternoon?

22         TRAVLNDADFL:  Not sure.  Did you send?

23         CAPTOES:  Still looking.

24         TRAVLNDADFL:  Okay.  Sorry.  Got booted for a

25   minute.  How difficult can it be to find your pic?

1        CAPTOES:  It is somewhere.  Don't give up.

2        TRAVLNDADFL:  Okay.  While I'm waiting I meant

3    to ask, what does your screen name mean?

4        CAPTOES:  Dress shoes I wear.

5        TRAVLNDADFL:  Oh, okay.  Any luck?  Well, I

6    need to run.

7        CAPTOES:  Okay.  Talk.

8        TRAVLNDADFL:  What.

9        CAPTOES:  Talk later.

10        TRAVLNDADFL:  Well, still waiting for the

11    invisible pic.  LOL.

12        CAPTOES:  You will get it.

13        TRAVLNDADFL:  We'll see.  Talk to you later.

14    I'm going to get kids.  Will be on later today.

15        CAPTOES:  Great.  Wish I were there.

16        TRAVLNDADFL:  Maybe some day you will be.

17    Bye.

18    BY MS. KAISER:

19    Q    Next publishing Government's Exhibit Number

20    78.  On what date was this chat, Detective Spector?

21    A    February 23rd, 2008.

22    Q    All right.

23        CAPTOES:  Hey, Wayne.  Went to NYC.  What a

24    mess and crowded and dirty.

25        TRAVLNDADFL:  Good morning.  How are you?  Are

1    you still in New York?  Did you leave?

2           CAPTOES:  Fine now.  Yes, back in VA.

3           TRAVLNDADFL:  That's cool.

4           CAPTOES:  Of you too had been there, would

5    have been okay.  Meeting went well.

6           TRAVLNDADFL:  That's good.  Is it snowing now

7    in Virginia?

8           CAPTOES:  No.  None here at all.

9           TRAVLNDADFL:  That's good.  So what are your

10   plans for the weekend?

11          CAPTOES:  None.  Thought I'd be up there.

12   What are yours?

13          TRAVLNDADFL:  Relaxing at the house, taking

14   the kids to the beach.  Nothing too much.

15          CAPTOES:  With GF?

16          TRAVLNDADFL:  She is working today.  This

17   evening we're going to a movie and dinner.

18          CAPTOES:  Wish I would be with you all.

19          TRAVLNDADFL:  Not sure my GF would appreciate

20   that.  LOL.

21          CAPTOES:  Just for beach.

22          TRAVLNDADFL:  Thought you left.  Yes.  Susie

23   loves beach.  So does my son.

24          CAPTOES:  That's great.

25          TRAVLNDADFL:  How long are you in Virginia?

1              CAPTOES:  Till 1 March, then Boston.

2              TRAVLNDADFL:  Oh, wow.  How come?

3              CAPTOES:  Work and meetings in both places.

4       Then home on the 15th.

5              TRAVLNDADFL:  Good for you.  Sounds like you

6       stay very busy.

7              CAPTOES:  In fits and starts.  Not always.

8       Rarely when home.  Eager to see you and Susie.

9              TRAVLNDADFL:  Yes.  It will be sometime after

10      the 15th.  When the time comes we'll have to make

11      plans.  Hopefully a weekend.

12             CAPTOES:  Oh, yes, for sure.  Will you join me

13      or just be there?

14             TRAVLNDADFL:  Depends.  More likely -- more

15      than likely join.  Again, I'm not bi.

16             CAPTOES:  Not necessary.  Only she.

17             TRAVLNDADFL:  Good.  My son is going on a

18      scouting trip either next weekend or the following.

19      I have been promising Susie a trip.  So we'll

20      probably do Sea World or Dizzie.

21             CAPTOES:  Okay.  I could get to Orlando

22      easily.  You will have to tell me what she can

23      handle easily.

24             TRAVLNDADFL:  I may go next weekend.  You will

25      still be out of town.

1          CAPTOES:  Yes.

2          TRAVLNDADFL:  Sorry.  Just a little confused.

3          CAPTOES:  I can get to Orlando any time when I

4    am home.

5          TRAVLNDADFL:  Oh, okay.

6          CAPTOES:  Thought you meant after 15th.

7          TRAVLNDADFL:  Thought you wanted to meet when

8    I'm there.  LOL.

9          CAPTOES:  Of course.

10          TRAVLNDADFL:  When you get back we'll figure

11    out where to meet.

12          CAPTOES:  We need full weekend, too.

13          TRAVLNDADFL:  But more than likely when I take

14    Susie, you'll still be in Virginia.

15          CAPTOES:  Yes.  This time, of course.  We'll

16    arrange one later.  It may end up being fairly

17    regular.

18          TRAVLNDADFL:  We'll see.  Hopefully we can

19    have a great relationship with discretion.

20          CAPTOES:  Of course.  Maybe even have another

21    join with daughter.

22          TRAVLNDADFL:  I don't know.  Anything is

23    possible.

24          CAPTOES:  Your choice.

25          TRAVLNDADFL:  Don't know anyone now that would

1       participate.

2               CAPTOES:  She comes first.

3               TRAVLNDADFL:  That's a must.

4               CAPTOES:  Think she will be like me?

5               TRAVLNDADFL:  I showed her your picture and I

6       told her we might meet you some time.  She said

7       okay, daddy.

8               CAPTOES:  Good first step.  You can tell me

9       exactly what I may do.

10              TRAVLNDADFL:  When the time comes closer,

11      we'll work out plans.  I'm almost open to anything.

12      Just need to keep in mind, she's 11 and I don't want

13      any pain for her.

14              CAPTOES:  No.  Will be careful because of

15      size.  She may need some time to learn to cope with

16      bigger, if you want.

17              TRAVLNDADFL:  What do you mean?  How would she

18      learn?  Anything very big would hurt her, wouldn't

19      it?

20              CAPTOES:  Slowly go in further as she gets

21      older.

22              TRAVLNDADFL:  Oh, okay.

23              CAPTOES:  If you will let me continue.

24              TRAVLNDADFL:  Lets take it slow.

25              CAPTOES:  Of course.  May I kiss her?

 1              TRAVLNDADFL:  Yes.

 2              CAPTOES:  And lick her?

 3              TRAVLNDADFL:  Yes.

 4              CAPTOES:  Love licking, Wayne.

 5              TRAVLNDADFL:  Cool.  Me, too.

 6              CAPTOES:  Am sure she'd like that.

 7              TRAVLNDADFL:  I believe she would.

 8              CAPTOES:  Off to do errands.  Talk soon.

 9              TRAVLNDADFL:  Take care.

10              CAPTOES:  You, too.

11     BY MS. KAISER:

12     Q    Going next to Government's Exhibit 80, which

13     starts on 2/25/08.

14              CAPTOES:  Hi, Wayne.

15              TRAVLNDADFL:  Hey, Charles.

16              CAPTOES:  How is all with you?

17              TRAVLNDADFL:  All is well.  Thanks.

18              CAPTOES:  Good.  Susie fine?

19              TRAVLNDADFL:  She is great.  She is actually

20     at some school project now.

21              CAPTOES:  Fine as long as she is happy.

22              TRAVLNDADFL:  She is.

23              CAPTOES:  Very eager to meet with you all.

24              TRAVLNDADFL:  Me, too.  I'm looking forward to

25     it.

1          CAPTOES:  A nice long weekend together.

2          TRAVLNDADFL:  Yes.  You said something around

3     15th?

4          CAPTOES:  Or 16th.  Not sure of days.

5          TRAVLNDADFL:  Sounds good.  Just keep in

6     touch.

7          CAPTOES:  I will.  Will we all share a room?

8          TRAVLNDADFL:  Yes, I hope so.  I can't leave

9     her alone.  Hope you understand.

10          CAPTOES:  Fine.  I really want to.  I think we

11     should all stay together.

12          TRAVLNDADFL:  Sorry, had a call.

13          CAPTOES:  We need to all stay together, Wayne.

14          TRAVLNDADFL:  Hey.

15          CAPTOES:  I know you shouldn't leave her.

16          TRAVLNDADFL:  Oh, okay.  Yeah.  Sorry.  Had to

17     leave earlier.

18          CAPTOES:  That's okay.  It will be more

19     enjoyable if we all are together.

20          TRAVLNDADFL:  Cool.

21          CAPTOES:  I need to really get to know her and

22     she know me.

23          TRAVLNDADFL:  Just be careful.

24          CAPTOES:  About what?

25          TRAVLNDADFL:  About what we're going to do.

1    Please be discreet.  I don't want anyone finding

2    out.

3         CAPTOES:  No one ever will from me.  That I

4    can assure you.

5    BY MS. KAISER:

6    Q     Detective Spector, can you just move a little

7    closer to the mic?  It's hard to hear you.

8    A     Certainly.

9         TRAVLNDADFL:  Okay.  Just a little nervous and

10   concerned.

11        CAPTOES:  When you meet me doubt that you will

12   be.

13        TRAVLNDADFL:  I'm sure you're right.

14        CAPTOES:  Will we all sleep together?

15        TRAVLNDADFL:  I hope so.  Like I said, I'm not

16   bi.

17        CAPTOES:  Has nothing to do with you.  This is

18   for her, Wayne.

19        TRAVLNDADFL:  That's true.

20        CAPTOES:  My only problem is that I get very

21   hard very easily.  Hope that's okay.

22        TRAVLNDADFL:  That's cool.

23        CAPTOES:  I will love holding her.

24        TRAVLNDADFL:  BRB.

25        CAPTOES:  Lost you.

1              TRAVLNDADFL:  Sorry.  Still on phone.

2              CAPTOES:  No problem.

3              TRAVLNDADFL:  I'm back.  Sorry.

4              CAPTOES:  Okay.  I want to get to know well

5      and slowly.

6              TRAVLNDADFL:  Good.  That will be fun.  So

7      you're still in Virginia?

8              CAPTOES:  Yes, I am.  Will go to Bson on

9      Saturday and then back to VA and home.

10             TRAVLNDADFL:  Wow.  You do a lot of traveling.

11             CAPTOES:  At times, yes.  Will give me more

12     opportunities to be with you all.

13             TRAVLNDADFL:  Sounds good.  I do hope this

14     turns out to be a good experience.

15             CAPTOES:  Why shouldn't it?

16             TRAVLNDADFL:  I'm sure it will.

17             CAPTOES:  I want it to be good for all of us

18     so we will continue.

19             TRAVLNDADFL:  Me, too.

20             CAPTOES:  I want her to both enjoy it and me.

21             TRAVLNDADFL:  Me, too.

22             CAPTOES:  I will learn what she likes and how

23     she likes it.  And that is the way it will be.

24             TRAVLNDADFL:  She will like whatever.  I just

25     don't want anything painful.

1          CAPTOES:  Not at all.  Does she like to kiss?

2          TRAVLNDADFL:  Yes.  She will do that.

3          CAPTOES:  Is there anything she especially

4     likes?

5          TRAVLNDADFL:  She loves Disney.  Will have to

6     meet there sometime.  LOL.

7          CAPTOES:  That will be fun.  I love the boat

8     ride, It's a Small World.

9          TRAVLNDADFL:  Cool.

10          CAPTOES:  Would she ever enjoy sitting on my

11     lap?

12          TRAVLNDADFL:  Yes.  She loves sitting on laps.

13          CAPTOES:  Good.  Love to have her there.  Does

14     she wear anything to bed?

15          TRAVLNDADFL:  T-shirt and undies.

16          CAPTOES:  Guess I should wear boxers, too.

17          TRAVLNDADFL:  That's cool.

18          CAPTOES:  I want her to enjoy me, Wayne.

19          TRAVLNDADFL:  I want that, too.  I want her to

20     be happy.  Does that make sense?

21          CAPTOES:  Perfect sense.  Think she minds a

22     hairy chest?

23          TRAVLNDADFL:  I have a hairy chest so she will

24     be fine with that.

25          CAPTOES:  Good.  All el will be taken slowly.

1          TRAVLNDADFL:  El.

2          CAPTOES:  Else.

3          TRAVLNDADFL:  Oh, okay.  LOL.

4          CAPTOES:  I love using my tongue, too.

5          TRAVLNDADFL:  Cool.

6          CAPTOES:  Hope she will enjoy that.

7          TRAVLNDADFL:  As long as you go slow.  Where

8    would you want your tongue?

9          CAPTOES:  Start at her navel and work around.

10         TRAVLNDADFL:  Cool.  She might like that.

11         CAPTOES:  Do you do that, too?

12         TRAVLNDADFL:  I do.

13         CAPTOES:  Want to go down to her little pussy.

14         TRAVLNDADFL:  Yes.

15         CAPTOES:  And in.

16         TRAVLNDADFL:  Slow.  That's all I ask.

17         CAPTOES:  Very slow and quietly.  Will she

18    mind a hard cock?

19         TRAVLNDADFL:  I don't think so.

20         CAPTOES:  Does she enjoy licking?

21         TRAVLNDADFL:  Yes, she does and will.  Speak

22    of devil.  She just walked in.

23         CAPTOES:  Great.

24         TRAVLNDADFL:  She said hi.  I showed her your

25    pic again.

1          CAPTOES:  Tell her hi from me.

2          TRAVLNDADFL:  Hi.  She's laughing.

3          CAPTOES:  Good.  I love her happy.

4          TRAVLNDADFL:  She is happy.

5          CAPTOES:  That makes me feed good.

6          TRAVLNDADFL:  Cool.  She's sitting on my lap.

7          CAPTOES:  That's really nice.

8          TRAVLNDADFL:  Yes.

9          CAPTOES:  Hope she'll like sitting on my lap.

10         TRAVLNDADFL:  I think she will.

11         CAPTOES:  I will love her very much.

12         TRAVLNDADFL:  Good.  Will call you Uncle

13    Charles.  LOL.

14         CAPTOES:  Would you like her to call me that?

15         TRAVLNDADFL:  If she wants to and it works

16    out, sure.

17         CAPTOES:  Whatever she likes.

18         TRAVLNDADFL:  Good.

19         CAPTOES:  Do you kiss her often, Wayne?

20         TRAVLNDADFL:  Kiss her every day.

21         CAPTOES:  Just once?

22         TRAVLNDADFL:  Depends.

23         CAPTOES:  I am usually very affectionate.

24         TRAVLNDADFL:  Good.  That's the way life

25    should be.

```
 1              CAPTOES:  That is also what a tongue is for.

 2              TRAVLNDADFL:  True.

 3              CAPTOES:  I will use mine as often as she

 4      likes me to.

 5              TRAVLNDADFL:  Cool.

 6              CAPTOES:  I will always kiss her in bed, too.

 7              TRAVLNDADFL:  Cool.

 8              CAPTOES:  Do you hold her when she sleeps?

 9              TRAVLNDADFL:  Yes.

10              CAPTOES:  I'd like to, also.

11              TRAVLNDADFL:  Okay.  I'm looking forward to

12      this adventure.

13              CAPTOES:  Me, too.  And if it goes well we

14      will keep doing it.

15              TRAVLNDADFL:  BRB phone.

16              CAPTOES:  Okay.

17              TRAVLNDADFL:  Neighbor here.  Got to go.

18              CAPTOES:  Okay.  Talk later.

19      BY MS. KAISER:

20      Q     Next publishing Government's Exhibit 82.  On

21      what date did this chat take place, Detective

22      Spector?

23      A     On March 7th, 2008.

24              CAPTOES:  Hi, Wayne.  How are you this

25      morning?  How is our little girl, too?
```

1          TRAVLNDADFL:  BRB.  Good morning.  My little

2     one is great.  Thanks.  So where is my traveling

3     friend today?  Did you get busy?

4          CAPTOES:  Phone.  Aory.  Am in Boston.

5          TRAVLNDADFL:  Oh, okay.  Sorry.  Didn't mean

6     to bother you.

7          CAPTOES:  Not at all.  Think about Susie

8     often.

9          TRAVLNDADFL:  You do?

10          CAPTOES:  Yes.  And how eager I am to meet you

11     two.

12          TRAVLNDADFL:  Me, too.  I'm looking forward to

13     our adventure.  Any idea when we should plan for?

14          CAPTOES:  Well, I'm free from 17 to 23 of Mar.

15          TRAVLNDADFL:  Okay.  Will you let me know?  If

16     it's a weekday I would have to meet after 3:00 or a

17     weekend anytime.

18          CAPTOES:  When is her spring break?

19          TRAVLNDADFL:  Good question.  Not sure.  I

20     will have to let you know.  Why?  What are you

21     thinking?

22          CAPTOES:  What us to start getting comfortable

23     with each other, she and I.

24          TRAVLNDADFL:  I understand completely.  What

25     does that have to do with spring break?

 1          CAPTOES:  Then it could be a weekend or a

 2      weekday.

 3          TRAVLNDADFL:  Or I can keep her out of school

 4      for a day, too.  I rarely do that, so wouldn't be a

 5      big deal.

 6          CAPTOES:  That's fine.  We need time to do it

 7      relaxedly so she feels comfortable.  Have you done

 8      anything with her recently.

 9          TRAVLNDADFL:  It's been about two weeks.  What

10      will you want to do for starters?

11          CAPTOES:  Have her sit on my lap and make her

12      feel at ease.

13          TRAVLNDADFL:  Okay.  You still coming here

14      first?

15          CAPTOES:  Meeting somewhere would be best,

16      right?  What did you do with her two weeks ago?

17          TRAVLNDADFL:  Just oral.  Yes.  We can meet at

18      my house -- or yes.  We can't meet at my house.  I'm

19      sorry.

20          CAPTOES:  Of course not.  Oral on her or she

21      on you?

22          TRAVLNDADFL:  Both.

23          CAPTOES:  Good.  I will do both with her.  I

24      will tongue her well, if she likes it.

25          TRAVLNDADFL:  Good.  I just need to be there.

1       As you know, she's 11 and I don't want her scared.

2       BY MS. KAISER:

3       Q      I'm sorry.

4       A      Thank you.

5              TRAVLNDADFL:  I like the idea of us not

6       jumping it into as soon as you arrive.  Watch a

7       movie or something first, pizza, etcetera.

8              CAPTOES:  Of course.  Did you cum in her

9       mouth?

10             TRAVLNDADFL:  Yes.

11             CAPTOES:  Did she swallow?  Did she like it?

12             TRAVLNDADFL:  Yes, she did, most of it.  That

13      okay?

14             CAPTOES:  Does she sort of think it's a game

15      or something she needs to do for dad?

16             TRAVLNDADFL:  Yes.  She knows I enjoy it.  And

17      as long as I can tell her, she's okay with it.

18      Please don't think I'm not a good father.  I am.

19             CAPTOES:  I know you are a good father.  Will

20      she mind my tongue in her?

21             TRAVLNDADFL:  I can't see that being a

22      problem.

23             CAPTOES:  It will even be better when a cock

24      finally is in her slightly.  But that will be much

25      later.

1           TRAVLNDADFL:  One min, call.  BRB.

2           CAPTOES:  Okay.

3           TRAVLNDADFL:  Hey, I'm back.  Sorry, work

4     call.

5           CAPTOES:  Okay.  Think she might like that?

6           TRAVLNDADFL:  Might like what?  Sorry.  Had

7     another call.

8           CAPTOES:  Having some cum in her, not far in

9     and licked out.

10          TRAVLNDADFL:  No, no, no.  What if she got

11    pregnant?  I would lose everything.

12          CAPTOES:  Just put on finger and work edge --

13    work and around edge then licked off.

14          TRAVLNDADFL:  That's fine.

15          CAPTOES:  Have done that before and girl loved

16    the idea.

17          TRAVLNDADFL:  How old was the girl?

18          CAPTOES:  12.

19          TRAVLNDADFL:  Nice.  So before you know it,

20    we'll be doing this.  I hope this will be a

21    relationship and something that can expand in the

22    future.  Like I said, I'm not bi, but always good to

23    have a new friend with the same interest.

24          CAPTOES:  Correct.  And develop a relationship

25    with her.

```
1              TRAVLNDADFL:  I agree.

2              CAPTOES:  And be with her often.

3              TRAVLNDADFL:  Yes.  We could visit you, as

4      well.

5              CAPTOES:  For an overnight.

6              TRAVLNDADFL:  Yes.  Will you be spending night

7      when you visit us or go back same day?

8              CAPTOES:  Spending night, I believe.

9              TRAVLNDADFL:  Okay.  Cool.

10             CAPTOES:  Depends on how she is handling it.

11             TRAVLNDADFL:  BRB.  Phone again.

12             CAPTOES:  Okay.

13             TRAVLNDADFL:  I'm back.  I'm making some

14     appointments for jobs, which is good.

15             CAPTOES:  Great.  If she is handling it all

16     well, will overnight.

17             TRAVLNDADFL:  Keep in mind I have a GF, so I

18     will have to be careful how long I stay.  She has

19     been working nights so that's a good thing.

20             CAPTOES:  That's good.  I want Susie to enjoy

21     an older, bigger cock.

22             TRAVLNDADFL:  Just we need to go slow.  Well,

23     let me know soon when the day you are coming so I

24     don't make any appointments.

25             CAPTOES:  Oh, yes, very slow.  Will do.
```

1          TRAVLNDADFL:  Good.  Hey, I need to get some

2     work done.  I will talk to you soon.  Bye.

3     BY MS. KAISER:

4     Q     Next publishing Government's Exhibit 83.  On

5     what date was this chat, Detective Spector?

6     A     March 10th, 2008.

7          CAPTOES:  Wayne, were interviews successful?

8          TRAVLNDADFL:  Hi there.  What interviews?

9          CAPTOES:  Some job things you mentioned.

10         TRAVLNDADFL:  Just got a couple of new ones.

11    No big deal.  How are you?

12         CAPTOES:  Fine, thanks.

13         TRAVLNDADFL:  Good.  You still out of state?

14         CAPTOES:  Yes.  I tart back Friday.

15         TRAVLNDADFL:  You're driving?

16         CAPTOES:  Yes, I am.

17         TRAVLNDADFL:  Okay.  My kids start their break

18    on Mon.

19         CAPTOES:  Most do, I hear.  What will they do

20    out of school?

21         TRAVLNDADFL:  Not sure yet.

22         CAPTOES:  Right.  Of course, we three can have

23    a great time together.

24         TRAVLNDADFL:  That would be fine.  Just let me

25    know when so I can plan it.

 1         CAPTOES:  Right.  Feel we need at least an

 2    overnight, if possible.

 3         TRAVLNDADFL:  That's fine.  When are you

 4    thinking?

 5         CAPTOES:  In the next two to three weeks.

 6    Want it to be relaxing.

 7         TRAVLNDADFL:  Okay.  That's fine.  Then it

 8    will have on a weekend.  Kids are off all next week.

 9         CAPTOES:  That is a disability, too.  Very

10    eager to start and continue.  Possibility.

11         TRAVLNDADFL:  No rush for me.  Just want to

12    have a plan in place.  Keep in mind I have a son I

13    need to care for or have plans for, plus a live-in

14    GF.  So planning is important for me.

15         CAPTOES:  Of course.  For me, too.  I want

16    this to be successful so it can continue.

17         TRAVLNDADFL:  I agree.  Will you be online

18    over the weekend?  BRB phone.

19         CAPTOES:  Phone, too.

20         TRAVLNDADFL:  I'm back.  You still busy?

21         CAPTOES:  No.

22         TRAVLNDADFL:  Okay.  Good.  Kids are home.  I

23    will be on later.

24         CAPTOES:  Lost you.

25         TRAVLNDADFL:  I will be online later.  Kids

1    just got home.  Need to spend some time with them.

2           CAPTOES:  Okay.

3           TRAVLNDADFL:  What's new?

4           MS. KAISER:  Oh, I'm sorry.  Sorry about that.

5    Could you start that again?  That was my fault.

6           CAPTOES:  Kids fed?

7           MR. TRAGOS:  Your Honor, could we have an

8    exhibit number?

9           MS. KAISER:  Page two of Government's Exhibit

10   83.

11          MR. TRAGOS:  Okay.

12          TRAVLNDADFL:  Yes.  What's new?

13          CAPTOES:  Nothing much.  You?

14          TRAVLNDADFL:  Nothing at all, just relaxing at

15   home with kids.

16          CAPTOES:  Nice.  Would enjoy relaxing with

17   Susie.

18          TRAVLNDADFL:  She's in my office now.

19          CAPTOES:  Doing what?  We could play a game or

20   draw together.

21          TRAVLNDADFL:  What game.

22          CAPTOES:  Not sure.  One she might like.

23          TRAVLNDADFL:  Doesn't matter.  She does like

24   to draw.  Kind of weird to do online.

25          CAPTOES:  Can't.  Only in person.

1          TRAVLNDADFL:  Okay.  When we meet.  Bring her

2     some coloring books.  She would love that.  Good ice

3     breaker.

4          CAPTOES:  Good idea.

5          TRAVLNDADFL:  Yeah would be.

6          CAPTOES:  I will do that.

7          TRAVLNDADFL:  Good.  So you're back in Florida

8     over the weekend?

9          CAPTOES:  Yes.

10         TRAVLNDADFL:  That will be nice.  I bet you're

11    looking forward to warm weather.  Going to eat.  See

12    ya.

13         CAPTOES:  Okay.

14    BY MS. KAISER:

15    Q     Next publishing Government's Exhibit 84.

16    Detective Spector, what was the date of this chat?

17    A     March 21st -- I'm sorry, March 12th, 2008.

18    Q     All right.

19         TRAVLNDADFL:  Hey.

20         CAPTOES:  Hello, Wayne.

21         TRAVLNDADFL:  Just wanted to say hi.  How are

22    you?

23         CAPTOES:  Fine, thanks.  Still thinking about

24    us three together.

25         TRAVLNDADFL:  Okay.  Cool.  Still up north?

1      CAPTOES:  Yes.  Leave Friday.

2      TRAVLNDADFL:  Sounds good.  Leave the cold

3   weather there.

4      CAPTOES:  Absolutely.  And then spend the

5   night with Susie, too.

6      TRAVLNDADFL:  Sounds good.  She's on spring

7   break next week.  I'm trying not to schedule much

8   next week.

9      CAPTOES:  Okay.  If I could make it, could we

10  meet?

11     TRAVLNDADFL:  Should be able to as long as my

12  g/f is working.

13     CAPTOES:  Right.  I want Susie to start

14  getting used to me.

15     TRAVLNDADFL:  Good.  Me, too.  That will be

16  the best way to have a successful relationship.

17     CAPTOES:  She needs to get used all of me.  I

18  would like her -- I would like to be with her as she

19  grows, too.

20     TRAVLNDADFL:  Good.

21     CAPTOES:  Then I will be able to do more with

22  her.

23     TRAVLNDADFL:  I agree.  Just need to start

24  slow.  Whatever happens, no pain to her.  I don't

25  want to see her in any pain of any type.

1           CAPTOES:  No.  But as she grows, there might

2     be some pain for her.

3           TRAVLNDADFL:  Why do you say that?

4           CAPTOES:  Anytime a man enters a woman at

5     times there can be a little pain.

6           TRAVLNDADFL:  I know.  I just don't like to

7     hear her scream.  She did the first time.

8           CAPTOES:  No.  If one goes slow and easy that

9     won't happen.

10           TRAVLNDADFL:  I know.  I'm looking forward to

11     our adventure.

12           CAPTOES:  Yes.  I want her to feel comfortable

13     with my cock.

14           TRAVLNDADFL:  I agree.

15           CAPTOES:  And also my tongue.

16           TRAVLNDADFL:  She will like that the most.

17           CAPTOES:  I will get it way in her, of course.

18           TRAVLNDADFL:  Okay.  Your tongue?

19           CAPTOES:  Yes.  She will get used to that.

20           TRAVLNDADFL:  Good.  You live alone, too,

21     right?

22           CAPTOES:  Yes.  She will get used to my cock

23     more when she is older.

24           TRAVLNDADFL:  So if things go well, we could

25     visit you, as well?

1          CAPTOES:  Yes.  And she would enjoy the pool,

2     too.

3          TRAVLNDADFL:  She loves the pool.

4          CAPTOES:  Good.  Don't know how much of my

5     cock will fit in her mouth.

6          TRAVLNDADFL:  Just go slow.  She will do the

7     rest.  Don't push it.

8          CAPTOES:  No, I won't.

9          TRAVLNDADFL:  Good.  Are you working any next

10    week?

11         CAPTOES:  Tuesday, yes.

12         TRAVLNDADFL:  Oh wow, you need to take a break

13    once in a while.

14         CAPTOES:  Yes.

15         TRAVLNDADFL:  Sorry.  Well, let me know.  I

16    will be around all weekend.

17         CAPTOES:  Okay.  Would you like to get

18    together next week?

19         TRAVLNDADFL:  I would if you want and can get

20    away.

21         CAPTOES:  I think I can.

22         TRAVLNDADFL:  Well, shoot me an e-mail and let

23    me know.  We'll work it out.  Hey, kids are here.

24    Just got home.  Let me chat with them.  Get back

25    with you later.  Bye.

1          CAPTOES:   Okay.

2     BY MS. KAISER:

3     Q       Detective Spector, you testified previously

4     that you continued to have chats and discussions

5     with the defendant through June; is that correct?

6     A       That's correct.

7     Q       So were there a number of other e-mails that

8     were not published?

9     A       Yes.

10    Q       And instant message chats between you and

11    Captoes?

12    A       Yes.   I'm not sure about e-mails but, yes,

13    instant messages.

14    Q       Why do you conduct these types of

15    investigations?

16    A       Unfortunately, there are individuals out there

17    that are looking for children and, also, involved in

18    the trading of child pornography.

19          MS. KAISER:   Your Honor, may I have a moment?

20          THE COURT:   Yes, ma'am.

21    (Brief pause.)

22          MS. KAISER:   I have no further questions.

23          THE COURT:   Cross-examination.

24

25

1                    <u>CROSS-EXAMINATION</u>

2     <u>BY MR. TRAGOS:</u>

3     Q       Detective Spector, your first contact was

4     February 12th, 2008; correct?

5     A       Yes, sir.

6     Q       Okay.  Now, you told him in that conversation

7     that you were 40 years old; correct?

8     A       Yes, sir.

9     Q       And he told you he was 69; correct?

10    A       I don't have the chats in front of me.

11    Q       Okay.  Let me get that for you.

12    A       Okay.  Thank you.  Thanks.  That's correct,

13    sir.

14    Q       He told you he was 69.  And then you asked

15    him, what are you into, Charles.  Do you see that?

16    A       I do, sir.

17    Q       Then he says, all ages, strict older dad.  And

18    then he asked you what you're into; right?

19    A       That's correct.

20    Q       And then you said, into young.

21    A       I did.

22    Q       And then you tell him, I -- not into fantasy

23    chat.  Do you see that?

24    A       Yes, sir, at 6:57 PM.  I do.

25    Q       Are you familiar, is fantasy chat a fairly

1       common thing on the internet?

2       A       They actually have a chat room on AOL called

3       fantasy chat.

4       Q       So it happens a lot?

5       A       Yes.

6       Q       And do you encounter that a lot?

7       A       I do.

8       Q       Okay.  And is that why here you want to make

9       sure that you weren't doing a fantasy chat?

10      A       That's correct.

11      Q       Okay.  And his answer is that he's not into

12      fantasy chat.

13      A       That's correct.

14      Q       And you gave him the ages of your children, a

15      daughter 11 and a son 12; correct?

16      A       Yes, sir.

17      Q       Okay.  Now, in this conversation, the first

18      conversation, did you get the impression that he was

19      interested in the daughter or the son?

20      A       I don't know.

21      Q       Well, eventually it became the daughter that

22      was the main focus of the interest; correct?

23      A       That's correct.

24      Q       Okay.  But you don't remember if that happened

25      in the first conversation?

1    A      I don't.

2    Q      Then on page two of that conversation, you get

3    a telephone number; correct?

4    A      Yes, sir.

5    Q      And did you write that number down?

6    A      I had it saved to the chat.

7    Q      Did you make -- did you do any reports in this

8    case?

9    A      I did not.

10   Q      How did you keep track of what you did and

11   when you did things?

12   A      From the chats.

13   Q      Okay.  Now, what did you do with this number?

14   Did you actually do anything with it?

15   A      No.  I don't believe I did a phone subpoena at

16   that point.

17   Q      Okay.  Did you use the number to make a phone

18   call?

19   A      Yes.

20   Q      Okay.  And did you make a phone call?

21   A      I did.

22   Q      When did you make that phone call?

23   A      I believe that day.

24   Q      And did you talk to Charles Friedlander that

25   day on the phone?

1    A      I did.

2    Q      Now, if you'll look at Exhibit 69.  And then

3    you spoke again on the internet on February 16th,

4    '08; correct?

5    A      Yes, sir.

6    Q      And you specifically told him again that you

7    have a daughter 11 and a son 12; correct?

8    A      Yes, sir.

9    Q      And that you are real.

10   A      Yes, sir.

11   Q      Then down at the bottom here, I think I may

12   have part of the -- I've got it all there.  Okay.

13   The bottom, you see the last thing where it says, we

14   haven't talked on the phone yet.  That's you talking

15   to him; correct?

16   A      That's correct.

17   Q      And he says, no, we have not, I don't believe;

18   correct?

19   A      That's correct.

20   Q      That's not true; is it?

21   A      That's not true.  That's correct.

22   Q      And, in fact, you had talked to him on the

23   phone already?

24   A      Yes, sir.

25   Q      Did you forget?

1    A       I did.

2    Q       Apparently he didn't remember, either, I

3    guess.  No, we have not, I don't believe.  Isn't

4    that what he said?

5    A       That's exactly what he said.  Yes.

6    Q       Now, on the second page of that chat, on the

7    second page of Exhibit 69, do you have it there in

8    front of you?

9    A       I do.  Sure.

10   Q       You ask him if you can call him.

11   A       That's correct.

12   Q       And then he gives you the same phone number;

13   correct?

14   A       That's correct.

15   Q       And you, in fact, did call him?

16   A       Yes, sir.

17   Q       And you, in fact, did speak to him that day?

18   A       Yes, sir.

19   Q       Then if you look at Exhibit 70 -- let me give

20   you this back.

21   A       Okay.  Thank you.

22   Q       Do you have Exhibit 73 there?

23   A       I do, sir.

24   Q       Okay.  Now, what is that?

25   A       That is an instant message from the defendant

1     on 2/19/08.

2     Q       Then why does it say he's away at 2:51?

3     A       Very simple, sir.  I must have been online and

4     away from my undercover computer.  He had sent me an

5     instant message.  And when someone on AOL leaves

6     AOL, they log off, and that captured that particular

7     logoff at 2:51.  That's what that means.  So I

8     captured that.

9     Q       Then if you'll look at Exhibit 77.  This is a

10    conversation you had on 2/20/08; correct?

11    A       Yes, sir.

12    Q       And in that conversation Captoes says, really

13    feel we need to and should meet.  Do you see that?

14    A       I do.

15    Q       And then you said, I hesitant -- I honestly am

16    a little hesitant; right?

17    A       Yes, sir.

18    Q       Then he said, okay.  Not if you don't want to.

19    A       That's correct.

20    Q       And then you say, I do.

21    A       And I continue and I wrote, just want to make

22    sure you're legit.  I don't need trouble.  Yes, sir.

23    Q       Now, the government has introduced Exhibits 93

24    and 94 which are the pictures of a -- youthful

25    pictures of a deputy; correct?

1    A     Yes, sir.

2    Q     And those are pictures that you sent to him;

3    correct?

4    A     Yes, sir.

5    Q     Okay.  Now, here you say, you never asked me

6    for a pic of my little one.  Is that true?

7    A     Yes, sir.

8    Q     So he never asked you for one?

9    A     That's correct.

10   Q     Now, the second page of that chat you say, how

11   difficult can it be to find your pic; right?

12   A     That's correct, sir.

13   Q     And then down here, well, still waiting for

14   the invisible pic.  Do you see that?

15   A     I do.

16   Q     You're getting impatient?

17   A     Apparently, I am waiting for this picture,

18   yes.

19   Q     Now, if you will look at Exhibit 78, which is

20   a chat which occurred on 2/23/08.  The question is

21   asked:  Will you join me or just be there?  That's

22   Captoes to you; correct?

23   A     Yes, sir.

24   Q     And then you say, depends.  And then you say,

25   more than likely join.  Again, I'm not bi.  What are

1        you saying there?  What does that mean, I'm not bi?

2        A       I'm not bisexual, sir.

3        Q       Okay.  Were you concerned that he was thinking

4        you were?

5        A       I wanted to make it clear that I wasn't in

6        this investigation.

7        Q       And you already -- in fact, that's not the

8        first time you've told him you're not bi because you

9        say there again, I'm not bi.

10       A       Correct.  Several times, I'm sure.

11       Q       Several times you told him that?

12       A       Correct.

13       Q       Because a lot of times he would say things

14       like, are we going to sleep together, same bed, that

15       kind of stuff, and you've got to keeping mentioning

16       you're not bi; correct?

17       A       Correct.  The reason I did that is so there

18       was no mistake that the communication was about

19       having sex with a child and not a male adult.

20       Q       But you had to keep reminding him of that;

21       didn't you?

22       A       Absolutely.

23       Q       Now, if you'll look at Exhibit 80, y'all talk

24       about meeting.  And you say -- he said something

25       about meeting around the 15th; correct?

1    A      Yes, sir.

2    Q      Okay.  And he said, or the 16th, not sure of

3    the days.

4    A      Yeah.

5    Q      What month were you talking about meeting the

6    15th or the 16th?

7    A      I would assume March, considering this was the

8    end of February.

9    Q      And then he goes on to say, I will.  Will we

10   all share a room?  Do you see that?

11   A      Yes, I do see that.

12   Q      Then he goes on to say, I think we should all

13   stay together.

14   A      Yes.

15   Q      By the way, you used terms like LOL, BRB, what

16   do those mean?

17   A      In slang on the internet, LOL would be laugh

18   out loud.  BRB would be be right back.

19   Q      He's told you also -- he told you that he has

20   had sexual contact with girls, hasn't he, other

21   little girls?

22   A      Yes.

23   Q      In fact, he told you that one of the girls was

24   12?

25   A      I recall that in a chat.  Yes, sir.

Spector - Cross

```
 1      Q       You also use the term g/f.  What does g/f

 2      stand for?

 3      A       Girlfriend.

 4      Q       Now, if you look at 83.

 5      A       Um-hum.

 6      Q       This is a March 10th, '08 chat.  And you tell

 7      him, the kids are off all next week.  And he says

 8      he's very eager to start and continue.

 9      A       Yes, sir.  That's what he wrote.

10      Q       On this call, we need to spend some time with

11      them.  There's an okay here at 3:19 PM; correct?

12      A       That's correct.

13      Q       Then I notice a 6:51 PM, kids fed in the same

14      conversation; correct?

15      A       Yes.

16      Q       So it was like a three-hour break there?

17      A       Yes, sir.

18      Q       But you kept the line open, is that how you

19      were able to continue it?

20      A       That's correct.

21      Q       Okay.  If you'll take a look at Exhibit 84, a

22      conversation on 3/12/08, where Captoes tells you,

23      anytime a man enters a woman, at times there can be

24      a little pain.  Do you see that?

25      A       I do, sir.
```

1    Q      A couple lines down you say, she did the first

2    time.  What did you mean there, what first time?

3    A      She did have sex the first time and did have

4    some pain.

5    Q      Okay.  So the 11-year-old -- you're telling

6    him the 11-year-old did have sex?

7    A      That's what I was referring to in the persona,

8    yes.

9    Q      Then Captoes tells you, okay, the second page

10   of the same conversation, okay.  Would you like to

11   get together next week.  Now, this is consistent

12   with what we earlier heard about the 15th or 16th;

13   correct?

14   A      Correct.

15   Q      Okay.  And let's see.

16          MR. TRAGOS:  Your Honor, may I have a moment

17   to speak with the prosecution for a moment?

18          THE COURT:  Yes, sir.

19   (Brief pause.)

20   BY MR. TRAGOS:

21   Q      Your chatting didn't stop with him with

22   Exhibit 84; did it?

23   A      No, sir, it did not.

24   Q      Let me show you what's been marked as

25   Government Exhibit 85, and ask you if you recognize

1       this.

2       A       I do, sir.

3               MR. TRAGOS:  Your Honor, at this time the --

4       BY MR. TRAGOS:

5       Q       Is this a copy of the chat that you had with

6       Captoes?

7       A       Yes, sir, it is.

8       Q       On 3/17/08?

9       A       Yes, sir.

10              MR. TRAGOS:  Your Honor, at this time the

11      defense would move into evidence Government's

12      Exhibit 85.

13              THE COURT:  Is there any objection?

14              MS. KAISER:  No objection, Your Honor.

15              THE COURT:  Government's 85 is now received.

16      (Whereupon, Government's Exhibit Number 85 is

17       received into evidence.)

18      BY MR. TRAGOS:

19      Q       Now, this is a conversation you had on

20      3/17/08; correct?

21      A       Yes, sir.

22      Q       And you did not -- did you talk to -- in any

23      way talk to Captoes between 3/12 and 3/17?

24      A       No, sir.

25      Q       And I notice in here that there's nothing

Spector - Cross

1    mentioned -- or you say you're surprised that you

2    haven't heard from him; right?   I was wondering why

3    I haven't heard from you.

4    A       Yes, sir.

5    Q       And weren't y'all supposed to get together on

6    the 15th and 16th?

7    A       Yes.

8    Q       And nobody ever e-mailed -- or Captoes never

9    e-mailed or anything to cancel that; did he?

10   A       No.   There was no meet set up, sir.   I believe

11   he said he was coming back into town on the 15th or

12   the 16th.

13   Q       He didn't say you were going to get together

14   on the 15th or the 16th?

15   A       If you can show that to me on the chats, I --

16   Q       I won't waste time.   But it's in evidence and

17   I think we talked about it so --

18   A       Okay.

19   Q       Did you try to schedule times to meet with

20   him?

21   A       I'm sure in the instant messaging during our

22   conversations it came up.   But I don't think we ever

23   had a clear, concise date of when we were actually

24   going to meet or where.

25   Q       Sir, do you have a memory of all the dates in

1    which you had spoken to him?

2    A       I don't.

3    Q       Okay.  Would it refresh your recollection to

4    take a look at the chats?

5    A       Yes, sir.

6            MR. TRAGOS:  May I, Your Honor?

7    BY MR. TRAGOS:

8    Q       Okay, sir.  After the 3/17/08, what was the

9    next contact you had with him?

10   A       On 3/26/08.

11   Q       Okay.  Did he tell you on that one, sir, if

12   you recall, that he was having houseguests from

13   Ireland?

14   A       He does.

15   Q       What's the next chat you had?

16   A       That would have been April 21st, '08.

17   Q       After April 21st, '08, what was the next chat

18   you had?

19   A       May 1st, '08.

20   Q       After May 1st, '08?

21   A       May 6th -- May 16th, '08.

22   Q       What's the next chat you had?

23   A       June 3rd, '08.

24   Q       What's the next chat you had?

25   A       June 25th, '08.

1    Q      What's the next chat you had?

2    A      I believe that would be it, sir.

3    Q      The last one was June 25th of '08?

4    A      Yes, sir.

5    Q      So in June you had -- the month of June you

6    had two chats, the month of May you had two chats,

7    and then in April you had one chat?

8    A      Yes, sir.

9    Q      You never did meet him; did you?

10   A      No, sir.

11   Q      And I think you explained the reason you

12   didn't meet him was because you found out that

13   somebody else was talking to him?

14   A      In July, yes.

15   Q      In fact, do you remember when you spoke to

16   Detective Romanosky?

17   A      I believe it was July 15th, '08, sir.

18   Q      July 15th of '08.  Okay.  At that time did

19   Detective Romanosky give you any biographical

20   information about Captoes?

21   A      I believe he did.  And then I believe I

22   exchanged and gave him some information, as well.

23   Q      Okay.  Well, in fact, you have -- you issued a

24   subpoena to AOL; didn't you?

25   A      I did.

1    Q      When did you do that?

2    A      I believe in February of '08.

3    Q      Would it refresh your recollection to see the

4    subpoena that you --

5    A      Sure.

6           MR. TRAGOS:  May I, Your Honor?

7           THE COURT:  Yes, sir.

8           THE WITNESS:  Thank you.  Yes, sir.  I stand

9    corrected.  That was March of '08.

10   BY MR. TRAGOS:

11   Q      In fact, it was March 3rd of '08; correct?

12   A      Yes.

13   Q      So you issued the subpoena on March 3rd of

14   '08.  And when did AOL respond to that subpoena you

15   issued on March 3rd of '08?

16   A      I don't have the date in front of me.  I would

17   assume within a week or two.

18   Q      Would it refresh your recollection to take a

19   look at the documents you received from AOL?

20   A      That would be great.  Thank you, sir.

21          MR. TRAGOS:  May I approach, Your Honor?

22          THE COURT:  Yes, sir.

23          THE WITNESS:  March 3rd, as well.

24   BY MR. TRAGOS:

25   Q      So you issued the subpoena on March 3rd of '08

1    and you received the information from AOL by fax;

2    correct?

3    A      Yes, sir.

4    Q      On March 3rd of '08?

5    A      That's correct.

6    Q      Okay.  And in that information that you

7    received -- in the information that you received on

8    March 3rd of '08, they told you the various screen

9    names under the Captoes moniker; correct?

10   A      They did provide that.  Yes.

11   Q      Shrinq2, Seerax and Shrinq; correct?

12   A      Yes.

13   Q      They also provided you on that date detailed

14   billing information?

15   A      Yes, sir.

16   Q      Are you familiar with what that is?

17   A      I am.

18   Q      And that shows the time that someone is

19   online; right?

20   A      It does.

21   Q      Okay.  And you not only did that, but you also

22   got other information with regard to Mr. Friedlander

23   including his driver's license, or a copy of it?

24   A      Yes, sir.

25   Q      With his picture?

1    A      Yes, sir.

2    Q      And how do you do that?  How -- physically how

3    does a detective do that?

4    A      Sure.  We had the defendant's name.  We had

5    our analyst run his driver's license to get a photo

6    ID.  Law enforcement has access to people's driver's

7    license information, including their photographs.

8    Q      And that gave you also the address of 12040

9    Mahogany Isle Lane, Ft. Myers, Florida; correct?

10   A      Yes.

11   Q      Okay.  As Charles Friedlander's -- Charles

12   Jackson's Friedlander's address?

13   A      Correct.

14   Q      And like I say, I may have said this before,

15   but also gave you a picture?

16   A      Yes, sir.

17   Q      And you also ran what's called a law

18   enforcement report.  Do you remember that?

19   A      Yes, sir.

20   Q      And what day did you run that?

21   A      I don't know, sir.

22   Q      Would it refresh your recollection to see a

23   copy of it?

24   A      Please.  Thank you.

25          MR. TRAGOS:  May I, Your Honor?

Spector - Cross

1          THE COURT:  Yes, sir.

2          THE WITNESS:  It was done on March 5th, '08.

3    BY MR. TRAGOS:

4    Q      So on March 5th of '08, when you ran this --

5    by the way, what is a law enforcement report?

6    A      Our analysts has -- it's some type of database

7    that she uses, and it comes up with background

8    information such as where a person lives, sometimes

9    it will have their occupation, it will have whatever

10   homes they own.

11   Q      A lot of information about a person; right?

12   A      Yes, sir.

13   Q      Including whether they had any possible

14   criminal record?

15   A      Yes.

16   Q      And in this case none was found; right?

17   A      That's correct.

18   Q      Including whether they had any possible sexual

19   offenses, and in this case none was found?

20   A      That's correct.

21   Q      Okay.  And it even tells if you have any liens

22   or judgments; right?

23   A      Yes, it does.

24   Q      And none was found?

25   A      Correct.

1    Q      Does it even tell you who their neighbors are?

2    A      It does.

3    Q      Does it tell you the cars that are registered

4    to him?

5    A      It does.

6    Q      Does it tell you what professional licenses

7    they hold?

8    A      It does.

9    Q      Including whether or not they're a licensed

10   mental health counselor?

11   A      It does.

12   Q      And it did tell you that in this case; didn't

13   it?

14   A      I don't recall if it did but if you --

15          MR. TRAGOS:  Your Honor, may I refresh his

16   recollection?

17          THE COURT:  Yes, sir.

18          THE WITNESS:  Thank you very much.  Yes, it

19   does.  Licensed mental health counselor.

20   BY MR. TRAGOS:

21   Q      It tells you about possible associates?

22   A      It does.

23   Q      And in this case, it told you about a Randall,

24   a Randall Hannah; correct?

25   A      Yes, sir.

1    Q      Who died at the age of 39; correct?

2    A      Yes, sir.

3    Q      And his date of death, 5/26/2001.  Would you

4    need to see this to refresh your recollection about

5    that?

6    A      I would but -- yes, sir.

7    Q      And you knew all this on March 5th, 2008?

8    A      Correct.

9    Q      Do you and Detective Romanosky speak often?

10   A      No.

11   Q      How did you happen to communicate on this?

12   A      He called me in July.

13   Q      He called you -- I'm sorry.

14   A      Yes, sir.  Prior to that, I don't believe I

15   had ever met or spoken to him before.

16   Q      Let me ask you to take a look at what's been

17   marked as Government's Exhibit 66.

18   A      Sure.

19   Q      I'll ask you if you recognize that.

20   A      I do, sir.

21   Q      What is that?

22   A      That is the AOL information from the

23   defendant's billing information.

24   Q      Okay.

25   A      It also has detailed billing information, as

1      well.

2      Q      In fact, that is what you received?

3      A      Yes.

4      Q      Okay.  Let me show you what we marked for

5      identification as Defendant's Exhibit 46.  Do you

6      recognize that, sir?

7      A      I do.

8      Q      What is that?

9      A      It's a Florida driver's license and a

10     photograph of the defendant.

11     Q      In fact, that's the one you received on March

12     5th, correct, or a copy of it?

13     A      Yes.

14            MR. TRAGOS:  At this time the defendant would

15     move Exhibit 46 into evidence.

16            MS. KAISER:  No objection.

17            THE COURT:  46 is received.

18     (Whereupon, Defendant's Exhibit Number 46 is

19      received into evidence.)

20            MR. TRAGOS:  Your Honor, at this time the

21      defendant would move Exhibit 66 into evidence.

22            MS. KAISER:  What is 66?

23            MR. TRAGOS:  AOL response.

24            MS. KAISER:  Objection, foundation.

25            MR. TRAGOS:  Your Honor, I'll --

1           THE COURT:  I'll allow it.  Overruled.

2      (Whereupon, Defendant's Exhibit Number 66 is

3    received into evidence.)

4    BY MR. TRAGOS:

5    Q     Let me show you what we marked as -- for

6    identification as Defendant Exhibit 47, and ask you

7    if you recognize that, sir.

8    A     Sure.  It's that law enforcement report we

9    discussed.

10          MR. TRAGOS:  At this time, Your Honor, we

11   would move to introduce Exhibit 47 into evidence.

12          MS. KAISER:  Objection, foundation.

13          THE COURT:  Sustained.

14   BY MR. TRAGOS:

15   Q     Detective, you -- you are the one that

16   supervised the running of this particular

17   information, the information in that law enforcement

18   report?

19   A     I gave it to an analyst and asked her to run

20   it and she provided that information to me.

21   Q     Under your direction?

22   A     Yes, sir.

23   Q     And this is a report commonly used by you to

24   gain information about identifying a suspect?

25   A     Absolutely.

1    Q      That is, it is not necessarily used as -- as

2    factual, but it is used strictly for the

3    investigative purpose of identification?

4    A      That's correct.

5    Q      And the -- and it's a common tool for you?

6    A      Certainly.

7    Q      Again, just for identification of an

8    individual?

9    A      Sure.

10          MR. TRAGOS:  Your Honor, at this time we would

11   again move the defendant exhibit into evidence.

12          MS. KAISER:  Same objection and a 103.

13          THE COURT:  Let me see counsel at side bar,

14   please.

15   (At side bar, on the record.)

16          THE COURT:  What's the relevance?

17          MR. TRAGOS:  Your Honor, I want to show that

18   since March of '08 they knew who he was, they knew

19   everything about him.  They knew what cars he drove,

20   they knew what property was his, all that stuff.

21   They also knew that, according to the conversations,

22   he was abusing children, and they didn't do a thing

23   about it even though they knew how to find him and

24   they knew where he was.

25          THE COURT:  What is the relevance of all of

1       that?

2            MR. TRAGOS:  The relevance is, Your Honor,

3       they also believed that what he was telling them was

4       fantasy, that it wasn't true, because if it was

5       true, any police officer in his right mind doing

6       their duty would not let someone continue to abuse

7       children when they knew who he was, where he was and

8       what he was driving.

9            THE COURT:  Ms. Kaiser, response?

10           MS. KAISER:  Your Honor, Mr. Tragos is

11      certainly free to make that argument.  He can

12      inquire of the witness, which he has, about the date

13      upon which law enforcement identified him.

14           The report that he's seeking to introduce is

15      from an online database, and I don't think this

16      witness prepared it.  He requested it be done, but I

17      don't think he can authenticate it, so I think

18      there's an improper foundation, and I think he has

19      that same evidence available to him through the

20      questioning of the witness.

21           THE COURT:  Mr. Tragos, response?

22           MR. TRAGOS:  Your Honor, he authenticated it

23      by saying this is the report he used to identify

24      Mr. Friedlander.  Now, I'm not -- in fact, I even

25      got him to say, you don't verify the information,

1    you just use it for one purpose, and that is to

2    identify the person that you're talking to.  That's

3    why I asked those questions because that's the only

4    purpose.  I'm not putting it in for the truth of the

5    matter asserted, only for the fact that this is what

6    law enforcement uses, and they had it.

7        THE COURT:  Well, I'm going to sustain the

8    objection on foundation.  The testimony from the

9    witness is what the jury should be hearing, not

10   something from a document that has no relevance

11   other than information that law enforcement relied

12   on.

13       So I'll sustain the objection, but you may

14   cross-examine the witness as to what actions, if

15   any, they took based on what information they had at

16   a given point in time.  So the inquiry is

17   appropriate, but not the document.

18       MS. KAISER:  Your Honor --

19       COURTROOM DEPUTY CLERK:  The jury needs a

20   break, Judge.

21       THE COURT:  All right.  Let's take a comfort

22   break.

23       COURTROOM SECURITY OFFICER:  Rise for the

24   jury, please.

25   (Jury out at 11:17 AM.)

1     (Recess was taken at 11:17 until 11:31 AM.)

2     (Back on the record.)

3          THE COURT:  Bring the jury in.  Where are we?

4     Are we ready?

5          COURTROOM SECURITY OFFICER:  Rise for the

6     jury, please.

7     (Jury in at 11:32 AM.)

8          THE COURT:  Thank you and be seated, please.

9     Mr. Tragos?

10         MR. TRAGOS:  Thank you, Your Honor.

11    BY MR. TRAGOS:

12    Q     This law enforcement report, do you

13    remember -- do you know what I'm talking about?

14    A     Yes, sir.

15    Q     Okay.  Now, we've established that the report

16    tells you he has no prior record, no sexual

17    offenses, no prior anything; right?

18    A     That's correct.

19    Q     How many source documents are checked for

20    this; do you know?

21    A     I have no idea, sir.

22         MR. TRAGOS:  May I approach, Your Honor?

23         THE COURT:  Yes, sir.

24         THE WITNESS:  It says on the report 119 source

25    documents.

 1      BY MR. TRAGOS:

 2      Q      How long have you been doing what you do on

 3      the computer?

 4      A      About ten years, sir.

 5      Q      And in the ten years, how many of these do you

 6      think you've ordered?

 7      A      A lot, sir.

 8      Q      Okay.  How many instant message -- are these

 9      instant message chats?

10      A      Yes, sir.

11      Q      Am I characterizing those properly?

12      A      You are.

13      Q      How many of those total did you have with

14      Captoes?

15      A      Whatever you have in evidence, sir, eight to

16      ten, was it?

17             MR. TRAGOS:  Your Honor, may I refresh his

18      recollection?

19             THE COURT:  Yes, sir.

20      BY MR. TRAGOS:

21      Q      Okay.  I show you what I believe is in

22      evidence.

23      A      Okay.

24      Q      Take a look at those.

25      A      Sure.  I count 11 instant message

1       communications.

2       Q       If I may, let me show you to refresh your

3       recollection copies of chats the government did not

4       put in evidence.

5       A       An additional seven, sir.

6       Q       So altogether there were 18 instant message

7       chats?

8       A       Appears so, sir.

9       Q       And -- and there were also three telephone

10      calls?

11      A       Yes, sir.

12      Q       Okay.  So altogether, then, you had 21

13      contacts with Captoes?

14      A       Correct.

15      Q       Over a -- I guess a three-month period from

16      March through June?

17      A       Instant messaging, yes.  I believe if you want

18      to add on a couple of electronic mails --

19      Q       Okay.  Weren't they -- okay.  I'm sorry.  How

20      many of those were there?

21      A       I think there were two.

22      Q       Okay.  So we're at 23 contacts now?

23      A       Correct.

24      Q       Okay.  And starting in March, ending in June?

25      A       Yes, sir.

1    Q     Did you ever send a -- or contact any law

2    enforcement agencies with reference to Captoes at

3    his home to review his home, to see his home, watch

4    his home, anything like that?

5    A     No, sir.

6    Q     Online Captoes told you that he had sex with

7    children and was having sex with children; right?

8    A     A 12-year-old, yes.

9    Q     Okay.  And in your chats anywhere did he ever

10   mention a razor strop?

11   A     A what, sir?

12   Q     A razor strop.

13   A     No.

14   Q     Did he ever mention a quirt?

15   A     No, sir.

16   Q     Did he ever mention a riding crop?

17   A     No, sir.

18   Q     Did he ever mention whipping a child with a

19   heavy belt?

20   A     No.

21   Q     In fact, there was no whipping or spanking or

22   any of that type of conversation between you and

23   Captoes; correct?

24   A     That's correct.

25   Q     The only conversation you had was limited to

1    sexual activity with an 11-year-old girl?

2    A     Yes, sir.

3    Q     Okay.  By the way, do you -- do you recall

4    now -- I asked you before, do you recall now how it

5    came to be that he started talking about the girl

6    and not the boy?

7    A     I believe the set of the conversation was that

8    I was involved with the daughter and not the son and

9    I wasn't bisexual.

10   Q     Oh, okay.  All right.  So you told him, look,

11   the sex here in this house is just with the

12   daughter?

13   A     Correct.

14   Q     And -- okay.  So you told him that sex with

15   the son was not something that you were involved in

16   because you're not gay; correct?

17   A     Correct.

18         MR. TRAGOS:  Have a moment, Your Honor?

19         THE COURT:  Yes, sir.

20   (Brief pause.)

21         MR. TRAGOS:  No other questions, Your Honor.

22         THE COURT:  Any redirect?

23         MS. KAISER:  Yes, Your Honor.

24

25

1                    REDIRECT EXAMINATION

2    BY MS. KAISER:

3    Q      Detective Spector, in your other chats with

4    the defendant, did he mention he was having out of

5    town guests?

6    A      He did, from Ireland.

7    Q      Did he mention that he was travelling to

8    different cities for work?

9    A      He did.

10          MS. KAISER:  Your Honor, may I approach the

11   witness?

12          THE COURT:  Yes, ma'am.

13   BY MS. KAISER:

14   Q      Detective Spector, I'm handing you what's been

15   premarked for identification as Government's

16   Exhibits 86 to 91, and ask you if you'd take a look

17   at those documents.  What are those documents?

18   A      Those are instant messages between myself and

19   Captoes.

20   Q      And did you keep them these as part of your

21   investigation?

22   A      I did.

23   Q      And in the ordinary course of business?

24   A      Yes.

25          MS. KAISER:  At this time, I'd move for

1       admission of Government's 86 to 91 into evidence.

2              THE COURT:  Is there any objection?

3              MR. TRAGOS:  Just a moment, Your Honor.

4       (Brief pause.)

5              MR. TRAGOS:  As long as they comply with the

6       court's prior order and my prior objections, no

7       objection.

8              THE COURT:  All right.  Exhibits 86 through 91

9       are now received.

10      (Whereupon, Government's Exhibit Numbers 86 through

11      91 are received into evidence.)

12      BY MS. KAISER:

13      Q      At any time during your chats with the

14      defendant, did he ever say, I don't want to get

15      together to meet your daughter Susie for sex?

16      A      No.

17      Q      Did he ever say, this is wrong, we shouldn't

18      be discussing this?

19      A      No.

20      Q      Did he ever indicate to you that he had any --

21      that he had changed his mind about wanting to meet

22      with you and Susie?

23      A      No.

24      Q      Thank you.

25             MS. KAISER:  I have no further questions.

1              THE COURT:  Thank you, sir.  You may step

2       down.  Please watch your step.

3              Ms. Kaiser?

4              MS. KAISER:  Your Honor, the government has no

5       other witnesses.

6              THE COURT:  Members of the jury, as you've

7       heard, both sides have rested, meaning that the

8       evidentiary portion of the trial has concluded.

9       What remains are the final arguments from the

10      attorneys, my instructions on the law and, of

11      course, then you would retire to deliberate your

12      verdict.

13             Let me caution you, it's all the more

14      important, considering what remains, that you not

15      form or express any opinions about the case, discuss

16      it among yourselves or allow it to be discussed in

17      your presence.  In other words, until you retire to

18      deliberate, do not discuss the case.

19             The jury instructions need to be reviewed

20      between the court and counsel.  That will probably

21      take some time.  So I'm going to go ahead and let

22      you guys go to lunch at this point, and let's return

23      at 1:15 by the courtroom clock ready for closing

24      argument.  We'll be in recess.

25             COURTROOM SECURITY OFFICER:  All rise.

1        (Jury out at 11:43 AM.)

2            THE COURT:  Any additional motions,

3    Mr. Tragos?

4            MR. TRAGOS:  Yes, Your Honor.  We would renew

5    our -- all our previous motions that were filed

6    pretrial as well as the ones we renewed at the

7    beginning of the trial, Your Honor, with reference

8    to non-redaction of portions of the tapes that came

9    into evidence.

10           We would move to dismiss based on the same

11   grounds with reference to the government not

12   providing sufficient evidence for a jury to be able

13   to find the defendant guilty, now considering the

14   case which the defense has put on.

15           We would also move, Your Honor, for a motion

16   for mistrial as well with reference to the court's

17   ruling on the rebuttal evidence that came in.  We

18   believe that now that it's in, that the court can

19   see the highly prejudicial nature and that it did

20   outweigh the probative value as well as when the

21   state was able to put it in during the rebuttal

22   case, I believe, is highly prejudicial to the

23   defendant.

24           We would also, Your Honor, renew our

25   objections to the admissibility of the evidence that

1    was placed in, renew those objections we made

2    earlier.  We renew our judgment of an acquittal,

3    Your Honor, and that's it.

4         THE COURT:  All right.  Thank you.

5    Ms. Kaiser, anything from the government?

6         MS. KAISER:  No, Your Honor.

7         THE COURT:  The previous motions are deemed

8    renewed.  They are denied, same ruling.  One

9    exception, of course, is the motion in limine

10   directed toward the chats with the last witness,

11   Detective Spector, which the court granted pretrial,

12   with the understanding that that would be revisited

13   in the event matters came out during the defense

14   which opened the door for inquiry.  That did happen.

15        So that motion has been revisited and denied,

16   with the exception of the mental status of the

17   child.  That concern has been evidenced by the court

18   consistently throughout.

19        As to the motion for mistrial, I don't see any

20   basis for that.  Assuming that it is timely, this is

21   proper rebuttal evidence.  It comes in under 404(b)

22   for all the reasons I've earlier discussed with

23   counsel.  So those motions are denied.

24        All right.  Jury instructions.  Let's go

25   through the government's packet first.  And what I'd

1    like, the procedure that has worked well,

2    Mr. Tragos, or whoever is representing the defendant

3    on this, as I go through, you need not say anything

4    unless you object.  But I want to make sure that we

5    all have the instructions before us that the court

6    intends to give.

7         The first instruction is basic number one

8    beginning with members of the jury.  The second

9    instruction is basic 2.1, duty to follow

10   instructions, presumption of innocence.  The next

11   instruction -- it was proposed as 2.2, it now has to

12   be 2.1 because the defendant has testified.

13        The next instruction is basic three,

14   definition of reasonable doubt.  The next

15   instruction is basic 4.2, consideration of the

16   evidence.  The next instruction is basic number

17   five, credibility of the witnesses.

18        The next instruction is basic 6.1, proposed.

19   But because the defendant testified, 6.3 would seem

20   to be the appropriate instruction.  Does everyone

21   agree?

22        MR. SARTES:  Agree, Your Honor.

23        MS. KAISER:  Agreed, Your Honor.

24        THE COURT:  The next proposed instruction is

25   basic 6.3, impeachment, inconsistent statement,

1    defendant testifies with no felony conviction.  The

2    next proposed instruction is basic number seven,

3    expert witnesses.

4         Next is basic 9.1, on or

5    about-knowingly-willfully.  The next is basic 10.1,

6    caution, punishment, single defendant, single count.

7    The government's number 11 is special 2.1, meaning

8    special instruction 2.1, confession-statement.  The

9    next proposed instruction is number 12, I believe

10   there's an objection to this.  This is the false

11   exculpatory instruction.

12        MR. SARTES:  That is correct.  Your Honor.

13        THE COURT:  Ms. Kaiser, I don't see any

14   authority cited.  I am familiar generally with this

15   instruction.  I know that it's been given from time

16   to time.  But what authority do you have for that?

17        MS. KAISER:  Just a citation that -- to the

18   modern federal jury instruction, consciousness of

19   guilt from false exculpatory statement, which is

20   referenced in the annotations, and apparently it was

21   used in a previous cases in 1994 in the Middle

22   District.  But aside from that, I don't have any

23   other authority.

24        THE COURT:  Maybe I don't have a copy of that

25   annotation page.  What is the cite?

1          MS. KAISER:  It's a criminal case number

2     94-155-CR-T-25B.

3          THE COURT:  Well, do you have any authority

4     from an appellate court?

5          MS. KAISER:  No, Your Honor.  The government

6     will withdraw its request for this instruction.

7          THE COURT:  All right.  I guess that moots the

8     objection, Mr. Sartes.

9          MR. SARTES:  Yes, sir.

10          THE COURT:  All right.  The next proposed

11     instruction is special instruction number four on

12     similar act evidence.  The next proposed instruction

13     is the offense instruction which is a modified

14     version of offense instruction number 80.

15          As I see this instruction as proposed,

16     Ms. Kaiser, you have essentially tracked offense

17     instruction 80 until the fourth element; is that

18     right?  You've added the attempt definition.  In

19     other words, this isn't anything but a modified

20     offense instruction 80; correct?

21          MS. KAISER:  Correct, Your Honor.

22          THE COURT:  All right.  Let me go down line by

23     line first.  We don't have a use of the mail, so

24     does anyone object to my striking through that

25     reference?

1          MR. SARTES:  No objection, Your Honor.

2          MS. KAISER:  No objection, Your Honor.

3          THE COURT:  All right.  So it would be to use

4     any facility of interstate or foreign commerce

5     including transmissions by computer on the internet.

6     In this case, a telephone or computer with access to

7     the internet.  The word "anyone" is not in the

8     government's proposed.  That might have been just an

9     oversight.  Offense instruction 80 reads:  To

10    persuade, induce, entice, coerce anyone under 18

11    years of age.

12         MR. SARTES:  Your Honor, may I for a moment?

13    There's also words to attempt to.  And on line one,

14    two, three, four of the government's proposed --

15         THE COURT:  All right.  I see that.  Let me

16    take care of the word anyone because that's just, I

17    think, a typo.  Should that not be included,

18    Ms. Keys?

19         MS. KAISER:  I just put any individual.  But

20    if you want to change --

21         THE COURT:  Oh, instead of anyone you used

22    individual?

23         MS. KAISER:  Yes.  I put any individual under

24    18.

25         THE COURT:  All right.

1           MS. KAISER:  So if you want to change it to

2     anyone under 18, that's fine.

3           THE COURT:  Let's just use the language used

4     in the Eleventh Circuit.  All right.  So there's an

5     objection, then, to the phrase to attempt?

6           MR. SARTES:  Yes, Your Honor.

7           THE COURT:  What's the basis for the

8     objection?

9           MR. SARTES:  Your Honor, I'm -- the way I

10    perceive this is it appears that the government is

11    trying to merge two separate and distinct jury

12    instructions into one.  The way I see the Eleventh

13    Circuit standard, it is the coercion and enticement

14    of a minor, it is not the attempt to.

15          I think if she wants to put an attempt

16    instruction in, then I think there's a standard

17    attempt instruction.  And I think that would be more

18    appropriate than trying to merge these two separate

19    jury instructions into one.

20          THE COURT:  The indictment alleges this very

21    phrase; does it not?

22          MR. SARTES:  It does, Your Honor.

23          THE COURT:  Ms. Kaiser?

24          MS. KAISER:  Your Honor, I checked with the

25    appellate section of my office when I was drafting

1    these and they said that it's perfectly acceptable

2    to merge the attempts.  Since it was charged as an

3    attempt, they said you could go ahead and put the

4    language in for the attempt within the offense

5    instruction.  So that's what I did so it's less

6    confusing.

7         THE COURT:  So what you've done is simply

8    merge the attempt instruction, the pattern attempt

9    with the substantive offense instruction?

10        MS. KAISER:  Yes, Your Honor.

11        THE COURT:  I do note that Section 2422(a) of

12   Title 18 as well as (b), for purposes of this case,

13   includes the phrase or attempts to do so.

14        MR. SARTES:  Correct, Your Honor.  If I may

15   add, when we get to the first element of the

16   standard, it also indicates, to attempt to persuade.

17   The attempt language is in the actual elements,

18   specifically in the first element.

19        THE COURT:  I see.  Well, if I take that

20   phrase and put it after the phrase criminal offense

21   in the sixth line down, would that not be consistent

22   with the statute?

23        MR. SARTES:  I'm sorry.  Could you read what

24   you're proposing.

25        THE COURT:  Well, go down to the sixth line.

1          MR. SARTES:  Okay.

2          THE COURT:  For which any person could be

3     charged with a criminal offense or attempts to do

4     so.  That's tracking the language of the statute.

5          MR. SARTES:  Yes.

6          THE COURT:  Any objection to that?

7          MR. SARTES:  No Judge.

8          THE COURT:  Ms. Kaiser?

9          MS. KAISER:  Your Honor, may I just think

10    about it for a minute, please.

11    (Brief pause.)

12         MS. KAISER:  That -- that would be acceptable.

13         THE COURT:  It's the same thing, it's just

14    more closely tracking the statute.  All right.  Then

15    we have the bracketed language from the pattern

16    instruction on attempt, which is special number 11

17    at page 54 in your book, if you've got it.

18         First, let me ask Mr. Sartes, is there any

19    objection to the content of the bracketed -- well,

20    it's bracketed in my copy, I'm sorry.  It's the

21    sentence after -- beginning on the end of the sixth

22    line after the words, criminal offense, beginning

23    with in some cases.  I don't know about in some

24    cases but --

25         MS. KAISER:  That's fine.

1          MR. SARTES:  Well, in some cases, in a

2    criminal case for anyone to attempt to commission of

3    -- attempt fails -- actually carried out, fully

4    committed.

5          THE COURT:  That's tracking the special number

6    11.

7          MR. SARTES:  It does, Your Honor.  I guess

8    that's what I'm trying to determine.  Is it better

9    to just give the attempt instruction separately and

10   just have the court read the standard the way the

11   Eleventh Circuit has placed it in the pattern

12   instruction, or is it a better exercise to actually

13   merge these two together?

14         THE COURT:  Better, I don't know.  But since

15   the statute says, or attempts to do so, it's not

16   necessary for the government to allege a violation

17   under Section 2 of Title 18, I presume, Ms. Kaiser.

18   Is that right?

19         MS. KAISER:  That's correct, Your Honor.

20         THE COURT:  It's not a separate offense.  It's

21   actually embodied within the statute itself here.

22         MS. KAISER:  That's correct.  That's correct.

23   And I think it's clear it stays right where it is.

24         THE COURT:  Well, again, let me go back.  Is

25   there any objection to the substance of that

1       statement?

2            MR. SARTES:  No.  There's no objection to the

3       substance of that statement.

4            THE COURT:  All right.  I'm going to give it

5       as proposed, finding that Section 2422(b) of Title

6       18 includes the phrase, or attempts to do so, as a

7       violation of the statute separate and apart from

8       Section 2 of Title 18, which is the more traditional

9       way of charging attempt.  And if I misspoke, I may

10      be referring to the aiding and abetting.

11           MR. SARTES:  Actually, Judge, you are.  But I

12      think we understand what you mean.

13           THE COURT:  I don't know why I was thinking of

14      subsection two.  But in any event, I don't see any

15      prejudice.  It's a correct statement of the law.  It

16      flows nicely.  It should assist the jury in

17      understanding that in this particular offense, one

18      may either commit the offense or attempt to commit

19      the offense.  Either way, it's a violation.  So

20      let's go down through now to the first element.

21           Again, if I don't hear an objection, I'm just

22      giving you a chance to follow along.  The second

23      element is individuals in the plural.  I would

24      suggest we take out the S.  This is a singular

25      alleged victim.

1          MR. SARTES:  No objection to that, Your Honor.

2          THE COURT:  Third seems to be a correct

3     statement.

4          MR. SARTES:  Agreed.

5          MS. KAISER:  Yes.

6          THE COURT:  The next element in the offense

7     instruction 80 is the knowingly and willfully.

8     That, of course, is now the fifth element in the

9     proposed instruction.  So what we have now is the

10    fourth element proposed by the government which is

11    the aspect of an attempt; correct, Ms. Kaiser?

12         MS. KAISER:  Correct, Your Honor.

13         THE COURT:  Is there an objection to the

14    fourth element?

15         MR. SARTES:  Your Honor, the objection is -- I

16    know where the language come from.  The language

17    comes from the *Murrell* case, that's M-U-R-R-E-L-L,

18    which is found at 368 Fd.3d, 1283.

19         THE COURT:  Actually, it comes out of the

20    attempt instruction, as well.

21         MR. SARTES:  Does it?  Okay.

22         MS. KAISER:  That's correct, Your Honor.

23         MR. SARTES:  Actually, you're right, Your

24    Honor, because I'm reading in that -- in that case

25    where they outline that attempt and the two elements

1        necessary for the attempt.

2            I just -- I am concerned that we're making

3        this now an element of the substantive offense as

4        opposed to, again, a separate instruction to attempt

5        to do so.  And I guess the way I'm looking at it,

6        I'm looking again at *Murrell*, also.  I don't think

7        this is what the Eleventh Circuit has agreed is the

8        appropriate instruction.  I think we're now

9        modifying this beyond what the standard instruction

10       for this offense is.

11           And I'm also concerned again with the *Murrell*

12       decision because it's not as if *Murrell* says this is

13       the instruction that was given and this is a correct

14       instruction.  This is a case where the defendant

15       pled.  And it's a -- as I think the court says, it's

16       an -- it's a discussion basically of theory.

17           And I'm -- I just am concerned about how much

18       we're merging these things together because we're

19       now really creating a separate and distinct jury

20       instruction.  So do I agree with the court -- just

21       to wrap that up -- that in attempt the defendant had

22       the specific intent to engage and that he took

23       substantial steps?  Yes, I agree that those are the

24       two elements necessary to prove an attempt.  I

25       believe that those are correct statements of the

1    law.  I just don't know if they're properly placed

2    here.

3            THE COURT:  Ms. Kaiser?

4            MS. KAISER:  Your Honor, the way the offense

5    instruction is written, it does combine the offense

6    with the attempt.  But there's no prohibition of

7    doing that.  As the court's aware, case law is clear

8    that the pattern jury instructions are drafted by

9    the committee of district judges appointed by the

10   chief judge of the circuit.  And while they're a

11   valuable resource, the case law says they're not

12   binding and the Eleventh Circuit case law takes

13   precedence; citing to *United States versus Dohan,*

14   508 F.3d 989, Eleventh Circuit 2007, which also

15   cites *United States versus Polar*, 369 F.3d 1248,

16   Eleventh Circuit 2004 and *U.S. versus Veltmann,*

17   V-E-L-T-M-A-N-N at 6 F.3d 1483, Eleventh Circuit

18   1993.

19           The way the instruction is drafted, it's

20   substantively accurate, it's accurate on the law.

21   He's been charged with an attempt.  And the way the

22   jury instruction as proposed is clear to the jury

23   encompasses the language it needs to for the

24   elements and won't confuse the jury.

25           THE COURT:  That element is taken directly

1      from the pattern instruction number 11 on attempt;

2      correct?

3              MS. KAISER:  Yes, Your Honor.

4              MR. SARTES:  Your Honor, may I respond?

5              THE COURT:  Just a moment.

6      (Brief pause.)

7              THE COURT:  All right.  Response?

8              MR. SARTES:  Yes, sir.  And the court knows

9      that there are modifications to the -- I guess the

10     realm of rules and codes that we use.  We just had a

11     modification for the Rules of Criminal Procedure

12     that took effect December 1st.

13             This jury instruction, Judge, I think the last

14     revision of this jury instruction is 2003.  There

15     are -- the statute was around, there are cases from

16     2005 onwards.  And I think it's been four -- three,

17     almost four years now since this jury instruction

18     was produced.  And the Court of Appeals could have

19     issued a modification to this jury instruction.

20     They have elected to not do so.

21             And again, if I'm going to go back and cite

22     *Murrell* or *Hornaday,* H-O-R-N-A-D-A-Y, which is 392

23     F.3d 1306, it's a 2004 case, it's the exact same

24     statute, almost a similar discussion that was being

25     had those two cases, and the Eleventh Circuit has

1       not changed the patterns.

2            And I will just -- our position would be, Your

3       Honor, if that'S the way that they say it should be,

4       then that's the way they say it should be.  If they

5       wanted to change it, they would have.

6            THE COURT:  Well, I don't quarrel with that

7       suggestion.  But at the same time, the question

8       before me is whether the proposed instruction is a

9       correct statement of the law.  Although the pattern

10      instructions are helpful and should be followed, I

11      have not seen any authority from the Eleventh

12      Circuit prohibiting the merging of the attempt

13      instruction with the substantive offense

14      instruction.

15           Either way, if I were to charge the jury on

16      attempt separately, I would be telling them exactly

17      what is embodied within this instruction.  So I

18      don't see there's any reason -- and I'll use form

19      over substance, not as a criticism, by any means, I

20      simply don't see any reason to provide form over

21      substance just by separating the two, particularly

22      whereas here, the statute charge is that an attempt

23      is a violation.

24           As the discussion in *Murrell* confirms,

25      Congress intended to proscribe two separate intents.

1      One, the act of persuasion itself and, two, the

2      attempt to persuade, not the performance of the

3      sexual acts.

4           The government in this case alleges that the

5      defendant violated the statute by attempting to

6      persuade a minor.  The grand jury alleges it in that

7      way and that's consistent with the statute.  So I'm

8      going to give the instruction as proposed.  It's

9      consistent with the indictment, it's consistent with

10     the pattern instruction 80 on offense and pattern

11     instruction 11 on attempt.

12          I don't see any confusion and I don't see any

13     prejudice to the defendant.  So to the extent

14     there's an objection, I will overrule it.

15          Now, the remaining instruction pretty much

16     tracks the offense instruction 80.  But if you'll

17     look at the top of the next page beginning with

18     also, you've not put in the words or, the

19     disjunctive, if you will.  Is there a reason for

20     that, Ms. Kaiser?

21          MS. KAISER:  I'm sorry, Judge.  Where are you

22     looking?

23          THE COURT:  Well, your first paragraph.  It's

24     three lines long.  It says, also, it's not necessary

25     for the government to prove that the individual was

1      actually persuaded, induced, enticed or coerced.

2              MS. KAISER:  Yes, Your Honor.

3              THE COURT:  The instruction reads was actually

4      persuaded or induced or enticed or coerced.  Is

5      there a substantive reason you didn't have the word

6      or?

7              MS. KAISER:  No, Your Honor.

8              THE COURT:  I presume they should be included,

9      then.  Is there any objection from the defendant?

10             MR. SARTES:  No, Your Honor.

11             THE COURT:  All right.  Again, I'm not sure it

12     makes any substantive difference.  But it makes

13     clear to the jury that either one of these is

14     sufficient.

15             And then the next paragraph begins -- you

16     haven't put the word so but that's in the pattern,

17     so I'm going to give it.  So the government must

18     prove that if the intended sexual activity had

19     occurred, etcetera.

20             Now, before we get to the last paragraph,

21     there is a phrase in the pattern instruction that

22     reads, in that regard, I instruct you as a matter of

23     law that the following acts are crimes under state

24     law, you've got it separately as your proposed 15.

25     Is that right, Ms. Kaiser?

1          MS. KAISER:  Yes, Your Honor.

2          THE COURT:  All right.  Then let's turn, then,

3     to the last paragraph beginning with, an individual

4     charged with a violation need not contact a minor

5     directly, and that comes from *Murrell*.  Any

6     objection to that?  It's not in the pattern.

7          MR. SARTES:  It's not in the pattern.  Yes,

8     Judge, we would object to that language.

9          THE COURT:  Grounds, please.

10         MR. SARTES:  And, again, when it comes to

11    *Murrell*, *Murrell* is a plea case.  And this is a

12    discussion, I would purport to this court, in

13    theory.  And, again, if the Eleventh Circuit wanted

14    this to be part of this instruction they would have

15    changed it between then and now, between 2003 and

16    today especially, you know, with *Murrell* coming in

17    2005.  And I think she can argue it.  I don't think

18    there's any doubt about that.  I think it is an

19    opinion of our Eleventh Circuit, but I don't know if

20    it should be in the actual jury instruction to this

21    jury.

22         THE COURT:  The last in *Murrell*, let me give

23    you a page reference if you have a copy.  If you

24    look at page 1287, it's on page five of the Westlaw

25    printout.  There's a paragraph that begins, *Murrell*

1    asserts that he could not have intended to induce a

2    minor to engage in illegal sex acts without actually

3    speaking to a person he actually believed to be a

4    minor.

5        The court goes on to discuss this argument,

6    and in the very bottom of page 1287, which is found

7    in the upper left-hand corner of page six of

8    Westlaw, the facts in that case, quote, *Murrell*

9    communicated with an adult who he believed to be the

10   father of a 13-year-old girl, and who presumably

11   exercised influence over the girl.

12       The court then turns to what they refer to as

13   the second element of attempt, whether the defendant

14   took a substantial step toward the intended goal.

15   And lastly, just above headnote seven in capital B,

16   the two-level sentencing enhancement instruction,

17   the court finds reasons, quote, "because we find

18   that direct communication with a minor or supposed

19   minor is unnecessary under the text of Section

20   2422(b), and that *Murrell*'s conduct satisfied the

21   elements of attempt, we hold that such conduct was

22   in violation of the statute."

23       My concern in this case is that the jury may

24   very well, notwithstanding your arguments, and I

25   would presume that Mr. Tragos is not going to argue

1    there's no violation because he never talked to a

2    minor, they would go back in the jury room and

3    that -- that could come up.

4        Best case scenario, we'd get a question that I

5    could clarify by referencing this language in

6    *Murrell*.   Worse case scenario is we don't get a

7    question, but they've deliberated on a matter that

8    I've not instructed them on.   Clearly under *Murrell*,

9    it's not necessary under the statute, it's not

10   required under the statute, it's not an element of

11   the offense under the statute that the defendant

12   actually speak with someone he thought was under the

13   age of 18.

14       It is sufficient if he spoke with someone as

15   an intermediary, as the government refers to it; in

16   this case, the undercover agent posing as a parent.

17   It would seem to me the jury should be instructed so

18   that they don't misunderstand the law in this

19   particular sequence.

20       I mean, it's a correct statement of law;

21   correct?   Not to be redundant, but it is correct,

22   without waiving your objection.

23       MR. SARTES:   Without waiving my objection, it

24   is a correct statement as to what *Murrell* says, the

25   language in *Murrell*.   I guess, Judge, I'm not

1    certain if this is a decision that we make or if

2    this is something the jury should consider, if it is

3    an option that they wish to consider.

4         THE COURT:  Well, let me just think out loud.

5    And *Murrell* factually is very much on point.  I

6    realize it may have been a different procedural --

7    or it would have been in a different procedural

8    posture, but the substantive discussion of the

9    elements of the offense and the facts leading up to

10   the violation were essentially the same.

11        The first element of this offense is that the

12   defendant knowingly used the internet in an attempt

13   to persuade, induce, entice or coerce an individual

14   under the age of 18.  Now, without more, the jury

15   could very well look at that and say, well, that

16   didn't happen in this case.  He never talked to

17   somebody under the age of 18.

18        So without an instruction that it is not

19   necessary for the defendant to actually speak with a

20   minor, the jury could very well misapply the law

21   because they have not been instructed on it.

22        There's nothing in the remaining elements to

23   educate them, if you will, on the fact that speaking

24   with the parent is sufficient.  That's the concern

25   I've got.  This particular statute would apply,

1    would it not, Ms. Kaiser to a situation where a

2    defendant actually communicates on the internet via

3    instant messaging or e-mail with a minor?

4        MS. KAISER:  Yes, Your Honor.  There's also

5    the *Hornaday* opinion that also cites the *Murrell*

6    opinion with approval.  And the cite for that is

7    *U.S. versus Hornaday* at 392 F.3d 1306.  It's a

8    December of '04 case in which it was factually

9    similar where the defendant in a 2422(b) action was

10   talking to an undercover law enforcement officer who

11   was posing as a parent of a child.

12       THE COURT:  What is the pertinent discussion?

13   I'm pulling it up, but as I do that --

14       MS. KAISER:  They discuss on page five on the

15   Westlaw cite part of his argument on appeal was that

16   because he never used the internet to communicate

17   directly with the minor and that he only

18   communicated with an adult, the Eleventh Circuit

19   noted, and I'm quoting, "That argument fails

20   because, while this appeal was pending, another

21   panel of this court held that the use of an adult

22   intermediary like Wayne does not take the

23   defendant's actions outside the prohibitions of

24   18 USC 2422(b), citing *United States versus Murrell*

25   368 F.3d 1283 at 1286 to 1288, Eleventh Circuit

1    2004.  *Murrell* involved the factual scenario that

2    matches this one in all relevant respects.  A sexual

3    predator used the internet to communicate with an

4    undercover agent posing as an adult intermediary who

5    would arrange for the sexual predator to engage in

6    various unlawful sexual acts with a minor. "

7          THE COURT:  Slow down just a little bit.

8          MS. KAISER:  Sorry.  The panel concluded with

9    the defendant's conduct fits squarely within --

10   concluded that the defendant's conduct fits squarely

11   within the definition of induce in Section 2422(b),

12   citing id at 1287, and that the use of an adult

13   intermediary did not change the analysis.  See id at

14   1287, parenthesis, noting that the efficacy of

15   Section 2422(b) would be eviscerated if a defendant

16   could circumvent the statute simply by imploring an

17   intermediary to carry out his intended objective.

18          Because the defendant in the *Murrell* case had

19   the intent to induce a minor to engage in unlawful

20   sexual activities and took a substantial step toward

21   committing the offense, the court upheld his 2422(b)

22   conviction.  And then it goes on again and just

23   parallels *Murrell* and cites it with approval.

24          THE COURT:  I note the word "stimulate" is in

25   the instruction.  That's taken out of *Murrell*, I

1      take it?

2           MS. KAISER:  Yes, Your Honor.

3           THE COURT:  I don't want to use that word.

4      That's not in the statute.  All right.  I'm going to

5      propose this.  I will overrule the objection because

6      I -- of the concerns I expressed, and consistent

7      with *U.S. versus Hornaday* as well as *Murrell*.  And

8      the possibility, if not likelihood, that the jury

9      could read the first element of the charge to

10     require that there be some direct communication with

11     a minor, which is not the law.

12          I would propose in lieu of this paragraph the

13     following be given:  It is not necessary for the

14     government to prove that the defendant communicated

15     directly with a minor or supposed minor.  It is

16     sufficient for the government to prove beyond a

17     reasonable doubt that the defendant attempted to

18     induce, persuade, entice or coerce a minor to engage

19     in sexual activity through communications with the

20     purported parent of a minor.

21          All right.  You'll have a copy of that as soon

22     as we get it printed out.  The next instruction as

23     we discussed is --

24          MR. SARTES:  Can we -- I'm sorry to interrupt

25     you, sir.  There's one more part of this that --

1          THE COURT:  Oh, there is?  That was the end of

2     mine.

3          MR. SARTES:  I'm sorry, Judge.  If I can

4     focus -- there's a part missing, though, in the

5     government's portion.  If I can focus the court's

6     attention on the standard jury instruction, if the

7     court recalls, the also it is not necessary

8     paragraph?

9          THE COURT:  Right.

10         MR. SARTES:  There's a continuation with a

11    semicolon after that.

12         THE COURT:  Any objection to that, Ms. Kaiser?

13    You may have thought you had it covered.

14         MS. KAISER:  No.  I do have an objection to

15    that, Your Honor.  Do you have the annotated version

16    of the government's --

17         THE COURT:  Yes.

18         MS. KAISER:  I've got a footnote there and I

19    put in brackets the original language which I took

20    out because it's an incorrect accounting of the law.

21    And in that footnote I explain why.  Basically given

22    the *United States versus Yost* at 479 F.3d 815 at 819

23    and eight 20 and *United States versus Murrell*, both

24    of those cases rejected the notion that the statute

25    required two separate intents, also cited *United*

1        *States versus Bailey* at 228 F.3d 637, which was a

2        Sixth Circuit case.

3             It was rejecting the notion that Section

4        2422(b) requires the specific intent to commit

5        illegal sexual acts rather than just the intent to

6        persuade or solicit the minor victim to complete the

7        sexual acts, quoting, while it may be rare for there

8        to be a separation between the intent to persuade

9        and the follow-up intent to perform the act after

10       persuasion, they are two clearly, separate and

11       different intents and the Congress has made a clear

12       choice to criminalize persuasion and the attempt to

13       persuade, not the performance of sexual acts

14       themselves.

15            Hence, a conviction under the statute only

16       requires a finding that the defendant had an intent

17       to persuade or to attempt to persuade.  That's

18       *Murrell* at 1287.  It's quoting *Bailey* at 639.  The

19       pattern jury instructions on those points are wrong.

20            THE COURT:  Response?

21            MR. SARTES:  Yes, Judge.  I don't think that

22       my reading this is different, because the way I see

23       this, the defendant has to have an intent to

24       persuade, induce, entice, coerce or engage in some

25       form of unlawful sexual activity.  He has to have

1      the intent to do both parts.  It is not the intent

2      to actually commit the intent to actually intend to

3      persuade the individual, but there has to be some

4      crime there.

5           It's not -- for example, it's not the intent

6      to sell a chocolate bar.  You can't convict based on

7      the intent to sell because he intended to coerce a

8      minor into doing something that's not illegal.  If

9      you take that up, Judge, the knowingly and willfully

10     parts that are in this statute are gone.  And

11     they're just basically mentioned in passing in --

12     within one -- within -- I'm sorry, number four of

13     the government's proposed -- is it number four or

14     number three?  I'm sorry, number five, which is

15     intermingled in the attempt language now.

16     (Brief pause.)

17          THE COURT:  I agree with the government in

18     this particular case, the allegations are not that

19     this defendant intended to engage in some activity,

20     but that he intended and attempted to persuade,

21     induce, etcetera, a minor to engage in sexual

22     activity.

23          So if I were to give the pattern as requested

24     by the defendant, it would erroneously instruct the

25     jury that the government had to prove that the

1    defendant actually intended to engage in some form

2    of unlawful sexual activity.  That is not the law

3    and that is not consistent with the allegation in

4    the indictment.

5         On the other hand, I think a modification of

6    this paragraph is appropriate, consistent with

7    *Murrell*.  Something along the lines that -- and I'm

8    going to now read from the third line.  But it is

9    necessary for the government to prove that the

10   defendant intended to persuade, induce, entice or

11   coerce a minor to engage in sexual activity -- in

12   some form of sexual activity.

13        MR. SARTES:  Judge, are you intending to put

14   the words knowingly and willfully in there

15   somewhere?

16        THE COURT:  That's already in the elements of

17   offense, the fifth element.  So I don't think it's

18   the intent to engage in activity with the individual

19   that is required.  Obviously, there could be an

20   instance where that could be, but it's -- the

21   prohibition is the persuasion or attempt to

22   persuade.  As *Murrell* says, quote, not the

23   performance of sexual activities themselves, closed

24   quote.

25        And it's a conviction under the statute only

1    requires a finding that the defendant had an intent

2    to persuade or to attempt to persuade.

3          MR. SARTES:  Judge, let me just ask, then, is

4    there a -- the substantial step is then the separate

5    paragraph after the fifth -- after the fifth element

6    that the defendant acted knowingly and willfully and

7    then separate paragraph, a substantial step, will

8    that language be there?

9          THE COURT:  That's what's in there, yes.

10         MR. SARTES:  I'm sorry.  Can you read it for

11   me one more time.

12         THE COURT:  Well, I haven't written it out.  I

13   was actually thinking out loud.

14         MR. SARTES:  Is the court telling me that the

15   defendant does not have to knowingly and willfully

16   intend to persuade for sex?

17         THE COURT:  I'm not telling you what it is or

18   isn't, so don't ask me.  What I'm telling you is

19   what the law requires.  The law is very clear that

20   the prohibition is an act of persuasion or the

21   attempt to persuade a minor to engage in some sexual

22   activity which would be a violation of state law,

23   not that the defendant actually intended to

24   participate is the word -- is the phrase.

25         There would be a violation of the statute, for

1    example, if a defendant tried to persuade somebody

2    to send their child up to have sex with his

3    neighbor.  That would be a violation.

4         MR. SARTES:  But doesn't there have to be an

5    intent to actually induce?

6    (Brief pause.)

7         THE COURT:  What I'm going to add to the

8    sentence the government has in the proposed

9    instruction beginning with also, is this sentence:

10   It is necessary for the government to prove beyond a

11   reasonable doubt that the defendant had the intent

12   to persuade or to attempt to persuade a minor to

13   engage in sexual activity.  I think that takes care

14   of the clause that was eliminated.

15        I'm not sure it's necessary to tell them

16   again, but since it follows with the caveat that

17   it's not necessary for the government to prove that

18   the individual was actually persuaded to engage in

19   sexual activity, the jury should be told the

20   government still must require or prove, excuse me,

21   that the defendant acted with that intent.

22        MR. SARTES:  Judge, that being said, if we

23   went back to that first paragraph --

24        THE COURT:  I'm not going backwards, sir.  I'm

25   going forward.  Your objection is noted.  Is there

1      any object to number 15, applicable Florida law?

2             MR. SARTES:  Your Honor, can I just put it for

3      the record so we all understand.  We --

4             THE COURT:  You have put it on the record.

5      We're moving forward.  Number 15, is there any

6      objection?

7             MR. SARTES:  No, Judge.

8             THE COURT:  Number 16 tells the jury that the

9      internet is a facility or instrumentality of

10     interstate commerce.  And, again, if I don't hear an

11     objection I'll assume there's not one.

12            Number 17 is a definition of induce.  Number

13     18 --

14            MR. SARTES:  There's an objection here, Judge.

15            THE COURT:  Yes.  This is the minor victim.  I

16     understand the last sentence is objected to,

17     beginning with moreover; is that correct?

18            MR. SARTES:  That's correct, Your Honor.

19            THE COURT:  Where did this come from,

20     Ms. Kaiser?

21            MS. KAISER:  Your Honor, I --

22            THE COURT:  I see where you say it's borrowed

23     from somewhere but --

24            MS. KAISER:  United States -- I believe I put

25     a copy of that jury instruction in the court's

1    packet and I gave a copy to defense counsel, as

2    well.  But it's the United States versus Moser.  It

3    was a 2422(b) case out of the middle -- or U.S.

4    District Court for the District of Maryland.

5    They've included that in the same type case, and I

6    think it makes sense.

7         THE COURT:  Isn't that a matter of argument?

8    Since it's -- the element is to persuade or attempt

9    to persuade the minor to engage in sexual activity

10   without regard to who the minor engages with, what

11   difference does it make whether this defendant was

12   capable of completing a particular sexual act?  I

13   mean, obviously you've got evidence he was going

14   to -- he discussed at least performing all kinds of

15   sexual acts, some of which had nothing to do with

16   the ability to have an erection.  So I don't know

17   what the facts were in Moser that may have prompted

18   this instruction.

19        MS. KAISER:  The government can withdraw that

20   request for the last sentence of the minor victim.

21        THE COURT:  It's going to be an argument.  You

22   know Mr. Tragos is going to argue -- you'd better

23   listen up -- you're going to argue, I'm sure -- if

24   he doesn't, I'd be surprised, but it's up to him --

25   that because of his medical condition he was unable

1        to carry out the act.

2            MS. KAISER:  Right.

3            THE COURT:  But there's other acts that you

4        have alleged through the evidence that he was

5        intending to participate in that did not have to do

6        with sexual function.

7            MS. KAISER:  Yes, Your Honor.

8            THE COURT:  All right.  Well, that last

9        statement, then, is withdrawn?

10           MS. KAISER:  Yes, Your Honor.

11           THE COURT:  All right.  That satisfies your

12       concern?

13           MR. SARTES:  Judge, let me ask.  I'm kind of

14       flipping back and forth from minor victim back to

15       the amended proposed 80, which is --

16           THE COURT:  You didn't understand.  I want to

17       move forward, not backwards.

18           MR. SARTES:  I know, Judge.  But I think we've

19       actually said all this stuff now in the previous

20       one, so I think they're going to be doubly

21       instructed.

22           THE COURT:  Well, meaning cumulative?

23           MR. SARTES:  That's correct.

24           THE COURT:  What say you, Ms. Kaiser?  What

25       say you?  Excuse me.

1          MS. KAISER:  I don't see what he's referring

2     to.

3          THE COURT:  Well, it's already been covered.

4     It doesn't have to be an actual minor.  It doesn't

5     have to actually happen.  So long as the defendant

6     believes the person that he was trying to persuade

7     engaged in sexual activity was a minor.  I think the

8     argument is we've already talked about all this in

9     the offense instruction.

10         MS. KAISER:  I don't think the offense

11    instruction though, has -- has it as clear, and I

12    don't think it says that the defendant's belief that

13    a minor is involved is sufficient.  We want to add

14    that sentence that an actual minor victim is not

15    required, we want to maybe take --

16         THE COURT:  Well, look at the bottom of

17    your -- the second page of your offense instruction

18    80.  It says it's not necessary for the government

19    to prove that the individual was, in fact, less than

20    18, but it is necessary for the government to prove

21    that the defendant believed such individual be under

22    that age.

23         MS. KAISER:  I would just -- I would just add

24    or modify that, then.  If we're going to take out

25    the minor victim, I would just modify that to say

1    it's not necessary for the government to prove that

2    an actual minor was involved, and that the

3    defendant's belief that a minor is involved is

4    sufficient.

5         THE COURT:  I'm going to sustain the

6    objection.  It's covered.  The next objection or,

7    excuse me, the next pattern instruction requested is

8    tape recordings, transcripts.  Now, remember,

9    transcripts are not in evidence of the recordings.

10   The e-mails are and the instant messages are.  But

11   the audio of the phone conversation as well as the

12   audio of the -- and video of the interview is in

13   evidence.  The next one is number 20, basic 11, duty

14   to deliberate.  Basic 12, verdict.

15        The defendant wants the pattern on character

16   evidence; correct?

17        MR. SARTES:  Correct, Your Honor.

18        THE COURT:  Special 12?  Any objection to

19   that, Ms. Kaiser?

20        MS. KAISER:  No, Your Honor.

21        THE COURT:  All right.  We'll include that.

22   Any other requested instructions?

23        Now, when they come out, they may -- the order

24   of these instructions may be slightly different than

25   what the government has proposed simply to follow

1    the pattern instructions the sequence in which

2    they're given.

3         MR. SARTES:  Judge, can counsel have a moment

4    just for a second, please.

5         THE COURT:  Yeah.

6         MR. SARTES:  Can we have a moment.

7    (Brief pause.)

8         MR. SARTES:  Your Honor, if I may.

9         THE COURT:  Yes, sir.

10        MR. SARTES:  Does the court understand, I

11   guess, or do I understand correctly that the court

12   has -- at least sees that we're not waiving our

13   prior objections.  What the court has ordered, we

14   understand the court's order, but we still object to

15   that modification.  We'd still like to do them

16   separately.  Is that the way --

17        THE COURT:  That's been made apparent by your

18   objections.  I understand.

19        MR. SARTES:  Thank you, Judge.

20        THE COURT:  All right.  The verdict form the

21   government has proposed, is there any objection to

22   that?  I'm not going to give an interrogatory style

23   verdict form as the defendant has requested.  So

24   without waiving your request, is there any objection

25   to the proposed verdict form?

1          MR. SARTES:  Judge, would the court insert the

2     word willfully after the word knowingly?

3          THE COURT:  Yes.  Knowingly and willfully;

4     correct, Ms. Kaiser?

5          MS. KAISER:  Yes, Your Honor.

6          THE COURT:  So it would be to attempt to

7     knowingly -- to knowingly and willfully attempt to

8     induce.

9          MR. SARTES:  And, Your Honor, this is what I

10    was getting at before.  Would the court add that

11    language, then, to its proposed, the court's

12    proposed instruction because we left the willfully

13    out?

14         THE COURT:  No, because it's in the elements

15    of the offense that the government must prove beyond

16    a reasonable doubt.  This is simply a paraphrasing

17    of the allegation.

18         Now, is the government requesting

19    interrogatory special verdict form?  Perhaps this is

20    the defendant's.  I apologize.

21         MS. KAISER:  No.  There's a special verdict

22    form.  There is a special verdict form.

23         THE COURT:  You're asking for that?

24         MS. KAISER:  Yes, Your Honor.

25         THE COURT:  Why?

1          MS. KAISER:  For *Apprendi* issues.

2          THE COURT:  *Apprendi*?

3          MS. KAISER:  Yes.  So the jury can find these

4     beyond a reasonable doubt.

5          THE COURT:  For sentencing enhancement

6     purposes?

7          MS. KAISER:  Yes, Your Honor.

8          THE COURT:  All right.  These have to be

9     proven beyond a reasonable doubt, however; correct?

10         MS. KAISER:  Yes, Your Honor.

11         THE COURT:  How about the lead-in, do you find

12    beyond a reasonable doubt, number one, did the

13    defendant knowingly misrepresent his age, etcetera;

14    two, did the defendant use a computer; three, were

15    the children -- shouldn't it be child?

16         MS. KAISER:  No.  I think it should be

17    children because the testimony was 10 and

18    11-year-old boys.

19         THE COURT:  Oh, that's right.  There's two.  I

20    apologize.  I don't know what I'm thinking about.

21    I'm thinking about the last witness.  Any objection?

22         MR. SARTES:  Judge, yes.  Let's get to number

23    one, if I may.  Can we add -- I guess let me start

24    with before I ask you to put willfully after

25    knowingly, I think the sentencing enhancement has to

1    do with if the defendant purports to be under the

2    age of 18, not if the defendant said he was not --

3    he was 80 as opposed to 87 -- I'm sorry, 70 as

4    opposed to 78.

5         THE COURT:  Which enhancement is it,

6    Ms. Kaiser?  Can you point me quickly to which

7    guideline provision?

8         MS. KAISER:  I don't have my sentencing

9    guidelines book with me, but I believe it's in 2G1.1

10   but I know it does -- it does apply to a defendant's

11   age, and it's not as Mr. Sartes stated.

12        THE COURT:  Specific offense characteristics?

13        MS. KAISER:  Yes, Your Honor.

14        THE COURT:  Under 2G1 point --

15        MS. KAISER:  I think it's 2G1.1.

16        THE COURT:  Well, I don't think it's one.  It

17   has to be 2G1.3, but that's commercial act.

18        MS. KAISER:  If I had the book I could find it

19   quickly.

20        THE COURT:  All right.  Here.  Would the 2007

21   manual be enough?

22        MS. KAISER:  That's fine.

23        THE COURT:  Okay.  We're going to stop.  We'll

24   get this worked out before the jury hears argument.

25   But the question is whether it's the defendant's age

1      as opposed to some other person's age?

2           MR. SARTES:  I guess I'm trying to figure out

3      what is the difference.  Why is it material if the

4      defendant said he was 70 as opposed to 78?

5           THE COURT:  As opposed to misrepresenting his

6      identity or something?

7           MR. SARTES:  Correct.  Correct.

8           THE COURT:  Well, Ms. Kaiser, then, have the

9      guidelines provision available so we can reference

10     that.

11          Other than that, any objection to the --

12          MR. SARTES:  Yes, Judge, number three.  I

13     think it should be did the defendant believe that

14     the children that the defendant intended to meet

15     were purported to be under the age of 18.  It's not

16     that they were purporting to be, it's his belief.

17          THE COURT:  Well --

18          MS. KAISER:  I found the reference, Your

19     Honor.

20          THE COURT:  Which one?

21          MS. KAISER:  The one regarding the age.

22          THE COURT:  Which section?

23          MS. KAISER:  It's in application of Subsection

24     (b)(2) under commentary application note three.

25          THE COURT:  Which subsection, G1.1 or --

```
 1          MS. KAISER:  It's 2G1.3.

 2          THE COURT:  Application note --

 3          MS. KAISER:  Three A.

 4          THE COURT:  Misrepresentation to which an

 5    enhancement in subsection (b)(2)(A) may apply

 6    includes misrepresentation of a participant's name,

 7    age, occupation, gender.  It seems to be covered.

 8          MR. SARTES:  Would the court then throw a

 9    knowingly and willfully in there?

10          THE COURT:  Well, I don't think that the

11    guideline requires that element.  Does it?

12          MS. KAISER:  No, Your Honor.  Knowing

13    misrepresentation, not knowing and willful.

14          THE COURT:  And as far as the age of the

15    children --

16          MS. KAISER:  No.  This is --

17          THE COURT:  No.  Now go to number three.

18          MS. KAISER:  Yes.  The special offense

19    characteristic that applies is (b)(5), under

20    2G1.3(b)(5).

21          THE COURT:  Well, then, let's -- it's the age

22    of the victims that is crucial, not whether he was

23    going to meet with them or persuade them; correct?

24          MS. KAISER:  Correct.

25          THE COURT:  So the word meet can be more
```

1       fairly characterized -- described or in substitution

2       persuade?  Is that acceptable, Mr. Sartes?

3            MR. SARTES:  Yeah.  I think that's correct,

4       Judge.

5            THE COURT:  Were the children that the

6       defendant intended to persuade --

7            MS. KAISER:  I'd say induce.

8            MR. TRAGOS:  Are you doing five?  Is it five?

9            MS. KAISER:  Yes.

10           MR. TRAGOS:  Do it exactly like five says.

11           MS. KAISER:  I would just say, were the

12      children -- were the potential child victims under

13      the age of 12.

14           THE COURT:  Were the purported children.

15           MS. KAISER:  Were the purposed children under

16      the age of 12.

17           THE COURT:  Were the purported children that

18      the defendant intended to persuade or induce under

19      the age of 12; is that acceptable to everybody?

20           MR. SARTES:  Judge, I'm reading the

21      guidelines.  The offense involved a minor who had

22      not attained the age of 12, 12 years.  Can we just

23      put that in there?

24           THE COURT:  What's the difference?

25           MR. SARTES:  Your Honor --

1           THE COURT:  Not attained the age of 12 and

2     under the age of 12 is the same thing; is it not?

3           MR. SARTES:  No, no, no.  It's not that part,

4     Judge.  B says the offense involved a minor who had

5     not attained the age of 12.  Can we just use that to

6     indicate has -- was the --

7           THE COURT:  Did the offense involved a minor

8     who had not attained the age of 12?

9           MR. SARTES:  That's correct, sir.

10          THE COURT:  Any problem with that, Ms. Kaiser?

11          MS. KAISER:  No, Your Honor.

12          THE COURT:  All right.  I'll give that.  The

13    number of children involved doesn't have any impact

14    on any of these provisions; is that right,

15    Ms. Kaiser?

16          MS. KAISER:  No, Your Honor.

17          THE COURT:  It's not correct or it does not?

18          MS. KAISER:  I don't think it applies.  I

19    don't think there's a specific offense for number of

20    victims.

21          THE COURT:  All right.

22          MS. KAISER:  I'm sorry.  Mr. Watts, may I see

23    that again.

24          THE COURT:  Well, there is a special

25    instruction on more than one victim, 2G1.1(d)(1).

1       I'll just say minors plural.  Involved minors who

2       had not attained the age of 12 years.  Acceptable?

3              MR. SARTES:  That sounds good, Judge.

4              MS. KAISER:  Yes, Your Honor.  Your Honor,

5       there's also a pattern -- a pattern enhancement, and

6       I'm just trying to see where that is real quick.

7              THE COURT:  All right.  We're going to give

8       the court reporter a break.  It's not fair to her to

9       sit here and not get a comfort break.  So we'll see

10      you back.  Take 15 minutes.

11             MR. TRAGOS:  Your Honor, will we be doing

12      argument then?

13             THE COURT:  Yes, sir, you will.  I'll go over

14      the instructions and the verdict form quickly before

15      we get started so you'll have a copy.

16             MR. TRAGOS:  Okay.

17      (Recess was taken at 1:04 until 1:38.)

18      (Back on the record.)

19             COURTROOM SECURITY OFFICER:  All rise, please,

20      the court.

21             THE COURT:  Let's look first at the verdict

22      form.  Is there any objection?  You should have a

23      copy.  No objection.  All right.  Everybody got a

24      copy?

25             MR. TRAGOS:  Could we have a minute, Your

1      Honor, to read it.

2           THE COURT:  Well, it's the same one you had

3      before.  Just took out the extra foreperson line.

4      We didn't need two.

5           MR. TRAGOS:  All right.  And you combined the

6      questions with the --

7           THE COURT:  Instructions.

8           MR. TRAGOS:  With the not guilty.

9           THE COURT:  Right.  Took out the word special

10     verdict form.  That didn't need to be in there.  For

11     you and I it's important, but not for the jury.

12          MR. TRAGOS:  No objection to the verdict form.

13          THE COURT:  All right.  Ms. Kaiser, is it okay

14     with you?

15          MS. KAISER:  Yes, Your Honor.

16          THE COURT:  All right.  As far as the

17     instructions, let's just flip through them together,

18     please.  We've taken the titles off since the copy

19     will go back.

20          MR. TRAGOS:  Are we going to do them one by

21     one, Your Honor, or --

22          THE COURT:  Well, I'm just going through them.

23     I'm assuming you can follow them.  I'm going to take

24     you to -- since the pages aren't numbered, 2.2 is in

25     there.  It's the seventh page in.  Sorry.  We should

1     have numbered these.  Now I'll get yelled at.  I

2     will, not y'all.

3          It starts off, you should also ask yourself.

4     It's actually 2.1 now.  That's the one we

5     substituted.  Do you see that?

6          MR. TRAGOS:  Yes.  Are all these standards up

7     to this point, Your Honor?

8          THE COURT:  Yes.

9          MR. TRAGOS:  Okay.

10         THE COURT:  The next one is expert witness.

11    The next one is on or about, knowingly, willfully.

12    The next one is basic 10.1.  It starts off, I

13    caution you, that's on punishment.

14         MR. TRAGOS:  Okay.  Is this after the --

15         THE COURT:  Right after knowingly --

16         MR. TRAGOS:  And willfully.

17         THE COURT:  -- willfully, on or about.

18         MR. TRAGOS:  Okay.

19         THE COURT:  The next one is single defendant,

20    special 2.1; again, standard.  The next one begins,

21    during the course of the trial.

22         MR. TRAGOS:  Mine must be -- mine must be --

23    because I've got 18 USC 22 -- I mean, 2422's

24    instruction.  Maybe that's wrong.  The court hasn't

25    made it to that one yet; right?

```
 1            THE COURT:  No.  The one right before that is

 2       the 404(b) instruction.  During the course of the

 3       trial, as you know from the instructions I gave you

 4       then, does everybody follow that?  Okay.  And then

 5       the next one is the substantive offense, 2422.  Is

 6       that -- got that?

 7            MR. TRAGOS:  Does the court want to hear

 8       objections on that?

 9            THE COURT:  We've already heard them.

10            MR. TRAGOS:  Right.  But I want to just make

11       sure we renew them.

12            THE COURT:  You don't need to keep renewing.

13            MR. TRAGOS:  Plus -- Plus --

14            THE COURT:  It's not required.

15            MR. TRAGOS:  Plus the -- there's language in

16       here that the court said orally that we've seen for

17       the first time, and that is it is sufficient for the

18       government to prove, the last -- the very last

19       sentence on page two.

20            We request that the court make that it can be

21       sufficient, because that looks like the court is

22       ordering the jury to say that that basically --

23       doing that alone is your guilty.  The jury can --

24            THE COURT:  I'm not going to say it can be.

25       That's not an artful way of saying.  It is
```

1    sufficient if they prove it.  Beyond a reasonable

2    doubt, that's the caveat, unless you can propose

3    alternative language.  I don't see that it does what

4    you are concerned about but --

5              MR. TRAGOS:  What about it may be sufficient?

6              THE COURT:  Well, I'd be happy to, instead of

7    it is sufficient, although I don't share your

8    concerns but to say, a violation of the statute may

9    be established by proof beyond a reasonable doubt.

10             MR. TRAGOS:  That would satisfy that concern,

11   Your Honor.

12             THE COURT:  Ms. Kaiser, do you follow us?

13             MS. KAISER:  Yes, Your Honor, that's fine.  I

14   have a comment, too, on that page when you are

15   ready.

16             THE COURT:  Go ahead.

17             MS. KAISER:  Two paragraphs, the second

18   paragraph on page that begins also.  Where it says

19   the second sentence is it is necessary for the

20   government to prove beyond a reasonable doubt that

21   the defendant had the intent to persuade or to

22   attempt to persuade, I thought we had discussed

23   induce there.  But I don't want that to be

24   misleading they focus on the word persuade.

25             THE COURT:  You could say persuade, induce,

1     what ties third one cores?

2          MS. KAISER:  Coerce, entice or cores.

3          THE COURT:  Well, entice isn't in the statute,

4     though.  That's what -- at least I don't think it

5     is.

6          MS. KAISER:  It's in the statute, Your Honor.

7     Persuade, induce, entice or coerce.  And I would

8     take out the first part.

9          THE COURT:  Wait, wait.  You're getting ahead

10    of me.  Persuade, induce, entice or coerce or

11    attempt to persuade, induce, entice or coerce.  All

12    right.  What else you got?

13         MS. KAISER:  Your Honor, I would just take

14    out -- I would just make it so it reads, it's

15    necessary for the government to prove beyond a

16    reasonable doubt that the defendant attempted to

17    persuade, induce, entice or coerce a minor to engage

18    in sexual activity, because I didn't charge the

19    substantive offense, I charged an attempt.

20         MR. TRAGOS:  Well, Your Honor, if the court

21    please, the way she read it left out intent.

22         MS. KAISER:  Had the intent to attempt to

23    persuade, induce, entice or coerce a minor to engage

24    in sexual activity.  The way it's written now it

25    looks like it's been charged both ways.

1           THE COURT:  What are you suggesting?

2           MS. KAISER:  That it be rewritten to say it is

3    necessary for the government to prove beyond a

4    reasonable doubt that the defendant had the intent

5    to attempt to persuade, induce, entice or coerce a

6    minor to engage in sexual activity.

7           THE COURT:  That's because you've only charged

8    him with attempting.

9           MS. KAISER:  Yes, Your Honor.  That's correct.

10          THE COURT:  That language came out of *Murrell*

11   so it's a bit awkward.  Mr. Tragos, as long as the

12   word intent is in there, you're satisfied; aren't

13   you?

14          MR. TRAGOS:  Yes.

15          THE COURT:  So it should be shortened that the

16   defendant had the intent to attempt to persuade,

17   induce, entice or coerce a minor to engage in sexual

18   activity; correct?

19          MS. KAISER:  Yes, Your Honor.

20          THE COURT:  All right.  I think that's the

21   only substantive change.  So we'll have that

22   changed.  You've got it handwritten, ready to go.

23   We'll just do that one page.

24          You've got -- now we'll have numbered copies

25   of the instructions, and we're going to substitute

1        that corrected page on the offense instruction.

2              Now, during the course of the argument, I

3        don't mind, of course, if you paraphrase and read

4        short snippets from the instructions.  But please

5        don't display the instructions to the jury or read

6        to them unnecessarily.

7              Remember that the two of you are not on trial,

8        so you should refrain from personal attacks.  Not to

9        suggest that you would, but keep it professional and

10       dignified.  I don't limit you on closing arguments.

11       I simply ask that you be efficient.  This jury has

12       paid close attention to this case.  It's been a

13       difficult case for them.  I don't think you need to

14       be up there all afternoon.  Any questions about the

15       protocol procedure?  Ms. Kaiser?

16             MS. KAISER:  Your Honor, could I just have an

17       oral motion in limine to request that the defendant

18       not mention punishment in part of his closing

19       because that's an inappropriate --

20             THE COURT:  Mr. Tragos?

21             MR. TRAGOS:  I think she's right.

22             THE COURT:  But it could slip out, so I'll

23       grant that motion.  Anything from you?  Any

24       questions about procedure protocol?

25             MR. TRAGOS:  Yes, Your Honor.  I plan on

1        showing a video clip as a demonstrative aid.

2            THE COURT:  Not if it hasn't been put in

3        evidence, you're not.

4            MR. TRAGOS:  Your Honor, it will not -- there

5        is no secret -- this --

6            THE COURT:  It doesn't matter.  It's too late

7        for demonstrative aids, particularly a video clip.

8        That's the first I've heard of that.

9            MR. TRAGOS:  Okay.  Your Honor, can I tell the

10       court what it is?

11           THE COURT:  You can put it on the record.

12           MR. TRAGOS:  Your Honor, it is a video clip of

13       the very beginning of a Country Western song

14       entitled My Space.  And --

15           THE COURT:  That's not going to be put in

16       front of the jury, Mr. Tragos.  I'm sorry.  You must

17       argue the facts and the law applicable to this case,

18       and not rely on extraneous matters.  I don't know of

19       any -- any rule of procedure that allows that.

20           MR. TRAGOS:  Your Honor, it was just a --

21       something to use for the jury to emphasize the

22       particular issues before them.  And I'd -- so if the

23       court's denying my --

24           THE COURT:  I am denying it.

25           MR. TRAGOS:  Okay.

 1          THE COURT:  Now, you know, everybody in this

 2     trial has been introduced.  Now we have a new lawyer

 3     at the table who's not been produced.  I don't want

 4     to be mean, but let's not inject new lawyers into

 5     the case at this juncture, please.  You can sit here

 6     during the next part of the trial --

 7          MS. FEW:  Yes, sir.

 8          THE COURT:  -- if we get there.

 9          MS. FEW:  Okay.  That's fine.

10          THE COURT:  On that point, Mr. Tragos,

11     remember, we have a forfeiture allegation in the

12     indictment.  I need to know after final arguments

13     have been concluded and you have -- the jury's out,

14     what your intentions are with respect to forfeiture

15     in the event of a conviction.  Ms. Kaiser, don't let

16     me forget that, please.

17          MS. KAISER:  Yes, Your Honor.

18          THE COURT:  Now, the trial is over.  Anybody

19     who is a spectator may come in.  I suggest if you

20     have them out there, you'd better invite them in

21     because once I start reading, these doors will be

22     locked.

23          MR. TRAGOS:  Your Honor, one of the -- can I

24     at least quote?  Because famous quotes are common in

25     closing arguments.

1        THE COURT:  You're at your own peril if you

2  do.

3        MR. TRAGOS:  I'm going to, yes.

4        THE COURT:  If you want to quote somebody and

5  Ms. Kaiser doesn't object, but that's a whole

6  different matter than playing a video.  This isn't

7  entertainment, this is argument.

8        Now, Mr. Crawford, who's your prosecutor?

9        MR. CRAWFORD:  Mr. Downing.

10       THE COURT:  Is he on his way or have you

11  talked to him?

12       MR. CRAWFORD:  I have.  And if we hadn't heard

13  anything from the court, we'd both be here by 2:00

14  so you could tell us what you want us to do.

15       THE COURT:  And you want to a continuance.

16       MR. CRAWFORD:  Correct.  And the government

17  has no objection.

18       THE COURT:  Ms. Kaiser?  You are a

19  representative of the U.S. Attorney's Office.

20  That's because of debriefings and things that are

21  ongoing?

22       MR. CRAWFORD:  That's correct, Your Honor.

23       THE COURT:  That's what I recall being -- at

24  least the clerk told me.  What are you talking, the

25  end of January or something?

1          MR. CRAWFORD:  Excuse me?

2          THE COURT:  End of January --

3          MR. CRAWFORD:  Well, the FBI asked for 90

4     days.  Perhaps if we could leave it unscheduled, I

5     could file an in camera motion that would give you

6     the reasons for that, and then you could rule

7     accordingly.

8          THE COURT:  Why don't we do that.  Why don't I

9     provisionally grant your motion, let Mr. Downing

10    know, let probation know.  They're standing here.

11    And then file something in camera or at least

12    request it be made in camera so that I can ascertain

13    the need for the length of the requested

14    continuance.  All right?

15         MR. CRAWFORD:  Thank you, Your Honor.

16         THE COURT:  Thank you.  Now that we've got all

17    our spectators in here, let me go over some of the

18    dos and don'ts, please.  That jury room door will be

19    locked once I start reading the law.  So if you

20    don't want to hear me read, Ms. Silverstein, you may

21    leave.  But that's to ensure that the jury is not

22    distracted.  You're welcome to be here.

23         Please be mindful of appropriate courtroom

24    demeanor.  None of you, particularly the witnesses,

25    have been in the courtroom for the duration of the

1    trial.  You may hear things that surprise you,

2    disappoint you or make you happy.  I don't know.

3    But it would not be appropriate to react audibly or

4    otherwise to the arguments of counsel.  They -- the

5    jury needs to pay attention to them and not be

6    distracted.

7         Once everybody has got in their seats and

8    they're comfortable, we're ready to go.

9         COURTROOM DEPUTY CLERK:  Ms. Kaiser, do you

10   want 103 in?  The court reporter doesn't have it.

11        MS. KAISER:  Okay.

12        THE COURT:  When would it have gone in, 103?

13        MS. KAISER:  I believe either Wednesday or

14   Thursday, Your Honor, with Special Agent Dave

15   Grawunder.

16        MR. TRAGOS:  The 11th.

17        MS. KAISER:  The 11th.

18        THE COURT:  I do not have 103 as having been

19   received.  I have 102, 104, 105, 106, 107, 109, 111.

20        MS. KAISER:  That's fine.  We can withdraw it,

21   Your Honor.  We had it marked on ours as in, but

22   that's fine.

23        THE COURT:  There might have been a -- it

24   might have been identified, but I don't have 103

25   even in my notes.  I have a blank.

1              MS. KAISER:  Yes, Your Honor.

2              THE COURT:  Government's number and then I

3      have a blank.  I'm assuming that's where it was

4      referenced.  Well, did you have any objection to

5      Mr. Tragos' video?

6              MS. KAISER:  Yes, Your Honor.

7              THE COURT:  I don't mean to be proactive here,

8      but I've never seen or heard of that being done in a

9      closing argument.  Why don't you get on the record

10     and find out if you're of like mind.

11             MS. KAISER:  I do object, Your Honor.

12             THE COURT:  And what would be the reasons that

13     you would object?

14             MS. KAISER:  I've never seen it.  I think it's

15     inappropriate.  It's never been disclosed,

16     prejudicial.

17             THE COURT:  Well --

18             MR. TRAGOS:  Your Honor, may I?

19             THE COURT:  It's not appropriate to inject

20     into the trial during closing argument a matter

21     which has not been exhibited to the jury even as an

22     aid, other than I've seen demonstrative exhibits

23     that might assist the jury in understanding evidence

24     and things of that nature but not an extraneous

25     videotape from an unknown source.

1      MR. TRAGOS:  Your Honor, may we -- we don't

2  have it on a separate DVD right now.  Would the

3  court allow us to place it into the record?

4      THE COURT:  You can do whatever you want it,

5  if you want to preserve it but --

6      MR. TRAGOS:  Just in order to preserve it.

7  Right.

8      THE COURT:  All right.  Are we ready?  And

9  remember, a copy of the instructions will go back to

10  the jury.

11      Bring the jury in, please.

12      COURTROOM SECURITY OFFICER:  All rise, please,

13  the jury.

14  (Jury in at 2:01 PM.)

15      THE COURT:  Thank you, and be seated.

16      Sorry for the delay, members of the jury, but

17  it is important that we have a complete set of

18  instructions that are accurate to my satisfaction.

19      At this time the attorneys will provide you

20  with their closing arguments, during which they will

21  argue the facts and suggest to you how the law

22  applies to the facts as you find them.  The lawyers

23  may have legitimate disagreement about what the

24  facts are or are not.  It is up to you to resolve

25  the factual disputes in the case.

1          What the lawyers have to say, however, is very

2     important.  Remember, they are not witnesses but

3     they are advocates and they should be able to assist

4     you in understanding the issues that are to be

5     addressed by your verdict.

6          They have a copy of the instructions I intend

7     to read to you, and they are free to paraphrase from

8     those instructions.  And you will have a copy of

9     them when you deliberate your verdict.

10         Ms. Kaiser, you may address the jury.

11         MS. KAISER:  Thank you, Your Honor.  Good

12    afternoon.  At the beginning of the trial in this

13    matter, I told you that the United States would

14    prove to you that the defendant, Charles

15    Friedlander, used a facility of interstate commerce

16    to arrange a meeting in which he was going to

17    sexually and physically abuse two little boys ages

18    10 and 11.  And I submit to you that the United

19    States has met its burden in this case.

20         The evidence in this case is simply

21    overwhelming.  You heard a lot of testimony, a lot

22    of chats, and my job in closing argument is to just

23    review with you some of the evidence that you heard.

24    I know that you all paid close attention, and both

25    parties appreciate that.  So I'm not going to

1    belabor the point because I know you were listening

2    during the trial, but you heard from a variety of

3    witnesses.

4         First you heard from Corporal Romanosky from

5    the Pinellas County Sheriff's Office.  He testified

6    that he had had chats with this defendant all the

7    way back in 2005 in which he was discussing his

8    desire to physically beat and have sex with two

9    little boys.

10        In 2008, back in June and July of this year,

11   Corporal Romanosky started another investigation.

12   And he encountered the defendant online once again

13   in a chat room devoted to subjects such as incest.

14   In that chat room, Corporal Romanosky had a number

15   of conversations with this defendant in which he

16   indicated that he wanted to physically abuse and

17   have sexual activity with a 10-year-old and an

18   11-year-old little boy.

19        The defendant engaged in numerous instant

20   message chats.  He called on the telephone.  He used

21   a computer to correspond with the detective.  And we

22   know that on July 21st of 2008, the defendant got in

23   his car, after having planned all this online and in

24   conversations with the agent, he got in his car and

25   he drove up all the way from Ft. Myers up to

1     Pinellas County to meet who he thought was Michael,

2     the person that he was going to meet to engage in

3     the sexual abuse of his two little boys.

4          You saw and you heard all the instant message

5     chats being read to you and you saw them up on the

6     overhead.  And you -- and if you'll recall, the

7     defendant was the one that initiated most of those

8     instant messages.  Even with the last witness who

9     you heard from today, if you noticed, the defendant

10    is the one that kept saying, hey, I want to meet,

11    hey, I really want to -- I want to get to know you

12    better.  When can we do this.

13         Both -- both Detective Romanosky and Detective

14    Spector, they know as part of their investigations

15    they're supposed to sit back.  They don't have to

16    suggest things to the defendant.  He's right there.

17    He's indicating, I want to do this.  I want to do

18    this.  When can we get together.  And on July 21st

19    he got in his car and he drove up here.

20         Now, I anticipate the defendant's going to

21    argue that this was all just a big fantasy.  That's

22    what I envision him saying.  But -- Your Honor, may

23    I approach?

24         THE COURT:  Yes, ma'am.

25         MS. KAISER:  It's not a fantasy when you talk

1    about beating children and you drive all the way,

2    hours with the implements, the very implements that

3    you said you were going to use to beat the children.

4         The defendant repeatedly referenced razor

5    strops, I've got these great razor strops.  I've got

6    them oiled.  Oh, they'll be great.  We'll use these.

7         And when he's arrested on July 21st, he has

8    all these in his car.  It's not a coincidence.  He

9    said he was going to bring them and he did.  This is

10   not a fantasy.

11        If Detective Romanosky hadn't been an

12   undercover, you know what would have happened.  It's

13   not a fantasy.  It's not a fantasy getting in a car

14   and driving hours to meet someone you haven't met

15   except for discussing it over the phone.  That's

16   ridiculous.

17        How do we know the defendant's -- the

18   defendant's interested in that type of conduct?

19   Let's talk about this gruesome box of evidence.

20   Your Honor, may I?

21        We've got a bagful of dildos.  We've got

22   handcuffs.  We've got paddles.  We've got whips.

23   We've got more smacking devices, punishment devices.

24   This is no fantasy.  This is what the defendant is

25   interested in.

1          These are his items, found in his residence.

2     He's got all the tools of the trade.  He's got

3     everything to use to beat people.  He stores them

4     all in a suitcase.  He puts them altogether.  He has

5     all the whips and all the sex toys in the very same

6     suitcase in his closet.

7          We reviewed the computer evidence that -- we

8     seized the computers from the defendant's residence

9     and we looked and you saw -- you saw what the

10    defendant was interested in.  You saw repeated

11    pictures like this that were on the defendant's

12    computers.  You saw worse ones than that.

13         This is no fantasy.  The defendant had a

14    variety of -- of saved favorite places, places that

15    he visited on the internet.  We looked at those

16    together.  When you deliberate, you'll have all

17    these -- all these exhibits and you can thumb

18    through them yourself.

19         His favorite places were 437 pages.  On here

20    he had the guide to the disciplinary spanking or

21    guy -- guy spank dot com.  He had the -- I think the

22    guide to the spanking of children or discipline of

23    children.  It goes on and on and on.  BDSM sites.

24    This is -- this is who the defendant is.  This is

25    not a fantasy.

1          Those items were shown to you to show his

2     intent precisely to meet the argument that, oh, this

3     is all just a fantasy.  That evidence that you saw

4     shows that clearly it's not.

5          You also heard from the ICE agents who

6     conducted the computer examinations, and you saw all

7     the references to his chats with all these other

8     people, as well.  The defense wants to portray the

9     defendant as some lonely guy.  Lonely guy?  He's

10    online constantly.  He's got a social calendar most

11    20-year-olds would enjoy, would love, would love to

12    have.  When does he have time to be lonely?

13         We know he's chatting with Corporal Romanosky.

14    You saw the other e-mails with all the other people

15    that he's meeting.  These are real people that he's

16    met on the internet.  He's -- you've got e-mails of

17    them with their flight arrival information, so you

18    know he's actually meeting these people.  He travels

19    between up north and here.

20         But the one thing that's clear in all this is

21    there's no doubt that he knew what he was doing when

22    he was coming to Tampa.  And you heard the phone

23    conversations he had with Corporal Romanosky.  In

24    that -- in that conversation, the defendant, a

25    licensed mental health counselor, actually asked the

1    detective, are you going to tie them up or am I?

2    Are you going to tie them up or am I?

3        A licensed mental health counselor is talking

4    about a 10-year-old and an 11-year-old.  He says it

5    as causally as if, oh, are you going to pick up the

6    mail or, oh, are we going to go to McDonald's.  He

7    said it as casually as he's talking about some

8    nonconsequential thing instead of the physical or

9    sexual abuse of children.

10       That's who the defendant is.  This isn't a

11   fantasy.  You don't get on the phone and talk to

12   people and make plans and drive up.  The judge is

13   going to tell you in the jury instructions that in

14   -- the defendant's been charged with a statute that

15   one of the ways of violating it is to induce a

16   person to -- who hasn't attained the age of 18 years

17   to engage in sexual activity.

18       Now, the law is clear that you don't have to

19   talk to a minor directly.  You can -- you can induce

20   that meeting by talking to a parent or an

21   intermediary of the child.  Or if someone -- if

22   someone were to say I have custody of this child and

23   I'm willing to share this child for sex, that's

24   sufficient.  In this case, Detective Romanosky posed

25   as a parent of a child, so the defendant doesn't

1      have to talk directly to the child.

2           The word "induce", the court is going to tell

3      you, means to stimulate the occurrence of or to

4      cause.  So this defendant essentially has been

5      charged with using a facility of interstate

6      commerce, which is a computer, on the internet to

7      induce or to cause or to stimulate the occurrence of

8      a meeting in which he was going to sexually abuse

9      and physically abuse two little children.

10          There's no requirement that the government

11     show that he contacted the children directly.  It's

12     sufficient that he talk to what he believed was the

13     parent of those children.

14          The evidence is simply -- is simply

15     overwhelming in this case.  The defendant can say

16     all day long that it was a fantasy.  But what's

17     interesting is during his interview with law

18     enforcement, which you all saw how accommodating

19     the -- Detective Romanosky was.  He never raised his

20     voice.  He treated Mr. Friedlander with the utmost

21     respect at all times.  And during that interview,

22     what's interesting is what the defendant didn't say.

23          All right.  He never said, gee, you know,

24     detective, this has all been a huge

25     misunderstanding.  This is a big mistake, you know.

1       This was just a fantasy.  I thought, you know, you

2       and I were just going to mess around or -- no, he

3       didn't say that.

4           Do y'all remember what he did say?  On his

5       interview -- during his interview when Corporal

6       Romanosky poses the question to him and says -- he

7       says basically, are you physically capable of

8       masturbating a child.

9           Because as you'll recall, the defendant was

10      claiming he had erectile dysfunction and, therefore,

11      he says -- in his interview the defendant says, I

12      can't possibly -- oh, I wasn't interested in that

13      because I can't get an erection, to which

14      Detective Romanosky says, well, you're physically

15      capable of masturbating a child; are you not?

16          So the defendant has to agree.  And he says,

17      well, you're physically capable of touching, right,

18      molesting a child, touching a child, fondling a

19      child.  And the defendant says -- he has to agree

20      with that.  But when he says, are you physically

21      capable of masturbating a child, the defendant --

22      what does he say?  He says, I thought they we're

23      going to do that to me.  I was going to be the

24      recipient.  Huh?  Where's the damage?

25          That's the defendant's response.  It wasn't,

1    oh, this is a big fantasy.  Oh, online I'm somebody

2    different.  Oh, online I'm some great person but in

3    reality I'm just this really sweet, nice, old man.

4        That's not what he said.  He said to the

5    detective as matter of factly, oh, I thought they

6    were going to do that me.  In other words, I thought

7    that the 10-year-old and the 11-year-old boys were

8    going to perform oral sex on me.  That's what he

9    said to law enforcement.

10       It's only now that we're in trial that there's

11    some -- you know, some difference, some big change.

12    The evidence is simply overwhelming in this case.  I

13    submit to you that the United States has met its

14    burden, and we'd ask for you to return a verdict of

15    guilty.  Thank you.

16       THE COURT:  Thank you, Ms. Kaiser.

17    Mr. Tragos?

18       MR. TRAGOS:  Well, ladies and gentlemen of the

19    jury, you've heard a lot of -- of stuff.  And you've

20    got to decide really did the government put on a

21    case about the crime charged or are they just trying

22    to appeal to the emotion that this guy, because he

23    says all this sick stuff, you've got to convict him,

24    and not because he's guilty of what they've charged.

25    Because if you take a look at the piles of stuff

1    over there and the piles of documents, see how much

2    of it really relates to the crime charged.

3         And we've heard about people having different

4    identities on the internet.  I don't know how many

5    of you are country fans, but Brad Paisley's got a

6    song that talks exactly about this called Online.

7    It starts out, I work down at the Pizza Pit and I

8    drive an old Hyundai.  I still live with my mom and

9    dad.  I'm five three and overweight.  I'm a sci-fi

10   fanatic, a mild asthmatic, never even been to second

11   base, but there's a whole 'nother me that you need

12   to see, check out my space.  Cause online I'm down

13   in Hollywood.  I'm six five and I look damn good.  I

14   drive a Maserati, I'm a black belt in karate, and I

15   love a good glass of wine.  It turns girls on that

16   I'm mysterious, I tell 'em I don't want nothing

17   serious, because even on a slow day, I can have a

18   three-way chat with women at one time.

19        It happens day in and day out.  The internet

20   is the wild west of today's world.  And you can do

21   and say anything on there you want and you can be

22   anybody you want, because it's protected.

23        The government agents told you and they know

24   what the whole world knows about fantasy.  This case

25   honestly is about a 78-year-old lonely man whose

1   only social life is on the internet.  The AOL guy

2   told you and you saw it how many hours and hours and

3   hours he spends on the internet.  And you will, if

4   you take a look and we will in a minute, to the

5   hundreds of people that he's talked to and met on

6   the internet.

7       You've got to predict the future in this case.

8   That's what it's about.  You've got to sit around

9   and predict what would have happened in the future

10  regarding Charles Friedlander.  It's about reading

11  his mind.  It's about the Constitution.  It's about

12  why we have juries in this country, because you have

13  to make a decision about whether or not the

14  government has found the defendant guilty beyond a

15  reasonable doubt.

16      The court's going to read you jury

17  instructions, and -- and listen carefully to what

18  the court says.  But let me highlight a couple of

19  those jury instructions because you're going to need

20  them to evaluate the evidence.

21      First, the defendant is presumed innocent.  No

22  matter how twisted your stomach may be when you hear

23  this stuff, he is presumed innocent.  And the law

24  does not require a defendant to prove his innocence.

25  Whatever evidence was put on by the defendant, it

1    was voluntarily done because it's not required.  We

2    did that to show you all the reasons you have for a

3    reasonable doubt in this case.

4         But remember, we don't have to prove anything.

5    They have to prove it beyond a reasonable doubt.

6    Proof beyond a reasonable doubt, therefore, is proof

7    of such a convincing character that you would be

8    willing to rely and act upon it without hesitation

9    in the most important of your own affairs.

10        Key words in this case, knowing and willful.

11   They are required in this case.  And you will see

12   when the court reads you about what the crime is,

13   that the crime has to be done knowingly and

14   willfully.  Knowingly is defined as the act was done

15   voluntarily and intentionally, and not because of

16   mistake or accident.

17        Willfully means that the act was committed

18   voluntarily and purposely, with the intent to do

19   something the law forbids, that is, with a bad

20   purpose either to disobey or disregard the law.  It

21   has to intend to do something the law forbids.

22        Now, the court read the instruction about the

23   specific charge.  Part of those instructions will

24   tell you what it is necessary for the government to

25   prove.  It is necessary that the government prove

1    that the defendant believed that such individual was

2    under the age of 18.  It is necessary for the

3    government to prove beyond a reasonable doubt that

4    the defendant had the intent to attempt to persuade,

5    induce or coerce a minor to engage in sexual

6    activity.

7         The court will also talk to you about

8    character evidence.  Remember, you heard about the

9    character of Charles Friedlander.  The defendant has

10   offered evidence of a trait of character.  Such

11   evidence may give rise to a reasonable doubt.  The

12   mere fact that he has a good character can give rise

13   to a reasonable doubt.

14        Now, you've got Romanosky,

15   Detective Romanosky.  By the way, remember the

16   government said, oh, we brought a slew of witnesses

17   in.  How many witnesses really testified about the

18   crime?  Two.  Romanosky and then you had a rebuttal

19   witness on intent from Port St. Lucie.

20        But what did Romanosky tell you?  He tells you

21   that in '05 he had contact with this man.  He tells

22   you that in '05 he had to break off because he was

23   not experienced enough.  Now, think about that.  If

24   a person is going to commit a crime, how much

25   experience do you need for that person to commit the

1    crime?  Why is it that the officer has to have

2    experience if this person is going to commit a

3    crime?

4         If Charles Friedlander in 2005 was the same

5    person you see here today, then what is the training

6    involved?  How tricky do you have to be?  What kind

7    of tricks do they teach them?  How do they teach

8    them to talk?  What is it that made a difference

9    between the crime that he was going to commit in '05

10   to the crime here committed in '08?  Why is it that

11   he has to be trained to do that?

12        Now, I admit, training is important.  But

13   you're going to get and you're going to make

14   mistakes if you just train too hard.  And what

15   they've got here was a mistake.  Charles Friedlander

16   should have never been arrested for this.  They

17   didn't go far enough in proving what he was really

18   going to intend to do.

19        And I asked the officer -- it was kind of

20   funny because Charles Friedlander said the same

21   thing the officer said.  When I said, well, what are

22   they -- you know, you lie.  And he goes, yes.  We

23   lie about things like the children and what we do

24   with the children.  Why?  We lie to gain acceptance.

25   That's what Romanosky said.

1       If you remember when Charles Friedlander

2   testified, we asked him, why did you say these

3   things?  Why do you carry on these conversations?

4   Why do you say these things the prosecutor was

5   asking over and over again?  He said, look, I say

6   these things to gain acceptance.  On the internet

7   you say things to gain acceptance to keep up those

8   conversations, no matter what type of conversations

9   they are.

10      Some of the things, erectile dysfunction.

11  Well, you don't have to have sex with a child to

12  commit this crime.  You just have to intend to.  One

13  of the things you can look at whether someone is

14  really intending to have sex is things like erectile

15  dysfunction.

16      If he didn't have erectile dysfunction -- and

17  you'll hear this a lot during this closing -- why

18  couldn't they find one of these people that he

19  supposedly had sex with?  All of this internet

20  conversation they had, all these e-mails, the

21  hundreds of people that they had in that -- in this

22  pile of stuff, they couldn't find one person that

23  could ever testify he had an erection.

24      They couldn't find one of these people he had

25  all these conversations with that supposedly the

1    prosecutor thinks came here, not one of them did

2    they find that ever testified that he had an

3    erection.  Not one of them did they find came here

4    and that he beat, spanked or whipped.  Not one.

5        Not one of them did he find -- did they find

6    ever testify -- would ever testify that this is a

7    reality.  The defense puts somebody on, and you know

8    that testimony couldn't have been easy, to testify

9    about the fact that he cannot get an erection and he

10   cannot reach an orgasm.  And they were together for

11   14 months.

12       Yet when he's talking to the detectives -- if

13   you remember, the detective specifically asked, you

14   know, how do you relieve yourself.  He said, well,

15   what does that mean?  He said, well, that means

16   ejaculating.  So they're talking about him

17   ejaculating.  They were talking about him having a

18   large penis.  To be able to have sex with the

19   children and not hurt them, how do you do that?  And

20   yet we all know that's not true.

21       Dr. DiMarco testified that once you have this

22   erectile dysfunction as a diabetic, it never comes

23   back.  You have it and it's gone forever.  It's

24   permanent.  Does Levitra help, Viagra?  No, not if

25   you've got it.

1          Interestingly enough, we talked about the

2     penis pump.  Where was the penis pump?  Was it in

3     the car?  No.  The penis pump was back at the home

4     in Ft. Myers.  If he was planning to use the penis

5     pump to get an erection, wouldn't it have logically

6     been in the car?  Why wasn't it in the car?  It is

7     the only way a diabetic with erectile dysfunction

8     can get an erection, according to Dr. DiMarco.  And

9     did you see the prosecution put any other expert

10    witness up to dispute that?  No.

11         In the conversations -- you know, you've got

12    to listen closely.  We went through them.  Because

13    the subtleties are what Detective Romanosky is great

14    at.  How did you show love, leading the defendant

15    right into the conversation.  Ejaculation.  But what

16    did the defendant say?  He can get an erection at

17    the drop of a hat.

18         And -- and this is kind of important to think

19    about his personality.  Friends are important,

20    they're not a commodity.  That's what he tells

21    Romanosky.  What's he really looking for?

22         And he talks about how he sits with a friend's

23    son.  On July 15th, he tells the detective, I sit

24    with a friend's son, and talks about the beatings.

25    On July 20th he talks about how -- excuse me -- July

1    15th -- that is '05, by the way, July 15th, '05, he

2    tells the detective he sits with his son and does

3    these things to his son.

4        July of '05, but the detective didn't do a

5    thing.  July 20 of '05 he tells them paddles are

6    dangerous.  It's important because later on if you

7    remember the conversation they talk about paddles,

8    and he's saying then it's excellent to use a paddle,

9    but they're dangerous in '05.  That's what Charles

10    Friedlander says.

11        June 17th of '08, he tells the detective, I

12    have the kids -- I'm having the kids over this

13    weekend.  And then in that same conversation the

14    detective says, are you going to love them

15    afterwards?  Same, June 17th again.  The children

16    are 11 and 13.  That's what Charles Friedlander

17    says.  The reason that's important is because on

18    July 20th, the kids become 12 and 14.  If you read

19    through the conversations, the kids' age actually

20    change throughout.

21        And if you go back to August of '05, Charles

22    Friedlander says the father of the children is six

23    five and 275 pounds.  July 14th of '08, I guess he's

24    lost weight in that time because the father becomes

25    six-five and 240 pounds.

1          Charles Friedlander asked the detective to go

2     to lunch twice.  The detective brings up the words,

3     sexual things.  The detective, instead of wanting to

4     go to lunch, starts talking about going and having

5     coffee and going to a coffee shop on July 9th of

6     '08.

7          June 18th of '08, Dr. Friedlander says, I'm

8     aroused quickly.  July 21 of -- so, you know,

9     it's -- you know, he's not aroused, he doesn't get

10    an erection.  He can't get an erection.  He has

11    children at his house.  He's beating them, but the

12    detective doesn't do a thing about it.  There's not

13    a squad car that goes by the house to see if there's

14    any kids there.  There's nobody checking the house

15    to see if there's anything going on.  Nothing.

16         Now, they ask the -- one of the witnesses, I

17    forget who it was, one of their computer guys, hey,

18    did you ever hear any conversation about him talking

19    to kids?  Remember that question?  And he has to

20    say, no, never him talking to kids.  But there was a

21    conversation where he talks about talking to kids.

22    And that's Exhibit 94.

23         If you look at Exhibit 94, all those

24    conversations happened on one day.  And the

25    government didn't have, couldn't find, subpoenaed

1    AOL, a single conversation that that actually even

2    happened.  The conversation is between two --

3    Charles Friedlander and some guy talking about the

4    guy's kid.  Yet there's no evidence that there was

5    ever any conversation with the kid.  Nothing.

6        And why is it that they only introduced

7    certain snippets of e-mails and we had to try to

8    find the string to put them in?  Why did the defense

9    have to do that?  What are they trying to hide about

10   Charles Friedlander?  They're trying to hide that

11   there's nothing there.

12       So what's not there?  How many experts did

13   they have check to see if there was any child

14   pornography on that computer?  They had at least

15   two, maybe three.  They talked about other

16   experts -- these experts talked about other experts.

17   Does it make any sense at all?  Does it create a

18   reasonable doubt that someone who is a pedophile,

19   who wants to have sex with children does not have a

20   single picture of child pornography on their

21   computers?  Not a one.  When they subpoenaed the AOL

22   account, they found zero, nothing.

23       And I'll show you 107, the buddy list.  These

24   are all screen names which includes Romanosky, which

25   includes Detective Spector, all screen names, more

1       screen names.   106, his address book.   Screen names,

2       screen names, screen names, screen names, screen

3       names.

4               Favorites, hundreds and hundreds and hundreds

5       of them.   How can it not create a reasonable doubt

6       that not one of them was a child?   Not one of them

7       had sex with Charles Friedlander.   Not one of them

8       was a child website.

9               Everything, everything, everything, totally

10      legal.   As we heard, there are no investigations

11      open from any of the stuff they got from Charles

12      Friedlander.   You heard Detective Romanosky tell you

13      that.   Nobody has anything going on.

14              And how long and how much trouble does it take

15      for them to get the information from AOL?   You saw

16      where Detective Spector from Port St. Lucie sent a

17      subpoena up there on March 5th, 2008, and got all

18      the information back on March 5th, 2008.

19              If they were going to prove, as the prosecutor

20      says, that he arranges meetings where he was going

21      to sexually abuse children, why is it that in the

22      thousands of names that they had available to them,

23      they couldn't find a single one where he ever

24      arranged to have sex with a child?

25              Why is it when they checked on everything, he

1    has no prior criminal record, he has no record of

2    any sex offenses, nothing?  And he's 78 years old.

3    How is it possible, then, at 78 years old on one

4    particular day he's going to have sex with a child

5    when he hasn't his whole life?

6         He was a high school counselor.  He goes back

7    to reunions and is still the most popular teacher at

8    the reunion.  Nothing.  Detective Romanosky must be

9    really surprised because he certainly expected --

10   and you could tell that from the interview tape --

11   that when his name got out there in the press, that

12   moms were going to start calling him about children

13   that he had molested.

14        Did he get a call from a single mom, no matter

15   how much newspaper coverage there was?  Absolutely

16   not.  Not a single mom called him.  Not a single

17   e-mail address was a child.  Nothing.  Zero.

18        How can that be overcome when you're talking

19   about reasonable doubt?  How many images were on the

20   computer?  Remember, there were two numbers.  They

21   add up to about 29,000 images.  Of the 29,000 images

22   on his computer, this is what the government shows

23   you.  That's it.  That's the only stuff.  And it was

24   all incoming stuff where people sent him stuff.  But

25   that's it.

1          Exhibit 35A, the old barber's belt or straight

2     razor.  Did the government have an ounce of

3     evidence, a drop of blood, DNA, human tissue,

4     anything to prove that this was ever used to spank

5     anyone?  Where is it?  Nothing.

6          And do you really think someone could survive

7     75 or a hundred blows from this?  Could Charles

8     Friedlander even hit somebody 75 or a hundred times

9     with this?  Does this make any sense to you that

10    this was ever used on a human being?  Is there any

11    evidence of him ever using it on a human being?

12         Bill Hayden, again, one person that certainly

13    can speak from firsthand knowledge about Charles

14    Friedlander, never a conversation with Bill Hayden

15    about whipping, beating or anything like that.  He

16    wouldn't stand for it.  The man's a CPA, worked 18

17    years for Commonwealth Edison.  Comes down, there's

18    no beating, there's no whipping, there is nothing.

19         You might not agree with the lifestyle.  The

20    testimony may shock you.  But that's not the crime

21    that's charged.  The crime that's charged is

22    inducing a child to have sex.

23         He tells you that there is no basement.

24    There's no basement in Ft. Myers.  There's no

25    basement in Washington.  In fact, in Washington the

1    basement is a rental apartment.  So where is the

2    torture room and basement that he has all set up for

3    this stuff, according to the e-mails?

4         Not a child is identified in any of this

5    stuff, not a single child.  Hundreds and hundreds

6    and hundreds.  He's on there hours and hours and

7    hours and they can't find a single child that he's

8    ever even talked to?

9         Then we have Detective Spector.  Detective

10   Spector was a little concerned when he was talking

11   with Charles Friedlander because you know what

12   Charles Friedlander was trying to do with Detective

13   Spector.  Detective Spector knew what he was trying

14   to do.  He was trying to get Detective Spector into

15   bed.  Detective Spector had to keep telling him he's

16   not bi.  He told you that.  He had to keep repeating

17   it to him.

18        And why did he talk about a girl with

19   Detective Spector?  Did Charles Friedlander want to

20   talk about a little girl?  We know that Charles

21   Friedlander has no interest in females.  But the

22   detective said that he led him into talking about

23   his daughter.  That's what the detective said

24   because he said, look, I told him I wasn't -- wasn't

25   gay and so naturally we started talking about his

1    daughter.

2         So Spector wanted to talk about the daughter,

3    Charles Friedlander talks about the daughter.

4    Detective Spector wants to talk about sex with the

5    daughter, Charles Friedlander talks about sex with

6    the daughter.  In three months, not a meeting.  In

7    three months they never met, it never actually

8    really happened.

9         And Spector specifically talked to him and

10   said -- and by the way, one of the phone calls

11   between Spector and Charles Friedlander, why didn't

12   the government put them on?  Why did I have to get

13   them to even -- to goad them by asking questions and

14   introducing them when they didn't put it on to put

15   on the other chats?  What aren't you hearing?

16   What -- is there a lack of evidence that Charles

17   Friday committed this crime?  Is there something

18   more that the government is supposed to do that

19   creates a reasonable doubt?

20        And, in fact, this is so important to Charles

21   Friedlander because he's -- he's -- he's so enticed

22   to have sex with a little girl that when the

23   detective says, have we talked on the phone because

24   the detective forgot.  What does Charles Friedlander

25   say?  No, I don't think we have.

1        They talked on the phone just a few days

2    before, but they both forgot about it.  If it's

3    important to Charles Friedlander to have sex with

4    children, why would he forget about that

5    conversation?

6        And then if you remember in Exhibit 77,

7    Charles Friedlander says to the detective, well, if

8    you don't want to, it's okay.  Remember that?  And

9    what did the detective say?  Oh, I do.  I do want

10   to.  It's not Charles Friedlander running the show.

11   These guys are trained how to run the show.

12        And the pictures, remember they showed you the

13   pictures of the little girl, that detective or I

14   guess an officer with the department whose got some

15   younger pictures she said that they could use.  Who

16   asked for those pictures?  Detective Spector goes,

17   don't you want some pictures?  Oh, yeah, yeah, yeah,

18   I want pictures.  If he wanted pictures, why didn't

19   he ask for them?  Why did Detective Spector have to

20   ask him if he wanted some pictures?

21        All right.  Let me show you Exhibit 82.  This

22   is a conversation on 3/7/08.  Keep in mind that on

23   3/5/08, he had all the information he needed about

24   Charles Friedlander, including the cars he owned,

25   the properties, the license, he had everything.

1     This is two days later.

2          And traveling dad, I'm looking forward to our

3     adventure.  Any idea when we should plan for?  Well,

4     I'm free from the 17th to the 23rd of March.  Okay.

5     Charles Friedlander tells him, look, you know, the

6     17th to the 23rd of March I'm free.  Remember, the

7     detective said that.  They never really planned.

8     Those dates weren't really any dates.  That's when

9     he was going to come back from a trip, but they

10    actually start talking about dates here.

11         3/10, three days later, Captoes, very eager to

12    start and continue.  Traveling dad says, kids are

13    off all next week.  Then we'll have it on a weekend.

14    So they're planning to get together.  Captoes,

15    keeping it up pretty good here, he goes, would you

16    like to get together next week?  I would if I can

17    get away, says traveling dad.

18         Exhibit 85 on 3/17, if you are serious, this

19    week would be a good one.  Kids are home.  Have

20    house guests coming tomorrow for a week.  Now,

21    remember that.  When he's really serious and wants

22    to actually meet?  An excuse.

23         And then they keep talking about meeting, and

24    this is on 3/26/08.  So we're past, now, the 17th.

25    Originally, hey, want to meet that week.  Then what

1    really happens is Captoes goes, no, can't do it.  So

2    then maybe next week or after.  I have guests coming

3    from Ireland for a week beginning Friday.

4         Now, that's true.  And how do we know that's

5    true?  Because Exhibit 94 is an e-mail from a friend

6    of his who is coming from England -- from Ireland

7    and the plane reservations are there.

8         Then why do we have a break after that?

9    Remember, he says, look, I've got friends coming

10   next week.  We can meet the week after.  But then

11   you see nothing from 3/26 to 4/21, and then there's

12   another huge break.  Why is there a huge break?

13        And the prosecutor asked you about the --

14   tells you about the fact that, you know, Captoes

15   always contacts these people.  Take a look and see

16   if travelling dad doesn't contact Captoes.  It

17   happens.  Why, if there's really -- why, if there is

18   really, really something they're worried about,

19   these officers, why aren't they jumping on this?  If

20   they think this guy is real, why aren't they jumping

21   on it?  Why aren't they doing something about it?

22   Because they know.  They know he's not real.  They

23   know that he is fantasy.

24        Would it be the greatest dereliction of duty

25   to ignore the fact that children are being beaten in

1    a home in Ft. Myers and as a law enforcement

2    officer, you do nothing about it?  Even if you

3    suspect it?

4         What they wanted to do is try to make a case.

5    They didn't want to prove that these things didn't

6    happen.  And Romanosky, if you keep -- if you read

7    those things says, are you bringing this stuff up

8    with you?  Are you bringing it?  Charles Friedlander

9    brought the stuff up because that's what Romanosky

10   wanted.

11        Charles Friedlander would have brought up

12   anything to talk to Romanosky forever.  He tried to

13   get Romanosky to go to lunch.  He tried to get him

14   to go to a coffee shop.  Just think about it.

15   You're driving up here to have sex with an

16   11-year-old, and what you want to do first is you

17   want to have lunch.  You don't want to go to that

18   house and have sex.  You want to have lunch.

19        You're driving up here to have sex with an

20   11-year-old, so what do you do?  You call your

21   friend Bill Hayden up that same day that you're

22   driving here and you tell him you're going to have

23   dinner with somebody up in St. Petersburg, two hours

24   away.  Does it make sense that you would make that

25   kind of a phone call if you're coming up here to

1    have sex with an 11-year-old girl or two?

2         Then Romanosky, we talked about how smooth he

3    is.  He talks about how well-trained he is.  And he

4    is, because think about it.  They didn't want to put

5    in that car ride from his arrest to the Sheriff's

6    Administration Building.  They didn't want to put

7    that in.  They recorded it but they didn't want you

8    to hear it, so the defense put it in so that you

9    could hear how Romanosky massages somebody to get

10   them to talk and say what he wants them to say.

11        Not just that, but Romanosky starts talking

12   about his retirement.  He's about to arrest the guy

13   for a phenomenally serious crime and he's talking

14   about a 78-year-old man enjoying his retirement.

15        How many times did Charles Friedlander tell

16   him he had no interest in children?  How many times

17   did Romanosky have to ask him before he would break

18   him down so Charles Friedlander would say something

19   like he wanted him to say?  How many times was he

20   talking about -- he told him the son was 29 to 39

21   and he died in 2001, but he still kept talking about

22   the son.

23        Even the detective in Port St. Lucie knew

24   about that death.  And all he has to do is do a law

25   enforcement report, and that law enforcement report

1    takes just a request and you get it.  These were no

2    secrets to Romanosky.  And then he tells him, look,

3    I'm only interested in 40-to-70-year-olds.  I have

4    no preference for under 18.

5         He tells Romanosky he's had these

6    conversations with other people.  He tells Romanosky

7    he's talked to other people and had sexual

8    conversations, at least two others he can think of.

9    Romanosky then goes, well, I've talked to multiple

10   law enforcement officers and they're -- all these

11   guys are investigating you.  A lie to get him to

12   talk.  Now we know that there's only one.  Not

13   multiple, one.

14        And he admitted that he had other

15   conversations, so where is the shock and horror of

16   it?  And then he says he has never talked to kids.

17   He tells him about his erectile dysfunction.  He

18   tells him -- now, I bet this really shocked

19   Romanosky -- there's no porn on my computer.  And

20   Romanosky probably said, sure.  Right.

21        And they were down there -- they weren't down

22   there the day after this interview, they were down

23   there during the interview.  Because remember, he

24   told him that during the interview they're already

25   at his house searching the computers.  And what do

1       they find?

2            I'm sure 64 is up there somewhere, Exhibit 64.

3       Exhibit 64 is the picture of the teenage boy.   If

4       you remember that picture, that's no underage child.

5       You've seen the picture.   But Romanosky tells him to

6       get him to talk, oh, yeah, we found this picture.

7       You'd better start fessing up now.   We're down there

8       right now searching your house.   And what

9       Dr. Friedlander says was true, nothing, zero, zip.

10           Sex toys.   These sex toys are interesting

11      because nowhere on the chats do we talk about sex

12      toys.   But once again, the government's proving the

13      case with something that has nothing to do with the

14      case.

15           And real people he met on the internet.   The

16      government hasn't produced a real person.   They have

17      two detectives, but not a single real person.   And

18      you have to decide what may or may not be sufficient

19      to prove this case.   That's your decision.

20           And the other thing, think about this for a

21      second.   These are not -- these are not fantasy

22      chats.   Two chats -- the two people we have that he

23      talked to -- actually, that's probably not good for

24      the court reporter -- the two people we have that he

25      talked to, we have Spector and we have Romanosky.

1    If these are real, then why are the chats so

2    different?  If it is real, then why did he bend his

3    chat and create his chat to comport with the wishes

4    of the person he was talking to?

5         You have in Romanosky a girl, in Spector a

6    boy -- excuse me, in Romanosky a boy, Spector a

7    girl.  Romanosky, whipping, beating, spanking.

8    Spector, not a single bit of corporal punishment,

9    not a whip, not a spanking, not a razor strop,

10   nothing.  Zero.  Zero.

11        You have pain for -- you know, with the whips

12   and stuff in Romanosky.  In Spector you have pain

13   from the sexual activity.  In Spector, it's very

14   clear that what we wants to do is meet Spector.  In

15   Romanosky, maybe wants to meet Romanosky, too, but

16   Romanosky doesn't tell him he's not bi or not gay

17   like Spector does.

18        It is night and day between those

19   conversations.  The person that is talking is

20   different.  If you look at Captoes's conversation,

21   the way he rolls his conversation, in Spector it is

22   different than how he rolls it with Romanosky.  It's

23   just different.  So you've got to keep that in mind.

24        And when you're going back there and you're

25   doing your deliberations, you're going to have this

1    stuff.  Look at it.  We went through it, went

2    through it in great detail with Romanosky and with

3    Spector about the conversations and how they flowed.

4         Yes, those things were said.  Yes, those

5    things are disgusting.  Yes, there's pictures of

6    whippings and beatings out of 29,000 pictures.

7    Those pictures exist.  And, yes, he has

8    conversations.  Out of thousands of e-mails, I think

9    there were like 200,000 files on the computers,

10   something like that that the expert talked about and

11   yet this is the only thing they show you.

12        Yes, he talked to people about all sorts of

13   stuff.  But was it ever real?  In your wildest

14   dreams, do you think that if they could find one of

15   those people that was real, they wouldn't have

16   brought them here?  In your wildest dreams, if they

17   couldn't have found one child, they wouldn't have

18   brought them here?  It doesn't exist and they

19   testified to it.

20        So ladies and gentlemen of the jury, a

21   reasonable doubt.  Here the instruction says it's

22   something that you do, the most serious things in

23   your life about reasonable doubt.  You know the most

24   serious thing in my life?  If someone came to me and

25   told me that my son had to have a leg amputated or

1    arm amputated.  That's how serious it is.  Would I

2    rely on what the government presented here to make

3    that decision to have it amputated or are there too

4    many unknowns, too many things that are

5    inconsistent?

6         Does a man's life not matter at all?  Does 78

7    years of law-abiding life not matter?  Does that not

8    create a reasonable doubt?  It has to matter.  It

9    has to make a difference.

10        Otherwise, why do you live 78 clean years if

11   it makes no difference?  And someone can say, hey,

12   we knew what you were going to do and that's what it

13   is.  We know beyond a reasonable doubt that that's

14   what you're going to do, that you willfully and

15   knowingly intended to get that person, to implore

16   that person so you could have sex with a child.  We

17   know you're going to do that.

18        Can you say beyond a reasonable doubt that you

19   know what's in the mind of a 78-year-old man that

20   has led a totally clean life.  Thank you.

21        THE COURT:  Thank you, Mr. Tragos.

22   Ms. Kaiser?

23        MS. KAISER:  Thank you, Your Honor.  Why

24   didn't we play the phone calls for you from the last

25   witness?  Well, Government's Exhibit 80, you heard

1    the defendant saying basically that he wanted her to

2    sit on his lap.  What does the 11-year-old wear to

3    bed?  What does the 11-year-old wear to bed?  Do you

4    think she'll mind my hairy chest?  This is the

5    defendant.  Want to go down to her little pussy.

6         Do you really need to hear phone calls, more

7    of this?  Government's Exhibit 80 -- oh, will she

8    mind a hard cock?  This is the defendant asking

9    about the little girl with the Easter Bunny, the

10   11-year-old little girl.  These are the defendant's

11   words.

12        Government's Exhibit 82, I will tongue her

13   well if she likes it.  Did you come in her mouth?

14   This is the defendant asking what he believes is the

15   little girl's father.  He goes on.  They talk about

16   whether or not the little girl might be in pain if

17   he penetrates her with his penis.  This is the

18   defendant's words.  It will be even better when a

19   cock finally is in her slightly, says the defendant.

20   I want Susie to enjoy an older, bigger cock.  He's

21   talking about having sex with an 11-year-old child.

22   Did you really need to hear more?  Weren't the chats

23   sufficient?

24        Naked pictures of the teen.  Mr. Tragos

25   brought that up, the naked pictures of the teen.

1      How many people have naked pictures of teens,

2      Polaroid pictures and they have no idea who they are

3      in their house?

4           Let's talk a little bit about Dr. Berlin.

5      Dr. Berlin started by saying that he testified for

6      anybody that asked him.  Well, the only problem with

7      that was the only people that could ask him are

8      people that have a lot of money to pay his big fees.

9      What did he say he got?  Over $30,000 to testify in

10     this case.

11          MR. TRAGOS:  Objection, beyond the scope.

12          THE COURT:  Overruled.

13          MS. KAISER:  He charged over $30,000 and he

14     didn't even bring the right book.  Let's talk about

15     those little gremlins that he referenced, the people

16     that somehow snuck into the publisher's office and

17     changed the DSM, the manual, without telling him.  I

18     guess we'll never know who did that.

19          One thing -- one thing he did say that was

20     worthwhile was he said you don't have to be a

21     pedophile to want to have sex with a child.  This

22     case is not about whether or not the government has

23     proven he's a pedophile.  It's about the charges

24     that he's been charged with.

25          There's no requirement.  You're not going to

1    hear -- when the judge reads you the jury

2    instructions, listen and listen and see if there's a

3    special instruction that says, and the government

4    has to prove he's some pedophile or he's some sexual

5    sadist.  There's no requirement of that.

6         Dr. Berlin -- and I had quite a disagreement

7    about the differences between the words or and the

8    words and.  The diagnostic manual says if you have

9    fantasies, urges or behaviors for six months or

10   more, you could be diagnosed with one of the

11   paraphilias, either the sexual sadism or the

12   pedophilia.

13        Well, we know just from the evidence the

14   defendants -- the proof in this case goes back to

15   2005, so we've got more than six months right there.

16   But you don't have to be from Johns Hopkins to

17   understand there's a difference between the word and

18   the word or.

19        When the defendant took the stand, he told you

20   that he was planning to go up and have lunch with a

21   fine, outstanding businessman.  That's who he

22   thought Michael was, if you recall.  Really?  A

23   fine, outstanding businessman?  That's who he

24   thought he was going to have lunch with?  The person

25   that he has discussed at length tying up, whipping

1    and having sex with a 10 and 11-year-old in the

2    defendant's words was some fine, upstanding

3    businessman that he was going to drive up to St.

4    Pete to meet for lunch.  Did that make any sense

5    whatsoever?

6         I asked Dr. Friedlander when he was on the

7    stand, do you have an interest in spanking people?

8    He could have said, well, yes, I do with other

9    consenting adults.  That would have been -- that

10   would have been just fine, but that's not what he

11   said.  Incredulously he -- he wouldn't agree.  He

12   wouldn't agree with that.

13        Despite the avalanche of his own writings, all

14   the e-mails and e-mails and e-mails, I've got a

15   razor strop, I'm into discipline, all the websites

16   he visits, looking for very -- the very implements

17   of torture, and he still won't admit he has an

18   interest in it.

19        He's got an advertisement, he testified, on

20   guy spank dot com.  Guy spank?  And he doesn't admit

21   he has any interest in that.  Oh, no, no.  Hum-um.

22   No.  No favorite places, corporal punishment clubs,

23   no.  He still won't admit it.

24        Let's talk about the quirt.  I thought this

25   was a riding crop, but he called this a quirt, a

1    quirt, some special English word.  Right?  When --

2    if you'll recall when he was on the stand, right,

3    that wasn't -- this wasn't just an implement to beat

4    the children.  He said, oh, that's for my

5    protection.

6         So he wasn't going to use a gun or a knife or

7    some mace.  No.  He's going to hit a bad guy with

8    that thing.  That was his testimony on the stand,

9    that he just happened to have that.  Even though he

10   said that he was going to use that to beat the

11   children, it just so happened to be in his car

12   because that's what he takes for personal

13   protection.  It's just a big coincidence.

14        What about the e-mail at the cabin about the

15   incident at the cabin and about how handsome he was

16   in his smoking jacket and about all the info about

17   the whips, right?  There's this whole long, long

18   e-mail about very graphic descriptions of what took

19   place at the cabin.

20        And in that, I believe the individual's name

21   was Mark.  He says, oh, you know, and then you

22   showed me the one whip and then you showed me the

23   second whip that you had bought for us, blah, blah,

24   blah.  And what does the defendant respond?  Geez,

25   you're crazy.  I don't know what you're talking

1    about.  Hey, don't call me dad.  He didn't say that.

2    He doesn't say what whips.  We never talked about --

3    we never had whips at the cabin.  No.

4         What does he say?  You're exactly right.  Your

5    memory is exactly right.  It was just as you

6    described.  It's only -- it's only when we're in

7    court today that somehow this guy who writes this

8    whole account at the cabin has somehow got it

9    inaccurate.  Before the defendant writes back and

10   says, oh, you've got it a hundred percent right.

11        Does he, a licensed mental health counselor,

12   ever say, hum, if we're engaging in sexual activity,

13   it's probably not a good idea for you to call me

14   dad?  That's kind of sick.  Does he ever say

15   anything like that?  No.  He signs his e-mails, hugs

16   and licks, dad.

17        When the defendant was first interviewed, he

18   talked about Randy.  He said Randy was his son that

19   had lived with him.  Now he comes to trial and now

20   Randy is just some guy that he rented some space to.

21   But what's interesting is apparently he and Randy

22   had exactly the same interests, right?  Because the

23   defendant took the stand and he told you that that

24   suitcase full of sex toys and whips was Randy's.  It

25   wasn't his; right?  All the sex objects, they're all

1    Randy's.  Those are -- no.

2         That's incredible.  A licensed mental health

3    counselor, a person with a PhD testified, I didn't

4    know how to get rid of it.  I said, well, why didn't

5    you put it in the dumpster?  Oh, I don't have a

6    dumpster.  Hum.  So the defendant couldn't think of

7    another way to dispose of that type -- those types

8    of items in seven years?  It would never have dawned

9    on him, hey, maybe I could just get a Glad trash

10   bag.  That suitcase isn't too big.  Maybe I can just

11   put it in there and put it out by the street.  It's

12   incredible is what it is.  It's incredible.

13        During the interview with law enforcement, the

14   defendant told Corporal Romanosky those sex toys

15   were for his lady friend.  You remember that.  He

16   said it was Miss Priss.  That's what he said.

17   During the interview he said, oh, that's for use

18   with Miss Priss.

19        Then when he came to trial, he said, oh, nope,

20   nope, those aren't mine.  These are Randy's.  Well,

21   if that were the case, why wouldn't he say that to

22   Corporal Romanosky at the time?  Because they were

23   his.

24        Let's talk about the Levitra.  Why does he

25   keep getting it?  We've had all this talk -- and

1     keep in mind, keep in mind, whether or not the

2     defendant has erectile dysfunction is not the issue.

3     He could certainly engage in sexual activity with a

4     child even if he had erectile dysfunction.

5          You know, the point was made that the

6     government didn't go out and go interview and ask a

7     hundred people if he ever had an erection.  Well,

8     why didn't we do that?  Because it's not relevant.

9     It's not relevant.

10         He says on tape that he wants to -- that he

11    was going to have oral sex with -- have the children

12    perform oral sex on him.  There's no necessity that

13    we prove that he can have an erection or that he was

14    going to use his penis to insert it in some child.

15    It's not necessary.  It's clear from the proof that

16    he wanted to engage in sexual activity with those

17    children.

18         But you have to ask yourself -- you know, we

19    put in just a little bit of the defendant's medical

20    records.  And in there it shows at least from -- I

21    think at least from October of '07 he was getting

22    Levitra.  So if it doesn't work, why does he keep

23    getting it?  Why does he keep asking for it?  If it

24    doesn't work at all, then that doesn't even make

25    sense.  Why would he keep getting it?  And why does

1    he get it three days before he drives up to meet

2    with Detective Romanosky?  Three days before he's in

3    the urologist's office saying, hey, give me some

4    more of that Levitra.

5        Then when they find it and take pictures of

6    it, some are missing.  He lies about that to

7    Detective Romanosky as well and says, oh, I never

8    take anything like that.  Oh, yes, he does.  They

9    found it.

10        What about the condoms?  Here's a person who

11   claims, oh, I've never -- I've never had an

12   erection.  Not only -- not only does he claim he

13   doesn't have any now, but apparently never in his

14   entire life.

15        I recall back to opening statement that you

16   were told that you had a 78-year-old virgin on your

17   hands.  Incredible.  So he's got condoms.  Why would

18   he use that?  He told law enforcement during the

19   interview it was for use with his lady friend.  Then

20   you're told during the trial, he has no lady

21   friends.  There is none.  And that he's never had an

22   erection.  Incredible.

23        Let's talk about the defendant's witnesses.

24   Margaret Vaughan, a friend of the defendant's from

25   Virginia testified.  They taught school together.

1        But she had no idea what the defendant was doing.

2        She had no idea what was on his computer.  The

3        defendant had never chatted with her about his

4        interest.  Of course not.  He couldn't share that

5        deviant behavior with her.

6            Bill Hayden, the defendant's best friend who

7        he met over the internet.  He also had no idea what

8        the defendant was interested in.  He testified --

9        interestingly, though, he testified that the

10       defendant told him he was coming up to St. Pete to

11       meet Michael, who you guys later learned was

12       Detective Romanosky for lunch.  Right?  That was the

13       testimony of Bill Hayden.  The defendant said, I'm

14       going to go up there to have lunch.

15           At the Cracker Barrel right before he was

16       arrested, if you'll recall, the defendant tells

17       Detective Romanosky who he still thinks is Michael,

18       hey, I just stopped for food on the way up.  He

19       doesn't say, I only just got a shake because I was

20       feeling weak.  No.  He said, I just ate lunch right

21       before I got here.  Inconsistencies.  It makes no

22       sense.

23           The defendant couldn't say hey, Bill, I'm not

24       really going up for lunch.  I'm going to go up to

25       St. Pete and join this group who -- who sexually and

1    physically abuse children.  Hey, I'll be back in a

2    few hours.  He couldn't say that.

3         His family member testified on his behalf.

4    That family member doesn't know.  That family member

5    lives out of state.  They love him.  It's

6    understandable.  I wasn't going to inquire further

7    of a family member.  I'm sure the defendant didn't

8    say, hey, yes, by the way, in my free time I go to

9    all these BDSM sites and I have all these torture

10   pictures and right now I'm corresponding with this

11   agent and I might -- or this person named Michael, I

12   might beat his kids and have sex with them.  He's

13   not going to tell family members that.

14        The defendant's interview had a number of

15   interesting points, but what's stark is what he

16   didn't say.  All right?  The defendant didn't say,

17   oh, I wouldn't have done that or have sex with a

18   child.  Are you kidding me?  That's sick and

19   disgusting.  He never says that.

20        As we talked before, he said, I thought they

21   were going to do it to me, that they were going to

22   perform oral sex on me.

23        We talked a little bit before about fantasy.

24   But talking on the phone is not a fantasy.  Typing

25   long messages on the internet is not a fantasy.

1    Driving up hours on the internet is not -- on the

2    interstate is not a fantasy.  Packing your car full

3    of implements that you talked about using to beat

4    children is not a fantasy.

5         He lied about his age.  He even admitted why

6    he lied about his age.  He said, you know, if I did,

7    you know, I was afraid they wouldn't talk to me.

8    You know, he purposely misrepresented his age.

9         Mr. Tragos said that law enforcement didn't go

10   far enough.  We didn't go far enough in this case.

11   Well, obviously, law enforcement doesn't have a 10

12   and an 11-year-old they could strip naked and tie to

13   a chair and give Mr. Friedlander a whip and wait

14   tell he arched his back to arrest him.

15        That's ridiculous.  I mean, his intent is

16   clear.  He drives hours out of his way with the same

17   implements he said he was going to use to beat the

18   children.  And on tape he says they're going to --

19   he's going to have them perform oral sex on him.

20        Mr. Tragos mentioned that there was no

21   evidence of his discussions with the kid that was

22   referenced in the greatscottadad e-mails, where he's

23   talking to the father and he says, hey, I talked to

24   your son Cade and I told him if I was there, they

25   would all be in big trouble, if you remember that

1    series of e-mails.  Just remember the testimony of

2    AOL and how long that they save records like that.

3         The same thing with chats.  The computers

4    don't ordinarily save chats so law enforcement

5    didn't find chats on the defendant's computer.  They

6    were saved by law enforcement.  When people engage

7    in chats, it's not automatically saved on their

8    computers.

9         Look at all the different websites the

10   defendant's in.  Father's chatting, family fun.

11   Now, what is he doing in those?  As

12   Detective Romanosky pointed out during his

13   interview, how many minutes did it take you to know

14   what the website was about.  Very quickly he knew

15   what it was about and what he was doing.

16        There was nothing in that ride to the Pinellas

17   County Sheriff's Office of great interest.  You

18   heard it.  If anything, Detective Romanosky

19   repeatedly was extremely polite to Mr. Friedlander.

20   He gave him every courtesy, extended every courtesy

21   to him, despite the facts in this case.

22        When you took oaths as jurors, you didn't

23   leave your common sense out on Florida Avenue.  Voir

24   dire means literally to speak the truth.  And the

25   United States is going to ask you to speak the truth

1        to this defendant and let him know that you know

2        what he did --

3              MR. TRAGOS:  Objection.

4              MS. KAISER:  -- and find him guilty in this

5        case.

6              MR. TRAGOS:  Objection, improper argument.

7              THE COURT:  Overruled.

8              MS. KAISER:  Thank you.

9              THE COURT:  Thank you, counsel.  Members of

10       the jury, if you'll sit back, I am about to instruct

11       you on the rules of law that you must follow in

12       reaching your verdict.  When I have finished, you

13       will begin your deliberations in the jury room.  We

14       are securing the courtroom so that I have your

15       undivided attention.

16             You don't need to take notes.  You'll have a

17       copy of these instructions in the jury room for your

18       ready reference.  A couple of pointers, and I'll

19       cover this in the instructions.

20             Remember that this is one entire statement of

21       the law applicable to the case.  It's paginated

22       through the computer, and on a number of pages

23       sometimes there's four or five lines.  But they are

24       provided to you in a certain order to assist you in

25       your deliberations.  You should consider them, as I

1    will tell you in a moment, as one entire statement

2    of the law, and you are not to disregard any one

3    instruction.

4        It will be your duty to decide in this case

5    whether the government has proven beyond a

6    reasonable doubt the specific facts necessary to

7    find the defendant guilty of the crime charged in

8    the indictment.  You must make your decision only on

9    the basis of the testimony and the other evidence

10   presented here during the trial, and you must not be

11   influenced in any way by either sympathy or

12   prejudice for or against the defendant or the

13   government.

14       You must also follow the law as I explain it

15   to you, whether you agree with the law or not; and

16   you must follow all of my instructions as a whole.

17   You may not single out or disregard any of the

18   court's instructions on the law.

19       The indictment or the formal charge against

20   any defendant is not evidence of guilt.  Indeed,

21   every defendant is presumed by the law to be

22   innocent.  The law does not require a defendant to

23   prove innocence or to produce any evidence at all.

24   The government has the burden of proof, and it must

25   prove the defendant guilty beyond a reasonable

1    doubt.  If it fails to do so, you must find the

2    defendant not guilty.

3         Thus, while the government's burden of proof

4    is a strict or heavy burden, it is not necessary

5    that a defendant's guilt be proved beyond all

6    possible doubt.  It is only required that the

7    government's proof exclude any reasonable doubt

8    concerning the defendant's guilt.

9         A reasonable doubt is defined as a real doubt,

10   based upon reason and common sense, after careful

11   and impartial consideration of all of the evidence

12   in the case.

13        Proof beyond a reasonable doubt, therefore, is

14   proof of such a convincing character that you would

15   be willing to rely and act upon it without

16   hesitation in the most important of your own

17   affairs.  If you are convinced that the defendant

18   has been proven guilty beyond a reasonable doubt,

19   say so.  If you are not so convinced, say so.

20        As I said earlier, you must consider only the

21   evidence that I have admitted in the case.  The term

22   evidence includes the testimony of the witnesses and

23   the exhibits which have been introduced and

24   admitted.

25        Remember that anything the lawyers say is not

1    evidence.  It is your own recollection and

2    interpretation of the evidence that controls.  What

3    the lawyers say is not binding upon you.

4         Also, you should not assume from anything I

5    may have said that I have any opinion concerning any

6    of the issues in the case.  Other than my

7    instructions to you on the law, you should disregard

8    anything I may have said during the course of the

9    trial in arriving at your own decision concerning

10   the facts.

11        In considering the evidence, you may make

12   deductions and reach conclusions which reason and

13   common sense lead you to make.  And you should not

14   be concerned about whether the evidence is direct or

15   circumstantial.  The law makes no distinction

16   between the weight you may give to either direct or

17   circumstantial evidence.

18        Direct evidence is the testimony of one who

19   asserts actual knowledge of a fact, such as an

20   eyewitness.  Circumstantial evidence is proof of a

21   chain of facts and circumstances tending to prove or

22   disprove any fact in dispute.

23        Now, in saying that you must consider all of

24   the evidence, I do not mean that you must accept all

25   of the evidence as true or accurate.  You should

1    decide whether you believe what each witness had to

2    say and how important that testimony was.

3         In making that decision, you may believe or

4    disbelieve any witness in whole or in part.  Also,

5    the number of witnesses testifying concerning any

6    particular dispute is not controlling.

7         In deciding whether you believe or do not

8    believe any witness, I suggest that you ask

9    yourselves a few questions.  Did the witness impress

10   you as one who was telling the truth?  Did the

11   witness have any particular reason not to tell the

12   truth?  Did the witness have any personal interest

13   in the outcome of the case?  Did the witness seem to

14   have a good memory?  Did the witness have the

15   opportunity and the ability to observe accurately

16   the things about which the witness testified?  Did

17   the witness appear to understand the questions

18   clearly and answer them directly?  Did the witness's

19   testimony differ from other testimony or other

20   evidence in the case?

21        You would also ask yourselves whether there

22   was evidence tending to prove that a witness

23   testified falsely concerning some important fact or

24   whether there was evidence that at some other time a

25   witness said or did something or failed to say or do

1    something which was different from the testimony the

2    witness gave before you during the trial.

3        You could keep in mind, of course, that a

4    simple mistake by a witness does not necessarily

5    mean that the witness was not telling the truth as

6    he or she remembered it, because people naturally

7    tend to forget some things or remember other things

8    inaccurately.

9        So if a witness has made a misstatement, you

10   need to consider whether it was simply an innocent

11   lapse of memory or an intentional falsehood.  The

12   significance of that may depend on whether it had to

13   do with an important fact or with only an

14   unimportant detail.

15       A defendant has a right not to testify.  If a

16   defendant does testify, however, you should decide

17   in the same way as that of any other witness whether

18   you believe the defendant's testimony.

19       When knowledge of a technical subject might be

20   helpful to the jury, a person having special

21   training or experience in that technical field is

22   permitted to state an opinion concerning those

23   technical matters.  We call these witnesses expert

24   witnesses.

25       Merely because such a witness has expressed an

1    opinion, however, does not mean that you must accept

2    it.   The same as with any other witness, it is up to

3    you to decide whether to rely upon it.

4         You'll note that the indictment in this case

5    charges that the offense was committed on or about a

6    certain date.   The government does not have to prove

7    with certainty the exact date of the alleged

8    offense.   It is sufficient if the government proves

9    beyond a reasonable doubt that the offense was

10   committed on a date reasonably near the date

11   alleged.

12        The word knowingly, as that term is used in

13   the indictment or in these instructions, means that

14   the act was done voluntarily and intentionally and

15   not because of mistake or accident.

16        The word willfully, as that term is used in

17   the indictment or in these instructions, means that

18   the act was committed voluntarily and purposely,

19   with the specific intent to do something the law

20   forbids, that is, with bad purpose either to disobey

21   or disregard the law.

22        I caution you, members of the jury, that you

23   are here to determine from the evidence in this case

24   whether the defendant is guilty or not guilty.   He

25   is on trial only for the specific offense alleged in

1        the indictment.

2              Also, the question of punishment should never

3        be considered by the jury in any way in deciding the

4        case.  If the defendant is convicted, the matter of

5        punishment is for the court alone to determine at a

6        later time.

7              When the government offers testimony or

8        evidence that a defendant made a statement or

9        admission to someone after being arrested or

10       detained, the jury should consider the evidence

11       concerning such a statement with caution and great

12       care.

13             It is for you to decide, first, whether the

14       defendant made the statement and, second, if so, how

15       much weight to give it.  In making those decisions,

16       you should consider all of the evidence about the

17       statement, including the circumstances under which

18       the defendant may have made it.

19             During the course of the trial, as you may

20       recall from the instruction I gave you at that time,

21       you heard evidence of acts or conduct of the

22       defendant which may be similar to those charged in

23       the indictment but which were committed on other

24       occasions.  You must not consider any of this

25       evidence in deciding if the defendant committed the

1    acts charged in the indictment.  However, you may

2    consider this evidence for other, very limited

3    purposes.

4        If you find beyond a reasonable doubt from

5    other evidence in the case that the defendant did

6    commit the acts charged in the indictment, then you

7    may consider evidence of the similar acts allegedly

8    committed on other occasions to determine whether

9    the defendant had the state of mind or intent

10   necessary to commit the charged offense in the

11   indictment, or whether the defendant committed the

12   acts for which the defendant is on trial by accident

13   or mistake.

14       Title 18 of the United States Code Section

15   2422(b) makes it a federal crime or offense for

16   anyone to use any facility of interstate or foreign

17   commerce, including transmissions by computer or the

18   internet, in this case a telephone or computer with

19   access to the internet, to knowingly and willfully

20   persuade, induce, entice or coerce anyone under 18

21   years of age to engage in any sexual activity for

22   which any person could be charged with a criminal

23   offense or attempts to do so.

24       In some cases it is a crime for anyone to

25   attempt the commission of an offense even though the

1    attempt fails and the intended offense is not

2    actually carried out or fully committed.  So in this

3    instance, the defendant is charged with attempting

4    to commit the offense of coercion, enticement or

5    inducement of a minor in violation of Section

6    2422(b) as alleged in Count One of the indictment.

7         The defendant can be found guilty of that

8    offense only if all of the following facts are

9    proved beyond a reasonable doubt:  First, that the

10   defendant knowingly used a facility or means of

11   interstate commerce in an attempt to persuade,

12   induce, entice or coerce an individual under the age

13   of 18 to engage in sexual activity as charged.

14        Second, that the defendant believed that such

15   individual was less than 18 years of age;

16        Third, that if the sexual activity had

17   occurred, the defendant could have been charged with

18   a criminal offense under the laws of the State of

19   Florida;

20        Fourth, that the defendant engaged in conduct

21   which constituted a substantial step toward the

22   commission of the crime and which strongly

23   corroborates the defendant's criminal intent; and.

24        Fifth, that the defendant acted knowingly and

25   willfully.

1          A substantial step means some important action

2     leading to the commission of a crime as

3     distinguished from some inconsequential or

4     unimportant act.  It must be something beyond mere

5     preparation.  It must be an act which, unless

6     frustrated by some condition or event, would have

7     resulted in the ordinary and likely course of things

8     in the commission of the crime being attempted.

9          It is not necessary for the government to

10    prove that the individual was, in fact, less than 18

11    years of age; but it is necessary for the government

12    to prove that the defendant believed such individual

13    to be under that age.

14         Also, it is not necessary for the government

15    to prove that the individual was actually persuaded

16    or induced or enticed or coerced to engage in sexual

17    activity.  It is necessary for the government to

18    prove, beyond a reasonable doubt, that the defendant

19    had the intent to attempt to persuade, induce,

20    entice or coerce a minor to engage in sexual

21    activity.

22         So the government must prove that if the

23    intended sexual activity had occurred, the defendant

24    could have been charged with a criminal offense

25    under the laws of the State of Florida.  It is not

1        necessary for the government to prove that the

2        defendant communicated directly with a minor or

3        supposed minor.

4             A violation of the statute may be established

5        by proof beyond a reasonable doubt that the

6        defendant attempted to in induce, persuade, entice

7        or coerce a minor to engage in sexual activity

8        through communications with a purported parent of a

9        minor.

10            If that regard, I instruct you as a matter of

11       law that the following acts are crimes are under

12       Florida law:  Namely, sexual battery of a child;

13       lewd or lascivious battery or a child, lewd or

14       lascivious battery, lewd or lascivious molestation

15       and lewd and lascivious conduct.  And in the

16       instructions there's a reference to each Florida

17       statute.

18            Sexual battery means oral, anal or vaginal

19       penetration by or union with the sexual organ of

20       another or the anal or vaginal penetration of

21       another by any other object.

22            Lewd or lascivious battery on a child is

23       defined as a person who encourages, forces or

24       entices any person less than 16 years of age to

25       engage in sadomasochistic abuse, sexual bestiality,

1    prostitution or any other act involving sexual

2    activity, that person commits what is known as lewd

3    and lascivious battery.

4         Lewd and lascivious molestation of a child:   A

5    person who intentionally touches in a lewd or

6    lascivious manner the breasts, genitals, genital

7    area or buttocks or the clothing covering them of a

8    person less than 16 years of age or forces or

9    entices a person under 16 years of page to so touch

10   the perpetrator commits a lewd or lascivious

11   molestation.

12        A lewd or lascivious conduct on a child:   A

13   person who intentionally touches a person under 16

14   years of age in a lewd or lascivious manner or

15   solicits a person under 16 years of age to commit a

16   lewd or lascivious act commits what is known as lewd

17   and lascivious conduct.

18        You do not need to find that all of the

19   proposed sexual activities, if engaged in, would

20   violate all of these laws.  You need only find that

21   the proposed sexual activity would violate any one

22   of those laws.

23        Let me re-read that because I might have said

24   plural when I intended singular.  You do not need to

25   find that all of the proposed sexual activity, if

1    engaged in, would violate all these laws.  You need

2    only find that the proposed sexual activity would

3    violate any one of these laws.

4        The internet is a facility, means and/or

5    instrumentality of interstate commerce.

6        The word induce can be defined in two ways.

7    It can be defined as to lead or move by influence or

8    persuasion, to prevail upon or, alternatively, to

9    stipulate the occurrence of cause -- to stimulate

10   the occurrence of, semicolon, cause.  These are

11   definitions of these terms that are included in

12   these statutes to assist you.

13       The defendant in this case has offered

14   evidence of the traits of character, and that

15   evidence may give rise to a reasonable duty.  Where

16   a defendant has offered testimony that the defendant

17   is an honest and law-abiding citizen, the jury

18   should consider that testimony along with all of the

19   other evidence in deciding whether the government

20   has proven beyond a reasonable doubt that the

21   defendant committed the crime charged.

22       In order to assist you in hearing the tape

23   recordings that were introduced in evidence, you

24   have been provided with transcripts of those

25   recordings as a guide.  I caution you, however, that

1    what was said at the time it was recorded is the

2    real evidence that you are to consider, and not the

3    transcripts.

4         Consequently, if you find that what you heard

5    or could not hear conflicts with the transcripts,

6    you are to rely on what you heard and not on the

7    transcripts themselves.

8         Any verdict that you reach in the jury room,

9    whether guilty or not guilty, must be unanimous.

10   That is, to return a verdict, you must all agree to

11   it.  Your deliberations will be conducted in secret

12   and you will never have to explain your verdict to

13   anyone.

14        It is your duty as jurors to discuss the case

15   with one another in an effort to reach agreement, if

16   you can do so.  Each of you must decide the case for

17   yourself, but only after full consideration of the

18   evidence with the other members of the jury.

19        While you are discussing the case, don't

20   hesitate to reexamine your own opinion and change

21   your mind if you become convinced that you are

22   wrong.  But do not give up your honest beliefs

23   solely because the others think differently or

24   merely to get the case over with.  Remember that in

25   a very real way you are judges, judges of the facts.

1    Your only interest is to seek the truth from the

2    evidence in the case.

3         When you go to the jury room, you should first

4    select one of your number to act as your foreperson

5    who will sign and date the verdict form, preside

6    over your deliberations and speak for you here in

7    open court.  We have a verdict form that has been

8    prepared.  Do you have it handy, Anne?  Here it is.

9    Use the one I'm going to give them.

10        You'll take the verdict form to the jury room,

11   together with the evidence, my instructions, a copy

12   of the indictment.  And when you've reached

13   unanimous agreement, the foreperson will fill in the

14   verdict form, sign and date it and return it to the

15   courtroom.

16        You'll see that the verdict form includes the

17   style of the case, identifying the court, the name

18   of the defendant and the case number assigned by the

19   clerk.  It's entitled:  Verdict, Count One of the

20   indictment.  And then, of course, there's only one

21   count.

22        As to the offense of using a facility or means

23   of interstate commerce to knowingly and willfully

24   attempt to persuade, induce, entice or coerce an

25   individual who has not attained the age of 18 to

1    engage in sexual activity for which any person can

2    be charged with a criminal offense, in violation of

3    that code provision, we, the jury, find the

4    defendant, Charles Jackson Friedlander, either

5    guilty or not guilty.

6        Then there's an instruction in bold print.  If

7    you find the defendant not guilty, the foreperson

8    should sign and date the verdict form.  If you find

9    the defendant guilty, please answer the following

10   questions.

11       Here you'll see a series of questions that we

12   will ask you to address only if you find the

13   defendant guilty beyond a reasonable doubt.  The

14   question is:  Do you find beyond a reasonable doubt,

15   number one, that the defendant knowingly

16   misrepresented his age in communicating with and

17   negotiation with the undercover officer who posed as

18   the father of the minors in an attempt to stimulate

19   or cause the minors the occurrence of a meeting to

20   engage in sexual activity?  Yes or no.

21       Number two.  Pull it down just a little bit.

22   There you go.  That the defendant used a computer to

23   communicate with and arrange the meeting with the

24   undercover officer to have sexual contact with his

25   sons.  Yes or no.  And, three, that the offense

1    involved minors who had not attained the age of 12

2    years.  Yes or no.

3         The verdict form concludes, so say we all,

4    this blank day of December 2008, and a signature

5    line for the foreperson.

6         Again, these special questions are to be

7    answered by you only if you find the defendant

8    guilty.  If you find the defendant not guilty, just

9    skip those questions and the foreperson signs and

10   dates the verdict form.

11        If you should require or desire to communicate

12   with me at any time, the foreperson should write

13   down the communication legibly, initial it, put the

14   time of day, knock on the door, hand it to the

15   courtroom security officer.

16        After I've conferred with counsel, I'll try to

17   answer your question.  A couple of suggestions,

18   however.  Before you start firing questions at me,

19   read these through instructions.  I think you may

20   find that most questions, if not all, will be

21   addressed in the instructions.

22        If you ask me what some witness said or didn't

23   say or what happened on a certain date, I cannot

24   answer that question.  You must resolve all of the

25   facts in the case.  I cannot assist you in anyway in

1        that respect.

2             If at any time you do communicate with me, you

3        should not indicate your numerical division in any

4        way.

5             It's almost a quarter till 4:00.  There is no

6        time limit on your deliberations.  The time of day

7        should have nothing to do with your verdict and your

8        deliberations.  If the foreperson determines at a

9        certain time that you should recess for the evening

10       and return in the morning, that is the prerogative

11       of the foreperson.  I will not interfere with that

12       in any respect other than to perhaps ask you what

13       your intentions are, because we do not have the

14       facilities to sustain you in terms of food and drink

15       after hours.

16            It's entirely up to you.  If you want to

17       deliberate well beyond close of business, we will

18       make arrangements to have air conditioning and that

19       kind of thing.  On the other hand, if you choose to

20       break, that's your prerogative, as well.

21            Let me just ensure that there are no issues

22       concerning the jury instructions or verdict form

23       from counsel.  If I could see you at side bar,

24       please.

25       (At side bar, on the record.)

1          THE COURT:  Here's the verdict form I'm going

2     to send back, the one that was read.

3          MS. KAISER:  I think there's a problem with

4     the first question.

5          THE COURT:  In what respect?

6          MS. KAISER:  An attempt to stimulate or cause

7     the minors the occurrence of a meeting.  It should

8     say, in an attempt to stimulate or cause the

9     occurrence of a meeting to engage in sexual activity

10    with the minors.  It doesn't make senses the way

11    it's written.

12         THE COURT:  Just a second.

13    (Brief pause.)

14         THE COURT:  If there is a problem, the problem

15    falls on your shoulders because it's exactly how it

16    was typed.  But I'll be more than happy to correct

17    it because it's a special interrogatory.  So what do

18    you think it should say?

19         In the meantime, these are the instructions

20    that I read.  Any objection to how they were read?

21         MR. TRAGOS:  Not as to how they were read.

22         THE COURT:  Yes.

23         MR. TRAGOS:  We have no objection as to how

24    they were read.

25         THE COURT:  All previous objections are deemed

1      renewed and the requested instructions not given are

2      deemed renewed, same rulings.

3           MS. KAISER:  I would propose that we just

4      change it to, in an attempt to stimulate or cause

5      the occurrence of a meeting to engage in sexual

6      activity with the minors, and then just take that

7      out here.

8           MR. TRAGOS:  Why don't we just say, the

9      defendant knowingly misrepresented his age in

10     communicating with or negotiating with the

11     undercover officer.

12          MS. KAISER:  Okay.  If you think that suffices

13     under --

14          THE COURT:  That's the essence of it.  That's

15     the trigger on the enhancement; is it not?

16          MR. TRAGOS:  Right.  Yeah.

17          THE COURT:  But a period right there after

18     officer.

19          MS. KAISER:  Fine with me.

20          MR. TRAGOS:  Yeah, I think so.  I don't have a

21     problem with that.

22          MS. KAISER:  Okay.

23          MR. TRAGOS:  Because if they find him -- if

24     they find him guilty -- wait a minute.

25          THE COURT:  It's the misrepresentation which

1     is the triggering offense characteristic.

2          MS. KAISER:  Correct.

3          MR. TRAGOS:  Why don't you put down the

4     defendant misrepresented his age, actually?

5          MS. KAISER:  I guess it -- it says, no.  It

6     says, if you find beyond a reasonable doubt the

7     defendant --

8          MR. TRAGOS:  The defendant knowingly

9     misrepresented his age, period.

10          THE COURT:  Well, we ought to go ahead and say

11     when as opposed to in the trial.

12          MS. KAISER:  While negotiating with the

13     undercover officer who posed as the father of the

14     minors, period, for --

15          THE COURT:  That would clarify it.  It's not

16     based on his trial testimony.

17          MS. KAISER:  That's fine with me.  If you guys

18     think that's sufficient for that guideline

19     application, then, yeah.

20          MR. TRAGOS:  Well, now I'm not saying that.

21     I'm not saying I don't object.

22          MS. KAISER:  That's why we're having this.

23          THE COURT:  Let's hurry.

24          MR. TRAGOS:  Let's put with whole thing in.

25     In an attempt to stimulate or cause --

1            MS. KAISER:  The occurrence of a meeting to

2       engage --

3            THE COURT:  How about just say the meeting.  I

4       don't know what occurrence of a meeting means.

5            MS. KAISER:  Okay.

6            THE COURT:  To cause --

7            MR. TRAGOS:  Is stimulate in the statute?

8            MS. KAISER:  It's in the definitions.

9            THE COURT:  It's in the guideline provision.

10      I made a comment because that's not in the statute,

11      but that's in the guideline provision.

12           MR. TRAGOS:  To stimulate -- to stimulate a

13      meeting to engage --

14           THE COURT:  They didn't have you there when

15      they were picking those words, George.

16           MR. TRAGOS:  I guess not.  I guess that's

17      fine.

18           THE COURT:  Is that acceptable if I just

19      delete that reference?

20           MS. KAISER:  That's fine.

21           THE COURT:  It's just poor wording.

22           MR. TRAGOS:  That's fine, Your Honor.

23           MS. KAISER:  Okay.  Thanks.

24           THE COURT:  All right.

25      (End of side bar discussion.)

```
 1          THE COURT:  Just one little minor correction

 2     on the verdict form.  As soon as my assistant brings

 3     it in, we're ready to go.  Ms. Ohle has the redacted

 4     indictment, the instructions and the verdict form.

 5     The evidence will be in there shortly.  Don't begin

 6     your deliberations until she confirms with you that

 7     you have everything in there that you need.  At this

 8     time I'll release the jury.  You're excused to the

 9     jury room.

10          COURTROOM SECURITY OFFICER:  Rise for the

11     jury, please.

12     (Jury out at 3:48 PM.)

13     (Recess was taken at 3:48 until 4:04 PM.)

14          THE COURT:  All right.  Let's get on the

15     record, please.

16     MR. TRAGOS:  He had to go to the restroom, Your Honor.

17          THE COURT:  All right.  First of all, the

18     video that Mr. Tragos wanted to present, let's mark

19     that as a court's exhibit so he preserves that for

20     the record, court's exhibit number one.  I don't

21     think we have any other ones.

22          And if you will, what is your intention at

23     this juncture, Mr. Tragos, only if there's a guilty

24     verdict concerning forfeiture?

25          MR. TRAGOS:  My intention would be for a
```

1    nonjury on the forfeiture.  And I've talked to the

2    prosecutor and we've discussed the court could do

3    this at the sentencing if it's a guilty verdict.  We

4    would not require any additional evidence.  The

5    court could use the evidence presented during the

6    trial.  We have, I think, agreed that the only items

7    that the government would be for -- for --

8    forfeiting would be --

9         THE COURT:  You make fun of me not being able

10   to say that word?

11        MR. TRAGOS:  But I can say it now -- would be

12   Exhibits 1 and 2 as listed in their bill of

13   particulars.

14        THE COURT:  The laptop and the tower?

15        MR. TRAGOS:  Right.

16        THE COURT:  Then I'll ask you, then, and

17   Ms. Ohle I think has a form, we need to have a

18   written waiver, and I can go over that with your

19   client if there's a guilty verdict.

20        MR. TRAGOS:  Correct.

21        THE COURT:  Is that acceptable to the

22   government, Ms. Few or Ms. Kaiser?

23        MS. FEW:  Yes, Your Honor.

24        THE COURT:  All right.  If things change,

25   please alert the clerk so we don't send this jury

1      away.

2              MS. KAISER:  All right.

3              THE COURT:  All right.  What I'm going to do

4      is I've got to run an earned.  I figure I'd better

5      do it now than wait too much later.  It will take me

6      about an hour.  So you're at ease for one hour until

7      5:00 -- let's just call it 5:10.  If the jury has a

8      question or they want to break for the evening, I'll

9      just ask them to stay until I get back.  You can

10     tell them I had to run an errand.  It should not be

11     any longer than an hour.  If it is, it's only

12     because traffic is bad, which I'm worried about now.

13             So you guys can go get something to eat or

14     something to drink, if you'd like.  Yes, ma'am.

15             MS. FEW:  I just have one question, Your

16     Honor.  Normally when there was a waiver of a jury

17     determination in forfeiture and there's a

18     conviction, subsequently the government would file a

19     motion for a preliminary order of forfeiture.  And

20     the -- if the court finds the nexus in the motion

21     between the items that are sought in forfeiture,

22     then he can go ahead and issue the order of

23     forfeiture, although we will not execute -- it does

24     not become final until the time of sentencing.  Is

25     that agreeable with you?  That's the normal

1       procedure.

2               THE COURT:   That's if there's a plea.

3               MR. TRAGOS:   Right.   If the court makes a

4       finding.   We're not stipulating to it.   We need the

5       court to make a finding.

6               THE COURT:   Well, what I'm hearing, then, is

7       Mr. Friedlander is going to waive his right to a

8       jury determination of forfeiture.   The procedure

9       that follows we can talk about, but that has to be

10      done in writing and I will have a colloquy with him

11      if that occurs.

12              And this is the form, Mr. Tragos, if you'd

13      like to go over it with him.   And he needs to sign

14      that in my presence, so just go over it with him.

15      And if there's a guilty verdict, we can excuse the

16      jury and go over that.   All right.   We'll be in

17      recess.   Thank you.

18      (Recess was taken at 4:07 until 5:09 PM.)

19      (Back on the record.)

20              COURTROOM SECURITY OFFICER:   All rise, please,

21      the court.

22              THE COURT:   We have two notes from the jury.

23      The first came at about 4:22, the jury would like a

24      DVD player, excuse me, to listen to and view various

25      evidence offered.

1          The second note came not too long ago.  The

2     jury would like to reconvene till 12/16/08 at 9

3     o'clock tomorrow morning.  And the jury would

4     appreciate all audio and video equipment be

5     available by 9:00 PM.  It's signed by Mr. Runfola,

6     juror number one.

7          So unless there's an objection, I'll just

8     instruct the court security officer to go ahead and

9     tell the jury to go ahead and leave, leave their

10    pads in the jury room, be safe.  And then we'll

11    expect them at 9:00 AM in the morning.  In other

12    words, they don't check in here, they'll just go

13    straight to the jury room.

14         MR. TRAGOS:  Are we going to talk about our

15    protocol.

16         THE COURT:  Yeah.  About the video equipment

17    and stuff?

18         MR. TRAGOS:  Yes.

19         THE COURT:  Is that all right, then?  Go ahead

20    and let them go, then.

21         COURTROOM SECURITY OFFICER:  Yes, sir.

22         THE COURT:  All right.  Let's talk a little

23    bit about this.  We've got the interview of the

24    defendant by the detective.  That's on a DVD player?

25         MS. KAISER:  Yes, Your Honor.

```
 1            THE COURT:  What else have we got on DVD?

 2            MS. KAISER:  We have the undercover phone

 3    calls.  It's like a CD, it's audio so --

 4            THE COURT:  So we've got an audio and a video

 5    DVD in evidence?

 6            MS. KAISER:  Yes.  Then the transport of the

 7    defendant was a -- the transport of the defendant

 8    from the arrest site to the sheriff's office was

 9    introduced by the defendant.

10            THE COURT:  That's in DVD format, as well?

11            MR. TRAGOS:  CD, Your Honor.

12            MS. KAISER:  But I think even though they're

13    in CD formats, I think you're going to need a

14    computer to play them.  I don't think you can play

15    them on a CD player.

16            MR. TRAGOS:  I think what they need is a

17    laptop.

18            THE COURT:  That's what I was thinking.

19            MR. TRAGOS:  Which would take care of all

20    their needs.

21            THE COURT:  Would a laptop assist them?  Now,

22    you know, there's a couple ways we can do this.  But

23    because there's more than one exhibit and one of

24    them is fairly lengthy, if we provide it to them, I

25    want to give them a strong cautionary that it's not
```

1      to be used except to view the exhibit, which they're

2      obviously entitled to do.

3           The other protocol is to bring them in here

4      and we clear the courtroom.  But if y'all are in

5      agreement that we can provide them with a laptop and

6      you can agree on one, we've just got to make sure --

7      well, actually, I've not one in chambers, don't I?

8           COURTROOM DEPUTY CLERK:  Yes, sir.

9           MR. TRAGOS:  Is it -- is it devoid of anything

10     that we wouldn't want them to see?

11          THE COURT:  It's the one that the law student

12     interns use from time to time.  There's nothing on

13     it --

14          MR. TRAGOS:  Oh.

15          THE COURT:  -- that I'm aware of.  But I would

16     tell them it can only be used to view the evidence.

17     And they're not to -- let me go get that and we'll

18     see right now if it's DVD compatible.  Well, I think

19     he's got the court's exhibit.  Is that a DVD?

20          MR. TRAGOS:  We have some that you could use.

21          THE COURT:  I just want to test it to see if

22     it works.

23          COURTROOM DEPUTY CLERK:  I can get one

24     tomorrow.

25          MR. TRAGOS:  We have a DVD.  You can use that

1    one.  And it's video, too, so --

2    (Brief pause.)

3         THE COURT:  I don't know where our laptop is.

4    Ms. Ohle confirms she can have one here ready to go

5    at 9:00 AM.  I'll see to it that it is clean.

6         You're welcome to be here if you want to be

7    here at 9:00.  But I'm going to give them a written

8    instruction that it's only to be used to view

9    evidence.  Now, I'll just send that in with them.

10        MR. TRAGOS:  We have no objection to that

11   procedure.

12        MS. KAISER:  No objection, Your Honor.

13        THE COURT:  Y'all need to be on 15-minute

14   telephonic standby.  I know that's a problem for

15   you, but --

16        MR. TRAGOS:  I was just wondering in the

17   morning if the -- could you let me come a little bit

18   later tomorrow morning?

19        THE COURT:  Oh, yeah.  You don't need to be

20   here at 9:00 unless you want to.  But we'll have

21   that set up for them and I guess a plug-in so in

22   case the battery goes dead, Anne.

23        COURTROOM DEPUTY CLERK:  Yes, sir.

24        THE COURT:  We can use this one.  This one is

25   in here somewhere.  Kristin has got it.  Other than

1        that, just be by 15-minute telephonic standby

2        tomorrow.

3                MR. TRAGOS:  Do you have something happening

4        here tomorrow?

5                THE COURT:  No, I did.  I canceled that trial.

6        I didn't think we could get a jury picked today.

7        All right.  We'll be in recess, then, tell 9 o'clock

8        tomorrow morning.

9        (Hearing adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH   )

5          I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 242, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 16th day of February 2009.

19

20

21            _____/s/ Linda Starr_____
                   Linda Starr, RPR, Official Court Reporter
22

23

24

25