1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION

3       UNITED STATES OF AMERICA,

4          Petitioner,

5              vs.              CASE NO. 8:08-CR-318-T-27TGW
                               14 NOVEMBER 2008
6                              TAMPA, FLORIDA
                               PAGES 1 - 171
7
        CHARLES FRIEDLANDER,
8
           Defendant.
9
        _____/
10
                     TRANSCRIPT OF MOTIONS HEARING
11          BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
12
        APPEARANCES:
13
        For the Petitioner:  **Amanda C. Kaiser**
14                           United States Attorney's Office
                             Middle District of Tennessee
15                           400 N. Tampa Street
                             Suite 3200
16                           Tampa, Florida 33602

17      For the Defendant:   **George E. Tragos**
                             Tragos & Sartes
18                           Suite 800
                             601 Cleveland Street
19                           Clearwater, Florida 33755

20      Court Reporter:      Linda Starr, RPR
                             Official Court Reporter
21                           801 N. Florida Avenue
                             Suite 13B
22                           Tampa, Florida 33602

23       Proceedings recorded and transcribed by
        computer-aided stenography.
24

25

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This

 2    Honorable Court is now in session, The Honorable

 3    James D. Whittemore residing.

 4              Please be seated.

 5              THE COURT:  Good morning.  Let's get the

 6    appearances on the record.  For the government?

 7              MS. KAISER:  Good morning, Your Honor.  Amanda

 8    Kaiser on behalf of the United States.

 9              THE COURT:  For the defendant?

10              MR. TRAGOS:  Your Honor, George Tragos, Peter

11    Sartes, and with the court's permission, in order to

12    operate our computer equipment, we have Tim Batelli,

13    a second year law student and our law clerk with us.

14              THE COURT:  Your client is not present?

15              MR. TRAGOS:  Yes.  The client is the next

16    person.

17              THE COURT:  Oh, I sorry.  I thought you said

18    three people.

19              MR. TRAGOS:  Well, Mr. Sartes is temporarily

20    missing.

21              THE COURT:  So I'm not missing things.

22              MR. TRAGOS:  You're not.  This is

23    Mr. Friedlander, Your Honor, the defendant is also

24    present.

25              THE DEFENDANT:  Good morning.
```

1          MR. TRAGOS:  Also, with the court's

2     permission, Mr. Friedlander has a diabetic condition

3     therefore, he does have food in the courtroom.  I

4     would like to inform the court of that, and with the

5     court's permission, I would like him to keep it in

6     the courtroom?

7          THE COURT:  All right.  Just keep -- as far as

8     today I'm not as concerned, but in terms of the

9     trial that should be discrete.

10         MR. TRAGOS:  Yes, Your Honor.

11         THE COURT:  We're set for trial Monday

12    morning.  We have a number of motions that -- I'm

13    fighting with this lamp.  Excuse me.  Ms. Kaiser,

14    you filed something this morning?

15         MS. KAISER:  Yes, Your Honor.

16         THE COURT:  What did you file?

17         MS. KAISER:  I filed an amended motion to

18    exclude the defense expert.

19         THE COURT:  When do you expect me to read

20    that?

21         MS. KAISER:  Well, Judge, the reason it was

22    filed when it was is I got the expert report -- one

23    of the three expert's report late yesterday.  So I

24    didn't have it before to draft the motion any

25    earlier than I did.  I didn't have the report for

1    their main expert, or what I consider their main

2    expert.

3         THE COURT:  Does the substance of your

4    position remain the same?

5         MS. KAISER:  Yes, although I've added some

6    additional bases that I didn't really address in my

7    previous motion based on the report.  The report

8    that I got yesterday indicated that they propose a

9    Dr. Berlin to testify to such matters as the

10   defendant's not a pedophile.

11        They want to talk about hypothetical internet

12   fantasy chats.  And he -- in his letter, Dr. Berlin

13   mentions that he examined -- or he wants to testify

14   basically to whether or not the defendant has some

15   sort of psychiatric disorder that could predispose

16   him to have sex with a child.

17        And this report, where I've barely had enough

18   time to read it once or really absorb it, but it

19   appears that Dr. Berlin's testimony is completely

20   inappropriate under 704(b).

21        THE COURT:  I didn't ask you to argue it.  I

22   just wanted to know if the position is in substance

23   the same.

24        MS. KAISER:  It's in substance the same, Your

25   Honor, but I have identified additional grounds for

1        exclusion of the testimony.

2            THE COURT:  All right.  Mr. Tragos, have you

3        given notice that you have an insanity defense?

4            MR. TRAGOS:  No, Your Honor.  This is not an

5        insanity defense.

6            THE COURT:  You realize all the cases that

7        you -- the two of you have cited deal with the

8        introduction or admissibility of expert testimony as

9        it relates to insanity defenses.

10           MR. TRAGOS:  Your Honor, the --

11           THE COURT:  Yes or no?

12           MR. TRAGOS:  All of them?  Hold on one second.

13           THE COURT:  The ones that are pertinent.

14           MR. TRAGOS:  If the court will just give me

15       one second, I will --

16           THE COURT:  *Thigpen* for example.

17           MR. TRAGOS:  Excuse me?

18           THE COURT:  *Thigpen*.

19           MR. TRAGOS:  Yes, Your Honor.

20           THE COURT:  And I want to know why you noticed

21       these experts so late.

22           MR. TRAGOS:  Okay.  Your Honor, if the court

23       remembers, at the October 3rd pretrial, the defense

24       at that time moved for a continuance, which the

25       court denied, and the state agreed that there was a

1    huge volume of items and did not oppose a

2    continuance because of the volume.

3         On the 17th of October, Your Honor, we filed a

4    motion with the court.  The court referred it, I'm

5    assuming, I didn't see no -- the court referred it

6    to the magistrate with regards to discovery and

7    asking for the government to give us an early

8    disclosure of the exhibits because of the huge

9    volume in this case.

10        The magistrate said, the defendant has

11   demonstrated that in light of the voluminous

12   production of materials it would be unduly

13   burdensome for the defendant to review all the

14   materials prior to trial.  On the other hand,

15   there's no apparent prejudice to the government from

16   requirement that it produce exhibit lists a few days

17   early.

18        The magistrate recognized the huge volume.  We

19   attached an exhibit to this document which is called

20   a file overview, which was given to us by the

21   prosecution.  The file overview goes through and

22   says things like, there are 12,963 graphics.  There

23   is --

24        THE COURT:  What's your point?

25        MR. TRAGOS:  My point is it took us this long

1       to go through this discovery to figure out what's

2       actually in the government's case.  Plus, the

3       government gave us on November 7th an additional

4       packet of discovery in this case which deals

5       directly with -- and it's stuff I've been asking

6       for, but it deals directly with the government's

7       case and a totally independent investigation of the

8       defendant conducted by another law enforcement

9       agency in another part of the state.

10          THE COURT:  What does that have to do with

11      your experts being noticed last week?

12          MR. TRAGOS:  My experts, Your Honor, needed to

13      know what was in the discovery, as we did, in order

14      to make any determinations.  We didn't know what

15      kind of experts we needed till we saw the discovery

16      and went through it.  And it took us that long to go

17      through it.

18          THE COURT:  This is a one count indictment.

19          MR. TRAGOS:  Your Honor, it might be one

20      count --

21          THE COURT:  Hear me out.  It's a one count

22      indictment.

23          MR. TRAGOS:  Yes.

24          THE COURT:  You've been on this case since

25      August the 7th.

1          MR. TRAGOS:  Yes.

2          THE COURT:  I've denied the motions for

3     continuance.

4          MR. TRAGOS:  Yes.

5          THE COURT:  I've given you a date certain, as

6     you asked for.

7          MR. TRAGOS:  Yes.

8          THE COURT:  And now I'm dealing with experts

9     identified, noticed a week ago or thereabouts --

10         MR. TRAGOS:  Yes.

11         THE COURT:  -- and now motions for continuance

12    by the government because of that.

13         MR. TRAGOS:  Your Honor, the government on

14    Monday gave me the resumes of their experts.

15         THE COURT:  Well, only in response to yours,

16    Mr. Tragos.

17         MR. TRAGOS:  No, Your Honor.  These experts

18    are not psychiatric experts.  These were their

19    computer experts.  When they gave me the initial

20    response to Rule 16, they said we may use some

21    computer experts.  On Monday, I get who their

22    computer experts are -- well, I get the resumes of

23    the computer experts on Monday.

24         So they give me their resumes on Monday.  They

25    got our resumes on Friday or Monday.

1          THE COURT:  Well, then, y'all have a lot of

2     work to do because we have a trial Monday morning.

3          MR. TRAGOS:  And, you know, Your Honor, we can

4     be ready for trial.

5          THE COURT:  You will be ready.

6          MR. TRAGOS:  And but -- what I'm just telling

7     the court is that we're doing it in as timely a

8     fashion as we possibly could do it under the time

9     constraints that are involved here.  I may have been

10    on this case since August 7th, but discovery wasn't

11    presented to me then.  I got discovery October 3rd,

12    some of the discovery October 3rd.  I got discovery

13    November 7th -- mailed to me the 7th, I got it the

14    10th -- November 7th.

15         Your Honor, 10 days before the trial I get

16    more discovery about a case.  I've been asking for

17    it because I knew that other case existed and I knew

18    that other things existed, and I finally got them.

19         But, Your Honor, you're right.  I can be ready

20    for trial on Monday, but I don't think that it's --

21    I don't think that it's proper to exclude my experts

22    as she wants to do because of the fact of a late

23    notice, considering how I got discovery and when

24    they even gave me their expert resumes on Monday, a

25    different issue.

1          And we have now computer -- they gave me those

2     on Monday.  We have computer guys now -- I've

3     provided their resumes to the government.  But we

4     have consumer experts, and I didn't notice that

5     they're being challenged or not for late notice.  I

6     don't think that -- I didn't really -- wasn't able

7     to read this supplemental or amended that she just

8     gave me this morning.

9          But we have computer experts that are going to

10    testify that are right now looking at the stuff

11    because we've discovered when looking at the stuff

12    that it's not all there, all the computer material.

13    My experts tell me that there are tens of thousands

14    of files that were not provided to me because what

15    the government did is it went through and gave me

16    what they thought was relevant files.

17         And when we finished looking through them, we

18    discovered how much more additional files there were

19    on those computers than we -- and the court knows

20    from past experience, I'm sure, that when the

21    government totally analyzes a computer, there are

22    times when the government's gotten continuances

23    because the FBI or whoever it is that was doing the

24    analysis needed additional time because it does take

25    time to review an entire computer.

1        And, you know, I've got experts right now

2    because we got -- we requested on Friday clones of

3    the computer's hard drive.  We received those clones

4    yesterday, I believe.  And my experts are working on

5    them right now because I've told them that we're

6    going to trial on Monday.  So they're working on it

7    right now to review all those.

8        But we're -- we did this as quickly as we

9    could under the time constraints we had and under

10   the volume of discovery and the discovery as it came

11   in from the government.  And all that discovery is

12   relevant to my experts' opinions because my client's

13   past conduct is relevant to their expert opinions.

14       Now, I think back to the court's initial

15   question about insanity, Your Honor, you want to go

16   back to that?

17       THE COURT:  No.  Your motion, Ms. Kaiser.

18   Docket 75, your motion to continue trial.

19       MS. KAISER:  Your Honor, shall I respond to

20   Mr. Tragos' comments.

21       THE COURT:  I think you should respond to what

22   I asked you to.

23       MS. KAISER:  Yes, Your Honor.  Judge, the

24   government is prepared to go to trial on Monday but

25   it sort of depends on the court's ruling as to the

1    experts.  Obviously, with just getting an expert's

2    report last night for one of the three proper

3    defense experts, the government hasn't had the

4    ability to go and either consider whether or not it

5    needs an expert to counteract any defense testimony.

6         I didn't know till yesterday really what even

7    Mr. Berlin was going to testify to without going

8    into why I don't think that is -- his testimony is

9    appropriate, anyway.  But so, really, the government

10   does not need a continuance if the court were to

11   exclude these experts.  So the government is ready

12   to go on Monday.

13        The only real monkey in the wrench, so to

14   speak, is the late notification of these experts.

15        THE COURT:  What are these computer experts

16   that Mr. Tragos alludes to that you've noticed late?

17   Who are they?

18        MS. KAISER:  Well, I didn't notice them late,

19   Judge, just so the record is clear.  Mr. Tragos has

20   had two discs of material, FTK material.  What

21   happen is when law enforcement seizes a computer,

22   the ICE agents make a mirror image of the

23   defendant's hard drives.  And then together with the

24   case agent, they go through and pull out information

25   that they think is relevant to the case, much like

1       if it was a financial investigation, say, a bankers

2       box full of documents, they pull out what's relevant

3       to the case.  That's what they do with the computer

4       evidence, as well.

5           Mr. Tragos has had those discs that contain

6       all the information that was pulled for months.  So

7       he's had the forensic reports for months.  What he's

8       talking about is their one page -- it's the ICE

9       special agent who prepared those reports that he

10      has, and he has the discs.

11          It's just their little resume that says their

12      training, and I believe it's a one or two page

13      document.  But he's had all the substance and all

14      the substantive reports of these experts for months.

15          THE COURT:  What is the ICE agent going to

16      testify to?

17          MS. KAISER:  Very simply, the ICE agent's just

18      going to testify that they received the computer and

19      they made a mirror image of the computer like they

20      always do, and then they went through the computer

21      with knowledge of what the case -- how the defendant

22      was charged and pulled out what they believed to be

23      relevant evidence for the case.

24          So the -- the only thing that they're going to

25      do is identify the defendant's own e-mails and

1     pictures that were on the defendant's computer.

2          THE COURT:  And then the undercover agent who

3     allegedly communicated with the defendant will

4     testify?

5          MS. KAISER:  Correct, Your Honor.

6          THE COURT:  How long is the government's case

7     in chief?

8          MS. KAISER:  I would say about two to three

9     days.

10          THE COURT:  Why so long?

11          MS. KAISER:  There's a very long interview of

12     the defendant that's approximately three hours in

13     length.  There's a number of chats that need to be

14     read into the record between the undercover and the

15     defendant.

16         There's a second investigation that was

17     conducted with a Port St. Lucie sheriff -- excuse

18     me, Your Honor -- in which the defendant had made

19     plans to have sex with that detective's handicapped

20     11-year-old daughter.

21          THE COURT:  What does that have to do with the

22     charge in the indictment?

23          MS. KAISER:  It's relevant conduct, Your

24     Honor.  It's relevant under 404(b) to show his

25     intent.

1          THE COURT:  Do you need it?

2          MS. KAISER:  Yes, Your Honor.

3          THE COURT:  You don't have enough with the

4     agent who communicated with him on whatever internet

5     or instance message, however it was done?

6          MS. KAISER:  Your Honor, the government would

7     be in a better position to respond more accurately

8     if -- if the government had the benefit of knowing

9     how the court was going to rule on the 404(b).

10         THE COURT:  Well, you don't have the benefit,

11    Ms. Kaiser.  Just assume -- it's your job to prove

12    this case beyond a reasonable doubt.  I'm asking you

13    what your case in chief is.  You're not going to be

14    putting mental health experts on in your case in

15    chief, you know that.

16         MS. KAISER:  Right.  Well, if the

17    government's -- if the government's defense is that

18    he wasn't predisposed to --

19         THE COURT:  You mean the defendant's defense.

20         MS. KAISER:  I'm sorry.  If the defendant's

21    defense is that he wasn't predisposed to commit this

22    crime, then the government should be allowed to put

23    evidence on to show that he had the intent and --

24         THE COURT:  Is predisposition a defense?

25         MS. KAISER:  It goes to show his intent in

1       meeting -- basically, the defendant wants to say

2       this was -- based on his expert notice, he wants to

3       say this was some sort of fantasy.  So the fact that

4       he --

5               THE COURT:  Again, you're getting into the

6       defense.  I want to know how you're going to prove

7       this case in your case in chief.  Assuming

8       Mr. Tragos doesn't put any witnesses on.

9               MS. KAISER:  Yes, Your Honor.

10              THE COURT:  He has no burden to.

11              MS. KAISER:  Yes, Your Honor.

12              THE COURT:  Tell me what your case in chief

13      is.

14              MS. KAISER:  I'm going to put my case agent on

15      to show that he had communicated with the defendant

16      for the underlying charge that's charged.  All

17      right.  Then he realized that he had chatted with

18      the defendant three years prior along the very same

19      lines of the recent chats.

20              And then approximately five months before he

21      chatted with Mr. Friedlander recently, another

22      detective from Port St. Lucie chatted with the

23      defendant about having sex with that undercover's

24      daughter.  So it certainly shows the lack of

25      mistake, a lack of fantasy.  It goes to show his

1       intent and it's relevant to the charges.

2           THE COURT:  The defendant is charged with

3       knowingly attempting to persuade, induce, entice or

4       coerce an individual underage by using a facility

5       and means of interstate commerce.  This is the chat

6       with the agent concerning the two adolescent males?

7           MS. KAISER:  Yes, Your Honor.

8           THE COURT:  And you have proffered through

9       your pleadings that you have evidence that the

10      defendant actually traveled from Ft. Myers up to the

11      Bay area --

12          MS. KAISER:  Yes, Your Honor.

13          THE COURT:  -- incident to these chats.

14          MS. KAISER:  Yes.

15          THE COURT:  Right?

16          MS. KAISER:  Yes, Your Honor.

17          THE COURT:  What more do you need to prove

18      your case in chief?  I'm not suggesting it's

19      convincing or not.  I'm just simply asking

20      evidentiary-wise, what more do you need to prove the

21      essential elements of the offense?

22          MS. KAISER:  Well, I have to show that

23      Mr. Friedlander had the intent.  And I believe part

24      of the way the government shows that is to show how

25      he's acted and show his -- show evidence that is

1    illustrative of his intent and his -- and that can

2    be shown through the prior chats with the detective

3    that he chatted with recently, and also the chats

4    that he had with Port St. Lucie approximately five

5    months earlier.

6         So that goes to show the defendant's intent.

7    And 403 is to be applied very sparingly.  So I don't

8    know if the court wants to hear arguments, but under

9    404(b), it's certainly relevant to Mr. Friedlander's

10   intent.

11        THE COURT:  Well, you have evidence of his

12   intent without that evidence; correct?

13        MS. KAISER:  Yes.

14        THE COURT:  You just want to buttress your

15   evidence by similar act type evidence.

16        MS. KAISER:  Correct.

17        THE COURT:  Without the similar act type

18   evidence, how long a case is this as far as the

19   government's case in chief?

20        MS. KAISER:  If the court rules no --

21        THE COURT:  I just asked you hypothetically,

22   how long is your case without all of that other

23   similar act evidence.

24        MS. KAISER:  Probably about two days.

25        THE COURT:  And that's primarily because you

1        have a three-hour taped interview.

2                MS. KAISER:  Yes, Your Honor.

3                THE COURT:  Are you going to redact any of

4        that in light of the motions?

5                MS. KAISER:  Well, Your Honor, the defense --

6        I had redacted part of it because in the beginning

7        of the tape, the defendant is sitting in a room by

8        himself before the detective starts the interview.

9        The defendant was having a lot of stomach problems

10       and passes gas extensively for about 20 minutes

11       before he --

12               THE COURT:  Well, that's not what I'm talking

13       about.  I'm talking about the commentary about

14       Florida law and things of that nature.

15               MS. KAISER:  Well, Your Honor, if I may,

16       Mr. Tragos said he wanted the entire portion of when

17       Mr. Friedlander is sitting in the room by himself

18       aired for the jury.  So this morning Mr. Tragos said

19       he wanted that whole portion where he's sitting by

20       himself played, as well.  So the government had

21       redacted that, and Mr. Tragos said that would make

22       it longer.

23               THE COURT:  The government doesn't put on

24       evidence at the direction of a defense lawyer,

25       obviously.  I just want to know if you are willing

1          or voluntarily going to redact those portions which

2          the defendant objects to dealing with the detective

3          opining as to certain medical issues and certain

4          state laws that may or may not have been violated.

5                  MS. KAISER:  No, Your Honor.  No.

6                  THE COURT:  What's the relevance of that?

7                  MS. KAISER:  Well, first -- first, Your Honor,

8          the way the defense motion's written, the detective

9          isn't testifying.  So the motion's incorrect where

10         Mr. Tragos says he -- there's a motion to exclude

11         expert testimony.  He's not testifying.

12                 What it is, it's an interview with the

13         defendant.  And during that interview, the defendant

14         makes a number of statements which are -- are

15         relevant.  He says that he has the -- the second

16         type of diabetes.  It's not the first type.  It's

17         not the juvenile onset diabetes.  He has the type

18         two.  He doesn't really have very many problems with

19         that at all.

20                 And he makes a number of statements along

21         those lines, and it's just a conversation.  It

22         puts -- it puts the rest of -- it puts the

23         defendant's responses in context.  The detective is

24         not going to take the stand and proffer any expert

25         testimony with respect to diabetes at all.

1           What Mr. Tragos is talking about is just a

2    give and take in the interview which the defendant's

3    statement would not make sense if you didn't know

4    the give and take between the defendant and the

5    detective.

6           The other portion -- and it's relevant

7    especially since Mr. Friedlander wants to proffer a

8    defense that his diabetes somehow precluded him from

9    forming the intent to commit the acts in this case.

10          THE COURT:  That's some type of mental

11   health -- mental competency defense, and that's not

12   what I'm reading his papers to be.

13          MS. KAISER:  Well, Your Honor, he also gave

14   notice on an endocrinologist.  So he has provided

15   the -- a couple sentence summary.  I have no

16   reports.  But Mr. Tragos has indicated he wants his

17   treating endocrinologist to testify about his

18   diabetes.

19          THE COURT:  All right.  So you are prepared

20   for trial as far as your case in chief; you are

21   concerned about what may come in as part of the

22   defense and your ability to be able to meet that.

23          MS. KAISER:  Exactly, Your Honor.

24          THE COURT:  All right.  Mr. Tragos, your

25   response to the motion to continue.

1          MR. TRAGOS:  Your Honor, first -- and the

2     court will note in the motion, we have a -- we have

3     no objection to the government's motion.  Although

4     we are -- we would be ready for trial.  The reason

5     we have no objection is because, honestly, the

6     court -- I understand the government's position.

7     And I understand because in their motion they said

8     they couldn't get an expert available I think until

9     January.  Is that right?

10         And I know, because we have the same problems

11    with finding experts, getting them and having them

12    available.  And so that's why -- that's one of the

13    reasons why it's taken us this long to do this.  So

14    I do understand that.

15         And I wouldn't -- we have waived speedy trial,

16    I believe, already till the end of the month and --

17    but again, if it's -- we are ready -- we're ready

18    from our side to go on Monday.  Our experts are

19    working almost day and night to be ready for the

20    trial.

21         The court asked the issue and I think this

22    related to what the court asked me about the motion

23    to continue about the redaction, is that related to

24    the motion to continue?  Because we can --

25         THE COURT:  No.  It was really just my

1    assessment of the length, duration and nature of the

2    government's case in chief, which is the first

3    consideration.

4         MR. TRAGOS:  Okay.  Because as I say, we have

5    about -- we have the actual clips from that

6    interview if the court wants to see them.  We

7    prepared just the clips.

8         THE COURT:  I'm not interested in that.

9         MR. TRAGOS:  Okay.

10        THE COURT:  I'm just interested in how long

11   the case was and why it was going to take three days

12   on a one count indictment.

13        MR. TRAGOS:  They're also, Your Honor, on

14   their computer expert, it will probably be an

15   extremely long cross-examination because of the fact

16   that, again, they pick and choose what they took off

17   the computer, and there's a lot of other files and

18   documents on the computer, how they did it,

19   methodology, those kinds of things may make for an

20   extremely long cross-examination.

21        But I think that she's correct that without

22   404(b) or all of the other extrinsic evidence they

23   want to put in that two days is probably correct for

24   the case in chief of the government.  Again, if

25   that's what the court's asking.

1          THE COURT:  All right.  Thank you.  I do not

2     intend to continue this case.  I understand the

3     government's dilemma, but I'm not convinced we're

4     going to be hearing all of this expert testimony.

5     And if some or all of it is not presented, then this

6     case can be tried efficiently and effectively next

7     week without problems.

8          So provisionally, I'm going to deny the motion

9     to continue.  Again, this case was set on a date

10    certain as requested.  It has been scheduled after

11    at least two conferences with counsel, and counsel

12    were on notice as a result of those conferences that

13    the case would not be continued beyond this trial

14    term.

15         I am not particularly impressed with the late

16    notice of these experts.  That's a nice way of

17    saying that this should have been done a long time

18    ago.

19         All right.  We have -- I'll try to take them

20    in order.  We've got a number of motions in limine,

21    looks like the earliest of which was docket 47.  The

22    defendant's motion in limine to preclude the

23    government from presenting nude or explicit

24    photographs of adults and incorporated memo.

25    Mr. Tragos, your motion.

1           MR. TRAGOS:  Your Honor, this motion -- as the

2      court has heard, we received a lot of photos from

3      the government.  We received a lot of e-mails from

4      the government that, again, I guess their expert

5      thought was relevant.

6           One of the interesting parts about this is

7      there's no nude or sexual photographs of children.

8      And this is strictly consenting adults as far as we

9      can know.  The state has not noticed me that any of

10     these e-mails came from juveniles.

11          They've had the names of the individuals who

12     are the screen names of those who've provided the

13     e-mails.  So none of this deals with any juvenile

14     activity.  And we believe that the case law deals

15     specifically with the fact that if it's juvenile

16     activity, it might have some relevance.  But

17     strictly having sexual activity with an adult

18     doesn't have any relevance.

19          The case that the government has cited,

20     interestingly enough, did not put those items in

21     based on the fact that they were 404(b) for sexual

22     activity with adults.  One of the cases was because

23     the photograph was the same room as the child was

24     molested in that it became relevant, not because

25     there was sexual activity because it was with an

1      adult.  But the room was relevant and that's why the

2      picture was allowed in.  There is nothing in these

3      photos that would indicate that he was going to have

4      sex with a child.

5            Secondly, none of these -- at least we were

6      looking at the photos, and of the sexual photos,

7      they were all photos that were sent to him that --

8      they were not produced by him, again, the sexual

9      activity.  I'm not talking now about -- they've

10     noticed some just -- where he's just standing naked

11     in his -- in his home.

12           But none of the sexual activity photos, the

13     sadomasochistic-type photos are photos he produced

14     or distributed.  He received e-mails.  They were

15     attachments to e-mails.  And this is, again, from

16     what we're able to glean from what we saw.

17           So I don't see any relevance to the fact that

18     there were sexually explicit photos of adults on his

19     computer to the charge of this crime which, again,

20     is not possession of child pornography, which was

21     another issue in some of those other cases.  There's

22     no child pornography.

23           THE COURT:  All right.  Thank you.  Response.

24           MS. KAISER:  Yes, Your Honor.  Mr. Tragos is

25     correct.  In distinguishing child pornography cases,

1       this is not a child pornography case.  This is what

2       we refer to as a traveler case.  And within the

3       statute, we're required to prove that it would have

4       been an offense under criminal -- under criminal law

5       if the activity had taken place.  And under state

6       law, under the lewd and lascivious statute for

7       Florida, it's --

8           THE COURT:  What adult nude pictures or even

9       adult pornography, what does that have to do with

10      this case?  What's the relevance.

11          MS. KAISER:  The images are not just nude

12      males, Judge.  It's not just homosexual --

13          THE COURT:  Females, too.

14          MS. KAISER:  Judge --

15          THE COURT:  What's the relevance?  They're

16      adults.

17          MS. KAISER:  The images are of men that are

18      tied up and being spanked, which is precisely the

19      same activity that the defendant wanted to engage in

20      with the undercover officer's children.

21          In this case the defendant chatted about tying

22      the boys up to either a chair or couch, stripping

23      them, whipping them.  He kept saying that he would

24      bring his razor straps so they could beat them

25      before they engaged in the sexual activity.

1        THE COURT:  So this is basically male bondage

2    type photography?

3        MS. KAISER:  Yes.  It's sadomasochistic

4    images.

5        THE COURT:  And that's it?  That's the extent

6    of these photographs that Mr. Tragos is concerned

7    about?

8        MS. KAISER:  Yes.  Your Honor, there was also

9    other -- other pornography, such as bestiality, such

10   as coprophilia --

11       THE COURT:  What does that have to do with

12   this case?

13       MS. KAISER:  What I'm saying is there was a

14   plethora of other photography that the government

15   didn't select.  The only images that the government

16   selected were the ones that we believe were directly

17   relevant to his interest in sadomasochistic

18   behavior.

19       THE COURT:  All right.  Describe those that

20   you intend to introduce now.  Male bondage?

21       MS. KAISER:  Male bondage, people getting

22   whipped.

23       THE COURT:  People?

24       MS. KAISER:  Men getting whipped.

25       THE COURT:  Male, female, children, adults?

1          MS. KAISER:  Males.  And images also of men

2     being restrained that are sexual in nature.  And the

3     e-mails that --

4          THE COURT:  We're just talking about

5     photographs.  I'm sorry.  You're talking about the

6     case in chief e-mails?

7          MS. KAISER:  Yes, Your Honor.

8          THE COURT:  Go ahead.  How do these pictures

9     of these males in these various scenarios, how is it

10    relevant to the particular e-mails that the

11    government's building its case on?

12         MS. KAISER:  Your Honor, they show his intent

13    that he's into this precise behavior.  This is a

14    very extreme type of interest that the government

15    needs to establish.  And this -- the fact that he

16    has sadomasochistic images depicting the very same

17    behavior that he indicates he wants to perform on

18    the undercover's children is certainly relevant and

19    illustrative of his intent.

20         THE COURT:  Do you think this is a 404(b)

21    analysis?

22         MS. KAISER:  Yes, Your Honor.

23         THE COURT:  Mr. Tragos, would you agree at

24    least with that?

25         MR. TRAGOS:  Oh, Your Honor, this is the first

1   time she's said that because she's given it two

2   ways.  She says extreme --

3         THE COURT:  I don't care what she said.  I'm

4   asking if you agree.  Is it 404(b) or not?

5         MR. TRAGOS:  Yes.

6         THE COURT:  I just want to make sure I'm

7   looking at the right standards.  All right.  So we

8   now know that these nude images deal with adults.

9   She's not going to put on bestiality.  Are these

10  heterosexual or homosexual or just individuals by

11  themselves, activities, that is?

12        MS. KAISER:  I believe most of the images,

13  Your Honor, are one person in the picture.  There

14  may be a couple where someone's actually engaged in

15  the whipping, so there may be images where there's

16  two people.

17        THE COURT:  And that's the extent of your

18  proof, then; right?

19        MS. KAISER:  With respect to the photographs.

20        THE COURT:  Right.

21        MS. KAISER:  Correct.

22        THE COURT:  Okay.  Response, Mr. Tragos.

23        MR. TRAGOS:  Your Honor, first off, the case

24  deals with his intent to have sex with the children.

25  The physical abuse aspect is not actually an element

1       of the case.  Secondly --

2             THE COURT:  It may not be an element but it's

3       evidence.

4             MR. TRAGOS:  It could be.  But I'm just saying

5       it's not --

6             THE COURT:  It's in the e-mails; correct?

7             MR. TRAGOS:  The -- the -- yes, it is.  It's

8       in the e-mails.  But, again, those e-mails -- even

9       the e-mails never deal with adults.  The e-mails on

10      the bondage and all those things, the e-mails are

11      talking about children.

12            These pictures are similar to, for instance,

13      if someone is accused of rape, then pictures of a

14      person having sex with another consenting adult, is

15      that evidence of the rape.  And that's what we've

16      got here is he may -- it may be a crime and the

17      crime they're charging is this intent to have sex

18      with children, but it is not evidence of having sex

19      with children that you had sex with adults, or that

20      you had any activity with an adult, because the

21      activities with an adult do not establish a crime or

22      are not evidence of a crime.

23            Plus, these were all images sent to him,

24      attachments on e-mails, not pictures that he

25      created, that he distributed or that he produced.

1          THE COURT:  But he kept them on his computer

2     in a file of some sort?

3          MR. TRAGOS:  Some, yes; some, no.  Some of

4     those pictures -- and that's one of the reasons

5     we're having it analyzed is we're trying to figure

6     out, some of those pictures he did not save to his

7     computer.

8          I don't know if the court is familiar and I

9     think the court has done probably other cases like

10    this, what's known as a temp file where if somebody

11    sends you something, even though you may not

12    manually save it to a file, it's saved to a

13    temporary file automatically and is on your

14    computer.  You don't have to do anything for it to

15    be saved on that computer.

16         And I think some of these -- some of these

17    pictures, Your Honor, he did not save them to a

18    file.  He didn't do anything that saved them to a

19    file.  He had to do nothing.  The computer

20    automatically saved them because they came in an

21    e-mail as an attachment.

22         And that -- that's of particular concern since

23    he did not do anything to save them.  But again, the

24    relevance of sexual -- consenting sexual activity

25    with adults and not activity he participated in, I

1    believe that that has no relevance, especially under

2    a 404(b) analysis, no relevance to the crime

3    charged.

4        THE COURT:  All right.  Based on the proffer

5    from Ms. Kaiser, these photographs depict males in

6    acts or situations similar or identical to those

7    described in the e-mails sent by the defendant to

8    the agent.  I will find that under a 404(b)

9    analysis, this evidence is relevant to intent.  They

10   are found in the possession of the defendant.

11       There may be some question about whether they

12   were saved or not.  But they are in his possession.

13   There's sufficient evidence to establish that from

14   the standpoint of being extrinsic.  And last, I do

15   find the probative value is not substantially

16   outweighed by unfair prejudice.  The defendant's

17   motion will be, therefore, denied.

18       I hope that you have anticipated some time

19   with me today including beyond the lunch hour.  Any

20   conflicts?

21       MS. KAISER:  No, Your Honor.

22       THE COURT:  All right.  I've got a short

23   suppression hearing I'd like to finish before noon

24   so, Anne, go ahead and have them here.  We have one

25   and a half witnesses left, and I don't want that to

1      interrupt our trial next week.  All right.  That was

2      docket 47.

3           MS. KAISER:  Your Honor, may I inquire?  Was

4      that -- docket number 47, was that for photographs

5      and e-mails?

6           THE COURT:  No.  That's just the photographs.

7           MS. KAISER:  Okay.

8           THE COURT:  It's a motion in limine to

9      preclude the government from presenting nude or

10     explicit photographs of adults.

11          MS. KAISER:  Thank you.

12          THE COURT:  The next docket entry is docket

13     48.  It's entitled motion in limine to preclude the

14     government from presenting e-mails or instant

15     messages of explicit correspondence with adults.

16     Mr. Tragos.

17          MR. TRAGOS:  Your Honor, this is a -- I guess

18     an even more difficult definition to grasp, I would

19     assume, and maybe we shouldn't -- that this is also

20     a 404(b) analysis that they are presenting on this

21     particular issue.

22          People would send e-mails to Mr. Friedlander,

23     and they would talk about things.  Some of the

24     things they would talk about is spanking,

25     discipline, those type of things.  And these are not

1    pictures.  Again, these are just e-mails with random

2    people.  And, Your Honor, of the total -- and this

3    is an estimate that my experts aren't sure of yet,

4    but it's an extremely small percentage of all the

5    activity on the computer.

6         And I would ask the court -- the court hasn't

7    seen any of these.  I don't know if the court wants

8    to see any of these e-mails to see what I'm talking

9    about as to conversations, but the government has

10   listed some so they may have some to show the court.

11   But I think the court probably should see what we're

12   talking about here.

13        And I think that it's going to become a

14   feature of the trial if we put in these photographs

15   and then we put in the e-mails.  And there's going

16   to be more information about adult activity in this

17   trial than there's going to be about him talking

18   about children, because there is no evidence that

19   any of these e-mails dealt with children.

20        Again, the government has had the ability to

21   track down who the e-mails were from.  They had the

22   screen names, and there is not single scintilla of

23   evidence that any of these conversations or e-mails

24   are with children.

25             THE COURT:  Thank you.  Ms. Kaiser, your

1        response.

2              MS. KAISER:  Yes, Your Honor.  The defendant

3        wants to paint an unfair impression for the jury as

4        to Mr. Friedlander's activities on his computer.

5        The e-mails that the government selected for

6        inclusion in the case under 404(b) are ones that he

7        drafted, not ones that -- just where some random

8        person sent him, but ones that he wrote himself

9        discussing spankings, beatings, wanting to get

10       together with other individuals to spank them, that

11       have to do with sadomasochistic activities.  So

12       these cases like the photographs are directly

13       relevant to establishing his intent.

14             Mr. Tragos wants to present this impression to

15       the jury that Mr. Friedlander is not involved in

16       this type of behavior, and it's just not true.  It's

17       a false impression.  And these e-mails clearly show

18       Mr. Friedlander's intent.  They're not ones that

19       were written by someone else, and it's -- and it

20       also negates any type of fantasy defense.  A number

21       of the e-mails --

22             THE COURT:  Well, there's where you're losing

23       credibility because you're now defending a defense.

24       This has to do with your case in chief.

25             MS. KAISER:  Yes, Your Honor.

1           THE COURT:  So either it's your case in chief

2      or you don't intend to present it in your case in

3      chief, but you may want to present it in rebuttal.

4      Two different things.

5           MS. KAISER:  Yes.

6           THE COURT:  So, you know, focus on that for me

7      so that I can understand how this is going to impact

8      our trial.

9           MS. KAISER:  Yes, Your Honor.  We believe that

10     his e-mails which discuss with -- in which he

11     discussing meeting and sadomasochistic activities,

12     and essentially describes the very type behavior

13     and -- for example, he mentions I'd like to -- and

14     I'm paraphrasing, obviously, but I want to use a

15     razor strop on you, or I have a number of razor

16     strops that I've had in my home.

17          Those type of implements which he mentions

18     with specificity in the e-mails are exactly the same

19     implements that he discusses with the undercover --

20          THE COURT:  Would you agree to limit the

21     presentation of these e-mails to those e-mails which

22     describe the specific acts or features of the

23     e-mails between the defendant and the agent, such as

24     the particular razor strops and --

25          MS. KAISER:  Right.  And the ones that

1      describe the activities that they wish to engage in?

2              THE COURT:  Yes.  My point is, is if you will

3      limit these e-mails to obviously the defendant's own

4      words, describing a feature or an aspect of that

5      which he discussed with the undercover agent

6      concerning the two adolescent males, then I think

7      you have a stronger argument.

8              MS. KAISER:  Yes, Your Honor.

9              THE COURT:  As opposed to just all sorts of

10     sadomaso -- I don't even know how to say that.  Say

11     that for me, Tragos.

12             MR. TRAGOS:  S and M is okay.

13             THE COURT:  S and M.  I mean, there's any

14     number of things.  He's referencing bestiality,

15     sexual activity, I mean, that's fairly generic.

16             MS. KAISER:  That's correct, Your Honor.  And

17     we have not put any e-mails or we have not

18     identified any e-mails that have to do with either

19     coprophilia or bestiality.  But we have identified

20     ones that have to do with beatings or spankings or

21     of physical punishment.  And the government would be

22     happy to limit it to just the ones that have to do

23     with physical punishment or beatings or instruments

24     of abuse.

25             THE COURT:  As referenced in the e-mails from

1    the defendant to the undercover agent which resulted

2    in the indictment, correct, not just any instruments

3    of abuse?

4         MS. KAISER:  Yes, Your Honor.

5         THE COURT:  Do you understand what I'm

6    limiting you to or suggesting that it be limited to?

7    If he talks about razor whips with the undercover

8    agent and you've got e-mails where he talks about

9    using razor whips, that's fair.  If you've got

10   e-mails that talk about electric choke collars but

11   he never mentioned that to the undercover agent,

12   purely as an example, that's not relevant.  Do you

13   understand the distinction?

14        MS. KAISER:  Yes, Your Honor.  What about

15   e-mails if he addresses spanking?  In the e-mails

16   where he addresses spanking, because he discussed

17   spanking with the undercover officer.

18        THE COURT:  If spanking is a word used in an

19   e-mail from the defendant to the undercover without

20   any further description and he uses the same word in

21   an e-mail to someone else, I think that's relevant

22   of intent, or to intent.

23        MS. KAISER:  Yes, Your Honor.

24        THE COURT:  But, again, I'm not suggesting

25   that other activities unrelated to that which he

1    described to the undercover agent would be relevant.

2    It would not be.

3           MS. KAISER:  Yes, Your Honor.

4           THE COURT:  Mr. Tragos has a point.  All

5    right.  How does that limit in terms of number --

6    and I realize we can't be precise but, I mean, have

7    we now limited it from 50 to 10, from 20 to three?

8           MS. KAISER:  I'd have to go back and look at

9    each one individually, but I'd say we probably maybe

10   cut it in half.

11          THE COURT:  From --

12          MS. KAISER:  From probably about 25.

13          THE COURT:  All right.  So we're not talking

14   about a great number.

15          MS. KAISER:  No.

16          THE COURT:  All right.  Response, Mr. Tragos.

17          MR. TRAGOS:  I thought the court gave an

18   order.

19          THE COURT:  I'm trying to get things out from

20   you two.  I have to play devil's advocate sometime.

21          MR. TRAGOS:  Your Honor, my response is that

22   these are, again, conversations with adults.  If

23   they're just wanting to show his propensity, which

24   is -- which is what I think they're trying to show,

25   that he has a propensity for sadomasochistic

1    activity, S and M, then they have done it by the

2    court allowing them to put those pictures in.  But

3    to keep on expanding that universe for that one

4    purpose I think is improper.

5         THE COURT:  Well, but you have to understand

6    or at least acknowledge that you may have a

7    plausible explanation for him receiving photographs

8    from any number of people, that's not the same as

9    him actually authoring in e-mail to someone

10   describing a similar type of act.

11        MR. TRAGOS:  Well, then, doesn't the authoring

12   of the e-mail, then, accomplish their purpose and

13   maybe the photographs are something that should not

14   allowed to be admitted because, again, of their -- I

15   think everybody will agree the photographs have far

16   more of an impact than the -- than the e-mails

17   would.

18        THE COURT:  You may be right.  But the issue

19   is not whether it's cumulative or necessary, it's

20   whether or not under 403(b) it's admissible.

21        MR. TRAGOS:  Well, I think there is an issue

22   about making something a feature of a trial.  And I

23   think that when you start adding this on, it becomes

24   a feature of the trial because it is something

25   beyond the scope of the charge because, again, no

1        juvenile's involved.

2               And that's the part that gives me pause is

3        that you can do something legitimate in your home

4        with an adult which is legal and that that becomes

5        evidence against you of a crime of something which

6        is illegal which is not the activity that you did at

7        home.

8               THE COURT:  I don't disagree with that, and

9        that may very well be what the jury thinks.  But if

10       the government thinks it should put on this

11       evidence, the only issue for me is whether it's

12       admissible under 403(b) -- or 404(b), excuse me.

13              MR. TRAGOS:  And I think we said 403, as well.

14              THE COURT:  403, 404.

15              MR. TRAGOS:  Right.  Both of them.

16              THE COURT:  I think my comments earlier

17       indicated I thought the government may be putting on

18       more than it needs to put on, but that's their

19       prerogative.

20              All right.  Again, the analysis is whether

21       it's relevant to an issue other than character.  For

22       the same reason the photographs would be relevant, I

23       find that the e-mails limited to those authored by

24       the defendant describing aspects or activities or

25       instruments which are also described in the

1    defendant's e-mails to the undercover agent would be

2    relevant to intent, because they were authored by

3    the defendant.   There's no question about this being

4    inadmissible extrinsic act.   Finally, I find that

5    the probative value is not substantially outweighed

6    by unfair prejudice.

7        I will, therefore, deny the motion in part and

8    limit -- grant it in part, grant it to the extent

9    that the government's presentation of these e-mails

10   with adults authored by the defendant are limited to

11   those which describe activities, instruments or

12   aspects of those same activities, instruments and

13   aspects described in the defendant's e-mails to the

14   undercover agent.

15       MR. TRAGOS:   Your Honor, I don't want to be

16   tricky with the court here.   I think the proper term

17   would probably be instant messages as opposed to

18   e-mails.

19       THE COURT:   Well, your motion said e-mails and

20   instant messages.

21       MR. TRAGOS:   Right.

22       THE COURT:   So when I say e-mails, I'm

23   including --

24       MR. TRAGOS:   Okay.

25       THE COURT:   -- anything authored by the

1      defendant in the format of an e-mail or an instant

2      message.  So you're telling me that these instant

3      messages are also saved in some manner on a

4      temporary basis?

5           MR. TRAGOS:  No, no.  The instant messages

6      were saved by the undercover officer.

7           THE COURT:  Well, that's not what we're

8      talking about, then.

9           MR. TRAGOS:  Well, we are.  We are.  That's

10     what we are talking about.

11          THE COURT:  Well, the subject of your motion

12     is not an instant message sent to some other adult.

13          MR. TRAGOS:  Right.

14          THE COURT:  That's gone forever.

15          MR. TRAGOS:  Right.

16          THE COURT:  Unless somebody copied it.

17          MR. TRAGOS:  No.  But the court said it's

18     limited to those things described in the e-mails to

19     the undercover.  Well, I think what the court really

20     intended to say --

21          THE COURT:  And/or instant messages --

22          MR. TRAGOS:  Right.

23          THE COURT:  -- to the undercover.

24          MR. TRAGOS:  Right.

25          THE COURT:  Thank you.  I was really focussing

1      on what was the subject of the motion, but you are

2      correct.  So docket 48 is granted in part, denied in

3      part.  Any question about the limitation,

4      Ms. Kaiser?

5           MS. KAISER:  No, Your Honor.

6           THE COURT:  The next docket number is docket

7      65, which is entitled motion to preclude the

8      government from admitting 404(b) evidence.

9           MR. TRAGOS:  Your Honor, that was amended by

10     docket number 67.  That's the most accurate --

11          THE COURT:  Which is the amended motion to

12     preclude --

13          MR. TRAGOS:  Right.

14          THE COURT:  -- the government from admitting

15     404(b) evidence, so we'll travel on that one.

16          MR. TRAGOS:  Yes, sir.

17          THE COURT:  All right.  So docket 65 is denied

18     as moot.  And we're now on docket 67.  Go right

19     ahead, Mr. Tragos.

20          MR. TRAGOS:  Your Honor, part of 67 the court

21     may have already resolved in our earlier arguments

22     on other motions, because the court found that with

23     limitations with reference to the e-mails and

24     photographs --

25          THE COURT:  All right.  Well, if so, just

1   limit the motion, then, to those matters that we

2   have not talked about.

3        MR. TRAGOS:  Right.  The government alluded to

4   a 404(b) issue with regards to prior chats.  And let

5   me explain, kind of.  In 2005, this same undercover

6   officer, Romanosky, had chats with Mr. Friedlander,

7   and they ended.  Detective Romanosky was using a

8   different screen name.

9        In early 2008, a detective in Port St. Lucie

10  had chats with Mr. Friedlander, and those eventually

11  terminated.

12       THE COURT:  What year?  I'm sorry.

13       MR. TRAGOS:  Early '08.  We have an '05 and an

14  early '08.  Around February March of '08.  And then

15  subsequent to that, Detective Romanosky, using

16  another screen name, has chats with Mr. Friedlander.

17  And Mr. Friedlander is -- and that results in him

18  driving up here from Ft. Myers and getting arrested.

19       What we're saying -- those particular issues

20  we're saying that the -- you know, the 2005 where

21  nothing happened but chatting and the 2008, early

22  2008 from Port St. Lucie, those I believe are --

23  would be considered 404(b), and we don't believe

24  that those are admissible evidence.

25       There was no drive-up.  There was -- in fact,

1    the conversations just ended.  They were just

2    conversations and nothing else with other

3    detectives.

4         THE COURT:  What was the subject of the

5    conversation?

6         MR. TRAGOS:  The subject of the conversations,

7    to be honest with the court, were similar to these.

8    They were similar.  They talked about children and

9    activities with children.  The --

10        THE COURT:  Spankings, whips, that kind of

11   thing?

12        MR. TRAGOS:  Yes.  Well, no.  I believe the

13   '08 did not talk about spankings.  All right.  I

14   believe '08 did not talk about spankings, the early

15   '08 conversations.  They were sexual in nature, but

16   I do not believe that they spoke about anything that

17   were spankings or anything that we considered

18   S and M.

19        The -- okay.  We talked about the photographs

20   already.  But the reason this is so broad, Your

21   Honor, is because the 404(b) notice that we received

22   basically covered all of the evidence that the

23   government has given us, and so we really didn't

24   know how to limit it.

25        We have jail calls on here, Your Honor.  The

1    government -- and I presume they are telling me the

2    truth -- today said that there are only two jail

3    calls that they intend on introducing, which would

4    be the one about -- the one about whatever money it

5    takes.  He said that on one jail call.  And the

6    other jail call about playing up his health.

7         Those two jail calls, Your Honor, I don't

8    believe are 404(b) evidence and, therefore, I don't

9    now need to address jail calls, although there may

10   be objections to them during the trial as to their

11   relevancy or the timing of when those would be

12   introduced, whether they're appropriate for a case

13   in chief or rebuttal.

14        But with the limitation of just those two

15   calls being introduced, then I don't think we have

16   any issues with jail calls on 404(b).

17        THE COURT:  Well, obviously, you're not

18   prejudiced from objecting --

19        MR. TRAGOS:  Right.

20        THE COURT:  -- in which you describe those, if

21   and when they're introduced.

22        MR. TRAGOS:  Right.  That's what I'm saying.

23   I don't think we're dealing with 404(b) there

24   anymore.

25        THE COURT:  All right.

1          MR. TRAGOS:  So we're really -- and the

2    court's limited the chats, e-mails and photographs.

3    So I don't know any other -- unless the government

4    has any other issues, I don't know any other 404(b)

5    other than the two prior conversations with

6    undercover officers in '05 and early '08.

7          THE COURT:  And those would have been e-mails

8    and/or instant messaging?

9          MR. TRAGOS:  I believe that's correct, Your

10   Honor.

11         THE COURT:  Authored by the defendant, as far

12   as you understand.

13         MR. TRAGOS:  Yes, and by the undercover agent.

14   Both.  Right.

15         THE COURT:  Ms. Kaiser, your response.

16         MS. KAISER:  Yes, Your Honor.  Starting with

17   the 2005, it's actually the same undercover agent

18   for the instant offense.  He had recalled chatting

19   with Mr. Friedlander previously and was able to

20   actually find the chats from 2005.

21         So during the 2005 chats, Mr. Friedlander was

22   basically -- the nature of the chats were along the

23   same lines as they are for the case in chief where

24   they talked about beating and engaging in sexual

25   activity with the undercover officer's two boys, two

1   sons.  So they're very similar and show

2   Mr. Friedlander's intent.

3        For the 2008 investigation, it started

4   approximately back in February of '08 and continued

5   through about June of 2008.  So right about the same

6   time that Detective Romanosky was chatting

7   Mr. Friedlander in -- for the case in chief, the

8   evidence for the case in chief, he was also chatting

9   with a detective from Port St. Lucie right about the

10  same timeframe.

11       In this case the defendant, I believe, was

12  arrested on 7/21/08.  And just referring to my

13  exhibit list which I produced to the defense

14  counsel, the last undercover chat with Detective

15  Spector from Port St. Lucie happened on June 25th,

16  2008.

17       So in that -- in the conversations that the

18  defendant had with the detective from

19  Port St. Lucie, he discusses having sex with that

20  undercover officer's child.  So it's --

21       THE COURT:  But is Mr. Tragos correct, that it

22  doesn't have to do with beatings or whips, that type

23  of activity?

24       MS. KAISER:  Correct.  It does not have to do

25  with whips, but it does have to do --

1          THE COURT:   Simply sexual activities?

2          MS. KAISER:   Yes, Your Honor.

3          THE COURT:   And when I say simply, we have to

4    be careful here.   I don't mean simply in the sense

5    of simple, but the more generic type of sexual

6    activity as opposed to S and M?

7          MS. KAISER:   Correct.   But we believe that

8    that is relevant in the sense --

9          THE COURT:   You guys will be conducting voir

10   dire, by the way, and opening statements.

11         MR. TRAGOS:   We will be?

12         THE COURT:   Yes.   Within limitations, of

13   course, so you can get all these phrases and words

14   out to the jury.   I think it's better coming from

15   you.   You know what the evidence is.   If I try to

16   describe it, I'm surely going to misstate something

17   and I don't want to do that.

18         I will do a general introductory voir dire as

19   I typically do, and then turn the floor over to you

20   for a reasonable voir dire.

21         All right.   So what you've got is an '05 --

22   you've got substantially similar chats, whether they

23   be e-mails or IMs, with an undercover agent

24   substantially similar to those that are the subject

25   of the indictment; correct?

1          MS. KAISER:  Yes.

2          THE COURT:  In '08 you've got chats, either

3     e-mails or instant messaging, with an undercover

4     agent with sexual activities with children but not

5     S and M.

6          MS. KAISER:  Correct.

7          THE COURT:  Did you say in '08 the subject was

8     two adolescent males?

9          MS. KAISER:  No.  It's an adolescent female,

10     an 11-year-old adolescent handicapped child.

11          THE COURT:  What's the nature of the handicap?

12          MS. KAISER:  Mental -- I believe mental

13     retardation.

14          MR. TRAGOS:  Are we talking about the early

15     '08?

16          THE COURT:  That's what I was asking about,

17     yes.

18          MS. KAISER:  Yes.

19          THE COURT:  Tell me more about that.

20          MS. KAISER:  There's phone calls, there's

21     chats, they're very explicit graphically.  In some

22     of the chats the defendant -- and, Your Honor, these

23     -- in the chats he says he wants to get in bed with

24     the 11-year-old, he wants to penetrate her

25     vaginally.  He wants to get a hotel room with the

1  undercover officer and share a hotel room with him

2  with the daughter.

3      There's phone calls regarding same where

4  they're talking about when he can actually come to

5  meet the undercover officer and the daughter.  The

6  defendant sends a picture of himself to the

7  undercover law enforcement officer and asked him to

8  show the picture to the child, so there's evidence

9  of a photo the defendant sent of himself.

10      The undercover officer sent Mr. Friedlander a

11  picture of the child, so they discuss at length

12  Mr. Friedlander's intention to have sexual activity

13  with that 11-year-old girl.

14      THE COURT:  Does that picture of that child

15  depict an obvious mental or physical handicap?

16      MS. KAISER:  No, Your Honor.  No.

17      THE COURT:  How is her handicap described by

18  the undercover agent?

19      MS. KAISER:  I believe he just said she's slow

20  mentally.  And Mr. Friedlander asks -- inquires on

21  one of the phone calls like how slow is she.  And I

22  believe the undercover just says, she does okay.

23      And I believe Mr. Friedlander's response is

24  something to the effect like, oh, that's fine.  So

25  it's not discussed at any great length at all.  It's

1        just a passing reference.

2            But the government's position is that these

3    chats are clearly relevant to show his intent at a

4    time relevant to the indictment.  Pretty much the

5    same timeframe he's chatting with Detective

6    Romanosky, he's also chatting with Detective Neil

7    Spector about having sexual activity with children,

8    which is what he's charged with in the underlying

9    case, enticing.

10           THE COURT:  Mr. Tragos?

11           MR. TRAGOS:  Your Honor, there are huge

12   differences in the early '08 chats for 404(b)

13   analysis.  First off, one of the things that the

14   government has presented to this court over and over

15   again this morning about why things are relevant was

16   because of the sadomasochistic activity, the whips,

17   the chains, the belts.  And the court said the only

18   photographs you can put in are photographs that

19   depict that kind of activity if it's mentioned on

20   the IMs or the e-mails with the undercovers.

21           The early '08 is a total aberration from the

22   others that they want to put in, or from their

23   theory of 404(b).  It is a female and not a male.

24   It is -- it is alleged heterosexual activity as

25   opposed to homosexual activity.  There is no

1    beatings, there is no razor straps, there are no

2    implements.  There is nothing in the early '08 chats

3    that is similar to the chats that we're talking

4    about here today as the crime -- the crime charged.

5    Nothing.

6          And the -- even the sexual activity is

7    different.  There is no similarity between them.

8    And --

9          THE COURT:  Do you intend to as part of your

10   defense -- obviously the motions address this, I'm

11   begging the question, but do you intend to present

12   evidence concerning what constitutes pedophilia.

13         MR. TRAGOS:  Yes.

14         THE COURT:  Does your proffer distinguish

15   between pedophilia as it relates to males or females

16   or is it all pedophilia?

17         MR. TRAGOS:  I think that what we're going to

18   talk about is the general concept or requirements of

19   pedophilia.

20         THE COURT:  Homosexual and heterosexual or do

21   you not -- I don't know.

22         MR. TRAGOS:  I don't think there's a

23   distinction.  I think that what we'll find is that

24   our client is homosexual.  And so that, you know,

25   any application of pedophilia to my client would be

1    with males.  And that that's why I'm saying this is

2    a -- this particular conversation with --

3    conversations with -- the early '08 conversations

4    don't fall within 404(b) because there's no

5    similarity between the two.

6         And I know the court hasn't reviewed all the

7    conversations, but the conversations about the

8    whips, those kind of things are very specific in the

9    '05 and in the '08 conversations with Detective

10   Romanosky.

11        THE COURT:  All right.  The defendant's

12   motion, which is docket 67 -- thank you -- with

13   respect to the 2005 chats between the defendant and

14   the same undercover agent involved in the chats

15   which led to the charge in the indictment, the

16   motion will be denied.

17        I do find that this is relevant to intent.

18   Clearly, it's not -- it's provable, it's not so

19   extrinsic that it cannot be linked to the defendant

20   because the defendant is the speaker and/or author.

21        With respect to the early 2008, I have a

22   concern for a couple of reasons.  One, whether or

23   not it's relevant to those aspects of the conduct of

24   the defendant giving rise to the indictment.  It's

25   different in nature.  It does not involved S and M.

1    The sexual or -- that is, the gender of the subjects

2    obviously is another consideration.

3         To the extent it may be evidence of this

4    defendant's intent to engage in sexual activities

5    with children, it would be relevant.  The question I

6    think ultimately is whether the probative value is

7    substantially outweighed by unfair prejudice.

8         It would seem to me that with the other

9    evidence the government has that I am allowing, this

10   evidence other than its temporal relationship to the

11   charged offense which is a highly relevant factor,

12   that this evidence may very well be unduly

13   prejudicial to the extent that it outweighs

14   probative value.

15        You're dealing with a handicapped child.  I'm

16   not in any way minimizing the seriousness of this.

17   But it is likely to inflame the jury when they

18   consider that this defendant spoke about and perhaps

19   intended to engage in sexual conduct with an

20   11-year-old mentally handicapped child.

21        So I'm going to grant the motion as to the

22   2008 activities.  I do caution the defense, however,

23   that on rebuttal, depending on the nature of the

24   defense, if it does present a defense, these matters

25   can be revisited on motion of the government.  I

1    just simply don't know what the defense will be, but

2    clearly this -- these conversations go well beyond

3    the earlier chats and, in fact, the activities

4    described in the chats that led to the indictment.

5    As to the other of the 2005, of course, the motion

6    is denied based on my analysis.  So it's granted in

7    part and denied in part.

8         MR. TRAGOS:  And, Your Honor, the issue with

9    regard to the jail calls, is the court going to make

10   that moot because of the government's

11   representation?

12        THE COURT:  Well, you've withdrawn that aspect

13   of the motion as far as I'm concerned, and you can

14   renew any objection you may have or make any

15   objection you have at the time the government offers

16   it, if they do.

17        The next docket number is docket 71, which is

18   the defendant's motion in limine to preclude the

19   government from referencing any prior case or

20   investigations against the defendant.  I assume

21   we're talking about the Port St. Lucie matter, but

22   then, again, it's your motion.

23        MR. TRAGOS:  Your Honor, would the court allow

24   me at this time -- and they're very short, during

25   the course of the interview with my defendant, the

1    two or three hour interview, these -- certain

2    references were made.  And I'd like the court to

3    listen just to those snippets, if I could.

4         THE COURT:  Why don't you describe them for

5    me.

6         MR. TRAGOS:  Okay.  In one of those snippets

7    they're talking about diabetes, and Detective

8    Romanosky basically gives his medical analysis of

9    diabetes, what it can and can't do and what people

10   can and can't do while a -- while they are a

11   diabetic.

12        And then he talks about how doctors would

13   agree when he was giving some of his opinions and he

14   said, I'm sure doctors would agree.  He also says

15   things like where's my book --

16        THE COURT:  This motion has to do with a

17   reference by Romanosky to prior cases or prior

18   investigations?

19        MR. TRAGOS:  Yes, Your Honor.  I'm doing it

20   all at once because the other motions deal with --

21   these are all --

22        THE COURT:  Well, we've got to take them one

23   at a time --

24        MR. TRAGOS:  Okay.

25        THE COURT:  -- so I can focus on each docket

1     entry.  So this one is strictly any references the

2     detective may have made to a prior investigation or

3     a prior cases against the defendant by himself or

4     some other law enforcement agency.

5          MR. TRAGOS:  Right.  He says on more than one

6     occasion, look, I've talked to agents throughout the

7     state, and they have cases going against you and

8     investigations going against you.  And I don't know

9     what's going to happen to those investigations.

10    And, now, those are their cases and you might get

11    charged, you might not.  Or I've received reports

12    from other agencies about you.

13         And first of all, it's a lie because if

14    anything, there's only one other agency and that's

15    Port St. Lucie.  There are no others.  And it makes

16    it sound like my client's being investigated by

17    everyone throughout the state of Florida for this

18    type of activity, when it's not true.

19         And I think that would be highly prejudicial

20    if brought before the jury that through the --

21    through this interview, especially since it's not

22    true, that there are active investigations

23    throughout the state against my client.

24         And he was using that basically to prod my

25    client into making statements.  I'd like that

1      redacted from the interview.

2              THE COURT:  All right.  Response?

3              MS. KAISER:  Yes, Your Honor.  Without having

4      what Kurt Romanosky says -- Detective Romanosky says

5      during the interview, the defendant's responses

6      won't make any sense.  Certainly, the government

7      would not present an improper picture to be left

8      before the jury.

9              THE COURT:  Is Romanosky going to testify?

10             MS. KAISER:  He is, Your Honor.  But --

11             THE COURT:  Is he going to testify that he

12     made reference to fictitious investigations and

13     cases as part of an interview technique?

14             MS. KAISER:  Yes, Your Honor.

15             THE COURT:  So he will clear the air that that

16     was not true, that was simply a technique he used?

17             MS. KAISER:  Correct.  He was -- he would

18     clarify that.  But it was true with respect to the

19     Port St. Lucie investigation, so he did know about

20     the other investigation when he was interviewing

21     him.

22             THE COURT:  What's the relevance of -- and

23     that's what we have to look at, a reference to

24     another investigation that has not at this point in

25     time resulted in charges and/or a conviction.

1          MS. KAISER:  Part of -- right at that time

2     during the interview, part of the ruse of saying,

3     yes, we know about other investigations is to have

4     him explain what screen names he uses.  And he

5     provides information to Detective Romanosky, because

6     at that point the defendant has no idea what law

7     enforcement knows and what they don't know.

8          But what I was going to do on -- after that

9     part of the tape or even stop it and say, now,

10    Detective Romanosky, when you reference other

11    investigations, is that -- is that something that's,

12    you know, true or is that a ruse that you use as an

13    interviewing technique.  But he does know about the

14    one -- other one but --

15         THE COURT:  Well, what's he going to say; yes,

16    but the Port St. Lucie was real?

17         MS. KAISER:  There was another investigation.

18    I mean, that's just the truth.  Basically the

19    defense wants to present this false impression of

20    the defendant for the jury that there were no other

21    investigations with the court's ruling on the 2008

22    one.  They want to say he's not a pedophile, he's

23    never thought to do this behavior before, but it's

24    not true, so --

25         THE COURT:  Well, again, your defending the

1    defense and that's not an appropriate attempt at

2    this juncture.

3         MS. KAISER:  Mr. Tragos can clearly

4    cross-examine Detective Romanosky and he could ask

5    him, have any other charges ever been brought

6    against the defendant, and he would truthfully say

7    no.

8         THE COURT:  So this Port St. Lucie

9    investigation is the one that I just addressed

10   concerning the 11-year-old mentally handicapped

11   child?

12        MS. KAISER:  Yes, Your Honor.

13        THE COURT:  All right.  I'm going to grant the

14   defendant's motion to this extent.  The reference to

15   the Port St. Lucie investigation will be redacted.

16   With respect to the ruse used by Detective

17   Romanosky, I'll deny the motion.  That is a

18   recognized interview technique this circuit has

19   recognized and acknowledged that this is a

20   legitimate law enforcement tactic.  And to that

21   extent, I will deny it so --

22        MR. TRAGOS:  Your Honor, if I might just have

23   a clarification from the court?

24        THE COURT:  Yes, sir.

25        MR. TRAGOS:  I don't believe that Port St.

1       Lucie was specifically mentioned in the interview.

2       I believe what he said was other investigations

3       throughout the state.

4           If I question him about that statement and he

5       says that, well, no, it wasn't true except for one,

6       Port St. Lucie, the fact that there is -- that there

7       is an investigation I think is highly prejudicial to

8       the defendant and is certainly not probative of

9       anything that there are other investigations.

10          How is he going to truthfully answer a

11      question when asked about other investigations?

12          THE COURT:  We're not talking about a

13      redaction as much as we are the potential that in

14      his explanation he may mention an actual

15      investigation.

16          MR. TRAGOS:  I'm accepting the court's order.

17      The court said it doesn't have to be redacted.  So

18      if --

19          THE COURT:  But there's no specific reference

20      to Port St. Lucie or the 2008 investigation?

21          MR. TRAGOS:  I believe that's correct.

22          THE COURT:  So we're not talking about a

23      redaction.  We're just simply avoiding a subject.

24          MR. TRAGOS:  Right.  So if I'm going to

25      cross-examine him on that being a lie, basically

1      that there weren't investigations throughout the

2      state and his -- and his answer being, oh, yeah,

3      there's one in Port -- there's one in

4      Port St. Lucie, then, number one, it will let the

5      cat out of the bag about Port St. Lucie.

6           THE COURT:  Well, my suggestion then is to ask

7      the questions very carefully.  I cannot instruct a

8      witness not to tell the truth.  The witness is not

9      going to be muzzled.  He has to be able to explain

10     his techniques.

11          I will rely on the government to instruct him

12     to avoid elaborating or referencing anything about

13     that investigation.  But you'll have to ask the

14     questions very carefully, Mr. Tragos.  I'm

15     protecting you as you've convinced me I should.

16          MR. TRAGOS:  Your Honor --

17          THE COURT:  But I can't muzzle a witness.

18          MR. TRAGOS:  I understand that, Your Honor.

19     But how can the jury receive an explanation about

20     that being untrue, what he said in the interview, if

21     the court -- if the jury is allowed to hear it?

22          THE COURT:  Well, I guess it depends on how

23     you ask the questions.  It seems to me you can ask

24     him a global question or a general question about

25     whether his representations to the defendant

1      included false representations about ongoing

2      investigations, then that's a fair question.  If he

3      says yes, mostly --

4           MR. TRAGOS:  I thought it was the

5      government's -- I thought the court was placing the

6      explanation for that --

7           THE COURT:  I am.  I'm instructing Ms. Kaiser

8      that he will not mention in his direct testimony or

9      on this tape -- apparently it's not on there now, I

10     thought it was -- anything about Port St. Lucie.

11     When you stand up and cross-examine the witness, I

12     can't control that.

13          MR. TRAGOS:  Okay.  And, Your Honor, I

14     apologize for -- for --

15          THE COURT:  You don't have to apologize.

16          MR. TRAGOS:  But, Your Honor, the jury is

17     going to hear multiple investigations throughout the

18     State of Florida.  All right.  And if it's -- if the

19     -- if the government doesn't clarify that that is

20     not true, that there are not multiple investigations

21     throughout the State of Florida, then they're going

22     to be left with that impression that there are

23     multiple investigations throughout the State of

24     Florida.

25          THE COURT:  And they'll be instructed that

1    he's on trial only for the offense charged in the

2    indictment, and I'll give a cautionary instruction

3    at the appropriate time if you request me to.  I

4    can't solve this problem for you.

5         MR. TRAGOS:  Well --

6         THE COURT:  It's not unusual, Mr. Tragos.

7    You've been there before.  So have I.  You have to

8    tread carefully.  And as long as the government

9    doesn't violate the order, then that's all I can

10   address at this juncture.

11        The next document is -- Ted, would you make

12   sure the lawyers aren't sitting out in the hallway?

13        COURTROOM DEPUTY CLERK:  I told them to be

14   here at 11:25.

15        THE COURT:  Okay.  Okay.  We should make good

16   time.  The next docket number is docket 73.  This is

17   the government's motion in limine to exclude expert

18   witnesses and a request for *Daubert* hearing.

19   Ms. Kaiser.

20        MS. KAISER:  Yes, Your Honor.  Pursuant to the

21   pretrial discovery order in this case, expert -- any

22   notices regarding experts from the defense should

23   have been provided months ago.  Last Thursday I

24   received notice that failed to comply with the rules

25   and really didn't adequately advise me of what

1      Mr. Tragos's experts are going to testify to.

2           I got a one page summary which had about a

3      small paragraph on each of the three proper

4      defendant's experts, but I received no reports

5      whatsoever until last night for Mr. Frederick

6      Berlin.

7           Upon reviewing Mr. Berlin's proposed

8      testimony, it appears that none of -- none of his

9      testimony is appropriate under the rules.

10     Mr. Berlin's report says that he was asked to

11     address three issues.  The first was to what extent

12     were his -- meaning Dr. Friedlander's -- chats about

13     beating children a manifestation of, A, a fantasy

14     interest and role playing versus, B, an interest in

15     actually consummating such real life acts.

16          That's the first -- that's the first of three

17     issues that he mentions that he was retained to

18     consider.  And, Your Honor, the government objects

19     to that testimony.  It's completely not relevant

20     what Mr. -- or Dr. Berlin's theory is regarding

21     fantasy versus role playing.

22          There's no standard, there's no test that

23     are -- that can be performed as to how many people

24     out there on the internet are engaging in behavior

25     versus talking on the internet.  There's no way to

1    tangibly even measure something like that.

2         So for an expert to come in and say that he's

3    talked to the defendant and read the chats in this

4    case and says in his opinion that it's all role play

5    really impinges upon the jury's function in 704(b).

6         Rule 704(b) provides no expert witness

7    testifying with respect to the mental state or

8    condition of a defendant in a criminal case may

9    state an opinion or inference as to whether the

10   defendant did or did not have the mental state or

11   condition constituting an element of the crime

12   charged or a defense thereto.  Such ultimate issues

13   are matters for the trier of fact.

14        It's the government's contention that the

15   defendant is trying to do through this supposed

16   fantasy expert what it doesn't want to do, and

17   that's have Mr. Friedlander take the stand and deny

18   it himself.  They're trying to put intent testimony

19   through a late-noticed expert who can't support the

20   opinion, anyway.

21        Certainly Mr. -- or Dr. Berlin is in no better

22   position to gauge whether or not some -- if

23   Mr. Friedlander's that one in 10 million people

24   who'd actually act out his fantasies or not, or

25   whether it even is a fantasy.  The only thing he

1    based that on is his interview with the defendant,

2    and that's not a peer-reviewed, scientific

3    methodology employed.

4         THE COURT:  You're talking about two different

5    things, then.  One is 704(b) and the other is

6    whether or not under *Daubert* there is a -- whether

7    he meets the *Daubert* standard in terms of peer

8    review and the methodology.

9         MS. KAISER:  That's correct, Your Honor.  The

10   second issue that Dr. Berlin stated that he was

11   hired to examine was whether or not Dr. Friedlander

12   had an actual interest in consummating real life

13   acts or whether he had a psychiatric disorder that

14   may have predisposed him or driven him to become

15   sexual with a child.

16        The notice that the defendant filed regarding

17   expert testimony, which was document 83, I believe

18   the court already noticed, the cases in there that

19   were cited are really not quite on point.

20   They're -- the one case, the *U.S. versus Thigpen*,

21   which was a schizophrenic bank robbery case where

22   there was a not guilty by reason of insanity claim.

23        So the cases I believe the court pointed out

24   have to do with an insanity defense.  As far as I

25   know, that's not what the defendant is trying to

1    raise.  And in any event, under Rule 12.2(b), he's

2    given me inappropriate notice of any type of mental

3    condition.  And Rule 12 -- 12.2(b) provides if a

4    defendant intends to introduce expert evidence

5    relating to a mental disease or defect or any other

6    mental condition of the defendant bearing on

7    issues -- on any issue, number one, the issue of

8    guilt or, two, the issue of punishment in a capital

9    case, the defendant must within the time provided

10   for filing a pretrial motion or at any time the

11   court sets notify an attorney for the government in

12   writing of this intention and to file a copy of the

13   notice with the clerk.

14        And it says, the court, for good cause, can

15   allow the defendant to file a late notice.  There's

16   been no good cause shown at all for the late notice.

17   Mr. Tragos has gone on about how he hadn't had all

18   the discovery.  But what he's referencing is the

19   defendant's own e-mails.

20        The plethora of discovery that was complained

21   about had to do with the defendant's own -- I guess

22   there's approximately 5,000 something e-mails on the

23   defendant's computer, which the government maintains

24   the defendant would be in more of a position to know

25   what's on there than even the government.

1          So that's really no excuse for late notice.

2     But getting an expert witness report last night

3     certainly hamstrings the government from trying to

4     frame any type of response or trying to get any

5     expert of their own to counteract the testimony.

6          The third -- the third issue that Dr. Berlin

7     says he was hired to examine was is it -- in reading

8     from the report on page -- page two of Dr. Berlin's

9     report, it says, is it possible to conclude with a

10    reasonable medical certainty that Dr. Friedlander

11    has had specific mental intent with respect to the

12    issue of becoming sexually involved with children.

13         So, again, we -- the government would argue

14    that that clearly impinges on 704(b).  This isn't a

15    medical malpractice case that -- where testimony

16    within a reasonable degree of medical certainty

17    would come in.  This is a criminal case.  And under

18    704(b), that type of issue is one for the jury.

19         What's interesting to note, though, is

20    Dr. Berlin doesn't limit his inquiry into

21    sadomasochistic activities with children.  He -- he

22    addresses sexual activity with children.  And if the

23    court's previous ruling is that the government

24    cannot offer other evidence of the defendant's

25    interest in children, it's going to be problematic

1     to cross-examine this expert, as well, because,

2     clearly, then, that brings in any other evidence of

3     the defendant wanting to have sex with a child

4     should come into impeach this expert.

5           But in any event, under 704(b), his testimony

6     is clearly not appropriate.  Under *Daubert*, he can't

7     meet the scientific criteria.  It wouldn't be

8     helpful for the jury.  He mentions in here in the

9     report that -- he opines that he's not a pedophile.

10          Well, the issue of whether or not

11    Mr. Friedlander is a pedophile is not for this jury.

12    That's not an issue in the trial.  He can be guilty

13    of this offense whether or not he's a pedophile.

14    And testimony regarding whether he is or isn't,

15    isn't really appropriate, anyway.  It's not one of

16    the issues in the case.  It's not one of the

17    elements of the offense.  And it would just confuse

18    the jury.

19          The jury shouldn't have to wrestle with, gee,

20    is he a pedophile or not.  It's not an element and

21    it shouldn't be argued.  It will just confuse the

22    jury.  And that's -- one of the standards for

23    admissibility of expert testimony is whether or not

24    it will help the jury, and this testimony clearly

25    wouldn't.

1           THE COURT:   Under 704(b) what are your

2      strongest cases that support the government's

3      position?

4           MS. KAISER:   Your Honor, I'd rely upon the

5      ones that I submitted.

6           THE COURT:   I want to know right now the names

7      of the cases that you rely on.

8           MS. KAISER:   Okay.  May I have a moment, Your

9      Honor?

10          THE COURT:   Yes, ma'am.  Mr. Tragos, I want

11     you to be prepared to give me your cites, as well,

12     and then we're going to break.

13          MS. KAISER:   I rely upon *United States versus*

14     *Powers*.

15          THE COURT:   Just a moment, let me write

16     these -- *Powers*?

17          MS. KAISER:   Yes, Your Honor.

18          THE COURT:   What's the cite, please.

19          MS. KAISER:   59 F.3d 1460, *United States*

20     *versus Alexander*, 805 F.2d 1458, Eleventh Circuit

21     1986.

22          THE COURT:   When was 704(b) amended, if you

23     know?

24          MS. KAISER:   The -- I don't know for sure, but

25     underneath it just says -- I'm looking at the

1    statute and it says October 12th, 1984 is the last

2    amendment that I see.  Did I give you *U.S. versus*

3    *Frazier*?

4          THE COURT:  *Frazier*?  Spell it, please.

5          MS. KAISER:  F-R-A-Z-I-E-R.  Eleventh Circuit

6    387 F.3d 1244.  And also, if I may, Your Honor, with

7    the defendant's memorandum of law regarding expert

8    testimony, he cites the case of *United States versus*

9    *Cross*.  And in his motion, he says that -- or in his

10   memorandum of law the defense says, the defendant --

11   the Eleventh Circuit affirmed the ability of an

12   expert to testify about the characteristic behavior

13   of pedophilia.

14         That's not entirely accurate, Your Honor.

15   That issue was not before the court so the Eleventh

16   Circuit didn't actually affirm that.  But what that

17   case was was a child pornography case in which the

18   government expert was allowed to testify regarding

19   that the pictures were of a sexual interest to

20   pedophiles and the pictures were obscene.

21         So that's -- that was the testimony.  It was

22   for a very limited purpose.  It wasn't just some

23   broad, let's talk about pedophilia in any case

24   involving children.  So I just didn't want that to

25   go unaddressed.  Those are the cases that --

1           THE COURT:  She doesn't know, does she,

2      Tragos?  I sat in that trial.

3           MR. TRAGOS:  I indicted Mr. Cross.

4           THE COURT:  Okay.  Your case is -- quickly,

5      because we've got a hearing I've got to conduct.

6      And I'm going to let you respond, obviously, to the

7      argument, Mr. Tragos.

8           MR. TRAGOS:  Okay.  Your Honor, quickly the

9      cases, I think these are all cited.  Do you need the

10     cites, too, or just --

11          THE COURT:  I want to know which ones you feel

12     compelling.

13          MR. TRAGOS:  *U.S. v. Manley*, 893 F.2d, 1221;

14     *U.S. v. Edwards*, 819 F.2d 262; *U.S. v. Davis*, 853

15     F.2d 274; *U.S. v. Barnette* -- or excuse me, *Thigpen*,

16     *Thigpen*, 4 F.3d 1573; and *U.S. v. Hansen*,

17     H-A-N-S-E-N, 262 F.3d, 1217.  And lastly, *U.S. v.*

18     *Roark*, R-O-A-R-K, 753 F.2d 991.

19          THE COURT:  All right.  We will adjourn until

20     1:30.  I will see you back then.

21          MR. TRAGOS:  Your Honor, can we leave our

22     stuff here?

23          THE COURT:  Well, we've got a hearing.  I

24     would suggest that you move it back to the back

25     table if you'd like to leave it.  We'll take a break

1     and we'll convene this next hearing.

2     (Recess was taken from 12:23 until 2:36 PM.)

3     (Back on the record.)

4          THE COURT:  Ms. Kaiser, anything else you'd

5     like to add?

6          MS. KAISER:  Your Honor, I'd just point out

7     there's an additional case that I may have omitted

8     the cite, *United States versus Yost*.

9          THE COURT:  How do you spell Yost, Y-O-S-T?

10         MS. KAISER:  Yes, Your Honor.  And it was 479

11    F.3d 813.

12         THE COURT:  Mr. Tragos?

13         MR. TRAGOS:  With the court's permission, I'd

14    like to hand the court a copy of Dr. Berlin's

15    report.

16         THE COURT:  Thank you.

17         MR. TRAGOS:  Your Honor, first going to the --

18    I think the necessity of a *Daubert* hearing in this

19    case --

20         THE COURT:  Why don't we first talk about

21    whether any of this is relevant.

22         MR. TRAGOS:  Okay.  We can start with that.

23         THE COURT:  Unless you can convince me it is,

24    there's no need for a *Daubert* hearing.

25         MR. TRAGOS:  Your Honor, I know I gave the

1    court the citations, but I'd like to start going

2    through just briefly some of the cases that I cited

3    for the court, the first being *Manley.*

4        In the *Manley* case, which is a case out of the

5    Eleventh Circuit, the court said that psychiatric

6    testimony may include the expert's diagnosis, the

7    characteristics of the particular mental disease or

8    defect and the expert opinion as to the defendant's

9    mental state and motivation at the time of the

10   alleged crime.

11       THE COURT:  Where -- I'm sorry.  Where are you

12   reading from?

13       MR. TRAGOS:  Page two of *Manley.*

14       THE COURT:  You mean on the Westlaw printout

15   two?

16       MR. TRAGOS:  Well, you know, I use Lexis.

17   Page five, page five of the opinion.

18       THE COURT:  See if you can give me a page

19   number.  That helps me.

20       MR. TRAGOS:  Page five of the opinion.  At

21   least, it looks like page five.  Or 1223, here we

22   go, I find it, 1223 of the opinion.  The paragraph

23   starts out, Rule 704 was not amended, however, to

24   eclipse the expert's role in enabling defendants to

25   raise the insanity defense.

1          THE COURT:  But that's not what you're doing.

2          MR. TRAGOS:  No.  But when you go down it

3     says, a psychiatrist can talk about a mental disease

4     or defect, and it gives an opinion about a

5     defendant's mental state and motivation at the time

6     of the alleged crime.

7          THE COURT:  If the defense is not guilty by

8     reason of insanity.

9          MR. TRAGOS:  Well, Your Honor, I don't think

10    it limits it.

11         THE COURT:  Well, that's why I said most of

12    your cases deal with insanity defenses.  I'm looking

13    for cases that deal with whatever it is you think

14    you have as a defense.  Obviously with an insanity

15    defense, medical and psychiatric testimony runs the

16    gamut.  You've got to tie it into a defense, what it

17    is you think your experts are going to talk about.

18         MR. TRAGOS:  Your Honor, my defense is that my

19    client has no interest, no sexual interest in

20    children, that -- that when he talks online, it's

21    merely a situation of being a lonely man finding

22    somebody to talk with, that he -- the history --

23    when the court -- one of the things that we're going

24    to show here, Your Honor, and we've talked to the

25    court and what the prosecution has admitted is that

```
 1      there is no child pornography on this man's

 2      computer, that all of the photographs and the

 3      e-mails on the computer were of adults, and that he

 4      has no interest whatsoever in having contact with

 5      children.  If the court will look at --

 6           THE COURT:  How is that a defense to the

 7      charge in the indictment?

 8           MR. TRAGOS:  Because, Your Honor, he has to

 9      intend to have sex with a child.

10           THE COURT:  Is that an essential element,

11      Ms. Kaiser?

12           MS. KAISER:  Not that he actually -- no.  Only

13      that if it had taken place, it would have been an

14      offense under the law.

15           MR. TRAGOS:  He had to intend to have sex with

16      a child.

17           MS. KAISER:  There's not double intent.

18           MR. TRAGOS:  Well --

19           MS. KAISER:  The case law is clear that

20      there's only one intent, and that's the intent to

21      induce.

22           MR. TRAGOS:  All right.  The intent to induce

23      a child to have sex.  He has to intend to induce a

24      child to have sex.  That has to be his intent.  So

25      he has to intend to induce a child to have sex.  If
```

1    he does not intend to induce a child to have sex,

2    then he is not guilty of the offense.

3        And what we're saying is if we can show that

4    he has no interest in sex with children, if we can

5    show that his e-mail history, his computer,

6    everything is devoid of anything that -- about sex

7    with children, and that his conduct on the internet

8    was strictly the conduct of a lonely man dealing in

9    fantasy, those are defenses because under those

10   circumstances, if we were able to convince the jury

11   of that, then he is not guilty of the offense.

12       Now, if you look at Dr. Berlin's report,

13   Dr. Berlin is from Johns Hopkins and he directs the

14   National Institute for the Study of Prevention and

15   Trauma and Treatment of Sexual Trauma.  He's also --

16   his institute is a national resource site by the

17   United States Department of Justice.

18       He is not some wacko theorist that we're

19   putting out here.  The DSM, which I know the court's

20   familiar with, which deals in mental disorders and

21   reports them and categorizes them, he's an author of

22   the DSM, and of particular, he contributed to the

23   area of paraphilias, which in layman's term is

24   sexual disorders.

25       When he gives his report, and you start on

1        page five of his report, he talks directly about

2        mental disorders and Mr. Friedlander's application

3        to the mental disorders, or the facts of this case

4        and how you deal with mental disorders and whether

5        or not he does or does not suffer from a mental

6        disorder.

7             The relevance is that it makes it -- it will

8        weigh on whether or not it's likely or unlikely to

9        establish a fact; being the fact that someone is not

10       a pedophile, the fact that someone is in a situation

11       where he can be manipulated in order to make

12       friendships and that he -- and he talks -- he'll

13       talk fantasy or say anything in order to make a

14       friend and to be a friend.

15            Keep in mind, Your Honor, although I know it's

16       not a necessary element, there was no conversations

17       with juveniles or who he thought was a juvenile at

18       any time either here or Port St. Lucie, which the

19       court's excluded, or on his computer.  There's no

20       conversations ever with a juvenile on his computer,

21       on his e-mails, no pictures, nothing.

22            And if you'll go -- if you go to -- let me

23       find it here, one second -- the *Thigpen* case, the

24       rule does not bar an explanation of the disease and

25       its typical effect on a person's mental state.

1          THE COURT:  That is also an insanity defense

2     case.

3          MR. TRAGOS:  It is an insanity defense case.

4          THE COURT:  So what case do you have that does

5     not deal with a defense of insanity that allows a

6     defendant to bring in expert testimony, whether

7     psychiatric or otherwise, bearing on the defendant's

8     state of mind?

9          MR. TRAGOS:  One second, Your Honor.  Your

10    Honor, all the cases -- apparently all the cases I

11    cited are insanity cases.  But I don't know why that

12    would diminish the --

13         THE COURT:  Because that is a defense, placing

14    at issue the defendant's capacity or competency, if

15    you will, his mental state at the time of the

16    offense.

17         MR. TRAGOS:  But how does --

18         THE COURT:  It's not a defense to this case.

19         MR. TRAGOS:  How does -- isn't the issue when

20    we're talking about relevance, isn't the issue about

21    whether or not a piece of evidence will make it more

22    or less likely that a defendant committed a

23    particular crime?

24         THE COURT:  That's propensity evidence.  It's

25    not allowed under 704.

1            MR. TRAGOS:  No, it's not propensity evidence.

2            THE COURT:  Well, you can disagree but I think

3     it is, Mr. Tragos.  I'm just looking for some case

4     law to support your position.

5            MR. TRAGOS:  All right.  *United States versus*

6     *Roark*, which we gave the court -- ROARK -- is not an

7     insanity defense.  In that case the expert testified

8     that she suffered from a condition known as

9     compulsive compliance, that this affliction led her

10    to confess to a crime she did not actually commit.

11           MS. KAISER:  What page are you reading from?

12           MR. TRAGOS:  It doesn't have a page cite.

13           MS. KAISER:  What section?

14           MR. TRAGOS:  It's 753 F.2d 991.

15           MS. KAISER:  What's the book you're reading

16    from?

17           MR. TRAGOS:  Eleventh Circuit Criminal

18    Handbook.

19           MS. KAISER:  What's the page from the Eleventh

20    Circuit?

21           MR. TRAGOS:  Page 22-26.

22           THE COURT:  So a quick reading of *Roark* tells

23    me that this issue involved the admission of a

24    confession, and the doctor in that case would have

25    testified that this defendant was, quote, extremely

1    susceptible to suggestions and that someone with her

2    level of suggestibility could be suggested into

3    making up untrue stories.

4         MR. TRAGOS:  If you will look at Dr. Berlin's

5    report --

6         THE COURT:  Well, let me finish.

7         MR. TRAGOS:  Sorry.

8         THE COURT:  The Eleventh Circuit says they

9    allowed it in that case because they could not find

10   any legal articulable reason for forbidding the

11   testimony but, quote, we do not hold that this kind

12   of testimony is always admissible in every

13   confession case.

14        So there it's the voluntary nature of the

15   confession which is at issue as opposed to whether

16   the defendant committed an offense.  And that's the

17   distinction.

18        MR. TRAGOS:  Your Honor, if the court will

19   look at Dr. Berlin's report on page eight.  One of

20   the opinions he provides, in my professional

21   opinion, over time Dr. Friedlander had come to feel

22   an emotional --

23        THE COURT:  Slow down.  Slow down for the

24   court reporter.

25        MR. TRAGOS:  Sorry.

1          THE COURT:  Go ahead.

2          MR. TRAGOS:  In my professional opinion, over

3     time Dr. Friedlander had come to feel an emotional

4     bond and an affiliation with the undercover agent

5     with whom, from Dr. Friedlander's perspective, he

6     had been sharing his fantasy interests.  In order to

7     ensure that the desired meeting with this other man

8     would actually occur, Dr. Friedlander had felt the

9     need to continue maintaining his fantasy persona.

10    In my judgment, his descriptions about what he had

11    intended to do with the agent's nonexistent children

12    had no more about real life intent than had his

13    descriptions about what he already had been doing to

14    his nonexistent son.

15         During the interviews, Your Honor, during the

16    IMs, he talked about his son and what he had been

17    doing with his son.  He doesn't have a son.  And

18    he's never been married.  And so this is almost

19    identical to I think the *Roark* case in that it's a

20    situation where he suffers from something that would

21    attach him to the agent and he'd want to continue on

22    dealing with the agent.

23         The court asked the question earlier about the

24    drive up from Ft. Myers.  I don't know if the court

25    noted that, that he came up from Ft. Myers.  And the

1    explanation for that drive, just like the

2    explanation for someone to confess to something they

3    didn't do, is that the man had a mental condition

4    that is articulable, that can be justified.

5        I mean, they can cross-examine him all day on

6    it if they want but, again, this is not a fly by

7    night opinion.  They have brought nothing in that

8    says that this is not legitimate science, as would

9    be required for a *Daubert* hearing.  This is a

10   legitimate opinion about a man's mental state and

11   why he did some of the things he did, just like why

12   you confess to something you don't -- you didn't do.

13       I mean, think about that -- that kind of

14   testimony.  He confessed but he didn't do it.  And

15   the reason why is because he suffers from compulsive

16   compliance.  It is -- it is a piece -- it is a bit

17   of evidence that supports the defendant's theory

18   that this was a fantasy from the beginning to the

19   end.  Does the court have any questions?

20       THE COURT:  Is *Roark* the only case, then, that

21   you have that deals with an issue that's not related

22   to a defense of insanity?

23       MR. TRAGOS:  Other than may be the *Cross* case,

24   the pedophilia.

25       THE COURT:  *Cross* is a completely different

1     matter.  You know that.  That has to do with the

2     government's expert and not whether or not the

3     defendant was -- committed the offense.

4          MR. TRAGOS:  But if someone can testify

5     about -- be an expert on pedophilia, then what

6     difference is that to what we're trying to put on to

7     show that -- just the opposite, that he is not a

8     pedophilia -- not a pedophile.  He's not a

9     pedophile.

10          He -- he -- our expert is also an expert on

11     sexual deviance on the internet to testify about

12     fantasy chats and how they are on the internet and

13     that fantasy chats are not necessarily related to

14     reality, and the fact that he created -- had a bond

15     with this agent.  He was a lonely man and was trying

16     to make a friendship.

17          And so I just -- you know, these are

18     recognized in the DSM.  He can testify about what

19     the traits are for these particular things and

20     whether or not he finds the traits in this evidence.

21     I don't see how it's any different than any other

22     expert.

23          THE COURT:  When was the *Roark* case tried with

24     respect to the amendment to Rule 704(b)?

25          MR. TRAGOS:  I think the amendment was like --

1      I think the prosecutor said like '85, and the *Roark*

2      case --

3           THE COURT:   '84.   The *Roark* case was decided

4      in '85, but I'm interested in when the trial

5      occurred.

6           MR. TRAGOS:   I don't know.

7           THE COURT:   It may likely predated the

8      amendment is my point.

9           MR. TRAGOS:   Well, even if it did, Your Honor,

10     the amendment -- this still wouldn't go to the

11     ultimate conclusion of the jury.

12          THE COURT:   The amendment is a very important

13     feature here, Mr. Tragos, because that is a specific

14     statement of the Congress.

15          MR. TRAGOS:   But, Your Honor, in the case law

16     the court can see that that amendment wouldn't

17     preclude even though it's an insanity case, the

18     amendment's interpretation in -- just a second here

19     -- in the *Thigpen* case.   In the *Thigpen* case, if the

20     court will go to page -- the page right before the

21     file -- 1580, and it's a paragraph that starts out

22     *United States v. Manley*.   Is the court with me?

23          THE COURT:   Gotcha.

24          MR. TRAGOS:   Okay.   While a thinly veiled

25     hypothetical may not be used to circumvent 704(b),

1    the rule does not -- may not be used to -- excuse

2    me.  The rule does not bar an explanation of the

3    disease and its typical effect on a person's mental

4    state.

5         So even after the amendment, it clearly says

6    that this amendment does not bar an explanation of

7    the disease and its typical effect on a person's

8    mental state.  And that's exactly what we're talking

9    about here.

10        THE COURT:  Well, I can't agree that it is

11   exactly what we're talking about.  The rule says

12   what it says.  No expert witness may state an

13   opinion or inference as to whether the defendant did

14   or did not have the mental state or condition

15   constituting an element of the crime charged, or of

16   a defense thereto.  Those are issues for the trier

17   of fact.

18        You are telling me that this doctor, for

19   example, Dr. Berlin, will testify to a specific

20   essential element, that is, the defendant's intent

21   to induce a child to participate in sexual activity.

22        MR. TRAGOS:  Well, Your Honor, no, that's not

23   what I'm saying.  What I'm saying is he is going to

24   talk about pedophilia, what pedophile is and whether

25   or not my client is or is not a pedophile.

1            THE COURT:  Whether he's a pedophile or not is

2       not the issue.  It's whether or not he intended to

3       persuade, induce, entice or coerce an individual

4       under 18 to engage in a sexual act.

5            MR. TRAGOS:  But if he's not a pedophile, it

6       is evidence that the jury should be able to consider

7       that he did not have the intent to persuade a child

8       to have sex.  I mean, that's -- that's just clear.

9       If someone is not a pedophile, they may still find

10      him guilty, but it certainly is a fact that goes to

11      the evidence.

12           Just like him making the statement, let's say

13      he makes a statement, I have no interest in having

14      sex with children, I don't -- I never have, which is

15      a statement he did make and which is going to be

16      presented to the jury.  It's on the -- the

17      confession, the alleged confession, where he does

18      any interest in having sex with children or ever

19      having sex with children.

20           When he makes that statement, it seems logical

21      that I can bolster that statement of my client by

22      putting on a well-qualified psychiatrist to say that

23      these are the criteria for a pedophile.  He does not

24      meet those criteria, number one.

25           Number two, he spoke three hours with this

1    police officer as well as multiple IMs and messages.

2    Why did he do that?  Why did he talk to this guy?

3    He talked to him because he was lonely and with his

4    personality he developed a bond with this person on

5    the internet and wanted to talk to him and continued

6    talking to him.

7         And -- and when he came up here with -- with

8    those implements, it wasn't to have sex with a

9    child.  It was to continue the bond and friendship

10   he thought he'd developed with this officer.  And

11   his having the mental ability, and of him being the

12   kind of person that develops those kind of bonds is

13   relevant.

14        And the third thing he testified to is he will

15   testify to -- and he is well-qualified in his

16   experience, the court has his report and we filed

17   his resume in the court file, I believe -- yeah, his

18   resume's in the court file.  He's well-qualified to

19   testify to activities on the internet in general,

20   about fantasy chatting on the internet in general,

21   about the relationship between reality and internet

22   fantasy chatting and how that occurs on the

23   internet.

24        And then a fourth element is how that would

25   apply -- what does he see in this evidence that

1    would indicate to him that this was a fantasy chat

2    as opposed to reality.  Now, they can still find

3    that my client intended to have sex with him.  He's

4    not saying that.  But he certainly can talk about

5    the traits involved and then -- his mental state,

6    and then let them make the determination of intent.

7         But he makes those statements on the

8    confession that the government is going to play for

9    the jury, all these denials about interest in

10   children and having sex with children and those kind

11   of things.  You know, when he was asked what age

12   group does he prefer, he prefers I think it was 40

13   to 70.  All those things are statements he makes and

14   the jury is going to hear those.

15        How can I not be able to explain to the jury

16   through expert testimony how what he says on that

17   tape is consistent with not being a pedophile or not

18   having interest in children -- having sex with

19   children?  The jury is going to hear those

20   statements from his own mouth from the prosecution's

21   case.

22        Oh, the case -- the CVs for the doctors are

23   document number 66.  Your Honor, again, I know the

24   court talks about this insanity, but in the *Hamilton*

25   case, that doctor was allowed to testify to non --

1    to a nonpsychotic condition, and he was allowed to

2    testify about it.  It wasn't even a DSM condition.

3    It was nonpsychotic, which was antisocial

4    personality.

5         THE COURT:  What case was that?

6         MR. TRAGOS:  That's the *Hamilton* case, U.S.

7    v -- excuse me, *Davis, U.S. v. Davis*.

8         THE COURT:  Davis.

9         MR. TRAGOS:  Right.  Page 276, I believe.

10        THE COURT:  Again, that was an insanity

11   defense; correct?

12        MR. TRAGOS:  It was.  But he was testifying

13   about antisocial --

14        THE COURT:  That's the point, Mr. Tragos, in

15   you not hearing me is that this testimony is

16   admissible when a defendant's sanity is placed in

17   issue.  Of course, it's admissible.

18        MR. TRAGOS:  But, Your Honor, when --

19        THE COURT:  That's not what we have here.  We

20   don't have a mental condition defense that's

21   recognized.

22        MR. TRAGOS:  Your Honor, it's not, but it is

23   relevant.  Any evidence that would go to prove or

24   disprove a fact is relevant.

25        THE COURT:  Evidence.  Evidence.

1          MR. TRAGOS:  Right.  And this --

2       THE COURT:  Not expert conjecture or

3    speculation.  That's what the rule prohibits, and

4    that's my point.  I'm looking for case law that

5    supports your proposition.  I haven't seen it yet.

6          MR. TRAGOS:  Well, Your Honor, what about the

7    *Rush* case?  The court, I guess --

8       THE COURT:  That's -- as we talked about,

9    that's before the amendment.

10         MR. TRAGOS:  But, Your Honor --

11      THE COURT:  It's a limited admissibility

12   situation.  I agree that by analogy it's somewhat

13   close.  But I have to look at this in the -- from

14   the perspective of the rule as it is in place today.

15         MR. TRAGOS:  But, Your Honor, the -- and I

16   know the -- I understand what the court is saying.

17   But when you read the statements and the

18   explanations given in those insanity cases, they

19   don't limit themselves to insanity.

20      THE COURT:  That's what makes it relevant,

21   though, is that there is a defense of insanity.  So

22   this psychiatric, psychological or medical testimony

23   becomes relevant because the issue of the

24   defendant's ability to appreciate the wrongfulness

25   of his conduct has been placed in issue.  But in

1    none of those cases is the doctor allowed to say

2    he's not guilty.

3         MR. TRAGOS:  What if -- let me just pose a

4    hypothetical, I could, to the court.

5         THE COURT:  Don't pose it to me.

6         MR. TRAGOS:  All right.  Well, here's the

7    argument.  What if the expert was able to get on the

8    stand and say, here is pedophilia, let me explain to

9    you what it is.  Let me tell you the criteria

10   that -- that you have that a psychiatrist uses to

11   gain what is a pedophilia or not.  Let me take that

12   criteria, apply it to the facts of the case and give

13   an opinion that he is not a pedophile.

14        He's going to the facts of the case.  It is --

15   or stop short of that last question and just let him

16   tell what a pedophile is and the criteria for a

17   pedophile.  And then the last thing is have him

18   explain how someone can do two things; one, fantasy

19   chats on the internet and to speak about those, and

20   I think he'd be qualified -- I can easily qualify

21   him as an expert about internet fantasy chats, and a

22   bond that someone gains with someone they're

23   chatting with on the internet, because all of these

24   go directly to the facts of this case where he

25   drives up here.  And the explanation is that he's

1    created a bond with this guy and that that's -- that

2    is certainly something that a psychiatrist -- that

3    does happen.

4         THE COURT:  That's something you might argue,

5    but it's not something this expert will testify to

6    in this courtroom.

7         MR. TRAGOS:  Well, how about --

8         THE COURT:  It's not allowed under the rule.

9         MR. TRAGOS:  How about if he doesn't do it

10   with relation to this defendant?

11        THE COURT:  I don't know how about.  You've

12   thrown it all at me and I'm telling you what the

13   rule says.  There's no case that supports Dr. Berlin

14   giving the ultimate opinion on whether this

15   defendant is guilty or not guilty of this offense.

16        MR. TRAGOS:  Will the court allow him to speak

17   about what is and is not pedophilia or fantasy

18   chats?

19        THE COURT:  I don't know yet, Mr. Tragos.  I

20   don't know if that's relevant.  I don't know how old

21   these children are represented to be.  And just

22   because someone is under 18 doesn't necessarily mean

23   that that person is a subject of a pedophile.  You

24   know that.

25        MR. TRAGOS:  I think they're 11 years old,

1    something like that, 10 or 11.

2         THE COURT:  I don't know.  What does he say is

3    a definition of pedophilia?  Does he draw an age

4    line?

5         MR. TRAGOS:  It's in the report.  I can read

6    the portion of the report if Your Honor will give me

7    a minute.

8         THE COURT:  The point is the rule does not

9    allow any expert to opine as to the ultimate fact.

10   That is for the jury.  And your proffer so far has

11   encompassed that and it's not admissible.

12        MR. TRAGOS:  The court's ruling that's not

13   admissible then -- is that the court's ruling,

14   before I go on, because I want the record to --

15        THE COURT:  I've said what I --

16        MR. TRAGOS:  Okay.

17        THE COURT:  -- said the law is, Mr. Tragos.

18   He cannot come in here and give an opinion to the

19   jury about whether this defendant committed the

20   crime or not.

21        MR. TRAGOS:  Okay.

22        THE COURT:  It's impermissible.

23        MR. TRAGOS:  Will the court allow him to --

24        THE COURT:  You tell me what you want to

25   proffer.

1           MR. TRAGOS:  Okay.

2           THE COURT:  Don't ask me what I'll allow him

3     to do.  I'm not trying this case, you are.

4           MR. TRAGOS:  Then --

5           THE COURT:  I know those words are biting, and

6     I don't mean to be.  But it's frustrating.  You know

7     the law as well I do.

8           MR. TRAGOS:  Your Honor, if --

9           THE COURT:  The rules of evidence will control

10    what's presented in this courtroom.  You don't have

11    any authority for what you've proffered thus far

12    with respect to Dr. Berlin.  I don't know about

13    these other two doctors.  We haven't talked about

14    them yet.

15          MR. TRAGOS:  Dr. Berlin then I would proffer

16    to the court would testify as to pedophilia, the

17    characteristics of pedophilia, fantasy chatting on

18    the internet and emotional bonds created through

19    chats on the internet, not specifically relating to

20    the defendant but to the general expertise of those

21    topics.

22          THE COURT:  Without opining as to whether what

23    that defendant did or did not constituted fantasy

24    chatting.

25          MR. TRAGOS:  Correct.

```
 1              THE COURT:  All right.  So you've limited your

 2      proffer.

 3              MR. TRAGOS:  Considering -- yes.  I still

 4      object to the court's prior ruling but --

 5              THE COURT:  My ruling is as I said it is.

 6              MR. TRAGOS:  Right.

 7              THE COURT:  So if you're backing off what you

 8      proffered earlier and you're willing to restrict his

 9      testimony, then that's what we're dealing with now.

10              MR. TRAGOS:  This is my second position.  Yes,

11      Your Honor.

12              THE COURT:  What about your other two experts?

13              MR. TRAGOS:  Dr. Friedlander would testify --

14              THE COURT:  Well, he's the defendant.

15              MR. TRAGOS:  I mean Krongold.  Dr. Krongold

16      would testify to basically the same thing as

17      Dr. Berlin.

18              THE COURT:  Well, then, you're running into

19      cumulative testimony, so pick your poison.

20              MR. TRAGOS:  Okay.

21              THE COURT:  You know you can't have multiple

22      experts.

23              MR. TRAGOS:  And then Dr. DiMarco is an

24      endocrinologist.  He will testify to diabetes, the

25      effects of diabetes on the body, that
```

1        Mr. Friedlander is a diabetic and that

2    Mr. Friedlander needs certain dietary as well as

3    medication to take care of his diabetes.

4        The reason that's relevant, Your Honor, is

5    because when he came up here for his -- for the

6    meeting with Detective Romanosky, that he did not

7    bring with him sufficient medical supplies for him

8    to stay an extended period of time, and that the

9    interview was conducted directly after that arrest,

10   and that that could have an impact on the answers he

11   gave at the interview.

12       THE COURT:  In what respect?

13       MR. TRAGOS:  In the respect that he might have

14   been suffering from some type of an insulin --

15       THE COURT:  Well, I mean, how does it affect

16   his interview?  Did he tell lies?  Did he exaggerate

17   or what?

18       MR. TRAGOS:  No.  He was -- there some points

19   in there where he was confused about answers and he

20   had trouble -- he was talking to himself and was

21   kind of disoriented during the -- during the

22   interview at times.  That could have been brought on

23   by the fact that he wasn't able to have his insulin.

24       THE COURT:  That has been -- we're not having

25   a discussion about the underlying offense, we're

1    dealing with the circumstances surrounding his

2    interview with the detective?

3         MR. TRAGOS:  And -- and the fact that -- the

4    objective fact that he needed insulin at a

5    particular time.  He did not bring the insulin with

6    him from Ft. Myers, and that the fact that he didn't

7    bring it meant -- is that he needed it, he didn't

8    bring it, that he was going back to Ft. Myers in

9    time to receive his insulin treatment.

10        THE COURT:  All right.  What's the relevance

11   of that?

12        MR. TRAGOS:  The relevance of that, Your

13   Honor, is to show that he wasn't planning on staying

14   up here for the activities that Detective Romanosky

15   said were going to happen.  The defendant --

16        THE COURT:  Who's going to testify to that?

17        MR. TRAGOS:  The defendant.

18        THE COURT:  Not the doctor?

19        MR. TRAGOS:  No, not the doctor.  The doctor

20   is just going to testify to the objective facts

21   from -- from -- about diabetes and the need for --

22   his need for insulin at certain times.

23        THE COURT:  Is he going to opine that this

24   defendant is insulin dependent?

25        MR. TRAGOS:  Yes.  I think that's an objective

1      fact that a doctor -- the endocrinologist is

2      certainly able to make.  He will not --

3           THE COURT:  He's examined the defendant and

4      is --

5           MR. TRAGOS:  He has examined all of the -- he

6      has examined records of the defendant.

7           THE COURT:  I asked if he had examined the

8      defendant.

9           MR. TRAGOS:  Has he examined him?  Not yet,

10     no.

11          THE COURT:  When is he going to do that?

12          MR. TRAGOS:  He will probably do it shortly.

13     We've had trouble getting all the -- his past

14     diabetic records, Your Honor.  But I think the

15     record -- even without the examination, I think the

16     records are sufficient from -- we've got records

17     from the hospital and his treating -- his treating

18     physician.

19          THE COURT:  He's not going to touch upon the

20     offense or the offense conduct.

21          MR. TRAGOS:  Correct.

22          THE COURT:  Is he going to -- do you intend to

23     have him discuss any aspects of the defendant's

24     interview with Detective Romanosky?

25          MR. TRAGOS:  Only to the effect that I'm going

1        to ask him what effect the lack of insulin has on a

2        person.

3              THE COURT:   What is he going to say?

4              MR. TRAGOS:   He is going to say that they can

5        become disoriented, weak --

6              THE COURT:   I'm sorry.   What?

7              MR. TRAGOS:   Disoriented, weak.

8              THE COURT:   Weak.

9              MR. TRAGOS:   Right.

10             THE COURT:   Anything else?

11             MR. TRAGOS:   Confused.

12             THE COURT:   And that is relevant to what

13       happened in the interview?

14             MR. TRAGOS:   Correct.

15             THE COURT:   Did he make incriminating

16       statements?

17             MR. TRAGOS:   Yes, he did.   There were times he

18       would say one thing, times he would say another

19       thing, that kind of thing.   And when they left him

20       alone in the room, he would talk to himself.   But,

21       again, he's not going to testify to the offense or

22       his intent, only the objective fact of the insulin

23       need.

24             THE COURT:   And he's not going to opine that

25       this defendant would not have traveled -- where was

1    this, Tampa or Sarasota?  I don't know why I --

2         MR. TRAGOS:  St. Petersburg.

3         THE COURT:  St. Petersburg.

4         MR. TRAGOS:  Ft. Myers to St. Petersburg.

5         THE COURT:  He's not going to say that this

6    defendant would not have traveled to St. Pete

7    intending to stay for any period of time without his

8    insulin.

9         MR. TRAGOS:  He's going to say that a

10   diabetic, not this particular defendant, a diabetic

11   needs his insulin on this -- and this defendant.

12        THE COURT:  You need to answer my question.

13        MR. TRAGOS:  Let me see if I -- make sure I

14   understand it.  He's not going to say that this

15   defendant would not have traveled up here.  No, he's

16   not going to say that.

17        THE COURT:  He's not going to talk about the

18   facts of this case, then.

19        MR. TRAGOS:  Only -- Your Honor, I'm going to

20   give him the time --

21        THE COURT:  Let me just cut through this.  I'm

22   trying to be delicate.

23        MR. TRAGOS:  Okay.

24        THE COURT:  He's not going to say this

25   defendant wouldn't have come up here to have sex

1    with a child because he didn't bring his insulin

2    with them.

3            MR. TRAGOS:  Correct.  He's not going to say

4    that.

5            THE COURT:  He can't say that.

6            MR. TRAGOS:  Right.  He's not going to say

7    that.

8            THE COURT:  All right.  Krongold,

9    K-R-O-N-G-O-L-D, Madam Court Reporter.

10           MR. TRAGOS:  I believe that's correct.  His

11   resume is in the file.

12           THE COURT:  Well, I understand that.  But if

13   his testimony is cumulative to Dr. Berlin, clearly I

14   have the discretion to prohibit cumulative

15   testimony.  Is there anything that Dr. Krongold

16   would testify above and beyond what Dr. Berlin

17   would?

18           MR. TRAGOS:  No, Your Honor.

19           THE COURT:  Is he better credentialed or

20   less -- is there any distinction between the two, in

21   other words?  It sounds like Berlin is better

22   credentialed, but that's entirely --

23           MR. TRAGOS:  Krongold is a psychologist,

24   Berlin is a psychiatrist.  We would -- if -- if it

25   came between the two, my guess is we would use

1        Berlin.

2            THE COURT:  All right.  So Berlin is an MD,

3        psychiatrist?

4            MR. TRAGOS:  Right.

5            THE COURT:  All right.  Ms. Kaiser,

6        Mr. Tragos, after my brow beating -- and he knows

7        that that's not what I intend, but it's the Socratic

8        method of testing the strength of his position --

9        has withdrawn to a second position in light of

10       704(b) -- appropriately, I think -- such that

11       Mr. Tragos will ask Dr. Berlin only to testify as an

12       expert on whether or not this defendant is a

13       pedophile; two, he will describe for the jury what

14       fantasy internet chatting is; and, three, the bonds

15       that are created through that activity.

16           He will not opine as to whether this defendant

17       did or did not engage in fantasy internet chatting

18       or did or did not intend to commit the offense

19       charged in the indictment.  Admissible or not?

20           MS. KAISER:  Not.

21           THE COURT:  Give me a case.  I hate to keep

22       asking that but you know case law is what guides us.

23           MS. KAISER:  Aside from the ones I provided

24       before the break, Your Honor, *U.S. versus Powers*,

25       59 --

1          THE COURT:  All right.  Let's look at *Powers*.

2     What does *Powers* say?

3          MS. KAISER:  It says testimony regarding

4     whether or not somebody is a pedophile is

5     irrelevant.

6          THE COURT:  All right.  Wait just a minute.

7     Let me pull it up.  All right.  *Powers* is, as you

8     cited earlier, 59 F.3d 1460, a Fourth Circuit

9     decision, 1995.

10         MS. KAISER:  Correct.

11         THE COURT:  The defendant was charged with

12    aggravated sexual abuse of a minor, that is, his

13    daughter, Section 2241(c).  What pages were you

14    reading from?  It looks like headnote 25 through 28?

15         MS. KAISER:  Yes.  It would be page 1470

16    through 1471, through -- look at the bottom of 1471.

17    Shall I read it for the court.

18         THE COURT:  No, I'm reading it.  It's not

19    necessary, in other words.  Let me ask Mr. Tragos,

20    is Dr. Berlin going to testify about any particular

21    tests that he administered to this defendant?

22         MR. TRAGOS:  Your Honor, the court has the

23    report, if you'll give me one second.

24         THE COURT:  Well, I haven't read it.

25         MR. TRAGOS:  That's why I'm going to refer to

1    it.   I do not believe that there's a -- kind of a

2    written test, if that's what the court asked.

3         THE COURT:   Well, any type of test.   I'm about

4    to confirm with Ms. Kaiser, this case is really a

5    *Daubert* issue, and that the psychologist testified

6    the results were -- or was prohibited from

7    testifying that the results of a penile

8    plethysmograph -- did you get that, Madam Court

9    Reporter?   P-L-E-T-H-Y-S-M-O-G-R-A-P-H test.

10        MR. TRAGOS:   It sounds painful.   I don't

11   believe that particular test was performed.

12        THE COURT:   If it was a *Daubert* issue and

13   that's what it had to do with, I just want to

14   distinguish the case if I'm following it.

15        MS. KAISER:   No, Your Honor.   If the court

16   keeps reading to the bottom of page 1471, it says

17   next *Powers* argued that the district court abused

18   its discretion in excluding the testimony of Dr.

19   Anthony Sciara.

20        THE COURT:   All right.   Just a moment.   Let me

21   catch up with you.

22        MS. KAISER:   Okay.

23        THE COURT:   Okay.   Right under the capital

24   letter B?

25        MS. KAISER:   Correct.

1          THE COURT:  All right.  Go ahead.  I've read

2     it now.

3          MS. KAISER:  All right.  Well, based on the

4     *Powers* opinion, we believe that it's just not

5     relevant.  Whether or not Mr. Friedlander or

6     Dr. Friedlander's a pedophile or not is not an

7     element in this case.  It's not helpful for the jury

8     to have such testimony.  And it's also not even

9     really in accord with the facts of this case.

10          Mr. Tragos mentioned earlier that there was

11     absolutely no evidence that the defendant ever

12     chatted with any other children.  That's just not

13     true.  There's e-mails that do suggest that

14     Mr. Friedlander chatted with the father of some boys

15     when the father wasn't home, and he goes into great

16     detail about his discussions with a minor.

17          THE COURT:  Wait a minute.  Wait a minute.

18     With the father of the boys when the father wasn't

19     home?

20          MS. KAISER:  He --

21          THE COURT:  You mean with the boys when the

22     father wasn't home?

23          MS. KAISER:  Yes.  He spoke to the boys when

24     the father wasn't home.  And there's evidence

25     through e-mails of the defendant relaying what he

1    had e-mailed or chatted with the boys about when the

2    father wasn't home.  So he's telling the dad, hey, I

3    spoke to your son when you weren't home and here's

4    what he said, and it's a sexual conversation.

5         So that part's just not true, and I need to

6    respond to some of the statements that Mr. Tragos

7    made just to correct the record.

8         He mentioned that there's no -- absolutely no

9    evidence that Mr. Friedlander had a sexual interest

10   in children on the computer.  That's just not -- not

11   true, as well.  There's -- we found evidence of the

12   Port St. Lucie investigation and the chats in which

13   in that case he wanted to arrange to have sex with

14   that child, as well.

15        THE COURT:  But that -- as he said, that's not

16   coming in unless it's proper rebuttal so --

17        MS. KAISER:  Your Honor, if I may just digress

18   for a moment on that issue on that --

19        THE COURT:  No.  I've already ruled on that.

20        MS. KAISER:  I know, Your Honor, but I need to

21   bring something to the court's attention.  In the

22   interview with the defendant, he made a number of

23   false exculpatory statements including that he had

24   no interest in children, just like he made a

25   statement that he had no interest in --

1          THE COURT:  And you may be able to get it in

2     in rebuttal.  That's why I said, Mr. Tragos

3     understands me.  It's not coming in in the case in

4     chief, but it may come up in rebuttal, depending on

5     what kind of defense they put on.  So you hear me,

6     you know what I mean.  It's highly inflammatory.

7     It's highly prejudicial.  But if they put on a

8     defense such as you've just described, it may very

9     well come into play.

10          MS. KAISER:  So as to not -- should the

11     government then redact the false exculpatory

12     statements?  Because typically with a false

13     exculpatory, the government would be allowed to put

14     on evidence to show that he made false statements.

15          THE COURT:  No.  I didn't order that you

16     redact anything.  I thought there was a reference to

17     Port St. Lucie during the interview.  If there's

18     not, there's nothing to redact.  It's simply a

19     matter of instructing your witness not to mention it

20     in the direct examination.

21          If he's asked a careless question on cross,

22     then that's an invited error on Mr. Tragos's part.

23     He understands that.  But if the defendant made a

24     false exculpatory statement but didn't identify

25     Port St. Lucie, that's a whole different matter.

1          MS. KAISER:  Your Honor, what the nature is

2     the defendant in his interview says, I have no

3     interest in children and that's flatly false, so the

4     government should be able to prove that that's a

5     false exculpatory statement.

6          THE COURT:  Maybe on rebuttal but not in your

7     case in chief.  I've ruled.

8          MS. KAISER:  Yes, Your Honor.

9          THE COURT:  We started this conversation off

10    about six hours ago asking you why you needed to put

11    all this stuff in.

12         MS. KAISER:  Well, that was an admission of --

13         THE COURT:  That's a clue to you that I think

14    you're creating issues by putting all this in.

15    That's fine, that's your prerogative.  But that will

16    not come in in your case in chief.

17         MS. KAISER:  I understand, Your Honor.  I just

18    don't know how the government is to deal with the

19    false exculpatories in the interview, because

20    typically in an interview situation if the defendant

21    lies and says bold face lies in the interview --

22         THE COURT:  That's a problem that you have to

23    deal with, Ms. Kaiser.

24         MS. KAISER:  Yes, Your Honor.

25         THE COURT:  I've made my ruling.

1            MS. KAISER:  Yes, Your Honor.

2            THE COURT:  I don't understand sometimes

3      lawyers that continue to argue with the judge.  Do

4      I have to bang a gavel on the desk?

5            MS. KAISER:  Your Honor --

6            THE COURT:  Do I have to yell at you?

7            MS. KAISER:  No, sir, Your Honor.

8            THE COURT:  Take an appeal if you don't like

9      my ruling.

10           MS. KAISER:  Your Honor --

11           THE COURT:  I have ruled.

12           MS. KAISER:  I understand.  That was a

13     separate issue that the false exculpatory was

14     completely separate than what we had discussed

15     earlier, so I just wanted to bring that to the

16     court's attention as it could be a potential problem

17     at trial.

18           THE COURT:  It's not a problem.

19           MS. KAISER:  Okay.  In terms of whether or not

20     the defendant's a pedophile, going back to the

21     *Powers* opinion, it makes it clear that the defendant

22     cannot do what he's trying to do, and that's

23     basically to say that there's this group of people

24     that he does not match the characteristics of.

25           He's trying to say that there's a group of

1    people out there that are pedophiles, and he wants

2    to put on expert testimony to say that his defendant

3    isn't one of them.  So it's sort of like negative

4    propensity evidence, if you will, and it's

5    impermissible under Rule 704(b).

6         THE COURT:  I agree.  Negative propensity

7    evidence is not admissible.  There's plenty of cases

8    out there.  But I understood the presentation or the

9    proffer that it was not negative propensity.  In

10   fact, I had essentially precluded that.

11        MS. KAISER:  To say he's not a pedophile --

12        THE COURT:  The question of whether he's a

13   pedophile, that's the issue.  Now, how Dr. Berlin

14   describes pedophilia and whether he looks at

15   statistical studies, I don't know yet.  There's no

16   way for me to tell even from his report.

17        But I can tell you that from my knowledge,

18   since 1995 this area of the law has developed

19   exponentially, so there's no wonder that Dr. Sciara

20   in that case couldn't connect it up under *Daubert*.

21   I expect we're in a whole different world today.

22        I guess the question is if it's remotely

23   admissible, we're going to have to find out whether

24   it fits under *Daubert* or it's admissible under

25   *Daubert*, because I can't tell how he reaches his

1    definition of pedophilia.

2         MS. KAISER:  And the issue of whether or not

3    he's a pedophile has nothing to do with the elements

4    under 2224(b).  It doesn't matter if he's a

5    pedophile.  Even if -- assuming arguendo that the

6    United States agrees that he's not a pedophile, so

7    what?  It doesn't negate his defense, in any way

8    negate his defense.  He doesn't have to be a

9    pedophile to have comitted the offense.  So it's --

10        THE COURT:  Is it not of consideration for the

11   jury, though, in determining whether he intended to

12   do what is alleged in the indictment?  A factor, I

13   should say.

14        MS. KAISER:  Whether or not someone -- a

15   psychologist labels him a pedophile or not is not

16   relevant to any of the elements of the offense.

17   Whether or not he has a diagnosis of pedophilia

18   under the DSM, which it's not even clear from the

19   report what all information Dr. Berlin's relied

20   upon.

21        THE COURT:  Well, that's a *Daubert* inquiry.  I

22   intend to do that if we get that be far.  But in

23   *Powers*, the problem as I see the -- in the case as

24   the opinion explains is the defendant was not able

25   to link non-proclivity for pedophilia with

1    non-proclivity for incest, which is the offense that

2    was charged in that case.  So there was no link

3    between the two; therefore, it wasn't relevant.

4         It seems to me that we have a slightly

5    different scenario where you've got, assuming for

6    purposes of discussion, a diagnosis that someone is

7    not a pedophile and whether that is linked to an

8    intent to induce an individual under 18, in this

9    case 11-year-olds?

10        MS. KAISER:  Yes.

11        THE COURT:  To engage in sexual acts.  It

12   could be a link.  All right.  What's the other

13   cases?  I mean, I read *Powers* and it says what it

14   says.

15        Well, let me ask you before you turn to

16   another case.  In terms of Dr. Berlin, if his

17   testimony is allowed and it's limited to those three

18   things that I have discussed with Mr. Tragos, are

19   you prepared -- if you want to, that is -- are you

20   prepared to have a comparable expert testify?

21        MS. KAISER:  No, Your Honor.  No.  I just got

22   the report last night regarding the content of

23   Dr. Berlin's testimony.  It's -- there's no way I

24   could get somebody by Monday on Friday afternoon.

25        THE COURT:  How long would it take you to get

1    somebody?

2         MS. KAISER:  I've been in contact with the

3    expert that the court heard from, and apparently

4    Mr. Tragos, too, in the *Cross* case.  And the

5    earliest he'd be available is the first week in

6    January.

7         THE COURT:  That's not acceptable.  There's

8    got to be somebody in town who could testify.

9    There's plenty of psychiatrists in this area who

10   have dealt with pedophilia.  When I say plenty, I

11   know there's more than one.

12        All right.  Well, let's move on.  Other than

13   *Powers*.

14        MS. KAISER:  The other cases cited in my

15   motion.  In the first motion, Your Honor, which is

16   docket number 74, I cited the *Murrell* case,

17   M-U-R-R-E-L-L, 368 F.3d 1283, Eleventh Circuit 2004.

18   And I cited that case for the proposition as to what

19   type of intent is at issue in a 2420(b) case.  And

20   as we discussed previously, it's the intent to

21   induce.

22        THE COURT:  I'm not sure I have a copy of

23   *Murrell*, but I can pull it up if you'll give me a

24   moment.  I thought I did.

25        MS. KAISER:  I probably have an extra copy if

1        the court would like one.

2            THE COURT:  That would be helpful if you do.

3        Thanks.  I thought that was one of the ones I read

4        last night.  Thank you, sir.  All right.  Go ahead.

5            MS. KAISER:  The *Murrell* case discusses -- it

6        says, while it may be rare for there to be a

7        separation between the intent to persuade and the

8        follow-up intent to perform the act after

9        persuasion, there are two clearly separate and

10       different intents and the Congress has made a clear

11       close to criminalize the persuasion and the attempt

12       to persuade, not the performance of the sexual acts

13       themselves.  Hence, a conviction under the statute

14       only requires a finding that the defendant had an

15       intent to persuade or to attempt to persuade or

16       induce.  That's at *Murrell* at 1287.

17           So I cited that case in my first motion with

18       the court to point out that whether or not

19       Mr. Friedlander is impotent, whether or not he

20       couldn't physically perform the sex acts, which

21       appears to be part of the reason they want to have

22       the diabetic testimony or testimony by an

23       endocrinologist, has to do with whether or not he'd

24       actually commit the sex acts.

25           And the same thing with Dr. Berlin.  He wants

1     to say, A, he's not a pedophile, B, it's all a

2     fantasy, therefore, he did not commit the act, or he

3     had no intent to commit the act.

4          THE COURT:  I haven't obviously been privy to

5     the evidence, Ms. Kaiser, but what evidence of a

6     sexual act do you intend to introduce?

7          MS. KAISER:  No -- no evidence that a sexual

8     act --

9          THE COURT:  Not that it took place, but I'm

10    talking about in terms of the statute.

11         MS. KAISER:  The statutory reference, Your

12    Honor?

13         THE COURT:  No.  I want to know what your

14    evidence is.  You've got to prove that the defendant

15    knowingly attempted to persuade, induce, entice,

16    etcetera, the individual under 18 to engage in a

17    sexual act.

18         MS. KAISER:  Correct.

19         THE COURT:  What is it that you contend will

20    be the sexual act?  Is it the bondage, the whipping,

21    the S and M?

22         MS. KAISER:  Lewd and lascivious

23    sadomasochistic abuse of a minor.

24         THE COURT:  As opposed to an act of

25    intercourse or something of that nature?

1          MS. KAISER:  Oral sex -- it will be oral sex

2     and handling will be the evidence, not physical

3     intercourse.

4          THE COURT:  Oral sex performed on the boys?

5          MS. KAISER:  Both.  Oral sex performed on the

6     boys or by the children on the defendant.  And they

7     discussed a word called handling to mean sexual

8     activity without penetration, although some of

9     the -- some of the chats may reference -- may

10    reference penetration indirectly.

11         THE COURT:  When the defendant was arrested,

12    what did he have with him as far as -- I think there

13    was either a mention of a razor whip or something.

14         MS. KAISER:  Razor -- he had a number of what

15    they call a razor strop.

16         THE COURT:  Strap?

17         MS. KAISER:  They spell it S-T-R-O-P.

18         THE COURT:  All right.  Other than that.  He

19    had that with him.  What else?

20         MS. KAISER:  A whip, a horse -- a horse whip,

21    a crop, riding crop and some belts.  He had a belt

22    and he had the -- the leather things that you use

23    to -- I guess razor strops that you use -- that he

24    discussed using to whip the boys.

25         THE COURT:  So implements that were discussed

1      in the exchange of communication?

2            MS. KAISER:  Correct.  Yes.

3            THE COURT:  All right.  Well, *Murrell* says

4      what it says.  But that case did not deal with the

5      admissibility of expert testimony; correct?

6            MS. KAISER:  Correct.  In the case that was

7      cited previously by defense counsel, another case is

8      *U.S. v. Manley*, which I believe Mr. Tragos cited

9      earlier, 893 F.2d 1221, the Eleventh Circuit held

10     that the evidence rule precluding expert opinion on

11     whether the defendant had the requisite mental state

12     or condition constituting an element of the crime or

13     defense precluded the psychologist from giving an

14     opinion prior to the introduction of any substantive

15     evidence on an the insanity question as to whether

16     the hypothetical person with the defendant's alleged

17     mental illness would be able to appreciate the

18     nature and quality or wrongfulness of his action.

19           THE COURT:  Where are you reading from?

20           MS. KAISER:  I was reading just from the

21     summary on the front page, but it's -- it's in the

22     opinion on page 1221.  There's a discussion that's

23     on the right column on page 1221, if you're looking

24     at the Westlaw printout.

25           THE COURT:  It wouldn't be on 1221.  That's

1    the summary.

2         MS. KAISER:  1224, I'm sorry.  I apologize,

3    Your Honor.  1223 -- at the end of 1223 to the top

4    of 1224.  I apologize.

5         THE COURT:  I have substantial doubts about

6    the admissibility of any of this evidence.  If one

7    reads *Murrell* closely, which I've tried to do here,

8    the requisite intent under 2422(b) is the persuasion

9    or inducement of the minor, quote "rather than the

10   sex act itself," closed quote.

11        It would seem to me that -- and there's a

12   parenthetical, "with himself or with a third party",

13   closed quote, meaning that the defendant could

14   commit a violation by inducing a minor to engage in

15   a sex act with someone else and violate the statute.

16   And, again, they say without then actually

17   committing any sex act himself.

18        So the question is going to be, Mr. Tragos,

19   whether this evidence that you've proffered, whether

20   the defendant's a pedophile, what fantasy internet

21   chatting is or isn't -- well, let's just talk about

22   whether he's a pedophile.  I'm not sure that's

23   relevant to the first element of the offense, that

24   is, the enticement or inducement aspect of the minor

25   when it's not the sex act itself which is the

1    subject of the intent.

2         MR. TRAGOS:  Your Honor --

3         THE COURT:  Now, whether he could perform or

4    not, and I gather that's where you're going, or

5    wanted to perform, doesn't seem to be relevant.

6         MR. TRAGOS:  Your Honor, the -- the actual

7    commission of the sex act is not a necessary

8    element.  There's no doubt about that.  But he has

9    to intend with this inducement to commit a sex act.

10   If he induces some child to blow bubbles, it's not a

11   crime.

12        THE COURT:  Well, you say to commit a sex act.

13   That's not what is alleged.  It's to induce the

14   child to engage in a sex act.

15        MR. TRAGOS:  Okay.

16        THE COURT:  That's why I was asking Ms. Kaiser

17   about what it was she thought the evidence was going

18   to establish.  If he's going to go in and perform

19   acts on the children --

20        MR. TRAGOS:  Your Honor, all of these -- the

21   evidence, I believe, that the government is going to

22   present is going to show that there is a variety of

23   sex acts, including penetration, including oral,

24   just a variety of sex acts.  If the crime is that

25   someone -- the crime is not inducing someone to blow

1    bubbles.   The crime is inducing someone to commit a

2    sex act.

3         So if a person doesn't want -- if the person

4    can't commit a sex act, then I believe it's relevant

5    to whether or not they would induce somebody to

6    commit a sex act.

7         THE COURT:   Physically can't?

8         MR. TRAGOS:   Excuse me?

9         THE COURT:   Physically can't perform the act?

10        MR. TRAGOS:   That he has no interest in

11   performing the act.

12        THE COURT:   Well, that's different from

13   physical because now I'm --

14        MR. TRAGOS:   Well, there's both.   Actually,

15   it's both.

16        THE COURT:   -- cued into your endocrinologist

17   testimony and the effects of diabetes.

18        MR. TRAGOS:   Right.

19        THE COURT:   We've been inundated with these

20   commercials lately about the effects of diabetes and

21   how they result in -- it results in sexual

22   dysfunction in males.   If that's where you're going,

23   I've got a problem with the endocrinologist.

24        MR. TRAGOS:   I'm going in to -- the

25   endocrinologist, there's multiple things he's

1    testifying to if the court -- but as far as the

2    impotency, the court hasn't heard the interview.

3    But the interview deals a huge amount with impotency

4    and diabetes and with the officer giving his medical

5    opinion about impotency and diabetes.

6         And we haven't gotten to that motion yet, but

7    there's a lot of testimony on there about impotency

8    and diabetes.  My client will testify to being

9    impotent and unable and having no interest in sex,

10   if he should testify which I would think there's a

11   high probability that he will.  But he will testify

12   to that.

13        My -- the endocrinologist, all he will do is

14   say that, yes -- again, not specifically saying that

15   he knows my client is impotent but, yes, diabetes,

16   all of these things can lead to impotency, that it

17   is a medical fact.  And that -- again, that's only

18   one, the diabetes comes into play several ways in

19   this case.  But just dealing with that one area,

20   it's a medical fact and a doctor is able to testify

21   to that medical fact.

22        My client can testify -- and if my client

23   didn't testify to this, by the way, I don't think

24   that the expert could testify to it.  But if my

25   client testifies to the impotency and the diabetes,

1        then I think that it's justified for an expert to

2        testify between the connection between impotency and

3        diabetes.  And --

4             THE COURT:  If it's relevant to an element of

5        the offense.

6             MR. TRAGOS:  Right.  An element of the offense

7        is that he has to intend to induce somebody to have

8        sex.

9             THE COURT:  No.  That's not the element.

10            MR. TRAGOS:  Okay.  Intend to induce somebody

11       to -- what's the word --

12            THE COURT:  Engage in a sexual act.

13            MR. TRAGOS:  Okay.  Engage --

14            THE COURT:  Either with him or someone else or

15       just in front of him --

16            MR. TRAGOS:  Right.

17            THE COURT:  It doesn't have to be with him is

18       my point.

19            MR. TRAGOS:  Right.

20            THE COURT:  I don't know what the evidence is

21       going to show.  Apparently it will show that but --

22            MR. TRAGOS:  Your Honor, the evidence is

23       strictly going to show the sex is going to be with

24       him.  There's no third-party that the sex is going

25       to occur.  The sex is going to be with the

1    defendant.  The officer was very clear in the IMs to

2    make sure that it was the defendant having sex with

3    his children.

4         So there's no third-party.  It is this man

5    having sex with the children.  If this man cannot

6    have sex with the children and if he says he is

7    impotent and has no interest in having sex with the

8    children and says that -- and a doctor then is

9    certainly able to come in and testify to a medical

10   truth, that is, diabetes produces impotency, that's

11   just a medical fact, he's not -- not saying he's not

12   guilty of any crimes, but it's a medical fact to

13   bolster the credibility of the defendant's testimony

14   when he says he is impotent.

15        And it is -- it is a piece for the jury to

16   consider in the credibility of the defendant when he

17   presents a defense saying he had no interest in

18   having sex with these children, none, and that these

19   conversations were not to induce sex with the

20   children.  They were to induce a relationship with

21   the man he was talking to on the internet.

22        So how do I -- how do I give him credibility

23   without some just bona fide testimony that what he

24   is saying about diabetes is correct?  And, again,

25   you'll see that untold moments are spent talking

1        about this on the interview.

2             THE COURT:  Do I understand correctly,

3        Mr. Tragos, that the admissibility of your experts,

4        if I allow it in on the limited basis we've talked

5        about, is entirely contingent upon there being an

6        evidentiary foundation in the record for this, that

7        is, from this defendant?

8             MR. TRAGOS:  Or from evidence which the

9        government introduces.  But there will be an

10       evidentiary foundation before they testify.

11            THE COURT:  Well, what is going to be the

12       evidentiary foundation if the defendant does not

13       testify for --

14            MR. TRAGOS:  If the government puts into

15       evidence the defendant's statement about his

16       impotency, about he could not get an erection

17       because of his diabetes, if the government puts that

18       in or -- then I would think that that would be an

19       evidentiary foundation for an expert to testify

20       about the fact that, yes, it is a medical fact that,

21       you know, diabetes and erectile dysfunction are

22       related.  If the government puts that in.

23            If they don't, then obviously we'd have to put

24       it in before the expert testified.  Yes.  There

25       would be facts -- before the expert testified, there

1      would be fact in evidence.

2           THE COURT:   What about the pedophilia or not?

3           MR. TRAGOS:   That, Your Honor, would be based

4      on, again, the evidence in the case which, again,

5      would be in before the expert testified.   The

6      existence of those various factors such as no child

7      pornography on the computers, that type of

8      information that the expert uses, but it will all be

9      in the evidence before he testifies about the DSM

10     definition.

11          Again, we're talking about a recognized -- one

12     of the problems I'm having as I go back and forth on

13     the government's argument about whether or not they

14     talk relevancy or whether they talk about sufficient

15     basis.  *Daubert* issue.   The government doesn't --

16     hasn't put forth anything to this court that the DSM

17     or that any of Dr. Berlin's conclusions from the

18     DSM --

19          THE COURT:   Well, they just got his report

20     last night.   What do you expect them to be able to

21     do?

22          MR. TRAGOS:   Well --

23          THE COURT:   That's another problem.   You know,

24     if they had asked me, I'd probably strike this

25     because of untimeliness.   They haven't asked but --

1     so I can't be critical of the government.  We'll

2     have a *Daubert* hearing.  We'll find out if his

3     methodology is reliable and whether or not it's

4     relevant under *Daubert*.

5          MR. TRAGOS:  Okay.

6          THE COURT:  But it's not fair to criticize the

7     government.  They just got this report.

8          MR. TRAGOS:  Your Honor, I think that he is --

9     his conclusions are based on the DSM criteria.  It

10    is a recognized criteria and he is not going to

11    testify -- and the court has stated it and I, of

12    course, accept the court's ruling to his -- to the

13    ultimate intent issue in this case.

14         But there are pieces of the puzzle to

15    corroborate the defense argument, such as criteria

16    for pedophilia and his -- the fantasy issues of what

17    fantasy chats are and how they are on the internet,

18    and the --

19         THE COURT:  What's going to be the evidentiary

20    foundation for that if the defendant doesn't

21    testify?

22         MR. TRAGOS:  If he does -- oh, there won't be.

23    If he doesn't testify, there will not be -- well,

24    never mind.  Their interview, their testimony.  But

25    I'm -- I guess the court can kind of see that I'm

1       not anticipating the defendant not testifying.  But

2       on the government's interview, the discussion that

3       these were fantasy is -- is stated on the interview.

4       It was all part of the interview.

5               THE COURT:  All right.  It seems to me that

6       the government's motion to strike -- actually, the

7       motion in limine, excuse me.  When did the original

8       pretrial discovery order require disclosure of

9       experts?  Was it August 18th?

10              COURTROOM DEPUTY CLERK:  Your Honor, it was on

11      the 18th, final pretrial motion in this case.

12      August 11th the government was given time for expert

13      disclosure.

14              THE COURT:  I assume the defendant asked for

15      discovery, Mr. Tragos, correct, Rule 16?

16              MR. TRAGOS:  Yes, Your Honor.

17              THE COURT:  Did, Ms. Kaiser, the government

18      request of the defendant disclosure of experts?

19              MS. KAISER:  Yes, Your Honor.  The government

20      always asks for reciprocal discovery in its

21      discovery letter.

22              THE COURT:  Did you get one, Mr. Tragos?

23              MR. TRAGOS:  Did we get a discovery letter?

24      Give us a moment, Your Honor.

25              THE COURT:  Yes, sir.

1       (Brief pause.)

2           THE COURT:  Have you got a copy of yours?

3       Maybe you can just help us out here.

4           MS. KAISER:  I don't, Your Honor.

5           MR. TRAGOS:  Your Honor, there is a request

6       for reciprocal discovery.

7           THE COURT:  What was the date of that?

8           MR. TRAGOS:  August 8th.

9           THE COURT:  Which would have meant compliance

10      with 15 days, on or about August 23rd, give or take.

11          MR. TRAGOS:  Right, for both sides.

12          THE COURT:  Well, that's yours back to her,

13      expert discovery back to the government.

14          MR. TRAGOS:  And the government's to us, as

15      well, Your Honor.

16          THE COURT:  Judge Wilson entered an order in

17      this case back in July -- actually it was August

18      1st, docket 12, requiring upon request that

19      disclosure under Rule 16 begin and be completed by

20      August 11th.  The defendant was required to disclose

21      its discovery by August 18th, or within 15 days

22      after the serving of the request, which is what I

23      just alluded to.

24          What I'm hearing is that both the government

25      and the defendant have essentially ignored this

1    order.  There's no motion for relief.  The defendant

2    moved for a continuance on August 22nd, which is

3    docket 25.  That motion was granted by order dated

4    August 26th, scheduling this case for trial on the

5    November trial term.

6         Not satisfied with that, there was a joint

7    motion filed by the parties on September 5th, docket

8    33, requesting a date certain and protection.  That

9    motion was denied on September 8th by an order

10   signed by me.  The defendant filed an unopposed

11   motion to continue trial, which is docket 40.  At

12   the status conference on October the 3rd, I

13   scheduled this case for date certain trial for

14   Monday, the 17th.

15        So on October the 3rd, the parties knew they

16   had a date certain trial date; yet until last week,

17   the defendant did not give notice of these experts.

18   And until last night did not furnish a report that

19   would have informed government counsel as to the

20   nature of the testimony proffered by the experts.

21        I'm inclined Mr. Tragos to strike your experts

22   unless you satisfy the standard under Rule 12.2(b)

23   that good cause --

24        MR. TRAGOS:  Your Honor, it is --

25        THE COURT:  I don't want to hear about the

1   government's volumes and volumes of discovery.  You

2   knew that back when we had the first case status

3   conference.

4       MR. TRAGOS:  Your Honor, on October 3rd --

5   first of all, Your Honor, on the first continuance,

6   that was within two or three weeks of the initial

7   appearance for that -- that continuance.  On October

8   3rd is when we received the bulk of the

9   government's -- I believe the bulk of the

10  government's discovery.  I think that's when we got

11  all the CDs and stuff, right, October 3rd.

12      MS. KAISER:  No.  They had all the relevant

13  chats, e-mails, undercover phone calls, they were

14  e-mailed to him before the initial appearance.  Alex

15  Hagedorn had e-mailed counsel all the relevant chats

16  from -- that form the basis of this charge before

17  the discovery order was issued.

18      MR. TRAGOS:  Your Honor, I --

19      THE COURT:  The October 3rd date, then, has to

20  do with all the 404(b) --

21      MR. TRAGOS:  Your Honor, I got five -- there

22  were five CDs, Your Honor, that I received on

23  October 3rd, five computer discs full of information

24  I received October 3rd at the status conference.

25      THE COURT:  What did you have before the

1        initial appearance?

2            MR. TRAGOS:  Before -- before the initial

3        appearance?

4            THE COURT:  That's what she just said.  She

5        said the agent sent discovery to you.  Not the

6        initial appearance, I'm sorry.  You said --

7            MS. KAISER:  I'd did, Your Honor.

8            THE COURT:  You said that, but you meant

9        arraignment?

10           MS. KAISER:  The arraignment.

11           MR. TRAGOS:  Before the arraignment I had some

12       hard copies of the -- I believe the chats between

13       Romanosky and my client, but I did not have the --

14           THE COURT:  The ones related to the charge in

15       the indictment?

16           MR. TRAGOS:  Right.  I did not have the 5,000

17       e-mails -- actually, more than 5,000, a lot more

18       than that -- e-mails and all that information before

19       then.  I received on October 3rd the five discs

20       which turned out to only contain the relevant -- or

21       what the government felt was relevant on the

22       computers.

23           THE COURT:  If I strike all of that evidence,

24       prohibit the government from putting it on, and

25       confine them to the discovery furnished to you at or

1    about the time of arraignment, what's your defense?

2         MR. TRAGOS:  At or about -- well, they gave me

3    their experts --

4         THE COURT:  I didn't ask you that.

5         MR. TRAGOS:  -- On Monday.

6         THE COURT:  What's your defense?  Same

7    defense; right?  I'm not a pedophile.  I couldn't

8    have done it even if I wanted to.

9         MR. TRAGOS:  Oh, no, Your Honor, because the

10   evidence was not as conclusive -- those e-mails and

11   the stuff we got on the computer, the fact that

12   there was no child pornography on the computer, the

13   fact that those are all extremely relevant to any

14   expert's opinion, especially as the pedophile or

15   fantasy.

16        THE COURT:  I'm sorry.  I might not have made

17   it clear.  I said assuming none of that is coming

18   in --

19        MR. TRAGOS:  But it was relevant to my experts

20   is what I'm saying.  It was relevant to expert

21   testimony that --

22        THE COURT:  Well, the government is not

23   required to give you evidence relevant to your

24   experts.  I'm asking you a hypothetical.  If the

25   government does not put on any evidence other than

1    what was provided to you in the course of the pre-

2    arraignment discovery exchange, you'd still have the

3    same defense; right?

4         MR. TRAGOS:  It would -- Your Honor, it would

5    be *Brady* information that --

6         THE COURT:  *Brady*?

7         MR. TRAGOS:  Yes.  Because I believe it proves

8    that my client did not attempt to induce a child to

9    have sex.

10         THE COURT:  All right.  Back to my

11    hypothetical.  My point is you had the evidence

12    supporting the charge in the indictment at the time

13    of arraignment.  If that's all the government

14    intended to present, we are in a posture some three

15    or four month later --

16         MR. TRAGOS:  Am I supposed to presume, Your

17    Honor, the court's -- yes.

18         THE COURT:  You're supposed to be ready for

19    trial and you're supposed to comply with the rules

20    as she is.  Neither one of you did and I'm not real

21    happy about it.  And I'm going to send the message

22    right now, if I continue to see it, there's going to

23    be some lawyers trying cases in here that are going

24    to be embarrassed.

25         And I'm not the only judge concerned about

1       this.  It's a lackadaisical approach to discovery.

2       The rules are what they are.  I don't care if agents

3       are out of town, on vacation or busy with other

4       cases.  This man's life is on the line.  He's

5       entitled to protections afforded by the rules.

6           I'm not picking on you, per se.  But I'm about

7       ready to concern myself with a request for a

8       continuance.  The two of you have been asking for a

9       continuance.  You've asked for it twice.  You've had

10      two joint motions.  And it's almost looks to me like

11      this is a backdoor way of getting a continuance.

12      And I'm doing everything I can to keep from granting

13      it, because I gave you a date certain.

14          My calendar has been affected because of this.

15      Other matters have been delayed.  I've got lawyers

16      calling the clerk today because they're on the tee

17      right behind you, and it's not fair to them, it's

18      not fair to my staff, it's not fair to you, your

19      clients, me, the witnesses.

20          I don't see what the good cause is here.  You

21      either had a defense when the discovery was first

22      furnished or you don't have a defense.  This

23      additional stuff is just more evidence the

24      government wants to put on.  That's their problem,

25      their prerogative.

1          MR. TRAGOS:  Your Honor, I cannot presume my

2     defense when I know that there's additional evidence

3     that the government is giving me.  And I cannot

4     presume that when that happens.  And I knew as we

5     all knew that there were computers that were going

6     to be analyzed, that there was reports that I was

7     going to receive, that there was documentation,

8     photos, e-mails, that was all coming.

9          And how can I presume a defense when that -- I

10    mean, I just -- and I know the court doesn't want to

11    hear about it, but about November 10th I just

12    received the last packet of information.  The

13    government resumes for their experts I got on

14    Monday.  They got my resumes on Monday.

15         I -- it's -- I just can't presume.  I know the

16    court -- it would be very clean if the government

17    gave me their stuff in a timely fashion and that was

18    it.  But we know -- and I know the -- I can

19    understand why the courts are frustrated with the

20    process, because I can tell you defense lawyers are,

21    too.  But when we know that more stuff is coming, we

22    know that even -- even late discovery happens --

23         THE COURT:  You know, it occurred to me at our

24    last status you didn't even mention that I recall

25    anything about experts or a concern about getting

1    experts.   The subject never came up; did it?

2         MR. TRAGOS:   My concern at that time was they

3    were handing me --

4         THE COURT:   It didn't come up; did it?

5         MR. TRAGOS:   No, because there was no reason

6    for it to come up at that time.

7         THE COURT:   All right.   So I set you for a

8    date certain after a status hearing when you were

9    both present.   And no one indicates in any way

10   whatsoever that we have potential experts lined up

11   to testify that are going to create issues

12   concerning relevance, admissibility, *Daubert* issues,

13   until literally the week before trial.

14        MR. TRAGOS:   And let me tell the court, too,

15   with regards to -- especially with regard to

16   Dr. Berlin, I contacted Dr. Berlin -- it took me

17   literally weeks before I could even have a long

18   conversation with him.

19        The prosecutor -- and I understand, I don't

20   dispute it because I certainly understand when she

21   says that she's contacted somebody that she can't

22   get till January.   If I --

23        THE COURT:   She didn't have any intention to

24   get an expert until you filed yours --

25        MR. TRAGOS:   Right.

1          THE COURT:  -- Mr. Tragos, so you can't blame

2     her.

3          MR. TRAGOS:  No, no, no, no.  I'm using that

4     to show the court that it sometimes takes months for

5     these really well-qualified experts to be working on

6     your case.

7          THE COURT:  When was Berlin first contacted?

8     I'm story to intrude.  And if you don't want to

9     answer, that's fine.

10          MR. TRAGOS:  No, Your Honor, I --

11          THE COURT:  But, you know, I had two status

12     conferences in this case, and this is the first I

13     heard about experts when I saw the motions being

14     filed.

15          MR. TRAGOS:  I'm trying to find out, Your

16     Honor, when we first contacted him.  Your Honor, the

17     report -- the report -- excuse me.  I'm sorry.

18     (Brief pause.)

19          THE COURT:  All right.  Go ahead.  I'm sorry.

20          MR. TRAGOS:  Your Honor, with regard to

21     Dr. Berlin, I made -- my initial contact with him

22     was approximately September 30th.  He was unable to,

23     I guess, see the client or anything until October

24     30th.  But I contacted him back on September 30th.

25     That's why I was using the government's example of

1    how these people are so busy they don't have time to

2    see you.

3         THE COURT:  Well, you know, I understand that,

4    Mr. Tragos.  But I expect that you can let me know

5    that you anticipate an expert.  We convened at least

6    two times during that interval and I never got that

7    impression.

8         What troubles me is I'm not even satisfied

9    this is admissible, and I won't be until I've

10   conducted a *Daubert* hearing.  I don't think there's

11   any question about Mr. -- excuse me, Dr. DiMarco, if

12   he's an endocrinologist, he's surely qualified to

13   testify about diabetes and the effects of that

14   disease and the need for insulin and how it impacts.

15   I don't think you need a *Daubert* for that, do you,

16   Ms. Kaiser, *Daubert* hearing, that is?

17        MS. KAISER:  No.  I would agree, Your Honor,

18   that I wouldn't need a *Daubert* hearing for that.

19   But there's others issues that surround that

20   expert's testimony.  One, I have no report.  B, I

21   have no idea what he's basing his opinion of the

22   defendant on.  C, I'd like to see the defendant's

23   medical records.  If he's going to base his expert

24   opinion on medical records of the defendant that

25   I've never seen before --

1        THE COURT:  Well, I'm about to cross that

2    bridge.  You are entitled to that.  You are entitled

3    to it as part of discovery.  And it sounds to me

4    like, Mr. Tragos, that the government, whoever they

5    choose, if they're going to have an expert, is

6    entitled to examine your client.  Would you

7    disagree?

8        MR. TRAGOS:  I would disagree if the court's

9    not going to allow Dr. Berlin's testimony.

10        THE COURT:  Well, of course.  If I'm going to

11    disallow his testimony completely, no.  Assuming for

12    purposes of the statement that he would be able to

13    testify and pass the *Daubert* test, if you will, and

14    be able to testify in some limited capacity.

15        MR. TRAGOS:  Right.  If the court -- if we

16    do -- and I don't want to presume that I'm reading

17    the court's mind, but if the court is intent on a

18    *Daubert* hearing, then I think it's relevant at that

19    *Daubert* hearing when the court -- if the court

20    decides he can testify to what he can testify to, if

21    his testimony is necessary pursuant to an

22    examination of Mr. Friedlander then, yes, I would

23    agree that the government --

24        THE COURT:  Well, I don't think he's going to

25    be able to tell us if he's a pedophile or not if he

1    hasn't examined the man.  That would defy logic.

2         MR. TRAGOS:  That's what I'm saying.  I'm

3    waiting for the court's -- what the court says he

4    can testify to at the *Daubert* hearing.  And if it is

5    something that requires an examination, then, yes,

6    we would have no objection to that.

7         THE COURT:  We've got two sentencings on

8    Monday, Anne?

9         MS. KAISER:  Your Honor, may I -- may I

10   correct some things that have been stated?

11        THE COURT:  Why?

12        MS. KAISER:  So the -- so the court's clear.

13        THE COURT:  You disagree with something I've

14   said.

15        MS. KAISER:  No, Your Honor.

16        THE COURT:  Something he said?

17        MS. KAISER:  Yes, sir.

18        THE COURT:  Save it for another day.

19        MS. KAISER:  Okay.  It's about factual -- it's

20   factually about discovery that the government --

21        THE COURT:  It doesn't matter at this point.

22   I've said what I said.  That's the impression I have

23   from the conduct of counsel in this case, and it's

24   an impression that's important that you need to be

25   aware of.  If I'm erroneous in my impression, then

1    you can correct it but dutifully complying with the

2    discovery order in the future.

3        We wouldn't be here today if we had had

4    compliance.  We wouldn't be here today if your

5    assumed position that your motion to continue would

6    be granted had not been disappointed.  But be it

7    said it from now on, don't assume anything, not in

8    this courtroom.  You're going to be trying these

9    cases when they're ready to go.

10       MS. KAISER:  Your Honor, if the court pleases,

11   the government really does not want a continuance.

12   The government would prefer you strike his experts.

13       THE COURT:  Well, I can't strike it without

14   being reversed.  How about that?

15       MS. KAISER:  Yes, Your Honor.

16       THE COURT:  I'd love to strike their experts.

17       MS. KAISER:  Under 12 --

18       THE COURT:  But I know right now I would get

19   reversed in a nano second.  So why go down that

20   road, Ms. Kaiser?  That's not a risk I'm willing to

21   take.

22       MS. KAISER:  In the *Yost* opinion, Your Honor,

23   the court excluded their experts, and it was

24   affirmed.

25       THE COURT:  Well, I don't know what those

1      circumstances were, but I choose not to.  There's a

2      man's life on the line here and I'm not going to

3      have him complaining about his lawyer or the court

4      or anybody else.  He'll get his day in court.  This

5      isn't a rush to justice.  It's my attempt to be

6      expedient and efficient, and that has been

7      frustrated.

8            Anne, call the civil case, have them here for

9      jury selection at 9 o'clock Monday.  At 1:15 I am

10     directing these lawyers, Mr. Tragos, Mr. Kaiser and

11     your expert --

12           MR. TRAGOS:  Talking about Dr. Berlin?

13           THE COURT:  Dr. Berlin to be here for a

14     *Daubert* hearing.

15           MR. TRAGOS:  1:15 on Monday?

16           THE COURT:  Yes, sir.  Unless you want to pick

17     a jury Monday morning.  That's your option.

18           MR. TRAGOS:  Your Honor --

19           THE COURT:  You were to be in trial Monday.

20     Ms. Kaiser has asked me for a continuance.  In the

21     alternative, a *Daubert* hearing.  She's going to get

22     a *Daubert* hearing.

23           MR. TRAGOS:  Your Honor -- and I appreciate

24     the court's frustration.  But the schedule -- we

25     have him scheduled for Thursday because that's when

1    the defense would probably --

2         THE COURT:  He'll be here when I tell him to

3    be here.

4         MR. TRAGOS:  Okay.

5         THE COURT:  And that's when I'm going to

6    conduct a *Daubert* hearing, Mr. Tragos.  I'm not

7    going to delay this matter anymore, any longer,

8    other than is necessary to give the government a

9    fair opportunity to test the relevance and

10   methodology that he subscribes to.

11        If I strike his testimony you guys will be in

12   trial the following Monday.  If I allow part of his

13   testimony, then I've got to consider how much time

14   to government needs to, in fairness, retain their

15   own expert to rebut whatever it is that he's going

16   to say.

17        MR. TRAGOS:  Okay.  Did the court -- just so

18   I'm clear, the court said the following Monday;

19   correct?

20        THE COURT:  I'm sorry?

21        MR. TRAGOS:  The court said the following

22   Monday; correct?  We'd be doing it that Monday.

23        THE COURT:  If I strike his testimony we're

24   trying this case on the trial calendar it was

25   scheduled for.  Yes, sir.

1          MS. KAISER:  Not -- not this coming Monday,

2     right, Your Honor?  That's what he's saying.

3          MR. TRAGOS:  That's what I'm saying.  You're

4     talking about --

5          THE COURT:  Monday we're having a *Daubert*

6     hearing.  I'm going to pick a jury in a civil case

7     Monday morning so I can make use for next week that

8     I blocked off for you guys.

9          MR. TRAGOS:  Then would our case go -- if the

10    court strikes it, then our case would start the

11    24th?

12         THE COURT:  Yes, sir.

13         MR. TRAGOS:  Okay.

14    (Brief pause.)

15         THE COURT:  Well, when we start this trial I

16    will determine, but be prepared for that week.  My

17    point is it will not be unduly delayed.  If it's not

18    the week of Thanksgiving it will be the week

19    following Thanksgiving.  If it's not that week, it

20    will be the following week.

21         So be here at 1:15 with your expert for a

22    *Daubert* hearing.  And Ms. Kaiser, you're more than

23    welcome to have an expert in the audience if you're

24    able to get one.  I realize that you don't have

25    time.  But I know that sometimes the government can

1    work miracles.

2         There are plenty of medical people in this

3    community with expertise in matters dealing with

4    pedophilia.  I don't know about fantasy internet

5    chatting.  That's a whole different domain.  My

6    point is they're entitled to be present during the

7    hearing.  And if you're not able to get one in time

8    then, of course, we'll cross that bridge when we get

9    to it.

10        MS. KAISER:  Yes, Your Honor.

11        THE COURT:  Okay.  Now, I think that takes

12   care of all the motions.

13        MR. TRAGOS:  No, Your Honor.  There's two

14   additional -- there's two more motions.

15        THE COURT:  Motion to allow electronic

16   equipment?

17        MR. TRAGOS:  No.  There's a motion to strike

18   references to legal testimony and medical testimony

19   of the --

20        THE COURT:  What docket number is that,

21   Mr. Tragos?  I may have just overlooked that one.

22        MR. TRAGOS:  Okay.  Docket number 78 and 79.

23        THE COURT:  Okay.  I've got it.  78, then, is

24   the defendant's motion to preclude government from

25   presenting Corporal Romanosky's expert medical

1        opinion.   Go right ahead.

2              MR. TRAGOS:   Your Honor, on -- during the

3        interview -- would the court like to see the snippet

4        of the --

5              THE COURT:   No.   I'd like to just have you

6        proffer it to me.

7              MR. TRAGOS:   Okay.

8              THE COURT:   I rely on you to do that

9        accurately.

10             MR. TRAGOS:   During the interviewing, the

11       detective on two occasions basically argued with the

12       defendant about diabetes and the effects of

13       diabetes, and cited that several doctors agree with

14       him with regards to his opinion about diabetes and

15       the effects of diabetes.   And that's during the

16       taped interview.

17             THE COURT:   He mentions several doctors?

18             MR. TRAGOS:   He just said and the doctors

19       would agree with me that, and then he goes on to

20       explain the effects of diabetes.

21             THE COURT:   Does he say anything like I'm a

22       diabetic myself?

23             MR. TRAGOS:   No.

24             THE COURT:   Ms. Kaiser?

25             MS. KAISER:   Your Honor, the -- Detective

1       Romanosky, Corporal Romanosky does not offer any

2       type of expert opinion.  What he's referring to is

3       his interview of the defendant in which at that

4       point in the conversation if I recall correctly the

5       defendant says essentially that he -- detective --

6       Corporal Romanosky asked him what would have

7       happened had there been real children.

8            The defendant responds, well, essentially

9       nothing because I'm impotent and I've got diabetes.

10      To which Corporal Romanosky says, well, just because

11      you have diabetes doesn't mean you lack sexual

12      interest.  I think doctors would agree with me.

13      Just because you have diabetes doesn't mean that you

14      don't have any interest in sex.

15           And the defendant -- and it's a conversation.

16      He is not offering any type of expert opinion.  It's

17      his interview with the defendant that they're

18      referencing.  So the government certainly is not

19      planning to, by any stretch of the imagination,

20      offer the law enforcement officer as a medical

21      expert.

22           And it's clear from the context that that's

23      the give and take.  It's just to put the defendant's

24      statements in context.  It's particularly relevant

25      now that he's wanting to call an endocrinologist to

1    talk about his diabetes, but certainly Corporal

2    Romanosky is not offering any type of expert

3    opinion.

4         THE COURT:  Mr. Tragos?

5         MR. TRAGOS:  Your Honor, the statements -- the

6    statement that he said, he's telling him what his

7    diabetes means or doesn't mean, what he can't and

8    can't do as a diabetic, and then he bolsters that

9    by, and doctors would agree with me.

10        I don't think he should be allowed to give

11   that kind of an opinion to the jury.  I think that

12   if there are doctors that say that, then that should

13   be presented, as opposed to Detective Romanosky

14   saying it.

15        THE COURT:  All right.  The motion will be

16   denied.  It will be presented in the context in

17   which it was made, that is, the exchange between the

18   detective and the defendant discussing what the

19   defendant represented was his medical condition.

20   It's not an expert opinion, it's simply a

21   conversation.  And I'd be happy if you ask at the

22   time to gave a curative instruction.  I don't think

23   it would be necessary, but it's up to you.

24        All right.  Docket number 79.  This is

25   entitled defendant's motion in limine to preclude

1    the government from presenting Corporal Romanosky's

2    recitation of applicable Florida law in the presence

3    of the jury.  Mr. Tragos.

4        MR. TRAGOS:  During the interview Corporal

5    Romanosky told him that he was guilty of and he

6    specifically went through and read the Florida

7    statutes that he violated.  I don't think it's

8    correct for -- to introduce to the jury a separate

9    crime, which would be that Florida statute, or for

10   Romanosky to be able to opine through that interview

11   about Florida's law and crimes that my client

12   committed under Florida law.  He actually

13   specifically states the statute.

14       THE COURT:  Does he read it or paraphrase it?

15       MR. TRAGOS:  I think he's got it memorized.

16   Yeah, he paraphrases it, but it sounds exactly -- I

17   think he's got it memorized.  Again, Your Honor, if

18   the court would like, I have the clip.

19       THE COURT:  Well, as long as there's no

20   dispute about what was said I don't need to hear it.

21   I accept what you're saying.  If there's a dispute

22   about what was said, of course I'll hear it.

23       Ms. Kaiser?

24       MS. KAISER:  Well, Your Honor, I don't think

25   Corporal Romanosky said that he was guilty of these

1    offenses.  I don't think he used the word guilty.  I

2    frankly don't recall.  But in any event, under

3    2422(b), the government does have to show that it

4    was a sexual activity for which any person can be

5    charged with a criminal offense.

6         So that information is coming in through

7    Corporal Romanosky, as well, that it would have been

8    a violation under state law.  But, again, this is

9    not an expert opinion.  This is just him saying -- I

10   think the defendant says, well, what am -- what am I

11   going -- what am I arrested for or something, and --

12        THE COURT:  He had already been arrested?

13        MS. KAISER:  Yes.  This is his post-*Miranda*

14   interview.  And I believe Romanosky says something

15   to the effect, well, there's a couple statutes that

16   might apply and rattles them off to him.

17        THE COURT:  All right.

18        MS. KAISER:  I don't think he makes any

19   additional claim that, and I find you guilty, you

20   know, of these offenses.  I don't think it's --

21        THE COURT:  But he says whatever he says --

22        MS. KAISER:  Basically -- I'm sorry.

23        THE COURT:  He says whatever he says in

24   response to a question by the defendant along the

25   lines, what am I being charged with?

1          MS. KAISER:  Yes, Your Honor.

2          THE COURT:  Is that accurate, Mr. Tragos?

3          MR. TRAGOS:  No.

4          THE COURT:  Well, play the snippet.  Let's

5    hear it.

6          MR. TRAGOS:  We'll play the snippet.

7          THE COURT:  Please.

8    (Brief pause.)

9          DETECTIVE ROMANOSKY:  In the state of Florida,

10   it's unlawful to (unintelligible) AOL to speak to a

11   child or a parent or guardian of a child that you

12   reasonably believe is legit to engage in this sort

13   of behavior or attempt to engage in this sort of --

14   (unintelligible).

15         THE COURT:  Please back it up so I can hear

16   whatever prompted that recitation of Florida law.

17         MR. TRAGOS:  Your Honor, could I say something

18   while he's pulling that up?

19         THE COURT:  Sure.

20         MR. TRAGOS:  The statute that he's talking

21   about there is not the statute that the government

22   is saying was violated -- not the state statute the

23   government is saying was violated.

24   (Brief pause.)

25         MR. TRAGOS:  I don't know -- I don't know if

1        the court heard what I just said.

2              THE COURT:  I heard you.

3              MR. TRAGOS:  Okay.

4              THE COURT:  You don't have to be precise.

5        Just back it up.

6              MR. TRAGOS:  We made a specific snippet so --

7              THE COURT:  Oh, I see.  All right.

8              MR. TRAGOS:  We had to go back to the full

9        interview now to find where it is.

10             THE COURT:  You can just read that to me

11       without worrying about the audio.  If you'll just

12       find out what prompted that recitation.

13             MR. TRAGOS:  20:15.  I don't know if that's

14       tape two.  Tape two, 20:15.

15       (Brief pause.)

16             MR. TRAGOS:  Are we ready?

17             THE COURT:  Yes.

18       (Recording playing.)

19             DETECTIVE ROMANOSKY:  (Unintelligible).

20             THE DEFENDANT:  Okay.  Now, let me ask you

21       this.  Supposing I hadn't come here, suppose I said

22       I just couldn't do it, what would have then been the

23       case.

24             DETECTIVE ROMANOSKY:  We would have come and

25       arrested you on a warrant.

1           THE DEFENDANT:  Oh, really.

2           DETECTIVE ROMANOSKY:  In the state of Florida,

3      it's unlawful to use an online service like AOL to

4      speak to a child or a parent or guardian of a child

5      that you reasonably believe is legit to engage in

6      this sort of behavior, or attempt to engage in this

7      sort of behavior.

8           THE DEFENDANT:  I see.  I see.

9           DETECTIVE ROMANOSKY:  So you would have come

10     in and talked to me, anyway.

11          THE DEFENDANT:  Okay.  I mean, I didn't know.

12          DETECTIVE ROMANOSKY:  There had been enough

13     concern and, honestly, it wouldn't have been too

14     much longer because I was concerned.  You were

15     mentioning you had friend's grand kids coming over.

16          THE DEFENDANT:  Um-hum.

17          DETECTIVE ROMANOSKY:  In the back of my mind I

18     was thinking why is saying this.  So -- that's okay.

19     So we will trust him more and think that he has the

20     same interests, or it could be legit.  I as a law

21     enforcement officer can't take that chance for very

22     long.  I start thinking this is legit, I have to act

23     on it.

24          THE DEFENDANT:  Right.  Right.

25          DETECTIVE ROMANOSKY:  So we would have been

1      talking probably within this week, anyway.

2              THE DEFENDANT:  Right.  Okay.  I just didn't

3      know.  You know, I'm trying to be as candid as I can

4      be.  I think I'm not --

5              DETECTIVE ROMANOSKY:  Well, to be honest with

6      you, I know you're a very educated man.  I know you

7      know, obviously, your -- if I was in your position,

8      I'd probably be doing the same type of thing.  You

9      would want to be truthful and be cooperative.

10     (End of recording.)

11             THE COURT:  All right.  So he referenced a

12     Florida statute dealing with online contact with

13     children or something?

14             MR. TRAGOS:  Right.  He said he violated that

15     statute.

16             THE COURT:  Right.  But the question Mr. -- or

17     Dr. Friedlander possessed to him was what?

18             MR. TRAGOS:  He just said --

19             THE COURT:  What did I do or what am I charged

20     with?  I just didn't quite catch it.

21             MR. TRAGOS:  Go back.

22             MS. KAISER:  I believe he said -- he said,

23     would you have come and gotten me anyway?  He said

24     something like -- he says, well, yes, we would have

25     come.  He said what if I hadn't traveled.

1        MR. TRAGOS:  Right.  What if I hadn't --

2        MS. KAISER:  What if I hadn't traveled?  And

3    he said, well, it's still a violation to communicate

4    online.

5        THE COURT:  All right.  I mean, that makes

6    sense.  I just didn't quite hear what he said.  The

7    detective was kind of talking over him a little bit.

8    And Mr. Tragos is correct, that that is not the

9    underlying statute that the government believes

10   was or would have been violated?

11       MS. KAISER:  There's a variety of statutes the

12   government believes would have been violated.

13       THE COURT:  Is that one of them?

14       MS. KAISER:  That's one of them.  That's one

15   of at least two that applies, if not three.  But

16   there's two, at least, and that's one of them that

17   would have applied.

18       MR. TRAGOS:  Your Honor, earlier the court

19   asked the government about that, and they said lewd

20   and lascivious.  They did not include this statute

21   when the court asked.

22       THE COURT:  It's kind of a shifting sand

23   thing, you know.  I understand that.

24       MS. KAISER:  Your Honor, in response, though,

25   that was only in response to the relevance of the

1    sadomasochistic imagines.  So there's a variety

2    of -- it's just factually, there's a variety of

3    statutes that fit the defendant.

4         THE COURT:  Which ones are you going to have

5    me instruct the jury on?

6         MS. KAISER:  Both.

7         THE COURT:  Both meaning what?

8         MS. KAISER:  The lewd and lascivious and the

9    comparable state statute.

10        MR. TRAGOS:  Your Honor, that wouldn't apply.

11        THE COURT:  We're not having a charge

12   conference.  I'm just trying to get from her what it

13   is that she's going to proffer to me by way of a

14   jury instruction that supports the allegation in the

15   indictment.  It's got to be an underlying crime;

16   does it not?

17        MR. TRAGOS:  It has to be what would have

18   happened if he had shown up and had sex.  That's not

19   what he described.

20        MS. KAISER:  He would have been charged with a

21   criminal offense.  The criminal offense doesn't

22   necessarily -- the statute under 2422(b) is not

23   specific.  It just says --

24        THE COURT:  Sexual act for which any person

25   can be charged with a criminal offense.

1         MS. KAISER:  Correct.  So the criminal

2    offense --

3         THE COURT:  Using the internet is not a sexual

4    act, as far as I know.  Although, I'm probably going

5    to be told otherwise at some point in this trial.

6         MS. KAISER:  The statutes that the government

7    has identified are 800.04.

8         MR. TRAGOS:  That's the lewd and lascivious

9    statute.

10        MS. KAISER:  And 847.0135, which is the use of

11   the computer which is the one that Corporal

12   Romanosky referenced.

13        MR. TRAGOS:  I guess we might be arguing that

14   in the future.

15        MS. KAISER:  But it --

16        THE COURT:  All right.  The motion is to

17   preclude this portion of the interview with the

18   defendant.  I'm going to deny the motion.  It is

19   taken in context with the conversation.  It's not an

20   instruction on the law from the jury.

21        I would be willing, of course, to give a

22   cautionary instruction to the jury upon request.

23   But I don't see how we can isolate one statement or

24   recitation by the witness without placing the entire

25   conversation out of context.

1          MR. TRAGOS:  Your Honor, that concludes the

2     motions, but I would like to --

3          THE COURT:  That was docket 79, Madam Clerk.

4          MR. TRAGOS:  I would like to raise two other

5     issues with the court, if I might.

6          THE COURT:  All right.  Go ahead.

7          MR. TRAGOS:  One is I would ask the court, if

8     the court could issue an order, Mr. -- I don't know

9     if the court knows the particulars of

10    Dr. Friedlander's release.

11         THE COURT:  I'm not doing anything about that.

12         MR. TRAGOS:  No, no, no.  I'm not changing

13    that.  No.  I'm asking the court if the court would

14    issue an order allowing him to come up here and stay

15    overnight with his security so I could -- so we

16    could work this weekend since the court's -- because

17    of what we're doing, plus the court is changing the

18    trial date.  We need an order -- pretrial services

19    needs an order from this court allowing him to come

20    up for trial purposes and trial preparation and stay

21    overnight.  But he'll have his security detail with

22    him, living with him.

23         THE COURT:  Does he not already have an order

24    allowing him to attend the trial?

25         MR. TRAGOS:  Yes.  But since the court has

1    continued the trial, I'm worried that pretrial

2    services will not allow him to be up here for trial

3    prep.

4         THE COURT:  Well, I've scheduled a hearing and

5    he is entitled to be and is directed to be present

6    Monday.  So as far as I'm concerned, that's for

7    trial.

8         MR. TRAGOS:  Okay.  Sunday night, can he stay

9    overnight Sunday night here?

10        THE COURT:  What does the order say?

11        MR. TRAGOS:  The order says his residence and

12   he has to be in his residence, other than when the

13   court orders differently.  The court issued an order

14   about the trial so he was staying up here the week

15   of the trial.  But pretrial services would need

16   something from the court allowing him to stay

17   overnight for the hearing.  I hate to burden the

18   court with this, but they're very sensitive.

19        THE COURT:  You're not burdening me.  We're

20   not going to do the hearing until 1:30.  That's what

21   I'm trying to figure out, why does he have to be

22   here Sunday night?

23        MR. TRAGOS:  Because I would like his -- we

24   had prepared, we had planned on working Sunday with

25   him, and the order allowed us to do that, the trial

1    order allowed him to come up Sunday so that we could

2    cork.  Now that the court has changed the trial

3    date, we would still like him to come up Sunday.

4         THE COURT:  Well, let me understand.  He has

5    an order that allows him to come up to this area

6    Sunday, work with you, spend the night and go to

7    trial Monday?

8         MR. TRAGOS:  Yes.

9         THE COURT:  You're covered.

10        MR. TRAGOS:  Thank you.

11        THE COURT:  As far as I'm concerned, this case

12   is still on my trial docket.  We're having a *Daubert*

13   hearing.  I'm just going to make use of the

14   remaining part of the day.

15        MR. TRAGOS:  Then the next issue, Your Honor,

16   I'd like to raise with the court is the fact that

17   the government routinely has an agent with them at

18   counsel table, and the agent is allowed to testify

19   at trial, if need be.  Tim Batelli, my law clerk is

20   in law school, is the one that has been doing all

21   the computer work in this case.  I would like him to

22   be able to sit --

23        THE COURT:  Has he been here all day today?

24        MR. TRAGOS:  Yes, he has.

25        THE COURT:  I'll ask him.  Do you really want

1    to be in this courtroom?

2          MR. BATELLI:  Yes, sir.

3          THE COURT:  That's fine.  Just dress

4    appropriately and conduct yourself.

5          MR. TRAGOS:  At some point, though, he may

6    have to testify about how many e-mails and those

7    types of things, nothing about the case but about

8    the discovery.  Is that okay with the court?

9          THE COURT:  I don't know.  Ms. Kaiser?

10         MS. KAISER:  Your Honor, I discussed this with

11   Mr. Tragos.  He told me that he was going to invoke

12   the rule.  So I -- if he's going to invoice the

13   rule, I was going to invoke the rule, as well, so

14   his witness cannot stay in the courtroom.

15         MR. TRAGOS:  Does that mean the agent cannot

16   stay?

17         THE COURT:  Well, the agents are excepted from

18   the rule.  You know that.  You've been doing this --

19         MR. TRAGOS:  Right.

20         THE COURT:  -- a lot longer than most of us in

21   the courtroom.  Not me, but --

22         MR. TRAGOS:  But I think that the court has

23   the discretion to allow that.

24         THE COURT:  Why don't we take care of that at

25   the trial.  On Monday it's not a problem, correct,

1     we're having a *Daubert* hearing.

2          MR. TRAGOS:  Yes.  Right.

3          THE COURT:  I'll reserve on that oral request.

4     Have we got everything else covered, Madam Clerk, as

5     far as pending motion?  We have deferred on the

6     motion -- the *Daubert* motion, which is the

7     government's, docket number 73.  That's what we're

8     going to conduct on Monday.

9          MR. TRAGOS:  Okay.

10         THE COURT:  Everything else covered?

11         MS. KAISER:  Yes, Your Honor.

12         THE COURT:  Anne?

13         MR. TRAGOS:  Your Honor, could I have just one

14    thing to say on the record so the record is clear?

15         THE COURT:  Oh, I thought you were Anne.  I

16    did.  75, 47, 48,65, 67, 71, 73.  The amended motion

17    you filed this morning, Ms. Kaiser?

18         MS. KAISER:  Yes, Your Honor.

19         THE COURT:  That's an amended motion to

20    continue?

21         MS. KAISER:  No, Your Honor.  It's an amended

22    motion to exclude the defendant's expert.

23         THE COURT:  Based on the report; correct?

24         MS. KAISER:  Yes, sir.

25         THE COURT:  Well, that goes hand in hand with

1        docket 73, your request for a *Daubert* hearing.

2              MS. KAISER:  Yes, Your Honor.

3              THE COURT:  The only other motion I see that

4        possibly may not have been addressed is somebody's

5        motion to allow electronic equipment.

6              MS. KAISER:  That was mine for this morning,

7        Your Honor, but the court didn't rule on it so I

8        didn't bring it.

9              THE COURT:  DO you need it Monday?

10             MR. TRAGOS:  We'll need it Monday, too,

11       probably, Your Honor.

12             MS. KAISER:  May I have it Monday, Your Honor,

13       so I can --

14             THE COURT:  It's not me saying it.  You've got

15       to have it in writing when you walk in that door

16       so --

17             MR. TRAGOS:  Would the court issue an order

18       for both of us?

19             MS. KAISER:  I may not need it for the

20       hearing, Your Honor, but I did want to bring over

21       the equipment and test it before we started the

22       trial at some point.

23             THE COURT:  Your motion, Mr. Tragos, has

24       already been granted.

25             MR. TRAGOS:  It has, Your Honor, but just for

1       today.

2              THE COURT:  All right.  I'll grant that from

3       for Monday, to allow Tragos and his team to bring in

4       their laptop.  Do you want something for Monday?

5              MS. KAISER:  Yes, Your Honor.

6              THE COURT:  And give Anne or Kristin the make

7       and model, what it is and who will have it.

8              MS. KAISER:  Yes, Your Honor.

9              THE COURT:  So you can get through security.

10      See you then Monday at 1:30.

11             MR. TRAGOS:  May I make one thing for the

12      record, Your Honor?  I just want to make sure that

13      I'm informing the court and the record is clear that

14      it's 4:10, and my expert is in -- I guess is in

15      Washington, D.C. at this time at Johns Hopkins, and

16      that it's fairly short notice to have him here at

17      1:15 on Monday.

18             THE COURT:  Well, Mr. Tragos, I don't know

19      what to do about that.

20             MR. TRAGOS:  I know.  I just wanted to make

21      sure --

22             THE COURT:  The case was set for trial on

23      Monday.  You could be in a trial posture, and I

24      think it would have behooved you to have him on

25      standby for Monday, as well, particularly in light

1      of a pending motion for a *Daubert* hearing.  Do your

2      best.

3           MR. TRAGOS:  Thank you, Your Honor.

4      (Hearing concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH    )

5           I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8           DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 171, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16          IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 17th day of March, 2009.

19

20

21              _____/s/ Linda Starr_____
                 Linda Starr, RPR, Official Court Reporter
22

23

24

25