```
 1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3       UNITED STATES OF AMERICA,

 4          Petitioner,

 5             vs.            CASE NO. 8:08-CR-318-T-27TGW
                              17 NOVEMBER 2008
 6                            TAMPA, FLORIDA
                              1:25 - 3:30 PM
 7                            PAGES 1 - 110

 8       CHARLES FRIEDLANDER,

 9          Defendant.

10       _____/

11                  TRANSCRIPT OF DAUBERT HEARING
                BEFORE THE HONORABLE JAMES D. WHITTEMORE
12                  UNITED STATES DISTRICT JUDGE

13       APPEARANCES:

14       For the Petitioner:  Amanda C. Kaiser
                              United States Attorney's Office
15                            Middle District of Tennessee
                              400 N. Tampa Street
16                            Suite 3200
                              Tampa, Florida 33602
17
         For the Defendant:   George E. Tragos
18                            Tragos & Sartes
                              Suite 800
19                            601 Cleveland Street
                              Clearwater, Florida 33755
20
         Court Reporter:      Linda Starr, RPR
21                            Official Court Reporter
                              801 N. Florida Avenue
22                            Suite 13B
                              Tampa, Florida 33602
23


24        Proceedings recorded and transcribed by
         computer-aided stenography.
25
```

 1          COURTROOM SECURITY OFFICER:  All rise.  This

 2   Honorable Court is now in session, The Honorable

 3   James D. Whittemore residing.

 4          Please be seated.

 5          THE COURT:  All right.  Are we ready to

 6   proceed?

 7          MR. TRAGOS:  Yes, we are, Your Honor.

 8          THE COURT:  Call your witness, please.

 9          MR. TRAGOS:  May we discuss with the court one

10   issue briefly before that.

11          THE COURT:  I'm sorry.  I didn't have my mic

12   on.  Go ahead.

13          MR. TRAGOS:  Okay.  Your Honor, I've talked

14   with Ms. Kaiser.  I was wondering if we could talk

15   to the court about a suggested trial date for this

16   trial to begin.  Could we discuss that with the

17   court?

18          THE COURT:  Well, why don't we have our

19   hearing and then talk about it.

20          MR. TRAGOS:  Okay.

21          THE COURT:  Is it possible that it could

22   impact on the trial date?

23          MR. TRAGOS:  It could, Your Honor.  But there

24   are -- are other expert issues and things like that

25   that are involved, but that could impact the trial

1    date.  We're not asking for a trial date that's well

2    in advance.  That's what I'm saying, it's not a very

3    distant --

4           THE COURT:  Well, I'd rather spend the time --

5           MR. TRAGOS:  Okay.

6           THE COURT:  If you had been here all day, you

7    would appreciate that we are trying to get a civil

8    case started and another criminal case because you

9    guys had this week reserved and it kind of threw my

10   calendar into a quagmire.

11          So I've juggled three cases today so far, and

12   I've got sentencings this afternoon so I'd rather go

13   ahead and get to the heart of the issue.

14          MR. TRAGOS:  Okay.  We would call Dr. Berlin.

15          COURTROOM DEPUTY CLERK:  Please stand here and

16   raise your right hand.  Do you swear or affirm the

17   testimony that you give in this case will be the

18   truth, the whole truth and nothing but the truth, so

19   help you God?

20          THE WITNESS:  I do.

21          COURTROOM DEPUTY CLERK:  Please be seated.

22          Please state your name and spell your last

23   name for the record.

24          THE WITNESS:  My name is Fred Berlin,

25   B-E-R-L-I-N.

1      COURTROOM DEPUTY:  Thank you.

2      THE COURT:  You're welcome.

3                  DIRECT EXAMINATION

4  BY MR. TRAGOS:

5  Q    Dr. Berlin, could you briefly give us your

6  educational background.

7  A    I have both a PhD degree, which is in

8  psychology.  Beyond that I have a medical degree.

9  Beyond my basic medical training and internship, I

10 then did training in psychiatry, and I am board

11 certified as a psychiatrist by the American Board of

12 Psychiatry and Neurology.

13 Q    What is your current employment?

14 A    I am employed both by the Johns Hopkins

15 University School of Medicine where I'm an associate

16 professor.  I'm also an attending physician at the

17 Johns Hopkins Hospital.  And beyond that I see

18 patients independently, as well.

19 Q    As an associate professor, what are your

20 instruction -- your responsibilities?

21 A    Well, to keep it brief, and I can expand if

22 you'd like, but there's basically three general

23 areas of responsibility.  One is clinical care, and

24 because of my particular area of expertise, that

25 often involves evaluating and treating persons who

1    have some form of sexual disorder.  So clinical care

2    is one of my responsibilities.

3        Second is teaching.  Much of that is what I

4    refer to as bedside teaching, teaching residents in

5    training, teaching medical students about how to

6    evaluate and treat and care for patients.  So

7    teaching is the second responsibility.

8        And thirdly, I'm expected to do research, and

9    I've published a number of papers in keeping with

10   that commitment.

11   Q    Can you give us examples of the papers that

12   you have published.

13   A    Yes.  You have my vitae so I'll, again, keep

14   it brief but I'll expand if you ask me to.  I've

15   published papers on pedophilia, on sexual sadism, on

16   Internet sexuality.  I've done some basic science

17   research that's looked at changes in brain chemistry

18   during sexual arousal.  I've published papers of a

19   forensic nature dealing with the insanity defense.

20   I don't know how much you want, but those would be

21   some examples.

22   Q    Have you ever published any papers or

23   documents with reference to the study of 406

24   pedophiles?

25   A    It was actually a larger study, but I know

1    what you're talking about.  It was a study on over

2    600 individuals who were treated.  There were a

3    group of a hundred exhibitionists and another group

4    who had been sexually assaulted against adult women.

5    But, yes, I was the senior author on that study.

6    Q    Have you ever participated in any educational

7    programs for the Federal Bureau of Investigation?

8    A    Yes.  I have been invited to several

9    symposiums sponsored by the FBI as well as others

10   sponsored by the Justice Department.  I've been

11   asked to actually present material at those

12   symposiums and, of course, I've been invited to stay

13   and learn and listen, as well.

14   Q    Okay.  Is your institute -- does that

15   institute have any special designation by the

16   Department of Justice?

17   A    Yes.  The institute that I direct has been

18   designated by the United States Department of

19   Justice as something they refer to as a national

20   resource site.  And it's -- because of the work that

21   we've done in the area, I've been asked as a result

22   to give training to individuals about how to deal

23   with persons who are sexually disordered.

24   Q    Aside from the FBI and the Department of

25   Justice, have you lectured to other -- any judicial

1    conferences?

2    A      I've been invited to address conferences of

3    judges in several states.  It's not necessarily

4    judicial, but I've been invited to address

5    legislative subcommittees both at the federal level

6    and at the state level.  I've been -- well, I guess

7    I won't expand beyond what you asked there.  I was

8    in a White House conference on child sexual abuse,

9    so those are examples.

10   Q      Okay.  Have you spoken to other law

11   enforcement agencies, as well, besides the FBI and

12   the Department of Justice?

13   A      Yes.  I routinely speak virtually every year

14   to the Baltimore County Police.  They have a seminar

15   on child sexual abuse, and there's a section where

16   they want the officers to have an opportunity to

17   hear from someone who has my sort of experience.

18   That would involve more city police.  I've done that

19   in Colorado with the police force out there.

20          Those would be examples of presentations I've

21   done to various police forces.  Most have been --

22   I'm not sure if this is pertinent to your question

23   or not, but I was a consultant psychiatrist to the

24   Maryland Division of Corrections in terms of how to

25   deal with sex offenders who are incarcerated.

1      Q       Have you ever done anything internationally?

2      A       I've been a consultant to the European

3      Parliament.  I've also had folks from a variety of

4      countries come to speak with me, and that's included

5      people from Japan, Korea, Great Britain.  Those are

6      some that I can think of off the top of my head.

7      Q       Have you ever been qualified as an expert to

8      testify in court?

9      A       Yes, many times.

10     Q       Okay.  Ever been qualified as an expert to

11     testify in court in Federal Court?

12     A       Yes, sir.

13     Q       Can you give us an approximate number of times

14     that you've been an expert in Federal Court?

15     A       Well, again, I don't keep a list.  If you need

16     to know exactly, I can probably go back and get that

17     information.  But probably a dozen or so.  But that

18     may -- that may be a bit of an underestimate, but I

19     think about a dozen times.

20     Q       Okay.  There is a document known as the DSM.

21     Are you familiar with that?

22     A       Yes, sir.  That's shorthand for the Diagnostic

23     and Statistical Manual of Mental Disorders.

24     Q       And what is the significance of the DSM?

25     A       It's the -- how do I put it -- it's a document

1       that identifies for the mental health profession the

2       nature of particular kinds of psychiatric disorders.

3       It's analogous to what the World Health Organization

4       has in physical illness that there's some consensus

5       that exists within the relevant profession that

6       these are diagnostic criteria that are legitimate,

7       and these are the factors that go into making such a

8       diagnosis.

9            So I hope that's clear.  It's really what it

10      says, a diagnostic manual listing the official --

11      the recognized disorders.

12      Q      Okay.  So it is basically a consensus

13      document?

14      A      Yes.  Although, I should add, it's not just

15      based purely on opinion.  There is an effort to have

16      it as evidence based as possible.  But nonetheless,

17      I wouldn't argue with what you just said.

18      Q      Okay.  Have you ever participated in drafting

19      that -- the DSM?

20      A      Well, you have to be careful about the word

21      drafting.  I was invited to be a member of the

22      subcommittee for the third revision of the DSM.  And

23      one is invited to be a member of a subcommittee

24      because of having established a national reputation

25      in a particular area.

1        The subcommittee that I was invited to
2   participate on is the subcommittee on what the
3   mental health profession calls the paraphilias.  In
4   laymen's terms, those would be the sexual disorders,
5   conditions such as pedophilia, sadism, necrophilia,
6   exhibitionism.  There's a whole list of them.
7   Q     Now, we're currently -- currently the most
8   recent edition of the DSM is IV; correct?
9   A     It's actually IV TR.  TR means teaching
10  revision.  There was some changes made in the
11  document or the text, and a couple changes made in
12  some of the criteria.  But it's essentially
13  something that's built on the -- on the prior
14  volume.
15  Q     Okay.  So when you say Volume IV TR, basically
16  that is built upon Volume III?
17  A     Yes.  I mean, the reason it's Volume III is
18  there's been a I and II, and now there's IV.  The
19  next one will be V.  Each time it's updated, there's
20  some things in there that new knowledge says should
21  be discarded, then that happens.  If there's new
22  information to build upon in terms of diagnoses that
23  are going to remain, then that's the way things
24  proceed.
25  Q     Okay.  Have you had an opportunity to review

Berlin - Direct

11

1       any of the evidence in this case?

2       A     Yes.  I was sent various discovery materials.

3       It's turned out that they're quite voluminous, so

4       I'm still continuing that process.  But I have

5       reviewed a good deal of that -- well, I'd better be

6       careful.  I've reviewed parts of that information.

7       Q     Okay.  Have you reviewed a sufficient amount

8       in order to come to some conclusions or opinions?

9       A     I have, with the understanding, which is

10      always the case, that if I'm presented with new

11      information and it's information to suggest I should

12      change an opinion, I'm not -- I'm not adverse to

13      doing that.

14      Q     Okay.  After reviewing the documentation --

15      well, let me ask you this.  You're familiar with

16      pedophilia?

17      A     Yes, sir.

18      Q     And are there certain criteria that you use in

19      identifying pedophilia?

20      A     Well, you say that I use.  The diagnostic

21      manual, the DSM that we were talking about spells

22      out the diagnostic criteria for each of the mental

23      disorders.  And to the extent that pedophilia is a

24      mental disorder, it defines diagnostic criteria for

25      that condition.

1    Q      Okay.   What is the diagnostic criteria?

2    A      Well, I'm paraphrasing here, but essentially a

3    person with pedophilia experiences intense recurrent

4    erotically arousing, that is, sexually arousing

5    fantasies and urges about children, so that's one

6    part of the criteria.   That has to be present for a

7    period of at least six months because they're not

8    trying to talk about someone who might have a

9    fleeting thought or an urge of that nature.

10         And then the criteria also talks about the --

11   that the individuals experiencing these fantasies

12   and urges is either going to be distressed by the

13   fact that he's having them or impaired some way in

14   his functioning.

15         There's also a comment in the DSM, because the

16   core mental elements are fantasies and urges that if

17   someone has repeatedly behaved sexually with

18   children, even if they're denying the fantasies and

19   urges, one can still make the diagnosis.   So that's

20   a shorthand summary of the major issues.

21   Q      What about the acting out on nonconsenting

22   persons, is that part of it?

23   A      No.   I think you're thinking more of --

24   Q      Sadism?

25   A      -- sexual sadism in that case.   A child by

1    definition is always nonconsenting because they

2    haven't achieved the maturity level that would

3    enable them to give a meaningful informed consent.

4    Q    Are you able to take that criteria and apply

5    it to the facts as you know it in this case?

6    A    Well, I'm going to have to be careful in terms

7    of how you phrase that question.  I can certainly

8    come to a conclusion about whether or not I believe

9    there's sufficient evidence to diagnose pedophilia

10   in this case.  So if I haven't answered your

11   question you can re-ask it, but I'm trying to be as

12   clear as I can.

13   Q    Well, go ahead and do what -- go ahead and do

14   that.

15   A    Okay.  How do I put this.  There simply isn't

16   sufficient evidence here that this is a man who has

17   either acted in a way where he's been repeatedly

18   involved with children or involved with children at

19   all, for that matter, in terms of actual sexual

20   contact.  There's nothing that he's acknowledging in

21   terms of his own self reports about having desires

22   sexually for children.

23        Obviously, however, he's in a situation where,

24   understandably, he wants to put his best foot

25   forward, so I have to look at whether there's

1    anything else that might infer if that's there, even

2    in the absence of his self admission.

3        Now, in this case because his computers have

4    been confiscated, there's a great deal of

5    information there.  He had, for example, no child

6    pornography, which would be unusual for someone

7    who's using a computer and has pedophilia.  He's

8    made no attempt to directly contact a child and

9    induce a child into sexual activity.

10        Again, he's 78 years old, and there's no

11    evidence of a prior criminal record or any prior

12    acts involving children.  So putting it altogether,

13    I simply cannot find enough evidence to suggest that

14    he would qualify for that condition.

15    Q    Okay.  Is sexual sadism, is that also

16    contained in the DSM?

17    A    Yes, sir.

18    Q    And what are the criteria for that?

19    A    Well, again, I'm just going to put this in

20    laymen's terms.  They're spelled out in terms of

21    fantasies, urges and duration and so on.  But just

22    to put it simply in laymen's terms, someone with

23    sexual sadism is an individual who is sexually

24    aroused, erotically aroused by the pain, suffering

25    and humiliation of another person.

1          One critical point, though, that the DSM does

2     make is that we're talking about real rather than

3     simulated acts that cause the person to become

4     sexually aroused.  There are, for example, people

5     who engage in consensual acts of bondage.  There are

6     people who engage in consensual acts of spanking and

7     things of that sort.

8          One can talk about what one thinks about those

9     kinds of actions, but that wouldn't be evidence of

10    sexual sadism.  The sexual sadist is someone who in

11    real life is aroused by real pain and suffering of

12    an actual individual, and it tends to involve

13    coercive and nonconsenting activity.

14    Q     Now, you talked about fantasy versus reality.

15    A     Yes.

16    Q     Okay.  Are you familiar with that type of

17    activity on the Internet?

18    A     Yes, sir.

19    Q     And how are you familiar with that?

20    A     Well, just in terms of the work that I do.  In

21    recent years, particularly many of the referrals

22    that I've seen to be evaluated involve activities

23    over the Internet.  I've published, as I mentioned

24    earlier, an article about that that was part of a

25    larger book, and I reviewed the articles in that

Berlin - Direct

1      book, which is an attempt to update much of what

2      goes on on the Internet.  I'm familiar with various

3      sites that are out there.

4           So I guess it's analogous to asking you as an

5      attorney how are you familiar with what goes on in

6      the legal system.  You first get a basic education.

7      You get certified by passing certain examinations.

8      You have continuing education in terms of formal

9      courses and -- and what you learn through your work

10     experiences.  So that's the way in which I also

11     would keep up in -- in terms of my area of

12     expertise.

13     Q     Can you give us kind of a brief outline or

14     illumination of how fantasy works on the Internet.

15     A     Well, it works --

16     Q     How fantasy works on the Internet and why it's

17     so prevalent on the Internet.

18          MS. KAISER:  Objection, lack of foundation.

19          THE COURT:  Overruled for purposes of --

20          THE WITNESS:  And, again, I want to make sure

21     I understand the -- the question and if I'm not

22     responsive, let me know.  But there's two ways in

23     which I believe fantasy -- at least two, there may

24     be more, but -- occur on the Internet.

25          One has to do with simulated role-playing

1     activity.  It's clear now that many people on the

2     Internet pretend to be someone whom they're not.

3     Many people have sort of an Internet persona, excuse

4     me, in which they act out fantasies.  They're

5     pretending to be someone that they're not or

6     pretending to be doing something that they're not

7     doing.  There's clear evidence in this case, for

8     example, that that was -- that that was occurring.

9          Fantasies also are an aspect of the Internet

10    to the extent that people who in a sense feel like

11    they in the privacy of their homes can explore their

12    fantasy lives.  For example, most people are not

13    going to publicly talk about things such as having

14    sexual feelings for animals, which for obvious

15    reasons most of us find disgusting, or having sexual

16    fantasies about corpses.

17          And yet we've now learned from the Internet

18    that there are sites out there, to use the two

19    examples I just gave, for both of those and that

20    they get remarkable numbers of hits.  And, of

21    course, that in terms of the issue of fantasy begs

22    the question, to what extent in any given instance

23    is this pure fantasy.  And I've seen cases with

24    corpses that I just talked about where it's clearly

25    nothing more than fantasy, or is this fantasy a

1    reflection of an actual interest in crossing over

2    into real life experience.  And, again, I've seen

3    cases where that happens in terms of the example I'm

4    giving, as well.

5         So just to summarize what I've said, there's

6    kind of the exploration of fantasy life through

7    going to certain sites and expressing certain

8    interests, and then there's a more formal role

9    playing and pretending to be a particular persona.

10   BY MR. TRAGOS:

11   Q    When you're doing your work, do you have to

12   try to make a determination when you're speaking to

13   someone whether or not what he's telling you is part

14   of a fantasy persona or whether or not it's real?

15   A    Certainly that's often extremely important.

16   It's going to have implications both for the persons

17   own well-being and it obviously has implications for

18   society at large.  So the answer is yes, I do need

19   to make those distinctions.  And as I said a moment

20   ago, I've seen cases that fall on both sides of that

21   line.

22   Q    What -- how do you determine or what do you

23   look for to determine whether or not -- again, in

24   general -- whether or not a case is someone that is

25   pure fantasy versus someone who really -- that this

1        is really real for them and they're really going to

2        act it out?

3        A        Well, I really try to look at the totality of

4        the information available to me and also to apply my

5        body of knowledge.  If I can make an analogy, it

6        would be similar to how does one come to a

7        conclusion in court where it's all circumstantial

8        evidence.  You can talk to people and ask them about

9        their experiences, you can look for evidence of the

10       kinds of behaviors they've engaged in.

11              In terms of applying a body of knowledge, I

12       would know, for example, that the best way to make

13       a -- to come to some conclusion about how someone is

14       likely going to be behaving is that of a past

15       pattern of behavior in front of me.  So I look for

16       pattern the same way a police force might look for

17       MO, have they behaved repeatedly in a certain

18       fashion.  So it's really the totality of the

19       information using my particular body of knowledge

20       and then trying to make a conclusion.

21              And if I may add, sometimes it's easy and

22       obvious.  I'm sorry, I didn't mean to interrupt you.

23       But, you know, there's cases where the person admits

24       they have these interests.  There's cases where you

25       look at their criminal record, and this is the third

1    time they've been arrested for a particular kind of

2    activity.  There's cases where other people have

3    called to my attention that someone in their family

4    has this problem, and then there's other cases that

5    can be more challenging.

6    Q    Okay.  When looking at the facts in this case,

7    what items would you use to make a determination of

8    whether or not it was or wasn't fantasy?

9    A    Well, again, the issue in this case has to do

10   with knowingly.  In other words, if the issue was

11   did somebody attempt to do something, that's purely

12   a factual issue.  Either they did or they didn't.

13        As I understand it, the issue here is did this

14   particular gentleman knowingly attempt to do

15   something, and so that brings into it the sphere of

16   state of mind, of -- of mental state.  And so I'm

17   having to try to come to some conclusion about that.

18   In terms --

19   Q    Let me interrupt you just for a second, with

20   the court's permission.  I don't want you

21   necessarily to come to a conclusion that -- the

22   court's ruled that we're not going to come to a

23   conclusion about the mental state, if I understand

24   the court's ruling from Friday.

25        Tell me just in this case what things you see

1        in this case that you would use to come to a

2        conclusion, not what your conclusion is.

3        A        Okay.  So let me be careful because I don't

4        want to cross the line in how I answer it.  I would

5        look -- for example, here's a 78-year-old man.  I

6        would look at what is the evidence as best I can

7        determine of how he's behaved in actual real life

8        situations.  That's one thing I would look at.

9            I would also look at the evidence of his

10       conversations to try to get some sense where the

11       facts are known of the extent to which they were

12       fantasy based or reality based.

13           To give an example, to make sure I'm being

14       clear, he has talked repeatedly about being very

15       strict as a father and in his family.  He talked

16       repeatedly about beating and whipping his own son.

17       He talked repeatedly about beating and disciplining

18       -- I should be careful about repeatedly on this

19       one -- he talked about having been a caretaker for

20       the alleged grandchildren of a friend and having

21       tough discipline with them, and seemed to be

22       inferring that he had whipped them, as well.

23           And, again, I could go on.  But the point is

24       there's very clear evidence here that those were

25       fantasy based and not reality based conversations.

1    The reason I say that evidence is there is that he's

2    never been married.  He's never had any children.

3    He's never had a family of his own.

4         Even in terms of other children, the

5    government has access to the same conversations that

6    I looked at, and I'm making a presumption here but I

7    think it's a valid one, that if they had evidence

8    that he had actually abused the grandchildren of a

9    friend of his, that they would have proceeded to

10   investigate and charge him accordingly.

11        So for all of these reasons, it seems pretty

12   clear to me that the bulk of the conversations he

13   had on the Internet with what unbeknownst to him had

14   been a government agent were fantasy as opposed to

15   reality conversations.

16   Q    Now, also, I think you had an opportunity to I

17   think review some of these conversations; correct?

18   A    Yes, sir.

19   Q    You've also had an opportunity to review the

20   interview done of Mr. Friedlander; correct?

21   A    I looked at a film of the police interrogation

22   that was done on the day of his arrest.  I think

23   that's what you're talking about.

24   Q    Yes.  That's what I'm talking about.  How

25   does, in your experience, law enforcement from what

Berlin - Direct

23

1    you've seen, how do they try -- what do they do to

2    try to connect with the people that they're talking

3    with or talking to?

4    A      What I've learned in some of the interactions

5    I've had with law enforcement is that they want to

6    try to establish a bond.  You'll see that they

7    called him by his first name.  If you look at the

8    Internet conversations even before the interrogation

9    that there's kind of a friendly tone, nice to hear

10   from you again, that sort of thing.

11         They want to win over the confidence of the

12   individual, and that's what they should be doing, so

13   that they can get the information they want to do

14   their job.  So they try to come across in many

15   instances as a -- as a caring person.

16         Now, we've all heard the thing, good cop, bad

17   cop.  There are situations where sometimes an

18   interrogating officer will take a more harsh

19   approach.  But in seeing this interrogation, there

20   was nothing harsh about it.

21         This was clearly one of those cases of trying

22   to develop a rapport and to seem to have some warmth

23   with the interaction between the officer and the

24   person being interviewed, at least in my judgment.

25   I mean, that's a judgment call, obviously.

1    Q      In your -- from the evidence and from your

2    work, are there people that try to -- when that bond

3    is achieved, really try to please the person they've

4    bonded with?

5    A      You know, I mean, the simple answer is yes.

6    It depends on the issues, on the person.  For

7    example, in this case when -- when there was

8    discussion about actually hurting a child,

9    Dr. Friedlander was pretty clear to say that he

10   would never do anything to physically injure a

11   child, at least that's my recollection of it.

12        But in terms of seeming to show great respect

13   for authority, seeming not in other ways to be

14   argumentative, very often a person out of respect

15   for authority will react in that fashion.

16   Q      Okay.  Does the same go for perhaps driving

17   two hours in the car to meet the person?

18   A      Let me see if I understand your -- I'm not

19   sure if I understand your question.  As I understand

20   it, my sense is that Dr. Friedlander wanted to meet

21   the person in question.

22        I think I had mentioned in my report that

23   during early conversations about a possible meeting

24   prior to the one that actually took place,

25   Dr. Friedlander, for example, had suggested that

1        they meet for lunch.  So it suggested that there was

2        some interest, not simply in something sexual, but

3        in establishing some sort of a relationship that was

4        not only about sex.  I guess that's the clearest way

5        I can put it.

6                MR. TRAGOS:  May I have a moment, Your Honor.

7        May I have a moment, please.

8        (Brief pause.)

9        BY MR. TRAGOS:

10       Q       In your -- in your research, your studies,

11       your interviews, is there a real distinction -- I

12       mean, are there really people who will talk about --

13       well, I think you said something about sex with

14       animals as fantasy versus the real people who really

15       would do that?

16       A       Yes.  I mean, just to give you a simple

17       example, I used it in another example of

18       necrophilia, which is people who are sexually

19       aroused by the idea of sex with corpses, something

20       that most of us find absolutely repugnant.

21               On the one end of the spectrum, I've seen

22       people who have acted in the most horrible way.

23       Perhaps the most infamous example would have been

24       Jeffrey Dahmer who killed a total of 17 people in

25       relationship to his necrophiliac desires.

Berlin - Direct

1          Another patient that I've seen for a number of

2     years who goes on the Internet, looks at these

3     images, masturbates looking at them, was sleeping

4     with a mannequin pretending it was a corpse, and

5     this has just gone on for years and years, and it's

6     clear that this is a person who's never going to go

7     out and try to act on this in a dangerous way.

8          So the answer to your question is yes.  And I

9     just give the two ends of the spectrum to make clear

10    there is a spectrum.  Obviously, one can get closer

11    to the middle and then it becomes more difficult in

12    some cases to tease it out.

13    Q     You mentioned Jeffrey Dahmer.  Were you a

14    participant in that case?

15    A     Yes, sir.

16    Q     Okay.  What was your participation in that

17    case?

18    A     I was an expert witness on an issue that had

19    to do with his diagnosis and things of that sort.

20    I've written a paper.  It's in my vitae, as well,

21    about that case.  So I did -- again, to be clear, I

22    was testifying -- I'm not sure if you're asking me

23    which side.  I was asked to testify on behalf of the

24    defense, if that was your question.

25    Q     Okay.

1        MR. TRAGOS:  That's all the questions I have,

2   Your Honor.

3        THE COURT:  Cross-examination.

4        MS. KAISER:  Thank you, Your Honor.

5                   CROSS-EXAMINATION

6   BY MS. KAISER:

7   Q     Good afternoon, Dr. Berlin.

8   A     Hi.  How are you.

9   Q     Could you please tell me, I'm a little bit

10  unclear on what material that you actually reviewed

11  in this case.

12  A     Yes.  And I realize that.  So what I've looked

13  at, I looked at a copy of the -- the criminal charge

14  against him, so I'm clear on that.  I looked at a

15  transcript of the conversations that he had with

16  what turned out to be the agent who arrested him,

17  the Internet conversations.

18        I've seen some other Internet messages that

19  had gone on between Dr. Friedlander and various

20  anonymous persons that discussed role playing of

21  being a boy or being beaten as a boy and so on.  And

22  I'd also, as was mentioned a moment ago, looked at

23  the interview that was done on him on the day of his

24  arrest by the police.

25        And I have looked at some other materials, as

1    well.  But as you know, there's just thousands and

2    thousands of pages.  So that's the essence of what

3    I've looked at and what I looked at in terms of the

4    report that I've generated.

5    Q     For the transcript of conversations --

6    A     Yes, ma'am.

7    Q     -- you said you reviewed the ones that he had

8    with the undercover law enforcement officer from --

9    A     Yes.

10   Q     Was that from 2008?

11   A     Yes.  It would have been the officer who

12   ultimately arrested him.  I'm blocking now on the

13   name that was used, but that's the one.

14   Q     Did you also review any of the chats from his

15   conversations with that same law enforcement officer

16   from 2005?

17   A     Yes, I did.  I don't have any way of knowing

18   if it was all of them, but I certainly have seen

19   some of them.

20   Q     Okay.  So just so I'm clear, you reviewed

21   chats from 2005 and chats from 2008 involving

22   Corporal Curt Romanowski.  Does that name ring a

23   bell?

24   A     I know Corporal Romanowski.  I think there may

25   have been another investigator at one point, as

1        well, because I think they were both state and

2        federal investigators that had some sense that

3        Dr. Friedlander was out there.  That's my

4        recollection, at least.  You can correct me if I'm

5        wrong on that.

6        Q        Did you review any chats from a law

7        enforcement officer, Detective Neil Spector, from

8        Port St. Lucie?

9        A        I don't recall that name because in reviewing

10       I -- I was looking at the screen names that were

11       being used.  So I may have, but I'm not -- I don't

12       recall the name.

13       Q        The chats -- the chats had to deal with him

14       wanting to have sex with a little girl, an

15       11-year-old little girl.

16       A        Oh, yes.  There was a boy and a girl.  Yes, I

17       did review those, then.

18       Q        All right.  And you said you reviewed the

19       taped interview of the defendant; correct?

20       A        That's correct.

21       Q        And then you reviewed some Internet e-mails;

22       is that correct?

23       A        That's correct.

24       Q        All right.  Now, we know there's a number of

25       e-mails in this case.  Do you have any idea how many

1          of those e-mails you reviewed?

2          A      Well, I mentioned some specifically in my

3          report, so you can certainly see the names of those,

4          and there were a couple others beyond that.  But it

5          wasn't more than a handful beyond what I mentioned

6          in the report.

7          Q      Do you have any knowledge as to how many

8          e-mails there were that discussed sadomasochistic

9          abuse in this case?

10         A      At this point I don't know what I have --

11         whether that's also the materials I haven't yet had

12         a chance to see.

13         Q      So do you have any idea whether there's 10

14         total or 500 total?  Do you have any idea how many

15         he had totally?

16         A      The answer is no, I don't.  He's told me that

17         there weren't a lot.  But, again, I'm not simply

18         depending upon his self disclosures.

19         Q      Dr. Berlin, do you have notes of your

20         interview with the defendant?

21         A      I don't have them with me, but I do have

22         notes, yes.

23         Q      Okay.  Did you know you were going to be

24         testifying regarding your interview of the defendant

25         today?

1    A      No.  I was told this was a *Daubert* hearing,

2    and I wasn't asked to bring anything.  I was just

3    told it was about whether or not the kinds of things

4    I would be saying would pass the *Daubert* criteria.

5    Q      Okay.  But you admit, sir, that your interview

6    with Mr. Friedlander was important; correct?

7    A      Absolutely.  And I'm glad to send you the

8    notes.  I'm not trying to hide anything.  I heard

9    about this hearing late in the day on Friday and I

10   was on call at the hospital all day Saturday and

11   Sunday.  So I came out of respect for the court.

12   But I had no time to prepare for a *Daubert* hearing

13   at all.

14   Q      So you'll send those notes?

15   A      If -- well, I'll do whatever the court tells

16   me to do.  If I understand you're entitled to have

17   them, I'll certainly make them available to you.

18        MR. TRAGOS:  Your Honor, if the doctor will

19   send them to us, we'll provide them to the

20   government.

21        THE COURT:  Very well.

22   BY MS. KAISER:

23   Q    Dr. Berlin, I'd like you to focus for a minute

24   on what you were actually retained, what -- when you

25   were first hired in this case, what were you asked

1    to determine?  What were you retained to do?

2    A     I was retained to do a comprehensive

3    evaluation of a forensic nature of Dr. Friedlander.

4    I was told that I would likely be asked to then

5    testify in court as an expert.  And my understanding

6    in testifying as an expert would be -- that the

7    purpose would be to provide information based on my

8    knowledge and expertise to the trier of fact, either

9    the judge or the jury, that might enable them to

10   make a more informed decision.  So that was my

11   understanding of what my role was going to be.

12   Q     All right.  So you were retained to do a

13   comprehensive evaluation of the defendant?

14   A     That's correct.

15   Q     And testify in court as an expert to something

16   that would be helpful to the jury?

17   A     Yes, ma'am.

18   Q     Okay.  And what information did -- were you

19   asked to evaluate or provide that you thought would

20   be helpful to the jury?

21   A     I wasn't asked to do anything specific.  I

22   wrote a report without any guidance as to how to do

23   that.  Again, my understanding when I looked at the

24   charges here was that the key issue had to do with

25   knowingly attempting, which, again, got it in the

1       ballpark of his mental state.

2             But the attorneys -- and I tell every

3       attorney, I'm going to call it as I see it.  They

4       did not instruct me as to how to go about doing my

5       work.

6       Q     So would it be fair to say, Dr. Berlin, that

7       you were asked to provide your opinion as to whether

8       or not the defendant had the intent to commit the

9       crime?

10      A     No.  I wasn't specifically asked to do that.

11      I had to try to figure out what might be most

12      useful.  I don't like to -- if I may, I just don't

13      like to be led by attorneys.  I like to do my job

14      and try to provide the information as I -- as I see

15      it.

16            So I wasn't asked specifically to look at

17      intent.  When I read -- I had to figure out because

18      normally a person -- normally I would not be

19      testifying on a question of guilt or innocence in a

20      criminal trial.  I don't see that I would have any

21      role in that.

22            So I look carefully to try to understand how

23      my testimony might be relevant.  I would have had no

24      problem saying I don't think it is.  And in looking

25      at it, I recognized that the issue was knowing

1    attempts, and that he knowingly attempted, which

2    helped me understand from my perspective as a

3    psychiatrist why there might be mental state issues.

4         But I was not told to do that.  That's

5    something that I concluded based on looking at the

6    information.

7    Q    And typically your experience as an expert

8    witness has been in commitment hearings, correct,

9    and not guilt and innocent?

10   A    I don't think ordinarily, if it's just a

11   question of what someone did or didn't do, that I

12   belong there, and so I haven't done that.  Now, just

13   for the record to be clear, I don't disagree.  I've

14   been in commitment hearings.

15        But I've done testimony in insanity cases,

16   I've done testimony in mitigation of sentence.  So

17   I've done a variety of things.  But I certainly

18   would not see a role for myself as a psychiatrist if

19   it's simply a question of did a certain act take

20   place or not, independent of the question of

21   knowingly.

22   Q    Right.  So you're focussed right on the

23   intent, correct, and not whether or not an act took

24   place?

25   A    Well, to me -- and, again, I'm speaking as a

1    psychiatrist.  I'm not trying to be difficult, but

2    I'm not a lawyer.  So to me a knowing attempt is the

3    same as intending to do it.  In other words, he made

4    a knowing attempt to engage or induce and so on,

5    then he was intending to do it.

6         So I realize there are legal issues.  I'm not

7    trying to suggest that I'm an expert on the legal

8    terminology.  But I was looking at it from the

9    psychiatric point of view in terms of knowingly

10   intending.

11        And the reason there was an issue as I've said

12   is there was this kind of virtual reality where

13   clearly through the Internet there was all sorts of

14   stuff that to someone who didn't know might seem

15   real but was pretend.  And then there's the real

16   legitimate question of was this an extension of the

17   pretend persona and discussion or because this,

18   indeed, is going to be a knowing attempt to actually

19   do it.

20        Again, I'm not here to answer the question.

21   I'm just providing information that might be helpful

22   with respect to that.

23   Q    Well, we'll get to your report, Dr. Berlin, in

24   just a few minutes and your opinions that are

25   contained in your report.

1   A      Okay.

2   Q      But first can you explain when you said you

3   did a -- you were hired to do a comprehensive

4   evaluation of the defendant, what did the

5   comprehensive evaluation of the defendant entail?

6   A      Well, it's a standard forensic evaluation and,

7   again, that's different from an ordinary evaluation

8   because if a person comes to my office and they're

9   depressed, I'm basically depending on what they have

10  to tell me.

11         When there's issues of, in fact, the

12  well-being of others, then I have to pull in as much

13  outside and independent corroboration as possible.

14  So it entailed doing what psychiatrists do, of

15  getting as much information as I could possibly get

16  about the individual, of sitting down with him and

17  getting a full history of his background and so on,

18  of getting a good mental status examination and then

19  trying to put it all together and see if I could

20  come to some conclusions with a reasonable degree of

21  medical certainty.

22  Q      And Dr. Friedlander himself is a psychologist;

23  correct?

24  A      He practices as a psychologist.  That's

25  correct.

1   Q      And so when you performed your comprehensive

2   evaluation of him, did you give him any sort of

3   test?

4   A      No, I didn't.  I mean, sometimes testing is

5   given, but I didn't see that any tests that I know

6   of were going to be particularly relevant to the

7   issues at hand here.  Now, there could have been

8   some physiological tests that I simply couldn't do.

9   There's a device called a penile plethysmograph

10  where you actually show images of boys, girls, men

11  and women and see what turns an individual on.

12        Even there, though, it isn't going to address

13  the question of his behavior in real life.  It will

14  give more information about his fantasies and what's

15  arousing to him, but it's not going to give evidence

16  of whether he will or won't act in a particular way.

17        And furthermore, my understanding is he's a

18  diabetic who may have difficulty with erections, so

19  that test may not even have been possible.  But

20  your standard tests, your Minnesota Multiphasics,

21  your personality tests and so on I don't think in my

22  judgment were going to add very much in this

23  particular case.

24  Q      Right.  So I just want to make sure that I'm

25  not missing anything in terms of your evaluation of

1    the defendant.   So you interviewed him; correct?

2    A      Correct.

3    Q      And then you relied upon the discovery

4    provided to you from defense counsel; correct?

5    A      Well, just to make clear, though, I told the

6    defense counsel that's why I've got so much of it,

7    that I don't want to depend just on something that's

8    triaged through defense counsel.   So I insisted on

9    seeing all of it.   And as I said earlier, if I had

10   come upon something that would lead me to change my

11   conclusion, I have no problem doing that.

12   Q      So -- but the answer to my question is yes;

13   right?

14   A      Yes.

15   Q      The only thing you --

16   A      I depended upon the discovery material, my

17   clinical interview and my mental status examination.

18   That is correct.   And in applying my body of

19   knowledge and expertise.

20   Q      And your mental status evaluation is just to

21   assure he's alert to time, place; correct?

22   A      Well, no.   I asked him about fantasies and

23   urges.   Again, I've dealt with hundreds of people

24   over the years.   Some of them who have those urges

25   would admit it.   He wasn't necessarily going to be

1    hurting himself, in my opinion, by saying that he

2    has certain fantasies and urges, the issue is

3    behavior, so I asked him about it.

4          He said he's not been sexually aroused by

5    children.  Now, again, I'm not just depending on

6    him.  I then go back and put it in context.  Excuse

7    me.

8    Q     All right.  So with your comprehensive

9    evaluation of the defendant, there was no scientific

10   tests that were done; correct?

11   A     I don't think I would argue with that.  But I

12   do want to make it clear that when a physician does

13   an examination, that's based upon a body of

14   knowledge and often on scientific principles.  But

15   in terms of was there a scientific test done, I

16   would agree with you, the answer would be no.

17   Q     Well, Dr. Berlin, could you tell me what

18   scientific test there is out there that would tell

19   you whether or not someone who says on the Internet,

20   I want to have sex and beat a child, is engaged in

21   Internet fantasy versus wanting to really get

22   together and beat and have sex with a child.  Is

23   there any scientific test out there that you know of

24   that can evaluate that?

25   A     Well, when he says he's been beating his own

1    child for years and he doesn't have a child, it's

2    very clear that that's a fantasy.

3    Q      So is the answer to my question, no, sir, that

4    there is no scientific test that can evaluate that?

5    A      The answer would be, no, ma'am, there's no

6    scientific test.  But it is going to be important,

7    because that's the ultimate issue here, for someone

8    to be able to answer that question.

9    Q      I agree.  But is there any scientific way for

10    you to determine as a psychiatrist whether or not

11    someone is engaging in a fantasy on the Internet or

12    if they actually want to do it?

13    A      Well, again, we have terms like reasonable

14    medical certainty.  If you're asking can anybody,

15    now, including a physician such as myself with a

16    hundred percent certainty, no.  Can I come to a

17    conclusion with reasonable medical certainty in the

18    same way that in court people are asked to come to

19    conclusions either beyond a reasonable doubt or, you

20    know, preponderance of the evidence and so on.

21         I can as a physician based on the way in which

22    I go about doing things, my body of knowledge, the

23    patient in front of me, the information available

24    come to a conclusion with reasonable medical

25    certainty.  Is there a test that will absolutely

1    tell me with 100 percent certainty?  No.

2    Q      So for you to make the determination that

3    Mr. -- that Mr. Friedlander was engaging in an

4    Internet fantasy, it's a coin flip between, yes,

5    he's either engaging in a fantasy or, no, he's not,

6    he really intends to do it; correct?

7    A      There's no coin flip with respect to much of

8    what he said.  It's crystal clear that much of that

9    was fantasy.  The ultimate question is going to be

10   in the real world was he simply -- when he was

11   talking about wanting to be with a child, was this

12   an extension of his Internet persona and of role

13   playing, or at age 78, had he now switched for the

14   first time in his life and was actually going to go

15   out and have sex with a child.  I don't think it's

16   flipping a coin, but I've been told not to give

17   final conclusions here so I'll stop at that point.

18   Q      Well, Dr. Berlin, you'd agree with me that --

19   for example, we'll take your opinion regarding

20   him -- your opinion that Dr. Friedlander's never

21   abused another child; correct?

22   A      That is my opinion based on the information

23   available to me.  That's absolutely correct.

24   Q      And you base that -- you testified earlier

25   with Mr. Tragos, correct, that you believe that

1    because he had never been prosecuted for molesting

2    any other children; correct?

3    A    That's one piece of evidence, yes.

4    Q    Well, what piece of -- what scientific test,

5    what test as a psychiatrist can you point me to to

6    tell me or show me that that's more than just your

7    opinion of whether or not Mr. Friedlander told you

8    the truth during the interview?

9    A    Well, there -- there is no test.  There's

10   simply the totality of the evidence.  There are many

11   cases where there's not a smoking gun.  One has to

12   look at all of the evidence and then make a

13   decision.  That's the real world that we all operate

14   in.

15   Q    So what special skills, sir, enable you as a

16   psychiatrist to make a determination that

17   Mr. Friedlander was engaged in a fantasy versus

18   acting out in real life?

19        MR. TRAGOS:  Your Honor, I'm going to object

20   at this point.

21        THE COURT:  Overruled.

22        THE WITNESS:  Well, again, I thought I had

23   answered some of that.  When it comes to the bulk of

24   conversations, which was what much of the

25   conversation was about of what he had already done,

1       I think it's clear that that's not true.  It's also

2       the case -- I'm sorry -- well, if I could finish,

3       please, I didn't mean -- it's also the case that as

4       a mental health expert, because in a sense it's

5       circumstantial evidence here, there isn't a factual

6       matter that can answer knowingly, I look at things

7       like does he have a disorder that might relate to

8       whether he would have done this in real life or not,

9       is there evidence of a behavorial pattern that might

10      relate to whether he might have done this or not.

11          Again, that's a little bit different from what

12      the lay person might do, and it may be helpful to

13      the trier of fact to hear how I would approach it.

14      If they don't feel it's helpful, that's fine with

15      me.  But that's my understanding of the role that I

16      have to play here.

17      BY MS. KAISER:

18      Q       So Dr. Berlin, when you testified earlier that

19      you believed that Dr. Friedlander had never molested

20      another child, you based that upon your belief that

21      no other law enforcement -- no other law enforcement

22      action had been taken against Mr. Friedlander;

23      correct?

24      A       I base it upon evidence, the same way one

25      would in court.  You could never prove a negative.

Berlin - Cross

1    I'm simply stating that I have not seen any evidence

2    whatsoever or any data from a psychiatric

3    perspective that would allow me to conclude that he

4    has had sex with a child.  Could I prove a negative?

5    Nobody can ever prove a negative.

6    Q     And so you don't know if perhaps there were

7    real children that he was referring to in those

8    e-mails about molesting; right?  His friend's

9    grandchildren that he had babysat, you have no way

10   of determining whether or not that's real or

11   fantasy; correct?

12   A     Other than I made the assumption, because I

13   believe police are conscientious and do their jobs,

14   that they had access to the same information I did

15   and it just oppresses plausibility that if they

16   believed there was a child or children out there

17   that he had molested, that they would have simply

18   left that undone.

19         And, in fact, they never came to his house at

20   the time he was having the conversations about

21   having the kids over for the weekend.

22   Q     Well, we'll get back to that point in a

23   minute.  But you would agree with me, sir, that

24   there's no way that you can as a psychiatrist

25   determine whether or not an Internet chat is fantasy

1    versus reality, right, just solely based on a lack

2    of arrests?

3    A       Well, if you want to make the question that

4    specific, and I don't want to be argumentative, the

5    answer to your question is that's correct.

6    Q       In fact, it could have nothing to do with

7    whether or not the police are conscientious, it

8    could have to do with the fact that maybe the

9    children who were potentially victims didn't report

10   the abuse; couldn't that be another explanation?

11   A       It could, but this is a case where the police,

12   I think, would have been mandated to investigate

13   because they had evidence that if this was real

14   would have constituted probable cause.

15   Q     All right.  But, sir, you would agree with me

16   that in the situation that you discussed earlier how

17   Mr. Friedlander had never engaged in real abuse of

18   children, despite his e-mails stating that because

19   he had never been arrested for it, it's equally

20   plausible, sir, is it not, that law enforcement had

21   no knowledge of who the children were?

22   A       Well, again, I'm not going to belabor the

23   point.  I'm talking about looking to the totality of

24   evidence.  What you say is possible.

25   Q       All right.  And, sir, you mentioned earlier

1    that law enforcement -- I believe your testimony

2    was, well, if they were concerned, they should have

3    gone to his house sooner.  Was that some kind of

4    what you were saying?

5    A     I believe that if they felt there were

6    children that were going to be placed into danger,

7    that they would have had a responsibility to

8    investigate.  Now, they didn't necessarily have to

9    break down the door.  But they would have presumably

10   wanted to keep an eye on him, put him under

11   surveillance.

12        If I'm a police officer hearing this is a man

13   that's telling me he's going to bring the

14   friend's -- the grandchildren of a friend over to

15   his place, that the friend's given him permission

16   for anything, that they're talking about strict

17   discipline, and this is a man who says he's been

18   beating and whipping children, I don't know how any

19   law enforcement officer could defend the idea, if

20   that was something that he or she believed was

21   reality, that they wouldn't have at least put him

22   under surveillance.  Were they going to let a child

23   walk into that trap?

24   Q     Dr. Berlin, let me ask you this.  When did law

25   enforcement identify Dr. Friedlander?

1    A      Well, I don't what date they identified him --

2    Q      Are you even aware --

3           THE COURT REPORTER:  I'm sorry.  I didn't hear

4    the answer.

5           THE COURT:  Slow down, please.

6           MS. KAISER:  I'm sorry.  Restate it.

7    (Whereupon, the court reporter read back the pending

8    question.)

9           THE WITNESS:  I don't know that.  But I know

10   they had the ability if it was an emergency to

11   pretty quickly figure out who he was.

12   BY MS. KAISER:

13   Q      So Dr. Berlin, are you an expert on law

14   enforcement tactics, as well?

15   A      I've attended many symposiums sponsored by law

16   enforcement.  I've talked about some of the FBI

17   symposium.  I -- I don't want to call myself an

18   expert, but I do think I'm quite familiar with how

19   they go about investigating a number of these

20   issues.

21   Q      So if law enforcement had not yet identified

22   Mr. Friedlander when he was talking about having

23   children over to beat, that would be a reason why

24   they wouldn't have rushed in; correct?

25   A      If they had not yet identified him and had no

1    way of identifying him at that point, then the

2    answer is yes.

3    Q     All right.  So you're making a judgment

4    because in your mind you believed, rightly or

5    wrongly, that law enforcement must have had him

6    identified; correct?

7    A     I didn't say they had him identified.  I said

8    I believe they had the ability to be able to

9    identify him.  They knew what Internet name he was

10   using.  They could have identified in the same way

11   that they ultimately did identify him if he hadn't

12   yet been identified.

13   Q     So if they hadn't gone to the house earlier

14   and it was because they didn't know who he was, that

15   would be an explanation, correct, it would have

16   nothing to do with their determination of how

17   dangerous Mr. Friedlander was if they hadn't had him

18   identified; correct?

19   A     That's correct.  But it doesn't explain why

20   after the fact when they did know who he was why

21   they wouldn't be looking for the children in

22   question.

23   Q     All right.  Well, let's talk about your report

24   because there are a number of issues that I'd like

25   to discuss with you, sir.

1          MR. TRAGOS:  Your Honor, may I provide

2     Dr. Berlin with a copy of his report?

3          THE COURT:  If he needs it.

4          MR. TRAGOS:  Would you like to have a copy of

5     your report?

6          THE WITNESS:  Well, I can wait and see.

7          THE COURT:  If he asks for something, he can

8     have it.

9     BY MS. KAISER:

10    Q     For the issues that you listed on page two of

11    your report, sir, that you said the issues -- issues

12    considered, you said, "In evaluating

13    Dr. Friedlander, I have attempted to address the

14    following three issues.  The first was, to what

15    extent were his Internet chats about beating

16    children a manifestation of a fantasy interest in

17    role playing versus an interest in actually

18    consumming real life acts."  Is that correct?

19    A     Yes.  You were just reading what I said.

20    Q     Okay.  And you've testified previously, sir,

21    that there was no type of scientific test that would

22    lead you to conclude one way or the other?

23    A     That's correct.

24    Q     The next thing that you listed that you were

25    asked to consider was at his current age of 78, does

1        Dr. Friedlander have a psychiatric disorder that

2        might have predisposed or driven him to become

3        sexual with a child; is that correct?

4        A        That's correct.  Although, as I think about

5        it, I'm not clear that I was asked to consider, I

6        may have simply decided to consider.  But otherwise

7        it's correct.

8        Q        All right.  And your conclusion was that he

9        did not; correct?

10       A        Well, I think my conclusion was talked -- was

11       couched in terms of reasonable medical certainty.

12       Q        Well --

13       A        Well, then, let me -- if I may, let me look at

14       the report because I don't want to be blind at it,

15       if I may.

16               MR. TRAGOS:  May I, Your Honor?

17               THE COURT:  Yes.  Let him have the report.

18               THE WITNESS:  Thank you.

19               MS. KAISER:  Sure.

20               THE WITNESS:  Okay.  Again, I'm sorry.  I just

21       want to be clear.  You're still talking about point

22       two, about whether he has a psychiatric disorder

23       that might have predisposed him; is that correct?

24       BY MS. KAISER:

25       Q        Correct.

Berlin - Cross

1    A      Okay.  I just wasn't sure where you were at.

2    But the answer to your question is yes.

3    Q      And so you weighed that.  And what was the

4    result of your evaluation with that, with respect to

5    that?

6    A      Well, I did not feel that he had a psychiatric

7    disorder.  I was more specific, either pedophilia or

8    sexual sadism.  And again, in terms of my

9    conclusions, someone who has that disorder would be

10   more likely than someone who doesn't to try to

11   approach a child in a sexual way.

12   Q      And you --

13   A      And again, I'm sorry, the sexual sadism would

14   have to involve an element of pedophilia, as well,

15   if it was a child they were approaching.  I'm sorry.

16   Q      Okay.  And you based your opinion that he's

17   not a sadist or -- I think a sexual sadist or a

18   pedophile on your opinion that he was being truthful

19   when he said it was all fantasy?

20   A      No, ma'am.  I made that -- I'm trained to

21   diagnose.  I mean, that's what I do as a physician,

22   that's what I do as a psychiatrist.  I don't simply

23   depend upon what he tells me.  I look at all of the

24   information available and then come to a conclusion.

25          I did not have any information available to me

1    that I felt would satisfy that criteria for him to

2    be diagnosed either with pedophilia or with sexual

3    sadism.

4    Q      What is the diagnostic criteria for

5    pedophilia?

6    A      Well, I said it earlier but I can repeat it.

7    The person would have to have had intense recurrent

8    erotically arousing fantasies and urges about sex

9    with a child, or since those are the mental

10   phenomenon, if they had repeatedly behaved that way

11   with a child and they're denying the fantasies and

12   urges, it would have been perfectly legitimate to

13   infer that the fantasies and urges must be present.

14   Those are the key mental elements of what constitute

15   the essence of pedophilia.

16   Q      And so the fact, sir, that Dr. Friedlander had

17   been communicating with law enforcement at least

18   since 2005 about sexually abusing and engaging in

19   sadomasochistic conduct with children wasn't

20   sufficient enough time to meet the criteria for

21   pedophilia?

22   A      Right.  And that's the key issue here, that

23   one might assume as someone who has not worked in

24   this area that if one has had those discussions they

25   must have pedophilia.  The fact of the matter is,

1      speaking as a professional, that is not necessarily

2      true.  One can have these fantasies, one can have

3      these thoughts and feelings, and if one has never

4      behaved on them not necessarily meet the criteria

5      for pedophilia.

6      Q      And once again, sir, you base whether or not

7      somebody has acted on them based on his self report;

8      correct?

9      A      No.  We're going over and over.  Based on the

10     totality of the evidence available to me.

11     Q      And based on his lack of arrests for other

12     crimes; correct?

13     A      That's one piece of information.  That's

14     correct.

15     Q      And then the last thing that you note in your

16     report that you were asked to determine, it says, is

17     it possible to conclude with reasonable medical

18     certainty that Dr. Friedlander has had specific

19     mental intent with respect to the issue of becoming

20     sexually involved with the children; correct?

21     A      Yes.  And if I may, just to repeat what I said

22     earlier, I'm talking not in the legal terms of

23     mental intent.  I said, in my mind -- and I'm

24     speaking just from a psychological point of view, if

25     he was knowingly attempting, then he was intending.

1    But I want to make it clear, I wasn't trying to step

2    on legal grounds.  That was just speaking from a

3    mental health point of view, not from a legal point

4    of view.

5    Q      You had mentioned previously that the

6    defendant had no son.  What information did the

7    defendant tell you about the person he referred to

8    as his son, Randy, in the interview with law

9    enforcement?

10   A      Again, I'm going by memory, but I believe

11   there had been a man who had acted as kind of a

12   custodian with him who he had referred to as his

13   son.  I also know he had several Internet

14   communications with people who referred to

15   themselves as wanting to be his boy, him to be the

16   father.  But in those cases, again, it was clear

17   these were adults he was speaking to and not a

18   child.

19   Q      Well, let's just focus on what he told you.

20   What specifically did the defendant tell you about

21   this person, Randy, that he said to the law

22   enforcement officer was his adopted son?

23   A      Well, I'll tell you what I remember at this

24   point, and that is that he had never had a son, he

25   had never had an adopted son.

1    Q    All right.  So are you unaware, then, sir,

2    that there was a person named Randy that lived with

3    him?

4    A    No, I'm not.  I just said that.  I said I

5    believe there was a person named Randy who lived in

6    his house or who had passed away a number of years

7    ago but who had been there as a caretaker and

8    someone who helped him out.  I'm aware of that.

9    Q    Did Mr. Friedlander tell you anything about

10   Randy and did he mention to you that he was his son,

11   his adopted son?

12   A    I'm trying to recall.  I just don't remember.

13   I know he talked about him being like a son.

14   Whether he used the word adopted or not I simply

15   don't recall the word.

16   Q    Do you recall that from the interview with law

17   enforcement?

18   A    I recall him talking to law enforcement about

19   beating his son.  I don't recall whether he had used

20   the word adopted or not.  I don't recall that.

21   Q    Did you have any discussions with

22   Mr. Friedlander about Randy's suicide?

23   A    I believe he had told me about the suicide.  I

24   don't recall going into any details about it.

25   Q    Do you know how old Randy was at that time?

1    A      My recollection was that he was an adult.

2    That's -- certainly that was what I had thought at

3    the time.

4    Q      So your previous testimony, sir, with

5    Mr. Tragos about him not having a son was he had no

6    son except for this person that he told law

7    enforcement about named Randy?

8    A      Yes.  But, again, it's going to be a factual

9    question of whether or not that was his son or not.

10   At this point I don't believe he's ever had a son.

11   But if there's evidence to the contrary, again, I'm

12   happy to look at that.

13   Q      Well, Dr. Berlin, you would agree with me that

14   if the defendant calls him his adopted son, then

15   whether or not legally all the papers were signed,

16   then he should be considered his son; correct?

17   A      No, absolutely not.  Given all of the false

18   statements and fantasy statements that he's made on

19   the Internet about his son and his friend's sons and

20   so on, no, absolutely not.  He was often talking in

21   a fantasy way, not a reality way.

22   Q      In your report, Dr. Berlin, you noted that the

23   Internet chats had to be fantasy in part because

24   you -- he mentioned beating I believe his son in the

25   basement; correct?

Berlin - Cross

1    A       Yes.  I remember saying that.

2    Q       All right.  And you made a point by saying

3    that he lived in Florida and there's no basements in

4    Florida; correct?

5    A       Yes.  I'm aware, if that's the issue, that he

6    has another home in Virginia.  That's correct.

7    Q       And that home has a basement; correct?

8    A       That home does.  That's correct.

9    Q       So that would have been important to note in

10   your report, correct, that -- that although he

11   doesn't have a basement in Florida, there is a place

12   where he could have had a basement?

13   A       I think that's fair.  I think my recollection

14   was he was talking about having done this in

15   Florida, certainly, that -- with his so-called

16   grandchildren.  But that's a fair point.  I think I

17   probably should have mentioned that.  I won't

18   quibble with that.

19   Q       What tests or what Internet studies have you

20   conducted of the public at large to determine how

21   much of what they're chatting about is fantasy

22   versus reality?

23   A       Well, I haven't personally conducted any of

24   those studies.  I've tried to keep up with the

25   literature.  I mentioned a book that was written

1    that really discussed those issues by Dr. Cooper a

2    few years ago.

3         I've done a chapter in that book.  So, you

4    know, I'm required to take continuing education

5    courses as a licensed physician.  I attend forensic

6    psychiatry meetings, so I've kept up in the way

7    people keep up with their profession.  But I haven't

8    myself done a study on that.

9    Q    So is there any study that we could look at to

10   base your opinion on that this was all just a

11   fantasy?

12   A    There's no study that would say that this was

13   all just a fantasy.  I think the facts in this case

14   establish that much of what he was saying must have

15   been a fantasy.

16   Q    Do you know how many individuals that

17   Mr. Friedlander was chatting with on the Internet

18   that he actually met in real life?

19   A    I don't know.  He had told me that he had met

20   a couple, but I don't have any other independent way

21   of knowing that.  I didn't see any Internet messages

22   about agreeing to meet other people.  If there are

23   some that come up, fair enough.  But at this point,

24   I don't think he met more than one or two, if what

25   he's saying is accurate.

1    Q       And you're just basing that on what he told

2    you; correct?

3    A       Yes.   And I don't know whether that is or

4    isn't correct.   I'm acknowledging that point.

5    Q       So he could have met numerous people that he

6    chatted with on the Internet?

7    A       It's possible.

8    Q       You put in your report, sir -- it says, to the

9    best of my knowledge and belief, Dr. Friedlander has

10   never engaged in sexually -- in a sexually sadistic

11   act with any nonconsenting person which by

12   definition would include a child, nor in spite of

13   the current charges against him has he ever made a

14   prudent attempt to do so.   Is that correct?

15   A       That's correct.   I don't have any evidence

16   that would contradict that.

17   Q       And you base that on the fact that he was

18   never arrested for any other crimes?

19   A       Well, again, that's one piece of evidence.

20   It's not the only piece of evidence.

21   Q       And your opinion that Dr. Friedlander never

22   beat his own son is based on him telling you that;

23   correct?

24   A       It's based on my belief that he doesn't have a

25   son, or didn't have a son.

Berlin - Cross

1    Q      But now that you know -- well, you knew he had

2    a son, correct, you knew he referred to a son?

3    A      The last thing you said is correct, I knew he

4    had referred to a son.  But the extent to which it

5    was fantasy versus reality is one of the issues at

6    hand here.

7    Q      But you don't -- and you have no idea if he

8    beat him or not?

9    A      All we can do is look at the evidence

10   available is the term we'd use in court.  I have to

11   look at the data that's available, which is what I

12   would use as a physician.  So I can only conclude

13   based on the information available to me.  Is it

14   possible?  Anything is possible.

15          MS. KAISER:  Your Honor, may I have a moment.

16          THE COURT:  Yes, ma'am.

17   (Brief pause.)

18   BY MS. KAISER:

19   Q      What is preferential sex offender?

20   A      It's a term -- it's usually preferential

21   pedophile.  It's a term that's not used much

22   anymore.  And again, kind of in laymen's terms, it's

23   someone that would have preferred to be sexual with

24   a child.

25          The DSM now talks about whether someone is

1    interested exclusively in children or whether they

2    have some degree of attraction with adults, but in

3    addition to that are much more strongly drawn to

4    children than are the rest of us.  But it really is

5    an older term that referred to someone who seemed to

6    be particularly drawn sexually toward children.

7    Q    Well, what's the clinical term for a person

8    that would have sex with a child or homosexual sex

9    with another, same sex, obviously, person?

10   A    I'm sorry.  The --

11   Q    What's the clinical term --

12   A    Well, there's different kinds of pedophilia.

13   One way of dividing the cake is in terms of gender.

14   So there's opposite gender or heterosexual

15   pedophilia.  There's same gender or homosexual

16   pedophilia, and there's both gender bisexual

17   pedophilia.

18        So if I understand your question correctly,

19   there are a group of individuals who the types --

20   the only type of children they're attracted to, if

21   it's a man, would be a boy.  That would be same

22   gender pedophilia.

23   Q    But somebody who's not -- putting aside

24   pedophilia for a minute, is there a clinical term

25   for a person who would have sex with a child just

1    the same as they would a woman, just the same as

2    they would a man, that they don't differentiate?

3    A       Certainly not in a diagnostic manual.  I mean,

4    one can talk about people who have sort of a -- just

5    a very little -- what's the word, discriminate --

6    they're attracted to just about everybody or

7    everything.  I mean, I think an old word, it's

8    never -- I don't think it's used these days -- was

9    called polymorphous perverse, which talked about

10   people who had sexual attractions to a variety of

11   objects and persons and seemed to cross all lines.

12        That term was dropped because of its lack of

13   precision and difficulty in having a good working

14   operation.  But that may be the term that you're

15   talking about that used to be used.

16   Q       And just so I'm clear, you base whether or not

17   someone is a pedophile, aside from evidence

18   presented to you during discovery, based on their

19   interview with you?

20   A       Well, I think most importantly on my body of

21   knowledge.  You know, I'm a doctor.  I'm trained to

22   diagnose conditions.  You know, if somebody has

23   asthma, there's no X-ray that shows asthma.  That's

24   what I'm trained to do.  I'm trained to make these

25   diagnoses.

1           Now, people can debate whether or not it's

2      accurate but I have a body of knowledge.  I am clear

3      on what the criteria are.  I'm clear as best I can

4      be on what his behavior pattern has been.

5           And I put those things together and say, can I

6      with reasonable medical confidence arrive at certain

7      diagnoses.  And in this case for the reasons I've

8      described, I can't.  It's not dependent on any one

9      thing anymore than a case involving circumstantial

10     evidence.  You could pick it all apart and say,

11     well, that thing doesn't prove it, does it, or that

12     doesn't -- but the totality of the situation may,

13     and that's what I'm talking about here.

14     Q     For example, you mention that you didn't

15     believe he was a pedophile because he didn't have

16     child pornography on his computer; correct?

17     A     Again, that was one of many things.  You know,

18     I can decide that a forest isn't a forest if I keep

19     removing every tree.  But when I look at them

20     altogether, I come to a certain conclusion.

21     Q     Well, there are other reasons he might not

22     have child pornography; correct?  It's illegal, so

23     maybe he was being careful.

24     A     Well, if he wasn't worried about being caught

25     for ostensibly attempting to have sex with a child,

1    why would he have been anymore worried about being

2    caught for looking at child pornography?

3    Q       Dr. Berlin, is there any scientific test that

4    you use to weigh these issues?

5    A       No.

6    Q       Thank you.

7            MS. KAISER:  I have no further questions.

8            THE COURT:  Redirect.

9                      REDIRECT EXAMINATION

10   BY MR. TRAGOS:

11   Q       Dr. Berlin, things like antisocial as a --

12   we've heard that word before?

13   A       Um-hum.

14   Q       Are they contained specifically in the DSM

15   with criteria?

16   A       Yes.  There are different -- and I don't want

17   to make this too complicated, but there's different

18   axes, five axes in the DSM.  Axis I refers to

19   conditions such as pedophilia where there would

20   clearly be something different about the person's

21   mental or sexual makeup and behavior.

22           Axis II talks about things like temperament,

23   character, personality, also levels of intellect

24   like mental retardation.  And so there is a

25   condition called antisocial personality disorder,

1    and in laymen's terms that would be a person who

2    lacks a sense of conscience and moral

3    responsibility.   In a pervasive way, these are the

4    kinds of folks that are often found to be your

5    career criminals.

6    Q       Okay.   And did you find any of those

7    tendencies in Dr. Friedlander?

8    A       Again, no evidence at all.   He's led a

9    productive and responsible lifestyle.

10   Q       Now, the prosecutor asked you about -- and you

11   talked about the fact that during these chats

12   Dr. Friedlander talked about beating his son;

13   correct?

14   A       Yes, sir.

15   Q       In these chats, didn't you find that the son

16   he was beating was like eight years old or starting

17   when he was eight or eleven years old, some time in

18   that range?

19   A       Yeah.   He talked about how he started to do it

20   in a certain way at eight, how he changed over to

21   using other ways of beating at eleven.   It was

22   pretty clear that often, at least, I don't want to

23   say always, sometimes you might not know for sure,

24   but he seemed to be talking about a very young son,

25   a young prepubescent boy.   And by the way,

1      pedophilia refers to prepubescent children.

2      Q      All right.  And with this person Randall --

3             THE COURT:  Let me ask -- I'm sorry,

4      Mr. Tragos.  What do you mean from your frame of

5      reference that to be, prepubescent?  Is there an

6      age?

7             THE WITNESS:  I'm sorry, Your Honor.  Yeah.

8      If you look at the DSM, it means prior to when the

9      child goes through the changes of puberty.  In a

10     girl it would be breast growth and so on, in a male

11     it's the development of pubic hair.  The DSM says

12     generally a child 13 and younger.  It's actually

13     spelled out in that way, as well.

14            THE COURT:  All right.  Thank you.

15            THE WITNESS:  Yes, sir.

16            THE COURT:  Go ahead, Mr. Tragos.

17     BY MR. TRAGOS:

18     Q      This person Randall that was talked about, did

19     you ever hear him mention anything other than as an

20     adult?

21     A      No, sir.

22     Q      And anything other than a caregiver, a

23     companion for Dr. Friedlander?

24     A      No, sir.  Again, to be fair, I mean, I don't

25     know if it was times when it was talked about that

1       it didn't specify his age.  But your question, have

2       I ever heard it where it's clear that it was

3       anything other than an adult, the answer is no.

4       Q      All right.  But you did remember in the

5       conversations that the beatings of a son that

6       Dr. Friedlander talked about started at eight?

7       A      That's clear.  That's even part of my report.

8       Q      Okay.  Is the fantasy -- is this discussion

9       you've had today about fantasy, is fantasy and

10      fantasy on the Internet a generally accepted

11      principle in psychiatry, that there is fantasy?

12      A      Well, just knowing what you're phrasing

13      generally accepted principle, it's been well

14      documented now that a tremendous amount of that --

15      of fantasizing goes on on the Internet.  I think

16      that's a well-established fact at this point in

17      time.

18      Q      Within your profession?

19      A      Within my profession and specific to this

20      case, as well.

21      Q      And it has been written about?

22      A      Yes, sir.

23      Q      By psychiatrists?

24      A      Yes.  And, again, things take -- because I

25      want to be clear here, things often take longer to

1    get into the printed publication than they do in

2    terms of getting presented at conferences and so on.

3    There's usually a bit of a delay.  So to answer your

4    question, there is stuff written, but there's been

5    more presented at conferences that I'm sure over the

6    next few years will start to get into the printed

7    press.

8    Q     When something is written about in a

9    professional way, psychiatry, is there a peer

10   review?

11   A     The most -- the studies that I think have the

12   most weight, to answer your question, are peer

13   reviewed.  I've done peer review myself.  So the

14   answer is that many of them are peer reviewed and

15   to -- but to not mislead, there are books that are

16   not necessarily peer reviewed.  There are a few

17   journals out there, very rare these days that are

18   not peer reviewed.  But the bulk of the medical and

19   psychiatric literature at this point, particularly

20   if you're talking about journals and not books,

21   would be peer reviewed.

22   Q     Okay.  The methodology that you've used here

23   and the -- the DSM, are those all considered the

24   items that are of general acceptance within your

25   profession?

1    A      Yes.   And to be clear, I mean, it's like

2    asking, you know, is it generally accepted that a

3    physician doing an examination, making a diagnosis

4    is doing something that is -- that is clearly

5    acceptable in terms of science, of medical -- of

6    practice and so on.   I mean, we're talking about me

7    doing what I've trained to do for many years.

8    And -- and that's included general psychiatry, it's

9    included experience in forensic psychiatry.

10        There's American Journals of Psychiatry in the

11   law.   I've published in there.   I was a president of

12   my local chapter of the American Academy of

13   Psychiatry and the Law.   These are all in the

14   mainstream of generally accepted ideas.   The DSM is

15   the -- the words been used in quotes, the Bible of

16   the psychiatric profession.   These are not things

17   that are somehow on the fringe or unaccepted.

18        MR. TRAGOS:   That's all the questions I have,

19   Your Honor.

20        THE COURT:   Thank you.   Dr. Berlin, if I could

21   ask you a few questions, please.

22        THE WITNESS:   Yes, sir.

23        THE COURT:   Tell me when and where and under

24   what circumstances you interviewed the defendant.

25        THE WITNESS:   Yes, sir.   I interviewed him --

1    I hope my memory is correct -- I believe it was

2    October 30th.  I had come down here -- actually to

3    Clearwater as opposed to Tampa.  It was in the

4    offices of Attorney Tragos.  The two FBI folks were

5    present but waited outside the room, and I used one

6    of the conference rooms, and the interview lasted

7    approximately four hours.

8         THE COURT:  Is that any different than your --

9    I'll use the word normal, not to suggest anything is

10   normal, but your regular manner of conducting an

11   interview incident to a comprehensive evaluation?

12        THE WITNESS:  No.  But to be complete, it's

13   not the only way I've done it.  I mean, there have

14   been interviews that I've done in prisons, for

15   example.  There's interviews I do with the

16   assistance of a psychiatric resident or a colleague,

17   so sometimes I don't do it alone.  But this is

18   certainly well within the mainstream of how I would

19   go about doing something of this sort.

20        THE COURT:  Have you done any follow-up

21   interviews since October 30th?

22        THE WITNESS:  No.  I am continuing to review

23   this voluminous amount of discovery material.  If I

24   felt a follow-up was necessary, I would inform the

25   attorney.  But at this point I haven't and so far

1       don't think that it would be necessary.

2               THE COURT:  You have referred to the DSM with

3       respect to pedophilia in the first axis.

4               THE WITNESS:  Yes.

5               THE COURT:  Do I understand correctly that the

6       DSM actually includes certain criteria for

7       ascertaining pedophilia?

8               THE WITNESS:  Yes.  If you open the DSM --

9               THE COURT:  But I am correct in understanding

10      that?

11              THE WITNESS:  Yes.  If you want a yes or no,

12      absolutely, Your Honor.

13              THE COURT:  All right.  Can the same be said

14      for sexual sadism?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Is that on the same axis?

17              THE WITNESS:  Yes, sir.

18              THE COURT:  Can the same be said for Internet

19      fantasy activity?

20              THE WITNESS:  No.  Internet fantasy is not a

21      diagnosis.  It's simply a description of the way in

22      which people are these days sometimes acting on the

23      Internet.  Now, it may or may not be related to the

24      diagnosis, but in and of itself is not a diagnosis.

25              THE COURT:  Is there anything in that manual

1    which addresses both concepts of pedophilia and

2    sexual sadism?

3         THE WITNESS:  Well, both of them are in there.

4    And if they occur in a combined form, either a

5    physician such as myself would make the two dual

6    diagnoses, or there's a category in there called

7    paraphilic disorder, not otherwise specified, which

8    means that you can say that this is a sexual

9    disorder, a paraphilic disorder, and then you have

10   to specify in what way.

11        And then you would say it is because it has a

12   combination of two conditions, sexual sadism and

13   pedophilia.  So there would be two ways of

14   addressing it through the DSM, either by making two

15   diagnoses if there's evidence to support them or,

16   again, if there's evidence to support it, making a

17   single diagnosis indicating the elements of the two

18   are combined.

19        THE COURT:  In the course of your practice

20   clinically in evaluating and attempting to diagnose

21   individuals, other than self reports, what

22   information would you ordinarily look to to assist

23   you in making a decision?

24        THE WITNESS:  Pretty much what I've done here.

25   And what I evaluated -- my office in either Hopkins

1       Hospital or my other office in Baltimore, before I

2       even agree to see someone, if there are forensic

3       issues, I insist that I get a clear sense of what

4       the allegations are against them.  If there's

5       victims' statements, I want to see them; if there's

6       police reports, I want to see them.  I want to have

7       some sense if they have a past psychiatric record.

8       I want to know if they have a prior police record.

9           I really want to get every bit of information

10      I can from a variety of perspectives about that

11      person so that when I do the clinical interview, I

12      can put that all into a context and then make

13      judgments in terms of whether this data supports or

14      not supports the diagnoses that I'm looking at.

15          THE COURT:  Have you had occasion to have a

16      patient or perhaps a subject that you're evaluating

17      at the request of a court or otherwise who has not

18      had a history similar to what you just described?

19          THE WITNESS:  Well, I have -- as I mentioned

20      earlier, I have patients who are simply troubled by

21      having fantasies but they've never acted on them.  I

22      mentioned the fellow that I used as an example of

23      going to the Internet and looking at dead bodies.

24      He actually works in a hospital and is worried that

25      he'd get in trouble because he was looking at these

1    things on a computer.  But there's no evidence that

2    he's ever acted in any way on this.  And I've seen

3    him for several years, so I have a pretty good track

4    record with him.

5        So I do see people who present not with formal

6    charges against them and in some cases present

7    because they're troubled by fantasies or worried

8    their fantasies or actions on the Internet will get

9    them into difficulty even if it's not at the level

10   of being a criminal charge.

11       THE COURT:  If you were asked to testify as to

12   criteria that a psychiatrist like yourself,

13   forensically or otherwise, would look to in

14   diagnosing someone as a pedophile or not, could you

15   list those or enumerate those considerations or

16   factors without reference to a special case?

17       THE WITNESS:  Yes, I believe I could.  And I

18   could probably also talk about the method that

19   psychiatrists would use without talking about a

20   specific case.  And without -- as I understand it,

21   you don't want it, so I wouldn't give conclusions

22   about the ultimate issues in this particular case.

23       THE COURT:  You could do that with pedophilia?

24       THE WITNESS:  Yes, sir.

25       The COURT:  Could you do that with sexual

1      sadism?

2            THE WITNESS:  Yes, sir, I could.

3            THE COURT:  Could you do that with Internet

4      fantasy?

5            THE WITNESS:  Yes, sir, I could.

6            THE COURT:  What would you draw from to do

7      that?

8            THE WITNESS:  Just the body of information

9      available to me.  It would include a discussion

10     about what the individuals themselves had said, a

11     discussion about other information that I have, a

12     discussion about whether or not the information

13     looked at in its totality is supportive of fantasy

14     or reality.  So I could try to help people

15     understand my body of knowledge, how I might

16     approach it, my sense of the issues without myself

17     actually drawing any final conclusions.

18           THE COURT:  But there is a distinction between

19     using the DSM with respect to pedophilia and sexual

20     sadism as opposed to the Internet fantasy concept.

21           THE WITNESS:  The -- the difference is that

22     the Internet fantasy is not a formal diagnosis.  But

23     I should add that fantasizing would include -- using

24     the Internet for fantasizing is relevant to the

25     issue of diagnosing both pedophilia and sadism.  The

1    word fantasy is actually included in the criteria.

2         THE COURT:  All right.  Thank you, sir.

3         THE WITNESS:  Thank you, Your Honor.

4         THE COURT:  You may step down.

5         THE WITNESS:  Thank you.

6         THE COURT:  Watch your step, please.

7         Clearly, the testimony today has gone beyond

8    the limitation I imposed Friday in many respects.

9    This is a slippery slope, Mr. Tragos.  If he is not

10   able to, under 704(b), express an opinion about an

11   ultimate issue of fact, it's somewhat circumventing

12   that prohibition by asking him about facts that he

13   found in this case without doing exactly what the

14   rule prohibits.

15        Clearly, this witness is qualified in the area

16   or field of psychiatry, forensic psychiatry.  He is

17   published.  He is educated.  He exerts extraordinary

18   professional experience.  There's no question about

19   qualifications, in other words.

20        So in the analysis, it looks to me that we are

21   looking at relevance based on his experience and in

22   some instances his methodology.  I think you would

23   have to acknowledge there's a methodology with

24   respect to the Axis I diagnosis but not the

25   fantasy -- Internet fantasy idea.

1        So under *Daubert*, I'm going to restrict you, I

2    reiterate.  He's not coming in here to tell this

3    jury whether or not this man knowingly did anything

4    or intended to do anything, as opposed to simply

5    identifying criteria that he would look for in

6    determining certain things, making a diagnosis.

7        MR. TRAGOS:  I didn't want to interrupt the

8    court.

9        THE COURT:  That's fine.  I just wanted to

10   give you that as a predicate.

11       MR. TRAGOS:  Okay.

12       THE COURT:  I know you tried to avoid that,

13   but it's almost inescapable that he's going to delve

14   into these matters.

15       MR. TRAGOS:  Well, that's why -- and I

16   understand, of course, why the court overruled my

17   objection.  But that's why I started to object

18   during the prosecution's case because I thought the

19   prosecution was going well beyond what I tried to

20   limit him to in my direct examination, because I did

21   in the direct examination even stop him once when he

22   was going to give an ultimate conclusion.

23       All I'm saying is there's steps I think in

24   this.  Step one, him telling us his expertise on

25   pedophilia, sexual sadism and fantasy chats.  On the

1    fantasy chats, the DSM specifically talks about

2    fantasy.  And it's no different than, for instance,

3    a law enforcement officer testifying about how a --

4    because he's interviewed so many drug defendants, he

5    can tell you how a boat gets from Colombia to the

6    United States.  He has sufficient experience and

7    education and knowledge to talk about Internet

8    fantasy as much as a law enforcement officer would

9    be able to talk about a modus operandi.

10        THE COURT:  That's the ultimate fact.  You are

11   contending that your client was engaged in fantasy

12   and never intended to engage in any of the conduct

13   charged in Count One of the indictment.

14        MR. TRAGOS:  All I'm going to ask him to do is

15   tell us about sexual fantasy, how it exists, how it

16   evolves and how it's used on the Internet.

17        THE COURT:  Well, that's not what you did here

18   today, though.

19        MR. TRAGOS:  I did it in two parts.

20        THE COURT:  You asked him all kinds of

21   questions about --

22        MR. TRAGOS:  I know.

23        THE COURT:  -- whether he was engaged in

24   fantasy or not and why not if he didn't think he

25   was.  And he went into a long explanation of the

1    falsity of what he's saying and, therefore, he was

2    fantasizing.  I don't accept that.

3        MR. TRAGOS:  That's part two.  Part one is

4    what I just said.  Part two would be whether or not

5    any of those three things he would be allowed to

6    take the facts of this case and plug them into any

7    one of those three explanations.  So at first we're

8    talking about three explanations:  Pedophilia,

9    sexual sadism, fantasy chatting on the Internet.

10       Part two.  Can he plug in what he knows about

11   this case, does this criteria -- does

12   Dr. Friedlander fit the category of pedophilia.  I

13   don't think that's the ultimate issue.  I think that

14   is just a factor that the jury can take into

15   consideration.  But I think he can plug those facts

16   into pedophilia.

17       Number two, sexual sadism.  Does he fit the

18   criteria for sexual sadism?  I think, again, that is

19   a factor, not the ultimate issue that the jury can

20   be plugged -- because the jury as the fact finder I

21   think can be helped by this information.

22       Part three, sexual fantasy.  If the court

23   doesn't believe -- and I didn't ask him for his

24   ultimate conclusion on whether it was or wasn't a

25   fantasy.  What I asked him was -- and I was very

1    careful in how I asked him -- what I asked him was

2    what do you see in the facts in this case that

3    would -- that you would take into consideration in

4    determining whether or not this was or wasn't

5    fantasy.

6         THE COURT:   That begs the question.   You know

7    that.   Because then he comes out with all of his

8    theories and conclusions and opinions about why it

9    was a fantasy.   That's why I said it's a slippery

10   slope.

11        MR. TRAGOS:   But I think if he does not come

12   up with the opinion and say this was or wasn't a

13   fantasy, if he doesn't give the ultimate conclusion,

14   the ultimate opinion, then I think that he should be

15   allowed to give the jury that second piece of the

16   fantasy of information that they could have because,

17   you know, jurors may not -- and we may -- we may --

18   and I know a lot, but the case law says that the

19   reason you have experts is because jurors, the

20   common everyday man sitting in that jury box may not

21   have all the extensive knowledge and information

22   that they really need and that things can help them.

23        A lot of those people, Your Honor, may not

24   know about the cultural fantasy on the Internet, the

25   cultural fantasy.   They may not know about it.   They

1       may not know it exists.  They may not even use the

2       Internet, for all I know.  And we know there's still

3       a substantial portion -- we know what kind of jurors

4       we get in the Federal Court as far as age and there

5       may be a substantial portion of that jury that is

6       unfamiliar with the Internet.

7            I have here a man who's certainly qualified to

8       tell them about sexual fantasies on the Internet.

9       The court may not allow me to allow him to plug in

10      the facts of this case, and I think that's where the

11      court may be leaning, but if the court doesn't allow

12      me to do that, then I think at the very least he

13      should be allowed to expound on sexual fantasies on

14      the Internet and how that exists out there.

15           He gave multiple examples, and the court even

16      asked him for one, about sexual fantasy on the

17      Internet.

18           THE COURT:  Let me ask you a hypothetical.  Am

19      I about to start hearing now in every single case

20      that -- not every case, that was an exaggeration,

21      but in cases, Ms. Dyer brings a defendant into court

22      with an expert saying, he's not antisocial,

23      therefore, he couldn't have robbed that bank.

24           MR. TRAGOS:  No, because I don't --

25           THE COURT:  That seems to me what you're

1    doing.

2         MR. TRAGOS:   No, because I don't think that

3    pedophilia and sexual sadism fall in that same

4    category.

5         The COURT:   What's the difference?   They're on

6    the axis identified by Dr. Berlin in the DSM manual.

7         MR. TRAGOS:   I think there's one specific case

8    that we cited to the court where they said that an

9    expert would be helpful to explain sadomasochistic

10   behavior to a jury because it is not the kind of

11   activity that is commonplace and that the average

12   juror may know about sufficiently, and it would be

13   helped by having an expert talk about sadomasochism.

14   In fact, I think there's a specific case in there

15   that we've cited if the court would --

16        THE COURT:   Well, talking about what it is is

17   one thing.   Talking about whether someone is

18   inclined to engage in that is quite another.   How

19   does he know?

20        MR. TRAGOS:   Does the court accept the premise

21   of my first argument where he's allowed to explain

22   these three things?

23        THE COURT:   If it's relevant.

24        MR. TRAGOS:   Okay.

25        THE COURT:   Now, that's an assumption.   If

1      it's relevant.

2           MR. TRAGOS:  All right.  Pedophilia, sexual

3      sadism and fantasy chatting.

4           THE COURT:  I think fantasy chatting is pretty

5      much out the door, to narrow the discussion a bit.

6      There's nothing scientific or experience based in

7      his opinions.  He simply has opinions as a qualified

8      expert in psychiatry.  His opinions are no more

9      reliable than those of yours and mine.

10          MR. TRAGOS:  What if an officer -- if a law

11     enforcement officer got up on the stand and is asked

12     the question, tell me how drug dealers get their

13     drugs from Colombia to the United States.  And the

14     way he knows is because he's interviewed -- and the

15     case law supports him testifying to this.  He's

16     interviewed five drug dealers and they've told him

17     this, so that qualifies him to testify to the jury

18     about how drugs get from Colombia to the United

19     States.  He's talked to far more than five --

20          THE COURT:  Not analogous, different situation

21     so let's not engage in hypotheticals.  This is no

22     different than having someone come in and tell us

23     how you tell someone is telling the truth.

24          MR. TRAGOS:  I'm not talking about him giving

25     an opinion, I'm talking about him just explaining

1    what defines sexual fantasy on the Internet, not

2    about plugging into these facts.

3         THE COURT:  I don't think he needs to explain

4    that to the jury.  That's not going to be helpful to

5    the jury in deciding this case.

6         MR. TRAGOS:  Okay.  So then we're limited to

7    pedophilia and sexual sadism.

8         THE COURT:  As far as I'm concerned you are.

9    I'm applying *Daubert*.  I'm not just --

10        MR. TRAGOS:  Well, you're the only opinion

11   that counts, Judge.

12        THE COURT:  I'm sorry?

13        MR. TRAGOS:  You're the only opinion that

14   counts, so --

15        THE COURT:  Well, it's not only my opinion.

16   The Eleventh Circuit might agree with me or not.

17   But I've applied *Daubert*.  He's just confirmed in my

18   short conversation with him that there is no

19   scientific methodology or experience based

20   methodology making his opinions about Internet

21   fantasizing reliable.

22        MR. TRAGOS:  What about just being an expert

23   with his experience, not a scientific issue?

24        THE COURT:  Or relevant.  The testimony is not

25   relevant in that regard.  This defendant has the

1    right if he chooses to get up there and tell the

2    jury, I was fantasizing, I didn't mean it, and

3    here's why.  That's not scientific.  That's fact.

4    That's the ultimate fact.  I either intended to do

5    it or I didn't intend to do it.

6         So let me ask Ms. Kaiser --

7         MR. TRAGOS:  Your Honor, would he be allowed

8    to at least say -- well, I'll let the court ask

9    Ms. Kaiser.

10        THE COURT:  Ms. Kaiser, the question is

11   relevance under *Daubert*.  We've got three subjects,

12   pedophilia, sexual sadism and Internet fantasy.

13   Internet fantasy, I don't think he's able to present

14   relevant testimony for the reasons I've alluded to,

15   or reliable testimony.  That doesn't mean he doesn't

16   have a valid opinion or an opinion that's credible.

17   It simply means from the standpoint of admissibility

18   under *Daubert*, it's not reliable expert testimony.

19   That's all.

20        MS. KAISER:  I agree.

21        THE COURT:  No more than someone coming in and

22   telling us how to observe someone and tell whether

23   or not they're telling the truth.  The jury is fully

24   capable of making that determination.

25        MS. KAISER:  Yes, Your Honor.  The government

1    certainly agrees and believes that the Internet

2    fantasy argument shouldn't come in because there's

3    no available data as to the margin of error or any

4    expert test or anything else that can determine

5    whether or not this was fantasy or reality, it's

6    just his opinion which he admitted on the stand.

7         And under *Daubert*, I would agree that he's

8    certainly an expert when it comes to psychiatric

9    diagnoses, but he's certainly not an expert in terms

10   of Internet fantasy and under *Daubert* --

11        THE COURT:  You've won on that.  Let's move to

12   pedophilia and sexual sadism.

13        MS. KAISER:  Yes.  Whether or not the

14   defendant is a pedophile, as I discussed at the last

15   hearing on Friday, Your Honor, isn't relevant to

16   this case.  Someone does not have to be a pedophile

17   to travel to have sex with a child, nor is that an

18   element of the offense.

19        So, you know, assuming arguendo that the

20   government would even agree that the defendant is

21   not a pedophile, it doesn't matter.  So what?  What

22   they're trying to sneak in is propensity evidence,

23   like negative propensity evidence by saying, here's

24   the characteristics of somebody that's a pedophile,

25   and he doesn't fit those characteristics so,

```
 1    therefore, what they want the jury to believe is

 2    that since he doesn't meet these criteria, he

 3    wouldn't have committed this crime.

 4         And that's very confusing, it's very

 5    misleading.  And it's not allowed in rape cases,

 6    it's not allowed in other sex cases.  Defense

 7    attorneys aren't allowed to, you know, put on

 8    evidence --

 9         THE COURT:  Have a seat, sir.  Thank you.

10         MS. KAISER:  In other criminal cases, you're

11    not -- defense attorneys are not allowed to put on

12    evidence that the characteristics of a rapist or

13    that they're angry, hateful people and my client

14    doesn't have those characteristics so therefore he

15    didn't commit the rape.

16         That's exactly what Mr. Tragos is trying to do

17    in this case.  It would confuse the jury.  It's

18    not -- the issue in this case is not whether or not

19    he's a pedophile.  It's just not, it's not relevant

20    to any of the elements of the charged offense.

21         It's also not relevant if he's a sadist.

22    Maybe he just woke up one day and decided he wanted

23    to engage in this behavior.  We don't have to show

24    that he had some pattern lifestyle forever that he

25    was in this sadistic behavior.  It's not an element
```

1      of the crime.

2            And so whether or not -- that testimony is

3      just not relevant to the jury.  It's not helpful.

4      It's confusing.  They're going to be sitting there

5      wondering, well, gee, if he's not a pedophile, well,

6      you know, that doesn't impact on the elements of the

7      offense in any regard.

8            Title 18 United States Code Section 17, the

9      last sentence was designed by Congress to preclude

10     just this type of evidence from coming into confuse

11     the jury.  It says, it is -- reading from the

12     statute it says -- under the insanity defense, it

13     says, it's an affirmative defense to a prosecution

14     under any federal statute that at the time of the

15     commission of the acts constituting the offense, the

16     defendant, as a result of a severe mental disease or

17     defect, was unable to appreciate the nature and

18     quality or the wrongfulness of his acts.

19           But the last sentence is what's important for

20     our purposes.  It says, mental disease or defect

21     does not otherwise constitute a defense.  So it's

22     not a defense.  Whether or not he has some diagnosis

23     of pedophilia or sadism or some, you know,

24     psychiatric diagnosis for those is not a proper

25     defense for these charges.  And that's exactly why

1        Title 18 United States Code Section 17 in the last

2        sentence in there was designed to prevent criminal

3        defendants from just putting their mental status or

4        mental state at issue without having to formally

5        plead that they were insane at the time they

6        committed the offense.

7                The same thing, if whether or not the

8        defendant was lonely.  If the defendant wants to

9        present evidence that he was lonely and that's why

10       he wanted to meet the law enforcement officer, then

11       he could take the stand and say that.  But to try to

12       put that evidence in through an expert which relies

13       upon nothing more than the defendant telling him he

14       was lonely and that's why he did it is not helpful,

15       it's misleading.

16               If you put somebody with his credentials from

17       John Hopkins on the stand, the jury is certainly

18       going to pay attention to it just based on

19       qualifications.  But the bottom line is the only way

20       he knows what he was planning to do or bases his

21       opinion on what the defendant told him.  And 99

22       percent of the opinions that Dr. Berlin testified to

23       this morning would be the exact same factors that

24       the jury is supposed to weigh in this case.

25               Dr. Berlin wouldn't even admit that he wasn't

1    an expert in law enforcement techniques.  But he

2    went through and said, well, because of this law

3    enforcement decision or that law enforcement

4    decision, they should have done this, they should

5    have done that and, therefore, he has his opinions.

6         Those are the -- he didn't rely on one

7    scientific test.  He didn't rely on any education

8    whatsoever that he had obtained to form any of his

9    opinions about Dr. Friedlander.  He said, here's how

10   pedophiles act or here's the criteria.  I don't

11   think he fits it because he basically told me so.

12   He hasn't been charged with other criminal offenses.

13   And that's it.  That's exactly what the jury would

14   have to decide.

15        There was not -- nothing about his training or

16   scientific methodology or tests used.  And under

17   *Daubert*, that's what you need.  So under 702, the

18   testimony isn't helpful to the jury and really

19   impinges on their role as the fact finders.  It

20   says, if scientific, technical or other specialized

21   knowledge will assist the trier of fact to

22   understand the evidence or determine a fact in

23   issue.

24        Well, what is a fact in issue?  It's not an

25   issue as to whether or not he's a pedophile.  It has

1    no bearing on the outcome of this case.  The same

2    thing if whether or not he's a sexual sadist.  So

3    under Rule 702, certainly that testimony won't help

4    the jury understand a fact in issue.  And it says

5    that the testimony has to be based upon sufficient

6    facts or data, the testimony is the product of

7    reliable principles and methods and, third, that the

8    witness has applied the principles and methods

9    reliably to the facts of this case.

10         Well, in this case there was nothing really

11   that Dr. Berlin testified to that was some special

12   purview of psychiatrists in weighing the evidence in

13   this case.  Basically what he testified to is he

14   looked at the evidence and he made a decision that

15   he doesn't think Mr. Friedlander had the intent to

16   commit the crime.

17         Well, there was no scientific criteria, there

18   was no scientific test.  So he wouldn't be

19   testifying as an expert at that point based on

20   knowledge, skill, experience, training or education

21   under 702.

22         It's confusing.  The basis for his -- under

23   703, we'd object.  The facts or data in the

24   particular case upon which an expert bases his

25   opinion or inference may be perceived, may be those

1    perceived by or made to the expert at or before the

2    hearing.  If it's the type reasonably relied upon by

3    experts in the particular field in forming opinions

4    or inferences upon the subjects.  The facts or data

5    need not be admissible in evidence in order for the

6    opinion or inference to be admitted.

7         But basically it has to be facts relied upon

8    in that particular field.  What Dr. Berlin testified

9    to is just common evidence, basically the evidence

10   in this case.  He just made an opinion that he's

11   looked at the evidence and he thinks, well, it must

12   all be a fantasy, Internet chat.

13        And there's not one shred of scientific jargon

14   that he presented that would fit that into some

15   scientific opinion or expert opinion.  So we think

16   it's misleading under 703, as well, and again under

17   704.  I think it really does impinge upon the

18   ultimate issue for the jury to decide in this case,

19   and that's whether or not Mr. Friedlander traveled

20   to -- whether he intended to commit the charged

21   offense.  Thank you.

22        THE COURT:  Briefly, Mr. Tragos.

23        MR. TRAGOS:  Your Honor, during the interview

24   of Dr. Friedlander by the law enforcement agent,

25   they must have spent a good 15, 20 minutes at

1    various times talking to him with about, well, you

2    do have an interest in children; don't you?  You do

3    get sexually aroused by children; don't you?  You

4    have had other children do this to you; don't you?

5    They keep going over and over again his history as a

6    pattern of child molesting or having a sexual

7    interest in children.

8         He is going to -- Mr. -- Dr. Friedlander --

9    and it's only relevant if he testifies, but if he

10   testifies talks about having no history and no

11   propensity toward -- or any interest in having sex

12   with children, that he's not a sadomasochist, he

13   doesn't like beating people and doing all this

14   stuff.

15        If the court remembers, the prosecution has

16   said they plan and the court approved them bringing

17   in any pictures that they found on his computer

18   dealing with whipping, with belts, with any of that

19   material.  Not that it ever happened, but the fact

20   that there is a picture or someone talked about it

21   on his computer, the court told the prosecutor

22   they're going to let it in.

23        So when the prosecutor says, we're not going

24   into -- her quote was that he didn't just wake up

25   one morning -- that this wasn't part of sadistic

1    behavior.  Sadistic behavior doesn't matter, but

2    they're putting in sadistic behavior.  That's going

3    to be part of their case.

4         And so -- and that the sadistic behavior, they

5    also claimed in the argument on Friday, that it was

6    sexual in nature.  And if it's -- so they're putting

7    in sexual sadomasochistic history behavior, they're

8    putting in a history of sex with a child or wanting

9    to have sex with a child, that's why he's doing

10   this.

11        They have an interview where they talk to him

12   about his history of having sex with children.  So I

13   don't see how it can't be relevant that if he

14   doesn't meet the criteria, that while the jury can't

15   take that as a piece of information that he doesn't

16   meet the criteria for a pedophile or for a sexual

17   sadist, and he gets up there and he denies both, he

18   denied it in the interview to law enforcement

19   officer, and yet the jury can't take that into

20   consideration.

21        I don't see how they can't have that piece of

22   information of what a person who meets that

23   criteria, what they are or aren't.

24        THE COURT:  Well, under *Daubert*, for the

25   record, 526 U.S. 137, discussed by the Eleventh

1     Circuit, and 415 F.3d 1257 in *United States versus*

2     *Brown*, *Daubert* enumerates a number of factors the

3     court considers in determining the admissibility of

4     expert testimony.  This is a flexible test.  Any

5     number of criteria in addition to those identified

6     by the Supreme Court can be considered by the court

7     in determining ultimately whether the proffered

8     testimony is reliable and relevant.

9          In reverse order, I find without any hesitancy

10    that Dr. Berlin's testimony concerning Internet

11    fantasies versus reality is not reliable, does not

12    meet the criteria for expert testimony under

13    *Daubert*, would not assist the jury under Rule 702.

14    The jury is perfectly capable of determining whether

15    or not this defendant was fantasizing or not when he

16    engaged in the chats that he apparently did.

17         Reliability being the lynchpin, if you will,

18    he can -- Dr. Berlin identifies no scientific

19    methodology, testing, anything that I can

20    comfortably premise a finding of reliability on.

21         The DSM doesn't recognize that as a diagnosis.

22    Of course, fantasy and fantasizing is mentioned, but

23    it's not a separate diagnosis, unlike pedophilia and

24    sexual sadism.

25         And in any event, any testimony concerning

1    whether this defendant was fantasizing or intended

2    this to be reality goes to the ultimate

3    determination of fact the jury will be asked to draw

4    and is, therefore, inadmissible under 704(b).

5         With respect to pedophilia and sexual sadism,

6    the government has indicated that it intends to

7    buttress its case against the defendant by placing

8    in evidence photographs and other chat-type evidence

9    engaged in by this defendant.

10        I don't know the relevance of any of that, Ms.

11   Kaiser, except to buttress the government's

12   contention that the defendant knowingly engaged in

13   the conduct alleged so as to induce a child to

14   engage in some type of sexual activity.  Because of

15   that, these issues become relevant.  The

16   government's essentially appropriately putting on

17   evidence of similar acts, evidence -- it goes to

18   issue of intent so it's not purely propensity

19   evidence.  It goes to his intent and knowledge.  It

20   is admissible, appropriately so.

21        If the defense has an evidentiary foundation,

22   vis-a-vis testimony of the defendant, placing in

23   issue whether or not he has sexual attraction to

24   children consistent with a diagnosis of pedophilia,

25   or his propensity to engage in sexual sadism,

1    meaning his own propensities, not from an

2    evidentiary standpoint, I think the defendant has

3    the right to call Dr. Berlin for a limited purpose.

4         Ms. Kaiser is correct.  Even if Dr. Berlin has

5    diagnosed Mr. Friedlander using appropriate criteria

6    under the DSM which is a recognized and acceptable,

7    as he said, Bible of psychiatry, that's not a

8    defense under Section 17.  He will not, therefore,

9    be permitted to express an opinion or diagnoses of

10   this defendant.  It's not relevant.

11        What he can do, if you choose, Mr. Tragos, he

12   can testify based on his background and experience

13   as to the criteria that a psychiatrist or clinical

14   psychiatrist in his position would turn to in

15   determining whether one was a pedophile and/or

16   likely -- well, I should not use the word likely.

17   Let me retract that.  I'm not sure what the noun

18   would be.  Sadomasochist?

19        MR. TRAGOS:  S and M.

20        THE COURT:  Well, I know that's the topic, but

21   whether one is that or not, I assume he said there's

22   a diagnosis.

23        MR. TRAGOS:  Right.

24        THE COURT:  The problem that presents itself

25   here is that whether or not this defendant is or is

1    not a pedophile, is or is not one who engages in

2    sexual sadism is not relevant to the ultimate

3    question of whether he violated the statute.  But if

4    the defendant places in issue his knowledge, his

5    intent, surely it would be helpful to the jury to

6    understand the criteria that an expert in that field

7    would look to in determining whether one is or is

8    not.

9         But as Ms. Kaiser correctly points out, and

10   the doctor will never admit this, understandably so,

11   you don't have to be a pedophile to violate the

12   statute, nor do you have to be a sadomasochist to

13   violate the statute.

14        So I do find that under *Daubert* his testimony,

15   to the extent that it could assist the jury in

16   understanding those two recognized sexual disorders

17   -- and I say disorders, I say that from the context

18   of psychiatry, because he's recognized them as

19   diagnosed sexual disorders.  He made it very clear

20   that we're not talking about consensual bondage

21   situations like that.  We're talking about the types

22   of pain and suffering inflicted on another that

23   arouses one sexually as opposed to a consensual

24   situation.  He draw that distinction early on.  I

25   think that's important.

1          So I'm granting the government's motion in

2     part, striking and prohibiting Dr. Berlin from

3     testifying at all about sexual fantasies on the

4     Internet, and from expressing an opinion or

5     diagnoses as to this defendant because it simply is

6     not relevant.  On the other hand, he is able to

7     under *Daubert*, he's well qualified and his testimony

8     is reliable, to identify and explain what

9     constitutes from a psychiatric perspective clinical

10    and forensic pedophilia and sexual sadism.

11         That being said, Ms. Kaiser, is it still your

12    intention to look for and engage a psychiatrist or

13    psychologist or other expert to testify?

14         MS. KAISER:  I'd like to consult with the

15    expert before I make the final determination, Your

16    Honor.

17         THE COURT:  You need to tell me now because,

18    otherwise, I'm getting this case -- setting this

19    case for trial on short notice.

20         MS. KAISER:  At this point, yes.  Yes.

21         THE COURT:  What in the world would your

22    expert testify to, that Dr. Berlin is totally off

23    his rocker in relying on the DSM?  Think about that.

24    This guy is probably as qualified as you're going to

25    find in this particular area.  I don't think anybody

1    would ever challenge his reliance on the DSM manual.

2    He's not going to express opinions about this

3    defendant.

4         MS. KAISER:  We could be ready in very short

5    order, Your Honor.  Whenever the court wants to set

6    it is fine with us.

7         THE COURT:  Which leads us to Mr. Tragos.  You

8    started asking me about a date for trial.

9         MR. TRAGOS:  Yes, Your Honor.  Okay.  Is the

10   court ready for me to speak on that?

11        THE COURT:  Go ahead.

12        MR. TRAGOS:  I'll talked to Ms. Kaiser, Your

13   Honor, about this.  And, again, I don't know what

14   the court's schedule is, of course, but I know the

15   court wishes to try this quickly.  I have some --

16   we've given Ms. Kaiser some issues on the documents

17   we gave our experts with reference to diabetes, and

18   she just received that today.  I think she wants to

19   ask the court -- or wants to require me to give her

20   all his medical records.  I don't know if she still

21   wants to ask that or not, which may have an impact.

22   He's 78 years old, Your Honor.  There's going to be

23   a lot of medical records.  These are records we did

24   not show our expert.

25        MS. KAISER:  Your Honor, I don't have a report

1      on the other expert.  But if the defendant's

2      position is that his diabetes had something -- some

3      impact on libido or on how long he was going to stay

4      when he came up to Ft. Myers, then I believe the

5      government has the right to review his medical

6      records and see if there's anything in there that

7      would impact on his sexual interest, including any

8      prescriptions for Viagra or Levitra or other drugs

9      that have to do with his sexual libido.

10          If that's the testimony -- if they're going to

11     put on expert testimony to say he's a diabetic and

12     does haven't the sexual urges, which is what he

13     tried to say, which we believe to be a false

14     exculpatory statement in his interview with law

15     enforcement, if they're permitted to put in evidence

16     regarding his diabetes, we should be able to examine

17     his medical state.  So I asked for his treating

18     physician and we'd like to review his medical

19     records.

20          THE COURT:  Do you have them readily

21     available, Mr. Tragos?

22          MR. TRAGOS:  No, Your Honor.  Like I say, he's

23     78 years old.  We only gathered his diabetes records

24     and have provided those.

25          THE COURT:  Does your expert have access to

1    any records other than what he or she has been

2    provided?

3         MR. TRAGOS:  No, Your Honor.

4         THE COURT:  Has he or she -- I can't remember.

5         MR. TRAGOS:  He.

6         THE COURT:  He.  Did he examine your client?

7         MR. TRAGOS:  Yes, Your Honor.

8         THE COURT:  By the way, Dr. Berlin is not

9    testifying about what he thinks was going on in the

10   interview room, either.  He's not an expert in law

11   enforcement.  He has opinions, maybe they're well

12   founded, maybe they're accurate.  They're not

13   scientific.

14        MR. TRAGOS:  Okay.

15        THE COURT:  So I didn't want you to be misled

16   by my not mentioning that in terms of the defendant

17   trying to plead -- or please, I think he said please

18   the detective.

19        MR. TRAGOS:  Right.

20        THE COURT:  That's something the jury can

21   figure out.  What do you want, Ms. Kaiser?  I'm

22   going to set the case for trial.

23        MS. KAISER:  Well, Your Honor, I want the

24   medical records for the defendant expeditiously so I

25   can determine whether or not we want to have him --

1      THE COURT:  Well, that's what I'm asking.  Do

2  you want something beyond what their expert has?

3      MS. KAISER:  Absolutely, Your Honor, because

4  if he's had, you know, 10 prescriptions for Viagra

5  in the last six months, that could impact an issue,

6  particularly if they're going to try to say that his

7  diabetes has caused him to act in any certain way.

8  So his treating physician may have a lot more

9  information that the diabetes doctor should have had

10  but didn't.  So I need to review that.

11      THE COURT:  What kind of a doctor is he?

12      MS. KAISER:  Endocrinologist.

13      THE COURT:  No, I'm talking about the

14  defendant.  Everybody keeps saying doctor.

15      MS. KAISER:  A psychologist.

16      MR. TRAGOS:  PhD.

17      THE COURT:  But he can't prescribe?

18      MR. TRAGOS:  No.

19      THE COURT:  All right.  The defendant is

20  directed to furnish the government with all medical

21  records in its possession, in his possession, the

22  defense's possession immediately, meaning --

23      MR. TRAGOS:  You're saying in the defendant's

24  possession or that he -- does he have to go into his

25  doctors to get --

1          THE COURT:  Well, if you'll give me a chance

2     I'll cover that.

3          MR. TRAGOS:  Okay.

4          THE COURT:  His possession, the defense's

5     possession, and I want that done within 48 hours.

6     He shall also as a condition to having this expert

7     testify execute a release and such releases as the

8     government presents authorizing them to gain access

9     to any and all medical records bearing on his

10    health.

11         MR. TRAGOS:  This is our expert you're talking

12    about, a release to our expert.

13         THE COURT:  No.

14         MR. TRAGOS:  Okay.  I'm sorry.  I mis --

15         THE COURT:  This defendant will sign a release

16    for Ms. Kaiser to get the medical records.

17         MR. TRAGOS:  Oh, okay.

18         THE COURT:  In other words, if you're going to

19    call an expert along the lines that I understand you

20    are dealing with his diabetes and the effect of

21    diabetes on him, whether it be his libido or his

22    confusion or whatever else it could be, the

23    government is entitled to secure the medical records

24    so that they can have their expert review them.  And

25    I'll, of course, entertain a request that the

1      defendant submit for examination if the government

2      seeks that.

3           MR. TRAGOS:  Your Honor, will the government

4      be required to give us copies of everything they

5      receive?

6           THE COURT:  Well, of course.  There's no

7      secrets here.  But, people, I don't know when you're

8      going to get all this done.

9           MS. KAISER:  Your Honor, if I may, if you

10     could --

11          THE COURT:  You're going to be picking a jury

12     with me in a few minutes.

13          MS. KAISER:  We need to know who to direct the

14     release of information to.  And, also, we still

15     don't have a report from the diabetes doctor to know

16     what he's going to testify to.

17          THE COURT:  Is he required to do a report?

18          MS. KAISER:  Yes.  He's required to provide

19     the basis of his opinion and what his opinion --

20          THE COURT:  What have you got, Mr. Tragos,

21     nothing?

22          MR. TRAGOS:  We gave them notice.  He examined

23     him this morning.  We could have a report to them

24     tomorrow.

25          THE COURT:  This morning?

1          MR. TRAGOS:  Yes.  We could have report to

2     them -- I was going suggest to the court December

3     8th.

4          THE COURT:  You're not going to be ready.  You

5     know that as well as I do.

6          MR. TRAGOS:  Well, okay.  I was just trying to

7     be speedy.  Are we looking at January?

8          THE COURT:  No.  You're going to try this case

9     in December if it has to be December 24th, because I

10    think this is a calculated delay, very candidly.

11         MR. TRAGOS:  Honestly --

12         THE COURT:  You have your client examined this

13    morning and we were set for trial a date certain

14    months ago?

15         MR. TRAGOS:  Your Honor, the only reason he

16    was examined him this morning is because the court

17    said on Friday that he had to be examined by our

18    expert.  We weren't planning on having him examined.

19         THE COURT:  Well, otherwise you've got an

20    expert --

21         MR. TRAGOS:  Relaying on documents.  That's

22    the only reason it was done this morning because the

23    court said that on Friday.

24         THE COURT:  Your expert is nearby, local or

25    down where he lives?

1          MR. TRAGOS:  Clearwater.

2          THE COURT:  All right.  Then I want the

3     documents in your possession delivered to her within

4     24 hours, close of business tomorrow.  The release

5     is executed in the government's favor by tomorrow.

6     You figure out how you --

7          MR. TRAGOS:  We've done it.  Your Honor, we

8     did that already today.  We gave her the documents

9     in our possession today.

10          THE COURT:  All right.  Well, I didn't know

11     that.  But she wants some releases so she can go

12     chase down other documents.  I'm also -- I think

13     it's appropriate that you notify Ms. Kaiser of the

14     name of his treating physician, any other aspects of

15     his medical treatment.  I don't know how you do

16     that, depending entirely on the defendant to furnish

17     that information.

18          MR. TRAGOS:  Your Honor, is there a time limit

19     on this?  Because -- are we talking about his whole

20     life's treating physicians?

21          MS. KAISER:  The last three years would be

22     sufficient.

23          THE COURT:  That's reasonable.  Last three

24     years.

25          MR. TRAGOS:  Fine.

1         THE COURT:   Including any prescriptions and --

2     you've got to be fair to the government.   Dealing

3     here in the eleventh hour with expert testimony.

4         MR. TRAGOS:   We're not arguing, Your Honor.

5     We'll furnish that.   I would ask for 48 hours since

6     he's down in Ft. Myers and we would have to go down

7     there, also, to get some stuff.

8         THE COURT:   48 hours to do what?

9         MR. TRAGOS:   To get her the name of the

10    treating physicians and the releases.

11        THE COURT:   Well, that's probably fair, 48

12    hours.   We've got FBI agents down there, don't we?

13        MS. KAISER:   ICE agents.   Yes.

14        THE COURT:   So as soon as the names are

15    available, you can have --

16        MR. TRAGOS:   I think this is an ICE case.

17        THE COURT:   Well, whoever.

18        MS. KAISER:   Yes, Your Honor.

19        THE COURT:   I didn't mean to insult you.

20    Sorry.   My point is there are agents down in that

21    area that can facilitate getting these

22    authorizations executed by the defendant and back to

23    you in short notice.

24        MS. KAISER:   Yes.

25        THE COURT:   And get your subpoenas ready to go

1       and hopefully we can get it all.  I want to see you

2       guys back on --

3               MR. TRAGOS:  Are we talking about -- I'm

4       sorry.

5               THE COURT:  Next Monday afternoon at 4

6       o'clock.

7               MR. TRAGOS:  Is that for a status, Your Honor,

8       or trial?

9               THE COURT:  Yes, status.

10              MR. TRAGOS:  Okay.

11              THE COURT:  And I'm looking at December 8th,

12      if we can at all do it, Mr. Tragos.  You suggested

13      it and that's a good suggestion.  I don't know what

14      else I've got on my calendar, but I don't want to

15      get you here the week before.  Let's find out if

16      we're on track.  I'll continue this case until the

17      week of the 8th of December.  All right.  Thank

18      y'all.

19              MR. TRAGOS:  Thank you, Your Honor.

20              MS. KAISER:  Thank you, Your Honor.

21      (Hearing concluded.)

22

23

24

25

1                    C E R T I F I C A T E

2

3     STATE OF FLORIDA              )

4     COUNTY OF HILLSBOROUGH   )

5        I, Linda Starr, RPR, Official Court Reporter for

6     the United States District Court, Middle District,

7     Tampa Division,

8        DO HEREBY CERTIFY, that I was authorized to and

9     did, through use of Computer Aided Transcription,

10    report in machine shorthand the proceedings and

11    evidence in the above-styled cause, as stated in the

12    caption hereto, and that the foregoing pages,

13    numbered 1 through 110, inclusive, constitute a true

14    and correct transcription of my machine shorthand

15    report of said proceedings and evidence.

16       IN WITNESS WHEREOF, I have hereunto set my hand in

17    the City of Tampa, County of Hillsborough, State of

18    Florida, this 28th day of November, 2008.

19

20

21              _____/s/Linda Starr_____
               Linda Starr, RPR, Official Court Reporter
22

23

24

25