```
 1                 UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3      UNITED STATES OF AMERICA

 4
           vs.              CASE NO. 8:08-CR-318-T-27TGW
 5                          24 MARCH 2009
                            TAMPA, FLORIDA
 6                          PAGES 1 - 265
                            VOLUME II
 7
        CHARLES JACKSON FRIEDLANDER
 8      _____/

 9            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              BEFORE THE HONORABLE JAMES D. WHITTEMORE
10                 UNITED STATES DISTRICT JUDGE

11      APPEARANCES:

12      For the Petitioner:   Amanda C. Kaiser
                              United States Attorney's Office
13                            Suite 3200
                              400 N. Tampa Street
14                            Tampa, Florida 33602

15      For the Defendant:    George E. Tragos
                              Tragos & Sartes, PL
16                            Suite 800
                              601 Cleveland Street
17                            Clearwater, Florida 33755

18                            Peter Anthony Sartes
                              Tragos & Sartes, PL
19                            Suite 800
                              601 Cleveland Street
20                            Clearwater, Florida 33755

21      Court Reporter:       Linda Starr, RPR
                              Official Court Reporter
22                            801 N. Florida Avenue
                              Suite 13B
23                            Tampa, Florida 33602

24         Proceedings recorded and transcribed by
        computer-aided stenography.
25
```

1

**WITNESS INDEX**

2

**Witness Name**                                      **Page Number**

3

**Kurt Romanosky**

4

Direct Examination by Ms. Kaiser..........   5
5       Voir Dire Examination by Mr. Tragos....... 194
        Direct Examination by Ms. Kaiser.......... 197
6       Voir Dire Examination by Mr. Tragos....... 229
        Direct Examination by Ms. Kaiser.......... 234

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **EXHIBIT INDEX**

2      **Number        Description                    Page Number**

3          9    Defendant's online profile.........  16
           10    Undercover Officer online Profile..  16
4          11    Instant Message Chat - 6/16/2008...  16
           12    Instant Message Chat - 6/17/2008...  16
5          13    E-mail - 6/17/2008.................  16
           14    Instant Message Chat - 6/17/2008...  16
6          15    Instant Message Chat - 6/18/2008...  16
           16    Instant Message Chat - 2:23 PM,
7                6/19/2008..........................  16
           17    E-mail on 6/19/2008 - 3:42 PM......  16
8          18    E-mail on 6/19/2008 - 3:55 PM......  16
           19    Instant Message Chat - 4:15,
9                6/19/2008..........................  16
           20    Instant Message Chat - 6/20/2008...  16
10         21    Instant Message Chat - 6/24/2008...  16
           22    E-mail on 6/27/2008................  16
11         23    E-mail on 6/30/2008................  16
           24    Instant Message Chat - 7/7/2008....  16
12         25    Instant Message Chat - 7/9/2008....  16
           26    Instant Message Chat - 7/14/2008...  16
13         27    Undercover phone call - 7/16/2008.. 105
           28    Instant Message Chat - 7/21/2008... 167
14        30A    Undercover audio................... 179
           32    Red Bag............................ 192
15         33    Riding Crop........................ 192
           34    Belt............................... 192
16       35A-D   Razor Straps....................... 192
           36    Bag with plastic gloves............ 192
17       31A-I   Photos from vehicle and arrest..... 198
           37    Audio of transport to jail......... 200
18         38    Advice of Rights/Miranda Waiver.... 226
           40    Consent to Search.................. 228
19

20

21

22

23

24

25

```
 1              THE COURT:  We're waiting on one of the
 2    jurors.  Looks like we may not be able to wait.  She
 3    is stuck on the Skyway because of an accident.  It's
 4    Juror Number 11; is that right?
 5              COURTROOM DEPUTY CLERK:  Yes, Your Honor.
 6              THE COURT:  Ms. Frieler-Baker.  It's now, you
 7    know, 9:38, I said 9:15.  Skyway's, even in normal
 8    conditions, 35, 40 minutes away.  So any objection
 9    to my excusing her?
10              MR. TRAGOS:  The defense has no objection,
11    Your Honor.
12              THE COURT:  It's Joann Frieler-Baker.  She was
13    far left corner in the back.
14              COURTROOM DEPUTY CLERK:  She was in the
15    first --
16              THE COURT:  I know that.  I'm talking about
17    jury selection.  Thank you.  Ms. Kaiser, are you
18    going to weigh in or not?
19              MS. KAISER:  That's fine, Your Honor.  That's
20    fine.  The United States has no objection.
21              THE COURT:  Anne, are you going to call her
22    one more time or --
23              COURTROOM DEPUTY CLERK:  Well, the jury clerk
24    is trying to call her right now.  I'm getting
25    messages back from her.
```

1              MS. KAISER:  I heard on the radio this morning

2      when I was driving in that there was a bad accident

3      on the Skyway, the Skyway's backed up.

4              THE COURT:  Where was she from, Bradenton?

5              COURTROOM SECURITY OFFICER:  She's here,

6      Judge.

7              THE COURT:  Oh, she's here?

8              COURTROOM SECURITY OFFICER:  Yes.

9              THE COURT:  Very good.  We're ready to go,

10     then.

11             MR. TRAGOS:  Your Honor, before she comes in,

12     I know the Court wants me to do this outside the

13     presence of the jury, but I would request the *Jencks*

14     material for this witness.  Does the Court want me

15     to do it individually for each witness?

16             THE COURT:  Is that a continuing request?

17             MR. TRAGOS:  I would like to do that if the

18     Court will allow it.

19             THE COURT:  It is received as a continuing

20     request and I'll direct the government to comply,

21     preferably before the witness testifies.  But since

22     this case has already been tried once, I assume you

23     have all this stuff, unless there's been an updated

24     interview.

25             MR. TRAGOS:  Right.

```
 1              THE COURT:  So Ms. Kaiser, make sure you

 2       comply.

 3              MS. KAISER:  Yes, Your Honor.

 4              THE COURT:  All right.  Bring the jury in,

 5       please.  The witness is on the stand.

 6              COURTROOM SECURITY OFFICER:  Rise for the

 7       jury.

 8       (Jury in at 9:40 AM.)

 9              THE COURT:  Good morning.  Please be seated.

10       Another fun drive over the Skyway, I take it.

11              JUROR 257:  Yes.  I'm so sorry.

12              THE COURT:  We heard about it.

13              JUROR 257:  Over two hours.

14              THE COURT:  You actually got here sooner than

15       we thought.  So we are now ready to proceed.

16       Ms. Kaiser, you may resume direct examination.

17              MS. KAISER:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19       BY MS. KAISER:

20       Q     Good morning, Corporal Romanosky.

21       A     Good morning.

22       Q     When we left off yesterday, we had been going

23       through chats that you had with the defendant from

24       2005; is that correct?

25       A     That's correct.
```

1          MS. KAISER:  Your Honor, may I approach?

2          THE COURT:  Yes, ma'am.

3     BY MS. KAISER:

4     Q     Corporal Romanosky, I believe the last chat

5     that you had testified to was regarding July 25th of

6     2005; is that correct?

7     A     That's correct.

8     Q     And that was Government's Exhibit 7?

9     A     I believe so.  I don't have the exhibit

10    numbers in front of me.

11    Q     Yes.  Did you have any other chats with the

12    defendant in 2005?

13    A     Yes.  I had a chat with the defendant on

14    August 1st of 2005.

15         MS. KAISER:  Your Honor, at this time the

16    government wishes to publish Government's Exhibit 8

17    for the jury.

18         THE COURT:  All right.  You may do so.

19    BY MS. KAISER:

20    Q     I'm putting on the overhead what's marked and

21    admitted as Government's Exhibit 8.  Who made the

22    first contact in this chat?

23    A     The defendant.

24    Q     Okay.  Now, in all these chats that you

25    testified previously that the defendant had

1    contacted you first, how does he go about doing

2    that?

3    A    In -- if we're not in a chat room setting,

4    after that initial contact as soon as I would log in

5    to America Online, he would have a buddy list box on

6    his computer screen.  He would see, if I'm on his

7    buddy list, that I had logged on.  At that point he

8    could directly send me an instant message from

9    there.  We wouldn't have to go back to the chat room

10   or anything.  Once that initial contact's made, and

11   somebody is on your buddy list, you can then

12   engage -- you can see when -- each other's status.

13   Q    Okay.  All right.  At this time, please

14   publish Government's Exhibit 8:

15       "CAPTOES:  Good afternoon.  How are you?

16       DUNEDINSUPERDAD:  Hey.  How's it going?

17       CAPTOES:  Fine.  Had to housesit again that

18   kid who is a brat.

19       DUNEDINSUPERDAD:  Oh, yeah?  How did it go?

20       CAPTOES:  Very rough.  He is still sore and

21   his dad gave it to him when he got home.

22       DUNEDINSUPERDAD:  Well, I'm sure it was

23   deserved.

24       CAPTOES:  It was.  And he was totally welted.

25       DUNEDINSUPERDAD:  This the same kid as before?

1          CAPTOES:  Yes.  But his dad is real big and

2     was twice as hard.

3          DUNEDINSUPERDAD:  Ah.  You would figure he

4     would have learned last name.

5          CAPTOES:  I would have thought so.  His dad

6     beats him constantly.

7          DUNEDINSUPERDAD:  Stubborn or he enjoys it?

8          CAPTOES:  I think both.  His dad is six-five

9     and weigh 275.

10          DUNEDINSUPERDAD:  Wow.  Big guy.

11          CAPTOES:  He really is, but nice.  I've known

12     him for years.  He started on the kid when he was

13     nine.

14          DUNEDINSUPERDAD:  Wow.  Just got to be careful

15     school doesn't find welts.  They will call HRS.

16          CAPTOES:  Oh, yes.  But he is in a Catholic

17     school which encourages discipline.

18          DUNEDINSUPERDAD:  Yeah.  But state law

19     requires them to report abuse when they suspect it.

20     Trust me.  I've been down that road before.  Tell

21     your friend to just be careful is all.

22          CAPTOES:  Oh, he will be.  One would not

23     suspect it to be abuse.  Were you in trouble about

24     that?  I never had a problem.

25          DUNEDINSUPERDAD:  I didn't get in trouble but

1    was investigated.  Just asked a lot of questions.

2    But everything was cleared up.  Actually happened

3    while we still married.  Hey, I got to go.  I may be

4    on later."

5    BY MS. KAISER:

6    Q    Corporal Romanosky, did you have any other

7    chats with the defendant from 2005?

8    A    I did not.

9         MS. KAISER:  Your Honor, may we approach side

10   bar?

11        THE COURT:  Yes, ma'am.

12   (At side bar, on the record.)

13        MS. KAISER:  Your Honor, the defense has not

14   requested it, but it might be prudent to give the

15   404(b) instruction regarding the 2005 chats at this

16   time.  The government takes no position but if the

17   defendant wants the 404(b) warning to be given to

18   the jury at this time at the conclusion of the 2005

19   chats, it may be appropriate.

20        THE COURT:  Mr. Tragos?

21        MR. TRAGOS:  Hum.

22        THE COURT:  I think I'm as confused as you

23   are.  We didn't do this the first time around.

24        MR. TRAGOS:  No.  We gave it before you did

25   the Wayne stuff, Wayne inspector stuff.

1          THE COURT:  All right.

2          MR. TRAGOS:  Can I take a look at the

3     instruction to see what it says in there?

4          THE COURT:  Well, it's just the indictment.  I

5     was looking at the dates.  You're suggesting this,

6     Ms. Kaiser, because this predates the --

7          MS. KAISER:  Correct, Your Honor.

8          THE COURT:  -- the terms in the indictment,

9     the allegations in the indictment?

10         MS. KAISER:  Yes, Your Honor.  It's 404(b)

11    evidence so --

12         THE COURT:  Page 44.  I don't see it as

13    similar act evidence, but certainly he's not charged

14    with any conduct related to the 2005.

15         MR. TRAGOS:  I don't necessarily -- we're not

16    requesting it.

17         MS. KAISER:  That's fine.

18         THE COURT:  He hasn't solicited anybody or

19    just talked about things.

20         MS. KAISER:  That goes to show his -- it's the

21    government's position it's 404(b) because it goes to

22    show his intent because he's talking about making

23    his son ask permission to masturbate and -- but

24    404(b) doesn't have to --

25         THE COURT:  All right.  Very good.  Thank you.

1              MS. KAISER:  Um-hum.

2       (End of side bar discussion.)

3              THE COURT:  Thank you, counsel.  You may

4       proceed.

5       BY MS. KAISER:

6       Q      Did you continue your investigation of the

7       defendant back in 2005 after that last chat from

8       August?

9       A      No, I did not.

10      Q      And can you explain why that is?

11      A      Back in August of 2005, we didn't have the

12      same laws on the books and -- for the state that we

13      do now.  The laws were pretty much centered on when

14      I was posing as a minor.  They really didn't cover

15      when I was posing as an adult for somebody to

16      solicit me as an adult to have access to my

17      children.

18             So I wasn't able to establish the charges that

19      I was used to working with then.  The statute some

20      other investigators were using, I really wasn't

21      comfortable with.  Not to mention, I was still newer

22      to doing adult cases back then.  I was doing case --

23      undercover cases where I was a child, and very

24      comfortable with doing those cases.  But this was

25      when I was starting to work cases where I was

1    portraying an adult and I wasn't really comfortable

2    keeping up my end of the conversation in those types

3    of cases.  I didn't have Mr. Friedlander identified

4    at that point, so I had just determined to

5    discontinue the investigation.

6         You'll notice that some of my chats are real

7    brief.  That's because I had actually discontinued

8    things, but he still knew I was online.  I was still

9    online with that screen name, so as soon as he would

10   see I was online, he would hit up and I would talk

11   to him briefly but make an excuse for me to get me

12   offline.

13   Q    Okay.  I believe you testified a moment ago

14   that you hadn't had him identified in 2005; is that

15   correct?

16   A    No, I did not.

17   Q    So did you -- were you able to take any

18   actions to determine if he had had any children in

19   his home that he had beaten?

20   A    No, I wasn't.  And to be honest with you, I

21   didn't -- I didn't think that he did.  A lot of

22   times people online will say they have access to a

23   lot of different kids to kind of develop street

24   credit, so they kind of give themselves some

25   validation in my eyes so I'll be thinking that if

1     we're going to --

2              COURT REPORTER:  Please slow down a little

3     bit.

4              THE WITNESS:  I apologize.  So that if there

5     was a meeting or something to take place, they would

6     have something to offer.

7     BY MS. KAISER:

8     Q     Did you subsequently conduct an investigation

9     in June and July of 2008, of last year?

10    A     I did.

11    Q     And how did you begin that investigation in

12    June and July of 2008?

13    A     In the same manner.  I had developed an

14    undercover profile as a parent and went into the

15    adult predicated chat rooms.

16    Q     And when you went into those chat rooms, did

17    you encounter anyone?

18    A     Yes.  I encountered the defendant on June

19    16th.

20             MS. KAISER:  Your Honor, may I approach the

21    witness?

22             THE COURT:  Yes, ma'am.

23    BY MS. KAISER:

24    Q     Corporal Romanosky, I'm handing you what's

25    been marked for identification as Government's

1      Exhibits 9 and 10, and ask you if you could take a

2      look at those documents and see if you recognize

3      them.

4      A      Exhibits 9 and 10 are the undercover profiles

5      used by myself and the defendant for the 2008

6      investigation.

7      Q      And if you would, please, take a look at

8      Government's Exhibits 11 through 26 and see if you

9      recognize those documents.

10     A      This is my online correspondence with the

11     defendant, June and July of 2008, consisting of

12     instant message conversations and e-mails back and

13     forth.

14     Q      All right.  Government's Exhibits 9 and 10

15     being the profiles and 11 through 26 being your

16     online communications, were all these documents

17     maintained by you in the ordinary course of business

18     as part of your investigation?

19     A      Yes.

20     Q      And are these true and accurate copies of your

21     communications with the defendant?

22     A      They are.

23     Q      And are the profiles, which are Government's

24     Exhibits 9 and 10, are those true and accurate

25     copies of the profiles that you had online and that

1     the defendant had online --

2     A     They are.

3     Q     -- in June and July of 2008?

4     A     Yes, ma'am, they are.

5           MS. KAISER:  Your Honor, at this time I'd move

6     for admission of Government's Exhibits 9 through 26

7     into evidence.

8           THE COURT:  Any objection?

9           MR. TRAGOS:  One moment, Your Honor.

10    (Brief pause.)

11          MR. TRAGOS:  Through 28?

12          MS. KAISER:  Through 26.

13          MR. TRAGOS:  Through 26.  No objection.

14          THE COURT:  Exhibits 9 and 10 and 11 through

15    26 are now received.

16    (Whereupon, Government's Exhibit Numbers 9 through

17    26 were received into evidence.)

18          MS. KAISER:  Thank you, Your Honor.  Request

19    permission to publish, Your Honor.

20          THE COURT:  Yes, ma'am.

21    BY MS. KAISER:

22    Q     Starting with Government's Exhibit number 10,

23    can you please tell the jury what we're looking at

24    here.

25    A     What we're looking at here is the input

1     information for my user profile for my undercover

2     screen name from the 2008 investigation.

3     Q      All right.  And what information did you put

4     in your profile that others could view?

5     A      Under the about me section -- or before that,

6     actually, location I put Florida; as my occupation I

7     put professional.  And then in the about me

8     section --

9     Q      Is that here on the left side?

10    A      Which part?

11    Q      On the -- where you said location.

12    A      Yes.  That's -- location I input Florida, and

13    then occupation I input professional.

14    Q      Okay.

15    A      And then to the right there, I put under the

16    about me, that's all information that I put in.

17    Q      Okay.  And if you could, please read that to

18    the jury.

19    A      It says 36-year-old white male in a

20    relationship with an open-minded female partner.  We

21    have three children between hers and mine.  We

22    enjoy -- enjoy outdoor activities and spending good

23    quality family time together.  We believe in a

24    strict but loving home.  Looking to meet other

25    like-minded individuals or couples to share

1     parenting or disciplining ideas.  Discretion a must.

2     No cyber or phone here.  Serious inquiries only.

3     Q     Now, Corporal Romanosky, what is it about this

4     profile that would lead someone to believe that

5     you're interested in abuse of children?

6          MR. TRAGOS:  Objection, Your Honor.

7          THE COURT:  Grounds.

8          MR. TRAGOS:  Speculation about others.

9          THE COURT:  Rephrase it as to what his

10    intentions were.

11    BY MS. KAISER:

12    Q     Why did you draft your profile in this manner?

13    A     In my experience subjects online --

14          MR. TRAGOS:  Objection, speculation.

15          THE COURT:  Overruled.

16          THE WITNESS:  In my experience with subjects

17    online they have varying degrees of an interest in

18    engaging in the physical or sexual abuse of

19    children.  This profile is written cryptically so

20    people with those interests will understand some of

21    the hidden meanings.

22          MR. TRAGOS:  Objection.

23          THE COURT:  Grounds?

24          MR. TRAGOS:  Again, he's speculating about

25    others.

1          THE COURT:  You've objected on that basis.

2          MR. TRAGOS:  Yes, sir.

3          THE COURT:  I've overruled it.

4          MR. TRAGOS:  Okay.

5          THE WITNESS:  This profile is written

6     cryptically.  As you -- if you look at it as is, it

7     looks pretty benign.  Obviously, I can't come out

8     and say things that I'm interested in sexual abuse

9     or physical abuse, because I would get shut down

10    very fast.  So that's where a lot of these cryptic

11    things have come into play over the years.  People

12    have learned ways around some of the filters on the

13    internet service providers.

14    BY MS. KAISER:

15    Q     For example, when you put enjoy outdoor

16    activities and spending good quality family time

17    together, what did you intend to convey by that?

18    A     My intention in outdoor activities is

19    sometimes a cryptic term for nudism.  And spending

20    good quality family time together is a cryptic term

21    for incest.

22    Q     And where it says, we believe in a strict but

23    loving home?

24    A     That's physical abuse and sexual abuse.

25    Q     And when you say, looking to meet other

1     like-minded individuals, what did you intend for the

2     reader to understand?

3     A      To meet people with the same interest, looking

4     to engage in the same type of behavior.

5     Q      And for discretion a must and no cyber or

6     phone here, what did you intend by that?

7     A      Well, discretion a must is, obviously, things

8     have to be kept secret.  No cyber or phone is a

9     reference to -- I try to put some sort of

10    information like that in my profile so I don't get

11    people that want to just engage in sex chat online

12    or they don't want to engage in phone sex.

13    Q      And serious inquiries only?

14    A      That's self-explanatory.  That means if you're

15    serious, contact me; otherwise, I don't want to hear

16    from you.

17    Q      Once again, those are your initials at the top

18    of this exhibit; is that correct?

19    A      Yes, ma'am.

20    Q      Now, Government's Exhibit 9 I'm placing on the

21    overhead.  Can you please tell the jury what we're

22    looking at here?

23    A      This is a screen shot of the defendant's

24    profile from the June and July of 2008

25    investigation.

```
 1    Q     Okay.  And what does he put about the personal
 2    details, or what's listed under his personal
 3    details?
 4    A     To the left there under personal details, it
 5    says, member since 6/20 of '98.  That is actually an
 6    AOL -- AOL automatically displays that unless you
 7    turn that off.  And I got caught on some of my
 8    undercover stuff.  I had left that on trying to say
 9    I was a new profile, and it showed it was on since
10    '04.
11          And then page updated, the last time that any
12    information was changed or added to this profile,
13    AOL would have kept track of that date, as well.
14    Q     And what did the defendant list as his about
15    me characteristics?
16    A     Under name he has Captoes.  Location was
17    Southwest Florida and mid Atlantic.  Interest
18    includes swimming, bike riding, theater, movies,
19    cooking and shoes.  Favorite gadget, tongue.
20    Personal quote, tongue those shoes well.
21    Q     And this was his profile in 2008?
22    A     Yes, ma'am.
23    Q     What was the first time that you -- what was
24    the date of the first chat that you had with the
25    defendant in 2008?
```

1    A      June 16th of 2008.

2    Q      And in what chat room did that chat take

3    place?

4    A      This was in strict parents.

5           MS. KAISER:  Your Honor, at this time I'd like

6    to publish Government's Exhibit 11.

7           THE COURT:  You may do so.

8    BY MS. KAISER:

9    Q      All right.  You said this was in a chat room

10   called strict parents?

11   A      Well, the chat was not.  We had actually had

12   contact -- he had contacted me from that chat room.

13   And this was an actual small chat box, there was a

14   two-way conversation between just he and I.

15   Q      And who made the first contact on June 16th of

16   2008?

17   A      The defendant at 3:46 PM.

18   Q      Okay.  If you would, please publish

19   Government's Exhibit 11.

20          "CAPTOES:  Old fashioned strict older div old

21   fashioned dad.

22          STRICDAD7:  Hello.

23          CAPTOES:  Good afternoon.

24          STRICDAD7:  Good afternoon.

25          CAPTOES:  My son is now older as am I.  Ran a

1    very structured household.

2         STRICDAD7:  That's nice.  A structured home is

3    a happy home.

4         CAPTOES:  I feel that way.  I permitted my son

5    to get away with nothing, as that is the way life

6    is.

7         STRICDAD7:  Same here.  That's why kids run

8    amuck today.  No discipline.

9         CAPTOES:  How many children have you all?

10        STRICDAD7:  Three.

11        CAPTOES:  How old now?  My son is now 37.

12        STRICDAD7:  Wow.  Much older.  Mine are 10 and

13   11, stepdaughter is 14.

14        CAPTOES:  Okay.  Yes, older.  And life was

15   easier then.  I agree that kids who ran amuck were

16   never prop disciplined.  Have no grand kids.

17        STRICDAD7:  That's too bad.  Older gentleman

18   like yourself probably has a lot to teach.

19        CAPTOES:  I think we do.  But many of my

20   friends have grand kids who live in too loose of a

21   household.

22        STRICDAD7:  Do they try to get those kids in

23   line?

24        CAPTOES:  No.  One friend's grand kids stay

25   with me on occasion and I discipline.  Parents

1    divorced and kids are half with one parent and half

2    with another.  Some parents feel I am too severe.

3         STRICDAD7:  Can't be when it comes to raising

4    them correctly.

5         CAPTOES:  I feel that way.  My house was a

6    corporal punishment one.

7         STRICDAD7:  Oh, definitely.  Society sees

8    corporal punishment as abuse now.  It is sad.

9         CAPTOES:  It is terrible.  I used a razor

10   strop on my son.

11        STRICDAD7:  Nice.

12        CAPTOES:  And very often.  I raised him

13   totally alone.  Divorced when he was seven.

14        STRICDAD7:  Bad that no mother figure around

15   to assist with discipline but also nice to have

16   privacy.

17        CAPTOES:  Both probably true.  Of course,

18   never raised a girl.

19        STRICDAD7:  Girls are harder, definitely.

20   More of a free spirit.  Boys will conform with

21   strictness.

22        CAPTOES:  I have been told that.  My son was

23   not a free spirit.  He conformed or got more.

24        STRICDAD7:  Exactly.  Girls you have to be

25   careful.

```
 1              CAPTOES:  Do you have boys?

 2              STRICDAD7:  Every boy in the world wanting to

 3     look at their butt.  Don't want visible marks for

 4     others to see.  Yes, two youngest, the 10 and 11.

 5              CAPTOES:  Okay.  I started with mine at eight

 6     with belt and then to strop.

 7              STRICDAD7:  Very nice.  We started around six

 8     with the belt.

 9              CAPTOES:  Then by 11 was the razor strop.

10              STRICDAD7:  Strap is an efficient method.

11              CAPTOES:  His friends were all raised the same

12     way.  He got it most every day.

13              STRICDAD7:  We don't practice on their

14     friends, since society doesn't look at strictness

15     the way we do.  Ours get it on the weekends

16     normally.  Punishment for everything they did during

17     the week.

18              CAPTOES:  Okay.  His friends' dads were all

19     friends of mine.  I found it best to do it the same

20     day as the infraction.

21              STRICDAD7:  I agree for very serious

22     fractions.  Other stuff goes on the list and they

23     worry about it all week.

24              CAPTOES:  Very true.  Do you do it every

25     weekend?
```

```
1              STRICDAD7:  Mental discipline also effective.
2       Just about.
3              CAPTOES:  You are correct.  Wait till boys
4       reach puberty.
5              STRICDAD7:  True.  I'm sure they will be more
6       of a handful then.
7              CAPTOES:  Oh, yes, for sure.
8              STRICDAD7:  Nothing that can't be handled,
9       though.
10             CAPTOES:  Oh, no.  He got 75 instead of 45.
11             STRICDAD7:  Question mark?
12             CAPTOES:  Swats with the strop.
13             STRICDAD7:  Very good.
14             CAPTOES:  I believe in it, and I have given it
15      to him as an adult, too.
16             STRICDAD7:  Adults don't interest me.  Lessons
17      have already been learned by then.
18             CAPTOES:  Yeah, I agree.  But when my boy lies
19      to me, I get furious.  I would do a better job with
20      kids am sure.
21             STRICDAD7:  Kids are more impressionable.
22             CAPTOES:  True.  And they tend to obey me.
23             STRICDAD7:  Very nice.  Probably obvious you
24      are experienced as soon as they meet you.
25             CAPTOES:  Well put.  I believe you are
```

1    correct.  Am very nice but no nonsense.

2           STRICDAD7:  That's the way you have to be.

3           CAPTOES:  My son was a little afraid of me, I

4    must admit.  Tough.  We were very close.

5           STRICDAD7:  A little afraid is good.

6           CAPTOES:  That was just the way it was.  Is

7    your wife supportive?

8           STRICDAD7:  Yes, very much so.  I have to go.

9    Nice chatting with you.

10          CAPTOES:  Thank you.  With you, too.

11          STRICDAD7:  Add me if you wish.

12          CAPTOES:  I would like to.  Thanks.  Add me if

13    you wish, also.

14          STRICDAD7:  Will do.

15          CAPTOES:  Enjoy the rest of the day.

16          STRICDAD7:  You, too."

17    BY MS. KAISER:

18    Q      Corporal Romanosky, when you said, you can add

19    me if you like, to what were you referring?

20    A      His buddy list.

21    Q      And what does the buddy list do?

22    A      A buddy list keeps track of people you've had

23    online contact with.  You can move people to friends

24    areas or family areas or it will just keep track in

25    a different section of everyone you've had online

1    contact with, whether they sent you a message or you

2    sent them a message.

3    Q      Did you have any other conversations with the

4    defendant?

5    A      Yes, the next day on the 17th.

6           MS. KAISER:  Your Honor, at this time I'd like

7    to publish Government's Exhibit Number 12.

8           THE COURT:  You may do so.

9    BY MS. KAISER:

10   Q      Who initiated the chat on June 17th?

11   A      The defendant did at 9:56 AM.

12   Q      All right.  You may proceed.

13          "CAPTOES:  Good morning.  Told my son all

14   about you on the phone late last night.

15          STRICDAD7:  Good morning.  Oh, really?  How

16   did that go?

17          CAPTOES:  Fine.  He was pleased to hear about

18   another dad who was like me.

19          STRICDAD7:  That's nice, that's --

20          CAPTOES:  He asked me if you were as rough on

21   your boys as I was.  I said hopefully.

22          STRICDAD7:  Laugh out loud.  How rough were

23   you on him?  You told me about the razor strap.

24          CAPTOES:  A heavy Garrison belt and crop come

25   to mind.  What do you use?

```
 1          STRICDAD7:  Belts, hair brush and a few
 2     leather straps I purchased at a crafts show, of
 3     course, hands, as well.  I also have a few wooden
 4     paddles of different sizes.
 5          CAPTOES:  Very effective.  I do best with
 6     leather.  Rarely used hands as he got older.  If
 7     poor language, cracked him across the mouth.
 8          STRICDAD7:  Of course.  We used soap and
 9     standing in the corner in front of everyone to solve
10     the language issue, as well.  Embarrassment and
11     humiliation are effective mental discipline.
12          CAPTOES:  Very good.  I fully agree.  I
13     believe most in corporal however and humiliation.
14     As he got older I got tougher.
15          STRICDAD7:  Of course, when younger you have
16     to be careful that marks are hidden from obvious
17     view.
18          CAPTOES:  After 12 he was really welted.  Are
19     your boys in regular school or home schooled?
20          STRICDAD7:  Home schooled.
21          CAPTOES:  Good.  Mine was too.  By you or in a
22     group?
23          STRICDAD7:  Myself and my spouse1.
24          CAPTOES:  Good.  I was asked about a year ago
25     to open up a school but haven't as yet.  Would be
```

1       very disciplined and demanding."

2              MS. KAISER:  Is that -- excuse me.  Is that

3       home schooled?  Would you read that again, please.

4              "CAPTOES:  Good.  I was asked about a year ago

5       to open up a home school but haven't as yet.  Would

6       be very disciplined and demanding.

7              STRICDAD7:  Very nice.  Good schools are hard

8       to find.

9              CAPTOES:  Well, have to find kids with very

10      strict parents.

11             STRICDAD7:  Of course.

12             CAPTOES:  I will keep my friend's two

13      grandsons this weekend.

14             STRICTDAD7:  Very nice.

15             CAPTOES:  Is demanding and strict so I may be,

16      also.

17             STRICTDAD7:  That's good to hear.

18             CAPTOES:  Permission for everything.

19             STRICTDAD7:  Very good.  How old are they?

20             CAPTOES:  Just 12 and just 14.

21             STRICDAD7:  Very nice.  I'm sure you would

22      have them tearing up in no time if they misbehave.

23             CAPTOES:  Oh, for sure.  Am sure I will tear

24      them up daily.

25             STRICTDAD7:  Laugh out loud.  Do you use any

1    special confinement techniques when administering

2    discipline?

3        CAPTOES:  In the basement and sometimes tied.

4        STRICDAD7:  Very nice.

5        CAPTOES:  Do you?

6        STRICDAD7:  Yes.  Have a similar setup.  No

7    basement, however.  Just room dedicated to lessons.

8        CAPTOES:  No problem.  If I don't use

9    basement, I have a special room, too.

10       STRICDAD7:  Very nice.  Are your pupils

11   required to wear any certain attire for lessons?

12       CAPTOES:  They will be totally stripped.

13       STRICDAD7:  Very nice.

14       CAPTOES:  Are yours?

15       STRICDAD7:  If a planned lesson then stripped.

16   If impromptu, pants and underwear down.

17       CAPTOES:  That is fine.  If I had a school,

18   would be just boys, I believe as not a believer in

19   coed in a school situation.  Might have a separate

20   one for girls.

21       STRICDAD7:  Yeah.  I understand completely.

22       CAPTOES:  Are you dressed when it's a planned

23   lesson?

24       STRICDAD7:  During lesson, yes.

25       CAPTOES:  Me, too, usually.

1          STRICDAD7:  How do you dress?

2          CAPTOES:  In a pair of boxers and t-shirt,

3     usually.  Otherwise shirt with tie and trousers and

4     dress shoes.

5          STRICDAD7:  Nice.

6          CAPTOES:  How do you dress?

7          STRICDAD7:  Like a reform school dean, dark

8     intimidating.

9          CAPTOES:  Good.  Well, my regular work dress

10    is coat and tie, dark dress trousers, black shoes.

11    Am big boned, but not fat.

12         STRICDAD7:  Do you still work or are you

13    retired?

14         CAPTOES:  Work a little still.  And you?

15         STRICDAD7:  Still working.

16         CAPTOES:  Good.  Wife work, too?

17         STRICDAD7:  No.

18         CAPTOES:  So she's with them all day?

19         STRICDAD7:  Yes.  Easier to control who has

20    access to them with one of us always being there.

21    Are you still there?"

22    BY MS. KAISER:

23    Q     Now, Corporal Romanosky, in this chat you

24    asked the defendant, do you use any special

25    confinement techniques when administering

1    discipline.  Why did you ask that?

2    A      Because when online my experience shows that

3    confinement techniques is like bondage.  That would

4    go along with administering physical punishment.

5    Q      And when you asked the defendant what the

6    students, what the pupils were required to wear,

7    what did you understand the defendant's response to

8    mean?

9    A      Stripped, naked.

10   Q      Okay.  And when the defendant asked you, are

11   you dressed when it's a planned lesson, what did you

12   understand the defendant to mean?

13   A      I understood that to mean he was asking me if

14   I was nude or if I was wearing something.

15   Q      Well, what did you understand he meant when he

16   said a planned lesson?

17   A      The administering of physical punishment.

18   Q      Now, at the end of that last chat,

19   Government's Exhibit 12 on June 17th, it sort of

20   ended abruptly, and you said are you still there; is

21   that correct?

22   A      That's correct.

23          MS. KAISER:  Next I'd like to publish

24   Government's Exhibit 13.

25          THE COURT:  You may do so.

1    BY MS. KAISER:

2    Q    All right.  Could you please explain to the

3    jury what we're looking at in Government's Exhibit

4    Number 13.

5    A    This is a screen shot of an e-mail that was

6    sent to my undercover profile from the defendant.

7    It was sent on the 17th at 10:52 AM.

8    Q    And could you please publish that to the jury.

9         "CAPTOES:  Sorry about this.  But AOL failed

10   and it took 10 minutes to get it fixed.  Did not

11   want you to think I had just up and left.  Hope to

12   chat soon."

13   BY MS. KAISER:

14   Q    And that was an e-mail from the defendant to

15   you?

16   A    That's correct.

17   Q    Did you have any further chats with the

18   defendant?

19   A    Yes.  Later the same day at approximately

20   2:30.

21        MS. KAISER:  At this time I'd like to publish

22   Government's Exhibit Number 14 into evidence.

23        THE COURT:  Yes, ma'am.

24   BY MS. KAISER:

25   Q    All right.  Can you explain the difference --

1    there's a little bit different writing up at the top

2    of this exhibit, Corporal Romanosky.  Can you

3    explain what we're looking at, please?

4    A    In 2008, by that time I had started using a

5    program called AOL power tools.  It has an auto save

6    backup feature in it.  When I was online, the

7    defendant came online so I sent him a message

8    indicating that I saw he had gotten booted, which is

9    a term used when your service gets abruptly ended by

10   AOL.  A lot of times it's a computer problem or

11   something that you get kicked off.  So I was

12   referencing his e-mail.

13        About that time I also was exiting a chat box

14   of a chat room that I was in so that I could have a

15   discussion with the suspect.  When I did that, there

16   was a glitch in my program and it locked my computer

17   up so I couldn't have any dialogue.  Well, once I

18   got AOL restarted and back into communication with

19   the defendant, the program did exactly what it's

20   supposed to do.  It did an auto save.  That's what

21   that first few lines is.

22   Q    Okay.  All right.  If you could just publish

23   both the beginning and then you can continue on with

24   the chat.

25        "STRICDAD7:  Hey.  Yeah, I saw you got booted.

1      Damn AOL.  Sorry about that.  Power went out.

2           CAPTOES:  That is okay.  Never a dull moment.

3      So is your wife strict enough with the boys at home?

4           STRICDAD7:  Yes.  Not to same degree but in

5      her own way.

6           CAPTOES:  Good.  In her own way.  You and I

7      probably would handle them the same.

8           STRICDAD7:  I'm sure.  She does, too, but has

9      more lenience where I do not.

10          CAPTOES:  I would not have any leniency ever.

11     I should give you one of my razor strops to start

12     with them.

13          STRICDAD7:  That would be great.  Can never

14     have enough tools or techniques.

15          CAPTOES:  Would be great to watch you with

16     them.

17          STRICDAD7:  Do you have friends that have same

18     interest as you?  Real time friends.

19          CAPTOES:  Oh, yes.  My son's bud's dad and his

20     grand kids.

21          STRICDAD7:  That's good.  Discretion is a

22     must.

23          CAPTOES:  The ones I shall have this weekend

24     I'm extremely discrete.

25          STRICDAD7:  Very good.  I am Michael, by the

1    way.

2          CAPTOES:  And I am Charles.  So good to meet

3    you.

4          STRICDAD7:  Nice to meet you, Charles.

5          CAPTOES:  Where are you all again?

6          STRICDAD7:  Palm Harbor, west of Tampa.

7          CAPTOES:  Right.  I am between Ft. Myers and

8    Naples.

9          STRICDAD7:  You're just a few hours south of

10   us.

11         CAPTOES:  Right.  Maybe you can come down, all

12   of you.

13         STRICDAD7:  A possibility sometime.  Right now

14   we prefer to administer lessons at home.

15         CAPTOES:  Okay.

16         STRICDAD7:  We have a few friends that share

17   in our interests that feel comfortable in our

18   setting.

19         CAPTOES:  That's great.

20         STRICDAD7:  Yes.  Discrete friends with our

21   interests very difficult to find.

22         CAPTOES:  Very.  I would love to meet you all

23   if you would like.

24         STRICDAD7:  I would like to meet you, as well.

25   I would have to get approval from the group before

1    allowing you to be present during lessons, however.

2    Everyone has to be comfortable with everything.

3          CAPTOES:  That's fine.  I may be too tough."

4    BY MS. KAISER:

5    Q    Stop right there.  Corporal Romanosky, just to

6    refresh the jury's recollection, to what are you

7    referring when you say, I have to get approval from

8    the group?  What were you referring to then?

9    A    What I was referring to was that I was

10   alluding him to believe that I had friends that I

11   engaged in this type of behavior with; and that

12   before he could attend, I would have to talk to them

13   to make sure they were okay with his coming when

14   they didn't know him.

15   Q    And what was the group about, what type of

16   group was it?

17   A    Physical and sexual abuse, sadomasochistic

18   abuse.

19   Q    You can proceed.

20         "STRICDAD7:  That's okay.  Can you bring your

21   friend's grandchildren to the lesson?  Most of our

22   members bring pupils to sessions.

23         CAPTOES:  I may be able to.

24         STRICDAD7:  Okay.  If you cannot, what lessons

25   can you offer the group?

```
1            CAPTOES:  I could use your kids, I guess.
2            STRICDAD7:  I would be okay with that as long
3    as ground rules are followed.
4            CAPTOES:  Very strictly.
5            STRICDAD7:  Good deal.
6            CAPTOES:  I would be the granddad to all.
7            STRICDAD7:  Nothing wrong with experience.
8    Your age and experience would be only reason allowed
9    without pupils and being single.  I'm sure you
10   understand why.
11           CAPTOES:  Yes, I do.  And I am probably
12   stricter than many.
13           STRICDAD7:  How so?
14           CAPTOES:  I take nothing from my own son and
15   there is no leeway.  And my beefings are very
16   intense.
17           STRICDAD7:  Beefings?
18           CAPTOES:  Beatings.  Sorry.
19           STRICDAD7:  Laugh out loud.  It's okay.
20   That's what I thought you meant.  Did you show him
21   that beatings were done out of love afterwards or
22   did it stop at the beatings or was the love part of
23   the beatings?
24           CAPTOES:  No.  Was very affectionate always.
25   But beatings were needed in the scheme of things.
```

1          STRICDAD7:  Of course.  Was affection

2     something else you're looking to do or just the

3     beatings?

4          CAPTOES:  My boy and I are extremely close.

5     Beatings and affection are mixed together.  Though

6     he is still a little afraid of me.

7          STRICDAD7:  Good.  That's respect.

8          CAPTOES:  I feel so, too.

9          STRICDAD7:  You okay with groups watching your

10    lessons, small groups?

11         CAPTOES:  Absolutely always.

12         STRICDAD7:  Great.

13         CAPTOES:  Am a friendly man with all family

14    members.

15         STRICDAD7:  Good to know.  You said before

16    that you preferred discipline with boys.  Correct?

17         CAPTOES:  Either one, though I have never

18    raised a girl.

19         STRICDAD7:  Okay.  No problem.  I can make all

20    three available when that time comes.

21         CAPTOES:  Good.  Are most moms and dads in

22    your group or single?

23         STRICDAD7:  We have mainly couples with kids.

24    A few have been -- a few singles have been approved

25    however.  It's a small group of about five couples

1    and a few singles.

2         CAPTOES:  Either way that is fine.  Sounds

3    great to me.

4         STRICDAD7:  How much notice do you need?

5         CAPTOES:  A couple of days.  Easy drive for

6    me.

7         STRICDAD7:  Great.  I'll meet with the others

8    soon and see what they have to say.  Do you have a

9    contact number?

10         CAPTOES:  Sure.  Easiest now is cell, which is

11    202-607-6666.  Do you have one for you I might have?

12         STRICDAD7:  Yes.  727-430-0008.  That's my

13    wife's cell number.  Please don't call without

14    checking with me first.  I haven't talked with her

15    about you yet.  And I don't want her to get caught

16    by surprise.  She'll be fine with it.  But if

17    someone she doesn't know calls, it might surprise

18    her.

19         CAPTOES:  Would not do that.  And thanks for

20    letting me know.  Mine you can call at any time at

21    all as I am alone, other than if my son visits.

22         STRICDAD7:  Very good.  Thanks.  Charles, you

23    may have told me and if so, I apologize for not

24    remembering.  But how old did you say you are?

25         CAPTOES:  I am just 70 last week.  Still say

1       69 as sometimes forget.

2            STRICDAD7:  Laugh out loud?  Very cool.  Lots

3       of strict experience then.

4            CAPTOES:  Loads.  Michael, the phone.  Be as

5       quick as I can.

6            STRICDAD7:  No problem.

7            CAPTOES:  Back.  Sorry.

8            STRICDAD7:  No problem.  You okay to talk or

9       do you have to go?

10           CAPTOES:  Fine to talk, Michael.

11           STRICDAD7:  Okay.  I see your profile says

12      Southwest Florida and Mid Atlantic.  You're not a

13      native, huh?

14           CAPTOES:  No.  Am a San Francisco native then

15      in VA.  In FL for 12 years.

16           STRICDAD7:  Wow.  You've moved around.  I

17      travel a lot for work.

18           CAPTOES:  I used to do a good bit.  But

19      usually abroad.

20           STRICDAD7:  Travelling can be fun but also a

21      hassle.

22           CAPTOES:  Too much for me now for sure.  I did

23      quite some a number of years ago with my boy

24      driving.

25           STRICDAD7:  How old is your son now?

```
 1            CAPTOES:  37 now, 38 on 19 June.

 2            STRICDAD7:  He running a strict household?

 3            CAPTOES:  It is just he.  He supposedly lives

 4       by my rules away.

 5            STRICDAD7:  Good for him.  My boys can be a

 6       handful.  That 10, 11 age is tough.

 7            CAPTOES:  And 13 and 14 is even worse.  But I

 8       was tough for sure.

 9            STRICDAD7:  Have to be.  They may cry and

10       whine now but they will thank me later.

11            CAPTOES:  Mine thanks me often.  Boys need

12       strict training I feel.

13            STRICDAD7:  I feel same way.

14            CAPTOES:  This weekend with the 11 and 13 will

15       been enjoyable most of the time.  When I see you,

16       will bring the razor strop.

17            STRICDAD7:  Very nice.

18            CAPTOES:  Will bring one that I used on my boy

19       often.

20            STRICDAD7:  That will be very nice.  Where did

21       he get his beatings?  Butt, legs, back?

22            CAPTOES:  All three.  More butt and legs.

23            STRICDAD7:  How did you handle marks?  Home

24       schooling wasn't big then.  Fortunately now a lot of

25       parents home school.
```

1        CAPTOES:  I left them right where they were.

2    Put oil and cream on them.  He was home schooled

3    before it was popular.

4        STRICDAD7:  Very nice.  You mentioned you were

5    probably more strict than others in our group.  How

6    so?

7        CAPTOES:  Well, I beat my son daily, hard and

8    long.  Many of the home schooled parents were not so

9    strict.  Though the dads of his two buds were.  Most

10   kids were one parent.  Usually dads.  But there were

11   one or two single moms, too, who I would have to

12   rescue sometimes.

13       STRICDAD7:  Nice.

14       CAPTOES:  They would say their boys were out

15   of control.  When I laid it on them, they became

16   more pliable.

17       STRICDAD7:  If group is okay with you coming

18   up, what would your idea of perfect setting be?

19   Laugh out loud.  Just trying to get idea of what you

20   may be wanting to do.  I'm sure I will be asked.

21       CAPTOES:  Well, first I need to get to know

22   them and what they usually do in their times

23   together.

24       STRICDAD7:  Okay.

25       CAPTOES:  Then I could decide what I could

1    show them or help them with or such to make me part

2    of their group.

3          STRICDAD7:  Okay.

4          CAPTOES:  Maybe the second one I could bring

5    the two boys.  What are the general ages of their

6    kids?

7          STRICDAD7:  Mine are 10 and 11 and 14, (girl).

8    Others range from 8 to 15, boys and girls.

9          CAPTOES:  That is very good.  Are most of the

10   kids home schooled, too?

11         STRICDAD7:  All are.  Like I said, small

12   group.

13         CAPTOES:  Good.  I'm a believer in marking

14   kids.  My son used to yell and cry but paid little

15   attention.

16         STRICDAD7:  That's how I feel.  Crying and

17   whimpering is just weakness.  Stand there and lay

18   there and take it.

19         CAPTOES:  That was my motto.  And too much

20   yelling meant more punishment.

21         STRICDAD7:  Yes.  Very nice.

22         CAPTOES:  Do you ever use a switch in their

23   crack?

24         STRICDAD7:  No.  I never have."

25   BY MS. KAISER:

1    Q     Stop right there.  Corporal Romanosky, when

2    the defendant said he's a believer in marking kids,

3    what did you understand him to mean?

4    A     Marks from physical abuse.

5    Q     And who was it that suggested that he would

6    bring an implement with him to a meeting?

7    A     The defendant.

8    Q     What did you understand him to mean when he

9    said, did you ever use a switch in their crack?

10   A     A switch, some sort of a switch implement in

11   their butt crack.

12   Q     Proceed.

13         "CAPTOES:  I have a number of times.  Very

14   effective.

15         STRICDAD7:  Sounds like it.  Sounds exciting.

16         CAPTOES:  Sometimes sent him for the switch.

17   Always sent him for the strop.

18         STRICDAD7:  Yeah.  I've done that, as well.

19   The walk to get it is almost as bad as the beating.

20   Almost.

21         CAPTOES:  Then came the pleading, which fell

22   on deaf ears.  How often do you meet with your

23   friends?

24         STRICDAD7:  Once a month normally.  Lets all

25   the marks heal up.

1        CAPTOES:  That's good.  Do all the kids come

2    to the group?

3        STRICDAD7:  Yes.  Most of the time.  When

4    children are spent they are sent to the other room

5    to reflect.  Then the next comes up and parents tell

6    us everything they did wrong over the past month.

7    Adults decide what the punishment will be and

8    parents or someone else they designate administers.

9        CAPTOES:  Very good.  Think it should

10   sometimes be parents to administer and sometimes a

11   designee.

12       STRICDAD7:  Of course.  New parents to the

13   group will sometimes show leniency.  Other adults

14   have to remind them not to.

15       CAPTOES:  I will never show leniency, Michael.

16   I never have.

17       STRICDAD7:  Good for you.  Do you show them

18   love after the beating?

19       CAPTOES:  I do.  Do you?

20       STRICDAD7:  We do.  How do you show that

21   beating was done out of love?

22       CAPTOES:  I told him I love you, but a boy

23   needs training from his dad often.  I kiss him, of

24   course.

25       STRICDAD7:  Very nice.  Charles, I hate to do

 1        this but I have to run.  Have a 4:20 meeting.

 2               CAPTOES:  Go ahead for sure, Michael.

 3               STRICDAD7:  I'll log on tomorrow if things are

 4        slow enough around here.

 5               CAPTOES:  Great.  Look for you then.

 6               STRICDAD7:  You bet.  Take care.

 7               CAPTOES:  You, too.  Bye for now."

 8        BY MS. KAISER:

 9        Q     Corporal Romanosky, yesterday you testified

10        that the defendant subsequently showed up on July

11        21st, 2008 to meet you; is that correct?

12        A     That's correct.

13        Q     And did you interview the defendant?

14        A     I did.

15        Q     Did he tell you what his occupation was?

16        A     I believe he told me he had an MD and a PhD,

17        psychologist, psychiatrist.

18        Q     At anytime during your chat with the defendant

19        did he ever say beating children is wrong?

20        A     No.

21        Q     Did he ever indicate to you that sexually

22        abusing children is a bad thing to discuss?

23        A     No.

24        Q     Did you have any subsequent discussion with

25        the defendant after June 17 of 2008?

```
 1    A     My next contact with the defendant was an

 2    instant message chat conversation on the 18th of

 3    June.

 4    Q     The next day?

 5    A     Yes, ma'am.

 6    Q     And who contacted who on that day?

 7    A     At 2:26 PM I received an instant message from

 8    the defendant.

 9          MS. KAISER:  Your Honor, at this time I'd like

10    to publish Government's Exhibit 15.

11          THE COURT:  You may do so.

12          MS. KAISER:  Thank you.

13          "CAPTOES:  Hello, Michael.

14          STRICDAD7:  Auto response from Stricdad at

15    2:26 PM.  I will be right back."

16    BY MS. KAISER:

17    Q     Can you explain that, Corporal Romanosky?

18    A     That's a feature in AOL.  If you're online but

19    leave the computer for a while and your profile is

20    idle, if somebody were to send you an instant

21    message it's going to send them an auto response

22    saying I'm away from the computer.  But you still

23    see it -- I see it on my end that somebody sent me a

24    message.

25    Q     Okay.  You can proceed.
```

1      A      Continue?

2      Q      Yes, please.

3      A      At 2:27 PM.

4             "STRICDAD7:  Hello, Charles.  How are you?

5             CAPTOES:  Fine, thanks.  Just got off the

6      phone with my son.

7             STRICDAD7:  That's nice.

8             CAPTOES:  He was complaining about his job and

9      hoping I would not get angry for him calling.

10            STRICDAD7:  So what happened?

11            CAPTOES:  I told him I would punish him for

12     complaining about something.  He then said, are you

13     sure?  I said yes.

14            STRICDAD7:  Sounds like he is wanting the

15     punishment.

16            CAPTOES:  That was my feeling.

17            STRICDAD7:  Do you find it more enjoyable to

18     administer punishment when they want it or don't

19     want it?

20            CAPTOES:  Both am sure.  I treat them the same

21     way either way.  Would you?

22            STRICDAD7:  Same here.  Reaction more genuine

23     from those that don't want it, don't you think?

24            CAPTOES:  Probably.  But mine would not want

25     it as severe as he would get it.

1   STRICDAD7:  True.  True.  Do your pupils know

2 that you enjoy administering the beating?

3   CAPTOES:  No.  Should they?

4   STRICDAD7:  Of course not.  Not allowed to

5 look.

6   CAPTOES:  Correct.  Punishment's done not that

7 close to here.

8   STRICDAD7:  Here?  Question mark?

9   CAPTOES:  If crying and yelling.  When I beat

10 I truly beat.

11   STRICDAD7:  Nice.  So how and when do you

12 release the enjoyment of giving the beating?

13   CAPTOES:  Shortly afterwards.  And you?

14   STRICDAD7:  Sometimes shortly afterwards,

15 sometimes during.

16   CAPTOES:  Dressed?

17   STRICDAD7:  Yes and no.  Sometimes either or.

18 How about you?

19   CAPTOES:  I usually beat dressed.  If not

20 dressed it might be during.

21   STRICDAD7:  Them dressed or you dressed?

22   CAPTOES:  I meant if I were dressed or

23 undressed.  They are always stripped.  If undressed

24 it might well just occur.

25   STRICDAD7:  True."

1   BY MS. KAISER:

2   Q     If you would please stop right there

3   Corporal Romanosky, when you asked the defendant, so

4   how and when do you release the enjoyment of giving

5   the beating, to what were you referring?

6   A     I was referring to ejaculation.

7   Q     You can continue.

8         "CAPTOES:  Would you do that, too, Michael?

9         STRICDAD7:  More than likely.  Did you have

10  your pupils help you out in that department or did

11  you take matters into your own hands?

12        CAPTOES:  With my son he helped.  With one or

13  two pupils they helped, or else just myself."

14  BY MS. KAISER:

15  Q     All right.  Corporal Romanosky, what did you

16  mean when you said, did you have your pupils help

17  out in that department or did you take matter into

18  your own hands?  Can you please describe for the

19  jury to what you're referring.

20  A     Did you have your pupils or children help you

21  ejaculate in some fashion or did you masturbate.

22  Q     Okay.  You can proceed.

23  A     I'm sorry.  I lost my place.  Were we at 2:45?

24  Q     Yes, sir.

25        "STRICDAD7:  Very nice.

1          CAPTOES:  Did you get help?

2          STRICDAD7:  Yes.  Same as you.

3          CAPTOES:  We both seem to be very much alike

4     in our approaches.

5          STRICDAD7:  Yes.  I think people with our

6     interests seem to be mostly consistent with probably

7     just a few personal preferences.

8          CAPTOES:  That is probably very true.  I am in

9     hopes that your group will accept me.

10         STRICDAD7:  I feel confident they will.

11    Otherwise, I would not suggest it.  It is just a

12    trust thing.  They are relying on my trust of you.

13         CAPTOES:  Pleased to hear that.

14         STRICDAD7:  The folks in this group are all

15    professionals and they have a lot to lose.

16         CAPTOES:  Am sure that when we meet I will

17    have your confidence, am sure.  And you know I am,

18    too.

19         STRICDAD7:  Yes.

20         CAPTOES:  When one in the group administers

21    punishment, are they dressed?

22         STRICDAD7:  Personal preference.  Group

23    respects each others preferences.  Which would you

24    prefer when you administer?

25         CAPTOES:  That's perfect.  I'd take the cue

1     from you, your advice.

2          STRICDAD7:  Like I said, it's up to personal

3     preference administering that particular punishment.

4     No cues.  That is too structured.

5          CAPTOES:  Right.  It depends on the kid and

6     the decision as to what to administer.

7          STRICDAD7:  Right.  Which of my three are you

8     most interested in?  Boys are 10 and 11, girl is 14.

9          CAPTOES:  Often I am just in boxers.  But I

10    can get very aroused quickly.  Only experience is

11    with boys and a girl or two.

12         STRICDAD7:  All three know the drill so it

13    would be up to you as to which you would enjoy most.

14         CAPTOES:  Either boy since I know neither.

15         STRICDAD7:  Okay.  Not a problem.

16         CAPTOES:  I would enjoy meeting everyone and

17    hopefully be in with the decision process.

18         STRICDAD7:  If you're approved, you're in on

19    the decision process.  That's why I'm asking

20    questions as to what interests you so that I can

21    pass on to the group.  That way they have an idea of

22    the agenda for the evening.  Are week nights a

23    problem for you?

24         CAPTOES:  No.  They are fine.  Ask any and all

25    questions, Michael.  Probably more at ease with boys

1      at first.

2            STRICDAD7:  That's fine.  Would you be --

3      would be bringing your razor strap?

4            CAPTOES:  Absolutely.  And maybe the Garrison

5      belt, too.

6            STRICDAD7:  Very good.  Any other favorite

7      implements that you would like to bring?  Everyone

8      normally brings their own.  It's another of the

9      personal preferences we allow.

10           CAPTOES:  That's good.  I might bring my quirt

11     if I can find it.

12           STRICDAD7:  Quirt?  Question mark?

13           CAPTOES:  That is an English type crop but

14     thinner.

15           STRICDAD7:  Never heard it called that.  I've

16     always known them as crops.  See, learn something

17     every day.

18           CAPTOES:  I got it from some horsey people in

19     England.

20           STRICDAD7:  Very cool.

21           CAPTOES:  The razor strop is my number one

22     implement.

23           STRICDAD7:  Nice.  I like the paddle and a

24     nice belt.

25           CAPTOES:  Holes in the paddle?

1          STRICDAD7:  Of course.  So you can hear the

2     wind.

3          CAPTOES:  Great.

4          STRICDAD7:  Do you ever take photos of

5     previous sessions?

6          CAPTOES:  Don't have a camera but I'm getting

7     one.  Do you?

8          STRICDAD7:  We have talked about it but

9     general agreement is no cameras during sessions.  So

10    for now we have to stick to the internet to look at

11    other's trophies.

12         CAPTOES:  Probably better.

13         STRICDAD7:  I agree.

14         CAPTOES:  Do you socialize much with many of

15    the group members?

16         STRICDAD7:  A couple of them yes, and a couple

17    of them are mainly online and phone contacts until

18    sessions.  Some people enjoy the distant type

19    relationships, which is fine.  We just did good

20    backgrounds on them before allowing them access.

21         CAPTOES:  I enjoy close ones, as well.

22         STRICDAD7:  Those are my favorites, as well.

23         CAPTOES:  I would have felt so.

24         STRICDAD7:  Well, I am going to run.  Have a

25    late afternoon meeting to attend.  Nice talking with

1      you, Charles.

2          CAPTOES:  Same here, Michael.  Very soon

3      again, I trust?

4          STRICDAD7:  Very good.  If things go well

5      after your first couple of sessions, would you be

6      willing to host a session?

7          CAPTOES:  Certainly.  Have a good place to do

8      it.

9          STRICDAD7:  Is it large enough?

10         CAPTOES:  Oh, yes.  It is three K feet under

11     air and roomy.

12         STRICDAD7:  Very nice.

13         CAPTOES:  Would they mind the drive?

14         STRICDAD7:  Not at all.

15         CAPTOES:  Okay.  You, your wife and kids could

16     even stay over.

17         STRICDAD7:  That's a possibility.  We'll see

18     how things go up here first.

19         CAPTOES:  Oh, you'd be more than welcome.

20         STRICDAD7:  Thank you.

21         CAPTOES:  Have three bedrooms.

22         STRICDAD7:  Very nice.  Next meeting will be

23     in around two weeks.  Will that timeframe work for

24     you?

25         CAPTOES:  I will be gone over the 4th of July

1    from the 30th on till the 6th.  Three weeks would be

2    perfect.

3         STRICDAD7:  Okay.  I'll see what I can do.

4    Others may have plans for the 4th, as well, so that

5    might even be better.  Where is area code 202 from

6    the phone number you gave me?

7         CAPTOES:  That is in DC where I have a little

8    pied a terre.  Sery tiny.  It is my cell phone.

9    SWFL (at least where I am) has only a limited cell

10   range.

11        STRICDAD7:  Okay.  I am okay with it.  Others

12   may question the out of area number and coming from

13   DC gives some folks the jitters (feds) laugh out

14   loud.

15        CAPTOES:  I have one in FL but it is never

16   sure to work.  It is 239-561-1400.

17        STRICDAD7:  Laugh out loud.  Okay.  Like I

18   said, I'm okay with it.

19        CAPTOES:  They can use that one, too.  The

20   other one can be for you.

21        STRICDAD7:  From what all we've talked about

22   on here I am quite certain you're good to go.

23        CAPTOES:  Had a lot of experience, I have to

24   say, and am a decent gentleman.

25        STRICDAD7:  I can tell.  You're good people.

1           CAPTOES:  Thanks.  Am most anxious to know you

2     much better.

3           STRICDAD7:  Same here.  I better run.  Got

4     meeting and shouldn't be late.  Of course, I'm the

5     boss so if late, that's tough.  Laugh out loud.

6     Take care, Charles.

7           CAPTOES:  You also, Michael."

8     <u>BY MS. KAISER:</u>

9     Q     During your online chats with the defendant,

10    why were you asking him for his phone number and why

11    were you giving him your phone number?

12    A     Well, again, during a chat I'm always trying

13    to elicit some information from the person that

14    might help in identifying who they are.  And I gave

15    him a contact number to reassure him that I was

16    comfortable with him giving him my number.  Of

17    course, that number comes back to an undercover cell

18    phone.

19    Q     Did you have any other conversations or online

20    chats with the defendant in June of 2008?

21    A     Yes.  The next chat with the defendant was on

22    the 19th of June.

23          MS. KAISER:  At this time I'd like to publish

24    Government's Exhibit 16.

25          THE COURT:  Yes, ma'am.

1    BY MS. KAISER:

2    Q     Who contacted who on June 19th?

3    A     At 2:23 PM I received an instant message from

4    the defendant.

5    Q     You can proceed.

6          "CAPTOES:  Hi, Michael.

7          STRICDAD7:  Hello Charles.

8          CAPTOES:  Just finished oiling the three razor

9    strops and Garrison belt.  Need to keep them supple.

10         STRICDAD7:  Laugh out loud.  Of course.

11         CAPTOES:  I should be in Tampa area on Sun 6

12   July if you would like to meet for lunch.

13         STRICDAD7:  That may be doable if I'm in town.

14   May be taking the family out of town for the fourth

15   weekend.

16         CAPTOES:  Oh, no problem.  I will be on my way

17   home.

18         STRICDAD7:  You have plans that weekend, huh?

19   Very good."

20   BY MS. KAISER:

21   Q     Why was there a break here in the chat,

22   Corporal Romanosky?

23   A     Same reason.  I was exiting out of the chat

24   box and my computer locked up.  In this case,

25   however, I didn't need to go into the archives of

1    the program to pull out the backup save.  The

2    conversation had been so brief I was able to copy

3    and paste it into a document, and then I was able to

4    get right back online.

5    Q     Okay.

6    A     There wasn't any lapse.

7    Q     All right.

8          "STRICDAD7:  Sorry.  Got booted.

9          CAPTOES:  Thought so.  Just coming back from

10   Daytona with family and going home.

11         STRICDAD7:  Very good.

12         CAPTOES:  Eager to meet everyone, especially

13   you.

14         STRICDAD7:  I am eager to meet you, as well.

15   You said you are between Ft. Myers and Naples,

16   correct?

17         CAPTOES:  In the country.  About six miles

18   from I-75.

19         STRICDAD7:  I have to meet a new client maybe

20   next week in Sanibel Island.  If you were close I

21   thought I might drop by and say hello.

22         CAPTOES:  Would be great, but I will be in

23   Charleston, SC making a speech there and in

24   Charlotte, NC.  Damn.  You could have come over.

25   Will you go back there again soon, too?  You can

1    always drop by any time.

2         STRICDAD7:  Don't know.  My secretary keeps my

3    schedule.  She knows better than I do.  Laugh out

4    loud.  What town are you in?  I'm not real familiar

5    with that area but have Google maps.

6         CAPTOES:  No town.  It is unincorporated Lee

7    County.  You get off at exit 131 and go east and a

8    little north.  I have not mastered computer maps.

9         STRICDAD7:  Laugh out loud.  That doesn't

10   sound too bad.  What are you speaking on in the

11   Carolinas?  If I am as active as you are at 70 I

12   will consider myself very luckily.

13        CAPTOES:  It is quite easy.  Am in a gigantic

14   community, 5800 acres.  Speaking about divorce and

15   custody problems.  I am fairly active and am sure

16   you will be, too.

17        STRICDAD7:  I hope so.

18        CAPTOES:  You sound very active.

19        STRICDAD7:  Yes, very much so.  Work keeps me

20   busy.  Except for my afternoon chats on here I don't

21   slow down much.

22        CAPTOES:  I glad you are doing that, Michael.

23        STRICDAD7:  I'm looking at Google maps.  Are

24   you in Lehigh Acres?  That's not too far from

25   Sanibel.

 1          CAPTOES:  God, no, not that far.  I am off

 2    Daniels Parkway in Gateway.

 3          STRICDAD7:  I see you now.  Golf community,

 4    huh?  You play?  I've played golf a few times with

 5    clients.  I'm not very good but it was nice to get

 6    away for half a day.

 7          CAPTOES:  Don't play anymore.  I never liked

 8    it.  I did play tennis.

 9          STRICDAD7:  Tennis is fun.

10          CAPTOES:  Now only bike ride and swim.  Swim

11    twice a day.

12          STRICDAD7:  Swimming is definitely good for

13    you.

14          CAPTOES:  For sure.  And my own pool, (which

15    your kids would love, I'm sure).

16          STRICDAD7:  I'm sure.  They love the water.

17    That is for sure.

18          CAPTOES:  Good to hear.  I love it, too.

19          STRICDAD7:  Be right back.  Phone.

20          CAPTOES:  Me, too.  Back as soon as I can.

21          STRICDAD7:  Back."

22    BY MS. KAISER:

23    Q    What was the next communication that you had

24    with the defendant?

25    A    I sent the defendant an e-mail at 3:42 PM.

```
 1              MS. KAISER:  At this time I'd like to publish

 2    Government's Exhibit 17.

 3              THE COURT:  Yes, ma'am.  You may do so.

 4    BY MS. KAISER:

 5    Q       Is this -- Government's Exhibit 17, is that a

 6    copy of the e-mail that you just referenced?

 7    A       Yes.

 8    Q       Could you please read that to the jury.

 9    A       I said, Charles, I apologize.  I had to go and

10    could not wait for your return, as I have an

11    employee issue to deal with.  I will talk to you

12    later today or tomorrow.  Michael.

13    Q       Did you receive any response to that e-mail?

14    A       Yes.  I received an e-mail from the defendant

15    at 3:55 PM.

16    Q       I'm publishing Government's Exhibit 18.  Is

17    this the e-mail response?

18    A       Yes, it is.

19    Q       And if you could please read that.

20    A       Michael, came back but had trouble getting AOL

21    to connect.  Eager to talk to you per usual,

22    Charles.

23    Q       Did you have any other instant message chats

24    with the defendant?

25    A       Yes.  At 4:15 PM on the 19th.
```

1    Q     That's the same date?

2    A     Yes.

3    Q     All right.

4          MS. KAISER:  At this time, Your Honor, I'd

5    like to publish Government's Exhibit 19.

6          THE COURT:  You may do so.

7          "STRICDAD7:  You made it back.

8          CAPTOES:  Yes, I did.  Damn AOL, too.

9          STRICDAD7:  Laugh out loud.  I understand

10   completely.  I get booted at least once a day.

11         CAPTOES:  Am not looking forward to the

12   speeches as I really don't enjoy doing them.  They

13   are needed, I feel.

14         STRICDAD7:  Yes.  That can't be the most

15   pleasurable topic to speak on.

16         CAPTOES:  No.  But I do some testifying on

17   this at times.

18         STRICDAD7:  Really.  That is interesting.  Are

19   you an expert in custody issues and divorce

20   proceedings?

21         CAPTOES:  Am supposed to be.  There is no easy

22   solution at times.

23         STRICDAD7:  There never is.  I own a company

24   that supplies offshore power boat teams and some

25   vehicle racing teams with equipment on a large

1    scale, not your Friday and Saturday night locals.

2        CAPTOES:  Very interesting.  Though know

3    little about it.

4        STRICDAD7:  It's a lot of fun.  Get to go to a

5    lot of events and get to travel from time to time.

6    With the internet I can do most of my meetings and

7    sales right from the office now, so that cut back on

8    travel.

9        CAPTOES:  That can always be fun.  Have you

10   been to Sanibel before?

11       STRICDAD7:  Yes, awhile back.  Captiva Island

12   was nice, Plantation Inn.

13       CAPTOES:  I love Captiva.  The hurricane made

14   a mess there and the hotels have declined.  There is

15   a great eatery there for lunch called the Bubble

16   Room.  Take people there fairly often.

17       STRICDAD7:  Hum.  Never been there.  I go to

18   Boca Raton from time to time.  A lot of my clients

19   practice offshore there.  And I can drop ship things

20   right to them.

21       CAPTOES:  Very convenient.  Have been to Boca

22   a few times.  But often go to the east coast.

23       STRICDAD7:  Yes me, too.  Daytona, Ormond

24   Beach, St. Augustine are all very nice.

25       CAPTOES:  I basically prefer the west coast as

1    it is quieter.  Am not big on going out that much.

2         STRICDAD7:  I can understand that.  Nothing

3    beats the peace and quiet of home.

4         CAPTOES:  That is the way I feel.  And that is

5    why I'd like you all to come to mine.  I designed it

6    for me.

7         STRICDAD7:  Sure.  I understand.  And I am

8    sure that can be arranged.  For your first session,

9    however, I think everyone would be more at ease in a

10   known location.  After everyone gets to know you,

11   then there wouldn't be an issue.  There is always

12   that first bit of nervousness when someone new joins

13   the group.

14        CAPTOES:  I can well understand.

15        STRICDAD7:  Are you able to travel here?

16        CAPTOES:  If I am home, of course.

17        STRICDAD7:  Of course.  Let me know your

18   schedule for the next few weeks."

19        THE COURT:  Just a moment, please.  Why don't

20   we take a little earlier than normal midmorning

21   break and let you clear your throat and everybody

22   can relax.  We'll pick up right where we left off.

23        COURTROOM SECURITY OFFICER:  Rise for the

24   jury.

25   (Jury out at 10:48 AM.)

1            THE COURT:  We'll be in recess.

2       (Recess was taken at 10:48 until 11:08 AM.)

3       (Back on the record.)

4            COURTROOM SECURITY OFFICER:  All rise.  This

5       Honorable Court is again in session.  Be seated,

6       please.

7            THE COURT:  Bring the jury in.

8            COURTROOM SECURITY OFFICER:  Rise for the

9       jury.

10      (Jury in at 11:09 AM.)

11           THE COURT:  Thank you, and be seated.  You may

12      resume direct examination.

13           MS. KAISER:  Thank you, Your Honor.

14      BY MS. KAISER:

15      Q    When we last left off before the break, we

16      were publishing Government's Exhibit Number 19 from

17      the chat on June 19th; is that correct?

18      A    That's correct.

19      Q    Okay.  You can proceed.

20      A    At 4:39 PM.

21           STRICDAD7:  Let me know your schedule for the

22      next few weeks.  We will be having a gathering very

23      soon.

24           CAPTOES:  I am free the 6th of July on.  Get

25      back from Daytona then.  After that, nothing really

1    unless someone stops by.

2         STRICDAD7:  Okay.  We can shoot for the week

3    following the 6th.  I will have the approval for you

4    to come by then.  I have already spoken with a

5    couple of members and they were okay with it.

6         CAPTOES:  Very nice.  Thank you.  Doing these

7    speeches always gets me anxious and doubt I will

8    accept many more invites.  Am fairly quiet and

9    somewhat shy so giving speeches is not my thing.

10        STRICDAD7:  I'm with you there.  Just imagine

11   everyone naked.  No, wait, don't do that.  Laugh out

12   loud.

13        CAPTOES:  Never know the variety who might be

14   at one of these.  In a small comfortable group I am

15   fine.

16        STRICDAD7:  True.  It's definitely a small

17   group.  Friends likes ours are difficult to find and

18   hard to trust.

19        CAPTOES:  Well, I think one gets a gut feeling

20   regarding the trust issue.  It is either there or it

21   isn't.  I basically am a trusting guy.

22        STRICDAD7:  Same here.  I have a good feeling

23   about you.

24        CAPTOES:  And I have an implicit trust of you,

25   Michael, implicit.

1        STRICDAD7:  Thank you, Charles.  That means a

2   lot.

3        CAPTOES:  I think our interests and goals seem

4   to dovetail in a number of important areas.

5        STRICDAD7:  Indeed.  Charles, I enjoy our

6   chats but I'm afraid I must go.  Need to go home and

7   make sure everyone's chores were done.

8        CAPTOES:  I would fully concur with that.  We

9   shall chat sure, am sure.

10        STRICDAD7:  I am sure.  Have a good night.

11        CAPTOES:  You, also."

12   BY MS. KAISER:

13   Q    Did you have any other instant message chats

14   with the defendant in June of 2008?

15   A    Yes.  The next instant message took place on

16   the following day on the 20th at 3:25 PM.

17        MS. KAISER:  At this time I'd like to publish

18   Government's Exhibit 20.

19        THE COURT:  Yes, ma'am.

20   BY MS. KAISER:

21   Q    Who contacted who on June 20th?

22   A    I received an instant message from the

23   defendant at 3:25 PM.

24   Q    You may proceed.

25        "CAPTOES:  Good afternoon, Michael.

1          STRICDAD7:  Hello, Charles.  How are you?

2          CAPTOES:  Fine, thanks.  And you?  Have those

3     two boys this weekend.

4          STRICDAD7:  I'm doing well.  Thanks.  Yes.

5     Boys are with me.

6          CAPTOES:  And I have my son's friend's boys

7     this weekend as granddad is going away.

8          STRICDAD7:  Very nice.  How old are they?

9          CAPTOES:  Just 12 and 14 today or tomorrow.

10          STRICDAD7:  Very nice.

11          CAPTOES:  A handful.  Their dad is very

12     absentee.  Their granddad raises them.

13          STRICDAD7:  Does he let them walk all over

14     him?

15          CAPTOES:  Not the granddad.  He is much like I

16     am.  Says no one else can handle them when he is not

17     there except yours truky.

18          STRICDAD7:  Laugh out loud.  I'm sure they

19     will behave for you.

20          CAPTOES:  They usually do.  I keep them on

21     occasion.  Strict rules and no leniency.

22          STRICDAD7:  Of course.

23          CAPTOES:  They seem to thrive on that with me.

24          STRICDAD7:  That means you're doing it right.

25          CAPTOES:  I believe so.  Their granddad runs a

1     strict house but his son does not.  The granddad

2     feels that strict discipline is mandatory.

3          STRICDAD7:  I agree with him.  If they get out

4     of line they need a backhand across the mouth.

5          CAPTOES:  They get that from me for sure and

6     then later the razor strop.

7          STRICDAD7:  Of course.

8          CAPTOES:  They stayed with me about six weeks

9     or so and were very sore when they went home.

10         STRICDAD7:  I'll bet.  Good for you.  I'll bet

11    you enjoyed that six weeks.

12         CAPTOES:  It was six weeks ago but only for

13    two weeks.  I enjoyed it very much and they did

14    fairly well.

15         STRICDAD7:  That's good.

16         CAPTOES:  Now we will see how they do for

17    these three nights.

18         STRICDAD7:  I am sure they will behave or they

19    will get more of the same.

20         CAPTOES:  The 12 year old probably will.  The

21    older tests continually.

22         STRICDAD7:  Well, I am sure it's nothing you

23    can't handle.

24         CAPTOES:  I can and do handle him with no

25    problem but yelling and crying.

1          STRICDAD7:  Hopefully not loud enough that the

2     neighbors hear.

3          CAPTOES:  They can hear nothing, as you will

4     see.

5          STRICDAD7:  Very good.  We had an 11-year-old

6     that liked to yell and cry a lot.

7          CAPTOES:  Does he still?

8          STRICDAD7:  Only if allowed.

9          CAPTOES:  If he yells too much he is stopped

10    in his tracks.

11         STRICDAD7:  Of course.

12         CAPTOES:  With one or two backhands after one

13    warning.

14         STRICDAD7:  Exactly.  Or they even make items

15    to help with silence.

16         CAPTOES:  I have used a gag on location.

17         STRICDAD7:  Exactly.  Who did you use gag on?

18    Friend's kids or son?

19         CAPTOES:  Both.

20         STRICDAD7:  Nice.

21         CAPTOES:  Son hated it more than these two.

22         STRICDAD7:  Do these two enjoy their

23    discipline or is it that they're just used to it?

24         CAPTOES:  The 12-year-old is used to it.  The

25    older fights all the way.

1          STRICDAD7:  Well his is of that age.

2          CAPTOES:  Correct.  But that doesn't make me

3     any less determined.

4          STRICDAD7:  Of course not.  Would make me more

5     determined to gain immediate compliance.

6          CAPTOES:  You sound exactly like me.  He gets

7     more and harder.

8          STRICDAD7:  Exactly.  Are you bigger than him?

9          CAPTOES:  Yes.  My son was bigger than I but I

10    am strong.  These two are shorter and thinner.

11         STRICDAD7:  I am sure you will break his will

12    without too much difficulty, then.

13         CAPTOES:  Oh, I will for sure.  It gets closer

14    now.  I have made up my mind to do it.  The older

15    will always be more compliant.

16         STRICDAD7:  Very good.  Do you do any fun

17    things with them?

18         CAPTOES:  Explain, please.

19         STRICDAD7:  Show them that you enjoy

20    administering discipline?

21         CAPTOES:  Not sure that I know quite what to

22    do in that area.

23         STRICDAD7:  Well, it would be difficult with

24    them not being around all the time.

25         CAPTOES:  They like me and we do horse around

1       some.  They say they want to live with me.  Why, who

2       knows.

3            STRICDAD7:  Laugh out loud.  Because kids like

4       discipline and structure.  They may not act like it

5       during harsh punishment but they know it is good for

6       them.  Wouldn't you agree?

7            CAPTOES:  Yes, I believe so.  My son knew he

8       needed it to keep him on my wave length.  (His

9       words.)  He needed assurance that I loved him and so

10      do these two boys.  Their granddad never says that

11      to them.

12           STRICDAD7:  That's too bad.

13           CAPTOES:  I have suggested that to him.  I am

14      fond of them.

15           STRICDAD7:  Sounds like it.  Charles, I hate

16      to cut this short but I need to go.  I am leaving

17      the office early today.

18           CAPTOES:  Very good.  Don't blame you.  They

19      come at 6.  Enjoy the weekend.

20           STRICDAD7:  You, too.  I may be coming in this

21      weekend to make sure some orders get out.  Do you go

22      online over the weekend?

23           CAPTOES:  Yes, I do, so I shall look for you.

24           STRICDAD7:  Yes.  I will probably come in

25      Sunday.  I'll talk to you then.

1          CAPTOES:  Great.  Look forward to it per

2     usual."

3     BY MS. KAISER:

4     Q     When the defendant said that he used a gag on

5     occasion, what did you understand that to mean?

6     A     A gag is sometimes used in sadomasochism

7     abuse.  It's something that can be inserted in the

8     mouth to keep the subject quiet.

9     Q     After the instant message chat on June 20th of

10    2008, did you have any other instant message chats

11    with the defendant in June?

12    A     The next instant message conversation took

13    place on the 24th of June 2008.

14    Q     And who initiated that conversation?

15    A     I received an instant message from the

16    defendant at 1:31 PM.

17         MS. KAISER:  At this time I'd like to publish

18    Government's Exhibit Number 21.

19         THE COURT:  Yes, ma'am.

20         "CAPTOES:  Good afternoon, Michael."

21         STRICDAD7:  Auto response from StricDad7.  I

22    am away from my computer right now.  At 1:34.

23    Hello, Charles.

24         CAPTOES:  How are you?

25         STRICDAD7:  Good.  And you?

1          CAPTOES:  Fine, thanks.  Still hoping I get

2     cleared to join you all.

3          STRICDAD7:  I've talked with everyone but one

4     and you're in so far.  The last person is out of

5     town right now.

6          CAPTOES:  Great.  Hope he/she says yes, too.

7          STRICDAD7:  I'm sure.  Hey, I would love to

8     chat but I need to run.  Had my weekend order get

9     messed up so it's chaos around here.

10          CAPTOES:  Of course.  Come back when you can.

11          STRICDAD7:  Will do.  Thanks.  Great hearing

12     from you.

13          CAPTOES:  Thanks.  Hope the mess gets

14     straightened out.

15          STRICDAD7:  It will.  Just takes a lot of work

16     to fix.

17          CAPTOES:  Never dull I'm sure.  Will be on

18     today.

19          STRICDAD7:  Okay.  Will talk to you later."

20     BY MS. KAISER:

21     Q     Did you have any further communication with

22     the defendant?

23     A     I received an e-mail from the defendant three

24     days later on the 7th of June at 12:46 PM.

25          MS. KAISER:  At this time I'd like to publish

1    Government's Exhibit 22.

2         THE COURT:  You may.

3    BY MS. KAISER:

4    Q     Is this the e-mail to which you're referring?

5    A     Yes, ma'am.

6    Q     All right.  If you would please read that.

7    A     It says, Michael, hadn't seen you online and

8    hope all is okay with you.  Drop me a line if you

9    wish to, Charles.

10   Q     Did you have any other correspondence with the

11   defendant?

12   A     I replied to that e-mail on the 30th of June

13   at 3:48 PM.

14        MS. KAISER:  At this time I'd like to publish

15   Government's Exhibit 23.

16        THE COURT:  Yes, ma'am.

17   BY MS. KAISER:

18   Q     Is this the e-mail to which you were just

19   referring, Government's Exhibit 23?

20   A     Yes, ma'am.

21        MS. KAISER:  Your Honor, at this time I'd like

22   to publish it.

23   BY MS. KAISER:

24   Q     If you could just read that.

25   A     It says, Charles, good to hear from you.

1     Things have been a little hectic around the office.

2     One of my clients was supposed to receive a rather

3     large and expensive order which was all messed up.

4     I had to fly out of town to correct the problem as

5     this client is very important to us.  I am back home

6     now and looking forward to the upcoming holiday.  I

7     have spoken with everyone in the group and everyone

8     is okay with you attending the next gathering.

9     Looking forward to our next chat to discuss the

10    agenda, Michael.

11    Q     Did you have any other instant message chats

12    with the defendant?

13    A     The next instant message conversation with the

14    defendant took place approximately seven days later

15    on July 7th.

16          MS. KAISER:  At this time I'd like to publish

17    Government's Exhibit Number 24.

18    BY MS. KAISER:

19    Q     Who initiated the chat on July 7th of 2008?

20    A     I received an instant message from the

21    defendant at 1:44 PM.

22    Q     All right.  If you could just publish this:

23          "CAPTOES:  Good afternoon, Michael.

24          STRICDAD7:  Hello, Charles.  How are you?

25          CAPTOES:  Fine, thanks.  So nice to be home.

 1          STRICDAD7:  Yes.   Travel is fun but nice to
 2     get home.
 3          CAPTOES:  You are so right.   Looking forward
 4     to being with you all.
 5          STRICDAD7:  Yes.  Did you get my e-mail?
 6     Everyone is okay with you coming to the next
 7     gathering.
 8          CAPTOES:  Yes, I did.   Thank you.   Am looking
 9     forward to it.
10          STRICDAD7:  What is your schedule like during
11     the week of the 17th through the 23rd?   Trying to
12     put something together for that week.
13          CAPTOES:  Fine, am sure.
14          STRICDAD7:  Very good.   I will be out of town
15     next week.   That was my original plan.
16          CAPTOES:  Either is fine.   The week of the
17     26th would have been bad, but 17 to 23 is great.
18     Boys behaving well these days?
19          STRICDAD7:  They were pretty good this
20     weekend.   We were down in Sarasota for the offshore
21     Grand Prix.   Few behavioral slipups I noted,
22     however.
23          CAPTOES:  Am sure you took care of those
24     easily.
25          STRICDAD7:  Yes, of course.   But also noted on

1     my list for the meeting.

2          CAPTOES:  Very good.  Both boys or just one?

3          STRICDAD7:  Which would you prefer?

4          CAPTOES:  Will defer to you for this first

5     time.

6          STRICDAD7:  Question mark?  I'm sorry.  I

7     thought you were looking to instruct.

8          CAPTOES:  I am.  But also need to get my feet

9     wet with the group in all phases.

10         STRICDAD7:  Understandable.  We can have

11    someone go first with their own child but I don't

12    think the group will be okay with someone coming to

13    just watch all evening.

14         CAPTOES:  Don't want to watch much.  Will

15    surely instruct totally.  Thought I would want to

16    work with both of your boys or just one.

17         STRICDAD7:  I am sure I will have a list of

18    misbehavings for both by then.  How will you want

19    them positioned and dressed?

20         CAPTOES:  That will be perfect.  I have some

21    thoughts already.  Did spend the day with a friend

22    of my son, his dad and his two sons.

23         STRICDAD7:  Very nice.  How did that go?

24         CAPTOES:  Very well.  Actually was for about a

25    24 hour period.  (The boys) the younger one more so,

1   had been continually misbehaving.  The granddad and

2   I took over with my razor strops and some backhands

3   as well.  The boys were straightened up quite

4   quickly.

5        STRICDAD7:  Very nice.  Will you be bringing

6   the razor strap or other favorite tools with you to

7   our gathering?

8        CAPTOES:  Yes, I shall.  A heavy wide belt and

9   the razor strop.  Do you usually discipline your

10  boys bare?

11       STRICDAD7:  Both clothes and bare.  Which

12  would you prefer?

13       CAPTOES:  Would prefer bare myself.  Find it

14  more effective.

15       STRICDAD7:  Of course.  Plus the slap of the

16  strap is nice.  Right?

17       CAPTOES:  Yes.  It also brings immediate

18  attention.

19       STRICDAD7:  Oh, yes.  How do you want them

20  positioned for your instruction?

21       CAPTOES:  Probably bent over a chair or a

22  couch.  Want them totally exposed.

23       STRICDAD7:  Bound to chair or couch or just

24  bent over?

25       CAPTOES:  Probably bound as use a fairly full

1    swing.

2        STRICDAD7:  Nice.  You understand no permanent

3    marks, though, correct?

4        CAPTOES:  Never do leave anything permanent,

5    of course.

6        STRICDAD7:  Anything that will heal is fine.

7        CAPTOES:  That is the only way I do it.  If it

8    heals in two or three days, that is fine.

9        STRICDAD7:  Very good.  Definitely on the same

10   page, then.

11       CAPTOES:  Will you have disciplined them for

12   the infractions prior to the meeting, also?

13       STRICDAD7:  Also you must use care to make

14   sure areas that are hit can be covered by clothing.

15   No black eyes or that sort of thing.  No.  I think

16   I'll let it build up until then.  Compile one heck

17   of a list by then, laugh out loud.

18       CAPTOES:  No worry.  No black eyes.  Will do a

19   backhand or so if warranted.

20       STRICDAD7:  That's fine.  Nothing they won't

21   have had before.

22       CAPTOES:  Correct.  Mine might be a little

23   harder.  I really am not sure.  I hope also possibly

24   to discipline them in between.

25       STRICDAD7:  Harder is great.  I am looking

1     forward to observing your technique.  In quotes and

2     question mark, in between?

3          CAPTOES:  In between the group meetings.

4          STRICDAD7:  That would be great.  Sometimes

5     can't wait for the meetings for serious rule

6     violations.

7          CAPTOES:  That is what I was thinning.  I feel

8     serious infractions need to be taken care of at once

9     and later at the group, as well.

10          STRICDAD7:  Of course, as reinforcement.  Were

11     you looking to use them for anything else besides

12     your demonstration of proper discipline?  If so,

13     it's okay.  Just want to know for myself since I

14     will be working with stepdaughter that night.

15          CAPTOES:  That will surely be a possibility.

16          STRICDAD7:  Nice.  My 14-year-old stepdaughter

17     has been talking back to her mother lately.  I can

18     see that the frequency of her involvement in the

19     group needs to increase.  I've been working with the

20     boys mostly and her behavior is starting to suffer.

21          CAPTOES:  Will you use her only for

22     demonstration or for something else, too?

23          STRICDAD7:  Both, of course.  I've neglected

24     both things with her since I've been so focused on

25     the boys.  Since you will be there to work with the

1      two boys, I can focus some quality attention to her.

2           CAPTOES:  That will be very good.  I will

3      totally focus on the boys.

4           STRICDAD7:  Very good.

5           CAPTOES:  Is your stepdaughter often a rule

6      breaker?

7           STRICDAD7:  She wasn't when getting regular

8      discipline.  Now that she's a few years older the

9      boys -- she's testing the rules more.  Regular

10     attention will bring her right back.

11          CAPTOES:  That's good.  Are the boys 11 and

12     12?

13          STRICDAD7:  Ten and 11.

14          CAPTOES:  Have you disciplined them since the

15     last group meeting?

16          STRICDAD7:  Just a little informal, nothing

17     major.  Like to save formal for the meetings since

18     that gives the heal time.

19          CAPTOES:  Correct.  Are the boys big or small

20     for their age?

21          STRICDAD7:  Average.

22          CAPTOES:  That's fine.  Have you been a bit

23     rough with them at the meetings?

24          STRICDAD7:  At times.

25          CAPTOES:  Good.  I might do much the same.

1          STRICDAD7:  Very good.  Ground rules are

2     simple.  No permanent injury or marks, and no

3     healing injury in a place where clothing won't

4     cover.  Other than that it's up to you for

5     discipline or other.  Do you want all the others to

6     watch a few or complete privacy?

7          CAPTOES:  They could surely watch some, and

8     some privacy or just with you.

9          STRICDAD7:  Okay.  Won't be a problem.

10         CAPTOES:  Do you prefer privacy or some

11    watching?

12         STRICDAD7:  Either.  I am close enough with

13    everyone in the group that it doesn't matter now.

14    When some new people join they want smaller audience

15    at first, which is fine.  Some people prefer large

16    audience.  We respect everyone's preference as long

17    as ground rules are followed.

18         CAPTOES:  I agree totally.  Were the boys

19    usually used for demonstration or other things, as

20    well?  I will want and hope to do more.

21         STRICDAD7:  More?  They have been used for

22    demonstration and more, in quotes.  Just want to

23    make sure we're talking about the same thing.  I

24    trust you so I have no problem telling you that they

25    have been used for more.

1        CAPTOES:  That is fine.  And you may surely

2    trust me.

3        STRICDAD7:  I do completely.  I know it's

4    difficult to say on here because we've never

5    actually met in person.  But were you referring to

6    more as sexual things with them?

7        CAPTOES:  If that has ever been introduced.

8        STRICDAD7:  Yes.  With the boys and

9    stepdaughter.  And others in the group are on the

10   same page, as well.  That and disciplining seem to

11   go hand in hand, I've found.

12       CAPTOES:  That's fine.  I was wondering about

13   both.  Pleased that all are on the same page.  I

14   feel they absolutely do go hand in hand.

15       STRICDAD7:  Absolutely.  Were you looking to

16   do some things with the boys following or during

17   their discipline?

18       CAPTOES:  Probably following, at least this

19   first time.

20       STRICDAD7:  Very nice.

21       CAPTOES:  You are welcome to be there, of

22   course, too.

23       STRICDAD7:  That would be a nice sight.  I

24   would be there.

25       CAPTOES:  That would be fine with me.

1          STRICDAD7:  Very good.  What would you like to

2     do with them?  Just trying to get a visualization

3     for myself.

4          CAPTOES:  Have to cogitate about that as don't

5     know what they have done.

6          STRICDAD7:  They've experienced a lot for 10

7     and 11.  I would imagine everything that you are

8     interested in doing with them -- interested.  Sorry

9     for the typing.  Was visualizing.

10          CAPTOES:  No problem.  I would do all that

11     they were capable of handling from oral on.

12          STRICDAD7:  I'm sure you won't be

13     disappointed.  Handling and oral they know well.

14          CAPTOES:  Have they progressed from there?

15          STRICDAD7:  Yes, a few times.

16          CAPTOES:  Good.  We will get to know each

17     other am sure.  And even easier with you being there

18     the first time.

19          STRICDAD7:  Yes.  That's what I was thinking.

20     I'm sure after the discipline you administer they

21     will prefer the other.  Phone.  Be right back.

22          CAPTOES:  Okay.

23          STRICDAD7:  Back.  Sorry.  Secretary was away

24     from her desk.

25          CAPTOES:  No problem.  I think the boys and I

1        should do well together.

2              STRICDAD7:  I agree."

3        BY MS. KAISER:

4        Q      If you could just stop right there,

5        Corporal Romanosky, and let me just back up for a

6        minute.  Earlier in the chat the defendant told you

7        that -- at 2:17 on the previous page he said,

8        correct, mine might be a little harder.  I really am

9        not sure.  Hope also possible to discipline them in

10       between.  What did you understand the defendant

11       meant by that?

12       A      In between the formalized meeting, our

13       sessions that he and I would have some sort of

14       relationship.

15       Q      When you asked the defendant or -- excuse me.

16       When the defendant stated, no problem, I would do

17       all that they were capable of handling from oral on,

18       at 2:57, what did you understand the defendant

19       meant?

20       A      Oral sex.

21       Q      Okay.  You can proceed.

22              "STRICDAD7:  How does the 21st look for you?

23       It is a Monday.

24              CAPTOES:  Sounds fine.  Would you like to meet

25       me before, like for lunch somewhere?

1          STRICDAD7:  Great.  I just heard from the last

2    two group members and that is the best date for

3    them.  We can meet Monday near the house and talk

4    for a few.  If we are both okay with everything,

5    then you can ride with me or follow me back to the

6    house.  You and I would just meet an hour or so

7    earlier than the time I give to everyone else.  If

8    you would like to meet for lunch prior to that it

9    would have to be soon since I am out of town all

10   next week screening new engine builders.

11        CAPTOES:  That is perfect.

12        STRICDAD7:  Okay.  Great.  We will meet before

13   the group on Monday, then go back to the house from

14   there.

15        CAPTOES:  That is fine.  Think we will do

16   nicely together, Michael.

17        STRICDAD7:  I agree completely.  Charles, I

18   hate to run, but I need to make a few calls before I

19   leave here for the day.  It's been great talking

20   with you.

21        CAPTOES:  You, topo.  We will continue

22   tomorrow if you're available.

23        STRICDAD7:  I'll be here.

24        CAPTOES:  Great.  Believe our friendship may

25   well extend beyond the meetings, Michael.

1           STRICDAD7:  I think you are right.  Good

2       night, Charles."

3       <u>BY MS. KAISER:</u>

4       Q       Did you have any subsequent internet chats

5       with the defendant?

6       A       Yes.  The next instant message communication

7       was on July 9th of 2008.

8       Q       And who initiated that conversation?

9       A       I received an instant message from the

10      defendant at 3:34 PM.

11          MS. KAISER:  At this time I'd like to publish

12      Government's Exhibit Number 25.

13          "CAPTOES:  Good afternoon, Michael.

14          STRICDAD7:  Hello, Charles.  You changed your

15      font, I see.

16          CAPTOES:  This is my laptop.  The desktop

17      stopped working.  Now fixed so will attach it

18      tonight.

19          STRICDAD7:  I hate it when that happens.

20      That's the only problem with computers.  You put all

21      your data on there and the damn thing stops working.

22          CAPTOES:  I know.  At least I had this five

23      year old laptop.

24          STRICDAD7:  Laugh out loud.  Hey, if it made

25      it five years, it owes you nothing.

1        CAPTOES:  You are totally correct.  Looking

2   forward to the 21st.

3        STRICDAD7:  Same here.

4        CAPTOES:  Oiled my two razor strops and

5   Garrison belt this morning.

6        STRICDAD7:  Nice.  Getting them ready, huh?

7        CAPTOES:  Exactly.  They will find their mark

8   well.

9        STRICDAD7:  Will be a nice demonstration I'm

10  sure.

11       CAPTOES:  Will try my best.  It should work

12  well.  May be quite a few tears.

13       STRICDAD7:  Tears are indicator that things

14  are being done right.

15       CAPTOES:  I agree.  And maybe some yells, too.

16       STRICDAD7:  That's fine.  House is well

17  insulated.

18       CAPTOES:  Will it be at your house?

19       STRICDAD7:  Yes.

20       CAPTOES:  Nice.  If all goes well, I can host

21  along the way.

22       STRICDAD7:  That would be great.

23       CAPTOES:  Does everyone dress pretty casually?

24       STRICDAD7:  Yes, no dress code.  Personal

25  preferences are respected.

1          CAPTOES:  Fine.  Everyone wear clothes,

2     usually?

3          STRICDAD7:  To some degree.  It's whatever

4     your preference is.

5          CAPTOES:  Fine with me.

6          STRICDAD7:  Do you have a preference for

7     yourself?

8          CAPTOES:  Not really.  As the evening goes on

9     may well shed some.  What about you?

10          STRICDAD7:  Usually dress authoritative, but

11     will see.

12          CAPTOES:  Don't have many authoritative

13     clothes.  Can't get into my AF uniform.

14          STRICDAD7:  I normally wear black pants, black

15     shirt, black sport coat on some cases.

16          CAPTOES:  Have sports jacket, trousers, shirt

17     and tie.

18          STRICDAD7:  Wear whatever you're comfortable

19     in.  I may even go casual for this meeting.  Might

20     help you relax more if you're casual, as well.

21          CAPTOES:  Probably so.  Appreciate your

22     thoughtfulness.

23          STRICDAD7:  No problem.

24          CAPTOES:  Looking forward to getting the boys

25     later, too.

1          STRICDAD7:  I am sure.  I'm excited about

2     that, as well.

3          CAPTOES:  Good.  And with both of us there.

4     More "progress".

5          STRICDAD7:  Exactly.

6          CAPTOES:  Have been thinking about that a bit.

7          STRICDAD7:  Really?  Anything in particular

8     come to mind?

9          CAPTOES:  Well, trying to decide what they can

10    handle, Michael.

11         STRICDAD7:  They will be fine with whatever

12    you choose.

13         CAPTOES:  Need to see their size, of course.

14         STRICDAD7:  True.  Average size for their

15    ages.  Not small but not big.

16         CAPTOES:  Fine.  Am a fairly big guy.

17         STRICDAD7:  As am I.

18         CAPTOES:  That's good to hear.  Eager to see

19    you with your stepdaughter.

20         STRICDAD7:  Yes.  I've been so focused on the

21    boys I've neglected her.  It shows since she smarts

22    off every now and then.  That will surely be

23    corrected that night.

24         CAPTOES:  I am pleased to hear that.  That

25    type of behavior needs stringent correction.

1          STRICDAD7:  Yes, it does.  It is completely

2     unacceptable.

3          CAPTOES:  She may be a pretty sore girl and

4     have lots to think about.

5          STRICDAD7:  You're right.

6          CAPTOES:  You had said the boys have a fair

7     list of errors, too?

8          STRICDAD7:  Yes.  And it will surely grow by

9     the 21st.

10          CAPTOES:  Right.  The group's decision will be

11     well carried out.

12          STRICDAD7:  Of course.  I cannot wait to see

13     the razor strap you've talked about.  That is

14     definitely old school.

15          CAPTOES:  True.  And I am fairly old school

16     myself.  They can cover a lot of territory.

17          STRICDAD7:  I am sure.  Do you drink coffee?

18          CAPTOES:  Really only duca (ph), decaf or soda

19     water.

20          STRICDAD7:  Okay.  Just thinking of a place to

21     meet before we go to the house.  There are a couple

22     of coffee shops nearby.

23          CAPTOES:  That's perfect.  Can have decaf or a

24     soda.

25          STRICDAD7:  Great.  I first thought we could

1    meet at a restaurant, but too many distractions.

2    Would rather have place with less audience.

3        CAPTOES:  Afterwards, too, the two of us will

4    have time with the boys.

5        STRICDAD7:  Of course.

6        CAPTOES:  Agress at a coffee shop will be

7    fine.  Agree.

8        STRICDAD7:  I'll talk with you more before

9    then, anyway.  I'll be in a blue Dodge mini van,

10   just FYI.  Newer.

11       CAPTOES:  Oh, sure.  I will drive a silver

12   Lexus 2001.

13       STRICDAD7:  Very nice.  I used to use

14   Suburbans and Tahoes for the business.  But with gas

15   prices being what they are, had to find other styles

16   of vehicles for everyone.

17       CAPTOES:  I like the old Lexus.  Runs well

18   and uses reg gas as does my little '93 red truck.

19       STRICDAD7:  Everyone has to have a truck at

20   their disposal.  I have a full size truck for

21   hauling and towing.

22       CAPTOES:  Mine is five on the floor.  Would

23   enjoy a big truck some of the time.

24       STRICDAD7:  I need it from time to time.  Have

25   towed client's offshore racing boats for them when

1    they were in a pinch.

2         CAPTOES:  Then you need it.  My brother-in-law

3    uses his Volvo to tow his small boat for fishing.

4         STRICDAD7:  Laugh out loud.  That has to be a

5    sight.

6         CAPTOES:  It truly is.

7         STRICDAD7:  Charles, I'm going to run.  Need

8    to make a few calls before I call it a day.

9         CAPTOES:  Sure.  Talk soon.  You get back from

10   bus trip a week from Friday?

11        STRICDAD7:  Correct.  I will have my laptop so

12   will be able to stay in touch during the week, also.

13   I will be in meetings during the day but I'll be

14   online at night.  I'm hoping to land two very large

15   clients that are in the championship runnings next

16   week.  Would be very good for business.

17        CAPTOES:  I hope you are successful.

18        STRICDAD7:  Thank you.  We do very well now,

19   but these are top shelf clients that get word out to

20   all the people in the sport that matter.  Would

21   bring us into the championship rank level which is

22   limited to very few parts suppliers and

23   distributors.

24        CAPTOES:  That would be fantastic.

25        STRICDAD7:  Yes.  I'm excited.  Well, I'll

1      talk to you soon.

2            CAPTOES:  Very good.  Have a good evening.

3            STRICDAD7:  You, too.

4            CAPTOES:  Thanks."

5      BY MS. KAISER:

6      Q      In the beginning of the chat,

7      Corporal Romanosky, when the defendant stated,

8      looking forward to getting the boys later, too, at

9      3:53 PM, what did you understand he was referring

10     to?

11     A      I understood that to be the sexual abuse that

12     was going to take place following the physical

13     abuse.

14     Q      Did you have any other internet chats with the

15     defendant?

16     A      I next spoke the defendant on 7/14/08 at 9:07

17     PM.

18     Q      Who initiated that conversation?

19     A      I received an instant message from the

20     defendant at 9:07 PM.

21           MS. KAISER:  At this time I'd like to publish

22     Government's Exhibit Number 26.

23           THE COURT:  Yes, ma'am.

24           "CAPTOES:  Good evening, Michael.

25           STRICDAD7:  Hello, Charles.  How are you this

1    evening?

2         CAPTOES:  Not bad.  Thanks.  Fell and bruised

3    my leg.  Otherwise in good shape.

4         STRICDAD7:  I'm sorry to hear that.  Are you

5    okay?

6         CAPTOES:  Oh sure.  Wet tiles.

7         STRICDAD7:  That will do it.  Must be careful.

8         CAPTOES:  Have been cogitating about Monday

9    and have derciderd to wear dress shirt and tie and

10   gray trousers.  That is fairly authoritarian for me.

11        STRICDAD7:  That is fine.  Very good.

12        CAPTOES:  I think probably your black outfit

13   sounds great to me.

14        STRICDAD7:  Yes.  It is intimidating.

15        CAPTOES:  Which is good since the boys will

16   need some of that both during and after.

17        STRICDAD7:  Of course.

18        CAPTOES:  I will wear black socks and black

19   dress shoes.

20        STRICDAD7:  That will be great.

21        CAPTOES:  And look forward to meeting

22   everyone.

23        STRICDAD7:  As they are you.

24        CAPTOES:  I will re-mink oil the implements on

25   Saturday so they will be dry and ready.

1        STRICDAD7:  Very nice.  Prized possessions for

2    sure.

3        CAPTOES:  Oh, yes.  And they do a great job.

4    Do you know what you will use on your stepdaughter?

5        STRICDAD7:  A paddle.  Oak with a leather

6    wrapped handle.  Drilled for aerodynamics.

7        CAPTOES:  That is excellent.

8        STRICDAD7:  Glad you like.

9        CAPTOES:  I will probably bring four or five

10    things.

11        STRICDAD7:  Very cool.  I can't wait to see a

12    collection from such an experienced person.  What

13    else will you bring besides your razor strap and

14    Garrison belt?

15        CAPTOES:  A smaller heavy double belt with

16    holes, a second razor strop and a heavy German belt.

17        STRICDAD7:  Very nice.  All experienced

18    implements, I presume?

19        CAPTOES:  You are welcome to use any of these,

20    too.  Oh, I have used them many times and they don't

21    appear new at all.

22        STRICDAD7:  Very, very nice.  I am sure they

23    will still deliver their message.

24        CAPTOES:  Loud and clear.  This may be a

25    little different experience for the boys.

1          STRICDAD7:  How so?

2          CAPTOES:  Well, the razor strop is a heavy and

3     stungun implement made of seasoned leather.  The

4     Garrison is a heavy piece of leather.

5          STRICDAD7:  Yes, you're right.  They have

6     never had a razor strap before or other such effect

7     vintage implements.

8          CAPTOES:  They have done well for years and

9     are excellent reminders of things gone wrong.

10         STRICDAD7:  True.

11         CAPTOES:  You are welcome to borrow a razor

12    strop if you like.

13         STRICDAD7:  Why, thank you.  I may take you up

14    on that.  How many lashes do you intend to give each

15    boy?

16         CAPTOES:  I have to see them.  Could be 15 on

17    each cheek.  Is that appropriate, do you feel?  I

18    often go 20, 25.

19         STRICDAD7:  Of course.  I will trust your

20    judgment, or when they have had enough, if that is

21    what it takes.

22         CAPTOES:  Am sure 15 is appropriate and will

23    see how they react.

24         STRICDAD7:  Okay.

25         CAPTOES:  Older boys would get more, of

1      course.

2            STRICDAD7:  Of course.

3            CAPTOES:  As they grow we will increase.

4            STRICDAD7:  Of course.  What is your favorite

5      age for using the strap on boys?

6            CAPTOES:  From nine or 10 up.  I like to start

7      young with lessons.

8            STRICDAD7:  Very nice.

9            CAPTOES:  In the mid teens, really lay it on.

10           STRICDAD7:  Nice.  How about for sexual acts?

11           CAPTOES:  It really depends on the size of the

12     boys.  Always five to 10 to begin and often use a

13     switch, too, with the sexual.

14           STRICDAD7:  Five to 10 to begin sexual or use

15     the switch at five to 10?

16           CAPTOES:  No.  Start the sexual play and use a

17     combo of strop and switch to go forward.

18           STRICDAD7:  Very nice.  Kind of introduction

19     to both.

20           CAPTOES:  Yes.  Will strip both boys later on,

21     of course.

22           STRICDAD7:  You mean mine or just generally?

23           CAPTOES:  In general.

24           STRICDAD7:  Okay.  I understand.  I had

25     thought you said you wanted my boys stripped and

1    bound over a chair or couch for Monday.  I want to

2    make sure I don't misunderstand you.

3         CAPTOES:  That is true.  And want them to stay

4    that way for later, too, if okay with you.

5         STRICDAD7:  I am fine with that.  They are

6    yours for the night.  You do as you please.

7         CAPTOES:  Perfect.  And you will, of course,

8    join me.

9         STRICDAD7:  If you wish.  Or I will just watch

10   and enjoy.

11        CAPTOES:  Your call.  Either or both.

12        STRICDAD7:  Will see how things go.

13        CAPTOES:  Of course.

14        STRICDAD7:  Charles, I'm going to run.  I am

15   accompanying my perspective clients to a jazz club

16   in Orlando tonight.  I will be in touch later on

17   this week.

18        CAPTOES:  That's fine.  Enjoy.

19        STRICDAD7:  Thank you much.  Have a good

20   evening.

21        CAPTOES:  Thanks.  Look forward to our next.

22        STRICDAD7:  Same here."

23   BY MS. KAISER:

24   Q    Corporal Romanosky, when the defendant said in

25   that chat that he started sexual play and used a

1    combo of strop and switch to go forward, what did

2    you understand the defendant to mean?

3    A      I'm sorry, ma'am.  What time are you referring

4    to?

5    Q      At 9:35 PM.

6    A      I took that to mean that he began the sex play

7    using the implements.

8    Q      When was your next communication with the

9    defendant?

10   A      During the week I think it started on the 13th

11   or the 17th.  I was actually in Orlando, Florida for

12   an internet crimes against children training

13   conference.  So my next communication with the

14   defendant took place on the night of the 16th, and

15   that was a phone call that I placed to him.

16          MS. KAISER:  Your Honor, may I approach the

17   witness?

18          THE COURT:  Yes, ma'am.

19   BY MS. KAISER:

20   Q      Corporal Romanosky, I'm showing you a DVD

21   which has been premarked for identification as

22   Government's Exhibit Number 27.  Do you recognize

23   that disc?

24   A      Yes.  This is a digital recording of the

25   undercover phone call between myself and the

1       defendant that took place on the 16th.

2       Q       And have you listened to that recording?

3       A       I have.

4       Q       Does that recording truly and accurately

5       depict the phone conversation that you had with the

6       defendant on that date?

7       A       It does.

8       Q       And was your equipment in operational order?

9       A       Yes.  It was working fine.

10              MS. KAISER:  Your Honor, at this time I'd move

11      for admission of Government'S Exhibit Number 27 into

12      evidence.

13              THE COURT:  Any objection?

14              MR. TRAGOS:  No objection.

15              THE COURT:  27 is received.

16      (Whereupon, Government's Exhibit Number 27 is

17      received into evidence.)

18              MS. KAISER:  Your Honor, at this time I'd like

19      to publish Government's Exhibit Number 27.

20              THE COURT:  You may do so.  Do you need the

21      machine on?

22              MS. KAISER:  Yes.

23      (Recording playing)

24              CORPORAL ROMANOSKY:  Today's date is

25      Wednesday, July 16th, 2008.  The time is 2100 hours.

1     This is in reference to Pinellas County Sheriff's

2     Office Case Number SO08184046.  My name is Corporal

3     Kurt Romanosky with the Pinellas County Sheriff's

4     Office Crimes Against Children Unit.  I'm going to

5     be making a phone call to Charles Jackson

6     Friedlander at phone number 202-607-6666.  The

7     subject is known as the AOL user Captoes.  This call

8     is being made in preparation for a meeting on

9     Monday, July 21st.

10          THE DEFENDANT:  Hello.

11          CORPORAL ROMANOSKY:  Hello.  May I speak to

12    Charles, please.

13          THE DEFENDANT:  This is he.

14          CORPORAL ROMANOSKY:  How you doing, Charles?

15    This is Michael.

16          THE DEFENDANT:  That's what I thought.  How

17    are you?

18          CORPORAL ROMANOSKY:  I'm doing very well, sir.

19    I apologize for the hour, but it's been kind of a

20    (unintelligible).

21          THE DEFENDANT:  That's fine.  That is no

22    problem whatsoever.  Glad you called.

23          CORPORAL ROMANOSKY:  Yeah.  I'm fixing to --

24    I'm over here in Orlando.  I'm fixing to take my

25    prospective clients out here again and we're running

1    a little behind, so I figured I'd give you a call

2    before it got too much later.

3         THE DEFENDANT:  Oh, that's fine.  That's fine.

4    Well, the time is drawing nigh.

5         CORPORAL ROMANOSKY:  Yes, it is.  How are you

6    feeling?  I know you said you fell on that wet tile.

7         THE DEFENDANT:  I did.  And, well, it was pure

8    hell for about 48 hours.  It's still annoying but, I

9    mean, I'm walking and doing everything like that.

10   There is -- there is still a lot of redness and it

11   was a tearing of a muscle.

12        CORPORAL ROMANOSKY:  Wow.  Did you have to go

13   to the doctor?

14        THE DEFENDANT:  Well, I went to my internist

15   and I said I think I know what it is.  And he said,

16   yeah, that's exactly what it is.  And he said, do

17   you want me to give you pain medicine?  And I said,

18   no.

19        CORPORAL ROMANOSKY:  Yeah.

20        THE DEFENDANT:  I'm not taking any pain -- I

21   don't like that.  And so it seems to -- I wrapped it

22   in a Four Ace bandage.

23        CORPORAL ROMANOSKY:  Wow.  That's a good idea.

24        THE DEFENDANT:  And -- yeah.  And -- that was

25   my idea.  And putting some ice on it occasionally

1     and staying off it some.

2         CORPORAL ROMANOSKY:  Good for you.  I'm glad

3     you're feeling better.

4         THE DEFENDANT:  Yeah.  Oh, yeah.  It's much,

5     much better.  You know, it's truly now at the

6     annoying stage.  It doesn't impede me at all.

7         CORPORAL ROMANOSKY:  Right.  That's good.

8         THE DEFENDANT:  No, not a bit.

9         CORPORAL ROMANOSKY:  Can't have that.

10        THE DEFENDANT:  No.

11        CORPORAL ROMANOSKY:  How are you -- how are

12    you looking for Monday?  Things still in line for

13    you?

14        THE DEFENDANT:  Oh, absolutely.

15        CORPORAL ROMANOSKY:  Okay.

16        THE DEFENDANT:  Absolutely.

17        CORPORAL ROMANOSKY:  Very good.

18        THE DEFENDANT:  How is that with you, good?

19        CORPORAL ROMANOSKY:  Oh, that's fine.

20    Everything is set up.  I think what -- what I'm

21    actually going to have you do is I have a meeting

22    later in the afternoon.  It's actually going to be

23    down toward the south part of the county.  So it may

24    work out good.  I'll just have you meet me down

25    there and you can follow me back to the house from

1      there.  That way I don't have to worry about you

2      getting lost.

3              THE DEFENDANT:  Oh, no.  That's fine.

4      (Unintelligible).

5              CORPORAL ROMANOSKY:  The county we live in is

6      very -- all the streets -- there's numbered streets

7      but up where I live there's a lot of named streets.

8      Really, unless you know where you're going, it's

9      pretty easy to get turned around so --

10             THE DEFENDANT:  What county is that?

11             CORPORAL ROMANOSKY:  It's Pinellas County.

12             THE DEFENDANT:  (Unintelligible) in Pinellas.

13             CORPORAL ROMANOSKY:  I'm actually in Pinellas.

14     I work all over the place, but I live --

15             THE DEFENDANT:  Right.

16             CORPORAL ROMANOSKY:  -- in Pinellas so --

17             THE DEFENDANT:  No.  That's fine.

18             CORPORAL ROMANOSKY:  Are you familiar with --

19     are you familiar with Pinellas County at all?

20             THE DEFENDANT:  Somewhat, yes.

21             CORPORAL ROMANOSKY:  Okay.  Well, it's really

22     (unintelligible).  I was thinking the best place,

23     probably the easiest place to meet you because I'm

24     going to be down towards St. Petersburg anyway is

25     that you --

1          THE DEFENDANT:  Right.

2          CORPORAL ROMANOSKY:  You come over the Skyway?

3          THE DEFENDANT:  Yeah.  I like the Skyway

4     Bridge.

5          CORPORAL ROMANOSKY:  Yeah.  Me, too.  If you

6     come over the Skyway and you just bear right, stay

7     right, take 275 north towards Tampa.  It only

8     goes --

9          THE DEFENDANT:  Right.

10         CORPORAL ROMANOSKY:  -- one direction,

11    actually.  You can't get lost.  Just stay on 275.

12    You're going to be on --

13         THE DEFENDANT:  Right.

14         CORPORAL ROMANOSKY:  (Unintelligible) oh, God,

15    probably 10, 12 miles.

16         THE DEFENDANT:  Right.

17         CORPORAL ROMANOSKY:  It's up around exit 26, I

18    think it's 26A or B or something.  If you get off

19    there, there's a Cracker Barrel right there at that

20    exit.  Meet me at the Cracker Barrel.

21         THE DEFENDANT:  And it's 26A or B?

22         CORPORAL ROMANOSKY:  Yeah.

23         THE DEFENDANT:  Is that the north -- is that

24    on the north side of it more or south?

25         CORPORAL ROMANOSKY:  The north side of what?

1          THE DEFENDANT:  Do you know what I mean?  In

2     other words, do you get -- the numbers, what I

3     remember, once you cross the Skyway you get -- the

4     numbers go -- get smaller on the streets.

5          CORPORAL ROMANOSKY:  Well, actually -- yeah.

6     What's going to happen is as soon as you come over

7     the Skyway and you get off on 275, that's exactly

8     what's going to happen.

9          THE DEFENDANT:  Yeah.

10          CORPORAL ROMANOSKY:  You're right.  You're

11     going to see like 54th Avenue South and --

12          THE DEFENDANT:  Correct.

13          CORPORAL ROMANOSKY:  (Unintelligible) and

14     you'll get 22nd Avenue South.  And then it's going

15     to start going back up.  You'll start getting 5th

16     Avenue North, 26 South.

17          THE DEFENDANT:  Right.

18          CORPORAL ROMANOSKY:  Where you're going to get

19     off is 54th Avenue North.

20          THE DEFENDANT:  Oh, okay.  I know where

21     it's -- (unintelligible).

22          CORPORAL ROMANOSKY:  It's about 10 or 12 miles

23     north of the Skyway toll plaza.

24          THE DEFENDANT:  Right.

25          CORPORAL ROMANOSKY:  Yeah.  You can't miss it.

1          THE DEFENDANT:  Especially 4th Avenue.

2          CORPORAL ROMANOSKY:  Yeah.

3          THE DEFENDANT:  I know where that is.  And

4     there's a Cracker Barrel.

5          CORPORAL ROMANOSKY:  There's a Cracker Barrel,

6     yeah.  There's like a hotel there, a Cracker Barrel.

7     I've had a few of my out-of-town clients stay there

8     before because it was close to zip back over the

9     Skyway to go to the -- some of the boat events so --

10          THE DEFENDANT:  Right.

11          CORPORAL ROMANOSKY:  The Cracker Barrel is

12     like right next to a -- I think it's a Holiday Inn

13     or -- is it a Holiday Inn?

14          THE DEFENDANT:  That's fine.

15          CORPORAL ROMANOSKY:  Yeah.  So just meet me in

16     that parking lot there.  I'll park like in the back

17     parking lot.  I'm in a blue van.

18          THE DEFENDANT:  Well, I'm going to be in a

19     silver Lexus.

20          CORPORAL ROMANOSKY:  Oh, very nice.

21          THE DEFENDANT:  It's an old one.

22          CORPORAL ROMANOSKY:  Still.

23          THE DEFENDANT:  (Unintelligible).  It's, let

24     me see, seven years old.

25          CORPORAL ROMANOSKY:  I'm sure it's been well

1      cared for.

2          THE DEFENDANT:  Well, except one little part

3      when I was at a hospital meeting and it was very

4      hard to get out so there's a little mess, not much,

5      on the front.

6          CORPORAL ROMANOSKY:  Uh-huh.

7          THE DEFENDANT:  But I've only got about 40,000

8      miles on it.

9          CORPORAL ROMANOSKY:  That's fantastic.

10         THE DEFENDANT:  So it's, you know, I mean, I

11     have 180 on the truck, but --

12         CORPORAL ROMANOSKY:  You have 180,000 miles on

13     your truck?

14         THE DEFENDANT:  Yes.

15         CORPORAL ROMANOSKY:  Wow.  They don't even

16     make cars that will do 180,000 anymore.

17         THE DEFENDANT:  Yeah.  Mine is a 1993.

18         CORPORAL ROMANOSKY:  Yeah.  I think now they

19     make 'em so you've got to buy a new one after about

20     100,000.

21         THE DEFENDANT:  Oh, really.  No.  Mine is a

22     Mazda.  It's an extended cab, but not much.  And

23     it's just a little four cylinder thing.

24         CORPORAL ROMANOSKY:  Yeah.  Well, you know, we

25     used to use -- I told you before, we used to use

1    Suburbans and Tahoes for our business.

2         THE DEFENDANT:  Right.

3         CORPORAL ROMANOSKY:  You know, we deal with

4    some pretty high end clientele.  And you want to

5    have a really nice vehicle and all that.  But to be

6    honest with you, I mean, I have some of my salesmen

7    who travel all over the state, you know, going to

8    meet clients and everything.  I can't afford the gas

9    in these things (unintelligible).

10        THE DEFENDANT:  It's terrible.  It's crazy.

11        CORPORAL ROMANOSKY:  Yeah.  These things are

12   getting 10, 12 miles to the gallon.  And, yeah, they

13   may look nice but they're ridiculous.  So I went out

14   and I bought small SUVs.  I bought myself a van

15   because I haul some equipment every now and then if

16   it's -- in a pinch, so --

17        THE DEFENDANT:  (Unintelligible).

18        CORPORAL ROMANOSKY:  I bought myself a nice

19   little mini van so --

20        THE DEFENDANT:  Whatever -- whatever works.

21   We're talking about the Lexus -- what do you call

22   it, it's a SUV but it's a small one.  They call it a

23   crossover or something.

24        CORPORAL ROMANOSKY:  Oh, yeah.

25        THE DEFENDANT:  But, you know, I

1    (unintelligible) to pay 50 grand for that.  That was

2    nuts because I wouldn't need it.

3         CORPORAL ROMANOSKY:  Yeah.  Yeah.

4         THE DEFENDANT:  (Unintelligible) and, you

5    know, it's -- for me, you know, the Lexus is fine.

6    It works well.  And I've had one now for 11 years.

7         CORPORAL ROMANOSKY:  Wow.

8         THE DEFENDANT:  And like it.  I used to drive

9    a Mercedes but it got too crazy for me so -- it was

10   a diesel and I used to like it when I lived abroad,

11   but (unintelligible).  It would really choke me, you

12   know.

13        CORPORAL ROMANOSKY:  Oh, yeah.

14        THE DEFENDANT:  (Unintelligible).

15        CORPORAL ROMANOSKY:  I tell you, I hope I have

16   as much skip in my step as you do at 70.  You sound

17   very chipper.

18        THE DEFENDANT:  Yeah.  I -- well, I'm in

19   pretty good shape.

20        CORPORAL ROMANOSKY:  Uh-huh.

21        THE DEFENDANT:  At least I feel so, let's put

22   it that way.  You know, I -- I swim every day.

23        CORPORAL ROMANOSKY:  Good for you.

24        THE DEFENDANT:  I try to if the weather isn't

25   bad.

1          CORPORAL ROMANOSKY:  Um-hum.

2          THE DEFENDANT:  And, you know, and I am, you

3     know, fairly strong, I believe.

4          CORPORAL ROMANOSKY:  Outstanding.

5          THE DEFENDANT:  You know.  Only time will

6     tell.

7          CORPORAL ROMANOSKY:  Yes.  Very much so.

8          THE DEFENDANT:  Do the boys know that a

9     different person is going to be around?

10         CORPORAL ROMANOSKY:  Oh, yeah.  Yeah.

11         THE DEFENDANT:  Right.

12         CORPORAL ROMANOSKY:  Well, I mean, they're

13     kind of used to the setup that we have things set

14     up.  They're, you know --

15         THE DEFENDANT:  Right.

16         CORPORAL ROMANOSKY:  It doesn't happen very

17     often but occasionally somebody new will come in,

18     you know, so they're --

19         THE DEFENDANT:  Right.

20         CORPORAL ROMANOSKY:  -- very used to seeing an

21     occasional new face.  And to be honest with you,

22     it's not up to them.

23         THE DEFENDANT:  No, of course not.

24         CORPORAL ROMANOSKY:  You know.

25         THE DEFENDANT:  Of course not.  No.  Uh-uh.

1    Certainly not.  So -- so let me ask you a question.

2    Will we each ourselves try to get a

3    (unintelligible)?

4         CORPORAL ROMANOSKY:  However you want to do

5    it.

6         THE DEFENDANT:  Right.

7         CORPORAL ROMANOSKY:  I mean, obviously, they

8    can't -- they won't do it themselves but, you know,

9    we can --

10        THE DEFENDANT:  No, no.  Right.

11        CORPORAL ROMANOSKY:  We can do that.

12        THE DEFENDANT:  Yeah.  Because I think that

13   really is going to have to -- I think it was a good

14   suggestion of yours, actually.

15        CORPORAL ROMANOSKY:  Well, that's what I

16   wanted to ask you, to be honest.  It's kind of hard

17   to -- as you know, it's -- when you talk to somebody

18   online, you've got to be careful who you're speaking

19   to because of the subject matter.

20        THE DEFENDANT:  Oh, yeah.  I know you're --

21   right.  I would have called you but I didn't want to

22   do that.

23        CORPORAL ROMANOSKY:  I'm sorry?

24        THE DEFENDANT:  I said I would have called you

25   but I know this is your wife's -- your wife's cell

1     phone (unintelligible).

2          CORPORAL ROMANOSKY:  Her phone gets better

3     reception than mine.  Mine is kind of not really

4     working real well.  I tell you, this Orlando -- I

5     think Disney, you know, controls the air waves over

6     here because --

7          THE DEFENDANT:  (Unintelligible) really.

8          CORPORAL ROMANOSKY:  I have been dropping

9     calls and -- like crazy.  I think they want you to

10    use their phones so they can charge you.

11         THE DEFENDANT:  I'm sure.  I'm sure.

12         CORPORAL ROMANOSKY:  So it's almost comical.

13    So if I lose you, I'll have to call you back because

14    I've already dropped (unintelligible).

15         THE DEFENDANT:  Oh, don't worry about it.  Oh,

16    no, don't worry.  Probably be -- (unintelligible).

17         CORPORAL ROMANOSKY:  I was trying to just get

18    an idea of, you know, how you did things and what

19    you might be wanting to -- wanting to do or see or

20    what.

21         THE DEFENDANT:  Right.  Do I sound like what

22    you thought I would (unintelligible) or what?

23         CORPORAL ROMANOSKY:  What's that, now?

24         THE DEFENDANT:  I said, do I sound like

25    someone you thought I would or what?  I don't know.

1          CORPORAL ROMANOSKY:  Yeah.  Yeah.  Absolutely.

2          THE DEFENDANT:  Good.  Good.

3          CORPORAL ROMANOSKY:  You definitely have a

4    chipper voice.  I hope I'm --

5          THE DEFENDANT:  Oh, yeah.

6          CORPORAL ROMANOSKY:  I can pull that off at 70

7    so --

8          THE DEFENDANT:  Oh, yeah, yeah.  People tell

9    me that I -- but I don't give a damn, by the way,

10   anyway -- that I don't look 70.  But I don't do any

11   (unintelligible), you know.

12         CORPORAL ROMANOSKY:  Uh-huh.

13         THE DEFENDANT:  To do anything much.  My hair

14   is white.

15         CORPORAL ROMANOSKY:  You just have the gift of

16   longevity in your genes.

17         THE DEFENDANT:  Well, my dad died two years

18   ago at 102.

19         CORPORAL ROMANOSKY:  Are you serious?  Wow.

20         THE DEFENDANT:  Yeah.  And he was an

21   alcoholic.

22         CORPORAL ROMANOSKY:  No kidding.

23         THE DEFENDANT:  So you never know, you know.

24   No.  Uh-uh.  No.  So it's, you know, fine for me

25   anyway.

1             CORPORAL ROMANOSKY:  Outstanding.

2             THE DEFENDANT:  I do pretty well.

3             CORPORAL ROMANOSKY:  Yeah, sounds like it.

4             THE DEFENDANT:  Oh, yeah.  Oh, yeah.  And, you

5        know, I'm looking to get to know everybody anyway so

6        it makes it easier.

7             CORPORAL ROMANOSKY:  Of course.  Absolutely.

8             THE DEFENDANT:  You know.  And so -- and, you

9        know, you can get to know the boys as people, too.

10            CORPORAL ROMANOSKY:  Uh-huh.

11            THE DEFENDANT:  You know.

12            CORPORAL ROMANOSKY:  Well, that will develop,

13       you know, as time goes.  They'll get --

14            THE DEFENDANT:  Oh, sure.  Absolutely.

15            CORPORAL ROMANOSKY:  I'm sure their first

16       impression of you, they probably won't be very

17       happy.  But again, like I said, that's not -- that's

18       their problem, not ours.

19            THE DEFENDANT:  Right.  Right.  I mean, you

20       know, I'm just very direct.

21            CORPORAL ROMANOSKY:  Uh-huh.

22            THE DEFENDANT:  And definite.  And --

23            CORPORAL ROMANOSKY:  Absolutely.

24            THE DEFENDANT:  But I'm sure you are, too.

25            CORPORAL ROMANOSKY:  Of course.

1          THE DEFENDANT:  Yeah.  So, you know, it's --

2     (unintelligible) with your stepdaughter.

3          CORPORAL ROMANOSKY:  Yes.  Like I told you

4     before, she's been a -- she's been slipping a little

5     bit because I haven't been giving her as much

6     attention as I used to, you know.  She gets a little

7     bit older in her teens and some of that's starting

8     to go.

9          THE DEFENDANT:  Right.

10         CORPORAL ROMANOSKY:  So we're going to have to

11    bring that back around.

12         THE DEFENDANT:  Right.  I think that will

13    work.

14         CORPORAL ROMANOSKY:  Yes.

15         THE DEFENDANT:  The idea, anyway, for sure.

16    And the boys probably are pretty good, anyway.

17         CORPORAL ROMANOSKY:  Well, yeah.  I mean,

18    they're still -- they're still boys, I mean.

19         THE DEFENDANT:  Oh, yeah.

20         CORPORAL ROMANOSKY:  When I'm home there with

21    them and everything, things are a little bit, you

22    know, they're a little better in line.  But

23    obviously when they're with their mom, she's tough

24    but not as tough and, you know, so every once in a

25    while I get a bad report or something like that and

1     it's something you have to handle.

2          THE DEFENDANT:  Right.  Oh, that's true.

3     That's true.  And I'm sure you do.

4          CORPORAL ROMANOSKY:  Uh-huh.  Of course.

5          THE DEFENDANT:  Yeah.  And, no, I think it

6     will be -- it will be -- work well.

7          CORPORAL ROMANOSKY:  Uh-huh.

8          THE DEFENDANT:  And then afterwards, you know,

9     we'll see how everything goes.

10         CORPORAL ROMANOSKY:  Absolutely.

11         THE DEFENDANT:  You know.  So, you know,

12    it's -- it will be good for me to see, you know,

13    what -- how big they are, how little they are, you

14    know.  It's just -- you never know.

15         CORPORAL ROMANOSKY:  Yeah.  I mean --

16         THE DEFENDANT:  (Unintelligible) yeah.

17         CORPORAL ROMANOSKY:  They're average size.

18    They're not -- I don't, you know, I guess you could

19    say my stock, you know, there's no little scrawny

20    kids.  That's for sure.  They're not real big but --

21         THE DEFENDANT:  Right.

22         CORPORAL ROMANOSKY:  They're average.

23         THE DEFENDANT:  Right.  No.  That's fine.

24    That's fine, you know.  And yeah.  We'll see how

25    they are going to react to everything.

1           CORPORAL ROMANOSKY:  Uh-huh.

2           THE DEFENDANT:  You know, see what -- what

3    will go on later.

4           CORPORAL ROMANOSKY:  Of course.

5           THE DEFENDANT:  You know.

6           CORPORAL ROMANOSKY:  Of course.  Like I said,

7    it's whatever, you know, they -- they have been down

8    the road so it's whatever you're comfortable with,

9    you know.  I want you to have an enjoyable time, I

10   want you to -- whatever you -- however you want to

11   push things or however you want to take things, to

12   that extent that's, you know, kind of throw that in

13   your arena.  They're yours for the evening.

14          THE DEFENDANT:  Right.

15          CORPORAL ROMANOSKY:  So you do whatever you

16   feel comfortable doing.

17          THE DEFENDANT:  Oh, sure.  Oh, yeah.  And I'll

18   see how they react, also.

19          CORPORAL ROMANOSKY:  Right.

20          THE DEFENDANT:  You know, because it's a

21   little different --

22          CORPORAL ROMANOSKY:  Uh-huh.

23          THE DEFENDANT:  -- than you, you know.

24          CORPORAL ROMANOSKY:  Oh, absolutely.

25          THE DEFENDANT:  And, you know.

1          CORPORAL ROMANOSKY:  I mean, I could be honest

2     with you, they probably will be a little surprised

3     if you use the crop thing like you were talking

4     about.

5          THE DEFENDANT:  Right.

6          CORPORAL ROMANOSKY:  That will probably be a

7     little bit of a surprise but, you know, hey.

8          THE DEFENDANT:  Right.  Well, I'm sure they'll

9     be able to handle that.

10          CORPORAL ROMANOSKY:  Uh-huh.

11          THE DEFENDANT:  You know.  Yes, it will be a

12     little bit of a surprise.

13          CORPORAL ROMANOSKY:  Right.

14          THE DEFENDANT:  As will the razor strop,

15     probably.

16          CORPORAL ROMANOSKY:  Yes.  Well, I mean, like

17     I say, we just have the simple ground rules that we

18     spoke of.

19          THE DEFENDANT:  Oh, yeah.  Well, I --

20     (unintelligible).

21          CORPORAL ROMANOSKY:  You know, I think you

22     were -- you were looking at -- what were you going

23     to keep it as far as, you know, the number of times?

24     You were talking what, 15 or something each cheek?

25          THE DEFENDANT:  15.  Yes.  Yes.

1        CORPORAL ROMANOSKY:  If things are going --

2   (unintelligible) you have to go more, that's

3   probably acceptable, as well.

4        THE DEFENDANT:  Right.  Yeah.  Not -- not that

5   much but just see how their reactions are, too.

6        CORPORAL ROMANOSKY:  A razor strap isn't

7   something that I've ever utilized with them so much.

8   I mean, what kind of -- what kind of marks or

9   injuries does it leave?

10        THE DEFENDANT:  There are no -- no.  There are

11   no injuries.

12        CORPORAL ROMANOSKY:  Okay.

13        THE DEFENDANT:  That's the one thing with --

14   with it.

15        CORPORAL ROMANOSKY:  Uh-huh.

16        THE DEFENDANT:  No.  There could be injuries

17   with wood.

18        CORPORAL ROMANOSKY:  Right.

19        THE DEFENDANT:  But you have to be really --

20   injuries with leather, it's supple.

21        CORPORAL ROMANOSKY:  Right.

22        THE DEFENDANT:  And that's why I have them so

23   well oiled.

24        CORPORAL ROMANOSKY:  Okay.

25        THE DEFENDANT:  With mink oil.  Yeah.  Because

1    it keeps them -- I don't want to say soft, but soft

2    to a point, you know.  And, no, there will be no

3    injuries (unintelligible) anyway, no.  There can be

4    small welts.

5         CORPORAL ROMANOSKY:  Okay.

6         THE DEFENDANT:  Which could last about two

7    days, maybe.

8         CORPORAL ROMANOSKY:  Okay.  That's fine.

9    How --

10        THE DEFENDANT:  Yeah.

11        CORPORAL ROMANOSKY:  When you say small welts,

12   how -- what kind of -- what's small?

13        THE DEFENDANT:  Well, I mean, you know, it

14   depends on each person's skin.

15        CORPORAL ROMANOSKY:  Right.

16        THE DEFENDANT:  But oh, probably maybe the

17   size -- a little bigger than a silver dollar.

18        CORPORAL ROMANOSKY:  Okay.

19        THE DEFENDANT:  You know, not huge things at

20   all.

21        CORPORAL ROMANOSKY:  Right.

22        THE DEFENDANT:  They will be red.

23        CORPORAL ROMANOSKY:  Okay.

24        THE DEFENDANT:  Oh, yeah.  For that there's no

25   question about.

1          CORPORAL ROMANOSKY:  Okay.

2          THE DEFENDANT:  And it will sting.

3          CORPORAL ROMANOSKY:  Uh-huh.

4          THE DEFENDANT:  And it will hurt.

5          CORPORAL ROMANOSKY:  Uh-huh.  Okay.

6          THE DEFENDANT:  But it's not a lasting sting.

7          CORPORAL ROMANOSKY:  Good.

8          THE DEFENDANT:  You know.  And the crop gives

9     them a little bit more sting.

10          CORPORAL ROMANOSKY:  Right.

11          THE DEFENDANT:  But no weight, really.

12          CORPORAL ROMANOSKY:  Right.

13          THE DEFENDANT:  No.  It just -- you know, it

14     -- it depends on how their skin reacts.

15          CORPORAL ROMANOSKY:  Okay.

16          THE DEFENDANT:  You know.  One is 10 and one

17     is 11?

18          CORPORAL ROMANOSKY:  Yes.

19          THE DEFENDANT:  How old are -- yeah.

20          CORPORAL ROMANOSKY:  Ten and 11.

21          THE DEFENDANT:  Okay.  Right.

22          CORPORAL ROMANOSKY:  They're actually about 14

23     months apart.  But one is 10, one is 11 right now.

24     My stepdaughter --

25          THE DEFENDANT:  Right.

1          CORPORAL ROMANOSKY:  She's -- she'll be 15

2     here coming up so 14 now so --

3          THE DEFENDANT:  Oh, my.

4          CORPORAL ROMANOSKY:  Yeah.  Rough age.

5          THE DEFENDANT:  Well, it can be --

6          CORPORAL ROMANOSKY:  Girls are definitely

7     different than boys.

8          THE DEFENDANT:  Oh, completely.  I mean, I

9     have friends who have girls and it's a completely

10    different thing.

11         CORPORAL ROMANOSKY:  Right.

12         THE DEFENDANT:  And I've never raised a girl

13    so I would have no idea.

14         CORPORAL ROMANOSKY:  Right.

15         THE DEFENDANT:  You know.  And I know how I

16    always act and boys adjust to it.

17         CORPORAL ROMANOSKY:  Right.

18         THE DEFENDANT:  A girl, you know, I just have

19    absolutely no idea.

20         CORPORAL ROMANOSKY:  Well, you know, to be

21    honest with you, maybe you can, you know, understand

22    me saying that what I -- my experience, I mean,

23    obviously is much more limited than yours.  But I

24    found that people usually have a preference, as

25    well, too, so --

1          THE DEFENDANT:  Well, I think my thought is

2     that I have a preference because certainly I know

3     what -- you know, I have experience with --

4          CORPORAL ROMANOSKY:  Right.

5          THE DEFENDANT:  -- much more with boys than

6     with girls.  A little bit with girls but really

7     extremely little.

8          CORPORAL ROMANOSKY:  Uh-huh.

9          THE DEFENDANT:  And, you know, I don't quite

10     understand what makes them tick totally, either.

11          CORPORAL ROMANOSKY:  Right.

12          THE DEFENDANT:  I know -- I know what makes a

13     boy tick.  Whether I like it or not at the time is

14     another point.

15          CORPORAL ROMANOSKY:  Ha, ha, ha, ha.

16          THE DEFENDANT:  But, you know, even with my

17     own son, I put up with nothing.

18          CORPORAL ROMANOSKY:  Uh-huh.

19          THE DEFENDANT:  Absolutely nothing.  You know,

20     I just think that if you let them go haywire --

21          CORPORAL ROMANOSKY:  Uh-huh.

22          THE DEFENDANT:  -- it can be terr -- it can be

23     hell.

24          CORPORAL ROMANOSKY:  Right.

25          THE DEFENDANT:  And as far as I'm concerned,

1    that was not permissible.

2          CORPORAL ROMANOSKY:  Right.

3          THE DEFENDANT:  And it was fine, you know.  I

4    mean, there were problems.  We had some traumas, of

5    course, when he borrowed the car when I didn't know

6    it.

7          CORPORAL ROMANOSKY:  Oh, boy.

8          THE DEFENDANT:  Oh, you can't imagine.  Oh.  I

9    think he may be sore after 20 years.  Really, it was

10    inexcusable.  I mean, I wouldn't have that.

11          CORPORAL ROMANOSKY:  Sure.

12          THE DEFENDANT:  We had certain rules.  We had

13    curfew times and we had, you know, everything else.

14    He had to ask permission for everything.

15          CORPORAL ROMANOSKY:  Uh-huh.

16          THE DEFENDANT:  That he did.  And he was

17    usually very good about it.

18          CORPORAL ROMANOSKY:  Right.

19          THE DEFENDANT:  But sometimes --

20          CORPORAL ROMANOSKY:  Well, the boys have a

21    tendency -- the boys have a tendency -- boys will be

22    boys, you know.  They have a tendency --

23          THE DEFENDANT:  Right.

24          CORPORAL ROMANOSKY:  They behave.  I run a

25    pretty structured household.

1           THE DEFENDANT:  Yeah.

2           CORPORAL ROMANOSKY:  And they behave for the

3    most part.  But every once in a while manners will

4    slip up or, you know, there'll be minor infractions

5    that need to be dealt with.  So it's just, you know,

6    today's, you know, day.  And society today doesn't

7    look at -- they kind of frown upon what we do,

8    unfortunately, you know, especially what we're

9    talking about here.  Some people would say, you

10   know, it's mentally legal but wrong.  But, you know,

11   that's -- that's their opinion, not ours.

12          THE DEFENDANT:  Right.  Right.  And it's been

13   done for years.

14          CORPORAL ROMANOSKY:  I agree.

15          THE DEFENDANT:  And everybody has survived.

16          CORPORAL ROMANOSKY:  Uh-huh.

17          THE DEFENDANT:  And I think better.

18          CORPORAL ROMANOSKY:  Right.

19          THE DEFENDANT:  You know, because I -- you

20   know, with my son it was always, yes, sir, no, sir.

21          CORPORAL ROMANOSKY:  Uh-huh.

22          THE DEFENDANT:  But never anything else.

23          CORPORAL ROMANOSKY:  Right.

24          THE DEFENDANT:  Now, whether everybody else

25   does that or not, that's up to them.

1          CORPORAL ROMANOSKY:  Uh-huh.

2          THE DEFENDANT:  But I felt that I -- I was

3     very, very structured with respect, integrity and

4     obedience.

5          CORPORAL ROMANOSKY:  Uh-huh.

6          THE DEFENDANT:  That was it, I mean, you know,

7     without delineating everything.  And he really was.

8     He would slip.  Oh, yeah, sure.  But, you know,

9     there were consequences.

10          CORPORAL ROMANOSKY:  Of course.

11          THE DEFENDANT:  And he knew it.  There was

12     never anything secret about anything.  And, you

13     know, and so I still won't put up with things.

14          CORPORAL ROMANOSKY:  Uh-huh.

15          THE DEFENDANT:  From him (unintelligible).

16          CORPORAL ROMANOSKY:  How old is he now?

17          THE DEFENDANT:  He was just 39.

18          CORPORAL ROMANOSKY:  Wow.  I bet the respect

19     factor is still there, though, isn't it.

20          THE DEFENDANT:  Oh, absolutely.  Absolutely.

21     And he felt it about two years ago, I think it was

22     about two years ago, I'm losing my time, when he

23     told me a bold face lie.

24          CORPORAL ROMANOSKY:  Uh-huh.

25          THE DEFENDANT:  Now, that he can't do at any

1      time.

2              CORPORAL ROMANOSKY:  Uh-huh.

3              THE DEFENDANT:  And I told him, I said, you

4      know, you have crossed the line, young man.

5              CORPORAL ROMANOSKY:  Uh-huh.

6              THE DEFENDANT:  And I don't care whether you

7      live under my roof or not.  Anytime you are around

8      me, rules are there.

9              CORPORAL ROMANOSKY:  Uh-huh.

10             THE DEFENDANT:  And I used the razor strap at

11     39.

12             CORPORAL ROMANOSKY:  (Unintelligible).

13             THE DEFENDANT:  Well, I mean, I just was not

14     going to have this.

15             CORPORAL ROMANOSKY:  Uh-huh.

16             THE DEFENDANT:  You know.  And he told me

17     something kidding or something like that.  That's a

18     different story.  But this was an absolute bold face

19     lie.

20             CORPORAL ROMANOSKY:  Uh-huh.

21             THE DEFENDANT:  And I just wouldn't.  And he

22     got a hundred.

23             CORPORAL ROMANOSKY:  Wow.

24             THE DEFENDANT:  50 on each cheek.

25             CORPORAL ROMANOSKY:  Uh-huh.

1          THE DEFENDANT:  And the next day he came to me

2     and he said, you know, I have to tell you this.  I

3     don't want to but I -- I said, oh, what?  And he

4     said, I deserved it.

5          CORPORAL ROMANOSKY:  Uh-huh.

6          THE DEFENDANT:  I said, you really did.  And

7     he said, I can tell you one thing.  I said, what's

8     that?  He said, never again.  I said, okay.  That's

9     fine.  And it's finished.

10         CORPORAL ROMANOSKY:  Uh-huh.

11         THE DEFENDANT:  I'm not bringing it up and

12    (unintelligible) hashing over something.

13         CORPORAL ROMANOSKY:  Right.

14         THE DEFENDANT:  It's done.  I'm not going to

15    bring it up to you and -- but, you know, that's the

16    way it is.  But I will not put up with that, as you

17    know.  So, you know, he -- he understood it.  And I

18    think that one of the problems with kids today is,

19    you know, that when they think they're 18 and get

20    older.

21         CORPORAL ROMANOSKY:  Uh-huh.

22         THE DEFENDANT:  And don't deserve anything

23    like this.  That's too bad.

24         CORPORAL ROMANOSKY:  Right.

25         THE DEFENDANT:  As far as I'm concerned, it

1        continues appropriately.

2              CORPORAL ROMANOSKY:  Sure.

3              THE DEFENDANT:  You know.  You know, have your

4        boys had much sexual experience or what?

5              CORPORAL ROMANOSKY:  Yes.  With -- I started

6        with them probably around eight.

7              THE DEFENDANT:  Okay.

8              CORPORAL ROMANOSKY:  They've -- they've had

9        some experience.  They should be fine.

10             THE DEFENDANT:  Okay.

11             CORPORAL ROMANOSKY:  The crop -- like I said,

12       the crop thing may surprise them a little bit but,

13       you know, that's -- they'll adapt.  But, yeah, they

14       should be fine.  What -- was there anything sexual

15       you were looking to do?

16             THE DEFENDANT:  I wasn't sure.

17             CORPORAL ROMANOSKY:  Uh-huh.

18             THE DEFENDANT:  Because I -- you know, I don't

19       know them.  You know, absolutely no idea.  You know.

20       You mean with the sexual thing?

21             CORPORAL ROMANOSKY:  Yes.

22             THE DEFENDANT:  Yeah.  Well, I presume oral.

23             CORPORAL ROMANOSKY:  Okay.  Yeah.  That --

24       that -- that won't be a problem.

25             THE DEFENDANT:  Right.  And I didn't know what

1     other experiences they've had.

2             CORPORAL ROMANOSKY:  Mainly --

3             THE DEFENDANT:  (Unintelligible).

4             THE COURT:  This goes on for a bit longer;

5     does it not?

6             MS. KAISER:  Yes, Your Honor.

7             THE COURT:  We'll take our lunch break at this

8     time.  Return at 1:15 by the courtroom clock.

9             COURTROOM SECURITY OFFICER:  All rise.

10    (Jury out at 12:14 PM.)

11            THE COURT:  We're in recess.

12    (Recess was taken at 12:15 until 1:21 PM.)

13    (Back on the record.)

14            COURTROOM SECURITY OFFICER:  All rise.  This

15    Honorable Court is again in session.  Be seated,

16    please.

17            THE COURT:  Bring the jury in, please.

18            COURTROOM SECURITY OFFICER:  Rise for the

19    jury.

20    (Jury in at 1:22 PM.)

21            THE COURT:  Thank you and be seated.  You may

22    resume the publishing of Exhibit 27.

23            MS. KAISER:  Thank you.

24    BY MS. KAISER:

25    Q       Before we start again, Detective, can you

1   please tell the jury when the defendant said -- when

2   you asked the defendant what he wanted to do with

3   the children on the phone call and he said, I

4   presume oral, what did you understand that to mean?

5   A     Oral sex.

6   Q     Okay.

7   (Recording playing.)

8         CORPORAL ROMANOSKY:  Well, mainly the oral,

9   for sure, handling, things like that.

10        THE DEFENDANT:  Right.

11        CORPORAL ROMANOSKY:  I don't know that I would

12  push the threshold with any kind of, you know,

13  insertion of anything.

14        THE DEFENDANT:  No.

15        CORPORAL ROMANOSKY:  At this point.

16        THE DEFENDANT:  No.  I don't think so.

17        CORPORAL ROMANOSKY:  The other things are

18  fine.  I mean, I'll leave that to your discretion,

19  whichever you --

20        THE DEFENDANT:  Right, right.

21  BY MS. KAISER:

22  Q     Okay.  Detective, at this point, just to

23  refresh the jury's memory before we left off,

24  what are you and the defendant discussing at this

25  point in the conversation?

1          MR. TRAGOS:  Objection, Your Honor.  The tape

2     is explanatory.

3          THE COURT:  Sustained.  Rely on the tape.

4          "CORPORAL ROMANOSKY:  Whichever you want to

5     do.  Were you wanting to do things with both boys or

6     just the older or younger or --

7          THE DEFENDANT:  Well, you know, I was

8     wondering.  Do you have any thoughts about that?

9     Since I don't know either of them, you know --

10         CORPORAL ROMANOSKY:  Well, they're both about

11    the same age.

12         THE DEFENDANT:  Right.

13         CORPORAL ROMANOSKY:  The -- one is a little

14    more outgoing, the older one is a little more

15    outgoing than the younger one but, you know, again,

16    I look at it this way.  These lessons or these

17    sessions are not -- you know, it's not about what

18    they want.  It's about what you know has to be done.

19         THE DEFENDANT:  What I want.  Oh, yeah.

20         CORPORAL ROMANOSKY:  Absolutely.  And I want

21    to make sure that, you know -- I know you know that.

22         THE DEFENDANT:  Oh, sure.

23         CORPORAL ROMANOSKY:  And then we'll make sure

24    they understand that.

25         THE DEFENDANT:  Sure.  Yeah.  I mean -- and

1     I'm sure you've at least introduced them to things,

2     anyway.

3            CORPORAL ROMANOSKY:  Oh, of course.  Yeah.

4            THE DEFENDANT:  Yeah.

5            CORPORAL ROMANOSKY:  We started about eight

6     years old.

7            THE DEFENDANT:  Yeah.

8            CORPORAL ROMANOSKY:  When we started that

9     so --

10            THE DEFENDANT:  No.  Well, that's fine, you

11     know.  I think oral, handling, you know, and -- and

12     make sure that they do things well.

13            CORPORAL ROMANOSKY:  Yes.  Yes.

14            THE DEFENDANT:  That I'm going to be --

15            CORPORAL ROMANOSKY:  That should be fine.

16            THE DEFENDANT:  Yeah.  And, you know, they

17     will -- they will slowly get used to it.

18            CORPORAL ROMANOSKY:  Uh-huh.  Charles, I have

19     to tell you, you'll definitely be the elder, the

20     oldest member of our group.

21            THE DEFENDANT:  Oh, I'm sure.

22            CORPORAL ROMANOSKY:  And to be honest with

23     you, not to get too personal or anything, but I was

24     just -- I'm happy to hear at -- you know, at 70

25     years old that things still work like that.  I was a

1    little worried about that, you know, for later in

2    life but, you know, that certainly is good to hear.

3         THE DEFENDANT:  Yes.  Well, you know, I'm a

4    diabetic.  I got it when I was 50.

5         CORPORAL ROMANOSKY:  Uh-huh.

6         THE DEFENDANT:  Okay.  I've had it for 20

7    years.  And, you know, you sort of have to be a

8    little careful but, I mean, not really.

9         CORPORAL ROMANOSKY:  Right.

10        THE DEFENDANT:  And I'm not saying that I

11    tickle myself or, you know, I do anything like that.

12        CORPORAL ROMANOSKY:  (Unintelligible).

13        THE DEFENDANT:  Well, I mean, you know, I -- I

14    do get exercise and that's significant.  Now, not

15    enough.

16        CORPORAL ROMANOSKY:  Yeah.  Do you have to use

17    Viagra or Cialis or something?

18        THE DEFENDANT:  No.  I've never used any of

19    them.

20        CORPORAL ROMANOSKY:  No kidding.  Anything

21    herbal or natural supplements?

22        THE DEFENDANT:  I've never used any of that.

23    Now, I may -- you know, I have -- I get samples of

24    everything God created.

25        CORPORAL ROMANOSKY:  Uh-huh.

1          THE DEFENDANT:  Now, I would never take

2     Cialis.  Never.  Because they don't really know

3     enough about it.

4          CORPORAL ROMANOSKY:  Uh-huh.

5          THE DEFENDANT:  And, you know, you can have

6     these -- these hours and hours long erections and it

7     can really raise hell with you, so I would not abuse

8     that.  I have Levitra and Viagra.

9          CORPORAL ROMANOSKY:  Uh-huh.

10          THE DEFENDANT:  You know, samples of it.  And

11     I've never taken it.  I'm being very honest with

12     you.

13          CORPORAL ROMANOSKY:  Uh-huh.

14          THE DEFENDANT:  I don't know.  I don't know

15     how I'd react.

16          CORPORAL ROMANOSKY:  Right.

17          THE DEFENDANT:  You know.  I can't say I can

18     perform perfectly every time at the drop of a hat.

19          CORPORAL ROMANOSKY:  Right.

20          THE DEFENDANT:  That would be a lie.

21          CORPORAL ROMANOSKY:  Uh-huh.

22          THE DEFENDANT:  But I seem to be able to hold

23     my own.

24          CORPORAL ROMANOSKY:  Right.  Well, I would

25     think that --

1           THE DEFENDANT:  You know.

2           CORPORAL ROMANOSKY:  -- with a session this

3      intense that, you know, maintaining an erection

4      probably won't be a problem so --

5           THE DEFENDANT:  No.  No.  No.  No.  No.  I can

6      get them, you know, anyway, at the drop of a hat but

7      there's no timing things for me, you know.  I don't

8      know.  Yeah.  I would presume I would.

9           CORPORAL ROMANOSKY:  Uh-huh.

10          THE DEFENDANT:  And, you know, it doesn't

11     bother me at all.

12          CORPORAL ROMANOSKY:  Right.

13          THE DEFENDANT:  Not a bit, you know.  And it

14     certainly won't bother anybody there.

15          CORPORAL ROMANOSKY:  Uh-huh.  No.  No.

16          THE DEFENDANT:  I wouldn't -- no.  No.  Do

17     most people dress -- how do they do it?  Usually --

18     I mean, I know what I'm going to wear because you

19     can wear your black outfit.

20          CORPORAL ROMANOSKY:  Right.

21          THE DEFENDANT:  You know, I --

22          CORPORAL ROMANOSKY:  It's not -- sometimes I

23     wear like a long-sleeve black shirt and black pants.

24     Just something that's dark and authoritative, kind

25     of a power color, that sort of thing.

```
1              THE DEFENDANT:  Right.

2              CORPORAL ROMANOSKY:  You know, we have people

3      that dress casually.  We have people that, you know,

4      dress less than casually.  We have people that like,

5      you know, being partially dressed or some folks that

6      have been -- in the past that have been completely

7      undressed.  You know, we run -- depends on what

8      we're doing here.  You know, everyone is --

9              THE DEFENDANT:  You have to.

10             CORPORAL ROMANOSKY:  -- onboard with the same

11     type of mentality, I guess you could say.

12             THE DEFENDANT:  Yeah.

13             CORPORAL ROMANOSKY:  We're very open.  It's

14     what the -- you know, it's an uninhibited type

15     group.

16             THE DEFENDANT:  Sure.

17             CORPORAL ROMANOSKY:  I mean, it really is.  I

18     (unintelligible).

19             THE DEFENDANT:  What are the ages?  What's the

20     age range about?

21             CORPORAL ROMANOSKY:  Of the parent?

22             THE DEFENDANT:  No.  Of the kid.

23             CORPORAL ROMANOSKY:  We've had as young --

24     we've had as young as -- people have started about

25     four or five.
```

1          THE DEFENDANT:  Oh, really.

2          CORPORAL ROMANOSKY:  And we've had all the way

3     up into the teens.

4          THE DEFENDANT:  Right.

5          CORPORAL ROMANOSKY:  So, I mean, 14, 15 is

6     probably getting about the oldest.

7          THE DEFENDANT:  Right.  Right.  And now

8     they're what, about seven or eight, the youngest

9     ones?

10          CORPORAL ROMANOSKY:  Yes.

11          THE DEFENDANT:  Right.

12          CORPORAL ROMANOSKY:  Well, they're no longer

13     in the group.  They moved.  So, you know, it's no

14     longer financially -- they're not able to, you know,

15     fly them back down here to participate any longer

16     so --

17          THE DEFENDANT:  Right.  Oh, I see.  How many

18     do you have, about?

19          CORPORAL ROMANOSKY:  Oh, it depends.  Depends

20     on --

21          THE DEFENDANT:  Oh.

22          CORPORAL ROMANOSKY:  -- who's going to be

23     available.

24          THE DEFENDANT:  Right.

25          CORPORAL ROMANOSKY:  There's probably --

1          THE DEFENDANT:  About six or eight?

2          CORPORAL ROMANOSKY:  I think we're up to

3     around 10.

4          THE DEFENDANT:  Oh, okay.  That's fine.

5          CORPORAL ROMANOSKY:  Ten families but not all

6     of them are there at any given time.  It's normally

7     five or six families at the most usually is who

8     shows up.

9          THE DEFENDANT:  Right.  That's fine.

10          CORPORAL ROMANOSKY:  Good.

11          THE DEFENDANT:  That's good.

12          CORPORAL ROMANOSKY:  Yeah, you know, adults,

13     everyone -- they're all -- everyone in the group

14     is -- I can tell that -- from our chats that you're

15     an educated individual.

16          THE DEFENDANT:  Yeah.

17          CORPORAL ROMANOSKY:  And everyone in our group

18     probably falls in line with that.  They're

19     professional people, you know.  Professional

20     people --

21          THE DEFENDANT:  More women?

22          CORPORAL ROMANOSKY:  -- need more discretion

23     than -- (unintelligible).

24          THE DEFENDANT:  Hopefully, yes.  Of course.

25     Yeah.  You got to learn that somewhere along the

1     way.

2          CORPORAL ROMANOSKY:  Right.

3          THE DEFENDANT:  Are there more women than men

4     or men than women?  How do we -- (unintelligible).

5          CORPORAL ROMANOSKY:  It's equal.

6          THE DEFENDANT:  Right.

7          CORPORAL ROMANOSKY:  They're about equal,

8     because to be honest with you, you're one of the

9     first single people that have been allowed to

10    attend.

11         THE DEFENDANT:  You know, well, I'm sort of

12    half single, I guess you call it, because, you know,

13    I have a son and I was married.

14         CORPORAL ROMANOSKY:  But our normal practice,

15    you know, that people meet -- that someone meets off

16    the internet or something like that, normally single

17    people won't be allowed to attend.

18         THE DEFENDANT:  Right.

19         CORPORAL ROMANOSKY:  (Unintelligible) so many

20    people out there with no kids and never been married

21    and --

22         THE DEFENDANT:  Right.  No.  I think --

23    (unintelligible).

24         CORPORAL ROMANOSKY:  (Unintelligible).

25         THE DEFENDANT:  Well, I think you have to have

1    gone through it to realize what really goes on.

2         CORPORAL ROMANOSKY:  Oh, yeah, absolutely.

3    But, you know, I'm sure you've talked to some people

4    online.  There's some -- you know.

5         THE DEFENDANT:  (Unintelligible).

6         CORPORAL ROMANOSKY:  A lot of people would

7    consider what we're doing, you know, sick and

8    illegal and everything else.  But I'm sure you've

9    talked to some people online that there are some

10   sickos out there.

11        THE DEFENDANT:  Oh, there really -- I mean,

12   it's beyond anything I really knew.  And they're

13   absolute pathological liars, as well.

14        CORPORAL ROMANOSKY:  Absolutely.

15        THE DEFENDANT:  I don't know whether they

16   believe what they say or not.  I've never quite

17   decided that.  But you know, it would --

18        CORPORAL ROMANOSKY:  (Unintelligible) person

19   to person.

20        THE DEFENDANT:  Yeah.  Yeah.  I mean, you

21   know, it's -- and they're like here today and gone

22   tomorrow.

23        CORPORAL ROMANOSKY:  Yeah.  Absolutely.

24        THE DEFENDANT:  You know, and it's -- it's

25   really -- it's really why.  I mean, it's really an

1      experience.

2            CORPORAL ROMANOSKY:  Right.  (Unintelligible)

3      took so long for us to actually invite somebody.

4      That's why I feel --

5            THE DEFENDANT:  Oh, yeah.

6            CORPORAL ROMANOSKY:  (Unintelligible) before

7      we even get close to asking them to come.

8            THE DEFENDANT:  Well, yeah.  I'm one of these

9      people who may be considered a little stodgy but,

10     you know, because of my age.

11           CORPORAL ROMANOSKY:  Uh-huh.

12           THE DEFENDANT:  But, you know, I -- at least

13     if I say I'm going to be somewhere, I'm going to be

14     there.

15           CORPORAL ROMANOSKY:  Right.

16           THE DEFENDANT:  And if I say I'm going to do

17     such a thing, I'm going to do it.

18           CORPORAL ROMANOSKY:  Uh-huh.

19           THE DEFENDANT:  You know.  That never is a

20     question.

21           CORPORAL ROMANOSKY:  Right.

22           THE DEFENDANT:  You know.  And --

23           CORPORAL ROMANOSKY:  Can I ask you a question?

24           THE DEFENDANT:  You can always ask me --

25           CORPORAL ROMANOSKY:  Do you wear any kind of

1      rings or anything?  I know you talked about, you

2      know, if there's any crying or whimpering, you

3      talked about backhands and things like that.  I just

4      want to make sure there's not going to be

5      (unintelligible).

6          THE DEFENDANT:  No.  I don't wear anything on

7      my fingers.

8          CORPORAL ROMANOSKY:  Okay.  I want to make

9      sure (unintelligible).

10          THE DEFENDANT:  I wear a watch.

11          CORPORAL ROMANOSKY:  Okay.  No scratches.

12          THE DEFENDANT:  Oh, no.

13          CORPORAL ROMANOSKY:  Okay.

14          THE DEFENDANT:  Oh, no.  No, no, no, no, no.

15      Uh-uh.  No.  Can you hold one second?

16          CORPORAL ROMANOSKY:  Sure.

17          THE DEFENDANT:  (Unintelligible).

18          CORPORAL ROMANOSKY:  All right.

19          THE DEFENDANT:  I wear a watch.

20          CORPORAL ROMANOSKY:  Uh-huh.

21          THE DEFENDANT:  You know, but that's about it.

22          CORPORAL ROMANOSKY:  Okay.  I was just

23      concerned.  I want to make sure there's no cuts or

24      scratches --

25          THE DEFENDANT:  Oh, no.

 1          CORPORAL ROMANOSKY:  -- to their face or

 2     anything.  That's (unintelligible).  We home school

 3     them.  We keep them home.  But, you know, we have to

 4     also -- we take them -- we give them a lot, too, you

 5     know, so they understand, you know.

 6     (Unintelligible).

 7          THE DEFENDANT:  Hold on one more second.  This

 8     is crazy.  Sorry.  The first one was my

 9     brother-in-law the second one is my sister.  No.

10     (Unintelligible).

11          CORPORAL ROMANOSKY:  We give them a lot so --

12          THE DEFENDANT:  Oh, yeah.

13          CORPORAL ROMANOSKY:  You know, we take them

14     out in public, in public places or to Disney and

15     stuff like that.  I don't -- you know, people ask

16     questions if there's black eyes or scratches and

17     things like that.

18          THE DEFENDANT:  No.  From my point, you know,

19     having had a child, although he's an adult now,

20     nobody ever would see anything.

21          CORPORAL ROMANOSKY:  Good.

22          THE DEFENDANT:  He would look like everybody

23     else, you know.  He did have a broken nose.  I had

24     nothing to do with it.  He played football.

25          CORPORAL ROMANOSKY:  Uh-huh.

1          THE DEFENDANT:  And, you know, that's what he

2    had.  There's nothing I could do about it.

3          CORPORAL ROMANOSKY:  Oh, yeah.  That kind of

4    stuff happens, you know.

5          THE DEFENDANT:  Yeah.  Oh, yes.  I mean, he

6    was very proud.  But, no.  As far as I'm concerned,

7    there's nothing visual.

8          CORPORAL ROMANOSKY:  Okay.

9          THE DEFENDANT:  Ever.  You can absolutely

10   depend on that.

11         CORPORAL ROMANOSKY:  Very good.

12         THE DEFENDANT:  You know.  Oh, no.  You know,

13   maybe put through a little more along the way.

14   That's -- that's the way it will be.

15         CORPORAL ROMANOSKY:  Yeah.

16         THE DEFENDANT:  That will be your decision and

17   my decision.

18         CORPORAL ROMANOSKY:  Uh-huh.  I'm sorry.  As

19   far as?

20         THE DEFENDANT:  As far as, you know, if I want

21   to do more with them in one way or more with them --

22   one of them in another way.  As long as everything

23   is copacetic, that's fine.

24         CORPORAL ROMANOSKY:  You mean physically or

25   sexually?

```
 1              THE DEFENDANT:  Both.

 2              CORPORAL ROMANOSKY:  Oh, yeah.  Well,

 3     absolutely.

 4              THE DEFENDANT:  Both.  Yeah.

 5              CORPORAL ROMANOSKY:  I'm sure what we're

 6     talking about that, you know, everything goes good,

 7     of course, I -- you seem like a very personable

 8     gentleman to me.

 9              THE DEFENDANT:  Yeah.

10              CORPORAL ROMANOSKY:  So as time progresses,

11     yeah.  I mean, I'm -- we're obviously very open to

12     see -- to seeing things we can learn from you and

13     things that you want to do.  This is definitely, you

14     know, a give and take, you know.

15              THE DEFENDANT:  Oh, absolutely.  Yeah.  I

16     agree.

17              CORPORAL ROMANOSKY:  Good friends like ours

18     are hard to find.

19              THE DEFENDANT:  I think that's true.  And, you

20     know, from my point of view, friends are important.

21     They're not just commodities.

22              CORPORAL ROMANOSKY:  Sure.  Especially with

23     this interest.

24              THE DEFENDANT:  Yeah.  And, you know, if I

25     think -- yeah.  I want them to get to know me.
```

1          CORPORAL ROMANOSKY:  Uh-huh.

2          THE DEFENDANT:  As a person.

3          CORPORAL ROMANOSKY:  Sure.

4          THE DEFENDANT:  As well.  You know, that --

5     that to me is very, very important.

6          CORPORAL ROMANOSKY:  Uh-huh.

7          THE DEFENDANT:  You know, you know --

8          CORPORAL ROMANOSKY:  Have you ever been a

9     member of any groups like this in the past?

10          THE DEFENDANT:  Only a very, very loose one of

11     -- well, no.  Well, yes and no.  I could tell you

12     what it was.  My son had two friends.

13          CORPORAL ROMANOSKY:  Uh-huh.

14          THE DEFENDANT:  (Unintelligible) but, I mean,

15     he had two friends who -- whose dads did exactly the

16     same thing as I did.

17          CORPORAL ROMANOSKY:  Uh-huh.

18          THE DEFENDANT:  And we would get together

19     usually once every two weeks.

20          CORPORAL ROMANOSKY:  Oh, wow.

21          THE DEFENDANT:  And we would change off.

22          CORPORAL ROMANOSKY:  Uh-huh.

23          THE DEFENDANT:  Our kids, you know, for

24     punishments and that sort of thing.

25          CORPORAL ROMANOSKY:  This was when your son

1     was younger, then?

2          THE DEFENDANT:  Oh, yes.

3          CORPORAL ROMANOSKY:  Okay.  I thought that was

4     something that was still pretty current.  So I was

5     like, maybe it would be something we could

6     actually -- (unintelligible).

7          THE DEFENDANT:  Well -- well, no.  It isn't

8     really.  It is in a way with one of my son's

9     friend's kids.

10         CORPORAL ROMANOSKY:  Uh-huh.

11         THE DEFENDANT:  So he -- his kid is real -- I

12    was going to say a friend of mine.  They're still

13    friendly.  But he is absent an awful lot.

14         CORPORAL ROMANOSKY:  Okay.

15         THE DEFENDANT:  He travels a lot.  So his dad

16    takes over.

17         CORPORAL ROMANOSKY:  Uh-huh.

18         THE DEFENDANT:  And then I come over every

19    little while.

20         CORPORAL ROMANOSKY:  Right.

21         THE DEFENDANT:  So that's sort of what it is.

22    I don't know whether you call that a group or not.

23    (Unintelligible).  It is in a way.

24         CORPORAL ROMANOSKY:  Well, just knowing you

25    have friends with that interest is close enough.

1          THE DEFENDANT:  Yeah.  Oh, yeah.  Oh, yeah.

2     And -- and, you know, sometimes, not often, but

3     occasionally the kids are left with me.

4          CORPORAL ROMANOSKY:  Uh-huh.

5          THE DEFENDANT:  So it's completely up to me.

6     It's -- you know, they live -- they -- the

7     grandfather, the father and the kids all live in one

8     house.

9          CORPORAL ROMANOSKY:  Uh-huh.

10          THE DEFENDANT:  So for the most part the

11     grandfather brings up these kids, you know, with a

12     lot of -- traveling a lot and everything like that.

13     So (unintelligible) --

14          CORPORAL ROMANOSKY:  Do they know what you do

15     with them or --

16          THE DEFENDANT:  Oh, yeah.

17          CORPORAL ROMANOSKY:  Oh, really.

18          THE DEFENDANT:  Oh, yeah.  Yeah.  They do it.

19          CORPORAL ROMANOSKY:  Oh, good for them.

20          THE DEFENDANT:  The grandfather is hell on

21     wheels.

22          CORPORAL ROMANOSKY:  Good for him.  Do you

23     guys do anything other than physical with them or

24     just pretty much physical with them?

25          THE DEFENDANT:  Both.  We do both.

1            CORPORAL ROMANOSKY:  Outstanding.

2            THE DEFENDANT:  Yeah.  And the grandfather did

3       it with his son.

4            CORPORAL ROMANOSKY:  Uh-huh.

5            THE DEFENDANT:  And the other gentleman that

6       has no kids did it with his son, but there are no

7       kids from that one.

8            CORPORAL ROMANOSKY:  Right.

9            THE DEFENDANT:  And we still know each other,

10      you know, we're still friendly.  Let's put it that

11      way.

12           CORPORAL ROMANOSKY:  Uh-huh.

13           THE DEFENDANT:  I don't have a lot of use for

14      the guy who's the father of the kids.

15           CORPORAL ROMANOSKY:  Right.

16           THE DEFENDANT:  I think he -- you know, I told

17      my son, you know, he really isn't worth the powder

18      to blow him to hell.

19           CORPORAL ROMANOSKY:  Right.

20           THE DEFENDANT:  He said, oh, but he's my

21      friend.  So I said, you're right, and that's more

22      important.

23           CORPORAL ROMANOSKY:  Yeah.

24           THE DEFENDANT:  You know, I don't mess with

25      them.  Oh, yeah.  The -- the grandfather is really

1    something.

2         CORPORAL ROMANOSKY:  Uh-huh.

3         THE DEFENDANT:  He's a big guy and he's very

4    bright, very nice.  But all of a sudden, you know,

5    he can go off.  Not easily, no, but, I mean, he can

6    just sort of lose his temper.

7         CORPORAL ROMANOSKY:  Right.

8         THE DEFENDANT:  Yeah.  I don't really lose my

9    temper that much.

10        CORPORAL ROMANOSKY:  Uh-huh.

11        THE DEFENDANT:  I mean, I don't yell and

12   scream and do all that stuff, ever.

13        CORPORAL ROMANOSKY:  Uh-huh.

14        THE DEFENDANT:  I mean, when I used to say to

15   my son, young man, get upstairs, get in your room,

16   get ready, I'm coming, that's as much as I -- you

17   know.

18        CORPORAL ROMANOSKY:  Yeah.  And the walk up

19   there was probably just as effective as what they

20   were going to get later.

21        THE DEFENDANT:  Oh, yeah.  Oh, yeah.  Yes.

22   And -- and I said -- and he knows.  I said, no, you

23   know, get the razor strop out of the closest.

24        CORPORAL ROMANOSKY:  Uh-huh.  All right.  Now,

25   you said you're going to bring your razor straps?

1           THE DEFENDANT:  Yes, I am.

2           CORPORAL ROMANOSKY:  Outstanding.

3      (Unintelligible).

4           THE DEFENDANT:  I am.  And as I said, you're

5      welcome to borrow something if you want.

6           CORPORAL ROMANOSKY:  Oh, great.  Well, you're

7      going to bring you said two straps.

8           THE DEFENDANT:  I'm bringing two straps, a

9      Garrison belt and a German leather belt and a crop.

10          CORPORAL ROMANOSKY:  Very nice.  Very nice.

11     Well, you know, if it's okay with you, I might -- I

12     might take you up and borrow one of the straps.

13          THE DEFENDANT:  Right.

14          CORPORAL ROMANOSKY:  I'm curious to see how

15     they work and what -- you know, what kind of mark

16     they leave and, you know --

17          THE DEFENDANT:  Right.

18          CORPORAL ROMANOSKY:  If need be, I'll keep one

19     and keep it oiled up.

20          THE DEFENDANT:  Yeah.  No, that's -- that's

21     fine.  And I may bring a very small 12-inch strap, I

22     don't know, with holes in it.

23          CORPORAL ROMANOSKY:  Uh-huh.  Wow.

24          THE DEFENDANT:  I'm not sure because that's

25     sort of sticky (unintelligible).  But the -- you

1   know, as you know, the razor strops are two

2   thicknesses.

3         CORPORAL ROMANOSKY:  Right.

4         THE DEFENDANT:  The leather --

5         CORPORAL ROMANOSKY:  I've seen them before but

6   I've never seen them work.

7         THE DEFENDANT:  Yeah.  They're a strip of

8   hemp.

9         CORPORAL ROMANOSKY:  Uh-huh.

10        THE DEFENDANT:  And a strip of leather.

11        CORPORAL ROMANOSKY:  Huh.

12        THE DEFENDANT:  Held together by some sort of

13  a fancy-ish looking clamp.  Another -- both of

14  these -- one is about 80 years old and one is about

15  90 years old.

16        CORPORAL ROMANOSKY:  Wow.  They're still in --

17  they're still in good shape, anyway.

18        THE DEFENDANT:  Well, you keep them oiled.

19        CORPORAL ROMANOSKY:  Right.

20        THE DEFENDANT:  If you don't keep them oiled,

21  I don't know what would happen.

22        CORPORAL ROMANOSKY:  Hum.  Probably like

23  leather, they would dry up and start cracking.

24        THE DEFENDANT:  Right.  Right.  Right.  And

25  they're a little sort of -- well, they're not

1    cracked, they're sort of more creased.

2         CORPORAL ROMANOSKY:  Right.  Can you hold on a

3    second?

4         THE DEFENDANT:  Sure.

5         CORPORAL ROMANOSKY:  (Unintelligible) hang on

6    a second.  Hello.  Where are you guys?  I'm down

7    here.  Yeah.  Just come on down.  It's about 20 till

8    10:00.  Yeah.  I know they're open till 2:00.  All

9    right.  See you in a few.  I'm wining and dining

10   some prospective clients that are enjoying going out

11   to these -- these jazz clubs and stuff on my dime.

12        THE DEFENDANT:  My God, well, listen.

13        CORPORAL ROMANOSKY:  It's part of the business

14   though, I mean.

15        THE DEFENDANT:  Oh, absolutely.

16        CORPORAL ROMANOSKY:  I deal with people that

17   are -- they have a whole lot more money than I do

18   and they throw -- I mean, these are people that will

19   drop a lot of money just on dinner and so, you know,

20   I'm trying to take them out and show them a good

21   time and stuff, but trying to keep up with them,

22   I'll tell you, geez.  They like to have a good time.

23        THE DEFENDANT:  Well --

24        CORPORAL ROMANOSKY:  That's for sure.  It will

25   pay off in the --

1           THE DEFENDANT:  Oh, sure.

2           CORPORAL ROMANOSKY:  If I can earn their

3      business, it will definitely pay off.

4           THE DEFENDANT:  Oh, no, you got to do -- you

5      got to play the game.

6           CORPORAL ROMANOSKY:  Absolutely.  Absolutely.

7      So.  Did I hear you say earlier one of your

8      patients -- are you a doctor or something?

9           THE DEFENDANT:  Yes.

10          CORPORAL ROMANOSKY:  Wow.

11          THE DEFENDANT:  Oh, didn't I tell you?  I

12     thought I did.

13          CORPORAL ROMANOSKY:  (Unintelligible) I

14     thought you said before you like testified or

15     something at child custody hearings or something?

16          THE DEFENDANT:  Yeah, you know, but I'm also a

17     doctor.

18          CORPORAL ROMANOSKY:  Like an MD or

19     psychologist or --

20          THE DEFENDANT:  I have two degrees.

21          CORPORAL ROMANOSKY:  Uh-huh.

22          THE DEFENDANT:  I have an MD and a PhD.  I

23     don't use my MD because it doesn't do any good.  I

24     don't get paid for it.

25          CORPORAL ROMANOSKY:  Uh-huh.

1          THE DEFENDANT:  And I -- (unintelligible) oh,

2      yeah.  Oh, yeah.  And I testify for divorce and

3      custody.

4          CORPORAL ROMANOSKY:  Wow.  That's enough right

5      there to keep you busy so --

6          THE DEFENDANT:  Oh, it's plenty.  Yeah.  Yeah.

7      But on the other hand, (unintelligible) careful as a

8      doctor.

9          CORPORAL ROMANOSKY:  Uh-huh.

10         THE DEFENDANT:  You know, to -- because there

11     is no -- as you say, do you wear rings or do you

12     wear the next thing, I'm very careful about marks.

13         CORPORAL ROMANOSKY:  Right.

14         THE DEFENDANT:  My own son, too, you know.  I

15     mean, it's -- there are certain things that are okay

16     and certain things that aren't.

17         CORPORAL ROMANOSKY:  Yes.  I agree.

18         THE DEFENDANT:  And, you know, and I -- you

19     know, the grandfather, I've made all those rules

20     very clear to him, too.

21         CORPORAL ROMANOSKY:  Uh-huh.

22         THE DEFENDANT:  You know, I mean, whenever I'm

23     involved in something, those rules are kept.

24         CORPORAL ROMANOSKY:  Right.

25         THE DEFENDANT:  If I'm not involved in it,

1     there's not a darn thing I can do.

2          CORPORAL ROMANOSKY:  Well, I can assure you

3     everyone that -- everyone that's a part of our group

4     is onboard with that because everyone knows if

5     somebody gets carried away, if they're leaving

6     bruises or --

7          THE DEFENDANT:  You can't.

8          CORPORAL ROMANOSKY:  -- marks or something,

9     then people ask questions and, you know, we don't --

10         THE DEFENDANT:  Right.

11         CORPORAL ROMANOSKY:  -- want that happening

12    either so.

13         THE DEFENDANT:  No.  No.  And I don't drink.

14    And I don't smoke.

15         CORPORAL ROMANOSKY:  Very good.

16         THE DEFENDANT:  I don't do drugs.

17         CORPORAL ROMANOSKY:  You'll get along with

18    everybody just fine.  Charles, I hate to cut you off

19    but I think (unintelligible) coming downstairs.

20         THE DEFENDANT:  (Unintelligible).

21         CORPORAL ROMANOSKY:  Tell you what, I will

22    be -- what I'll probably do, do you remember --

23         THE DEFENDANT:  Yeah.

24         CORPORAL ROMANOSKY:  Do you still have the

25    directions?  Just 275 north and the Skyway?

1           THE DEFENDANT:  Yeah.  26A or B.

2           CORPORAL ROMANOSKY:  Yeah.  10 or 12 miles to

3   exit 26A or B, the Cracker Barrel.  I'll probably

4   call you.

5           THE DEFENDANT:  Right.

6           CORPORAL ROMANOSKY:  I'll probably call you on

7   Monday just to --

8           THE DEFENDANT:  That's great.

9           CORPORAL ROMANOSKY:  -- make sure everything's

10  good to go, let you know what time (unintelligible)

11  I'll be down there.

12          THE DEFENDANT:  That's fine.

13          CORPORAL ROMANOSKY:  But I'm thinking probably

14  6:30 or so.

15          THE DEFENDANT:  Any time that's easiest for

16  you.

17          CORPORAL ROMANOSKY:  Okay.  Yeah.  I have a

18  late meeting.  I should be done with that and then

19  I'll just zip over and wait for you.

20          THE DEFENDANT:  Okay.  Great.  Wonderful.

21          CORPORAL ROMANOSKY:  Good talking to you.

22  I'll probably be online -- probably if I -- probably

23  not tonight because I know these guys are going to

24  stay up till 2:00, so maybe -- (unintelligible) get

25  online.

1          THE DEFENDANT:  Okay.  Great.  And call me any

2     time that's easy for you.

3          CORPORAL ROMANOSKY:  All right, Charles.  Good

4     talking with you.

5          THE DEFENDANT:  Right.  Good talking to you,

6     Michael.  Thanks a lot.

7          CORPORAL ROMANOSKY:  Bye-Bye.

8          THE DEFENDANT:  Bye, now."

9     BY MS. KAISER:

10    Q    Corporal Romanosky, during your investigation,

11    did you try to interview the defendant's son?

12    A    No, ma'am.

13    Q    Okay.  Did the defendant -- after he was

14    arrested, did he make any statements?

15    A    Yes.  He had said that he had a young man in

16    his life from about the age of 29 to 39, and that

17    gentleman had committed suicide.

18    Q    Now, during your chats with the defendant, he

19    referenced other -- having other children in his

20    home.  Did you ever set up any surveillance on the

21    defendant's home or did you ever conduct any

22    investigation with respect to who these other

23    children might be?

24    A    No.  I didn't believe they existed.  There

25    were some discrepancies in a couple of chats.  One

1    time he said they were like 11 and 13, and the next

2    day it was 12 and 14.  I felt that he was giving --

3    he was indicating that he had access to children for

4    that street credit so that I'd believe he was a

5    little more valid.

6    Q    At some point during the chats when he had

7    mentioned other children, had you had him identified

8    yet?

9    A    No, not initially.  Not till around June 19th,

10   and not at all on the '05 chats.

11   Q    After your undercover phone call with the

12   defendant, did you have any other communications

13   with him before his arrest?

14   A    Yes, ma'am.  We had a brief instant message

15   conversation on the morning of the arrest, July

16   21st, 2008.

17        MS. KAISER:  Your Honor, may I approach the

18   witness?

19        THE COURT:  Yes, ma'am.

20   BY MS. KAISER:

21   Q    Corporal Romanosky, I'm showing you what's

22   been marked for identification as Government's

23   Exhibit 28.  Do you recognize that document?

24   A    I do.  This is the instant message chat

25   conversation from July 21st.

1    Q      Has that been maintained by you in the case

2    file?

3    A      Yes, ma'am.

4    Q      And is it a true and accurate copy of your

5    instant message chat with the defendant on July

6    21st, 2008?

7    A      It is.

8    Q      Okay.

9           MS. KAISER:  Your Honor, at this time I'd move

10   for admission of Government's Exhibit 28 into

11   evidence.

12          MR. TRAGOS:  No objection.

13          THE COURT:  Exhibit 28 is received.

14   (Whereupon, Government's Exhibit Number 28 is

15   received into evidence.)

16   BY MS. KAISER:

17   Q      What was the date on which the defendant was

18   arrested in this case?

19   A      Also on July 21st of 2008.

20   Q      And is this instant message chat the same day

21   as the arrest?

22   A      Yes.  This is the morning prior to the arrest.

23   Q      And who initiated the chat?

24   A      I received an instant message from the

25   defendant at 9:37 AM.

1          MS. KAISER:  Your Honor, at this time I'd like

2     to publish Government's Exhibit 28.

3          THE COURT:  All right.  You may do so.

4     BY MS. KAISER:

5     Q     And who began this chat, as well?

6     A     The defendant.

7     Q     And did he contact you?

8     A     Yes, ma'am.  At 9:37 AM I received an instant

9     message.

10    Q     Okay.  Please proceed.

11         "CAPTOES:  Good morning, Michael.

12         STRICDAD7:  Well, good morning, Charles.  I

13    didn't expect to see you on this early.

14         CAPTOES:  Just decided to as thought you might

15    be on.

16         STRICDAD7:  Yes.  I am taking care of some

17    paperwork before heading out to my meetings this

18    afternoon.

19         CAPTOES:  Guess that's mandatory.  Did the

20    Orlando conference turn out well for you?

21         STRICDAD7:  Yes.  Two new clients.

22         CAPTOES:  Excellent.  Am getting ready for

23    later.  I have a meeting at 1:30.

24         STRICDAD7:  Very good.  6:30 still good for

25    you?

1          CAPTOES:  Perfect.  What time do most people

2     arrive?

3          STRICDAD7:  By seven'ish.  It will take us

4     about 30 to 45 to get to my house from the Cracker

5     Barrel.  The traffic is horrible up here.

6          CAPTOES:  Can imagine.  Will grab a bite on

7     the way up.

8          STRICDAD7:  Good idea.  I will probably grab a

9     bite before my last meeting.

10          CAPTOES:  Excellent.  Eager to meet everyone,

11     most of all you.

12          STRICDAD7:  Same here.

13          CAPTOES:  Will be in striped long-sleeved

14     shirt, tie and charcoal trousers and black dress

15     shoes.

16          STRICDAD7:  Okay.  I'll be in blue dress

17     slacks and a greenish tannish polo shirt.  I'll be

18     in my work vehicle, a blue mini van.  I'll park in

19     an open part of the Cracker Barrel parking slot so

20     you can see me.  If you get there first, please do

21     the same so I'm not looking all over for you.  It's

22     a Cracker Barrel so it's always business.

23          CAPTOES:  Will do.  It is a silver 2001 Lexus.

24          STRICDAD7:  Very good.

25          CAPTOES:  Eager to work with the boys later,

```
 1       too.

 2            STRICDAD7:  Of course.  I am eager, as well.

 3       They've been pestering me for a dog all weekend

 4       despite my telling them no.

 5            CAPTOES:  That certainly needs to be on your

 6       list.

 7            STRICDAD7:  Oh, yes, it is.  Dogs are great

 8       but you know who would end up caring for it.  Plus

 9       makes it harder to get away for long weekends.

10            CAPTOES:  Oh, yes.  And none of that.  Do you

11       all take many long weekends?

12            STRICDAD7:  Usually for work-related things.

13       Sometimes camping or for fun.  Do you have any pets?

14            CAPTOES:  I used to.  But too confining, also.

15            STRICDAD7:  Thank you.  My point exactly.

16            CAPTOES:  Right.  And they need to be informed

17       to stop nagging about it.

18            STRICDAD7:  Exactly.  Charles, I have a call.

19       Will you be on long?

20            CAPTOES:  Oh, I shall stay on.

21            STRICDAD7:  Okay.  Be back in 10 to 15.

22            CAPTOES:  Great."

23            THE WITNESS:  At 10:14 AM.

24            "STRICDAD7:  Back.

25            CAPTOES:  Here, also.
```

1         STRICDAD7:  Do you still have the directions

2    to the Cracker Barrel?

3         CAPTOES:  Yes.  275 to Exit 26 A, B.  54th

4    Avenue north.  Do I take A or B from the south?

5         STRICDAD7:  I believe it is A, 54th Avenue

6    North.

7         CAPTOES:  Fine, but vital.

8         STRICDAD7:  There is a 54th Avenue South right

9    after you get off the Skyway but you don't want that

10   one.  Go north to 54th Avenue North, Exit 26A.

11   Cracker Barrel visible from I-275.

12        CAPTOES:  Great.  Or as visible as possible.

13   They usually never hide.

14        STRICDAD7:  Of course.  Got to pull in the

15   hungry travelers.

16        CAPTOES:  Always.  I know people who swear by

17   them.  Have only been to one once.

18        STRICDAD7:  I've been to several.  Food is

19   good but don't know why people are so crazy for

20   them.

21        CAPTOES:  I don't know either except it is

22   visible and non-fast food.

23        STRICDAD7:  True.  You still bringing the

24   straps, belt and crop?

25        CAPTOES:  Yes, for sure.

1          STRICDAD7:  Very nice.  Can't wait to see

2     them.  Have a few paddles to show you at the house

3     that are well made.

4          CAPTOES:  Look forward to seeing them.  You

5     are welcome to borrow any you like.

6          STRICDAD7:  Thank you.  I may take you up on

7     that.  Same goes for the paddles if you like to try

8     on your friend's grand kids.

9          CAPTOES:  Thanks.  Appreciate that.  They came

10    over yesterday for a few hours.

11         STRICDAD7:  Nice.  Any problems?

12         CAPTOES:  Yes.  He dropped them over as he was

13    tired.  I can see why.

14         STRICDAD7:  Laugh out loud.  I'm sure you

15    remedied that.

16         CAPTOES:  Oh, yes.  The younger is more

17    difficult.

18         STRICDAD7:  How old?

19         CAPTOES:  About 12 and a half.  The other is

20    14 plus.

21         STRICDAD7:  Nice ages.  Did you administer any

22    beatings?

23         CAPTOES:  Yes, I did.  More with the younger.

24         STRICDAD7:  Nice.  You wear him out?

25         CAPTOES:  I sure did.  Screaming and crying

1     with reason.

2          STRICDAD7:  Very nice.  Anything happen with

3     him?  Anything else?  Sorry.  Can't type.  It's

4     Monday.

5          CAPTOES:  Some, yes.

6          STRICDAD7:  Very nice.

7          CAPTOES:  With the older one.

8          STRICDAD7:  Some there, as well?

9          CAPTOES:  Yes.  Knew granddad would take care

10    of that at home, also.

11         STRICDAD7:  Very nice.

12         CAPTOES:  At six five and 240 pounds.

13         STRICDAD7:  Wow.  Big guy.

14         CAPTOES:  Very.  But usually quite mild except

15    with them.

16         STRICDAD7:  Nice.  Charles, unfortunately I

17    must go.  Have an 11:30 meeting I must attend.  I

18    will see you tonight.  If you get lost or need

19    directions, please call.

20         CAPTOES:  Yes.  Very eager.

21         STRICDAD7:  Me, too.  Take care and I will see

22    you later.

23         CAPTOES:  Enjoy your meetings.

24         STRICDAD7:  I may be online later if schedule

25    permits.  What time are you leaving to get up here

1      by 6:30?

2              CAPTOES:  About 4:00.

3              STRICDAD7:  Very good.  I'll talk to you

4      later.

5              CAPTOES:  Or give a ring.

6              STRICDAD7:  Okay.  Sounds great.  Talk to you

7      later.

8              CAPTOES:  Right.  Bye."

9      BY MS. KAISER:

10     Q      All right.  Corporal Romanosky, during that

11     last chat you were discussing meeting at the Cracker

12     Barrel; is that correct?

13     A      That's correct.

14     Q      And why was that location picked?

15     A      The Cracker Barrel is a -- one, it's easily

16     accessible from the interstate.  It's very visible.

17     The second one is for tactical considerations.

18     There's a Holiday Inn Express and a Cracker Barrel

19     that adjoin each other so it's a very large parking

20     lot.  I can put lots of undercover vehicles in there

21     that will blend in.  It has a lot of vantage points

22     for -- we can view it from different locations, so

23     it's very tactically sound.

24     Q      And in terms of going in and having a meal

25     before you went back to your house, what was your

1    thought process in terms of where you'd actually

2    meet the defendant before you went back to your

3    residence?

4    A     We were going to meet in the parking lot, as

5    indicated in the chats.  He had indicated he was

6    going to get a bite on the way up.  And I told him

7    that I was going to get a value meal before the

8    meeting.  So the plan was to meet in the parking lot

9    and then go back to my house.

10   Q     Did you subsequently meet the defendant in the

11   parking lot at the Cracker Barrel?

12   A     I did, at approximately 6:15, 6:30.

13   Q     Was that on July 21st of 2008?

14   A     That is correct.

15   Q     When you met the defendant in the parking lot,

16   did you wear any type of recording device?

17   A     I did.  I wore a body mic to record the

18   dialogue between us at the time of the meeting.

19         MS. KAISER:  Your Honor, may I approach the

20   witness?

21         THE COURT:  Yes, ma'am.

22   BY MS. KAISER:

23   Q     Corporal Romanosky, I'm showing you what's

24   been marked for identification as Government's

25   Exhibits 30A, and 30A which is marked copy, and also

1     Government's Exhibit 30B.  Do you recognize these

2     items?

3     A     Yes.  30A is the original recording from the

4     dialogue between myself and the defendant as

5     recorded through the body mic.  It's in a special

6     type of disc that you need a special player for.

7     30A copy is a copy of that conversation that's been

8     put on to a CD so you can listen to it from a

9     computer.  And 30B is a transcription from the body

10    mic audio.

11    Q     And have you listened to the copy that's

12    marked 30A copy and, if so, does that truly and

13    accurately depict your meeting with the defendant on

14    July 21st of 2008?

15    A     It does.  There's a few unintelligible things

16    that are being said in there because the body mic

17    that I was wearing -- it's a fantastic body mic, but

18    it's better suited for almost an indoor environment

19    because it picks up everything, traffic, cars

20    passing, everything so -- but the transcription is

21    accurate.

22    Q     And so you have have reviewed Government's

23    Exhibit 30B which is a transcript; is that correct?

24    A     Yes, ma'am.  And compared it to the recording.

25    Q     And does the transcript accurately reflect

1    what is heard on the DVD?

2    A      It does.

3          MS. KAISER:  Okay.  Your Honor at this time,

4    I'd move for admission of Government's Exhibit 30A

5    and the 30A that's the copy, and would ask that 30B

6    be given to the jury as an aide in listening to the

7    tape.

8          THE COURT:  Any objection?

9          MR. TRAGOS:  Could I have a side bar, Your

10   Honor?

11         THE COURT:  Yes, sir.

12   (At side bar, on the record.)

13         MR. TRAGOS:  I don't believe the transcript

14   should be admitted into evidence, just the tape.

15   And I would also request that the Court instruct the

16   jury that the transcript is not evidence, you know,

17   the usual instruction.

18         THE COURT:  Yes, sir, I'll do that.  The

19   transcript is not typically introduced as evidence.

20         MS. KAISER:  Yes.  I didn't move to admit it,

21   just --

22         THE COURT:  As a court's exhibit?

23         MS. KAISER:  Right.  Just as an aide to the

24   jury.

25         THE COURT:  Do you have an objection?

1          MR. TRAGOS:  I don't have a problem as a

2     court's exhibit.

3          THE COURT:  Other than that?

4          MR. TRAGOS:  No.

5          THE COURT:  Are you going to just put the

6     transcript up on the screen as it's played?

7          MS. KAISER:  No.  I have copies for the

8     jurors.

9          MR. TRAGOS:  For me, too, I hope.

10          MS. KAISER:  Pardon?

11          MR. TRAGOS:  For me, as well?

12          MS. KAISER:  Yours is in the binder.  All your

13     exhibits are in the binders.

14          THE COURT:  All right.

15     (End of side bar discussion.)

16          THE COURT:  All right.  Members of the jury,

17     Exhibit 30A is received.  That is the audiotape, a

18     copy of the original.  30B is the transcript.  That

19     will be received as a court's exhibit, although you

20     will be able to follow along on the transcript as

21     you listen to the audio recording.

22          The evidence is what is said on the audio

23     recording.  The transcript is to be used by you to

24     assist you in following who said what and what was

25     said.  But the evidence comes from what the audio

1     depicts.  So, for example, if there is a discrepancy

2     or inability to match the transcript with what is

3     said, the audiotape controls.  That is the evidence

4     in the case.

5          You want to go ahead and hand out -- those are

6     Court's Exhibits 30B.

7     (Whereupon, Government's Exhibit Number 30A is

8     received into evidence.)

9          THE COURT:  Now, try not to get ahead of the

10    audio.  You'll see that this will follow pretty well

11    with the audio.

12    BY MS. KAISER:

13    Q     Now, before we start -- before we start the

14    undercover tape, Corporal Romanosky, could you just

15    please tell us what immediately preceded this.

16    A     As far as?

17    Q     Like where were you located at the Cracker

18    Barrel and did you see the defendant's vehicle?

19    A     I actually didn't start at the Cracker Barrel.

20    I started a couple blocks away at a motel.  That's

21    where the first part of the tape, you hear the date

22    and the time.  That's called indexing the tape.  I

23    had met with a member of our tactical unit and

24    completed that over there.

25          I then drove the two blocks.  You'll hear it

1       on the tape how I'm describing where I'm at.  As I'm

2       pulling in, I indicate that -- where I see the

3       defendant's vehicle.  I circle back around and park

4       next to him.

5       Q      Were you able to identify the defendant?

6       A      Yes.  Prior -- obviously, prior to this

7       meeting I had him identified.  I knew what vehicle

8       through DHSMV records, what the tag number would be,

9       what type of vehicle it would be, and I had a

10      driver's license photo of the defendant.  So I was

11      able to recognize him as I pulled in.

12      Q      How were you able to identify the defendant?

13      A      By -- visually by seeing him, recognizing him

14      from his DL photo and by recognizing the vehicle.

15      Q      But initially how did you -- how did you

16      identify it was the defendant that you were chatting

17      with?

18      A      Through information elicited from the chats,

19      information he had given me from phone numbers,

20      comparing it to DHSMV records.  There had also been

21      some subpoenaed information from AOL.

22      Q      All right.

23             MS. KAISER:  At this time, Your Honor, request

24      permission to publish Exhibit 30A, the copy which is

25      the DVD.

1          THE COURT:  You may do so.

2          MS. KAISER:  Thank you.

3      (Recording playing.)

4          "CORPORAL ROMANOSKY:  Okay.  Today's date is

5      Monday, July 21st, 2008.  The time is 1800 hours.

6      This is going to be in reference to Case Number

7      SO08184046.  This will be a controlled meeting

8      between myself, Corporal Kurt Romanosky of the

9      Pinellas County Sheriff's Office and AOL user

10     Captoes, later identified as Charles Jackson

11     Friedlander.  Okay.

12          Okay.  Eastbound on 54th Avenue.  Passing

13     over the interstate.  I'm coming up to 22nd Street

14     north side.  Okay.  I think I see him with the

15     handicapped tag there.  I'm going to make a circle

16     and look like I'm looking for him.  Okay.  There he

17     is.  All right.  Let's circle back.  I'm going to

18     pull on his driver's side.  And I think that's our

19     guy right there.  He's on the phone.

20          Charles?

21          THE DEFENDANT:  How are you?

22          CORPORAL ROMANOSKY:  How you doing?  Michael.

23     God, nice to meet you in person.  I feel like I know

24     you.

25          THE DEFENDANT:  Thanks.  Thank you.  I was

1    hoping that this would be far enough away.  I didn't

2    know whether --

3         CORPORAL ROMANOSKY:  Well, this place -- I

4    know the Cracker Barrel's always crazy.  I thought,

5    I figured you were probably up by the Cracker Barrel

6    or something.

7         THE DEFENDANT:  Well, that's what you said.

8         CORPORAL ROMANOSKY:  I actually got here

9    early, so --

10        THE DEFENDANT:  Oh, I did too.  I mean, I made

11   it so quick.

12        CORPORAL ROMANOSKY:  Traffic wasn't too bad?

13        THE DEFENDANT:  Not a thing.

14        CORPORAL ROMANOSKY:  Hopefully my directions

15   were accurate.  (Unintelligible).

16        THE DEFENDANT:  In fact, I got off and had a

17   bite at -- I got off at 34th Street South, which I

18   knew.

19        CORPORAL ROMANOSKY:  Oh, yeah.

20        THE DEFENDANT:  I thought I'd go up 19 and

21   stop where I wanted to stop.

22        CORPORAL ROMANOSKY:  Where'd you go?

23        THE DEFENDANT:  I wanted to go to Grill and

24   Chill.  Have you ever heard of them?

25        CORPORAL ROMANOSKY:  No.

1          THE DEFENDANT:  That's the new Dairy Queen.

2     (Unintelligible).

3          CORPORAL ROMANOSKY:  No, not much down there.

4     Matter fact, I -- I probably would have told you

5     probably not a good idea to get off in that part of

6     town.

7          THE DEFENDANT:  It's all right.  I know that

8     part slightly.

9          CORPORAL ROMANOSKY:  To the left isn't bad

10    because you get out towards Tierra Verde and the

11    islands.  But if you go right you're in a place you

12    don't want to be.

13         THE DEFENDANT:  No.  I just stayed right along

14    19.  And then I kept heading north.

15    (Unintelligible).  And --

16         CORPORAL ROMANOSKY:  (Unintelligible).

17         THE DEFENDANT:  And so, you know, I --

18         CORPORAL ROMANOSKY:  I just had a value meal

19    on the way over so --

20         THE DEFENDANT:  Where?

21         CORPORAL ROMANOSKY:  I had a value meal at

22    McDonald's, got the 99 cent menu so --

23         THE DEFENDANT:  (Unintelligible).

24         CORPORAL ROMANOSKY:  It's been crazy today.  I

25    walked in and it's like -- you know how Mondays are,

1      you walk in and there's just numerous things to get

2      done.  And I had all these meetings today.  I was

3      like I can't wait for the day to get over with so we

4      can meet and all that stuff.

5           THE DEFENDANT:  It's crazy.

6           CORPORAL ROMANOSKY:  Very good.  Did you bring

7      the belts and stuff?  I'm dying to see them.

8           THE DEFENDANT:  Oh.

9           CORPORAL ROMANOSKY:  I love your car.

10          THE DEFENDANT:  Oh, thank you.  It's old.

11          CORPORAL ROMANOSKY:  Old?  It's brand new.

12          THE DEFENDANT:  It's seven years old.

13          CORPORAL ROMANOSKY:  Oh, it's just probably

14     not costing you a bunch of money in payments every

15     month.

16          THE DEFENDANT:  And I love it.

17     (Unintelligible).

18          CORPORAL ROMANOSKY:  (Unintelligible).

19          THE DEFENDANT:  Here is the crop.

20          CORPORAL ROMANOSKY:  Oh, wow.

21          THE DEFENDANT:  Yeah.  It's a pretty lethal

22     thing.

23          CORPORAL ROMANOSKY:  Yeah, it sure is.  Holy

24     cow.

25          THE DEFENDANT:  Yeah.

1          CORPORAL ROMANOSKY:  Holy cow.  That's cool

2     looking, though.  Very effective.

3          THE DEFENDANT:  Very effective.  Very good.

4     Now we have this one.

5          CORPORAL ROMANOSKY:  Nice.  Now these are like

6     something you'd see on the barbers and stuff like

7     that with the razor?  What do they do?  They keep

8     them sharp or just -- (unintelligible).

9          THE DEFENDANT:  No, no, no, no, no.  You see,

10    it's first this.

11         CORPORAL ROMANOSKY:  Right.

12         THE DEFENDANT:  Then this.

13         CORPORAL ROMANOSKY:  Right.

14         THE DEFENDANT:  Then (unintelligible).  I

15    shave usually with a straight razor.

16         CORPORAL ROMANOSKY:  Uh-huh.

17         THE DEFENDANT:  So.

18         CORPORAL ROMANOSKY:  Cool.

19         THE DEFENDANT:  Oh, yeah.

20         CORPORAL ROMANOSKY:  Wow.  You've got to have

21    a steady hand for that one.

22         THE DEFENDANT:  Now, this is the oldest one.

23    This is nearly a hundred years old.

24         CORPORAL ROMANOSKY:  Holy cow.

25         THE DEFENDANT:  It's very soft.

1          CORPORAL ROMANOSKY:  Wow, that is soft.

2     That's something else.  Awesome.

3          THE DEFENDANT:  And then this one, which is

4     only about 50 years old.  (Unintelligible).

5          CORPORAL ROMANOSKY:  Where did you find these?

6          THE DEFENDANT:  They're from the family.

7          CORPORAL ROMANOSKY:  Ah.

8          THE DEFENDANT:  I never found them.  I sold

9     them, yeah, but I didn't buy them.  And this is,

10    this is the Garrison belt.

11         CORPORAL ROMANOSKY:  Wow.  It's like an old

12    military style belt.

13         THE DEFENDANT:  It is.  No.

14         CORPORAL ROMANOSKY:  Oh, is that what you were

15    saying?  You said German, old German.

16         THE DEFENDANT:  Yeah.

17         CORPORAL ROMANOSKY:  Like an old German

18    military (unintelligible) infantry.  Oh, cool.

19         THE DEFENDANT:  And then this is the small

20    one.

21         CORPORAL ROMANOSKY:  Wow.  Wow.  You come well

22    equipped.  That's for sure.

23         THE DEFENDANT:  Did you feel it would be like

24    that or you didn't know?

25         CORPORAL ROMANOSKY:  Well, I -- you know, I

1        looked up at Google and stuff because I'm not

2        like -- like I said, I've never seen one of those

3        used and I was like, wow, that's kind of cool.  Like

4        I've never actually seen one.  Especially an antique

5        one like that.

6             THE DEFENDANT:  They're (unintelligible).  I

7        don't know whether they make them anymore or not.

8        They may.

9             CORPORAL ROMANOSKY:  Uh-huh.  Well, I think

10       they still do but they're --

11            THE DEFENDANT:  But they're --

12            CORPORAL ROMANOSKY:  A modernized version.

13            THE DEFENDANT:  Yeah.  And they'd be very

14       stiff and old and horrible.  (Unintelligible).

15            CORPORAL ROMANOSKY:  Very good.  Very cool.

16       My house is about 30 or 45 minutes from here.

17            THE DEFENDANT:  Okay.

18            CORPORAL ROMANOSKY:  If you just want to

19       follow me that'd be the best way to do it.

20            THE DEFENDANT:  That's the only way I'll get

21       there.

22            CORPORAL ROMANOSKY:  Yeah.  What we're going

23       to do is we'll just end up going back out to 19 and

24       we'll go north.  We're going to go north up about 15

25       miles, so --

1          THE DEFENDANT:  On 19?

2          CORPORAL ROMANOSKY:  On 19.  We're going to

3     get off on Tampa Road, which is, like I said, it's

4     about 25 minutes from there.

5          THE DEFENDANT:  (Unintelligible).

6          CORPORAL ROMANOSKY:  I actually live in Palm

7     Harbor.

8          THE DEFENDANT:  Oh.

9          CORPORAL ROMANOSKY:  But I do work from there.

10         THE DEFENDANT:  Oh.

11         CORPORAL ROMANOSKY:  But I do work.  My work

12    takes me everywhere.  I go, you know, to St. Pete.

13    I go over here.  I go to Hillsborough County.  I go

14    all kinds of places.

15         THE DEFENDANT:  Yeah.  I've been up to Palm

16    Harbor once.  I do a lot of work with the Sheriff's

17    Boy's Ranch.

18         CORPORAL ROMANOSKY:  Oh, no kidding.

19         THE DEFENDANT:  Yeah.

20         CORPORAL ROMANOSKY:  That's a good cause.

21         THE DEFENDANT:  (Unintelligible) in Palm

22    Harbor.  But it's co-ed.

23         CORPORAL ROMANOSKY:  Uh-huh.  Yeah.

24         THE DEFENDANT:  And they're always wanting to

25    know if (unintelligible) the head of it, if I have

1     (unintelligible) --

2             CORPORAL ROMANOSKY:  Wow.

3             THE DEFENDANT:  But, oh, yeah.

4             CORPORAL ROMANOSKY:  I get flyers from them a

5     lot.  They send stuff out in the mail wanting

6     donations and stuff.

7             THE DEFENDANT:  Yeah.  I support them and I

8     have forever.

9             CORPORAL ROMANOSKY:  Oh, no kidding.

10            THE DEFENDANT:  And they're very nice people.

11            CORPORAL ROMANOSKY:  Oh, too -- too bad you

12    couldn't go over and help them out with some

13    troubled youths.

14            THE DEFENDANT:  Oh, it's not for delinquents.

15            CORPORAL ROMANOSKY:  Uh-huh.

16            THE DEFENDANT:  Even though most people think

17    it is.  No.  It's for usually abandonment, or that

18    they live with their grandparents and their

19    grandparents die.

20            CORPORAL ROMANOSKY:  Wow.

21            THE DEFENDANT:  Oh, it's a mess.

22            CORPORAL ROMANOSKY:  Sounds like it's a real

23    train wreck.  Well, do you want to follow me?

24            THE DEFENDANT:  Sure.

25            CORPORAL ROMANOSKY:  Just follow the blue van.

1      I have my phones if you get separated in traffic.

2            THE DEFENDANT:  All right.

3            CORPORAL ROMANOSKY:  Good deal.  Let's go do

4      it.

5            THE DEFENDANT:  Very good.

6            UNIDENTIFIED SPEAKER:  Put your hands up.

7      Don't move."

8      (End of recording.)

9            THE COURT:  We need to collect the

10     transcripts, Mr. O'Neil.

11     BY MS. KAISER:

12     Q     Corporal Romanosky, during that recording, we

13     heard your discussions with the defendant at the

14     scene where he was arrested; is that correct?

15     A     That is correct.

16     Q     And during that transcript -- or during the

17     recording, we heard the defendant showing you

18     various items.  Is that correct?

19     A     That is correct.

20           MS. KAISER:  Your Honor, may I approach the

21     witness?

22           THE COURT:  Yes, ma'am.

23     BY MS. KAISER:

24     Q     Corporal Romanosky, I'm showing you what's

25     been marked for Government's Exhibit as 32.  Do you

1    recognize that item?

2    A    Yes.  This was a bag that was on the front

3    passenger seat of the vehicle.  The other items were

4    inside of it.  He was removing the items from this

5    bag to show them to me.

6    Q    Corporal Romanosky, I'm showing you

7    Government's Exhibit 33.  Do you recognize that

8    item?

9    A    I do.  Exhibit 33 is the riding crop that the

10   defendant brought to the meeting.

11   Q    Government's Exhibit 34, do you recognize that

12   item?

13   A    Yes.  Exhibit 34 was the old German military

14   belt I referred to as the Garrison belt.  The

15   defendant brought this to the meeting.

16   Q    I'm showing you Government's Exhibits 35A,

17   35B, 35C and 35D.  Do you recognize those items?

18   A    Yes.  35A is the razor strap, the leather with

19   the hemp clip.  This was brought by the defendant to

20   the meeting.  35B is the same thing, a little

21   smaller.  35C is also the same thing.  And 35D is a

22   black leather strap with holes.  These items were

23   all brought to the meeting by the defendant.

24   Q    Where did the defendant have these implements

25   in his vehicle?

1      A      They were in that red bag in the front

2      passenger seat of the vehicle.

3            MS. KAISER:  Your Honor, at this time I'd move

4      for admission of Government's Exhibits 32, 33, 34,

5      and 35A through D.

6            MR. TRAGOS:  No objection.

7            THE COURT:  Exhibits 32, 33, 34 and 35A

8      through D are now received.

9      (Whereupon, Government's Exhibit Numbers 32, 33, 34

10     and 35A through D were received into evidence.)

11     BY MS. KAISER:

12     Q      Corporal Romanosky, I'm showing you what's

13     been marked for identification as Government's

14     Exhibit 36.  Are you familiar with that item?

15     A      Yes.  This was a pair of rubber gloves, latex

16     gloves that were in the bag, also.

17           MS. KAISER:  Your Honor, I'd move for

18     Government's Exhibit 36 into evidence.

19           THE COURT:  Any objection?

20           MR. TRAGOS:  Relevance.

21           THE COURT:  36 is received.  Your objection is

22     overruled.

23     (Whereupon, Government's Exhibit Number 36 is

24     received into evidence.)

25           MS. KAISER:  Your Honor, may I publish these

1    to the jury?

2         THE COURT:  Yes, ma'am.  Members of the jury,

3    you will have all of the evidence received in the

4    jury room during deliberations.  But take a moment

5    to acquaint yourself with the exhibits as they are

6    being presented to you so that you can follow the

7    testimony.

8    BY MS. KAISER:

9    Q     All right.  Now, Corporal Romanosky, you

10   mentioned Government's Exhibit Number 33 was what?

11   A     The riding crop, if that's the one you're

12   holding there.  That's 33.

13   Q     And what is the item used for?

14   A     Well, I would say its normal use would be for

15   horseback riding.

16   Q     And is this one of the implements the

17   defendant references in his chats with you?

18   A     Yes.  He had said he had gotten it from some

19   horsey people.

20   Q     I'm showing the jury Government's Exhibit 34.

21   Corporal Romanosky, what is Government's Exhibit

22   35A?

23   A     That is the razor strap that we discussed, or

24   like the one we discussed.

25   Q     And 35B?

1    A      Same thing, smaller.

2    Q      And Government's Exhibit 35C?

3    A      That's also referred to as a razor strap.

4    Q      And finally, Government's Exhibit 35D?

5    A      That's a leather strap with holes.

6           MS. KAISER:  May I approach the witness, Your

7    Honor?

8           THE COURT:  Yes, ma'am.

9    BY MS. KAISER:

10   Q      Corporal Romanosky, I'm showing you what's

11   been marked for identification as Government's

12   Exhibits 31A through 31K, and ask if you could take

13   a look at these and tell me if you recognize them.

14   A      31A is a photograph of the rear of the

15   defendant's vehicle.  31B is a close-up of the

16   defendant's license plate.  31C is a photograph of

17   the interior of the vehicle.  31D is a photograph of

18   the interior of the defendant's vehicle from the

19   passenger's side.  31E is a photograph of the front

20   passenger's side of the defendant's vehicle showing

21   the red bag and items.  31F are those items laid out

22   on the ground.  31G are the latex gloves, a

23   photograph.  31H is a photograph of the rear of the

24   defendant's vehicle, rear interior compartment.  31I

25   is a photograph of the rear of the defendant's

1    vehicle, interior compartment, with an open bag

2    showing some shoes.  31J is a photograph of the

3    interior of the defendant's trunk.  And 31K is a

4    close-up of some items inside of the defendant's

5    trunk, looks like the club and a broom and some

6    other little things.

7    Q    Do these photographs fairly and accurately

8    depict the defendant's vehicle and contents on July

9    21st, 2008?

10   A    I recognize the interior ones because I was

11   there for those portions, the front of the interior

12   and somewhat as I walked up on the vehicle.  The

13   trunk and those items, I wasn't there for -- when

14   those photographs were taken but I have reviewed

15   them.

16        MS. KAISER:  Your Honor, at this time I'd move

17   for admission of Government's Exhibits 31A through

18   31I into evidence.

19        THE COURT:  Any objection?

20        MR. TRAGOS:  May I voir dire, Your Honor?

21        THE COURT:  Yes, sir.

22              VOIR DIRE EXAMINATION

23   BY MR. TRAGOS:

24   Q    Detective, do you still have those photographs

25   there of the exhibits in front of you?

1    A      No, sir.  They're right there.

2    Q      Okay.

3    A      Okay.  I have them.

4    Q      Okay.  31C and 31D and 31E, are those the way

5    the items looked before anyone moved them or touched

6    them in the vehicle?

7    A      To the best of my knowledge, yes.  That bag --

8    the red bag is mainly what I was focussed on.

9    That's what he was taking the items out of and

10   that's where they were when I was talking to him.

11   Q      Okay.  All right.  And going to 31D, you see

12   there's also like a -- kind of a tan plastic bag.

13   Is that where it was located when you were talking

14   to him before his arrest?

15   A      I believe so, sir.  I wasn't focused on the

16   tan bag.

17   Q      Okay.  How about the blue bag, was that where

18   it was when you were speaking to him before his

19   arrest?

20   A      I believe so.  These photographs appear -- it

21   was overall photographs before the vehicle was

22   searched.

23   Q      Okay.

24   A      That would be standard practice.

25   Q      Okay.  Then the 31G, these gloves were taken

```
 1    out of the bag; correct?  That's not the way it was

 2    when he was arrested?

 3    A     Correct.  They were in the bag.  These were

 4    taken out and photographed by forensics.

 5    Q     And there were three gloves?

 6    A     It appears -- there appears to be here, sir.

 7    Q     Okay.  Then 31H and I, which one of those two

 8    is the way it appeared at the time of his arrest?

 9    A     It would be I, before anything was open or

10    disturbed.

11    Q     I?

12    A     I'm sorry, H.

13    Q     H.

14    A     I looks like after it was opened up.

15    Q     Okay.

16          MR. TRAGOS:  No objection, Your Honor.

17          THE COURT:  Exhibit 31A and 31 -- let's just

18    say A through I are received.

19    (Whereupon, Government's Exhibit Numbers 31A through

20    31I were received into evidence.)

21          MS. KAISER:  Thank you, Your Honor.  May I

22    publish them to the jury, Your Honor.

23          THE COURT:  Yes, ma'am.

24

25
```

1          <u>DIRECT EXAMINATION</u> (Continued)

2     <u>BY MS. KAISER:</u>

3     Q     All right.  Corporal Romanosky, what are we

4     looking at here in Government's Exhibit 31A?

5     A     That's the rear of the defendant's vehicle.

6     It's parked where it was at the time that I met with

7     him just prior to the arrest.

8     Q     And Government's Exhibit 31B?

9     A     That's the defendant's Florida license plate.

10    Q     And Government's Exhibit 31C, what are we

11    looking at here?

12    A     This is a photograph of the interior front

13    portion of the defendant's vehicle.  You can see the

14    red bag positioned there on the front passenger

15    seat.

16    Q     And can you see any implements that he brought

17    with him in that picture?

18    A     The riding crop is sticking out.  That was the

19    tallest.

20    Q     And Government's Exhibit 31D?

21    A     This was a photograph of the front interior

22    compartment of the defendant's vehicle.  This is

23    taken from the perspective of the passenger's side.

24    Q     Government's Exhibit 31E?

25    A     Same thing, closer view.

1    Q      And Government's Exhibit 31F?

2    A      This is these items here.  They're laid out

3    and photographed by our forensics specialist.

4    Q      And 31G?

5    A      Those are the gloves.

6    Q      And 31H, what are we looking at here?

7    A      This is a photograph of the interior

8    compartment of the defendant's vehicle taken from

9    the perspective of the rear -- it's the rear

10   compartment and it's taken from the driver's side.

11   Those were, I guess, bags that were in the vehicle.

12   Q      And 31I?

13   A      It appears to be after they opened up the one

14   bag there so you can see its contents.

15   Q      At the end of the tape we heard the defendant

16   being placed under arrest; is that correct?

17   A      That's correct.

18   Q      Can you tell the jury what happened after the

19   defendant was placed under arrest?

20   A      After the defendant was placed under arrest --

21   obviously, it was a real emotional time at that

22   point.  I re-approached the defendant, introduced

23   myself, explained who I was and told him that I'd

24   like to go back to my office so that we could

25   discuss the case.  He agreed to accompany me back to

1    my office.

2    Q     Okay.

3          MS. KAISER:  Your Honor, may I approach the

4    witness?

5          THE COURT:  Yes, ma'am.

6    BY MS. KAISER:

7    Q     I'm showing you what's been marked for

8    identification as Government's Exhibit 37.  Do you

9    recognize that item?

10   A     This is a digital recording of my transport

11   from the location of the arrest back to my office.

12   Q     Have you listened to this digital recording of

13   the transport?

14   A     I have.

15   Q     And does it truly and accurately depict any

16   conversation you had with the defendant on the ride

17   to your office?

18   A     It does.

19         MS. KAISER:  Your Honor, at this time I'd move

20   for admission of Government's Exhibit 37 into

21   evidence.

22         THE COURT:  Any objection?

23         MR. TRAGOS:  No objection.

24         THE COURT:  37 is received.

25   (Whereupon, Government's Exhibit Number 37 was

1    received into evidence.)

2    BY MS. KAISER:

3    Q     Do you typically tape transports of

4    defendants?

5    A     It's not something typical.  It's something

6    I'm starting to do more often.

7    Q     And why do you do that?

8    A     Well, for a couple reasons.  One is to record

9    any kind of spontaneous or emotional statements they

10   might make while in route back to my office.  And

11   second is just in the past during my career I've

12   been criticized by some defense counsel saying that

13   I didn't --

14          MR. TRAGOS:  Objection.

15          THE COURT:  That's not relevant to the

16   proceedings.  Ask another question, please.

17   Sustained.

18          MS. KAISER:  Your Honor, at this time I'd

19   request permission to publish Government's Exhibit

20   37 to the jury.

21          THE COURT:  All right.

22          CORPORAL ROMANOSKY:  Other than -- other than

23   me being a deputy sheriff, I'm still the same guy

24   you've been talking to; okay?  So I'm not going to

25   be mean to you.  I'm a nice guy.

1          UNIDENTIFIED SPEAKER:  Make sure we got the

2     right things, pal.  Here's the black --

3     (unintelligible).

4          THE DEFENDANT:  I can't see.

5          UNIDENTIFIED SPEAKER:  That's all right.

6          THE DEFENDANT:  Yeah.  No, not the green one.

7     It's black.  It's (unintelligible).

8          UNIDENTIFIED SPEAKER:  Okay.

9          THE DEFENDANT:  And a phone and a black thing

10    that's zippered.  It's sort of I think folded on the

11    floor.

12         CORPORAL ROMANOSKY:  (Unintelligible) we had a

13    meeting like this, but you seem like a nice guy.  I

14    just have some --

15         THE DEFENDANT:  I don't think you'll find

16    anything.

17         CORPORAL ROMANOSKY:  Well, I have to look at

18    them, anyhow, just because we've chatted back and

19    forth.

20         THE DEFENDANT:  Right.  I don't have --

21         CORPORAL ROMANOSKY:  If you never saved --

22    even if you've never saved them yourself, the

23    computer may still automatically log those chats.

24    You won't see it.  It will be hidden in the program

25    files so deep you would never find it.

1              THE DEFENDANT:  Oh.  The --

2              CORPORAL ROMANOSKY:  Laptop.

3              THE DEFENDANT:  Laptop, it's seven years old

4      and it doesn't work half the time.  Funny.

5              CORPORAL ROMANOSKY:  What's that?

6              THE DEFENDANT:  It's funny.  They're going

7      through all my stuff.

8              CORPORAL ROMANOSKY:  Well, they're going to

9      have to.  We have to -- we have to do a complete --

10             THE DEFENDANT:  (Unintelligible).

11             CORPORAL ROMANOSKY:  Oh, well, that stuff.

12     No.  What we're going to do is just open your wallet

13     and make sure there's no dope or something like that

14     in there, no razor blades, that kind of stuff.

15     Charles, let me tell you.  You've been in your

16     business a long time, I've been doing this a long

17     time, you never know what people will have on them.

18     I've had people who've had little like plastic

19     baggies with cocaine and a razor blade to cut it up.

20     I've had people, you know, in the middle of an

21     interview, they, oh, do you mind if I get my ID out.

22     They take out their ID -- got enough air?  Make sure

23     to get you some.  It's kind of warm out today.  I'm

24     sorry.

25             THE DEFENDANT:  (Unintelligible).

1          CORPORAL ROMANOSKY:  I'm sorry?

2     (Unintelligible).  Reference 14.  There really isn't

3     a signal here.

4          UNIDENTIFIED SPEAKER:  (Unintelligible).

5          CORPORAL ROMANOSKY:  Yes.

6          UNIDENTIFIED SPEAKER:  Sir, there's cash in

7     here.  I want to just keep this in your sight.  So

8     the detective will probably keep it in his custody.

9          CORPORAL ROMANOSKY:  18406.

10         UNIDENTIFIED SPEAKER:  I want to be able to

11    keep it up here in front.  That's your insulin.  Got

12    it.  And I've got your phone.  But I want to keep

13    this in your eyesight.

14         THE DEFENDANT:  Okay.  This, I'm on call so --

15         UNIDENTIFIED SPEAKER:  All right.  I'll leave

16    that up there with you and so when it rings he

17    can -- all right.  Watch your leg.

18         CORPORAL ROMANOSKY:  Who are you on call for?

19         THE DEFENDANT:  Anybody.

20         CORPORAL ROMANOSKY:  Patients?

21         THE DEFENDANT:  Yeah.

22         CORPORAL ROMANOSKY:  Oh, okay.  There's not a

23    whole lot of room in here.

24         UNIDENTIFIED SPEAKER:  That's okay.

25         CORPORAL ROMANOSKY:  Sure.  I'm going to try

1     to give you the most air.

2          THE DEFENDANT:  Oh, no.

3          CORPORAL ROMANOSKY:  Okay.  Driver's license.

4          THE DEFENDANT:  Can I have that?

5          CORPORAL ROMANOSKY:  Well, I'll give that back

6     to you.

7          THE DEFENDANT:  You may know it or not, this

8     is the very first time I've ever had a problem.  I

9     don't know whether you can believe it or not.

10         CORPORAL ROMANOSKY:  Well, obviously I checked

11    your history to find out if you had any prior

12    arrests or anything so --

13         THE DEFENDANT:  No, really not.  Do I have to

14    keep these on?

15         CORPORAL ROMANOSKY:  Well, just until we get

16    to my office.  We have a --

17         THE DEFENDANT:  I mean, I'm not dishonest.

18         CORPORAL ROMANOSKY:  I understand, but it's

19    our company policy.  We've had people get hurt in

20    the past so we just --

21         THE DEFENDANT:  I have to -- if I start

22    sweating or anything, we'll have to grab these.

23         CORPORAL ROMANOSKY:  All right.  Did you take

24    your insulin before you ate?

25         THE DEFENDANT:  No.  I take it in the evening.

1        CORPORAL ROMANOSKY:  Oh, you don't take it

2    like before meals or anything?

3        THE DEFENDANT:  No, no.  However, if I get a

4    problem I have to do it.

5        CORPORAL ROMANOSKY:  Oh, okay.  What time in

6    the evening do you take it?

7        THE DEFENDANT:  After dinner.  You know,

8    it's -- (unintelligible) unless you feel funny.

9        CORPORAL ROMANOSKY:  How long have you had

10    diabetes?

11        THE DEFENDANT:  20 something years.

12    (Unintelligible).

13        CORPORAL ROMANOSKY:  No.  But I've had family

14    members that have it.  That's a tough one.  Every

15    time, you know, you get an injury, it makes it

16    harder to heal and all that.

17        THE DEFENDANT:  I know.  That's why this is a

18    problem.

19        CORPORAL ROMANOSKY:  What is?

20        THE DEFENDANT:  My leg.

21        CORPORAL ROMANOSKY:  Oh, really?  What

22    happened to your leg?

23        THE DEFENDANT:  I fell.

24        CORPORAL ROMANOSKY:  Ah, not good.

25        THE DEFENDANT:  No.

1              CORPORAL ROMANOSKY:  Is that from when you

2      were telling me on the chat the other night that you

3      fell, you slipped on the tile?  Is it already

4      starting to give you a problem healing?

5              THE DEFENDANT:  Well, you don't know yet.

6              CORPORAL ROMANOSKY:  Um-hum.

7              THE DEFENDANT:  You know, what happens is this

8      gets lighter purple, then it goes further down and

9      gets darker.  You don't know.

10             CORPORAL ROMANOSKY:  Hum.  There's nothing

11     that (unintelligible).  That's for sure.

12             THE DEFENDANT:  No.

13             CORPORAL ROMANOSKY:  I will tell you, Charles,

14     I know -- I know your actual age is 78, not 70, but

15     you look good for 78.  I never would have -- you

16     know, like my perception of 78, I would have thought

17     you would be limited to traveling and all that.  You

18     definitely have the longevity gene in your family.

19             THE DEFENDANT:  That I do.

20             CORPORAL ROMANOSKY:  Did you tell me your dad

21     lived to be 108?

22             THE DEFENDANT:  No, 102.

23             CORPORAL ROMANOSKY:  102.  Wow.  That's got to

24     be some kind record.

25             THE DEFENDANT:  Oh, no.  His business partner

1    was 105 two weeks ago.

2          CORPORAL ROMANOSKY:  His business partner?

3          THE DEFENDANT:  Um-hum.

4          CORPORAL ROMANOSKY:  He wasn't still in

5    business at that age, though, was he?

6          THE DEFENDANT:  Oh, no.  No, No.

7          CORPORAL ROMANOSKY:  That was (unintelligible)

8    years ago.

9          THE DEFENDANT:  No.  They weren't even

10   friendly.

11         CORPORAL ROMANOSKY:  No kidding.  At the end

12   or even while they were doing business together?

13         THE DEFENDANT:  You know, I really don't know.

14   I know near the end.

15         CORPORAL ROMANOSKY:  Uh-huh.  Did your dad

16   live with you before he passed?

17         THE DEFENDANT:  No.  No.  He lived in assisted

18   living at a nursing home.  He had a stroke.

19         CORPORAL ROMANOSKY:  Hum.  What do they call

20   them, rehab centers or something?

21         THE DEFENDANT:  No, no, no, no, no.  He -- he

22   couldn't do anything for himself.

23         CORPORAL ROMANOSKY:  Right.

24         THE DEFENDANT:  So it was in an actual nursing

25   home.  Is this St. Petersburg or no?

1          CORPORAL ROMANOSKY:  Right now it's

2    technically considered St. Petersburg,

3    unincorporated area.

4          THE DEFENDANT:  Oh, I see.

5          CORPORAL ROMANOSKY:  But my office is actually

6    in Largo, just north of here.  We'll be there in

7    about 15 minutes.  So what all do you do with the

8    Boy's Ranch?

9          THE DEFENDANT:  Oh, I just give advice, you

10   know.  I don't -- I go to the people who work with

11   the people.

12         CORPORAL ROMANOSKY:  Oh.  You don't actually

13   work with the kids?

14         THE DEFENDANT:  Oh, no.

15         CORPORAL ROMANOSKY:  You work with the -- like

16   the counselors?

17         THE DEFENDANT:  Yeah, whenever the -- I do

18   very little of that, you know, but I -- I do it free

19   because it seems like a good organization.  Maybe

20   not.

21         CORPORAL ROMANOSKY:  Are they like teen

22   counselors that you work with or are they actually

23   adults?

24         THE DEFENDANT:  Oh, no, they're old.

25         CORPORAL ROMANOSKY:  Uh-huh.

1          THE DEFENDANT:  So --

2          CORPORAL ROMANOSKY:  I'd offer you one but

3     it's sugar so --

4          THE DEFENDANT:  That's all right.  I don't

5     know what it is.

6          CORPORAL ROMANOSKY:  It's a breath mint.

7          THE DEFENDANT:  You could try.

8          CORPORAL ROMANOSKY:  I'd better not.

9          THE DEFENDANT:  No, it won't hurt me.  I

10    just -- it's pretty bad now so that's why.

11         CORPORAL ROMANOSKY:  What is?

12         THE DEFENDANT:  My breath.  I could take one

13    if you wouldn't mind, or would you rather not?

14         CORPORAL ROMANOSKY:  I'd prefer -- not knowing

15    how it's going to affect the diabetes.  It's all

16    sugar so --

17         THE DEFENDANT:  No.  I have in my satchel some

18    gum.

19         CORPORAL ROMANOSKY:  Okay.

20         THE DEFENDANT:  Some sugarless gum.

21         CORPORAL ROMANOSKY:  You don't use the glucose

22    tablets?

23         UNIDENTIFIED SPEAKER:  I have a friend that's

24    got diabetes and he --

25         THE DEFENDANT:  I have them with me but the

1      glucose tablets are only when you feel faint.

2            CORPORAL ROMANOSKY:  Right.

3            THE DEFENDANT:  Oh, yeah, I carry those,

4      needless to say.

5            UNIDENTIFIED SPEAKER:  He uses the pump.  He

6      says --"

7      BY MS. KAISER:

8      Q      Corporal Romanosky, could you please identify

9      the other speaker on the tape?

10     A      The other speaker on the tape is Sergeant

11     Charles Vaughn.  He was the incoming tac sergeant

12     for our tactical unit.  Our department policy

13     requires us to have two people present in the

14     vehicle in an uncaged car.

15     Q      Okay.  Thank you.

16           THE DEFENDANT:  He probably has it worse than

17     I do.  I can say that.

18           UNIDENTIFIED SPEAKER:  Yeah.  He's -- he

19     didn't develop it until he was about 17.

20           CORPORAL ROMANOSKY:  Wow.

21           UNIDENTIFIED SPEAKER:  He got it early.

22           THE DEFENDANT:  Well, that's what we call JD,

23     juvenile diabetes, which is much more serious.

24           CORPORAL ROMANOSKY:  Right.

25           THE DEFENDANT:  Mine is not.

1          CORPORAL ROMANOSKY:  Juvenile is more severe?

2          THE DEFENDANT:  Oh, much.

3          CORPORAL ROMANOSKY:  Because they're not going

4     to grow out of it, are they?

5          THE DEFENDANT:  No, they can't.  They can't.

6     And they're on the kind of insulin you talked to me

7     about.

8          CORPORAL ROMANOSKY:  No kidding.  Cool enough

9     for you?

10          THE DEFENDANT:  In a way, yes.

11          CORPORAL ROMANOSKY:  Well, it's just so hot

12     out.  Most of the time because the sun is starting

13     to go down a little bit.  That's one thing about

14     this van, it doesn't have rear air in it.  There's

15     so much room in here it's gotta try to cool.  During

16     the heat of the day it takes forever to get this

17     thing cool.

18          THE DEFENDANT:  Could you reach a piece of gum

19     for me?

20          UNIDENTIFIED SPEAKER:  I can.

21          THE DEFENDANT:  Would you mind?

22          UNIDENTIFIED SPEAKER:  Is it in the --

23          THE DEFENDANT:  In here, in this part.  Right

24     there.  It's sugarless.  Yeah.  Yeah.  You have to

25     pull the little --

1              UNIDENTIFIED SPEAKER:  This one?

2              THE DEFENDANT:  Oh, yeah, yeah.  That's fine.

3       Okay.  Will they give me back the computer or do

4       they keep it or what?

5              CORPORAL ROMANOSKY:  Well, it will be

6       determined at the end of the case disposition.

7       After everything is over with and they look at any

8       property that's in evidence and they make -- make a

9       determination of what's going to happen with it.

10             THE DEFENDANT:  You want the truth?

11             CORPORAL ROMANOSKY:  Uh-huh.

12             THE DEFENDANT:  It doesn't make any

13      difference.

14             CORPORAL ROMANOSKY:  How do you mean?

15             THE DEFENDANT:  I don't care whether I ever

16      see it again.

17             CORPORAL ROMANOSKY:  Okay.  Well, seven years

18      old, may be time for a new one.

19             THE DEFENDANT:  Well, the other one doesn't

20      work so that's why I --

21             CORPORAL ROMANOSKY:  Well, it's definitely

22      time for a new one, then.

23             THE DEFENDANT:  Yeah.  No.  But this one, it

24      works a third of the time.

25             CORPORAL ROMANOSKY:  How do you access the

1    internet at home?  Do you have dialup or --

2         THE DEFENDANT:  Yeah.

3         CORPORAL ROMANOSKY:  Do you?  Probably one of

4    the few troopers still using dialup, are you.

5    Nothing wrong with that.  Tried and true.  It works.

6    Makes file transfer a little bit hard if you're

7    trying to download something but --

8         THE DEFENDANT:  I don't download.  You know,

9    why don't you get broadband or --

10        CORPORAL ROMANOSKY:  Yeah, cable.

11        THE DEFENDANT:  I said, it doesn't make any

12   difference to me.  I don't do anything.  I mean, you

13   can see people laugh at me.  But they won't have to

14   laugh anymore because I don't want one.

15        CORPORAL ROMANOSKY:  Don't you need one for

16   your business to a certain degree, though?

17        THE DEFENDANT:  A little bit.  A little bit,

18   but I can hire a service.

19        CORPORAL ROMANOSKY:  Oh, that maintains like

20   an e-mail or something like that?

21        THE DEFENDANT:  Well, I don't get e-mails.

22   They really do your billing and stuff.

23        CORPORAL ROMANOSKY:  You told me you have an

24   MD and a PhD?

25        THE DEFENDANT:  Yeah.  But I've never used the

1    MD, so what the hell, excuse my French.  And I use

2    my PhD, yes.

3         CORPORAL ROMANOSKY:  Because you do

4    psychology?

5         THE DEFENDANT:  Well, yeah.  Insurance

6    companies don't pay for anything more than that.

7         CORPORAL ROMANOSKY:  Oh, really.

8         THE DEFENDANT:  No, unless you wanted to

9    dispense meds.  If you dispense meds, you cost so

10   much in the malpractice.

11        CORPORAL ROMANOSKY:  Right.  Oh, yeah, I can

12   bet.  Seems like everyone wants to sue for something

13   these days.

14        THE DEFENDANT:  Yes.  I never have been.

15        CORPORAL ROMANOSKY:  Do you have any specialty

16   as far as your -- are you -- what actually is your

17   title?  Are you a mental health counselor?  Do you

18   need a license in the State of Florida for a mental

19   health counselor?

20        THE DEFENDANT:  Yeah.

21        CORPORAL ROMANOSKY:  So is that what your

22   actual title is or do you go by psychologist or --

23        THE DEFENDANT:  Well, I have a degree in

24   psychology, but the State of Florida doesn't -- if

25   you haven't graduated from a school in the State of

1       Florida, they don't want you.  It's similar to

2       California, so I'm told.

3            CORPORAL ROMANOSKY:  So what's your specialty,

4       though?  I mean, do you --

5            THE DEFENDANT:  I talk with the most part with

6       people who are getting divorced.

7            CORPORAL ROMANOSKY:  Um-hum.

8            THE DEFENDANT:  People who are in marital

9       difficulty, you know.

10           CORPORAL ROMANOSKY:  So like family

11      counseling?

12           THE DEFENDANT:  Well, I don't do too much with

13      family.

14           CORPORAL ROMANOSKY:  Um-hum.

15           THE DEFENDANT:  It's parents who, you know,

16      their own thing, you know.  But I've been seriously

17      looking for something else.  It's too much.

18           CORPORAL ROMANOSKY:  I can imagine.  I mean,

19      it's time to enjoy your retirement years.

20           THE DEFENDANT:  Well, yeah.  Both computers

21      are in my den, one right next to the other.

22           CORPORAL ROMANOSKY:  Very good.

23           THE DEFENDANT:  One doesn't work.

24           CORPORAL ROMANOSKY:  Okay.  I'm sure they'll

25      collect it, anyway.  Even though it may not work for

1      you -- it may not work for you, but we'll make it

2      work.

3             THE DEFENDANT:  Well, that's fine.  I can't.

4      The laptop does work.

5             CORPORAL ROMANOSKY:  Okay.

6             THE DEFENDANT:  It may be --

7             CORPORAL ROMANOSKY:  I was just asking the

8      question before about like dogs and -- because those

9      guys are -- you know, they have to go in your house.

10     They don't know what's in there.  They have to make

11     sure they weren't going to encounter any big guard

12     dog or something.

13            THE DEFENDANT:  I don't know how they're going

14     to get in.  Do you?

15            CORPORAL ROMANOSKY:  I don't know.  They may

16     call a locksmith or something like that, you know.

17     We do this a lot so we'll find a way in.  They'll do

18     it so they can secure it when they leave properly so

19     -- so you live in a golf course community down

20     there, huh?

21            THE DEFENDANT:  Well, more or less but I'm not

22     on a golf course.

23            CORPORAL ROMANOSKY:  You don't play?

24            THE DEFENDANT:  (Unintelligible).

25            CORPORAL ROMANOSKY:  Oh, really?

1          THE DEFENDANT:  I can't see anymore.

2          CORPORAL ROMANOSKY:  It's still nice down

3     there, the trees and -- they don't clear everything

4     off like they do in most neighborhoods.

5          THE DEFENDANT:  Well, they did, really.  My --

6     where I live was a cow pasture.

7          CORPORAL ROMANOSKY:  Oh, no kidding.  Still a

8     few of them down there.

9          THE DEFENDANT:  Oh, yeah.  And there were no

10    trees.

11         CORPORAL ROMANOSKY:  Um-hum.

12         THE DEFENDANT:  So I put up trees.

13    (Unintelligible) water.

14         CORPORAL ROMANOSKY:  I can get you some.

15    We're almost to my office.  I'll get you some water.

16         THE DEFENDANT:  Do you mind?

17         CORPORAL ROMANOSKY:  No.  I'll get you some

18    water.  I promise.

19         THE DEFENDANT:  (Unintelligible).

20         CORPORAL ROMANOSKY:  What's that?

21         THE DEFENDANT:  (Unintelligible).

22         CORPORAL ROMANOSKY:  No.  We'll get you some

23    water.

24         THE DEFENDANT:  That's one of the things about

25    diabetes.

1          CORPORAL ROMANOSKY:  You're always thirsty or

2     something, right.

3          THE DEFENDANT:  Well, lots of the time, yeah.

4     I drink 12 to 14 glasses of water a day.

5          CORPORAL ROMANOSKY:  It's good for you.

6          THE DEFENDANT:  That's how I survive.

7     (Unintelligible).

8          CORPORAL ROMANOSKY:  Yes, they will.  It's a

9     combination of several different roads, but

10    technically it's Alternate 19.

11         THE DEFENDANT:  Oh.

12         CORPORAL ROMANOSKY:  It will weave its way

13    north.  So where do you have to give your injections

14    when you use the insulin?

15         THE DEFENDANT:  In my tummy.

16         CORPORAL ROMANOSKY:  Wow.

17         THE DEFENDANT:  I can do it in my arm.

18         CORPORAL ROMANOSKY:  Oh, can you.

19         THE DEFENDANT:  It's best in your tummy or

20    your leg.

21         CORPORAL ROMANOSKY:  Is there a reason why?

22    Absorb faster or --

23         THE DEFENDANT:  Do I know the truth?  No, I

24    don't know.

25         CORPORAL ROMANOSKY:  It's just what they teach

1     you, right?

2          THE DEFENDANT:  Yeah, exactly.  If I have to

3     give it to people, which sometimes I do because they

4     can't, they'll do it usually in their leg.  Women

5     prefer it in their leg.

6          CORPORAL ROMANOSKY:  Really?

7          THE DEFENDANT:  You have to do it way up, I

8     mean, you know.  You don't -- (unintelligible).

9     That might be why.  You have to have your alcohol,

10    your needles (unintelligible).  What is very nice

11    now, Medicare supplies you with some of it.

12         CORPORAL ROMANOSKY:  Oh, no kidding.  That

13    helps.

14         THE DEFENDANT:  Not your -- not your needles

15    or that.  They do insulin.

16         CORPORAL ROMANOSKY:  That helps some,

17    prescription medications.

18         THE DEFENDANT:  Oh, yeah.  See, you don't only

19    take that, you take pills.

20         CORPORAL ROMANOSKY:  Wow.

21         THE DEFENDANT:  I mean, it's a -- it's a --

22    (unintelligible).

23         CORPORAL ROMANOSKY:  I've known a couple

24    diabetics.  It's the same thing.  They have to give

25    injections in the stomach.  I never understood why.

1      THE DEFENDANT:  Did it ever bother you to do

2   it?

3      CORPORAL ROMANOSKY:  No, I didn't have to.

4   Oh, watch them?

5      THE DEFENDANT:  Oh, oh.  You didn't have to do

6   it.

7      CORPORAL ROMANOSKY:  Oh, no, no, no.  I had

8   relatives, they would have to do that before --

9   usually before meals.

10      THE DEFENDANT:  Yeah.  Well, you have a couple

11   different kinds of diabetics.  Some have to have it

12   before meals and take a specific pill right

13   afterwards.  I don't know how the --

14   (unintelligible).  I've never been up in here.

15      CORPORAL ROMANOSKY:  Oh, no?  Well, this isn't

16   too bad up here.  Actually, it's a lot of elderly

17   people in this area.

18      THE DEFENDANT:  Yeah.  I know someone who's in

19   a -- two women who are in a nursing home in Palm

20   Harbor.

21      CORPORAL ROMANOSKY:  There's a lot of those in

22   Palm Harbor.

23      THE DEFENDANT:  Oh, are there?  They think

24   they've found heaven.

25      CORPORAL ROMANOSKY:  Well, Palm Harbor is

1    nice.  I think it's -- the north county is a little

2    quieter.  We have a pretty big little campus here,

3    huh?

4         THE DEFENDANT:  Looks like it to me, yeah.

5         CORPORAL ROMANOSKY:  We're a pretty large

6    agency.  There's the ramp there.  Save stress on the

7    hip.  Walk up the ramp.  There we go.  I don't want

8    you to walk up the stairs.  We'll take the ramp."

9         THE COURT:  Would now be a good time for a

10   comfort break?

11        MS. KAISER:  Yes, Your Honor.

12        THE COURT:  Let's take an afternoon comfort

13   break.

14        COURTROOM SECURITY OFFICER:  Rise for the

15   jury.

16   (Jury out at 3:01 PM.)

17   (Recess was taken at 3:01 until 3:19.)

18   (Back on the record.)

19        COURTROOM SECURITY OFFICER:  All rise.  This

20   Honorable Court is again in session.

21        MS. KAISER:  Your Honor, on the transcripts

22   for Government's Exhibit 30, there was actually two

23   copies of each one that were given to the jurors.

24   It was one through seven, but there had been two

25   photocopies made, but they're all exactly the same.

1    So they just had an extra copy behind it, so I just

2    wanted to advise the Court and advise defense

3    counsel.  It's exactly the same thing.

4         THE COURT:  There were two copies stapled

5    together?

6         MS. KAISER:  Exactly.  It was just

7    mis-stapled.

8         THE COURT:  I'm sure they figured that out.

9    Do you want me to explain anything to them,

10   Mr. Tragos?

11        MR. TRAGOS:  No, Your Honor.  They're not

12   going to see those again; right?

13        THE COURT:  Not unless they asked for them

14   during deliberations.  I think last time they did

15   because that tape's fairly inaudible in many

16   respects.  And I don't mean that as a ruling on the

17   law, simply an acknowledgement that it is difficult

18   to follow without the assistance of a transcript.

19        Bring the jury in, please.

20        MS. KAISER:  Thank you.

21        THE COURT:  We're going to go till 4:00.  I

22   have a hearing at 4:00 so --

23        COURTROOM SECURITY OFFICER:  Rise for the

24   jury.

25   (Jury in at 3:20 PM.)

1          THE COURT:  Thank you, and be seated.  Please

2     resume direct examination.

3          MS. KAISER:  Thank you, Your Honor.

4     BY MS. KAISER:

5     Q     Corporal Romanosky, on Government's

6     Exhibits --

7          MS. KAISER:  May I approach, Your Honor?

8          THE COURT:  Yes, ma'am.

9     BY MS. KAISER:

10    Q     For Government's Exhibits 33 which was the

11    riding crop, 34 which was the belt and 35A through D

12    which you testified to earlier, did your office ever

13    send those items out to be tested?

14    A     For?

15    Q     Any type of bodily fluids.

16    A     No.

17    Q     Are you familiar with the term, DNA?

18    A     Yes, of course.

19    Q     And what does that mean?

20         MR. TRAGOS:  Objection, Your Honor, to his --

21    qualified.

22         THE COURT:  Well, based on his understanding

23    what is it.

24         THE WITNESS:  DNA basically is a composition

25    of what a person is made up of?  The -- that's

1      probably the best way to put it.  It defines who you

2      are.

3      BY MS. KAISER:

4      Q      Do children typically have their DNA recorded?

5      A      No.

6      Q      Whose DNA does law enforcement have?

7      A      The database that is maintained by law

8      enforcement is normally convicted felons.  People

9      are required by different statutes to submit a DNA

10     sample.

11     Q      After the defendant was driven to your office,

12     did you have an opportunity to interview him?

13     A      I did.

14     Q      Was the defendant read his rights?

15     A      He was.

16     Q      Did he indicate that he understood those

17     rights?

18     A      He did.

19            MS. KAISER:  Your Honor, may I approach the

20     witness?

21            THE COURT:  Yes, ma'am.

22     BY MS. KAISER:

23     Q      Corporal Romanosky, I'm showing you what's

24     been marked for identification as Government's

25     Exhibit Number 38.  Do you recognize that document?

1      A      I do.  This is a Pinellas County Sheriff's

2      Office rights advisement form.

3      Q      And how do you recognize that document?

4      A      My signature is on the bottom as a witness.

5      The defendant signed it under signature.  And the

6      heading information is things that I input into the

7      computer before I printed it such as name, case

8      number, the defendant's name and address.

9      Q      And did you review that form with the

10     defendant prior to his interview?

11     A      I did.

12         MS. KAISER:  Your Honor, at this time I'd move

13     for admission of Government's Exhibit 38 into

14     evidence.

15         THE COURT:  Is there any objection?

16         MR. TRAGOS:  No objection.

17         THE COURT:  38 is received.

18     (Whereupon, Government's Exhibit Number 38 is

19     received into evidence.)

20         MS. KAISER:  Your Honor, at this time I'd like

21     to publish Government's Exhibit 38.

22         THE COURT:  All right.

23     BY MS. KAISER:

24     Q      All right.  And this is the form you went over

25     with the defendant?

 1     A      That's correct.

 2     Q      And on this form, do you advise him of his

 3     rights?

 4     A      I do.

 5     Q      Did you go over each and every one of the

 6     questions indicated on this form?

 7     A      I did.

 8     Q      Did the defendant agree to waive his rights

 9     and to speak to you?

10     A      He did.

11            MS. KAISER:  Your Honor, may I approach the

12     witness?

13            THE COURT:  Yes, ma'am.

14     BY MS. KAISER:

15     Q      Corporal Romanosky, I'm showing you what's

16     been marked for identification as Government's

17     Exhibit Number 40.  Do you recognize that document?

18     A      Yes, ma'am.  This is a Pinellas County

19     Sheriff's Office consent to search waiver for

20     computer and/or related accessories.

21     Q      And did you use that form with the defendant?

22     A      I did.  I had requested the defendant's

23     permission to search his computer.

24     Q      Did he give you permission to do so?

25     A      He did.

1    Q      All right.

2           MS. KAISER:  Your Honor, at this time I'd move

3    for admission of Government's Exhibit Number 40 into

4    evidence.

5           THE COURT:  Is there any objection?

6           MR. TRAGOS:  No.

7           THE COURT:  Exhibit 40 is received.

8    (Whereupon, Government's Exhibit Number 40 was

9    received into evidence.)

10   BY MS. KAISER:

11   Q      Where did the interview of the defendant take

12   place?

13   A      The interview of the defendant took place at

14   the Pinellas County Sheriff's Office in the crimes

15   against children interview room.

16   Q      Was that interview recorded?

17   A      It was.

18   Q      And was a digital recording made of that

19   interview?

20   A      It was.

21          MS. KAISER:  Your Honor, may I approach the

22   witness?

23          THE COURT:  Yes, ma'am.

24   BY MS. KAISER:

25   Q      Corporal Romanosky, I'm showing you what's

1    been marked for identification as Government's

2    Exhibit 39A and 39B.  Do you recognize those items?

3    A     39A is the interview with the defendant.  39B

4    is a digital recording of the interview with the

5    defendant, but I believe this had redactions for the

6    times that I was out of the room extended.  Did you

7    want me to discuss this?

8    Q     Yes.  And I'm showing you what's been marked

9    for identification as Government's Exhibit 39C.

10   A     39C is a very brief, like a transcription,

11   some statements made by the defendant.

12   Q     All right.  And Corporal Romanosky, have you

13   listened to Government's Exhibits 39A and 39B?

14   A     I have.

15   Q     And do those recordings truly and accurately

16   depict your interview with the defendant at your

17   office on July 21st, 2008?

18   A     They do.

19   Q     And is Government's Exhibit 39B a redacted

20   copy of Government's Exhibit 39A?

21   A     Yes.  There were some times I had to leave the

22   room, and those were redacted for time constraints.

23   Q     And approximately how -- how many times did

24   you have to leave the room?

25   A     It would be a guess, a few times.

1          MS. KAISER:  Your Honor, at this time I'd move

2     for admission of Government's Exhibits 39A and B

3     into evidence.

4          MR. TRAGOS:  May I voir dire, Your Honor?

5          THE COURT:  Yes, sir.

6                   VOIR DIRE EXAMINATION

7     BY MR. TRAGOS:

8     Q     Corporal Romanosky, by redaction I think you

9     said parts of A are not in B; correct?

10    A     That's correct, sir.

11    Q     How much -- how much time-wise was taken out

12    of A and put on B?

13    A     I'm guessing, but I think it was around an

14    hour.

15    Q     And how -- so how long was the total

16    interview?

17    A     Well, the actual interview --

18    Q     How long was A?  Maybe that's a better way.

19    A     I want to say it's like two hours and 45

20    minutes or something like that.

21    Q     Okay.  And so B is about two hours?

22    A     Roughly.

23    Q     Okay.  And all the times that you were out of

24    the room was -- was taken out of B?

25    A     Yes, just for time constraints.

1    Q    Okay.  So you should be present all the time

2    that B is playing or B is on -- on B; correct?

3    A    No.  I think there's a segment where the

4    defendant is sitting by himself in the room, but he

5    makes a couple statements out in the open.  I think

6    those are on there, as well.

7    Q    Okay.  All right.  Just so I understand, so B

8    is not just the times you were in the room, but some

9    of the times you were out of the room is also on B?

10   A    Right.  Because he had made a few statements

11   just openly.  We wanted to make sure those were

12   captured.

13   Q    Okay.  All right.  And then the other times --

14   except for those times, the other times you were out

15   of the room are not on B?

16   A    Correct.

17   Q    Okay.

18        MR. TRAGOS:  Your Honor, we would object to B

19   but not A.  If the Court wants a side bar --

20        THE COURT:  No.  The objection is overruled.

21   Both exhibits will be received in evidence.  The

22   government may publish whichever one it wishes to.

23        MS. KAISER:  Thank you.  Your Honor, the

24   government would request --

25        THE COURT:  What about C, Mr. Tragos, the

1      same --

2          MR. TRAGOS:  Your Honor, that -- she didn't

3      move that one into evidence, Your Honor.

4          THE COURT:  Oh, I thought you did.  I

5      apologize.

6          MS. KAISER:  No, Your Honor, but I would like

7      it to assist the jury.

8          THE COURT:  As a court's exhibit?

9          MS. KAISER:  Yes, sir.

10         MR. TRAGOS:  Your Honor, could we have a side

11     bar on this?

12         THE COURT:  Yes, sir.  Come forward, please.

13     (At side bar, on the record.)

14         THE COURT:  Yes, sir.

15         MR. TRAGOS:  I've never seen this.  I've never

16     seen C.

17         MS. KAISER:  It was used in the last trial and

18     it's in your binder.

19         MR. TRAGOS:  We just looked in the binder.

20     There's no C in our binder.

21         MS. KAISER:  You can have a copy.  But we used

22     it last trial.

23         THE COURT:  Exhibit 39C was used in the last

24     trial, which was a document purporting to contain

25     statements made while the defendant was alone in the

1          room.

2              MR. TRAGOS:  Your Honor, we would object to

3      39C in that, for one is, it's not a complete

4      transcript but highlights certain portions that

5      should be highlighted for argument and not

6      highlighted by giving them as a transcript.

7              THE COURT:  When you say highlighted, you

8      don't mean literally highlighted --

9              MR. TRAGOS:  No.  It highlights in their minds

10     only certain statements.  I mean, it would be like

11     saying, okay, I've got these eight statements I want

12     highlighted, so I want to give to them while they're

13     listening to it.

14             THE COURT:  Well, the balance of the tapes are

15     available to you; are they not?

16             MR. TRAGOS:  They are, Your Honor.  But I'm

17     talking about -- I'm not talking about the tapes,

18     I'm talking about these --

19             THE COURT:  I can't -- I can't restrict the

20     government's presentation of its evidence.  I don't

21     see any prejudice to the defendant.  If the

22     government wants the jury to be able to follow along

23     the statements, I think that's their prerogative.

24     But let me ask you this, Ms. --

25             MS. KAISER:  Kaiser.

1          THE COURT:  I'm thinking ahead of myself, I

2     apologize, Ms. Kaiser.  How does Exhibit 39C, how

3     does it relate to 39B?

4          MS. KAISER:  Your Honor, in the --

5          THE COURT:  Is it just one?  I just don't

6     recall.  Is it just one --

7          MS. KAISER:  Yes.

8          THE COURT:  One five minute --

9          MR. TRAGOS:  Your Honor, it's just a few

10    lines.

11         MS. KAISER:  It's just a few lines that he

12    says under his breath which are very difficult to

13    hear so a transcript was created.

14         THE COURT:  Well, I remember that statement.

15         MS. KAISER:  Right.  Right.

16         THE COURT:  But we'll be following 39B and

17    there will be a point when the detective leaves the

18    room to get him some water or something?

19         MS. KAISER:  Yes, but that's redacted.  I

20    think this is in the very beginning of the tape when

21    he's by himself.

22         THE COURT:  But the jury will be to see the

23    tape as these statements are made.

24         MS. KAISER:  Yes, Your Honor.  Yes.  But it's

25    difficult to hear.

1          THE COURT:  Just have the witness explain in a

2     little more detail how this exhibit was prepared.

3          MS. KAISER:  Okay.

4          THE COURT:  What was -- when did it start,

5     when did it end, what does it depict or not depict?

6          MS. KAISER:  Okay.  Okay.

7          THE COURT:  And, of course, he'll be subject

8     to cross-examination.

9          MS. KAISER:  Yes.

10         THE COURT:  Overruled.

11              DIRECT-EXAMINATION (CONTINUED)

12

13    BY MS. KAISER:

14    Q     Okay.  Corporal Romanosky, I'm showing you

15    again Government's Exhibit Number 39C.

16    A     Yes, ma'am.

17    Q     Can you please explain to the jury what

18    this -- this transcript is of.

19    A     These were some comments made by the defendant

20    openly at the very beginning portions of the

21    interview, right after he was left in the interview

22    room.

23    Q     And approximately how far into the tape were

24    these statements made?

25    A     Very early on, probably around the first

1      couple of minutes.

2      Q      And was anyone else in the room when the

3      defendant made those statements?

4      A      No.

5             MS. KAISER:  Your Honor, at this time I'd ask

6      that Government's Exhibit 39C be given to the jury

7      as an aid.

8             THE COURT:  All right.  That would be fine.

9      When we get to the point in the tape, if it's in the

10     beginning --

11            MS. KAISER:  Yes, Your Honor.

12            THE COURT:  Let's play it and then stop the

13     tape and we'll collect the transcripts.

14            Again, members of the jury, what you will hear

15     on the videotape is the evidence.  The very short

16     transcript you're about to be handed is to be used

17     by you only as an aid in understanding what is being

18     said.  If you hear anything different from what is

19     typewritten, what you hear controls.

20            MS. KAISER:  Ms. Ohle.  Your Honor, at this

21     time, we'd request permission to publish

22     Government's Exhibit 39B.

23            THE COURT:  All right.

24     (Recording playing.)

25            THE DEFENDANT:  "No.  No.  No.  Whew.  Hum-um.

1    I shouldn't have done it.  Should not have done it."

2    (End of recording.)

3         MS. KAISER:  Your Honor, that's the extent of

4    the transcript.

5         THE COURT:  Okay.  If you'll just collect

6    those transcripts, then.  Thank you, sir.

7         MS. KAISER:  Your Honor, at this time we'd

8    like to proceed with the playing of Government's

9    Exhibit 39B.

10         THE COURT:  All right.  We're going to play

11    this until 4:00, and then stop.  I've got another

12    hearing scheduled.  It's about, what did you say,

13    two hours?

14         MS. KAISER:  Yes, Your Honor.

15         THE COURT:  So we'll play 25 minutes of it or

16    so and then resume in the morning, ladies and

17    gentlemen.

18         MS. KAISER:  Yes, Your Honor.

19    (Recording playing.)

20         "THE DEFENDANT:  I shouldn't have done it,

21    should not have done it.  It was stupid.  Whew.  No.

22    Hum-um.  No.  Whew."

23         CORPORAL ROMANOSKY:  Okay, Charles.

24         THE DEFENDANT:  Did I leave my insulin

25    anywhere?

1              CORPORAL ROMANOSKY:  It's in the other room.

2              THE DEFENDANT:  Okay.  I don't need it right

3         this minute.

4              CORPORAL ROMANOSKY:  Okay.  Well, if you have

5         a problem, I mean, a sincere problem --

6              THE DEFENDANT:  (Unintelligible).

7              CORPORAL ROMANOSKY:  -- let me know.  All

8         right.  There's a couple things I need to go over

9         with you, some paperwork.  We've had a chance to

10        talk a little bit on the way -- on the way back.

11        Like I said, I wanted to come back to my office so

12        we could talk a little more in depth.

13             THE DEFENDANT:  Is this your office?

14             CORPORAL ROMANOSKY:  The building.  I refer to

15        the building as my office.

16             THE DEFENDANT:  Oh, okay.

17             CORPORAL ROMANOSKY:  What I want to talk to

18        you about is the nature of our online contact.

19             THE DEFENDANT:  Yes.

20             CORPORAL ROMANOSKY:  Some of the things that

21        we talked about.

22             THE DEFENDANT:  Okay.

23             CORPORAL ROMANOSKY:  Some of the interests

24        that I feel you have.  And I know it's embarrassing.

25             THE DEFENDANT:  No.

1        CORPORAL ROMANOSKY:  I'm not here to judge

2    you, as embarrassing as it may seem.

3        THE DEFENDANT:  Right.

4        CORPORAL ROMANOSKY:  Absolutely.  Please.  I

5    just want to make sure we get -- we can get to the

6    truth and that you're honest and cooperative with

7    me.  Okay?

8        THE DEFENDANT:  I think I have been.

9        CORPORAL ROMANOSKY:  You seem like a real nice

10   guy.  And to be honest with you, you're an

11   intelligent man, I know you're educated.  You know,

12   if we're at this point, I already have copies of all

13   the chats.  Everything we've talked about --

14       THE DEFENDANT:  (Unintelligible) oh, yeah.

15   Yes.

16       CORPORAL ROMANOSKY:  Essentially what I want

17   to get into here was just kind of why everything is

18   happening; okay?  But before we get into that, I do

19   have to advise you of your rights.  Okay?

20       THE DEFENDANT:  Okay.

21       CORPORAL ROMANOSKY:  No one has ever done that

22   with you before?

23       THE DEFENDANT:  No.

24       CORPORAL ROMANOSKY:  Okay.

25       THE DEFENDANT:  You mean the *Miranda* thing?

1          CORPORAL ROMANOSKY:  Your *Miranda* rights.

2    They're all on paper here.  We can review them

3    together.

4          THE DEFENDANT:  Okay.

5          CORPORAL ROMANOSKY:  Make sure that there's

6    going --

7          THE DEFENDANT:  Could I see them?

8          CORPORAL ROMANOSKY:  Absolutely.  We're going

9    to review them together.

10          THE DEFENDANT:  Oh, oh, oh.

11          CORPORAL ROMANOSKY:  Okay.  What this is

12    here -- I'm going to read them upside down, so

13    forgive me if I miss a word.  Today's date, time is

14    7:02 when I printed the form out.  I'm Corporal Kurt

15    Romanosky.  I'm with the Pinellas County Sheriff's

16    Office.  The case number is 08184046.  And, again,

17    it says --

18          THE DEFENDANT:  Excuse me.

19          CORPORAL ROMANOSKY:  I am Corporal Kurt

20    Romanosky with the Pinellas County Sheriff's Office.

21          THE DEFENDANT:  Um-hum.

22          CORPORAL ROMANOSKY:  Please state your name,

23    age and address.

24          THE DEFENDANT:  Correct.

25          CORPORAL ROMANOSKY:  You see that I put in

1    here, Charles Jackson Friedlander.

2          THE DEFENDANT:  Yes.

3          CORPORAL ROMANOSKY:  78, 12040 Mahogany Isle

4    Lane, Ft. Myers, Florida.  Is that correct?

5          THE DEFENDANT:  Yes.

6          CORPORAL ROMANOSKY:  Okay.  You understand

7    that you have the right to remain silent?

8          THE DEFENDANT:  Yes.

9          CORPORAL ROMANOSKY:  Okay.

10          THE DEFENDANT:  Should I write yes?

11          CORPORAL ROMANOSKY:  Yes, if you would.  Do

12    you understand that anything you say can and will be

13    used against you in a court of law?

14          THE DEFENDANT:  Yes.

15          CORPORAL ROMANOSKY:  Okay.  Do you understand

16    that you have the right to speak to a lawyer and

17    have him or her present with you while you're being

18    questioned?

19          THE DEFENDANT:  Yes.

20          CORPORAL ROMANOSKY:  Do you understand that if

21    you cannot afford to hire a lawyer, one will be

22    appointed to represent you for questioning, if you

23    wish?

24          THE DEFENDANT:  Yes.

25          CORPORAL ROMANOSKY:  Do you understand that

```
 1      you can decide at any time to exercise these rights

 2      and not answer any questions or make any statements?

 3            THE DEFENDANT:  Yes.

 4            CORPORAL ROMANOSKY:  Do you understand each of

 5      these rights I have explained to you?

 6            THE DEFENDANT:  Yes.

 7            CORPORAL ROMANOSKY:  Having these rights in

 8      mind, do you wish to talk with me now?

 9            THE DEFENDANT:  I don't have any choice, being

10      truthful.

11            CORPORAL ROMANOSKY:  Well, you do.  You don't

12      have to -- you don't have to give a statement.  You

13      don't have to answer any questions.  You don't have

14      to do any of that.  You can say, I don't want to

15      talk to you, you can say, I want a lawyer, you can

16      do either of those options.

17            THE DEFENDANT:  Well --

18            CORPORAL ROMANOSKY:  It's your decision.

19            THE DEFENDANT:  What does one do?  I mean, you

20      know, I'm completely new with this.

21            CORPORAL ROMANOSKY:  Well, that --

22            THE DEFENDANT:  (Unintelligible).

23            CORPORAL ROMANOSKY:  I can't advise you on

24      what you --

25            THE DEFENDANT:  I know.
```

1       CORPORAL ROMANOSKY:  You're an adult.  You're

2    an educated man.  You have to decide, I'm at a

3    juncture right now, what decision do I make.  I'm

4    offering you the opportunity -- you can't come back

5    to this point again right now where you and I sit

6    down and talk.  I'm offering you the opportunity to

7    provide me with your side of the story.

8       THE DEFENDANT:  Will that be held against me?

9       CORPORAL ROMANOSKY:  Well, we're talk --

10   obviously, I'm asking you very pointed questions.

11   I'm a deputy sheriff.  I mean, if I'm asking you,

12   you know, things about our online contact and all

13   that, obviously, it's case related.  It's not just

14   between you and I.  It's part of the official case

15   file but --

16      THE DEFENDANT:  What do you here, you know

17   (unintelligible) --

18      CORPORAL ROMANOSKY:  Well, it's just like I

19   said, I can -- I can take this in front of the state

20   attorney, I can take this in front of a judge, I can

21   take this in front of a jury showing all the chats,

22   profiles, there's some more stuff we have to talk

23   about.  I can lay all of that out in front of them

24   and show them what happened, when it happened, where

25   I was, where you were.  I can -- that's the easy

1       part.

2               THE DEFENDANT:  Um-hum.

3               CORPORAL ROMANOSKY:  I would rather go sit

4       down with the state attorney's office.  I would

5       rather -- when this gets to a courtroom, if it ever

6       goes to a courtroom, that we understand why things

7       have taken place -- that's okay -- that we

8       understand why things happened.

9               THE DEFENDANT:  Okay.

10              CORPORAL ROMANOSKY:  I think that's the most

11      important.

12              THE DEFENDANT:  Okay.  Okay.  So what do I put

13      here?

14              CORPORAL ROMANOSKY:  If you wish to speak with

15      me, then you would put yes.  If you don't wish to

16      speak with me --

17              THE DEFENDANT:  I do wish to speak with you.

18              CORPORAL ROMANOSKY:  Then the answer would be

19      yes.  What I'd like you to do is sign right there

20      where it says signature.

21              THE DEFENDANT:  Okay.  I'm sorry.

22              CORPORAL ROMANOSKY:  Well, I know you've got a

23      PhD.  That's how -- that's how people with --

24      doctors and stuff sign so -- I'm going to sign here

25      that I witnessed your signature.  (Unintelligible)

1      what that number was.  Okay.

2           THE DEFENDANT:  Sit back here.

3           CORPORAL ROMANOSKY:  Absolutely.  Be

4      comfortable.  Charles, how long -- how long have you

5      been using AOL?

6           THE DEFENDANT:  That's a good question.

7           CORPORAL ROMANOSKY:  It's an approximation,

8      obviously.

9           THE DEFENDANT:  It's the only thing I have.

10          CORPORAL ROMANOSKY:  Do you access the

11     internet through dialup to AOL?

12          THE DEFENDANT:  Yeah.

13          CORPORAL ROMANOSKY:  Okay.

14          THE DEFENDANT:  That's all.  So --

15          CORPORAL ROMANOSKY:  How long have you been

16     doing that?  Is it greater than 10 years?

17          THE DEFENDANT:  No.

18          CORPORAL ROMANOSKY:  More than five?

19          THE DEFENDANT:  Yes.  I would say --

20          CORPORAL ROMANOSKY:  Somewhere between five

21     and ten?

22          THE DEFENDANT:  -- between five and ten.  I

23     can't honestly tell you.

24          CORPORAL ROMANOSKY:  Well, and to be honest

25     with you, I have used AOL both professionally and

1    personally --

2         THE DEFENDANT:  Um-hum.

3         CORPORAL ROMANOSKY:  -- in the past.  And

4    I've -- I didn't keep a log of when I signed up,

5    either, so --

6         THE DEFENDANT:  No.

7         CORPORAL ROMANOSKY:  It's understandable.  On

8    AOL, what are your screen names?

9         THE DEFENDANT:  Captoes.

10        CORPORAL ROMANOSKY:  Um-hum.

11        THE DEFENDANT:  Shrinq, with a Q,

12   S-H-R-I-N-Q.

13        CORPORAL ROMANOSKY:  Okay.

14        THE DEFENDANT:  And I believe I have Shrinq2,

15   also, because --

16        CORPORAL ROMANOSKY:  Spell that the same way?

17        THE DEFENDANT:  Yes.

18        CORPORAL ROMANOSKY:  Okay.

19        THE DEFENDANT:  With a 2 on the end of it.

20   Okay.  Wait a minute.  So I'm not telling you

21   anything untrue.  Shrinq, Shrinq2, which I don't

22   ever use.  I guess, I mean, I can't --

23        CORPORAL ROMANOSKY:  Are there any that you've

24   had in the past that you no longer use that come to

25   mind?

1          THE DEFENDANT:  Oh, no.

2          CORPORAL ROMANOSKY:  Okay.

3          THE DEFENDANT:  I can't remember that far.

4     No.

5          CORPORAL ROMANOSKY:  Do you get e-mail on

6     Captoes?

7          THE DEFENDANT:  Yes.

8          CORPORAL ROMANOSKY:  Do you get e-mails?  Do

9     you receive e-mails on Shrinq?

10         THE DEFENDANT:  Yes.

11         CORPORAL ROMANOSKY:  Okay.

12         THE DEFENDANT:  Usually for business things.

13         CORPORAL ROMANOSKY:  So Shrinq you use for

14    business?

15         THE DEFENDANT:  Business or they're trying to

16    sell me something.

17         CORPORAL ROMANOSKY:  Okay.  So business or

18    solicitors.

19         THE DEFENDANT:  Solicitors, yeah.  But I don't

20    know who they are.

21         CORPORAL ROMANOSKY:  I have (unintelligible)

22    when you buy something, they say, we need your

23    e-mail to send you alerts on (unintelligible).

24         THE DEFENDANT:  Yeah.  Exactly.  That's --

25         CORPORAL ROMANOSKY:  You don't use Shrinq2 at

1      all?

2           THE DEFENDANT:  No.  No.  But I got

3      something -- I occasionally get an e-mail in there

4      that I don't even know what it is, you know, a

5      solicitation.

6           CORPORAL ROMANOSKY:  Yeah.  They're good about

7      that.  And how -- Captoes is personal?

8           THE DEFENDANT:  Yes.  Well, yeah, I was going

9      to say -- yes.  Yes.

10          CORPORAL ROMANOSKY:  Do you use any of the --

11     what I call web based e-mail clients or e-mails that

12     you go through like Yahoo or Google mail or --

13          THE DEFENDANT:  Well, I don't use e-mail from

14     Yahoo.

15          CORPORAL ROMANOSKY:  Do you use their instant

16     message service?

17          THE DEFENDANT:  Yes.

18          CORPORAL ROMANOSKY:  Okay.  What was your

19     screen name on Yahoo?

20          THE DEFENDANT:  Captoes2.  That's all.

21          CORPORAL ROMANOSKY:  Okay.  Any others?

22          THE DEFENDANT:  I don't use MSN.

23          CORPORAL ROMANOSKY:  Or Google or MySpace?  Do

24     you use any --

25          THE DEFENDANT:  No.  I have -- I have done

1      www.google.com if I have to look up like a telephone

2      number, something like that.

3             CORPORAL ROMANOSKY:  But you don't use their

4      free e-mail or anything like that?

5             THE DEFENDANT:  No.  And you know that.

6             CORPORAL ROMANOSKY:  Well, I'd like to -- I

7      mean, there could be things I don't -- I haven't

8      found out.  I do a lot of internet research before

9      we sit down and talk, but a lot of times --

10            THE DEFENDANT:  (Unintelligible) yeah.

11            CORPORAL ROMANOSKY:  The internet is a big

12     place.

13            THE DEFENDANT:  It's scary.

14            CORPORAL ROMANOSKY:  So you use AOL for their

15     chat services and e-mail; is that correct?

16            THE DEFENDANT:  Yes.

17            CORPORAL ROMANOSKY:  And you use Yahoo for

18     instant messages?

19            THE DEFENDANT:  Yes.  No mail because I don't

20     think I have that.

21            CORPORAL ROMANOSKY:  It comes free.

22            THE DEFENDANT:  Okay.

23            CORPORAL ROMANOSKY:  Most people don't.  Do

24     you ever notice every once in a while when you go to

25     look at someone's profile or something and go to

1    check your own profile at Yahoo and it says would

2    you like to automatically be signed in?

3         THE DEFENDANT:  You know, I've never looked at

4    my profile.

5         CORPORAL ROMANOSKY:  Oh, no kidding.

6    (Unintelligible) when you do that, it asks you if

7    you want to automatically be signed in.  That's what

8    it's referring to.  It wants to sign you into your

9    Yahoo account where you (unintelligible) accounts

10   and all that.

11        THE DEFENDANT:  No.

12        CORPORAL ROMANOSKY:  How long have you had

13   Captoes2 at Yahoo for chat?

14        THE DEFENDANT:  From Yahoo?  You got me.

15   Somebody suggested I do it so that's why I got it.

16   I don't like to use it very much because it's too

17   confusing for me.  I'm trying to give you the truth.

18        CORPORAL ROMANOSKY:  (Unintelligible).

19        THE DEFENDANT:  I would say about four years.

20        CORPORAL ROMANOSKY:  Okay.  How often do you

21   chat on Yahoo?

22        THE DEFENDANT:  Not often.

23        CORPORAL ROMANOSKY:  Once a month?  More than

24   that?

25        THE DEFENDANT:  I don't usually go to it.

1    Somebody does -- you know, sends me something.  I'm

2    trying to think if I ever go -- practically very,

3    very rarely.

4        CORPORAL ROMANOSKY:  Would you use it once a

5    month or less than that?

6        THE DEFENDANT:  I'm trying to think.  You mean

7    to one person, for example, or --

8        CORPORAL ROMANOSKY:  Right.  Like you and I

9    were talking on AOL (unintelligible).

10       THE DEFENDANT:  Okay.  I use it once a month.

11       CORPORAL ROMANOSKY:  Okay.  How often do you

12   chat on AOL using Captoes?

13       THE DEFENDANT:  How often?

14       CORPORAL ROMANOSKY:  Daily?

15       THE DEFENDANT:  Daily.  Yes.

16       CORPORAL ROMANOSKY:  How about do you chat

17   using Shrinq or Shrinq2 at all?

18       THE DEFENDANT:  Only if I have to send

19   something to somebody, you know, or -- no.

20       CORPORAL ROMANOSKY:  And you said you accessed

21   the internet -- this was on the ride over -- you

22   told me you access the internet through dialup?

23       THE DEFENDANT:  Yeah.  It's the only thing I

24   have.

25       CORPORAL ROMANOSKY:  One of the troopers.  I

1    didn't think there was anyone left.

2          THE DEFENDANT:  One of the troopers?

3          CORPORAL ROMANOSKY:  I say that because not

4    many people use dialup anymore.

5          THE DEFENDANT:  Oh.

6          CORPORAL ROMANOSKY:  Only the diehards and the

7    troopers would still do that.

8          THE DEFENDANT:  No.  I thought you meant a

9    trooper.

10          CORPORAL ROMANOSKY:  On a scale of one to ten,

11    with one being you basically know how to turn the

12    computer on and access AOL and check your e-mail --

13          THE DEFENDANT:  I do.

14          CORPORAL ROMANOSKY:  -- and ten being someone

15    who can write programs, where would you put yourself

16    from one to ten?

17          THE DEFENDANT:  Two or three, maybe.  Two,

18    probably.  I don't know how to do anything much.  I

19    can sign on.

20          CORPORAL ROMANOSKY:  Okay.

21          THE DEFENDANT:  I can sign off.

22          CORPORAL ROMANOSKY:  Just AOL?

23          THE DEFENDANT:  Yeah.  No, I have nothing

24    else.

25          CORPORAL ROMANOSKY:  Well, you use Google, you

1    say you go to google.com and type in phone numbers

2    and (unintelligible) --

3         THE DEFENDANT:  Well, if I wanted --

4         CORPORAL ROMANOSKY:  -- internet searching.

5         THE DEFENDANT:  Not internet searching,

6    really.  Just sort of -- I don't know.  Like, I

7    wanted to find something or other, I forget what it

8    was, so I put in -- oh, it's for hospitals.

9         CORPORAL ROMANOSKY:  Uh-huh.

10        THE DEFENDANT:  Yeah.  I put in the name of a

11   hospital.  If I wanted to know something about --

12   oh, what do you call that?

13        CORPORAL ROMANOSKY:  Searching the web.  That

14   would be internet searching.

15        THE DEFENDANT:  Oh, okay.

16        CORPORAL ROMANOSKY:  So you do that on a

17   pretty limited basis, I take it?

18        THE DEFENDANT:  Oh, practically never.

19   (Unintelligible), but I can't, which may sound

20   funny.

21        CORPORAL ROMANOSKY:  Do you use any file

22   sharing programs like Line Wire or Bear Share or any

23   of those to download music or (unintelligible)?

24        THE DEFENDANT:  No.  I don't download.  Does

25   that sound funny?

1          CORPORAL ROMANOSKY:  No.  Some people --

2          THE DEFENDANT:  (Unintelligible).

3          CORPORAL ROMANOSKY:  -- got into that, then

4     they stopped when they realized all the viruses they

5     were getting.

6          THE DEFENDANT:  No.

7          CORPORAL ROMANOSKY:  Do you use any kind of

8     file encryption or anything?

9          THE DEFENDANT:  What's that?

10          CORPORAL ROMANOSKY:  To hide files or to make

11     files so they're not readable unless you have

12     passwords, things like that.  I know you're in the

13     mental health field.  I didn't know if you used any

14     programs to --

15          THE DEFENDANT:  No.

16          CORPORAL ROMANOSKY:  For customer or client

17     documents.

18          THE DEFENDANT:  No.  I didn't even know you

19     could do that.

20          CORPORAL ROMANOSKY:  (Unintelligible).  On

21     your desktop computer or your laptop computer, do

22     you have any client sensitive information on there,

23     like lists, mail lists, anything like that?

24          THE DEFENDANT:  No.  I was told not to do

25     that.  Insurance companies (unintelligible).

1          CORPORAL ROMANOSKY:  I can imagine that.  Do

2     you have any works to be published on your laptop or

3     your desktop?

4          THE DEFENDANT:  No.  Nothing like that.

5          CORPORAL ROMANOSKY:  I just want to make sure

6     you weren't writing a book on mental health or

7     something (unintelligible).

8          THE DEFENDANT:  No.  No.  No.  No, truly not.

9          CORPORAL ROMANOSKY:  All right.  When you go

10    into AOL and you use the chat function, what kind of

11    chat rooms do you go in?  What are some of the names

12    of the chat rooms that you frequent?

13         THE DEFENDANT:  Strict Parents, which is where

14    I think I found you.  (Unintelligible) correct me if

15    I am.  Okay.  Fathers Chatting.

16         CORPORAL ROMANOSKY:  Uh-huh.

17         THE DEFENDANT:  It's hard for me to remember

18    some of these things.  Men for Men Unusual.

19         CORPORAL ROMANOSKY:  M for M?

20         THE DEFENDANT:  I think that's what it is.

21    Yeah.  And Unusual M for M.

22         CORPORAL ROMANOSKY:  Okay.

23         THE DEFENDANT:  I'm trying to think.

24    (Unintelligible).

25         CORPORAL ROMANOSKY:  That's all right.

1          THE DEFENDANT:  It's the diabetes.

2     (Unintelligible).

3          CORPORAL ROMANOSKY:  How about if I throw a

4     couple of names out here to see if they sound

5     familiar.

6          THE DEFENDANT:  Fine.  And I'll tell you --

7     I'll tell you.

8          CORPORAL ROMANOSKY:  Open Minded Parents?

9          THE DEFENDANT:  Yes.  I virtually never used

10    it, though.

11         CORPORAL ROMANOSKY:  Open Minded Moms or Open

12    Minded Dads?

13         THE DEFENDANT:  Didn't know they had those.

14         CORPORAL ROMANOSKY:  Male for Males Started

15    Early?

16         THE DEFENDANT:  Yes.  (Unintelligible).

17         CORPORAL ROMANOSKY:  Unfortunately.  Do you go

18    into any of the other rooms that are predicated for

19    like bondage, sadomasochism, anything like that?

20         THE DEFENDANT:  No.

21         CORPORAL ROMANOSKY:  Tell me about Strict

22    Parents.  Why do you go onto Strict Parents?  What

23    are you looking for in that room?

24         THE DEFENDANT:  Well, I don't know what I'm

25    looking for, really.  This really comes out more for

1    my work.  I find that an awful lot of kids are let

2    go and --

3         CORPORAL ROMANOSKY:  You find that a lot of

4    kids go in that room?

5         THE DEFENDANT:  No, no.  A lot of -- a lot of

6    kids as I, you know (unintelligible).

7         CORPORAL ROMANOSKY:  Okay.

8         THE DEFENDANT:  Because parents aren't there.

9    Parents are separated, so it's part of the divorce

10    thing I deal with.  And those that are hemmed in

11    more.

12         CORPORAL ROMANOSKY:  Um-hum.

13         THE DEFENDANT:  At least they seem to

14    know where -- you know, there was this old saying,

15    where are your kids, if you know where your kids

16    are.  So that -- I felt that the more structured

17    households, the less problems with kids.  And I was

18    interested in that because I believe in structure.

19         CORPORAL ROMANOSKY:  Um-hum.

20         THE DEFENDANT:  I would say --

21         CORPORAL ROMANOSKY:  Do you have any children?

22         THE DEFENDANT:  No.

23         CORPORAL ROMANOSKY:  You have no children?

24         THE DEFENDANT:  Well, I had sort of an adopted

25    child, yes, who died.

```
1              CORPORAL ROMANOSKY:  How old?

2              THE DEFENDANT:  He was 39.

3              CORPORAL ROMANOSKY:  What did he die from,

4       primarily?

5              THE DEFENDANT:  He committed suicide.

6              CORPORAL ROMANOSKY:  Um-hum.  How long ago was

7       that?

8              THE DEFENDANT:  Seven years.

9              CORPORAL ROMANOSKY:  How long -- how long was

10      he under your -- when did you adopt him?

11             THE DEFENDANT:  I never legally did it because

12      I didn't want to have to support his mother who was

13      a mess.  His sister, who was not his real sister and

14      who had been married five times and was in and out

15      of hospitals, okay.  So about ten years.

16             CORPORAL ROMANOSKY:  And from what age to what

17      age do you think that would have been for him?

18             THE DEFENDANT:  29 to 39, about, you know.

19             CORPORAL ROMANOSKY:  Are you married?

20             THE DEFENDANT:  No.

21             CORPORAL ROMANOSKY:  Have you ever been

22      married?

23             THE DEFENDANT:  No.  I sort of had a

24      relationship with his mother, but she died.

25             CORPORAL ROMANOSKY:  His mother passed away?
```

1              THE DEFENDANT:  Yeah.  And she had sort of --

2      well, I don't know the whole story, really, but he

3      was sort of left on his own and she was pursuing her

4      own career.  So he sort of did everything on his

5      own.

6              CORPORAL ROMANOSKY:  Um-hum.

7              THE DEFENDANT:  (Unintelligible).  I'm sorry.

8              CORPORAL ROMANOSKY:  That's okay.  Don't be

9      sorry.

10             THE DEFENDANT:  Yeah.

11             CORPORAL ROMANOSKY:  What would your -- what

12     would you consider your sexual orientation?  Would

13     you say heterosexual, homosexual, bisexual?

14             THE DEFENDANT:  I would say bisexual.

15             CORPORAL ROMANOSKY:  And where does your

16     preference lie?  Where does your interest lie?  What

17     age bracket?

18             THE DEFENDANT:  For anybody, basically?

19             CORPORAL ROMANOSKY:  Um-hum.

20             THE DEFENDANT:  Probably from 40 to 70.

21             CORPORAL ROMANOSKY:  Okay.

22             THE DEFENDANT:  I have a lady friend.

23             CORPORAL ROMANOSKY:  Okay.

24             THE DEFENDANT:  I don't know if I'm supposed

25     to say that.

1          CORPORAL ROMANOSKY:  That's all right.  You

2     can say whatever -- we're just having a -- we're

3     having a conversation.

4          THE DEFENDANT:  Right.  A *Miranda* Act

5     (unintelligible).

6          CORPORAL ROMANOSKY:  Well, (unintelligible)

7     something we have to go through before we --

8          THE DEFENDANT:  Right.

9          CORPORAL ROMANOSKY:  Before we actually talk

10    about this.  But, no --

11         THE DEFENDANT:  I'm trying to --

12         CORPORAL ROMANOSKY:  You don't see any

13    spotlights in here.

14         THE DEFENDANT:  No, no, no.

15         CORPORAL ROMANOSKY:  It's not like NYPD Blue

16    where they're kicking the chair out from

17    underneath -- (unintelligible).

18         THE DEFENDANT:  Oh, no, no.

19         CORPORAL ROMANOSKY:  As you can see, it's far

20    different from what TV and all that portrays.  I

21    like to look at this as, yeah, we have to -- we have

22    to go through *Miranda* so that you know we are

23    talking about case-related information.

24         THE DEFENDANT:  Right.

25         CORPORAL ROMANOSKY:  But it's a conversation.

1      It's, you know -- the whole time I've chatted with

2      you, yeah, there were some things that obviously I

3      had concern about, that's why we're here.  And it

4      did qualify as a violation of some Florida statutes,

5      but --

6              THE DEFENDANT:  Oh, does it?  Oh.

7              CORPORAL ROMANOSKY:  You definitely seem like

8      a nice man to me.  From talking to you, you seem

9      like you're a nice guy.  That's why I wanted to --

10     you know, that's why we're having a conversation.

11             Do you -- have you at any time or do you have

12     any kind of preference for under 18?

13             THE DEFENDANT:  No.

14             CORPORAL ROMANOSKY:  No boys, no girls?

15             THE DEFENDANT:  No.  No.

16             CORPORAL ROMANOSKY:  Have you ever portrayed

17     online that you have that interest?

18             THE DEFENDANT:  Well, that's an interesting

19     question because you know the answer.  I've

20     portrayed it to you.  Do I -- would I portray it to

21     a child?

22             CORPORAL ROMANOSKY:  I'm talking about others.

23             THE DEFENDANT:  Yes.  Probably two others.

24             CORPORAL ROMANOSKY:  Okay.  Would you know

25     where those folks were located geographically?

1          THE DEFENDANT:  No.  Is that (unintelligible)?

2     They're parents, I believe.

3          CORPORAL ROMANOSKY:  They're parents?

4          THE DEFENDANT:  Yeah.

5          CORPORAL ROMANOSKY:  Have you ever talked,

6     other than -- other than myself, I know you and I

7     have talked --

8          THE DEFENDANT:  Yes.

9          CORPORAL ROMANOSKY:  -- about tonight's

10    meeting, which was basically to administer physical

11    and --

12         THE DEFENDANT:  Right.

13         CORPORAL ROMANOSKY:  -- sexual abuse upon --

14         THE DEFENDANT:  Well, I think that --

15         CORPORAL ROMANOSKY:  -- two boys and a girl.

16         THE DEFENDANT:  Well, you know, but the sexual

17    abuse thing, when I got here, I was simply going to

18    say anyway no because I -- I don't want to say I'm

19    impotent.

20         CORPORAL ROMANOSKY:  Um-hum.

21         THE DEFENDANT:  But if you know anything about

22    diabetes, I have erectile dysfunction.

23         CORPORAL ROMANOSKY:  Oh.

24         THE DEFENDANT:  And to be very crude about it,

25    nothing can happen.

1          CORPORAL ROMANOSKY:  Is there an excitement if

2     you talk about it at some point or --

3          THE DEFENDANT:  (Unintelligible).

4          CORPORAL ROMANOSKY:  This will probably happen

5     over the (unintelligible) while we're talking.

6     Excuse me.  Corporal Romanosky.  The factory

7     warranty on my van is about ready to expire.

8          THE DEFENDANT:  Was that one of those -- oh,

9     yeah.

10          CORPORAL ROMANOSKY:  I took it in for service

11     one time and they asked for a contact number when it

12     was done, and now -- (unintelligible).

13          Okay.  You said you have erectile dysfunction

14     because of the diabetes.  You're impotent.  You

15     can't get an erection at all, is that what you're

16     telling me?

17          THE DEFENDANT:  Well, I can maybe in an

18     emergency sometime, but you'd never know it.

19          CORPORAL ROMANOSKY:  Is there any excitement

20     in talking about it, though?

21          THE DEFENDANT:  Truthfully?

22          CORPORAL ROMANOSKY:  Um-hum.

23          THE DEFENDANT:  I sometimes say it, but it

24     doesn't work."

25          THE COURT:  We will resume tomorrow morning at

1    9:00 AM.  Please have a safe evening and do not

2    discuss the case among yourselves or allow it to be

3    discussed in your presence.

4         COURTROOM SECURITY OFFICER:  Rise for the

5    jury.

6    (Jury out at 4:01 PM.)

7         THE COURT:  We'll be in recess.  I've got a

8    hearing, gentlemen and lady.  We need to clear out.

9    (Hearing adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3     STATE OF FLORIDA          )

4     COUNTY OF HILLSBOROUGH    )

5         I, Linda Starr, RPR, Official Court Reporter for

6     the United States District Court, Middle District,

7     Tampa Division,

8         DO HEREBY CERTIFY, that I was authorized to and

9     did, through use of Computer Aided Transcription,

10    report in machine shorthand the proceedings and

11    evidence in the above-styled cause, as stated in the

12    caption hereto, and that the foregoing pages,

13    numbered 1 through 265, inclusive, constitute a true

14    and correct transcription of my machine shorthand

15    report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17    the City of Tampa, County of Hillsborough, State of

18    Florida, this 13th day of September 2009.

19

20

21            _____/s/ Linda Starr_____
              Linda Starr, RPR, Official Court Reporter
22

23

24

25
```