```
 1                   UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION


 3       UNITED STATES OF AMERICA

 4              vs.             CASE NO. 8:08-CR-318-T-27TGW
                               25 MARCH 2009
 5                             TAMPA, FLORIDA
                               PAGES 1 - 251
 6                             VOLUME III


 7       CHARLES JACKSON FRIEDLANDER
         _____/
 8
                    TRANSCRIPT OF TRIAL PROCEEDINGS
 9             BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
10


11       APPEARANCES:

12       For the Petitioner:  Amanda C. Kaiser
                              United States Attorney's Office
13                            Suite 3200
                              400 N. Tampa Street
14                            Tampa, Florida 33602

15       For the Defendant:  George E. Tragos
                             Tragos & Sartes, PL
16                           Suite 800
                             601 Cleveland Street
17                           Clearwater, Florida 33755

18                           Peter Anthony Sartes
                             Tragos & Sartes, PL
19                           Suite 800
                             601 Cleveland Street
20                           Clearwater, Florida 33755

21       Court Reporter:     Linda Starr, RPR
                             Official Court Reporter
22                           801 N. Florida Avenue
                             Suite 13B
23                           Tampa, Florida 33602


24        Proceedings recorded and transcribed by
         computer-aided stenography.
25
```

1

2                              **WITNESS INDEX**

3       **Witness Name**                             **Page Number**

4       **Kurt Romanosky**

5       Direct Examination by Ms. Kaiser.........100
        Cross Examination by Mr. Tragos..........110
6
        **Jeff Capra**
7
        Direct Examination by Ms. Kaiser.........142
8       Cross Examination by Mr. Tragos..........147

9       **Don Colcolough**

10      Direct Examination by Ms. Kaiser.........151
        Cross Examination by Mr. Tragos..........171
11      Redirect Examination by Ms. Kaiser........185

12      **Brad Carrozza**

13      Direct Examination by Ms. Kaiser.........188
        Cross Examination by Mr. Tragos..........202
14
        **Gregory Monk**
15
        Direct Examination by Ms. Kaiser.........211
16      Cross Examination by Mr. Tragos..........223
        Redirect Examination by Ms. Kaiser........228
17

18                             **EXHIBIT INDEX**

19

20

21

22

23

24

25

```
 1                (Call to order at 9:08 AM.)

 2           COURTROOM SECURITY OFFICER:  All rise.  This

 3      Honorable Court is in session, The Honorable James

 4      D. Whittemore presiding.

 5           Be seated, please.

 6           THE COURT:  Bring the jury in, please.

 7           COURTROOM SECURITY OFFICER:  Rise for the

 8      jury.

 9           (Jury in at 9:08 AM.)

10           THE COURT:  Good morning.  Please be seated.

11      We are ready to proceed.  You may resume publishing

12      Government's Exhibit 39A.

13           MS. KAISER:  39B.

14           THE COURT:  39B, you're right, 39B.

15           MS. KAISER:  Thank you, Your Honor.

16           THE COURT:  Thank you.

17      (Tape playing.)

18           "CORPORAL ROMANOSKY:  Okay.  You said you have

19      erectile dysfunction because of the diabetes.

20      You're impotent.  You can't get an erection at all,

21      is that what you're telling me?

22           THE DEFENDANT:  Well, I can maybe in an

23      emergency sometime, but you'd never know it.

24           CORPORAL ROMANOSKY:  Is there any excitement

25      in talking about it, though?
```

```
 1              THE DEFENDANT:  Truthfully?

 2              CORPORAL ROMANOSKY:  Um-hum.

 3              THE DEFENDANT:  I sometimes say it, but, no,

 4      it doesn't work.

 5              CORPORAL ROMANOSKY:  The other folks that you

 6      talked to other than me --

 7              THE DEFENDANT:  Yes, sir.

 8              CORPORAL ROMANOSKY:  You said there had been

 9      approximately two others.

10              THE DEFENDANT:  Two others.

11              CORPORAL ROMANOSKY:  Was the conversation

12      about physical and sexual abuse of children with

13      those other people?

14              THE DEFENDANT:  One is a very crazy guy.

15      There was no physical abuse mentioned.

16              CORPORAL ROMANOSKY:  So one was sexual abuse

17      only you talked about with him?

18              THE DEFENDANT:  Well, he did.  I didn't open

19      my mouth, really, very much.  He -- he's off the

20      wall.

21              CORPORAL ROMANOSKY:  Okay.

22              THE DEFENDANT:  The other person, it was

23      probably both.

24              CORPORAL ROMANOSKY:  Okay.

25              THE DEFENDANT:  Though he was the one
```

1        promoting it, you know what I mean.

2        (Unintelligible).   He pushed it.

3             CORPORAL ROMANOSKY:   Okay.   Where did you meet

4        those individuals?   Was they in those chat rooms

5        that we had talked about before?

6             THE DEFENDANT:   The one, the crazy one, I

7        don't remember.

8             CORPORAL ROMANOSKY:   Okay.

9             THE DEFENDANT:   The other one, it must have

10       been somewhere, but I really don't remember which it

11       was.   Let's say Fathers Chatting.

12            CORPORAL ROMANOSKY:   Okay.

13            THE DEFENDANT:   I think that would probably be

14       the most logical.   (Unintelligible).

15            CORPORAL ROMANOSKY:   Do you have -- in all

16       honesty here, I mean --

17            THE DEFENDANT:   Sure.

18            CORPORAL ROMANOSKY:   Do you have a sexual

19       interest or do you receive some sort of lascivious

20       gratification by talking about physical abuse of

21       children?

22            THE DEFENDANT:   No.

23            CORPORAL ROMANOSKY:   Okay.   Well, why -- why

24       talk so much about using razor straps and Garrison

25       belts and --

1          THE DEFENDANT:  Well, okay.

2          CORPORAL ROMANOSKY:  -- crops and stuff on

3    kids?

4          THE DEFENDANT:  Well, crops, not really.

5    Somebody else brought that one up to me.  Razor

6    strap, I don't know.  Because so many people these

7    days --

8          CORPORAL ROMANOSKY:  Um-hum.

9          THE DEFENDANT:  -- are using paddles.

10         CORPORAL ROMANOSKY:  Um-hum.

11         THE DEFENDANT:  And I have made very clear to

12   everybody I've spoken to that paddles are dangerous.

13         CORPORAL ROMANOSKY:  Um-hum.

14         THE DEFENDANT:  Physically, bone-breaking,

15   that sort of thing.

16         CORPORAL ROMANOSKY:  Um-hum.

17         THE DEFENDANT:  And I don't want anybody to

18   use that.  I made that very clear to you, I mean, I

19   think.  I -- I -- there are too many injury things

20   going on.

21         CORPORAL ROMANOSKY:  Well, why -- why do

22   you -- you seem -- in chatting with me, you seem as

23   if there's some degree of enjoyment in talking about

24   administering lashings with the razor strap or a

25   belt.  It's not just --

1          THE DEFENDANT:  No.

2          CORPORAL ROMANOSKY:  You know, I mean, I would

3     understand corporal punishment to a degree, but some

4     of the chat conversations we had where you talked

5     about -- I know you said that with your son --

6          THE DEFENDANT:  Yeah.

7          CORPORAL ROMANOSKY:  You were talking about

8     administering, you know, up to 75 lashes and that --

9          THE DEFENDANT:  (Unintelligible).

10         CORPORAL ROMANOSKY:  That's stretching beyond

11    what corporal punishment is.

12         THE DEFENDANT:  Well, no.  That's really

13    strictly, what do you call it, fantasy?  Is that --

14         CORPORAL ROMANOSKY:  Is it, though, Charles?

15    I mean, let's be honest with each other.

16         THE DEFENDANT:  Yeah.  (Unintelligible) --

17         CORPORAL ROMANOSKY:  You came up here

18    tonight -- in all honesty, you came up here tonight

19    to meet with me thinking that I was a dad and that

20    we were going back to my house --

21         THE DEFENDANT:  Yeah.

22         CORPORAL ROMANOSKY:  -- so you could

23    physically beat a 10-year-old and an 11-year-old

24    boy --

25         THE DEFENDANT:  Well, but --

1          CORPORAL ROMANOSKY:  Well, hang on.  Let me

2     finish.  And whether or not after that happened

3     there would have been sexual abuse, there was talk

4     that there was going to be.

5          THE DEFENDANT:  There definitely was talk.

6     But when I arrived, I was going to say to you,

7     listen, there's -- there's none of that whatsoever.

8     I'm not even capable.  So, you know, I can't even

9     masturbate.

10          CORPORAL ROMANOSKY:  I watched a guy on a

11     video, on a webcam, and he had severe diabetes to

12     the point that he was a double amputee, I watched

13     him, okay -- this man took insulin all the time, he

14     had all kinds of stuff amputated off of him, I

15     watched him masturbating and have an 8-year-old girl

16     perform oral sex on him on a webcam.  Okay?  I know

17     that it's not impossible.

18          THE DEFENDANT:  Well, let me tell you

19     something.  There are an awful lot of people who

20     have diabetes who don't have anything.  There are an

21     awful -- I think I would have had -- I have BPH.  I

22     don't know whether you know what that is or not.

23     (Unintelligible).  It's called benign prostatic

24     hypertrophy.

25          CORPORAL ROMANOSKY:  Um-hum.

1        THE DEFENDANT:  It isn't cancer, in other

2   words.  Well, I was in the New England Journal of

3   Medicine, I don't know, years and years ago when I

4   was about 15 because my mother took me to my -- to

5   her, whatever -- pediatrician, anyway, whom I didn't

6   know.  And I was having a discharge at 15.  So she

7   was very concerned.  And I guess so was I, though in

8   all honesty, I don't remember.  And she -- she

9   explained to the doctor and what have you.  And he

10  looked at me and he said, young man, you have

11  gonorrhea.

12       Now, I was a very protected child.  I had

13  never heard the words gonorrhea.  My mother was

14  furious.  This was during the war, so everything was

15  screwy, okay?  And so she said, I'm leaving.  And

16  she made an appointment with me to a urologist.  And

17  she told the urologist when we walked in the room,

18  his pediatrician said he has gonorrhea.  And I

19  remember the urologist saying, no.  He wouldn't even

20  know what it was.  And he asked me, do you know what

21  gonorrhea is?  And I said, no, I've never heard of

22  it before, which was true.

23       CORPORAL ROMANOSKY:  Um-hum.

24       THE DEFENDANT:  And so, anyway, they took

25  tests.  And it was from the prostate.  And, you

1    know, from the prostate for a 15-year-old, he just

2    couldn't understand it.  But he did whatever, he did

3    everything.  And he said you have urethritis caused

4    by a prostate problem.  I don't think they knew

5    exactly what things were back then.

6         CORPORAL ROMANOSKY:  Um-hum.

7         THE DEFENDANT:  And so throughout my life, I

8    have to go every 90 days -- don't laugh -- for --

9    excuse me, I'm sorry -- for a prostate massage.

10        CORPORAL ROMANOSKY:  Um-hum.

11        THE DEFENDANT:  Otherwise, I can't urinate.

12        CORPORAL ROMANOSKY:  Wow.

13        THE DEFENDANT:  Or if I can, I go and in about

14   10 minutes, I have to go again.

15        CORPORAL ROMANOSKY:  Um-hum.

16        THE DEFENDANT:  So now I have them.  I had one

17   last Friday.  What's today?  Monday.  Yeah, Friday.

18   And I was having a little trouble with urinating and

19   not -- not finishing, apparently, you know.  So I

20   had got that and then afterwards they had me

21   urinate, and I emptied completely, so this worked.

22        CORPORAL ROMANOSKY:  Um-hum.

23        THE DEFENDANT:  But I think a lot of my

24   erectile dysfunction is from that, too.  We don't

25   know where one begins and the other ends.  But

1    that's what I've been advised, you know, that it can

2    be from diabetes.  And some benign prostatic

3    hypertrophy, if it doesn't -- (unintelligible).

4         CORPORAL ROMANOSKY:  So what's your purpose,

5    then, for --

6         THE DEFENDANT:  (Unintelligible).

7         CORPORAL ROMANOSKY:  -- for going into chat

8    rooms and talking about using these implements on --

9    on children or even talking about sexual abuse?  I

10   mean, as a mental health counselor, I think you even

11   fall under the mandatory reporter where if somebody

12   else was talking about sexual abuse, you'd be

13   obligated by law to report that.

14        THE DEFENDANT:  Yeah.

15        CORPORAL ROMANOSKY:  Yet, you will go into

16   chat rooms and engage subjects to discuss sexual

17   abuse and physical abuse of children.

18        THE DEFENDANT:  Yeah.

19        CORPORAL ROMANOSKY:  What's the --

20   (unintelligible).

21        THE DEFENDANT:  And I'm --

22        CORPORAL ROMANOSKY:  I'm trying to figure out

23   what you get out of that.

24        THE DEFENDANT:  Yeah.  I'm trying to figure

25   out, too.

```
 1              CORPORAL ROMANOSKY:  (Unintelligible).

 2              THE DEFENDANT:  That's right.

 3              CORPORAL ROMANOSKY:  Do you feel that it's

 4      possible -- I know you're -- you're a mental health

 5      counselor.

 6              THE DEFENDANT:  Sure.

 7              CORPORAL ROMANOSKY:  But analyze yourself

 8      here.  Do you think there's --

 9              THE DEFENDANT:  I've been analyzed.  Yeah.

10              CORPORAL ROMANOSKY:  Do you think there's --

11      do you think there's some sort of lascivious

12      interest that makes you do this and talk like this?

13      And I'm going to be honest with you, Charles.

14              THE DEFENDANT:  Yeah.

15              CORPORAL ROMANOSKY:  I'm going to be a

16      straight shooter.  I'm not the only undercover

17      you've spoken with.  Okay?

18              THE DEFENDANT:  I don't think --

19              CORPORAL ROMANOSKY:  We all communicate just

20      like --

21              THE DEFENDANT:  (Unintelligible).

22              CORPORAL ROMANOSKY:  (Unintelligible)

23      communicate.

24              THE DEFENDANT:  I believe --

25              CORPORAL ROMANOSKY:  There's a lot more people
```

```
 1     that have already called me that you have talked
 2     to --
 3              THE DEFENDANT:  I'm sure.
 4              CORPORAL ROMANOSKY:  -- from chat rooms, more
 5     than just two.  I'll tell you that right now.
 6              THE DEFENDANT:  I only really know of two.
 7              CORPORAL ROMANOSKY:  There's more than two.
 8     And you actually even talked to me a couple of years
 9     back under a different -- when I was using a
10     different profile.
11              THE DEFENDANT:  I don't know.
12              CORPORAL ROMANOSKY:  So -- and we talked about
13     much of the same thing so --
14              THE DEFENDANT:  Oh, I will do the same thing
15     all the way along.  I mean, it's --
16              CORPORAL ROMANOSKY:  Well, that's what I'm
17     trying to find out.  Why -- let's diagnose you here.
18     Let's analyze you.
19              THE DEFENDANT:  Yeah.
20              CORPORAL ROMANOSKY:  Why would you talk
21     about --
22              THE DEFENDANT:  I guess --
23              CORPORAL ROMANOSKY:  -- wanting to do this?
24              THE DEFENDANT:  Well, the sexual thing, I
25     don't really know because I -- maybe I feel that I
```

1       can't do anything.

2               CORPORAL ROMANOSKY:  Um-hum.

3               THE DEFENDANT:  And I'm trying to get myself

4       to be able to do something, I mean, just --

5               CORPORAL ROMANOSKY:  Does the physical have an

6       appealing interest to you?  Do you want to

7       administer the lashings and --

8               THE DEFENDANT:  I don't get any -- I mean, in

9       other words, probably -- probably I'd rather do it

10      to a -- if I did it to anybody, to an adult.  No, I

11      mean -- do you know what I mean?

12              CORPORAL ROMANOSKY:  When we spoke, you were

13      pretty age specific.  You said you like to start

14      them from about five to eight, and then by 11 you

15      were on the razor strap.  And we talked about --

16              THE DEFENDANT:  Right.

17              CORPORAL ROMANOSKY:  -- what age do you like

18      to start the sexual stuff, and you were still --

19              THE DEFENDANT:  11, 12, 13.

20              CORPORAL ROMANOSKY:  But still, that's still

21      young.  That's still prepubescent.

22              THE DEFENDANT:  You're absolutely right.  But

23      my actual -- how would you say, interest?

24              CORPORAL ROMANOSKY:  Um-hum.

25              THE DEFENDANT:  Would be much more with an

1    adult.   And the -- what I have found mostly on the

2    internet is it's very hard -- everybody you start

3    talking to about an adult ends up with someone

4    younger.   And --

5         CORPORAL ROMANOSKY:   If you're in rooms like

6    Fathers Chatting, Strict Dads, Strict Parents, yeah,

7    I'll give you that.   But if you're in rooms like the

8    Bonfire or --

9         THE DEFENDANT:   I have never --

10        CORPORAL ROMANOSKY:   Florida, Ft. Myers, then

11   you're more likely to encounter people who --

12   adults.

13        THE DEFENDANT:   Right.

14        CORPORAL ROMANOSKY:   I mean, there's hundreds

15   of chat rooms out there with the (unintelligible)

16   titles, and you're an intelligent man.   With titles

17   like this, you know what you're getting into when

18   you go into those rooms.

19        THE DEFENDANT:   Fathers Chatting, I didn't

20   know what I would be getting.

21        CORPORAL ROMANOSKY:   How long did it take

22   before you figured it out?   Anyone who -- I can

23   teach any new detective to chat, and within a day

24   they'll tell me that's (unintelligible).

25        THE DEFENDANT:   No.   I would say two to three

1    days because I got at times everybody wanting to --

2    or I see it all the time, with daughters --

3         CORPORAL ROMANOSKY:  Um-hum.

4         THE DEFENDANT:  You know, continually.

5         CORPORAL ROMANOSKY:  Um-hum.  Dads and

6    daughters?

7         THE DEFENDANT:  Dads and daughters, yeah.

8         CORPORAL ROMANOSKY:  So those names are

9    pretty -- I'll give you a couple of days, two or

10   three days, you know what those rooms are all about.

11   Why do you go in there again?  Why do you continue

12   chatting with people in those rooms, talking about

13   the things that you're talking about here?

14        THE DEFENDANT:  I guess because I find it

15   easy.  I'm sorry.

16        CORPORAL ROMANOSKY:  That's okay.

17        THE DEFENDANT:  I'm sorry.  Embarrassed.

18        CORPORAL ROMANOSKY:  Don't be embarrassed.

19   It's a bodily function.

20        THE DEFENDANT:  I'm trying to -- yeah.  I

21   don't get excited because I can't.  Okay?  That I

22   can tell you.  You can do anything to me and it

23   doesn't work.

24        CORPORAL ROMANOSKY:  But I've been told,

25   though, that the training we go to --

```
1                THE DEFENDANT:  Yeah.

2                CORPORAL ROMANOSKY:  -- we talk about in

3        talking to people about stuff like this and learning

4        about some of those disabilities --

5                THE DEFENDANT:  Yes.

6                CORPORAL ROMANOSKY:  -- that the impulse and

7        the interest and the drive is still there.  Although

8        the physical thing can't happen, the interests are

9        still there.

10                THE DEFENDANT:  My interests really, to be

11        very candid with you, with anything sexual at this

12        point in my life, honestly is a --

13                CORPORAL ROMANOSKY:  Because too many people

14        are telling me that you talked about sexual abuse --

15        sexual activities with kids.  So needless to

16        say (unintelligible) --

17                THE DEFENDANT:  All I can tell you, I don't

18        believe that any of those people will tell you that

19        I started the conversation like that.

20                CORPORAL ROMANOSKY:  But we all know in the

21        chat rooms when you and I talk that people don't

22        just come out -- because they're afraid that they're

23        talking to me, they won't just come out and say,

24        hey, I want to have sex with your kids.  I have two

25        kids and we want to have sex with them.  We know
```

1     that doesn't happen.  You and I both know that the

2     first couple of chats are very cryptic in what we

3     say and the things we say.  I mean, let's be honest

4     with each other.

5          THE DEFENDANT:  I just want to

6     (unintelligible) cryptic.  Maybe they were.  I don't

7     remember.

8          CORPORAL ROMANOSKY:  Well -- and some of the

9     terms you use are commonly -- were back and forth.

10    That's how these things -- you know as well as I do,

11    that's how these things happen.  We don't come out

12    because there's a element of trust at first.

13         THE DEFENDANT:  Right.

14         CORPORAL ROMANOSKY:  I have to trust you and

15    you have to trust me.

16         THE DEFENDANT:  Right.

17         CORPORAL ROMANOSKY:  Right?

18         THE DEFENDANT:  Correct.

19         CORPORAL ROMANOSKY:  So, obviously, you're not

20    going to come out and say, hey, if you have kids,

21    I'm up for this.

22         THE DEFENDANT:  Oh, no.  No.

23         CORPORAL ROMANOSKY:  We're going to develop

24    that trust.

25         THE DEFENDANT:  Correct.

1          CORPORAL ROMANOSKY:   Which is what happened

2     since what, mid June since we started talking?

3          THE DEFENDANT:   Whenever it was, yeah.

4          CORPORAL ROMANOSKY:   If I would have said that

5     first day, the first day you made contact with me,

6     hey, I've got two boys, 10 and 11, that, you know,

7     if you want to come over and beat them up with some

8     implements and you want to have sexual activity --

9          THE DEFENDANT:   Right.

10          CORPORAL ROMANOSKY:   -- you would have said,

11     get away from me, because you probably would have

12     thought I was a cop or I was some nut.

13          THE DEFENDANT:   Yeah.   That would be even

14     more.   I actually --

15          CORPORAL ROMANOSKY:   But as the trust

16     develops --

17          THE DEFENDANT:   Yeah.   As the trust develops.

18     So I guess -- and your question was again?   I'm not

19     trying to --

20          CORPORAL ROMANOSKY:   Well, my question was

21     essentially why you --

22          THE DEFENDANT:   Why am I doing it.   Yeah.

23          CORPORAL ROMANOSKY:   Why are you doing it?

24     Why are you going in the chat rooms talking about

25     these things with all these other folks?   And I

1       know -- like I say, I have a few case files being

2       sent over to me from different parts of Florida.

3               THE DEFENDANT:  I haven't been to different

4       parts of Florida.

5               CORPORAL ROMANOSKY:  Well, but -- right.  But

6       they're people that you've chatted with that were in

7       other parts of Florida.

8               THE DEFENDANT:  Oh, yeah, you're right.

9               CORPORAL ROMANOSKY:  At this point, I'm not

10      going to make those screen names available to you

11      because I have to make sure what we're going to do

12      with their cases.  But at some point during this

13      legal process, you'll be given full discovery or

14      disclosure of what those other screen names were

15      because they'll be part of my case file.

16              THE DEFENDANT:  I can guess -- like I say, I

17      can guess one, two, and that would be really all.

18      The rest -- I don't know, honestly.  I mean, I'd

19      tell you if I did.

20              CORPORAL ROMANOSKY:  In all honesty, is this

21      something that -- is this the first time that you

22      ever acted out on this interest?

23              THE DEFENDANT:  Yes, sir.  Yes, sir.

24              CORPORAL ROMANOSKY:  Have you never met any

25      other parents?  I'm not going to get phone calls

1   saying that you've met other parents at these --

2         THE DEFENDANT:   I have never met anybody.

3         CORPORAL ROMANOSKY:   To your understanding,

4   what were you coming for tonight?

5         THE DEFENDANT:   You know, it was funny.   I

6   didn't know what I was going to come for because I

7   was sort of leery.   So I said, this guy -- and I

8   trust people so, you know -- is wanting me to come

9   and he really seems like he's in the boat business.

10   I don't know anything about boats.   And, you know,

11   it's such a group I'd never heard of before, by the

12   way.   Never.   And I thought to myself, group?

13   Something is wrong here.   I'd never -- you know, I'd

14   never been, never heard of that.   But he seems so

15   honest and so interested, I'll make it -- an

16   attempt.   And then when I started to go, because of

17   the fall (unintelligible), no, I'm not going to do

18   it.   And I started twice, and I thought, you know --

19         CORPORAL ROMANOSKY:   What's that?

20         THE DEFENDANT:   (Unintelligible).   And then I

21   said, but he's so nice and such an honest character

22   and what have you, I'm going to do it.   I have no

23   idea what I'm really getting into, no idea.   And I

24   thought, (unintelligible), you know.   And then I

25   thought, no, he seems very intent.   And to be

1    honest, I had no suspicions, if you want the truth,

2    because if I had had suspicions, I wouldn't have

3    come.

4        CORPORAL ROMANOSKY:  Sure.  I understand that.

5        THE DEFENDANT:  You did -- you did a great

6    job.

7        CORPORAL ROMANOSKY:  Well, the scary thing --

8    the scary thing is, Charles, is that there are --

9    unfortunately, there are parents out there offering

10   their children up for this sort of thing.  Okay?  In

11   this case --

12       THE DEFENDANT:  Now, that I didn't know.

13       CORPORAL ROMANOSKY:  You didn't know?  In this

14   case you were talking to me thinking I was one of

15   those parents but --

16       THE DEFENDANT:  Yeah.

17       CORPORAL ROMANOSKY:  -- unfortunately, we've

18   worked cases on the other side of it where we've

19   gone after the parent's after things have happened

20   and learned that these were the activities that took

21   place.

22       THE DEFENDANT:  Oh, right.

23       CORPORAL ROMANOSKY:  So one thing I obviously

24   have a concern about is if you wouldn't have met me

25   tonight or you would not have met some of my

1    associates when they came up after we first met

2    there, you might have been a real parent, what would

3    you have done if you had gone back to the house?

4    You had the belts, you had the razor straps, you had

5    that crop.

6         THE DEFENDANT:  Right.

7         CORPORAL ROMANOSKY:  What would you have done

8    if that option would have presented itself to you

9    tonight, if it would have been a real -- in fact, a

10   real parent?  When you would have gotten to the

11   house and the kids would have been bound, bent over

12   a chair or a couch --

13        THE DEFENDANT:  That all bothered --

14   (unintelligible).

15        CORPORAL ROMANOSKY:  What would you have done?

16        THE DEFENDANT:  You want to know the truth?  I

17   don't know.  I really don't.  The whole thing

18   didn't -- in retrospect.

19        CORPORAL ROMANOSKY:  Um-hum.

20        THE DEFENDANT:  I wondered what was really

21   going to go on.

22        CORPORAL ROMANOSKY:  Well, there had to be

23   some part of you that hoped this activity was going

24   to be real.

25        THE DEFENDANT:  Well, not the sexual part, no,

1      because (unintelligible).

2           CORPORAL ROMANOSKY:   Okay.   Well, we'll take

3      out the sexual part.   Some part of you had to hope

4      that it was going to be a real possibility that you

5      could act on this, the physical part.

6           THE DEFENDANT:   Yes, I'm sure I thought that.

7           CORPORAL ROMANOSKY:   Um-hum.

8           THE DEFENDANT:   But I still -- I never

9      entertained or imagined a group situation.   No,

10     never.   I'd never heard of that.   And I thought -- I

11     mean, I really -- I didn't understand it.   Okay.

12     But I thought --

13          CORPORAL ROMANOSKY:   Is it possible you were

14     looking towards this group to validate your own

15     interests?   Maybe you, Charles Friedlander, the

16     mental health counselor, the PhD, you don't want to

17     admit to yourself that you have these feelings or

18     these impulses to want to do these things, but if

19     there's other people out there that have these same

20     interests, maybe that validates some of my behavior

21     and say, hmm, well, if they're into it, I guess

22     maybe it's not so bad because there's other people

23     with the same interests.   Does that make any sense

24     to you?   I mean, is that a possibility?

25          THE DEFENDANT:   It could.   It could.   Right.

1     I don't know.  I mean, I'm trying to think.  That's

2     a possibility.  However, you know, for me, because

3     you've been checking up on me, this is the first

4     time that I -- I was very -- I didn't know, I mean,

5     you know.  I was having to make special plans for my

6     food, you know what I mean?

7          CORPORAL ROMANOSKY:  I'm sorry.  Special plans

8     for your food?

9          THE DEFENDANT:  I had to be sure I had food

10    before coming, you know.

11         CORPORAL ROMANOSKY:  Right.

12         THE DEFENDANT:  Could I trouble you for

13    another (unintelligible)?

14         CORPORAL ROMANOSKY:  Absolutely.  Absolutely.

15    Let me get you --

16         THE DEFENDANT:  (Unintelligible).

17         CORPORAL ROMANOSKY:  No, I understand.  I want

18    to make sure you're comfortable.

19         THE DEFENDANT:  I mean, it's just --

20         CORPORAL ROMANOSKY:  Let me -- I'll just step

21    out for just a second and get you some more water.

22    I'll be right back.  Do you need to use the bathroom

23    or anything or --

24         THE DEFENDANT:  No, I'm fine.

25         CORPORAL ROMANOSKY:  I'll be right back.

1          THE DEFENDANT:  I did that on the way, or very

2     close.

3          CORPORAL ROMANOSKY:  Okay.  I'll be right

4     back.

5          THE DEFENDANT:  No.

6          CORPORAL ROMANOSKY:  There you go.

7          THE DEFENDANT:  Sorry to put you through all

8     this.

9          CORPORAL ROMANOSKY:  No, don't worry about it.

10     Okay.  Let's talk about your screen name for a

11     minute, Captoes?

12          THE DEFENDANT:  Yes, sir.

13          CORPORAL ROMANOSKY:  In your profile, it talks

14     about an interest in, like, shoes?

15          THE DEFENDANT:  Right.  I collect them like

16     Imelda Marcos.

17          CORPORAL ROMANOSKY:  Um-hum.

18          THE DEFENDANT:  I mostly wear capped toes but

19     not always.  That's it.

20          CORPORAL ROMANOSKY:  Okay.

21          THE DEFENDANT:  There's no --

22          CORPORAL ROMANOSKY:  One part says, tongue

23     those shoes?

24          THE DEFENDANT:  Yes.  That means I really like

25     spit-shined shoes.

```
 1              CORPORAL ROMANOSKY:  Okay.

 2              THE DEFENDANT:  But sometimes you can't.

 3      Excuse me.  It's coming out all ends.

 4              CORPORAL ROMANOSKY:  You mentioned on the way

 5      in that you work with the Florida Sheriff's Youth

 6      Ranch?

 7              THE DEFENDANT:  Just for -- I contribute money

 8      to them, and then I've offered to -- they have some

 9      language problems.

10              CORPORAL ROMANOSKY:  Um-hum.

11              THE DEFENDANT:  Okay.  I speak three

12      languages.

13              CORPORAL ROMANOSKY:  Oh, really?

14              THE DEFENDANT:  Yeah.

15              CORPORAL ROMANOSKY:  Which languages do you

16      speak?

17              THE DEFENDANT:  French, Spanish and German.

18              CORPORAL ROMANOSKY:  Very good.

19              THE DEFENDANT:  Yeah.  So they were talking to

20      me that they even had some Creole people from Haiti,

21      and that they were having to have people learn more

22      languages because they weren't only getting

23      Americans.

24              CORPORAL ROMANOSKY:  Um-hum.

25              THE DEFENDANT:  So I offered to teach
```

1     languages, to a point, I mean, you know.

2           CORPORAL ROMANOSKY:  And you speak Spanish,

3     French --

4           THE DEFENDANT:  And German.

5           CORPORAL ROMANOSKY:  Wow.

6           THE DEFENDANT:  But German wouldn't help at

7     all.  French would and Spanish would so --

8           CORPORAL ROMANOSKY:  Have they ever taken you

9     up on your offer?

10          THE DEFENDANT:  Well, I've spoken to them and,

11    no, they haven't yet.  I think they'd rather -- I

12    think they are coming into this business sort of

13    new.  I don't mean the Sheriff's Boys Ranch.  I

14    mean, you know, having to know what the language is.

15    It's not -- I don't think it's occurred for a long

16    time.  See, they don't have -- Florida Sheriff's

17    Boys Ranch is not for kids in trouble.

18          CORPORAL ROMANOSKY:  Um-hum.

19          THE DEFENDANT:  It's mostly for abandoned kids

20    and that sort of thing.  And they're referred by --

21    some by sheriffs, some by school counselors, I mean,

22    there's a bunch of different things.  And a lot of

23    them have -- (unintelligible).

24          CORPORAL ROMANOSKY:  I'm sorry.  Just played a

25    little rough when I was younger.

1          THE DEFENDANT:  Okay.  They -- and now, for

2     example, they had two Russian kids.  Well, I don't

3     speak Russian, and they were not successful and they

4     had to leave them.  Now they've gotten I think two

5     Creole ones or (unintelligible).  But then they

6     found a third one who knew enough English to, you

7     know --

8          CORPORAL ROMANOSKY:  Do you ever instruct any

9     of the kids there?  Do you ever -- (unintelligible).

10          THE DEFENDANT:  No.  No.  I've never done

11     that.

12          CORPORAL ROMANOSKY:  No (unintelligible).

13          THE DEFENDANT:  No.

14          CORPORAL ROMANOSKY:  Which one have you mainly

15     worked with, up here or down there?

16          THE DEFENDANT:  No.  It's only up in -- up

17     there.

18          CORPORAL ROMANOSKY:  Up in where?

19          THE DEFENDANT:  Live Oaks.

20          CORPORAL ROMANOSKY:  Live Oaks?

21          THE DEFENDANT:  Yeah.

22          CORPORAL ROMANOSKY:  So you've had no contact

23     with anyone over here in Safety Harbor, the one here

24     in Pinellas County?

25          THE DEFENDANT:  No.  I only learned about that

1    one because it was co-ed.  I think that was Pinellas

2    County.  It's Palm Harbor, is that Pinellas County?

3         CORPORAL ROMANOSKY:  Safety Harbor.

4         THE DEFENDANT:  Safety Harbor.  Yeah, I only

5    learned about that one.  And they have a girl's one

6    in Bartow, but I don't even know exactly where

7    Bartow is.  But they have a small one in Bradenton.

8    I've never been to any of these.  I mean, you know,

9    other than the main one.  And at the main one I've,

10   you know, only dealt with the adults.

11        CORPORAL ROMANOSKY:  Who's your contact there?

12   Do you know a name?

13        THE DEFENDANT:  Should I plead the fifth there

14   or what?  In other words -- well, I mean, I don't

15   know.  I would prefer they not be involved in this.

16   (Unintelligible).

17        CORPORAL ROMANOSKY:  If you're asking me if

18   I'm going to call them, the answer would be no.

19   But, I mean, I'm curious who you're dealing with at

20   Live Oaks up there.

21        THE DEFENDANT:  Oh, Roger Bruchard, he's the

22   head of it.  You know him?

23        CORPORAL ROMANOSKY:  I'm trying to think if I

24   do.

25        THE DEFENDANT:  He's not a sheriff.

1            CORPORAL ROMANOSKY:  No.  But that -- people

2       think that that organization is directly tied to

3       every sheriff's agency, and that's not true.

4       It's -- it's actually a private organization.

5            THE DEFENDANT:  Oh, yeah.  But that's who it

6       is, Roger Bruchard.  He -- I don't know if they're

7       called CEOs or presidents.  I have no idea.

8            CORPORAL ROMANOSKY:  But you've had no

9       interaction with any of the children at the camps,

10      then.  Everything you're doing is volunteering to

11      provide language instruction to --

12           THE DEFENDANT:  I do them both

13      (unintelligible) the counselors, how they -- you

14      know, if they have somebody who's acting out.

15           CORPORAL ROMANOSKY:  Um-hum.

16           THE DEFENDANT:  That sort of thing.  No, it's

17      strictly business, is that what you call it?  No.

18           CORPORAL ROMANOSKY:  When you were younger,

19      were you physically abused or sexually abused at

20      home?

21           THE DEFENDANT:  Not to my knowledge, no.

22           CORPORAL ROMANOSKY:  Okay.

23           THE DEFENDANT:  I have to say not to my

24      knowledge because I think I, like a lot of kids, my

25      father was an alcoholic.

1              CORPORAL ROMANOSKY:  Um-hum.

2              THE DEFENDANT:  So I don't really remember a

3        whole lot of -- except that he didn't want much to

4        do with us.

5              CORPORAL ROMANOSKY:  Um-hum.

6              THE DEFENDANT:  Except to raise hell.

7              CORPORAL ROMANOSKY:  How far back do you

8        remember (unintelligible)?

9              THE DEFENDANT:  Used to go for

10       (unintelligible).

11             CORPORAL ROMANOSKY:  Do you remember grade

12       school or anything like that?

13             THE DEFENDANT:  I remember one or two

14       teachers.  Do I remember anything that happened

15       there?  No.

16             CORPORAL ROMANOSKY:  I mean at home, do you

17       remember any of your home life when you were in

18       grade school?  Anything -- any significant events or

19       anything?

20             THE DEFENDANT:  Well, in a way, I guess.  I

21       was -- I was reared by a nanny.  Okay?  So there was

22       very little interaction with family.

23             CORPORAL ROMANOSKY:  Okay.  What did your

24       father do for a living?

25             THE DEFENDANT:  He was a stockbroker and a

1     banker.

2          CORPORAL ROMANOSKY:  But not to your

3     knowledge, there was no sexual abuse at home?

4          THE DEFENDANT:  I really don't believe so.

5     You know, somebody asked me about -- I have a

6     sister.  And somebody asked me did that happen with

7     her, because she's very difficult, and I -- we were

8     really kept so apart that I don't really -- and I

9     never had much to do with my parents, period, if

10    that sounds strange.

11         CORPORAL ROMANOSKY:  Other than your son that

12    you said was not a legal adoption --

13         THE DEFENDANT:  No.

14         CORPORAL ROMANOSKY:  -- but kind of an

15    adoption.

16         THE DEFENDANT:  Yeah.

17         CORPORAL ROMANOSKY:  How long was he in your

18    life?  You said about ten years?

19         THE DEFENDANT:  Yes, sir.

20         CORPORAL ROMANOSKY:  From the time he was 29

21    to the time he was 39?

22         THE DEFENDANT:  Yes.

23         CORPORAL ROMANOSKY:  Okay.  Have you -- have

24    you adopted or had any legal custody of any children

25    under 18?

1           THE DEFENDANT:  No, sir.

2           CORPORAL ROMANOSKY:  One of the things that we

3      had talked about during our chats was you told me

4      that you had a friend whose grand kids would be

5      dropped over to your house from time to time?

6           THE DEFENDANT:  Right.

7           CORPORAL ROMANOSKY:  What was that all about?

8           THE DEFENDANT:  It was a lot of crap.

9           CORPORAL ROMANOSKY:  Okay.  So there's no

10     children that frequent your residence or anything?

11          THE DEFENDANT:  No.  I -- I -- this sounds

12     strange, and I don't mean to say it this way, but

13     when my cousins were going to come over and visit --

14          CORPORAL ROMANOSKY:  Um-hum.

15          THE DEFENDANT:  -- I said, please don't bring

16     kids.

17          CORPORAL ROMANOSKY:  Um-hum.  For what

18     purpose?

19          THE DEFENDANT:  You mean, did I say that?

20          CORPORAL ROMANOSKY:  Yeah.  Why did you tell

21     them to not bring their kids?  You just didn't want

22     kids around?

23          THE DEFENDANT:  Well, it just drives me crazy.

24     You know, they were one year old and two year old

25     (unintelligible).

1          CORPORAL ROMANOSKY:  (Unintelligible).

2          THE DEFENDANT:  And, you know, I would have

3     had to proof my house and all of that.  No.

4     I didn't want that.

5          CORPORAL ROMANOSKY:  So there are no teenagers

6     that come over?

7          THE DEFENDANT:  No.  I've never had any kids.

8          CORPORAL ROMANOSKY:  So all that you were

9     telling me about, you know, how you'd discipline

10    them when they'd come over -- (unintelligible).

11         THE DEFENDANT:  Was a whole lot of crap.

12         CORPORAL ROMANOSKY:  So none of that was true?

13         THE DEFENDANT:  No, sir.

14         CORPORAL ROMANOSKY:  Do you have any room at

15    the house designated for giving punishment lessons

16    or --

17         THE DEFENDANT:  No.

18         CORPORAL ROMANOSKY:  Any basement at the

19    house?

20         THE DEFENDANT:  No.  You know how Florida

21    houses are.

22         CORPORAL ROMANOSKY:  True.  These are water

23    tables -- (unintelligible).

24         THE DEFENDANT:  Yeah.  Right.  They wouldn't

25    work.

1              CORPORAL ROMANOSKY:  But some of the -- I know

2      some of the homes out on the beach are built up a

3      little bit so they can technically have a basement.

4      It's like half underground.

5              THE DEFENDANT:  Yeah.  I've seen these places

6      out in Captiva, you know, that are built up high.

7      But there was nothing underneath.

8              CORPORAL ROMANOSKY:  Other than the items that

9      you brought tonight, the razor straps, the belt, the

10     English crop, are there any other devices like that

11     at your house right now?

12             THE DEFENDANT:  Yes.

13             CORPORAL ROMANOSKY:  What's all there?

14             THE DEFENDANT:  A couple of dildos, or isn't

15     that the same thing?

16             CORPORAL ROMANOSKY:  Okay.

17             THE DEFENDANT:  Is that the same thing?

18             CORPORAL ROMANOSKY:  As what?

19             THE DEFENDANT:  I mean, is that what you

20     meant?

21             CORPORAL ROMANOSKY:  Yeah.

22             THE DEFENDANT:  Oh.  Oh.  Oh.

23             CORPORAL ROMANOSKY:  Sexual items or any

24     items --

25             THE DEFENDANT:  Okay.

1          CORPORAL ROMANOSKY:   -- used for bondage,

2     sadomasochism or --

3          THE DEFENDANT:   No.  Well, I have -- I have

4     two whips which were my son's when he did roping and

5     stuff or, you know, calves, I don't know.  I wasn't

6     involved in that.  Other than that, I'm trying to

7     think if there was anything.

8          CORPORAL ROMANOSKY:  Are the dildos and the

9     whips stored together?

10         THE DEFENDANT:  Yes.

11         CORPORAL ROMANOSKY:  So it would be safe to

12    say that the whips have -- you can use them for

13    sexual play, as well?

14         THE DEFENDANT:  No.  These were not that.

15    These were --

16         CORPORAL ROMANOSKY:  Why would they be stored

17    with the dildos?

18         THE DEFENDANT:  Well, I just throw things into

19    places.  I don't --

20         CORPORAL ROMANOSKY:  Where are they at?  Where

21    are those things at?

22         THE DEFENDANT:  They're in a little suitcase.

23         CORPORAL ROMANOSKY:  Okay.  And where's the

24    suitcase?

25         THE DEFENDANT:  In a closet.

1          CORPORAL ROMANOSKY:   Okay.   So the dildos and

2     the whips will be stored in the same suitcase in the

3     same closet?

4          THE DEFENDANT:   Well, I don't use any of them.

5          CORPORAL ROMANOSKY:   Why do you have them?

6          THE DEFENDANT:   Well, the dildos I thought

7     maybe I would use it, you know, maybe if my

8     girlfriend, lady friend wanted to do -- use the

9     dildo or something.   But I've never used them.

10    They're unused.

11         CORPORAL ROMANOSKY:   Um-hum.

12         THE DEFENDANT:   So --

13         CORPORAL ROMANOSKY:   What about the whips,

14    though?

15         THE DEFENDANT:   I've never used --

16         CORPORAL ROMANOSKY:   And understand, Charles,

17    I'm not here to judge you.

18         THE DEFENDANT:   I know.   I know.

19         CORPORAL ROMANOSKY:   It's not fair for me to

20    say what's normal and what's not.

21         THE DEFENDANT:   No.

22         CORPORAL ROMANOSKY:   I'm just trying to figure

23    out --

24         THE DEFENDANT:   Randy -- Randy used them but,

25    I mean, he used them with cows and with roping and

1       stuff like that, which he did.  I didn't get

2       involved in any of that stuff.

3            CORPORAL ROMANOSKY:  Does your lady friend

4       have any enjoyment as far as --

5            THE DEFENDANT:  No.  No.

6            CORPORAL ROMANOSKY:  -- any of that stuff?

7            THE DEFENDANT:  No.

8            CORPORAL ROMANOSKY:  Well, I mean, you see

9       where I'm going with it.

10           THE DEFENDANT:  Yeah.  No.  My lady friend --

11      my lady friend is Miss Priss.

12           CORPORAL ROMANOSKY:  Um-hum.  But you see

13      where I'm going, though.

14           THE DEFENDANT:  Yes.  I see that --

15           CORPORAL ROMANOSKY:  We're in a chat room

16      talking about physical abuse of children.

17           THE DEFENDANT:  Right.  Right.

18           CORPORAL ROMANOSKY:  Sexual abuse of children.

19           THE DEFENDANT:  Right.

20           CORPORAL ROMANOSKY:  And at your house you

21      have dildos and whips in the same bag in the

22      bedroom.

23           THE DEFENDANT:  Well, you know, I'm -- if

24      you'll look in my -- I just pile anything anywhere,

25      you know.  I'll put them in a drawer.  Those were

1    wherever Randy had those at the time.  I don't even

2    know whether I had any dildos (unintelligible), I

3    forget, really, how long I've had these things

4    (unintelligible).

5         CORPORAL ROMANOSKY:  Um-hum.

6         THE DEFENDANT:  I think it's one dildo, maybe

7    two, but I think it's one.

8         CORPORAL ROMANOSKY:  Do you have any images of

9    child pornography at the house?

10        THE DEFENDANT:  No, sir.

11        CORPORAL ROMANOSKY:  On any CDs or any VHS

12   tapes or floppy discs or --

13        THE DEFENDANT:  I don't own any of that stuff.

14        CORPORAL ROMANOSKY:  Do you have VCR tapes or

15   anything at the house?

16        THE DEFENDANT:  I have some VCR tapes of

17   shows, I think.

18        CORPORAL ROMANOSKY:  Any of them pornographic?

19        THE DEFENDANT:  Oh, no.  They're musical

20   shows.

21        CORPORAL ROMANOSKY:  Any child porn?  Any

22   child pornography?

23        THE DEFENDANT:  No.  I've never even seen any,

24   if you want the truth of the matter.  No, I do not

25   have any.

1          CORPORAL ROMANOSKY:   Okay.   Have you ever

2     visited any web sites or anything centered around

3     bondage, sadomasochism, anything like that?

4          THE DEFENDANT:   No.   No.

5          CORPORAL ROMANOSKY:   Now, we talked a little

6     bit about a possible interest or some sort of an

7     interest in the physical abuse, using the Garrison

8     belts and the straps.

9          THE DEFENDANT:   Um-hum.

10          CORPORAL ROMANOSKY:   And the possibility of

11     talking to other people on the internet and maybe

12     even acting out, coming up here to meet with who you

13     thought had the same interests as maybe some sort of

14     validation for your own interest.   Would that be a

15     safe assumption?   Would that be a good assumption?

16          THE DEFENDANT:   I'm trying to tell you the

17     truth, okay?   That's why I'm hesitating.

18     (Unintelligible).

19          CORPORAL ROMANOSKY:   I just -- yeah.   That's

20     what I'm after, I'm after the truth.   I know you're

21     an intelligent man.   I know if I was in your

22     position, I would be thinking what can I say at this

23     point to minimize the damage or minimize the impact

24     this is going to have in the justice system.   I can

25     tell you this.   We need to be honest and frank with

1    each other because if that's what -- what you are

2    trying to do --

3            THE DEFENDANT:  No.

4            CORPORAL ROMANOSKY:   -- is trying to minimize

5    any impact, the chats are going to speak for

6    themselves.

7            THE DEFENDANT:  Oh, thank God.  Yeah.

8            CORPORAL ROMANOSKY:  All that's going to do is

9    make you look worse, make you look like you're

10   trying to hide something.  The best thing at this

11   point, if we're here and we're talking about it,

12   let's just get into it.

13           THE DEFENDANT:  Well, one of the things, I

14   don't know.  I mean, you know, I do know, and I'm

15   being perfectly frank, that I have the erectile

16   dysfunction and I can't do anything sexually with

17   anybody.

18           CORPORAL ROMANOSKY:  You can't make

19   penetration with anyone sexually with your penis.

20           THE DEFENDANT:  That's what I meant.

21           CORPORAL ROMANOSKY:  That does not prevent you

22   from fondling, from masturbating another, from

23   performing oral sex on another.  There's a lot of

24   sexual acts with fingers, there's a lot of sexual

25   acts that can take place even though you have

1    erectile dysfunction.  And I think there's enough

2    doctors that know that having erectile dysfunction

3    doesn't take away from the urge, doesn't take away

4    from the sexual interest, it just prohibits the

5    physical --

6         THE DEFENDANT:  Right.

7         CORPORAL ROMANOSKY:  -- things from happening.

8    So let's not kid each other.

9         THE DEFENDANT:  No.  I'm not trying to kid.

10        CORPORAL ROMANOSKY:  In all honesty here --

11        THE DEFENDANT:  No.

12        CORPORAL ROMANOSKY:  -- for me to have talked

13   to other detectives in the State of Florida --

14        THE DEFENDANT:  No.

15        CORPORAL ROMANOSKY:  For them to call me about

16   your screen names saying I have investigated this

17   person, also, and chatted with this person and they

18   had expressed a sexual interest in my child, as

19   well, in a round-about way in our chats here, we got

20   to that, as well, okay?  Because the first time you

21   and I talked, you were right on that.  So I knew

22   that's where you were going.  When I -- when you

23   initiated contact with this profile, I knew that's

24   where you were going.  So for me --

25        THE DEFENDANT:  Yeah.

1          CORPORAL ROMANOSKY:   -- to hear that you

2     have -- you can't -- you may have a little bit of an

3     interest in the physical abuse but you have no

4     interest at all in the sexual abuse of children --

5          THE DEFENDANT:  Well, I don't know.

6          CORPORAL ROMANOSKY:   -- I don't buy it.  I

7     really don't.

8          THE DEFENDANT:  Okay.  I don't have sexual --

9     I don't have sexual interest truthfully in anything.

10    I mean, I -- I -- how do you say this?  I don't see

11    how you can have the interest without being able to

12    do it.

13         CORPORAL ROMANOSKY:  Well, I think a lot of

14    people would like to answer that question, but they

15    know it's possible to have the interest and the

16    impulse and just maybe not the physical ability to

17    see it all the way through.  Maybe that would

18    increase the -- the interest or the impulses because

19    when they stop is when you have that release.

20         THE DEFENDANT:  Right.

21         CORPORAL ROMANOSKY:  But if you don't have

22    that release, there's really nothing to stop them.

23         THE DEFENDANT:  There's no release.  No.

24         CORPORAL ROMANOSKY:  So there would be nothing

25    to really -- it's not like you can look at

1    pornography, even adult pornography and get that

2    release, so the impulse and interest are still going

3    to be there.

4         THE DEFENDANT:  I'm sure that I have to have

5    some interest or it wouldn't occur.  As far -- but,

6    I mean, in the sexual thing, it's very hard still

7    for me to imagine something that I can't do.  You

8    know what I mean?  I can't --

9         CORPORAL ROMANOSKY:  Could you masturbate a

10   child?

11        THE DEFENDANT:  I never have.

12        CORPORAL ROMANOSKY:  I know you haven't, but

13   could you?

14        THE DEFENDANT:  You mean, would I have the

15   capability of doing that?

16        CORPORAL ROMANOSKY:  Do you have the physical

17   capability of doing that?

18        THE DEFENDANT:  Oh, I'm sure.  We all do.

19   Yeah.

20        CORPORAL ROMANOSKY:  Do you have the physical

21   capability of performing oral sex on a child?

22        THE DEFENDANT:  I -- I --

23        CORPORAL ROMANOSKY:  Do you have the physical

24   capability --

25        THE DEFENDANT:  I have the physical

1    capability.   Absolutely.

2         CORPORAL ROMANOSKY:   What are the two things

3    that we talked about, any sexual activity that might

4    have taken place after the beatings tonight?

5         THE DEFENDANT:   Right.

6         CORPORAL ROMANOSKY:   What were the two things

7    we talked about?

8         THE DEFENDANT:   Not penetration.

9         CORPORAL ROMANOSKY:   Not penetration.   What

10   were the two things we talked about?

11        THE DEFENDANT:   We talked about oral.

12        CORPORAL ROMANOSKY:   And what else did we talk

13   about?

14        THE DEFENDANT:   But that was --

15        CORPORAL ROMANOSKY:   What did the boys have

16   experience in.   And I asked you, what do you think

17   you might be doing.   You said oral and what else?

18   Handling.

19        THE DEFENDANT:   Did I say handling?

20        CORPORAL ROMANOSKY:   Um-hum.

21        THE DEFENDANT:   Oh, okay.   But I felt that

22   they would be doing that to me.

23        CORPORAL ROMANOSKY:   Well, either --

24        THE DEFENDANT:   No.   I mean, I --

25        CORPORAL ROMANOSKY:   (Unintelligible) at that

1    point, I mean, it could be oral sex, it could go

2    back and forth.

3            THE DEFENDANT:  Well, yeah.  I wasn't --

4            CORPORAL ROMANOSKY:  I wasn't going to be that

5    specific with you and say, well, you know, you want

6    to make this -- I might be provoking some suspicion

7    then if I'm asking you to draw me a schematic.

8            THE DEFENDANT:  Yeah.  But when -- I mean,

9    when I think of these things, it isn't I being the

10   active person, ever.

11           CORPORAL ROMANOSKY:  Um-hum.  It's you being

12   the recipient.

13           THE DEFENDANT:  The recipient.  Yes.  Yes, it

14   is, not the acting.

15           CORPORAL ROMANOSKY:  How long have you had

16   the -- some sort of interest in that, do you think?

17           THE DEFENDANT:  Now, you asked something and I

18   remembered something, okay?

19           CORPORAL ROMANOSKY:  We can go back to that.

20           THE DEFENDANT:  No, no, no, no, no.  I mean,

21   but it has to do with this so -- I had somebody when

22   I was at camp -- I don't know how old I was.  16,

23   maybe?

24           CORPORAL ROMANOSKY:  Um-hum.

25           THE DEFENDANT:  Who attacked me and performed

1       oral sex on me.  It was the first time.

2              CORPORAL ROMANOSKY:  Was it a counselor or --

3              THE DEFENDANT:  No.

4              CORPORAL ROMANOSKY:  Just another camper?

5              THE DEFENDANT:  It was another camper.

6              CORPORAL ROMANOSKY:  How old were they?

7              THE DEFENDANT:  A little bit older than I.

8       You know, I remember this, I remember it happening.

9       And I remember being very frightened.

10             CORPORAL ROMANOSKY:  Um-hum.

11             THE DEFENDANT:  And he performed oral sex.

12      Can I tell you what happened?  No, I don't remember.

13             CORPORAL ROMANOSKY:  You remember that part.

14             THE DEFENDANT:  I remember that part.  Yeah.

15             CORPORAL ROMANOSKY:  Do you think that might

16      have kindled something that later on in life --

17             THE DEFENDANT:  Yeah.  That's why I brought it

18      up.  I think it may have.  I mean, I didn't -- I

19      didn't think about it before.  And he did it and he

20      tried it again and I said -- you know, I said no.

21      But he stopped, you know, there was not anything

22      like that.  And -- but that probably was a

23      beginning.

24             CORPORAL ROMANOSKY:  So we're going back to --

25      you said you were 16, so that's quite a long time.

1      Have your interests always been centered around --

2      as far as that genre of kids, has it always been

3      centered on boys or girls or either?

4           THE DEFENDANT:  I think probably more boys.

5      That's the way it would appear to me.  I had

6      interest in girls, but I didn't --

7           CORPORAL ROMANOSKY:  Predominately boys?

8           THE DEFENDANT:  I think it would be

9      predominately boys.  But my real interest -- I mean,

10     this is what amazes me about me, too -- my real

11     interest is more people who are older.

12          CORPORAL ROMANOSKY:  Um-hum.

13          THE DEFENDANT:  It is not -- I mean, you know,

14     if I were to -- if I were to think of a

15     preference --

16          CORPORAL ROMANOSKY:  If I call -- if I call

17     AOL, okay?

18          THE DEFENDANT:  Sure.

19          CORPORAL ROMANOSKY:  And we have AOL send me a

20     listing of all the chat rooms that you've been in --

21          THE DEFENDANT:  Um-hum.

22          CORPORAL ROMANOSKY:  -- within the last 90

23     days, however -- depending on how far we go back,

24     maybe up to six months.

25          THE DEFENDANT:  Yeah.

1          CORPORAL ROMANOSKY:  How many are going to be

2     predicated towards adults or people your own age?

3          THE DEFENDANT:  More.

4          CORPORAL ROMANOSKY:  More than the ones that

5     are predicated towards young and --

6          THE DEFENDANT:  Oh, yes.  Oh, my god, yes.

7          CORPORAL ROMANOSKY:  Which ones -- which ones

8     do you go to for adults, looking for adults?

9          THE DEFENDANT:  Okay.  If I'm going for

10    adults, I would go Men for Men in Ft. Myers.  Let's

11    just say Men for Men (unintelligible).  Men for Men

12    in -- (unintelligible).  I'm just trying to think of

13    the unusual ones I told you about.

14         CORPORAL ROMANOSKY:  What kind of stuff do you

15    talk about in the unusual ones?

16         THE DEFENDANT:  Usually --

17         CORPORAL ROMANOSKY:  (Unintelligible) unusual.

18         THE DEFENDANT:  Yeah.  Practically nothing at

19    all because nobody pays any attention to me.  So, I

20    mean, you know.

21         CORPORAL ROMANOSKY:  Why do you think that is?

22         THE DEFENDANT:  Well, I'm older, you know.

23         CORPORAL ROMANOSKY:  Well, there are guys

24    older looking for someone, too, I would think.

25         THE DEFENDANT:  Well, most of the time I get

1    these -- these -- what you call it, IMs.

2         CORPORAL ROMANOSKY:  Um-hum.

3         THE DEFENDANT:  And they want to know my age.

4    And the minute I say 70 -- (unintelligible) you

5    don't even get an answer.

6         CORPORAL ROMANOSKY:  So I think -- would it be

7    a safe assumption that -- are you saying, obviously,

8    there's some interest, though, but you're telling me

9    your predominate interest is more towards older?

10        THE DEFENDANT:  Yes.  Yes.  And you won't --

11        CORPORAL ROMANOSKY:  With some interest in

12   children while you're in those rooms, talking about

13   it or making comment about it.

14        THE DEFENDANT:  I think talking about it and

15   maybe making comment, but basically if you were to

16   look at my history or my -- I don't know the words

17   you might use, but you would find it with adults.

18   Men for Older Men.

19        CORPORAL ROMANOSKY:  Um-hum.

20        THE DEFENDANT:  Over 60, Man for Man.  Okay.

21   That's what it is.  Those two are in there.  I'm

22   just trying to think of -- you know, it's hard when

23   you sit and try to think of something.

24        CORPORAL ROMANOSKY:  (Unintelligible).

25        THE DEFENDANT:  Right.  Exactly.  And I'm

1    trying to be honest about where it could be.   On

2    occasion, Naples, Men for Men Naples.

3         CORPORAL ROMANOSKY:   Now, I think we kind of

4    at least broached on the subject of there had to be

5    some sort of interest there as far as sexual

6    activity with kids, whether that's a predominate

7    interest or not, at least some sort of interest is

8    why you're at least going in these rooms and talking

9    to people about it.

10        THE DEFENDANT:   Yes.

11        CORPORAL ROMANOSKY:   Would it be the same, you

12   think, as far as physical abuse not only children

13   but -- not only children, but with adults, using

14   those implements on both children and adults?

15        THE DEFENDANT:   I think it would be more

16   interest in adults than children.   I -- I -- I'm not

17   a real child oriented person.   I know this sounds

18   funny to say.

19        CORPORAL ROMANOSKY:   Well, but in the chats,

20   though, I mean, in the chats, you're very specific

21   about the age that you like.

22        THE DEFENDANT:   Well --

23        CORPORAL ROMANOSKY:   When you talk about your

24   friends, you're very specific about boys at 11, 12,

25   13 area or 14, 15, you know, how many lashes, the

1    backhand, you're very descriptive as far as --

2         THE DEFENDANT:  I -- I --

3         CORPORAL ROMANOSKY:  I can tell that's where

4    your interest lies because every time we talked,

5    you're right there, I mean.

6         THE DEFENDANT:  Yeah.

7         CORPORAL ROMANOSKY:  You're not branching out

8    and saying I like to do that to 20, 21 year olds.

9    Are there any adults at this party that are going to

10   be there that will let me do this.  It's always,

11   bam, we're right here.

12        THE DEFENDANT:  Well, yeah.  And -- and --

13   but, in -- in --

14        CORPORAL ROMANOSKY:  In our previous chats,

15   the same way.  I told you my sons were, I think --

16        THE DEFENDANT:  11 and 12.

17        CORPORAL ROMANOSKY:  11 and 12 previously,

18   this was a couple of years ago, and you were the

19   same thing on then.  And each time you told me you

20   had grand -- that a friend's grand kids were going

21   to come over, always the same age.

22        THE DEFENDANT:  Right.

23        CORPORAL ROMANOSKY:  Same description.  So I

24   know, whether you want to admit to me or not --

25        THE DEFENDANT:  Well, (unintelligible).

1          CORPORAL ROMANOSKY:  (Unintelligible).  And

2     that's where it's at.

3          THE DEFENDANT:  I know.  I mean, I don't deny

4     this at all.  I'm not denying it.  I'm trying to see

5     how I've never acted on anything.  You see what I

6     mean?  Yes, I -- I'm sure I have said -- and I --

7     you know, and I hear more crap on those things than

8     anything you can imagine.  But I -- I have never,

9     never acted upon anything.  And, really, I was very

10    leery --

11         CORPORAL ROMANOSKY:  Again, let's go back to

12    what would have happened if I had been a real parent

13    tonight and gave you the opportunity to do it.  You

14    told me yourself you don't know what would have

15    happened.

16         THE DEFENDANT:  I don't.  I don't know.

17         CORPORAL ROMANOSKY:  Does that -- does that

18    scare you at all, though?

19         THE DEFENDANT:  Well, I don't --

20         CORPORAL ROMANOSKY:  It ought to scare the

21    heck out of you because there's no --

22         THE DEFENDANT:  (Unintelligible).

23         CORPORAL ROMANOSKY:  (Unintelligible) wouldn't

24    have gone through with it.

25         THE DEFENDANT:  I -- I -- you know, I -- if I

1    can say to you I wouldn't have, you can say to me,

2    then, why did you do it, why did you think about it.

3    You know, I can't tell you, I mean, I -- I -- you

4    know, I only say that I have never done this.  Okay.

5    So if I have never done it, then the question could

6    be perfectly logically why did you talk about it.

7         CORPORAL ROMANOSKY:  Um-hum.

8         THE DEFENDANT:  Because that -- I mean, that

9    would be my thinking.

10        CORPORAL ROMANOSKY:  I mean, we can go back

11   and forth.  Obviously, I don't know that --

12   realistically, I don't know that you can dispel in

13   my mind that there wouldn't have been real kids and

14   a real parent willing to allow you to do this that

15   would have had these interests --

16        THE DEFENDANT:  How would I --

17        CORPORAL ROMANOSKY:  -- that it wouldn't have

18   happened.

19        THE DEFENDANT:  I don't know.  I -- I --

20        CORPORAL ROMANOSKY:  And on the other side of

21   it, you can say, well, how do you know that it would

22   have happened, I might have backed out.  But that's

23   not what the chats, conversations suggest.

24        THE DEFENDANT:  Right.

25        CORPORAL ROMANOSKY:  The chats and the

1    conversations say that the interest is there.  You

2    came to a meeting with the implements to do it.

3          THE DEFENDANT:  Okay.  Now, let me ask you

4    this.  Supposing I hadn't come here, supposing I

5    said I just couldn't it.  What would have then been

6    the case?

7          DETECTIVE ROMANOSKY:  We would have come and

8    arrested you on a warrant.

9          THE DEFENDANT:  Oh, really.

10         DETECTIVE ROMANOSKY:  In the State of Florida,

11   it's unlawful to use an online service like AOL to

12   speak to a child or a parent or guardian of a child

13   that you reasonably -- is legit to engage in this

14   sort of behavior, or attempt to engage in this sort

15   of behavior.

16         THE DEFENDANT:  I -- I see.  Okay.

17         DETECTIVE ROMANOSKY:  So we would have

18   (unintelligible.)

19         THE DEFENDANT:  Okay.  I mean, I didn't know.

20         DETECTIVE ROMANOSKY:  There had been enough

21   concern and, honestly, it wouldn't have been too

22   much longer because I was concerned when you were

23   mentioning you had friends' grand kids coming over.

24         THE DEFENDANT:  Um-hum.

25         DETECTIVE ROMANOSKY:  In the back of my mind,

1       I was thinking you might just be saying this so that

2       we would -- it's okay -- so that we will trust him

3       more and think that he has the same interests, or it

4       could be legit.  I as a law enforcement officer

5       can't take that chance very long.  If I start

6       thinking this is legit, I have to act on it.

7               THE DEFENDANT:  Right.  Right.

8               DETECTIVE ROMANOSKY:  So we would have been

9       talking probably within this weekend.

10              THE DEFENDANT:  Right.  Okay.

11              DETECTIVE ROMANOSKY:  So that's

12      (unintelligible) that.

13              THE DEFENDANT:  Okay.  I just didn't know.

14      You know, I'm trying to be as candid as I can be.

15              DETECTIVE ROMANOSKY:  Well, I appreciate it.

16              THE DEFENDANT:  You probably think I'm not,

17      but --

18              DETECTIVE ROMANOSKY:  Well, to be honest with

19      you, I know you're a very educated man and I know

20      you know how this (unintelligible).  Obviously, if I

21      were in your position, I would probably be doing the

22      same type of thing.  You want to be truthful and be

23      cooperative, which I believe you are.

24              THE DEFENDANT:  Exactly.

25              DETECTIVE ROMANOSKY:  But I also believe that

1    you're also being careful.  And honestly, I'm not

2    going to fault you for that because you're trying

3    to -- you're trying to give me statements that

4    probably have the least impact.

5         THE DEFENDANT:  I'm trying to give you an

6    honest statement when I know the answers.  If I

7    don't know the answers, I'm not going to say I would

8    have done this or I wouldn't have done this.  I

9    can't -- I can't do that because I don't know.  I

10   really don't.

11        DETECTIVE ROMANOSKY:  Okay.  One of the things

12   I wanted to go over with you here --

13        THE DEFENDANT:  Did I do something wrong?

14        DETECTIVE ROMANOSKY:  No, no, no.  This is --

15   obviously, I have detectives at your house right

16   now.  They're going to be taking possession of your

17   computers.  In all honesty, I know they've already

18   taken possession of the dildos and the whips.

19        THE DEFENDANT:  Okay.

20        DETECTIVE ROMANOSKY:  Because at this point on

21   face value they appear they could possibly be

22   related, or at least along the same lines as this

23   type of investigation.  Since they are going to be

24   taking the computers from the home, I'd like to have

25   those computers sent off to the Florida Department

1    of Law Enforcement and have them forensically

2    analyzed to confirm what you told me, to confirm

3    that you're not downloading (unintelligible) child

4    pornography, look at your buddy lists on AOL from

5    your computer standpoint, look at any chats that may

6    be hidden in the computer that you don't know about

7    that are in data files and backup files and

8    unallocated data areas where the computers throw

9    stuff at random.

10        THE DEFENDANT:  I don't know where anything --

11   you know, I mean --

12        DETECTIVE ROMANOSKY:  Well, basically what I'm

13   asking you for, would that be -- would you give me

14   your consent to do that?

15        THE DEFENDANT:  Yes, I would.

16        DETECTIVE ROMANOSKY:  Okay.  I'm going to

17   review this with you.

18        THE DEFENDANT:  Okay.

19        DETECTIVE ROMANOSKY:  Is there anyone you can

20   think of that you're actively communicating with

21   online on a regular basis like you were talking to

22   me that has expressed a desire to meet with you or

23   has offered up their children?

24        THE DEFENDANT:  You mean that has

25   physically --

1          DETECTIVE ROMANOSKY:  Yeah.  Is there anyone

2     that you're talking to online that says, hey, I have

3     kids.  If you want to meet with me, 200 bucks an

4     hour or --

5          THE DEFENDANT:  No.

6          DETECTIVE ROMANOSKY:  Would you have any

7     objection to me going on -- logging on as you to see

8     if anyone would make contact with me based on the

9     prior chats you might have had with them?  I guess

10    what I'm asking is would you have any objection if I

11    were to logon and assume your screen name?

12         THE DEFENDANT:  I don't (unintelligible).

13         DETECTIVE ROMANOSKY:  Well, then, just to

14    see -- you know, I'm looking to see if anyone is

15    going to make contact with me and say, hey, are you

16    still interested in abusing my kids.  If so, here's

17    my name and number or here's my -- here's my number

18    and something that I might be able to develop other

19    investigations on.

20         THE DEFENDANT:  Hum.  That's an interesting

21    question.  There are the two people that I told you

22    about, remember?

23         DETECTIVE ROMANOSKY:  Um-hum.  Do you still

24    have contact with them?

25         THE DEFENDANT:  Occasionally with one, the

1    crazy one.  You never know.  I mean, he can

2    disappear, or he has.  He asked me last if I was a

3    cop.  Why I wouldn't send him a nude picture, and I

4    said, I don't have any such things.

5         DETECTIVE ROMANOSKY:  That's a whole different

6    kind of trust to send someone that kind of picture.

7         THE DEFENDANT:  Well, I said, you know, I

8    don't have such a thing.  Well, how come?  Can't you

9    get one?  And I said, no.  That was true.  The other

10   one --

11        DETECTIVE ROMANOSKY:  I'm sorry?

12        THE DEFENDANT:  The other one, I don't know.

13   I -- yeah, you might get an answer from him, and to

14   be honest with you sitting here, he probably is a

15   police person.

16        DETECTIVE ROMANOSKY:  Think so?  What's his

17   screen name?  Do you know where he's at, where he

18   claims to be?

19        THE DEFENDANT:  Somewhere outside of Orlando,

20   but I don't know where.

21        DETECTIVE ROMANOSKY:  It wasn't me.

22        THE DEFENDANT:  No, no, no, no, no.  But now,

23   I mean, now I would be suspicious of everybody so,

24   you know.

25        DETECTIVE ROMANOSKY:  Let me ask you the

```
 1    million dollar question.  Should this opportunity

 2    ever present itself again, is it something you would

 3    act out on?

 4          THE DEFENDANT:  No.  Would I guarantee you?

 5    Yes.  Would I put it in blood?  Yes.

 6          DETECTIVE ROMANOSKY:  There's no need to do

 7    that.

 8           THE DEFENDANT:  I mean, no, I would not.  You

 9    have as completely, I can honestly tell you,

10    squelched anything I have.  I don't want anybody of

11    any age.  How's that?  I wouldn't.

12          DETECTIVE ROMANOSKY:  Your Yahoo is Captoes2?

13          THE DEFENDANT:  With the number two on it,

14    yes.

15          DETECTIVE ROMANOSKY:  Is there any unique

16    spelling to Captoes, C-A-P-T-O-E-S?  Is it capital C

17    always?

18          THE DEFENDANT:  Yes.

19          DETECTIVE ROMANOSKY:  What is your password

20    for your AOL account Captoes at AOL?

21           THE DEFENDANT:  (Unintelligible).

22          DETECTIVE ROMANOSKY:  If you won't let me log

23    on as you, absolutely.

24          THE DEFENDANT:  Tell me something, can you?

25          DETECTIVE ROMANOSKY:  Um-hum.
```

```
 1              THE DEFENDANT:  How would I know what you were

 2      going to say or something?  You know, I mean, I

 3      don't -- you know --

 4              DETECTIVE ROMANOSKY:  Oh, you mean as far as

 5      if I logged on as you, how do you know I'd be

 6      authentic?

 7              THE DEFENDANT:  Yeah.  What, you know --

 8              DETECTIVE ROMANOSKY:  Believe it or not, most

 9      of the time we just convince people of that, that's

10      all.

11              THE DEFENDANT:  Oh.  You're good at that.

12      Yeah.

13              DETECTIVE ROMANOSKY:  Unfortunately, I --

14      unfortunately, yeah, I guess I am good at it.

15      Unfortunately, I have to do this a lot.

16              THE DEFENDANT:  As Captoes2 I don't think

17      you'll find practically anybody.

18              DETECTIVE ROMANOSKY:  Okay.

19              THE DEFENDANT:  You could certainly do that.

20      I would prefer you not use the Shrinq one, though.

21              DETECTIVE ROMANOSKY:  No, no.  That's a

22      business one.

23              THE DEFENDANT:  That's a business one and I --

24      yeah.  Okay.

25              DETECTIVE ROMANOSKY:  Captoes is the one we
```

1      had correspondence with (unintelligible) --

2              THE DEFENDANT:  Yeah.  That's the other one,

3      yes.

4              DETECTIVE ROMANOSKY:  So that would be the one

5      I would want to use.

6              THE DEFENDANT:  Yeah.  Let me ask you this.

7      What would you do if you were I with giving you

8      permission to do this?  I mean, I'm just very leery

9      of everything now, so --

10             DETECTIVE ROMANOSKY:  I'll be very honest.  If

11     there's a lot of other people that you've talked to

12     about meeting and there's other folks, then I would

13     probably not give it to me because I wouldn't

14     want -- if I were you, I wouldn't want me to

15     discover those -- those people.

16             THE DEFENDANT:  Well, yeah.

17             DETECTIVE ROMANOSKY:  If you've just chatted

18     with people as you say you've just chatted --

19             THE DEFENDANT:  Yeah.

20             DETECTIVE ROMANOSKY:  -- and not very many,

21     then I wouldn't think there would be too much of an

22     issue on it because there shouldn't be anyone

23     beating down the door --

24             THE DEFENDANT:  Oh, nobody's beating down my

25     door.

1          DETECTIVE ROMANOSKY:  You know, to say, hey, I

2     thought you were coming tomorrow.

3          THE DEFENDANT:  No.  No.  I have never made an

4     appointment because for the most part I don't even

5     know where they are.

6          DETECTIVE ROMANOSKY:  Right.  Well, to be

7     honest with you, I would like to -- to log into

8     those accounts and see what comes out of it.  If

9     nothing comes out of it, then I'm only going to try

10    it for a couple of days.  To be honest with you,

11    once I -- once we leave here, I'm going to be

12    sending something to AOL, anyway, and they're going

13    to shut your account down.

14          THE DEFENDANT:  Oh, they are.

15          DETECTIVE ROMANOSKY:  Yeah.  They're going to

16    preserve it.  I'll send a preservation letter.

17    They're going to lock it up.  So when I do this I

18    have to do this fast because I want to see if

19    there's anything there that's worth -- worth

20    developing.  And if there's not, then it will be

21    shut down, anyway, so -- Like I said, all -- it's

22    something I'm going to do fairly recent, or fairly

23    soon so, you know, I want to establish if there's

24    anything else (unintelligible).

25          THE DEFENDANT:  Oh --

1          DETECTIVE ROMANOSKY:  That I can develop from

2     your screen name, not so much as far as looking to

3     make additional cases against you, but to develop on

4     any additional people you were talking to.  I just

5     want to use you kind of as a springboard for other

6     investigations.

7          THE DEFENDANT:  Oh, I see.

8          DETECTIVE ROMANOSKY:  I mean, in this case

9     here, we are where we are, it is what it is, we're

10    stuck at where we're at.

11         THE DEFENDANT:  Right.

12         DETECTIVE ROMANOSKY:  Anything I develop off

13    your screen name, obviously I'm using your screen

14    name as a springboard to other investigations.  If

15    there are other people that are doing this, then I

16    need to know about it.

17         THE DEFENDANT:  I have to think.  I'm not

18    trying to protect people because I don't know even

19    whom I'm protecting because there's nobody whom I've

20    seen.

21         DETECTIVE ROMANOSKY:  Right.

22         THE DEFENDANT:  You know.  This will not

23    better my case or worsen my case?

24         DETECTIVE ROMANOSKY:  No.

25         THE DEFENDANT:  Really?

1           DETECTIVE ROMANOSKY:  No.  No.  It definitely

2     won't -- it definitely won't worsen.  Obviously, if

3     there's additional people I can develop from that,

4     certainly I will let people know that you were

5     cooperative enough to let me -- to do that.  But in

6     all honesty, no, it won't change -- it won't change

7     this case.

8           THE DEFENDANT:  (Unintelligible).

9           DETECTIVE ROMANOSKY:  Yeah.  We are -- we have

10    what we have at this point.  While you're thinking

11    about that, let me go over the consent to search for

12    you with the computers as far as having the

13    computers analyzed.

14          THE DEFENDANT:  Don't you think that's

15    appropriate?

16          DETECTIVE ROMANOSKY:  What's that?

17          THE DEFENDANT:  Don't you think that's

18    appropriate?

19          DETECTIVE ROMANOSKY:  What's that?

20          THE DEFENDANT:  That I should let you do this.

21          DETECTIVE ROMANOSKY:  That's up to you.  I

22    mean, I can't -- like I said, that's a legal

23    decision I can't make.  You're obviously, you know,

24    an educated adult.  You understand that whether

25    you're going to give me consent or not to have your

1    computers forensically analyzed.

2         THE DEFENDANT:  Tell me what forensically

3    analyzed means.

4         DETECTIVE ROMANOSKY:  Basically what it means

5    is they're going to take your computer and they're

6    going to make a complete duplicate copy, a -- what's

7    called a bit for bit forensic copy.  It's an exact

8    copy of your entire hard drive.  And then we're

9    going to look at that hard drive.  We're going to be

10   looking for the chats that you and I had.  We're

11   going to be seeing -- making sure those were on --

12   which computer they were on, seeing if they were

13   stored, what kind of, you know, files they were

14   stored.

15        THE DEFENDANT:  And, of course, I don't know.

16        DETECTIVE ROMANOSKY:  I'm going to use that to

17   corroborate what you told me about not downloading

18   child pornography.

19        THE DEFENDANT:  I don't know how to do --

20        DETECTIVE ROMANOSKY:  (Unintelligible), child

21   pornography on there, then that corroborates what

22   you told me.  If I find child pornography on there,

23   then I'll know you weren't completely candid with me

24   and we're going to have to talk again.  But --

25        THE DEFENDANT:  Yeah.  No.

1          DETECTIVE ROMANOSKY:  That's what I'm looking

2     to do.  I'm looking to have them forensically

3     copied.  I'm looking through them specifically for

4     our chats and for downloading child pornography or

5     trading child pornography via the internet.

6          THE DEFENDANT:  I'm not.  Yeah.  So would

7     you --

8          DETECTIVE ROMANOSKY:  I can't advise you on

9     what I would do in your situation.  I cannot give

10    legal advice.

11         THE DEFENDANT:  I don't want you to give legal

12    advice.

13         DETECTIVE ROMANOSKY:  That's one of the things

14    I can't do.  That's like someone coming to you

15    telling you about their marital problems and saying,

16    you think I should divorce her.

17         THE DEFENDANT:  They do that all the time.

18         DETECTIVE ROMANOSKY:  You're not going to --

19    you're not -- you don't dare tell them, yeah, I

20    think you should or, no, I don't think you

21    shouldn't.

22         THE DEFENDANT:  No.

23         DETECTIVE ROMANOSKY:  But these are your

24    options (unintelligible).

25         THE DEFENDANT:  Okay.  Let me ask you this.

1    If I'm putting you on the spot, tell me.  If I said

2    yes, you could do it, and there was no child

3    pornography --

4    (Phone ringing.)

5         DETECTIVE ROMANOSKY:  Corporal Romanosky.

6    Hey, how you doing.  Yeah, we're in the interview

7    right now.  All right.  Bye.

8         I'm sorry.  Now, what were you saying?

9         THE DEFENDANT:  If they found there was no

10   child pornography, because I don't even know how to

11   do it; okay?

12        DETECTIVE ROMANOSKY:  All right.

13        THE DEFENDANT:  Would that help the situation

14   any?

15        DETECTIVE ROMANOSKY:  Well, it would show that

16   you were being honest with me in relation that

17   you're not downloading quantities of child

18   pornography.

19        THE DEFENDANT:  No.  Because I don't know how.

20   Yeah.

21        DETECTIVE ROMANOSKY:  If you were downloading

22   child pornography, it certainly would not be good

23   for you.  But if anything, what it would show is

24   that you were --

25        THE DEFENDANT:  Honest.

1          DETECTIVE ROMANOSKY:  -- cooperating with me

2     and you were honest in those answers regarding those

3     questions.  The other reason, like I said, that I

4     would want to look at your computers was to recover

5     the chats that you and I had.  I have a copy, but I

6     want the copy from your computer, as well.

7          THE DEFENDANT:  Yeah.  It would have the same

8     as yours.

9          DETECTIVE ROMANOSKY:  Absolutely.

10          THE DEFENDANT:  No.  I don't --

11          DETECTIVE ROMANOSKY:  Those are the things

12     that I'm looking for.

13          THE DEFENDANT:  Okay.  There's really nothing

14     else that they would --

15          DETECTIVE ROMANOSKY:  No, I mean, there's not.

16     We're not going to go into your financial documents

17     or anything like that.

18          THE DEFENDANT:  That doesn't bother me.

19          DETECTIVE ROMANOSKY:  Absolutely no.  We could

20     care less about that.  Usually what we're looking

21     for is movie files, video files, database files,

22     text files, things like that.  We're not

23     (unintelligible) spreadsheets, things like that.

24     That's not our concern.  Now, if you're laundering a

25     bunch of money or something --

1            THE DEFENDANT:  Oh, no.  No.

2            DETECTIVE ROMANOSKY:  (Unintelligible).  Let's

3    go through this.  This says, I, Charles Jackson

4    Friedlander, hereby voluntarily give my full consent

5    to Pinellas County Sheriff's Office or other law

6    enforcement agency they so deem necessary, which

7    would be the Florida Department of Law Enforcement,

8    they have forensic analysts, to conduct a complete

9    search of my computer hardware -- follow me through

10   this, it gets a little technical here -- hardware,

11   software and data, including but not limited to

12   central processing units, hard discs, hard drives,

13   floppy disc drives, tape drives, CD ROM drives,

14   modems, scanning devices -- what this says here is

15   we're going to look at your computer --

16   (unintelligible) hard discs are inside your

17   computer, that's what stores all the memory; hard

18   drives is the same thing, that's the internal memory

19   of the computer; floppy disc drives are like the

20   little floppy things (unintelligible) if those were

21   recovered, then I would ask to look at those; tape

22   drives, I don't think anyone uses anymore, but like

23   some businesses use tape backup for things.  This

24   form is just designed to be all inclusive, that's

25   why (unintelligible), CD ROM drives, if you had CDs,

1        like DVDs or CDs, (unintelligible), commercially

2        made or privately made --

3              THE DEFENDANT:  No, no.  I don't even know how

4        to do that.

5              DETECTIVE ROMANOSKY:  Modems is what your

6        computer accesses the internet with.  Some modems

7        have the capability of storing some data in them.

8              THE DEFENDANT:  Oh, the modem is the one that

9        (unintelligible).

10             DETECTIVE ROMANOSKY:  Scanning devices, like

11       if you had a scanner.

12             THE DEFENDANT:  I don't have one.

13             DETECTIVE ROMANOSKY:  Magnetic tapes.

14             THE DEFENDANT:  Don't know what that is.

15             DETECTIVE ROMANOSKY:  Cassette tapes, those

16       are old school.  VCR tapes.

17             THE DEFENDANT:  No, I don't have any.

18             DETECTIVE ROMANOSKY:  Floppy discs, USB memory

19       storages, the little thumb drive people see

20       (unintelligible) in the computer and put the stuff

21       back and forth on them.

22             THE DEFENDANT:  Don't have them.

23             DETECTIVE ROMANOSKY:  Or any other form of

24       computer memory storage specified below used to

25       store or record data found together or separately

1      from one another located at your home address.

2              THE DEFENDANT:  Um-hum.

3              DETECTIVE ROMANOSKY:  You're giving this

4      consent freely and voluntarily without compulsion,

5      threat or promise of any kind.  I understand my

6      constitutional right to refuse a search of said

7      computer, hardware, and it's going to list all these

8      things again, nothing's added there.

9              THE DEFENDANT:  Um-hum.

10             DETECTIVE ROMANOSKY:  And I'll let you read

11     through that as we go through this.  So you

12     understand that you have the right to refuse to

13     consent of that search without a search warrant and

14     it is your intention to fully and completely waive

15     such right by this consent.  I understand that

16     anything may be found -- anything that may be found

17     through a search of this computer hardware, and it's

18     going to list all those things again, can and will

19     be used against me at trial (unintelligible) which I

20     may be accused, meaning if you have a bunch of child

21     pornography on there, you'll be criminally charged

22     with it.  The data that's found in that computer as

23     far as corroborating these chats, I'm going to say I

24     have those chats if they're recovered, if your

25     computer didn't save it, if your login feature

1    wasn't on and they don't recover them then obviously

2    we can't use them.  But if we recover them, I'm

3    going to say here are the same chats that I have,

4    they were on his computer.

5         THE DEFENDANT:  Is that bad?

6         DETECTIVE ROMANOSKY:  Well, it's corroborative

7    to my case.  It's not good or bad at that point.  At

8    this point we've already talked, you've already kind

9    of admitted we've been chatting.

10        THE DEFENDANT:  Right.

11        DETECTIVE ROMANOSKY:  We've talked about it.

12        THE DEFENDANT:  Right.

13        DETECTIVE ROMANOSKY:  So at this point it's

14   kind of moot.  If you had said, I never chatted with

15   you --

16        THE DEFENDANT:  Oh, no.

17        DETECTIVE ROMANOSKY:  I have no idea what

18   you're talking about.

19        THE DEFENDANT: (Unintelligible).

20        DETECTIVE ROMANOSKY:  And then I'm asking

21   (unintelligible) well, I'm going to find that to

22   prove that you're lying to me, then you might think,

23   well, I don't know if I want to do this.  Okay?

24        THE DEFENDANT:  No.

25        DETECTIVE ROMANOSKY:  I understand that

1       conducting a search of the computer hardware, and it

2       lists all those things again, is a time-consuming

3       and lengthy documentation process.  That means I'm

4       not going to have it done overnight.

5            THE DEFENDANT:  No.  No.

6            DETECTIVE ROMANOSKY:  It will take a while.

7       Okay?

8            THE DEFENDANT:  Um-hum.

9            DETECTIVE ROMANOSKY:  That's page one.  And

10      page two is just the signature page.

11           THE DEFENDANT:  Um-hum.

12           DETECTIVE ROMANOSKY:  If you'd like to read

13      through that laundry list of things again, please

14      (unintelligible) understand what it says.

15           THE DEFENDANT:  I know what it says.  I really

16      do.  Now, I don't have most of those things so I

17      don't even know what they are.

18           DETECTIVE ROMANOSKY:  A lot of them won't be

19      applicable to you, then.

20           THE DEFENDANT:  And I wouldn't know how to

21      download.

22           DETECTIVE ROMANOSKY:  Right.

23           THE DEFENDANT:  Now, someone once sent me

24      about a 15-second thing.  (Unintelligible) it was

25      some -- I forget what it was.

1          DETECTIVE ROMANOSKY:  A 15-second thing?

2          THE DEFENDANT:  I think it's 15.  They sent

3     me --

4          DETECTIVE ROMANOSKY:  Oh, someone sent you an

5     e-mail with an attachment?

6          THE DEFENDANT:  Yeah.

7          DETECTIVE ROMANOSKY:  And it had, what, a

8     pornographic video on there?

9          THE DEFENDANT:  It was about 15 seconds.

10         DETECTIVE ROMANOSKY:  Was there a child in

11    there?

12         THE DEFENDANT:  No.

13         DETECTIVE ROMANOSKY:  Then I could care less.

14         THE DEFENDANT:  There are no children.  I

15    mean --

16         DETECTIVE ROMANOSKY:  I mean, in all honesty,

17    most of the computers that I go through, I find a

18    large quantity of pornography.  Some of it, none of

19    it's children, you know, it's all adults and it

20    still takes us weeks to go through it.

21    (Unintelligible).  The adult stuff I could care less

22    about.  The only things that -- images and videos

23    that I would have any interest in at all pertaining

24    to this case obviously would be children, an attempt

25    to identify children or, you know, it's against the

1      law to have child pornography or any videos --

2            THE DEFENDANT:  I don't have --

3            DETECTIVE ROMANOSKY:  Any pictures of bondage,

4      sadomasochism, things like that.

5            THE DEFENDANT:  I don't have anything like

6      that.

7            DETECTIVE ROMANOSKY:  There you have it.  I

8      mean, if that's -- if that's the case --

9            THE DEFENDANT:  No, it is the case.

10            DETECTIVE ROMANOSKY:  That's what we're

11      looking for.

12            THE DEFENDANT:  No.

13            DETECTIVE ROMANOSKY:  I just need your

14      signature at the bottom.

15            THE DEFENDANT:  It's real.

16            DETECTIVE ROMANOSKY:  I would hope so.  I just

17      saw you sign it.  Now, If I missed that --

18            THE DEFENDANT:  I've tried to be cooperative.

19            DETECTIVE ROMANOSKY:  I agree.  I think you

20      have been cooperative with me.  Okay.  And lastly is

21      your permission or your consent for me to log on as

22      you.  If you're not comfortable with it, then don't

23      do it.  This has to be something that you're

24      comfortable with.

25            THE DEFENDANT:  I'm really -- I'm really not.

1          DETECTIVE ROMANOSKY:  Okay.  Is there a

2    reason?  Anything I could dispel maybe that you're

3    concerned about?

4          THE DEFENDANT:  It has nothing to do with

5    children.  It doesn't.  You know, there are

6    certain -- (unintelligible).

7          DETECTIVE ROMANOSKY:  Need some more water?

8          THE DEFENDANT:  That's fine.  Thank you.  Just

9    a minute.  You know, there are certain things you

10   sort of consider sacrosanct, you know what I mean.

11         DETECTIVE ROMANOSKY:  Um-hum.

12         THE DEFENDANT:  It's not that I think you're

13   going to discover anything, no.

14         DETECTIVE ROMANOSKY:  Um-hum.

15         THE DEFENDANT:  I guess it's sort of -- I

16   guess I sort of considered that sort of thing being

17   violated.

18         DETECTIVE ROMANOSKY:  Um-hum.

19         THE DEFENDANT:  Now, I would hate for somebody

20   to log in as me and not be me.

21         DETECTIVE ROMANOSKY:  Um-hum.  Okay.  Like I

22   said, if you're not comfortable --

23         THE DEFENDANT:  Have you ever had anybody say

24   no?

25         DETECTIVE ROMANOSKY:  Oh, yeah.  All the time.

1          THE DEFENDANT:  Oh, you do.  Okay.

2          DETECTIVE ROMANOSKY:  And it's on a case by

3     case basis.

4          THE DEFENDANT:  Oh, okay.

5          DETECTIVE ROMANOSKY:  It's, you know --

6          THE DEFENDANT:  No.  I would feel

7     uncomfortable.  I mean, if you wanted me to log in

8     and you wanted to be there and (unintelligible).

9     But I think for somebody to assume your identity to

10    me is a --

11         DETECTIVE ROMANOSKY:  That's understandable.

12    (Unintelligible).

13         THE DEFENDANT:  Yeah.  I mean, it's not --

14    it's not you personally.

15         DETECTIVE ROMANOSKY:  That's all right.  I

16    mean, no explanation necessary.  Do you need some

17    more water, Charles?  Do you need to use the

18    bathroom or anything like that?

19         THE DEFENDANT:  I never know when I'm going to

20    do it.  This is my problem.

21         DETECTIVE ROMANOSKY:  That's why I'm asking.

22    If you don't think you have to, I'll be back in a

23    few minutes, anyway.  We can try, you know, at a

24    later time.  I'll get you some more water.

25         THE DEFENDANT:  I'll try the bathroom.

1          DETECTIVE ROMANOSKY:  Okay.

2          THE DEFENDANT:  May I?

3          DETECTIVE ROMANOSKY:  Yeah, absolutely.  Why

4     don't you come along with me and I'll walk you over

5     there.

6          THE DEFENDANT:  Should I take my water with me

7     because I may need some more water.

8          DETECTIVE ROMANOSKY:  Why don't you leave that

9     here.  I'll get it from you because that's in a

10    secure part of the building.  (Unintelligible).

11    Just where the water fountain is, it's beyond our

12    secure area, so I'll walk you -- (unintelligible).

13    Need a hand?

14         THE DEFENDANT:  I'm fine.  I've got it.  Thank

15    you.

16         DETECTIVE ROMANOSKY:  We're going to make a

17    left.  We're going to make a right.

18         UNIDENTIFIED SPEAKER:  Do you want some more

19    water.

20         THE DEFENDANT:  Oh, yeah.  (Unintelligible).

21    Would you mind?

22         UNIDENTIFIED SPEAKER:  Sure.  Just have a seat

23    and I'll be right back.

24         UNIDENTIFIED SPEAKER:  (Unintelligible).

25         DETECTIVE ROMANOSKY:  Did you get some more

1    water?

2          THE DEFENDANT:  He did.

3          DETECTIVE ROMANOSKY:  Good deal.  I just

4    talked to the detective down in -- by your house.

5          THE DEFENDANT:  What did they think?

6          DETECTIVE ROMANOSKY:  Well, there's a couple

7    questions they had for me.  Where are the keys to

8    the pickup?

9          THE DEFENDANT:  I have them.

10         DETECTIVE ROMANOSKY:  You have the keys to the

11   pickup?  There's no other ones at the house?

12         THE DEFENDANT:  I don't believe so.

13         DETECTIVE ROMANOSKY:  Is there anyplace they

14   might be I could tell them to look there?

15         THE DEFENDANT:  I always use these so --

16         DETECTIVE ROMANOSKY:  In your bedroom, I

17   guess, they found a Polaroid photograph of a naked

18   teenager with a tattoo on him on his pectoral, on

19   his pec.

20         THE DEFENDANT:  Who is that?  I don't even

21   know I had --

22         DETECTIVE ROMANOSKY:  That's what I'm asking.

23         THE DEFENDANT:  I don't (unintelligible).  A

24   Polaroid?

25         DETECTIVE ROMANOSKY:  A Polaroid photograph of

1       a naked teen with a tattoo on his pec.

2            THE DEFENDANT:  I have no idea.  I really

3       don't.

4            DETECTIVE ROMANOSKY:  Okay.  If you do, now

5       would be the time.

6            THE DEFENDANT:  I don't -- it's nobody that

7       I --

8            DETECTIVE ROMANOSKY:  Doesn't sound familiar?

9            THE DEFENDANT:  No.

10           DETECTIVE ROMANOSKY:  Someone give it to you,

11      mail it to you?  Anyone maybe you've met in the past

12      or (unintelligible) a picture?

13           THE DEFENDANT:  No.  No.  (Unintelligible).

14      No.  Truly.

15           DETECTIVE ROMANOSKY:  They found some keys

16      that look like safe deposit box keys.

17           THE DEFENDANT:  They could be.

18           DETECTIVE ROMANOSKY:  Where would the safe

19      deposit box be?

20           THE DEFENDANT:  In the bank.

21           DETECTIVE ROMANOSKY:  Which bank?

22           THE DEFENDANT:  Bank of America.  But I don't

23      think I had -- did they look in my desk drawer, do

24      you think?  That's probably where they --

25           DETECTIVE ROMANOSKY:  It doesn't say.  It

1     says -- (unintelligible) in the bedroom, but I could

2     be wrong.  Safety deposit box keys is all it says.

3             THE DEFENDANT:  Yeah.  If -- the only way it

4     would be a safety deposit box would be in an

5     envelope that says the safety deposit box.

6             DETECTIVE ROMANOSKY:  What kind of things do

7     you keep in there?

8             THE DEFENDANT:  I haven't been in a long time.

9     Mostly a will and -- truthfully, I have a -- I think

10    you might think are pornographic.  They're very --

11    they're very famous.  And I don't know where I have

12    them, to be truthful with you.  They're worth about

13    probably $20,000 each.

14            DETECTIVE ROMANOSKY:  Wow.

15            THE DEFENDANT:  No.  They're -- they're art

16    photographs done by a very famous photographer that

17    I have gotten from a friend of mine.  It was given

18    to me years and years ago who's dead.

19            DETECTIVE ROMANOSKY:  Um-hum.

20            THE DEFENDANT:  They're by a man named Von

21    Luden.  They were done in the 1890's.

22            DETECTIVE ROMANOSKY:  What do they depict?

23            THE DEFENDANT:  Oh, they just are -- he was --

24    he had a (unintelligible).

25            DETECTIVE ROMANOSKY:  Um-hum.

1          THE DEFENDANT:  Oh, they're just individual

2     pictures.  They're not all teenagers or anything.

3     You don't know how old they are.

4          DETECTIVE ROMANOSKY:  Are they like nude

5     pictures or something?

6          THE DEFENDANT:  They're nude but they're

7     posed, you know what I mean, with garlands and --

8     it's 1890 stuff.

9          DETECTIVE ROMANOSKY:  Right.  So you can't

10    tell the age of the people, it could be just anybody

11    in the pictures?

12         THE DEFENDANT:  No.

13         DETECTIVE ROMANOSKY:  Anything else you can

14    think of that might be in there?

15         THE DEFENDANT:  No.  The rest would be, you

16    know, sort of -- I mean, they're documents and

17    stuff, you know, like -- like for stocks stuff.

18         DETECTIVE ROMANOSKY:  Financial type of

19    things?

20         THE DEFENDANT:  Well, financial and -- I'm

21    trying to think what kind of things would be in

22    there.  They're not -- it's a very -- you know, it's

23    that thick.  So there's nothing pornographic.

24    There's nothing -- it's mostly textual stuff with --

25    with -- my family trees may be in there.  I'm not

1       sure, I mean, you know.

2               DETECTIVE ROMANOSKY:  We talked about the

3       dildos a little bit.  Those were, you said, for your

4       lady friend?

5               THE DEFENDANT:  Well, I don't know what they

6       were for.  I thought maybe if I had that in mind.

7       Yes.

8               DETECTIVE ROMANOSKY:  Have they been used

9       before?

10              THE DEFENDANT:  No.

11              DETECTIVE ROMANOSKY:  So they've never been

12      used?

13              THE DEFENDANT:  NO.

14              DETECTIVE ROMANOSKY:  How about the condoms?

15      They found condoms and K-Y jelly.

16              THE DEFENDANT:  Oh, I always keep those.

17              DETECTIVE ROMANOSKY:  For?

18              THE DEFENDANT:  I don't know.  Well, yeah,

19      sometimes if I think I'm going to be able -- the K-Y

20      or something if I can masturbate.  But it doesn't

21      work.

22              DETECTIVE ROMANOSKY:  How about the condoms?

23      What would you have those for?

24              THE DEFENDANT:  If I happen to want to have

25      sex with this woman.

1          DETECTIVE ROMANOSKY:   And the (unintelligible)

2      prescription or is it just (unintelligible) Levitra?

3          THE DEFENDANT:   I have Levitra that my

4      urologist gave me to maybe see if I can ejaculate.

5          DETECTIVE ROMANOSKY:   Does it work?

6          THE DEFENDANT:   I haven't tried it yet.   I

7      don't have the nerve.   I'm always afraid of drugs.

8      Okay, you know.

9          DETECTIVE ROMANOSKY:   You never know what the

10     side effects will be.

11         THE DEFENDANT:   Well, yeah.   You see

12     (unintelligible), which he should have known because

13     he gave me the prescription for it.   There is -- if

14     you're taking Hytrin for prostate, it says you're

15     not supposed to take (unintelligible).   Or if you

16     take it, you're supposed to take half the dose or

17     you could get a bad reaction, you could faint.

18     Well, when I read that, I don't want to do anything

19     like that.

20         DETECTIVE ROMANOSKY:   Right.   Okay, Charles.

21         THE DEFENDANT:   But that bothers me with the

22     Polaroid thing.   I -- I --

23         DETECTIVE ROMANOSKY:   It doesn't sound like

24     anything maybe --

25         THE DEFENDANT:   No.

1           DETECTIVE ROMANOSKY:  -- in the past someone

2      sent you or mailed you or maybe it was a guy friend

3      that you met down there somewhere that you snapped a

4      Polaroid of?

5           THE DEFENDANT:  No.

6           DETECTIVE ROMANOSKY:  Do you own a Polaroid

7      camera?

8           THE DEFENDANT:  It's -- I found it, finally.

9      And it is seven years old or more.  And I had a

10     thing of film that was -- expired in 2001.

11          DETECTIVE ROMANOSKY:  Anyone visiting or

12     any --

13          THE DEFENDANT:  No.  I didn't even find it.

14          DETECTIVE ROMANOSKY:  Right.

15          THE DEFENDANT:  Until I was trying to clean

16     out the closet.

17          DETECTIVE ROMANOSKY:  Well, in all honesty,

18     you know, the investigators down there in Ft. Myers,

19     they're going to continue to look into that picture

20     to see if they can get the person identified.

21          THE DEFENDANT:  I don't know.

22          DETECTIVE ROMANOSKY:  That's why I say, now is

23     the time to -- somebody that you know who it is.

24          THE DEFENDANT:  No.

25          DETECTIVE ROMANOSKY:  Or that you've met

1       or something -- (unintelligible).

2              THE DEFENDANT:  No.  And I don't have --

3              DETECTIVE ROMANOSKY:  Even if they're 18,

4       (unintelligible).

5              THE DEFENDANT:  No.  I wish -- could I see it

6       and maybe I would be --

7              DETECTIVE ROMANOSKY:  I don't have it here.

8              THE DEFENDANT:  Oh.  If I was able to tell --

9       I never -- I don't take Polaroid pictures, really.

10             DETECTIVE ROMANOSKY:  Um-hum.

11             THE DEFENDANT:  And --

12             DETECTIVE ROMANOSKY:  (Unintelligible)

13      something from the past, maybe, when Polaroids were

14      popular.

15             THE DEFENDANT:  Yeah.  They're not now.  If

16      you want the truth, I don't know.  If I -- if they

17      would show it to me I might be able -- I might, I

18      don't know, but I don't -- I don't have those sort

19      of things.  I really don't.

20             DETECTIVE ROMANOSKY:  Okay.  Well, let me see

21      if I can maybe get them to somehow get it up to me.

22      Maybe they can take a picture and e-mail it to me or

23      something and I can print it out and show you.

24             THE DEFENDANT:  Yeah.  I don't have --

25             DETECTIVE ROMANOSKY:  (Unintelligible).  You

1    want any water?

2         THE DEFENDANT:  It will be okay for now.

3         DETECTIVE ROMANOSKY:  Okay.  I'll be right

4    back.

5         THE DEFENDANT:  No, I -- no.  I cut myself.

6         DETECTIVE ROMANOSKY:  How did you do that?

7         THE DEFENDANT:  With my mouth.

8         DETECTIVE ROMANOSKY:  Okay.  You need to wash

9    your hands?

10        THE DEFENDANT:  Can I wash them?

11        DETECTIVE ROMANOSKY:  Yeah.

12        THE DEFENDANT:  (Unintelligible).

13        DETECTIVE ROMANOSKY:  Uh-huh.

14   (Unintelligible) anymore questions."

15        THE COURT:  Ms. Kaiser, let's take our morning

16   break at this time.  15 minutes.

17        COURTROOM SECURITY OFFICER:  All rise.

18   (Jury out at 10:31 AM.)

19   (Recess was taken at 10:31 until 10:59 AM.)

20   (Back on the record.)

21        COURTROOM SECURITY OFFICER:  This Honorable

22   Court is again in session.

23        THE COURT:  Bring the jury in, please.

24        MR. TRAGOS:  Your Honor, could I have a

25   moment?

1          THE COURT:  Does it have to do with this tape?

2          MR. TRAGOS:  No.  But it has to do with

3     something right now.

4          THE COURT:  Go ahead.

5          MR. TRAGOS:  Your Honor, could -- under the

6     same rulings the court made before, we'd like to

7     have Mr. Batelli sit in the courtroom at counsel

8     table because the cross-examination, which is going

9     to start soon and all the other things are going to

10    be very document intensive and we'd like to have

11    him --

12         THE COURT:  Do that at the appropriate time

13    and introduce him to the jury.

14         MR. TRAGOS:  Thank you, Your Honor.

15         THE COURT:  Bring the jury in, please.

16         COURTROOM SECURITY OFFICER:  Rise for the

17    jury.

18    (Jury in at 11:00 AM.)

19         THE COURT:  Thank you, and be seated.  You may

20    resume publishing of the video.

21         MS. KAISER:  Thank you, Your Honor.

22    (Video playing.)

23         "THE DEFENDANT:  Did they get the picture?

24         DETECTIVE ROMANOSKY:  They can't send it to me

25    but I'll -- (unintelligible) at a later time.  How

1      much do you weigh, sir?

2              THE DEFENDANT:  Right now?

3              DETECTIVE ROMANOSKY:  Um-hum.

4              THE DEFENDANT:  About 198.

5              DETECTIVE ROMANOSKY:  What color eyes do you

6      have?  Brown?

7              THE DEFENDANT:  Brown.

8              DETECTIVE ROMANOSKY:  Do you have any scars,

9      marks or tattoos, birthmarks, surgical scars?

10             THE DEFENDANT:  Well, I have an appendectomy

11     scar.  And I have, you know, occasionally a scar

12     from where the thing didn't heal too well as a

13     diabetic.

14             DETECTIVE ROMANOSKY:  No tattoos, birthmarks?

15             THE DEFENDANT:  No, no tattoos.

16     (Unintelligible) birthmarks.

17             DETECTIVE ROMANOSKY:  Are you a US citizen?

18             THE DEFENDANT:  Yes.

19             DETECTIVE ROMANOSKY:  What's your phone number

20     down there on (unintelligible)?

21             THE DEFENDANT:  239-561-1515.

22             DETECTIVE ROMANOSKY:  And your cell phone

23     number again?

24             THE DEFENDANT:  202-607 -- don't laugh --

25     6666.  Everybody (unintelligible).

1            DETECTIVE ROMANOSKY:  Do you still go back up

2     north every now and then or --

3            THE DEFENDANT:  Yeah, oh, yeah.  Most of the

4     time.

5            DETECTIVE ROMANOSKY:  Okay.  Give me a couple

6     more minutes, I'll be right back.  Want more water?

7            THE DEFENDANT:  Oh, I would love some, if you

8     don't mind.

9            DETECTIVE ROMANOSKY:  Sure.  Yeah, no problem.

10           THE DEFENDANT:  (Unintelligible).

11           DETECTIVE ROMANOSKY:  Yes and no.

12           THE DEFENDANT:  Uh-uh.  Uh-uh.  I think it

13    stopped.

14           UNIDENTIFIED SPEAKER:  Are you all right?

15           THE DEFENDANT:  Yeah.  Oh, yeah.  It stopped.

16    Thank you very much, sir.  Um, sir?

17           DETECTIVE ROMANOSKY:  Did the bleeding stop?

18           THE DEFENDANT:  Yeah, it did.  But I do have

19    to do one thing in a minute.

20           DETECTIVE ROMANOSKY:  Bathroom?  Okay.  Let me

21    just review this paperwork with you.

22           THE DEFENDANT:  Okay.

23           DETECTIVE ROMANOSKY:  This is regarding your

24    vehicle.  Okay?  You're being charged with two

25    felonies.  You're being charged with using an online

1    service to lure, entice a person believed to be a

2    parent, guardian or custodian of a child to engage

3    in unlawful activity (unintelligible) physical and

4    sexual abuse.  And you're being charged with

5    traveling to meet a minor, travel anywhere within

6    the state or from another state for the purposes of

7    meeting a minor to engage in any unlawful act,

8    separate offense.  Okay?

9         THE DEFENDANT:  (Unintelligible).

10        DETECTIVE ROMANOSKY:  Well, you did, quite

11   clearly.  You came up here with the --

12        THE DEFENDANT:  Oh, yeah.  Oh, I see.  I

13   thought you meant if I did it again or something.

14        DETECTIVE ROMANOSKY:  Right.  No.  Those are

15   for what happened on this case.

16        THE DEFENDANT:  Okay.

17        DETECTIVE ROMANOSKY:  Okay.  For what happened

18   (unintelligible).  Being that you used your vehicle

19   to travel up here from Ft. Myers.

20        THE DEFENDANT:  (Unintelligible).

21        DETECTIVE ROMANOSKY:  And you carried items

22   with you for the purpose of the meeting tonight.

23        THE DEFENDANT:  Yeah.

24        DETECTIVE ROMANOSKY:  The vehicle is being

25   seized under the Contraband Forfeiture Act.  So your

1        vehicle is being seized by the sheriff's office.

2               THE DEFENDANT:   What does that mean?

3               DETECTIVE ROMANOSKY:   What that means is we're

4        taking your vehicle.   The sheriff's office is taking

5        your vehicle.   Okay.   Is the vehicle paid off?

6               THE DEFENDANT:   Yeah.

7               DETECTIVE ROMANOSKY:   Okay.   You have a right

8        to contest that seizure of the vehicle.   And it's

9        all explained on the form.   I'm just going to go

10       over it with you real quick.   This is the case

11       number.

12              THE DEFENDANT:   Yeah.

13              DETECTIVE ROMANOSKY:   This is today's date.

14       This is to you.

15              THE DEFENDANT:   Um-hum.

16              DETECTIVE ROMANOSKY:   Your address.   This is

17       regarding a 2001 silver Lexus and the VIN number.

18              THE DEFENDANT:   (Unintelligible).

19              DETECTIVE ROMANOSKY:   This is to advise you

20       that on July 21st, 2008, the Pinellas County

21       Sheriff's Office seized the above referenced

22       property for a violation of the Florida Contraband

23       Forfeiture Act.   You used the vehicle in commission

24       of a felony.   You are notified that you are entitled

25       by law to request an adversarial preliminary hearing

1       to determine whether there is probable cause to

2       believe the property was used in violation of the

3       act, which means you can contest the seizure is what

4       that's saying.

5              Please note that the adversarial hearing is

6       not mandatory and you need not request a hearing to

7       later contest the action taken against the property

8       described herein.  Okay.  Meaning you don't have to.

9       If you don't want to contest the seizure, you

10      certainly don't have to.  Each claimant will be

11      given the opportunity to appear in court for a final

12      disposition of this matter, meaning anyone who has a

13      vested interest in the vehicle has the right to

14      appear and --

15             THE DEFENDANT:  (Unintelligible).

16             DETECTIVE ROMANOSKY:  (Unintelligible).  If

17      you desire such a hearing, you must make a request

18      in writing by certified mail, return receipt

19      requested to Pinellas County Sheriff's Office,

20      general counsel's office at the address listed below

21      within 15 days of receiving this notice.  You have

22      15 days to give a written notice saying you want a

23      hearing to contest the seizure.  This request must

24      be accompanied by a copy of this notice.  The

25      seizing agency will notify you of the time, date and

1    place of that hearing.  I am certifying that I am

2    providing you a copy of this notice.

3        THE DEFENDANT:  You did.

4        DETECTIVE ROMANOSKY:  I'm going to give you a

5    copy of this, on the 21st day of July 2008.

6        THE DEFENDANT:  Correct.

7        DETECTIVE ROMANOSKY:  And that's my signature

8    there.  What this is saying right here, you don't

9    have to agree with the seizure.  You're just saying

10   that I have received the foregoing notice apprising

11   me of my right to post-seizure adversarial hearing,

12   and I need you to sign for me right by the X.

13   (Unintelligible) copy of this.  (Unintelligible).

14   Okay.  Understand, it's not personal.  It's what I

15   have to do for my job.

16       THE DEFENDANT:  (Unintelligible).

17       DETECTIVE ROMANOSKY:  (Unintelligible).  And

18   I'll be back here in just a sec.  Get you a ride and

19   get you out of here (unintelligible).

20       THE DEFENDANT:  Could I --

21       DETECTIVE ROMANOSKY:  Use the bathroom?

22   (Unintelligible).  Come on back.

23       THE DEFENDANT:  Do I leave this here?

24       DETECTIVE ROMANOSKY:  Yeah.  We'll be right

25   back in a minute.  No problem.

1              THE DEFENDANT:  (Unintelligible).

2              DETECTIVE ROMANOSKY:  Well, make sure.  You

3      don't want to stir it up again.

4              THE DEFENDANT:  No.  I shouldn't have done

5      this.  (Unintelligible).

6              DETECTIVE ROMANOSKY:  Okay.  Mr. Friedlander,

7      I've got you a ride here.  This deputy's a real nice

8      deputy.  He's going to take you out to Pinellas

9      County jail so we can get the booking process

10     started.

11             THE DEFENDANT:  Am I going to jail?

12             DETECTIVE ROMANOSKY:  Well, it's just for the

13     initial booking process.  Calm down.  Calm down.

14     It's like -- it's like the lobby of the Holiday Inn.

15     It doesn't -- trust me.  It's not like -- was what

16     we did in here like what you saw on TV?

17             THE DEFENDANT:  No.

18             DETECTIVE ROMANOSKY:  It's the same way.

19     You're going to go out there.  They're going to ask

20     you some questions.  They're going to get your name

21     and stuff like that.  You're going to see a

22     screening nurse.  The screening nurse is going to

23     ask you about your medical history, and that's the

24     time to talk to her about the diabetes.  You're

25     going to be afforded the opportunity to use the

1    phone so you can call some people if you want to

2    make arrangements for any bond so they can get you

3    out.

4            THE DEFENDANT:  Now, how do I -- I don't know

5    how to do --

6            DETECTIVE ROMANOSKY:  Well, I'll explain it to

7    you.  Okay?  What's going to happen is you're going

8    to go out to the jail, okay, and they're going to

9    take the two charging documents that I came in here

10   and filled out.  They're going to set a bond.  That

11   bond hypothetically might be 10,000, it might be

12   20,000.  Okay.  The jail is going to require you

13   give them 10, 20, whatever the bond is either in

14   cash or you call a bondsmen.  And there's a whole

15   list of bondsmen you can call.

16           THE DEFENDANT:  I don't carry $10,000 cash.

17           DETECTIVE ROMANOSKY:  No.  Hear me out,

18   Charles.

19           THE DEFENDANT:  Okay.

20           DETECTIVE ROMANOSKY:  You can call a bondsman

21   and say, my name is Charles Friedlander.  These are

22   my charges.  I want you to bond me out.  They're

23   going to require probably 10 percent of whatever the

24   bond is and they're going to post a surety bond for

25   you to get out, okay?  There's plenty of people in

1    there to tell you this again, okay?  Once you leave

2    me doesn't mean that no one's going to tell you that

3    again."

4              (End recording.)

5              MS. KAISER:  May I proceed, Your Honor?

6    BY MS. KAISER:

7    Q      Corporal Romanosky, during the interview when

8    the defendant told you that prior to meeting you he

9    had no suspicions, that you had done a great job,

10   and had he known he wouldn't have come, what did you

11   understand him to mean?

12             MR. TRAGOS:  Objection, relevance.

13             THE COURT:  Sustained.

14   BY MS. KAISER:

15   Q      At any time during your interview with the

16   defendant, did he ever tell you that he didn't feel

17   well?

18   A      No.

19   Q      Did he ever sweat profusely?

20   A      No.

21   Q      How was his skin color?

22   A      He appeared normal, did not appear to be in

23   any distress.

24   Q      Did he ever appear disoriented?

25   A      No.

1    Q       With the exception of passing gas and biting

2    his cuticle, did he ever appear in any other type of

3    physical distress whatsoever?

4    A       He did not.  And I had even told him at the

5    start of the interview that if he had any problems,

6    to let me know.

7    Q       Did he ever say he was hungry?

8    A       No.  He had eaten -- if I recall, he had eaten

9    on the way up.

10   Q       Did he ever say anything about needing any

11   insulin?

12   A       No.

13   Q       I believe it was on Monday I asked you if --

14   in general, if sexual activity had occurred, would

15   that have been a violation of state law.  I want to

16   get more specific.

17           If the defendant had performed oral sex on the

18   boys, ages 10 and 11, would that have been a

19   violation of state law?

20           MR. TRAGOS:  Objection, Your Honor, leading

21   and repetitive.

22           THE COURT:  Overruled.

23           THE WITNESS:  Yes, it would have.  In the

24   State of Florida, to engage in sexual activity with

25   a child under the age of 12 would be a capital

1       felony under the sexual battery statute.

2       BY MS. KAISER:

3       Q       And if the defendant had one or both of the

4       boys perform oral sex on him, would that have been a

5       violation of state law?

6       A       Yes.  It would be the same charge.

7       Q       During interviews of subjects, do you

8       sometimes lead them to believe that you have a

9       certain basis of knowledge in order to get them to

10      share more information with you or to confess or

11      fess up to the entirety of their criminal behavior?

12      A       Of course.

13      Q       Now, during this interview, you told the

14      defendant that you were in contact with a number of

15      other members of law enforcement who were also

16      investigating him.

17              Was that an example of that interviewing

18      technique that you use with subjects to glean

19      information?

20      A       It was.

21      Q       So is it fair to say that, to your knowledge,

22      there was not a number of other law enforcement

23      officers investigating the defendant?

24      A       That's correct.

25      Q       In your work as an undercover officer, do you

1      sometimes use decoys?

2      A      Yes, quite frequently.

3      Q      Can you explain to the jury when a situation

4      would be that you would actually use a decoy versus

5      when you wouldn't?

6      A      Normally, my decoys come into play when I

7      conduct undercover investigations where I'm posing

8      as a child.  For obvious reasons, I can't

9      communicate on the phone with somebody as a

10     14-year-old girl, or I can't meet them in person as

11     a 14-year-old girl, so I have deputies that have a

12     very youthful appearance that assist me in that

13     capacity.

14     Q      Why -- were any decoys used in this case?

15     A      No.  The only decoy in this case was myself.

16     I had mentioned that I had a 14-year-old

17     stepdaughter several times throughout the chats for

18     if the defendant had been looking for validation

19     that I was real, that I could produce a picture of a

20     14-year-old stepdaughter.

21            If he had asked for pictures of my 10 and

22     11-year-old boys, I probably would have went down

23     the lines of telling him that I respect their

24     privacy or didn't want to put their picture on the

25     internet.  Since my daughter puts hers on MySpace,

1    that would be no big deal.

2    Q     Why in this case didn't you have a 10 and an

3    11-year-old boy meet the defendant?

4    A     Well, for obvious reasons.  One, I don't have

5    a deputy that can appear as a 10 or 11-year-old boy,

6    either on the phone or in person; and, two, we would

7    never dream of using an actual 10 or 11-year-old

8    child for purposes in an undercover police meeting.

9    You never know when these won't go as planned.

10   Q     Okay.  During his interview, the defendant

11   mentioned to you that he had been in another chat

12   room called fathers chatting.  Are you familiar with

13   that chat room?

14   A     Yes.  Fathers chatting is another one of the

15   AOL user created rooms normally found under the

16   genre of special interests or mature interests.

17   It's -- from my experience, it usually centers on

18   the lines of sexual abuse or incest.

19   Q     In your conversations with the defendant

20   before he was arrested, did he ever mention to you

21   that he had erectile dysfunction?

22   A     No.

23   Q     When was the first time he brought that up?

24   A     At the time of the interview.  I think he

25   might have mentioned something about it on the phone

1    call, when he said something on a phone call about

2    he didn't have any problems.

3    Q     During your investigation, what names did you

4    find that the defendant used?

5    A     I found that he used -- well, obviously, his

6    screen name, Captoes.  I found that he was under

7    Charles Jackson Friedlander, which is the

8    ultimate --

9          MR. TRAGOS:  Objection, basis, and also object

10   to hearsay.

11         THE COURT:  Lay a foundation, please.

12   BY MS. KAISER:

13   Q     During your investigation when you were trying

14   to identify the defendant, did you notice or did you

15   receive information about what names the defendant

16   had used?

17         MR. TRAGOS:  Objection, hearsay.

18         THE COURT:  Sustained.

19   BY MS. KAISER:

20   Q     During your investigation, how did you

21   identify the defendant?

22   A     I identified him through using information

23   elicited from the chats, comparing it to the DHSMV,

24   the Department of Highway Safety Motor Vehicle

25   database, running his cell phone number that he gave

1    me, running the Ft. Myers phone number, and

2    ultimately from information that was received from

3    AOL was kind of a confirmation.

4    Q     From your investigation, was there ever a time

5    that the defendant used different names?

6           MR. TRAGOS:  I'm going to object.  May we have

7    a side bar?

8           THE COURT:  No, sir.  What's your objection?

9           MR. TRAGOS:  Objection, hearsay.

10          THE COURT:  Overruled.

11          THE WITNESS:  Yes.  The -- the Ft. Myers phone

12   number came back under a Charles Jackson.

13   BY MS. KAISER:

14   Q     And what other names did you find the

15   defendant used?

16   A     I found --

17          MR. TRAGOS:  Objection, again, hearsay and --

18   and basis.

19          THE COURT:  And what?  I'm sorry.

20          MR. TRAGOS:  The basis for his knowledge.

21          THE COURT:  Lay a foundation, please.

22   Otherwise, overruled.

23          THE WITNESS:  I found the Charles Jackson --

24          THE COURT:  Ask a question, Ms. Kaiser,

25   please.

1       BY MS. KAISER:

2       Q       How did you determine that Mr. Friedlander

3       went by the name of Mr. Friedlander and also by the

4       name of Charles Jackson?

5       A       Mr. Friedlander was determined through the

6       communications, the DHSMV database, the AOL

7       information.  Charles Jackson was determined through

8       the phone number in Ft. Myers and through the

9       Florida Sheriff's Youth Ranch.

10      Q       Corporal Romanosky, we listened to the

11      transport of the defendant to the sheriff's office.

12      Why didn't you start interviewing the defendant

13      before you got to your office?

14      A       For a couple of reasons.  One is I like to use

15      that time to develop a rapport with the person on

16      their -- I like to do my interviews at my office,

17      for one.  We can video record there.  We can go --

18      walk through *Miranda* there.

19              But I like to use the time from the transport

20      to the arrest to my office to have the defendant

21      calm down and start developing a rapport before the

22      interview, because at the time of an arrest,

23      obviously, it's very emotional, a lot's just

24      happened.  They've just been approached by a

25      tactical unit.  They've been told they're under

1    arrest.  That emotional element is there.

2           So the ride back where there's some casual

3    conversation gives us a chance to have the defendant

4    calm down.  We get that rapport back and forth.

5           In this case that was not as crucial because I

6    had been communicating with the defendant for a

7    period of time.  So there was already somewhat of a

8    rapport, even though I wasn't who he thought he

9    was -- I was.

10   Q      Did you conduct any follow-up after the

11   interview to Florida Youth Ranch to determine

12   whether or not the defendant had any direct contact

13   with children there?

14   A      I did.  I had spoken with their director of

15   contributions, I believe.

16   Q      And what was the result of that inquiry?

17          MR. TRAGOS:  Objection, Your Honor, hearsay.

18          THE COURT:  Sustained.

19   BY MS. KAISER:

20   Q      To your knowledge, Corporal Romanosky, did the

21   defendant have any other direct contact or any

22   direct contact with children?

23   A      No, ma'am.

24   Q      Corporal Romanosky, was it your job in this

25   case to conduct any forensic examination of the

1     computer evidence in this case?

2     A     No.  After the case was adopted federally, I

3     turned over all the analysis and electronic items to

4     the Department of Homeland Security, Immigration and

5     Customers Enforcement.  If the case would have

6     remained in the state courts, then I would have sent

7     everything over to the Florida Department of Law

8     Enforcement, and then I would have had to do the

9     analysis.

10    Q     So is it fair to say that you did not conduct

11    any forensic exam of the computers?

12    A     That's correct.

13    Q     In your undercover profile as Michael, what

14    was the basis of your relationship with the

15    defendant?

16    A     It was an association based on a common

17    interest.

18    Q     And what was that common interest?

19    A     The physical and sexual abuse of children.

20    Q     At any time during your conversations with the

21    defendant, did he display an interest in having an

22    adult homosexual relationship with you?

23    A     No.

24          MS. KAISER:  Your Honor, may I have a moment?

25          THE COURT:  Yes, ma'am.

 1              (Brief pause.)

 2              MS. KAISER:  I have no further questions.

 3              THE COURT:  Cross-examination.

 4              MR. TRAGOS:  Your Honor, at this point would

 5       the Court allow our law clerk, Tim Batelli, to sit

 6       at counsel table?

 7              THE COURT:  Yes, sir.  That would be fine.

 8                       CROSS-EXAMINATION

 9       BY MR. TRAGOS:

10       Q      Detective Romanosky, let me talk to you about

11       terms that you used.  And when you use them, you

12       understand them to mean certain things.

13              Let's talk about the term "love".

14       A      Yes, sir.

15       Q      When you use "love" when you're doing your

16       work, what do you -- what do you believe "love"

17       means?

18       A      "Love" can be a cryptic form to refer to

19       incest.

20       Q      Okay.  And when you use the word "affection,"

21       what do you believe that -- when you're using it,

22       what is your belief when you're using it what it

23       means?

24       A      It would be the same.

25       Q      Okay.  When you use the word "chatty," what do

1      you believe that that word means?

2      A      In what context?

3      Q      In the context of these conversations, you

4      used the word, "Do you hope that children aren't

5      chatty."  What did you mean -- what did you

6      understand that to mean when you said it?

7      A      That they didn't tell.

8      Q      Tell?

9      A      Disclose that they were being abused.

10     Q      To outsiders?

11     A      Correct.

12     Q      Okay.  In 2005 when you spoke to

13     Dr. Friedlander -- by the way, what is his full

14     name?

15     A      Charles Jackson Friedlander.

16     Q      Okay.  When you spoke to Dr. Friedlander in

17     '05, what screen name was he using?

18     A      He was using Captoes.

19     Q      Okay.  And when you spoke to him in '08, what

20     screen name was he using?

21     A      He was using Captoes.

22     Q      And how many times between '05 and '08 had you

23     changed screen names?  How many screen names had you

24     used during that time?

25     A      For parents, probably only a few.

1    Q     What's a few; five, ten?

2    A     I don't think even five.

3    Q     Okay.  And how about as a child?

4    A     Probably around ten.

5    Q     Okay.  By child, I mean you represented

6    yourself to be a child.

7    A     Yes, boy, girl.

8    Q     Okay.  And in '05, he told you that he was

9    whipping and beating children in his home; correct?

10   A     Yes, sir.

11   Q     And but -- now, wasn't that a crime?

12   A     It would be.  Yes.

13   Q     Okay.  But you say you did not pursue it?

14   A     Correct.

15   Q     And you didn't pursue it because you didn't

16   believe it was happening?

17   A     That's correct.

18   Q     Okay.  And then in '08, he also told you that

19   he was again beating children in his home; correct?

20   A     That's correct.

21   Q     But you didn't pursue that, either?

22   A     No.  I didn't believe him.

23   Q     Okay.  And the -- but you -- the one thing you

24   did believe was that he had razor strops?

25   A     Yes, sir.

1    Q      Okay.  And, in fact, you, on multiple

2    occasions, told him that you wanted him to make sure

3    he was bringing his razor strop with him when he

4    came to see you?

5    A      That's correct.

6    Q      And you also told him you wanted him to bring

7    other implements with him, whatever he had?

8    A      His favorite items.  Correct.

9    Q      Okay.  Well, it wasn't just his favorites, you

10   told him to bring whatever implements he had; isn't

11   that --

12   A      No.  I think there was a reference to

13   favorites.  I asked him if he had any other favorite

14   items.

15   Q      Yes, you did ask him.  But then after that,

16   you asked -- made sure he brought them up with him;

17   right?

18   A      Yes.  I think I referenced them, asked him if

19   he was bringing the crop or the Garrison belt.

20   Q      You asked him that?

21   A      I didn't say, "Bring everything you have," no.

22   Q      And he also told you that he had a son that

23   was 37 that was going to be 38; right?

24   A      Roughly.  I remember it was an adult son, yes.

25   The age sounds right.

1    Q      Okay.  But you later found out that seven

2    years earlier, this person he had referred to had

3    committed suicide?

4    A      That's correct.

5    Q      And, in fact, you verified that; didn't you?

6    A      Correct.  Lee County authorities investigated

7    that.

8    Q      Okay.  And that this person had lived with him

9    from the age of 29 to 37?

10   A      Approximately.  I think he told me ten years,

11   29 to 39, but that's --

12   Q      Approximately that?

13   A      Approximately.

14   Q      Okay.  And you also -- he's never been

15   married; correct?

16   A      He claims not to ever have been married, and I

17   don't have any records to show otherwise.

18   Q      And he's never had children?

19   A      Correct.

20   Q      All right.  Did he ever -- who was the first

21   one to want to know how old your children were?

22   A      I think that actually was at the beginning --

23   talking 2005 or 2008?

24   Q      2008.

25   A      I think we kind of established that right off

1    the bat.

2    Q      Well, did he ask you or did you volunteer the

3    age of your children?

4    A      I think I volunteered, because he told me he

5    was a divorced dad, his son was older.

6    Q      So you volunteered your children's ages?

7    A      Yeah.  That's customary in this type of

8    setting.

9    Q      Okay.  Now, when he told you that he used a

10   razor strop, you're saying that he had -- you asked

11   him if he had any other favorites or did you ask him

12   if he had any other instruments of discipline?

13   A      I know I asked him at one point if he had any

14   other favorites, but I'm sure I asked him if he had

15   any others.

16   Q      Now, in '08, your first conversation was on

17   6/16/2008; is that correct?

18   A      That's correct, sir.

19   Q      Okay.  Your second conversation was 6/17/2008?

20   A      Correct.

21   Q      Now, if you would look at Exhibit 12.  Do you

22   see that, sir?

23   A      Yes, sir.  I'm with you.

24   Q      Do you recognize that as the chat of

25   6/17/2008?

1    A      Yes.  This was the first chat.  There were

2    actually two that day.

3    Q      Okay.  And do you see there about eight lines

4    down:  "StricDad7:  You told me about the razor

5    strap.  Do you have any other instruments of

6    discipline?"

7    A      Yes, sir.

8    Q      You didn't ask him the word "favorites;" did

9    you?

10   A      Yes.  But I know in the communications either

11   from '08 or '05, I did make the statement to him,

12   "did he have any other favorites."

13   Q      And then further on in that conversation, you

14   asked him this:  "Do you use any special confinement

15   technique when administering discipline?"  You asked

16   him that; correct?

17   A      Yes, sir.

18   Q      And that's when he said, "In the basement,

19   sometimes tied"?

20   A      Correct.

21   Q      Okay.  Now, sir, if you will go to your

22   conversation, your second conversation on 6/17/2008.

23   A      Exactly what exhibit is that, 13?

24   Q      That would be 14.

25   A      14.  Okay.  I'm with you.

1    Q    About 12 lines down, do you see where it says

2    Stricdad7?  That was you, by the way; correct?

3    A    Yes, sir.

4    Q    And you asked him -- or you told him, "You can

5    never have enough tools or techniques."

6    A    That's correct.

7    Q    Okay.  And on that date, 6/17 of '08, you

8    received a phone number from him, his cell phone

9    number?

10   A    Yes, sir.

11   Q    Okay.  Now, also on that date, he tells you

12   he's 69 but he was 70 last week.  That would be on

13   page three, about eight lines from the top.

14   A    Yes.  "I am just 70 last week.  Still say 69

15   as sometimes forget."

16   Q    Okay.  Now, I believe you testified to the

17   prosecutor that it is common for people to lie in

18   these conversations?

19   A    Sure.

20   Q    And that it is common for them to lie about

21   things like their age?

22   A    Absolutely.

23   Q    And that, in your opinion, the reason they lie

24   is to make themselves more attractive to the people

25   they're talking to?

1     A     Yes.  That's my opinion.

2     Q     Okay.  Now, on page -- that same conversation,

3     Page 4, Captoes volunteered to bring two boys with

4     him to the session; didn't he?

5     A     Yes, sir.  Which time are you referring to?  I

6     just want to make sure I'm with you.

7     Q     3:57 PM.

8     A     Okay.

9     Q     Do you see that?

10    A     Let's see.  Yes.

11    Q     Okay.  And he said, "Maybe the second one I

12    could bring the two boys."

13    A     Um-hum.

14    Q     Okay.  So he offered to bring two boys with

15    him?

16    A     Correct, on the second one.

17    Q     On the second one, your second visit.  Now,

18    the issue of this release, the -- which your

19    interpretation is an ejaculation; correct?

20    A     Yes, sir.

21    Q     You raised that; correct?

22    A     Yes.

23    Q     And the issue of his pupils helping him out,

24    you raised that; correct?

25    A     Yes.  I have to keep my end of the

1     conversation up.

2     Q      Okay.  Now, if you will look at Exhibit 15,

3     Page 2 at 3:02 PM.

4     A      Okay.  I'm with you.

5     Q      Okay.  Now, that's where you tell him -- or

6     ask him, "Would you be bringing your razor strap?"

7     A      Yes, sir.

8     Q      And then he says, "Absolutely, and maybe the

9     Garrison belt, too"?

10    A      Yes, sir.

11    Q      And then very good -- that's you talking,

12    "Very good.  Any other favorite implements that you

13    would like to bring?  Everyone normally brings their

14    own.  It's another of the personal preferences we

15    allow."

16           And then he says, "That's good.  I might bring

17    my quirt if I can find it."

18           Your -- then you ask the question, "Quirt?"

19           And he says, "Yes.  That's an English-type

20    riding crop but thinner."

21           So at very beginning of this conversation when

22    he talks about what he brings, you start out by

23    asking -- or saying, "Would you be bringing your

24    razor strap?"

25    A      Yes, sir.

1    Q    And then he continues on and then you tell

2    him, "Bring any favorites you want."

3    A    Sure.

4    Q    Okay.  And then on 6/19/08, Exhibit 16, he

5    actually gives you driving -- I'll wait till you get

6    there.

7    A    What time, sir?

8    Q    2:40 PM.

9    A    Okay.

10   Q    He actually starts giving you driving

11   directions of where you go north and right and what

12   exit, that kind of thing, so you can find exactly

13   where his house is?

14   A    Yes, sir.

15   Q    That's on 6/19.  So now go to 6/20/08.

16   A    Exhibit 17?

17   Q    No.  That would be Exhibit 20.  I'm sorry.

18   A    Okay.

19   Q    Do you see that, sir?

20   A    What time?

21   Q    Well, now, if you'd look at 3:27 PM.

22   A    Okay.

23   Q    And you say that -- he tells you there, "I

24   have my son's friend's boys this weekend as grandpa

25   is going away."

1          And then he tells you they're 12 and 14 and

2     they're a handful, and how he gives them the back of

3     his hand over their mouth; correct?  Back of hand's

4     at 3:34.

5     A     That's what I was looking for.

6     Q     Right.

7     A     Yes.

8     Q     Okay.  Now, prior to 3/20, on 3/19 -- excuse

9     me.  Prior to 6/20, on 6/19 you got exact driving

10    directions to his house; correct?

11    A     Correct.

12    Q     Did you contact -- just in case, did you

13    contact the Ft. Myers police or the Lee County

14    Sheriff's Office to do a surveillance of his house

15    just to see if anybody came over?

16    A     No.  Because he had made other comments that

17    they were 11 and 13, and now they're 12 and 14, and

18    in the other chats they were, you know, 12 and 14.

19    So like I said, I didn't believe that they were

20    real.  I thought he was trying to validate himself

21    to me.  I certainly wasn't going to risk

22    jeopardizing the investigation by having

23    surveillance get blown.

24    Q     Now, if you'll look at 7/7/08, which is

25    Exhibit 24.

1      A      Okay.  I'm with you.

2      Q      Now, if you'd look down at 2:06 PM.

3      A      Yes, sir.

4      Q      This is you speaking:  "Very nice.  Will you

5      be bringing the razor strap or other favorite tools

6      with you to our gathering?"

7             Do you see that?

8      A      Yes, sir.

9      Q      So you're again asking him, you know, making

10     sure he brings these things; right?

11     A      Yes.

12     Q      And further on in that conversation, the last

13     page, 3:08 PM.

14     A      Okay.

15     Q      Okay.  This is Dr. Friedlander speaking, or

16     Captoes:  "Sounds fine.  Would you like to meet me

17     like for lunch somewhere?"

18            So he wanted to meet you for lunch?

19     A      Yes.  And I gave him that opportunity.

20     Q      Okay.  You gave him the opportunity to meet

21     you for lunch?

22     A      Yeah.  Right down at 3:11, I said, "If you

23     would like to meet for lunch prior to that, it would

24     have to be soon."

25     Q      Okay.

1    A        "Since I am out of town all next week

2    screening new engine builders."

3    Q        And how did he respond?

4    A        "That is perfect."

5    Q        Okay.  But you didn't meet for lunch?

6    A        No.

7    Q        In fact, you didn't want to meet for lunch;

8    did you?

9    A        No.  We met at the Cracker Barrel prior to.

10   Q        Well, you, in fact, changed it.  If you will

11   look at --

12   A        Yeah.  It was supposed to be a coffee shop,

13   but I was concerned -- in other cases I've had, the

14   body mic picked up the music they were playing

15   inside, it picked up the registers, other customers,

16   and we couldn't hear a word what was being said by

17   our undercover decoy or by the body mic, so that's

18   why I changed it.  Learned from experience.

19   Q        Well, look at Exhibit 25, starting at -- let's

20   go to 4:03 PM.

21   A        Okay.  I'm with you.

22   Q        Okay.  Where you say, "I cannot wait to see

23   the razor strap you've talked about.  That is def

24   old school."  Do you see that?

25   A        Yes, sir.

1    Q      Again, you're encouraging him to bring that

2    with him?

3    A      Sure.

4    Q      Okay.  And then you go down to 4:04 PM, you

5    speaking.  "Okay.  Just thinking of a place to meet

6    before go to the house.  There are a couple of

7    coffee shops nearby."

8           Captoes:  "That's perfect.  Can have decaf or

9    a soda."

10   A      Right.  I had just asked him if he drank

11   coffee.

12   Q      Okay.  And then you go, "Great."  And then you

13   say, "I first thought we could meet at a restaurant,

14   but too many distractions.  Would rather have a

15   place with less audience."  Do you see that?

16   A      Um-hum.

17   Q      Okay.  So then you agree, later on there's an

18   agreement to go to the coffee shop at 4:06 PM;

19   correct?

20   A      Correct.  That was the original plan right up

21   until the date of the controlled phone call, because

22   the coffee -- I was going to meet him in North

23   County, like at a Starbucks or something, but I

24   didn't -- then everyone started telling me, well,

25   don't bring him up towards Hillsborough and have him

1     come across Hillsborough, he'll get lost, so let's

2     do it somewhere easier to find.  And that's how,

3     with the assistance of Detective Stevens, we picked

4     the Cracker Barrel.

5     Q     Then on 7/14/08, Exhibit 26?

6     A     Yes, sir.

7     Q     Strictdad, 9:18 PM.

8     A     Okay.

9     Q     Very -- this is you speaking:  "Very cool.  I

10    can't wait to a collection from such an experienced

11    person.  What else would you bring beside your razor

12    strap and Garrison belt?"

13          "Captoes:  A smaller heavy double belt with

14    holes, a razor strop and a heavy Garrison belt."

15          Do you see those?

16    A     Yes, sir.

17    Q     Now, he also told you several times that the

18    razor strop is hung on a nail in his house; correct?

19    A     He told me it was hung on a nail, and he told

20    me he kept it by his chair.

21    Q     Okay.  And, in fact, when you started asking

22    about what he does with his boy, in '05, he told you

23    he went camping and fishing?

24    A     Correct.

25          MR. TRAGOS:  May we use the overhead, Your

```
 1      Honor?

 2              THE COURT:  Yes, sir.

 3      BY MR. TRAGOS:

 4      Q       This is Exhibit 10.  Do you recognize it?

 5      A       Yes, sir.  That's the information I input for

 6      my undercover profile, StricDad7, for the 2008

 7      investigation.

 8      Q       Okay.  Now, you -- the prosecutor asked you

 9      about your profile before it was introduced into

10      evidence.  She asked you if you were sending a

11      message, or what -- what message you were sending or

12      what did you say in your profile.  And your answer

13      was you were communicating that you're interested in

14      incest?

15      A       Correct.

16      Q       Okay.  And this is the profile that you're

17      saying you're communicating -- in your opinion, that

18      you're communicating incest?

19      A       Yes.

20      Q       Okay.  Now, "no cyber or phone here."  Let me

21      ask you about that.  Give me a little more detail.

22      What -- what does that mean?  At least in your mind

23      what does it mean?

24      A       Those are slang terms.  Cybering is when

25      somebody makes contact with you online and all they
```

1    want to do is sex chat.  They just want to -- and

2    they're very graphic.  And within the first couple

3    of minutes of the chat, it's, you know, tell me

4    about what you've done, tell me about the details,

5    what did it look like, and they want to just keep

6    going on and on.

7         Phone is the same thing, but there are folks

8    online that want to get you to the phone right away

9    so they can just engage in phone sex.  So I put that

10   in there to try to discourage those people from

11   contacting me.

12   Q    Does it work?

13   A    Oh, no.  Well, probably reduces it some, but

14   they're still --

15   Q    Still -- a lot of them still call you, they

16   don't even care what that says; do they?

17   A    True.

18   Q    How about "serious inquiries only," why did

19   you put that there?

20   A    That's kind of self-explanatory, just for

21   people that were serious, to go ahead and initiate

22   contact.  Otherwise, don't bother.

23   Q    So this, "no cyber or phone here, serious

24   inquiries only," you were hoping that it would

25   discourage people from indulging in their fantasies

1      with you; right?

2      A      Yeah -- well, yeah, absolutely.

3      Q      But, in fact, it really doesn't discourage

4      people, they still call you and want to indulge in

5      fantasies with you; don't they?

6      A      Sure.

7      Q      Now, in the video, you arrest Dr. Friedlander

8      for some state charges; right?

9      A      Yes, sir.

10     Q      Now, those charges have been dropped; correct?

11     A      As soon as the case was adopted federally, I

12     contacted the State Attorney's Office, and they

13     dropped those charges.

14     Q      Okay.  Now, the prosecutor asked you why

15     didn't you start the interview when you're

16     transporting him from his arrest to the sheriff's

17     office.  Do you remember that?

18     A      Yes, sir.

19     Q      In fact, that is part of the interview; isn't

20     it?

21     A      It's a stage of an interview process.  It's

22     not actually an interview because I'm not asking

23     direct questions to elicit answers.

24     Q      But it's a stage in the process?

25     A      Absolutely.

1    Q        And what stage is it?

2    A        It's a rapport building stage.

3    Q        So that he could feel comfortable with you?

4    A        Absolutely.

5    Q        Talk to you?

6    A        A very emotional thing has just happened.

7    Q        And in the interview, Dr. Friedlander tells

8    you that the kind of conversations he's had with

9    you, he's had with maybe two others; correct?

10   A        That's what he told me.

11   Q        And you also told him that you've checked up

12   on him; right?

13   A        Yes.  I told him that I checked his history

14   and things like that.

15   Q        Okay.  And you found that he has no prior

16   arrests?

17   A        That's correct.

18   Q        That he basically has a clean record?

19   A        That's correct.

20   Q        And you checked out his, I guess, driver's

21   license?  I mean --

22   A        Sure.  That would be part of a background.

23   Q        Got his, I guess -- or somebody got his safe

24   deposit box keys?

25   A        I think they asked me about them while they

1    were serving the search warrant.  Someone asked me,

2    hey, there's a safe deposit box or some keys to

3    looks like a safe deposit box.

4    Q      And you also told him that you didn't want

5    this to get out, and when it got out -- this did get

6    press, right, there was newspaper articles about

7    this; correct?

8    A      Yes.  They go look at the booking sheets as

9    soon as somebody is arrested and they want a press

10   release on it.

11   Q      And you told him that you wanted him to be

12   honest with you, because when this stuff gets out,

13   parents start calling you to tell you about how

14   their kids were molested by the person that was in

15   the paper; right?

16   A      Yeah.  That's another one of those interview

17   techniques.

18   Q      Okay.  In fact, it does happen, though,

19   doesn't it?

20   A      Occasionally.  Normally around cases involving

21   schools and teachers.

22   Q      In this case, not a single parent called you

23   or anyone called you?

24   A      That's correct.

25   Q      And no one has given you any information that

1    there was an actual molestation done by

2    Dr. Friedlander to anybody?

3    A       That's correct.

4    Q       And the -- have you tried to find out if -- I

5    know you didn't believe it, but did you even make an

6    attempt to find out if there were these children

7    that you thought were fictitious that he was talking

8    about at his house that he was beating, did you try

9    to investigate any of that?

10   A       Through the course of his background search,

11   we didn't find any relatives or anything, any

12   information related to kids.

13   Q       Okay.  These razor strops that we've got here,

14   and various items, did you ever send them away to be

15   tested for, let's say, if there was blood or human

16   tissue on them or anything like that?

17   A       No.  There's nothing obvious on them that

18   warrants them to be sent off for further testing,

19   nor is there any specific allegations from any

20   victims saying that they were used on them.

21   Q       So did you believe that all the stuff he was

22   telling you about whipping kids with them, that was

23   fantasy, too?

24   A       I can't say that was fantasy.

25   Q       Well, you said you had no indication that

1        these were used on any victims.

2        A       Correct.

3        Q       He told you they were.  I mean, he flat out

4        said, he did it.

5        A       Correct.  But we don't send things off for an

6        exploratory just to see if they've been used

7        sometime since they've existed.  We have to have

8        something visible on there that would warrant

9        testing, or if we had somebody come forward to say

10       that a crime was committed and I'm the victim of

11       that and that's the implement that was used, then we

12       might send it off for some sort of corroborative.

13       But normal practice is not to send something off as

14       an exploratory.

15       Q       Okay.  So it's not enough, then, for someone

16       to tell you -- for instance, someone tells you, "I

17       used this gun to kill a man," it's not enough for

18       you to test the gun to see if it's been fired?

19       A       Well, guns are different.  That's called drug

20       fire.

21       Q       So guns are different?

22       A       Right.  Because they make a database of the

23       riflings.

24       Q       But this one -- I mean, the fact that there is

25       no blood or no tissue visible, the fact that someone

1       told you that you do -- that they were used on human

2       beings, that in itself is not enough for you to

3       verify if there was any human blood, human tissue,

4       human skin, human anything, semen, anything on any

5       of these things?

6       A      Right.  Because latent DNA comes from blood

7       and semen.  They have to have something visible to

8       test.  There has to be something there for them to

9       make a swabbing and then to do testing.  Those

10      things are huge.  I mean, when they do DNA testing,

11      it's very small.  They're not going to do an

12      exploratory on all those items.

13      Q      Did you ask?

14      A      Sir, I've been a sex crimes investigator since

15      2001.

16      Q      Did you ask?

17      A      That's not something we do.  That's not common

18      practice.

19      Q      Did you ask?

20      A      No, sir.

21      Q      Is the reason you didn't ask really because

22      you knew you wouldn't find any blood or any tissue

23      on there?

24      A      No.

25      Q      Well, you just told us you didn't believe that

1       he was doing those things.

2       A       I didn't believe in the chats that he had

3       access to all those kids, but it's not the reason I

4       didn't send those off.

5       Q       To your knowledge, was any child pornography

6       found at Dr. Friedlander's home?

7       A       No.

8       Q       No, there wasn't?

9       A       No, there wasn't.

10              MR. TRAGOS:  Could I have Exhibit 64, please.

11              (Brief pause.)

12              MR. TRAGOS:  Your Honor, could I have the

13      original?

14              THE COURT:  Is there a question?  Let's --

15              MR. TRAGOS:  I'm asking for an original.

16              THE COURT:  Then confer with Ms. Kaiser off

17      the record, please.

18              MR. TRAGOS:  All right.  Thank you.  May I

19      approach the witness?

20              THE COURT:  Yes, sir.

21      BY MR. TRAGOS:

22      Q       The prosecutor asked you about a Polaroid of a

23      teenage -- appeared to be, from what you said, a

24      teenage boy.  Do you remember that question?

25              MS. KAISER:  Objection, lack of foundation.

1           THE COURT:   Overruled.

2    BY MR. TRAGOS:

3    Q       Do you remember that question?

4    A       I remember a discussion of the Polaroid in the

5    video.

6    Q       Okay.  And the Polaroid that was in the video,

7    I'd ask you to take a look at Exhibit 64.  Is that

8    the Polaroid that you were referring to?

9    A       Yes.  These two Polaroids were recovered from

10   the defendant's residence during the service of the

11   search warrant in Ft. Myers.  Detective Carrozza and

12   my contact with him told me they'd found two

13   photographs, which were discussed on the video.

14   These were the only two photographs recovered, so I

15   would presume these would be the same.

16           MR. TRAGOS:  Your Honor, at this time defense

17   would move Exhibit 64 into evidence.

18           THE COURT:  As a defense exhibit?

19           MR. TRAGOS:  Yes.

20           THE COURT:  Defendant's Exhibit 64.  Is there

21   any objection?

22           MS. KAISER:  Foundation, Your Honor.

23           THE COURT:  Overruled.  Defendant's 64 is

24   received.

25   (Whereupon, Defense Exhibit Number 64 is received

1   into evidence.)

2           MR. TRAGOS:  May I publish?

3           THE COURT:  Yes, sir.

4           MR. TRAGOS:  May I pass them around, Your

5   Honor?  They don't come out too well on the screen.

6           THE COURT:  Just put them on the screen.  You

7   can hold something above that light to eliminate

8   glare.

9   BY MR. TRAGOS:

10  Q      Detective, the tattoo you're referring to, is

11  that in the upper right-hand side of the chest?

12  A      Yes.  I believe on the video I referred to it

13  as a tattoo on the pec.

14  Q      Detective, at this point in time, are you

15  aware of any instance where the defendant had any

16  sexual contact with any children?

17  A      I am not.

18  Q      When you requested a search be done of the

19  defendant's residence, did you give the officers any

20  specifics as to things to look for?

21  A      Yes, sir.  Obviously, computer-related items

22  and items used to show interest in sadomasochistic

23  activity.

24  Q      Did you ask them to look for designated

25  punishment rooms?

1    A       Yes.  And I had told Detective Carrozza to

2    look for that, as well.

3    Q       Let me ask you, how do you -- how did you set

4    up the search at his house?  How does that process

5    work?

6    A       Well, being that the defendant lived in

7    Ft. Myers, outside the jurisdiction of the Pinellas

8    County Sheriff's Office, I had enlisted the

9    assistance of the Florida Department of Law

10   Enforcement.  I was actually in a training

11   conference in Orlando, Florida, and one of my

12   instructors and friends worked for FDLE.

13           I told him what kind -- a little bit of a

14   brief synopsis on the case, and told him that I

15   needed a contact in the Ft. Myers area.  He put me

16   in contact with Special Agent Steve Uebelacker.  We

17   conferred about the case.  I explained that I was

18   going to need a search warrant at the residence.  I

19   drafted him an order of probable cause, sent it to

20   him.  And then following the meeting with the

21   defendant, contacted them to let them know the

22   defendant had arrived and the search warrant was

23   served.

24   Q       Okay.  Now, what was the date the defendant

25   arrived?

1    A       On the 21st.

2    Q       What was the date that you had this

3    conversation?

4    A       It was during the week of the 13th through the

5    17th.   I think it was right before the controlled

6    phone call, so right about the 14th or 15th.

7    Q       Of June?

8    A       Of July.

9    Q       Of July?

10   A       Correct.

11   Q       All right.   So the 13th or 14th of July you

12   had the conversation, and then on the 21st of July

13   is when you made the arrest?

14   A       Correct.

15   Q       Okay.   So the -- the -- the procedure for this

16   search being done by FDLE, then, started before you

17   arrested him?

18   A       Yes.

19   Q       In fact, it started even before he drove up

20   here?

21   A       Right.   I just got everyone ready.   There's a

22   lot to do in preparation for a search warrant.   So

23   the more notice you can give somebody, the better.

24   Q       The items that were seized, and I think the

25   prosecutor covered some of them with you, but the

1        computers that were seized, did the FDLE or your

2        department do any analysis?

3        A        Our agency did not.  We turned over all those

4        items to the Department of Homeland Security,

5        Immigration and Customs Enforcement.

6        Q        Okay.  Also known as ICE?

7        A        Correct.

8        Q        And the stuff that was in the vehicle, there

9        was a camera in the vehicle; correct?

10       A        Yes, sir.

11       Q        And was that turned over, as well?

12       A        I believe all evidence in the case was turned

13       over.

14       Q        Okay.  And you didn't do any analysis on any

15       of them?

16       A        No, sir.

17       Q        Okay.  The razor strops, the -- all these --

18       the implements there, were they also turned over?

19       A        Yes.

20               THE COURT:  Would this be a good time,

21       Mr. Tragos, to stop for lunch?

22               MR. TRAGOS:  Yes, Your Honor.

23               THE COURT:  All right.  We'll break for lunch

24       until 1:15 by the courtroom clock.

25               COURTROOM SECURITY OFFICER:  All rise.

 1                    (Jury out at 12:02 PM.)

 2                    (Recess was taken at 12:02 until 1:20 PM.)

 3                    (Back on the record at 1:20 PM.)

 4          THE COURT:  I have a question from my staff,

 5     anticipating our jury instructions discussion.  Do

 6     either of you anticipate any change in the

 7     instructions?

 8          MR. TRAGOS:  Do we anticipate the court making

 9     different rulings or --

10          THE COURT:  No.  Any change in the

11     instructions?

12          MS. KAISER:  No, Your Honor.

13          MR. TRAGOS:  We're going to -- our arguments

14     will be the same.  We'll raise the same issues.

15          THE COURT:  But in terms of the -- we can use

16     those instructions as a working draft, then?

17          MR. TRAGOS:  Yes.  Yes.  Yes.

18          THE COURT:  Okay.  I think she probably heard

19     us.  She'll go ahead and just make copies of those

20     so we've all got them.

21          MR. TRAGOS:  He's talking about the ones from

22     the last trial.

23          MR. SARTES:  I know.  The jury instructions --

24          THE COURT:  Mr. Sartes, stay out of this.

25          MR. SARTES:  I'm sorry, Judge.

```
 1              THE COURT:  Bring the jury in, please.

 2              COURTROOM SECURITY OFFICER:  Rise for the

 3     jury.

 4              (Jury in at 1:21 PM.)

 5              THE COURT:  Thank you, and be seated.  You may

 6     resume cross-examination.

 7              MR. TRAGOS:  Your Honor, at this time we'd

 8     announce we're finished with our cross-examination

 9     of Detective Romanosky.

10              THE COURT:  All right.  Any redirect?

11              MS. KAISER:  No, Your Honor.

12              THE COURT:  Thank you, sir.  You may step

13     down.

14              THE WITNESS:  Thank you, sir.

15              THE COURT:  Call your next witness, please.

16              MS. KAISER:  The United States calls Jeff

17     Capra.

18              COURTROOM DEPUTY CLERK:  Raise your right

19     hand.

20              (Witness complied.)

21              COURTROOM DEPUTY CLERK:  Do you swear or

22     affirm the testimony that you give in this case will

23     be the truth, the whole truth and nothing but the

24     truth?

25              THE WITNESS:  Yes, ma'am.
```

1          COURTROOM DEPUTY CLERK:   Please be seated.

2          (Witness complied.)

3          COURTROOM DEPUTY CLERK:   Please state your

4    name and spell your last name for the record.

5          THE WITNESS:   Jeffrey Capra, C-a-p-r-a.

6                    DIRECT EXAMINATION

7    BY MS. KAISER:

8    Q     Good afternoon.

9    A     Good afternoon.

10   Q     Can you please tell the jury where you work.

11   A     Pinellas County Sheriff's Office.

12   Q     And what is your position with the sheriff's

13   office?

14   A     Currently I'm assigned to crimes against

15   children as a detective.

16   Q     And how long have you been so employed?

17   A     Sixteen years with Pinellas County.

18   Q     And how long have you been in the crimes

19   against children task force?

20   A     Since February of '07, -- correction, '08.

21   Q     Detective Capra, did you have an opportunity

22   to participate in the investigation of Charles

23   Jackson Friedlander?

24   A     I did.

25   Q     And on July 21st of 2008, did you participate

1       in the arrest of Charles Jackson Friedlander?

2       A       I did.

3       Q       Okay.  Can you please tell the jury what your

4       responsibilities were on July 21st of 2008.

5       A       Myself and Detective Lyons assisted as far as

6       inventory and Mr. Friedlander's vehicle.

7       Q       And did you actually conduct part of the

8       search of the vehicle?

9       A       I assisted Detective Lyons, yes.

10      Q       Okay.  Prior to searching the defendant's

11      vehicle on that date, where -- where were you

12      located?

13      A       I was like the outer perimeter.  I was located

14      in the Holiday Inn Express parking lot, the

15      northwest corner, where I couldn't see his vehicle

16      coming in or the detective's vehicle.

17      Q       Were you subsequently given a sign to come in

18      and conduct the search of the vehicle?

19      A       Yes, once he was taken into custody.

20      Q       Okay.

21              MS. KAISER:  Your Honor, may I approach the

22      witness?

23              THE COURT:  Yes, ma'am.

24      BY MS. KAISER:

25      Q       Detective, I'm showing you what's been

1    admitted as Government's Exhibits 31A and 31C.   Do

2    you recognize those pictures?

3    A      Yes, I do.

4    Q      And what are those pictures of?

5    A      Mr. Friedlander's car.

6    Q      And is that the vehicle that you discussed

7    searching on July 21st, 2008?

8    A      Yes, ma'am.

9    Q      All right.  I'm also showing you what's been

10   marked for identification as Government's Exhibit

11   59.  Do you recognize that?

12   A      Yes, ma'am.

13   Q      What is that?

14   A      That's a piece of paper that I found in the

15   front right passenger seat of the vehicle.  It's a

16   phone number, Pinellas County phone number, and also

17   has 54th Ave and then N-O on it.

18   Q      And why did you seize that paper from the

19   vehicle?

20   A      I believed at the time that that was

21   Corporal Romanosky's cell phone number.

22   Q      And was there any significance to you about

23   the 54th Avenue North?

24   A      That's the -- where the Holiday Inn Express

25   is.  There's two exits off of the interstate, 275,

1      and that's where we were located at, 54th Avenue

2      North.

3              MS. KAISER:  Your Honor, at this time I'd move

4      for admission of Government's Exhibit Number 59 into

5      evidence.

6              THE COURT:  Is there any objection?

7              MR. TRAGOS:  May I see it for a moment, Your

8      Honor?

9              THE COURT:  Yes, sir.

10             (Brief pause.)

11             MR. TRAGOS:  No objection.

12             THE COURT:  Exhibit 59 is received.

13     (Whereupon, Government's Exhibit Number 59 is

14      received into evidence.)

15             MS. KAISER:  May I publish to the jury, Your

16     Honor?

17             THE COURT:  Yes, ma'am.

18     BY MS. KAISER:

19     Q      Putting up first Government's Exhibit 31C,

20     which you said was the inside of the defendant's

21     vehicle, could you tell the jury where you found

22     Government's Exhibit 59, which you've identified as

23     this piece of paper?

24     A      Like the right passenger -- the front seat,

25     right side, right on the --

1    Q       You can point to it on the screen.

2    A       Okay.

3            THE COURT:   You can touch the screen.

4    A       Okay.   Right in this area.

5    Q       Okay.   And is that the piece of paper that you

6    were just referring to that you found?

7    A       Yes, ma'am.

8    Q       Did the defendant also have some personal

9    items in his vehicle that were unrelated to the

10   case?

11   A       Unrelated to the case?

12   Q       Yes.

13   A       Yes.

14   Q       Now, Detective Capra, previously -- I'm

15   showing you what's been admitted as Government's

16   Exhibits 34, 35A through D and also 33.   Do you

17   recognize these implements?

18   A       I do.   The one in your right hand, I would

19   call it like a whip type thing.

20   Q       Aside from these items that I just showed you

21   that have already been admitted as evidence, did you

22   also see other personal items in the defendant's

23   vehicle?

24   A       Yes.   There was other articles not pertaining

25   to the case, such as clothes, some sort of mustard

1        in a jar or jars, various types of shoes, dress

2        shoes.

3               MS. KAISER:  I have no further questions.

4        Thank you.

5               THE COURT:  Any cross-examination?

6               MR. TRAGOS:  Yes, Your Honor.  May I have a

7        moment with the prosecutor?

8               THE COURT:  Yes, sir.

9               (Brief pause.)

10                        CROSS-EXAMINATION

11       BY MR. TRAGOS:

12       Q       Detective, you made an inventory of what you

13       found in the car; correct?

14       A       Detective Lyons did, yes.

15       Q       Okay.  Was it jointly with you?

16       A       I helped her out, but she had control of

17       everything as far as the inventory.

18       Q       Do you need to see her report in order to

19       refresh your recollection?

20              MS. KAISER:  Objection, improper foundation.

21              MR. TRAGOS:  That's not improper foundation.

22              THE COURT:  Overruled.

23       BY MR. TRAGOS:

24       Q       Would that help you?

25       A       Sure.  Again, though, I -- you know, I didn't

1    write it.

2    Q      Now, in that vehicle, can you please tell me

3    what was found -- totally everything that was found

4    in the vehicle.

5    A      What I recall is the items to the left of me,

6    clothes, personal clothes, the mustard, like I said.

7    You know, like I said before, the items over on this

8    table I saw.

9    Q      Okay.  Did you see a camera?

10   A      Detective Lyons did find a camera, correct.

11   Q      And were you also aware that she tried to work

12   it but the batteries were dead?

13   A      I knew she had it.  I didn't know if she was

14   trying to see if there was anything on there.

15   That I don't know.

16   Q      Okay.  So you're not aware of her trying it?

17   A      She may have been, with forensics.

18   Q      Were there grocery bags in the car?

19   A      There was plastic bags in the car, as I

20   recall.

21   Q      And there were shoes in the car?

22   A      Yes.

23   Q      How many pairs of shoes were in the car?

24   A      I don't recall how many.  There were more than

25   one, though.

1    Q      Detective, did you do a report?

2    A      I did.

3    Q      And did you review any reports before you

4    testified today?

5    A      I did.

6    Q      And what reports did you do?

7    A      My report.  Detective Lyons' report I looked

8    at.

9    Q      So you looked at Detective Lyons' report?

10   A      Yes.

11   Q      And that's the same report that I handed you?

12   A      Hers is supplement number seven.

13   Q      Did you review that?

14   A      I did.

15   Q      Okay.  Where were the Vidalia mustard jars,

16   where were they located in the car?

17   A      I don't recall that, sir.

18   Q      Where were the shoes located?

19   A      I believe the shoes were both in the back seat

20   floorboard as well as in the trunk.

21   Q      Were you present when the photographs were

22   taken?

23   A      I was within the area, yes.

24   Q      Did you observe the photographs taken?

25   A      I wasn't right there when the photographs were

1      taken.   I was out away from the vehicle.

2      Q       So you didn't direct what photos were taken or

3      anything like that?

4      A       No.   Detective Lyons was assisting the

5      forensics specialist.

6      Q       All right.   So this basically was all Lyons'

7      responsibility and not yours?

8      A       Well, I assisted her, correct.

9      Q       But she was -- was she in charge, I guess, of

10     that?

11     A       Yes.

12     Q       And she was in charge of gathering the

13     evidence?

14     A       Yes.

15     Q       She was in charge of directing the

16     photographs?

17     A       Photographs of evidentiary items that were

18     recovered.

19     Q       That was her responsibility?

20     A       Yes.

21     Q       Okay.   So you actually weren't the one

22     responsible for gathering the evidence?

23     A       I helped her out if she needed assistance.

24     Q       Who had the responsibility?

25     A       Detective Lyons was assigned.

1     Q       Oh, okay.

2             MR. TRAGOS:  No other questions.

3             THE COURT:  Any redirect?

4             MS. KAISER:  No, Your Honor.

5             THE COURT:  Thank you, sir.  You may step

6     down.  Watch your step, please.

7             Call your next witness.

8             MS. KAISER:  United States calls Don

9     Colcolough.

10            COURTROOM DEPUTY CLERK:  Raise your right

11    hand, please.

12            (Witness complied.)

13            COURTROOM DEPUTY CLERK:  Do you swear or

14    affirm the testimony that you give in this case will

15    be the truth, the whole truth and nothing but the

16    truth?

17            THE WITNESS:  Yes.

18            COURTROOM DEPUTY CLERK:  Please be seated.

19            (Witness complied.)

20            COURTROOM DEPUTY CLERK:  Please state your

21    name and spell your last name for the record.

22            THE WITNESS:  My name is Don Paul Colcolough.

23    My last name is spelled C-o-l, another C-o-l,

24    o-u-g-h.

25

1                          <u>DIRECT EXAMINATION</u>

2       <u>BY MS. KAISER:</u>

3       Q       Good afternoon, Mr. Colcolough.

4       A       Good afternoon.

5       Q       Could you please tell the jury where you work.

6       A       Yes.  I work at America Online, Incorporated.

7       Q       And what is your position with America Online?

8       A       I'm the director of investigations and global

9       security.

10      Q       And what are your duties in that position,

11      sir?

12      A       Well, there are many.  Basically to oversee

13      all the security aspects of our networks that our

14      members use and, in particular, the -- any sort of

15      criminal abuse of these services or cases that deal

16      with abuse on our services that are of interest by

17      law enforcement, I oversee the technical aspects of

18      those.  I'm also a custodians of records within the

19      AOL legal department.

20              MS. KAISER:  Your Honor, may I approach the

21      witness?

22              THE COURT:  Yes, ma'am.

23      <u>BY MS. KAISER:</u>

24      Q       Mr. Colcolough, I'm showing you what's been

25      marked for identification as Government's Exhibit

1    Number 29, and ask if you could please take a look

2    and review that document.

3    A      Yes.

4    Q      Do you recognize it, sir?

5    A      I do.

6    Q      Could you tell us what that is?

7    A      This is a hard copy printout of some

8    electronic information that we produced pursuant to

9    a law enforcement request that deals with an America

10   Online account.

11   Q      Is that record a true and accurate copy of

12   records contained by AOL?

13   A      Yes, it is.

14   Q      Is it maintained and created in the ordinary

15   course of business?

16   A      Yes, it is.

17   Q      Is it created by a person with knowledge at or

18   about the time the records are prepared?

19   A      Yes, it is.

20          MS. KAISER:  Your Honor, at this time I'd move

21   for admission of Government's Exhibit Number 29 into

22   evidence.

23          THE COURT:  Any objection --

24          MR. TRAGOS:  May I voir dire, Your Honor?

25          THE COURT:  Yes, sir.

<u>VOIR DIRE EXAMINATION</u>

1

<u>BY MR. TRAGOS:</u>

2

3      Q      Detective, how do you gather this kind of

4      information?

5      A      I'm sorry?

6      Q      I'm sorry.  Mr. AOL, what -- what -- what is

7      your title?

8      A      My title is director of investigations and

9      global security.

10     Q      All right.  And how do you gather this kind of

11     information that's in that exhibit?

12     A      We have a number of different databases.  And

13     we have search engines that know how to query these

14     databases and mind these databases.  A very few

15     people at America Online are given access to those

16     rights to query these databases.

17            And, basically, if you have those rights and

18     you input information that, say, comes in with a

19     screen name or an e-mail address, one of the

20     individuals that has rights can actually search on

21     the databases that pulls this information, and when

22     it's pulled, we can either print it out or

23     memorialize it on a CD.

24     Q      And in this case who asked you to do this?

25     A      I didn't do this.  One of our compliance

1   paralegals did this.

2   Q     Do you know who asked her?

3         MS. KAISER:  Objection, relevance.

4         MR. TRAGOS:  Your Honor --

5         THE COURT:  Overruled.

6   BY MR. TRAGOS:

7   Q     Who asked her to do it?

8   A     It would be a law enforcement request that

9   would come in to her.  I don't have that

10  information.

11  Q     Okay.  So you don't -- you don't specifically

12  know who asked her to do it?

13  A     No.  I'm not in the compliance team.  I'm the

14  director of investigations.  We have a compliance

15  team that does this.

16  Q     Okay.  So you don't know who asked her and you

17  don't know actually how it was put together;

18  correct?

19  A     I know the system that we have that puts it

20  together.  I was part of putting together the system

21  that does this sort of thing.  However, we have

22  lawyers and paralegals and compliance analysts who

23  actually respond to law enforcement requests.

24  Q     So this particular request, and what you have

25  actually in your hands, you weren't part of the team

1       that put that together?

2       A       No.

3       Q       And you weren't part of the team that gathered

4       that information?

5       A       Well, I guess I should say I'm part of the

6       team.   This is the AOL Legal Compliance

7       Investigations Department.   The compliance is a

8       team, investigations is a team.   I run the

9       investigations, what deals with the technology, the

10      forensics, the abuse online.   The compliance side of

11      the team deals with law enforcement requests,

12      subpoenas, search warrants, court orders,

13      preservations and those sorts of things.

14      Q       I'm sorry.   Go ahead.

15      A       I know how it works; that is just simply not

16      my role.

17      Q       Okay.   So the compliance people are what

18      actually assembled this -- this document?

19      A       Correct.

20      Q       And when was the -- well, this particular

21      document, prior to the government handing it to you

22      or prior to the government giving it to you, is this

23      a document that you retrieved from AOL?

24      A       When you say "you", you mean me personally?

25      Q       Yes, you personally.

1      A      I retrieved this information to look at it

2      before I come down to testify about this

3      information, meaning when I see this, I recognize

4      the same information that I reviewed prior to me

5      coming down earlier this week to say it's the same.

6      I don't carry the information with me simply because

7      it -- it's something my lawyers tell me not to do.

8      Q      Okay.

9           MR. TRAGOS:  Your Honor, we would object that

10     the improper predicate has not been laid for this

11     document.

12          THE COURT:  The objection is overruled.

13     Exhibit 29 is received.

14     (Whereupon, Government's Exhibit Number 29 is

15      received into evidence.)

16          MS. KAISER:  Your Honor, may I publish to the

17     jury?

18          THE COURT:  Yes, ma'am.

19               DIRECT EXAMINATION (CONTINUED)

20     BY MS. KAISER:

21     Q      Thanks.

22     A      You're welcome.

23     Q      All right.  Mr. Colcolough, I'm putting on the

24     overhead what's been admitted as Government's

25     Exhibit Number 29.  And I'm going to ask you if you

1       could please explain to the jury what it is we're

2       looking at here, starting with the top left.

3       A       Starting at the top left, in general, this is

4       an account of an America Online user.  The top left

5       simply presents the screen names that have been

6       created and used on this particular America Online

7       account.

8       Q       And who is -- I'm sorry.

9       A       There are four screen names.

10      Q       And what are those screen names listed as?

11      A       The first screen name is Shrinq, spelled

12      S-h-r-i-n-q.  The second screen name is Seerax,

13      S-e-e-r-a-x.  The third screen name is Shrinq2,

14      S-h-r-i-n-q-2.  And the last screen name is Captoes,

15      C-a-p-t-o-e-s.

16      Q       And who was the subscriber on this account?

17      A       The subscriber is Charles Jackson.

18      Q       And what is -- do you know why Captoes is in

19      bold?

20      A       The bolded screen name means the screen name

21      that our compliance analysts put into the system

22      that searches for accounts, and that's the screen

23      name that was being requested by a law enforcement

24      agency.

25      Q       Okay.  And does the subscriber information

1       also contain a mailing address for this person?

2       A       Yes, it does.

3       Q       And a phone number; is that correct?

4       A       Yes.  Actually, two phone numbers.  One in the

5       evening, one's in the day.

6       Q       And do those different phone numbers have

7       different area codes?

8       A       Yes, they do.

9       Q       All right.  On Page 2 of Government's Exhibit

10      29, can you tell the jury what we're looking at

11      here.

12      A       Yes.  This is what we call a monthly detailed

13      billing summary for the account that is owned by

14      this particular screen name, of which Captoes is one

15      of.  It simply is the login and logout dates and

16      time for each screen name on this account.  We keep

17      these for a number of months moving backwards in

18      time.

19      Q       And how far back does AOL keep this

20      information?

21      A       Most of the time it's approximately six

22      months; sometimes it's a little longer.

23      Q       And does this information go from the most

24      recent and go back in time?

25      A       Yes, it does.

1    Q      Does this detailed billing information that

2    you discussed, is that on pages -- basically

3    starting on Page 1, and does it go through Page 62

4    of Government's Exhibit 29?

5    A      I remember that to be correct, yes.

6    Q      All right.  Starting at the bottom of Page 62,

7    can you please tell the jury -- can you see that,

8    sir?

9    A      I can, yes.

10   Q      Can you please tell the jury what information

11   is contained on the bottom quarter of the page.

12   A      That information is what's called a buddy list

13   for an individual screen name.  In this case, it's

14   Captoes.  When we --

15   Q      I'm sorry.

16   A      Go ahead.

17   Q      Could you tell us what a buddy list is.

18   A      Yes.  That's what I was going to do.  Each and

19   every screen name on America Online has the ability

20   to have what's called a buddy list.  It's a list

21   that is created by that particular user's screen

22   name to add friends and family's screen names so he

23   or she can take notice of when those screen names

24   are logged in at the same time he or she is.

25          In other words, if I'm online and want to know

1      when my brother is online, I can put his screen name

2      on my buddy list, and then I will be notified when

3      he logs on.  In the lower left-hand corner, you see

4      contents of the buddy list for screen name Captoes,

5      and the first category is called recent buddies.

6      And then below that you see two screen names that

7      are contained on his buddy list.

8      Q      Is Page 63 additional screen names or, excuse

9      me, additional buddies on the buddy list?

10     A      Yes.

11     Q      And do you see StricDad7 on this buddy list?

12     A      I do.  It's six or seven from the bottom.

13     Q      Can you please point to it on the screen.

14            THE COURT:  You can actually make a mark next

15     to it.

16     A      Yes.  Oops.

17     Q      Thank you.

18     A      Somewhere around there.

19     Q      Okay.  All right.  Now, is this buddy list

20     something that the user creates?

21     A      Yes.

22     Q      And how do they go about doing that?  How do

23     they go about recording that so that their buddies

24     come up each time they log in?

25     A      There's a number of different ways.  First,

1    you can go to your buddy list window, which appears

2    every time you log into the America Online service.

3    There's a button on that particular window called

4    set up.  You simply click that button called set up,

5    and the first thing it's going to ask you is, do you

6    want to add buddies to your buddy list.  If you

7    answer yes, it's going to produce a field where you

8    can type in the screen name of the buddy you want to

9    add to your list.

10        Historically, that's the most common way.  We

11   do have a newer feature where if, indeed, you

12   instant message or you send an e-mail to another AOL

13   user, that is automatically added to your buddy list

14   in terms of what's called a recent buddy.  And some

15   people accumulate those types of buddies on their

16   buddy list from instant messaging and e-mailing

17   people.

18   Q    Okay.  Can you read the name of the first

19   buddy on Page 63 of Government's Exhibit 29.

20   A    Yes.  It appears to be looking for BDSM dad.

21   Would you like me to spell it?

22   Q    No.  That's fine.  That's fine.  And on Page

23   64 of Government's Exhibit Number 29, is that also a

24   continuation for the top third of the page of the

25   buddy list for Charles Jackson?

1    A      Yes, it is.

2    Q      Could you please tell the jury what they're

3    looking at where it says "friends" about halfway

4    down the page.

5    A      That is a category contained within a buddy

6    list.  On America Online when you first have a buddy

7    list, you're given three general categories.  One is

8    called friends, one is called family, one is called

9    coworkers.  This is a generic category called

10   friends where there appears to be eight to ten

11   screen names added to that category called friends.

12   Q      Beginning at the -- about the bottom half of

13   Page 64, can you tell the jury what we're looking at

14   here.

15   A      Yes.  This is the member profile for screen

16   name Captoes.

17   Q      And who inputs this information?

18   A      The actual user puts in most of the

19   information.  The information that is actually

20   presented to the other users in -- fundamentally,

21   America Online members have about 80 million

22   different member profiles.  It's simply a way to

23   tell other members information they can search on

24   who you are, where you live, your hobbies, your

25   marital status, any kind of quote, just personalized

1      information in your member profile for your screen

2      name.

3      Q      And on Page 66, is that a continuation of the

4      personal profile to which you were just referring?

5      A      Yes, it is.

6      Q      And what does the defendant list in his about

7      me category?

8      A      He lists his name, his location, his

9      interests, his personal quote, his favorite things

10     to do.  Would you like me to read them?

11     Q      Yes, please.

12     A      He states his name is Captoes.  His location

13     is Southwest Florida and Mid Atlantic.  His interest

14     is swimming, bike riding, theater, movies, cooking,

15     shoes.  Favorite gadget is his tongue.  Personal

16     quote is, "tongue those shoes well."

17     Q      Can you please tell the jury what an AOL

18     address book is.

19     A      Yes.  When you have a screen name on America

20     Online, you may use that screen name to e-mail

21     different users of America Online or other different

22     users around the internet.  In order to do that

23     efficiently and in an organized fashion, AOL gives

24     you an easy to use directory of people you want to

25     e-mail or people you want to know more about simply

1   based on knowing their e-mail.  And it's simply a

2   feature that is bolted on or connected to your

3   e-mail form.

4        In other words, when you pull up an e-mail

5   form to send somebody an e-mail, on the right-hand

6   side of that form, there's a button called address

7   book.  You can click on that, and in a nice,

8   alphabetical, easy to read format, there's all the

9   e-mail addresses and people you want to communicate

10  with via electronic mail or e-mail.

11  Q    Can you describe for the jury what AOL

12  favorites are.

13  A    Yes.  When AOL members log on, everywhere they

14  go on the AOL service or everywhere they go out on

15  the internet is presented to them in a window.  In

16  the upper right-hand corner of each window, there's

17  a little heart.  That heart is what's called, in the

18  AOL world, as a favorite place heart.

19       It is a moveable logo where you can take your

20  mouse and drag that heart to another little place

21  called your favorites, kind of an easy function

22  where, if you've been to a particular website or a

23  chat room or a place on AOL, you can easily move

24  that into your favorite places.

25       That means you can easily, you know, click on

 1    your favorites, and there will be a list of what you

 2    consider your favorite places, as opposed to trying

 3    to find that place again or typing that same place

 4    you want to go again and again.  It just makes it

 5    easier for you.

 6    Q      Are you familiar with the term "town square"?

 7    A      Yes, I am.

 8    Q      Within the meaning of AOL, what does the term

 9    "town square" refer to?

10    A      In a couple words, that's our chat room area

11    of America Online.  The general area that you go to

12    chat with others in electronic chat rooms is called

13    town square.

14    Q      Approximately how many chat rooms does AOL

15    have operating at any given type?

16    A      Every 24 hours yields about 30,000 chat rooms

17    on AOL.

18    Q      Now, if there was a chat room called fathers

19    chatting, would that be something users create or

20    would that be something generated by AOL?

21    A      That would be a user created chat room, or

22    what we call a member chat room.

23    Q      Can you tell the jury what the difference is

24    between those?

25    A      Certainly.  There's actually three types of

1    chat rooms on America Online.  The first is a public

2    chat room.  Those are chat rooms in town square

3    where we name the room at AOL.  The room names are

4    like lobby or sports chat, generic sounding rooms.

5        The second category is member rooms, where the

6    members can create the names of the room.  South

7    Florida or Virginia or acoustic guitar, I could name

8    those rooms, and they will be presented on a list.

9    And other members can peruse the list and see what

10   interests them, and then select those rooms to

11   enter.  Those are member chat rooms.

12       The third category is called private chat

13   rooms.  They're member created, but they're not

14   listed anywhere; ergo, private.

15   Q     If two people are talking on America Online in

16   Florida, say, they're both in Tampa, how does that

17   electronic communication actually travel?  How does

18   it get from -- from one person to another?

19   A     Well, if you're in Florida on a computer

20   that's connected to AOL, and I'm on a computer in

21   Florida in the same, say, courtroom that's connected

22   to AOL, and you and I are either e-mailing or

23   instant messaging or in a chat room together, those

24   communications go from your computer through a

25   series of networks to America Online in Virginia,

1      ultimately to my computer in the same courtroom.

2      All communication via e-mail, instant messages and

3      chat rooms go through our servers located in

4      Northern Virginia.

5      Q      So all those communications go out of state

6      and then come back, is that correct, go through the

7      servers out of state and then go to the recipient?

8      A      Yes; unless, of course, you're in Virginia.

9      Q      Right.  Does AOL have very many dial-up users?

10     A      Yes, we still do.

11     Q      Do you know approximately how many?

12     A      Seven to eight million at this point.  It's

13     shrinking, though.

14     Q      Why -- why does AOL still have so many dial-up

15     users?

16     A      There could be a number of different reasons.

17     The predominant reason is there's still some areas

18     of the country that don't have high speed internet

19     access, maybe more rural areas.  With the economy

20     such as it is, it could be a little more expensive

21     to have a whole high speed connection, you know,

22     $50, $60 a month some places charge for high speed

23     internet access.

24          Also, some people move around the country.  If

25     you have, you know, two or three homes, you have to

1    have internet access that's high speed in each of

2    the homes, or you can have one dial-up provider, and

3    if you simply knew a local telephone number you

4    could call, those people like to have one internet

5    service provider and use dial-up.  It's a little bit

6    more cost effective doing it that way if you have

7    more than one place to live.

8    Q      How long does AOL store e-mail, users' e-mail?

9    A      The default is 28 days for new and sent

10   e-mail.  There's some dependencies with that,

11   especially in the more current timeframe.  Users can

12   opt to save mail longer, if they choose to.  But if

13   they do nothing and take our defaults, it's 28 days.

14   Q      Mr. Colcolough, does Government's Exhibit 29,

15   Page 1, detail when this AOL account was first

16   created?

17   A      Yes, it does detail that.

18   Q      And what was the date that this account was

19   created?

20   A      It was created on June the 20th of 1998.

21   Q      And where do you see that information on this

22   screen?

23   A      It's in the second box under what's called

24   status information where it says "member since."

25   That's the exact date and time down to the second

1       that the account was created in the Eastern Time

2       Zone.

3       Q       Can you point to it on the screen.

4       A       Yes.

5       Q       Okay.  Now, following up on some questions on

6       the screen names that you see up on top, do those

7       screen names, are those all necessarily for the same

8       person?

9       A       They are the screen names for the account that

10      is held by Charles Jackson.  They could be different

11      users of those screen names.

12      Q       Do you see that sometimes with families?

13      A       Yes.  As a matter of fact, that's the whole

14      fundamental reason we created that particular

15      service, where a typical family, maybe have a mom

16      and a dad and two or three kids, they can all

17      independently have their own screen name and, yet,

18      they can all be online at the same time

19      simultaneously with different screen names on the

20      same account.

21      Q       So when you're looking at the detailed billing

22      information, if you see the names Seerax, the user

23      name Seerax and then Captoes, Shrinq, Captoes,

24      Seerax, see that on the left side that I'm pointing

25      to?

```
1      A       I do, yes.

2      Q       That doesn't necessarily mean it's all the

3      same person; correct?

4      A       Correct.

5      Q       And there actually can be overlap, is that --

6      is it fair to say there can be overlaps between,

7      say, for example, Seerax and Captoes?

8      A       There could be with what we call multi,

9      simultaneous usage.  Also, there could be a switch

10     screen name where you see literally the same second

11     that one logs off the other logs on.

12     Q       Is there anything in this billing information

13     from America Online that tells us where the user

14     was?  Can you tell whether or not the user was in

15     Washington DC versus Florida at the time?

16     A       No, not with this record.

17             MS. KAISER:  Your Honor, may I have a moment?

18             THE COURT:  Yes, ma'am.

19             (Brief pause.)

20             MS. KAISER:  I have no further questions.

21     Thank you.

22             THE WITNESS:  You're welcome.  Thank you.

23             THE COURT:  Cross-examination, Mr. Tragos.

24

25
```

1                        CROSS-EXAMINATION

2    BY MR. TRAGOS:

3    Q      I'd ask you to take a look, sir, if you would,

4    at Exhibit 29, and it's the first page.   This

5    information -- let's start with the screen names.

6    Screen names -- how many screen names can you have

7    active at any one time?

8    A      An account can have up to seven active screen

9    names at one particular time.

10   Q      Okay.  And can someone actually delete a

11   screen name?

12   A      Yes.  You have to be logged into what's called

13   a primary master screen name to create and delete

14   screen names, though.

15   Q      In this case, it's Captoes; right?

16   A      No.  The actual screen name -- the master

17   screen name is the very first one.

18   Q      Shrinq?

19   A      Shrinq.

20   Q      Okay.  So if you're logged into Shrinq, for

21   instance, you can actually delete Captoes if you

22   want as a screen name on this account?

23   A      Yes.

24   Q      And how many times can someone delete a screen

25   name?

1    A      As many times as they have screen names.

2    Q      It's unlimited?

3    A      Unlimited, but only seven at a time.

4    Q      You can only have seven active?

5    A      Right.

6    Q      But you can delete hundreds?

7    A      Thousands.

8    Q      Thousands.  Okay.  This information, address,

9    telephone numbers, those kind of things, do you --

10   is this information available to you?  I'm talking

11   about you individually.

12   A      Yes.

13   Q      To you on any AOL screen name?

14   A      Yes.

15   Q      So if you got a subpoena or a request from law

16   enforcement on a particular screen name, you could

17   go into that screen name and you could gather all

18   this information?

19   A      When you say "this information," you mean what

20   I'm looking at now?

21   Q      Yes, sir.

22   A      Yes.

23   Q      Okay.  And you even have a credit card number;

24   correct?

25   A      Correct.

1       Q       Now, that's important; isn't it?

2       A       I'm sorry?

3       Q       That credit card number is pretty important to

4       AOL; isn't it?

5       A       Yes, very much.

6       Q       Because what does AOL do with that credit card

7       number?

8       A       We protect it.

9       Q       Do you bill on it?

10      A       We -- of course.

11      Q       So the way AOL collects their money is by

12      charging this credit card?

13      A       Correct.

14      Q       And that has to be done -- is it -- do you do

15      it monthly, annually, how is it done?

16      A       We usually do it monthly.  We have an annual

17      fee payment, but it's rarely used.

18      Q       Okay.  So if that credit card number is wrong,

19      you would eventually know about it because you'd get

20      a -- it would be bounced back to you as

21      uncollectible?

22      A       Correct.

23      Q       And this account -- by the way, did you check

24      on the action on this account?  Is it still active?

25      A       I haven't checked lately.

1    Q      When was the last time you checked it that it

2    was active?  Was that around December?

3    A      Yes.

4    Q      Okay.  And so as of about December, this

5    account was still an active account?

6    A      Correct.

7    Q      You just haven't checked since then?

8    A      Correct.  I verified these records.  I just

9    didn't take a look at the electronic information

10   that's live.

11   Q      Okay.  Now, let's go further down here, and we

12   see this detailed billing information.  What does

13   that tell us?  Let's just start with the first

14   Captoes there.

15   A      Okay.

16   Q      If you'll kind of go across there and tell us

17   what we're seeing.

18   A      Okay.  Screen name, Captoes, logged into the

19   AOL service at 12:36 and 45 seconds Eastern Time on

20   July 21st, 2008, and logged out of the service later

21   that afternoon at 15:12 or -- yes, 15:12 and 55

22   seconds Eastern Time.  And that would be

23   approximately three hours later.

24          And session charges are where if, indeed,

25   you're dialing into a toll free number that we're

1      going to charge you a certain amount, in this case

2      it wasn't so we charged him zero.  Any type of

3      credit that we have, you know, applied to the

4      account, it's zero.  That's what that particular

5      from head to toe means in terms of that --

6      Q       What is EDT, is that Eastern --

7      A       Eastern Daylight Time.

8      Q       Okay.  And I guess you -- the way you do dates

9      kind of confuses me a little bit.  08-21-07 is July

10     21, 2008?

11     A       Correct.

12     Q       This is Page 2 of 66.  Okay.  Do you see that,

13     sir?

14     A       Yes, sir, I do.

15     Q       Okay.  I want you to take a look at July --

16     let's just say July 20th, 2008 on Captoes.  Do you

17     see that?

18     A       There's three logins on that particular day.

19     Which one?

20     Q       Okay.  All three of them.

21     A       Okay.

22     Q       Would you please tell me what that tells you

23     about the total time that Captoes was online with

24     AOL on July 20th, 2008.

25     A       Yes.  Well, again, there's three logins on

1       July the 20th, 2008.  The first one starts at 7:48

2       AM, Eastern Daylight Time, and extended all the way

3       until basically 7 o'clock at night, or 19:25 and 33

4       seconds.

5       Q       Let me stop you there, if I could.  So that's

6       14 straight hours or so?

7       A       Yes.  It's a long time.

8       Q       Okay.  And then -- go ahead.  Then what

9       happens?

10      A       Then the logout was at 19:25 and 33 seconds.

11      Then there was another login at 19:25 and 29

12      seconds, literally around the same time, that

13      extended to 19:38, just shortly after that,

14      Eastern Daylight Time.  And then some 13 minutes

15      later, there's a login at 19:50 and 55 seconds and a

16      logout a few hours later at 22:22:08.

17      Q       Let me ask you just a question that occurs to

18      me when I'm looking at this.  How can you log out at

19      19:25 and 33 seconds but log in at 19:25 and 33

20      seconds?

21      A       This is something we've seen as a result of

22      the switch --

23      Q       19:25 and 29 seconds, how can you log back in

24      before you logged out?

25      A       The switch screen name process I was referring

1    to, I can explain that better, if you'd like.

2    Q     Okay.

3    A     On America Online, with different screen

4    names, we have -- when people want to log off, they

5    actually have a choice of doing two things; simply

6    logging off and there's a button at the top of every

7    AOL application called sign off.  When you click

8    sign off, two choices come down, switch screen name

9    or sign off.

10         When you sign off, it logs you off and the

11   application is disconnected.  When you switch screen

12   names, it actually logs you off the screen name and

13   then it presents to you all of your screen names,

14   where you then have to go through the process of

15   selecting the screen name you want, adding the

16   actual password that you want and then clicking log

17   in.

18         And then that process, especially if it's a

19   dial-up process, takes awhile because dial-up speeds

20   are kind of slow, and you're actually going through

21   some encrypting of your password that takes a little

22   time, and then transmitting that through a telephone

23   line ultimately to America Online servers in

24   Virginia.

25         What this is, I would suspect, is exactly a

1    product of Captoes wanting to log off, getting that

2    screen of which screen names to switch to and then

3    simply choosing the same screen name that he logged

4    off on, and having the -- I forget how many seconds,

5    but a number of seconds between the actual logoff of

6    Captoes and the re-login of Captoes some few seconds

7    later.

8    Q      The total, then, on July 20th, as an example,

9    how many hours was Captoes on AOL?

10   A      Oh, wow, 15, 16, 17.

11   Q      Seventeen hours?

12   A      Something long, long.

13   Q      Go down to July 17th, 2008.

14   A      I can't see that on this.  Okay.  Thank you.

15   Q      Can you see that?

16   A      I can.  Thank you.

17   Q      And let me do this for you, too.  I think you

18   need to see both of those; right?

19   A      Yes.

20   Q      Now, tell me how many hours Captoes was online

21   on July 17th, 2008, was online with AOL.

22   A      I'll just estimate, if you give me a moment.

23   Q      Sure.

24   A      I'm assuming you don't want me to include the

25   prior night which started at 7:00 AM all the way

1    till midnight or shortly after.

2    Q     You mean on the 16th?

3    A     Yeah, I'm sorry.  The 16th at 7:00 PM all the

4    way to midnight that starts the 17th.

5    Q     All right.  So he logged off at -- I see what

6    you're saying.  He logged off at 25 minutes after

7    midnight on the 17th?

8    A     Correct.

9    Q     And then he logged back on at 5:00 AM on the

10   17th?

11   A     Correct.

12   Q     Okay.  All right.  Don't include that.

13   A     Okay.  Did you want me to include just Captoes

14   or all of them?

15   Q     Just Captoes.

16   A     Okay.  I don't have a pen so --

17   Q     Just a rough estimate is fine.

18   A     Okay.  Thirteen hours, somewhere around there.

19   Q     Then, sir, on July 21st, 2008, I'll show you

20   this just to show you that there isn't anything

21   before that.

22   A     Okay.  Same question, you want the number of

23   hours?

24   Q     Right.  Approximately how many -- how much

25   time was he on AOL on the 21st of July, 2008?

1    A      On screen name Captoes?

2    Q      Yes, Captoes.

3    A      Six hours.

4    Q      Now, the prosecutor asked you about buddy

5    lists, and this is the beginning of the buddy list.

6    It's alphabetical; correct?

7    A      I believe so.

8    Q      Okay.  And then there's a Page 2 to the buddy

9    list which has these names on it.

10   A      Okay.  It's not alphabetical, though.

11   Q      Right.  Okay.  So those are just Page 2 of the

12   buddy list; correct?

13   A      Correct.

14   Q      And this is Page 3 of the buddy list?

15   A      Correct.

16   Q      If someone had the legal authority to request

17   it from you, how long would it take you to get the

18   addresses, credit card information, telephone

19   numbers, the same thing we saw in the first page

20   here of those people on that buddy list?  Let's say

21   they gave you one of them and said, hey, let's pick

22   one out here, let's say -- well, they like that BDSM

23   guy.  Let me see if we can find him.

24   A      He's at top of that page.

25   Q      Top here somewhere?

1      A      Yes, very first one.

2      Q      This guy.  Okay.  How long would it take you

3      to find out who that is, what his address is, his

4      credit card number, all that stuff?

5      A      To find it or respond to a legal request?

6      Q      Well, let's say someone said, go find it.

7      A      A second, really.  If I could type in the

8      screen name to our search engine, it would present

9      it within seconds after that search.

10     Q      And how long does it take to respond to a

11     request -- let's say ICE gives you a subpoena.  How

12     long does it take you to respond to that subpoena?

13            MS. KAISER:  Objection, relevance.

14            THE COURT:  Overruled.

15            THE WITNESS:  Our turnaround time on legal

16     requests from law enforcement agencies ranges from

17     hours to days, depending on the subpoena, the

18     jurisdiction.  If it's ICE, in your request, your

19     suggestion, it would take probably a matter of hours

20     or a day or two.

21     BY MR. TRAGOS:

22     Q      You respond quickly to ICE?

23     A      No preference on federal or state.  Just

24     states have to go through Loudon County Sheriff's

25     Office, and federal agencies can come straight to

1     AOL.  We don't have any preference based on agency.

2     Q      Now, this, Page 65 of 66, 64 of 66, this is

3     the member profile?

4     A      Correct.

5     Q      Now, are you saying that all of the

6     information on here is inputted by the member?

7     A      No.  Just some of the information is inputted

8     by the member.

9     Q      I thought you said all of the information was.

10    A      No.  The information that's personalized --

11    this is really how the profile actually looks in

12    terms of the code that says, present this, don't

13    present that.  The actual content that's on the

14    other page, that was input by the member.

15    Q      Okay.  So the only part inputted by the member

16    is the "about me" part?

17    A      Correct.

18    Q      Okay.  Let's talk about dial-up.  Ft. Myers,

19    do they have high speed dial-up there?

20    A      I'm sure they do.

21    Q      Okay.  This buddy list information, you're

22    saying that there's a feature where whoever you

23    e-mail or whoever you IM -- by the way, what is an

24    IM?

25    A      Instant message.

1       Q       What is that?

2       A       It's the ability to communicate real time in

3       text boxes on your AOL account with another screen

4       name.

5       Q       Okay.

6       A       You both, sender, receiver, have to be online

7       at the same time to have an instantaneous message

8       exchange.  Therefore, we call it instant message or

9       instant messaging.

10      Q       Okay.  And you're saying that now that what

11      we've got is -- and, again, it all depends on what

12      you select, but you can select a feature that says,

13      my buddy list will automatically contain the names

14      of everybody I e-mail or IM?

15      A       Well, the default setting says to turn on what

16      are called recent buddies when somebody creates an

17      America Online account.  And you actually have to

18      turn that feature off if you don't like it.

19      Q       You also said that at any, I guess, one time,

20      there are like 30,000 chat rooms?

21      A       Within a 24-hour period.

22      Q       Within a 24-hour period.  So at any 24-hour

23      period, you've got about 30,000 chat rooms?

24      A       Correct.

25      Q       And do you ever have law enforcement come to

1    you and say that this chat room is being used for

2    illegal activity, shut it down?

3    A      They have in years past told us about rooms

4    that facilitate illegal activity.  They've never

5    said to shut it down.  There's never been an order

6    to shut it down.

7          But what we simply do is have a process where

8    we investigate this.  And if we find that what

9    they're telling us is, in fact, the reality, we do

10   not only shut the room down, we make it so it's not

11   able to be created.

12   Q      And are you familiar with a chat room called

13   strict parents?

14   A      I'm not familiar with it, but I'm sure it can

15   happen.

16   Q      Okay.  But you're not familiar with that?

17   A      No.  I -- I don't recall having heard of that

18   particular screen name -- or chat room name.

19   Q      Okay.  Have the -- has ICE or their agents in

20   any way communicated with you that they believe that

21   certain chat rooms are being used to facilitate

22   illegal activity?

23   A      ICE?  No, they have not.

24          MR. TRAGOS:  May I have a moment, Your Honor?

25          THE COURT:  Yes, sir.

1            (Brief pause.)

2            MR. TRAGOS:  That's all the questions I have.

3            THE COURT:  Any redirect?

4            MS. KAISER:  Yes, Your Honor.

5                      REDIRECT EXAMINATION

6    BY MS. KAISER:

7    Q      Mr. Colcolough, if a person had a subscription

8    to AOL and decided to log into their AOL account in

9    the morning before going to work, and if they did

10   not sign out before they left for work, would AOL

11   record that time period such as on the detailed

12   billing records that we saw?

13   A      Yes, we would.

14   Q      Okay.  So is it fair to say that records of --

15   in Exhibit 29 that we saw does not necessarily mean

16   that the person is sitting in front of the computer

17   the entire time?

18   A      Oh, that's correct.  We simply regard the

19   account as online.  Back in the mid nineties, we had

20   the ability to log people off for inactivity to kind

21   of facilitate our need for more band width.  But,

22   you know, as of about 2001, we had a very balanced

23   network where a user could log in and stay logged in

24   for days or weeks, if they wanted to.

25            It does not necessarily mean they're in front

1      of the computer typing on the keyboard, moving the

2      mouse.  They're just simply connected.  We don't log

3      people off for inactivity; haven't done so in a

4      decade, really.

5      Q      Would the same be true if someone remotely

6      accessed AOL, say, from their office at work, if

7      they logged into their AOL account and then

8      minimized it and went on to other work, would it

9      still reflect that they're logged into AOL?

10     A      Yes.

11     Q      So do they have to actually be working in AOL

12     for it to record that time period?

13     A      No, no online activity whatsoever.

14     Q      Can they be away from their computer doing

15     other activities?

16     A      Yes.  As a matter of fact, I'm online right

17     now back in my hotel room and at home.

18     Q      Thank you.

19            MS. KAISER:  No further questions.

20            THE COURT:  Thank you, sir.  You may step

21     down.  Please watch your step.

22            Call your next witness, please.

23            MS. KAISER:  The United States calls Brad

24     Carrozza.

25            COURTROOM DEPUTY CLERK:  Raise your right

1    hand.

2         (Witness complied.)

3         COURTROOM DEPUTY CLERK:  Do you swear or

4    affirm the testimony that you give in this case will

5    be the truth, the whole truth and nothing but the

6    truth?

7         THE WITNESS:  I Do.

8         COURTROOM DEPUTY CLERK:  Please be seated.

9         (Witness complied.)

10        COURTROOM DEPUTY CLERK:  Please state your

11   name and spell your last name for the record.

12        THE WITNESS:  Brad Carrozza, C-a-r-r-o-z-z-a.

13                  DIRECT EXAMINATION

14   BY MS. KAISER:

15   Q     Good afternoon.

16   A     Good afternoon.

17   Q     Could you please tell the jury where you work.

18   A     I'm a detective with the Pinellas County

19   Sheriff's Office in Pinellas County, Florida.

20   Q     And how long have you been so employed?

21   A     Approximately four, four and a half years.

22   Q     What is your current position with the

23   Pinellas County Sheriff's Office?

24   A     Currently I'm assigned as a detective with the

25   Crimes Against Children Unit.

1    Q      Did you participate in the search of the

2    defendant, Charles Friedlander's, residence?

3    A      Yes, I did.

4    Q      When did that occur?

5    A      On July 21st, 2008.

6    Q      And could you tell the jury where the search

7    was conducted.

8    A      12040 Mahogany Isle Lane in Ft. Myers.

9    Q      Was anyone at the search site location with

10   you?

11   A      Yes, there was.

12   Q      And who else was there?

13   A      There's three additional agents with Florida

14   Department of Law Enforcement.  They were Special

15   Agent Monk, Special Agent Uebelacker and Special

16   Agent Supervisor Rose.

17   Q      And what duties, if any, did you have for the

18   search of the residence?

19   A      My main assignment was to search the office at

20   the residence.

21   Q      And did you do that?

22   A      Yes, I did.

23   Q      After you searched the residence, did you

24   return items that were found during the search to

25   Pinellas County?

1    A      Yes, I did.  Not only the items I found, but

2    all the items that were obtained during the search

3    warrant.

4          MS. KAISER:  Your Honor, may I approach the

5    witness?

6          THE COURT:  Yes, ma'am.

7    BY MS. KAISER:

8    Q      Detective, I'm handing you what's been marked

9    for identification as Government's Exhibits 41

10   through 53.  And then I'd ask, please, if you could

11   take a look through these and tell me if you

12   recognize those items.

13   A      The first item is a picture that was taken of

14   the desk inside the office that I searched at the

15   residence.

16   Q      Okay.  If you could just generally just look

17   through them briefly first and just tell me if

18   you -- if you recognize those images.

19   A      All these are photographs which were taken on

20   the crime -- at the crime scene of items we observed

21   or items that we took from the residence.

22   Q      Now, when you say crime scene, did you just

23   mean the residence of the defendant?

24   A      Correct.  Yes.

25   Q      All right.  Now, do these pictures,

1    Government's Exhibit 41 through 53, do they fairly

2    and accurately depict the residence on July 21st of

3    2008?

4    A       Yes, they do.

5         MS. KAISER:  Your Honor, at this time I'd move

6    for admission of Government's Exhibits 41 through 53

7    into evidence.

8         THE COURT:  Is there any objection?

9         MR. TRAGOS:  Your Honor, can we have a side

10   bar?

11        THE COURT:  All right.

12        (At side bar, on the record.)

13        MR. TRAGOS:  Your Honor, the reason for the

14   side bar is at the last trial, I believe this

15   witness gave an opinion that a dildo was a used

16   dildo as opposed to a new dildo.  I would object to

17   him being able to give such an opinion as to whether

18   it is or is not used, unless he has some particular

19   experience or expertise.  We have not been given his

20   name as an expert witness, so I don't think he

21   should be allowed to give an opinion about whether a

22   dildo was or wasn't used.

23        THE COURT:  Do you expect to elicit that

24   testimony, Ms. Kaiser?

25        MS. KAISER:  Yes.  But I don't think it's

1    expert testimony.  I'm going to ask him if it

2    appears to be a new -- a new dildo.

3           THE COURT:  And what's his answer going to be?

4           MS. KAISER:  No.  It does not appear to be

5    new, as it is dirty.

6           THE COURT:  How does he know that?

7           MS. KAISER:  He can tell by looking at it.

8           THE COURT:  What, is it shiny versus dull,

9    scratched, not scratched?  Come on.

10          MS. KAISER:  It's -- he can tell by looking at

11   it that it's not in new condition.  It's not like in

12   a package that it would come in and it's obviously

13   not brand new.

14          THE COURT:  Well, obviously is a relative

15   term.  What does that mean?  What does he base that

16   opinion on?  Let's send the jury out.  Let's let him

17   do it in front of me; all right?

18          MS. KAISER:  Okay.

19          (End of side bar discussion.)

20          THE COURT:  We're going to take a short

21   comfort break, members of the jury.  Let me take up

22   a matter that might take more than a couple minutes.

23   You'll be more comfortable in the jury room.  Thank

24   you.

25          COURTROOM SECURITY OFFICER:  Rise for the

1      jury.

2              (Jury out at 2:32 PM.)

3              THE COURT:  All right.  Ms. Kaiser, let's get

4      right to the heart of the matter.  What's the

5      exhibit number?

6              MS. KAISER:  Your Honor, Mr. Tragos misspoke.

7      This isn't the correct witness.  It's the next

8      witness, Mr. Monk, who -- who talked about --

9              THE COURT:  Then why are we doing this?

10             MR. TRAGOS:  Because, Your Honor, I don't know

11     who she's going to ask.

12             THE COURT:  You're not going to ask this

13     witness?

14             MS. KAISER:  No, Your Honor.

15             MR. TRAGOS:  She's going to ask the next

16     witness.

17             THE COURT:  All right.  Then before that

18     question is asked, proffer to me outside the

19     presence of the jury.  It's 2:32.  Take 10

20     minutes -- 12 minutes, excuse me.  We'll take a

21     12-minute comfort break, Mr. Witness.

22             THE WITNESS:  Thank you.

23             (Recess was taken at 2:33 until 2:47 PM.)

24             (Back on the record.)

25             COURTROOM SECURITY OFFICER:  All rise.

1          THE COURT:  All right.  Bring the jury in,

2     please.

3          COURTROOM DEPUTY CLERK:  We're missing one.

4          THE COURT:  Oh, we are.

5          MR. TRAGOS:  Your Honor, today at 4 o'clock

6     when the court breaks, if the court has time, there

7     is a matter that might be lengthy that I'd like to

8     take up with the court.

9          THE COURT:  I have a hearing I've got

10     scheduled at 4:00.  If we have time, we can do it

11     after that.

12          COURTROOM SECURITY OFFICER:  Rise for the

13     jury.

14          (Jury in at 2:48 PM.)

15          THE COURT:  Thank you, and be seated.  You may

16     resume -- well, we have Exhibits 41 through 53.  Any

17     objections, Mr. Tragos?

18          MR. TRAGOS:  No, Your Honor.

19          THE COURT:  All right.  Exhibits 41 through 53

20     are now received.  Ms. Kaiser?

21          MS. KAISER:  Thank you.

22     (Whereupon, Government's Exhibit Numbers 41 through

23     53 are received into evidence.)

24     BY MS. KAISER:

25     Q     All right.  I'm putting on the overhead

1    Government's Exhibit 41.  Can you tell the jury what

2    we're looking at here.

3    A      This is inside the defendant's residence,

4    inside the office at his desk.

5    Q      And what were you assigned to search during

6    the search of the residence?

7    A      My assignment was this room where the picture

8    was taken.

9    Q      Government's Exhibit 42, what is that?

10   A      This is an Office Depot notepad.  It was found

11   during my search of the office.  It was on the desk

12   that you just saw just slightly north of the laptop

13   computer which was on the desk.  On the pad are

14   several names, screen names and phone numbers.

15          Approximately halfway down the pad is the name

16   -- the screen name StricDad7, along with the name

17   Michael and a phone number, which were the

18   identities that Corporal Romanosky was using during

19   his investigation.

20          THE COURT:  Hold it up above the lamp, just

21   move it around till you get a shadow.

22   BY MS. KAISER:

23   Q      Can you point to the list and where you see

24   Corporal Romanosky's undercover profile.

25   A      Again, it's approximately halfway down.  Right

1    above the red marks where it says StricDad7, then

2    Michael, then the phone number and Florida, it says.

3    Oops.

4    Q      Government's Exhibit 43, that's what?

5    A      This is a photo that was taken also in the

6    office of Mr. Friedlander.  It's a Gateway computer

7    tower that was found below the desk that we

8    previously saw a picture of.

9    Q      And Government's Exhibit 44?

10   A      This is the rear -- this is a picture of the

11   rear of the same tower showing the serial number of

12   the tower.

13   Q      And Government's Exhibit 45?

14   A      This is a photograph of a Levitra packaging

15   that was located inside the suspect's residence.

16   Q      Government's Exhibit 46, can you tell us what

17   that is?

18   A      This is another photograph of the Levitra

19   packaging.  This time it's open, and it shows that

20   one pill is missing out of the packaging.

21   Q      Government's Exhibit 47, what is that?

22   A      This a photograph of two devices commonly

23   referred to as a penis pump that was located inside

24   the suspect's office, the room that I searched.

25   Q      Government's Exhibit 48?

1     A      Another photograph of the -- several pieces

2     that were found that assembled to be a device that's

3     commonly referred as to a penis pump.

4     Q      Did you seize the penis pumps as evidence?

5     A      No, I did not.

6     Q      And why not?

7     A      Because they were not listed on the terms of

8     the search warrant.

9     Q      How about the Levitra, did you seize the

10    Levitra?

11    A      No, we did not.  Again, it was because it did

12    not meet the terms of the search warrant.

13    Q      Exhibit 49, is that just another picture?

14    A      Yes, it is, depicting the penis pumps.  Yes.

15    Q      All right.  Putting on the overhead

16    Government's Exhibit Number 50.  Tell us what we're

17    looking at here.

18    A      This item was a photograph of a white suitcase

19    that was located in a closest of the suspect's

20    residence.  This item was found by, I believe,

21    Special Agent Monk.

22           Upon opening these -- the suitcase, we found

23    multiple leather style whips, belts, devices

24    commonly referred to as a dildo, a device commonly

25    referred to as an anal or butt plug.  I believe

1    there are also handcuffs in there that aren't

2    depicted in that image.

3    Q      And Government's Exhibit 51, what's in that

4    picture?

5    A      These are some of the items removed from that

6    suitcase.   Again, it's showing leather type whips.

7    This picture does depict the handcuffs in the

8    left-hand side, the anal or butt plug, some sort of

9    chain in the upper part of the picture, just

10   multiple items that would depict sadomasochistic

11   type sexual toys.

12   Q      Government's Exhibit 52?

13   A      Another photograph of a different angle of the

14   items that were located in the piece of luggage.

15   Q      And can you point to the handcuffs that are

16   depicted in the image.

17   A      Right there.

18   Q      And Government's Exhibit 53, what is that?

19   A      Another item that's commonly referred to as a

20   dildo that was found in the suspect's luggage.

21        MS. KAISER:   Your Honor, may I approach the

22   witness?

23        THE COURT:   Yes, ma'am.

24   BY MS. KAISER:

25   Q      Detective, I'm showing you what's been marked

1    for identification as Government's Exhibit 54.  Do

2    you recognize that item?

3    A     Yes, I do.  It appears to be the computer

4    tower which was found underneath the suspect's desk

5    that we previously saw a photograph of.

6    Q     And did you seize this item during the search

7    of the defendant's residence?

8    A     Yes, I did.

9    Q     How do you know that this is the same computer

10   that you seized?

11   A     If I can refer to my report, I copied down the

12   serial number.  I can compare it to that serial

13   number.

14   Q     Yes, that's fine.

15   A     The serial numbers match the one I took that

16   evening to this computer.

17   Q     Okay.  Once you took this computer out of the

18   defendant's residence, what did you do with it?

19   A     I placed the computer in my department-issued

20   vehicle at that time.  After I collected all items

21   that were seized that evening, I drove directly to

22   Pinellas County where I placed the items into the

23   Pinellas County Sheriff's Office property and

24   evidence section.

25   Q     Next I'm showing you what's been marked for

1    identification as Government's Exhibit 55.  Do you

2    recognize that item?

3    A      Yes, I do.  It's the Dell laptop that was

4    found on top of the defendant's desk.

5    Q      How do you know that that's the same laptop

6    that was found on the defendant's desk?

7    A      Again, I -- on scene, I wrote down the serial

8    number and placed it into my report.  The serial

9    number on the laptop and the serial number I

10   observed on scene are a match.

11   Q      Detective, I'm showing you what's been marked

12   for identification as Government's Exhibit 56.  Do

13   you recognize that item?

14   A      Yes.  This is the Office Depot notepad that we

15   previously saw a photograph of that depicts

16   Corporal Romanosky's undercover information.

17   Q      And where was this item found in the

18   residence?

19   A      This was found on top of his desk just north

20   of where the laptop computer was found.

21   Q      And I'm showing you what's marked as

22   Government's Exhibit 56A, and ask you to take a look

23   at that.

24   A      This is what's called the home phone pad.

25   This item was found also inside the defendant's

1    office, partially underneath the laptop computer.

2         MS. KAISER:  Your Honor, at this time I'd move

3    for admission of Government's Exhibit 56 and 56A

4    into evidence.

5         THE COURT:  Any objection?

6         MR. TRAGOS:  May I have a moment, Your Honor.

7         (Brief pause.)

8         MR. TRAGOS:  No objection.

9         THE COURT:  56 and 56A are now received.

10   (Whereupon, Government's Exhibit Numbers 56 and 56A

11    are received into evidence.)

12        MS. KAISER:  Your Honor, at this time I

13    request permission to publish to the jury.

14        THE COURT:  Yes, ma'am.

15   BY MS. KAISER:

16   Q     All right.  Is this the actual -- this is the

17   actual tablet that you found in the residence; is

18   that correct?

19   A     Correct.

20   Q     And that's the one we saw the picture of

21   earlier?

22   A     Yes.

23   Q     All right.  And this message, which is

24   admitted as Government's Exhibit 56A, why was this

25   seized?

1    A      While examining the phonebook, I found this

2    handwritten note inside the book.  It gives

3    directions and the name of the Cracker Barrel where

4    the scheduled meet with Corporal Romanosky was --

5    was scheduled to meet him.

6         MS. KAISER:  Your Honor, may I have a moment?

7         THE COURT:  Yes, ma'am.

8         (Brief pause.)

9    BY MS. KAISER:

10   Q      Detective, I'm showing you what's been

11   admitted, I believe, as Defense Exhibit 64, 1 and 2.

12   Do you recognize these Polaroid pictures?

13   A      Yes, I do.  These Polaroid pictures were found

14   in the suspect's office inside a -- the desk had two

15   center drawers, the northern most drawer of the

16   center -- two center drawers.

17   Q      And who found these pictures?

18   A      I did.

19   Q      Did you ever identify who was depicted in the

20   pictures?

21   A      No.  We were unable to ever do so.  Let me add

22   to that, that I'm aware of.

23   Q      Thank you.

24        MS. KAISER:  I have no further questions.

25        THE COURT:  Cross-examination.

1          MR. TRAGOS:  May we have a moment to consult

2     with the prosecutor?

3          THE COURT:  All right.

4     (Brief pause.)

5                    CROSS-EXAMINATION

6     BY MR. TRAGOS:

7     Q     Detective, I ask you to take a look at Exhibit

8     9, Defense Exhibit 9A through M, and ask if you

9     would look through those, please.

10    A     Okay.

11    Q     Sir, do you recognize those photographs as

12    being depictions of the interior of Charles Jackson

13    Friedlander's home?

14    A     Yes, I do.

15    Q     Okay.  As it appeared on the day of the

16    search?

17    A     Yes correct.

18         MR. TRAGOS:  Your Honor, at this time the

19    defendant would move into evidence Defense Exhibit

20    9A through M.

21         MS. KAISER:  No objection, Your Honor.

22         THE COURT:  Defendant's Exhibit 9A through M

23    is received.

24    (Whereupon, Defense Exhibit Number 9A through M is

25     received into evidence.)

1    BY MR. TRAGOS:

2    Q       Is this a depiction of the kitchen at the

3    home?

4    A       Yes, it is.

5    Q       If you can see it well enough to tell me if

6    that's the living room area?

7    A       It's a little fuzzy but, yes, I can make out

8    that it was the living room area.

9    Q       The dining room area?

10   A       Yes, correct.

11   Q       Where was this?

12   A       This was another room in the residence.  I

13   believe it was on the west side of the residence.  I

14   could not tell you for sure.  I'd have to talk to

15   one of the FDLE agents who actually took the

16   photograph.

17   Q       Do you recognize that?

18   A       Yes.  It's a bedroom in the residence.

19   Q       Do you recognize that?

20   A       Yes.  It's an entryway to a bedroom in the

21   residence.  I believe -- it's not a great photo, but

22   I believe that is what I considered to be the master

23   bedroom of the residence.

24   Q       Okay.  Was that an area that you were near

25   when you were doing your searches?

1    A      The office is near that area, so I was in that

2    vicinity during the search.

3    Q      On top of this -- I don't know if you can see

4    it, but right on top there, do you see, it looks

5    like it might be a camera?  Was there a camera

6    seized?

7    A      Yes, there was.

8    Q      Do you see that, sir?

9    A      Yes, I do.

10   Q      Do you see all these shoes?

11   A      Yes, I do.

12   Q      Okay.  And was -- where was this located?

13   A      This was one of the closets of the residence.

14   I believe this was a depiction of the -- what I

15   consider to be the master closet.  Without a full

16   scale picture, I would not be able to definitely

17   say.

18   Q      And do you recognize that, sir?

19   A      Yes.  It's another closet inside the

20   residence.

21   Q      Do you recognize this?

22   A      Yes.  This is the office that I was

23   responsible for searching.

24   Q      And do you recognize that?

25   A      Yes.  This is the photo of the east wall of

1      the office.

2      Q      It looks like the credenza for that desk?

3      A      Correct.

4      Q      Now, sir, in your -- I guess your

5      responsibility with regards to this -- to this

6      search, were you responsible for gathering the

7      evidence?

8      A      My initial responsibility was to search the

9      office.  Once I searched the office, all the items

10     that I found, I handed over to FDLE.  The reason for

11     this was this house was in Ft. Myers, outside of my

12     jurisdiction; therefore, FDLE had to be the lead

13     officers on the search warrant.

14            So after all items were handed over to FDLE,

15     they conducted an inventory of all items collected,

16     had me sign off on all items collected.  And then

17     all items were placed into my vehicle and

18     transported to Pinellas County.

19     Q      Okay.  Was there a media card seized?

20     A      Yes, there was, a Fuji film, I believe.

21     Q      Explain what a media card is.

22     A      It's a card that most often is found in

23     digital cameras.  It's the card that holds the

24     pictures.  They also can be found in a variety of

25     other places, but the most common place that they're

1        found is digital cameras.

2        Q       Was it removed from a digital camera in that

3        residence?

4        A       I believe so.  It wasn't myself that collected

5        it, so I cannot state that for a fact.

6        Q       Okay.  When you received it, did you not get

7        an FDLE receipt form?

8        A       Yes, I did.

9        Q       Do you have that with you?

10       A       I do.

11       Q       Okay.  Would you please check that form with

12       regards to the location of the camera that the

13       digital media card came from.

14       A       Okay.  From this receipt form, it shows that

15       the media card was taken from the master bedroom

16       from a camera found on the bed post.

17       Q       And media cards, they hold pictures on them;

18       right?

19       A       Data, digital data.

20       Q       Well, on a camera, would we assume that

21       they're pictures?

22       A       Correct.

23       Q       And there were other media retention devices

24       seized, as well, besides the computers; correct?

25       A       Yes.

1    Q       And there were some CDs seized?

2    A       Correct.

3    Q       One entitled Harry Connick, Jr.?

4    A       Correct.

5    Q       One entitled Napster Music?

6    A       Correct.

7    Q       I guess one entitled Imation?

8    A       Correct.  That was the brand of the CD.  There

9    was no additional writing on it.

10   Q       Okay.  And another one called Photowise was

11   seized?

12   A       Correct.

13   Q       Another CD called Corel 8 was seized?

14   A       Yes.

15   Q       Another CDR called prof copy backup?

16   A       Correct.

17   Q       An Apatec camera?

18   A       Correct.

19   Q       A purple floppy disc that says AOL organizer

20   folders?

21   A       An AOL ORG folder.  Correct.

22   Q       ORG folder.  Okay.  Then there was a Sony CD

23   case seized; correct?

24   A       Correct, with two DVRs -- DVDRs inside.

25   Q       Now, the white case that you mentioned that

1    you opened, were you part of the opening process?

2    A       No, I was not.  I was informed of the case

3    after it had been opened.

4    Q       Okay.  You also seized Government's Exhibit 56

5    here; correct?

6    A       Correct.

7    Q       Okay.  Do you know if anyone checked to see if

8    any of these people were children?

9    A       I do not know.  Again, that was not my duty or

10   responsibility at the time, so I could not confirm

11   or deny.

12   Q       Did you see a room in the house that was

13   specifically designated and designed for torture or

14   whipping or anything like that?

15   A       No.  I did not observe a room, just the

16   suitcase.

17   Q       Right.  But no room designed for that?

18   A       No, sir.

19   Q       You've seen such rooms; haven't you?

20   A       Personally, never in person, but I have seen

21   photographs of rooms that are designed for torture

22   purposes.

23   Q       The prosecutor may have asked you this, but

24   she showed you a picture of, I think you described

25   it as, a penis pump?

1    A      Correct.

2    Q      Okay.  And is that also known as a vacuum

3    erection device?

4    A      It could be, yes.

5    Q      Okay.  And you found that at the house?

6    A      Correct.  Inside his office; two, to be exact.

7    Q      Was the packaging open?

8    A      The -- I do not believe I opened any packaging

9    to get inside to the pump itself.

10   Q      So the pump, was the pump wrapped in plastic?

11   Was it open or --

12   A      Yes.  I believe that there was some wrapping.

13   I can't say for sure.  I didn't state that in my

14   report, and I don't recall that at the moment.

15   Q      You don't recall if the original wrapping was

16   around the pump?

17   A      I don't -- I don't recall opening any new

18   packaging.

19   Q      In all the discs you seized, all the computers

20   you seized, all the media you seized, after it was

21   analyzed, do you know if anybody found any child

22   pornography in any of that stuff?

23   A      Once I collected it and transported it to the

24   property and evidence section, I have no further

25   knowledge of anything that happened with the digital

1    media at that point.

2         MR. TRAGOS:  Okay.  That's all the questions I

3    have.

4         THE COURT:  Any redirect?

5         MS. KAISER:  No, Your Honor.

6         THE COURT:  Thank you, sir.  You may step

7    down.  Please watch your step.

8         Call your next witness, please.

9         MS. KAISER:  United States calls Special Agent

10   Gregory Monk.

11        COURTROOM DEPUTY CLERK:  Raise your right

12   hand.

13        (Witness complied.)

14        COURTROOM DEPUTY CLERK:  Do you swear or

15   affirm the testimony that you give in this case will

16   be the truth, the whole truth and nothing but the

17   truth?

18        THE WITNESS:  I do.

19        COURTROOM DEPUTY CLERK:  Please be seated.

20        (Witness complied.)

21        COURTROOM DEPUTY CLERK:  Please state your

22   name and spell your last name for the record.

23        THE WITNESS:  Greg Monk, M-o-n-k.

24        COURTROOM DEPUTY CLERK:  Thank you.

25                         DIRECT EXAMINATION

1    BY MS. KAISER:

2    Q      Good afternoon.

3    A      Good afternoon.

4    Q      Can you please tell the jury where you work.

5    A      I work at the Florida Department of Law

6    Enforcement, Ft. Myers.

7    Q      And what is your position with the Florida

8    Department --

9    A      I'm a special agent.

10   Q      How long have you been so employed?

11   A      I've been with the agency for -- since August

12   2004.  I've been a special agent since January '07.

13   Q      Where is your office located?

14   A      It's located at 4700 Terminal Drive in

15   Ft. Myers.

16   Q      Did you have an occasion to participate in the

17   search of the residence of Charles Friedlander in

18   Ft. Myers?

19   A      Yes, ma'am.

20   Q      When did that take place?

21   A      That took place on July 21st, 2008.

22   Q      And what were your responsibilities during the

23   search of the defendant's residence?

24   A      I assisted with entry into the residence and

25   the location and seizure of evidence.

1    Q      And specifically what were you asked to --

2    what were you tasked to do?

3    A      I was tasked to go through the residence and

4    locate potential evidence pursuant to the search

5    warrant.

6    Q      And did you find any items that were within

7    the search warrant?

8    A      I did.

9           MS. KAISER:  Your Honor, may I approach the

10    witness?

11          THE COURT:  Yes, ma'am.

12    BY MS. KAISER:

13    Q      Special Agent Monk, I'm showing you what's

14    been marked for identification as Government's

15    Exhibit 57.  Do you recognize this item?

16    A      I do.

17    Q      And what is this item?

18    A      It is a -- it appears to be a white suitcase

19    or some other type of container.

20    Q      And where was this item located?

21    A      It was located in what would be the master

22    bedroom closet of the residence.

23    Q      And who found this?

24    A      I did, ma'am.

25          MS. KAISER:  Your Honor, at this time I'd move

1      for admission of Government's Exhibit 57 into

2      evidence.

3              MR. TRAGOS:  No objection.

4              THE COURT:  57 is received.

5      (Whereupon, Government's Exhibit Number 57 is

6      received into evidence.)

7      BY MS. KAISER:

8      Q      Was there anything inside Government's Exhibit

9      57 which we just -- I just showed you?

10     A      Yes, ma'am.

11     Q      What was inside of there?

12     A      Various sex toys, dildos, leather strap

13     devices.

14     Q      Agent Monk, I'm showing you what's been marked

15     for identification as collective Government's

16     Exhibit Number 58.  Do you recognize these items?

17     A      I do.

18     Q      How do you recognize them?

19     A      These items are consistent with the items that

20     were in that previous exhibit you showed me.

21             MS. KAISER:  Your Honor, at this time I'd move

22     for admission of Government's Exhibit 58 into

23     evidence.

24             THE COURT:  Is there any objection?

25             MR. TRAGOS:  Yes, Your Honor.  May I have a

1       moment?

2              THE COURT:  Yes, sir.

3              (Brief pause.)

4              MR. TRAGOS:  I do have an objection.  Can we

5       have a side bar?

6              THE COURT:  Yes, sir.

7              (At side bar, on the record.)

8              MR. TRAGOS:  There is -- they all have these

9       evidence tags on them which show the crimes

10      arrested, show the name, basically give a lot of

11      information that is above and beyond the exhibit

12      that I don't think the jury should see and that the

13      jury could be prejudiced by seeing those tags.

14             THE COURT:  Are the offenses identified

15      different from that of which the defendant is

16      charged?

17             MR. TRAGOS:  I'd have to take a closer look.

18             THE COURT:  Are they state law offenses?

19             MR. TRAGOS:  I think they are state tags, so

20      my guess is they're state.

21             THE COURT:  Ms. Kaiser?

22             MS. KAISER:  Yes, Your Honor.  We had the same

23      objection last time and the court allowed it with

24      some foundation.  We were able to peel off two of

25      the labels.  There's one that's remaining.  We got

1    about half of it off.  I think it says his name and

2    it says travelling to meet a minor as the offense.

3    We could open the bag and put it into a different

4    bag before it goes to the jury, if the defense is

5    concerned.

6         THE COURT:  The tags -- I'm sorry.  The tag is

7    on the bag itself, then, as opposed to individual

8    items?

9         MS. KAISER:  Yes, Your Honor.

10        MR. TRAGOS:  I haven't looked at the items, I

11   haven't looked inside, but I know there's tags on

12   the outside.

13        THE COURT:  I don't see any prejudice to the

14   defendant.  The jury understands what occurred here.

15   There's already been explanation that he was

16   originally investigated for a violation of state law

17   and it was turned over to the federal government.

18        So have the witness explain these exhibit

19   tags.  And I will, if necessary, instruct the jury

20   they are to disregard -- well, not disregard, but

21   that the defendant is on trial only for the specific

22   offense charged in the indictment.  And that should

23   address any concern about any other pieces.

24        Any objection to that suggestion, Mr. Tragos?

25        MR. TRAGOS:  No, Your Honor.  As long as we're

1     up here, -- I would ask the court to make an

2     explanation, too.  But as long as we're up here, do

3     you want to talk about the dildo question, about the

4     used dildo?

5            THE COURT:  Not really.  You asked me.

6            MR. TRAGOS:  Well, I would say if she's going

7     to ask that question, as long as we're up here --

8            THE COURT:  All right.  When you get to that

9     point, Ms. Kaiser, if you feel it necessary to ask

10    that question --

11           MS. KAISER:  Yes, Your Honor.

12           THE COURT:  -- alert the court, and we'll have

13    the jury excuse themselves for a few moments so we

14    can go through the proffer.

15           MS. KAISER:  Your Honor, it's going to be like

16    in a minute or less.

17           THE COURT:  And are you confident that he is

18    going to be able to testify in an admissible

19    fashion?

20           MS. KAISER:  I think what I asked him the last

21    time was does this appear to be in new condition or

22    in old condition.

23           MR. TRAGOS:  I think you said used.  My

24    objection is that --

25           THE COURT:  I understand your objection.  I

 1    have the same concern.  But we didn't have this

 2    problem the last trial, I don't think.

 3         MR. TRAGOS:  Well, because it just came out

 4    now.

 5         THE COURT:  Well, lots of things have come

 6    out.

 7         MR. TRAGOS:  I know.  But I know in advance

 8    now.  The jury doesn't need him to give an opinion

 9    about the condition of a dildo.  They can look at it

10    the same as he can look at it.

11         THE COURT:  That's a pretty good point,

12    Ms. Kaiser.  If you want to proffer, I'll be happy

13    to do it now.

14         MS. KAISER:  Okay.

15         THE COURT:  DO you want to do it?

16         MS. KAISER:  Yes, Your Honor.

17         (End of side bar discussion.)

18         THE COURT:  We have to take up a brief

19    evidentiary matter that I thought we were going to

20    do at the last break, but we had the wrong witness.

21    I apologize.  Innocent oversight.  So let me ask you

22    to step into the jury room for just a few moments

23    while we take up a matter outside your hearing.

24         COURTROOM SECURITY OFFICER:  Rise for the

25    jury.

1              (Jury out at 3:29 PM.)

2              THE COURT:  That's fine.  That's fine,

3    Mr. McNeil.  That's fine.  All right.  Have a seat.

4    The jury is excused.  Brief proffer on what exhibit?

5              MS. KAISER:  Government's Exhibit 58.

6              THE COURT:  58, which is, Mr. Witness, for the

7    record?

8              THE WITNESS:  Excuse me, Your Honor.  I

9    believe 58 is the actual items.  58 is the items

10   from the suitcase, Your Honor.

11             THE COURT:  Well, I know that.  But is there a

12   specific number for the dildo, Ms. Kaiser?

13             MS. KAISER:  No, Your Honor.  It's within the

14   Collective Exhibit 58.

15             THE COURT:  All right.  Well, go ahead.  Let's

16   do this proffer while the jury is out, please.

17   BY MS. KAISER:

18   Q      Mr. Monk, could you take a look at

19   Government's Exhibit 58, and tell the jury whether

20   or not the dildo appears to be in new condition.

21   A      To me it does not appear to be in new

22   condition, no.

23   Q      And on what do you base that?

24   A      I base that on the dirt on the items.

25   Q      Okay.

1     A       Dirt and markings.

2             THE COURT:  Cross?

3             MR. TRAGOS:  No, Your Honor.

4             THE COURT:  I assume that concludes your

5     proffer, Ms. Kaiser?

6             MS. KAISER:  Yes, Your Honor.

7             THE COURT:  All right.

8             MR. TRAGOS:  I don't have any cross on that

9     issue.  I just would have some argument for the

10    court on the issue.

11            THE COURT:  Well, would you describe to me,

12    Mr. Monk, or Agent Monk, when you say markings, what

13    are you describing?

14            THE WITNESS:  Specifically, it looks like

15    there's discoloration markings.  It's actually a

16    little bit hard to describe, but black, almost like

17    between dirt and some other substance that's been on

18    it.

19            THE COURT:  How would you describe for me what

20    a new dildo of that nature would appear to be?

21            THE WITNESS:  I would -- I'd surmise it would

22    be cleaner.

23            THE COURT:  I mean -- I'm sorry, but I don't

24    know where we're going with this.  It's dirty.  Is

25    it scuffed up or something --

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  -- like it's been mishandled, is

 3      that what you're saying?

 4              THE WITNESS:  Yes, sir.  It appears to be

 5      scuffed up, Your Honor.

 6              THE COURT:  Can you relate those marks in any

 7      way to the use of the dildo in some form of sexual

 8      activity?

 9              THE WITNESS:  No, sir.

10              THE COURT:  Ms. Kaiser?

11              MS. KAISER:  Your Honor, the question is not

12      whether or not this witness thinks that it was used

13      in sexual activity.  The question is does it appear

14      in new condition.

15              THE COURT:  Okay.  So what's the relevance of

16      whether it's new or used -- or old, I should say,

17      new or old, not used?

18              MS. KAISER:  Because in the defendant's

19      interview, he said to Corporal Romanosky during the

20      interview that he had this dildo for his lady friend

21      but it was new and it had never been used.  And it's

22      a false state attributable to the defendant.

23              THE COURT:  Well, this witness can't tell us

24      whether it's been used or not.  He can simply say

25      it's dirty and it's marked up, doesn't appear to be

1    new.

2         MS. KAISER:  Exactly.  And so the question --

3    he was not going to be asked whether or not it had

4    been used in sexual activity.  The question was

5    going to be, does it appear new.  And he would say,

6    no, it does not appear to be new.

7         THE COURT:  Well, where we started was the

8    concern that he was going to testify that it

9    appeared to be used as opposed to new.  So what

10   you're now proffering is that he would testify that

11   it does not appear to be new to him because it has

12   marks that he's just described.

13        MS. KAISER:  Correct.

14        THE COURT:  And not in any way, shape or form

15   suggesting that it's been used in any type of sexual

16   activity.

17        MS. KAISER:  Correct.

18        THE COURT:  Mr. Tragos?

19        MR. TRAGOS:  Your Honor, number one, it's an

20   opinion.  And it's -- if he's going to give an

21   opinion, it's got to be a situation where he has

22   either some special expertise or something beyond

23   what an average juror would have.

24        What he's describing, I don't see how a juror

25   couldn't see the same things.  There's no

1       specialized knowledge.  There's nothing unique about

2       seeing dirt or marks on -- on my shoes that --

3       nobody would have to come in and have an expert to

4       say, in my opinion, these shoes are not new.

5               THE COURT:  Well, this is not an item, at

6       least from my perspective, and I certainly can be

7       shown to be wrong, Mr. Tragos, if I am wrong, that

8       we can presume every juror on this panel is familiar

9       with.

10              MR. TRAGOS:  Your Honor, let me --

11              THE COURT:  This witness may very well have a

12      background based on his employment.  I don't know.

13      That hasn't been asked yet.

14              MR. TRAGOS:  Well, how many new dildos have

15      you seen?

16              THE COURT:  You're asking the witness;

17      correct?

18              MR. TRAGOS:  Yes.

19              THE COURT:  Thank you.

20              MR. TRAGOS:  How many new dildos -- I'm not

21      asking you, Your Honor, I'm asking the witness.

22                       CROSS-EXAMINATION

23      BY MR. TRAGOS:

24      Q       How many new dildos have you seen?

25      A       I couldn't put a specific number on that, sir.

1       I've seen them.

2            THE COURT:   In your training, do you -- in

3       your training -- a little different -- in your

4       training do -- do you examine and do you become

5       familiar with sex toys like this?

6            THE WITNESS:   I've worked cases before, sir,

7       with sex toys where they have been seized from a

8       search warrant.   Yes, sir.

9            THE COURT:   Can you tell us what the material

10      is?   Is it a rubberized type material, is it

11      plastic?

12           THE WITNESS:   Sir, there's three items in

13      here.

14           THE COURT:   Well, specifically the dildo, or

15      dildos.

16           THE WITNESS:   They appear to me to be some

17      sort of rubber.

18           THE COURT:   A more pliable material than, say,

19      hard plastic?   I assume that, based on your

20      description of the markings.

21           THE WITNESS:   Yes, Your Honor.

22           THE COURT:   All right.   Do you acknowledge,

23      Mr. Tragos, that Mr. Friedlander in his interview

24      referenced the dildo as being new and had never been

25      used by his female friend?

1          MR. TRAGOS:  I've got to be honest, I don't

2     remember the "new".  I do remember that he did say

3     that it's never been used.  I could be wrong on the

4     "new".  And we do have a transcript of it.

5          THE COURT:  I can understand if you missed

6     that.  But let's ask the agent, maybe he can help us

7     out.  Do you have a transcript?

8          MR. TRAGOS:  We do have a transcript of it.

9     But, again, Your Honor --

10         THE COURT:  I don't even know what the

11    relevance of all this is.  If his girlfriend used it

12    or didn't use it, what's the point, Ms. Kaiser?

13    This has to do with children and whether he had an

14    intent to solicit children.  This thing was back at

15    his house.

16         MS. KAISER:  It impeaches his statement.  It's

17    a false statement that he made to a law enforcement

18    officer during his interview.

19         THE COURT:  All right.  Read to me the

20    statement, then.  And I'm not disagreeing with you,

21    but I don't recall a reference to it being new.  How

22    many dildos were found, Agent Monk?  I know there's

23    been a reference to more than one, but I didn't know

24    the specific number.

25         THE WITNESS:  Sir, with -- with this bag,

1    there are two that I would clearly identify as

2    dildos and a third item which probably is not, Your

3    Honor.

4         (Brief pause.)

5         THE COURT:  All right.  You know, I'm just

6    going to put this all to a merciful end.  We're not

7    going to go down this road.  He can describe what

8    he's described to me, the markings, the

9    discoloration.  But he will not be asked whether

10   it's new.  He will not be asked whether it's used.

11        If the government is correct that

12   Mr. Friedlander says it was new, and they believe

13   that the description based on a 701 opinion of Agent

14   Monk shows that statement to have been false, so be

15   it.  It's collateral.  It's not relevant to these

16   proceedings, as far as I'm concerned.  So we're not

17   going to go down that road.  We're spending a lot of

18   time on something that has nothing to do with the

19   charges in the indictment.

20        Are we ready to proceed?  The objection is

21   sustained, in other words.  So in other words, Agent

22   Monk, your testimony is limited to however you

23   perceive these instruments or toys to be.  And under

24   Rule 701, this is proper opinion testimony by a lay

25   witness as to his perception which may assist the

1        jury in understanding the witness's testimony, and

2        it certainly is not based on scientific, technical

3        or other specialized knowledge.

4              Bring the jury in, please.  What's your

5        lengthy proceeding you want to engage, Mr. Tragos?

6              MR. TRAGOS:  Your Honor, I'm going to discuss

7        with the court Dr. Berlin's testimony being expanded

8        because of the questions that were asked to Agent

9        Romanosky about his opinion of sadomasochism, and

10       that that opinion made it a crime, lewd and

11       lascivious under state statute.

12             THE COURT:  No.  You can proffer it, but he's

13       going to be restricted to the opinions that I have

14       already ruled are relevant in this case.  We're not

15       going to have a medical expert start opining about

16       Florida law and whether something's in violation of

17       Florida law.

18             COURTROOM SECURITY OFFICER:  Rise for the

19       jury.

20             THE COURT:  Thank you.  Please be seated.  I

21       apologize for that delay.  But I know that you

22       understand there will be times in any trial when the

23       lawyers and the court might -- are called upon to

24       address certain evidentiary matters outside of your

25       presence.

1          So please bear with us.  We are ready to

2     proceed.  Ms. Kaiser?

3          MS. KAISER:  Thank you, Your Honor.  Your

4     Honor, at this time I'd move for admission of

5     Government's Exhibit 58 into evidence.

6          THE COURT:  58.  Is there any objection?

7          MR. TRAGOS:  Same ones we articulated at side

8     bar, Your Honor.

9          THE COURT:  Exhibit 58 is received.

10    (Whereupon, Government's Exhibit Number 58 is

11     received into evidence.)

12          MS. KAISER:  Your Honor, at this time may I

13     publish them to the jury?

14          THE COURT:  Yes, ma'am.  How do you intend to

15     do that?

16          MS. KAISER:  Open the bags and walk them over

17     to the jury box so they can see them.

18          THE COURT:  All right.

19                    REDIRECT EXAMINATION

20    BY MS. KAISER:

21    Q      Agent Monk, before I do that, can you please

22    describe the items in the bag closest to you?

23    A      With respect to this bag, I -- I see two sex

24    toys which I would call dildos, a third which is

25    also a phallic shape, and a pair of handcuffs, as

1    well as I'm not quite sure what this -- it appears

2    to be some electronic device.

3         MR. TRAGOS:  Excuse me, Your Honor, but I

4    believe the packaging was going to be explained to

5    the jury.

6         THE COURT:  Yes.  If you'll do that.  Thank

7    you.

8         MS. KAISER:  Yes, Your Honor.

9    BY MS. KAISER:

10   Q     Agent Monk, on the other side of this bag

11   which is part of Collective Government's Exhibit 58,

12   there's a partial tag.  Can you please explain that

13   to the jury.

14   A     Yes, ma'am.  It's the Pinellas County

15   Sheriff's Office property evidence label sticker.

16   It -- the first line dictates the offense number.

17   Would you like me to read that?  Okay.  The date,

18   the offense type, whether it's a misdemeanor or

19   felony, who collected it, the property number, the

20   case agent, the agency, grid number, incident

21   location, subject class, the name of the subject and

22   the address of the subject.

23   Q     What's the purpose of this tag that's on the

24   bag?

25   A     This sticker is to label what's inside the bag

1    for the purpose of inventory of evidence.

2    Q     And is it -- is it labeled such so that people

3    know which case these items go with?

4    A     Not that I see, no.  I don't -- to the -- oh,

5    the case, the --

6    Q     Yes.

7    A     Oh, yes.  Yes, ma'am.

8    Q     Okay.

9          THE COURT:  So just to clarify, Agent, these

10   are identifying stickers indicating to which

11   investigation the particular items are related?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  All right.

14   BY MS. KAISER:

15   Q     And, Agent Monk, can you please just describe

16   the dildos that are in the first bag.

17   A     The dildos in this bag here appear to be

18   rubber.  There are marks on them as well as, it

19   looks to be, dirt.  This one appears to be a hard

20   plastic.

21         THE COURT:  Members of the jury, all of the

22   evidence in the case, other than something that

23   might be considered contraband, and I don't know

24   that there is any in this case, will be available to

25   you in the jury room during deliberations.  Take a

1    moment just to acquaint yourself with the exhibit.

2          (Brief pause.)

3          THE COURT:  Thank you, Ms. Kaiser.  By the

4    way, when I say contraband, that's a big word.  But

5    in this case, there might be one exhibit already in

6    evidence that might be considered sensitive or

7    contraband, and I will make that determination.  Of

8    course, you are to consider all of the evidence in

9    the case, whether it's in that jury room or not.

10   Thank you.

11         (Brief pause.)

12   BY MS. KAISER:

13   Q      Now, Agent Monk, were all of these sex toys

14   and whips all found within that case?

15   A      Yes, ma'am.

16   Q      During your review of -- or your search of the

17   defendant's residence, did you locate any child

18   pornography?

19   A      No, ma'am.

20   Q      Did you locate any children's toys?

21   A      Not that I'm -- not that I remember, no,

22   ma'am.

23   Q      Now, your position as a special agent, is that

24   what all members of the Federal Department of Law

25   Enforcement are called?

1          MR. TRAGOS:  Florida Department of Law

2     Enforcement.

3     BY MS. KAISER:

4     Q       Florida Department of Law Enforcement?

5     A       Yes, ma'am.  All agents are special agents.

6     Q       Do you know whether or not any of those items

7     that were seized were tested for any bodily fluids?

8     A       Not to my knowledge.

9     Q       Thank you.

10          MS. KAISER:  I have no further questions.

11          THE COURT:  Cross-examination, Mr. Tragos.

12          MR. TRAGOS:  Ms. Kaiser, are all these one

13     exhibit number?

14          MS. KAISER:  Yes, Your Honor -- yes,

15     Mr. Tragos.

16          MR. TRAGOS:  58?

17          MS. KAISER:  Except the suitcase.

18                         CROSS-EXAMINATION

19     BY MR. TRAGOS:

20     Q       Special Agent Monk, would you please pull out

21     the items that are illegal in 58.

22     A       None of the items that I can see would be

23     illegal against Florida law.

24     Q       So those are all legal items?  You can own

25     them, possess them, keep them in your house, no

1    problem?

2    A      Yes, sir.

3    Q      Were any of those items dusted for

4    fingerprints?

5    A      No, sir, not to my knowledge, sir.

6    Q      Did you find anything in his house that was

7    illegal?

8    A      No, sir.

9           MR. TRAGOS:  That's all the questions I have.

10          THE COURT:  Any redirect?

11          MS. KAISER:  No, Your Honor.

12          THE COURT:  Thank you, sir.  You may step

13   down.  Please watch your step.

14          Call your next witness, please.

15          MS. KAISER:  The United States calls Larry

16   Marone.

17          COURTROOM DEPUTY CLERK:  Raise your right

18   hand.

19          (Witness complied.)

20          COURTROOM DEPUTY CLERK:  Do you swear or

21   affirm the testimony that you give in this case will

22   be the truth, the whole truth and nothing but the

23   truth?

24          THE WITNESS:  Yes, I do.

25          COURTROOM DEPUTY CLERK:  Please be seated.

1              Please state your name and spell your last

2      name for the record.

3              THE WITNESS:  Lawrence Marone, M-a-r-o-n-e.

4                        DIRECT EXAMINATION

5      BY MS. KAISER:

6      Q      Good afternoon, Mr. Marone.

7      A      Good afternoon.

8      Q      Can you please tell the jury where you work.

9      A      Florida Urology Physicians in Ft. Myers.

10     Q      And, sir, how long have you been so employed?

11     A      Four years.

12     Q      What are your duties there?

13     A      I'm the practice administrator.

14     Q      And as the practice administrator, is it part

15     of your duties to act as the records custodian for

16     your -- for the business?

17     A      Yes, it is.

18             MS. KAISER:  Your Honor, may I approach the

19     witness?

20             THE COURT:  Yes, ma'am.

21     BY MS. KAISER:

22     Q      Mr. Marone, I'm showing you what's been marked

23     for identification as Government's Exhibit Number

24     60.  Do you recognize that document?

25     A      Yes, I do.

1    Q       And, sir, what documents are those?

2    A       This is the office note of the physician and

3    patient.

4    Q       All right.  And who is the physician?

5    A       Dr. Steven Harrison.

6    Q       Are those records kept by the practice in the

7    ordinary course of business?

8    A       Yes, they are.

9    Q       Are they made by a person with knowledge at

10   the time those records are created?

11   A       Yes.

12           MR. TRAGOS:  Excuse me, Your Honor.  We have

13   no objection to this exhibit.

14           MS. KAISER:  Your Honor, at this time I'd move

15   for admission of Government's Exhibit Number 60 into

16   evidence.

17           THE COURT:  Exhibit 60 will be received.

18           MS. KAISER:  Thank you.

19   (Whereupon, Government's Exhibit Number 60 is

20   received into evidence.)

21           MS. KAISER:  May I publish it to the jury,

22   please.

23           THE COURT:  Yes, ma'am.

24   BY MS. KAISER:

25   Q       Do you know what time period these records

1      encompass?

2      A       They encompass January 2006 to December 2008.

3      Q       I'm putting up on the overhead Page 1 of

4      Government's Exhibit Number 60.  Can you tell the

5      jury what we're looking at here.

6      A       This is an office note from July 18th, 2008.

7      Q       And can you please read the office -- the

8      content of the office note.

9      A       "Dr. Friedlander comes in today for follow-up

10     of his chronic prostatitis.  He is requesting

11     prostatic massage again.  This was done in the

12     office at his request.  He is still on Hytrin for

13     his BPH symptoms, and he will continue that as is.

14             "Dr. Friedlander raised the issue of erectile

15     dysfunction at this visit.  He has difficulty both

16     obtaining and maintaining erectile rigidity, and is

17     interested in pursuing medical therapy.  He has

18     never tried Levitra.  And since he is diabetic, I

19     think that is the best place to start.

20             "Samples of the 20 milligram dose, as well as

21     a prescription, were provided.  Proper use and

22     potential side effects were reviewed.  I will see

23     him back on an as-needed basis at this point, Steven

24     A. Harrison, M.D. "

25     Q       Could you tell the jury what we're looking at

1      here.

2      A      This is another office note of October 10th,

3      2007.

4      Q      Can you read the second paragraph.

5      A      "The patient is also requesting a trial of ED

6      therapy, and all of the agents were reviewed.  He is

7      interested in Viagra and Levitra, and samples were

8      provided.  Potential side effects were reviewed, as

9      well.

10          "He will continue with Hytrin and Celebrex as

11     is, and will follow up on an as-needed basis, Steven

12     A. Harrison, M.D."

13          MS. KAISER:  Your Honor, may I have a moment?

14          THE COURT:  Yes, ma'am.

15          (Brief pause.)

16     BY MS. KAISER:

17     Q      I have no further questions.  Thank you, sir.

18          THE COURT:  Any cross, Mr. Tragos?

19          MR. TRAGOS:  No, Your Honor, but we would

20     request a side bar.

21          THE COURT:  All right.

22          MR. TRAGOS:  But this witness can be excused,

23     if that's --

24          THE COURT:  You may step down, sir.  Watch

25     your step, please.

```
 1                (At side bar, on the record.)
 2           MR. TRAGOS:  I just want to make a statement
 3      so that the record is clear about -- and then that
 4      will end the issue of -- the issue of expanding
 5      Dr. Berlin's testimony.
 6           THE COURT:  Well, we can do that after the
 7      jury is gone.
 8           MR. TRAGOS:  Okay.  I just thought it would
 9      take a second.  That's why I was --
10           MS. KAISER:  Can I request that you instruct
11      the jury once again not to access the internet in
12      light of Mr. Tragos's comments about newspaper
13      coverage with Corporal Romanosky?
14           THE COURT:  Why don't you tell them not to.
15      I'm just kidding.
16           We have a jury who recognized Agent Monk as a
17      fellow classmate at Jesuit High School.  I presume
18      from looking at Agent Monk, that was probably eight
19      to ten years ago.  The juror didn't sign the note,
20      so I can't tell you which one, but I believe it to
21      be a male.
22           How would you suggest we handle that?
23           MR. TRAGOS:  That's a good question.
24           THE COURT:  Here.  I'll just --
25           MR. TRAGOS:  Can we find out who it is?
```

1          THE COURT:  Here's the note.  He's done

2     exactly what I think I asked the jurors to do if

3     that happened.

4          MR. TRAGOS:  I guess he didn't recognize the

5     name.

6          THE COURT:  I'm sorry?

7          MR. TRAGOS:  I guess he didn't recognize the

8     name.

9          THE COURT:  That's what I presume.  He's a

10    fairly distinctive looking fellow, so that's

11    probably why he recognized him.

12         MR. TRAGOS:  Frankly, Your Honor, I think we

13    probably would -- because I know I wouldn't have

14    picked him if I would have known that, and I had a

15    preemptory left.  I think I'd want him excused.

16         MS. KAISER:  I don't think there's any basis

17    to excuse him, just the fact that he knows him.

18    Apparently they weren't close enough that he would

19    recognize the name, so it doesn't even appear from

20    that note that they were close or anything else.

21    Otherwise, he would have recognized the name when we

22    read it.

23         THE COURT:  Well, we have 14 jurors; right?

24         COURTROOM DEPUTY CLERK:  Yes, sir.

25         THE COURT:  Jesuit High School, it's my

1    understanding -- Jesuit High School, it's my

2    understanding, is a fairly tight-knit environment,

3    all male students.  My nephew goes there.  From the

4    comments I've heard, there's a bond, if you will,

5    almost a fraternal-type bond; although, that may be

6    going beyond what I need to say.

7         But I think in an abundance of caution, I will

8    grant the request, excuse the juror, and just tell

9    him that's one of the unfortunate aspects of being

10   on a jury.  I don't even know who he is.  So I'm

11   going to ask Mr. McNeil to tell me, all right?

12        MS. KAISER:  Would you remind the jurors not

13   to look on the internet?

14        THE COURT:  Oh, yeah.

15        MS. KAISER:  Thank you.

16        THE COURT:  Why don't we go ahead and conclude

17   today.  We're at 4 o'clock.

18        MS. KAISER:  Yes, Your Honor.

19        MR. TRAGOS:  Will you let me have the one

20   minute after the jury is gone?  Just one minute.

21        (End of side bar discussion.)

22        THE COURT:  Well, thank you.  Sorry.  We're

23   talking about one of you.  One of you has passed up

24   a note, and I appreciate it.  You've done exactly

25   what I would have expected you to do.  Mr. Mendez;

1    is that right?

2        JUROR:  Yes, sir.

3        THE COURT:  You recognize one of the witnesses

4    as someone you went to high school with.  You know,

5    in this -- in this day and age, that's not unusual.

6    And I appreciate that you have done this.

7        I'm going to go ahead and excuse you, just in

8    an abundance of caution.  Obviously, had you

9    recognized the name during the original voir dire

10   you would have raised your hand.  And we appreciate

11   that you have been not only dutiful in bringing this

12   to my attention, but also your attention during the

13   course of the trial thus far.  So we appreciate

14   that.

15       The other members of the jury, let me -- we're

16   going to recess for the day.  I've got another

17   hearing scheduled.  Let me remind you not to get on

18   the internet and do any Googling or searching or

19   anything of that nature.

20       I am not going to prohibit you from doing what

21   you customarily would do on a daily basis.  But I am

22   instructing you that if you see anything about this

23   case or any other case that's in progress, you are

24   not to be exposed to it.  And if you are, even

25   accidentally, you need to alert me tomorrow.

1          Now, in terms of the internet, I say exactly

2     what I say, don't Google anything about this case.

3     Anything.  Because you might be inadvertently

4     exposed to something that might influence your

5     deliberations.  Your decision must be based on the

6     evidence presented, meaning the testimony of the

7     witnesses and the exhibits, and not what you might

8     learn or be exposed to from outside sources.  So be

9     very careful in that regard.  Remember, you are

10    judges.

11         With that, we will recess for the afternoon.

12    We'll see you at 9 o'clock in the morning.  Thank

13    you.

14         COURTROOM SECURITY OFFICER:  Rise for the

15    jury.

16         (Jury out at 4:03 PM.)

17         THE COURT:  Mr. Mendez's notes, if any, we'll

18    just collect and I'll have shredded in my chambers.

19    Actually, the revocation is at 4:30.  So, Tragos,

20    what is it you wanted to bring to my attention

21    regarding Dr. Berlin?

22         MR. TRAGOS:  Okay.  Your Honor, I just wanted

23    to make the record clear that what I was saying was

24    that Agent Romanosky was able to say that the

25    specific conduct of this defendant was, in fact,

1 sadomasochistic or sexual sadism.  He was allowed to

2 make that conclusion.

3    THE COURT:  What conduct?

4    MR. TRAGOS:  The conduct in this case, what he

5 did in this case.

6    THE COURT:  Well, he didn't do anything.  I

7 mean, what he discussed doing?

8    MR. TRAGOS:  Well, yes, what he discussed

9 doing was, in fact, sadomasochistic, and he was able

10 to give that opinion.  When I --

11    THE COURT:  Is Dr. Berlin going to define what

12 that is, from his medical perspective?

13    MR. TRAGOS:  Correct.  And then apply the

14 facts as he knows them in this case to determine

15 whether or not, in fact, we do have sexual sadism or

16 not.

17    THE COURT:  Ms. Kaiser?

18    MS. KAISER:  I don't see Mr. Tragos's point at

19 all.  I don't think he's -- I don't think

20 Corporal Romanosky opened the door to anything.

21    THE COURT:  Turn the mic towards you.

22    MS. KAISER:  I'm sorry.

23    THE COURT:  Did Romanosky not describe the

24 conduct that was being discussed as that?

25    MS. KAISER:  He said -- yes.  He said that he

1    wanted to beat and have sex with children.

2         THE COURT:  And that it constituted --

3         MS. KAISER:  Sadomasochistic abuse.

4         MR. TRAGOS:  In his opinion.

5         MS. KAISER:  In his opinion.

6         THE COURT:  And do you think Berlin is going

7    to say it doesn't?

8         MR. TRAGOS:  No.  What Berlin is going to say

9    is that in the true criteria for sexual sadism, this

10   conduct does not satisfy the criteria for sexual

11   sadism.

12        THE COURT:  What's the relevance of that

13   issue?

14        MR. TRAGOS:  It contradicts Corporal

15   Romanosky's -- I objected when they started to get

16   into this with -- with Corporal Romanosky.  And the

17   court said he's allowed to give his opinion or what

18   he thinks or -- and he went on to give his opinion.

19        What I'm saying is, number one, his opinion of

20   sexual sadism is, number one, wrong.

21        THE COURT:  Well, you know, Ms. Kaiser is

22   going to ask him is it wrong about -- to do that

23   with children.  So where are we going with it?

24        MR. TRAGOS:  Well, she can.  But what I'm

25   saying is I want to ask him the same questions that

1       she was allowed to ask Romanosky.  Number one, what

2       is sexual sadism?  Romanosky gave his opinion,

3       Dr. Berlin is going to give his, and it's going to

4       be a different -- different opinion of what it is.

5              THE COURT:  You're going to argue to the jury

6       that this wasn't that.  But what does that have to

7       do with his guilt or not of the offense charged in

8       the indictment?

9              MR. TRAGOS:  Because the government is putting

10      forth -- unless they've changed their strategy,

11      which I don't think they have since they filed

12      motions opposing my motions -- the government is

13      going to put forth that that's what this man is.

14      They're going to put on the pictures of the whips

15      and chains.  They put the whips in.

16             There was no conversation about these dildos

17      or anything or him bringing dildos up to use it on

18      the kids.  But they're putting all this stuff in.

19      The Court has allowed it under the theory that it

20      just -- it shows either some pattern of conduct or

21      some relevance to sadomasochism.

22             And that's why this Court has allowed them,

23      and they've argued it, to put in all these pictures

24      that they're going to put in soon about all the

25      people that he has -- all the pictures that he has

1    on his computer, which was at home, of adults that

2    he beats, according to the government's theory, even

3    though these pictures are not him, he's not in the

4    pictures and he's not doing the activity.  But the

5    Court is going to let him do all this.

6         And Romanosky has set the stage that my client

7    is a sexual sadist.  They were allowed to get that

8    in with Corporal Romanosky.  The only way I can

9    contradict that is I have a true expert, not

10   Corporal Romanosky, but a true expert in this to say

11   whether or not my client is or isn't.  And

12   Romanosky -- I mean, you know, it's -- Romanosky is

13   the one that poisoned the well here by being allowed

14   to give his opinion of sexual sadism.

15        THE COURT:  I don't think the well was

16   poisoned by his testimony, Mr. Tragos.

17        MR. TRAGOS:  Okay.  Is it poisoned by the

18   pictures coming in?

19        THE COURT:  It's poisoned, but I don't know by

20   what and by who.

21        MS. KAISER:  Your Honor, if I may --

22        THE COURT:  No.  I haven't asked you yet.  I

23   don't see the relevance of Dr. Berlin's testimony.

24   You're creating an issue that's not an issue.  This

25   man is not on trial for being a sadomasochist.  He's

1    on trial for enticing children to travel by use of

2    the internet, the enticement, that is, for purposes

3    of some sexual act which would be a violation of

4    state law.

5         In his statements to the corporal, he denied

6    any interest in that.  Then he did say, well, if I

7    was going to do it, I'd do it with adults.  But he

8    denied any interest in it, so it's -- the evidence

9    has been relevant to his state of mind and his

10   intention.  But whether it is or is not classified

11   as a particular type of sexual conduct under a

12   medical perspective, I don't see the relevance of

13   that.

14        MR. TRAGOS:  Your Honor, then, why -- and I

15   say this respectfully, why did the Court let

16   Romanosky testify about sexual sadism?

17        THE COURT:  I just said, it's bearing on his

18   intent.

19        MR. TRAGOS:  Well, then, I --

20        THE COURT:  He denied it.  He denied it in his

21   interview.

22        Well, unless and until I hear Dr. Berlin's

23   proffer, we're dealing in a vacuum.  So I'm not

24   going to rule one way or the other.  I express my

25   doubts because I don't know that it's relevant.

1        Be prepared to address that when you call him

2    as a witness.  We can do that very briefly.  He's

3    testified before the Court.  You don't need to lay a

4    foundation.  You can ask him right away.  I assume

5    you're going to ask it in a hypothetical question or

6    some manner to present it to him?

7        MR. TRAGOS:  So initially, then, with

8    Dr. Berlin, the Court is going to have a hearing

9    outside the presence of the jury?

10       THE COURT:  If you want to go down that path,

11   I think I should allow you to proffer the testimony.

12       MR. TRAGOS:  Okay.  That's fine.

13       THE COURT:  How I rule on it, I don't know.

14       MR. TRAGOS:  Okay.

15       THE COURT:  Ms. Kaiser, I'd just suggest that

16   you be prepared to respond accordingly as to its

17   admissibility.

18       All right.  Where is the government in its

19   schedule?

20       MS. KAISER:  The government thinks it will

21   rest tomorrow, Your Honor.  I think I may rest

22   probably maybe tomorrow after lunch.

23       THE COURT:  I'm sorry.  Tomorrow what?

24       MS. KAISER:  Probably sometime tomorrow after

25   lunch.

1          THE COURT:  After lunch, early afternoon?

2          MS. KAISER:  I think so.

3          THE COURT:  All right.  Mr. Tragos, you've

4     heard, so be prepared with your witnesses.

5          MR. TRAGOS:  We are, Your Honor.

6          THE COURT:  I don't know how that measures up

7     to our trial estimate.  But if there's a likelihood

8     of presenting this case to the jury Friday, be

9     anticipating that.

10          MR. TRAGOS:  I don't think so.  I don't think

11     so, Your Honor.  I think it's Monday.

12          THE COURT:  Well, I mean, it could be.  I just

13     want to say, if we move along quickly, then be

14     prepared.  I'm not going to adjourn at 2 o'clock on

15     Friday just because you're not ready.  I want you to

16     be ready.

17          MR. TRAGOS:  Okay.

18          THE COURT:  All right.  We will be in recess.

19     We will see you tomorrow morning at 9:00.

20          COURTROOM SECURITY OFFICER:  All rise.

21          THE COURT:  We have a copy of the instructions

22     I gave first time around.  Ms. Esposito will give

23     you a copy, so take a look at that.  This is

24     Sartes's job; right?  You don't listen when I talk

25     so you're going to miss something.

1          MR. TRAGOS:  It's his job, the jury

2    instructions.

3          THE COURT:  That's what I said.  Look over the

4    instructions.  These are the ones we gave last time.

5    That way you don't have to duplicate your efforts.

6          The government, I presume, will proffer these

7    as your requested instructions and then you can note

8    any objections you have or any additional

9    instructions.  But at least we've got a working

10   draft.  That saves you guys some time in terms of

11   preparing and typing and that kind of thing.

12         All right.  We'll see you in the morning.

13         (Proceedings concluded at 4:12 PM.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF FLORIDA          )

 4     COUNTY OF HILLSBOROUGH    )

 5         I, Linda Starr, RPR, Official Court Reporter for

 6     the United States District Court, Middle District,

 7     Tampa Division,

 8         DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 251, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 13th day of September 2009.

19

20

21              /s/ Linda Starr
              Linda Starr, RPR, Official Court Reporter
22

23

24

25
```