```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION

 3      UNITED STATES OF AMERICA

 4           vs.            CASE NO. 8:08-CR-318-T-27TGW
                           26 MARCH 2009
 5                         TAMPA, FLORIDA
                           PAGES 1 - 211
 6                         VOLUME IV

 7      CHARLES JACKSON FRIEDLANDER
        _____/
 8
                 TRANSCRIPT OF TRIAL PROCEEDINGS
 9         BEFORE THE HONORABLE JAMES D. WHITTEMORE
                 UNITED STATES DISTRICT JUDGE
10                      and a jury

11      APPEARANCES:

12      For the Petitioner:  Amanda C. Kaiser
                             United States Attorney's Office
13                           Suite 3200
                             400 N. Tampa Street
14                           Tampa, Florida 33602

15      For the Defendant:   George E. Tragos
                             Tragos & Sartes, PL
16                           Suite 800
                             601 Cleveland Street
17                           Clearwater, Florida 33755

18                           Peter Anthony Sartes
                             Tragos & Sartes, PL
19                           Suite 800
                             601 Cleveland Street
20                           Clearwater, Florida 33755

21      Court Reporter:      Linda Starr, RPR
                             Official Court Reporter
22                           801 N. Florida Avenue
                             Suite 13B
23                           Tampa, Florida 33602

24       Proceedings recorded and transcribed by
        computer-aided stenography.
25
```

1

2                                    **INDEX**

3        **WITNESS NAME**                              **PAGE NUMBER**

4        **Patricia Kelly**

5        Direct Examination by Ms. Kaiser...........6
         Cross-Examination by Mr. Tragos...........11
6
         **David Grawunder**
7
         Direct Examination by Ms. Kaiser..........16
8        Voir Dire Examination by Mr. Tragos........24
         Voir Dire Examination by Mr. Tragos........26
9        Voir Dire Examination by Mr. Tragos........50
         Voir Dire Examination by Mr. Tragos.......70
10       Cross-Examination by Mr. Tragos...........74
         Redirect Examination by Ms. Kaiser........97
11
         **Alex Hagedorn**
12
         Direct Examination by Ms. Kaiser..........106
13       Cross-Examination by Mr. Tragos...........115

14       Government rests..........................119
         Defendant's oral motion pursuant to
15       Rule 29...................................121
         Defense rests.............................158
16       Closing summation by Ms. Kaiser...........159
         Closing summation by Mr. Tragos...........174
17       Rebuttal summation by Ms. Kaiser..........198
         Defendant's oral motion for mistrial.......208
18

19

20

21

22

23

24

25

1

**GOVERNMENT'S EXHIBITS**

2

| Number | Description | Page Number |
|---|---|---|
| 32 | Red bag........................46 |
| 61 | AOL address book (laptop)......24 |
| 62 | AOL e-mail records............46 |
| 63 | 07/21/08 chat.................46 |
| 95-1 | 03/15/08 e-mail...............57 |
| 95-20(A-G) | 01/13/06 seven e-mails........57 |
| 96 A | 01/09/06 e-mail...............58 |
| 96 B | 01/09/06 e-mail...............58 |
| 97-1 | Photographs (sadomasochistic)..54 |
| 98-1 | 04/12/08 e-mail...............58 |
| 98-5 | 01/13/08 e-mail...............58 |
| 102 | Buddy List (laptop)...........68 |
| 104 | AOL Favorites (desktop).......68 |
| 106 | AOL address book (desktop)....71 |
| 107 | Buddy List (desktop)..........71 |
| 109 | 2005/Dunedinsuperdad contact...72 |
| 111 | 2005/Dunedinsuperdad contact...72 |

3
4
5
6
7
8
9
10
11
12

**DEFENDANT'S EXHIBITS**

13

| Number | Description | Page Number |
|---|---|---|
| 3 | Summary chart.................95 |
| 20 | E-mails dwportland1977........75 |
| 21 | E-mails allarr55..............75 |
| 22 | E-mails absalom2..............75 |
| 23 | E-mails pj_mass...............75 |
| 24 | E-mails kenbost...............75 |
| 25 | E-mails sincereperson 41......75 |
| 26 | E-mails Nautical1971,,,.......75 |
| 27 | E-mails psmnow................75 |
| 28 | E-mails Ghslim61..............75 |
| 29 | E-mails markofm...............75 |
| 30 | E-mails mdlearner.............75 |
| 31 | E-mails jj1515................75 |
| 39 | E-mails shoe_sx...............75 |

14
15
16
17
18
19
20
21
22
23
24
25

```
1              (Call to order at 9:08 a.m.)

2              COURTROOM SECURITY OFFICER:  All rise.  This

3    Honorable Court is in session, The Honorable James

4    D. Whittemore presiding.

5              Be seated, please.

6              THE COURT:  Is it your turn?

7              MR. TRAGOS:  Your Honor, I just want to make

8    sure -- we had a ruling last time.  I want to make

9    sure the record is clear for this trial.  All prior

10   motions in limine that were filed and that the Court

11   denied, that I don't need to renew those during the

12   course of the trial.

13             THE COURT:  Whatever motions have been filed

14   have been ruled on.

15             MR. TRAGOS:  And I don't need to renew them?

16             THE COURT:  Mr. Tragos, I can't give you

17   advice.  I don't know what you're referring to.

18             MR. TRAGOS:  The Court gave us an order last

19   time that said -- that's what I'm saying.

20             THE COURT:  You have to give me more

21   specifics.  This is the second trial.  I don't want

22   you or I to inadvertently back into an error.  If

23   you feel you need to renew something that has not

24   been renewed, then you must do so.

25             MR. TRAGOS:  Well, Your Honor, this next
```

```
 1     witness is the witness --

 2          THE COURT:  Bring the next witness in.  Call

 3     your next witness, please.

 4          MR. TRAGOS:  Okay.

 5          THE COURT:  We're not going to start every day

 6     with just general discussion, okay?  We've got to

 7     get this trial completed.

 8          What's your next witness, Ms. Kaiser?

 9          MS. KAISER:  Patty Kelly.

10          THE COURT:  Do you have a matter with regard

11     to Ms. Kelly, Mr. Tragos?

12          MR. TRAGOS:  I don't believe so, Your Honor.

13     I thought Grawunder was her next witness.  I'll

14     wait.

15          THE COURT:  All right.  Bring the jury in,

16     please.

17          COURTROOM SECURITY OFFICER:  Rise for the

18     jury.

19     (Jury in at 9:10 a.m.)

20          THE COURT:  Good morning.  Please be seated.

21     We are ready to proceed.

22          Call your next witness, please.

23          MS. KAISER:  The United States calls Special

24     Agent Patty Kelly.

25          COURTROOM DEPUTY CLERK:  Raise your right
```

1    hand.

2              (Witness complied.)

3              COURTROOM DEPUTY CLERK:  Do you swear or

4    affirm that the testimony that you give in this case

5    will be the truth, the whole truth and nothing but

6    the truth, so help you God?

7              THE WITNESS:  Yes.

8              COURTROOM DEPUTY CLERK:  Please be seated.

9              (Witness complied.)

10             COURTROOM DEPUTY CLERK:  Please state your

11   name and spell your last name for the record.

12             THE WITNESS:  Patricia Kelly, K-e-l-l-y.

13                      DIRECT EXAMINATION

14   BY MS. KAISER:

15   Q      Good morning, Agent Kelly.

16   A      Good morning.

17   Q      Can you please tell the jury where you work.

18   A      I'm a criminal investigator for Immigration

19   and Customs Enforcement, also known as ICE, in

20   Tampa, Florida.

21   Q      How long have you been so employed?

22   A      Since April, 2001.

23   Q      What are your duties as a special agent with

24   Immigration and Customs Enforcement?

25   A      I'm assigned to the cyber crimes unit, and my

1    duties are to conduct examinations on computers and

2    other electronic media.

3    Q       And what type of training have you had to be a

4    forensic computer analyst?

5    A       I attended a two-month course on computer

6    evidence recovery training.

7            MS. KAISER:  Your Honor, may I approach the

8    witness?

9            THE COURT:  Yes, ma'am.

10   BY MS. KAISER:

11   Q       Special Agent Kelly, I'm showing you what's

12   been marked for identification as Government's

13   Exhibit Number 54, and ask if you recognize this

14   item.

15   A       Yes, I do.

16   Q       And how do you recognize it?

17   A       It was brought in for a forensic examination.

18   Q       Did you conduct any forensic examination with

19   respect to this computer?

20   A       I processed the -- I didn't do the

21   examination, but I did process the evidence, yes.

22   Q       And how do you know that this is the same

23   computer that you processed?

24   A       The serial number on the side matches the

25   serial number on my notes.

1    Q      And I'm showing you what's been marked for

2    identification as Government's Exhibit Number 55.

3    Do you recognize that item?

4    A      Yes, I do.

5    Q      And what is that item?

6    A      It's a laptop computer, and the serial number

7    matches.

8    Q      Okay.  What were you asked to do with respect

9    to the laptop computer?

10   A      The computers were brought in by the case

11   agent, Alex Hagedorn, for forensic examination, and

12   these cases are assigned on a rotational basis.  The

13   examiner who was going to be assigned this case was

14   not in, so I took the initiative to process and make

15   copies of the hard drive and the evidence and

16   photograph it and start the case in the forensic

17   software for the other agent who was going to be

18   assigned the case.  I was asked to preview for any

19   child pornographic images.

20   Q      And did you see any child pornographic images

21   on either the laptop or the desktop?

22   A      No, I did not.

23   Q      Can you explain to the jury -- when you said

24   that you prepared the laptop and the desktop in a

25   format for another agent to review, can you explain

1    that process?

2    A    Yes.  When we receive the items, we take

3    pictures of the computers themselves before we start

4    disassembling it.  Then I document in my notes the

5    serial number, the make, model of the computer.

6    Then I open the computer up, and while I'm taking

7    pictures, I remove the hard drive from inside the

8    computer, document its serial, make and model

9    number, and then I connect the -- I make a copy of

10   the original evidence for working with -- reviewing

11   the evidence, because we don't ever do any type of

12   examination on the original evidence itself.

13        So I use a write blocker, which is a piece of

14   forensic equipment that prevents the computer, my

15   computer, from writing to the defendant's hard

16   drive.  And then we make a copy of the original

17   evidence.

18   Q    And is that so later that original evidence,

19   the defendant's original hard drive, can't be

20   changed?

21   A    Correct.

22   Q    And is that the purpose of the write blocker?

23   A    Yes, it is.

24   Q    Okay.  Do you know where the hard drives in

25   the case were manufactured for the computers?

```
1    A     The laptop hard drive was manufactured in

2    Thailand, and the desktop hard drive was

3    manufactured in Malaysia.

4    Q     Once you made copies of the defendant's hard

5    drive, what, if anything, did you do?

6    A     I put the hard drives back into the computers

7    and stored it as evidence, and then the case -- it

8    takes a long time for the software to actually

9    process the evidence to make the image.  It takes

10   hours, sometimes days.  So with that being said,

11   when it -- once that was done, then I just stored

12   those evidence files for the case agent for when he

13   returned, so he could just start analyzing the

14   evidence.

15   Q     Did any other computer forensic special agents

16   with ICE look at the computer evidence?

17   A     Yes.  It was assigned for examination to

18   Special Agent David Grawunder.

19   Q     Just so we're clear, did you just get those --

20   that computer evidence in a format for Agent

21   Grawunder to review?

22   A     Correct.

23   Q     Okay.  Thank you.

24         MS. KAISER:  I have no further questions.

25         THE WITNESS:  Okay.
```

1          THE COURT:  Any Cross?

2                    CROSS-EXAMINATION

3     BY MR. TRAGOS:

4     Q     Agent, aside from these two computers, you

5     also examined other media-saving devices, correct?

6     A     Yes, I did.

7     Q     What else?

8     A     A memory card, eight CDs, a floppy disc and a

9     pen camera were also brought in, and I was asked to

10    review them for child pornographic images.  And I

11    did not find any.

12    Q     Let's start with the media card.  Is that from

13    the -- is that the Fuji from the digital camera?

14    A     No.  I never examined the digital camera.

15    Q     Okay.  How about the memory card?

16    A     It was just the memory card by itself; yes, I

17    did.  There was no -- there was no data whatsoever

18    on the memory card.

19    Q     Let's make sure we're talking about the same

20    memory card.  Do you have a copy of the FDLE receipt

21    form?

22    A     No, I do not.

23    Q     Do you have something that identifies the

24    memory card as being from a digital camera?

25    A     No.  I don't have anything on a digital

1      camera.

2      Q      What else?  Did you say you examined some CDs?

3      A      Yes.

4      Q      And did those CDs have any writing on them?

5      A      Some of them did; one did not.

6      Q      What writing was on the CDs you examined?

7      A      One said, "Photowise."  One said, "Corel 8."

8      One said, "Harry Connick, Jr."  One said, "Napster

9      music CD."  There was one unlabeled, and there's two

10     wedding movie DVDs.

11     Q      Okay.  And then did you examine a pen camera?

12     A      No.  I did not have the proprietary cable for

13     the pen camera, so I never reviewed it.

14     Q      However, you were able to do some testing on

15     it; weren't you?

16     A      On the pen camera?

17     Q      Yes.

18     A      No.  I was able to research the internet that

19     said that there was no internal memory on the pen

20     camera, so it would not be relevant.

21     Q      So if you have no internal memory, that means

22     no images can be on it?

23     A      Correct.

24     Q      Any other items that came across your desk or

25     in your hands with reference to this, other than the

1       two computers and the items you've just mentioned?

2       A       No.

3       Q       And you personally examined the CDs; correct?

4       A       Correct.

5       Q       And you personally examined the memory card?

6       A       Correct.

7       Q       Okay.  Aside from you and agent -- how do you

8       pronounce his name?

9       A       Grawunder.

10      Q       Grawunder.  Are you aware of any other agents

11      that examined any of this media?

12      A       Probably the case agent, Alex Hagedorn.

13      Q       By the way, when I say media, could you tell

14      us what I mean by that?

15      A       Anything that contains data, which would be

16      memory cards, cameras, compact discs, floppies.

17      Q       Now, I know you said that you transferred data

18      from the computers to another disc; correct?

19      A       Correct.

20      Q       Prior to doing that, did you turn the

21      computers on?

22      A       No, I did not.

23      Q       Okay.  So you were able to do the transfer

24      without turning the computers on?

25      A       That's correct.

```
 1      Q       How does that work?

 2      A       You remove the computer, you remove the hard

 3      drive, and then you connect it to the write blocker.

 4      And then once you turn the write blocker on, that

 5      turns the hard drive on.

 6      Q       Okay.  So the hard drive is operated by the

 7      write blocker?

 8      A       Correct.

 9      Q       Not by the computer itself or the PC?

10      A       Correct.

11      Q       Did you ever see an ApaTech camera?

12      A       That's the pen camera.

13      Q       Okay.  It's called ApaTech?

14      A       That's the name brand, yes.

15      Q       Did you ever see a purple floppy disc?

16      A       There was a floppy diskette, yes.

17      Q       And did you review that?

18      A       Yes, I did.

19      Q       Was there anything on there?

20      A       Yes, there were.

21      Q       What was on there?

22      A       There was some -- it was labeled AOL ORG

23      folder, dated November 2002.  And there was some

24      chats and it identified some e-mail addresses.

25      Q       And any images?
```

```
 1     A      No.

 2     Q      And then there was a Sony CD case with two

 3     DVDRs.  Did you see that?

 4     A      I don't have that label, so I'm not sure.  The

 5     DVDs -- there was two wedding movie DVDs.  I don't

 6     know if that's what you're referring to or not.

 7     Q      You examined those?

 8     A      Yes, I did.

 9     Q      And they were wedding DVDs?

10     A      Yes.

11            MR. TRAGOS:  That's all the questions I have.

12            THE COURT:  Any redirect?

13            MS. KAISER:  No, Your Honor.

14            THE COURT:  I'm sorry.  I didn't hear you.

15            MS. KAISER:  No, Your Honor.

16            THE COURT:  You may step down.  Please watch

17     your step.

18            Call your next witness, please.

19            MS. KAISER:  United States calls Dave

20     Grawunder, special agent.

21            COURTROOM DEPUTY CLERK:  Raise your right

22     hand.

23            (Witness complied.)

24            COURTROOM DEPUTY CLERK:  Do you swear or

25     affirm the testimony that you give in this case
```

1    shall be the truth, the whole truth and nothing but

2    the truth?

3           THE WITNESS:  I do.

4           COURTROOM DEPUTY CLERK:  Please be seated.

5           (Witness complied.)

6           COURTROOM DEPUTY CLERK:  Please state your

7    name and spell your last name for the record.

8           THE WITNESS:  David Grawunder

9    G-r-a-w-u-n-d-e-r.

10                    DIRECT EXAMINATION

11   BY MS. KAISER:

12   Q      Good morning.

13   A      Good morning.

14   Q      Can you please tell the jury where you work.

15   A      I'm a special agent with the Department of

16   Homeland Security, Immigration and Customs

17   Enforcement in Tampa, Florida.

18   Q      Sir, how long have you been so employed?

19   A      Since 2003.

20   Q      What are your current duties with Immigration

21   and Customs Enforcement?

22   A      I'm a computer forensics agent.

23   Q      How long have you been a forensics agent?

24   A      For four years.

25   Q      What type of specialized training do you have

1     for that assignment?

2     A     I attended training through my department at

3     our cyber crimes center in Fairfax, Virginia.  In

4     addition to that, I spent about six weeks at the

5     Federal Law Enforcement Training Center in Glynco,

6     Georgia, getting computer forensic training.  And I

7     attended one to two training classes per year in

8     continuance of that skill.

9     Q     And what did you do before you became a

10    forensic computer specialist with Immigration and

11    Customs Enforcement?

12    A     I was assigned to the National Security Group

13    with Immigration and Customs Enforcement, which is

14    an export group.  Prior to that, our agency was

15    Customs.  Prior to that, I spent approximately seven

16    to eight years with other law enforcement agencies.

17    Q     Special Agent Grawunder, in this case did you

18    have an occasion to conduct a forensic examination

19    of the defendant's computers?

20    A     Yes, ma'am.

21    Q     How many computers did you analyze?

22    A     Two.

23    Q     What types of computers were they?

24    A     A Dell laptop computer and a Gateway desktop.

25          MS. KAISER:  Your Honor, may I approach the

```
 1    witness?

 2          THE COURT:  Yes, ma'am.

 3    BY MS. KAISER:

 4    Q     Agent Grawunder, I'm showing you what's been

 5    marked for identification as Government's Exhibit

 6    Number 55.  Do you recognize this item?

 7    A     Yes.

 8    Q     And what is this?

 9    A     It's a Dell laptop computer.

10    Q     I'm showing you what's marked for

11    identification as Government's Exhibit 54.  Do you

12    recognize this item?

13    A     Yes.  It's a Gateway desktop.

14    Q     Now, you testified that you conducted an

15    investigation or an analysis of a desktop and a

16    laptop computer; is that correct?

17    A     Correct.

18    Q     Where did you get the actual -- the data that

19    you reviewed?

20    A     I never actually worked on those two

21    computers.  My co-worker in my lab, Special Agent

22    Patricia Kelly, imaged the hard drives of those two

23    computers, placed the forensic image on a

24    government-purchased hard drive, and then gave me

25    that government hard drive to do my analysis.
```

```
 1    Q      All right.  The analysis that you conducted

 2    with respect to those two computers, was that a copy

 3    of the data that you received from Special Agent

 4    Kelly?

 5    A      Well, Special Agent Kelly copied the

 6    information that was on those original hard drives

 7    and provided me with that copy, yes.

 8    Q      And then did you analyze the copy?

 9    A      Yes.

10    Q      And what prompted your review of those copies

11    of the defendant's hard drives?

12    A      I was asked by the case agent in this case,

13    Special Agent Alex Hagedorn, to conduct an

14    examination of those computers for evidence of any

15    crime or for conversations between a UC, undercover,

16    and the defendant, for graphic files, any other

17    e-mails, key word searches, those types of things.

18    Q      How did you determine what the scope of your

19    analysis would be of the copies of the hard drives?

20    A      We review the search warrant in each case.  We

21    review the reports of investigations submitted by

22    the law enforcement officers and have conversations

23    with the case agent who gives us a summary of the

24    case and what type of information they may believe

25    to be on the evidence, and what they would feel is
```

1      relevant to their investigation.

2      Q      Specifically, what did Agent Hagedorn ask you

3      to look for on the defendant's computers?

4      A      He asked me to see if I could recover any

5      undercover chats between specific individuals, to

6      recover all e-mails that were on -- the images, to

7      look for explicit graphic pictures.  I was given a

8      list of key word searches for various terms to find

9      information regarding address books, buddy lists,

10     and other types of files used to communicate

11     on-line.

12     Q      Did Agent Hagedorn give you a specific search

13     term of the word "disciplined?"

14     A      Yes.

15     Q      How about "M for M started early?"

16     A      Yes.

17     Q      How about "fathers chatting?"

18     A      Yes.

19     Q      How about "mahogany" --

20            MR. TRAGOS:  Objection, Your Honor, leading.

21            THE COURT:  Sustained.

22     BY MS. KAISER:

23     Q      Did Agent Hagedorn give you "StricDad7" to

24     look up?

25            MR. TRAGOS:  Objection, leading.

1           THE COURT:  Sustained.  Ask the man what he

2   was given instead of suggesting an answer.

3   BY MS. KAISER:

4   Q     What search terms were you asked to look for?

5   A     I have a list of the search items from the

6   case agent in my notes.  I don't recall every single

7   one of them.  It was a long list.

8   Q     Would it --

9           THE COURT:  You can refer to your notes if

10   necessary, sir.

11          THE WITNESS:  Thank you.  Some of the terms I

12   was given includes the term "Captoes, Captoes2,

13   Shrinq, Shrinq1, StricDad7, Dunedin Super Dad,

14   strict parents, M for M started early, fathers

15   chatting," several phone numbers and addresses, and

16   the term "disciplined."

17   BY MS. KAISER:

18   Q     Did Agent Hagedorn ask you whether -- to see

19   whether or not the defendant had any buddy lists on

20   his computer?

21   A     Yes, he did.

22   Q     Did he ask you to review whether or not any

23   favorites were saved on his computer?

24   A     Yes.

25   Q     Did your review of the mirror image of the

1    laptop and desktop encompass the entirety of the

2    computers, the hard drives?

3    A     Yes.

4    Q     What format did you give that information that

5    you were able to glean from the computers to Agent

6    Hagedorn?

7    A     We create an electronic report that we place

8    on a CD.  It's based in a format of Internet

9    Explorer, so it's very easy to navigate.  There's

10   hyperlinks on one side of the page which have the

11   bookmarks I've created.  And I would create a

12   bookmark such as "graphics" and in that graphics

13   bookmark, would be all the pictures I found that we

14   determined to be relevant.  And attached to each one

15   of those bookmarked files is the file properties of

16   that file.

17        So we burn all that to a CD and give it to the

18   case agent, and then prepare a report of

19   investigation summarizing the information on that

20   electronic report.

21   Q     And could you just explain what you meant by

22   the FTK software?

23   A     "FTK" is an acronym for Forensic Tool Kit.

24   It's a software made by Access Data software

25   company.  It's a tool that we use to assist in our

1       analysis of a computer or other electronic media.

2              MS. KAISER:  Your Honor, may I approach the

3       witness?

4              THE COURT:  Yes, ma'am.

5       BY MS. KAISER:

6       Q     Agent, I'm showing you what's been marked for

7       identification as Government's Exhibits 54A and

8       54B -- I mean, I'm sorry, 55A.  Do you recognize

9       these items?

10      A     Yes.  This appears to be the electronic

11      reports that I created for the case agent.

12      Q     What did you do with these discs?

13      A     Once I burn the discs and ran copies of the

14      discs, I gave all the copies to the case agent.

15      Q     That would be Agent Hagedorn?

16      A     Yes.

17             MS. KAISER:  Your Honor, may I approach?

18             THE COURT:  Yes, ma'am.

19      BY MS. KAISER:

20      Q     Agent Grawunder, I'm showing you what's been

21      marked for identification as Government's Exhibit

22      Number 61.  Do you recognize that document?

23      A     Yes.

24      Q     And how do you recognize it?

25      A     It is an AOL address book.  The entries on

1    this document I found on the defendant's hard drive,

2    and I can tell that from the file path at the bottom

3    which references my FTK report.

4    Q     And do you know which computer this came from?

5    A     This came from the Dell laptop.

6          MS. KAISER:  Your Honor, at this time I'd move

7    for admission of Government's Exhibit 61 into

8    evidence.

9          THE COURT:  Any objection?

10         MR. TRAGOS:  May I voir dire, Your Honor?

11         THE COURT:  Yes, sir.

12                   <u>VOIR DIRE EXAMINATION</u>

13   <u>BY MR. TRAGOS:</u>

14   Q     Agent, Exhibit 61, is this the only address

15   book?

16   A     I don't recall.  I believe there was -- on

17   that computer there was one large address book that

18   encompassed most of the entries for that one

19   computer.  There may have been one for the other

20   computer.  I can't recall.

21         MR. TRAGOS:  Okay.  No objection.

22         THE COURT:  All right.  Exhibit 61 is

23   received.

24         (Whereupon, Government's Exhibit Number 61 is

25   received into evidence.)

1    <u>BY MS. KAISER:</u>

2    Q      When searching the defendant's computers,

3    Agent, did you see any evidence of the defendant's

4    chat with the undercover who was posing as

5    StricDad7?

6    A      Yes.

7    Q      Agent, I'm showing you what's been marked for

8    identification as Government's Exhibits 62 and 63.

9    I'd ask you to take a look at those documents and

10   see if you recognize them.

11   A      Yes, I do.

12   Q      And starting with Government's Exhibit 62, can

13   you tell us what that is?

14   A      This is a bookmark I created in my report

15   detailing several hits for the search term

16   StricDad7.

17   Q      And which computer is that from?

18   A      The Dell laptop.

19   Q      And for Government's Exhibit 63?

20   A      This is a section from a carved chat from the

21   Dell laptop which depicts a conversation between

22   Captoes and StricDad7.

23          MS. KAISER:  Your Honor, at this time I'd move

24   for admission of Government's Exhibit 62 and 63 into

25   evidence.

```
 1              THE COURT:  Is there any objection?

 2              MR. TRAGOS:  Yes, Your Honor.  May I voir

 3      dire?

 4              THE COURT:  Yes, sir.

 5                      VOIR DIRE EXAMINATION

 6      BY MR. TRAGOS:

 7      Q       Exhibit 62, that is actually your report;

 8      correct?

 9      A       I'm sorry.  I'd have to --

10      Q       I'm sorry.

11      A       This is from my report.  Yes, sir.

12      Q       Okay.  And so that was created by you or by

13      your software, whatever, as part of the report that

14      you provided to, I guess, Agent Hagedorn?

15      A       Yes, sir, that's correct.

16      Q       And that is not a direct printout off of

17      anything that's actually off the -- that is not

18      actually directly a printout off of the computer.

19      It's not a copy of something that's on the computer?

20      A       Correct.  It's a summary of information that

21      was contained in the computer.

22              MR. TRAGOS:  Okay.  May we come to side bar,

23      Your Honor?

24              THE COURT:  Yes, sir.  Do you have any

25      questions about 63?  Let's get that accomplished
```

```
1       while you're up there.

2              MR. TRAGOS:  63?  Your Honor, no, I don't.

3              THE COURT:  All right.

4              (At side bar, on the record.)

5              THE COURT:  Yes, sir.

6              MR. TRAGOS:  With regards to 62, Your Honor,

7       this is a report.  It's not --

8              THE COURT:  What's the objection?  I know what

9       it is.  I've read it before.

10             MR. TRAGOS:  Okay.  It is -- first off, it's

11      hearsay.

12             Secondly, it's allowing this witness to

13      provide a report into evidence which is not

14      evidence.  If it came off the computer, that would

15      be evidence, but this is not evidence.  It's

16      hearsay.  It's developed through some law

17      enforcement software that they put in, I guess,

18      certain parameters and it prints something -- the

19      software prints something out.  So it's hearsay.

20             I also believe that it is irrelevant and that

21      it is improper for them to put a report into

22      evidence.

23             THE COURT:  Ms. Kaiser?

24             MS. KAISER:  Your Honor, the witness testified

25      that they used the FTK software to search for any
```

1    correspondence with StricDad7, and this is the form

2    it printed out in.  The agent has explained it.  He

3    can explain it further, but it's clearly

4    appropriate.  It shows that the defendant was

5    chatting with Corporal Romanosky, and it's evidence

6    of those chats.

7         THE COURT:  It's a summary of what he found on

8    the computer?

9         MS. KAISER:  Correct.

10        THE COURT:  What's your response to the

11   hearsay objection?

12        MS. KAISER:  I don't believe it is hearsay.

13   It's evidence that he found and he put in this

14   format.  The defendant does not want us to put the

15   actual computers in evidence because of all the

16   bestiality and other stuff.  So this is what we've

17   done to try to limit the jury from finding out about

18   the plethora of other smut on the defendant's

19   computer.  So we've tried to do it to protect the

20   defendant by not putting in everything else, but

21   this is just an analysis that he did that shows he

22   was talking to StricDad7.

23        MR. TRAGOS:  Your Honor, I might be mistaken,

24   but if they found chats on his computer with

25   StricDad7, that's what should be placed into

```
 1     evidence.  If they found -- again, I don't
 2     necessarily know what this is, but --
 3          THE COURT:  Let me see the exhibit, please,
 4     62.
 5          MR. TRAGOS:  All right.
 6          THE COURT:  Why do you think it's hearsay?  I
 7     don't quite understand that objection.
 8          MR. TRAGOS:  Because, Your Honor, it's a
 9     statement, it's an out-of-court statement of this
10     witness of what was on that computer.
11          THE COURT:  But he is here subject to
12     cross-examination.
13          MR. TRAGOS:  Right.  But that items -- if
14     those are actual evidence of things found on the
15     computer, then they should print -- if the Court
16     will take a look at 63, this is what they should be
17     putting in, which is the actual data that's on the
18     computer.
19          THE COURT:  So 62 is simply a summary of the
20     searches that, as I understand it, resulted in
21     certain hits.  I don't know how many, but -- is that
22     correct?
23          MS. KAISER:  Correct, correct.  He did
24     a search for --
25          THE COURT:  So there's no substance in 62,
```

```
 1      simply a history of the responses to the search?

 2           MS. KAISER:  Correct.  And summary charts are

 3      completely acceptable.

 4           THE COURT:  The objection is overruled.  It's

 5      simply a summary of the hits.  It doesn't contain

 6      any substance whatsoever.  There's no hearsay.  It's

 7      a record of the search.  I don't even know why the

 8      government is putting it in, but I don't see any

 9      objection in terms of hearsay.

10           It's relevant because it confirms that the

11      agents did, in fact, search the defendant's computer

12      to confirm that that was the computer used to

13      correspond with the undercover agent.  So I'll

14      overrule the objections.

15           MR. TRAGOS:  Your Honor, while we're up here,

16      does the Court want to take up the objections that

17      they're going to -- with this witness with regards

18      to them putting in graphic images of sadomasochism

19      and other types of activities that don't involve

20      children that the government plans on putting into

21      evidence?  We'd like to renew our motions.

22           THE COURT:  Are you going to get into that,

23      Ms. Kaiser?

24           MS. KAISER:  Yes, I am, Your Honor.

25           THE COURT:  What's the relevance?
```

1          MS. KAISER:  It goes to show his intent and

2     sadomasochistic activities.  The images -- based on

3     the Court's previous rulings, we're limited to those

4     pictures which show the defendant's interest in

5     whippings and canings and, therefore, they're

6     relevant to the charges.

7          MR. TRAGOS:  Your Honor, they would only be

8     relevant if they were children.  The fact that he is

9     indulging in legal activity is not relevant to show

10     that he would -- it would only be illegal --

11          THE COURT:  Did he not deny during his

12     interrogation, I'll call it, with the undercover

13     detective, any interest in that type of activity?

14          MR. TRAGOS:  He denied -- yes, he denied

15     interest in sadomasochistic activity.  But the only

16     relevant one would be children.

17          THE COURT:  Well, that's your spin on it, but

18     I don't agree with that because the defendant's

19     intent has been placed in issue by virtue of his

20     denials, and I think it is relevant even though it

21     involves adults.

22          The only concern I have, Ms. Kaiser, is

23     whether the probative value is outweighed by the

24     danger of unfair prejudice.  I've seen all these

25     photographs in the first trial, if you will, and it

1    certainly demonstrates an interest in this activity.

2    It certainly can be done without exhibiting the

3    photographs.  I assume if there's an objection, then

4    the photographs come in.  But there has to be a

5    balance between unfair prejudice and probative

6    value, and I think that's the critical

7    determination.

8         Can you get this evidence in without the

9    actual photographs being displayed?

10        MS. KAISER:  I don't believe so, Your Honor,

11   and I don't believe it would have --

12        THE COURT:  Why not?  Why can't an agent who

13   examined them simply describe them?

14        MS. KAISER:  Well, I think it sort of ties the

15   government's hands.  We have to show that this man

16   intended to engage in sexual activity,

17   sadomasochistic sexual activity with children.  He

18   gets on his --

19        THE COURT:  All you've got to show is that he

20   coerced, attempted to coerce a child to engage in

21   sexual activity --

22        MS. KAISER:  Correct.

23        THE COURT:  -- under the statute.

24        MS. KAISER:  Correct.  But as part of it, one

25   of the -- one of the Florida statutes that would

1    have been a violation had he succeeded has to do

2    with sadomasochistic abuse of children, so the --

3    2422(b) says it has to be a violation of state law,

4    and one of the state laws is sadomasochistic abuse.

5        THE COURT:  I understand that.  Can you not

6    have an agent, then, with knowledge describe what he

7    found or she found on the computer without

8    exhibiting the photographs?

9        MS. KAISER:  I could, but I don't think --

10       THE COURT:  All right.  You could.

11       Would there be an objection to that,

12   Mr. Tragos?

13       MR. TRAGOS:  Yes, Your Honor, because if I

14   didn't object to it, then I'd be waiving my

15   objection to her putting in that category.  Now, if

16   I can preserve the objection on the category of

17   putting that stuff in, if the Court's overruling me,

18   then certainly --

19       THE COURT:  Well, is your objection to the

20   photographs or the substance of the testimony?

21       MR. TRAGOS:  Both.

22       THE COURT:  Well, then, I'd have to overrule

23   your objection because it bears directly on the

24   defendant's intent, motive, as well as his denials

25   in the interview with the undercover detective in

1       the sheriff's office.

2               MR. TRAGOS:   Then I would go to 403, Your

3       Honor.   I would ask the Court to make a

4       determination as to which of this evidence is

5       necessary for the government so as not to be unduly

6       prejudicial.

7               THE COURT:   403 doesn't require necessity.

8               MR. TRAGOS:   Right.   But it does require the

9       Court to make some determination as to whether or

10      not the photographs would or would not be necessary.

11              THE COURT:   All right.   Let me get rid of the

12      jury.

13              (End of side bar discussion.)

14              THE COURT:   Members of the jury, I apologize.

15      This is going to take a few more minutes.   Why don't

16      we let your relax in the jury room.

17              We'll be in recess so I can take this matter

18      up with counsel.

19              COURTROOM SECURITY OFFICER:   Rise for the

20      jury.

21              (Jury out at 9:47 a.m.)

22              THE COURT:   Be seated, please.   All right.

23      First, the objections as to 62 are overruled as

24      consistent with the bench conference.   So when we

25      resume, Ms. Kaiser, move 62 and 63 into evidence so

1    I can do that in front of the jury.

2         MS. KAISER:  Yes, Your Honor.

3         THE COURT:  The issue now before the Court is

4    the defendant's objection to what both lawyers

5    expect will be asked -- or exhibits that both

6    lawyers expect will be presented to this witness

7    which depict certain conduct.

8         I have seen them in the first trial.  They are

9    graphic.  They involve adults.  They involve

10   bondage, whipping and various aspects of

11   sadomasochistic sexual behavior.  When I say

12   graphic, they depict, as I recall, male organs in

13   various stages of sexual arousal.

14        Why is the government putting this evidence

15   in?  You have a solid case against this defendant.

16   He is on tape admitting the behavior.  He's

17   physically in Tampa or St. Petersburg with the

18   intent to attend a meeting in which two young boys

19   are to be whipped by him and otherwise sexually

20   abused.  He has implements in his possession.  Why

21   do you think it's important to put on this evidence,

22   Ms. Kaiser?

23        MS. KAISER:  Your Honor, for a number of

24   reasons.  The first reason being the defendant in

25   his interview makes a number of false statements.

1    The United States has a right to prove --

2         THE COURT:  So he does.  He makes false

3    statements.  He falsely denies an interest when it's

4    obvious to anybody with a modicum of reason and

5    common sense that not only did he have an interest

6    in talking about it, he traveled to St. Pete to do

7    it.

8         MS. KAISER:  Your Honor, he's going to put an

9    expert on the stand tomorrow --

10        THE COURT:  Maybe.

11        MS. KAISER:  -- saying that it's all a fantasy

12   and --

13        THE COURT:  Maybe.

14        MS. KAISER:  -- he's going to take the stand

15   and say it's all a fantasy.

16        THE COURT:  That hasn't happened yet.

17        MS. KAISER:  Exactly.  But he's also already

18   made false admissions that the United States has a

19   right to prove are false.

20        THE COURT:  Here's what I'm going to do.  I'm

21   going to sustain the objections because I think this

22   is overkill.

23        Under 404(b), the danger of unfair prejudice

24   outweighs any probative value at this stage in the

25   case.  If this defendant takes the stand and denies

1    any interest in this activity, it's coming in in

2    rebuttal.  He knows that.  He's hearing it from me.

3    There's a point when reason and fairness come into

4    play, and that's where I'm drawing the line.  The

5    unfair prejudice outweighs probative value.

6         I have thought long and hard about the first

7    trial.  You made a mistake in that trial and that's

8    why we're here again.  I'm not going to allow

9    another mistake to be made.

10        If he testifies or puts on a defense that

11   raises this issue of intent and interest in this

12   type of activity, it will come in in rebuttal, and

13   then he will have to explain to the appellate court

14   why it wasn't relevant.

15        But at this stage, Ms. Kaiser, I'm very

16   concerned that an argument can be made that this is

17   simply unfairly prejudicial to the defendant because

18   of the graphic nature of these adult sadomasochistic

19   photographs.  They are extremely troubling.  They

20   have nothing to do with children.  And at this stage

21   in the proceedings, I don't think his intent is

22   sufficiently at issue just because he falsely denied

23   an interest in the face of graphic discussions about

24   it.

25        Again, if he testifies, the door will be

1   opened and any danger of unfair prejudice will be

2   mitigated by the probative value to address any

3   false denials, if that's what the government

4   believes them to be.  That is my ruling.

5       Let's mark these exhibits for the record so we

6   have an understanding of which ones they are going

7   to be.

8       MS. KAISER:  Your Honor, within the -- within

9   some of the pictures, there does appear to be what

10  could certainly be a minor boy that's bent over

11  the --

12      THE COURT:  Ms. Kaiser, I have asked you to

13  identify the exhibits that depict this behavior

14  objected to by Mr. Tragos.  That is not an

15  invitation to re-argue the matter.  Give me the

16  exhibit numbers.

17      MS. KAISER:  97, 1 through 20.

18      THE COURT:  I'm sorry.  97, is that a

19  subcategory?

20      MS. KAISER:  Yes, 97-1 through 97-20.

21      THE COURT:  So there are 20 photographs within

22  Exhibit Number 97?

23      MS. KAISER:  That's correct.

24      THE COURT:  All right.

25      MS. KAISER:  And Government's Exhibit 99, one

1     through three.

2          THE COURT:  So three photographs in Exhibit

3     99?

4          MS. KAISER:  Correct.  Your Honor, may I make

5     an offer of proof?

6          THE COURT:  Well, is that the extent of the

7     photographs depicting this adult behavior?

8          MS. KAISER:  Yes, Your Honor.

9          THE COURT:  All right.  So for the record, we

10    have Exhibits 97 and 99, and I'm asking, which

11    display or depict adult activities involving whips,

12    bondage, sexual activity?

13         Mr. Tragos, is that an accurate summary,

14    without getting into specifics?

15         MR. TRAGOS:  I think so, Your Honor.

16         THE COURT:  Ms. Kaiser?

17         MS. KAISER:  Yes, Your Honor.

18         THE COURT:  Now, what's the other exhibit that

19    you want to discuss?

20         MR. TRAGOS:  Are you talking to me, Your

21    Honor, or Ms. --

22         THE COURT:  No.  Ms. Kaiser.  I assume you're

23    not offering it.

24         MS. KAISER:  Well, Your Honor, I want to make

25    an offer of proof with respect to 97.  The first

1        picture, 97-1, depicts a person.  You can't

2        determine if it's a child or not, but it's bent over

3        another person's lap.  His hands are bound as if

4        he's about to get a spanking.  And considering that

5        this defendant wanted to tie the children up and

6        spank them --

7                THE COURT:  Let me see Exhibit 1, sub one, of

8        97, please.  Thank you, sir.

9                Mr. Tragos, do you have Exhibit 97-1?

10               MR. TRAGOS:  Yes.

11               THE COURT:  That depicts two males, one

12       straddling the lap of another.  The one straddling

13       the lap appears to be a very young male, as early

14       as, I would say, mid-teens dressed in underwear.

15       His hands are bound.  His mouth is covered by a

16       hand, and there is a -- the adult's left hand is on

17       the buttocks depicting, I'll call it, a spank.

18               What's the objection to that?

19               MR. TRAGOS:  Well, Your Honor, it goes to --

20       again, there the issue is sadomasochism.  That's the

21       issue that they are --

22               THE COURT:  I know what it goes to.  What's

23       the objection?  This depicts a young male being

24       spanked by an adult.

25               MR. TRAGOS:  Well, Your Honor, honestly, they

 1    are probably others that have males being spanked by

 2    adults.

 3          THE COURT:  Young males?

 4          MR. TRAGOS:  I don't know what young --

 5          THE COURT:  Yes, you do.  Use common sense.

 6    Look at the picture.  How old do you think the man

 7    in the underpants or underwear is?

 8          MR. TRAGOS:  Your Honor --

 9          THE COURT:  Is it reasonable to conclude that

10    that gentleman is 14- or 15-years-old?

11          MR. TRAGOS:  I do not think it is.

12          THE COURT:  All right.  Well, I think it does.

13          What's the next photograph?

14          MS. KAISER:  There's other images, Your Honor,

15    of just naked, red behinds that you can't tell how

16    old the people are, but it certainly displays an

17    interest in spanking, which is what the defendant

18    talked at length about wanting to administer

19    corporal punishment.

20          THE COURT:  Here's how we're going to proceed.

21    I will allow the government to put into evidence

22    97-1 over objection, because it does depict

23    spanking, an activity consistent with that described

24    in the defendant's chats with Detective Romanosky.

25          It also depicts a young male, who, by the

1    Court's observation, is no more than 15- or

2    16-years-old; clearly, a minor.  No younger than, I

3    would say, 12.  There's very little hair, body hair.

4    The physical size of the person indicates a younger

5    person.

6         So I'm overruling the objection to 97-1,

7    finding that, in this instance, the danger of unfair

8    prejudice does not outweigh the probative value

9    bearing on the defendant's intent.

10        If you have another photograph similar to

11   this, I'll look at it now.  If they are simply

12   photographs of adult bondage or other activities

13   that do not depict a young male, then my ruling

14   stands.

15        And I am, also, absent a more specific

16   objection, overruling an objection to the agent,

17   while identifying this photograph, responding to a

18   question whether or not other photographs were found

19   on the defendant's computers depicting spanking

20   and/or bondage.

21        MR. TRAGOS:  Sorry, Your Honor, I didn't

22   understand the last part.  The Court's allowing that

23   question?

24        THE COURT:  Yes, sir, without describing the

25   photographs.  And then, of course, if there is a

1      defense that's presented, that opens the door that

2      will be revisited.

3            All right.  I'm now looking at 97-6, which

4      depicts a male bound by the hands and the feet on

5      his belly.  I cannot and could not determine the age

6      of this individual other than he is clearly not

7      preadolescent.

8            And the difference between 97-1 and 97-6 is

9      97-1 depicts a young male straddling, consistent

10     with the description of the chats, the older male's

11     knee, similar to what was described of bending the

12     young males over a chair or couch.  97-6 is a

13     completely different scenario.  So I'll sustain the

14     objection to 97-6.  That's dash six, Madam Court

15     Reporter.

16           What else you got?  Anything else?

17           MS. KAISER:  No, Your Honor.  The other

18     pictures you can't tell the age of the --

19           THE COURT:  All right.  So the way you're

20     going to proceed is you can have him identify 97-1.

21           And your objection is deemed renewed,

22     Mr. Tragos.  You don't need to object again unless

23     you feel you need to.

24           Once it's in, you may ask a general question

25     as to whether the agent found other photographs on

1    the defendant's computer depicting, and be more

2    specific than just a general category, spankings,

3    bondage, the things that were discussed in the

4    chats.  If he says yes, that's the end of it.

5         Now, I will revisit the matter again on

6    rebuttal if the defense or through testimony the

7    issue arises as to whether or not the defendant had

8    an interest in this type of sexual activity.  I

9    think that's a fair procedure.  It's fair to the

10   government, fair to the defendant.  It avoids unfair

11   prejudice to the defendant.  It's in his hands.

12        MR. TRAGOS:  Your Honor?

13        THE COURT:  Yes, sir.

14        MR. TRAGOS:  Related to this, does that ruling

15   also go for the text messages that deal with --

16        THE COURT:  Hand those back, Mr. McNeil,

17   please.

18        MR. TRAGOS:  -- that deal with sadomasochism?

19   We also have text -- the government also intends to

20   introduce --

21        THE COURT:  No.  I don't find any unfair

22   prejudice in text messaging, particularly in light

23   of the testimony thus far that people just say

24   whatever they want to say, sometimes falsely.  It's

25   the graphic photographs that I'm troubled by,

1     Mr. Tragos.

2          MR. TRAGOS:  And then, secondly, Your Honor,

3     specifically there's a different issue with regards

4     to -- I believe it's Exhibit 94 of the government.

5     That exhibit is the exhibit about Cade.  If the

6     Court will remember, earlier in this trial --

7          THE COURT:  About what?  I'm sorry.

8          MR. TRAGOS:  Cade, C-a-d-e.  Earlier in this

9     trial, Your Honor, we raised the issue that they

10    presented -- their question to the witness was --

11         Your Honor, could the witness be excused for

12    argument?

13         THE COURT:  Are you going to offer 97,

14    Ms. Kaiser, through this witness?

15         MS. KAISER:  Yes.

16         THE COURT:  Let me see it, please.

17         MR. TRAGOS:  94, I think we're arguing --

18         MS. KAISER:  94 was the one you just saw, Your

19    Honor.

20         THE COURT:  I mean 94.

21         MS. KAISER:  Your Honor, I'm not going to

22    offer 94.

23         THE COURT:  All right.  That moots that issue,

24    Mr. Tragos.

25         MR. TRAGOS:  Yes, Your Honor.

```
1              THE COURT:  Anything else we need to take up?

2              Why don't you take a short comfort break and

3       let's get going, please.

4              Mr. Witness, you step down.

5              (Recess from 10:03 a.m. until 10:13 a.m.)

6              THE COURT:  Okay.  Are we ready to proceed?

7              MS. KAISER:  Yes, Your Honor.

8              THE COURT:  Bring the jury in, please.

9              COURTROOM SECURITY OFFICER:  Rise for the

10      jury.

11             (Jury in at 10:14 a.m.)

12             THE COURT:  Thank you, and be seated.  I

13      appreciate your patience.  I know you understand

14      these breaks are necessary.

15             The objection to Government's Exhibit 32 is

16      overruled.  It will be received.

17             (Whereupon, Government's Exhibit Number 32 is

18      received into evidence.)

19             THE COURT:  And is there an objection to 63,

20      Mr. Tragos?

21             MR. TRAGOS:  Is --

22             THE COURT:  That's the carved chat.

23             MR. TRAGOS:  No objection.

24             THE COURT:  All right.  63 is received.  You

25      may resume direct examination.
```

1          (Whereupon, Government's Exhibit Number 63 is

2     received into evidence.)

3          MS. KAISER:  And, Your Honor, 62?

4          THE COURT:  I received 62.

5          (Whereupon, Government's Exhibit Number 62 is

6     received into evidence.)

7          MS. KAISER:  Thank you, Your Honor.

8     BY MS. KAISER:

9     Q     Agent Grawunder, can you explain what a carved

10    search is.

11    A     When we conduct our examination, sometimes

12    files are not found in their native format.  When we

13    run a search term, it will hit on files that are not

14    normally viewable on the computer.  So I have to

15    manually go out and carve that section of text from

16    the file where it was located and put it in a

17    readable format.

18         MS. KAISER:  Your Honor, at this time I'd like

19    to publish Government's Exhibit Number 62.

20         THE COURT:  You may do so.

21    BY MS. KAISER:

22    Q     Agent, could you tell the jury what we're

23    looking at here?  And this is just a portion.  I'll

24    try to zoom out, but what are we looking at here?

25    A     This is a printout of a page from my

1    electronic report, and what it shows is the bookmark

2    name, which is 12 in brackets, search term seven,

3    StricDad7.  And then below are the -- the file count

4    is 18.  That's 18 files that were found and placed

5    in that specific bookmark with the -- that had the

6    term StricDad7.  And below that to the -- between

7    the two lines is the first hit, and then there'd be

8    17 others under that.

9    Q    When you say "first hit" what do you mean?

10   A    When I type in the words, in this case

11   "StricDad7," the software searches all the text in

12   the forensic image for that specific term, and it

13   reports to me a hit of the files that had that term

14   in it.

15        For example, the first one is -- it shows the

16   file path, Exhibit 1, which was the Dell laptop;

17   partition one, no name; NTF is documents and

18   settings; owner desktop; AOL saved; PFC; C

19   underscore America Online 9.08; organize; cache;

20   Captoes00; Captoes; new male; 06/07/2008; StricDad7;

21   no subject.  And that is an AOL e-mail folder

22   depicting some type of electronic communication

23   either to or from StricDad7 on that date, 6/17/2008.

24   Q    All right.  Now, is part of that -- part of

25   the path -- and you can touch the screen.  But is

1    part of the path -- where it says full path, is that

2    part of -- is part of that what you create or is

3    that all from the defendant's computer?

4    A      Part of that is from -- the first part,

5    Exhibit 1, is how Special Agent Kelly identified the

6    laptop as Exhibit 1; the Gateway desktop as Exhibit

7    2.  So that's created by us.

8          The rest of the file path is the path that it

9    was found on the subject's computer.

10   Q      And you said that there's a file count of 18;

11   is that correct?

12   A      Yes, ma'am.

13   Q      So would -- what does that mean?  Does that

14   mean that there's 18 separate times StricDad7 came

15   up?

16   A      At least.  Those are 18 files that when the

17   search results came back for that term that I placed

18   into that bookmark.

19   Q      And Government's Exhibit 63 that I'm putting

20   on the overhead, what is that?

21   A      That is a carved section of an electronic chat

22   between the user name Captoes and StricDad7.

23   Q      Agent, I'm showing you what's been marked for

24   identification as Government's Exhibit 97-1.  Do you

25   recognize that document?

1    A     Yes, I do.

2    Q     What is that document?

3    A     This is a picture that looks like it was

4    attached to an e-mail message found on the subject's

5    laptop computer.

6         MS. KAISER:  Your Honor, at this time I'd move

7    for admission of Government's Exhibit 97-1 into

8    evidence.

9         MR. TRAGOS:  May I voir dire, Your Honor?

10        THE COURT:  Yes, sir.

11                    VOIR DIRE EXAMINATION

12   BY MR. TRAGOS:

13   Q     Agent, let me ask you.  You said this was an

14   attachment.  Could you explain what that means?

15   A     It -- when people communicate over the

16   internet, if they want to send a picture or a file

17   or a Word document, they can attach it to an e-mail

18   message and it will travel over the internet to the

19   other person's account and they will be able to read

20   the text and the attachment, if there is some, and

21   view the picture.

22   Q     So this picture was sent to Captoes?

23   A     I'd actually have to look at the path to know

24   that, sir.

25        MR. TRAGOS:  May I approach?

```
 1          THE COURT:  The voir dire should be as to the

 2    admissibility of the exhibit, not other matters,

 3    Mr. Tragos, please.

 4          MR. TRAGOS:  Yes, Your Honor.

 5    BY MR. TRAGOS:

 6    Q    Okay.  So when you retrieved it, you retrieved

 7    it, and that's the information you found out when

 8    you retrieved it, that it was attached to an e-mail

 9    that came to him?

10    A    In looking at the file path, the path is

11    incoming, saved mail, Message 0642, which to me

12    shows that it was attached to an e-mail.  But the

13    corresponding e-mail message is not attached to this

14    document.

15    Q    So there was something -- that's not a

16    complete -- that picture without the e-mail message,

17    without the attachment, is not a complete document?

18    A    I'm not sure I understand your question.

19          THE COURT:  Is the e-mail that it was attached

20    to part of the exhibit?

21          THE WITNESS:  No.  It's not in this exhibit

22    here.

23          MR. TRAGOS:  Okay.  Your Honor, we would renew

24    our prior objections, and also object to the fact

25    that that's an incomplete document.
```

1         THE COURT:  Ms. Kaiser, do you have the e-mail

2    to which it was attached?

3         MS. KAISER:  No, Your Honor.  May we approach

4    side bar?

5         THE COURT:  Yes, sir.  Yes, ma'am, excuse me.

6         (At side bar, on the record.)

7         THE COURT:  Yes, ma'am.

8         MS. KAISER:  Your Honor, no, we don't have the

9    e-mail that it was attached to, but this, again,

10   goes with the government's argument about these

11   pictures.  The government's concern, obviously, is

12   that Mr. Tragos is trying to paint this -- he's

13   going to make the point that this was e-mailed to

14   the defendant.  I'm assuming that's where he's going

15   with that.

16        THE COURT:  Well, that's a fact, so --

17        MS. KAISER:  Right.  But this is in his

18   incoming, saved mail, and it's part of how the agent

19   retrieved it.  I don't know if it was possible for

20   him to even have the e-mail with it, but --

21        THE COURT:  Well, then, lay a foundation that

22   he, as I understand, would have had to download and

23   save the image.

24        MS. KAISER:  All right.

25        THE COURT:  Therefore, what he found was the

1    downloaded image as opposed to the e-mail with the

2    attachment.  So the e-mail no longer exists or at

3    least was not retrieved.

4         MS. KAISER:  Right.

5         THE COURT:  With that, I think the objection

6    is overruled, Mr. Tragos.

7         MS. KAISER:  Okay.

8         (End of side bar discussion.)

9    BY MS. KAISER:

10   Q    All right.  Agent, I'm showing you what's been

11   marked for identification as Government's Exhibit

12   97-1.  Can you tell me where that image came from on

13   the computer?

14   A    Yes.  The file path is from the Dell laptop,

15   partition one, no name NTFS, documents and settings,

16   owner, desktop, Charles Jackson, desktop, AOL, saved

17   PFC, America Online 8.0, organize, Captoes, Captoes

18   mail, incoming saved mail message 0642, AOL, ADPMA

19   11659379-0004.  And the remaining name of the file

20   is 1E23 dot JPG.

21   Q    Would this have been an image that was

22   attached to an e-mail?

23   A    I believe so, yes.

24   Q    Is there anything about the path that tells

25   you that it was opened and saved by the defendant?

1           MR. TRAGOS:  Objection, leading.

2           THE COURT:  Sustained.  Rephrase, please.

3    BY MS. KAISER:

4    Q    Can you -- do you note anything significant in

5    the path name with respect to this picture?

6    A     Well, in the path name is incoming saved mail,

7    which indicates to me that the defendant downloaded

8    this e-mail and any attachments onto his computer

9    from the AOL -- from AOL servers, e-mail servers.

10   Q    When you pulled this image from the

11   defendant's computer, was there an e-mail attached

12   to it?

13   A     I believe there was.

14   Q    And do you know where that -- where that

15   e-mail would be on the defendant's computer?

16   A     It should be in the same folder.

17          MS. KAISER:  Your Honor, at this time I'd move

18   for admission of Government's Exhibit 97-1 into

19   evidence.

20          THE COURT:  Same objection?

21          MR. TRAGOS:  Yes, Your Honor, especially with

22   the testimony that was given.

23          THE COURT:  Well, the objection will be

24   overruled.  97-1 will be received.

25          (Whereupon, Government's Exhibit Number 97-1

1       is received into evidence.)

2           MS. KAISER:  Your Honor, request permission to

3       publish to the jury.

4           THE COURT:  Yes, ma'am.

5       BY MS. KAISER:

6       Q    Can you please describe what's depicted in

7       Government's Exhibit 97-1.

8       A    That appears to be a young man bent over the

9       knees of another man.  The man laying on his stomach

10      is stripped down to his underwear.  His hands are

11      tied behind his back, and his mouth appears to be

12      covered by the adult who's sitting in the chair.

13      Q    Agent, in your review of the defendant's

14      computers, did you see any other images that

15      depicted any sort of spankings?

16      A    Yes.

17      Q    Did you see any other images that depicted any

18      sadomasochistic images?

19          MR. TRAGOS:  Your Honor, objection.

20          THE COURT:  Sustained.  Rephrase it, please.

21      BY MS. KAISER:

22      Q    Did you see any other images that depicted

23      bondage?

24      A    Yes.

25      Q    Did you see any other images of people that

1    had been whipped?

2    A      Yes.

3    Q      Agent, I'm showing you what's been marked for

4    identification as Government's Exhibit 95-1 through

5    95-20, A through G.  Take a look at those documents,

6    if you will.

7    A      I've reviewed them.

8    Q      And what are those documents?

9    A      These are e-mail messages found on the

10   defendant's computers.

11          MR. TRAGOS:  Could I have those exhibit

12   numbers again?  I'm sorry.

13          MS. KAISER:  It's 95-1 through 95-20, A

14   through G.

15   BY MS. KAISER:

16   Q      I'm sorry.  Please continue.

17   A      I had finished answering.

18   Q      And where did those documents come from?

19   A      It appears that all of these e-mails came from

20   the AOL e-mail folders on the laptop computer.

21          MS. KAISER:  Your Honor, at this time I'd move

22   for admission of Government's Exhibits 95-1 through

23   95-20, A through G, into evidence.

24          MR. TRAGOS:  Just renew our objections, Your

25   Honor.  Yes, just renew our objections.

1   BY MS. KAISER:

2   Q      Agent Grawunder --

3          THE COURT:  Just a moment.  Just a moment,

4   please.

5          MS. KAISER:  I'm sorry.

6          THE COURT:  Exhibits 95-1 through 95-20 are

7   received, and 95-20 includes A through G.  Correct,

8   Ms. Kaiser?

9          MS. KAISER:  Yes, Your Honor.

10         THE COURT:  Those exhibits are now received.

11         MS. KAISER:  Thank you.

12         (Whereupon, Government's Exhibit Numbers 95-1

13   through 95-20, A through G, are received into

14   evidence.)

15   BY MS. KAISER:

16   Q      Agent, I'm showing you what's marked as

17   Government's Exhibit 96A through 96B, 96A and B.  If

18   you could please take a look at those.

19   A      These are e-mails from the America Online

20   folders found on the laptop computer.

21         MS. KAISER:  Your Honor, at this time I'd move

22   for admission of Government's Exhibit 96A and B into

23   evidence.

24         THE COURT:  Any objection?

25         MR. TRAGOS:  May I have a moment, Your Honor?

```
 1              THE COURT:  Yes, sir.

 2              MR. TRAGOS:  Same objection.

 3              THE COURT:  The objection will be overruled,

 4      and 96A and 96B are now received.

 5              (Whereupon, Government's Exhibit Numbers 96A

 6      and 96B are received into evidence.)

 7      BY MS. KAISER:

 8      Q     Agent, I'm showing you what's been marked for

 9      identification as Government's Exhibit 98-1 through

10      98-5.  Do you recognize those items?

11      A     Yes.  These are e-mail messages from the

12      desktop computer that were found in the AOL e-mail

13      folders.

14              MS. KAISER:  At this time I'd move for

15      admission of Government's Exhibits 98-1 through

16      98-5.

17              THE COURT:  Did you say 98?

18              MS. KAISER:  Yes, Your Honor.

19              MR. TRAGOS:  Same objection, Your Honor.

20              THE COURT:  Those objections are overruled,

21      and 98-1 through 98-5 are now received.

22              (Whereupon, Government's Exhibit Number 98-1

23      through 98-5 are received into evidence.)

24              MS. KAISER:  At this time I'd like to publish

25      Government's Exhibit 95-1.
```

1          THE COURT:  You may do so.

2     BY MS. KAISER:

3     Q     Agent Grawunder, if you could please tell the

4     jury what we're looking at here.  And if you would

5     just read the e-mail.  First, just address who it's

6     from and to, and the date and the content.

7     A     This is a printed message from Captoes to,

8     looks like, BrianW9367, dated 3/15/2008.  And the

9     message says, "Very strict dad with my son."

10    Q     Government's Exhibit 95-2.  If you'd do the

11    same.

12    A     This is an e-mail message with the subject

13    name from captoes2@silverdaddies from Captoes on

14    07/27/2007 to clay10023@gmail.com.

15          The message says, "Clay, I have just read and

16    re-read your very well-written profile.  I'm a

17    70-year-old mostly retired doctor living in both DC

18    and Southwest Florida outside of Naples.  I am

19    five-foot-ten, 185 pounds, and have a full head of

20    gray and white hair.  I also wear glasses.  I am a

21    kind and gentle man, but will spank when there is a

22    need for immediate correction.  I swim and bike ride

23    for exercise, and I, too, enjoy the," it appears

24    that that should say "theater and an occasional

25    movie.  I have traveled extensively and still enjoy

1    traveling, but more in the US these days.

2         "I have the ability to teach and mentor a

3    younger man, too.  Am an affectionate gentleman who

4    would enjoy getting to know you.  My e-mail is

5    Captoes@AOL.com.

6         "My best, Charles."

7    Q    Government's Exhibit 95-3.

8    A    This e-mail has no subject line other than

9    it's a reply from Captoes to, looks like, CPneeded,

10   on 05/09/2007.

11        It says, "I am in SW Florida and am a

12   disciplinarian who uses a razor strop."

13   Q    Government's Exhibit 95-4.

14   A    It's an e-mail from Captoes to matt845NY on

15   07/18/2006.

16        "Am a divorced older man who raised my son

17   alone.  Used Garrison belt and razor strop

18   extensively."

19   Q    Exhibit 95-5.

20   A    It's from Captoes to dwportland1977@gmail.com

21   on 07/04/2006.  Subject line is a reply

22   guyspank.com.  NewtospankingX2.

23        It says, "David, thanks for yours.

24        "Yes, of course, I am interested.  I am in SW

25   Florida and at times in Washington, DC.  Am much

1    older and very experienced.  My main implement is

2    usually leather.  I travel a bit, so availability is

3    limited at times.  Would appreciate photos and look

4    forward to hearing from you.

5         "Charles."

6    Q    Government's Exhibits 95-6.  And does this

7    e-mail contain both the initial e-mail and the

8    response e-mail?

9    A    Yes.

10   Q    All right.  If you would please read them in

11   the order that they were sent.

12   A    It appears -- let's see.  On June 18th, 2006,

13   Captoes wrote:  "Sean, thanks for yours.  When will

14   you be in Tampa?  I am just about 2.5 hour drive

15   south of there.  I am all for ownership.  Makes

16   discipline and control all much easier.  With us,

17   you would be totally controlled and you would hear

18   much from me verbally.  I never raise my voice, but

19   my tone is unmistakable.  Maybe you could come down

20   for a weekend."

21        Then on 06/21/2006, from

22   allarr55@earthlink.net to Captoes@AOL.com.

23        "Hi.  A weekend of you dominating my nude body

24   sounds wonderful.  Will let you know when I am down

25   there.  How would you be creative?  What would you

1    first order me to do?"

2           And it's signed "S."

3    Q    And Government's Exhibit 95-8, does that also

4    appear to be two e-mails, the first e-mail and then

5    a response?

6    A    Yes.

7    Q    If you would please also read those in the

8    order that they were sent.

9    A    29 March, 2006, from Captoes to absalom2.

10          "John, dear.  Very excited about your pending

11   arrival.  Tell me where you'll be on Friday or Sat

12   so I can call.

13          "Dr. Charles Jackson, 12040 Mahogany Aisle

14   Lane, Ft. Myers, Florida 33913, 239-561-1400.  Of

15   course, I shall be there with open arms.

16          "Love and licks, Charles."

17          Then on 04/03/2006 from absalom to Captoes.

18   "Hi, Charles.  I am all packed.  Your boy is on his

19   way to give himself and entrust himself to your care

20   and discipline.  I will see you at Ft. Myers airport

21   tomorrow" looks like that should be "evening."

22          "Hugs and licks from an excited boy.  John

23   XXXX."

24   Q    Government's Exhibit 95-9.

25   A    This appears to be a reply to an undated

1     e-mail.  It just says Captoes@AOL.com wrote:  "PJ,

2     this dad uses razor strops and straps only, as did

3     some in Victorian times.

4          "Dad."

5          On 1/30/2006 from PJ_mass to Captoes:

6          "I have never had the razor strop, Dad, and

7     worry about welting.  When you say strap, is that

8     like a belt a dad would wear with a suit?  PJ."

9     Q     Government's Exhibit 95-10.

10    A     1/25/2006 from Captoes to absalom:

11         "Dear John, thanks for yours.  Most eager to

12    spend quality time with you and heavily train you to

13    be mine.  There will be continual physical

14    punishment to make it clear that you are totally

15    mine.  You will always be totally and always

16    accountable and obedient.  You are always

17    respectful, I know.

18         "I will be here in Florida all of April,

19    though will have family here some of the time.  It's

20    lovely and warm here now and should continue that

21    way.  When you return to the UK, we will talk on the

22    phone.  I will be back in DC on 6 Feb.  Need to know

23    that hugs and licks will abound.

24         "Always, Charles."

25    Q     Government's Exhibit 95-12.

1      A       1/12/2006 from Captoes to absalom:

2             "Dear John, sorry for my delay but have had a

3      good bit to do business-wise.  You do sound as if

4      you are enjoying yourself and that is good to hear.

5      I do want to start training you for me and also how

6      much love we will have as well as heavy discipline.

7      It will be very deep, intense and often.  My boy

8      needs a very structured, heavy disciplined

9      existence.  The razor strop will be part of our way

10     of life.  Keep on enjoying yourself with lots of

11     love and licks.  Charles."

12     Q       Government's Exhibit 95-14.

13     A       On 07/06/2005, from Captoes to kenbost:

14            "Dear Kenny, thanks for yours.  I am a very

15     strict dad.  Like man who administers corporal

16     punishment only.  I never use wood, only leather.  I

17     usually do it across a bed or over a chair.  OTK

18     never can be hard enough.  I am 70, five-foot-ten,

19     185 pounds, full head of silver hair.  I surely feel

20     boys should yell or cry when being disciplined.  I

21     do it for a purpose, to correct poor behavior and

22     language.  Does this fit in with your needs?

23     Charles."

24     Q       Government's Exhibit 95-15.

25     A       On 04/19/2005, from Captoes to

1       sincereperson401.

2               "Thanks for your e-mail.  My living

3       environment will be so totally structured that there

4       will be little wiggle room.  My boy will be so

5       totally trained that his performance will always be

6       precise.  He will be very heavily disciplined at all

7       times and only by me.  He will make no decisions at

8       all."

9       Q       Will you just read the first paragraph of

10      Government's Exhibit 95-20?

11      A       "Thanks for your prompt reply.  Discipline of

12      my boy is for his own benefit.  I think one of dad's

13      jobs is to enforce rules consistently, and that I

14      take quite seriously.  I guess in ways I am a 1950's

15      dad with values that are not quite as present now.

16      I believe only in bare bottom spankings."

17      Q       That was Government's Exhibit 95-20 A.

18              Government's Exhibit 96B, if you could read

19      that one.

20      A       On 1/09/2006, from Captoes to MarkofM:

21              "Dear Mark, wow, what a memory.  You hit it

22      all right on the head perfectly.  Your chronology is

23      exactly as you wrote it.  We now need to talk about

24      and address re-living much of it in an updated way.

25      I think we both see that there was, is and always

1     shall be something very real here.  All of the

2     incidents that you so cogently remember have great

3     significance, each one in themselves.  Your true

4     intimate acquaintanceships with all things vital to

5     me, vital to you, me and us, singularly and

6     collectively, our cock similarity, my implements to

7     be used on my son, and the true feeling of love that

8     existed and surely still does.  Hope my letter and

9     photo arrive in good order.  You know what I wish

10    and believe you do, too, affection galore.  Dad."

11    Q    Government's Exhibit 95-8.  Does that also

12    contain two messages?

13    A    Yes.

14    Q    If you could please read them in the order

15    that they were sent.

16    A    On 11/13/2008 at 12:56 p.m., Captoes wrote:

17    "Am an older DIV dad who likes to have his

18    shoes and boots worshipped well."

19    On 01/13/2008 at 1:03 p.m., obedientlad to

20    Captoes:

21    "Very nice.  I have tongue polished a master's

22    shoes before.  I have even sucked off a man with him

23    cumming on the floor.  He then stepped in the cum

24    puddle and fed me his cum by having me lick it off

25    the sole of his shoe."

1    Q      Agent Grawunder, from your review of the

2    e-mails, is it fair to say that the ones that were

3    not read also reference discipline and razor strops?

4    A      You mean the ones from the exhibits?

5    Q      Yes.

6    A      Yes, ma'am.

7    Q      Agent, I'm showing you what's been marked for

8    identification as Government's Exhibit 102 and ask

9    if you recognize that document.

10   A      Yes, I do.

11   Q      What is that document?

12   A      These are several buddy lists from AOL.

13   Q      And whose computers did those come from?

14   A      They're from the defendant's computers, and it

15   appears that all of these came from the laptop

16   computer.

17   Q      All right.  And I'm showing you what's marked

18   for identification as Government's Exhibit 104.  Do

19   you recognize that item?

20   A      Yes, I to.

21   Q      And what is Government's Exhibit 104?

22   A      This is a list of AOL favorite files.

23   Q      And how many files does it show?

24   A      There's 1429 favorites printed here.  It looks

25   like these all came from the desktop computer.  Oh,

1    excuse me.  Hold on.  Yes, desktop computer.

2              MR. TRAGOS:  What was that number again?

3              MS. KAISER:  102 and 104.  Your Honor, at this

4    time I'd move for admission of Government's Exhibits

5    102 and 104 into evidence.

6              THE COURT:  Is there any objection?

7              MR. TRAGOS:  One moment, Your Honor.  Renew

8    the objections, Your Honor, as far as the content on

9    104.

10             THE COURT:  All right.  Exhibits 102 and 104

11   are received.  The objection is overruled.

12             (Whereupon, Government's Exhibit Numbers 102

13   and 104 are received into evidence.)

14   BY MS. KAISER:

15   Q     Agent Grawunder, I'm showing you what's been

16   marked for identification as Government's Exhibit

17   105.  Do you recognize that document?

18   A     Yes, I do.

19   Q     And what is Government's Exhibit 105?

20   A     These are two AOL e-mail folders depicting

21   electronic communication with StricDad7, and they

22   come from the desktop computer of the defendant.

23   Q     Do they have the actual content of the

24   e-mails?

25   A     No.  It just indicates that on the two dates,

```
 1    on 6/19/2008 and 6/30/2008, there was some type of

 2    communication with StricDad7.

 3    Q     Is this information you received from your

 4    carving of the data on the defendant's computer?

 5    A     I believe these were found as a result of the

 6    key word searches, and these were found in the AOL

 7    e-mail folders.  I did not have to carve them out.

 8    But it's just a folder with no data contained inside

 9    the folder.

10    Q     Next I'm showing you what's been marked for

11    identification as Government's Exhibit 106, and ask

12    if you could take a look at that item.  Do you

13    recognize that document?

14    A     Yes, I do.

15    Q     And what is Government's Exhibit 106?

16    A     It is an AOL address book.

17    Q     And where did that come from?

18    A     From the defendant's desktop computer, and

19    it's -- this is a list of contacts that the

20    defendant would have contacted or would have

21    contacted him, just like a written address book.

22    Q     And I'm showing you what's marked for

23    identification as Government's Exhibit 107 --

24    A     Yes, ma'am.

25    Q     -- and ask if you recognize that document?
```

```
 1    A      Yes, I do.

 2    Q      And what is Government's Exhibit 107?

 3    A      This is an AOL buddy list from the desktop.

 4           MS. KAISER:  Your Honor, at this time I'd move

 5    for admission of Government Exhibits 105, 106 and

 6    107 into evidence.

 7           THE COURT:  Is there any objection?

 8           MR. TRAGOS:  May I voir dire on 105, Your

 9    Honor?

10           THE COURT:  Yes, sir.

11                     VOIR DIRE EXAMINATION

12    BY MR. TRAGOS:

13    Q      105 is actually a report; is that correct?

14    A      I'm sorry.  I'd have to see it.  105 is a

15    printout of the AOL e-mail folder as it's

16    interpreted by my software so it's readable.

17    Q      So that's not actually a copy of the data

18    that's on the computer?

19    A      Correct.  It's a view that's been converted --

20    since this information resided in the AOL e-mail

21    folder, so it would be viewable outside that --

22    excuse me, the AOL program, so it would be readable

23    outside that AOL program.  It's just one line of

24    text describing what the folder name was.

25    Q      Okay.  I'm trying to understand.  Is it
```

1    your -- is it the software that's interpreting

2    what's in the AOL folder?

3    A      It's showing me the name of the AOL folder.

4    Q      The software is?

5    A      Yes.

6    Q      Okay.  So that's not actually a copy of the

7    AOL folder?

8    A      Correct.

9          MR. TRAGOS:  We would object, Your Honor.

10         THE COURT:  Objection is overruled and

11   Exhibits 105, 106 and 107 are now received.

12         MS. KAISER:  Thank you.

13         (Whereupon, Government's Exhibit Numbers 105,

14   106 and 107 are received into evidence.)

15   BY MS. KAISER:

16   Q      Agent, I'm showing you what's been marked as

17   Government's Exhibit 109, and ask if you could take

18   a look at that.  Do you recognize that document?

19   A      Yes, I do.

20   Q      What is Government's Exhibit 109?

21   A      This is a carved section of the chat for the

22   term "DunedinSuperDad."

23   Q      And where was that located?

24   A      In drive-free space on the desktop computer.

25   Q      Can you explain to the jury what that means?

1    A       Drive-free space is an area of the computer

2    that's not currently being actively used by the

3    operating system, and it's a part of the hard drive

4    that is known to store deleted or old, unused files.

5    Q       And I'm showing you what's been marked as

6    Government's Exhibit 111.

7    A       Yes.

8    Q       Do you recognize that document?

9    A       Yes.  This is another carved section of text

10   from the laptop computer drive-free space.

11   Q       And do both Government's Exhibits 109 and 111

12   show Corporal Romanosky's undercover name of

13   DunedinDad?

14   A       DunedinSuperDad, yes.

15   Q       DunedinSuperDad?

16   A       Yes.  Yes, ma'am.

17           MS. KAISER:  At this time, Your Honor, I'd

18   move for admission of Government's Exhibits 109 and

19   111 into evidence.

20           MR. TRAGOS:  No objection.

21           THE COURT:  109 and 111 are now received.

22           (Whereupon, Government's Exhibit Numbers 109

23   and 111 are received into evidence.)

24           MS. KAISER:  Your Honor, may I have a moment?

25           THE COURT:  Yes, ma'am.

1                (Brief pause.)

2       BY MS. KAISER:

3       Q       Agent Grawunder, was a copy of the defendant's

4       files made and given to the defense in this case?

5       A       Yes, they were.

6       Q       Did they have access to the same information

7       that the defendant had on his computer that you did?

8               MR. TRAGOS:  Objection, relevance.

9               THE COURT:  Rephrase it, please.

10      BY MS. KAISER:

11      Q       What -- can you explain to the jury what the

12      defendant was given.

13              MR. TRAGOS:  Objection, relevance.

14              THE COURT:  It is not relevant to the jury's

15      function in this case, Ms. Kaiser.  I will sustain.

16              MS. KAISER:  Yes, Your Honor.

17      BY MS. KAISER:

18      Q       Agent Grawunder, once you gave Agent Hagedorn

19      -- or strike that.  Once you researched the list of

20      terms that Agent Hagedorn asked you to review, what

21      did you do with that information?

22      A       The search terms?

23      Q       Yes.

24      A       The search terms were placed onto -- the hits

25      for those search terms were placed onto the

1    electronic report which was provided to the case

2    agent, Special Agent Hagedorn.

3    Q      Did you take any further -- aside from giving

4    that information to Agent Hagedorn, did you

5    personally take any actions with respect to those

6    exhibits?

7    A      No.  My job was to forensically examine these

8    computers as to any evidence relating to any

9    criminal activity, and then my function stopped.

10   Q      Okay.  So it's fair to say that you didn't

11   conduct any followup with respect to those exhibits;

12   is that fair to say?

13   A      That's correct.

14          MS. KAISER:  I have no further questions.

15   Thank you.

16          THE COURT:  Cross-examination?

17                    CROSS-EXAMINATION

18   BY MR. TRAGOS:

19   Q      Agent, let me ask you to take a look at

20   Defense Exhibits 20, 21, 39, 22, 23, 24, 25, 26, 27,

21   28, 29, 30 and 31.  What I'll ask you do, sir, if

22   you would take a look at what's in evidence as

23   Government's Exhibits 25, 26 and 28.  Sorry, 95, 96

24   and 98.  Just tell me if those are e-mails,

25   additional e-mails, which correspond to or are from

1     the same people and from the computers of the

2     defendant?

3     A     Yes, sir.  Yes, sir.  From my brief review, it

4     appears these did come from the defendant's

5     computers, and they are -- many of them, most of

6     them, if not all, are from the same e-mails in the

7     government's exhibits.

8              THE COURT:  Are they offered at this time?

9              MR. TRAGOS:  Yes, sir, we'll offer them.

10             THE COURT:  Any objection?

11             MR. TRAGOS:  Excuse me?

12             THE COURT:  Any objection?

13             MS. KAISER:  I just want a moment to review

14     them, please.

15             THE COURT:  Any objection?

16             MS. KAISER:  I don't know, Your Honor, because

17     I haven't seen them before now.

18             THE COURT:  The objection will be --

19             MR. TRAGOS:  Your Honor, could we have a side

20     bar?

21             THE COURT:  No, ma'am.  No, sir.  If there's

22     not an objection, the exhibits come into evidence,

23     20 through 31 and 39.

24             (Whereupon, Defendant's Exhibit Numbers 20

25     through 31 and 39 are received into evidence.)

1    BY MR. TRAGOS:

2    Q       These exhibits, they were also part of your

3    analysis; correct?

4    A       Yes, sir.

5    Q       They are on the computer?

6    A       Yes, sir.

7    Q       They were part of your reports?

8    A       Yes, sir.

9    Q       Okay.  Let's start with the reports that you

10   gave to Agent Alex Hagedorn right here.

11   A       Yes, sir.

12   Q       Okay.  Let's start with -- and we're just

13   going to go -- we're just going to do a couple of

14   these.  We're not going to do them all.

15   A       Okay.

16   Q       And I'll show you Exhibit 31.  This is from

17   JJ1515; correct?

18   A       That's correct.

19   Q       And that is to Captoes?

20   A       Yes, sir.

21   Q       And it talks about his flight from Newark was

22   an hour late?

23   A       That's correct.

24   Q       Going to Dublin?

25   A       Yes, sir.

1    Q    By the way, on any of those e-mails were you

2    able to identify that any of them were to children?

3    A    No.

4    Q    Okay.  Defense Exhibit 29.  Now, this is an

5    e-mail from MarkofM to Captoes?

6    A    Yes, sir.

7    Q    Okay.  And it says, "Here I sit with my

8    smoking jacket on writing you."

9    A    Essentially, yes, sir.

10   Q    And he refers to Captoes as "Dear Dad."

11   Correct?

12   A    Yes, sir.

13   Q    Okay.  Now, this one corresponds to 95-19 that

14   the government's introduced and this is Exhibit 28

15   from the defendant?

16        THE COURT:  Before making a statement,

17   Mr. Tragos, perhaps you can ask the witness that

18   question.

19        MR. TRAGOS:  Okay.

20   BY MR. TRAGOS:

21   Q    Do you see GHSLIM61?

22   A    Yes, sir.

23   Q    Would you compare that to Government's Exhibit

24   95-19?

25   A    Yes, sir.  95-19 is from GHSLIM61.

```
 1    Q      Okay.  And within Defense Exhibit 28, there is

 2    an -- is this an e-mail, by the way?

 3    A      Yes, sir.

 4    Q      Okay.  "Hi, Dad.  Pic of me in Rome."  Do you

 5    see that?

 6    A      No, sir.

 7    Q      Oh, I'm sorry.  It's not on your screen?

 8    A      Oh, I'm sorry.  In the subject line, yes, sir.

 9    Q      Okay.  And it's from GHSLIM61?

10    A      Yes, sir.

11    Q      Now, before you testified -- the government

12    introduced Exhibits 97-1.

13    A      Yes, sir.

14    Q      You said that that was attached or embedded in

15    an e-mail; correct?

16    A      That's what it appears.

17    Q      Okay.  And if you will turn -- I turn the page

18    here, and there's a -- there's an attachment to this

19    e-mail; correct?

20    A      Yes.

21    Q      Exhibit 28?

22    A      Yes.

23    Q      And that is the attached picture?

24    A      Yes, sir, I believe so.

25    Q      Okay.  So this is a picture -- I guess that's
```

1     the Colosseum.  But this is a picture of him writing

2     to a person he calls dad, which in this case is

3     Captoes, saying it's a picture of him; correct?

4          "Hi, Dad.  Pic of me in Rome."

5     A     Yes, sir, that's what it appears.

6     Q     Okay.  Now, if you will take a look at

7     Government's Exhibit 95-18, and if we look at

8     Defense Exhibit 27, is it from the -- are they from

9     the same person?

10    A     From and to are the same people, yes, sir.

11    Q     Okay.  And in this case he actually says his

12    age as 45-years-old; correct?

13    A     Yes.

14    Q     And in this e-mail also from PSMNOW, he tells

15    him that he has a wife and three small children?

16    A     Yes, that's what it says.

17    Q     He likes leather discipline?

18    A     Yes, sir.

19    Q     Then if you'll look at Government's Exhibit

20    95-17 -- by the way, I'm sorry if I asked you this,

21    but all these e-mails that I'm showing you now that

22    were defense exhibits, they're all also in the

23    possession of the government; correct?

24    A     Yes, sir, that's correct.

25    Q     Now, sir, if you'll look at Government's

1    Exhibit 95-15 and -16, and if you'll look on the

2    screen at Defense Exhibit 25 --

3    A      It doesn't appear I have -15.  I'm sorry, here

4    it is.  They're out of order.

5    Q      Okay.  If you would compare the two e-mails in

6    the government's exhibit and tell me whether or not

7    they are from the same person, sincereperson41, to

8    Captoes.

9    A      Yes, sir, that's correct.

10   Q      Now, sir, if you would look at, on the screen,

11   the e-mail within Defense Exhibit 25.  Would you

12   please read that e-mail.

13   A      Yes, sir.  From sincereperson41 to Captoes, on

14   4/21/2005.

15   Q      If you could read the subject line.

16   A      Is "demanding night."

17          "Yes, sir.  To answer your question first, I

18   am a five-ten-ish, 178 pounds.  I try and work out

19   three slash four times a week, but still have a

20   35-inch waist.  Would like to drop an inch or so.

21   Clean shaven face, smooth bottom, not much else to

22   say.

23          "Obviously, the boy will dress as directed,

24   but I haven't worn socks and garters before.  Do not

25   like the look on the boy and usually wear briefs.  I

1    had expected that you would ask your boy to not only

2    be available during the day, but to sleep in your

3    bed with you at night.  This usually would, I

4    expect, lead to a very tiring and demanding night

5    for the boy to be constantly available all night,

6    particularly to a man who appears to have the

7    stamina you have.  I know you have talked of using

8    the razor strop, which I have been taught using

9    before, and I know it must be the man's final

10   decision, but what, sir, do you foresee in

11   whip-training the boy?  It would certainly take

12   obedience to a new level."

13   Q      Now, sir, if you will look at Government's

14   Exhibit 95-14.

15   A      Yes, sir.

16   Q      And if you look at Defense Exhibit 24.  And

17   are they to and from the same person?

18   A      Yes, sir, they are.

19   Q      Okay.  And what does the subject line say?

20   A      "Your guyspank listing."

21   Q      Okay.  And then what is the message?

22   A      "Hi.  I'm a 52-year-old little boy, six-foot,

23   190, who needs real daddy spankings from a real

24   daddy.  Thanks, Kenny."

25   Q      Also, the to and from contained in that same

1    exhibit, Defense Exhibit 24 -- by the way, what was

2    the date of that first one that you just read?

3    A    6/24/2005.

4    Q    And what is the date of this one?

5    A    6/30/2005.

6    Q    Would you read that one, please.

7    A    "Hi."  Do you want me to read the --

8    Q    If you would read the --

9    A    -- original at the bottom?

10   Q    Just read the message body.

11   A    Sure.  "Hi, Charles.  I'm a white male,

12   52-year-old little boy, six-foot, 190, who is

13   looking for a real daddy spanking.  I need to be

14   over the knee spanked and scolded just like a child.

15   I do cry hard when I'm given a sound spanking.

16   Kenny.

17        "P.S.  Tell me about yourself and what you're

18   looking for."

19   Q    Now, sir, if you look at Government's Exhibit

20   95-9 through 13, and if you'll tell me if those are

21   to and from -- if the government's exhibit are to

22   and from the same people as the Defense Exhibit 23?

23   A    Sir, 95-9 is the same, but I believe you said

24   through 13?

25   Q    That's correct.

1    A    10, 11, 12 and 13 have a different subject.

2    Q    They have a different to and from?

3    A    Well, it's -- these include absalom2.

4    Q    Okay.

5    A    95-9 is a conversation between Captoes and PJ.

6    Q    Let's just go to -9 then.  Same people?

7    A    Yes, sir.

8    Q    So there's only one there, then, from PJmass

9    and that's -9?

10   A    That's what it appears.

11   Q    Now, sir, I'd ask you to take a look at

12   Defense Exhibit 23 and read the subject all the way

13   down to the message body.

14   A    "Reply:  Spank me.  From silverdaddies, from

15   PJ_mass, on 01/13/2006, to Captoes.

16        "Hi, Dad.  Nice to hear from you.  You sound

17   very much like the type of father I need.  Someone

18   who is stern but spanks for my own benefit.  I am in

19   my thirties and have been interested in this type of

20   traditional spanking for as long as I can remember.

21   I have always thought of friends' fathers and

22   grandfathers and dads on TV spanking me.  I've

23   always been particularly interested in those 1950s

24   dads like Ward Cleaver, very traditional and

25   wholesome.

1           "I am five-six, 135 pounds, with light brown

2      hair, hazel eyes, and clean shaven.  I have a

3      non-spanking partner and have to be discrete.

4           "How often do you get to Boston?  It would be

5      great to meet you there.  Can you tell me more about

6      you?  If you have a picture, I would love to see it,

7      but if you think it is too soon, I understand.  PJ."

8      Q      Now, was there also on that e-mail message an

9      e-mail from Captoes to PJ?

10     A      Yes.

11     Q      Would you read that, please.

12     A      "Dear PJ, thanks for your reply.  Yes, I am a

13     traditional dad, granddad.  I do use my suit or

14     sport jacket, trouser belt as a discipline

15     implement.  They are usually about one and a half

16     inches wide and not too heavy.  I have, however,

17     been known to use my razor strop for serious

18     infractions.

19          "I am a 69-year-old man who is a partially

20     retired professional.  I do travel to Boston for

21     meetings and to see family members, and split my

22     time between DC and SW Florida, non-seasonal.

23          "I have always been an advocate for strict

24     discipline and corporal punishment and will not

25     change this stance.  I do feel, as Gilbert and

1    Sullivan so adroitly put it, that the punishment fit

2    the crime.

3         "Will you tell me more about you, please?

4         "My best, Charles Chip."

5    Q    Now, sir, if you'll take a look at Exhibit

6    25-8.  Excuse me, 95-8.  Sir, if you will compare

7    that to the "to and from" in Defense Exhibit 22.

8    A    They're the same.

9    Q    Okay.  Now, sir, if you will read the January

10   1st, 2005 e-mail.

11   A    "Subject, reply JJ47 of silverdaddies from

12   absalom to Captoes.

13        "Hello, Charles.  A very happy new year.  I

14   hope you saw something in my silverdaddies profiles

15   that attracted you.  I am 50 and have always been

16   attracted to older, traditional gentlemen.  I am a

17   semi-retired academic, and I can do my researches

18   from anywhere in the world and frequently do,

19   traveling five to seven times a year.  Financially

20   independent.  I am not exactly rich, but I don't

21   have to work.  I have a wide range of interests from

22   the high brow to the low brow.  Not quite sure where

23   sex comes in that scale, but I love sex with a tight

24   man.

25        "I share a rented flat in London, but have my

```
 1    own cottage in the country about 70 miles away in

 2    Hampshire.

 3           "Tell me a little about yourself.  I would

 4    love to know more about you.  Best wishes, John."

 5    Q       Now, sir, if you look at Government's Exhibit

 6    95-7.

 7    A       Yes, sir.

 8    Q       And if you'll compare that to Defense Exhibit

 9    39.  Are the two "to and froms" the same?

10    A       Both of these are from shoe_SX.  But it

11    appears this first one went to a Yahoo group.

12    Q       What's a Yahoo group?

13    A       That's a -- when you -- you can go on-line, in

14    this case to Yahoo, and sign up using your e-mail to

15    be on a group list where several people can

16    communicate to each other at the same time.

17    Q       And this group posting, is that the correct

18    way of saying it?

19    A       Yes, sir.

20    Q       This group posting, you found a copy of this

21    on Dr. Friedlander's computer?

22    A       Yes, sir.

23    Q       And would you please tell me what the message

24    body says.

25    A       "Hi, guys.  I just moved to south Florida
```

between Miami and Ft. Lauderdale.  GWM, 50 YM, with

a major shoe fetish here.  If you are in south

central Florida and want to get acquainted, give me

a shout at shoe_SX.  From Tom."

Q     Now, sir, if you will look at Government's

Exhibit 95-6.

A     Yes, sir.

Q     And do the "to and froms" on that compare to

Defense Exhibit 21?

A     Yes, sir.

Q     Okay.  And could you please read the 6/16

e-mail.

A     "Love being dominated by older men."  From

allarr55 to Captoes.

      "Hi.  You wrote to me on sdaddies.com.  On

that site I am slutboy55.  I will be in Florida for

my job much of July, August, possibly longer.

      "When you have more time, write more what you

are looking for and are into.  Any pictures?

      "Here are some more details about me.  Looking

more for something ongoing than a one-time fling,

but that can be hard to predict.  I love being

ordered around while nude and love being dominated

and love during sexual situations to be treated and

addressed as a slut.  Within the bounds of safety, I

1    enjoy giving up complete control of my body.  I

2    enjoy very much pleasing my master.  When you are

3    pleased and happy, that is a turn-on for me.  I am

4    not into one-way streets.  I am not into extreme

5    pain, but I do enjoy being spanked.  I have been

6    told I am very oral and I have big, very sensitive

7    nipples.  Big nipples.  I like a creative

8    atmosphere.  I like to be encouraged to be sexual,

9    and I like being verbally humiliated.  I like being

10   called your bitch, slut, etcetera."

11   Q    Okay.  Sir, if you will look at Government's

12   Exhibit 95-5, and then if you'll compare that to

13   Defense Exhibit 20.

14   A    It's communication between the same people.

15   Q    Okay.  If you'll take a look at the 7/4/06

16   e-mail.

17   A    Yes, sir.

18   Q    And if you will please read the paragraph that

19   I'm pointing to there.

20   A    "Since adolescence, I have been attracted to

21   older, authority figure men.  I have been out as a

22   gay man since age 21.  About 20 years ago, I felt

23   burned out with the gay scene and stopped connecting

24   with guys.  Last autumn, I started again trying to

25   find ways to meet guys and have since been exploring

1    the internet scene."

2    Q    Now, sir, I ask you to take a look at the

3    7/4/06 e-mail and ask you, was there an image

4    attached to this e-mail, or is there an image?

5    A    It appears that there was an attachment titled

6    "David on roof."

7    Q    Okay.  And is that the attached e-mail?

8    A    Actually, I can't say for sure.  There at the

9    bottom of that picture is there a file path or --

10   MR. TRAGOS:  Okay.  May I approach the

11   witness, Your Honor?

12   THE COURT:  Yes, sir.

13   THE WITNESS:  This picture does not have the

14   file path from where it came, but it is a picture of

15   a man standing on a roof.  But I don't recall

16   specifically that that came from this e-mail.

17   BY MR. TRAGOS:

18   Q    Altogether on these two computers, how many

19   graphic images did you find?

20   A    I don't recall, but I have that in my report.

21   Q    Feel free to refresh your recollection, with

22   the Court's permission.

23   A    The laptop computer contained 12,963 graphics,

24   and the desktop contained 16,927 graphics.

25   Q    Okay.  So between the two of them, you have

1    almost 30,000?

2    A      Yes, sir.

3    Q      Okay.  And one of the things that was

4    introduced into evidence -- I believe it's exhibit

5    -- let me see.  Exhibit 104.

6    A      Yes, sir.

7    Q      And what is that?

8    A      This is a list of favorites from America

9    Online.

10   Q      Okay.  And how many -- how many favorites were

11   there?

12   A      It appears there's 1,429.

13   Q      Can you explain, how does something become a

14   favorite?

15   A      When someone frequently visits a website or if

16   they find a website they are interested in and would

17   like to come back to later, they can mark it as a

18   favorite to review later.

19   Q      In fact, you did a cursory review of these

20   favorites; didn't you?

21   A      Yes.

22   Q      And one of the things that you looked for was

23   child pornography sites; right?

24   A      Yeah.  We looked for sites that it's obvious

25   in the name of a site that it may contain child

1     pornography.

2     Q      And you found none?

3     A      I did not find any.  No, sir.

4     Q      Now, sir, would you look at Government's

5     Exhibit 106.

6     A      Yes, sir.

7     Q      Now, what is that?

8     A      This is an AOL address book.

9     Q      Okay.  And tell me what an AOL address book

10    is.

11    A      It's a list of on-line contacts, usually

12    e-mail addresses and their contact name, maybe phone

13    numbers or other identification to facilitate e-mail

14    or other electronic contact between individuals.

15    Q      Okay.  And those -- that information on the

16    address book, that actually contains the person's

17    AOL or e-mail address; correct?

18    A      Yes.  This first page I'm looking at, some of

19    them include the e-mail address, some of them only

20    include a screen name.

21    Q      Okay.  And with a screen name or e-mail

22    address, the service provider, let's say AOL as an

23    example, is able to provide information about that

24    person; correct?

25    A      Correct.

1    Q      And how many people are listed in that address

2    book?  You can give me an approximate.

3    A      There's probably a couple hundred.

4    Q      In fact, there's probably close to 1,200;

5    isn't there?  There's about 100 pages there and

6    about 12 on a page?

7    A      Yes, sir.  There's approximately 12 and it's

8    not numbered.  The pages aren't numbered, but, yes,

9    it could be that number.

10   Q      Okay.

11   A      It's a large stack.

12   Q      Sir, did you attempt in any way to make any

13   contact with any of these people in this address

14   book?

15   A      No, I did not.

16   Q      Did you subpoena or request a subpoena to AOL

17   to find out information about any of the people in

18   this address book?

19   A      No, sir.  My focus was specifically on the

20   evidence on the computers.

21   Q      Sir, would you look at Exhibit 102?

22   A      Yes, sir.

23   Q      And what is that?

24   A      It's a list of buddies on AOL.

25   Q      Okay.  And are there more than one buddy list,

```
1      by the way?  Did you find more than one buddy list
2      on these computers?
3      A      Yes, sir, I did.
4      Q      Could you identify what the other buddy list
5      -- give me the exhibit number for the other one.
6      A      I believe they're all contained in -- I'm
7      sorry, 107.  And this Government's 102 has a couple
8      different buddy lists.
9      Q      Approximately how many screen names are in
10     Exhibit 102?
11     A      There appears to be approximately 70 in each
12     one, and there are one -- looks like there's four,
13     so that's 250, 300 approximately.
14     Q      Okay.  And then in 107?
15     A      There's only one file containing buddy list
16     info, so there's approximately 70 on this exhibit.
17     Q      How many e-mails did you find on these
18     computers?
19     A      I don't specifically recall.  I have that in
20     my report, also.  The laptop contained 6,730
21     e-mails.  When the duplicates and blank e-mails were
22     removed, that number came out to 5,494.  And the
23     desktop contained 2,184 e-mail messages, but, again,
24     when duplicates and blank e-mails were removed, that
25     number was 659.  So that's over 6,000 e-mails.
```

1    Q      And can you be sure that that's all the

2    e-mails that were on there?

3    A      I'm fairly -- the only e-mails that would not

4    be included would be ones that were strict web

5    based.  For example, Yahoo e-mail is a web based

6    where the e-mails get cached into temporary internet

7    files.  It can be difficult for us to recover those

8    specifically as e-mail messages because they're not

9    marked as that.  They're marked as internet pages.

10   Q      Did you ever, sir, do yourself a -- well, let

11   me ask you to take a look at Defense Exhibit 3.

12   A      Yes, sir.

13   Q      And do you recognize that?

14   A      I do.

15   Q      And tell me what is that, sir.

16   A      This is a list of e-mail -- senders of e-mails

17   with dates that I received from the case agent who

18   advised me that this was a list --

19   Q      Just don't tell us what someone else told you.

20   A      Okay.

21   Q      So you received that from the case agent?

22   A      I did.

23   Q      And what did you do with that list?

24   A      I was asked to print all the corresponding

25   e-mails to and from the individuals on this list.

1    Q    And did you do that?

2    A    I did.

3    Q    Excuse me?

4    A    I did, yes.

5    Q    Okay.  And did you verify the accuracy of that

6    list?

7    A    Yes.  As I recall of the hundred names on this

8    list, there was only one error, but it was a

9    person's true name as opposed to their e-mail

10   address.  But that name did correspond to other

11   e-mails that were on the hard drive.

12   Q    Okay.  And this was provided to you by Agent

13   Hagedorn for you to verify it?

14   A    Yes, sir.

15        MR. TRAGOS:  At this time, Your Honor, we'd

16   move Defense Exhibit 3 into evidence.

17        THE COURT:  Any objection?

18        MS. KAISER:  No objection, Your Honor.

19        THE COURT:  Exhibit 3 is received.

20        (Whereupon, Defendant's Exhibit Number 3 is

21   received into evidence.)

22   BY MR. TRAGOS:

23   Q    After reviewing this list and after verifying

24   it, did you try to find out who these people were?

25   A    No, I did not.

```
 1    Q      Did you try to find out at any time if there

 2    were any people that were either on this list, on

 3    the buddy list, on the address book, anything where

 4    any of them at any period of time -- were you able

 5    to find any of them that were juveniles?

 6    A      I never looked.

 7    Q      And in your report to Agent Hagedorn, did you

 8    specifically tell him that there was no child

 9    pornography found on these computers?

10    A      In regards to this list --

11    Q      No.  I'm talking about other -- the report.

12    Your whole report that you did on all the computers.

13    A      Can you ask the question again, please?

14    Q      Okay.  Did you inform Agent Hagedorn that

15    there was no child pornography on these computers?

16    A      Yes, I did.

17    Q      What was the time range on the computers of

18    the e-mails?  When did they start and when did they

19    stop?

20    A      If I recall, one computer's e-mails went from

21    approximately 2001 up until the time they were

22    seized, and the other computer went from

23    approximately 2007, 2008.

24    Q      What's a file on a computer?

25    A      A file is an individual document, picture, or
```

1      other type of program that is interpreted by the

2      computer either as a program that runs, a picture to

3      be viewed by a user, or a document that they've

4      created.

5      Q      How many files were on these computers?

6      A      I believe one had over 100,000.  The other one

7      had maybe almost 200,000.  I have the exact numbers

8      in my notes.

9      Q      If you would.

10     A      Sure.  The laptop contained 109,968 total

11     files.  The desktop contained 170,505 total files.

12            MR. TRAGOS:  That's all the questions I have.

13            THE COURT:  Any redirect?

14            MS. KAISER:  Yes, Your Honor.

15                     REDIRECT EXAMINATION

16     BY MS. KAISER:

17     Q      Putting on the overhead what's been admitted

18     as Defense Exhibit Number 20.  Can you please

19     identify the date and to who this e-mail was

20     addressed and then please read this e-mail?

21     A      7/4/2006 to DWPortland1977.

22            "Good afternoon, David.  Thank you for your

23     excellent e-mail and photos.  Two of the three came

24     through.  The third roof did not.  You are a very

25     handsome man.  I would enjoy seeing some front shots

1      also.  I shall try and address each of your points,

2      though not necessarily in order.

3           "First of all, proximity is always ideal, but

4      rarely possible at the outset.  I realize nonprofits

5      never remunerate well, so we may have to handle that

6      differently.  Ironically enough, last night elderly

7      cousins of mine called me and they have settled in

8      Portland after leaving New Orleans 24 hours prior to

9      Katrina.  It is nearly a year and they are enjoying

10     it.  They wanted me to visit.  I stated that I was

11     unsure.  I might possibly visit.  If not, we could

12     meet, as my guest, halfway like Chicago or such.  I

13     would like to mentor or train you.

14          "I consider spanking as discipline.  I believe

15     in corporal punishment as a correction tool.  I am

16     not big on over the knee, though it is fine if it

17     appears appropriate.  You mentioned strong willed.

18     That is interesting to listen to, but I would knock

19     it out of you, and you would end up probably wanting

20     the spankings that you would deserve.  I would be in

21     total control.  If I decided that your cock and

22     balls needed to be grabbed when you were being

23     spanked, I would have no hesitation to do it.  In

24     the sexual area, that is a point to be clarified

25     with each individual person.  There could be sexual

1    activity after the spankings.  Some people feel they

2    need that type of assurance or not.

3         "Last of all, you talked about a career job

4    change issues.  I would happily keep you in line and

5    focused in that area as the authority figure that

6    you both need and want.  Keep in touch.  If you want

7    to talk on the phone about any of this, let me know.

8         "My best, Charles."

9    Q    I'm putting on the overhead Government's

10   Exhibit -- I mean, excuse me, Defense Exhibit 29.

11   Again, it appears to be two separate e-mails.  Do

12   you see that?

13   A    Yes, ma'am.  Yes, ma'am.

14   Q    If you would please start with the first

15   e-mail, and then I'll put the second page on it and

16   you can read the second e-mail which is in response.

17   A    Original message from Captoes to MarkofM,

18   January 8th, 2006.  It's a reply with no subject.

19        "Dear Mark, thanks for your most welcomed

20   e-mail.  You should have the letter tomorrow or at

21   the latest Tuesday.  I would love a photo of you if

22   you have one.  Do want to speak with you as soon as

23   you can.

24        "My love and affection, Dad."

25   Q    All right.  And if you could publish that one.

1    A       From MarkofM to Captoes, 01/08/2006.

2            "Hello, Dad.

3            "Thanks for the quick response to my note to

4    you.  It was nice hearing from you.  I have one

5    photo scanned on another disc that I can send you.

6    The disc is not here at the moment, but downstairs

7    in a box.  I'll get it later, and send the pic on to

8    you.  I think you might already have it, however,

9    but I will send it for sure.

10           "I have so many good memories of you, Dad, so

11   many.  Here are just a few:  I recall the very first

12   time I saw you at the first cabin we stayed in at --

13   I forget the name of the park.  It began with a D,

14   as I recall, near Lexington.  The minute we got

15   inside, you hugged me, and over your shoulder I saw

16   all of your implements, which you had already told

17   me about, lying on that couch just waiting and

18   ready, including the triple strop.  I had never seen

19   anything like that before that moment, nor have I

20   since.

21           "I recall going into Lexington with you and

22   you showing me some of your old stomping ground.  I

23   recall our meal that night at the restaurant.  I

24   recall the first time you strapped me.  I believe

25   you used your military belt.  I definitely recall

1   you were wearing that beautiful blue silk robe,

2   which you had brought along with you.  I recall the

3   first time I saw your cock, Dad, and realized just

4   how similar it was to mine, though larger.

5       "I recall that evening in the second cabin,

6   the second time we got together, when after coming

7   home from dinner, you simply handed me your ascot

8   and I knew what to do.  I tied it around your neck

9   and then asked you if you wanted your smoking

10  jacket.  You simply said, 'Of course,' and told me

11  it was hanging in the bathroom behind the door.  I

12  went and got it and put it on you and the sight of

13  you took my breath away, exactly as I had imagined

14  you, my dad, would look so handsome.

15      "I saw you sitting on the couch with me

16  sitting next to you servicing one of your shoes.  I

17  remember fondly using my tongue on your beautiful

18  shoes, both there on the couch and later that

19  evening as we lay in bed together.  I recall you

20  sitting on my face, Dad.  Oh, what a privilege that

21  was for me to have my mouth and nose nestled in your

22  ass crack, feeling your ass cheeks surrounding my

23  face and also feeling the satin of your smoking

24  jacket lining running against the sides of my head.

25      "I recall later that evening as I was lying

1    naked on the bed, you approached fully dressed in

2    your dress slacks, capped toe shoes, ascot and

3    smoking jacket, carrying the bull whip which I had

4    given you, and then later showing me the second whip

5    you had purchased.  I recall us lying together in

6    bed and you telling me how a friend of yours

7    regularly uses a bull whip on his boy and how you

8    intended to do the same thing at times.

9         "I recall you talking about your new house in

10   Florida, describing all the details of the place,

11   including the pool, etcetera.

12        "I recall us talking about a custom designed

13   spanking bench, one that would put my butt in the

14   perfect position for your leather and one which

15   would also put one of your shoes in perfect position

16   for my service while being beaten.  So many

17   memories, sir.

18        "Later, Mark."

19   Q    Next, if you would read and first identify the

20   e-mail, the second e-mail on this page, and the

21   date.

22   A    This is from Captoes to MarkofM, January 9,

23   2006.

24   Q    Please publish it.

25   A    "Dear Mark, wow, what a memory.  You hit it

1   all right on the head perfectly.  Your chronology is

2   exactly as you wrote it.  We now need to talk about

3   and address reliving much of it in an updated way.

4   I think we both see that there was, is and always

5   shall be something very real here.  All of the

6   incidents that you so cogently remember have great

7   significance, each one in themselves.  Your true

8   intimate acquaintanceships with all things vital to

9   you, me and us, singularly and collectively, our

10  cock similarity, my implements to be used on my son,

11  and the true feeling of love that existed and surely

12  still does.

13       "Hope my letter and photo arrive in good

14  order.  You know what I wish and believe you do,

15  too.

16       "Affection galore, Dad."

17       THE COURT:  Let's break for lunch at this time

18  until 1:15 by the courtroom clock.

19       COURTROOM SECURITY OFFICER:  All rise.

20       (Jury out at 12:02 p.m.)

21       (Recess from 12:02 p.m. until 1:19 p.m.)

22       (Back on the record.)

23       COURTROOM SECURITY OFFICER:  All rise.

24       THE COURT:  Bring the jury in, please.

25       COURTROOM SECURITY OFFICER:  Rise for the

1     jury.

2              (Jury in at 1:20 p.m.)

3              THE COURT:  Be seated, please.  You may resume

4     redirect examination.

5              MS. KAISER:  Thank you, Your Honor.

6     BY MS. KAISER:

7     Q      Agent Grawunder, I'm putting on the overhead

8     what's been admitted as Government's Exhibit 102,

9     which I believe you previously identified was a

10    buddy list; is that correct?

11    A      Yes.

12    Q      Are you familiar with how buddy lists get

13    saved on the computer?

14    A      Not exactly in this AOL case.  I'm not an

15    expert in AOL, but usually --

16             MR. TRAGOS:  Objection.

17             THE COURT:  Sustained.

18             MS. KAISER:  May I approach the witness?

19             THE COURT:  Yes, ma'am.

20    BY MS. KAISER:

21    Q      Agent, if you could take a look at

22    Government's Exhibit 102, and tell me, does that

23    contain just one buddy list or a series of different

24    saved buddy lists?

25    A      A series of different saved buddy lists.

1    Q      And do you know how that comes to be or how

2    that happens on the internet?

3    A      In this particular exhibit, the reason there's

4    more than one of these buddy lists is because

5    they're from different versions of America Online

6    that were saved on the computer, just were there

7    from previous versions before it was upgraded.

8    Q      Would it be fair to say, then, that when a

9    user updates his AOL --

10         MR. TRAGOS:  Objection, leading.

11         THE COURT:  Sustained.

12   BY MS. KAISER:

13   Q      Can you explain how that happens, for the

14   jury.  Can you explain what you just meant?

15   A      When AOL, in this case, comes out with new

16   versions of their software, a user is prompted to

17   download the new version, which updates a previous

18   version.  And depending on the version, some

19   information is carried over into the new version,

20   some information is repeated from various versions.

21   Q      Agent, in your review of the defendant's

22   e-mails from his computer, did you ever see any

23   e-mails in which the defendant discussed erectile

24   dysfunction?

25   A      No.  I don't recall seeing any of those.

1          MS. KAISER:  I have no further questions.

2          THE COURT:  Thank you, sir.  You may step

3     down.  Watch your step, please.

4          Call your next witness.

5          MS. KAISER:  The United States calls Special

6     Agent Alex Hagedorn.

7          COURTROOM DEPUTY CLERK:  Raise your right

8     hand.

9          (Witness complied.)

10         COURTROOM DEPUTY CLERK:  Do you swear or

11    affirm the testimony that you give in this case will

12    be the truth, the whole truth and nothing but the

13    truth?

14         THE WITNESS:  I do.

15         COURTROOM DEPUTY CLERK:  Please be seated.

16         (Witness complied.)

17         COURTROOM DEPUTY CLERK:  Please state your

18    name and spell your last name for the record.

19         THE WITNESS:  Alex Hagedorn, H-a-g-e-d-o-r-n.

20                    DIRECT EXAMINATION

21    BY MS. KAISER:

22    Q     Good afternoon, Agent Hagedorn.

23    A     Good afternoon.

24    Q     Can you please tell the jury where you work.

25    A     For Immigration and Customs Enforcement in

1        Tampa.

2        Q      What is your position with Immigration and

3        Customs Enforcement?

4        A      I'm a special agent.

5        Q      How long have you been a special agent?

6        A      A little over six years.

7        Q      What is your current assignment?

8        A      The general investigations group.  That

9        includes cyber crimes and child exploitation crimes.

10       Q      What training have you had with Immigration

11       and Customs Enforcement?

12       A      Originally, the academy at the Federal Law

13       Enforcement Training Center in Glynco, Georgia.  And

14       additional training once in the field, in the field

15       of child exploitation and cyber crime.

16       Q      Do you have an occasion in this case to

17       participate in the investigation of Charles

18       Friedlander?

19       A      I did.

20       Q      What role did you play in the investigation?

21       A      I was the case agent for Immigration and

22       Customs Enforcement.

23       Q      Did you review any of the computer evidence in

24       this case?

25       A      I did.

1      Q      And what did your review entail?

2      A      I reviewed the forensic exam that Special

3      Agent Grawunder provided me.  Specifically, the

4      e-mail images, internet activity from the

5      defendant's computers.

6      Q      And what was the purpose of your review of the

7      defendant's e-mails and information on his computer?

8             MR. TRAGOS:  Objection, facts not in evidence

9      that he reviewed the report.

10            THE COURT:  Overruled.

11            THE WITNESS:  I was looking for images of

12     sadistic sex, child pornography, communication with

13     other individuals via the internet and looking for

14     any possible communication with children.

15     BY MS. KAISER:

16     Q      Did you see any child pornography on the

17     defendant's computer?

18     A      No.

19     Q      Through your investigation, have you

20     determined whether, to your knowledge, the defendant

21     had any direct contact with children on the

22     internet?

23     A      He did not.

24     Q      Do you know who Eric Suggs is?

25     A      I do.

1    Q    Who is Eric Suggs?

2    A    He is a resident at the defendant's

3    Washington, DC address.

4    Q    And who is Seerax?

5    A    Seerax is the AOL screen name for Eric Suggs.

6    Q    In your review of defendant's AOL information,

7    did you see any e-mails that had been written by

8    Seerax?

9    A    I did.

10    Q    And who were those e-mails signed by?

11    A    Eric Suggs or Eric.

12    Q    Did you review the defendant's AOL favorites

13    in this case?

14    A    Yes, I did.

15    Q    Did you see any AOL favorites which indicated

16    any interest in sadistic or sadomasochistic abuse?

17         MR. TRAGOS:  Objection, leading and no

18    foundation.

19         THE COURT:  It's not leading.  I will overrule

20    that.  But lay a foundation, please.

21    BY MS. KAISER:

22    Q    Did you review the defendant's AOL favorites?

23    A    Yes, I did.

24         MS. KAISER:  May I approach the witness, Your

25    Honor?

```
 1              THE COURT:  Yes, ma'am.

 2     BY MS. KAISER:

 3     Q      Agent Hagedorn, I'm showing you what's been

 4     admitted as Government's Exhibit 104.  Do you

 5     recognize that document?

 6     A      I do.

 7     Q      And what is that?

 8     A      It is the AOL favorites from the forensic

 9     examination of the computer.

10     Q      As part of your analysis of the computer

11     evidence, did you review this, Government's Exhibit

12     104?

13     A      Yes, I did.

14     Q      And did you see any indication in Government's

15     Exhibit 4 (sic) of any demonstrated interest in

16     sadomasochistic abuse or sex?

17              MR. TRAGOS:  Objection to form of the question

18     and foundation.

19              THE COURT:  Sustained.

20     BY MS. KAISER:

21     Q      Agent Hagedorn, in your review of Exhibit 104,

22     what, if anything, did you note?

23     A      There were numerous favorites that contained

24     websites related to sadistic sex.

25     Q      Do you have a list or did you note anywhere
```

1    what favorites you're referring to?

2    A     Yes, I did.

3          MR. TRAGOS:  Objection to the foundation.

4          THE COURT:  Overruled.

5    BY MS. KAISER:

6    Q     And do you have those sites indicated by page

7    number, Agent Hagedorn?

8    A     I do in my notes.

9    Q     Would it help to refer to your notes?

10   A     Yes, please.

11   Q     Agent Hagedorn, what's the first site that you

12   noted?

13   A     On Pages 51 and 52 of Exhibit 104, the Atlanta

14   Corporal Punishment Club.

15   Q     Can you see that, Agent Hagedorn?

16   A     I can, yes.

17   Q     Is that the site that you're referring to?

18   A     Yes, ma'am.

19   Q     Were there any other sites of note that you

20   reviewed?

21   A     Yes, ma'am.  Pages 64 and 65.

22   Q     And if you could -- if you could read the file

23   names.

24   A     Bondage gear, sex toys, bondage toys, BDSM

25   toys, bondage equipment, extreme RE.

1    Q      Were there any other favorites that you noted?

2    A      Pages 94 and 95.

3    Q      And what on Page 94 did you note?

4    A      E stem, urethral insert, extreme restraints.

5    Q      Is that the same on Page 95?

6    A      Yes, ma'am.

7    Q      Were there any other sites that you noted?

8    A      Pages 190 and 191.

9    Q      What on Page 190 did you note?

10   A      Jimca's (ph) archive of M/M spanking stories.

11   Q      Were there any other sites?

12   A      Pages 212, 213.

13   Q      What on Page 212 did you notice?

14   A      MMSA story guide to the disciplinary spanking

15   of adolescent boys.

16   Q      Any other sites?

17   A      Yes, Pages 261 and 262.

18   Q      What on Page 261 did you note?

19   A      Slaves, bdsm.com.

20   Q      Was that the same thing you noted on Page 262?

21   A      Yes, ma'am.

22   Q      Were there any other saved favorites that you

23   noted?

24   A      Pages 266 and 267.

25   Q      What on Page 266 did you note?

1    A      Spanking central, adult male slash male,

2    discipline, punishment, spanking, caning, padd.

3    Q      And on Page 267?

4    A      The same.  In addition, there is a favorite

5    for the special interests chat room, Father's

6    Chatting.

7    Q      Were there any other sites of note?

8    A      Pages 275 and 276.

9    Q      What on Page 275 did you note?

10   A      Special interest, pain and shame, another AOL

11   chat room.  And special interests, open-minded

12   parent, also an AOL chat room.

13   Q      Were there any other sites that you noted?

14   A      Yes.  Pages -- I'm sorry, Page 401.

15   Q      What on Page 401 did you note?

16   A      Uncle Jan's M/M spanking site.

17   Q      Were there any other saved favorites that you

18   noted?

19   A      No, ma'am.  That's inclusive of what I noted.

20   Q      Now, Agent Hagedorn, would it be fair to say

21   within this exhibit, which is 437 pages, that the

22   defendant also had a number of other regular

23   websites saved as favorites?

24   A      Yes.  Things such as Craig's List.

25   Q      Agent Hagedorn, I'm putting what's been

1     admitted as Government's Exhibit 102 on the

2     overhead.  Did you review this document?

3     A     Yes, I did.

4     Q     And what is this document?

5     A     This is a buddy list for the screen name

6     Captoes.

7     Q     And during your review, did you see any

8     references to Corporal Romanosky's undercover

9     profile?

10    A     Yes, I did.

11    Q     Can you note on the computer screen --

12    A     Yes, right there, StricDad7.

13    Q     Agent Hagedorn, I'm showing you what's already

14    been admitted as Government's Exhibits 61 and 106,

15    and ask if you recognize those documents.

16    A     Yes.  Exhibit 61 is an AOL address book for

17    the screen name Captoes, and Exhibit 106 is also an

18    AOL address book for the screen name Captoes.

19    Q     Did you review Government's Exhibit 61?

20    A     Yes, I did.

21    Q     Did you see any references to

22    Corporal Romanosky's undercover profile within the

23    AOL address book?

24    A     Yes, I did.  I believe it's Page 5 of the

25    exhibit.  Yes.

1    Q      Putting on the overhead Page 5 of Government's

2    Exhibit 61.  Can you erase the first mark?

3    A      I don't know how.

4    Q      Thank you.  All right.  Agent Hagedorn, if you

5    would, if you could please identify the reference.

6    A      StricDad7.

7    Q      How about for Government's Exhibit 106?

8    A      Yes, Page 92.

9    Q      Putting on the overhead Page 92 of

10   Government's Exhibit 106.  Can you identify the

11   reference?

12   A      Yes, StricDad7.

13   Q      Did you review the defendant's e-mails on his

14   computers?

15   A      Yes, I did.

16   Q      During your review of the defendant's e-mails,

17   did you ever see any references to erectile

18   dysfunction?

19   A      No, I did not.

20   Q      Agent Hagedorn, I'm showing you what's been

21   admitted as Government's Exhibit 111.  Do you

22   recognize that document?

23   A      Yes, I do.  This is a carved chat that was on

24   the forensic exam provided to me by Special Agent

25   Grawunder, which references the screen name

1    DunedinSuperDad used by Detective Romanosky.

2    Q     And when did Detective Romanosky use that

3    screen name?

4    A     In 2005, when communicating with Captoes.

5          MS. KAISER:  I have no further questions.

6    Thank you.

7          THE COURT:  Cross-examination?

8                    CROSS-EXAMINATION

9    BY MR. TRAGOS:

10   Q     Agent, during the course of this investigation

11   and pursuant to the analysis done by the agent who

12   just testified, you received probably literally

13   hundreds if not thousands of screen names or e-mail

14   addresses; right?

15   A     That's correct.

16   Q     And how many subpoenas or requests have you

17   sent out to identify who those people are that

18   communicated with Captoes?

19   A     ICE has issued three summons for information

20   on identifying those screen names.

21   Q     And how many screen names were contained

22   within those summons?

23   A     A total of 12.

24   Q     So of all these hundreds, you picked 12?

25   A     That's correct.

 1    Q      Okay.  And did AOL respond and give you the

 2    identifying information for those 12?

 3    A      They did.

 4    Q      When did they do that?

 5    A      Originally, the first summons on October 30th,

 6    the response to that summons was incomplete.  I got

 7    the full response back on November 6th of 2008.

 8    Q      What 12 screen names did you choose to ask for

 9    information about?

10    A      I would have to look at my notes.

11    Q      Certainly.  Go ahead.

12    A      Thank you.  The first one is greatScottadad.

13    The second is intdiscspk.  The third one is

14    estrats220.  The fourth is sonofmarsspqr.  The fifth

15    is stildason, s-t-i-l-d-a-s-o-n.  The sixth is buma,

16    b-u-m-a, 7263.  The seventh is funfamilyguy4you.

17    The eighth is centerfield56.  The ninth is

18    nclakeboiz.  The tenth is bdboy2spnk.  The eleventh

19    is skeeter, s-k-e-e-t-e-r, 120.  The twelfth is

20    mdlearner.

21           MR. TRAGOS:  May I approach, Your Honor?

22           THE COURT:  Yes, sir.

23    BY MR. TRAGOS:

24    Q      Let me show you Government's 95, 96 and 98,

25    which are e-mails the government has put into

1    evidence.  Are any of the names on those e-mails a

2    member of the 12 that you requested information on?

3    A       There is one, mdlearner.

4    Q       MD, which one?

5    A       Learner.

6    Q       Okay.  Would you identify that by the exhibit

7    number?

8    A       Yes.  98-1.

9    Q       Okay.  So of the 12, only one of them is

10   contained in the e-mails that the government

11   introduced; correct?

12   A       That's correct.

13   Q       Now, when you got the information about these

14   12, what did you do with that information?

15   A       I used that to determine if any of those had

16   -- if any of those profiles were children.

17   Q       And what did you find out?

18   A       None of them were.

19   Q       And did you -- I mean, how do you do that?  Do

20   you send out messages to other agents?

21   A       Yes.  For example, one screen name in

22   particular, I sent an inquiry to a separate office

23   to investigate.

24   Q       Okay.  And did they go out and actually

25   interview the person?

1   A      They did.

2   Q      Is that the norm, the way you do these kinds

3   of things?

4   A      Yes.

5   Q      Did you find out -- you found out and said

6   none of them were children.  Did you find out about

7   whether any of them had actually met the defendant?

8   A      None to my knowledge, no.

9   Q      Had ever met the defendant?

10  A      Correct.

11  Q      In the favorites, the Exhibit 104 that the

12  government showed you -- do you remember that?

13  A      Yes, sir.

14  Q      The prosecutor showed you.  In those sites

15  that you pointed out, did you go on those sites?

16  A      Yes.  I can specifically remember one to my

17  memory.

18  Q      And are those sites still in operation?

19  A      Some of them were.  Many were not.

20  Q      Okay.  In your investigation, did you find out

21  whether any of those sites were illegal?

22  A      Nothing that I viewed was illegal.

23         MR. TRAGOS:  Thank you.  That's all the

24  questions I have.

25         THE COURT:  Any redirect?

1          MS. KAISER:  No, Your Honor.

2          THE COURT:  Thank you, sir.  You may step

3     down.  Watch your step, please.

4          Ms. Kaiser?

5          MS. KAISER:  Your Honor, may I have a moment?

6          THE COURT:  Yes, ma'am.

7          MS. KAISER:  May I approach?

8          THE COURT:  Yes.

9          (Brief pause.)

10          MS. KAISER:  The United States rests, Your

11     Honor.

12          THE COURT:  Mr. Tragos?

13          MR. TRAGOS:  On motions, Your Honor?

14          THE COURT:  I'll reserve on any motions.  Do

15     you have a witness?

16          MR. TRAGOS:  Could we have a side bar?

17          THE COURT:  Yes, sir.  You want to take a

18     short break, members of the jury?

19          COURTROOM SECURITY OFFICER:  Rise for the

20     jury.

21          (Jury out at 1:53 p.m.)

22          THE COURT:  Come forward, please.

23          (At side bar, on the record.)

24          MR. TRAGOS:  Your Honor, Dr. Friedlander has

25     decided not to testify.  If the Court wants to make

1    an inquiry of him with regards to that --

2         THE COURT:  All right.  Other than that, do

3    you have any other defense witnesses?

4         MR. TRAGOS:  No, Your Honor.

5         THE COURT:  All right.  Why don't we hear

6    motions first, then.  You need to do that from --

7         MR. TRAGOS:  We need our stuff back there.

8         MR. SARTES:  We can do it from here.

9         THE COURT:  I mean, you can do it in his

10   presence.

11        MR. TRAGOS:  Oh, yeah.

12        (End of side bar discussion.)

13        THE COURT:  All right.  The jury is out of the

14   courtroom.  Any motions on behalf of the defendant?

15        MR. TRAGOS:  Yes, Your Honor.  Your Honor, at

16   this time we would move for a directed verdict.

17        First, we would renew all our prior motions

18   that we have made in this case, our prior objections

19   and the pretrial motions that we have also made in

20   the case.

21        THE COURT:  All right.  Go ahead.

22        MR. TRAGOS:  Okay.  Your Honor, we believe

23   that the government has failed to prove their case

24   in this matter that the defendant did knowingly

25   attempt to persuade, induce, entice or coerce an

1    individual who had not attained the age of 18 to

2    engage in a sexual act.

3        Your Honor, there is no evidence to show that

4    this defendant in any way intended to induce a minor

5    to engage in a sexual act.  If the Court will

6    listen, even Detective Romanosky's testimony that he

7    did not believe the defendant when the defendant

8    said that he was engaging in sexual acts with minors

9    or beatings or anything of that nature.

10        There's no evidence that any of the implements

11    were ever used that way in the past, that the -- the

12    testimony is that the defendant -- and, again,

13    Detective Romanosky verified that all this he

14    thought was fantasy.  He even talked about the

15    inconsistencies in the testimony.  And therefore, I

16    believe that without some direct evidence, that

17    there really isn't any evidence by which a jury

18    could find beyond a reasonable doubt that this

19    defendant did knowingly attempt to persuade, induce,

20    entice or coerce an individual.

21        Plus, Your Honor, if -- and we don't concede

22    this because we do object to this, even under the

23    theory that it could be done through a third-party,

24    the third-party was Detective Romanosky.  And

25    Detective Romanosky's testimony was clear that he

1    himself did not believe it.  So I think that they

2    have failed to prove their case, Your Honor,

3    sufficiently so that it could survive at this point

4    a motion for directed verdict after the close of all

5    the evidence in the case.

6        In addition, Your Honor, we do have some

7    additional argument that I'll have Mr. Sartes

8    present to the court, as well.

9        MR. SARTES:  Your Honor, in addition, we would

10   actually at this point move that this court consider

11   18 United States Code 2422 unconstitutionally

12   overbroad and violative of the First Amendment for

13   the following reasons.  This statute --

14       THE COURT:  Just a moment.  That is a pretrial

15   matter, Mr. Sartes.  I'm not going to be blind-sided

16   with a substantive motion attacking the statute.

17   This case has been pending since 2008.  This is not

18   the time to address the constitutionality of a

19   statute; is it?

20       MR. SARTES:  Well, Your Honor, it can be

21   raised at any time because it is jurisdictional.

22       THE COURT:  Have you given notice to the

23   government or to the Court that you're going to

24   raise a substantive, facial challenge to a statute?

25       MR. SARTES:  Have not as of this moment,

1    Judge.

2         THE COURT:  When did you expect me to rule on

3    that?

4         MR. SARTES:  Well, I can -- if the court would

5    like, I would file it with the court's ECF system

6    and let the Court rule on it at a different time.

7         THE COURT:  You file a motion setting forth

8    your argument and whatever authority you have.  Of

9    course, you may attack the constitutionality of a

10   statute.  I don't know that you can attack it at any

11   time, as you say, but certainly before the defendant

12   is convicted.

13        We are now at the point of challenging the

14   sufficiency of the evidence.  Make your motion

15   orally, briefly, get it on the record.  I'll defer

16   ruling on it, assuming that procedurally I can do

17   that.

18        MR. SARTES:  To make it brief, Your Honor, the

19   statute is very specific as to what constitutes an

20   offense.  In order to make the leap from where the

21   government's case-in-chief lies, the court has to

22   take into consideration the *Murrell* case and its

23   progeny, expand 2422, specifically subsection (b),

24   and allow an offense to be committed through a proxy

25   that is not a child and is not specifically what is

1    underlined or outlined within 2224(b).

2        The second part of it, Your Honor, is that

3    there's a First Amendment issue.  Basically, the way

4    this statute has been manipulated through case law

5    makes speech, the actual conversation, illegal.  And

6    that is improper pursuant to the First Amendment.

7        THE COURT:  All right.  Ms. Kaiser, the first

8    issue would be the sufficiency of the evidence

9    underlying the offense charged in the indictment.

10       MS. KAISER:  Yes, Your Honor.  Your Honor, the

11   United States asserts that it has met its burden in

12   this case.  Under 2422(b), the United States has

13   shown that the defendant did, in fact, use a

14   facility of interstate commerce, namely, his

15   computer with access to the internet, to arrange for

16   sex with what we believed was two little boys, ages

17   10 and 11.

18       There was testimony that if the sexual

19   activity had occurred, it would have been a

20   violation of Florida law.  And the fact that the

21   defendant got in his vehicle and drove two hours

22   with whips and implements that he was going to use

23   is strongly corroborative of his intent.

24       And so he's not just punished for speech, he's

25   actually -- the statute talks about the attempt.

1    And he certainly did take a number of substantial

2    steps toward the commission of a crime.

3         The United States believes that the evidence

4    is overwhelming, and Corporal Romanosky's testimony

5    is as well as the defendant's interview with

6    Corporal Romanosky also are indicative of his

7    intent, which was to have sex and to -- sex with the

8    minors and also engage in their physical abuse.

9         THE COURT:  What do you understand the

10   procedural requirements concerning a facial attack

11   on the constitutionality of the statute?  If you're

12   not on top of that, I'm not trying to trick you.  I

13   just would like your input, if you have it.

14        MS. KAISER:  I am not on top of it.  I know

15   that in the *Hornaday* case, which is at 392 F.3d

16   1306, which is Eleventh Circuit, December of 2004,

17   the litigants in that case had argued that applying

18   2422(b) in the situation of a parent who is offering

19   their children for sex exceeded Congress's power

20   under the commerce clause.  And the litigants in

21   that case had argued that it was violative of the

22   First Amendment.

23        And the Eleventh Circuit rejected that

24   argument and also upheld, citing the *Murrell*

25   opinion.  Law enforcement posing as a parent

1    offering their children for sex, that that fit

2    within 2422(b).

3         So I don't know about the timing of

4    Mr. Sartes's request.  But on Page 6 of the *Hornaday*

5    opinion, the Eleventh Circuit mentioned -- in ruling

6    on the constitutionality of the statute, it said on

7    Page 6 of the opinion at 1311 -- it says, "Congress

8    may reach in and prohibit the use of a telephone or

9    the internet to set up the sexual abuse of children

10   through intermediaries just as it may prohibit the

11   use of those instrumentalities to set up a

12   fraudulent scheme or to arrange a contract for

13   murder.  The communication does not have to be

14   directly with the victim."

15        And it goes on, "We need not pause for long on

16   account of *Hornaday's* frivolous argument that

17   applying Section 2422(b) to him is unconstitutional

18   because it punishes him for engaging in speech

19   activities protected by the First Amendment.  Speech

20   attempting to arrange the sexual abuse of children

21   is no more constitutionally protected than speech

22   attempting to arrange any other type of crime.

23        "To sum up our decision so far, the conduct

24   that the evidence proved *Hornaday* committed is

25   prohibited by 2422(b).  A defendant properly may be

1    convicted and punished for that conduct.  None of

2    *Hornaday's* contrary arguments has any merit."

3         And the *Hornaday* case was a case that was

4    exactly on point in which the parent -- in which law

5    enforcement poses as the parent of an underaged

6    child.

7         So as to the timing of Mr. Sartes's request, I

8    don't know, but I know Eleventh Circuit has rejected

9    it, his argument, in the *Hornaday* opinion.

10        THE COURT:  Well, cert was denied in *Hornaday*.

11   I'll have to reacquaint myself with that holding.  I

12   recall that being discussed.

13        With respect to the prior motions, objections,

14   and pretrial motions filed by the defendant, I renew

15   the same rulings, deny those, overrule those

16   objections.

17        As to the challenge to the sufficiency of the

18   evidence, I deny that motion.  Viewing the evidence

19   in the light most favorable to the government in

20   resolving any conflicts in favor of the government

21   and accepting all reasonable inferences in support

22   of the government's case, the motion is properly

23   denied under the standard discussed in *United States*

24   *vs. Ward* at 197 F.3d 1076.  That is the standard

25   applicable to the Rule 29 motion.

1          With respect to the challenge to the facial

2     constitutionality of Section 2422(b), assuming that

3     the defendant may at this time challenge it, because

4     that involves a substantive analysis that I did not

5     contemplate, I prefer and direct that such a motion

6     be reduced to writing and filed.  And I'm going to

7     say within -- well, I don't know, Mr. Sartes.  I

8     want it filed quickly, but whether it needs to be

9     filed before the jury deliberates and returns a

10    verdict, I don't know.

11         I have not had this happen before.  I'm not

12    being critical.  Simply, I don't want you to default

13    or waive your challenge.  I'll defer on the ora

14    tenus motion, which I think will preserve it, but I

15    think you should reduce it to writing and give the

16    government a fair opportunity to respond, and

17    obviously address the holding in *Hornaday* and

18    *Murrell* to the extent it's relevant to your

19    contentions.

20         MR. SARTES:  Your Honor, what I do is actually

21    have a motion ready.  I will put it on the ECF

22    system at the close of today's proceedings, if the

23    Court wishes me to.

24         THE COURT:  That's fine.  I'll just defer

25    ruling on it.

1          All right.  It's my understanding that the

2     defendant does not intend to put on a defense.  If

3     that is, in fact, the defendant's intention, it is

4     incumbent upon me now to make some inquiry in-camera

5     with respect to the defendant's intention.

6          Assuming that colloquy occurs and it is the

7     defendant's intention not to testify, let me ask,

8     have you reviewed these jury instructions and are

9     there any objections or additional instructions that

10    we need to discuss?

11         MR. SARTES:  Your Honor, if I may?

12         THE COURT:  Yes, sir.

13         MR. SARTES:  Procedurally, we probably at this

14    point need to remove government's request for jury

15    instruction number seven, which is 6.3, the

16    inconsistent statement/impeachment when the

17    defendant testifies.

18         THE COURT:  All right.

19         MR. SARTES:  And substitute it with the

20    instruction, the standard instruction, that the

21    defendant does not testify.

22         THE COURT:  Here's my jury instruction guru.

23    Let her get her computer up to speed, and she can --

24    that would be 6.1 instead of 6.3(b).  I'm referring,

25    of course, to the Eleventh Circuit pattern jury

1        instruction in criminal cases.

2             MR. SARTES:  Is the judge ready on the next

3        round?

4             THE COURT:  I'm sorry?

5             MR. SARTES:  I've got another one that we

6        could probably dispose of.

7             THE COURT:  Let me just double-check.  Not

8        that I don't trust Kristin, I just want to make sure

9        the record is very clear.

10            And the next one?

11            MR. SARTES:  Number 12, Your Honor, character

12       evidence.

13            THE COURT:  Remove that?

14            MR. SARTES:  Yes, sir.

15            THE COURT:  Yes, sir.  We didn't use it last

16       time.  It might have been requested and not given,

17       but in any event, it was number 12.

18            2.2 is the duty to follow instructions when a

19       defendant does not testify.  We need to substitute

20       that for the 2.1.

21            MR. SARTES:  I think 2.1 is already in here,

22       Judge.

23            THE COURT:  We need to use 2.2, because it

24       specifically instructs the jury that they cannot

25       consider the fact that the defendant did not

1   testify.

2         MR. SARTES:  Yes, sir.  I believe there's also

3   a -- somewhere in here there's an instruction

4   regarding expert witnesses.

5         THE COURT:  That's number seven.

6         MS. KAISER:  Number seven.

7         MR. SARTES:  Number seven.

8         THE COURT:  We haven't had a per se expert.

9   We've had some technical testimony, but some of

10   these internet people -- I'll leave it up to

11   counsel.  I mean, it's a fairly straightforward

12   instruction, but -- have we had any opinions

13   concerning any of the internet activities?

14         MR. SARTES:  My brother counsel is telling me

15   to leave it in.

16         THE COURT:  Leave it in?

17         Ms. Kaiser, do you have any objection?

18         MS. KAISER:  No, I don't care.  You can leave

19   it in.  That's fine.  I don't think we had --

20         THE COURT:  You know, it might assist the jury

21   in assessing some of the testimony from the agents

22   who have demonstrated some expertise in this area,

23   how they have been able to read these computers

24   using software.  So we'll leave it in.  I don't see

25   any harm, certainly.  It may very well help the

1      jury.

2            What else?

3            MR. SARTES:  Your Honor, there's nothing else

4      that I anticipated changing or removing, I should

5      say.

6            I would, though, like to reiterate and

7      preserve some formerly requested instructions.

8            THE COURT:  Yes, sir.  Let's make sure we

9      identify them sufficiently.

10           MR. SARTES:  Your Honor, if I may refer back

11     to the defendant's filing of proposed jury

12     instructions number one, which is Document 188.

13     That is the pattern Eleventh Circuit jury

14     instruction for the substantive offense.

15           THE COURT:  At the last trial, there was a

16     lengthy discussion about this pattern instruction,

17     which is Eleventh Circuit Number 80 in the offense

18     instruction section at Page 445 of the blue Eleventh

19     Circuit pattern instruction manual.

20           My notation is that the *Murrell* decision had

21     some language which prompted me to modify the

22     pattern instruction.  Is that consistent with

23     everybody else's recollection?

24           MR. SARTES:  Yes, sir.

25           THE COURT:  Let me ask specifically, then, in

1    lieu of the defendant's number one, the court gave a

2    modified version of offense instruction 80, using

3    the language from *Murrell*.

4        Is there a specific objection to that

5    instruction for purposes of this trial, Mr. Sartes?

6        MR. SARTES:  Yes, Judge.  We would like to

7    preserve our objection.  We would prefer the pattern

8    instruction be given, but without having -- unless

9    the court wants me to reiterate the arguments from

10   the last trial, I understand the court's logic in

11   putting it in there.  We do take exception, but if

12   that's what the court's decision is going to be,

13   then that's going to be the instruction that we

14   would then have again at this trial.

15       THE COURT:  Well, because it's been awhile

16   since we tried the case, tell me exactly what it is

17   that you find fault with in the modified instruction

18   that we used.  And if you're not on top of it -- and

19   I keep saying that, but that means, you know, we

20   spent a lot of time and effort last time around, but

21   I surely would understand.

22       MR. SARTES:  Actually, Your Honor, what it

23   comes down to is that whole proxy situation that we

24   have.  The pattern instruction does not allow for

25   the proxy to have that intermediary party.  It

1    actually requires the communication with someone

2    under the age of 18 for an illicit sexual -- or for

3    prostitution.

4        And the *Murrell* instruction the court has

5    given includes the *Murrell* language which allows

6    that proxy to fulfill the government's burden.

7        THE COURT:  It's the very last paragraph in

8    the modified instruction.

9        MR. SARTES:  Obviously, it's not a jury

10   instruction from the Eleventh Circuit.  It's

11   something that we have modified in order to

12   accommodate the *Murrell* ruling.  We would just

13   object to that portion.

14       THE COURT:  All right.  Ms. Kaiser, your

15   thoughts and position on this?

16       MS. KAISER:  Yes.  As we pointed out at the

17   last trial, the Eleventh Circuit patterns are just

18   that.  They're pattern instructions.  They're not

19   actually promulgated by the Eleventh Circuit and

20   they're meant to be modified, so they're

21   substantively accurate.

22       At the last trial, we modified them so that

23   they were substantively accurate and incorporated

24   the *Murrell* and *Hornaday* opinions.  So the only --

25   the only difference is -- what the defense objects

1    to is the last paragraph of that instruction, which

2    is crucial, really, for the government's case,

3    regarding the fact that it doesn't -- they don't

4    have to -- a defendant doesn't have to talk directly

5    to a child.  It's sufficient if they arrange for a

6    sexual act with the parent of the child.  So the

7    instruction that was given last time is

8    substantively accurate and properly reflects the law

9    in the Eleventh Circuit.

10           THE COURT:  All right.  I have again reviewed

11   the *Murrell* decision at 368 F.3d 1283.  I find that

12   the pattern instruction is no longer a correct

13   statement in light of the discussion in *Murrell*,

14   specifically with regard to the discussion on

15   Page 446 of the pattern in which the instruction

16   reads, "It is," in italics, "necessary for the

17   government to prove that the defendant intended to

18   engage in some form of unlawful sexual activity."

19           Clearly, it could have been activity with

20   someone else, so that part of the instruction is

21   modified.  The individual who would ostensibly

22   engage in the sexual activity could be another

23   person.

24           Secondly, the pattern does not address the use

25   of the undercover agent posing as, in this instance,

1    a parent.  And, clearly, *Murrell* approves of that.

2    When I say approves, it recognizes that it would be

3    a violation of the statute for an undercover agent

4    to pose as a parent, and that the defendant

5    attempted to persuade or induce the child to engage

6    in activity by speaking through the parent.  The

7    pattern, therefore, is not a complete statement of

8    law, and in that very small aspect an incorrect

9    statement of the law.

10   Therefore, I will overrule the objection, deny

11   the request to defendant's number one, and find that

12   the modified version of offense instruction 80 that

13   the court intends to give is a correct statement of

14   the law.

15   What else?

16   MR. SARTES:  Judge, it may be useful now to

17   refer to Docket 187, which is the defendant's

18   proposed special verdict form.  Would the court like

19   me to just touch base on what the important parts of

20   this are?

21   THE COURT:  Yes, sir, please.

22   MR. SARTES:  We have done -- well, the first

23   thing is it is actually the standard Eleventh

24   Circuit jury instructions for the substantive

25   offense broken down into each paragraph that the

1    jury would have to find specifically guilty on each

2    one of them.  And since it is the defendant's

3    instruction, we've placed the not guilty block

4    first.

5         I guess, in other words, Judge, we have left

6    out the *Murrell* portions of the instruction in our

7    special verdict form.

8         THE COURT:  All right.  Ms. Kaiser?

9         MS. KAISER:  Yes, Your Honor.  That's

10   procedurally incorrect.  That's why we used the

11   verdict form we did the last time.  The verdict form

12   proposed by the government has both guilty and not

13   guilty on it, and I believe the United States,

14   although not necessary to do so, actually put in the

15   specific offense characteristics after the guilt or

16   innocence.

17        But the defense proposed verdict form is not

18   required.  There's no requirement that the jury make

19   specific findings for each element.  It's guilty --

20   just as it is with every other offense, it's guilty

21   or not guilty.

22        THE COURT:  All right.  I will reject and

23   decline to give the proposed special verdict form

24   proffered by the defense.  First, it's incomplete.

25   Second, it's not required that each element be

1        addressed by the jury in its verdict.

2            Ms. Kaiser, last time you requested and I

3        included in the verdict form a special finding

4        concerning misrepresentation of the defendant's age.

5        Do you still request that?

6            MS. KAISER:  Yes, Your Honor.

7            THE COURT:  Proffer to me the evidence you

8        believe supports that.

9            MS. KAISER:  The defendant told

10       Corporal Romanosky that he was 70-years-old and

11       he's, in fact, 78, and Corporal Romanosky testified

12       as to his age.

13           Also, I believe the defendant during his

14       interview testified or said his age.

15           THE COURT:  Mr. Sartes or Mr. Tragos?

16           MR. SARTES:  Your Honor, I don't have my

17       sentencing guidelines with me, and I remember at

18       some point -- I understand that this is an

19       enhancement, and there's a specific finding that has

20       to be made.

21           The two things that I would ask this court to

22       consider are, number one, the defendant didn't

23       testify in this trial, so he hasn't said how old he

24       is, but for whatever happens to be inside the chats.

25       I don't know if it's in evidence but, frankly --

1              MR. TRAGOS:  They didn't put anything in

2       evidence.

3              MR. SARTES:  In fact, I don't think anything's

4       in evidence that indicates his age.

5              THE COURT:  Well, Corporal Romanosky

6       testified.  You have the chat in which the defendant

7       represented his age.

8              Isn't this guideline provision intended to

9       address situations where an older defendant

10      represents himself as a younger person in order to

11      gain confidence of the minor?

12             MS. KAISER:  It's for that, as well.

13             THE COURT:  It's 70 and 78.  What's the point?

14             MS. KAISER:  Because it's a specific lie to

15      induce the meeting.  And even the defendant in his

16      interview with Corporal Romanosky said, "When I tell

17      people my true age, nobody responds to me."

18             So it's a misrepresentation, but it's a

19      misrepresentation to engage -- to get the other

20      person to agree to engage in the act with him.

21             THE COURT:  Romanosky's testimony about his

22      actual age was what, now?

23             MS. KAISER:  Seventy-eight.

24             THE COURT:  I know that.  But, I mean, did he

25      verify that through some form of documentation or

1    history?  I just don't recall.

2         MS. KAISER:  I believe he just testified his

3    actual age was 78.  He also testified that he had

4    reviewed his DMV information.

5         THE COURT:  He did testify to that from which

6    the date of birth can be confirmed.

7         All right.  The government also requested a

8    special interrogatory concerning use of a computer

9    to communicate with and arrange the meeting of the

10   undercover officer to have sexual contact with his

11   sons.  That, again, is another sentencing finding.

12        Do you request that, Ms. Kaiser?

13        MS. KAISER:  Yes, Your Honor.

14        THE COURT:  Mr. Sartes?

15        MR. SARTES:  Judge, I'm going to make the same

16   argument actually for this one and for the previous

17   one.  We object that it be given.  I don't think it

18   matters one way or the other.  I don't think the

19   jury has to find -- I'm not sure if it's an *Apprendi*

20   issue.

21        But the request that I would have -- if the

22   court is going to ask the jury to make the

23   determination, we would ask that the court do this

24   after and only if the jury comes back with a verdict

25   of guilty.  I don't know if I'd want to have these

1    particular requests sent back during the guilt

2    phase.

3         THE COURT:  Well, they only get to those

4    questions if they've, in fact, found him guilty, and

5    that's an instruction in bold print on Page 1.

6         MS. KAISER:  Your Honor, the United States

7    would withdraw the request for any of those

8    questions to the jury if the defense is not going to

9    raise it in sentencing, that those specific offense

10   characteristics weren't found by the jury.  If they

11   want to let probation score him, that's fine with

12   the government.

13        But the reason they're in there is to avoid

14   any argument at sentencing that the jury should have

15   found that he spoke to a 10- and 11-year-old or that

16   he misrepresented his age or didn't use a computer.

17        THE COURT:  And the third one, of course, we

18   haven't addressed is the age of the minors

19   referenced in the chat rooms and the discussions.

20   Chats, I'm sorry.

21        MS. KAISER:  So the reason it was proposed

22   like that was to avoid any argument at sentencing.

23        MR. SARTES:  Judge, first of all, let me just

24   say I kind of find it bad karma to talk about

25   sentencing things before the guilt phase is coming,

1   but --

2       THE COURT:  Well, that's what *Apprendi* is all

3   about, though.  If you believe that these are

4   factual findings to which the defendant is entitled

5   to have the jury address itself to, then they need

6   to be included in the verdict form.

7       MR. SARTES:  I don't know at this point if our

8   argument would be that the computer wasn't used or

9   that the children, purported, weren't of the age.  I

10  think those are factual allegations that are --

11      THE COURT:  They're sentencing enhancement

12  factors under the guidelines.  So absent a waiver,

13  I'm going to give them or I'm going to put them on

14  the verdict form so that we have a determination one

15  way or the other, beyond a reasonable doubt, of

16  these specific considerations.

17      MR. TRAGOS:  Could the Court put them on a

18  separate page or make it easy so that we could

19  contemplate that for a little bit, whether we want

20  to waive that or not, let us think about that for a

21  few minutes?

22      THE COURT:  Well, it's not -- it's up to

23  Dr. Friedlander to waive it or not.

24      MR. TRAGOS:  Right.

25      THE COURT:  It would have to be in writing and

1    very specific.  So, of course, until this goes back

2    to the jury, you can revisit this.  But in its

3    present form without waiving that objection, then we

4    can use this verdict form that was essentially the

5    same one we used before?

6         MR. TRAGOS:  Yes.

7         THE COURT:  All right.  Any other requests?

8         MR. TRAGOS:  We -- not without waiving our

9    already voiced objections.

10        THE COURT:  Right.  The form is what I'm

11   asking about.

12        Any other requested instructions from the

13   defense or the government?

14        MR. SARTES:  Judge, one final one.  I'm sorry.

15        MS. KAISER:  Go ahead.

16        MR. SARTES:  One final one from the

17   defendant's perspective is Docket Number 215, which

18   is the jury instruction regarding the minimum

19   mandatory sentences.  I know the court has already

20   taken this into consideration and ordered -- filed

21   an order, which is Docket 224, but we would

22   reiterate -- I know that the court has already

23   considered this issue and issued an order pursuant

24   to Docket Number 224, but we would still reiterate

25   this and request that the court reconsider giving

1      it.

2            THE COURT:  Ms. Kaiser, would you like to

3      weigh in on that?

4            MS. KAISER:  Your Honor, the United States

5      would adopt its previous response.  It's completely

6      inconsistent with the Eleventh Circuit law.  It's

7      inappropriate.

8            THE COURT:  Well, the matter of punishment is

9      not for the jury to be concerned with, and I will

10     decline to give that instruction.

11           Anything else on the instructions or the

12     verdict form?

13           MS. KAISER:  Your Honor, I'd like to just go

14     through quickly and just confirm that we're on the

15     same page as --

16           THE COURT:  That's fair.  Let me do that for

17     you.  Just follow along.  You have the packet.

18     There'll be two changes in light of the discussion.

19     The first page is members of the jury.

20           Second page, the government's 2.1 is removed.

21     We're inserting 2.2, which is duty to follow

22     instructions, presumption of innocence when any

23     defendant does not testify.

24           Number three, definition of reasonable doubt.

25           Number four, consideration of the evidence,

1    direct and circumstantial.

2         Number five, credibility of witnesses.

3         Number six, 6.3 is removed and we are now

4    inserting 6.1 entitled impeachment-inconsistent

5    statement.

6         Seven, expert witnesses, 9.1, on or about

7    knowingly-willfully, 10.1, caution, punishment,

8    single defendant, single count, 2.1, confessions,

9    statement.

10        Number four, I'm not sure we need that now,

11   404(b) similar act evidence.

12        MS. KAISER:  Well, Your Honor, I would leave

13   it in because -- although, I know counsel didn't --

14   defense counsel didn't request it at the time, it

15   was the government's position, and I approached at

16   side bar when we read in the chats from 2005, that

17   technically those chats were outside the timeframe

18   of the indictment and could conceivably be

19   considered 404(b).  So I would leave that

20   instruction in in an abundance of caution.

21        THE COURT:  Well, we'll have to modify it

22   somewhat because the defense did not request an

23   instruction at that time.  In fact, specifically

24   asked me not to instruct the jury.

25        MR. KAISER:  Yes, Your Honor.

```
1            THE COURT:  Not to draw attention to it.

2            Is there some version of the pattern

3    instruction, Mr. Sartes or Mr. Tragos, that you'd

4    like?  Obviously, we need to take out the one

5    sentence about instructions given to the jury, then,

6    which they were not.

7            MR. SARTES:  Judge, we're of the mindset over

8    here that we should ask that it be removed.  It just

9    is going to wind up bringing more attention to the

10   2005 chats than is warranted, from our opinion.

11           MS. KAISER:  Your Honor, I would object.  I'd

12   ask that the instruction be kept in.  I think it

13   would be substantively accurate if maybe you just

14   deleted the first line and where it starts "you

15   heard," you could make that "you have heard evidence

16   of acts of the defendant."  And that way you could

17   start the sentence there and put "you have heard

18   evidence of acts."

19           MR. TRAGOS:  Would the Court allow me to speak

20   on this?

21           THE COURT:  You know, it appears to me if you

22   consider this instruction and the intent, the act

23   has to be similar to the offense with which the

24   defendant is charged.  The prior e-mails or chats

25   from 2005 did not encompass an intent to induce or
```

1    coerce a child to engage in sexual acts.  It was

2    simply a discussion of things.  So all you -- I

3    mean, I think it's appropriate evidence clearly

4    because it bears on the defendant's intent and

5    knowledge and all of that, but I don't know that

6    it's a similar act, Ms. Kaiser, that was committed

7    on another occasion.  It was simply conduct of the

8    defendant bearing on his intent and knowledge.

9         MS. KAISER:  Your Honor, I believe it was

10   admissible under 404(b), and I believe it is similar

11   act evidence.  I mean, he talked about the razor

12   strop.  He talked about disciplining his son.  I

13   mean, it was very, very parallel to the discussions

14   he had in 2008.  So it certainly went to establish

15   his intent and his state of mind.

16        THE COURT:  All right.  Mr. Tragos, what's

17   your position?  I know the government's position.

18        MR. TRAGOS:  Your Honor, if you remember, the

19   way it even came in was because Detective Romanosky

20   remembered him having a similar name.  And, in fact,

21   Romanosky said that he didn't believe that there was

22   a crime on those first chats because it preceded

23   some statute.

24        The reason it came in is the -- I guess the

25   inextricably intertwined argument that the

1    government also presented to this court earlier on

2    this particular issue.  It came in because he

3    remembered talking to Captoes, and he was relating

4    the similar conversation.  That's why he was able to

5    talk a certain way in '08.  I don't think that there

6    was another crime or action committed in '05 that

7    makes it a similar crime.

8         THE COURT:  You object to it, then?

9         MR. TRAGOS:  Yes, I do.

10        THE COURT:  And give me the reason.

11        MR. TRAGOS:  The reason is because there was

12   no crime committed in '05 and no wrong -- or no act

13   committed in '05 at the time; that it was brought

14   into evidence because Romanosky related back to it

15   because of the conversations were similar to the

16   conversations and that's how he remembered it was

17   Captoes in '05.

18        THE COURT:  I presume that if you are not

19   entirely accurate in your analysis of what that

20   evidence was or was not, as a tactical reason you

21   don't want it given because it draws attention to

22   something?

23        MR. TRAGOS:  Yes, I do, Your Honor.  And it

24   also might be confusing to the jury because --

25        THE COURT:  That's another concern I've got.

1          MR. TRAGOS:  No, no.  I was going to raise

2     something else that hasn't been raised on that.  If

3     you remember during the video interview, the

4     detective raised, "Well, I've talked to other people

5     and you've done other things.  I got other

6     detectives calling me," and all that.  I don't want

7     to draw attention to that there may be other things

8     out there that they can use to determine intent.

9          And so I think that if you give this

10    instruction, it's not going to be unique to 2005, so

11    they may think you're talking about the things they

12    were talking about in that video.

13         THE COURT:  I presume, and I'm not asking for

14    attorney-client communications, but you and your

15    client have discussed this in terms of its

16    advantages or disadvantages of having this

17    instruction?

18         MR. TRAGOS:  No.

19         THE COURT:  Well, do so and make sure he

20    concurs in your decision.

21         Let's go through the rest of these and then

22    I'll confer momentarily with the defendant and

23    counsel.

24         MR. TRAGOS:  You want us to talk to him after

25    we finish the rest of these?

 1          THE COURT:  Yes, yes.  The next one is offense

 2     instruction 80, which we've talked about.  It's the

 3     modified version of the pattern.

 4          The next one is Number 15, applicable Florida

 5     law defined.

 6          Number 16 is the definition of internet.  You

 7     had a bunch of IT people on this jury, at least a

 8     couple of them.  We're probably going to offend them

 9     with that instruction.

10          Number 17, induced defined.

11          Number 12 was the character evidence, which is

12     withdrawn.

13          Number 19, the tape recording standard

14     instruction concerning transcripts versus what they

15     actually hear.

16          Number 20 is the duty to deliberate.

17          Twenty-one is the verdict.

18          Any other requested instructions?

19          MS. KAISER:  No, Your Honor.

20          THE COURT:  All right.

21          MR. SARTES:  No, Judge.

22          THE COURT:  Take a moment to confer with your

23     client, Mr. Sartes, Mr. Tragos.  And I need to

24     conduct that bench conference.  Then we'll proceed

25     with closing arguments.

1           Now, I'm going to tell this jury because of

2     other commitments I've got to be somewhere at 6:00.

3     So it's not quite a quarter till 3:00.  We can

4     certainly get closing arguments in.  We might

5     instruct them in the morning.  If we get close to

6     5:00, I'm going to tell them that's what we'll do,

7     if that's consistent with your calendars.

8           MR. TRAGOS:  I didn't have anything planned

9     tomorrow.

10          THE COURT:  Well, I know we all thought we

11    were going to be in trial.  I just don't want them

12    going out after 5:00 and deliberating late into the

13    evening.  We don't have the facilities to take care

14    of them.

15          MR. TRAGOS:  I just want to make sure, even if

16    the Court can't instruct them, if the Court does

17    give them some instruction about how they should

18    conduct themselves.

19          THE COURT:  I will.  I will do that,

20    certainly.

21          Take a few moments to speak with

22    Dr. Friedlander about this 404(b) instruction.

23          (Brief pause.)

24          MS. KAISER:  Your Honor, may I be excused for

25    a moment?

```
 1              THE COURT:  Yes, ma'am.

 2              Ms. Kaiser is out, but I do need to conduct an

 3    in-camera conference with the client and counsel, if

 4    you'll come forward, please.

 5              Deputies, if you'll escort Dr. Friedlander up

 6    to side bar, please.

 7              (At side bar, on the record, under seal.)

 8              MR. TRAGOS:  I was going to say -- ask the

 9    Court to remind me to tell you about the side bar

10    with my double homicide client a couple years ago

11    with Judge K.

12              THE COURT:  Come on up.  All right.  This is

13    in-camera.  It will be sealed and not transcribed

14    without an order from this court.

15              Dr. Friedlander, I want to make sure you

16    understand at this juncture in the trial you do have

17    the right to testify.

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  And you have the right not to

20    testify.

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  The decision is entirely yours.

23    Do you understand that?

24              THE DEFENDANT:  Yes, sir.

25              THE COURT:  I know you've conferred with your
```

1    attorneys, and I'm not asking you about those

2    conferences.  But do you have any questions about

3    your right to testify or not?

4         THE DEFENDANT:  No, I do not.

5         THE COURT:  And you understand that is your

6    decision, not the attorneys'?

7         THE DEFENDANT:  Yes, sir.

8         THE COURT:  I have used some strong words in

9    some of the argument here today, specifically

10   concerning some of the government's evidence that I

11   kept out.

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  What I said is what I said.

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  That may very well have influenced

16   the decision you made, but I want you to understand

17   that the decision, whatever it is, is yours to make

18   for whatever reason.  And if you choose not to

19   testify --

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  -- I will instruct the jury that

22   they are not to consider that --

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  -- in determining whether the

25   government proved its case beyond a reasonable

1    doubt.  Do you understand that?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Do you have any questions about

4    this at all?

5          THE DEFENDANT:  No.

6          THE COURT:  All right.  On the instruction of

7    the similar act evidence, do you agree with

8    Mr. Tragos and Mr. Sartes that that instruction

9    should not be given?  It's called the similar act --

10         MR. TRAGOS:  It's the one about the 2005.

11         THE DEFENDANT:  Yes, I agree with them.

12         THE COURT:  Okay.  Do you have any questions

13   about that?

14         THE DEFENDANT:  No, sir.  They explained it.

15         THE COURT:  All right.  Anything else?

16         MR. TRAGOS:  No, Your Honor.

17         THE COURT:  I see you have some of your

18   witnesses in the back.

19         MR. TRAGOS:  Yes.

20         THE COURT:  Do you intend to rest without

21   calling any witnesses?

22         MR. TRAGOS:  Yes.

23         THE COURT:  They are here --

24         MR. TRAGOS:  Yes.

25         THE COURT:  -- in the event the decision was

1      made to call them?

2              MR. TRAGOS:  Yes.

3              THE COURT:  You're in agreement with that

4      decision, Dr. Friedlander?

5              THE DEFENDANT:  The decision that --

6              THE COURT:  Not to call the witnesses --

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  -- that testified in the first

9      trial.

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Do you have any questions about

12     that?

13             THE DEFENDANT:  No, sir.

14             THE COURT:  All right.  Thank you, sir.

15             THE DEFENDANT:  Thank you.

16             (End of sealed side bar discussion.)

17             THE COURT:  We'll take a short comfort break.

18     Everybody get comfortable and then we'll start with

19     the closing argument.

20             COURTROOM SECURITY OFFICER:  All rise.

21             (Recess from 2:49 p.m. until 2:57 p.m.)

22             COURTROOM SECURITY OFFICER:  Please be seated.

23     All right.  Just for the record, Mr. Tragos or

24     Mr. Sartes, concerning the similar act evidence

25     instruction, is it still your objection -- do you

1      still object to that instruction?

2            MR. TRAGOS:  Yes, Your Honor.

3            THE COURT:  All right.  I will sustain that

4      objection, find that it's not appropriate, and in

5      light of the defendant's objection, I will not give

6      it.

7            All right.  As you know, I do not limit

8      closing arguments.  I just ask that you be efficient

9      with the jury's time.  It's not quite 3:00.  They'll

10     be in here within a minute or so.  So we have plenty

11     of time to give a reasonable final argument.  If we

12     get near 4:30, I will instruct them in the morning

13     before they deliberate.

14           MS. KAISER:  Could you remind them again, Your

15     Honor, not to look on the internet before they leave

16     tonight?

17           THE COURT:  I'll tell them all that good

18     stuff.

19           MS. KAISER:  Okay.

20           THE COURT:  We do need to have each side rest.

21     Ms. Kaiser's already rested.

22           Mr. Tragos, if you'll just announce rest.

23           We have all the exhibits in here.  Are there

24     any exhibits that you do not believe should go back

25     to the jury room, Ms. Kaiser?

1          MS. KAISER:  No.  But I have not reviewed the

2     exhibits yet.  There shouldn't be any that shouldn't

3     go back to the jury, but I have not gone through

4     what's on the desk.

5          THE COURT:  Well, before we leave here today,

6     make sure you do it.

7          How about Mr. Tragos, anything you don't think

8     should go back?

9          MR. TRAGOS:  We probably need to look at them,

10    too.

11         THE COURT:  No contraband, though, right?  I

12    mean, the one photograph is --

13         MR. TRAGOS:  There's no contraband.

14         THE COURT:  I don't think that's contraband.

15         All right.  Those of you in the audience,

16    you're certainly welcome to be here.  Please be

17    mindful of your facial expressions.  Let the

18    attorneys have 100 percent of the jury's attention.

19         Bring the jury in, please.

20         COURTROOM SECURITY OFFICER:  All rise.

21         (Jury in at 3:02 p.m.)

22         MR. TRAGOS:  Could we have a side bar?

23         THE COURT:  Yes, sir.

24         (At side bar, on the record.)

25         THE COURT:  Yes, sir.

1   MR. TRAGOS:  I figured, consistent with the

2 Court's ruling, I would like to play the song

3 On-Line, the video -- portion of the video for the

4 jury.  I'm presuming with the Court's ruling that

5 that will be denied.

6   THE COURT:  Ms. Kaiser?

7   MS. KAISER:  It think it's completely

8 inappropriate, Your Honor.

9   THE COURT:  I do, too, Mr. Tragos.

10   MR. TRAGOS:  Okay.

11   THE COURT:  I think it's simply -- it's not a

12 demonstrative exhibit.  It's extraneous and I will

13 preclude it.  I appreciate you bringing it to my

14 attention again, though.

15   (End of side bar discussion.)

16   THE COURT:  The government having rested,

17 Mr. Tragos, what says the defendant?

18   MR. TRAGOS:  Your Honor, the defendant rests.

19   THE COURT:  Members of the jury, as you've

20 heard, the parties have rested, meaning that the

21 evidentiary portion of the trial has concluded.

22 What remains to be accomplished are the attorneys'

23 final arguments to you, the court's instructions on

24 the law and, of course, your deliberations.

25   My plan at this juncture is to allow the

 1    attorneys to present their closing arguments.  If we

 2    get close to 4:30, which I think we probably will,

 3    I'm going to recess and instruct you first thing in

 4    the morning and then let you begin your

 5    deliberations.  I have another hearing at 4:30, and

 6    I don't want you working late into the night.  That

 7    allows you to get a good night's sleep.

 8         Remember, again, that what the attorneys say

 9    is not evidence, but what they have to say should

10    assist you in understanding the law as it is to be

11    applied to your verdict.  They differ and disagree

12    on what the facts are or are not.  It is your

13    recollection of the evidence which controls.  So

14    give them your close attention, please.

15         Ms. Kaiser?

16         MS. KAISER:  Thank you, Your Honor.

17         Good afternoon, ladies and gentlemen.  At the

18    beginning of this case, I told you that the United

19    States would prove that the defendant, Charles

20    Friedlander, used his computer to arrange a meeting

21    in which he was going to sexually abuse and

22    physically abuse two little boys, ages 10 and 11,

23    and I submit to you that the United States has met

24    its burden.

25         MR. TRAGOS:  Objection, Your Honor.  It's

1    improper argument.

2         THE COURT:  Overruled.

3         MS. KAISER:  And I submit to you that the

4    United States has met its burden in this case.

5         Ladies and gentlemen, the evidence is

6    overwhelming.  In the beginning of this case, you

7    heard for a couple days Corporal Romanosky's

8    testimony.  Corporal Romanosky testified regarding

9    his -- his communications on the internet with this

10   defendant.

11        Beginning in June of 2008, he engaged in a

12   series of instant message chats, and they were read

13   into the record.  You saw them on the overhead.  And

14   you heard the give-and-take between the two parties,

15   between Corporal Romanosky and this defendant.

16        Corporal Romanosky, as you know, was posing as

17   a father who had two little boys, ages 10 and 11.

18   This defendant believed that he was setting up a

19   meeting in which he was going to physically abuse

20   and sexually abuse Corporal Romanosky's son, or

21   StricDad7's son.  The defendant thought he was

22   talking to a person named Michael, which you all

23   know as Corporal Romanosky.

24        They engage in a series of very sexually

25   explicit chats.  The defendant discussed at length

1    all of the implements that he wanted to use with the

2    boys.

3         You saw all the chats.  First, you heard the

4    chats from 2005 because, as you'll recall,

5    Corporal Romanosky actually recalled talking to this

6    defendant three years earlier.  You'll recall in

7    2005, the defendant mentioned that he made his son

8    ask permission for everything.  He referenced

9    Michael's son, or the undercover's son, and said

10   "Well, I guess he's too young to masturbate," and he

11   brought up masturbation.

12        If you'll recall, in all the chats, almost

13   every single chat between the defendant and

14   Corporal Romanosky, the defendant is the one that

15   initiated the conversation.  Corporal Romanosky

16   didn't instant message him and engage him in

17   conversation.  It was the defendant that reached out

18   to Corporal Romanosky's undercover profile.

19        At one point he said he made his son ask

20   permission.  He said he walked around naked in the

21   house.  His son would just have to get used to it.

22        Back in June of 2008, putting Government's

23   Exhibit 11 on the overhead, he brings up the razor

24   strop.  He talked about belts.  He talks about how

25   he wants to -- to engage in relations with

1    10-year-old and 11-year-old boys.  Nowhere in these

2    chats that you heard and saw on the overhead was

3    there ever any -- any discussion by the defendant

4    when chatting with the undercover, "Hey, we

5    shouldn't do this.  This is terrible.  Abusing

6    children, are you crazy?  That's not a good idea."

7        No.  What the evidence shows is not only did

8    the defendant chat at length about sexually abusing

9    these boys and physically abusing these boys, but

10   then he got in his car and drove two hours with all

11   the implements of torture that he described.  He

12   packed his car and brought precisely the implements

13   he said he would.  He said, "I'll bring the riding

14   crop.  I'll bring that."  And it was found in his

15   vehicle.

16       He said he'd bring straps, leather straps.

17   There they were, right on the front seat.  If you

18   recall the picture, this is in the red bag right on

19   the front seat of the defendant's vehicle when he

20   was arrested.  It had these leather straps.  These

21   are called razor straps, all of these.

22       The defendant drove over two hours to meet a

23   man that he thought had a 10-year-old and an

24   11-year-old boy that he was going to engage in

25   physical and sexual abuse of.

1        You saw the references to the chats.  You saw

2   numerous times he talked about belts and whipping

3   and how he was into corporal punishment.  They

4   discussed when do you release the enjoyment of

5   basically beating the children or beating someone?

6   Is it during or after?  Corporal Romanosky testified

7   that they were talking about ejaculation.

8        During the chats, the defendant is the one who

9   repeatedly wants to know when the group is going to

10  allow them -- allow him to come and join the group.

11  He believes there's a group of people who get

12  together and beat their children and have sex with

13  their children.  And the defendant wants to know,

14  "Hey, when's my turn?  Hey, am I going to get

15  approved to join the group?  Now, did you check with

16  everyone yet?  When can I come?  When's the next

17  meeting?"

18       Chat after chat.  Government's Exhibit 15.

19  Corporal Romanosky asked, "Do your pupils know that

20  you enjoy administering the beatings?"

21       The defendant, "No.  Should they?"

22       "Not allowed to look?"

23       "Correct.  Punishment's done not that close to

24  hear."

25       Later the defendant says, "I usually beat

1    dressed.  If not dressed, it might be during."

2    They're talking about when do you release the

3    enjoyment of giving the beating.

4         Detective Romanosky, "Them dressed or you

5    dressed?"

6         The defendant, "I meant if I were dressed or

7    undressed.  They're all stripped.  If I'm dressed,

8    it might well occur, it might well just occur."

9         He talks about whether or not the pupils help

10   him, help him ejaculate, help him have an erection

11   and masturbate.

12        Chat after chat after chat.  The content of

13   what they planned to do and what the defendant

14   planned to do when he came up to meet with

15   Corporal Romanosky is crystal clear when you read

16   these chats.  It's crystal clear.

17        You will have all these exhibits that you'll

18   be able to refer to during your deliberations.  You

19   saw the defendant's computer records from America

20   Online.  You saw -- you saw the picture, or excuse

21   me, you saw the piece of paper that was in the

22   defendant's vehicle referencing where he was going

23   to meet Detective Romanosky.  You saw the note pad

24   that was found at his house that referenced the

25   Cracker Barrel where he drove to meet the undercover

1    officer.  You saw the note pad that was found in his

2    residence that had the undercover profile,

3    "StricDad7, Michael, Florida" of

4    Detective Romanosky.  You saw the AOL address book

5    that the defendant had on his computer that listed

6    all his contacts, and within there you saw

7    Corporal Romanosky's name and contact information.

8         You're aware that after the defendant was

9    arrested, a search warrant was conducted at his

10   house.  And if you'll recall, while the search

11   warrant was being conducted, the defendant was being

12   interviewed by Corporal Romanosky.  And you saw the

13   couple-hour long interview that was conducted back

14   at the Pinellas County Sheriff's Office.  And what

15   did the defendant say when he thought no one else

16   was listening to him?  What did he say?

17        Judge, if I may have the -- Ms. Ohle?

18        (Portion of unidentified government's exhibit

19   played in open court as follows:)

20        THE DEFENDANT:  "I should not have done it.  I

21   shouldn't have done it.  No, I shouldn't have done

22   it.  I should not have done it.  It was stupid."

23        MS. KAISER:  The defendant's words:  "I

24   shouldn't have done it.  I shouldn't have done it.

25   It was stupid.  I shouldn't have done it."  That's

1    what the defendant says when he thinks nobody's

2    listening.

3         How do you know that the defendant intended to

4    have sex with these boys?  Well, for starters, he

5    brought all the implements that he planned to use on

6    those boys and drove over two hours, back in July of

7    '08, when gas prices I think were pretty high.  It

8    clearly shows his intent.  You don't drive two hours

9    to meet somebody that you've been discussing this

10   physical and sexual abuse of children, and pack your

11   car full of the implements that you were going to

12   use on the children, and drive if you don't intend

13   to carry it out.

14        Now, this case is not a child pornography

15   case.  The government has not alleged, nor have we

16   charged the defendant with possessing child

17   pornography.  So that's not what this case is about.

18   This case is about whether or not this defendant

19   used the internet to arrange a meeting in which he

20   was going to have sex with a 10-year-old and an

21   11-year-old boy.

22        If you'll recall, Corporal Romanosky testified

23   that in his chats initially the defendant

24   misrepresented his age.  He said he was 70.  During

25   the interview with Corporal Romanosky, he said,

1      "When I tell people my true age, nobody wants to

2      meet with me."  So he purposely makes himself seem

3      younger so as not to scare anyone away.

4           How else do we know what the defendant

5      intended?  During the interview, the defendant told

6      you himself again what he planned to do with those

7      boys, with what he thought was a 10- and 11-year-old

8      boy.

9           (Portion of unidentified government's exhibit

10     played in open court as follows:)

11          THE DEFENDANT:  "I can't."

12          CORPORAL ROMANOSKY:  "Could you masturbate a

13     child?"

14          THE DEFENDANT:  "I never have."

15          CORPORAL ROMANOSKY:  "I know you haven't, but

16     could you?"

17          THE DEFENDANT:  "You mean, would I have the

18     capability?"

19          CORPORAL ROMANOSKY:  "Do you have the physical

20     capability of doing it?"

21          THE DEFENDANT:  "I'm sure we all do, yeah."

22          CORPORAL ROMANOSKY:  "Do you have the physical

23     capability of performing oral sex on a child?"

24          THE DEFENDANT:  "I -- "

25          CORPORAL ROMANOSKY:  "Do you have the physical

1     capability?"

2         THE DEFENDANT:  "I have the physical

3     capability, absolutely true."

4         CORPORAL ROMANOSKY:  "What are the two things

5     that we talked about?  Any sexual activity that

6     might have taken place after the beatings tonight."

7         THE DEFENDANT:  "Right."

8         CORPORAL ROMANOSKY:  "What were the two things

9     we talked about?"

10        THE DEFENDANT:  "Not penetration."

11        CORPORAL ROMANOSKY:  "Not penetration.  What

12    were the two things we talked about?"

13        THE DEFENDANT:  "We talked about oral."

14        CORPORAL ROMANOSKY:  "And what else did we

15    talk about?"

16        THE DEFENDANT:  "But that was -- "

17        CORPORAL ROMANOSKY:  "If the boys had

18    experience.  And then I asked you, 'What do you

19    think you might be doing?'

20        "You said, 'Oral,' and what else?  Handling."

21        THE DEFENDANT:  "Did I say handling?

22        CORPORAL ROMANOSKY:  "Uh-huh."

23        THE DEFENDANT:  "Oh, okay.  But I felt that

24    they would be doing that to me."

25        (End of portion of unidentified government's

1    exhibit.)

2         MS. KAISER:  He's being interviewed by a

3    Pinellas County sheriff's deputy and he's saying,

4    "Well, you know, I really couldn't have done

5    anything because I've got erectile dysfunction.

6    I've got erectile dysfunction; nothing could

7    happen."

8         So Corporal Romanosky says, "Well, wait a

9    minute.  Wait a minute.  You could have performed

10   oral sex on the boys; right?"

11        And how does the defendant respond?  You see

12   it on the tape.  "I thought they were going to do

13   that to me," as if somehow that's okay.  It's the

14   defendant's own statements.  How do you know what

15   the defendant intended?  Just review his interview.

16        He didn't say, "Oh, I wasn't going to have sex

17   with those boys.  No, no, no.  It was all just a big

18   misunderstanding."  That's not what the defendant

19   said when he was interviewed by Corporal Romanosky.

20   He didn't say, "Hey, I just came up here but, you

21   know, I'm a mental health guy.  I was going to stop

22   you or I was going to call the police."

23        No, that's not what he says.  He says, "I

24   thought they were going to do it to me.  I thought

25   these 10- and 11-year-old boys were going to perform

1    oral sex on me."  That's the defendant's own words.

2         The judge is going to give you jury

3    instructions, but one thing that you need to listen

4    for, okay, is -- see if there's any requirement that

5    the defendant actually talked directly to the

6    children.  You won't hear it.  In fact, that's not

7    the law.  The judge is going to instruct you that

8    under this statute, talking to a parent and

9    arranging for sex with the child is sufficient.

10   It's not permitted.  You cannot get on the internet

11   and arrange for a meeting to sexually abuse a

12   10-year-old and 11-year-old, and drive hours with

13   the implements of abuse and torture.  It's not

14   permitted.  The judge is going to read you jury

15   instructions that say that.

16        The judge is going to talk about the

17   definition of the word "induce" and how the word

18   "induce" can mean to stimulate the occurrence of or

19   cause.  So if a person talks to a parent of a child

20   and arranges for a meeting for sex, it can be a

21   violation under the statute.  The government hasn't

22   alleged that this defendant talked directly to those

23   children, to any children.  The government has

24   alleged that this defendant used the facility of

25   interstate commerce to arrange a meeting in which he

1    was going to have sex with the 10- and 11-year-old

2    boys by arranging that with the parent of -- what he

3    thought was the parent of those boys and which

4    turned out to be law enforcement.  There's no

5    requirement that this defendant talk directly to any

6    child.

7         Now, during the interview, as you're aware,

8    law enforcement was conducting a search warrant at

9    the defendant's residence, and you all saw what was

10   found at his house.  Corporal Romanosky asked him

11   did he have any interest in sadomasochistic or

12   sadistic sex.

13        He said, "No."

14        They found whips.  They found paddles.  They

15   found more whips.  They found more straps.  They

16   found various sex items stored in the very same

17   suitcase that the whips were stored in.  They found

18   a pair of handcuffs.

19        So what's the significance?  He didn't bring

20   these items to the meeting, so what's the

21   significance of these items?  Well, it goes to show

22   that he's interested in sadomasochistic sex; that he

23   enjoys that type of behavior; that, to him,

24   whippings and sex are all intertwined.  Otherwise,

25   people would think, who wants to just beat a child?

1    What possible sexual gratification can one have for

2    beating some stranger's children?  This is the

3    answer.  There are the defendant's.  These were at

4    the defendant's house.

5        How else do you know what the defendant was

6    interested in?  Take a look through his AOL

7    favorites.  Agent Hagedorn testified site after

8    site:  Corporal punishment club, spanking websites,

9    BDSM sites.  The United States wouldn't care if the

10   only communication was between this defendant and

11   adults about having adult relations.  The problem is

12   that's not where it stopped.

13       There's really no -- if Mr. Friedlander wanted

14   to have all that -- all those whips and beat other

15   adults, you know, really, the government wouldn't

16   care.  The problem is this defendant wanted to

17   engage in sex with children.  He wanted to engage in

18   oral sex with those children.

19       Let's also talk about what else shows his

20   intent.  Just a couple of days before he drove up

21   here, the defendant -- approximately three days

22   before he came up to the meeting, the defendant went

23   and got an extra dosage of Levitra, the erectile

24   dysfunction drug.

25       All right.  During the interview with

1     Corporal Romanosky, he said, "I haven't taken any.

2     Oh, no, no, no, no."  But one was missing.  Three

3     days before the meeting with Corporal Romanosky,

4     he's getting some erectile dysfunction medicine and

5     one's missing from the tab, missing from the packet.

6          You heard the transport of the defendant to

7     the jail.  You actually heard from the time that

8     Corporal Romanosky first met him at the Cracker

9     Barrel all the way through the interview.

10    Corporal Romanosky was polite.  He was considerate.

11    He got the defendant water.  He was extremely

12    accommodating.

13         This defendant knew exactly what he was

14    saying.  He wasn't -- he wasn't scared.  He may have

15    been scared, but he certainly wasn't sick or shaking

16    or intimidated.  Nobody roughed him up, nothing.

17    What you saw was the defendant's own words about

18    what he intended to do with those children.

19         You can also, when you're deliberating, if you

20    choose to, listen to the phone call again between

21    Detective Romanosky and this defendant.  In the

22    phone call the defendant says, "Are you going to tie

23    up the children or am I?  Which one of us?  Just,

24    you know, just thinking.  You know, just planning

25    ahead.  Who's going to tie up the children, you or

1   me?"  If you'll recall, the defendant wanted the

2   children bound over a chair or couch.

3        And it was the defendant who said, "Hey, when

4   I beat, I truly beat.  I want to have enough room

5   because I've got a fairly full swing."

6        So they're even talking about where in the

7   room these children are going to be positioned and

8   tied to the furniture.

9        Ladies and gentlemen, the proof, I submit to

10  you, is overwhelming.  "Voir dire" means to speak

11  the truth, and by your verdict you need to speak the

12  truth to this defendant and let him know that you

13  know what he did.  And we ask that you find this

14  defendant guilty.  Thank you.

15       THE COURT:  Thank you, Ms. Kaiser.

16       Mr. Tragos?

17       MR. TRAGOS:  The only level playing field is

18  this courtroom.  Before we get to trial, it's not a

19  level playing field.  You've got to see how it's not

20  level.  You've got to see how the indictment, which

21  is not evidence, only the prosecutor presents

22  evidence to a grand jury; a defense lawyer is not

23  allowed there.  You've got to see in that interview

24  when -- Detective Romanosky might have been acting

25  nice, she thought, but when he asked, "Should I get

1       a lawyer?"  Who in his right mind would have not

2       said, "Yes, you do need a lawyer."

3           But what did Romanosky say? "Well, I can't

4       really advise you of that, you know, but I'll tell

5       the judge how you've been cooperating.  Be a nice

6       guy."  You know, it's not a level playing field in

7       that room where he took him in that sheriff's

8       office.  He wasn't allowed to even get up without an

9       escort.

10          It's not a level playing field anywhere but

11      this courtroom, and what makes it a level playing

12      field is you make it a level playing field.  Because

13      a jury now is going to make a decision after hearing

14      cross-examination, after hearing the government's

15      witnesses actually cross-examined and asked the

16      tough questions.  So now you know everything.

17          Now, let me highlight for you, with the

18      court's permission, a couple of jury instructions.

19          THE COURT:  Well, I prefer that you paraphrase

20      them and not use the overhead.  I'll be reading

21      through those with the jury shortly, and they'll

22      have copies.

23          MR. TRAGOS:  You're going to get copies of

24      this.  But one of the areas that in the jury

25      instructions they talk about is the law does not

1    require a defendant to prove innocence, but to

2    provide -- or to provide any evidence.  If he

3    doesn't testify, you cannot use that against him

4    because the burden is always on the prosecution to

5    prove each and every element beyond a reasonable

6    doubt.

7         I'm going to give you a list as I go through

8    here of reasonable doubts in this case.  You see if

9    those reasonable doubts have been countered in any

10   way by the evidence so that they have done

11   everything to prove every element beyond a

12   reasonable doubt, each and every element.

13        Now, reasonable doubt.  The judge is going to

14   give you some instruction on reasonable doubt.  But

15   normally, the easiest way to put it is -- it is

16   something you'd make your more serious decisions on.

17   For instance, let's say you have a child and a

18   doctor tells you that the child's arm has to be

19   amputated.  You would not do that unless you were

20   convinced beyond a reasonable doubt that that arm

21   needed to be amputated.  You would have to think

22   here today that if this evidence was the evidence

23   presented to you, would you have your child's arm

24   amputated?  Is this, what you saw here, enough?

25        Another important fact is this crime has to be

1    done knowingly and willfully.  They have to prove

2    beyond a reasonable doubt that Dr. Friedlander --

3    the acts were done knowingly, voluntarily,

4    intentionally, not because of any accident or

5    mistake; that they were done willfully, which means

6    they were on purpose with a specific intent to do

7    what the law forbids.  They have to prove that he

8    had the specific intent to do what the law forbids,

9    and they have to prove that beyond a reasonable

10   doubt.

11        And the charge in this case is persuading or

12   inducing, enticing, or coercing an individual under

13   the age of 18 to engage in sexual activity.  That's

14   what they have -- that's the specific intent that's

15   needed.

16        So reasonable doubt, let's start with it.

17   They say that this is not a child pornography case.

18   But we all know that the way they tried to prove

19   this case was by computer analysis, analyzing data.

20   They got a safety deposit box key.  They went and

21   subpoenaed AOL.  They subpoenaed other people that

22   were on his list.  That's the way they wanted to

23   prove the case.  In their wildest dreams, you know

24   that they never expected that no child pornography

25   would be found on this computer.  Not one computer,

1    but two computers.

2         Reasonable doubt?  How do they counter the

3    reasonable doubt caused by someone who supposedly

4    came here to have sex with 10- and 11-year-olds that

5    all of a sudden after 78 years, that one day is his

6    life changed.  He never, ever was a -- had child

7    pornography on his computer.  That's reasonable

8    doubt.

9         Another reasonable doubt.  Never went to a

10   website that had child pornography on it.  All of a

11   sudden one day, he just gets attracted to kids?

12   Never even went to a website.  Another reasonable

13   doubt.

14        Another reasonable doubt.  Alex Hagedorn, he

15   testified -- testified that they checked, never had

16   any contact with children on the internet.  Never

17   had any contact with children on the internet.

18   Another reasonable doubt.

19        Next, didn't have any toys or anything in his

20   house to indicate any children or any child

21   interest.  Another reasonable doubt.  What have they

22   presented to counteract all of that?

23        And it doesn't stop there, because you can get

24   a reasonable doubt from the lack of evidence.  Once

25   all this fell apart, how aggressive were they in

1    trying to find more evidence?  They gave up, or they

2    were scared, or they just didn't want to find it

3    because they knew how it would come out.  They knew

4    what kind of man that they had, that he wasn't

5    coming up here to have sex with a 10-year-old.  And

6    you know how you know they knew it?  They had

7    thousands of people that they could have checked.

8    They could have written AOL and gotten all the

9    information.

10       So what do they do?  They pick 12, and 11 of

11   the 12 aren't even some of the e-mails that they

12   introduced into evidence.  Why?  Reasonable doubt.

13   Why didn't they contact those thousands?  Because

14   they finally realized that there wasn't going to be

15   a single child or a single parent who had a child in

16   that whole group that would say a bad thing about

17   him.

18       Remember on the interview as part of a police

19   interrogation technique, the officer talks about all

20   the other investigations and all the other people

21   that, "I'm getting calls from all over the place."

22       And the prosecutor asked, "You haven't had

23   multiple people calling you about this, really; have

24   you?"

25       "No, I haven't."

1         It's just a ruse, something you use as an

2    investigative technique; right?  That's what she

3    asked him.

4         He had to admit, "Yeah, that's all it is."

5         Then he goes, "Look, when this gets in the

6    paper, I'm not going to have a bunch of moms calling

7    me; am I?"  Well, not a single mom made a phone call

8    after it was in the paper.  Reasonable doubt.

9         The notepad, Exhibit 42.

10        COURTROOM DEPUTY CLERK:  56.

11        MR. TRAGOS:  Excuse me?

12        COURTROOM DEPUTY CLERK:  56.

13        MR. TRAGOS:  Thank you.  Not only did we have

14   "StricDad7, Michael" with a phone number, take a

15   look at all the other names on here with their

16   e-mail address or their AOL name and the phone

17   numbers.  Not a single child.  Not a single parent

18   who was having a child and using it for sex,

19   nothing.  And they had all this right there with

20   StricDad7.  Right there with StricDad7.  They had

21   all these.  They had Mike here, and you had Bill,

22   and Peacock, nothing.  A reasonable doubt.  The fact

23   they didn't check these out is a reasonable doubt.

24        She says he said he should not have done it.

25   At that point what had he done?  Shouldn't have done

1   it.  Shouldn't have come up?  Shouldn't have driven

2   up here?  That's for sure.  Shouldn't have tried to

3   meet Romanosky?  That's for sure.  But he hadn't

4   done it.  The "it" they're talking about is sex with

5   a child.  He hadn't done it.  So why would the "it"

6   mean sex with a child?  Only under the strained

7   interpretation that a prosecutor is going to give

8   it.

9       Safe deposit box.  They wanted his safe

10  deposit box key.  Remember that?  Nothing.  Nothing.

11  No evidence.

12      Those whips and all those things there.

13  They've got the belts.  Why wouldn't they test those

14  for any human tissue?  Why wouldn't they have

15  said -- you don't have to identify them just to tell

16  us, "Hey, they have been used in that manner."  If

17  you would have found some human blood on it, human

18  tissue, you would have known it would have been used

19  in that manner.  They would have had evidence to

20  show you.  They sure are hot on showing you that

21  he's a sadomasochist.  So why wouldn't they do that

22  to show that it's more than talk?

23      And what about the e-mails?  They put in a

24  bunch of e-mails.  I have to put in e-mails that

25  they had in their possession that they seized to

1        show you that these are adults in those e-mails.

2        Not a single child in a single e-mail.  Not even a

3        story about a child in those e-mails.  Reasonable

4        doubt?

5             Not a single illegal item is found in his

6        home.  Not one.  Reasonable doubt?

7             Not a single illegal website that -- he didn't

8        go to a single illegal website, not one.

9             Screen name.  In 2005, he has a Captoes screen

10       name and he's talking to the agent.  In 2008, he has

11       Captoes screen name and talking to the agent.  If

12       you will see from his AOL account, which has been I

13       think since 1998, he never changed his screen name.

14            Now, if you're out there doing illegal

15       activity, don't you change your screen name?  Do you

16       use the same screen name for ten years?  Never,

17       never is there a deletion of his screen name on his

18       AOL account.  A reasonable doubt.  Questions to ask

19       and questions that have to be answered beyond a

20       reasonable doubt.

21            The government doesn't care if he beats

22       adults.  If that were true, then, why was it such a

23       big part of their case?  Why did they try so hard to

24       tell you about that stuff?  Why did they try so hard

25       to bring in evidence that wasn't even brought up to

1    Pinellas County?  Why did they try so hard to send

2    FDLE, sheriff's office, all these guys down to

3    search his house and tear it apart and find nothing

4    illegal?  Not a child pornography picture, not a

5    child pornography website, nothing.

6         Why didn't they -- if this -- if Levitra was

7    an important part of their case, why wasn't a blood

8    test taken at the time to show whether or not he had

9    it in his system?  They never answered these

10   questions.

11        Thirty thousand images on his computer,

12   30,000.  Not a single child pornography picture or

13   anything illegal.  Thousands of e-mail names, never

14   checked out.  As the AOL guy told you, it only takes

15   about an hour.

16        But you know the answer to most of these

17   questions.  You know it and I know it.  The answer

18   to most of these questions are that when this case

19   fell apart, they said, whoa, we've got to stop

20   digging because all we're doing is turning up

21   reasonable doubt.

22        And then to cap it all off,

23   Detective Romanosky.  Detective Romanosky didn't

24   believe that Dr. Friedlander -- and I tell you it

25   shocked me but, you know, I guess he was just being

1     honest.  He didn't believe that Dr. Friedlander was

2     doing any of these things with the kids.  How can

3     that not be a reasonable doubt, if the lead

4     detective, the case agent in the case, doesn't

5     believe that Dr. Friedlander was doing this stuff?

6          And he's telling you, he doesn't send any cars

7     to go down to Ft. Myers to surveil his house,

8     doesn't check it out.  I mean, if he did believe

9     him, he certainly was a pretty incompetent and scary

10    detective because he was allowing kids to be beaten

11    and abused and bloodied by somebody, and he was

12    letting it happen.  So you know it's true he didn't

13    believe him.

14         So if he -- so you're being asked now to

15    believe that Dr. Friedlander was going to come up

16    here and have sex with kids when the lead detective

17    didn't believe he was doing it.  That's a reasonable

18    doubt.  That one should scream at you.

19         But Romanosky -- which that's why this is a

20    level playing field, that's why you've got to have

21    juries.  Regardless of whether Romanosky believed it

22    or not, he still tried to make a case, and that's

23    the scariest part of this, because in that interview

24    you'll see.  She played a snippet for you.  We all

25    remember his denials.  We all remember him saying he

1    has no interest in this.  He was not coming up for

2    that.  No, no interest in it.

3         Then Romanosky just kept pushing and pushing

4    and would ask questions like, "Well, you could, you

5    know, physically masturbate a child."  Well, anybody

6    can.  This could -- well, you know, it -- you know,

7    I wasn't going to do that.  He just kept pushing and

8    pushing till -- he had to have some semblance of an

9    answer, but he wasn't going to stop until he got it.

10        Then after that, my client waived his rights

11   to have his house searched, to go get his computers,

12   all that stuff.  Told him there was no child

13   pornography on there.  Didn't like admitting the

14   other stuff that was on there, but it was all legal.

15   Nothing on his computers, nothing -- again,

16   reasonable doubt -- was illegal.

17        Another way of reasonable doubt.  Totally

18   clean record for 78 years.  Does that not count for

19   something in life?  Does that not count for

20   something?  Does that not raise a reasonable doubt?

21        The other thing is they have decoys.  They

22   could have had him talking to a child.  They have

23   all that ability.  They didn't do it.  That could

24   have cleared up a lot, but they didn't.  Why didn't

25   they?  That's a reasonable doubt to ask that

1    question.  That gives me a reason that why didn't

2    they do it.

3         And remember why Detective Romanosky said he

4    didn't believe Dr. Friedlander?  Why did he say

5    that?  And he even gave an example, oh, gosh,

6    inconsistent.  He said 11, one year, 12 another

7    time.  I didn't believe him because of that.

8         However, you are asked to believe everything

9    Dr. Friedlander says, even though it was

10   inconsistent, when Romanosky by his own standard

11   didn't believe it.  But you have -- they're asking

12   you to believe it.  And you have to believe it

13   beyond a reasonable doubt.

14        So that Romanosky's opinion about his

15   inconsistencies and not believing him, that's

16   something you are asked to ignore, because if you

17   thought about it and if you retained it, and you

18   believed Romanosky that he didn't believe

19   Dr. Friedlander, you have to find him not guilty,

20   because there's the reasonable doubt.  It's all over

21   the place.

22        In the chats they talk about torture rooms,

23   basements, torture rooms.  No torture rooms, no

24   basement.  Not there.  Hang this up on a nail.  You

25   have the pictures of the search and the pictures of

1    the house that were taken by the police officers

2    when they were there searching the house.  No nail.

3         "What do you do with your boy?"  This is the

4    2005 conversation.  "Camping and fishing."

5         Eventually, he figured out what Romanosky

6    wanted to talk about and started talking about it.

7    He talked about anything he wanted, but where, when

8    they looked at this -- analyzed these computers,

9    where is there any other conversation like this?  If

10   this is what he's interested in and this is what

11   he's talking about, and he's talking to children or

12   parents of children about their children, where?

13        The government, they picked and chose what

14   e-mails they were going to show you.  Read those

15   e-mails.  See if there's any child abuse in those

16   e-mails.  See if there's any sex with children in

17   those e-mails.  Not a one, including all the ones I

18   put in, which are on each side, because they only

19   gave you the middle.  I gave you the whole story.

20        Take a look at them.  That's a reasonable

21   doubt, why those e-mails don't contain any evidence,

22   why those computers only contained -- the only thing

23   those computers contained was what

24   Detective Romanosky inserted over the internet into

25   his computers.  If there was anybody else anywhere,

1      it would have been there.

2          They have special software that they use to go

3      in there and check all the deleted files and

4      everything else.  Not a single other conversation

5      like Romanosky's is there.  Zero.  None.  That

6      computer was --

7          MS. KAISER:  Objection, Your Honor.  May we

8      approach?

9          THE COURT:  Yes, ma'am.

10         (At side bar, on the record.)

11         THE COURT:  What's the objection?

12         MS. KAISER:  Your Honor, he's misstating the

13     truth to this jury.  I didn't object when he put in

14     the sheet of paper on the overhead that listed

15     travellingdad, which we know is Detective Neil

16     Spector, but Mr. Tragos has made references that

17     there's been no other people that he's communicated

18     about having sex with children with, but that's just

19     factually not true.

20         MR. TRAGOS:  That's not what I said.

21         THE COURT:  Listen, guys.  If counsel

22     disagrees with the factual argument of opposing

23     counsel, you may address that in response without

24     accusing anybody of misstating or misrepresenting

25     something.  This is factual argument.  I can't

1        control that, Ms. Kaiser.

2            MS. KAISER:  Your Honor, my hands are tied,

3        though, if I'm not allowed to mention the fact that

4        he did, in fact, have --

5            THE COURT:  Sure, you can mention that; just

6        don't attack Mr. Tragos.  If he's wrong, he's wrong.

7            MS. KAISER:  So I can mention the Neil Spector

8        stuff in my closing argument and say that Mr. Tragos

9        is --

10           THE COURT:  The only evidence before this jury

11       is what they've heard.

12           MS. KAISER:  Well, I -- the government

13       understands that, Your Honor.  But then Mr. Tragos

14       should not be allowed to make an unfair, improper

15       argument that this defendant has never engaged in

16       conversations regarding sex with children when he

17       has.  They can't have it both ways.

18           MR. TRAGOS:  That's not what I said.  I said

19       the computer --

20           THE COURT:  The objection is overruled.

21           MR. TRAGOS:  Thank you.

22           (End of side bar discussion.)

23           THE COURT:  All right.  Short comfort break,

24       that's fine.

25           COURTROOM SECURITY OFFICER:  Rise for the

1    jury.

2         (Jury out at 3:55 p.m.)

3         THE COURT:  The objection is overruled, but I

4    do want to caution counsel to be careful.  The only

5    evidence before this jury is what's before the jury.

6    And if you allude to matters that are not before the

7    jury, accurately or inaccurately, while I may

8    overrule an objection, there may be other forums in

9    which that might be raised.  So let's be very

10   careful.

11        And I specifically caution counsel against

12   attacking opposing counsel's -- not the argument,

13   but personal attacks.  If you disagree with what the

14   evidence is, you're free to say that, Ms. Kaiser.

15   But you cannot allude to matters that are not in

16   evidence.

17        MS. KAISER:  Your Honor, may I --

18        THE COURT:  No.  That's my ruling.

19        MS. KAISER:  I understand, Your Honor.  But

20   for the record -- can I please make a statement for

21   the record?

22        THE COURT:  What are you going to do?  Appeal

23   a guilty verdict or a not guilty verdict?  That's my

24   ruling.  I'm controlling this litigation.  I

25   understand your concern.  I don't think that's what

1    was intended by Mr. Tragos.  That's not what he

2    said.

3          MS. KAISER:  Your Honor, if I may, the one

4    exhibit that he put on the overhead, he said --

5    there was a list of names and he said that there was

6    no proof that the defendant had engaged in or

7    discussed having sex with children with any of the

8    other people on that list.  And Detective Spector

9    was on that list.  I didn't object then, but it does

10   seem fundamentally unfair if the defense is making

11   an argument that he didn't have any other

12   conversations about having sex with children, when

13   that's --

14         THE COURT:  If he makes that argument, you can

15   raise that before the grievance committee and the

16   Florida Bar.  Because you're absolutely right,

17   that's not in evidence and we know what the evidence

18   truly is or the facts truly are.  That's not what he

19   said.  And I think Mr. Tragos understands the

20   concern you have.

21         We're just waiting on the jury.  Everybody

22   relax.

23         (Brief pause.)

24         THE COURT:  During the examination of --

25   actually, I believe it was either the redirect or

1    cross of David Grawunder, the ICE agent, one of the

2    jurors asked the court security officer if she was

3    not feeling well if she could "jump up and go to the

4    bathroom."

5        My note to him was, "Yes."

6        I kind of watched her.  It's juror number

7    four.  She's sitting next to the empty chair.  She

8    seems to be okay, but their prolonged bathroom

9    break, I presume it's a bathroom break, gives me

10   some reason to be concerned about her well-being.

11       Is there any objection to my inquiring if all

12   the jurors are comfortable and ready to proceed?

13       MR. TRAGOS:  None from the defense.

14       MS. KAISER:  None from the government.

15       THE COURT:  If she indeed is ill, of course,

16   that would still leave us with 12.  You want to just

17   check and make sure everybody is okay?

18       COURT SECURITY OFFICER:  (Indiscernible.)

19       THE COURT:  Okay.  Well, she reports that

20   she's feeling better.  Let's see if we can get them

21   in here.  Maybe they don't know to let you know.

22       COURTROOM SECURITY OFFICER:  Rise for the

23   jury.

24       (Jury in at 4:03 p.m.)

25       THE COURT:  Thank you.  Be seated.  Is

1    everyone feeling all right, ready to proceed?  Okay.

2    Just want to make sure that you're all comfortable.

3            Mr. Tragos, you may address the jury.

4            MR. TRAGOS:  Thank you, Your Honor.

5            I spoke to you and said that even with all

6    this, and even with what Romanosky personally

7    believed, he still tried to make a case.  And if you

8    look at the chats, you will see the progression and

9    how he did that, and how he manipulated

10   Dr. Friedlander into doing this.

11           And we start with the first chat, July 12th,

12   2005, Exhibit 2.  DunedinSuperDad, which -- see,

13   Romanosky changes names between '05 and '08, but not

14   Dr. Friedlander.

15           "Good deal.  I'm sure mine need motivation.

16   Always controlled mine totally.  I would not let

17   them make decisions.  They were mine to make.  I

18   agree, parents sometimes need to do that."

19           Not a one-sided conversation.  Romanosky just

20   doesn't sit there.  He participates, eggs him on,

21   and leads him in a direction.  We've all known

22   people like that that can do that, especially

23   someone trained.  Romanosky says -- he personally

24   said it, "I'm very good at what I do."  So he starts

25   in July of '05.

1              Now, you remember looking at Exhibit 11.

2        Remember how Romanosky says -- remember how

3        Romanosky says he uses code words, you know, love,

4        affection, chatting, they mean things to Romanosky.

5        Let's see if they mean the same to everybody.

6              Chat number -- Exhibit 2, and this is on July

7        12th of '05.  Excuse me one second.  Excuse me.

8        Exhibit 3.  One of the key words -- one of these

9        words that Romanosky talks about is the word

10       "chatty".  Do you see that right here?  And who's

11       asking about that?  Again, it's Romanosky.  He

12       starts the conversation, "How do you avoid him being

13       chatty?"

14             Now, what Romanosky says is that means that

15       I'm talking -- these people are talking to somebody

16       from the outside.  I don't want them talking to

17       somebody on the outside.

18             Take a look at Captoes' response.  "In what

19       way?  Any disrespect to an elder was pure hell for

20       him.  Too chatty and he got the strop."

21             Does that sound like they're communicating as

22       to what chatty means?  Romanosky says, "Ah, I know

23       cause I do this all the time and people who do this

24       all the time must know.  It means talking to

25       third-parties."

1          But instead, Captoes thinks he's talking about

2     the guy being a big mouth and disrespectful to his

3     elders, and he's going to get the strop for being

4     disrespectful.  They were not communicating on the

5     same level, talking about the same stuff.

6          June 16th, 2008, Exhibit 11.  Captoes:  "How

7     many children do you have?"

8          "Three."

9          "How old now?  My son is 37."

10         "Wow.  Much older.  Mine are 10, 11 and 14."

11         Now, who brings up the ages of 10, 11, 14?

12    It's brought up by Romanosky.  Captoes is talking

13    about older.  "My son's 37."  But Romanosky inserts

14    now the ages of his children as being 10, 11 and 14,

15    and the conversation just rolls on from there.

16    Romanosky inserts it, they want to keep talking and

17    they keep talking.

18         Exhibit 12.  This is the June 17th of '08

19    chat.  Romanosky:  "You told me about the razor

20    strap.  Did you have any other instruments of

21    discipline?"

22         Romanosky keeps bringing it up.  "Tell me some

23    more.  Give me more instruments of discipline."

24         As you see later on, Romanosky keeps telling

25    him, "You gotta bring them up here.  I want to see

1    them."

2         Another thing in that chat to note, Romanosky:

3    "Do you use any special confinement techniques when

4    administering discipline?"  Leading him right into

5    the conversation.

6         Then as we go through, if you remember, I'm

7    asking Detective Romanosky:  "Didn't you repeatedly

8    keep telling him, bring up this stuff, bring up the

9    razor strops?  Bring it up."

10        He said, "Yes, I did.  I'm sure I did.  Yes, I

11   did."

12        We went through conversation after

13   conversation after conversation.  You have all the

14   conversations.  They're right there for you to look

15   at.  But still, the bottom line is while Romanosky

16   was carrying on these conversations, he didn't

17   believe Dr. Friedlander.  He himself couldn't bring

18   himself to believe that he was doing those things to

19   the extent that he didn't even bother protecting

20   what might have been children that were in that

21   house getting beaten.

22        So, ladies and gentlemen of the jury, I'll

23   close with that thought.  This is the only level

24   playing field, if they -- if a case like this can

25   happen, then we all have to be in fear, because all

1    you have to do is be a little different, be gay,

2    like to talk about stuff that most of us don't like

3    to talk about, and that was the majority of the

4    case.

5         Think about the case.  Think about the number

6    of witnesses you saw.  How many of those witnesses

7    had anything to do with the crime charged?  How many

8    of them?  You had Romanosky.  He told you about the

9    things that happened, but then he himself didn't

10   believe that this guy was committing a crime or was

11   going to commit a crime.

12        And then it followed.  AOL guys, nothing to do

13   with the crime charged.  All he proved was he and

14   Romanosky talked, that's it.  And there were

15   thousands and thousands of people he talked to.

16        Agents:  "Yep, I seized stuff.  I seized a

17   camera.

18        "Any pictures on the camera?

19        "No.

20        "How about the discs?

21        "Yeah, we seized five or six discs.

22        "Any child pornography on these discs?

23        "No.  Couple of weddings.

24        "Agent, did you analyze the computer?

25        "Yeah.  We have special software so that we

1    can -- you try to delete something, but you can't.

2    We can get you.

3         "So anything illegal on the computers?

4         "No.

5         "Agent Hagedorn, you take the stand.  Anything

6    illegal?

7         "No.

8         "Any child pornography?

9         "No.

10        "Anything illegal in the house?

11        "No.

12        "Anything illegal in those websites?

13        "No, no, nothing illegal on the websites."

14        So tell me how many of their witnesses had

15   anything to do with the crime charged.

16        Ladies and gentlemen of the jury, if Romanosky

17   didn't believe him, then why should we?  Thank you.

18        THE COURT:  Thank you, Mr. Tragos.

19        Ms. Kaiser, your response.

20        MS. KAISER:  Thank you, Your Honor.

21        Let's talk about what Corporal Romanosky

22   believed and what he didn't believe.  His testimony

23   to you, ladies and gentlemen, was he didn't think

24   that the defendant had children at his house that he

25   was beating.  Corporal Romanosky never said, "Oh, I

1   think he just drove two hours with the implements to

2   beat the 10- and 11-year-old, but I didn't think he

3   was going to do that."  No.  Corporal Romanosky's

4   testimony was very specific, if you'll recall.

5       During that chat -- there was two different

6   chats on one day, if you'll recall, and during those

7   two chats the defendant changed the names of the

8   children that he was claiming that he was watching

9   and that he had access to and was beating.

10      Those were the children that

11  Corporal Romanosky said, "I don't think he really

12  had access to them because his writings were

13  inconsistent on the very same day."

14  Corporal Romanosky never took the stand and told

15  you, "Oh, I think this is all just a joke.  Oh, I

16  don't think the defendant intended to beat the

17  children after he drove two hours to

18  St. Petersburg."  That's ridiculous.

19      Corporal Romanosky believed that the defendant

20  may not have access to children, but he certainly

21  wanted access to Corporal Romanosky's children.  He

22  certainly wanted access to Michael's children.

23  After all, he spent chat after chat saying, "Hey,

24  did the group say I could come in yet?"  Every

25  single chat I believe -- I forget the number

1    offhand, but take a look.  Who started each chat?

2    Why is that important?  Because it -- it's been

3    argued that Corporal Romanosky's the one that's

4    putting all these ideas into this little, innocent

5    head who, you know, is so easily led.  A doctor

6    easily led?  Really?

7        Somebody says, "Hey, I've got this group.  We

8    get together and we, you know, we molest the kids.

9    You know, we beat them."  All right.

10       A doctor doesn't say, "What?"  A doctor

11   doesn't say, "Hey, where do you live?  Hum, let me

12   get the information.  Let me report this.  This is

13   insane.  I'm a licensed mental health counselor.

14   How could I" --

15       MR. TRAGOS:  Objection, facts not in evidence.

16       THE COURT:  Overruled.

17       MS. KAISER:  "How could I let this abuse go

18   on?"  How could a doctor -- but instead what we have

19   is we have a doctor who says, "Hey, sounds good to

20   me.  When can I join?  When can I join?  When are

21   they going to let me in the group?"

22       It's been argued that Corporal Romanosky was

23   able to just direct the conversations how they go.

24   When Corporal Romanosky asked the defendant, "How

25   did you keep them from being too chatty?"

1           The defendant didn't say, "Too chatty?  What

2     do you mean?  Oh, do you mean at the dinner table,

3     how do you keep them from talking about his day?"

4           No.  He knew exactly what -- he knew exactly

5     the context that Corporal Romanosky meant it.  You

6     just saw his response.  He said -- he said, "Well,

7     if they disrespect their elders, they get the strop.

8     I don't tolerate any disrespect."  That would be

9     considered disrespectful for him to go tell anybody

10    else.  He wouldn't tolerate that.

11          In the beginning of the case, Mr. Tragos told

12    you that the defendant was this lonely, old man and

13    that's why he did all this stuff.  Take a look --

14    when you get a chance to deliberate, take a look at

15    his address book.  Look how many people he's been

16    chatting with.  Look how many people's address he

17    has.

18          Mr. Tragos told you that law enforcement

19    hadn't subpoenaed all the approximately 1,200 -- I

20    think Mr. Tragos added it up, about approximately

21    1,200 different people's screen names that he had

22    saved.  Right.  And why didn't law enforcement

23    subpoena 1,200 people?  Right.  Essentially

24    Mr. Tragos wants to make the argument that since we

25    haven't found a child he molested that we should

1    just forget that he drove up from St. Petersburg to

2    molest the 10- and 11-year-old.  So it's like maybe

3    one free molestation and torture session in

4    Mr. Tragos's -- if you believe Mr. Tragos's

5    argument.

6        So in other words, if the United States hasn't

7    located a child that's been molested by this

8    defendant, well, then, oh, well, all bets are off.

9    He can just talk about it all day long.  He can

10   schedule meetings to molest and torture children.

11   And he can get in his car, and he can have lots of

12   discussions about it and make definitive plans to go

13   meet the detective, and join a group, and tie

14   children up, and strip them naked and maybe he'll

15   undress, maybe he won't.  And he can tie them to a

16   chair or a couch, and he can get in his car and

17   drive all the way to St. Petersburg.  He can bring

18   the whips, he can bring the crop, but none of that

19   counts.  Why?  Because Mr. Tragos says, "Well,

20   because you haven't found a kid who actually was

21   molested."  That's ridiculous.  It's ridiculous.

22       Mr. Tragos talked about whether or not it was

23   an accident or a mistake, and he talked about where

24   he says on the tape, "I shouldn't have done it.  I

25   shouldn't have done it."  Mr. Tragos made the

1    argument that he hadn't done anything at that point,

2    but he had.  He had.

3         The jury's -- the judge, like I said earlier,

4    is going to read you the jury instructions.  You

5    look at the elements.  Look carefully at the

6    elements and you see if these elements include

7    actually having to have molested the child.  That's

8    not what he's been charged with.  He hasn't been

9    charged with molesting children.  He's been charged

10   with using a facility of interstate commerce and the

11   internet to arrange a meeting in which he planned to

12   have sex with minors.

13        And as the defendant said himself, "I thought

14   they were going to do that to me.  I thought they

15   were going to perform oral sex on me."

16        So when the defendant says on the tape, "I

17   shouldn't have done it.  I shouldn't have done it.

18   It was stupid," he knew what he did.  He realized

19   the game was up.  He's sitting there and he's

20   thinking, "Man, this guy's not Michael after all.  I

21   shouldn't have done it."  He knew exactly what he

22   was saying he shouldn't have done.

23        At the beginning of the case the defense says

24   that this was just an AOL courtship.  It was just --

25   he was lonely and this was some new, great

1    relationship.  Corporal Romanosky testified there

2    was never one chat in which this defendant indicated

3    that he wanted to engage in a relationship with

4    Corporal Romanosky.  The whole basis of the

5    relationship was to get together and sexually abuse

6    and torture those little boys.

7         So why didn't law enforcement subpoena 1,200

8    people?  Really?  1,200 people?  You know, when you

9    look at the elements for this offense, it's

10   traveling to have sex with a minor.  Essentially,

11   it's using a computer to facilitate a meeting in

12   which you're going to have sex with a minor.  Law

13   enforcement doesn't have the capabilities to go in

14   every single case --

15        MR. TRAGOS:  Objection.

16        THE COURT:  Overruled.

17        MS. KAISER:  -- have the ability to subpoena

18   1,200 people in every case like this.  That would be

19   unreasonable, 1,200 interviews.  Would they have to

20   go and follow up and interview 1,200 people?  No

21   need to.  This defendant gets in his car, packs all

22   his little whips and/or belts and razor strops

23   and quirts, right, the thing that you smack a horse

24   with, and drives up.  And says on tape, "Oh, I

25   thought they were going to do it to me."  Why would

1    law enforcement need to go interview 1,200 people?

2    For what?  For what purpose?

3        Why were the e-mails introduced today?  Why?

4    Between adults.  Why would the government do that?

5    The reason you were shown those e-mails was to show

6    the defendant is interested in this type behavior.

7    Why?  Because it's not -- it's not an everyday

8    occurrence for most people.  Most people don't know

9    about sadistic and masochistic activities.  Most

10   people don't have experience with whips or refer to

11   whips casually.

12       Mr. Tragos mentioned why you didn't see more

13   evidence of internet chats and other chats and

14   everything else.  Well, internet providers don't

15   keep chats.  The reason we have the chats in this

16   case is because Detective Romanosky saved them.

17       MR. TRAGOS:  Objection, Your Honor.

18       THE COURT:  Overruled.  It's a fair response.

19       MS. KAISER:  If you only had e-mails -- if you

20   only had e-mails between Detective Romanosky and

21   this defendant, you probably wouldn't be able to

22   glean what they were talking about.  It's the

23   instant message chats that provide all the contact

24   of their communications.

25       Mr. Tragos mentioned decoys, law enforcement

1    has decoys.  Well, we should have just used some

2    decoys.  Well, you heard from the witness stand,

3    Detective Romanosky said, well, sometimes in

4    undercover cases when they're posing directly as a

5    child, right, a young girl, perhaps, they may have

6    another member of law enforcement maybe give a

7    picture, if it's a female, or sometimes they'll pose

8    as a child.

9         But as Detective Romanosky said, they don't

10   have anybody on the staff at the sheriff's office

11   that looks like a 10- and 11-year-old boy.  It's

12   ridiculous.  They wouldn't use a decoy in this case.

13   Corporal Romanosky was essentially the decoy.  He

14   was the undercover officer.

15        Law enforcement can't just have a 10- and

16   11-year-old boy strip naked and tied to a chair and

17   then wait for the defendant to get the whip back

18   and, "Oh, stop.  Stop right there, you know,

19   defendant.  Don't hit the kid.  You're under

20   arrest."  They can't let it go that far.

21        I mean, certainly packing your car full of

22   implements of torture, driving two hours and meeting

23   with an undercover officer at the scene of the

24   Cracker Barrel, where, as you heard on the tape, the

25   defendant is all proud of what he brought and is

1    showing them, right, to Detective Romanosky.  "Yeah,

2    I brought the stuff.  Hey, let's go."

3         You know, Mr. Tragos suggests that, well,

4    maybe we should have even let it gone on further

5    and, you know, maybe -- gosh, maybe we could have

6    found some children, you know.  Now, where would law

7    enforcement find children to put in that position?

8    Doesn't happen.  Doesn't happen.

9         Mr. Tragos suggested that Corporal Romanosky

10   just led the conversation, that he just -- you know,

11   he just led it.  Well, I don't know too many doctors

12   that can just be led into discussing the physical

13   and sexual abuse of children.

14        Look at the communications.

15   Corporal Romanosky testified that he kept up his

16   side of the conversation.  But every single

17   conversation, or almost every single conversation,

18   was started by who?  Started by the defendant.

19        Ladies and gentlemen, when you come in here,

20   you don't throw your common sense out the door.

21   You've seen all the evidence, you've seen the

22   defendant's own words, you've seen his confession to

23   law enforcement.  We just ask that you use your

24   common sense, and we'd ask for you to return a

25   verdict of guilty.  Thank you.

```
 1              THE COURT:  Thank you, Ms. Kaiser.

 2              Members of the jury, we will recess for the

 3      evening.  What remains are my instructions on the

 4      law to you and, of course, your deliberations.

 5              It's very important for you to recall that you

 6      should not discuss the case among yourselves or

 7      allow it to be discussed in your presence.  Go home,

 8      get a good night's sleep.  Do not form or express

 9      any opinions about the case until you've heard my

10      instructions on the law and you begin your

11      deliberations.

12              It's important, again, that you not be

13      inadvertently exposed to any news accounts of this

14      trial or any other trial that may be in progress,

15      including television or radio or internet

16      broadcasts.  And you should not Google or conduct

17      any internet search concerning any aspect of this

18      case.

19              With that, we'll see you in the morning at

20      9:00 a.m. for the instructions on the law.

21              COURTROOM SECURITY OFFICER:  Rise for the

22      jury.

23              (Jury out at 4:28 p.m.)

24              THE COURT:  Anything else we can take up,

25      counsel?  I've got a hearing at 4:30.
```

1          Ms. Kaiser?

2          MS. KAISER:  No, Your Honor.

3          THE COURT:  Mr. Tragos?

4          MR. TRAGOS:  I would have a motion.  We can do

5     it in the morning, though, if you want.

6          THE COURT:  Do it now.

7          MR. TRAGOS:  I'd like to move for a mistrial

8     based on the closing argument of the prosecutor in

9     that the prosecutor continually inserted and

10     testified about matters which were not in evidence.

11          THE COURT:  Well, I disagree, of course.  The

12     motion will be denied.  Her comments and argument

13     were responsive to your argument and comments.  To

14     the extent anybody strayed from the facts in the

15     case, both of you are on the edge, but I do not feel

16     that either statements were inappropriate.

17          I do direct that you each review these

18     exhibits now before I begin this hearing so that the

19     clerk is not delayed in presenting them to the jury

20     when I have completed reading the instructions in

21     the morning.  So please do that.

22          We'll be in recess.

23     (Hearing adjourned.)

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH   )

5         I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8         DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 211, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 13th day of September 2009.

19

20

21            _____
                 */s/ Linda Starr*
22            Linda Starr, RPR, Official Court Reporter

23

24

25