1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                         TAMPA DIVISION

3        UNITED STATES OF AMERICA

4              vs.              CASE NO. 8:08-CR-318-T-27TGW
                               5 FEBRUARY 2009
5                              TAMPA, FLORIDA
                               PAGES 1 - 76
6                              VOLUME VII

7        CHARLES JACKSON FRIEDLANDER
         _____/
8
                    TRANSCRIPT OF HEARING ON MOTIONS
9            BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
10

11       APPEARANCES:

12       For the Petitioner:  **Amanda C. Kaiser**
                               United States Attorney's Office
13                             Suite 3200
                               400 N. Tampa Street
14                             Tampa, Florida 33602

15       For the Defendant:   **George E. Tragos**
                               Tragos & Sartes, PL
16                             Suite 800
                               601 Cleveland Street
17                             Clearwater, Florida 33755

18       Court Reporter:      Linda Starr, RPR
                               Official Court Reporter
19                             801 N. Florida Avenue
                               Suite 13B
20                             Tampa, Florida 33602

21

22

23

24        Proceedings recorded and transcribed by
         computer-aided stenography.
25

```
 1              (Call to order at 12:40 PM.)

 2              COURTROOM SECURITY OFFICER:  All rise.  This

 3    Honorable Court is now in session, The Honorable

 4    James D. Whittemore presiding.

 5              Be seated, please.

 6              THE COURT:  Good afternoon.  We are here

 7    convened in the matter of United States versus

 8    Charles Friedlander.  Let's get the appearances.

 9    For the government?

10              MS. KAISER:  Amanda Kaiser for the United

11    States.  Good afternoon, Your Honor.

12              THE COURT:  Good afternoon.  And for the

13    defendant?

14              MR. TRAGOS:  George Tragos on behalf of the

15    defendant, Your Honor.

16              THE COURT:  Good afternoon.  I note the

17    defendant's presence.

18              We have two motions, the first of which is the

19    defendant's motion for new trial.  I would like to

20    focus first, if you don't mind, on the issues

21    concerning Dr. Berlin and the cross-examination of

22    the witness by the prosecutor concerning the DSM

23    manual.  Evidently, both of you have access to the

24    testimony.

25              MR. TRAGOS:  Does the Court not have access to
```

1        it?

2               THE COURT:  Well, I may have, but I have

3        not -- I'm looking to see if it was filed.  Linda

4        very well could have mentioned she was typing it up.

5        But I have not read it other than read, of course,

6        your quotes.  So if you have a copy and we're going

7        to talk about that examination, I would welcome you

8        loaning me a copy so I can follow along.

9               MR. TRAGOS:  Your Honor, I have a copy, one

10       copy.  It is marked up.  It's not a clean copy.

11       It's my only copy.  But I'll be happy to let the

12       Court look at it, but I have notes that I'm going to

13       be referring to.

14              THE COURT:  Well, would it be effective if we

15       turn the ELMO on and you could show me those

16       portions as we go through the argument?

17              MR. TRAGOS:  Your Honor, I have no objection.

18       It might be faster for you just to have this.

19              THE COURT:  All right.  That's fine.

20              MR. TRAGOS:  And I'll just refer to pages and

21       the Court can -- I'm sure the Court has the ability

22       to ignore my highlights.

23              THE COURT:  Thank you, sir.  I haven't found

24       any of the cases cited particularly instructive

25       because, factually, they just weren't on point.  So

 1    if you've found something since you filed your

 2    briefs, that would be something I would like to be

 3    aware of right up front.

 4         MR. TRAGOS:  Well, right up front, Your Honor,

 5    I -- as far as I can tell, there's never been

 6    another case like this.  This is highly unique.

 7    It's -- in so many ways it's -- you're right, it is

 8    different.  There is no appellate case that deals, I

 9    think, with the specific issue and the way it was

10    presented to this Court during the trial.

11         However, I do believe that there is some

12    instructive language in the cases that were cited.

13    I mean, it's going to come down to whether this

14    Court believes that Mr. Friedlander got a -- not a

15    perfect but a fair trial, considering the errors

16    with regards to the book that was presented to

17    Dr. Berlin by the prosecutor.

18         If I could, Your Honor, I'd like to go through

19    some history very briefly.  Your Honor, I presented

20    some exhibits to the Court.  I don't know if the

21    Court has those exhibits.  There you go.  Okay.

22         Your Honor, beginning with Exhibit 1, this is

23    a letter dated November 9th.  It was provided to the

24    prosecution.  The last page will show the fax cover

25    sheet provided to Ms. Kaiser on November 13th.

1          And the reason that I'm presenting this to the

2     Court was that if the Court will look on Page 5 of

3     the letter --

4          THE COURT:  Are you talking about the November

5     9th correspondence to you?

6          MR. TRAGOS:  Yes.  Dated November 9th to me,

7     and I provided it to Ms. Kaiser on November 13th.

8     And if you look on Page 5 of the November 9th

9     correspondence, in the second paragraph under the

10    heading, does Dr. Berlin (sic) manifest a

11    psychiatric disorder that could predispose him to

12    become sexual with a child, you'll see there that

13    Ms. Kaiser was noticed at that point that the

14    diagnostic and statistical manual of DMS-IV TR was

15    the basis of the testimony that he would be

16    providing.  And that if you look at the bottom of

17    that paragraph where it says, paren B, does the

18    Court see that?

19         THE COURT:  Um-hum.

20         MR. TRAGOS:  The person who acted on those

21    sexual urges with nonconsenting persons or those

22    sexual urges or fantasies cause --

23         COURT REPORTER:  Mr. Tragos, will you slow

24    down, please.

25         MR. TRAGOS:  I'm sorry.  Or those sexual urges

1     or fantasy cause marked distress or inner personal

2     difficulty, that is key because that is the -- that

3     is one of the major areas of cross-examination out

4     of the book that was used by the prosecutor.

5          So the prosecutor knew then that he would be

6     basing his decision on that portion of the manual

7     and the specific manual he would be using.

8          THE COURT:  I know he does not reference the

9     edition of the DMS (sic).

10         MR. TRAGOS:  Yes, he does, Your Honor.

11         THE COURT:  In what manner?  Is that the Roman

12    Numeral IV?

13         MR. TRAGOS:  IV-TR, yes.

14         THE COURT:  What does that signify?

15         MR. TRAGOS:  Teaching revision.  That is

16    the -- that is the edition.

17         THE COURT:  Roman Numeral IV, is that the

18    fourth edition or what is that?

19         MR. TRAGOS:  Well, the fourth edition, but TR

20    is the -- the government used the fourth edition,

21    but TM.  Those are the designation differences, the

22    TR and the TM.

23         THE COURT:  Teaching reference and teaching

24    manual?

25         MR. TRAGOS:  I don't know what TM stands for.

1          MS. KAISER:  I think TR stands for text

2     revision.

3          MR. TRAGOS:  Oh, text revision?  All right.  I

4     don't know what TM stands for.  Do you know what TM

5     stands for?

6          THE COURT:  All right.  Well --

7          MR. TRAGOS:  Your Honor, I've got further

8     exhibits that will explain that.  But he was using

9     the IV-TR, which was a specific designation for a

10    specific book.

11         If the Court will look at exhibit -- Defense

12    Exhibit 4, this is the cover, and the copyright page

13    from the DSM-IV TR, which does say text revision.

14    Does the Court have Exhibit 4?

15         THE COURT:  Yes.

16         MR. TRAGOS:  Okay.  And if you look at the

17    next page of Exhibit 4, Page 2 of the exhibit, you

18    will see there that the copyright is 2000.  This

19    particular one -- I received this one.  I wanted the

20    most recent one.  It has not changed.  It's in its

21    11th printing, and the 11th printing was July 2008,

22    which is also on Page 2 of the exhibit.

23         THE COURT:  What does Exhibit 4 have to do

24    with the issue?

25         MR. TRAGOS:  Because Exhibit 4 is the book he

1    testified from as then -- when he initially

2    testified before he was cross-examined.  And we're

3    showing what the issue is, is the date of copyright

4    and publication that this is -- the most recent book

5    is the one he was using, the DSM-IV TR.

6         THE COURT:  All right.

7         MR. TRAGOS:  And the government admits this in

8    the pleading they filed.

9         Now, if you'll look at Exhibit 3, this exhibit

10   is the book the government used in their

11   cross-examination of Dr. Berlin.  This is the cover

12   page, the first page, and the copyright page.  This

13   is the DSM-IV TM.  If you look on the cover page,

14   the very small TM above the Roman Numeral IV to the

15   right of it.

16        If you look, then, at the copyright page, the

17   copyright for this book is 1994.  This book was last

18   printed in its ninth printing May of 1999.  I have

19   to tell the Court -- the prosecutor has brought the

20   book with her -- that the prosecution's book -- in

21   fact, I think it's the last -- the last printing on

22   the copyright page in their book is March of '96,

23   because that's when they got the book in the U.S.

24   Attorney's Office.  It's stamped as being received

25   in 1996.

1          So they -- their printing was the fifth

2      printing, which is the '96 printing, from the book

3      that she used.  Is that clear to the Court?

4          THE COURT:  I follow you.

5          MR. TRAGOS:  Okay.  Now, the Court allowed at

6      the *Daubert* hearing on November 17th -- on November

7      17th, Dr. Berlin testified that he was using the

8      DSM Volume IV, TR.  And the Court was

9      particularly -- I don't know if impressed was the

10     right word, but the Court found that that manual

11     justified his being able to testify about two of the

12     three areas we wanted him to testify about,

13     pedophilia, the sadism and the fantasy.  The Court

14     did not allow fantasy because it was not listed as a

15     diagnosis in the DSM, but the other two were.

16          The -- in that testimony, the acting out

17     language which, again, is key to the prosecutor's

18     cross-examination, was referenced.  And the Court

19     said on Page 94, Line 9, "With respect to pedophilia

20     and sexual sadism, the government has indicated it

21     intends to buttress its case against the defendant

22     by placing in evidence photographs and other chat

23     type evidence engaged in by this defendant.

24          "I don't know the relevance of any of that,

25     Ms. Kaiser, except to buttress the government's

1    contention that the defendant knowingly engaged in

2    conduct allegedly so as to induce a child to engage

3    in some type of sexual activity.  Because of that,

4    these issues become relevant.

5         "The government's essentially, appropriately,

6    putting on evidence of similar act evidence.  It

7    goes to the issue of intent.  So it's not purely

8    propensity evidence, it goes to his intent and

9    knowledge.  It's admissible, appropriately so."

10        So the Court found that -- had earlier found

11   that the government can put this in, and the Court

12   characterized it at the *Daubert* hearing as similar

13   act evidence to buttress their intent issue.  And,

14   therefore, in order to counteract that intent issue,

15   the Court allowed Dr. Berlin's testimony to a

16   limited degree, pursuant to the order that it issued

17   on the *Daubert* hearing.

18        The Court also allowed the similar fact

19   evidence of Wayne, which is the Port Charlotte

20   officer regarding the conversations that he had had

21   with the defendant, where the defendant was talking

22   to him about having some sexual contact with his

23   daughter.

24        The Court, in ruling that way, found,

25   according to the case law by implication that that

1       was necessary evidence because the evidence of

2       intent was not so strong as to preclude it.

3           For instance, in citing -- in the case of *U.S.*

4       *versus Williams*, which is in the material, the rule

5       of this circuit is extrinsic evidence of similar

6       acts will possess great probative value if the

7       defendant's intent is at issue and if the government

8       lacks other strong evidence of defendant's intent.

9           So -- and there's several cases that say the

10      same thing.  So by allowing similar fact evidence,

11      the Court is saying that their evidence on intent

12      isn't so strong, that I'm going to let them buttress

13      that evidence of intent by putting in this similar

14      fact evidence, which the Court basically said in

15      that *Daubert* hearing, the section that I read.

16          So the government doesn't have a basic -- that

17      strong a case on intent, so let them use these other

18      things.  To counteract that, the defense is able to

19      put on Dr. Berlin.  So Dr. Berlin's testimony is --

20      was key to the defense, plus her ability to

21      effectively destroy his credibility with that

22      cross-examination also destroyed the credibility of

23      the defense and affected the entire defense of the

24      case because we were now in a situation where we

25      lost credibility with the jury because we put on

1    someone who apparently didn't know what they were

2    talking about and didn't bring the most recent book.

3        THE COURT:  Well, what do you think the

4    standard is applicable to the prosecutor's use of a

5    manual that predated the one he used?

6        MR. TRAGOS:  The prosecutor's standard?

7        THE COURT:  No.  The standard applicable to

8    the relief that you've requested.  Does it have to

9    be a knowing use?

10       MR. TRAGOS:  It does not have to --

11       THE COURT:  Wait a minute.  Let me finish.

12       MR. TRAGOS:  Okay.  I'm sorry.

13       THE COURT:  Do you have to show that she

14   knowingly used -- I don't want to say false evidence

15   because I think that mischaracterizes it --

16   knowingly used the wrong manual which resulted in an

17   implication that the witness was relying on an

18   outdated manual or is it does she have to have

19   intentionally done it or is it that she should have

20   known or is it she just made a mistake and that's

21   enough?  What is it?

22       MR. TRAGOS:  Your Honor, it can be, in my

23   opinion, inadvertent, and it also can be should have

24   known.  I don't think there's a requirement that she

25   did it on purpose to mislead the jury.

1           THE COURT:  Well, you're focusing, then, and

2      as I read your motion, on the conduct of the

3      prosecutor in asking the questions as opposed to the

4      testimony of the witness.  And virtually all of the

5      cases deal with perjured testimony of a particular

6      witness, whether it be a confidential informant or

7      some other witness whose testimony is false and the

8      prosecutor is deemed to have either known about it

9      or should have known about it and corrected it at

10      the time.

11           So we've got a situation where it's not false

12      testimony on the part of the witness, it's the

13      prosecutor's -- and I'll say inartful, if you will,

14      because I don't want to take a position -- inartful

15      use of the wrong manual in the cross-examination.

16           So I need some guidance.  I don't see this

17      case fitting within the traditional *Giglio*, *Brady*,

18      *Napue* -- that's N-a-p-u-e -- scenarios.

19           MR. TRAGOS:  I think it does fit into the

20      *Brady* scenarios.

21           THE COURT:  In what respect?

22           MR. TRAGOS:  I think it does because what we

23      have is basically the prosecutor using -- impeaching

24      a witness.  But the thing that makes this so

25      different is because this is a defense witness.

1                 THE COURT:  He's an expert, though.

2                 MR. TRAGOS:  Yes.

3                 THE COURT:  Shouldn't he know that he used the

4       wrong manual?

5                 MR. TRAGOS:  Your Honor, if you'll read his

6       testimony, are we to presume in this court or any

7       court in this land that a prosecutor is going to get

8       up there and make that kind of mistake?  A

9       prosecutor has -- and I've got the quote and I can

10      read the quote from other cases -- but a

11      prosecutor -- there was a case called *Hall versus*

12      *United States*.  Government counsel is an individual

13      properly and highly respected by members of the jury

14      for his integrity, fairness and impartiality.

15      Consequently, improper suggestions, insinuations and

16      especially assertions of personal knowledge are apt

17      to carry much weight against the accused when they

18      should properly carry none.

19                When a prosecutor gets up there and says to a

20      witness who -- and this book was not disclosed

21      beforehand, the witness had never had an opportunity

22      to see it beforehand.

23                THE COURT:  Well, there's no duty to disclose.

24      I understand you're making that argument.

25                MR. TRAGOS:  Right.

1           THE COURT:  But she doesn't have to tell the

2      witness what she's going to be asking him on

3      cross-examination.

4           MR. TRAGOS:  Which is exactly my point.  I

5      didn't say there was a duty for her to disclose

6      that.  But she does have a duty when she's going to

7      do something like that that she makes sure that

8      she's right when she asks that.

9           She started her questioning -- if the Court

10     will look on Page 30, Line 22 of the transcript.  It

11     says, "Well, sir, are you aware that the diagnostic

12     criteria for sexual sadism changed since 2000?"

13          THE COURT:  What line are you on?  I'm sorry.

14          MR. TRAGOS:  Line 22, Page 30.  Is the Court

15     with me?

16          THE COURT:  Yes, sir.

17          MR. TRAGOS:  So she starts out by telling him,

18     are you aware that the diagnostic criteria for

19     sexual sadism has changed since 2000?  That's what

20     she starts out.  Before showing any books, before

21     showing anything, that's the way she starts out this

22     question.

23          Are we to presume -- or what are we to presume

24     when the prosecutor asks that question?  She flat

25     out says, are you aware it's changed.  The jury over

1      here hears that question.  She is the Assistant

2      United States Attorney.  Her role in this is the

3      role of a minister of justice.  She has a duty to

4      make sure that she is not asking improper questions

5      or making improper inferences.

6           She has to check her facts.  Then if you go

7      further down on Page 31, she asks, "Do you recognize

8      the book I'm holding?"  And then she walks over and

9      says to the witness -- by the way, she goes, "May I

10     approach the witness?"  The Court will remember --

11     and I know the Court tries a lot of cases -- but the

12     Court will remember, she walks over to the witness,

13     opens up the book and opens it to this specific

14     copyrighted page on the book and shows him that and,

15     to my recollection, points to it.

16          He looks at it and says, "I presume" -- well,

17     the Court -- I didn't do the whole thing in my

18     notes, but the Court can read there what he says.

19     And then she goes, "Actually, it's put out in 2005,

20     although its's a little bit unclear."  That's Page

21     31, Line 16.  She's confused him by showing him this

22     book that she says is the more recent book that

23     changed.

24          THE COURT:  Well, I understand that's your

25     spin.  But the witness recognized the book she

1    handed him as the DSM IV-TM.  It was copyrighted in

2    1994.  He correctly identified that particular text.

3         MR. TRAGOS:  Right.  But then if you go on to

4    see when she pressured him, it became a 2005 book,

5    and that's how she referred to it.

6         THE COURT:  He said that first; didn't he?

7         MR. TRAGOS:  Yes, Your Honor, because she

8    directed him, and he said it's unclear.  And then

9    she goes, "So if it's from 2005, that would be the

10   most recent."

11        THE COURT:  Well, let's back up.  You've got

12   to read this in context.

13        MR. TRAGOS:  Yes.

14        THE COURT:  And I'm surely not advocating on

15   behalf of the government.  But if you'll follow his

16   testimony, she approaches the witness, hands him the

17   DSM IV-TM manual, asks him if he recognizes it.  He

18   said, "Yes.  This is the DSM IV-TM," recognizing --

19        MR. TRAGOS:  The Court --

20        THE COURT:  Wait a minute -- the distinction

21   between TM and TR.

22        MR. TRAGOS:  Right.

23        THE COURT:  Which is the manual she just

24   identified as the one he used.

25        MR. TRAGOS:  Right.

1           THE COURT:  She then asked a rather innocuous

2      question:  "And when was this book published?"  The

3      witness said "Copyright, 1994."  Then the witness

4      says, quote, "It says correspondence regarding this

5      to be directed to Division of Publications, 2005.

6      So I presume that's it."

7           It's the witness who first injected 2005 into

8      the conversation.  So you suggested that she -- I

9      used a word a moment ago "influenced" him or --

10          MR. TRAGOS:  Yes, she did.

11          THE COURT:  He's the one that said, "yes, it's

12     2005."

13          MR. TRAGOS:  Your Honor, if you'll look at her

14     notice of mutual mistake, because she also thought

15     it was 2005.  And that's -- when she was up there

16     with him, that's what she pointed to.  She didn't

17     say that in her notice, but her notice did say that

18     they both -- it was a mutual mistake because she

19     thought it was 2005, as well.  It turns out that

20     that's the zip code that's on that page.

21          And -- but, Your Honor, she should have known

22     before asking him that it was not the more recent or

23     changed definition.  She asked him that before she

24     showed him the book.  And then if you'll go down to

25     line -- Page 32, Line 22, he unfortunately relies on

1    her because he says, "I don't think you're trying to

2    trick me."   Page 32, Line 22 and 23.   And then if

3    the Court will go to Page 33, Line 19, and read the

4    prosecutor's question there.

5        THE COURT:   So what is your contention, that

6    Ms. Kaiser knowingly misled the witness,

7    inadvertently misled the witness, mistakenly misled

8    the witness or what?

9        MR. TRAGOS:   I can't --

10        THE COURT:   I think we have to understand what

11    your contention is.

12        MR. TRAGOS:   Without -- and I don't -- I can't

13    say about the knowingly because, obviously, who can

14    know if she knew it or not.   But presuming that she

15    didn't know, then it would be either inadvertently

16    or should have known before she presented it to the

17    witness and to the jury as the most recent book and

18    before she presented to the jury that the diagnostic

19    criteria had changed.

20        I mean, I could go through if the Court wants

21    me to continue to go through to the multiple times

22    she refers to this book as the most recent book,

23    just like she did on Line 19 saying, "Why would you

24    come all the way down here from Johns Hopkins and

25    not compare the definitions with the most recent

1      book?"

2           THE COURT:  So you are relying on her

3      question, Page 30, Line 22, as the introduction to

4      the witness and to the jury that diagnostic criteria

5      for sexual sadism had changed since 2000?

6           MR. TRAGOS:  That is the beginning, yes.

7           THE COURT:  Beginning --

8           MR. TRAGOS:  Your Honor, if you go to Page 30,

9      Line 11.

10          THE COURT:  All right.  Line 11, Line 22.  So

11     it's her questioning to introduce the idea of

12     change?

13          MR. TRAGOS:  Correct.  Line 11 says the same

14     thing.  Are you aware the diagnostic criteria has

15     changed since 2000 when, in fact, it hadn't.

16          THE COURT:  All right.  So what we have, then,

17     from your perspective is either an inadvertent or

18     mistaken reliance on the wrong manual by Ms. Kaiser

19     or a situation where she should have known that the

20     manual she was using was not, in fact, the more

21     recent version but, in fact, an older version;

22     right?

23          MR. TRAGOS:  Yes, Your Honor.  Unless the

24     Court would allow me to ask some peripheral

25     questions of Ms. Kaiser to see whether or not she

1    did or didn't know beforehand, I can't say that.

2    I'm just making a presumption because I believe like

3    a lot -- I believe an Assistant U.S. Attorney would

4    not deliberately do something like that.

5         THE COURT:  Well, you need to be more specific

6    because I have to make a very difficult decision

7    here.  And if it's your contention this was, as she

8    has said in her notice, simply a mistake on her part

9    and the witness, that's one thing.  If you are

10   suggesting that she intentionally put the wrong

11   manual and took him down a path, that's quite

12   another.  We will have a very short hearing if

13   that's the case.  Under the standards as I

14   understand them, the intentional conduct on the part

15   of a prosecutor to mislead a witness through false

16   questioning or implications, I'll grant a motion for

17   new trial.

18        MR. TRAGOS:  Your Honor, I'm not --

19        THE COURT:  That's not a fair trial.  But if

20   it's inadvertence and mistaken and she's equally as

21   culpable as the witness and the witness has the

22   upper hand as an expert, that's quite another matter

23   because he should have known.  And that's going to

24   get to the bottom line, seems to me, of what you

25   started with and, that is, whether or not this is a

1    fair trial.

2         MR. TRAGOS:  And, Your Honor --

3         THE COURT:  If you want to take her

4    examination under oath, that's the request you have

5    to make.  If --

6         MR. TRAGOS:  I would request that I be allowed

7    to have a short examination, Your Honor.

8         THE COURT:  Well, Ms. Kaiser, what do you say?

9    Cases seem to suggest that requests for an

10   evidentiary hearing in matters of this nature is

11   probably the preferred procedure.  But it puts you

12   in a little different posture than being an

13   advocate.

14        MS. KAISER:  That's fine.  He can ask whatever

15   questions he wants, Your Honor.  That's fine with

16   me.

17        THE COURT:  I think if we -- it would seem to

18   me if we address it now, it's in the record,

19   whatever the answers are.  And we can either deal

20   with that or move on to the standard of

21   inadvertence.

22        MR. TRAGOS:  I believe so.  I think this is

23   going to be short and it will make the record clear.

24        THE COURT:  All right.  Well, Madam Clerk,

25   where are you?

```
 1          COURTROOM DEPUTY CLERK:  Right here.

 2          THE COURT:  We're going to administer the oath

 3     to Ms. Kaiser for brief examination.  I don't know

 4     how we're going to handle cross-examination, but

 5     there may not be any.

 6          COURTROOM DEPUTY CLERK:  Raise your right

 7     hand.  Do you solemnly swear or affirm that the

 8     testimony you give in this cause will be the truth,

 9     the whole truth and nothing but the truth, so help

10     you God?

11          MS. KAISER:  I do.

12          COURTROOM DEPUTY CLERK:  Please state your

13     name for the record.

14          MS. KAISER:  Amanda Kaiser.

15          THE COURT:  You can remain seated, Ms. Kaiser.

16     Go right ahead, Mr. Tragos.

17                    DIRECT EXAMINATION

18     BY MR. TRAGOS:

19     Q     Ms. Kaiser, when did you first know that

20     Dr. Berlin was going to be using the DSM-IV-TR?

21     A     I first knew, I would imagine, after probably

22     getting your notice about his testimony that he was

23     using the DSM.  But, frankly, I don't recall ever

24     appreciating the difference between TM and TR.

25     Q     When did you -- when did the DSM-IV-TM first
```

1      come into your possession?

2      A      Prior to trial I used it to prepare for the

3      *Daubert* hearing, so I got it from our law library

4      and did some research out of it --

5      Q      Okay.

6      A      -- to prepare for my cross-examination of

7      Dr. Berlin.

8             THE COURT:  You mean the U.S. Attorney's law

9      library?

10            MS. KAISER:  Yes, sir.

11     BY MR. TRAGOS:

12     Q      You say that was prior to the *Daubert* hearing?

13     A      Yes.

14     Q      Which occurred on November 17th, 2008?

15     A      Yes.

16     Q      Okay.  And when did you first review the

17     diagnostic criteria for pedophilia and for sexual

18     sadism that's contained in the DSM-IV-TM?

19     A      Probably sometime before that hearing as to

20     whether or not Dr. Berlin would be able to testify

21     and the scope of his testimony.

22     Q      So before the *Daubert* hearing, you did review

23     the diagnostic criteria contained in the DSM-IV-TM

24     for pedophilia and sexual sadism?

25     A      I think I did.  I can't be a hundred percent

1    sure.  I -- I think I did but, like I said, I just

2    had -- I had the book with me at trial.  And the

3    only way I even came to look at it during the trial

4    was after I got a copy of your exhibit, my agent

5    astutely noticed that there was a misspelled word

6    in your defense exhibit.

7         So that's the only reason I even got my book

8    out at trial was because there was a misspelled

9    word, we knew it hadn't been photocopied directly

10   from the manual.  So I took my book out and compared

11   the diagnostic criteria that was listed on your

12   exhibit with the book that I had, and noticed they

13   were different.

14   Q     But going back to my question, you did review

15   the diagnostic criteria from the DSM-IV-TM prior to

16   the *Daubert* hearing, as well?

17   A     I'm pretty sure I did.  I can't say a hundred

18   percent, but I'm pretty sure I did.

19   Q     Okay.  All right.  And I think in your answer

20   that you previously gave, you said that the first

21   time you noticed that there was a difference in the

22   diagnostic criteria that Dr. Berlin was testifying

23   to and that contained in the DSM-IV-TM was during

24   trial?

25   A     Correct.

1      Q      Okay.

2             MR. TRAGOS:  That's all the questions I have,

3      Your Honor.

4             THE COURT:  Ms. Kaiser, would you like to

5      supplement your direct testimony by a statement

6      under oath?

7             MS. KAISER:  Well, Your Honor, as I said, the

8      only time during trial that I even pulled out the

9      DSM-IV-TM was after noticing that there was a

10     misspelled word in the defense exhibit.  So I knew

11     that his hadn't been copied directly from any

12     manual.

13            So it wasn't purposeful and I certainly -- and

14     I asked Dr. Berlin repeatedly, is this book -- is

15     this government's book more recent or not.  I handed

16     him the book.  I asked him about three different

17     ways, as is delineated in my government's response

18     to the motion for new trial.  I asked him, is it a

19     more recent book of the same book that he had showed

20     earlier.  And he said it would appear to be.  I

21     asked him about four different ways, is my book more

22     recent, and he said, yes, and I thought it was.

23            THE COURT:  Well -- and I was going to ask,

24     Mr. Tragos, if you don't, why do you think it was

25     more recent?  You looked at the zip code and misread

1      that?

2           MS. KAISER:  I think I did.  I think I

3      looked and I just glanced at it real quick.  After

4      we noticed that they were different, I glanced, I

5      thought it said 2005.  So I thought mine was more

6      recent and that's why I handed it to him.  And I

7      asked him a few different ways, is mine more recent,

8      because I wasn't a hundred percent sure.  I thought

9      it was, but I wasn't a hundred percent sure.  I

10     figured Dr. Berlin would know.  And I figured if I

11     was wrong, he would certainly tell me.

12          So I'm fairly certain I wouldn't ask the

13     question of him, are you aware that the diagnostic

14     criteria had changed, if I didn't think it had.

15     Obviously I wouldn't have asked that if I hadn't

16     thought it had changed.

17          So -- but I definitely handed him the book and

18     kept asking him on Page 31, Line 18, "So is this a

19     more recent book?"  And then I asked him -- I asked

20     him again on Page 32.  "Is this a more recent

21     edition of the same book you mentioned earlier?"

22     And he said, "It would appear to be.  Yes."

23          So I -- in my cross-examination of him, I

24     definitely tried to confirm repeatedly that my book

25     was more recent than his book.

1          THE COURT:  So your position is you were as

2     mistaken as the witness?

3          MS. KAISER:  Yes, Your Honor.

4          MR. TRAGOS:  Could I ask a follow-up question,

5     Your Honor?

6          THE COURT:  Yes, you may.

7     BY MR. TRAGOS:

8     Q     Is there a stamp in the book as to when the

9     U.S. Attorney's Office received the DSM-IV-TM?

10    A     I think there is, but it's not on the

11    copyright page.  It's in the very beginning of the

12    book like a stamp the library would have, but it's

13    not -- it's not where the copyright information is.

14    Q     What date is on the stamp of when the U.S.

15    Attorney's Office received the book?

16    A     April 25th, 1996.

17    Q     Thank you.

18         MR. TRAGOS:  That's all I have.

19         THE COURT:  And that was the only DSM manual

20    in the library?

21         MS. KAISER:  Yes, Your Honor.

22         THE COURT:  All right.  Okay.  Mr. Tragos,

23    now, based on that testimony, where -- where do we

24    go next?  What do you think the standard is?

25         MR. TRAGOS:  Should have known and whether or

1    not it was -- it's not relevant whether it was

2    inadvertent or not, it was whether or not

3    Mr. Friedlander received a fair trial under those

4    circumstances as to what happened here.  There would

5    have been a huge difference without that

6    cross-examination, without her ability to conduct

7    that cross-examination.

8        I can keep going through the transcript to

9    show the repeated places, and most of them are

10   actually quoted in the motion for new trial, where

11   she repeatedly -- I mean, he even says at Page 45,

12   Line 15, that he should have been aware that there

13   was a change.  I mean, you know, all these things --

14   you know, she's making him admit all these things

15   and they're not true.  She's making him admit that

16   there should have been a change, making him admit

17   the wording has changed, and they're all not true.

18       He was right and then she makes him admit that

19   he was wrong because she presents him with a

20   document that she believes to have been a more

21   recent document, and it wasn't.  And she presented

22   that to the jury.  And the reason I quoted the rule

23   in there about prosecutors being witnesses is that

24   that rule specifically, and the citation below it,

25   goes to the fact that prosecutors are witnesses and

1       the real advantage is they can't be cross examined.

2              If the Court will look -- the Court I know

3       probably doesn't have the closing argument.  But if

4       I could quote Ms. Kaiser's closing argument, a

5       portion of it, about Dr. Berlin.  "He charged over

6       $30,000 and he didn't even bring the right book.

7       Let's talk about those little gremlins that he

8       referenced, the people that somehow snuck into the

9       publisher's office and changed the DSM, the manual,

10      without telling him.  I guess we'll never know who

11      did that."

12             And that's the kind of closing argument and

13      that's the way Dr. Berlin was characterized in her

14      closing argument based on a book that was -- that,

15      again, we had no right to see beforehand.  The

16      reason that we're not -- we don't have to see those

17      things beforehand is because I think the Court and

18      everyone else presumes that they're not going to

19      present cross-examination of material that is wrong

20      and inaccurate.

21             It's like standing up, Your Honor, and

22      cross-examining a witness about prior convictions

23      when, oops, sorry, we made a mistake here about

24      those prior convictions.  It was another Joe Jones.

25      You just -- you know, those things don't go away

1          lightly.  When a prosecutor says someone's got prior

2          convictions, that jury is going to believe it.  When

3          a prosecutor stands up and presents a book that says

4          the diagnostic criteria has changed, that jury is

5          going to believe it because they're not going to

6          believe a prosecutor is going to lie about the

7          diagnostic criteria being changed.

8                THE COURT:  Well, I'd like you to address two

9          things.  One, this is not an ordinary witness.  This

10         is a retained expert, imminently qualified, I would

11         point out, who I would presume to be capable of

12         withstanding not only rigorous and probing

13         cross-examination but, in this instance, mistaken

14         cross-examination and a witness who, I would

15         presume, would have been able to counter such a

16         question and embarrass Ms. Kaiser.

17               From my observation he was, as you saw,

18         completely caught off guard and was not able to --

19         to respond and correct her.  So that's the first

20         observation, the nature of the witness.  This isn't

21         a cooperator whose prior record or agreements with

22         the government are misrepresented to the jury with

23         the knowledge of the prosecutor.  Those are the more

24         traditional circumstances that we see.

25               I kind of drawn an analogy with many of the

1    civil cases that we see where these experts get

2    involved, and a lot of them are nothing more than

3    retained experts who come in and say whatever suits

4    their particular client.  And it's not uncommon to

5    see experts like that embarrassed, ridiculed and

6    sometimes lawyers ridiculed and embarrassed because

7    they ask silly questions.

8         So it's the nature of the witness that I'd

9    like you to address.  And then secondly, I need you

10   to focus on what you believe to be the controlling

11   case law in terms of a standard to be applied in a

12   situation like this.  I know we don't have a case on

13   point factually.  But surely, some of these cases

14   talk about whether it's a collateral issue, whether

15   it may have had an effect on the jury.  So those are

16   my two areas of concern.

17        MR. TRAGOS:  All right.  Going to your first,

18   let's begin by saying he's not being

19   cross-examination -- examined by an ordinary person.

20   He's being cross-examined by an Assistant United

21   States Attorney.  And there's a difference between

22   just a lawyer and a person who represents the people

23   of the United States when they get up there and when

24   they speak and the authority upon which they speak.

25        Secondly, an expert is not less vulnerable but

1    more vulnerable to this type of suggestion because

2    if you're a fact witness, you know the facts of the

3    case.  You rely on your memory.  An expert witness,

4    there is a multitude of documentation out there if

5    it is an area such as we're dealing with today.  And

6    to say he has to be familiar with every single book

7    ever published at any time in the past is an

8    example.

9         THE COURT:  The DSM is not every kind of book,

10   it is "the book".  It's the Bible of diagnostic

11   methodology, if you will.

12        MR. TRAGOS:  But, Your Honor, I am -- I'll

13   just use myself as an example, maybe a bad example.

14   But I've been practicing for a long time.  I have

15   testified as an expert on areas or matters of law.

16   If some Assistant United States Attorney stood up

17   and said that they had -- that the law had changed

18   in a particular area that I was testifying about,

19   that Congress had passed a law or something that

20   changed it, it would make me doubt my testimony

21   because I wouldn't in a million years think that an

22   Assistant United States Attorney would say something

23   like that, would say the law has changed unless it

24   had.

25        And the fact that she tells him the diagnostic

1    criteria has changed -- and if you will look, he

2    tells her, "I don't think you're trying to trick

3    me."  That's what he says in his testimony.  It is

4    obvious that he is relying on her credibility

5    because he doesn't presume that she's going to lie

6    to him.  He doesn't presume that she's going to

7    mislead him.  He doesn't presume she's going to make

8    that kind of mistake, that she's going to present a

9    book to him that is wrong, that she's going to talk

10   about diagnostic criteria changing when it hasn't.

11        So I don't -- it doesn't surprise me that he

12   would have confidence in an Assistant United States

13   Attorney asking him those questions.  He was trying

14   to -- you know, he tried to be fair.  And he said,

15   if they've changed, I'll admit it, fine.  I wasn't

16   aware that they had changed.  I wasn't aware that I

17   didn't bring down the most recent book.  That's what

18   he told her.  And I can cite the Court to those

19   statements to her when she asked him questions.  He

20   wasn't aware he didn't bring down the most recent

21   book.  He wasn't aware that the diagnostic criteria

22   had changed.  The reason he wasn't aware of it is

23   because it hasn't.

24        THE COURT:  Well, when you say the standard

25   applicable to this is what the prosecutor should

1    have known, isn't that a responsibility that a

2    retained expert also has, that is, he should know

3    and should be able to respond to a mistaken

4    suggestion or proposition by the prosecutor?

5         MR. TRAGOS:  Your Honor, again, we're not in a

6    civil forum where we have two private lawyers asking

7    questions.  A prosecutor has a particular duty.  You

8    have a right as a citizen, as a person on that

9    witness stand --

10        THE COURT:  All right.  We're getting to it,

11   then.  You're suggesting, then, that there is a duty

12   on the part of an Assistant United States Attorney

13   not to be mistaken in the questioning of a witness.

14        MR. TRAGOS:  Under the scenario --

15        THE COURT:  I've got to zero in on what you

16   think carries the day here.

17        MR. TRAGOS:  Under these circumstances, under

18   the facts of this case, I'm not saying that's a

19   general proposition, because everybody makes

20   mistakes.  What I'm saying is under these

21   circumstances, when you're talking about a document

22   and you're talking about specific language in a

23   document and you're representing that document as

24   something and it's not a -- it's not an obscure fact

25   but you have had this book, you reviewed the

1      criteria -- the prosecutor admitted that she

2      reviewed the criteria before November 17th.  She

3      reviewed the diagnostic criteria.  And if she used

4      this book and if she reviewed it and if she would

5      have compared it to the November 13th report of

6      Dr. Friedlander (sic), she would have seen that the

7      DSM he was relying on and the one she was reading

8      were different.

9          And she didn't bother to find out why they

10     were different.  And she -- and when she brought

11     this book in here today, the TM, she knew it was not

12     the same book he was using because she knew, again,

13     back on November 13th that she was using the TR.

14     She didn't bother to take a look at the differences,

15     why one is TM and why one is TR.

16         There was just such a rush in excitement.  And

17     I can understand it.  You're in trial.  You think

18     you've got something that's a real killer that

19     you're going to get up there and beat somebody over

20     the head with, so you're excited to get up there and

21     do it.  But you have a duty before you do that to

22     check and make sure that it is -- that you are not

23     making a mistake.  You have a duty to take a look.

24         THE COURT:  All right.  Let's accept that for

25     purposes of our hearing today that she has this duty

1    and for whatever reason she asked an ill-premised

2    question, and the witness was understandably

3    embarrassed in credibility and the weight of his

4    testimony was diminished.  What's the standard?

5         MR. TRAGOS:  Your Honor, I would go back to

6    the *Brady* standard because I think that is the

7    standard, which is sufficient to undermine

8    confidence in the outcome, a reasonable probability

9    sufficient to undermine confidence in the outcome.

10        THE COURT:  All right.  Ms. Kaiser is going to

11   stand up here and say -- and I'm not clairvoyant,

12   it's in her pleadings -- that the evidence in this

13   case was overwhelming whether or not Dr. Berlin

14   accurately described Mr. Friedlander as a pedophile

15   or not is completely collateral to whether or not he

16   violated the statute.

17        I tend to agree with her that the evidence in

18   the case was overwhelming.  Therein lies why I

19   questioned why she wanted similar act evidence.  It

20   didn't appear to be a weak case.  I beg to differ

21   with your inferences that you drew.  But in any

22   event, you've got in my mind, at least, overwhelming

23   evidence that this defendant violated the statute.

24        We've got an expert who you call ostensibly to

25   suggest to the jury that he's not a pedophile and,

1    therefore, the conduct attributed to him is

2    inconsistent with his leanings, if you will.  It's a

3    collateral issue, in other words.  How do you

4    respond to that?

5         MR. TRAGOS:  Your Honor, I respond to it in

6    several ways.  First, the Court noted itself at the

7    *Daubert* hearing -- I did not transcribe the other

8    hearings but the *Daubert* hearing -- that the

9    prosecution is the one that has broadened its

10   evidence with regard to intent.

11        The two -- the Court let in two different

12   types of similar fact evidence.  One was the

13   pictures and the material off of his computer that

14   was unrelated to this specific case and, two, was

15   the Port Charlotte -- Port St. Lucie, I'm sorry,

16   Port St. Lucie evidence with regards to other chats.

17        Now, I know what the Court just said, but the

18   case law says that if the evidence is overwhelming

19   with regards to intent, then we should not let in

20   the similar fact evidence.  We only let that similar

21   fact evidence in if the government's position needs

22   to be bolstered with regards to intent.

23        THE COURT:  That evidence came in only after

24   Mr. Friedlander testified.  He opened the door.  So

25   that's not the controlling issue, Mr. Tragos.

1          MR. TRAGOS:  But, Your Honor, you let it in as

2     404(b).

3          THE COURT:  On rebuttal.

4          MR. TRAGOS:  Right.  But 404(b) nonetheless.

5          THE COURT:  Be that as it may, that's not what

6     carries the day here, in my view.

7          MR. TRAGOS:  Well, again, I'm going to the

8     case law and what the case law says about 404(b).

9          THE COURT:  But we're not talking about 404(b)

10    evidence.  We're talking about a retained expert who

11    is confused by an ill-premised question and a series

12    of questions by the prosecutor.

13         MR. TRAGOS:  But the Court, in asking me just

14    now, asked me to explain why this is not collateral.

15    And what I'm saying is it's not collateral because

16    perhaps the facts are clear, but the issue of intent

17    I don't believe that that was -- again, it's the

18    Court's judgment -- that that was so clear and that

19    perhaps you can't -- the Court was here -- an

20    appellate court is probably going to have a tough

21    time, but the Court was here and saw what her

22    cross-examination did to the defense case.  The

23    Court saw how our expert, who we paid $30,000 to,

24    apparently had gremlins running around changing the

25    DSM.  And the prosecution certainly knew the impact

1    of that because it was one of her more colorful

2    phrases during closing argument, saved for

3    Dr. Berlin.

4         We, on the other hand, weren't able to argue

5    much about Dr. Berlin after that cross-examination.

6    That credibility, that damage to the defense case

7    spilled over to the entire defense case.  And the

8    fact that the intent issue, the defendant testifying

9    with regards to the intent issue, that was the key

10   to the defense in our case with -- with the fact

11   that he's saying he does not have -- and the

12   prosecution asks questions about interest in

13   children and on and on and on in their

14   cross-examination.

15        And Dr. Berlin certainly would have made the

16   case for the fact that he does not, that that

17   criteria does not fit him.  And she particularly

18   jumped on a particular -- the particular difference

19   in the criteria, being acting out on the sexual

20   urges and that being a necessary part.  That

21   acting-out criteria was in what Dr. Berlin testified

22   to.  She is the one that challenged it because it

23   was left out of the TM, the old version.  The old

24   version did not have the acting out.

25        And a lot of evidence came in about the fact

1       that there was no evidence of him ever acting out.

2       That was a key to the defense, the fact that he

3       never acted out.  The Court will remember evidence

4       came in, no prior record, nobody ever called in, no

5       child, no nothing.  But it didn't matter after

6       Berlin's testimony and after the prosecutor said

7       that the diagnostic criteria had changed and

8       psychologists and psychiatrists all over the world

9       now don't believe you have to act out to be a

10      pedophile or a sexual sadist.

11          But that's wrong, you do, that is the

12      criteria.  And it just -- it just totally took the

13      air or the wind out of the defense case.  That's why

14      it's important.  That's why it's so important.  And

15      the Court viewed its admission, and I don't know if

16      it's in the -- I think it is partially in *Daubert*,

17      in the *Daubert* hearing.  But the Court viewed the

18      admission of Dr. Berlin's testimony as a direct

19      counter attack to the prosecution putting in items

20      that went beyond -- even beyond the case.

21          And the prosecution chose to try a case a

22      certain way.  We chose to defend it a certain way.

23      And through, I guess, negligence, whatever you want

24      to call it, not intentional, but through an

25      inadvertent act of the prosecution, he did not

1    receive a fair trial and there is -- there is a

2    question about having confidence in what this jury

3    did.

4         But, again, the Court was here.  I think the

5    Court can remember what the atmosphere was like

6    during that cross-examination and after it.  Does

7    that answer the Court's question?

8         THE COURT:  Well, it surely touched on the

9    Court's question.  Why don't we give Ms. Kaiser a

10    chance to respond.

11        MS. KAISER:  Your Honor, first, I'd like to

12    respond to one of the last things that Mr. Tragos

13    said, if I may.  He said that crucial to his defense

14    was the fact that the new DSM required that a person

15    had acted on the sexual urges or behaviors.

16        That's not the case.  And if the Court reviews

17    the transcript of Dr. Berlin and also the excerpts

18    that I had placed in my response to their motion for

19    new trial, that assertion is just not correct.

20    Because even in the revised version or the correct

21    book that Dr. Berlin had, the only difference was

22    that subsection B for pedophilia, and it states,

23    "The person has acted on the sexual urges or the

24    sexual urges or fantasies caused marked distress or

25    inner personal difficulty."

1          So what Mr. Tragos had just said about the --

2    Dr. Berlin's book's version requiring behavior, it

3    doesn't.  It doesn't require behavior now at all.

4    It just has another -- it just adds that as a basis

5    for a diagnosis.

6          I've got a chart here that shows -- and I may

7    have incorporated it into my -- I think it's in my

8    response to the motion for new trial.  I listed the

9    differences between the two books.  And, certainly,

10   as I testified to earlier, it wasn't a purposeful

11   misstatement when I questioned Dr. Berlin.  But, I

12   mean, how Dr. Berlin didn't know the difference

13   between the two books is -- is -- is really

14   shocking.

15         He said he sat on the committees that made the

16   books.  But despite my cross-examination, Dr. Berlin

17   repeatedly testified that even though the books were

18   different, substantively they were the same, anyway.

19   And so in my response to the motion for new trial

20   starting on Page 10, Dr. Berlin -- and I'll just

21   read some of the quotes.  He said, "To the best of

22   my belief, there's been no significant changes."

23   Transcript, Page 33, he says, "I don't see anything

24   that's standing out at me that looks different in

25   terms of those criteria," Page 34.

1          On Page 35 he says, "The wording, I'll

2     acknowledge, is slightly different.  The intent, the

3     theme, what is meant to represent is essentially the

4     same."

5          On Page 36 he said, "The wording is somewhat

6     different, but the essence of what it's all about,

7     in my judgment, is precisely the same."

8          On Page 42, he says, "Again -- yeah, again,

9     these are text revisions so they've changed the

10    words but there's been no meetings of the

11    subcommittee to change the essence."

12         Page 42 he also says, "The words are different

13    but the meaning is not different."

14         On Page 44 he says, "And so, yes, the wording

15    had changed but the essence of it that there has to

16    be a real, not simulated, not fantasy but real

17    behavior of a sadistic nature hasn't changed.  It is

18    presented in a somewhat different fashion but giving

19    you both A and B," and he was referencing the

20    defendant's book and the government's book, "the

21    essence of what it's all about has not changed."

22         On page 45, he says, "I don't think the

23    essence of what pedophilia is all about has

24    changed."

25         So the big mistake between the two books,

1    based on Dr. Berlin's testimony which he did address

2    at trial, I mean, he repeatedly said how minimal it

3    was and how they were essentially the same

4    standards, anyway.   I put on Pages 11 to 12 of my

5    response to the motion for new trial the differences

6    between the two books so we could review them.   And

7    essentially the differences between the diagnostic

8    criteria for pedophilia, the first -- from the older

9    book it just says, "The fantasies, sexual urges or

10   behaviors caused clinically significant distress or

11   impairment in social, occupational or other

12   important areas of functioning."

13       In the more recent book it just says, "The

14   person has acted on these sexual urges or the sexual

15   urges or fantasies caused marked distress or inner

16   personal difficulty."   So it's just worded a little

17   bit different.   So even though there was a mistake

18   on which was the more recent, Dr. Berlin testified

19   that essentially it's the same, anyway.   This was

20   clearly --

21       THE COURT:   Well, if that's all we had, I

22   think you would have a very sound argument.   But you

23   understandably capitalized on his inability to

24   recognize that he was using an outdated manual.   And

25   you got him to essentially acknowledge, mistakenly,

1    that he was relying on an outdated manual and

2    focused on that in your final argument.

3         So it's not just a matter of the substance of

4    the two criteria being, according to Dr. Berlin,

5    essentially the same, he testified to that.  That

6    was his only response.  It's the fact that his

7    credibility as an expert, a retained expert, was

8    soundly torpedoed, if you will, to your credit.

9         If you were right, then, you know, that's what

10   experts get into when they overstep their bounds,

11   but you were not right.  So we left this jury with

12   the impression that a retained expert basically had

13   no credibility.

14        So if you start with that proposition, that

15   observation by me, where do we go?  What's the

16   standard?  Is it the likelihood of a different

17   result?  Is it undermining the confidence in the

18   outcome, as Mr. Tragos suggests, or something in

19   between?

20        MS. KAISER:  I believe it's a harmless error

21   standard.  And I reviewed a number of cases and I've

22   copies for defense counsel and the Court in which --

23   even in cases where there's been constitutional

24   errors.  As the Court's aware, the defendant's

25   entitled to a fair trial, he's not entitled to a

1   perfect one.  And that's been affirmed over and over

2   by the U.S. Supreme Court.

3         In the Supreme Court case of *Delaware versus*

4   *Van Arsdale*, it's at 106 Supreme Court 1431, the

5   Supreme Court held that there had been a

6   constitutional error, which I don't think that in

7   this case there's been any type of constitutional

8   error, but even assuming that you could somehow make

9   the argument that there was, the Supreme Court in

10  *Van Arsdale* said, you use a harmless error standard.

11  The preference is to uphold jury verdicts.

12        In *Van Arsdale*, the defense attorney had been

13  improperly limited on cross-examining a witness.

14  And in that case, on page seven of the opinion, the

15  Court talked about how there's a harmless error

16  standard.  It says, "As we've stressed on more than

17  one occasion, the Constitution entitles a criminal

18  defendant to a fair trial, not a perfect one."

19        And they referenced the *Chapman* opinion.  It

20  says, "In *Chapman*, the Court rejected the argument

21  that all federal constitutional errors, regardless

22  of their nature or the circumstances of the case,

23  require a reversal of a judgment of conviction.  The

24  Court reasoned that in the context of a particular

25  case, certain constitutional errors no less than

1      other errors may have been harmless in terms of

2      their effect on the fact-finding process at trial."

3           So the standard is a harmless error standard.

4      And the questions that -- on page eight of the

5      opinion, it notes that the factors include in that

6      case whether or not the witness was important,

7      whether or not the testimony was cumulative, whether

8      or not there was other evidence.  But it's harmless

9      error as to whether or not the same result the

10     person would have been convicted without the error.

11          It says, "The harmless error doctrine

12     recognizes a principle that the central purpose of a

13     criminal trial is to decide the factual question of

14     the defendant's guilt or innocence and promotes

15     public respect for the criminal process by focusing

16     on the underlying fairness of the trial rather than

17     on the virtually inevitable presence of an

18     immaterial error."

19          In this case, certainly, the error was

20     immaterial.  Whether or not the -- which standard

21     was used, Dr. Berlin clearly pointed out in his

22     testimony that he believed that it didn't matter

23     which book you used, that the standards were the

24     same, anyway.

25          As for him not knowing or being made to look

1       that he didn't know the right book, even if,

2       certainly, that was the case, the reality, though,

3       it's a collateral issue.  Whether or not the

4       defendant was a pedophile, whether or not he was a

5       sexual sadist, Dr. Berlin couldn't even testify

6       about, anyway.  He was precluded from making that

7       connection.  So the discrepancy becomes, then, which

8       of the two standards is accurate.

9            And under *Van Arsdale*, the Court said, "Even

10      in a constitutional error context," which I don't

11      agree that in this case there is a constitutional

12      error, "a harmless error analysis applies."  Also in

13      the case of *U.S. versus Hastings*, 103 Supreme Court

14      1974, it's a 1982 opinion.  And in that case the

15      prosecutor had made a purposeful error and made a

16      comment about the defendant's failure to testify at

17      trial.  And the Supreme Court said that the harmless

18      error doctrine applied, even though there was a

19      *Griffin* mistake there.  And they found that that was

20      a constitutional error, a comment on the defendant's

21      failure to testify.  And the court said that the

22      test was whether without the prosecutor's comments a

23      different result would have happened.

24           In this case, the proof was overwhelming.  And

25      there's no way that the definition which was

1    collateral to begin with would have changed the

2    outcome in this case at all, given the overwhelming

3    proof.  But in the *Hastings* opinion, the Supreme

4    Court used a harmless error analysis, as well, and

5    they also noted that.  It says, "In holding that the

6    harmless error rule governs even constitutional

7    violations, the Court recognized that given the

8    myriad safeguards provided to assure a fair trial,

9    taking into account the reality of the human

10   fallibility of the participants, there can be no

11   such thing as an error-free, perfect trial, and the

12   Constitution doesn't require such a trial."

13        The Supreme Court noted that the question a

14   reviewing court must ask is this, and in the

15   particular case it said, "The question is this.

16   Absent the prosecutor's illusion to the failure of

17   the defense to proffer evidence to rebut the

18   testimony of the victims, is it clear beyond a

19   reasonable doubt that the jury would have returned a

20   verdict of guilty."  And the Court continues and

21   goes through how much evidence there was in the case

22   and finds that it was harmless error.  That's *U.S.*

23   *versus Hastings*.

24        The Court could, I believe, treat this

25   possibly as newly-discovered evidence since the

1     defense didn't know and they handled the book and

2     had access to the book during trial, as did the

3     government.  And I believe Mr. Tragos actually did

4     use the government's book, as well, during his

5     redirect of Dr. Berlin.  So he handled the book, had

6     another opportunity to review the dates of

7     publication with Dr. Berlin when he was on the

8     stand.

9          But if the Court were to treat it as evidence

10    that was discovered after trial, the standard for

11    that under the Eleventh Circuit was, is the new

12    evidence not merely cumulative or impeaching and is

13    the new evidence material or would a new trial

14    produce a different result.  In this case which

15    standard is which is really -- is really immaterial.

16    It's a collateral issue.  And even if the Court were

17    to order a new trial, the verdict wouldn't be any

18    different.

19         Finally, Your Honor, the Court could look at

20    the standards in the case of United States -- a

21    Supreme Court case of *Rose versus Clark*.  It was a

22    habeas case.  And in that case, the error was

23    improper jury instructions went to the jury on

24    intent.  And even in that case, the Supreme Court

25    said that it was a harmless error standard.  They

1    said that that was a constitutional violation but

2    that -- it says, the harmless error doctrine

3    recognizes the principle that the central purpose of

4    a criminal trial is to decide the factual questions

5    of a defendant's guilt or innocence and promotes

6    respect -- public respect for the criminal process

7    by focusing on the underlying fairness of the trial,

8    rather than on the virtual inevitably presence --

9    inevitable presence of immaterial error.

10         THE COURT:  Let me take a look at these three

11   cases.

12         MS. KAISER:  Yes, Your Honor.

13         THE COURT:  Let's take a short break where I

14   can look at that, because I think this issue turns

15   on the standard applicable to what occurred.  And if

16   it's undermining the confidence, that's one

17   standard.  If it's harmless error, that's quite a

18   different standard.  I'm not sure it's either one of

19   those two.  But I want to look at those three cases.

20   Those were not, as I recall, cited.  *Van Arsdale*,

21   *Hastings*, and what was the third one?

22         MS. KAISER:  *Clark*, *Van Arsdale* --

23         THE COURT:  And give Mr. Tragos copies.  Take

24   a moment, take a comfort break, let me read through

25   these real quickly.

1          MS. KAISER:  Yes, Your Honor.  And *Hastings*.

2          (Recess was taken at 1:53 until 2:21 PM.)

3          (Back on the record.)

4          COURTROOM SECURITY OFFICER:  All rise.  This

5     Honorable Court is again in session.

6          Be seated, please.

7          THE COURT:  Sorry.  But these cases are a

8     little longer than I thought.

9          Ms. Kaiser, had you bottomed out your

10    argument?

11         MS. KAISER:  Yes, Your Honor.  I would just

12    add that in the jury instructions, the jury is

13    instructed that what the lawyers say is not

14    evidence.  So I don't think that even an improper

15    question is or could be considered evidence on -- in

16    the trial.

17         THE COURT:  All right.  Mr. Tragos, these

18    cases seem to suggest that the harmless error

19    standard is applicable.  Of course, that always

20    comes up in the -- in the review by the appellate

21    court.

22         MR. TRAGOS:  Well, there's several things

23    about these cases that -- that I -- you know, I just

24    read them, as the Court did.  And one is if in the

25    case of *Clark*, on Page 8, it cites an interesting

1        phrase from *Chapman* about two thirds of the way down

2        on the left-hand side.  "Error is harmless if beyond

3        a reasonable doubt it did not contribute to the

4        verdict obtained."  And I don't believe that

5        harmless error is the standard here, but it's

6        interesting that what the Court would have to find

7        is beyond a reasonable doubt what happened here did

8        not contribute to the verdict.

9            And if the Court will then look at *Chapman*,

10       Page 6, about a little more than two thirds, about

11       three quarters of the page down is a phrase that

12       starts, "under these circumstances."  I don't know,

13       did the Court find that?

14           THE COURT:  You're actually in *Chapman* itself?

15           MR. TRAGOS:  Yes, in *Chapman* itself.

16           THE COURT:  I don't think I had *Chapman*.  I've

17       probably got it up here in this stack.

18           MR. TRAGOS:  I think the prosecutor has copied

19       it.  The Court's getting it now.

20           THE COURT:  All right.  What page are you on?

21           MR. TRAGOS:  Page 6.  The left-hand side,

22       about three quarters of the way down, "under these

23       circumstances," has the Court found that?

24           THE COURT:  Um-hum.

25           MR. TRAGOS:  "Under these circumstance it is

1    completely impossible for us to say that the state

2    has demonstrated beyond a reasonable doubt that the

3    prosecutor's comments and the trial judge's

4    instructions did not contribute to the petitioner's

5    conviction."  And then -- kind of changing a little

6    bit, but in the *Lee* case, in the *Lee* case, they had

7    testimony that was contradictory already.  This was

8    just cumulative, when they were talking about that

9    in the *Lee* case.  If the Court remembers, the Court,

10   I believe, instructed that we would only be putting

11   one expert on to this area, and that would be

12   Dr. Berlin.  So we didn't have multiple experts

13   testifying.  Dr. Berlin was our only one testifying

14   in this area.

15        The other interesting thing, and I know I

16   think the Court alluded to it when the Court first

17   came back on the bench is that these are appellate

18   courts.  And appellate courts are giving the

19   presumptions to trial courts at this time.  You were

20   here and actually sat in on the trial.  So there's

21   great weight given to the effect that this

22   cross-examination and destruction of an expert

23   witness's testimony, your opinion of how that

24   destruction impacted the trial.

25        So they're going to give you great weight,

1    Judge, whatever decision you make here.  And so I

2    don't believe that -- oh, another interesting thing.

3    Talking about *Chapman*, these are all things that

4    could have been corrected during the course of the

5    trial.  This is not something that was correctable

6    during the course of the trial because it didn't

7    surface until after the trial.

8        And so it wasn't a situation where you made --

9    you had the ability to make a right or wrong ruling

10   or we have the ability to object.  That didn't

11   happen.  And you didn't have that ability to have

12   things happen during the trial.  These are all

13   things or errors that happened during the trial with

14   a court, an impartial judge making rulings during

15   the course of the trial.  You had no opportunity to

16   make a ruling during the course of this trial on

17   this issue.  You had no opportunity to correct what

18   was going on.

19       And like the Court said earlier, we had no

20   right to see any of this beforehand, so we had no

21   opportunity to present the argument to the Court.

22   And I think that the Court has to use that *Brady*

23   standard that I enumerated before to now make its

24   decision because this is most similar to those *Brady*

25   situations where things are discovered after the

1    trial and where mistakes are discovered after the

2    trial.

3         And in *Brady*, even though they were

4    inadvertent, the standard that I read to the Court

5    before is the standard that this Court should apply

6    in this case to determine whether or not a fair

7    trial was received by this defendant.  And I believe

8    that this defendant deserves a new trial under these

9    circumstances.

10        THE COURT:  All right.  Well, thank you.

11   Well, needless to say, I am disappointed that we

12   have to deal with an issue such as this in a case,

13   particularly when I thought it was otherwise fairly

14   well tried.  The evidence in the case was, in my

15   view, overwhelming.  But that is surely not the

16   standard, as these cases teach.

17        I do find that the harmless error standard

18   does apply in these circumstances.  This is

19   essentially a question of whether inadvertent or

20   mistaken understandings, if you will, by the

21   prosecutor in the examination of Dr. Berlin were

22   such that undermine the fairness of the trial.

23        I have not found a case on point.  This is not

24   a situation where we have the knowing use of

25   perjured or false evidence or testimony by the

1   prosecutor, obviously, not intentional use of false

2   or perjured testimony or evidence, but simply a

3   mistake, perhaps rising to the level of negligence,

4   but a mistake, nonetheless.

5       If this had been a knowing and intentional use

6   of the wrong manual to impeach Dr. Berlin, as I said

7   earlier, this would have been a much shorter

8   hearing.  I don't know that we would have even had a

9   hearing.  But we now have testimony consistent with

10  Ms. Kaiser's notice that she filed, which I commend

11  her for doing, by the way.  That simply was a

12  mistake on the part of the prosecutor and the

13  witness.

14      I don't think I can deny the motion based on

15  the responsibility of an expert witness to know that

16  about which he's testifying.  In a civil case, I

17  would deny this motion in a heartbeat.  But we have

18  a much different standard applying.  We can call it

19  harmless error, which I believe is the correct

20  standard.

21      I want to just deliberate and rule on this

22  now.  I don't want to take this under advisement.

23  It's too important of an issue.  We have a

24  sentencing scheduled.  If this case is going to be

25  re-tried, we need to re-try it fairly quickly, as

1          the Court's schedule will allow.

2               In finding that harmless error standard would

3          apply, I think *Chapman versus California*, 386 U.S.

4          18 controls.  I found an Eleventh Circuit case

5          during the break, *United States versus Suggs* at 755

6          F.2d 1538, a 1985 case.  At Page 1540 *Chapman* is

7          quoted, and I want to read from that decision.  And,

8          again, factually it's not on point.  Quote, "The

9          question on this appeal, then, is whether we are

10         required to reverse a defendant's conviction because

11         of its mistake.  We think not.  A prosecutor's

12         remarks, even of constitutional magnitude, may not

13         require a reversal if the court is able to declare,

14         believe that it was harmless beyond a reasonable

15         doubt."

16              That just confirms to me the standard to be

17         applied here.  I don't think Ms. Kaiser's

18         cross-examination of Dr. Berlin rose to the level of

19         constitutional error or magnitude.  It had nothing

20         to do with any of the defendant's constitutional

21         rights.  It had to do with whether he received a

22         fair trial under due process principles.

23              There's no question that Ms. Kaiser has a duty

24         that transcends that of the ordinary advocate.  The

25         Supreme Court recognizes that, "a prosecutor is the

1    representative not of an ordinary party to a

2    controversy, but of a sovereignty . . . whose

3    interest . . . in the criminal prosecution is not

4    that it will win a case, but justice shall be done."

5    That's *United States versus Bagley* at 473 U.S. 667,

6    Page 675, footnote six.  That discussion in that

7    note, I think, is instructive.

8          Again, discussing an alleged *Brady* violation

9    and a prosecutor's failure to disclose certain

10   information or withholding information, the court

11   quotes from its earlier decision in *United States*

12   *versus Agurs*, quote, "For unless the omission

13   deprived the defendant of a fair trial, there was no

14   constitutional violation requiring that the verdict

15   be set aside; and absent a constitutional violation,

16   there was no breach of the prosecutor's

17   constitutional duty to disclose."  And to reiterate,

18   the court says, unless his omission is of

19   significance to result in the denial of the

20   defendant's right to a fair trial, the prosecutor

21   will not have violated this constitutional duty of

22   disclosure.

23         Again, we're not dealing with disclosure here.

24   We're dealing with simply a mistaken understanding

25   of the most current version of the DSM manual, a

1    treatise well-known to physicians and most civil

2    litigators dealing in medical malpractice or

3    personal injury.  It's an understandable mistake.  I

4    don't want to be unfairly critical of Ms. Kaiser.

5    But then again, she does have responsibilities which

6    transcend that of her opposition, that is, she

7    should be correct, plain and simple.

8          So the question is whether her mistake and the

9    devastating impact on the credibility of Dr. Berlin

10    occasioned by that mistake deprived Mr. Friedlander

11    of a fair trial.  As I said, the evidence in this

12    case as far as the crime charged in the indictment

13    was compelling.  Mr. Friedlander took the stand and

14    testified, thereby subjecting himself to rigorous,

15    probing cross-examination and placing his intent

16    squarely in issue.

17          Dr. Berlin's testimony, limited as I

18    determined it should be, was an important aspect of

19    the defense.  Although I prohibited him from making

20    a specific diagnosis or expressing an opinion as to

21    Dr. Friedlander, I did allow him, as he did, to

22    discuss pedophilia and the diagnostic

23    characteristics or criteria, if you will.

24          And he did reference the DSM manual as the

25    authoritative source in his field, the authoritative

1    source.  That's the tool of the trade.  And he was

2    understandably befuddled when confronted with what

3    was represented to be an earlier or more recent

4    edition with some semantics which -- change in

5    semantics.  The wording was different in the

6    criteria.

7        He tried to explain away the seemingly

8    differences, but suffice it to say that his

9    credibility was, as I said earlier, effectively

10   torpedoed.  He had no credibility when he got off

11   the stand.  It was obvious to me and anyone who was

12   a witness to that.  And Ms. Kaiser made a very

13   effective observation in her closing argument,

14   focusing on the less than impressive expert called

15   to testify on behalf of the defendant.

16       *Napue versus Illinois* at 360 U.S. 264, again

17   addressing this in the context of a prosecutor's

18   knowing use of false testimony or evidence teaches

19   that these protections don't cease to apply merely

20   because the false testimony goes only to the

21   credibility of the witness.  I'm reading now at page

22   269.  "The jury's estimate of the truthfulness and

23   reliability of a given witness may well be

24   determinative of guilt or innocence.  And it is upon

25   such subtle factors as the possible interest of the

1    witness in testifying falsely that a defendant's

2    life or liberty may depend."

3         Of course, that case involved a cooperating

4    witness as opposed to an expert witness.  But the

5    point is that if a false premise is presented to the

6    jury, as it was in this case, which effectively

7    destroys the credibility of an important witness to

8    the defendant, there are concerns that the

9    defendant's right to a fair trial have been

10   diminished, if not detrimentally impacted.

11        The Eighth Circuit case cited by the

12   defendant, *United States versus Runge*, R-u-n-g-e, at

13   593 F.2d 66 has some discussion incident to the

14   defendant's motion for new trial.  In that case

15   there was an allegation, a contention, that is, of

16   the knowing use of perjured testimony.  And when

17   that happens it requires that a conviction be set

18   aside, quote, "if there's any reasonable likelihood

19   that the false testimony could have affected the

20   judgment of the jury," closed quote.

21        Quoting from *United States versus Agurs*, again

22   taking from the opinion in *Agurs*, quote, "the

23   government may be responsible even if the prosecutor

24   did not actually know the testimony was perjured,

25   but should have known."  And, again, discussing even

1    false testimony which merely impeaches a witness's

2    credibility may require a new trial.

3         I find that, although there is no suggestion

4    nor indication that Ms. Kaiser knowingly or

5    intentionally used the wrong DSM-IV manual in her

6    cross-examination of Dr. Berlin, as a representative

7    of the United States, she should have known.  I

8    cannot find that the devastating impact on

9    Dr. Berlin's credibility was harmless beyond a

10   reasonable doubt.  I don't know.

11        All I can say is that it may have had a

12   difference.  Based on my impression of Dr. Berlin

13   when he left the stand, I suspect that the 12 jurors

14   had a similar impression, that he had been made to

15   look the fool, notwithstanding his impressive

16   credentials.  He came across and was presented to

17   the jury as an expert who was not prepared, who did

18   not know which edition of the DSM-IV manual was the

19   most current.

20        The fact that he was ill-prepared and should

21   have known, as well, is not determinative.  Clearly,

22   the responsibility falls squarely on the government.

23   And I find that based on the mistaken impression

24   occasioned by the wrong -- use of the wrong manual

25   by the prosecutor, that there is a reasonable

1    likelihood that false testimony could have affected

2    the judgment of the jury.  I can't find that it's

3    harmless, in other words.  I have no way of

4    speculating to the point of being certain.  I simply

5    find that I cannot find beyond a reasonable doubt

6    that it was harmless.

7         I, accordingly, am going to grant the

8    defendant's motion for new trial, and at the same

9    time commend Ms. Kaiser, once again, for filing the

10   notice of mutual mistake of fact, which is Docket

11   162, candidly acknowledging her mistake, an

12   understandable mistake, I might add, one that

13   Mr. Tragos or I in our earlier days could very well

14   have made.

15        And I'm not suggesting that's a product of

16   inexperience at all; simply a situation where a

17   criminal prosecutor who is not accustomed to dealing

18   with a DSM manual and very well relied on the one in

19   her library, and I'm sure much to her chagrin today.

20   So I find, although the defendant's entitled to a

21   new trial, this was simply a mistake.  It's

22   understandable.  But that is not the standard.

23        So that makes the remaining motions moot, in

24   particular the defendant's renewed motion for

25   judgment of acquittal, Document 164, which I would

1    have denied without further discussion.  And,

2    likewise, the remaining grounds in the defendant's

3    motion for new trial moot, none of which I found had

4    any merit at all.

5         I am beginning a trial Tuesday and beginning

6    jury selection in a capital case on the 23rd.  The

7    guilt phase should begin March the 2nd.  If not --

8    well, it will begin March 2nd.  If there is a

9    conviction, the penalty phase would likely begin

10   soon thereafter, meaning the end of the guilt phase.

11   So it looks like through the week of March the 9th I

12   am occupied.

13        I don't know what the government's options are

14   at this point, Ms. Kaiser.  It matters not to me.

15   I'm simply trying to schedule this case for a new

16   trial when I can fit it in, if you will.  It looks

17   like the best I can do would be mid to late March.

18        MR. TRAGOS:  May I speak, Your Honor?

19        THE COURT:  Let me talk to Ms. Kaiser first.

20   She has witnesses she needs to consider.

21        MS. KAISER:  Yes, Your Honor.  I would need to

22   just check and see their availability.  I'm

23   available but --

24        THE COURT:  Well, I presume you have to go

25   through some review and analysis with your office

1    concerning my ruling, and they're entitled to do

2    that.  If I set this case toward the latter part of

3    March, will that give you enough time to make that

4    decision and either advise Mr. Tragos and I that

5    there's going to be review of this decision or not?

6         MS. KAISER:  Yes, Your Honor.  Yes, Your

7    Honor.

8         THE COURT:  All right.  Mr. Tragos?

9         MR. TRAGOS:  Your Honor, first off, the

10   exhibits that I gave the Court, could they also be

11   made part of the record of this hearing?  I didn't

12   actually move them into evidence.

13        THE COURT:  I didn't hear any objection to my

14   considering them.  Ms. Kaiser?

15        MS. KAISER:  The only objection I would have

16   is that on apparently one of the exhibits, it's not

17   the actual book that the defendant's expert had

18   used.  It's a more recent edition.

19        MR. TRAGOS:  It's not a more recent edition.

20        MS. KAISER:  It's not a copy from the book he

21   used.

22        THE COURT:  Which one is that, please?  Which

23   exhibit?  Was that three?

24        MR. TRAGOS:  I think it was four.

25        MS. KAISER:  Four.

1          MR. TRAGOS:  Your Honor, if you look at

2    Exhibit 4, all she's saying is it's a more recent

3    printing.  It's the same book, just had different

4    printing dates.

5          THE COURT:  Well, you know, in this case we're

6    not going to have anything but whatever was

7    presented.  So I'll sustain the objection to four.

8    But I suspect that there will not be any

9    disagreement as to what the witness relied on and

10   what Ms. Kaiser used in cross-examination.  That's

11   undisputed.

12         MS. KAISER:  Correct.

13         THE COURT:  I meant to say that earlier that

14   what happened in the course of the trial is

15   undisputed.

16         MR. TRAGOS:  Your Honor, I also have some

17   witness issues that I have to deal with, as well.

18   And, plus, I don't have my calendar with me since

19   it's in my Blackberry.

20         MS. KAISER:  Your Honor, we may need more

21   time, as well, because I think in order to -- I

22   think the appellate section is going to want to have

23   a whole complete trial transcript.

24         MR. TRAGOS:  We would, too, Your Honor, before

25   the trial.  We'd like to have a transcript, as well.

```
 1           THE COURT:  Well, I don't know of any rule or

 2    case law that requires me to afford you that

 3    opportunity, so you guys do whatever you have to do.

 4    I'm going to try this case sometime in the end of

 5    March or early April.

 6           MR. TRAGOS:  Does -- my understanding is the

 7    Court has a trial probably that's going to go April

 8    6th that may go multiple weeks.

 9           THE COURT:  Probably want to get you in before

10    that, then.

11           MR. TRAGOS:  Well, what I was going to suggest

12    to the Court, I am familiar with the process that

13    Ms. Kaiser is talking about about review with

14    regards to a possible appeal.  And, plus, again --

15           THE COURT:  How many days they have?

16           MR. TRAGOS:  -- witness issues.  How many days

17    they have from the order?

18           THE COURT:  The order has been issued.

19           MR. TRAGOS:  I think ten days; right?

20           MS. KAISER:  I think ten days.

21           MR. TRAGOS:  Ten days.  And --

22           THE COURT:  Well, what I meant by that is I've

23    announced my ruling, and I did that intentionally.

24    At the risk of sounding inartful to the appellate

25    court, I think you're both entitled to a prompt
```

1    ruling.  And if I took it under advisement and got

2    caught up in trial next week, there would be a delay

3    in ruling on the motion.  My ruling is as it is.  I

4    don't intend to memorialize it, in other words.

5         MR. TRAGOS:  Would it be possible -- and I'm

6    only suggesting this to the Court because, again, we

7    each have witness issues, plus there may be some

8    additional motions and things like that.  Is April

9    20th too far away?  Because I think you'll be

10   finished with that Chinese boat case trial probably

11   by then.

12        THE COURT:  Isn't this a case that they kept

13   wanting me to give them a date certain and --

14        MS. KAISER:  Yes.

15        THE COURT:  Guess what?  You'll be here when I

16   tell you to be here based on my calendar.  It will

17   not be before the -- and I'm being somewhat

18   facetious with counsel.  I hope they appreciate it.

19        MR. TRAGOS:  We appreciate it.

20        THE COURT:  It will not be before the week of

21   March the 23rd, because I've got trials up through --

22        MR. TRAGOS:  Is the 23rd a Monday?

23        THE COURT:  In referencing March, I'm sorry.

24   The trial I start next week, next week is the 9th

25   and that's Nardelli.  And then in the capital case,

1      jury selection begins on the 17th of February.  I

2      might have referenced March.  I apologize.  And

3      it's -- we'll begin the guilt phase the week of the

4      23rd.  It's expected to finish that week.  If there

5      is a conviction and there is a penalty phase, that

6      would likely be conducted the week of March 2nd.

7      You're saying I've got the boat case beginning the

8      9th?

9             MR. TRAGOS:  I think it's April.  The boat

10     case is April 6th.

11            THE COURT:  All right.  So the earliest you

12     could be called, then, would be March 9th, more than

13     likely the 23rd.

14            MR. TRAGOS:  The 23rd of March?

15            THE COURT:  Yes, sir.

16            MR. TRAGOS:  Could the Court give us that

17     because Dr. Berlin, again, is such a tough person to

18     schedule.  Could you give us a date certain?

19            THE COURT:  Are you sure he's going to want to

20     come down here and testify again?

21            MR. TRAGOS:  He's chomping at the bit.  And we

22     have some motions we'd like to file.

23            THE COURT:  Will you be here tomorrow for my

24     criminal statuses, Ms. Kaiser?

25            MS. KAISER:  No, Your Honor.  I'm not planning

1      to.

2              THE COURT:  Do you have any, Mr. Tragos?

3              MR. TRAGOS:  No.

4              THE COURT:  That's for the March calendar.

5      Could either of you -- could you both be here or

6      have somebody, Mr. Sartes, perhaps?

7              MR. TRAGOS:  I'm lecturing in Miami at a

8      criminal law seminar tomorrow.

9              THE COURT:  I suspect that boat case is in

10     here tomorrow morning?  No.

11             MR. TRAGOS:  Apparently you set them because I

12     know I've talked to them.  They're set to go April

13     6th, I'm told.

14             MS. ESPOSITO:  Jury selection is March 30th.

15             MR. TRAGOS:  Oh.  Jury selection is March

16     30th, trial is the 6th?

17             THE COURT:  All right.  Why don't I do this,

18     then.  Let me ask that you have Mr. Sartes here

19     tomorrow.  If need be, he can appear telephonically.

20             MR. TRAGOS:  Okay.  I don't know what his

21     calendar is so I'll tell him.  I don't know if he

22     has another --

23             THE COURT:  Just so you'll have the benefit of

24     the rest of the March cases and where I have to plug

25     these things in.

1          MR. TRAGOS:  Do you think it's possible for a

2     date certain tomorrow for us?

3          THE COURT:  It's possible.

4          MR. TRAGOS:  Anything is possible.  Your

5     Honor, could I also ask the Court reinstate the bond

6     conditions?

7          THE COURT:  I'm not going to visit that today.

8     File a motion.  Ms. Kaiser, can you be here tomorrow

9     or have someone standing in that would know

10    something about the case?

11         MS. KAISER:  Yes, Your Honor.  What time?

12         THE COURT:  I just want you guys in the loop

13    either directly or indirectly through

14    representatives to remind me that I've got to plug

15    you in.

16         MR. TRAGOS:  What time are your statuses?

17         THE COURT:  9:30.

18         MR. TRAGOS:  I won't be able to do it.  Okay.

19         THE COURT:  Kristin says I've only got five

20    cases in March.  But then again, I'm in trial the

21    first week or two.  So at the very earliest, I think

22    it would be March 23rd.

23         MR. TRAGOS:  March 23rd.  Okay.

24         THE COURT:  All right.  So we'll just make a

25    note of that.  And if I can give them that date

1    certain, I'll be happy to do that.  And that gives,

2    Ms. Kaiser, you and your office plenty of time.

3         And Mr. Tragos, if for some reason Mr. Sartes

4    has conflicts, what time are you lecturing tomorrow?

5         MR. TRAGOS:  I start at 10:40.

6         THE COURT:  Well, if you want to call in at

7    9:30, we'll need a number we can call you.  Do we

8    have your cell phone?

9         MR. TRAGOS:  You may, but I'll give it to.

10        THE COURT:  That might be the best way, just

11   call you first.

12        MR. TRAGOS:  Okay.

13        THE COURT:  Although you won't have the

14   benefit of the rest of the calendar.  What I'll do

15   is plug you in.  And then when I sit down with the

16   clerk after the statuses and we schedule trials, I

17   may very well be able to give you guys a date

18   certain for witness scheduling.

19        MR. TRAGOS:  Okay.

20        THE COURT:  All right.  Thank you.  We'll be

21   in recess.  What I'm going to do is just memorialize

22   the ruling in a very short -- based on the findings

23   and conclusions announced today.  So the essence of

24   my ruling is on the record.

25        Ms. Kaiser, I mean -- Mr. Tragos, this is your

1      transcript.   The other three exhibits were admitted

2      for purposes of this hearing.   Thank you.

3              (Proceedings concluded at 3:00 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4      STATE OF FLORIDA             )

5      COUNTY OF HILLSBOROUGH   )

6          I, Linda Starr, RPR, Official Court Reporter for

7      the United States District Court, Middle District,

8      Tampa Division,

9          DO HEREBY CERTIFY, that I was authorized to and

10     did, through use of Computer Aided Transcription,

11     report in machine shorthand the proceedings and

12     evidence in the above-styled cause, as stated in the

13     caption hereto, and that the foregoing pages,

14     numbered 1 through 76, inclusive, constitute a true

15     and correct transcription of my machine shorthand

16     report of said proceedings and evidence.

17         IN WITNESS WHEREOF, I have hereunto set my hand in

18     the City of Tampa, County of Hillsborough, State of

19     Florida, this 5th day of October 2009.

20

21

22         _____/s/ Linda Starr_____
           Linda Starr, RPR, Official Court Reporter
23

24

25