```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3        UNITED STATES OF AMERICA

 4             vs.            CASE NO. 8:08-CR-318-T-27TGW
                              23 MARCH 2009
 5                            TAMPA, FLORIDA
                              PAGES 1 - 275
 6                            VOLUME I

 7        CHARLES JACKSON FRIEDLANDER
          _____/
 8
                    TRANSCRIPT OF TRIAL PROCEEDINGS
 9         BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
10                       and a jury

11        APPEARANCES:

12        For the Petitioner:   Amanda C. Kaiser
                                United States Attorney's Office
13                              Suite 3200
                                400 N. Tampa Street
14                              Tampa, Florida 33602

15        For the Defendant:    George E. Tragos
                                Tragos & Sartes, PL
16                              Suite 800
                                601 Cleveland Street
17                              Clearwater, Florida 33755

18                              Peter Anthony Sartes
                                Tragos & Sartes, PL
19                              Suite 800
                                601 Cleveland Street
20                              Clearwater, Florida 33755

21        Court Reporter:       Linda Starr, RPR
                                Official Court Reporter
22                              801 N. Florida Avenue
                                Suite 13-B
23                              Tampa, Florida 33602

24         Proceedings recorded and transcribed by
          computer-aided stenography.
25
```

1

2                              **WITNESS INDEX**

3       **Witness Name**                                **Page Number**

4       **Kurt Romanosky**

5       Direct Examination by Ms. Kaiser.......... 211
        Voir Dire Examination by Mr. Tragos....... 236
6       Direct Examination by Ms. Kaiser.......... 237

7

8                        **GOVERNMENT'S EXHIBIT INDEX**

9       **Number      Description**                    **Page Number**

10      1       Defendant's online profile..........237
        2       Instant Message Chat - 7/12/2005....237
11      3       Instant Message Chat - 7/13/2005....237
        4       Instant Message Chat - 7/15/2005....237
12      5       Instant Message Chat - 7/20/2005....237
        6       Instant Message Chat - 7/21/2005....237
13      7       Instant Message Chat - 7/25/2005....237
        8       Instant Message Chat - 8/1/2005.....237
14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This
 2     Honorable Court is in session, The Honorable James
 3     D. Whittemore presiding.
 4          Be seated, please.
 5          THE COURT:  All right.  We're here for trial
 6     in the matter of United States versus Friedlander.
 7     Let's get the appearances.  For the government?
 8          MS. KAISER:  Amanda Kaiser on behalf of the
 9     United States.  Good morning, Your Honor.
10          THE COURT:  Good morning.  For the defendant?
11          MR. TRAGOS:  George Tragos and Peter Sartes,
12     Your Honor, for the defendant.
13          THE COURT:  All right.  I've ordered a panel.
14     They should have been up here by now.  I'm sorry.
15     What's the matter, Mr. Tragos, that you want to
16     bring up?
17          MR. TRAGOS:  Okay.  Your Honor, I believe that
18     -- well, I received no notice of additional Rule 16
19     or Brady or Giglio since the last trial.  There is
20     an additional item on the government's witness list
21     called subscriber information.  And I have not
22     received any additional information from the
23     government.
24          I would request that if there is additional
25     Rule 16 or Brady and Giglio that we receive it
```

1    immediately, certainly before opening statements so

2    that I can review it before the opening statement.

3         In addition, Your Honor, there is an

4    additional witness on the government's witness list

5    who was identified in the last trial.  And his name

6    is Andrew Beierle I think is -- I don't know if

7    that's the correct pronunciation.  During the last

8    trial, the agent, Agent Hagedorn, said that he had

9    subpoenaed subscriber information.  I don't know if

10   the Court recalls this or not, and I know the

11   court's had a lot since then.

12        But there was a question that Ms. Kaiser asked

13   Agent Hagedorn, and it's this:  "Agent Hagedorn, did

14   you ever see any indirect evidence that the

15   defendant had chatted with minors online?"  When she

16   asked that question, she was referring to Exhibit

17   94, which is an e-mail to Great Scott Dad.  Great

18   Scott Dad is Andrew Berwell (ph) or Beierle, who is

19   listed now as a witness for the government.

20        And the reason that's important to the defense

21   is in that e-mail, allegedly Mr. Friedlander --

22   Dr. Friedlander is talking to Great Scott Dad about

23   Great Scott Dad's supposed son named Cad.  If there

24   is -- and I'm not saying there is -- is or is not a

25   Cad, if there really is a person named Cad who is

1    the son of Andrew Beierle, it certainly would be

2    significant.

3         First, if there isn't a Cad, then the

4    government would be introducing evidence that is

5    false and having a false inference by saying that

6    that is my client talking to a juvenile when, in

7    fact, the government knows there is no juvenile that

8    he's talking to named Cad.  If there is a Cad then

9    that certainly would also be significant to the

10   defense since they're referring to that as a

11   conversation with a juvenile.

12        So if the government knows information about

13   Cad or Mr. Beierle, or with reference to the

14   subscriber information they've listed, I certainly

15   believe that it would be discoverable and it should

16   be presented to the defense.

17        THE COURT:  All right.  Ms. Kaiser, your

18   response first as to the -- the Rule 16 issue.

19        MS. KAISER:  Your Honor, I listed subscriber

20   records for Andrew Beierle in case we wanted to use

21   him in rebuttal.  It's not the government's intent

22   to call him in the government's case in chief.

23   Based on that, his subscriber records from AOL

24   really have nothing to do with this case.  It's only

25   if we were to call him as a witness in our rebuttal

```
 1    case, which I sincerely doubt at this point.

 2         So we'd argue that it's really technically not

 3    Rule 16 discovery.  It's not material.  His

 4    subscriber records with AOL are not material to the

 5    defense and don't fit within any of the other

 6    subcategories of Rule 16.  The government doesn't

 7    intend to use it in our case in chief, but just

 8    listed it on the exhibit list in an abundance of

 9    caution, if we wanted to use it in partial rebuttal.

10         And witness interview statements are not

11    discoverable by the defense.  If he wants to

12    interview Mr. Beierle, he's welcome to do so.  But

13    any reports of interviews are not discoverable,

14    anyway.

15         THE COURT:  So you do not intend to call this

16    gentleman in your case in chief?

17         MS. KAISER:  That's correct, Your Honor.

18         THE COURT:  Proffer to me what his testimony

19    would be if called concerning this person known as

20    or identified or referred to as Cad.

21         MS. KAISER:  He -- he was interviewed, Your

22    Honor, and I haven't seen a report of the interview

23    yet because it was done out of state.  But what's

24    been relayed to me, is that he will testify that he

25    had chats with Mr. Friedlander about Mr. Friedlander
```

1    coming to have sex with his son.  But he said that

2    he doesn't actually have a son, but that

3    Mr. Friedlander didn't know it.  But they had

4    discussed having -- having sexual relations with

5    Andrew Beierle's son Cade.  Andrew Beierle said that

6    he had been molested and his way of dealing with, I

7    guess, the trauma of the molestation was that he

8    enjoyed -- it was like therapy for him to discuss

9    online having sex with children.  But he said that

10   Mr. Friedlander didn't know that he didn't actually

11   have a son, but that they had chatted about

12   Mr. Friedlander traveling to have sex with his son.

13        But this was part of a secondary criminal

14   investigation to determine if there was, in fact, a

15   child named Cade who was in some sort of danger, so

16   law enforcement was just following up on that --

17   that separate criminal matter.

18        THE COURT:  Mr. Tragos, any response?

19        MR. TRAGOS:  Yes, Your Honor.  It would be

20   improper for the government, then, to infer that --

21   again, the question that the government said to

22   the -- at the time was, is there evidence defendant

23   chatted with any minors online.  Exhibit 94, the

24   government's Exhibit 94 says, is Dr. Friedlander

25   saying I spoke with I believe your son Cad last

1    week, or something like that.  It's -- it's obvious

2    that that is an inaccurate statement since there is

3    no son Cad.

4         THE COURT:  Wait a minute.  It's Friedlander's

5    own statement.

6         MR. TRAGOS:  Correct.  But the government is

7    alleging --

8         THE COURT:  Well, what's material about it?

9    Isn't it Friedlander's intent that's the issue, not

10   whether or not the person existed?

11        MR. TRAGOS:  Well, Your Honor, for the

12   government -- I understand.  But if the government

13   alleges, which they had -- which they did in the

14   prior trial that he had spoken to a minor named Cad,

15   that is improper because there is no minor named

16   Cad.  Mr. -- Dr. Friedlander testified --

17        THE COURT:  Well, she says -- I don't know if

18   this is even going to come up.  But if it comes out

19   that he spoke with someone who he believed to be a

20   minor, then that would be accurate based on her

21   proffer; right?

22        MR. TRAGOS:  But there is no -- there is no

23   such e-mail.  That's the problem.  This is an e-mail

24   to the adult.

25        THE COURT:  Oh, I see.

1          MR. TRAGOS:  This is an e-mail to Great Scott

2     Dad, this Andrew Beierle.  It is to him, not to the

3     child.  And in the e-mail, there is a statement

4     about Beierle's son, nonexistent son.  My problem is

5     that the government in closing and during

6     questioning inferred that my client had spoken to a

7     minor because, obviously, a big issue in this case

8     is, has the defendant ever spoken to a minor.  And

9     there is no evidence that he has ever spoken to a

10    minor online.

11         And this e-mail is misleading because he did

12    not speak to a minor online, even regarding this

13    e-mail, since it was to an adult and there is no

14    such minor for him to have even talked to.  That's

15    what's relevant about what the government has

16    developed and should have disclosed before today I

17    think to the defense, is that Mr. Friedlander did

18    not talk to a minor named Cad because there is no

19    minor named Cad.

20         THE COURT:  How do you disclose a negative?

21         MR. TRAGOS:  Then they should have disclosed

22    by saying that -- that their -- their position that

23    he was talking to Cad, because that was the

24    allegation that they presented to the jury and in

25    closing that he had talked to a minor named Cad, and

1    that this was an indirect reference to his

2    discussion to Cad.

3        Now that they know there is no Cad, they

4    certainly should have -- I believe should have

5    disclosed that.  But my problem is, as we go on into

6    this trial, they should not be now inferring that an

7    e-mail to an adult, Great Scott Cad (sic) proves

8    that my client spoke to a minor because, in fact, my

9    client did not speak to a minor because there is no

10   Cad.

11       THE COURT:  How did you intend to address

12   that, Ms. Kaiser, one way or the other?

13       MS. KAISER:  Well, certainly now that we know

14   that Cad doesn't -- is not Andrew Beierle's actual

15   son, I certainly wouldn't leave the impression with

16   the jury that Cade is a real person.  But the

17   question is, what did the defendant think.  And it's

18   the defendant's writing to Andrew Beierle in which

19   he references, hey, I spoke to Cade, your son, and

20   so the defendant had no idea that Cade wasn't real.

21       So I think that that can clearly be handled

22   with a question to Agent Hagedorn, did the defendant

23   engage in any chats with what he thought was a

24   child.  And then I can ask Agent Hagedorn, has

25   Andrew Beierle been interviewed in the --

1          THE COURT:  But you know that to be

2     inaccurate, because he didn't.  He simply said

3     something in an e-mail.  If you knew it didn't take

4     place, then why would you want to ask that question

5     and suggest to the jury that it did take place?

6          MS. KAISER:  No.  It did take place, Your

7     Honor.  It did take place based on -- the

8     defendant's e-mail says -- to Andrew Beierle

9     references, I had a conversation with your son,

10    Cade.  Okay.  So the defendant's belief was that he

11    was talking to a minor.

12         THE COURT:  Well, what did that e-mail

13    reference, what conversation?  Something with the

14    father?

15         MS. KAISER:  No, with the son.

16         THE COURT:  No, I know.  But did it reference

17    a chat or an e-mail exchange between the defendant

18    and Mr. Andrew Beierle?  That's B-E-I-E-R-L-E.

19         MS. KAISER:  It references the defendant's

20    talking to Mr. Beierle, and he says, I had a chat

21    with your son.

22         THE COURT:  So the defendant thought that the

23    senior Beierle was the son?

24         MS. KAISER:  Correct.

25         THE COURT:  And there is evidence of the

1    e-mail exchange between the defendant and Andrew

2    Beierle; correct?

3         MS. KAISER:  Yes.  And in the content there --

4    therein, the defendant's the one that tells Andrew

5    Beierle, hey, I was talking to your son.

6         THE COURT:  All right.  Well, I don't see a

7    Rule 16 violation.  I will direct the government,

8    however, to make available to Mr. Tragos any

9    documents it intends to introduce, whether rebuttal

10   or direct.  I don't want there to be any surprises

11   in this trial.  So if you have subscriber

12   information, then I think you should provide it to

13   him in an abundance of caution.

14        As far as the interviews, obviously, that's

15   not discoverable unless and until the witness

16   testifies under *Jencks*.  And I caution the

17   government not to imply or insinuate the existence

18   of something that it knows doesn't exist, not to

19   suggest you'll do that.  But be very careful in the

20   questioning.  What else?  Anything else?  We've got

21   the panel outside.

22        MR. TRAGOS:  Your Honor, could I inquire about

23   something the prosecutor just said?

24        THE COURT:  No.  What else?

25        MR. TRAGOS:  Okay.  Your Honor, in the

1    proposed questions that the government has for the

2    jury, the government says it's going to ask a

3    question that says, if you -- it's their voir dire

4    request number 12.  The defendant in this case is

5    charged with attempting to induce, stimulating

6    the -- induce, stimulating the occurrence of and

7    causing sexual activity with a child by discussing

8    and arranging same with what he believes to be the

9    child's parent.  Does anyone feel that if a person

10   induces a child by discussing and arranging same

11   with the undercover officer posing as a parent of a

12   child, as opposed to an actual parent, that the

13   person should not be convicted?

14        THE COURT:  That would be an improper

15   question.  I agree.

16        MR. TRAGOS:  Okay.  Thank you.

17        MS. KAISER:  Your Honor, just so the record is

18   clear, I'm giving Mr. Tragos subscriber records from

19   AOL for Andrew Beierle.  It's one through 47 and

20   also one through four.

21        THE COURT:  All right.  Thank you.  We're

22   ready to proceed.  When we bring the jury in, please

23   remained seated.  Left to right, as you know, one

24   through six in the first row and then so on.

25        Sir, you'll have to move over to this side.

1       Thank you.  We'll need that front row right behind

2       the prosecution, please.  All right.  Bring the jury

3       in, please.

4            COURTROOM SECURITY OFFICER:  Juror number one

5       -- 304.

6            COURTROOM DEPUTY CLERK:  Juror --

7            COURTROOM SECURITY OFFICER:  304.

8            COURTROOM DEPUTY CLERK:  Juror number 304,

9       Barbara Woolley, W-O-O-L-L-E-Y.

10           THE COURT:  Come forward, please.

11           COURTROOM DEPUTY CLERK:  Come forward and sit

12      in that first seat there, please.

13           COURTROOM SECURITY OFFICER:  412.

14           COURTROOM DEPUTY CLERK:  Juror 412, Mary

15      Thompson, T-H-O-M-P-S-O-N.

16           COURTROOM SECURITY OFFICER:  331.

17           COURTROOM DEPUTY CLERK:  Juror 331, Bonnie

18      Pedersen, P-E-D-E-R-S-E-N.

19           COURTROOM SECURITY OFFICER:  266.

20           COURTROOM DEPUTY CLERK:  Juror 266, Kira

21      Walsh, W-A-L-S-H.

22           COURTROOM SECURITY OFFICER:  406.

23           COURTROOM DEPUTY CLERK:  Juror 406, Edward

24      Mendez, M-E-N-D-E-Z.

25           COURTROOM SECURITY OFFICER:  343.

```
1              COURTROOM DEPUTY CLERK:  Juror 343, Susan

2      Harris, H-A-R-R-I-S.

3              COURTROOM SECURITY OFFICER:  294.

4              COURTROOM DEPUTY CLERK:  Juror 294.  Jose

5      Martinez, M-A-R-T-I-N-E-Z.

6              COURTROOM SECURITY OFFICER:  286.

7              COURTROOM DEPUTY CLERK:  Juror 286, Glenn

8      Taylor, T-A-Y-L-O-R.

9              COURTROOM SECURITY OFFICER:  312.

10             COURTROOM DEPUTY CLERK:  Juror 312, Mary

11     Hawkins, H-A-W-K-I-N-S.

12             COURTROOM SECURITY OFFICER:  303.

13             COURTROOM DEPUTY CLERK:  Juror 303, Dalila

14     Coats, C-O-A-T-S.  Please come forward.

15             COURTROOM SECURITY OFFICER:  277.

16             COURTROOM DEPUTY CLERK:  No.  Juror 415 we

17     need.

18             THE COURT:  Vazquez.

19             COURTROOM DEPUTY CLERK:  Ramona Vazquez.  One

20     second, ma'am.

21             COURTROOM SECURITY OFFICER:  415.

22             COURTROOM DEPUTY CLERK:  Juror 415, Ramona

23     Vazquez, V-A-Z-Q-U-E-Z.  Please come forward, ma'am.

24             COURTROOM SECURITY OFFICER:  277.

25             COURTROOM DEPUTY CLERK:  And Juror 277,
```

1      Araceli -- please have a seat right there on the end

2      over there, ma'am.

3              THE COURT:  Right next to the last lady.

4              COURTROOM DEPUTY CLERK:  Perez, P-E-R-E-Z.

5      Good morning.  Please have a seat in the last row,

6      far seat.

7              COURTROOM SECURITY OFFICER:  319.

8              COURTROOM DEPUTY CLERK:  Juror 319, Catherine

9      Mollon, M-O-L-L-O-N.

10             COURTROOM SECURITY OFFICER:  402.

11             COURTROOM DEPUTY CLERK:  Juror 402, Ryan

12     Dorey, D-O-R-E-Y.

13             COURTROOM SECURITY OFFICER:  365.

14             COURTROOM DEPUTY CLERK:  Juror 365, David

15     Monaco, M-O-N-A-C-O.

16             COURTROOM SECURITY OFFICER:  417.

17             COURTROOM DEPUTY CLERK:  Juror 417, Katherine

18     Scanlan, S-C-A-N-L-A-N.

19             COURTROOM SECURITY OFFICER:  417.  Have a seat

20     right here over to the end.

21             COURTROOM DEPUTY CLERK:  Juror 352.

22             COURTROOM SECURITY OFFICER:  352, not 417?

23     352?

24             JUROR:  I'm 352.

25             COURTROOM DEPUTY CLERK:  Okay.  Rachel

1        Shelley, S-H-E-L-L-E-Y.

2              JUROR:  Yes, ma'am.

3              COURTROOM DEPUTY CLERK:  Good morning.

4              COURTROOM SECURITY OFFICER:  253.

5              COURTROOM DEPUTY CLERK:  Juror 253, Daniel

6        Perez, P-E-R-E-Z.

7              COURTROOM SECURITY OFFICER:  373.

8              COURTROOM DEPUTY CLERK:  Juror 373, Eleanora

9        Morris, M-O-R-R-I-S.

10             COURTROOM SECURITY OFFICER:  426.

11             COURTROOM DEPUTY CLERK:  Juror 426, Dorothy

12       Kelley, K-E-L-L-E-Y.

13             COURTROOM SECURITY OFFICER:  412.

14             COURTROOM DEPUTY CLERK:  Juror 442, Robert

15       Beck, II, B-E-C-K.

16             COURTROOM SECURITY OFFICER:  395.

17             COURTROOM DEPUTY CLERK:  Juror 395, Ernest

18       Lisi, Jr.  Is that correct, sir?

19             JUROR 395:  That's correct.

20             COURTROOM DEPUTY CLERK:  Okay.  Please have a

21       seat.  L-I-S-I.

22             COURTROOM SECURITY OFFICER:  332.

23             COURTROOM DEPUTY CLERK:  Juror 332, Philip

24       Austin, A-U-S-T-I-N.

25             COURTROOM SECURITY OFFICER:  338 -- 388.  All

1       the way down to the end.

2               COURTROOM DEPUTY CLERK:  Wait a minute, wait,

3       wait, wait.

4               COURTROOM SECURITY OFFICER:  388.

5               COURTROOM DEPUTY CLERK:  It's 257, Juror 24.

6               COURTROOM SECURITY OFFICER:  24?  257.

7               COURTROOM DEPUTY CLERK:  Yes, sir.  257, Joann

8       Frieler-Baker, F-R-I-E-L-E-R B-A-K-E-R.

9               COURTROOM SECURITY OFFICER:  310.

10              COURTROOM DEPUTY CLERK:  Juror 310, Jennifer

11      Scott, S-C-O-T-T.

12              COURTROOM SECURITY OFFICER:  388.

13              COURTROOM DEPUTY CLERK:  And Juror 388, Jason

14      Saice.  Is that how you pronounce it, sir?

15              JUROR:  Saice.

16              COURTROOM DEPUTY CLERK:  Saice, S-A-I-C-E.

17              COURTROOM SECURITY OFFICER:  262.

18              COURTROOM DEPUTY CLERK:  Juror 262, Christina

19      Pacific, P-A-C-I-F-I-C.

20              COURTROOM SECURITY OFFICER:  361.

21              COURTROOM DEPUTY CLERK:  361, Robert Wile,

22      W-I-L-E.

23              COURTROOM SECURITY OFFICER:  350.

24              COURTROOM DEPUTY CLERK:  Juror 350, Gregory

25      Laney, L-A-N-E-Y.

1            COURTROOM SECURITY OFFICER:  432.

2            COURTROOM DEPUTY CLERK:  Juror 432, Nancy

3      Machmer.  Is that how you say that?

4            JUROR 432:  Machmer.

5            COURTROOM DEPUTY CLERK:  Thank you.  Sorry.

6      M-A-C-H-M-E-R.  Please have a seat.

7            COURTROOM SECURITY OFFICER:  276.

8            COURTROOM DEPUTY CLERK:  Juror 276, Winfield

9      Lindeman, L-I-N-D-E-M-A-N.

10           COURTROOM SECURITY OFFICER:  295.

11           COURTROOM DEPUTY CLERK:  Juror 295, Michelle

12     Brookins, B-R-O-O-K-I-N-S.

13           COURTROOM SECURITY OFFICER:  362.

14           COURTROOM DEPUTY CLERK:  Juror 362, Anthony

15     Marco, Jr., M-A-R-C-O.

16           COURTROOM SECURITY OFFICER:  427.

17           COURTROOM DEPUTY CLERK:  Juror 427, Reinalda

18     Flores, F-L-O-R-E-S.

19           COURTROOM SECURITY OFFICER:  Juror 333.

20           COURTROOM DEPUTY CLERK:  Juror 333, Debora

21     Bickel, B-I-C-K-E-L.

22           Your Honor, that completes the seating of 35

23     prospective jurors.

24           THE COURT:  Thank you, Madam Clerk.  Good

25     morning, ladies and gentlemen.  I'm Judge

1    Whittemore.  We are here to select a jury in a

2    criminal case.  The case is expected to last through

3    the week.

4         We know that juror service never comes at a

5    convenient time.  But I also know that most of you,

6    if not all of you, appreciate that this is a small

7    responsibility for the privilege of being a citizen

8    of this country.

9         Serving as a juror is an important

10   responsibility preserved in the Constitution of the

11   United States by the founders.  It's a right that

12   you have no doubt thought about or at least read

13   about from time to time.  The importance of citizens

14   serving in our civil and criminal justice system

15   cannot be overstated.

16        You will make the decision in this case, if

17   you are selected.  Excuse me.  You cannot make a

18   mistake.  Twelve of you will decide the case.  If a

19   mistake is made, it is my responsibility.  We ask

20   only that you bring your common sense and collective

21   life experiences into the courtroom.  Let the

22   lawyers do their job.  I will provide you with the

23   law that you must apply in reaching your verdict.

24   And when all is said and done, we ask only that you

25   use your common sense, base your verdict on the

1    evidence presented and the law that I give you, and

2    bring back a verdict which speaks the truth.

3          Our system of justice is premised on truth.

4    In a criminal case, such as this, the prosecutor,

5    you'll hear me refer to the prosecutor as the

6    government, has the entire burden of proof.  The

7    burden never shifts to a defendant in a criminal

8    case.

9          If this trial ends right now and 12 of you go

10   back into the jury room to bring back a verdict,

11   there is only one verdict under the law that you may

12   bring back, and that is not guilty because you

13   haven't heard any evidence yet.  Therefore, the

14   government could not have possibly met their burden

15   of proof.

16         I have heard it said from time to time and it

17   may be coming up this morning as we go through jury

18   selection, that many of you believe that a defendant

19   should step forward and explain or deny or prove

20   innocence.  That is not the law.

21         If you are selected as a juror in this case,

22   you will take an oath to follow the law.  So even

23   though that may be a logical position to have as

24   you're sitting around the coffee table in the

25   morning listening to news accounts of a trial, or

1   maybe even a logical position to take as we sit here

2   now, if you take the oath as a juror, you must

3   follow the law and put that type of impression, no

4   matter how logical it may seem to you, aside.

5       If chosen, you serve in the capacity of a

6   judge, a judge of the facts.  I, of course, am the

7   judge of the law.  I will provide you with the law

8   that you must follow in reaching your verdict.  But

9   in determining the facts, specifically whether the

10  government has carried its burden of proof in this

11  case, you will act as a judge and, accordingly, you

12  have certain responsibilities.  First and foremost,

13  of course, is you must follow the law, whether you

14  agree with the law or not.

15      And that's why I start out by addressing some

16  of the positions that I know some of you may very

17  well have about a criminal case.  When all is said

18  and done, you must put those types of impressions or

19  positions aside, follow the law and bring back a

20  verdict which speaks the truth based on the evidence

21  presented and the law that I give you.  Those are

22  pretty simple concepts.  But they are important

23  rules of law applicable to this case.

24      You no doubt have heard someone, and maybe

25  even yourself, refer to the Constitution as a

1    technicality, when you hear about presumption of

2    innocence, things of that nature.  Well, they may

3    seem like technicalities, but they are rules of law

4    embodied in the Constitution of the United States,

5    and that's where our system of law begins.

6         The statutes that will you hear about in this

7    case obviously are the law enacted by Congress in

8    Washington.  But first and foremost are the

9    constitutional provisions applicable to this case.

10   Those are rules of law.

11        The government in this case has the burden of

12   proving the defendant's guilt beyond a reasonable

13   doubt.  The burden never shifts to a defendant.  The

14   defendant, through his lawyers, is not required to

15   ask the first question.  They never have to get out

16   of their chair.  They may sit back, watch and

17   observe and hold the government to its burden of

18   proof.  And you will have an instruction at the end

19   of the case that if the government fails to prove

20   the defendant's guilt beyond a reasonable doubt, you

21   must find the defendant not guilty.

22        Under the Constitution, you've heard about the

23   Fifth Amendment.  A defendant in a criminal case has

24   the right not to testify.  And if a defendant

25   chooses not to testify, you cannot consider that in

1    determining whether the government has proven its

2    case beyond a reasonable doubt, because the entire

3    burden is on the government.  It never shifts to the

4    defendant.

5         So the first time one of you says, well, but

6    the defendant -- the rest of you must correct that

7    juror.  Remember, the law requires the government to

8    prove its burden, its case, and fulfill its burden

9    of proof beyond a reasonable doubt and it never

10   shifts to the defendant.

11        As I said, jury service never comes at a

12   convenient time.  There are no magic ways to get out

13   of jury service.  I've heard them all and so have

14   these lawyers.  So nothing you say here this morning

15   will get you out of jury service other than a family

16   emergency or something of that nature.

17        We will listen very carefully to any concerns

18   you may have about serving in this case.  And,

19   certainly, they will be considered by the lawyers

20   and the Court in deciding whether you can be a juror

21   in this case.  But we start with the proposition

22   that this is a responsibility of citizenship, not

23   one to be taken lightly, and I certainly don't think

24   that any of you take it lightly.

25        Let me introduce the case to you by its style.

1    Listen carefully to all of the names that are

2    mentioned in the next few minutes, because we need

3    to know whether you recognize any of the names or

4    maybe you've heard something about the case.

5    Remember, you're a judge.  So as a judge, you want

6    to come in here with a neutral posture without any

7    preconceived notions about the case one way or the

8    other.

9         We have to ask questions of you to ensure that

10   that is the situation.  The process of jury

11   selection is necessarily personal.  You'll be asked

12   some questions in a public setting, questions that

13   you don't want to answer but questions which are,

14   nonetheless, important.  We will not unnecessarily

15   embarrass you, of course, or pry unnecessarily into

16   your personal lives, but these questions are

17   important.

18        The lawyers have the responsibility of

19   selecting a jury who can fairly and impartially

20   consider the case without any preconceived agenda or

21   prejudice for or against either side.  And these

22   questions are intended to bring these things out, to

23   get you thinking about sitting as a juror in this

24   particular case.

25        One of the misnomers about our civil and

1    criminal justice system that I hear from many of my

2    nonlawyer friends is that they think that lawyers

3    are very creative and they're able to handpick

4    juries and kind of skew the balance.  Nothing could

5    be further from the truth.  The rules provide each

6    side in a case with a predetermined number of

7    excuses that they may exercise, what we call

8    preemptory challenges based on your background, your

9    life experiences, your answers to the questions.

10   They cannot consider, however, your gender or your

11   race or your ethnic heritage or your religious

12   beliefs.  Those are impermissible considerations,

13   again, under the Constitution.

14        So these lawyers are able to excuse a

15   predetermined number of you for pretty much any

16   reason other than those constitutionally

17   impermissible reasons.  They can't handpick a jury.

18   Their questions and my questions, again, are

19   intended to get you thinking about some of the

20   concerns that we think you may have, to get these

21   things discussed, out in the open, so when all is

22   said and done we have 12 of you who can sit as

23   judges in this case.

24        Let me formally call the case for trial.  This

25   is United States of America versus Charles Jackson

1    Friedlander, Case Number 08-CR-318.  For the

2    government?

3        MS. KAISER:  Amanda Kaiser on behalf of the

4    United States.  Good morning, Your Honor.  Seated at

5    counsel table to my left is special agent Alex

6    Hagedorn from Immigration and Customs Enforcement.

7        THE COURT:  And for the defense.

8        MR. TRAGOS:  George Tragos, Your Honor, on

9    behalf of the defendant, Dr. Charles Friedlander.

10    Sitting with me will be my partner, Peter Sartes.

11    And at times our law clerk, Tim Batelli, may also be

12    sitting here.

13        THE COURT:  I recognized a name or two in this

14    jury list.  It's not uncommon.  If for some reason

15    one of you or two of you and I have crossed paths in

16    the past, socially or otherwise, you should bring

17    that out for the lawyers' benefit.  It surely

18    doesn't qualify you or disqualify you.

19        But if you know one of the lawyers or you

20    recognize any of the witnesses, it's important for

21    you to raise your hand and let us know because it

22    would be very awkward for you, I'm certain, if your

23    next door neighbor walked in and took the oath to

24    testify.  It may be a good thing or a bad thing for

25    the witness.  But the important thing is you're a

1    judge.  And if you know a witness in the case, the

2    first thing you should do is disclose that.  It may

3    be inconsequential, but disclosure is the rule.

4         Obviously, if you know one of the lawyers

5    professionally or socially, you should disclose

6    that.  Use me as an example.  If you had a case in

7    front of me, let's just, hypothetically, you had a

8    dispute with someone over some matter.  And you came

9    in for trial on Monday morning and your opponent

10   says, hey, Judge, and it turns out that that person

11   and I have played golf together.  I think you might

12   have some reason to think maybe I'm not the right

13   judge for your case.  And that's what we want you

14   thinking about.  So disclosure is the important part

15   so that there's nothing that might undermine the

16   integrity of the process.

17        So if you recognize the name of a witness and

18   you think you might know that witness, please, raise

19   your hand.  Let's get that aired out.  It would be

20   most embarrassing if suddenly the witness walked in

21   and you were in a quandary of whether to raise your

22   hand and embarrass yourself.  You'd have to do that,

23   by the way, if that happens because we need to

24   address that when it happens, not after the fact.

25   We don't want to try the case a second time because

1    something happens that we could have avoided first

2    time.

3        We have some people in the courtroom assisting

4    the Court.  Anne Ohle is my deputy clerk.  She's

5    right in front of me to your left, my right.  She is

6    in charge of my calender and docket.  She will be

7    marking the exhibits as they're received into

8    evidence as, for example, Government's Exhibit 1,

9    Exhibit 2, etcetera.

10        Linda Starr, to my left, is taking down

11   everything that's being said.  She's the official

12   court reporter.  She will take down everything

13   that's said by you, by the lawyers, by the witnesses

14   so that we have an accurate record of what occurs.

15   If you were to look over her shoulder and follow

16   her, you could more or less follow what she's

17   typing, but it's in what I call a shorthand version

18   of what's being said.  It certainly is not something

19   you would read like you would a book.  It would not

20   make a lot of sense because she uses a lot of

21   letters and phrases to represent words that are not

22   spelled out.

23        We don't have the facilities to provide you

24   with transcripts as this case is presented.  You'll

25   be allowed to take notes and you'll be able to rely

1    on your own notes in recalling the evidence as it's

2    presented.  Everything in a criminal case is done on

3    the record.  So if I confer with the lawyers over to

4    the left here, what we call side bar, Linda will be

5    typing those conferences out, even though she

6    doesn't move because she's got her headphones on.

7    And that is why she has the authority to address any

8    of us to speak up if we get away from the mic or our

9    voices trail off.  We have a portable microphone

10   you'll be asked to use while you're answering these

11   questions.

12       Let me tell you just a little bit about the

13   case.  In any criminal case in the federal system, a

14   grand jury considers evidence, summaries from

15   agents, other witnesses, and determines whether or

16   not there is reason to charge someone with a

17   criminal offense.

18       A grand jury is a group of citizens very much

19   like yourselves who are called in on a Monday

20   morning, sworn in by a judge like me, and their

21   responsibility over the next 18 months or so would

22   be to meet once a week and hear summaries from

23   agents and witnesses and testimony, and decide

24   whether or not to bring a formal accusation against

25   a defendant.

1            That formal accusation is called an

2     indictment.  You've heard of that, I'm certain.

3     It's nothing more, however, than a piece of paper, a

4     formal accusation.  It's not evidence.  It's the

5     beginning of a criminal case.  Again, the

6     Constitution requires that.  The founders put that

7     in the Constitution to ensure that a group of

8     citizens stood between law enforcement and the

9     government and the citizenry.  So before a formal

10    charge could be brought against any of us, a group

11    of jurors like you must consider whether that formal

12    charge should be brought.

13            So it's not up to the prosecutor or the U.S.

14    Attorney's Office.  It's up to a group of citizens.

15    It's a shield, so to speak, a protection the

16    founders contemplated.  But, again, the indictment

17    is not evidence.  It's nothing more than a formal

18    accusation.

19            The indictment in this case charges one

20    offense.  It's referred to as Count One.  I'm going

21    to read it to you at this time.  The grand jury

22    charges that between on or about June 16th of 2008,

23    and on or about July 21st of 2008, in Hillsborough

24    County and elsewhere in the Middle District of

25    Florida, Charles Jackson Friedlander, the defendant

1    herein, did knowingly and attempt to persuade,

2    induce, entice and coerce an individual who had not

3    attained the age of 18 years to engage in a sexual

4    act for which any person can be charged with a

5    criminal offense, by using a facility and means of

6    interstate commerce, that is, a telephone and a

7    computer and modem with access to the internet via

8    American Online -- America Online.  Excuse me.

9         You now know what the accusation is in this

10   case.  But that's all it is.  If the case ended

11   right now, there's only one verdict the law would

12   allow you to bring back, and that is, not guilty,

13   because you haven't heard any evidence.

14        After jury selection, the lawyers will make

15   opening statements, during which they will summarize

16   the evidence and what they expect you'll hear.  If

17   the case ended at that moment, there's only one

18   verdict, not guilty, because what the lawyers say is

19   not evidence.  You would not have heard any

20   evidence.

21        Evidence comes from the witnesses who testify

22   under oath before you and are subject to

23   cross-examination, and from documents, tangible

24   items that are received in evidence.  Your decision

25   must be based on the evidence presented in the case

1    and the law that I give you, and not on anything

2    else.

3         This is a charge which may be very troublesome

4    for some of you to consider.  But it is an

5    accusation which must be resolved by 12 of you, one

6    way or the other.  There may be evidence which would

7    be very troubling for you to look at and consider,

8    but you must consider all of the evidence in the

9    case.  You can't just not look at something because

10   you don't want to.  You're a judge.

11        You must consider it in assessing whether the

12   government has proven its case beyond a reasonable

13   doubt.  These are responsibilities of serving as a

14   juror, that is, as a judge, a judge of the facts.

15   You can't just ignore facts, you have to consider

16   them and apply the law to the facts as you find

17   them.

18        How many of you have served as a juror before

19   in any kind of a case?  Just raise your hand so the

20   lawyers get an idea.  Quite a few of you.  All

21   right.  How many of you have served on a criminal

22   case?  Not a civil but a criminal case?  All right.

23   About half of you.

24        In a civil case, the burden is typically on

25   the plaintiff, the person who brings the lawsuit.

1        Let's use an automobile example as -- an automobile

2        accident as an example.  The defendant runs a red

3        light, crashes into the plaintiff causing property

4        damage and personal injury.  You know the plaintiff

5        has a right to bring a lawsuit against the defendant

6        to recover for repairs to the automobile, medical

7        expenses, perhaps pain and suffering.  That's a

8        civil matter.  No one is going to jail.  Someone

9        might be paying some money, but no one is going to

10       jail.

11            The plaintiff in that case has the burden of

12       proving his or her case by the greater weight of the

13       evidence.  You may recall seeing the Lady of Justice

14       with the blindfold holding up the scale.  That scale

15       is representative of the civil burden of proof.

16       Whoever tips that scale in a civil case wins.

17            In a criminal case, on the other hand, the

18       government, in this case Ms. Kaiser as an Assistant

19       United States Attorney, has the burden of proving

20       the defendant's guilt beyond a reasonable doubt, a

21       much heavier burden than in the civil scenario.

22       It's beyond a reasonable doubt.

23            You have heard this phrase, beyond a shadow of

24       a doubt.  Hollywood fiction.  It's never been a part

25       of any law in this country.  It just sounds really

1    good.  Perry Mason, some of you might be old enough

2    to remember.  It's beyond a reasonable doubt, a

3    doubt that's reasonable, based on common sense.

4    There's a definition of reasonable doubt which I

5    will read to you at the end of the case.  But it's

6    based on reason and common sense.

7         You have not heard much about the case other

8    than the name of the defendant, a summary of the

9    charges.  You've heard the lawyers introduced.  Do

10   any of you think you've heard anything about this

11   case?  Just raise your hand if you do.

12        All right.  As we go along this morning, if

13   something occurs and you may think you might have

14   heard or read something, please, raise your hand.

15   Don't blurt it out, just raise your hand and then we

16   can address it.

17        In any criminal matter, as you know, the

18   newspapers or radio or television may cover

19   something.  Courtrooms are open to the public.

20   Reporters come and go all the time.  We're used to

21   it.  Hopefully they don't distract you.  But they're

22   entitled to be in here, because an open, public

23   trial is also a protection afforded you and I as

24   citizens, so the trials are not conducted in secret.

25        So it's entirely possible that you may have

1    read something about this case or another case that

2    sounds familiar to it.  It's important that we talk

3    about that because, again, your verdict must be

4    based on the evidence presented in this courtroom,

5    and not on what you read in the Tampa Tribune or the

6    Sarasota Herald, I hope I said it right, or the

7    St. Pete Times.

8        During the course of the trial you'll not be

9    permitted to get on the internet and Google anybody

10   or do any research.  Or go to Wikipedia or any of

11   those things that some of you might enjoy doing.

12   You're a judge.  Your decision must be based on the

13   evidence in the courtroom, and not on what you learn

14   by doing your own research.

15       That's become a common issue in trials in this

16   country, because most of us have access to the

17   internet.  And almost daily, we're on there reading

18   the news or Googling things and just out of

19   curiosity, reading about things that might be

20   newsworthy.  And I'm reading more and more

21   decisions, opinions talking about whether a

22   defendant is entitled to a new trial because one of

23   the jurors got on the internet and Googled the case.

24   And it's very problematic.

25       We rely on you as jurors to perform your duty

1    as I instruct you, and not to do the things that I

2    tell you not to do.  You are judges.  You are to

3    follow the law, including my instructions.

4         So be careful as you go home tonight if you're

5    selected and you want to read the news and things.

6    That's fine.  But if you see anything about this

7    case or any of the participants, ignore it.  Set it

8    aside.  After the trial is over and you've returned

9    a verdict, you can read till your heart's content.

10        I cannot participate in your decision at all.

11   I will be steering this ship, trying to get us from

12   Point A to Point Z.  You will make the decision,

13   however.  Other than rulings on the law that I will

14   be required to make, you are to disregard anything

15   that I say or do in this case as suggesting to you

16   that I have a position on the merits.  The decision

17   is yours alone to make.

18        You are to follow the law, as I explained

19   earlier, whether you agree with the law or not.  If

20   the law needs to be changed, it's changed in

21   Washington by the Congress, not by 12 jurors in

22   Courtroom 13-B.  We are sworn to follow the law.  It

23   would be a violation of your sworn oath to base your

24   verdict upon anything other than the evidence in

25   this case and the law that I explain to you.

1        As jurors you will be required to calmly,

2    fairly and dispassionately consider all of the

3    evidence in the case, and from that evidence and the

4    law which I give you, arrive at your verdict.   In

5    that regard, you are not to be swayed in the

6    performance of your duty by prejudice or sympathy

7    for or against either side.

8        That is something I wanted to explain to you

9    early on because as we go through the jury selection

10   and you are wondering how in the world you can be a

11   juror in a case with an accusation that might

12   trouble you, we want you to understand that it may

13   be a difficult trial to sit as a juror in, but the

14   law requires, if selected, that you do your duty in

15   accordance with the law.

16       At this time I'm going to ask each of you to

17   summarize your jury questionnaire.  We don't want to

18   know the names of your children.  But if they are

19   adults and they're out there working or looking for

20   a job, we'd kind of like to know what they do for a

21   living.  For example, if you have a son or a

22   daughter who's a lawyer, that could be important.

23       You don't need to stand up.  Just relax, take

24   a deep breath, talk a little slower than you're used

25   to talking.  That's some of the tricks of the trade

1     in public speaking.  I think you've probably seen a

2     lot of that in the last few months.  Even some of

3     the higher ups in our government are learning how to

4     talk publicly.

5          I don't mean that as a criticism, but we talk

6     fast.  But in order for others to understand us and

7     follow us, we have to slow down a bit.  And if I

8     pronounce your name inaccurately, correct me.  I'm

9     not particularly sensitive to that.  With a name

10    like Whittemore, I'm used to it.  But we want to

11    pronounce your name as you like it to be heard.

12         Ms. Woolley, good morning.

13         JUROR:  Yes, sir.  My name is Barbara Woolley.

14    And I live in Tampa and I've lived in Tampa for six

15    years.  I've been in Florida for 22.  I'm a high

16    school teacher.

17         THE COURT:  What subject?

18         JUROR:  I'm sorry?

19         THE COURT:  What subject?

20         JUROR:  I teach French.  I'm married, and my

21    husband is a director of technology at USF.  And I

22    have two sons; one 15 and one 11.  No military

23    service and I've never served on a jury before.

24         THE COURT:  This process we're going through

25    is what we refer to as either voir dire or voir dear

 1      (ph).  You can probably pronounce it correctly.

 2           JUROR:  Yes, sir.  I say voir dear (ph).

 3           THE COURT:  There you go.  We haven't been

 4      that wrong.  It means, loosely translated, to speak

 5      the truth, as I understand it.

 6           JUROR:  Yes, sir.

 7           THE COURT:  And that's what this process is

 8      all about.  Thank you.  You're the first

 9      French-speaking juror I've had in recent memory.

10           Ms. Thompson, good morning.

11           JUROR:  Good morning.  My name is Mary

12      Thompson.  I've lived at my address for 39 years.

13      I've been in Florida for 57 years.  I'm a janitor

14      part-time.

15           I'm married.  My husband is retired.  He was a

16      bus driver for the City of St. Pete.  I have four

17      children; 46, 47, 49.  No military service, and I've

18      never been on a jury.

19           THE COURT:  What kind of work do your children

20      do, generally?

21           JUROR:  Secretary.  My oldest son is in the

22      service and my youngest son is a -- works at a

23      furniture store.

24           THE COURT:  All right.  Have you lost a child?

25           JUROR:  Yes.

1          THE COURT:  Okay.  Was that child an adult?

2          JUROR:  No.  It was a baby.

3          THE COURT:  Okay.  Thank you, ma'am.  Have you

4     ever served on jury before?

5          JUROR:  No.

6          THE COURT:  No military service?

7          JUROR:  No.

8          THE COURT:  All right.  Thank you.  If you've

9     served on a jury before, be sure to alert me so I

10     can ask some follow-up questions.

11          Ms. Pedersen, good morning.

12          JUROR:  Good morning.  My name is Bonnie

13     Pedersen.  I live in Parrish, and have for nine

14     years.  I've been in Florida for nine years.  I'm a

15     retired nurse and social worker.

16          I'm married.  My husband is retired.  He was a

17     middle manager in retailing.  We have two children.

18     They're 43 and 45.  They are in information

19     technology, but I can't tell you much more than

20     that.

21          We do not -- I don't have any military service

22     and I've never been on a jury.

23          THE COURT:  All right.  Thank you.  Ms. Walsh,

24     good morning.

25          JUROR:  My name is Kira Walsh.  I've lived in

1    Bradenton, Florida for 21 years, and only in

2    Bradenton.  I'm a teacher's assistant.  I'm single.

3    I have a five-year-old son.  No military service or

4    previous jury service.

5         THE COURT:  Are you in a particular subject

6    matter classroom or is it general?

7         JUROR:  Teenage pregnancy program.

8         THE COURT:  All right.  Thank you.  Mr.

9    Mendez, good morning.

10        JUROR:  Good morning, Your Honor.  My name is

11   Edward Mendez.  I've been in Tampa -- I lived in

12   Tampa 28 years and I've been in the State of Florida

13   for 28 years.  Born and raised here.  I'm actually a

14   stay-at-home dad and a student.

15        I am married.  My wife is a corporate tax

16   accountant.  We have a three-month-old daughter.

17   And I was in the military service.  I was in the

18   United States Marine Corps.  I was stationed in

19   Paris Island, South Carolina as a primary marksman

20   instructor and also overseas in Okinawa as a

21   wireman.  And I've never been on a jury before.

22        THE COURT:  You've got some child care.  Have

23   you taken care of matters?

24        JUROR:  Yes, sir.  My mom is -- actually lives

25   two minutes away from us so she watches the baby and

1      it gives me a little bit of a break, too.

2          THE COURT:  Very good.  Thank you.

3      Ms. Harris, good morning.

4          JUROR:  Good morning.  My name is Susan

5      Harris.  I've lived in Tampa for 27 years.  I've

6      lived in Florida for 51.  I'm a billing supervisor

7      for an OB-GYN office.  I've been married for 27

8      years.  My husband is a maintenance manager for West

9      Coast of Florida, for his company.  My children are

10     both grown.  One is a manager for shipping.  Do I

11     name the company or --

12         THE COURT:  Free advertising, if you want.

13         JUROR:  Fed Ex.  And my daughter is a

14     receptionist at another OB-GYN office.  No military

15     service and I have been on jury duty before.

16         THE COURT:  Civil or criminal case?

17         JUROR:  Civil.

18         THE COURT:  Without telling us what the

19     verdict was, did the jury reach a verdict?

20         JUROR:  Yes.

21         THE COURT:  Did you serve as the foreperson?

22         JUROR:  Yes.

23         THE COURT:  Was that a positive experience?

24         JUROR:  I enjoyed it.

25         THE COURT:  Well, I ask you that because I

1    think regardless of the type of case, it may not

2    be a pleasant matter.  But when all is said and

3    done, it should be a positive experience, that is,

4    it reinforces the important of citizens serving as

5    jurors.  How long ago was that case?

6         JUROR:  Probably four or five years ago.

7         THE COURT:  Did that burden of proof analogy I

8    used ring a bell?

9         JUROR:  Yes.

10        THE COURT:  So we're in a reasonable doubt

11   posture now, not greater weight or preponderance of

12   the evidence.

13        JUROR:  Right.

14        THE COURT:  Very good.  Thank you.

15        JUROR:  Um-hum.

16        THE COURT:  If you'll pass the mic back.

17   Mr. Martinez, good morning.

18        JUROR:  Good morning, sir.  My name is Jose

19   Martinez.  I live in the city of Brandon for two

20   years.  I have lived in the State of Florida for 15.

21   I'm a supervisor information technology specialist.

22        I'm married.  My wife works as an animal

23   provider -- care provider.  I have two childs.  One,

24   22, in the Coast Guard, one, 19, in school.  I have

25   military service.  I was in the Army.  I was a

1     logistician in charge of supply, maintenance and

2     automation.  And I have never served as a jury.

3          THE COURT:  All right.  Thank you, sir.

4     Mr. Taylor, good morning.

5          JUROR:  Good morning.  My name is Glenn

6     Taylor.  I've lived in Valrico, Florida for 24

7     years.  I'm currently unemployed but worked in IT

8     prior to that.  I am married.  My wife is an RN.

9     And I have two children, 15 and 18.  No military

10    service, and I have not served on a jury before.

11         THE COURT:  All right.  Thank you, sir.

12    Ms. Hawkins, good morning.

13         JUROR:  Good morning.  My name is Mary

14    Hawkins.  I live in Dade City and in Florida for

15    eight years in Dade City.  I'm a part owner of an

16    RV resort, my husband and I and his mother.  I am

17    married.  I have four children, one son who's 30 and

18    three girls, 28, 26 and 22.  No military service.  I

19    have served on the Dade -- in Dade City on a civil

20    case.

21         THE COURT:  All right.  Reach a verdict?

22         JUROR:  Yes.

23         THE COURT:  Were you the foreperson?

24         JUROR:  Yes.

25         THE COURT:  All right.  What kind of work

 1    generally have your children done?

 2         JUROR:  My son works at our RV resort.  And I

 3    have one daughter who lives in Virginia Beach and

 4    she's a dermatology PA, and I have one daughter in

 5    New York City who's -- she's a fashion designer for

 6    swimwear.  And one still at home who's 22.  She's a

 7    dental hygienist.

 8         THE COURT:  All right.  Thank you.  Ms. Coats,

 9    good morning.

10         JUROR:  Good morning.  My name is Dalia Coats.

11    I've been -- I live in Tampa.  I've been in my

12    residence for 15 years.  Been living in Florida for

13    22 years.  I am collateral analyst.  I am married.

14    My husband is a customer service.  I have two

15    children.  One is 30 and one is 13.  The one that is

16    30 years old, he's in IT.  And I've never been in

17    the military and I never been a jury service.

18         THE COURT:  When is your vacation scheduled

19    for?

20         JUROR:  The 9th of April.

21         THE COURT:  That's redundant, isn't it.  It's

22    when is your vacation scheduled.  My wife would have

23    corrected me.  The 9th of April?

24         JUROR:  Yes.

25         THE WITNESS:  Well, I don't think we'll be in

1    session on the 9th of April.  So are you comfortable

2    if this case lasts about a week?

3        JUROR:  Yes.

4        THE COURT:  Okay.  I got your note.  That's

5    why I wanted to make a notation of it.  Thank you.

6    Ms. Vazquez, good morning.

7        JUROR:  Good morning.  My name is Ramona

8    Vazquez.  And I've lived in Oldsmar for 13 years.

9    I've been in Florida for 30 years.  I'm a home

10   health nurse.  And I am married.  My husband is a

11   school teacher.

12       I have two children.  One lives in Oregon,

13   he's a college professor; and the other lives here,

14   he's self-employed.  He does construction type of

15   work.  And I've not been in the military, and I have

16   not served on jury before.

17       THE COURT:  All right.  Thank you.  If you'll

18   pass the mic up, please, to Ms. Perez.  Good

19   morning.

20       JUROR:  Hi.  My name is Aracelli Perez.  I

21   live in Winter Haven.  I've lived there for 25

22   years.  I've lived in Florida for 32 years.  I'm a

23   nurse at the Polk County jail.

24       I'm married.  My husband is a truck driver.

25   We have two children, 14 and eight.  I've never had

1    any military service.  And I've been -- I've never

2    served on a jury but I -- in January I had to go for

3    jury service but I wasn't selected.

4         THE COURT:  You went through the questioning

5    like we're doing now?

6         JUROR:  Yes.

7         THE COURT:  Well, that often happens.  In this

8    case we'll probably seat at least 13 of you, maybe

9    even 14 to make sure that at the end of the case we

10   have 12 jurors.  People do get sick or have

11   accidents or family matters, and those like

12   yourself, are called alternates.

13        But if you are picked and you start counting,

14   don't try to figure out who the alternate is.  We

15   don't know until that jury steps out of the

16   courtroom and then I excuse the one or two people

17   that we are not needing.  So I appreciate that you

18   have served, although it was probably a little

19   disappointing you didn't get to go in and discuss

20   the case; right?

21        JUROR:  Yeah.

22        THE COURT:  All right.  Thank you.

23   Ms. Mollon, good morning.

24        JUROR:  Good morning.  My name is Catherine

25   Mollon.  I've lived in Seminole since 1998.  I've

1    lived in Florida since 1981.  I'm an insurance CE

2    coordinator.  And my husband is a school bus driver

3    trainer.  No children, never been in the military

4    and never served on a jury.  Been called a couple

5    times but never even got this far.

6         THE COURT:  All right.  Well, congratulations.

7    You made it.  Mr. Dorey, good morning.

8         JUROR:  Good morning.  Name is Ryan Dorey.  I

9    currently live in Riverview.  I've been there four

10   months.  I've been in Florida for 25 years.  I work

11   in information security consulting.  I am married.

12   My wife is a school teacher.  We have no children at

13   this time.  And I've never been in the military nor

14   have I served on a jury.

15        THE COURT:  All right.  Thank you, sir.

16   Mr. Monaco, good morning.

17        JUROR:  Good morning.  My name is David

18   Monaco.  I've lived in Clearwater about three and a

19   half years.  Lived in the State of Florida for about

20   30 years.  I'm an account manager for the America

21   Asia Division.  Single, no children.  Have not

22   served in the military and I have been on the State

23   of Florida grand jury.

24        THE COURT:  So you knew about what I described

25   earlier about the grand jury function.

1          JUROR:  Um-hum.

2          THE COURT:  The State of Florida has a grand

3    jury system very similar to the federal system.  The

4    difference is, as you no doubt experienced, is that

5    the state grand juries address capital cases, crimes

6    that are highly political or publicized, but not

7    typically the day-to-day offenses that you read

8    about in the paper.  In the state system, the state

9    attorney for a given county determines whether to

10   bring a formal accusation against a defendant, with

11   the exception of capital cases and certain other

12   cases.

13         So you hear what we call an information

14   referred to, with a capital I.  That's like an

15   indictment, but it's the state court equivalent of a

16   formal accusation.  In the federal system, any case

17   involving a felony accusation must be initiated by

18   what we call the indictment.

19         Thank you, sir.  How long were you on the

20   state grand jury, approximately?

21         JUROR:  Probably the remaining three months.

22   It was extended beyond the one year term, and then I

23   was called up and I served for about three months.

24         THE COURT:  All right.  Thank you, sir.

25         JUROR:  Thank you.

```
 1            THE COURT:  Ms. Scanlan, good morning.

 2            JUROR:  Good morning.  Catherine Scanlan.  I

 3       live in Bradenton.  I've lived there for about five

 4       and a half years.  I've lived in Florida

 5       approximately 40 years.  I'm a radiographic

 6       technologist.  I am employed.  I am married.  My

 7       husband is an attorney.  He does a civil trial

 8       practice.  He's also worked as a state attorney.

 9       You may want to know that.

10            THE COURT:  So he has a civil practice now as

11       we speak?

12            JUROR:  Um-hum.

13            THE COURT:  All right.

14            JUROR:  I have two stepsons.  Their ages are

15       35 and 38.  One is in recreational sales and the

16       other is law enforcement.  And I've never served in

17       the military and I've never served on a jury before.

18            THE COURT:  All right.  Thank you.  Let me ask

19       these jurors a few general questions, and if you'd

20       raise your hand, Ms. Scanlan, if you'll pass the

21       mic.

22            First of all, have any of you ever studied law

23       beyond, say, business law in junior college or high

24       school?  In other words, have you ever pursued a

25       career in paralegal studies or maybe attended law
```

1    school?  Anybody?

2          How about anybody else back there, anybody?

3    Okay.  I won't have to ask that question again.

4    Disputes with the United States Government.  Now,

5    let's narrow it down.  Disputes that trouble you as

6    we sit here today.  Maybe an audit that went

7    terribly bad, disputes with the FBI, DEA, Homeland

8    Security, U.S. Attorney's Office, all of those

9    acronyms, DEA, FBI, ATF.  Anybody have a dispute

10   with the United States Government that's still

11   festering?  We won't get into too many details, Ms.

12   Vazquez, but let's --

13          JUROR:  I just had an audit.  That's all.

14          THE COURT:  An audit?

15          JUROR:  Yeah.

16          THE COURT:  Did it work out, I mean, in terms

17   of when all is said and done?

18          JUROR:  Yes.

19          THE COURT:  You don't hold any grudges.

20          JUROR:  No, I don't think so.  I don't like it

21   but --

22          THE COURT:  All right.  But nothing that would

23   interfere with your ability to be a fair juror in

24   this case?

25          JUROR:  Not in this case, no.  I don't know.

1          THE COURT:  Well, go ahead.  If you do that

2     we're going to ask you.  It's like an auction, if

3     you move, we're going to ask you.  You said not in

4     this case --

5          JUROR:  When you say -- I have two little twin

6     granddaughters, little baby girls, and they're three

7     years old now.  And when you said the case, my heart

8     started to thump.

9          THE COURT:  Okay.  We're going to get into

10    that.  Thank you.  How about back in the back, any

11    disputes with the United States Government or any of

12    its agencies that would interfere with your ability

13    to be a fair and impartial juror in this case?  All

14    right.  I see no hands.  Thank you.

15         Some of you have been through divorces, maybe

16    other court proceedings, lawsuits, things of that

17    nature.  Have any of you had a bad experience with a

18    judge or a lawyer or a jury?  Anything in the court

19    system that now is starting to come back and you're

20    beginning to think about that bad experience?  No?

21    How about back in the back, anybody?  We have one

22    hand.  Don't let me forget to ask you that.

23         Okay.  How about law enforcement?  We just

24    had -- I think Ms. Scanlan mentioned someone in her

25    family.  Do you have any close friends or family

1    members who are in law enforcement today?  All

2    right.  Let's talk about that.  Who's got the mic?

3    Ms. Vazquez?

4         JUROR:  My brother was a New York City police

5    detective.

6         THE COURT:  Who was it?

7         JUROR:  My brother.  He's retired now.

8         THE COURT:  All right.  Anything about his

9    career that would affect your ability to follow the

10    law and --

11         JUROR:  No.

12         THE COURT:  -- be a fair juror?

13         JUROR:  No, sir.

14         THE COURT:  All right.  Why don't you hand it

15    right behind you to Mr. Monaco.  Yes, sir.

16         JUROR:  Brother-in-law.  He's a deputy for

17    Pinellas County.

18         THE COURT:  Currently?

19         JUROR:  Yes.

20         THE COURT:  What's he assigned to, do you

21    know?

22         JUROR:  Court bailiff.

23         THE COURT:  He's a courtroom deputy, then.

24    All right.  Anything about his occupation that would

25    interfere with your ability to be a fair juror?

1          JUROR:  Not at all.

2          THE COURT:  All right.  Thank you.

3    Ms. Scanlan?

4          JUROR:  My husband also served in the

5    sheriff's department.

6          THE COURT:  In what capacity?

7          JUROR:  As a deputy and also as their legal

8    adviser.

9          THE COURT:  So this was part of his legal

10   career, so to speak?

11         JUROR:  Yes, sir.

12         THE COURT:  Anything about that that would

13   interfere with your ability to be fair and

14   impartial?

15         JUROR:  No, sir.

16         THE COURT:  Now, the reasons for these

17   questions, obviously, are this.  Some of you might

18   be close enough to your brother or husband or

19   whoever it is -- close to your husband, I hope so --

20   such that you might feel that you might have a

21   little bit of an agenda when you walk in here.  In

22   other words, you hear about it every day and you

23   believe in your husband or your friend or relative

24   such that when you walk into the courtroom you're

25   kind of looking at the defense side, Mr. Tragos and

1      Mr. Sartes going, all right, what are you up to.  If

2      you feel that way, share it with us.  It's perfectly

3      natural.  As I said, we've heard it all in here.

4      That's why we're asking these questions, to get you

5      thinking about these subjects.  Mr. Dorey, you had

6      someone in your family?

7           JUROR:  My grandfather is retired police and

8      my cousin is currently active in Apopka.

9           THE COURT:  A deputy sheriff or detective or

10     what?

11          JUROR:  Just a sheriff at this point.

12          THE COURT:  Anything about that and your

13     grandfather, his career, that would affect your

14     ability to be fair and impartial in this case?

15          JUROR:  Absolutely not.

16          THE COURT:  All right.  Thank you.  Who else?

17     Back down in the front row.  Ms. Woolley?

18          JUROR:  Thank you.  I have a good friend

19     that's a deputy in Pasco County.

20          THE COURT:  Do you know what type of work?

21          JUROR:  Property crimes.

22          THE COURT:  Property, like grand theft and

23     that type of thing?

24          JUROR:  I think.

25          THE COURT:  Doesn't sound like that's

1    something you live with day-to-day.

2         JUROR:  No.

3         THE COURT:  Nothing that's going to affect

4    your ability to be fair and impartial in this case?

5         JUROR:  No.  No, sir.

6         THE COURT:  Now, I made a comment about

7    defense lawyers a minute ago.  I did that on

8    purpose.  How many of you are expecting Mr. Tragos

9    and Mr. Sartes to prove something to you?  Anybody?

10   What if they just sit there and do nothing?  Are you

11   going to hold the government to its burden of proof?

12   Remember, the law never shifts the burden of proof

13   to the defense.

14        Does anybody have any philosophical or

15   personal problems with that, disagreement, if you

16   will?  Can each of you follow the law as I describe

17   it to you?

18        All right.  We do have a subject matter that

19   Ms. Vazquez has touched upon.  I don't know what

20   else to tell you.  You've heard the charge.  You're

21   going to hear evidence in support of that charge.

22   And as jurors, you'll be acting as judges.  You must

23   consider all of the evidence and follow the law as I

24   explain it to you.

25        If you believe that you cannot do that, now is

1    the time to raise your hand.  And I know it's a

2    tough thing to do, but you're not going to hurt our

3    feelings if you raise your hand.  But we need to air

4    those concerns out.  The lawyers are going to ask

5    you this same question in a different way because

6    they understand that some of you may be sensitive to

7    the subject matter.

8         Just like if this were a cocaine case and you

9    had a relative or a friend who overdosed, you'd have

10   some problems.  So although the subject matter might

11   be different in that setting, nonetheless, it's a

12   sensitive issue that we want you to be thinking

13   about and alert us if you think deep down you cannot

14   fulfill your duty as a juror.  Is there anybody?

15   Ms. Vazquez, is it going to be tough for you?

16        JUROR:  (Inaudible).

17        COURT REPORTER:  I'm sorry.  I can't hear you.

18        THE COURT:  We need to get the mic back.  I'm

19   sorry.  See, Linda can't hear you, she has the

20   authority to speak up.

21        JUROR:  I just don't -- I'm not sure that I

22   could be impartial because I'm just thinking about

23   my little granddaughters.

24        THE COURT:  All right.

25        JUROR:  And I waited a long time for them to

1    come.

2         THE COURT:  I'm sorry?

3         JUROR:  I said I waited a long time for them

4    to come.  My son is 40.

5         THE COURT:  Well, I'm going to leave you with

6    that thought.  And the lawyers may have some

7    follow-up questions.  Ultimately the question will

8    be for each of you, including you, Ms. Vazquez, can

9    you follow the law and serve as a juror in this

10   case, consider all of the evidence and follow the

11   law as I explain it to you, including putting the

12   government to its burden of proof, following those

13   instructions?  And if you in good faith don't feel

14   you can do that, then that's all we can ask you to

15   do is tell us.  Thank you, ma'am.  We appreciate

16   that.

17        All right.  Let's go back to the back of the

18   room.  And while the mic is being passed back, you

19   might be wondering about our schedule.  Typically

20   during this time during a trial, I'd be taking a

21   morning break.  We don't want any of you

22   uncomfortable.  If you become uncomfortable, please,

23   raise your hand.  If you've had a lot of coffee this

24   morning, you might be uncomfortable.  I have the --

25   unfortunately the prerogative of saying, well, it's

1   time for a comfort break.  So if you're

2   uncomfortable, let me know.  We can take a short

3   adjournment.  We'll shoot for about another 15

4   minutes or so.  Are you okay?  All right.

5        Let me get my notes in front of me.  Ms.

6   Shelley, good morning.

7        JUROR:  Good morning.  My name is Rachelle

8   Shelley.  I reside in Sarasota, Florida, where I've

9   been there for 41 years.  I am a middle school

10  principal.  I currently have two wonderful children,

11  18-year-old female and a senior who's graduated from

12  high school this year, 17.  And my husband is a

13  commercial driver.

14       THE COURT:  Any prior jury service?

15       JUROR:  No.

16       THE COURT:  Military?

17       JUROR:  No military service, no, sir.

18       THE COURT:  It's good to have teachers and

19  particularly principals as jurors because, although

20  this may be inconvenient for some of you with your

21  class schedules and things, you can then share this

22  experience with your students as the opportunity

23  presents itself.  I think that's very important for

24  all of us to do with young people, particularly in

25  the junior high, high school age.  They get

1    inundated with information about our court system,

2    not all of which is very accurate.  So I hope that

3    those of you who do serve in that capacity will take

4    a positive experience back to your children, of

5    course, if you're selected.  Thank you, ma'am.

6         JUROR:  You're welcome.

7         THE COURT:  Mr. Perez, good morning.

8         JUROR:  Good morning.  My name is Daniel

9    Perez.  I've lived in Parrish for five years and in

10   the State of Florida 47.  I'm a retail sales

11   manager.  My wife is a supervisor at Raymond James

12   Financial.  We have a nine-year-old daughter.  I've

13   never been in the military and have no prior jury

14   service.  You mentioned earlier about law

15   enforcement.  I have three relatives that are law

16   enforcement officers.

17        THE COURT:  In the area, generally?

18        JUROR:  A cousin in Pinellas County, a cousin

19   in Manatee County and an uncle as a detective in

20   Manatee County.

21        THE COURT:  Do you know what they're assigned

22   to in terms of the type of work they investigate?

23        JUROR:  My cousins are patrol cops.  The uncle

24   is a detective.  He's done different things in the

25   past, but he's also done sexual predator monitoring.

1          THE COURT:  Well, these are relatives,

2     obviously.  Anything about their careers, their

3     present occupation that would interfere with your

4     ability to follow the law and be a juror in this

5     case, impartial to both sides?

6          JUROR:  I don't believe so.  I don't believe

7     so.

8          THE COURT:  All right.  Thank you, sir.

9     Ms. Morris, good morning.

10         JUROR:  Good morning.  My name is Eleanora

11    Morris.  I've lived in Tampa for 22 years.  I've

12    lived there in Florida for 31.  I'm retired.  I was

13    a sales manager for a commercial satellite company.

14    I am married.  My husband works for Hillsborough

15    County.  He is in the clerk -- the Office of the

16    Clerk of Circuit Court.  He is in tax deed sales.

17         I have three children.  The oldest is 47.  She

18    was a successful doll artist, so she is retired.  I

19    have a son who is 45.  He repairs hospital

20    equipment.  I have a daughter 44 who is a sales

21    manager.  I have had no military experience.  And I

22    have been called for jury for Hillsborough County

23    but never chosen because I always knew the judge.

24    But I don't know you.

25         THE COURT:  All right.  I don't know whether

1    I'm hurt or -- I've been away from there for about

2    nine years, so maybe that's why you don't know me.

3    That's all right.  Anonymity sometimes is a welcome

4    thing around here.  Ms. Kelly, good morning.

5         JUROR:  Good morning.  My name is Dorothy

6    Kelly.  I live in Fort Meade, Florida, and I've

7    lived there all my life.

8         THE COURT:  And you have a very soft voice, so

9    use that mic.  Thank you.

10        JUROR:  Excuse me.  I said, my name is Dorothy

11   Kelly.  I live in Fort Meade, Florida.  I've lived

12   there all my life.  And I've lived in Florida all my

13   life.  I work for Mosaic, the mining industry.  I'm

14   single.  And I have three kids, 27, 18 and 14.  And,

15   let's see.  I have no military service and I've

16   never served on a jury.

17        THE COURT:  All right.  Thank you.  Mr. Beck,

18   good morning.

19        JUROR:  Good morning.  My name is Robert Beck.

20   I live in Brooksville.  I've lived there for about

21   four years.  I've lived in Florida for 23 years.

22   I'm a cook for Outback Steakhouse.  I'm married.  I

23   have three children.  My wife is a waitress.  My

24   children are eight, six and four.  I served three

25   years in the United States Navy.  I was a yeoman.

1        And I've never been on a jury.

2            THE COURT:  When you are at work, do you have

3        a night shift?

4            JUROR:  Yes, sir.  We have days and nights.

5            THE COURT:  Our schedule typically would be we

6        would start at 9:00 in the morning.  And more often

7        than not, we would stop at 4:00, maybe 4:30.  Would

8        you be able to comfortably serve with us if it were

9        a week and maybe hit the night schedule a couple of

10       times?  That's up to you, of course.

11           JUROR:  Our night shift normally goes in at

12       3:00 and gets off around midnight.  And day shift

13       goes in at 9:00 in the morning.  But I work night

14       shift.  I'm on vacation right now, so it probably

15       won't interfere.

16           THE COURT:  All right.  Well, thank you.  And

17       no one is going to ask for any recipes.  We know

18       better.  Mr. Lisi, good morning.

19           JUROR:  Good morning, Your Honor.  My name is

20       Ernie Lisi.  I've been in Florida since 1993, about

21       16 years or so.  And I've lived in Florida about 16

22       years, originally from Connecticut.  I'm a training

23       specialist for the school district of Hillsborough

24       County.  We deal with adult education and such.

25           And I am married.  My wife is president of the

1    Performing Arts Center here.  I have two wonderful

2    kids.  My daughter is 38 and my son is 36.  I have

3    no military experience.  And I have served honorably

4    and happily in the jury system twice.

5         THE COURT:  Criminal or civil?

6         JUROR:  One of each, Your Honor.

7         THE COURT:  All right.  Anything about that

8    experience that would be problematic for you?

9         JUROR:  Not problematic at all.  Just the

10   opposite.

11        THE COURT:  Were you the foreperson, by any

12   chance?

13        JUROR:  Both times.  Yes.

14        THE COURT:  We've had three people who have

15   been fore people.  Four?  Mr. Taylor, I'm sorry.  I

16   missed you.  Well, that's unusual.  Somebody else?

17   But I'm glad that you're here because much of what

18   I've tried to explain you've heard before.  I hope

19   it's accurate and it helps all of you understand

20   what will be expected of you.  Thank you, sir.

21        JUROR:  You're welcome.

22        THE COURT:  Mr. Austin, good morning.

23        JUROR:  Good morning.  My name is Phil Austin.

24   I've lived in New Port Richey for the past 20 --

25   well, actually 32 years.  And I've been in Florida

1    32 years.  I'm an air conditioning technician.  I'm

2    married.  My wife is a secretary for a financial

3    institution.  I've got three kids, two daughters

4    that are back up in Ohio that I don't have a lot of

5    contact with.  I think they're both doing

6    secretarial work, as far as I know.  And a son

7    that's 27.  He lives right next door to me.  He's a

8    parts manager for a Honda dealership in New Port

9    Richey.  And I have no -- no military service.  And

10   I've been here three times and never picked for the

11   jury.

12        THE COURT:  You've been through the

13   questioning?

14        JUROR:  Right.

15        THE COURT:  All right.  Thank you, sir.  If

16   you'll pass it back to Ms. Frieler-Baker.

17        JUROR:  Hi.  My name is Julian Frieler-Baker.

18   I live in Bradenton.  And I've been there for 28

19   years.  I've lived in Florida since November of

20   1974.  I am currently a home mom.  I was previously

21   in banking for 13 years.  I am also now widowed.  I

22   have two children, a 17-year-old son and an

23   eight-year-old daughter.  Both are in school.

24        I have never been in the military service.

25   And I have served on a jury in June of 1991, and it

1    was criminal and I was the foreperson.  And I

2    thoroughly enjoyed it.

3          THE COURT:  Very good.  Enjoyed it because it

4    was a positive experience; right?

5          JUROR:  Yeah.  I enjoy this.  I -- I enjoy --

6          THE COURT:  How long did the jury deliberate;

7    can you remember?

8          JUROR 257:  I was going to -- about -- it was

9    one day, I think.  I'm not really a hundred percent

10   sure of that.  I remember it was in June of 1991

11   because I was nine months pregnant.  That part I

12   remember.

13         THE COURT:  Well, my question really was --

14   and I don't want to know what the verdict was.

15   That's part of the sanctity of jury deliberations.

16   But now that you are the fifth foreman --

17   foreperson, did the jury follow the law and take its

18   responsibility seriously?

19         JUROR 257:  Oh, yes.

20         THE COURT:  That has been my understanding.

21   I've never served on a jury, but you're a great

22   example, and I appreciate your comments.  Thank you.

23         Ms. Scott, good morning.

24         JUROR 310:  Good morning.  I'm Jennifer Scott.

25   I've lived in Tampa 23 years, in Florida for 25

1    years.  I am a part-time traffic assistant at a

2    television station.  My husband -- I am married.  My

3    husband is a reporter for a newspaper.  I have two

4    children.  One is 10 and one is 13.  I have -- I'm

5    not in the military, I have never been in the

6    military and I have not been on a jury before.

7         THE COURT:  Does your husband cover the courts

8    or some other area?

9         JUROR 310:  No.  He's a business reporter.

10        THE COURT:  Business.  All right.  And if you

11   don't mind, who does he work for.

12        JUROR 310:  St. Pete Times.

13        THE COURT:  All right.  Thank you.  Ms. Stice

14   (ph), good morning -- Mr. Stice.  I'm sorry.

15        JUROR 388:  It's Saice.

16        THE COURT:  S-A-I-C-E, but pronounced Sice

17   (ph).  Thank you.

18        JUROR 388:  Yeah, without the A.  My name is

19   Jason Saice.  I've been in the state for about 20

20   years.  I've lived in Tampa for about six.  I'm a --

21   I'm an overnight high speed support lead for a --

22   one of the local ISPs.

23        I'm married.  My wife is currently unemployed.

24   She's a librarian.  I don't have any children.  I

25   don't have any previous occupation with the

1        military.  I have been called for jury duty in

2        Hillsborough Court, but our case was dismissed on

3        the way to the courtroom.

4            THE COURT:  All right.  You, like a couple of

5        other jurors have positions -- you work at night.

6        Now, when you're serving as a juror, certainly it's

7        perfectly fine for you guys to go catch up with work

8        after we're finished.  But I do want everybody to

9        get a good night's sleep.  So I had one -- one juror

10       once who insisted on working the night shift and

11       after about three days, that juror was pretty much a

12       basket case.  Would you be able to work a schedule

13       out to be able to perform your duty here and do

14       catch-up with whatever you do at work?

15           JUROR 388:  I wouldn't be able to do work

16       while I was here, mainly because it's -- my job is a

17       very high stressful job.  I'm actually -- I pretty

18       much take escalations all night.  So that and this

19       would overlap with the -- my actual schedule.  So I

20       usually go in around noon and I get out around

21       10:00.  It's very unusual for me to be awake at this

22       hour, so I'd completely change my sleeping habits.

23           THE COURT:  Well, I'll have to rely on you.

24       And the lawyers may ask some follow-up whether you

25       can adjust for a week or so.

```
1              JUROR 388:  I should be able to.

2              THE COURT:  All right.  Thank you, sir.

3    Ms. Pacific?

4              JUROR 260:  Yes, good morning.

5              THE COURT:  Good morning.

6              JUROR 260:  My name is Christina Pacific.

7    I've lived in Tampa and Florida for 12 years.  I am

8    a computer network technology person doing product

9    management for military encryption systems as well

10   as health care information technology systems.

11             I'm single.  I have no children.  I did serve

12   in the Air Force, and I have served on a jury

13   before.

14             THE COURT:  Civil or criminal?

15             JUROR 260:  Criminal.

16             THE COURT:  Reach a verdict?

17             JUROR 260:  Yes, sir.

18             THE COURT:  Were you the foreperson?

19             JUROR 260:  No, sir.

20             THE COURT:  I see you've asked to be excused

21   because of job responsibilities.  Would you just

22   describe that for the benefit of the lawyers.  I

23   don't think they've seen this.

24             JUROR 260:  My position currently requires me

25   to travel to Salt Lake City every couple of weeks.
```

```
1       I manage a fairly large team of people.  And trying

2       to keep up with that while part of the time I'm here

3       in Tampa and in Salt Lake City gets cumbersome at

4       times.

5            THE COURT:  And you say you've missed a couple

6       of intervals?

7            JUROR 260:  Yeah.

8            THE COURT:  Meaning a couple of trips out

9       there?

10           JUROR 260:  Correct, because I've been calling

11      in and didn't want to get stuck in Salt Lake and not

12      show up here.

13           THE COURT:  Well, I have to rely on you.

14      Obviously, this case -- I would say it would last no

15      longer than Monday.  We hope to wrap it up this

16      week, but that's always something I can't predict

17      accurately.  Can you be with us this week one more

18      time?

19           JUROR 260:  If it's a week, I think that would

20      be appropriate.

21           THE COURT:  All right.  Thank you very much.

22      And a couple of you have written notes.  I've got

23      them up here.  Ms. Scanlan, I've got one from you.

24      I'll get back to you.  Thank you.

25           Mr. Wile, good morning.
```

```
1              JUROR 361:  Good morning, sir.  My name is

2        Robert Wile.  I live in Oldsmar.  I've been there

3        four years.  I'm an original Floridian.  I work for

4        the City of Clearwater, been there 29 years.  I'm

5        single.  I don't have any children.  I didn't serve

6        any military duty.  I served on a county jury, but I

7        wasn't chosen to serve.

8              THE COURT:  All right.  Thank you, sir.

9        Mr. Laney, good morning.

10             JUROR 350:  Good morning.  Gregory Laney.

11       I've lived in Hudson for 15 years, Florida for 15

12       years.  Vice president officer, Outback Steak House.

13       And marital status, married, two children.  My wife

14       is a homemaker.  Two children, 19 and 7.  No

15       military service and no previous jury service.

16             I also do have family members that are also in

17       law enforcement, also.  New York City and out in

18       Suffolk County.  And I have quite a friends down in

19       the Hudson area.

20             THE COURT:  Well, would those relationships

21       and familial relationships have any impact on your

22       ability --

23             JUROR 350:  No.

24             THE COURT -- to be fair?  Excuse me.

25             JUROR 350:  No, they won't.
```

```
 1              THE COURT:  Do you happen to know the cook in
 2      front of you?
 3              JUROR 350:  No, I don't.  Nice to see you,
 4      though.  It's a big company.
 5              THE COURT:  Yes, it is.  I understand that.
 6      And Ms. Machmer.
 7              JUROR 432:  Yes.  My name is Nancy Machmer.
 8      And I live in Lutz, Florida, for almost 16 years.
 9      I'm a stay-at-home mom for 21 years.  And very over
10      protective.  And I am married, and my husband is a
11      buyer for an electronic company.
12              And my children are -- I have a high school
13      daughter who is almost 17, and a son in college, and
14      he's almost 21.  And I have no military service.
15      And, yes, I have been on a jury in Dade City.  I
16      guess it was civil, I think.
17              THE COURT:  Did the jury deliberate and reach
18      a verdict, without telling me what it was?
19              JUROR 432:  Yes, they did reach a verdict.
20              THE COURT:  And were you the foreperson?
21              JUROR 432:  I really don't know what that is,
22      when you were asking.
23              THE COURT:  The person who leads the
24      discussion, kind of the --
25              JUROR 432:  Oh, definitely not.
```

1           THE COURT:  All right.  Well, that was

2    emphatic.  You raised your hand earlier when I asked

3    about I think it was a bad experience in a court

4    case.  Was that it?

5           JUROR 432:  Yes, it was, but --

6           THE COURT:  Can you just tell us enough to

7    clue us in on what that might have been?

8           JUROR 432:  Well, it didn't take place in a

9    courtroom.  It was in a small little room with a --

10   me and our judge -- I mean, our -- our lawyer and

11   the person and their lawyer.  These were for rich

12   doctors who had rich lawyers.  And it was a -- it

13   was -- I was charging against a doctor.

14          THE COURT:  All right.  Was it a mediation or

15   a settlement type discussion, or may be a

16   deposition?

17          JUROR 432:  I don't really -- it was the fact

18   that we were taking them to court for things that we

19   thought that, you know --

20          THE COURT:  That wasn't a pleasant experience,

21   I take it.

22          JUROR 432:  No, absolutely not.

23          THE COURT:  Did it ultimately get resolved?

24          JUROR 432:  No, it really didn't.  It had to

25   just be -- it was -- our lawyer just couldn't find

1      enough evidence.  And it -- their lawyers were

2      extremely -- these were for rich doctors and who had

3      rich lawyers and it was a bad situation.

4            THE COURT:  All right.  Well, I understand

5      that.  How long ago was that?

6            JUROR 432:  It was -- it was awhile ago.  It

7      was 19 -- 1992, to be exact.

8            THE COURT:  Can you put that experience aside

9      and not look at Mr. Tragos or Ms. Kaiser or

10     Mr. Sartes and be thinking about those defense

11     lawyers and let them do their job on behalf of their

12     clients?

13           JUROR 432:  I think so.  My -- my biggest

14     problem was with when I did jury is we were locked

15     in a room.  And, you know, if I knew the door wasn't

16     locked I think I would -- that's -- that was my

17     worst experience.

18           THE COURT:  We're not going to lock your door.

19     But -- but when juries deliberate, you are --

20           JUROR 432:  No windows or anything in there --

21     in theirs, in the one that I was in, you know.

22           THE COURT:  You're a little claustrophobic, I

23     take it?

24           JUROR 432:  Yes.  And that's kind of why I

25     couldn't even focus on my jury situa -- I mean,

1    my --

2           THE COURT:  Your dispute.

3           JUROR 432:  Yes.  That's the word.

4           THE COURT:  All right.  Well, let me explain

5    something.  When the jury begins its deliberations,

6    of course, you can't leave that room unless the

7    foreperson decides, all right, we're going to stop

8    for 10 minutes, we're going to take a break.  I have

9    some control over that.  For example, no smoke

10   breaks, you don't go out to have lunch without me

11   saying this is how you do it, because there has to

12   be some control, sorry, but that's the bottom line,

13   so that that jury deliberation process is not

14   infected.  So whenever decisions like that are made,

15   it's under the Court's supervision, but the door

16   isn't locked.

17          JUROR 432:  Okay.

18          THE COURT:  And there's a big window in the

19   jury room.

20          JUROR 432:  Okay.

21          THE COURT:  All right.  Okay.  Left side of

22   the room.  Before we do that, Mr. McNeil, let me ask

23   some general questions to make sure.  Studied law,

24   bad experience in court, friends or relatives in law

25   enforcement or any dispute with the government.  We

1    have one hand back in the corner.  Yes, ma'am.

2    Ms. Frieler-Baker?

3         JUROR 257:  Yes.  My father was a police

4    officer in New York, but he died in November of

5    19 -- excuse me -- August of 1974.  But I just

6    thought I should bring that up.

7         THE COURT:  Well, you lived and breathed it,

8    though, as a young person; right?

9         JUROR 257:  Yes, quite young.  I was 10 when

10   he died.

11        THE COURT:  Okay.  Well, impressions are --

12   they last forever.

13        JUROR 257:  Right.

14        THE COURT:  As you walked into the courtroom

15   did you feel allegiance one way or the other?

16        JUROR 257:  No.

17        THE COURT:  How about now?

18        JUROR 257:  No.

19        THE COURT:  Okay.  Thank you.  Anybody else on

20   that side?  Yes, ma'am.  Right up in the front row.

21        JUROR 426:  I have a judge, a lawyer and three

22   sheriffs in my family.

23        THE COURT:  You have a judge, a lawyer and

24   what did you say?

25        JUROR 426:  Three sheriffs.

1              THE COURT:  All right.  Ms. Kelley, are they

2     local?

3              JUROR 426:  They're in Polk County.

4              THE COURT:  Okay.  I think I might know of the

5     judge part of the family.  What's his or her name?

6              JUROR 426:  Clinton Curtis.

7              THE COURT:  Anything about those relationships

8     that would affect your ability to be a fair juror in

9     this case?

10             JUROR 426:  No.  I'm good with it.

11             THE COURT:  All right.  Anybody else?  Yes,

12    ma'am.  Ms. Morris.

13             JUROR 373:  As -- my husband does work in the

14    courthouse and we are very good friends of Judge

15    Nielsen.

16             THE COURT:  As am I.

17             JUROR 373:  Oh, good.

18             THE COURT:  That doesn't disqualify you.  But,

19    obviously, this isn't Judge Nielsen's case.  You can

20    follow the law as I explain it to you?

21             JUROR 373:  Yes, sir.

22             THE COURT:  All right.  Thank you.  All right.

23    We'll finish up this side and then take a comfort

24    break.  Ms. Lindeman, good morning -- Mr., I'm

25    sorry.  I was looking at the first juror and not --

1          JUROR 276:  That's all right.  No problem.  My

2     name is Winfield Lindeman.  I live in Palm Harbor

3     where I've resided for about six years.  I've lived

4     in Florida for over 40 years.  I am a retired

5     Florida Department of Transportation employee.  And

6     I currently am a consultant serving as the senior

7     managing associate for an environmental consulting

8     firm in our Tampa office.

9          I am married.  My wife is retired from the

10    medical profession.  I have two children; a son who

11    is 33, lives in Tallahassee and is an advertising

12    account executive for Cade and Associates.  My

13    daughter is 37 and is a resident of Richmond,

14    Virginia where she is a RN currently on hiatus while

15    she is attending to our two grandchildren.  No

16    military experience whatsoever, thankfully, and I am

17    a previous juror in Tallahassee in a criminal case.

18    I was not a foreperson.

19         THE COURT:  Without telling us the verdict,

20    did the jury reach a verdict?

21         JUROR 276:  Oh, absolutely.

22         THE COURT:  That was fairly emphatic, too.

23         JUROR 276:  It was quick.

24         THE COURT:  All right.  Well, let me ask

25    generally, do any of you with this prior criminal

1       jury service, did the case involve any charge

2       remotely related to the subject matter of this case?

3               JUROR 276:  Mine was child abuse.

4               THE COURT:  Okay.  As opposed to any type of

5       accusation of sexual interaction?

6               JUROR 276:  That is correct.

7               THE COURT:  All right.  We have one more hand,

8       just -- I'll get back to you in a moment.

9       Ms. Brookins, good morning.

10              JUROR 295:  Good morning.  How you doing?

11              THE COURT:  Good.

12              JUROR 295:  My name is Michele Brookins.  I'm

13      a happy sunshine grown Floridian.  I've lived here

14      my entire life, which is 22 years.  Currently I

15      reside in Holiday, which is in Pasco County.  I've

16      lived there for about five years.  Currently I'm a

17      full-time student.  I go to PHCC.  I'm studying in

18      an associates in science for radiography.

19      Previously I was customer service representative.

20      I'm single.  I have no children.  I have no previous

21      military experience nor have I been on a jury.

22              THE COURT:  Your full-time student schedule,

23      if you will, does that -- will that be impacted if

24      you're selected?

25              JUROR 295:  They'll excuse me from exams and

1        I'll be able to make them up at a later time.

2             THE COURT:  And you're comfortable you can do

3        that?

4             JUROR 295:  Yeah.

5             THE COURT:  All right.  Well, good.  Thank you

6        very much.  Mr. Marco, good morning.

7             JUROR 362:  Good morning.  My name is Anthony

8        Marco.  I've lived in Riverview for the last two

9        years.  I've been in the State of Florida for 30.  I

10       work for Hillsborough County Plan and Growth

11       Management.  I am a transportation house site

12       reviewer.

13            I have two children, one is 28, a son, and a

14       24-year-old daughter.  My son is a route delivery

15       man.  My daughter is unemployed at this time.  I

16       have no military service.  I also sat on a criminal

17       jury trial.  And I wasn't the foreperson, and we did

18       get a verdict.

19            THE COURT:  Anything remotely related to the

20       subject matter of this case.

21            JUROR 362:  Not at all.

22            THE COURT:  Ms. Flores, good morning.

23            JUROR 427:  Good morning.  My name is Reinalda

24       Flores.  I live in Land O' Lakes, lived there for

25       about six years, been in Florida for about eight

1    years.  I'm a student and employee of Publix.  I'm

2    single, no children, never been in the military and

3    never been on a jury.

4         THE COURT:  You are a full-time student,

5    according to your request to be excused.

6         JUROR 427:  Yes.

7         THE COURT:  What's your class schedule,

8    generally.

9         JUROR 427:  I go Monday and Wednesdays.

10        THE COURT:  You're missing classes today,

11   then.

12        JUROR 427:  Um-hum.

13        THE COURT:  Well, you tell me.  Are you

14   comfortable that you could make up those classes or

15   not if you're here for a week?

16        JUROR 427:  I do believe I'll be excused.

17        THE COURT:  Okay.  Because we could spill over

18   into Monday.  I want to be very cautious in case we

19   do, so that would impact three days; today,

20   Wednesday and Monday.

21        JUROR 427:  Um-hum.

22        THE COURT:  All right.  You're comfortable;

23   you're okay with that?

24        JUROR 427:  Yes.

25        THE COURT:  Okay.  Thank you.  And Ms. Bickel,

1    good morning.

2         JUROR 333:  Good morning, Your Honor.  I'm

3    Debora Bickel.  I've lived in Clearwater for 24

4    years.  I've been in the State of Florida for 50

5    years.  I -- my occupation right now is I work for

6    Bay Care.  I'm a medical assistant.  I've retired

7    from Verizon after 25 years.  I'm divorced and I've

8    never been in the military and I've never been on a

9    jury.

10        THE COURT:  All right.  This side of the

11   courtroom, the five of you, ever studied law,

12   disputes with the government, bad experience in a

13   court case or law enforcement relatives or friends?

14   Anybody?  Yes, ma'am, Ms. Bickel.

15        JUROR 333:  Yes.  I have a brother that just

16   retired from Clearwater Police Department.  I have a

17   stepsister that works for the District Attorney's

18   Office in Clearwater.  And I have a stepsister that

19   is an attorney in California.

20        THE COURT:  Anything about their jobs, their

21   responsibilities that would affect your ability to

22   be a fair juror in this case?

23        JUROR 333:  No, Your Honor.

24        THE COURT:  All right.  Mr. Lindeman, I didn't

25   ask but the thought occurred to me, given your past

1    employment and present, do you testify from time to

2    time?

3            JUROR 276:  Yes, sir, I do.

4            THE COURT:  I had a sneaking suspicion that

5    you did.  As an expert witness?

6            JUROR 276:  Yes, sir.

7            THE COURT:  All right.  Anybody else testify

8    on a regular basis as an expert witness, or any

9    other kind of witness?  How many of you have

10   testified in a court case, whether by deposition or

11   in a courtroom?  Anybody?  All right.  Let's

12   eliminate divorces.

13           All right.  We still have three hands.  All

14   right.  Deposition.  We don't have depositions in

15   federal criminal matters.  But the fact that you've

16   been in a deposition and have been asked questions

17   under oath is my point.  Mr. Lindeman, anything

18   about your current vocation or the manner in which

19   you are called to testify that would affect your

20   ability to be fair and impartial in this case?

21           JUROR 276:  No, sir.

22           THE COURT:  You may or may not hear from

23   individuals who we would typically call expert

24   witnesses.  Will you weigh and consider their

25   testimony just as any other witness?

1          JUROR 276:  Yes, sir.

2          THE COURT:  The law will -- I will instruct

3     you in accordance with the law that merely because

4     someone is an expert, you've no doubt heard this,

5     doesn't mean that their testimony is considered any

6     differently than any other witness, and the jury may

7     believe in whole or in part anything a witness says,

8     including an expert.  Do you have any problems with

9     that?

10         JUROR 276:  No, sir.

11         THE COURT:  Anybody else?  All right.  Who

12    else we had on that back row?  Somebody else raised

13    their hand.  Yes, Ms. Bickel.

14         JUROR 333:  I was in a medical deposition.

15         THE COURT:  Go ahead and pass it down to

16    Ms. Bickel.  Did that go okay or was it as bad as --

17         JUROR 333:  No, it was fine.  I had no problem

18    with it at all.

19         THE COURT:  The process of questioning and

20    cross-examination by lawyers was all right?

21         JUROR 333:  Right.  Yes.

22         THE COURT:  All right.  Thank you.  Mr. Marco?

23         JUROR 362:  I've given depositions for

24    Hillsborough County on traffic-related issues.

25         THE COURT:  Is that typically pretty orderly

1   and civil?

2          JUROR 362:  Yes, it was.

3          THE COURT:  Any problems?

4          JUROR 362:  None whatsoever.

5          THE COURT:  And Ms. Brookins.

6          JUROR 295:  During high school I was a witness

7   in just a simple civil case between two friends.

8          THE COURT:  All right.  You were asked

9   questions under oath by lawyers?

10         JUROR 295:  Yes, sir.

11         THE COURT:  Did that go orderly, in an orderly

12  way?  Or was it orderly, I should say?

13         JUROR 295:  Yeah, it was fine.

14         THE COURT:  Okay.  All right.  We had one

15  other hand back here and this Ms. -- I'm going to

16  get back with you, Ms. Scanlan, because you've asked

17  to be excused.  Yes, ma'am.

18         JUROR 260:  You had asked if my previous jury

19  experience was -- the case was remotely related to

20  the charges.

21         THE COURT:  Yes, Ms. Pacific.

22         JUROR 260:  My previous jury service was a

23  sexual battery case.

24         THE COURT:  Involving an adult or a minor?

25         JUROR 260:  Adults.

1          THE COURT:  All right.  All right.  Why don't

2     we take a 15-minute comfort break.  That will take

3     us back -- let's call it 10 after 11:00.  Please

4     look at your watches.

5          Now, you can go downstairs, if you like.  I'm

6     not suggesting you do or don't.  But please be back

7     at 10 after.  There's a facility for men on this

8     side of the courtroom as you walk out the doors to

9     the right, ladies all the way down to the left.

10    Please don't discuss the case among yourselves.  Be

11    back in 15 minutes.

12         COURTROOM SECURITY OFFICER:  All rise.

13    (Recess was taken at 10:52 until 11:16 AM.)

14    (Back on the record.)

15         COURTROOM SECURITY OFFICER:  All rise.  This

16    Honorable Court is again in session.  Be seated,

17    please.

18         THE COURT:  All right.  I've got a couple of

19    juror requests I want to address.  Who's got the

20    mic?  All right.

21         Ms. Scanlan, right up here to the right.

22    Well, this is work related.  You work Tuesdays and

23    Wednesdays doing bone mineral density exams?

24         JUROR 417:  Yes, sir.

25         THE COURT:  Patients have scheduled

1    appointments, etcetera.  Go ahead and summarize for

2    the lawyers your request.

3         JUROR 417:  Well, I have a schedule of

4    patients that have already been scheduled.  So if I

5    knew ahead of time that I would not be able to

6    there, that can be rescheduled.  No one else does

7    those exams in our office.  So while I'm not there,

8    those patients aren't getting the exams and they're

9    being postponed to a later date.

10        THE COURT:  Has this week been taken care of

11   or do you still have appointments.

12        JUROR 417:  My manager is canceling all the

13   appointments for tomorrow in anticipation of not

14   knowing whether I would be there or not.  And the

15   first day that I was to report, that Tuesday, was

16   also completely canceled so --

17        THE COURT:  Well, you tell me, or tell us.

18   Can they get by without you?  Are these patients who

19   are facing -- and don't divulge anything.

20        JUROR 417:  They're not emergency exams, if

21   that's what you mean.

22        THE COURT:  You're not going to lose your job

23   over this.  I know that, now.  Federal law protects

24   us.  But at the same time, let's be realistic.

25        JUROR 417:  Well, I think there was some

1      comment as to whether it would be a two-week trial,

2      and that would probably pretty set back --

3           THE COURT:  It wouldn't be two weeks.

4           JUROR 417:  -- the appointments.

5           THE COURT:  At the very most we might spill

6      over into Monday.

7           JUROR 417:  That would be okay.

8           THE COURT:  All right.  And the lawyers might

9      have some follow-ups with everybody.  Ms. Kelley,

10     back in the back.  That's the end of this week.

11          JUROR 426:  I'm not really sure yet.  I called

12     the doctor --

13          COURT REPORTER:  I'm sorry?

14          THE COURT:  I'm sorry.  I did that on purpose,

15     Linda, so you'd get aggravated, so hang on.  All

16     right.  Ms. Kelley has a doctor's appointment, so to

17     speak, for the end of this week, you think.

18          JUROR 426:  I'm not really sure until I call

19     them today to see if they're going to schedule me or

20     not.

21          THE COURT:  All right.  Well, that's probably

22     not something you really want to talk about.

23          JUROR 426:  Not really.

24          THE COURT:  But I'll share it with the

25     lawyers, and they'll have some follow-up.  You have

1     a -- you think a procedure scheduled as early as

2     late this week.

3            JUROR 426:  Right.

4            THE COURT:  But you're not certain about the

5     exact date.

6            JUROR 426:  Right.

7            THE COURT:  Okay.  Well, that's obviously very

8     sensitive.  And Mr. Lisi, back down here.

9            JUROR 395:  Yes.  Thank you.  I appreciate

10    that.  Yes.  I have a couple of training sessions

11    set up for City of Tampa.  Today's class was gone.

12    And I have one set up for Wednesday and Thursday and

13    then Wednesday and Thursday of next week.

14           My manager said she'd pick up the next two,

15    but she's not that experienced in the program

16    itself.  And so there may be a need to maybe

17    reschedule or whatever.  But she said not to worry,

18    I can handle Wednesday and Thursday.  So -- and then

19    your statement before reiterating how important this

20    is, as long as it doesn't go beyond Monday, I think

21    I could probably hang in there.

22           THE COURT:  All right.  Well, that's our

23    estimate.

24           JUROR 395:  I understand it could --

25           THE COURT:  Again, I could have emergency

```
 1    matters, one of us becomes ill, but that's our

 2    schedule.  And we've talked about this, the lawyers

 3    and I, so we're pretty comfortable with that

 4    schedule.

 5         JUROR:  That's good.

 6         THE COURT:  Thank you.  At this time, members

 7    of the jury, please give the lawyers your close

 8    attention.  Let me let them ask some follow-up and

 9    some additional questions they may have.

10    Ms. Kaiser?

11         MR. TRAGOS:  Your Honor, I'm sorry.  May we

12    have a side bar?

13         THE COURT:  Yes, sir.  Come forward, please.

14    (At side bar, on the record.)

15         THE COURT:  Yes, sir.

16         MR. TRAGOS:  I would request the Court give

17    some additional explanation on the grand jury.  The

18    Court went into quite a bit of detail about it.  But

19    I think the jury may be left with the impression

20    that the grand jury hears both sides, that it -- it

21    brings these cases themselves, because the Court

22    said that the prosecutor --

23         THE COURT:  I don't mind doing that.

24    Ms. Kaiser, do you have a problem with that?

25         MS. KAISER:  No.  That's fine, Your Honor.
```

1      Also --

2           MR. TRAGOS:  Sorry.  Just that they know that

3      only the prosecutor's side is heard.

4           MS. KAISER:  Your Honor, at this point do you

5      want us to read our witness list to the jurors?

6           THE COURT:  Yes.  Be sure to do that when

7      you're there asking questions.

8           MR. TRAGOS:  Did you ask about whether they

9      knew any of us or any of the participants?

10          THE COURT:  No.  I can do that, too.

11          MR. TRAGOS:  Okay.

12          THE COURT:  I've summarized their requests.

13     And if you'd like to look at them, they're right

14     there.  One lady had some possible heart surgery.

15          MR. TRAGOS:  Is that Ms. Kelley?

16          THE COURT:  Yeah.  And until she talks to her

17     doctor she doesn't know whether it would be

18     scheduled this week or next, so I don't know.  She's

19     told us everything she can tell us.  I suspect she

20     could make a call at the break, but you know how

21     that is, trying to reach a doctor's office and

22     getting information out of them.

23          MR. TRAGOS:  I know.

24          THE COURT:  Here's her written excuse.  All

25     right.

1    (End of side bar discussion.)

2         THE COURT:  Thank you, counsel.  A couple of

3    things before we let Ms. Kaiser ask some follow-up

4    questions.  I neglected to ask and I typically do,

5    do any of you know any of us, court staff, lawyers,

6    the judge?  I thought I recognized a couple of your

7    faces and names, but I might have been mistaken and

8    that's fine.  And we -- yes, ma'am.

9         JUROR:  I don't know that I know him, but that

10   guy in the back over there, he looks familiar to me.

11   So I don't want to have any secrets.  I don't know

12   if you have anything to do with anything but --

13        THE COURT:  Okay.

14        JUROR:  So I'm not sure if I know you.

15        THE COURT:  You don't know him personally?

16        JUROR:  No.  I -- he looks familiar but I

17   don't want to be --

18        THE COURT:  He's not a witness in the case.

19        JUROR:  Okay.  Okay.

20        THE COURT:  Thank you.  I did touch upon the

21   function of the grand jury.  And I think actually we

22   had an exchange about the differences between the

23   state and federal grand jury function.  I want to

24   make sure that I didn't leave anything out.

25        In most cases, the grand jury receives

1      evidence only from law enforcement, typically case

2      agents who summarize investigations.  And they may

3      call witnesses from time to time, people that have

4      personal knowledge.  But it's typically not a

5      situation where a defendant is allowed to come in.

6      It's a -- not being critical, but it's a one-sided,

7      investigative tool of the federal system.  The grand

8      jurors receive evidence but typically only from law

9      enforcement, summaries from the agents, the lawyers.

10     The Assistant U.S. Attorneys assist them and draft

11     indictments for the grand jury.

12          But, for example, Mr. Tragos wouldn't have

13     been invited to come into the grand jury and make

14     argument.  It's not that kind of a process.  It's a

15     probable cause determination.  The grand jury simply

16     determines whether there's sufficient evidence to

17     bring an accusation.  At that point, their function

18     ends.

19          And as I said earlier, an indictment is not

20     evidence.  It's simply a piece of paper with a

21     formal accusation.  I want to make sure that we

22     clarified that proceeding.

23          All right.  Thank you.  Ms. Kaiser, you may

24     inquire.

25          MS. KAISER:  Thank you, Your Honor.  Good

1    morning.  Good morning, ladies and gentlemen.  Good

2    morning.  I'm afraid, based on where you're sitting,

3    I'm necessarily going to have to turn my back on

4    some of you at some point, so for that I apologize.

5         But as the Court has advised you, this purpose

6    of voir dire is to find out if you have any

7    preconceived ideas or something that would prevent

8    you from being fair and impartial to both sides of

9    this case.  So the questions I have for you are

10   designed to see if, perhaps, you have any prejudice

11   either for or against the United States, or for or

12   against the defendant in this matter.  Obviously, we

13   all want a fair and impartial jury to hear this

14   evidence in this case.

15        But before I ask some follow-up questions,

16   I've been asked to read the government's witness

17   list.  And the purpose of that is to see if any of

18   the names on the list you know personally or have

19   any familiarity with.  So let me start.

20        The first witness is Corporal Kurt Romanosky,

21   Detective Kelly Lyons, Katherine Hook, Jeffrey

22   Capra, Steve Uebelacker, Brad Carrozza, Andrew Rose,

23   Gregory Monk, Don Colcolough, Patty Kelly, Dave

24   Grawunder, Larry Marone and/or Steven Harrison, Alex

25   Hagedorn, Detective Neil Spector, Barry Taylor,

1    Gerald Falcone, Lori Coleman and Andrew Beierle.

2    Does anyone recognize any of those names or have any

3    personal affiliation with any of those witnesses?

4    Anyone?

5         All right.  The first question I have -- and

6    if there's anything that's sensitive, we can always

7    approach side bar with the judge so you're not

8    embarrassed.  The point is not to embarrass anyone

9    here today.  But the first question is have you or

10   any member of your family or close friend ever been

11   the victim of a crime?  Yes.

12        JUROR 304:  I've had two cousins that were

13   murdered.

14        MS. KAISER:  As a result of those cases, were

15   those cases ever solved?

16        JUROR 304:  Yes.  One was.

17        MS. KAISER:  Is there anything about that

18   horrible circumstance that would affect your ability

19   to be fair and impartial in this case?

20        JUROR 304:  No.  I'm fine.

21        MS. KAISER:  Okay.  Did the -- were you

22   satisfied with the effort that law enforcement put

23   into those cases?

24        JUROR 304:  Yes, I was.

25        MS. KAISER:  Okay.  Anyone else?  Anyone else

1   been the victim of a crime?  Ma'am?  If you could

2   please pass the mic down.

3        JUROR 343:  Right after I started residing in

4   Tampa and we had moved into our home, a month after

5   we moved in, just about to the date, we were robbed.

6   As I was sleeping in my bedroom, they were coming in

7   and took jewelry boxes and everything.  A year to

8   the date, the following year, got robbed again.

9   They never caught anybody but that's all, and that

10  was -- I'm okay.

11       MS. KAISER:  Was there anything about that --

12  that crime that made you displeased with law

13  enforcement?  Did they do something or not do

14  something that you wanted them to do?

15       JUROR 343:  No.  They came out and, you know,

16  they did the fingerprints and all that stuff.  And

17  they just weren't able to get a clear enough, you

18  know, prints or anything.  And nothing was recovered

19  and some of it was very old but, you know, life goes

20  on.

21       MS. KAISER:  Was there anything about that

22  experience that would cause you not to be fair and

23  impartial to the government?

24       JUROR:  No.

25       MS. KAISER:  Or to the defense in this case?

1          JUROR:  No.

2          MS. KAISER:  Okay.  Anyone else?  Anyone?

3     Sir?

4          JUROR 395:  It's Amazing all these things come

5     up.  You know, I just thought of it now.  It was

6     back in New Haven about 28 years ago, there was

7     break-in in our home.  Nothing was stolen, but there

8     was a couple of windows broken and a door was -- the

9     jamb was broken.  And that was the only time.

10    Police came out, they were very nice, pleasant,

11    whatever.  But nothing -- at least to this date has

12    ever, you know, transpired as far as finished.

13         MS. KAISER:  Was there anything about that

14    experience, sir, that would cause you to be

15    prejudiced either for or against the government or

16    the defense?

17         JUROR 395:  No, not at all.

18         MS. KAISER:  Okay.  Anyone else?  All right.

19    The next question I have is, has any member of the

20    jury panel or any family member, relative or close

21    personal friend or acquaintance of yours ever been

22    investigated by any federal, state or local law

23    enforcement agency?  Anyone?  Sir?

24         JUROR 332:  Well, it may not be pertinent

25    because it was juvenile.  It was, you know, many,

1    many years ago.  But I did go through a process

2    where I was investigated.

3        MS. KAISER:  Is there anything about that

4    experience that would cause you to either be unable

5    to be fair and impartial in this case?

6        JUROR:  Not particularly, this particular

7    case.  Law enforcement in general and the way the

8    system is set up is ludicrous and is illogical as

9    anything could be.  But beyond that, this particular

10   case, it's not -- doesn't fall into that necessary

11   area.

12       MS. KAISER:  Okay.

13       THE COURT:  To assist in an accurate record,

14   those of you who have responses, please give us your

15   name again so Ms. Starr can write your name down.

16   Thank you.

17       MS. KAISER:  Sir, what was your name again?

18       JUROR 332:  Phil Austin.

19       MS. KAISER:  Mr. Austin?

20       JUROR 332:  Um-hum.

21       MS. KAISER:  Anyone else?

22       THE COURT:  You've got one back there.

23       JUROR 295:  My brother, upon the death of his

24   wife, was investigated just as a routine thing to

25   make sure there was no foul play because she did die

1    from an overdose of cocaine.  So they wanted to make

2    sure that it wasn't foul play.

3         MS. KAISER:  Was there anything about that

4    experience that -- that led you to either have a

5    prejudice for or against the United States or for or

6    against any law enforcement members?

7         JUROR 295:  No, ma'am.

8         MS. KAISER:  Do you feel like your brother was

9    treated fairly?

10        JUROR 295:  Yes.

11        MS. KAISER:  Okay.  Anyone else?  Anyone?  Is

12   there anyone who feels they would not put their

13   prejudice aside or any preconceived ideas they may

14   have aside in a child exploitation case?  Anyone?

15        JUROR:  (Inaudible).

16        COURT REPORTER:  Sorry?

17        THE COURT:  She asked if the question could be

18   repeated.

19        MS. KAISER:  Yes.  Is there anyone here who

20   feels that they couldn't put their -- any

21   preconceived ideas that they have aside and be fair

22   and impartial in a child exploitation case?

23        MR. TRAGOS:  Your Honor, I think she answered

24   the question but she didn't have a microphone.

25        THE COURT:  Yes.  This is Ms. Vazquez.  She

1    raised her hand and nodded yes.

2         MS. KAISER:  Anyone aside from Ms. Vazquez?  I

3    believe we've already -- anyone else?  Anyone else?

4    Mr. Austin, how about you?

5         JUROR 332:  No.  Because this particular case

6    doesn't -- doesn't apply to the problems that I

7    have.

8         MS. KAISER:  Okay.

9         THE COURT:  Can you hear that, Linda?

10         COURT REPORTER:  Yes, Judge.  Thank you.

11         THE COURT:  All right.  Thank you.

12         MS. KAISER:  Okay.  Sometimes in the course of

13    investigating criminal activity, law enforcement

14    officers have to act in an undercover capacity.  Is

15    there anyone here that feels that it's unfair for

16    law enforcement to act in an undercover capacity?

17    Does everyone know what I mean when I say that,

18    undercover capacity?  That they pretend to be

19    someone that they're not?  Does anyone think that

20    that's unfair?  Anyone?

21         In investigating child exploitation and child

22    enticement cases, law enforcement officers often

23    pose as bad parents who would share their children

24    for sex, in an undercover capacity on the internet,

25    in order to identify child molesters or pedophiles

1       or people who pose dangers to children.

2              Does anyone feel that the use of an undercover

3       officer posing as a bad parent is unfair, is

4       fundamentally unfair?  Does anyone have any

5       preconceived ideas about whether or not that would

6       lead you not to be fair and impartial in this case?

7       Anyone?

8              Does anybody feel that it's unfair for law

9       enforcement acting in an undercover capacity to

10      provide a setting or conditions for a defendant to

11      act out a -- act out criminal interests?  Anyone?

12      All right.

13             Does any member of the jury panel have any

14      strong feelings or opinions concerning the United

15      States Government either for or against?  Anyone?

16      Anyone?  Mr. Austin, nothing?

17             JUROR 332:  (Witness moves head from side to

18      side.)

19             MS. KAISER:  Or more specifically, does anyone

20      have any strong feelings about immigration and

21      customs enforcement as an agency?  Does anybody have

22      any strong feelings one way or the other about

23      immigration and customs enforcement?  Anyone?

24             Okay.  Do any among you have a conscientious

25      objection to sitting in judgment of anybody else?

1      Some people for religious reasons or personal

2      reasons sometimes don't want to judge other people,

3      and that's something we need to know.  Does

4      anyone -- does anyone feel that way?  Does anyone

5      have a conscientious objection to sitting in

6      judgment of another person?  Anyone?  Anyone?

7           Okay.  Is there anybody that feels that they

8      would be unable to follow the court's instructions

9      in reaching a verdict in this case that you cannot

10     be influenced in any way by either sympathy or

11     prejudice for or against either the defendant or the

12     United States?  Anyone?

13          Okay.  Thank you.  That's all the questions I

14     have, Your Honor.  Thank you.

15          THE COURT:  Mr. Tragos?

16          MR. TRAGOS:  May it please the Court.  Good

17     morning.

18          (JUROR PANEL IN UNISON:)  Good morning.

19          MR. TRAGOS:  I'm going to ask you some

20     questions, and after a while you'll start to realize

21     that these questions have something to do with

22     understanding who you are, because it's very

23     important which is why we're here selecting a jury.

24     You may be good for one jury but not good for

25     another kind of jury.  And it goes back and forth.

1          So in this particular case, we're looking for

2     jurors that would be fair and impartial as to this

3     case with the kind of charge we're talking about.

4     Let me start out by asking, does anybody have any

5     bumper stickers on their car?  Okay.  Ms. Perez, I'm

6     sorry.  You don't have a microphone.

7          JUROR 277:  Yes.

8          MR. TRAGOS:  And what kind of a bumper sticker

9     do you have?

10         JUROR 277:  It just says that my child was

11    like an honor student at her elementary school.

12         MR. TRAGOS:  Okay.  Anyone else have bumper

13    stickers?  Ms. Woolley?

14         JUROR 304:  I have a Rays and a Bulls bumper

15    sticker on my car.

16         MR. TRAGOS:  Okay.  Anyone else?

17         JUROR 406:  A Rutgers' alumni sticker and a

18    2008 national championship Florida Gator football

19    bumper sticker.

20         THE COURT:  Hold on.  The mic just went out.

21         COURT REPORTER:  Mr. Tragos, you need to

22    repeat what you just said.

23         MR. TRAGOS:  What I just said?  I said, yes,

24    we'll hold that against you.

25         THE COURT:  We have a hand back in the back,

1        Mr. Tragos.

2              MR. TRAGOS:  I'm not going to try to do it --

3        I'm sorry, Your Honor.  Okay.  Back here, bumper

4        stickers?

5              JUROR 432:  Just my son's university.

6              MR. TRAGOS:  What is that?

7              JUROR 432:  Clemson.

8              MR. TRAGOS:  It's Ms. Mishmer (ph); right?

9              JUROR 432:  Machmer.

10             MR. TRAGOS:  Machmer?

11             JUROR 432:  Um-hum.

12             MR. TRAGOS:  Anybody have any vanity tags?

13       Oh, I'm sorry.  I think I see -- I see somebody over

14       here.

15             JUROR 295:  Yes, sir, I have a bumper sticker

16       on my car.

17             MR. TRAGOS:  Excuse me?

18             JUROR 295:  Yes.  I do have a bumper sticker.

19             MR. TRAGOS:  What does it say?

20             JUROR 295:  Look twice, save a life,

21       motorcycles are everywhere.

22             MR. TRAGOS:  Do you ride motorcycles?

23             JUROR 295:  Yes, I do.

24             MR. TRAGOS:  All right.  Does anybody have any

25       vanity plates that say, you know, Florida Gators or,

1    better yet, Florida State, national champions or

2    things, you know, such as that?  Let me start since

3    the mic's back here.

4         JUROR:  I just have a Bucs tag.

5         MR. TRAGOS:  Bucs?

6         JUROR:  Yeah.

7         MR. TRAGOS:  Okay.  Down at the end.

8         JUROR:  University of Florida, of course.

9         MR. TRAGOS:  Okay.  Anyone else?

10        JUROR:  Chicago Cubs.

11        MR. TRAGOS:  Okay.  For the record, we do

12   need, sorry, to say your names so --

13        JUROR 427:  Reinalda Flores.

14        MR. TRAGOS:  Okay.  And what did you say it

15   was, Chicago Cubs?

16        JUROR 427:  Yes.

17        MR. TRAGOS:  Cubbies fan?

18        JUROR 427:  Yes.

19        MR. TRAGOS:  Okay.  Anybody else on this side?

20        JUROR 442:  I have two.  I have one on the

21   front that says Florida State and the back is Duke

22   University.

23        MR. TRAGOS:  FSU and Duke?

24        JUROR 442:  Yes, sir.  My name is Robert Beck.

25        MR. TRAGOS:  Okay.

 1            JUROR 373:  I don't have bumper stickers, but

 2    I do have a decal and a permanent thing that's

 3    marked that's on the car, stuck on.  One is a

 4    Christian symbol for a fish, and the other is a

 5    gator head.

 6            MR. TRAGOS:  Okay.  Inconsistent.  Okay.

 7    That's Ms. Morris; correct?

 8            JUROR 373:  Yes, sir.

 9            MR. TRAGOS:  Okay.

10            THE COURT:  Remember that what the lawyers say

11    is not evidence.

12            MR. TRAGOS:  Anyone else?  Oh, over here.

13    Okay.

14            JUROR 266:  I just have one that says Mote

15    Marine on it.

16            MR. TRAGOS:  Okay.  That's Ms. Walsh, correct?

17            JUROR 266:  Yes, I'm sorry.

18            MR. TRAGOS:  Okay.  What did you say,

19    wolver --

20            JUROR 266:  Mote Marine.

21            MR. TRAGOS:  Mole?

22            JUROR 266:  Mote Marine.

23            MR. TRAGOS:  Oh, okay.  Mote Marine.  Okay.  I

24    thought you said wolverine.

25            JUROR 406:  Edward Mendez, 2008 national

1      championships, Florida Gators.

2           MR. TRAGOS:  Okay.  Have you got anything else

3      besides Florida Gators on your car?

4           JUROR 406:  No.

5           MR. TRAGOS:  Okay.

6           JUROR 406:  The Rutgers' alumni sticker.

7      That's about it.

8           MR. TRAGOS:  Okay.  Next?  I'm sorry, ma'am.

9           JUROR 412:  Mary Thompson.  My car is hemi and

10     running with the big dogs.

11          MR. TRAGOS:  All right.  I know that we asked

12     a lot of children's ages, but some of you indicated

13     you had grandchildren.  And if you could, we'll

14     start here in the jury box.  If you have

15     grandchildren, could you tell me how old they are.

16     Okay.  We'll start with you, Ms. Thompson.  You're

17     shaking your head.

18          JUROR 412:  All of them?

19          MR. TRAGOS:  Excuse me?

20          JUROR 412:  All of them?

21          MR. TRAGOS:  How about give me the range.

22     Start with youngest and go to the oldest.

23          JUROR 412:  Okay.  The youngest is eight

24     months and the oldest is 27.

25          MR. TRAGOS:  How many do you have?

1          JUROR 412:  I have 15 grand and seven great

2     grand.

3          MR. TRAGOS:  Okay.  Excellent.  Anybody else

4     here with grandchildren?

5          JUROR 331:  Bonnie Pedersen.  And we have one

6     grandchild.  He's nine.

7          MR. TRAGOS:  Okay.  Okay.  Moving down.

8     Ms. Harris?

9          JUROR 343:  I have three.  The oldest is 12

10    and the youngest is four.

11         MR. TRAGOS:  Okay.  Anyone else in the box?

12    Second row.

13         JUROR 415:  Ramona Vazquez.  I have

14    three-year-old twin girls and an 18-year-old boy.

15         MR. TRAGOS:  Okay.

16         JUROR 303:  Dalila Coats, and he's five years

17    old.

18         MR. TRAGOS:  Okay.  Ms. Scanlan?

19         JUROR 417:  I have seven grandchildren.  They

20    range from two years old to 10.

21         MR. TRAGOS:  Okay.  Anyone else in the box?

22    Okay.  Going back here and we'll start with the left

23    side.  Grandchildren.  Okay.  Mr. Austin?

24         JUROR 332:  Yeah.  I have five.  And the

25    youngest is nine months and the oldest is 12.

1          MR. TRAGOS:  Okay.  Anyone else in that first

2      row?

3          JUROR:  I have two and a half, and one of

4      them -- both of them are two years old.

5          MR. TRAGOS:  Okay.  Anyone else?  I think

6      Ms. Morris wants it.

7          JUROR 373:  I'm Ms. Morris.  And I have 12

8      grandchildren from 27 to 11, and three great

9      grandchildren, four, two and six weeks.

10         MR. TRAGOS:  Okay.  Next row?  Anybody back

11     there, grandchildren?  No.  Okay.  Okay.  This first

12     row?

13         JUROR 276:  Win Lindeman.  I have two; a

14     grandson nine and a granddaughter six.

15         MR. TRAGOS:  Okay.  Okay.  Mr. Austin, when

16     the judge said the charge that, you know, it

17     involved soliciting a minor for sex, most everybody

18     had a poker face except for you and Ms. Vazquez.  As

19     we were watching you, you kind of reacted to it.

20     Why did you have that kind of reaction to it?

21         JUROR 332:  Well, they turn out to be -- those

22     type of cases, they turn out to be incredibly

23     complex.  And 99 percent of the time, you know, it's

24     very difficult to deal with any facts.  It's --

25     there's so much supposition, so much

1    he-said-she-said, what someone did or didn't type on

2    a computer.

3         It's so -- it's such a difficult case that it

4    just -- you know, the very minute you mentioned it,

5    it elicits the idea of a conundrum right from the

6    very beginning.  And, you know, I just -- it's not

7    something anybody really wants to deal with.

8         MR. TRAGOS:  Okay.  Mr. Saice, pass that back

9    to Mr. Saice, please.  Mr. Saice, you -- and I'm not

10   really sure what you do although I know it's highly

11   technical, but you work for an ISP; correct?

12        JUROR 388:  Yeah.  I work for Brighthouse

13   Networks, actually.

14        MR. TRAGOS:  Okay.  You work for my ISP.

15        JUROR 388:  And I take -- I take escalations

16   for technical issues and customer service problems.

17        MR. TRAGOS:  So if I call up and I have a

18   problem and the first guy I talk to can't handle the

19   problem and the second guy I talk to can't handle

20   the problem, when does it get to you?

21        JUROR 388:  I'm pretty much the last thing

22   before you go to upper management.

23        MR. TRAGOS:  Okay.

24        JUROR 388:  I'm the last line in the technical

25   department.  And I primarily deal with high speed

1    internet, but I also deal with phone and cable.  But

2    the bulk of my stuff is high speed internet issues.

3         MR. TRAGOS:  Okay.  How long have you worked

4    for them?

5         JUROR 388:  I've been with them seven -- well,

6    it will be seven years in November.

7         MR. TRAGOS:  Okay.  And where did you work

8    before that?

9         JUROR 388:  Before that I was a contractor.  I

10   worked for IT departments and it was right after

11   the --

12        COURT REPORTER:  I'm sorry.  You need to slow

13   down.

14        JUROR 388:  I'm sorry.  After the September

15   11th kind of crash of the IT industry around here is

16   when I wound up going over to Brighthouse and its

17   technical support.

18        MR. TRAGOS:  Okay.

19        JUROR 388:  But before that I worked about

20   six, seven years in the IT industry as like

21   assistant admin and as a -- as a disaster recovery

22   specialist.

23        MR. TRAGOS:  Okay.  Did you ever have occasion

24   during any of your employment in this field to

25   monitor any kind of chat rooms or any kind of

1    instant message that goes on?

2         JUROR 388:  Not in my current capacity.  Back

3    when I was doing IT work, we would routinely log

4    employee data and keep it on file, so --

5         MR. TRAGOS:  Okay.  I'm not sure I understand.

6    Log employee data, what does that mean?

7         JUROR 388:  When you work on servers and the

8    such, any type of interoffice or outer-office

9    communication via like AIM or chat programs and the

10   such, a lot of that goes through a filter and gets

11   logged.  Those logs are typically stored for

12   whatever reasons.  Some companies choose to keep

13   those kind of logs and some companies choose to

14   purge those kind of logs.

15        MR. TRAGOS:  Okay.  Magazine subscriptions,

16   anybody here subscribe to a magazine?  Okay.  We're

17   going to start in the box.  Well, actually, where is

18   the microphone?  We'll start back here.

19        JUROR 388:  Yeah.  I subscribe to Popular

20   Mechanics, Popular Science, National Geographic

21   primarily.  And then I usually just pick up at the

22   newsstands computer magazines.

23        MR. TRAGOS:  Okay.  What's a good computer

24   magazine?

25        JUROR 388:  PC World is actually really good.

1            MR. TRAGOS:  Good.

2            JUROR 388:  It has a lot of the more up to

3    date stuff in it.  Other than that, 114 stick with

4    EGM, Electronic Gaming Monthly because it's a cross

5    platform type gaming magazine.

6            MR. TRAGOS:  Okay.  Anybody else back here

7    subscribe to any magazines.  Okay.  Right next to

8    you, sir.  Ms. Scott?

9            JUROR 310:  Jennifer Scott.  Prevention,

10   Family Circle, Today's Christian Woman.  I think

11   that's it.

12           MR. TRAGOS:  Okay.  Ms. --

13           JUROR 257:  Joann Frieler-Baker.

14           MR. TRAGOS:  Right.

15           JUROR 257:  I have a long list.  We're in -- I

16   mean, mine personally is Reader's Digest, Better

17   Homes and Gardens, Lucky, Self.  I have -- the kids

18   have Nickelodeon, Car and Driver, American Girl.

19           MR. TRAGOS:  Okay.  I --

20           JUROR 257:  We had a fundraiser for school

21   magazines and I just bought them all.  What can I

22   tell you.  I'm probably missing out a few, but just

23   sum it up, you know.

24           MR. TRAGOS:  Okay.  I get the picture.

25           JUROR 257:  Okay.

1          MR. TRAGOS:  Anyone else?  Okay.  Right in

2     front of you.  Just hand it to Ms. Shelley.

3          JUROR 352:  Yes.  My name is Rachel Shelley.

4     Mostly educational magazines.  Principal Leadership,

5     Ed Week, those types of things.

6          MR. TRAGOS:  Okay.  Anyone else in this group

7     here?  Pass the mic down, please.

8          JUROR 373:  Ms. Morris.  I get Prevention

9     Magazine.

10         MR. TRAGOS:  Okay.

11         JUROR 442:  Robert Beck.  Excuse me, Robert

12    Beck.  I get Sports Illustrated, ESPN the Magazine

13    and Nick Junior Magazine.

14         MR. TRAGOS:  What was the last one?

15         JUROR 442:  Nick -- Nickelodeon Junior.

16         MR. TRAGOS:  Okay.  Thanks.

17         JUROR 395:  Ernie Lisi.  The Nation, New York

18    Review of Books and Prevention, also.

19         MR. TRAGOS:  Okay.  Mr. Austin?  Right behind

20    you there.

21         JUROR 350:  Greg Laney.  Motor Trend,

22    Restaurant, Technologies and -- I can't remember my

23    third one -- oh, Popular Mechanics.

24         MR. TRAGOS:  Okay.  Anybody else in this group

25    over here?  We have one other lady if you just --

1        oh, I'm sorry.  She skipped you.  Go ahead.

2               JUROR 432:  You want me to go?

3               MR. TRAGOS:  Yes.  Go ahead.

4               JUROR 432:  Nancy Machmer, National

5        Geographic, Tennis and Runners.

6               MR. TRAGOS:  Okay.  Ms. Kelley; correct?

7               JUROR 260:  Pacific.

8               MR. TRAGOS:  Pacific.  I'm sorry.

9               JUROR 260:  Several photography magazines and

10       technical courtesy subscriptions to technology.

11              MR. TRAGOS:  Okay.  I got everybody here?

12       Okay.  Over in this row.

13              JUROR 333:  Debora Bickel.  I get CMA, which

14       is Certified Medical Assistant Magazine and also

15       Tampa Bay Magazine.

16              MR. TRAGOS:  Okay.

17              JUROR 295:  Michele Brookins.  I subscribe to

18       Game Informer and also to Wing World Magazine, which

19       is a motorcycle magazine.

20              MR. TRAGOS:  Okay.  Now we'll go to the box.

21              JUROR 266:  I have a subscription to J-14 for

22       my little sister.

23              MR. TRAGOS:  Okay.  Ms. Walsh?

24              JUROR 266:  Yes.

25              MR. TRAGOS:  J --

1          JUROR 266:  J-14.

2          MR. TRAGOS:  What is that?

3          JUROR 266:  It's like a teenager magazine.

4          MR. TRAGOS:  Okay.  Anybody else here in the

5     first row?  Okay.  Ms. Woolley?

6          JUROR 304:  Yes.  ESPN the Magazine, Sports

7     Illustrated and Fine Cooking.

8          MR. TRAGOS:  Okay.  Second row?

9          JUROR 286:  My wife gets probably 10 different

10    subscriptions.  They're all women's magazines.

11         MR. TRAGOS:  You don't read them?

12         JUROR 286:  No.  I just pay for them and see

13    the covers.

14         MR. TRAGOS:  Okay.  Mr. Taylor, thank you.

15         JUROR 286:  Self, Us, you know, all the -- My

16    daughter gets Teen Vogue, my son gets Scouting and

17    Boys Life and I get National Geographic.

18         JUROR 312:  Mary Hawkins.  I have Southern

19    Living, Harper's Bizarre, Vogue, In Style and Food

20    Every Day.

21         MR. TRAGOS:  Okay.  Ms. Vazquez?

22         JUROR 415:  Ramona Vazquez.  I get Conde Nast,

23    Budget Travel, National Geographic and Prevention.

24         MR. TRAGOS:  Okay.

25         JUROR 402:  Ryan Dorey.  I get American Hunter

```
 1    and America Rifleman.

 2         MR. TRAGOS:  Anyone else in that row?  Okay.

 3    Now, this case involves, as we've told you many

 4    times, the sexual solicitation on the internet of a

 5    minor.  And you're going to hear things that are

 6    said, things that are different than your normal

 7    conversation, things that deal with sadomasochism,

 8    those kind of conversations.

 9         Those kind of thoughts, sadomasochistic

10    thoughts, some people believe that even thinking

11    about those things, that those people should be

12    arrested and locked up, the kind of people that even

13    think about whipping and that kind of stuff.

14         Does anyone here feel like as a matter of

15    prevention that we should arrest people just for

16    having -- just for saying those kinds of things, to

17    do those kinds of things, let's say, to children?

18    Anybody think that way?  You shouldn't be able to do

19    that?  Mr. Taylor, you have a 15 and an 18-year-old;

20    correct?

21         JUROR 286:  Yes, sir.

22         MR. TRAGOS:  And as a parent, you're, I'm

23    sure, very protective of them.

24         JUROR 286:  Yes.

25         MR. TRAGOS:  What do you think about being
```

1    able -- people that are on the internet converse

2    about whipping and sexually molesting children?  I

3    mean, should they be locked up?

4         JUROR 286:  Not on the internet.  I see the

5    internet as a, you know, open source.  And you go

6    there where you choose to go there.

7         MR. TRAGOS:  Now, you're an IT person; right?

8         JUROR 286:  Yes.

9         MR. TRAGOS:  And you say you view the internet

10   as an open source.  Is it kind of a Wild West kind

11   of place?

12        JUROR 286:  It probably used to be.  I think

13   it's getting a little more under control, but pretty

14   much.  I think you can find just about anything out

15   there.

16        MR. TRAGOS:  And talk just about anything?

17        JUROR 286:  Yes.

18        MR. TRAGOS:  Find people willing to talk to

19   you?

20        JUROR 286:  I'm sure.

21        MR. TRAGOS:  Okay.  Ms. Coats?

22        JUROR 303:  Yes, sir.

23        MR. TRAGOS:  Ms. Coats, you have a

24   13-year-old?

25        JUROR:  Yes.

1         MR. TRAGOS:  And let me ask this question.

2    How many people here subscribe to AOL?  Two, three,

3    anybody else?  Three people.  Okay.  How many people

4    here subscribe or how many people here have never

5    ever been in a chat room?  Okay.  Ms. Harris.

6         JUROR 343:  Yes.

7         MR. TRAGOS:  You've never been in a chat room?

8         JUROR 343:  No, sir.

9         MR. TRAGOS:  Why?

10        THE COURT:  Who's got the mic?  Let's pass it

11   down, please.

12        MR. TRAGOS:  Oh, I'm sorry.  Why?

13        JUROR 343:  To be honest with you, I just

14   don't really go on the internet and do a whole bunch

15   of that kind of stuff.  I check my e-mail on my

16   Yahoo account and that's about it.

17        MR. TRAGOS:  Okay.  How many people here have

18   never been in a chat room or done any instant

19   messaging?  Okay.  Let me start with the box here.

20   Okay.  And Ms. Harris, we talked to you and you gave

21   us your reason.  Mr. Mendez?

22        JUROR 406:  Yes, sir.

23        MR. TRAGOS:  Tell me why you've never been in

24   a chat room or done an instant message.

25        JUROR 406:  Well, first, I never had a

1    computer until probably about three or four years

2    ago.  And I just have never had a desire or any need

3    to -- to involve myself with that.  I mean, I check

4    my e-mail.  The only thing I do is look at ESPN.com,

5    see the football scores, baseball scores, stuff like

6    that.

7        MR. TRAGOS:  Ms. Walsh, did you raise your

8    hand?

9        JUROR 266:  I have used --

10       MR. TRAGOS:  Oh, you have?  Okay.  Anybody

11   else in this first row who has never chatted or done

12   instant messaging?

13       JUROR 412:  Mary Thompson.  I don't use the

14   computer.  My husband does it all.

15       MR. TRAGOS:  Okay.  Ms. Pedersen, did you

16   raise your hand?

17       JUROR 331:  I did.  I just never had the

18   occasion to use a chat room or thought about it.

19   Instant text messages I sort of associate with a

20   cell phone, and I don't have one.

21       MR. TRAGOS:  Okay.  Ms. Woolley, did you raise

22   your hand?

23       JUROR 304:  Yes, I did.  Personally in my

24   profession I try to avoid conversations like that,

25   being a teacher and just as a professional guard of

1   anything that could be said.  I don't text message,

2   I don't do instant messaging.  And I just kind of

3   say if I'm going to talk to them, I'd rather talk to

4   them.

5        MR. TRAGOS:  Okay.  Of the people -- talking

6   to these people, how many people view these chat

7   rooms as just evil places, they're just bad places,

8   nothing good happens there, I don't want to go

9   there?  Does anybody just view them that way?

10  Nobody thinks of them as just evil places?  Okay.

11       How many people here read mystery fiction?

12  Okay.  Ms. Pedersen, what's your favorite kind?

13  Right here, right there.

14       JUROR 331:  What was my favorite what?

15       MR. TRAGOS:  Mystery fiction.  What's your

16  favorite type, murder mysteries?

17       JUROR 331:  Oh, no.  I go for the lawyer ones.

18       MR. TRAGOS:  Go for the lawyer ones.  Okay.

19  And so -- all right.  Interesting genre.  But yes.

20  So you like lawyer, courtroom things, things such as

21  that?

22       JUROR 331:  Um-hum.

23       MR. TRAGOS:  Okay.  Anyone else in the first

24  row that reads mystery fiction?  Second row?

25       JUROR:  Mostly fiction like Jurassic Park and

1      Lost in Space, that kind of stuff.

2           MR. TRAGOS:  Sci-fi kind of stuff?

3           JUROR:  Yeah, kind of.  Yes, sir.

4           MR. TRAGOS:  All right.  Anyone else?  Next

5      row?  Pass that back.

6           JUROR 277:  Araceli Perez.  I like the kind of

7      fiction books like the Twilight Books, the series,

8      that kind of stuff, you know.

9           MR. TRAGOS:  Okay.  Anybody else in that row?

10     Pass it down -- back down to Ms. Pedersen, please.

11     I'm going to come back here in a minute on that.

12     Ms. Pedersen, you like the lawyer fiction kind of

13     books; right?

14          JUROR 331:  (Witness moves head up and down.)

15          MR. TRAGOS:  Scott Turow?

16          JUROR 331:  Yes.  I've read him.

17          MR. TRAGOS:  Okay.  Now, he was a lawyer.

18          JUROR 331:  Yeah.

19          MR. TRAGOS:  Right?  And who else?  What other

20     authors do you like?

21          JUROR 331:  Well, I did read John Grisham for

22     a while, but he turned out to be sort of a formula

23     and it was always the same.

24          MR. TRAGOS:  Okay.  Did you like Scott Turow?

25          JUROR 331:  Yes, I did, although it's been a

1   while since I read anything that he wrote.

2       MR. TRAGOS:  Okay.  Do you think those people,

3   when they write those things, have to do some

4   personal experience?  You know, they've got to go to

5   a courtroom or know a courtroom or those kind of

6   things, or do you think they can just sit in their

7   room and make up that stuff?

8       JUROR 331:  I don't think that as attorneys

9   they can turn that off if they're trying to write

10  something that's part of their life experiences.

11  And as attorneys, they're probably already in a

12  courtroom, so that would not be a new experience.

13      MR. TRAGOS:  I guess what I'm asking, most

14  authors write what they write and -- like, for

15  instance, a murder -- well, anybody back here in

16  this group?  I've got that -- this group back here,

17  who does mysteries?  Who reads those mystery

18  fictions?  Got two, three over here.  That's why our

19  bailiffs stay so thin.  Okay.  Who's got the mic?

20  Okay.  Ms. Kelley.  Okay.  Ms. Kelley, what kind do

21  you like?

22      JUROR 426:  James Patterson.

23      MR. TRAGOS:  Okay.  And what does he write?

24  I'm -- I've not seen the names.  My daughter reads

25  them.

1          JUROR 426:  Detectives.

2          MR. TRAGOS:  Okay.  Detective type murders?

3     Do you think Mr. Patterson has to commit a murder in

4     order to write about them?

5          JUROR 426:  No.  I think he's more like a

6     detective type person.

7          MR. TRAGOS:  Okay.  And he's able to tell you

8     about guns or give you some -- you know, do you

9     think that in order to tell you about a gun he had

10    to actually hold a gun?

11         JUROR 426:  Probably eventually he has, I'm

12    sure.

13         MR. TRAGOS:  Okay.  And do you try to solve

14    them before the book ends?

15         JUROR 426:  Not really.  I just kind of read

16    them and see who did it.

17         MR. TRAGOS:  Okay.  Ms. Kelley, let me ask you

18    as long as you've got the microphone.  You have a

19    medical procedure that's coming up.  One of the

20    things that's really important, and everybody really

21    needs to hear this, is your focus has to be here and

22    nowhere else when you're here, because what you're

23    doing is life-changing for Dr. Charles Friedlander.

24    And your verdict is life-changing.  So you've got to

25    really only have your mind here and concentrating on

1      what's said from the witness stand and the evidence.

2              If you have something that could be medical,

3      it could be personal, it could be something at home,

4      if you have something that is distracting you,

5      something that would take your mind off of what's

6      happening here, you need to tell us about that,

7      because we want only to have people that have a

8      hundred percent of their attention here.

9              So after saying that, Ms. Kelley, regardless

10     of maybe you do or don't have an appointment, is the

11     fact that this is happening in your life, do you

12     think that will draw your attention away from the

13     trial that would be happening this week?

14             JUROR 426:  Only until I find out what's

15     really going on and everything, you know.  I don't

16     know how to answer that.

17             MR. TRAGOS:  Okay.  Well, like, for instance,

18     it would take -- let's say things are happening on

19     Friday but you're going to be here -- let's say

20     you're here tomorrow.  Would you be thinking about

21     Friday and would it be concerning you so that maybe,

22     you know, your mind might wander once in a while?

23             JUROR:   (Witness moves head up and down.)

24             MR. TRAGOS:  Excuse me?

25             JUROR 426:  Yes, sir.

1       MR. TRAGOS:  Okay.  I appreciate your being

2    honest because that's the only -- anyone else have a

3    situation like that, where they think that they'll

4    be thinking about something else?  And I'm also

5    including for those of you that have children, this

6    case, as you know, involves children.  Is your --

7    the fact that you have children, is your mind going

8    to be wandering, putting your children in place of

9    these children or thinking I've got to protect my

10   children, that's what I've got to do here, as

11   opposed to just listening to the evidence in this

12   case and determining whether or not someone is

13   guilty or innocent?

14       And that's an important factor.  You've got to

15   be able to leave that stuff behind when you come in

16   here.  So does anyone think that the fact that they

17   have something else on the outside that may distract

18   them or may influence them in some way in the

19   verdict that they might make, you need to tell me

20   about that.  You need to tell us about it.  Anybody

21   in the box think that way?  Ms. Vazquez, you've

22   spoken up before.  Thank you.  Anyone?

23       JUROR:  (Inaudible.)

24       MR. TRAGOS:  Hold on.  I'll be right back to

25   you.  The mic's back here, though, so I'm trying to

1     save him some calories.  Anybody back here think

2     that there may be something in their personal life

3     that may distract them from doing this?  Okay.  Pass

4     the microphone here to Ms. Machmer, is that right?

5     I'll get it right.

6          JUROR 432:  That's okay.  It doesn't matter.

7     I have a 17-year-old daughter that I take to school

8     and pick up every single day.  And I very rarely

9     miss any of the functions because I guess I'm just

10    overprotective.  But I've always from the day both

11    my children were born, I stayed totally focused and

12    involved in what they're doing.

13         MR. TRAGOS:  And --

14         JUROR 432:  I don't know that that would

15    really distract me from --

16         MR. TRAGOS:  Well, that's what I'm asking.

17    That's not -- I mean, there's nothing wrong with --

18    with being involved in everything your child is

19    doing.  What I'm saying to you is that if you hear

20    evidence today and they talk about, let's say,

21    little girls, is that fact -- is the fact that

22    you've got a little girl that you're so

23    overprotective about, is that going to have an

24    influence on what you think about here?

25         JUROR 432:  Well, I would hope not.

1          MR. TRAGOS:  Well --

2          JUROR 432:  Well, something --

3          MR. TRAGOS:  Do you have a doubt?  Do you have

4     a doubt?

5          JUROR 432:  No.

6          MR. TRAGOS:  I'm sorry.  I didn't get that.

7          JUROR 432:  Until something, you know, more

8     went into it and I -- I mean, how would you really

9     know?  If you're overprotective of -- any of us who

10    have children and they -- you know, you're worried

11    about what goes on outside of schools and in

12    communities and stuff, I think we'd all be a little

13    bit doubtful and worried about what could happen to

14    them.  Otherwise, I don't know -- I don't know what

15    to say.

16         MR. TRAGOS:  Okay.  I'm just talking about

17    you, individually you.

18         JUROR 432:  Okay.

19         MR. TRAGOS:  Do you have a doubt as to whether

20    or not you would be able to be a fair and impartial

21    juror if you heard that this case involved someone

22    soliciting a child over the internet for sex or for

23    whippings and beatings?

24         JUROR 432:  I really can't answer that.  I

25    don't -- I would hope I would be fair.

1        MR. TRAGOS:  But you don't know, you have a

2   doubt?

3        JUROR 432:  Well, maybe a little bit, a little

4   bit of doubt.

5        MR. TRAGOS:  Okay.  Anyone else think that

6   way?  Ms. Shelley.

7        JUROR 352:  As the principal of my school,

8   I've had an opportunity to participate in many

9   trainings and workshops pertaining to

10  this particular topic.  I am not sure how it's going

11  to impact me during this proceedings.  I would be

12  totally honest with you and say afterwards I'm sure

13  it will have an impact on me and what I share with

14  my staff and students.

15       MR. TRAGOS:  Okay.  I'm not sure that -- it's

16  not clear to me whether you're saying that these

17  workshops and these things that you have

18  participated in outside of this courtroom would

19  have -- could have an impact on your decision-making

20  here in this courtroom.

21       JUROR 352:  I don't believe that it would.

22  But I wanted to be honest and share with you that I

23  have had an opportunity to participate in various

24  workshops pertaining to this particular topic.

25       MR. TRAGOS:  Okay.  So you have a -- you have

1    a concern at this point?

2         JUROR 352:  I don't have a concern.  But what

3    you asked was whether or not it could have an impact

4    on us.  And that's just what I'm sharing with you.

5         MR. TRAGOS:  So this could have an impact on

6    you?

7         JUROR 352:  It could.  Absolutely it could.

8    It may not, but it could.  And I just wanted to be

9    honest and state that upfront.

10        MR. TRAGOS:  Okay.  Well, Ms. Shelley, you're

11   a principal of a middle school?

12        JUROR 352:  That is correct.  Yes.

13        MR. TRAGOS:  And one of the things that you --

14   that you're charged with doing is that if you should

15   become aware of any kind of abuse, that it's your

16   responsibility by law to report that abuse.

17        JUROR 352:  Yes.  I am a mandated reporter.

18   Yes.

19        MR. TRAGOS:  Okay.  And as a mandated

20   reporter, you don't necessarily have to judge things

21   beyond a reasonable doubt.

22        JUROR 352:  Absolutely you're correct.  Yes.

23        MR. TRAGOS:  Here today, it's beyond a

24   reasonable doubt.

25        JUROR 352:  Um-hum.

1        MR. TRAGOS:  The heaviest burden there is in

2    the law.

3        JUROR 352:  Um-hum.

4        MR. TRAGOS:  I mean, there's no heavier burden

5    on the state than -- on the government than what

6    we've got here.  Do you think that you're going to

7    be able to switch hats from being a -- from what you

8    have to do as a mandated reporter to judging beyond

9    a reasonable doubt?

10       JUROR 352:  Yes, I can.

11       MR. TRAGOS:  Do you think you're feeling --

12   and I'm sure you have it and we all hope you have it

13   as a principal of a middle school, of the need to

14   protect our children.  Do you think that if you

15   think -- let's say you think Dr. Friedlander

16   probably solicited a child for sex.

17       JUROR 352:  Okay.

18       MR. TRAGOS:  But it wasn't beyond a reasonable

19   doubt, could you still find him not guilty even

20   though you think he probably did it?

21       JUROR 352:  I'm sure I can.  Yes.

22       MR. TRAGOS:  Okay.  Let me ask you -- again,

23   we've got the mic back here for a while.  Anybody

24   back here think that they couldn't or they would

25   find it very difficult but they couldn't find

```
1    someone not guilty if they thought they probably

2    solicited a child over the internet?  Could still

3    find him not guilty even though you think he

4    probably did it?  Everybody think they could still

5    find him not guilty?  Some people aren't shaking

6    their heads, some people -- raise your hand if you

7    have a doubt about that, if it troubles you.  Okay.

8    And Ms. Scott.

9         JUROR 310:  Yes.  I'm a mom.

10        MR. TRAGOS:  Okay.  So you think that if you

11   think he probably did it, that you would have a

12   tough time freeing him, finding him not guilty?

13        JUROR 310:  I would have a tough time.  I

14   think I could do it, but it would weigh on me.

15        MR. TRAGOS:  Well, do you have a doubt as to

16   whether or not you could do it?

17        JUROR 310:  I don't have a doubt.  I don't

18   have a doubt, but it would weigh on me.

19        MR. TRAGOS:  Okay.  Well, you have a 10 and an

20   13-year-old; correct?

21        JUROR 310:  Yes.

22        MR. TRAGOS:  That's going to be right around

23   the ages of the allegations in this case.  So does

24   that change your mind any?  The allegations are

25   right there at those ages.
```

```
1              JUROR 310:  I -- I would try -- no, I would.

2       No, it doesn't change my mind.  I would be able to

3       be fair and honest and I could do it.  But like I

4       said, it would -- it would weigh.

5              MR. TRAGOS:  You don't think you would picture

6       your children in the place of the children that

7       they're going to be talking about?

8              JUROR 310:  I may, but I do believe I can be

9       fair.

10             MR. TRAGOS:  Okay.

11             JUROR 310:  And I believe I could make a

12      decision based on the law.

13             MR. TRAGOS:  Okay.  Mr. Perez, you -- excuse

14      my back, also.  But you have a bunch of friends that

15      are police officers.

16             JUROR 253:  Relatives.

17             MR. TRAGOS:  Relatives.  Okay.  What -- where

18      are they located?

19             JUROR 253:  Pasco County, Manatee County.

20             MR. TRAGOS:  Okay.  And you say one of them

21      is -- does sexual predator stuff?

22             JUROR 253:  He was responsible for monitoring

23      predators that hadn't checked in.

24             MR. TRAGOS:  Okay.  The registration?

25             JUROR 253:  Exactly.
```

1          MR. TRAGOS:  Okay.  Mr. Lisi.  If you could

2     pass this down to Mr. Lisi.

3          JUROR 395:  Yes.

4          MR. TRAGOS:  Mr. Lisi, you talked about

5     training sessions.  What kind of training are you

6     talking about?

7          JUROR 395:  We do team building, interpersonal

8     communication, diversity awareness perception.

9          MR. TRAGOS:  Okay.  Okay.  Let's see.  Pass

10    the microphone over here, please.  Ms. Bickel.

11         JUROR 333:  Yes.

12         MR. TRAGOS:  You have a stepsister that's

13    where, the state attorney's office?

14         JUROR 333:  Yes.

15         MR. TRAGOS:  What's her name?

16         JUROR 333:  Debbie Coon.

17         MR. TRAGOS:  Okay.  And that's Pinellas

18    County?

19         JUROR 333:  Yes.

20         MR. TRAGOS:  And you have a brother that's

21    retired from the Clearwater Police Department?

22         JUROR 333:  Yes.

23         MR. TRAGOS:  What was his last name?

24         JUROR 333:  Greg Bickel.

25         MR. TRAGOS:  Okay.  Do you ever talk to him

1    about any of these cases?

2         JUROR 333:  Not -- no, not really.  No.

3         MR. TRAGOS:  Okay.  Okay.  Pass it to

4    Mr. Lindeman.  Mr. Lindeman, you've testified as an

5    expert.

6         JUROR 276:  Yes, sir.

7         MR. TRAGOS:  Okay.  And when you testify as an

8    expert, did you get any kind of training or anything

9    about testifying, how you testify, what you do,

10   those kind of things?

11        JUROR 276:  To some degree, yes.

12        MR. TRAGOS:  How did you receive that

13   training?

14        JUROR 276:  Through the attorneys that were

15   involved both at federal and state court.

16        MR. TRAGOS:  Okay.  And who do you testify

17   for, usually?

18        JUROR 276:  For the state.

19        MR. TRAGOS:  All right.  For the state?  Okay.

20   For the Department of Transportation?

21        JUROR 276:  That is correct.

22        MR. TRAGOS:  Did you ever testify for the

23   defense or the non-state people?

24        JUROR 276:  No, I never have.

25        MR. TRAGOS:  So one hundred percent of your

1          testimony has been for one side?

2               JUROR 276:  One hundred percent.

3               MR. TRAGOS:  Okay.  Do you think that because

4          a hundred percent of your expert testimony has been

5          for the state, do you think that you have any bias

6          toward the government because that's all you've

7          worked for?

8               JUROR 276:  Not really.  It's just that that's

9          what my job required.

10              MR. TRAGOS:  Okay.  Go on up to -- let's see,

11         Ms. Mollon; is that right?  Pass that up to her.

12         Ms. Mollon, do you think there should be a limit of

13         how extreme someone's sexual fantasies are?

14              JUROR 319:  Well, last I knew it was still a

15         free country.

16              MR. TRAGOS:  Okay.  And so you don't see that

17         there -- you don't think that there should be a

18         limit, people can fantasize about anything they

19         want, I guess?

20              JUROR 319:  Yeah.  Like I said, last I knew it

21         was still a free country.

22              MR. TRAGOS:  Okay.  Does anybody disagree with

23         that in the box?  Does anybody think there should be

24         a limit on the extremeness of your fantasies, what

25         you think and talk about?  Anybody ever see a movie

1    with Tom Cruise where they are punishing people

2    before they commit crimes?  Anybody see that movie?

3    If you have, raise your hands.  Yes, sir.  Mr.

4    Taylor, what was the name of that movie, remember?

5         JUROR 286:  No.

6         MR. TRAGOS:  I tried to remember the name of

7    it the other day.  Anybody remember the name of that

8    movie?

9         JUROR 395:  Minority Report.

10        MR. TRAGOS:  Minority Report.  There you go,

11   Minority Report.  What did you think about that,

12   Mr. Taylor?  Think it was a good idea?

13        JUROR 286:  No.  I thought that was a little

14   too far out there.

15        MR. TRAGOS:  How about you, Mr. Martinez, what

16   did you think?

17        JUROR 294:  I believe the same, you know,

18   just -- they were charging somebody before they

19   actually did the crime, so it's too far out there.

20        MR. TRAGOS:  Okay.  Who else?  Who named the

21   movie back here?  Who remembered the name?  Okay.

22   Mr. Lisi, what did you think of the movie?

23        JUROR 395:  It was an excellent film.  Steven

24   Spielberg.

25        MR. TRAGOS:  How about the theory behind it?

1          JUROR 395:  Well, it's fantasy.

2          MR. TRAGOS:  Okay.

3          JUROR 395:  It's an excellent film.  It's

4     fantasy.

5          MR. TRAGOS:  How about you, Mr. Austin?

6          JUROR 332:  Well, if it could work it would be

7     great; wouldn't it?  It would be like everything

8     else, you know.  If you could prevent all the bad

9     things before they happened, it would be wonderful.

10    But, obviously, that's never going to work so -- but

11    it was an excellent film.

12         MR. TRAGOS:  Okay.  You earlier said -- you

13    used the word ludicrous when you --

14         JUROR 332:  Procedures.  And mostly with

15    dealing with -- just let me tell you exactly what I

16    had to deal well and it's -- it really is not

17    pertinent to this particularly, but it's just the

18    type of things that go on.  Anything that has to do

19    with bureaucracy to me is an overblown mess that

20    could undoubtedly be cut way down and be much more

21    efficient.

22         But I work with a -- I do guitar repairs for a

23    music store.  And we had some guitars stolen a while

24    back.  And they turned up in -- eventually in pawn

25    shops around the area that just people that come to

1    our store saw them and reported it.  I thought, now,

2    I wonder, this went on for months, like nine months

3    and they -- and still, they showed up, but they

4    showed up by individuals going and seeing them and

5    calling us and letting us know about it.

6         So I went and eventually paid for them all and

7    got them all back.  Turns out, when we reported this

8    crime, they came and took the fingerprints, they

9    took the pictures, they did the whole bit, but never

10   once was there any type of release whatsoever from

11   the police department to all the local pawn shops

12   that these guitars were stolen.

13        This is an item -- you see this in every movie

14   and every TV show.  Immediately all these pawn shops

15   are aware that something was stolen.  That's not

16   something that actually occurs.  Yet, it's the most

17   logical thing that you could possibly think should

18   happen.  And almost everything involved in

19   bureaucracy is that way.  The things that make

20   sense, that might actually occur and cause something

21   to happen probably never do.

22        This is my problem with the whole system.  You

23   know, I say -- the more I talk about it, the madder

24   it makes me, so I just kind of stay away from it as

25   much as I can.

1          MR. TRAGOS:  We'll stay away from it.

2          JUROR 332:  There you go.

3          MR. TRAGOS:  Okay.  Back to the box.

4          Ms. Coats.  Ms. Coats, you said you're an

5     analyst?

6          JUROR 303:  Collateral analyst, yeah, for

7     Countrywide Mortgage.

8          MR. TRAGOS:  And what does that mean?

9          JUROR 303:  That means -- well, I am the QA,

10    in the QA department, quality control to verify

11    the -- every information is correct before the

12    mortgage or the loans get approved.

13         MR. TRAGOS:  Okay.  Mr. Dorsey?

14         JUROR 402:  Dorey.

15         MR. TRAGOS:  Dorey, I'm sorry.  Dorey.

16    Mr. Dorey, your job is IT security; right?

17         JUROR 402:  Yes.  That and either building up

18    an infrastructure or securing it and doing

19    penetration tests, things along those lines.

20         MR. TRAGOS:  Okay.  You don't like monitor

21    text messages or chats or things like that?

22         JUROR 402:  Absolutely not.  I'm a consultant

23    so we're brought in for specific tasks and tests,

24    and then we're out.  And that would much more follow

25    in the lines of network administrator.

1          MR. TRAGOS:  Oh okay.  Ms. Scanlan, your

2     husband was an assistant state attorney?

3          JUROR 417:  Yes.

4          MR. TRAGOS:  Okay.  Where was that?

5          JUROR 417:  Sarasota County.

6          MR. TRAGOS:  And where is his practice now?

7          JUROR 417:  Bradenton.

8          MR. TRAGOS:  And you say it's civil.  Is it

9     specialized in any particular kind of area?

10         JUROR 417:  Automobile accidents, mostly.

11         MR. TRAGOS:  Okay.  And he was a deputy and a

12    legal advisor.  Where was that?

13         JUROR 417:  Sarasota County Sheriff's

14    Department.

15         MR. TRAGOS:  Ms. Perez.  Pass that down.

16         JUROR 277:  Yes.

17         MR. TRAGOS:  You're a jail nurse.

18         JUROR 277:  Yes, I am.

19         MR. TRAGOS:  Okay.  What jail?

20         JUROR 277:  Polk County jail.

21         MR. TRAGOS:  Okay.  Polk County is fairly

22    well-known on TV for having people who want to

23    solicit children for sex, they're the -- I guess

24    it's Night Line, I think does it.  But Night Line --

25    they actually have a child appearing person actually

1       meet the people when they come in the house.  They

2       come into this house and they have the little person

3       that looks like they're 12 and they actually meet

4       that person.

5            JUROR 277:  Um-hum.

6            MR. TRAGOS:  I don't know, have you come in

7       contact with any of those people that were arrested

8       in any of those things?

9            JUROR 277:  I don't watch the news because I

10      don't -- I just -- it's too much bad stuff and it's

11      too depressing, so I don't watch the news.  But I do

12      know that there are a lot of people there who are my

13      patients that I do treat.  But I don't necessarily

14      look up to see what they're there for, but I know

15      that some of them are there for those reasons.

16           MR. TRAGOS:  Are you an employee of the

17      sheriff's office or are you a contract employee?

18           JUROR 277:  Contracted.

19           MR. TRAGOS:  How long have you worked at the

20      jail.

21           JUROR 277:  Two years.

22           MR. TRAGOS:  Now, they know you're here for

23      jury duty, I would imagine; correct?

24           JUROR 277:  Yes.

25           MR. TRAGOS:  And if you go back there and tell

1    them that you let off some guy that's accused of

2    soliciting a child for sex, do you think you're

3    going to get any grief?

4         JUROR 277:  Probably not because, you know,

5    they will know that, you know, I'm a good person,

6    I'm a moral person and, you know, I have to go by

7    the facts that are presented to me.

8         MR. TRAGOS:  So if you think that -- if

9    there's enough evidence to think, well, maybe he

10   probably did it, you know, you don't have any

11   problem finding him not guilty and letting him go

12   back on the street?

13        JUROR 277:  No.  Because if there's no actual

14   proof that says that he did definitely do it, then,

15   you know, I -- you know, as I work there at the

16   jail, that's what we've always been -- you know,

17   said.  You know, they're human, too.  You know, you

18   can't treat them, you know, any different than you

19   would another patient if you worked at a hospital or

20   something.  And you're, you know, shown that you

21   have to be, you know, like impartial.

22        MR. TRAGOS:  Okay.  Thank you.  Mr. Martinez,

23   you're an IT supervisor?

24        JUROR 294:  Yes, sir.

25        MR. TRAGOS:  And what kind of work do you do

1    specifically?

2         JUROR 294:  Supervisor IT specialist.  I

3    also -- if the IT specialists don't show up for work

4    that day because they're sick or we got a problem, I

5    also am assistant administrator and I will manage

6    the system.

7         MR. TRAGOS:  Where is it that you work?

8         JUROR 294:  Department of Veterans Affairs,

9    St. Petersburg Regional Office.

10        MR. TRAGOS:  Okay.  So you work for a federal

11   department?

12        JUROR 294:  Yes, sir.

13        MR. TRAGOS:  Okay.  Now, you understand that

14   this case is being prosecuted by the federal

15   government?

16        JUROR 294:  Yes, sir.

17        MR. TRAGOS:  Same -- you get the same pay

18   check from the same place.

19        JUROR 294:  Yes, sir.

20        MR. TRAGOS:  Do you feel that you have any --

21   any duty or responsibility to give greater weight to

22   the federal government because they're your

23   employer?

24        JUROR 294:  No, sir.  I'm trained to be

25   impartial.  That's part of my job as a supervisor in

```
 1    my office.  I have to be impartial, listen to all

 2    the facts before I make a determination.

 3         MR. TRAGOS:  Okay.  Do you feel like that this

 4    could come back to haunt you some day, that if you

 5    found somebody not guilty?

 6         JUROR 294:  No, sir.

 7         MR. TRAGOS:  Ms. Walsh.  Ms. Walsh, you're a

 8    teen -- you work at a teen pregnancy program?

 9         JUROR 266:  Yeah.  Yes.

10         MR. TRAGOS:  And so you work with pregnant

11    teenagers?

12         JUROR 266:  Yes.

13         MR. TRAGOS:  I know.  I went to law school.

14    And are any of these under 16?

15         JUROR 266:  I work with the middle school

16    students so they range from fifth grade to eighth

17    grade.

18         MR. TRAGOS:  Okay.  And, I mean, that's a

19    terrible problem in society; right?  Middle

20    school --

21         JUROR 266:  That's a terrible problem society?

22         MR. TRAGOS:  Terrible problem in society.

23         JUROR 266:  A problem in society.

24         MR. TRAGOS:  That we have middle school

25    children that are pregnant.  Do you think so?
```

1          JUROR 266:  I don't know.  I try to think

2     about it every day on what I think is right and what

3     I think is wrong, and I just go on and do my job.

4          MR. TRAGOS:  Okay.  So you don't have any

5     opinion about whether middle school children being

6     pregnant is right or wrong?

7          JUROR 266:  I know what's right for me and my

8     family, but I don't -- no.  I don't judge the girls

9     at all that I work with, if that's what you're

10    asking.

11         MR. TRAGOS:  How about the people that got

12    them pregnant?

13         JUROR 266:  I don't know -- I'm just the

14    assistant in the class so I don't have like the

15    authority to look in their file, so I don't know

16    exactly what their stories are.  So I don't really

17    have a thought on them because I don't really know

18    what it is.

19         MR. TRAGOS:  Are you aware of any of the

20    fathers being prosecuted?

21         JUROR 266:  Yes.

22         MR. TRAGOS:  You're aware that they have been

23    prosecuted?

24         JUROR 266:  From what I've heard, not anything

25    official.  But one of the dads was over age and went

1     to jail.

2          MR. TRAGOS:  Okay.  And the program --

3     obviously, you know, you see this program.  This

4     program has -- I guess there's a lot of sympathy in

5     this program because we're talking about a case here

6     of soliciting a child for sex over the internet.  Do

7     you think that your employment will -- would

8     prejudice you one way or the other in this case?

9          JUROR 266:  I don't think that it will because

10    I have such a -- I'm just so -- I go in and I do my

11    job and I don't see past what I'm in there to do.

12    Does that make sense, what I'm saying?

13         MR. TRAGOS:  Do you do your job

14    dispassionately?

15         JUROR 266:  Passionately?

16         MR. TRAGOS:  Dispassionately.

17         JUROR 266:  No.  I do it -- I do it because I

18    care about them.

19         MR. TRAGOS:  Okay.

20         JUROR 266:  You know, like, I work with young

21    girls and I want them to make good choices.  So I go

22    in and I set a good example and hopefully, you

23    know --

24         MR. TRAGOS:  So you don't talk to them about

25    being pregnant at 13 or 12 as being a bad choice?

1          JUROR 266:  I tell them ways that they can

2     maybe make better choices.

3          MR. TRAGOS:  Okay.  How long have you been

4     working in the teen pregnancy program?

5          JUROR 266:  I believe this will be -- at the

6     end of this year will be my fourth year.

7          MR. TRAGOS:  Okay.  Have a moment, Your Honor?

8          THE COURT:  Yes, sir.

9     (Brief pause.)

10          MR. TRAGOS:  Has anybody here been accused of

11     a crime?  Just talking about accused now, not -- not

12     arrested.  The mic's up here.  Let's start up here.

13          THE COURT:  She's got it.

14          MR. TRAGOS:  Okay.  Would you pass that over

15     to Ms. Harris.  Ms. Harris, what's your opinion of

16     psychologists or psychiatrists?

17          JUROR 343:  They're there to help people.

18          MR. TRAGOS:  Okay.  Does anyone have a bad

19     opinion of psychologists or psychiatrists?  They

20     think that, you know, it's all mumbo jumbo and not

21     really legitimate science?  Okay.  Anyone here?

22          How about back here?  Anybody have a bad

23     opinion of a psychiatrist or a psychologist?  Okay.

24     Now, if we could have the mic back.  Mr. Perez?

25          JUROR 253:  Yes.

1          MR. TRAGOS:  Mr. Perez, I asked a question

2     earlier about if you have children, this kind of a

3     case and, you know, can you -- can you ignore the

4     fact that you have children and can you -- do you

5     have something that may be on your mind when you

6     hear testimony in this case that will draw your

7     attention from the specifics of this case.  Do you

8     remember that question?

9          JUROR 253:  Yes, I do.

10          MR. TRAGOS:  And did I miss -- did you raise

11     your hand and I not --

12          JUROR 253:  Yes.

13          MR. TRAGOS:  Okay.

14          JUROR:  I believe I could be fair in trial.

15     But I could not help but put my child in the place

16     of the victim.  Any parent would, I believe.

17          MR. TRAGOS:  Okay.  So you think you would put

18     your child in the place of the victim?

19          JUROR 253:  Yes, I do.

20          MR. TRAGOS:  Okay.  Mr. Beck, did you also

21     have something to say on that question?

22          JUROR 442:  I feel the same way as Mr. Perez

23     does.  I think I'd put one if not all three of my

24     daughters in the same position.

25          MR. TRAGOS:  In the place of the victim?

1           JUROR 442:  Yes, sir.

2           MR. TRAGOS:  Okay.  Mr. Saice, did you have

3      something you wanted to say on that?

4           JUROR 388:  No.

5           MR. TRAGOS:  Okay.  Well, let me then ask that

6      question.  Maybe I should have phrased it that way.

7      How many of you feel that you would have a problem

8      with -- well, have the same problem they would have,

9      that you would place your children in the place of

10     the victims in this case while you're making your

11     determinations?  Okay.  Let's go back here.  Anybody

12     else back here that think they'd put their children

13     in the place of the victims?  Okay.  Ms. -- I'm

14     sorry, Machmer?

15          JUROR 432:  That's fine.

16          MR. TRAGOS:  Okay.  You think you might do

17     that?

18          JUROR 432:  I already said that there's a

19     possibility, but I would try to be fair.

20          MR. TRAGOS:  Okay.  Okay.  Anybody on this

21     side?  Okay.  Now over to the box.

22          JUROR 312:  Mary Hawkins.

23          MR. TRAGOS:  Yes, ma'am.

24          JUROR 312:  I have three daughters.  They're

25     all in their 20s now, but I think that I would have

1     that problem.

2          MR. TRAGOS:  Of putting your daughters in the

3     place of the victims?

4          JUROR 312:  Yes, I think I would.  I remember

5     them at those ages and they're so trusting.  And I

6     just -- I just don't think that I could get over

7     that.  I really do think that I would put them in

8     that place.

9          MR. TRAGOS:  And I think Ms. Vazquez, we've

10    already talked you.  You would have that problem;

11    right?

12         JUROR 415:  Um-hum.

13         MR. TRAGOS:  Anybody else in the box think

14    they would be doing that while they heard the

15    testimony, putting your children or grandchildren in

16    the place of the victims?  Ms. Thompson?

17         JUROR 412:  Yeah.  I think I would because

18    my -- my granddaughter, she's very book smart but

19    not street smart.  And she talks on the internet.

20    And I have a 12-year-old, she's not here but she's

21    on the internet.

22         MR. TRAGOS:  Anyone else in the box?  Let me

23    ask that question.  Ms. Thompson, you raised a good

24    issue.  How many of you have children that are 16 or

25    under that are on the internet participating in

1    chats, conversations, things like that?  Start with

2    the box.  Raise your hand in the box here.

3         Okay.  Mr. Taylor.  Mr. Taylor, you're an IT

4    person, so I would guess you've got some way of

5    monitoring that.

6         JUROR 286:  Yeah, I try to.  But he's on more

7    hours than there are hours in the day.  So it's --

8    it's hard.  But I've -- you know, he's pretty much

9    down to his friends who are going on line gaming.

10        MR. TRAGOS:  Okay.  And behind you, I think

11   that's Ms. Perez.

12        JUROR 277:  Yeah.  My daughter has, you know,

13   the MySpace thing and she has like a game that she

14   plays on there and chats with people on there, but

15   she doesn't go -- like go to a chat room.

16        MR. TRAGOS:  Anyone else in the box?

17   Ms. Woolley?

18        JUROR 304:  My 15-year-old son does, but I

19   guess my husband is one of his friends on his

20   Facebook, so we kind of monitor what he's doing.

21   I'm not sure how the whole thing works.

22        MR. TRAGOS:  Okay.  Anyone else in the box

23   here?  Okay.  How about back here?  Anybody else 16

24   and younger on the internet?  Ms. Frieler-Baker?

25        JUROR:  (Inaudible).

1          COURT REPORTER:  I'm sorry.  I didn't hear

2     you.

3          THE COURT:  Use the mic, please.

4          MR. TRAGOS:  Ms. Frieler-Baker.

5          JUROR 257:  Yes.  My daughter, she does like

6     the chats on this Webkins, which is the internet.

7     I'm not really up on this chatting thing.  I've

8     never -- I don't do instant messaging, but she does

9     with her friends, the texting and chatting and --

10    but not like I -- I think it's called -- what are

11    they, a chat room?  It's -- you can't -- she has to

12    pick -- drop and pick your statements.  Does that

13    make sense?

14         MR. TRAGOS:  And this is your eight-year-old;

15    correct?

16         THE COURT:  Yes.

17         MR. TRAGOS:  Okay.  Anyone else over here?

18    Mr. -- okay.  We've got Ms. Kelley and Mr. Beck.

19         JUROR 426:  My daughter does.  She's 14.  She

20    has the MySpace thing.

21         MR. TRAGOS:  Okay.  Is she on there a lot?

22         JUROR 426:  Constantly.

23         MR. TRAGOS:  Okay.  Do you monitor it in any

24    way?

25         JUROR 426:  As much as I can because she has

1      the little side kick phone thing.

2           MR. TRAGOS:  Um-hum.  Okay.  Mr. Beck?

3           JUROR 442:  Yes.  My eight-year-old, my wife

4      lets her get MySpace.  And I don't know how it works

5      because I don't know nothing about computers, but my

6      wife monitors it and --

7           MR. TRAGOS:  Okay.  Anyone else back there?

8           JUROR 432:  Machmer.

9           MR. TRAGOS:  Machmer.  I'm scared to say it

10     now.  Mach -- Machmer.

11          JUROR 432:  Right.  That's fine.

12          MR. TRAGOS:  Okay.

13          JUROR 432:  My daughter is 16.  She's not

14     allowed on MySpace or My Face or whatever the heck

15     it is, but she does type in to her friends.

16          MR. TRAGOS:  Okay.  Anybody over on this side?

17     No.  Okay.  Excuse me, Your Honor.

18          THE COURT:  Mr. Tragos, you need to wrap it

19     up.  I'd like you to mention, also, any names of

20     witnesses who may potentially be called.

21          MR. TRAGOS:  Okay.  Yes, Your Honor.  These --

22     these might called.  Michael Caputi, Bill Prast,

23     Dr. Paul DiMarco, Dr. Frederick Berlin, Bill Hayden,

24     Margaret Vaughan, Paul Kaufman, William Steinhart,

25     Deputy Deanna Kist, Dr. Mitchell Kroungold and Tim

1    Bettelli.  Does anyone know any of those people?

2    Okay.  That's all the questions I have, Your Honor.

3         THE COURT:  Thank you.  Ms. Vazquez, I think

4    in light of your responses you'll probably be

5    excused.  So if you're concerned about your Costa

6    Rican trip --

7         JUROR 415:  Pardon me?

8         THE COURT:  Don't you have a trip to Costa

9    Rica planned?

10        JUROR 415:  I do.

11        THE COURT:  I don't think that's going to be a

12   problem.  In other words, your -- don't worry about

13   your vacation.

14        JUROR 415:  Okay.

15        THE COURT:  Let me address the panel in

16   general before the lawyers and I confer.  It's not

17   my position or place to tell you what this case is

18   or isn't other than to summarize the indictment.

19   But many of you in responding to some of the

20   questions that you might put your children in that

21   place of a victim, that kind of thing.  Good

22   questions to get you thinking about the subject

23   matter of the trial.

24        But remember, this is a -- this is not an

25   evidentiary portion of the trial.  In other words,

1    you'll hear the evidence after you're sworn and the

2    lawyers make their opening statements.  I want all

3    of you to think very carefully about this last

4    question.  First of all, I don't think you're going

5    to hear evidence there's an actual child or children

6    who we will identify as victims in this case.

7        You heard Ms. Kaiser ask you about undercover

8    detectives and investigative techniques where

9    they're posing as people that they really aren't.

10   So while the questions are valid questions to get

11   you thinking about this in terms of your ability to

12   listen and consider all of the evidence and follow

13   the law, I don't want you to get the mistaken

14   impression of what this case is or isn't going to

15   be.

16       So with that being said, can each of you,

17   other than Ms. Vazquez, I think you've expressed

18   some concerns, can each of you bring your collective

19   common sense and life experiences into the

20   courtroom, put your emotions aside and follow the

21   law and apply that law to the evidence in the case?

22   Is there anyone who cannot do that?  And there's not

23   a right or wrong answer to this and you're not going

24   to offend me or anyone else if you cannot do that in

25   good faith.  All right.  I see no hands.

```
 1          Let me then see counsel up here at side bar

 2     and we will go through the process of selecting.

 3     Please forgive them.  They're going to have to put a

 4     name with a face.  So every once in a while they're

 5     going to turn to you and make sure they're talking

 6     about the right person.  If you need to stand and

 7     stretch, feel free to do so.

 8     (At side bar, on the record.)

 9          THE COURT:  Ms. Vazquez had asked a question

10     about -- I guess she's got a trip to Costa Rica.

11     And I think in light of her responses, there's

12     probably going to be a challenge for cause, so

13     that's what I was alluding to.

14          MR. TRAGOS:  Okay.

15          THE COURT:  Let's take challenges for cause

16     first.

17          MR. TRAGOS:  Your Honor, could I have some

18     time to speak to my client?

19          THE COURT:  Mr. Tragos, you've been up there

20     for more than an hour.

21          MR. TRAGOS:  I know.  But I haven't -- by

22     being up there, I wasn't able to discuss it with my

23     client.  Just a few minutes if I could have --

24          THE COURT:  All right.  Take a few moments.

25     Ms. Kaiser, if you need to talk with your agent,
```

1    take just a few moments, please.

2    (End of side bar discussion.)

3         THE COURT:  Members of the panel, while the

4    lawyers are conferring, let me just alert you to a

5    couple of things.  The temperature today is to me

6    very comfortable, but it might not be to you.  I

7    wear this robe and it's quite warm.  If you are

8    selected, bring a jacket or a sweater that you can

9    put on or take off as the temperature dictates.

10   It's usually a little cooler in here than you might

11   otherwise expect.  There's a lot of reasons for

12   that, keep us all alert, keep the building safe and

13   comfortable so we don't have any water intrusion

14   issues.  But we don't want you to be sitting there

15   shivering.  I see a couple of you have sleeveless

16   outfits on and you will be uncomfortable if you

17   don't bring a wrap.

18        Schedule, we're running late today.  That's on

19   purpose because we want to try to get you selected

20   before we break for lunch so those of you who are

21   not selected can go on about your business.  They're

22   not needed the rest of the day; right, Anne?

23        COURTROOM DEPUTY CLERK:  Correct, Your Honor.

24        THE COURT:  Right.  So if you are excused,

25   unless I tell you otherwise, you're to just call in

1    the normal course.  I think there's just one more

2    week in this trial docket.

3         COURTROOM DEPUTY CLERK:  Yes, sir.

4         THE COURT:  Next week.  And a couple of you

5    I'm going to excuse for cause so you won't have to

6    worry about calling in next week.  If you are

7    selected, you'll be sworn and then 114 let -- we're

8    going to take a comfortable lunch break.  You're

9    free to call back to your office or homes, wherever

10   you need to alert them where you're going to be.

11   You can give them my name and number, if necessary,

12   for emergencies.  But other than that, don't discuss

13   the case.

14        The reason for this, of course, lies in the

15   fact that if you mention the case or what it is, it

16   might evoke a statement of sorts from somebody that

17   might somehow influence you.  So remember, mum's the

18   word.  You are a judge.  Conduct yourselves

19   accordingly once you are sworn in.

20        We appreciate your attention this morning and

21   responses.  And we will carefully consider all of

22   the concerns that you may have raised.  And those of

23   you who have conflicts, I think I've talked to

24   everybody with the exception of Ms. Vazquez.  But I

25   don't think that will be a problem.

1          If we can assist you if you are selected in

2    any way in enhancing the audio or the visual

3    presentation of the evidence, all you need to do is

4    alert the court security officer and we will make

5    those arrangements.

6          You know, I forgot.  Mr. Taylor, is there

7    something you wanted to bring to my attention?

8    Before the break you mentioned something and I

9    said --

10         JUROR 286:  It was okay.

11         THE COURT:  All right.  I didn't ask this, and

12   the lawyers wouldn't have any reason to.  But do any

13   of you have any physical reasons that you can't sit

14   in the jury box and watch and listen to the

15   evidence?  Bad lower back, sciatic, that kind of

16   thing?  You're free to bring a cushion in, if that

17   would help, by the way.  I don't see any hands.  I

18   just want to make sure that we're aware of anything

19   like that.  We do have a hand back in the back.

20   Yes, sir.

21         JUROR:  I've got a lot of problems with my

22   legs with cramps.

23         THE COURT:  Right.

24         JUROR:  That's why I'm standing up now for so

25   long.  It's always a problem.  I was hoping it

1    wouldn't occur this way.  I take medication for it

2    but -- she can hear me, anyway.

3         THE COURT:  If we take the breaks as I've

4    described and you're able to --

5         JUROR:  About how long is the average session,

6    though?

7         THE COURT:  We usually go from 9:00 to about

8    10:30 or so, take about a 15-minute break, break at

9    lunch.

10        JUROR:  Oh, yeah.  That shouldn't be too much

11   of a problem, then.

12        THE COURT:  Come back about 1:00.

13        JUROR:  Just as long as nobody is going to

14   throw me out and scream at me if I have to stand up

15   and shake a leg.

16        THE COURT:  No.  In fact, I was going to

17   suggest if you need to do that, don't -- don't not

18   do it.  I will do it from time to time because

19   sitting up here in this chair, your back gets stiff.

20   And just a momentary stand and stretch is not a

21   problem.  I want you to be comfortable.  Yes, ma'am.

22        JUROR:  I wanted to say something and no one

23   asked me.

24        THE COURT:  That's a good point.

25        COURT REPORTER:  Hold on a second.

1          THE COURT:  Wait until we get the mic up here.

2     Yes, ma'am.

3          JUROR:  I thought I should disclose that -- I

4     told you my stepson works for law enforcement.  And

5     he did participate with the show that targeted

6     sexual predators of children.

7          THE COURT:  Kind of like the show that I think

8     Mr. Tragos was describing?

9          JUROR:  South counties.

10         THE COURT:  How long ago was that?

11         JUROR:  Probably a couple of years.

12         THE COURT:  Can you put that experience aside

13    and base your verdict on the evidence in the case

14    and the law that I give you?

15         JUROR:  Yes.  The only participation I saw was

16    to see the show that he was in.

17         THE COURT:  Okay.  Thank you.  Are y'all

18    ready?  All right.  Come forward, please.

19    (At side bar, on the record.)

20         THE COURT:  We'll take challenges for cause on

21    the first page, please.  Do you have your list, your

22    jury list like this?

23         MR. TRAGOS:  No.

24         THE COURT:  Well, let's just get that.  Have

25    you got yours, Ms. Kaiser?

1            MS. KAISER:  No, Your Honor.

2            THE COURT:  Why don't you get it so as I go

3     through page by page we can -- okay.  If you'll just

4     use that page, page one of four is the first

5     reference.  Any challenges for cause on the first

6     page, from the government?

7            MS. KAISER:  No, Your Honor.

8            THE COURT:  From the defense?

9            MR. TRAGOS:  We'd challenge Mary Hawkins.

10           THE COURT:  Juror number nine.

11           MR. TRAGOS:  Juror number nine.

12           THE COURT:  Grounds, please.

13           MR. TRAGOS:  That she would place her daughter

14     in the place of the victims.  In this case, Your

15     Honor, although there's not a real victim, the

16     testimony graphically describes victims who are

17     beaten and sexually molested either at the

18     defendant's home or with Detective Romanosky.

19           There were only, I think, three or four that

20     said that but --

21           THE COURT:  Response.

22           MS. KAISER:  Your Honor, actually, I think

23     that's an improper question that Mr. Tragos posed to

24     the jury.  Any juror in their right mind would

25     certainly reflect upon their family and any children

1    that they have.  So I think we'd be hard pressed to

2    find any jurors that wouldn't think about their own

3    children in a case such as this.

4         The issue and the question, the proper legal

5    question is whether or not, despite having children

6    that they can be fair and impartial to both sides,

7    and I believe Ms. Hawkins said she could.

8         THE COURT:  I agree.  I'm going to deny that

9    challenge.  Without addressing the appropriateness

10   of the question, I certainly addressed it in my

11   summation question, pointing out that the question

12   is whether they could follow the evidence and the

13   law, base their verdicts on the evidence and follow

14   the law, and they've all confirmed that they would.

15        MR. TRAGOS:  Does the Court wish me to

16   continue?

17        THE COURT:  We'll go to page two.

18        MR. TRAGOS:  I'm still on page one.

19   Ms. Thompson.

20        THE COURT:  Let's go in the order, please.

21        MR. TRAGOS:  Okay.  Ms. Thompson.

22        THE COURT:  Juror number two?

23        MR. TRAGOS:  Juror number two.

24        THE COURT:  All right.

25        MR. TRAGOS:  She also said that she would

1    place her -- grandchildren in her case in the place

2    of the victims.

3            THE COURT:  All right.  Same ruling.  I find

4    that that's not a sufficient basis to have a

5    reasonable doubt about the juror's ability to follow

6    the law.  Any others on page one for cause only,

7    please?

8            MR. TRAGOS:  No, Your Honor.  No, sir.

9            THE COURT:  Page two, beginning at the top,

10   Ms. Coats.  How about Ms. Vazquez, any objection to

11   excusing her for cause?  I don't mean to make a

12   motion on my own, but my sense was both of you

13   accepted that she had expressed strong reservations.

14   Ms. Kaiser?

15           MS. KAISER:  For cause?

16           THE COURT:  Yes, ma'am, page two.

17           MS. KAISER:  That's fine.

18           THE COURT:  That you agree?

19           MS. KAISER:  I agree, Your Honor.

20           THE COURT:  Mr. Tragos?

21           MR. TRAGOS:  I agree.

22           THE COURT:  She'll be stricken for cause.  Any

23   other challenges for cause on page two?

24           MR. TRAGOS:  Ms. Scanlan.  Your Honor --

25           THE COURT:  Number 16?

1          MR. TRAGOS:  I have 417, I have her --

2          THE COURT:  She's 16.

3          MR. TRAGOS:  Number 16.

4          THE COURT:  Basis, please.

5          MR. TRAGOS:  The basis, Your Honor, is the --

6     her husband's an attorney and former prosecutor.

7     Her son's a police officer who participated in the

8     sexual predator shows which she watched.  And for

9     those reasons, Your Honor.

10          THE COURT:  Response.

11          MS. KAISER:  There's nothing in there that

12    mentions that she's not going to be fair and

13    impartial, which is the standard.  Probably most

14    jurors have seen programs on sexual predators.

15    They're almost on once a week.  So that does not

16    disqualify her as a juror.  She did not say she

17    could not be fair and impartial.

18          THE COURT:  I will deny that challenge, find

19    that this juror has not expressed reservations that

20    rise to the level of reasonable doubt about her

21    ability to be fair and impartial.  In fact, she

22    specifically confirmed her ability to be fair,

23    notwithstanding those experiences.

24          MR. TRAGOS:  Next, Your Honor, number 18, Mr.

25    Perez.

```
 1              THE COURT:  Yes, sir.

 2         MR. TRAGOS:  He also said he would -- he is

 3    actually -- some of these are -- these individuals

 4    raised this.  The question was not specifically

 5    asked to them, they did raise that with regards to

 6    the child being -- their children being in the place

 7    of the victim.  Mr. Perez raised it himself.

 8              Also, Your Honor, his friends are part of the

 9    sexual predator show, apparently, but -- sexual

10    predator team.  But the main reason, Your Honor, is

11    that he brought up on his own that he would put his

12    child in the place of the victims.

13              THE COURT:  Response.

14         MS. KAISER:  Again, Your Honor, certainly any

15    juror would think about their own children in a case

16    involving children.  So he did not say he could not

17    fair and impartial, which is the standard.

18              THE COURT:  I will deny that challenge for

19    cause and again find that the response to the

20    court's final question, all jurors indicated their

21    ability to be fair and impartial, to follow the law

22    and to base their verdict on the evidence.

23              And the concern I have, Mr. Tragos, I

24    understand why you're making the motion, but even

25    you suggested to them there were actual victims in
```

1    this case, and I tried to clarify that without going

2    too far.  So I don't think the question was premised

3    on the facts that they're actually going to hear.

4    But in any event, so far none of these jurors have

5    indicated, with the exception of Ms. Vazquez, that

6    they could not set aside any personal experiences or

7    feelings.

8         Page three, any challenges for cause, from the

9    government?

10        MS. KAISER:  Phil Austin, Your Honor, juror

11   number 23.

12        THE COURT:  Grounds, please.

13        MS. KAISER:  He stated that he thought the

14   whole law enforcement was ludicrous, all the

15   procedures were ludicrous.  He had a prior juvenile

16   issue and seemed to have some hostility toward the

17   United States and toward government in general.

18        THE COURT:  Response.

19        MR. TRAGOS:  Your Honor, I didn't hear him say

20   that he thought he would be unfair or that he

21   wouldn't have a fair attitude.  He just thought in

22   his case, he said that -- I think he specifically

23   said, this is the way it happened in my case.  It

24   has nothing to do with this case.  I think he even

25   premised it even with that when he gave that

1   explanation.

2       THE COURT:  I agree.  I'm going to deny that,

3   finding there's not a reasonable basis to find that

4   this juror cannot follow the law and be fair.  He

5   was very candid in his responses but did, as

6   Mr. Tragos recalls, say it had nothing to do with

7   this particular case.

8       Any other challenges from the government on

9   page three?

10      MS. KAISER:  No, Your Honor.

11      THE COURT:  From the defense?

12      MR. TRAGOS:  Yes, Your Honor.  With regards to

13  Ms. Kelley, she specifically answered that she felt

14  that her mind would be on her medical issues and

15  that she might have a problem concentrating on this

16  case.

17      THE COURT:  Ms. Kaiser?

18      MS. KAISER:  That's correct.  She did say

19  that.  I don't disagree that if she's going to have

20  a heart procedure later this week that that's

21  probably weighing on her mind.

22      THE COURT:  114 grant that challenge.  I think

23  that's a reasonable basis.  Any other challenges for

24  cause on page three, from the defense?

25      MR. TRAGOS:  Yes, Your Honor.  I'm sorry.

1        Yes, Your Honor.  Mr. Beck stated that he would put

2        his child in the place of the victim.

3              THE COURT:  Ms. Kaiser?

4              MS. KAISER:  Again, Your Honor, the question

5        is whether or not the jury can be fair and

6        impartial.  Almost any juror that has children would

7        certainly admit that they would think about their

8        own children in a case.  But the question is whether

9        or not they can be fair and impartial to this

10       defendant.

11             THE COURT:  Same reasons I explained earlier.

12       I don't find that there's a sufficient basis to find

13       reasonable doubt about this juror's ability to be

14       fair and impartial.  He confirmed his willingness

15       and ability to follow the law and base his verdict

16       on the evidence.

17             Anyone else on page three?  All right.  Page

18       four, any challenges for cause from the government?

19             MS. KAISER:  Nancy Machmer, Your Honor.

20             THE COURT:  Grounds, please.

21             MS. KAISER:  She's -- she stated that she's

22       claustrophobic and she would find it very difficult

23       to focus on the --

24             MR. TRAGOS:  We have no objection.

25             THE COURT:  Can you give me a reason other

1      than that?

2            MR. TRAGOS:  I've got some good ones, too,

3      Your Honor.

4            THE COURT:  I didn't her say she was

5      claustrophobic.  She said -- that was my question to

6      her.

7            MR. TRAGOS:  Didn't she say that she might

8      have a doubt that she could be fair under the

9      circumstances?  She did have a doubt, she kept

10     wavering and vacillating on that particular issue,

11     and I have no -- I would also join in the motion for

12     cause.

13           THE COURT:  All right.  114 strike her for

14     that reason, grant the motion.  Any other challenges

15     for cause on page four from the government?

16           MS. KAISER:  No, Your Honor.

17           THE COURT:  From the defense?

18           MR. TRAGOS:  No, Your Honor.

19           THE COURT:  Okay.  The government will proceed

20     first with one challenge.

21           MS. KAISER:  Four for cause?

22           MR. TRAGOS:  Three.

23           MS. KAISER:  Do you have three that were

24     stricken for cause, Your Honor?

25           THE COURT:  It doesn't matter.  Let's go.

1          MS. KAISER:  Okay.

2          THE COURT:  If you'll focus on the first 12

3     jurors, that's -- you may back strike, but I would

4     suggest that you stay within the first 12.  And as

5     we replace them, of course, you may exercise your

6     preemptories.  What says the government?  One

7     challenge, please.

8          MS. KAISER:  Juror number four, Kira Walsh.

9          THE COURT:  That would then put juror number

10    13 -- actually, 14 into the twelfth seat.

11    Defendant, two challenges, please.

12         MR. TRAGOS:  Woolley, number one.

13         THE COURT:  Juror number one.  Second

14    challenge?

15         MR. TRAGOS:  And Hawkins.

16         THE COURT:  Number nine; is that right?

17         MR. TRAGOS:  Yes.

18         MS. KAISER:  Juror number 13, Catherine

19    Mollon.

20         MR. TRAGOS:  Which one.

21         MS. KAISER:  Juror number 13.

22         MR. TRAGOS:  Mollon?

23         THE COURT:  M-O-L-L-O-N.  That would put

24    Rachel Shelley into the twelfth seat.  What says the

25    defendant?  Two challenges, please?

1            MR. TRAGOS:  Have a moment, Your Honor?

2            THE COURT:  Yes, sir.

3            MR. TRAGOS:  We're all the way through who

4      now?

5            THE COURT:  Ms. Shelley.

6            MR. TRAGOS:  Oh, Ms. Shelley.  We would

7      challenge Shelley.

8            THE COURT:  Do you have an additional

9      challenge?

10           MR. TRAGOS:  And Daniel Perez, the next --

11           THE COURT:  Number 18?

12           MR. TRAGOS:  Right.

13           THE COURT:  That would put Eleanora Morris

14     into the box.

15           MS. KAISER:  Juror number 23, Phillip Austin.

16           THE COURT:  Well, we're not there yet.  If you

17     want to exercise, that's fine.

18           MS. KAISER:  Okay.  We can back strike, right?

19           THE COURT:  Sure.  If you want to go ahead and

20     challenge him, that's fine.  The twelfth seat right

21     now is occupied by Ms. Morris, who's the nineteenth

22     juror.  Are you going to challenge Mr. Austin,

23     Ms. Kaiser?

24           MS. KAISER:  I'm sorry?

25           THE COURT:  Are you challenging Mr. Austin?

1          MS. KAISER:  Who's the last person in the box,

2     Your Honor?

3          THE COURT:  Morris.

4          MS. KAISER:  Juror number --

5          THE COURT:  19.

6          MS. KAISER:  19.  Yes, Mr. Austin.

7          THE COURT:  All right.  What says the defense?

8          MR. TRAGOS:  Your Honor, are we doing one and

9     one now, still doing --

10          THE COURT:  No.  Two more, please.

11          MR. TRAGOS:  I'm still doing two?

12          THE COURT:  They have three left, you have

13     six.

14          MR. TRAGOS:  Okay.  Morris.

15          THE COURT:  Number 19; is that right?

16          MR. TRAGOS:  I think so.  Yes.

17          THE COURT:  That would put Mr. Beck into that

18     twelfth seat.  What says the defendant?  One more,

19     please.

20          MR. TRAGOS:  And Mr. Beck.

21          MS. KAISER:  What number?

22          THE COURT:  That would put Mr. Lisi into the

23     twelfth seat.  What says the government?

24          MS. KAISER:  Pass.

25          THE COURT:  What says the defense?

```
 1          MR. TRAGOS:  Could I have one second?

 2     (Brief pause.)

 3          MR. TRAGOS:  Okay.  How many am I supposed to

 4     do right now?

 5          THE COURT:  You have just one.

 6          MR. TRAGOS:  One now.  Okay.  We would strike

 7     Ms. Scanlan.

 8          COURTROOM DEPUTY CLERK:  Judge, one of the

 9     jurors has to use the restroom.

10          THE COURT:  All right.  That's fine.  That

11     would put Ms. Frieler-Baker into the twelfth chair.

12          MS. KAISER:  Pass, Your Honor.

13          THE COURT:  You pass?

14          MS. KAISER:  Um-hum.

15          THE COURT:  Okay.

16          MR. TRAGOS:  We're up to Frieler-Baker?

17          THE COURT:  Which is seat 24.

18          MR. TRAGOS:  How many strikes do we have left?

19          THE COURT:  You have two.

20          MR. TRAGOS:  I have two left?

21          THE COURT:  Three, I'm sorry, three.

22          MR. TRAGOS:  And the government has how many

23     left?

24          THE COURT:  Three.

25          COURTROOM DEPUTY CLERK:  Three.
```

1          MR. TRAGOS:  Pass.  We accept the jury.

2          THE COURT:  What says the government?

3          MS. KAISER:  Your Honor, may I have a moment?

4          THE COURT:  I'm sorry?

5          MS. KAISER:  Your Honor, may I have a moment?

6          THE COURT:  Yes.

7     (Brief pause.)

8          MS. KAISER:  United States strikes juror

9     number 15, David Monaco.

10         THE COURT:  Monaco?

11         MS. KAISER:  Um-hum.

12         THE COURT:  That would put Jennifer Scott into

13    the twelfth seat, juror number 25.  What says the

14    defendant?

15         MR. TRAGOS:  Strike Ms. Scott.

16         THE COURT:  That would put Jason Saice into

17    the twelfth seat.  What says the government?

18         MS. KAISER:  Government strikes Jason Saice.

19         THE COURT:  That would put Christina Pacific

20    into the twelfth chair.  What says the defendant?

21         COURTROOM DEPUTY CLERK:  Judge, can I have a

22    count of the jurors that you show?

23         THE COURT:  All right.  I'm going to read the

24    names.  Follow along, please.  These are the ones in

25    the box.  Thompson, Pedersen, Mendez, Harris,

```
1      Martinez, Taylor, Coats, Perez, Dorey, Lisi,

2      Frieler-Baker and Pacific.   What says the defendant?

3             MR. TRAGOS:   Defense would strike Pacific.

4             THE COURT:   That would put Robert Wile,

5      W-I-L-E, into the twelfth chair.   What says the

6      government?

7             MS. KAISER:   United States would strike Robert

8      Wile.

9             THE COURT:   The government has exhausted its

10     preemptories.   What says the defendant?   Mr. Gregory

11     Laney is the twelfth juror.

12            MR. TRAGOS:   We'd accept the jury.

13            THE COURT:   Let's see.   I'm sorry.

14            MS. KAISER:   Your Honor, can I ask one --

15     there's one issue with Mr. Laney that I'd like to

16     explore before we finish.   The United States had an

17     investigation involving an Outback Steak House that

18     our office declined to prosecute.   And I just wanted

19     to confirm.   He didn't say he knew me, but I want to

20     make sure that that's not the same Outback because

21     if it turns out to be the same one, that could be a

22     problem.

23            THE COURT:   Well, it's a little late for that;

24     isn't it?

25            MR. TRAGOS:   I don't think he was asked.
```

1           THE COURT:  A specific location you're

2    talking about --

3           MS. KAISER:  Yes, Your Honor.

4           THE COURT: -- or corporate?

5           MR. TRAGOS:  He's a corporate VP.

6           MS. KAISER:  I think he said he was a manager

7    of an Outback.  I just want to confirm it's not the

8    same one.

9           THE COURT:  What do you want me to ask him

10   without zeroing in to much on --

11          MS. KAISER:  Just ask if --

12          THE COURT:  Are you a manager of a specific

13   location?  If so, which one?

14          MS. KAISER:  Yes.

15          THE COURT:  Any objection to that?

16          MR. TRAGOS:  I think we would object at this

17   time, Your Honor, because I think that he was

18   asked -- he was asked about any -- if he's ever been

19   accused of a crime.  He was asked those questions

20   before.  And the government's asked about, you know,

21   federal -- been involved in the federal government

22   with anything.  I mean, I think he was asked and it

23   would have come up.

24          THE COURT:  I'm going to ask it in a way that

25   I think camouflages it.  I'll make sure Mr. Beck is

1    not --

2         MR. TRAGOS:  Laney.

3         MS. KAISER:  Mr. Laney.

4         THE COURT:  I know.  I'm going to ask again,

5    even though I've asked it, 114 take the dumb label,

6    which location he's at, which one is Beck at, make

7    sure they're not the same one.  All right.  So stand

8    by.

9    (End of side bar discussion.)

10        THE COURT:  A quick couple of questions.  I

11   may have covered it before, but I want to be very

12   careful.  Mr. Beck, you're a cook at one of the

13   Outback locations.  Which one is that?

14        JUROR 442:  Wesley Chapel on 75 and 54.

15        THE COURT:  All right.  Right off 54.  All

16   right.  And Mr. Laney, are you assigned to a

17   particular location?

18        JUROR 350:  No.  Home office Tampa.

19        THE COURT:  Home office, corporate?

20        JUROR 350:  Yes.

21        THE COURT:  All right.  So you guys don't work

22   together.

23        JUROR 350:  No.

24        THE COURT:  All right.  Thank you.

25   (At side bar, on the record.)

```
1              THE COURT:  Did that clear it up?

2              MS. KAISER:  Yes.

3              THE COURT:  Okay.  All right.  I think we

4     ought to seat at least one if not two alternate.  So

5     the defendant has one remaining challenge, the

6     government has no challenges.  So 114 give one more

7     to the government and one more to the defendant.

8              MR. TRAGOS:  That means I have two?

9              THE COURT:  For purposes of alternate

10    striking, yes.

11             MR. TRAGOS:  Only alternate strikes.

12             THE COURT:  Mr. Alderman is the first -- I'm

13    sorry, Mr. Lindeman, far right, back row.  Any

14    objection from the government?

15             MS. KAISER:  No, Your Honor.

16             THE COURT:  He's the one that's the expert

17    witness.

18             MR. TRAGOS:  We would strike him.

19             THE COURT:  All right.  Michele Brookins, any

20    objection from the government?

21             MS. KAISER:  Yes.  The United States would

22    strike her.

23             THE COURT:  All right.  Any objection from the

24    defendant as to Mr. Marco?

25             MR. TRAGOS:  No, no objection.
```

1          THE COURT:  Alternate number one, then.  How

2     about Reinalda Flores, any objection from the

3     defendant?

4          MR. TRAGOS:  No objection to Flores.

5          THE COURT:  She'll be alternate number two.

6     I'll have the jury sworn, we'll take a break and

7     then come back and give openings and get ready to

8     move forward.

9          MR. TRAGOS:  We're taking a lunch break now?

10         THE COURT:  Yeah.

11         MR. TRAGOS:  Okay.

12     (End of side bar discussion.)

13         THE COURT:  Thank you.  Sorry for that period

14     where you're left out.  Those bench conferences are

15     conducted from time to time in any trial.  Lawyers

16     have to be able to talk to me candidly without fear

17     of influencing your deliberative process.

18          As I read the names of those of you who will

19     stay, let me thank the rest of you for your patient

20     participation this morning and now this afternoon.

21     They are to call back in Friday; is that right,

22     Anne?

23         COURTROOM DEPUTY CLERK:  Yes, sir.  The

24     recording.

25         THE COURT:  With the exception of Ms. Vazquez.

1    You're going to be excused so you can go on your

2    vacation.  Where are you going in Costa Rica?

3    Where?

4         JUROR 415:  Around the whole country.

5         THE COURT:  Good for you.  I've been there

6    many times.  I was just curious.  All right.

7         The following jurors will remain with us.

8    Ms. Thompson, Mr. Pedersen, Mr. Mendez, Ms. Harris,

9    Mr. Martinez, Mr. Taylor, Ms. Coats, Ms. Perez,

10   Mr. Dorey, Mr. Lisi, Ms. Frieler-Baker, Mr. Laney,

11   Mr. Marco and Ms. Flores.  The remaining jurors are

12   excused.  Thank you.  Please watch your steps as you

13   exit the courtroom.

14   (Jury panel excused.)

15        THE COURT:  All right.  Ms. Thompson, if

16   you'll scoot down one chair, please.  Sorry.  I

17   didn't have my mic on.  Ms. Pedersen, Mr. Mendez,

18   Ms. Harris and then Mr. Martinez, take that last

19   seat here.  Well, just a moment.  Got to get you in

20   a certain order.  Mr. Martinez and then Mr. Taylor.

21   And then would be Ms. Coats, if you'll slide down,

22   and then Mr. Perez the next chair, and then

23   Mr. Dorey, and then Mr. Lisi, then

24   Ms. Frieler-Baker.  And we don't want you sitting by

25   yourself, Mr. Laney, so up in the top row and next

1      to you will be Mr. Marco and Ms. Flores.

2            Now, that's your assigned seat.  Kind of get

3      oriented so when we return from lunch you'll sit in

4      the right chair.  Madam Clerk, please administer the

5      oath.

6            COURTROOM DEPUTY CLERK:  Please stand and

7      raise your right hands.  Do each of you swear or

8      affirm that you will well and truly try the case now

9      before the Court and render a true verdict according

10     to the law and the evidence and the instructions of

11     this Court?

12           JURORS:  I do.

13           THE COURT:  Please be seated.  We're going to

14     take our lunch break now.  Let's return at 2:15 by

15     the courtroom clock.  At that time I will give you

16     some further instructions, and the lawyers will give

17     you their opening statements.  We're going to stop

18     at 4:00 today.  So wherever we are, we'll stop.

19           Now, lunch.  When you exit the courthouse,

20     you're facing toward the Gulf of Mexico.  I know

21     that sounds kind of silly.  But those of you who are

22     not familiar with Tampa, you'll be facing west.  If

23     you go down Florida Avenue that way, which would be

24     south, there is a place called Secret Garden down

25     past the old courthouse and there's a Catholic

1   church, you'll see it, sandwiches and a salad bar.

2         If you go one block west, you'll see on your

3   left TECO Plaza.  They have a restaurant in there

4   with hot food, cold food, sandwiches.  And then as

5   you go down Franklin Street south, there's a number

6   of different places all the way down to a Quizno's

7   on the left about three blocks.

8         You're free to go wherever you want.  You

9   don't have to go with each other, you can go

10  individually.  Go ahead and report back to work or

11  home.  Again, don't discuss the case or allow it to

12  be discussed in your presence.  And we will resume

13  in one hour.

14        MR. TRAGOS:  No contact, Your Honor, with us.

15        THE COURT:  I'm sorry.  The lawyers are not

16  going to talk you, they're not going to look at you.

17  If you say hi to them, they're going to ignore you.

18  Don't think they're being rude.  They're avoiding

19  any improper communication.  So if you get in the

20  elevator with one of them, please forgive them.

21  They're going to turn their back.  Don't think

22  they're being rude.  Thank you.

23        COURTROOM SECURITY OFFICER:  Rise for the

24  jury.

25  (Jury out at 1:15 PM.)

1          THE COURT:  Go ahead and give them their

2     badges they can wear while they're in and out of the

3     courthouse.  Just give them a chance to leave,

4     please.  That way we won't have any awkward moments.

5     And always be mindful if for some reason the jury is

6     escorted into the courtroom prematurely, please, one

7     of you stop the CSOs or the marshals so we don't

8     have an interaction with the defendant accidentally.

9          All right.  We'll be in recess until 2:15 by

10    the courtroom clock.

11    (Recess was taken at 1:16 until 2:20 PM.)

12    (Back on the record.)

13         COURTROOM SECURITY OFFICER:  All rise.

14         THE COURT:  Ready?

15         MS. KAISER:  Yes, Your Honor.

16         THE COURT:  Bring the jury in, please.

17         COURTROOM SECURITY OFFICER:  Rise for the

18    jury.

19    (Jury in at 2:21 PM.)

20         THE COURT:  Thank you, and be seated.  You

21    have now been sworn as the jury to try this case.

22    By your verdict you will decide any disputed issues

23    of fact.  I will decide all questions of law that

24    arise during the course of the trial.  And before

25    you begin your deliberations at the end of the case,

1    I will instruct you on the law that you must follow

2    in reaching your verdict.

3         During the course of the trial, you should

4    give careful attention to the testimony and the

5    evidence as it is presented, because we do not have

6    the facilities to provide you with a transcript of

7    the testimony.

8         Also, remember you should not form or express

9    any opinion about the case one way or the other

10   until you've heard all of the evidence, the closing

11   arguments from the attorneys and my instructions on

12   the law.  Remember, you are judges.  You should wait

13   until it is time to deliberate your verdict before

14   making any decisions or reaching any conclusions.

15        You may not discuss the case among yourselves

16   or in the presence of anyone else, or allow it to be

17   discussed in your presence.  Remember, again, that

18   if you run into one of the lawyers in the building

19   or out in the sidewalk, they are not going to speak

20   with you.  They will literally turn their back.

21   Please don't think they're being rude.  They are

22   following a strict rule of procedure to avoid even

23   the appearance of improper communication.

24        You should also avoid being exposed to any

25   newspaper articles, radio commentary or television

1    coverage of this or any other trial that may be in

2    progress.  Again, the decision you make in this case

3    must be based on the evidence presented in the

4    courtroom and the law that I give you, and not on

5    any outside influence that you may be exposed to.

6         From time to time during the course of the

7    trial, I will be asked to make rulings on objections

8    or motions.  The lawyers have an obligation to their

9    clients to make objections and to make motions which

10   they believe the circumstances require.  You should

11   never hold it against either side because of the

12   number of objections or the nature of those

13   objections.  Again, those lawyers have an obligation

14   to make those objections, and if they don't, they

15   waive that objection.

16        During the course of questioning a witness,

17   there may be an objection, for example, to a

18   question posed, something like, objection, Your

19   Honor, calls for hearsay.  I will rule on the

20   objection, either sustaining the objection, meaning

21   that I agree and the witness will not be permitted

22   to answer, or I will overrule the objection, meaning

23   I disagree with the objection and the witness will

24   be permitted to answer.

25        Lawyers can genuinely disagree about the

1        applicability of the rules of evidence.  They are

2        complicated, and the circumstances sometimes dictate

3        different views of whether something is admissible.

4        Those are decisions I will make, and you are to be

5        guided by those decisions.  And they should never be

6        the subject of your deliberations.  Even if you

7        think it was a good question that should have been

8        asked and should have been answered, the rules of

9        evidence may preclude a witness from answering a

10       question under those particular circumstances.

11            If I do instruct a witness not to answer the

12       question, you should not speculate on what the

13       witness might have said.  Nor if the witness blurts

14       out the answer before I get a chance to rule and I

15       instruct you to disregard it, are you to consider

16       the answer.

17            In a moment the attorneys will have the

18       opportunity to make their opening statements, during

19       which they will summarize what they believe the

20       evidence in the case will show.  The defendant may

21       make an opening statement but is not obligated to do

22       so.

23            After opening statements, the government will

24       begin calling witnesses and introducing exhibits

25       into evidence in support of the accusations in the

1    indictment.  After the government has completed its

2    presentation, it will announce that it rests,

3    meaning that the government has finished its case.

4         At that time the defendant may, but is not

5    obligated produce evidence.  Again, in a criminal

6    case, the burden is entirely on the government.  The

7    defendant never has the burden of introducing any

8    witnesses or any evidence or calling any witnesses.

9    If the defendant does produce testimony or evidence,

10   the government then has an opportunity to present

11   what we call rebuttal evidence.

12        After the attorneys make their final

13   arguments, I will read to you the law that you must

14   follow in reaching your verdict, and you will have a

15   copy of those instructions in the jury room to

16   assist you in your deliberations.

17        I will say from time to time, as I already

18   have and in a somewhat more -- in a lighter tone,

19   that what the lawyers say is not evidence in the

20   case.  But they're advocates, they're experienced.

21   They have investigated the case.  They understand

22   what the evidence is likely to be.

23        So their statements to you now and the final

24   arguments they make later are intended to help you

25   and should assist you in understanding how the law

1    applies to the facts as you find them.  So you

2    should give them your close attention.

3        At this time we'll hand out the notepads for

4    your use in taking notes if you choose to do so.

5    You are not required to take notes.  Some of you

6    probably haven't taken notes since high school or

7    college.

8        On the other hand, some of you may take notes

9    every day like I do and the lawyers do, so we're

10   accustomed to it.  If you do choose to take notes,

11   let me give you some guidelines.  First of all,

12   there are some rules.  Your notes will be collected

13   at the end of each trial day by my courtroom

14   security officer and they will be kept in my

15   chambers.

16       No one is going to look at them, of course.

17   But they are removed from the courtroom to safeguard

18   them.  You'll not be able to take them home and

19   study them at night.  Once your verdict is returned,

20   your notes will be shredded in my office under my

21   supervision so, again, your deliberative thoughts

22   and notations are never disseminated outside of our

23   presence and control.

24       Now, if you're not in agreement with that rule

25   then do not take notes, because that is the rule I

1    will follow.  A couple of other things.  Don't put

2    your name on your pad, just put your juror number

3    that identifies you with the particular pad, and

4    leave it on your chair as you exit the courtroom so

5    that we can collect them in the order in which they

6    are sitting.

7         Everything that happens in the courtroom is

8    important for you.  What you hear is important, what

9    you see is important.  You will be watching the

10   lawyers and the witnesses.  You will be listening to

11   the witnesses testify.  And you know from common

12   sense that when you are deciding whether to believe

13   a witness, by watching that witness and how they

14   respond to the questions, you are assisted in making

15   those difficult credibility determinations.

16        So if you are busy doodling or drawing, you're

17   going to miss important evidence.  Use your notes to

18   refresh your own recollection of what the evidence

19   is.  You may want to keep track of the day of the

20   week, maybe before lunch, after lunch.  Write down

21   the name of each witness even though you may not

22   take notes on that witness.  It will give you the

23   sequence of the evidence that should assist you in

24   your deliberations when the case concludes.

25        If you're a copious note-taker, if you know

1    shorthand, let me suggest that you not try to take

2    everything down.  Listen to the evidence.  The

3    note-taking process is relatively new to our jury

4    system.  It's kind of arisen in the last, I would

5    say, 12, 13, 14 years.

6         Nothing wrong or improper, but historically

7    jurors have not taken notes except in complicated

8    financial cases.  There's no reason you can't take

9    notes, but just take them wisely.  And your notes

10   should never be a substitute for the recollection of

11   your fellow jurors of the evidence and testimony as

12   they hear it.

13        With that, it is now time for the lawyers to

14   make opening statements to you.  Please give them

15   your close attention.  Ms. Kaiser?

16        MS. KAISER:  Thank you, Your Honor.  Good

17   afternoon, ladies and gentlemen of the jury.  May it

18   please the Court.  My name is Amanda Kaiser.  And

19   together with Special Agent Alex Hagedorn, we're

20   going to prove to you that the defendant, Charles

21   Friedlander, who's seated at the far end of the

22   table, used a computer and the internet to arrange a

23   meeting in which he planned to sexually abuse and

24   torture two little boys, ages 10 and 11.

25        The evidence in this case will show that the

1    defendant communicated with an undercover law

2    enforcement officer from Pinellas County and

3    arranged to meet him in Pinellas County back in July

4    of last year.

5         The evidence in this case will show that

6    Corporal Kurt Romanosky is a detective with the

7    Pinellas County Sheriff's Office, and he's assigned

8    to a special unit, the Crimes Against Children Unit.

9    And his duty involved -- his duties involve

10   investigating any type of crime related to a child,

11   whether it be physical abuse, sexual abuse or both.

12        Now, the evidence in this case will show that

13   sometimes law enforcement officers have to go

14   undercover.  The evidence will show that in certain

15   types of cases and with certain types of crimes,

16   people don't operate out in the open.  People that

17   have a sexual interest in children or a

18   sadomasochistic interest in children and the sexual

19   and physical torture of children don't operate out

20   in the open.  So sometimes law enforcement has to go

21   undercover to conduct those investigations.

22        The evidence will show that there's some

23   people out there who do derive sexual pleasure from

24   torturing and having sex with minors.  Back in June

25   of last year, Corporal Romanosky started an

1    undercover investigation online.

2         Now, as part of his undercover investigation,

3    he created what's called an internet profile.  Now,

4    this evidence will show that he created a profile

5    calling himself, quote, StricDad7.  And he went into

6    what's called an internet chat room, a user-created

7    chat room within America Online, which is a place

8    where the people who have accounts with America

9    Online can go and converse with each other regarding

10   specific topics.

11        So Corporal Romanosky went into a chat room

12   called strict parents and waited.  And the evidence

13   will show that as he waited in that chat room, he

14   was approached by the defendant, Charles

15   Friedlander, and the two began to communicate one on

16   one using instant messaging.  So within this chat

17   room, the evidence will show that the defendant

18   contacted Corporal Romanosky who was posing as

19   StricDad7 within a chat room called strict parents.

20        The defendant was using a screen name known as

21   Captoes.  That's what he called himself online.  The

22   defendant is a 78-year-old licensed mental health

23   counselor, who practices family counseling and has a

24   home in the Ft. Myers area and also a multi-story

25   home in Virginia.

1          Soon, Corporal Romanosky, who was posing as

2     StricDad7, and the defendant engaged in various

3     internet chats in which they discuss the physical

4     and sexual abuse of Corporal Romanosky, who was

5     posing undercover, of his two little boys, ages 10

6     and 11.

7          Corporal Romanosky posed as a parent who would

8     share their children for sex.  He posed as a parent

9     who was a member of a group of other people that got

10    together and engaged in sadomasochistic abuse of

11    children, sexual abuse and physical abuse of

12    children.

13         The defendant expressed his desire to join the

14    group.  During his discussions, the defendant, the

15    evidence will show, said that he was 70 years old to

16    try to convince StricDad7 who, as you'll see, is

17    Corporal Romanosky, to allow him to join the group

18    so he could also engage in the physical and sexual

19    torture of his two little boys, ages 10 and 11.

20         The evidence will show the defendant chatted

21    online in various chats.  He talked on the phone.

22    We have recorded phone calls that you'll hear

23    between the defendant and Corporal Romanosky, who is

24    posing undercover.  And, also, they exchanged

25    e-mails back and forth.

1              And arrangements were made on July 21st of

2       last year, of 2008, for the two to actually meet,

3       and they were to go back to the residence of

4       StricDad7, of Corporal Romanosky in his undercover,

5       to engage in the sexual and physical abuse of the

6       two boys, ages 10 and 11.

7              During the chats, the defendant told Corporal

8       Romanosky that he was going to bring various

9       implements with him to engage in the physical and

10      sexual abuse of the minor children.  The evidence

11      will show that the defendant mentioned that he would

12      bring a razor strop, which is a leather implement,

13      and a riding crop, a leather riding crop that one

14      uses to hit a horse.  The evidence will show that

15      the defendant also mentions he would bring various

16      whips and belts with him.

17             The evidence will show that the defendant

18      stated that his preference was that the children

19      would be stripped naked and bound during the

20      physical and sexual abuse.  The evidence in this

21      case will show that on July 21st of 2008, the

22      defendant drove from his home in the Ft. Myers area,

23      approximately two, two and a half hours to a

24      Cracker Barrel in St. Petersburg, where he met with

25      Corporal Romanosky who was posing as the bad parent

1     who was going to share his boys for sex.

2          At that meeting in St. Petersburg, when the

3     defendant arrived, the evidence will show that on

4     his way up he had just recently eaten, and he went

5     to the Cracker Barrel which was the predetermined

6     meeting location where he was going to meet

7     Detective Romanosky.  At that meeting, the defendant

8     had in his possession various belts, a riding crop,

9     all the implements that he told the undercover

10    officer that he would bring to use in the physical

11    and sexual abuse of the children.

12         On July 21st after the meeting at the

13    Cracker Barrel, the defendant was placed under

14    arrest and he was taken back to the Pinellas County

15    Sheriff's Office and interviewed.  The evidence will

16    show that the defendant made a number of post-arrest

17    statements to law enforcement.  And that interview

18    was taped; so that's part of the evidence in this

19    case that you'll see is the defendant's interview

20    with law enforcement after he was arrested.

21         Also, all the internet chats between

22    Corporal Romanosky and the defendant were recorded.

23    So as part of the evidence in this case, you'll also

24    hear all the chats back and forth between the

25    defendant and Corporal Romanosky.

1           Additionally, as I mentioned previously, there

2    was an undercover phone call that was taped, as

3    well, so you'll have an opportunity to listen to an

4    undercover phone call between Corporal Romanosky and

5    the defendant.

6           When the defendant was arrested, law

7    enforcement conducted a search warrant at his

8    residence in Ft. Myers.  You're going to hear

9    evidence in this case about what was found in the

10   defendant's residence.  Specifically, you're going

11   to hear about the various items that they seized

12   from his house, including computers.

13          And you're going to hear testimony about

14   various pieces of evidence that show the defendant

15   has an interest in sadomasochistic sex and physical

16   abuse.  You're going to see a number of pictures

17   that were seized from the defendant's computer as

18   well as a number of e-mails, as well.

19          Now, while Corporal Romanosky was chatting and

20   conducting this investigation of this defendant back

21   in June and July of last year, the content of the

22   chats made him think back, and he remembered that he

23   had had very similar chats in the past,

24   approximately three years earlier in 2005.

25   Corporal Romanosky checked his files and located

1    chats that he had had with this defendant,

2    Mr. Friedlander, from 2005 in which they also

3    discussed the physical and sexual abuse of children.

4         So during this trial, you're also going to

5    hear evidence from 2005 in the form of chats that

6    the same detective had with this defendant from

7    2005, as well.

8         As in most cases, a lot of law enforcement

9    officers have a very small part in the

10   investigation.  Initially, there's -- there's

11   officers that conducted the investigation, then

12   there's officers that conducted the search at the

13   residence.  Some officers may have inventoried

14   property, some may have searched the computers.  So

15   you're going to hear from a number of witnesses,

16   some of whom may have only had a very small part to

17   play.

18        The evidence will show in this case that this

19   defendant used his computer to induce a child for

20   sex by arranging for a meeting with that -- those

21   children's parent, Corporal Romanosky, to engage in

22   the physical and sexual abuse of children.  And at

23   the end of the proof in this case, the United States

24   is going to come back and ask you to return a

25   verdict of guilty.  Thank you.

1          THE COURT:  Thank you, Ms. Kaiser.

2     Mr. Tragos, would you like to give an opening at

3     this time?

4          MR. TRAGOS:  Yes, Your Honor.  When you were

5     picked as jurors and when we did the jury selection,

6     one of the important things was the open mind; that

7     you're going to listen to all the evidence in the

8     case, and that you were going to render a verdict

9     beyond a reasonable doubt.  That's the standard.

10    That's their burden.

11         Now, the prosecutor started out by telling you

12    that they're going to prove this case beyond a

13    reasonable doubt, and she told you what she was

14    going to prove.  And I'm telling you that there is

15    tons of reasonable doubt, and that we're going to

16    ask you for a verdict of not guilty because she

17    can't prove her case beyond a reasonable doubt.

18         She started out by telling you that he planned

19    to sexually abuse and torture two boys, ages 10 and

20    11.  They have to prove that he knowingly and

21    willfully intended to do that, that that was his

22    intent.  If he intended anything else, or you have a

23    reasonable doubt of him intending anything else, you

24    have to find him not guilty.

25         Now, she told you pieces of evidence.  But

1    you've got to look at all the evidence in context.

2    First, let's start with Charles Friedlander.  He's a

3    78-year-old man.  He was born in New York City, and

4    he has one sister.  He grew up in the New York City

5    area.

6        He got his undergraduate degree at William and

7    Mary College.  He was a teacher from 1963 to 1967.

8    He taught French and English.  He was a guidance

9    counselor from 1967 to 1986.  He received a master's

10   from George Washington and a PhD from George

11   Washington in student personnel.

12       He retired and had a private counseling

13   practice.  He grew up in an era different from most

14   of us.  And he didn't finally admit to himself that

15   he might be gay until his late 20's or early 30's.

16   And it was hard for him at that time because it

17   certainly wasn't an accepted thing.  So for a while

18   he tried to convince himself, even to recent times,

19   that he was bisexual.  But on any date he ever went

20   out on, he had no sexual interest in the girls.  And

21   he finally had to admit to himself that he was gay.

22       He is 78 years old and never had sexual

23   intercourse.  He has a severe case of diabetes which

24   he's had for years and years and he has erectile

25   dysfunction.  He tries everything possible to get an

1    erection, and he can't get one.

2         And you'll see some of the things because the

3    law enforcement, when they searched his place, took

4    some pictures of it.  And you'll hear about how it

5    works and how -- you'll also hear about how his

6    diabetes can cause the erectile dysfunction.

7         Now, the government talked about chats, and

8    you're going to hear some chats.  You're going to

9    hear chats between Detective Romanosky and

10   Dr. Friedlander, and the chats are going to be very,

11   very graphic.  They're going to mutually talk about

12   whipping children, beating them, doing all sorts of

13   things to them.  And you're going to be horrified by

14   those chats.

15        But I want you to listen to them because --

16   and I want you to listen to them very carefully.

17   Because not only do you have to listen to them, but

18   you have to also put them in context with everything

19   that has gone on and everything that the government

20   did look at and what they found and what they didn't

21   find.

22        First, you will hear that he never acted on

23   anything he chatted about.  They're not going to be

24   able to show you one child that was ever touched by

25   Dr. Friedlander.  Detective Romanosky suspected that

1   when this hit the paper, and the arrest did hit the

2   paper, mothers would be calling, you know, about

3   their children and coming in contact with this man.

4   Not a single mother.

5       They searched his computer, and they found

6   hundreds and hundreds of e-mails.  They found over

7   8,000 e-mails on his two computers, his laptop and

8   his desktop.  They found hundreds of e-mail

9   addresses of people that they can identify because

10  they issued subpoenas to AOL and all these places to

11  find out who these people are.

12      And after all that, they found 40,000 graphic

13  images on his computer, 40,000 pictures on his

14  computer.  Not a single one of those 40,000 pictures

15  was a child in any kind of sexual activity.  Not

16  one.  Now, think about that.  He is accused of being

17  a person that wants to --

18      MS. KAISER:  I'm going to object.  It's

19  argument.

20      THE COURT:  Keep it non-argumentative, please.

21  Thank you.

22      MR. TRAGOS:  So put in context, a person

23  accused of wanting to torture and sexually abuse a

24  child, and then the evidence showing not a single

25  picture of that kind of activity.  Out of 8,000

1    e-mails, the evidence will show not a single e-mail

2    to a child.  Chats, IMs, not a single chat with a

3    child.  Not a single instant message with a child.

4         When you're listening, listen for whether or

5    not it was Detective Romanosky that was carrying

6    this conversation on or was it Dr. Friedlander that

7    was the one that wanted to carry the conversation on

8    in the sexual nature.

9         When you're listening, listen for words like

10   ejaculation.  Dr.  Friedlander can't ejaculate.  But

11   listen, they talk about him ejaculating.  They talk

12   about him -- Dr. Friedlander makes up a story in

13   these -- in these chats that he has children staying

14   at his house, that he is beating these children

15   with these implements that the prosecutor is going

16   to talk about.

17        And do the police drive by his house?  No

18   evidence.  You'll hear no evidence of the police

19   driving by his house.  Do the police try to save

20   these children from this abuse?  You'll hear no

21   evidence of police trying to save these children of

22   this abuse.

23        You'll hear evidence where they -- where he

24   talks about torture rooms.  No evidence of the

25   existence of any torture rooms in the house.  He'll

1    talk about abusing children on multiple occasions.

2    No evidence of that.  He'll talk about beating the

3    children with these leather belts.

4         Now, if you're going to beat children with

5    leather belts and have them take off their pants and

6    do all this stuff, wouldn't you think there would be

7    some blood or some DNA evidence on these leather

8    belts, and wouldn't you think they could connect

9    those up with a child?  You'll hear no evidence of

10   any evidence of any beatings of any children at any

11   time.

12        When you hear questions about, what do you

13   want to do for sex, find out who it is that's

14   talking and who wants to talk the most about sex.

15   Is it Detective Romanosky or is it Dr. Friedlander?

16   Romanosky is trained over and over again of how to

17   lead people in these conversations.  And maybe it

18   would have been best for people not to deal in these

19   kind of conversations.  But these kind of

20   conversations are not illegal.  But Romanosky talks

21   about it.

22        Now, what is Dr. Friedlander doing?  When

23   you're 78 years old and you're alone and you're in a

24   house, then you try to find friends somewhere.  He

25   went and found his friends on the internet.  You'll

1    hear testimony and evidence about the dozens and

2    dozens of hours he spends on the internet.  You'll

3    hear about the hundreds and hundreds of buddies he

4    has on his buddy list.  And you'll hear what a buddy

5    list is.

6        He has an address book with hundreds and

7    hundreds of people on it.  Not a single child.  And

8    the hours and hours he spends on AOL, no evidence

9    that he ever talks to a single child on any of that.

10   None.

11       What is he doing with Romanosky?  Well, it's a

12   bit of an AOL courtship.  And he wants to come up

13   here and meet Romanosky.  Romanosky, in order to

14   meet him, wants to see these implements, and so he

15   comes up with the implements to show Romanosky.

16       You'll hear on the tapes where he tries to get

17   Romanosky to go to lunch with him.  Now, if you're

18   coming up here to beat children -- he did not come

19   up here to beat children, because he didn't care

20   about going right to that house and beating those

21   children and have sex with them.  What he wanted to

22   do is come up here and have lunch with Detective

23   Romanosky.  Maybe they could strike something up.

24       Romanosky keeps putting off lunch and then

25   changes it to go for coffee.  He says, fine, let's

1    go for coffee.  Then Romanosky changes it and says,

2    well, why don't we just go directly to my house.

3         Charles Friedlander was carrying on an AOL

4    courtship.  You will see that he has done that

5    before with adult men, no children.  And that's the

6    key when you're looking at this evidence, no

7    children.

8         He has -- he had a clean record as a high

9    school counselor, no complaints.  He had a clean

10   record as a teacher.  He has a clean record -- he

11   has never been arrested for anything.  All of that

12   would show you and he's going to testify that he has

13   never ever done anything like this, that it was talk

14   and that he thought Romanosky was interested in him.

15   And to keep Romanosky's interest, that's what he

16   did.  He brought these things up.

17        So ladies and gentlemen of the jury, I ask you

18   to listen carefully to those tapes and those

19   transcripts and those chats.  Look for what

20   Romanosky is saying and what Dr. Friedlander is

21   saying.  See if Dr. Friedlander is just keeping up

22   Romanosky's interest in him.  And then think about

23   this.  The prosecutor talked to you about 2005.

24   Romanosky is allegedly chatting with him in 2005.

25   If this man was such a danger to children --

```
 1          MS. KAISER:  Objection, argumentative.
 2          THE COURT:  Sustained.  Keep it factual,
 3     please.
 4          MR. TRAGOS:  There is no evidence that
 5     Romanosky did anything from 2005 to 2008 to have
 6     additional investigations or have anything done or
 7     have Dr. Friedlander watched.  Not a single thing.
 8          The evidence will show that Detective
 9     Romanosky was able to mold his conversations.  You
10     will see an interview that happens later on, and
11     Romanosky will tell you that he's trained to do
12     these.  After the arrest you'll see an interview and
13     you'll listen to it.  Listen to how the interview
14     goes.  See if Romanosky, when he doesn't like the
15     answers --
16          MS. KAISER:  Objection, Your Honor,
17     argumentative.
18          MR. TRAGOS:  Your Honor, that's factual.  I'm
19     sorry.
20          THE COURT:  Overruled.
21          MR. TRAGOS:  Excuse me?
22          THE COURT:  Overruled.
23          MR. TRAGOS:  Okay.  See what happens when
24     Detective Romanosky doesn't like the answers he gets
25     from Dr. Friedlander.  He'll ask the question six
```

1    different ways until he gets the answer he wants.

2         When Dr. Friedlander denies any interest in

3    children, when Dr. Friedlander says that he only is

4    interested in adults, see what Romanosky does and

5    how he tries to twist it back and forth until he's

6    able to get this 78-year-old man to say what he

7    wants him to say.

8         So listen carefully to all of this, because in

9    there, in that, in all that I've told you is where

10   you're going to find the reasonable doubt.  Because

11   if they can't prove all of those things beyond a

12   reasonable doubt, then it has to be a not guilty.

13   Thank you.

14        THE COURT:  Thank you, Mr. Tragos.  Call your

15   first witness, please.

16        MS. KAISER:  United States calls Detective

17   Corporal Kurt Romanosky.

18        COURTROOM DEPUTY CLERK:  Raise your right

19   hand.

20        (WITNESS COMPLIED.)

21        COURTROOM DEPUTY CLERK:  Do you swear or

22   affirm the testimony that you give in this case will

23   be the truth, the whole truth and nothing but the

24   truth?

25        THE WITNESS:  I do.

1           COURTROOM DEPUTY CLERK:  Please be seated.

2           THE WITNESS:  Thank you.

3           COURTROOM DEPUTY CLERK:  Please state your

4    name and spell your last name for the record.

5           THE WITNESS:  My name is Kurt Romanosky.

6    That's spelled R-O-M-A-N-O-S-K-Y.

7                    DIRECT EXAMINATION

8    BY MS. KAISER:

9    Q     Good afternoon, Corporal Romanosky.

10   A     Good afternoon.

11   Q     Could you please tell the jury where you work.

12   A     I'm employed with the Pinellas County

13   Sheriff's Office.

14   Q     And how long have you been so employed?

15   A     I've been with sheriff's office since May 13th

16   of 1991.

17   Q     What is your current assignment with Pinellas

18   County?

19   A     Currently I'm assigned to the Crimes Against

20   Children Unit.

21   Q     What does that work involve?

22   A     Our Crimes Against Children Unit at the

23   Pinellas County Sheriff's Office is charged with the

24   investigation of any serious offense committed

25   against a person under the age of 18.  We

1    investigate everything from death, inclusive of

2    homicides, suicides, accidents.

3         We investigate physical abuse cases involving

4    serious physical injury to the victim.  We

5    investigate all sorts of sexual abuse cases.  And in

6    my case, I'm also charged with investigating

7    internet and computer facilitated crimes against

8    children.

9    Q    What type of training have you had for your

10   position?

11   A    Well, all law enforcement officers attend a

12   police academy at some point in their career before

13   they start.  After you're hired by an agency,

14   typically you'll receive training that's geared

15   towards your assignment in patrol.

16        Once being selected for a position of

17   detective, your training will then shift into more

18   of a latent investigation type mode, interviewing,

19   interrogation, forensic analysis of written

20   statements, things along those lines.

21        Once moving into a specialized unit like mine,

22   the training then shifts to what your specialty is

23   going to be.  In this case it was investigating

24   physical and sexual abuse cases, interviewing child

25   victims, interviewing sex offenders, interviewing

1       physical abuse offenders.

2           Once I moved into the computer investigations,

3       the training then shifted to those types of cases,

4       things like websites and databases, protecting

5       children online, undercover operations techniques,

6       how to track things across the internet, training

7       along -- centered, geared towards that.

8       Q     What type of investigations do you conduct

9       now?

10      A     I still conduct physical and sexual abuse

11      investigations, death investigations.  And I'm the

12      point of contact for our agency's participation in

13      the Internet Crimes Against Children Task Force.

14      Q     Do you conduct any undercover investigations?

15      A     Yes, ma'am, routinely.

16      Q     And why do you conduct undercover

17      investigations?

18      A     My experience has shown that there are people

19      using the internet to either meet children online,

20      to victimize them sexually or physically.  There are

21      also people using the internet in other online

22      services to meet adults, parents, guardians,

23      custodians, or in this case, people they think are

24      parents or guardians or custodians for the purposes

25      of gaining access to children to commit physical or

1     sexual abuse-related offenses.

2     Q     Why is it necessary to go undercover to do

3     that?  Why can't you just a conduct a regular

4     investigation?

5     A     Well, that kind of -- that kind of says it

6     all.  You have to be undercover.  If you were not

7     undercover, if you were out there as a law

8     enforcement officer online, people would not -- they

9     wouldn't talk to you.  They wouldn't engage in

10    discussions regarding physical and sexual abuse.

11    They wouldn't tell you what they were doing.  They

12    wouldn't tell you where they were doing it.  So

13    it's necessary.

14          You know, it can almost be equated to other

15    undercover investigations.  We have to act as if we

16    have an interest or we are into the same activity to

17    meet people that are looking to do that.

18    Q     How do you go about doing an undercover child

19    exploitation investigation?

20    A     The first thing I have to do is I have to

21    decide what chat service I'm going to use.  This

22    case centers around America Online.  That's one of

23    the more common internet service providers.

24          After selecting what type of case I'm going to

25    do and what type of -- what service I'm going to

1      use, I then create a screen name which is my

2      identity online.  That screen name can be pretty

3      much anything that want it to be.  I can pick any

4      combination of letters or numbers to say what I want

5      my name to be.

6            From that point, I can then input user

7      information about my screen name.  I can put my

8      hobbies or my interests, or I don't have to.  I can

9      put as little or as much as I want.  I can put

10     pictures, I can do whatever.

11           After creating a user name, putting some

12     information in a user profile, I then -- and this

13     type -- this is a chat-related case, 114 then select

14     a chat room.  On America Online, there's two sets of

15     chat rooms.  One is the chat rooms that are created

16     by America Online.  The other set is the chat rooms

17     that are user created and they're listed by genre.

18           There are genres that are friends, places, new

19     generation, locations, or there's also genres like

20     mature interest or special interests.  Mature

21     interests or special interests are the ones on adult

22     cases that I focus in.

23           In this case, I entered, I think it was,

24     special interests, strict parents.  And I go into

25     that chat room and I just sit there.  I don't

1    participate in a chat.  I just sit there, knowing

2    that other members that come into those chat rooms

3    are going to be looking at my user profile

4    information.

5          Normally, the information that I put in that

6    user profile is somewhat worded or cryptically

7    termed for people that have the same interests as

8    what I'm trying to portray.  When they read that

9    user profile, they will then send me an instant

10   message.

11         When that happens, we go from the open chat

12   room to an instant message chat conversation, which

13   is a two-way conversation.  An actual chat room is

14   like an airport lobby or a hotel lobby.  There's

15   numerous conversations taking place all at one time.

16   It can be very confusing, very difficult to follow.

17   I don't even participate in those.  I just sit

18   there.

19         Once I receive that instant message and I

20   reply, now there's a two-way conversation going.

21   From there, there may be a series of conversations

22   that take place, maybe e-mails that are sent back

23   and forth.  There may be phone conversations.

24         Ultimately when we have engaged in enough

25   correspondence to determine that a violation of law

1    has been committed, a meeting will then be set up.

2    When that person --

3         MR. TRAGOS:  Your Honor, I object to the

4    narrative nature of the answer.

5         THE COURT:  Ask a question, please.

6    BY MS. KAISER:

7    Q    If we could, Corporal Romanosky, before we go

8    any further, could we just back up for a minute.

9    For some members of the jury who may not be too

10   familiar with computers and -- and some of the

11   internet communications, if you could, can you just

12   go back again and explain what you mean when you say

13   you create a profile.  And, like, how does one -- if

14   they're not used to the computer, how does one

15   communicate with somebody else that's got a

16   computer?  How does that happen?

17   A    Well, in this case it's done through America

18   Online.  After creating your screen name and putting

19   some information about yourself, once you've met

20   somebody or talked with someone that you want to

21   communicate with, you can send them an instant

22   message, like in this case, you can correspond

23   through e-mails, electronic mail.  Then from there

24   it will move forward, cases like this, into phone

25   calls and things but --

```
 1    Q      So is America Online an internet provider that
 2    hosts different websites or has a forum, I guess, on
 3    the internet where people can go and look up topics
 4    of interest?
 5    A      Yes.
 6    Q      Okay.  And then once people go into America
 7    Online on find a chat room that they're interested
 8    in, do they just go into that chat room?
 9    A      Yes.  You search by genre.  And then once you
10    go into genre special interests, it's going to list
11    a whole listing of chat rooms that are supposed to
12    be under that genre.  It might be -- in special
13    interests it could be anything, it could be any
14    topic.
15           And then once I select a chat room or a user
16    selects a chat room they want to enter, they just
17    double click or enter into that chat room, and then
18    they can then monitor what's taking place.
19    Q      Okay.  Now, you said that you created an
20    online profile.  What's the purpose of an online
21    profile?  What is that?
22    A      In undercover investigations, the purpose of
23    an online profile is to not only have my online
24    identity, but also put information in that profile
25    so others with the same interests, in this case,
```

1    physical and sexual abuse of children, would see

2    some of those terms and realize I might be involved

3    in some of the same things they have an interest in.

4    That would then prompt them to want to initiate

5    contact with me.

6    Q    So -- just so -- so the jury is clear, when

7    people are in a chat room, can they see each other's

8    profiles?

9    A    Yes.  When you enter into a chat room, there's

10   a list of people that are inside of that chat room.

11   You can then view the buddy info or the profile info

12   for any of the people in that chat room.

13   Q    Is it sort of -- is a chat room sort of like

14   a -- almost like a virtual --

15        MR. TRAGOS:  Objection, Your Honor, leading.

16        THE COURT:  Don't lead the witness, please.

17        MS. KAISER:  Yes, sir.

18   BY MS. KAISER:

19   Q    Can you describe for the members of the jury

20   what a chat room is, like what it would look like on

21   the screen.

22   A    A chat room would be a text box and it would

23   be scrolling as the conversations progressed.  In an

24   open chat, like I said, it's like a hotel lobby or

25   an airport lobby.  There's numerous conversations

1    taking place and you can read the comments as they

2    keep scrolling and scrolling.  And some of them go

3    very fast.  Some of them -- there's a lot of people

4    in the chat room and nobody's talking.  That's

5    because they're probably talking on instant message.

6         But it's essentially just a text box that just

7    scrolls and keeps track of all the communications

8    taking place by the members in that chat room.

9    Q     Corporal Romanosky, if you could, can you

10   explain to the jury what the difference is between

11   chatting within the chat room itself and then

12   chatting on an instant message one on one?

13   A     Chatting in an actual chat room itself, like I

14   said, there's numerous conversations taking place

15   all at the same time.  There might be two or three

16   or four people in the same conversation, or there

17   could be a series of two different people talking.

18        An instant message chat is when I send, or

19   someone else sends me, a message directly to my

20   profile.  A second box will then open up and that

21   communication is just two-way, me and them, that's

22   it.  That's all that's taking place.  No one else in

23   the main chat room even can see what we're saying.

24   It's now a two-way conversation.

25   Q     Now, when you say -- when you say chatting,

1    are you referring to written texts back and forth,

2    written messages back and forth?

3    A    Yes.  Just as if we would be carrying on a

4    conversation now.  Much of it is abbreviated because

5    you're typing it instead of speaking.

6    Q    Okay.  Did you have an occasion to investigate

7    Charles Friedlander in June and July of last year?

8    A    Yes.  The investigation began on June 16th.

9    Q    And can you describe for the jury how the

10    investigation began and what you did.

11    A    As I described, I logged into America Online.

12    I entered the chat room under the genre special

13    interests, strict parents.  I entered the chat room

14    and waited there, and I received an instant message

15    from the defendant.

16    Q    Now, why did you choose the chat room, strict

17    parents?

18    A    Strict is one of the terms that --

19    MR. TRAGOS:  Objection, Your Honor.

20    THE COURT:  Grounds.

21    MR. TRAGOS:  Improper predicate.

22    THE COURT:  Overruled.

23    MR. TRAGOS:  And speculation.

24    THE COURT:  Overruled.

25    THE WITNESS:  In my experience, the term

1    strict online is a cryptic term for people that are

2    interested in the physical abuse of children.  In

3    this case, the parents is a reference to the

4    children.  Strict is a physical abuse, parents is a

5    reference to the children.

6    BY MS. KAISER:

7    Q     You testified that you went into that chat

8    room and just waited; is that correct?

9    A     That's correct.  I just sat there.

10   Q     And what happened after you went into that

11   chat room?

12   A     Well, I received the message from the

13   defendant in this case.  And then our contact turned

14   to instant message where it was a two-way

15   conversation.

16   Q     Did you and the defendant both use the

17   internet to communicate?

18   A     We did, through America Online.

19   Q     And at that point did you talk one-on-one with

20   the defendant?

21   A     Yes, several times.

22   Q     Okay.  And did the defendant use his real name

23   or did he also have a screen name or a name that he

24   used online when he was chatting with you?

25   A     The defendant's online name was Captoes.

1    Q      Approximately when did you identify that

2    Captoes was actually the defendant, Charles

3    Friedlander?

4    A      A few days later.  One of the things that I do

5    during undercover investigations, and in this case,

6    is that as I'm chatting with somebody, I'm trying to

7    subtly ask them or elicit information from them,

8    little things, like trying to get them to give me a

9    phone number for contact or talking about where they

10    live, what geographical part of the country they

11    live.

12         That's done so I can kind of vector in closer

13    to where they might be.  And in a lot of cases,

14    people will give me enough information that, using

15    my law enforcement databases, because I have a law

16    enforcement computer here and my undercover computer

17    here, I'm able to take that information and

18    establish who they actually are.

19    Q      Approximately how many times did you

20    communicate with the defendant during the course of

21    your investigation in 2008?

22    A      Over a dozen.  I want to say right around a

23    dozen, maybe a little more.  I know we had some

24    e-mail correspondence and then we had a phone call.

25    Q      Had you ever spoken to the defendant before

1      June and July of last year?

2      A      I did.  During some of the -- when I started

3      speaking to the defendant in this case, some of the

4      terms and references to -- that he was making like

5      to razor straps and things like that were familiar.

6      I checked my archives, and realized that back in

7      July of 2005, I had spoken to him while using a

8      different undercover screen name.

9      Q      And what was the screen name you had used back

10     in 2005?

11     A      In 2005 I was using DunedinSuperdad.

12     Q      How was it that you were able to confirm that

13     the person that you had chatted with in 2005 was the

14     defendant, Charles Friedlander?

15     A      Much of the same -- well, I mean, the screen

16     name, records obtained later on, we know he had had

17     that screen name for a period of time.  But in the

18     chats from 2005 and the chats from 2008 are very

19     similar.  A lot of the same terms are used, the same

20     way of speaking.

21     Q      Did the defendant use the same screen name

22     Captoes when he was communicating with you in 2005?

23     A      Yes, he did.

24     Q      Can you describe for the jury what your online

25     profile was about.  How did you describe yourself?

1    A     I described myself as a 36-year-old dad with

2    children.  I described myself as having an

3    open-minded partner, having interest in incest.

4    Q     Did the defendant make any representations to

5    you about himself?

6    A     Yes.  He told me that he was a 70-year-old

7    male, that he was a strict, old-fashioned father,

8    that he lived in -- shared time between Ft. Myers

9    and the mid Atlantic.

10   Q     Did you subsequently find out how old the

11   defendant was?

12   A     Yes.  Later on, I established he was actually

13   78 years of age.  And that's probably a little bit

14   of the delay in getting him identified is I was

15   doing all my searches for somebody 65 to 70.

16   Q     During your work in posing as an undercover

17   agent on the internet, do you ever encounter people

18   who misrepresent facts to you about themselves such

19   as their age?

20   A     Yes, frequently.

21   Q     And why do they do that?

22         MR. TRAGOS:  Objection, relevance.

23         THE COURT:  Overruled.

24         THE WITNESS:  My experience has shown that

25   people that give me inaccurate information about

1   themselves is for two reasons.  One, to avoid

2   detection, and the other is to make themselves

3   appear more desired by what -- the profile they're

4   contacting.

5        If you -- in cases where I act as a child,

6   somebody who comes at me that gives me a true age,

7   10 or -- that's their true age, they're afraid

8   they're going to be turned off.  So they may give me

9   one that's 10 or 15 years younger so that maybe 114

10  drop my guard and be more willing to talk to them.

11       In this case I think it was along the same

12  lines that I later learned from Mr. Friedlander that

13  a lot of people wouldn't talk to him once he told

14  them how old he actually was.

15  BY MS. KAISER:

16  Q    What did you and the defendant discuss during

17  your various internet chats and e-mails and phone

18  conversation?

19  A    We discussed engaging in physical --

20       MR. TRAGOS:  Objection, date, time and place.

21       THE COURT:  Overruled, for purposes of a

22  general predicate.

23       THE WITNESS:  We discussed engaging in the

24  physical and sexual abuse of my undercover profile's

25  two young boys, 10 and 11 years of age.

1    BY MS. KAISER:

2    Q     Did you and the defendant ever discuss meeting

3    in person?

4          MR. TRAGOS:  Objection, leading.

5          THE COURT:  Sustained.  Don't lead the

6    witness.

7          MS. KAISER:  Yes, Your Honor.

8    BY MS. KAISER:

9    Q     Did you and the defendant ever have any

10   discussions about meeting?

11   A     Yes.

12   Q     And could you please explain.

13   A     We had discussed actually meeting for the

14   purposes of acting out on the things that we had

15   discussed.  And that meeting was set for July 21st

16   of 2008.

17   Q     What had you told the defendant in your online

18   communications about your interest in the sexual

19   abuse of children?

20         MR. TRAGOS:  Objection, date, time and place.

21         THE COURT:  Let's get specific, please.  Give

22   us a timeframe.

23   BY MS. KAISER:

24   Q     During your chats with the defendant in June

25   and July of last year, what did you tell the

1    defendant was your interest in the physical and

2    sexual abuse of children?

3         MR. TRAGOS:  Objection, date, time, place and

4    who was present.

5         THE COURT:  Overruled.

6         THE WITNESS:  I had told the defendant that I

7    was involved in the physical and sexual abuse of my

8    own children and that I was associated with other

9    people that had the same interests.

10   BY MS. KAISER:

11   Q    At any time during your internet conversations

12   in June and July of last year, did the defendant

13   ever indicate he wanted to join the group?

14   A    Yes.

15   Q    Did you ever schedule a meeting to actually

16   meet the defendant in person?

17        MR. TRAGOS:  Objection, leading, date, time

18   and place.

19        THE COURT:  Overruled.

20        THE WITNESS:  I did.  The meeting was set for

21   July 21st.

22   BY MS. KAISER:

23   Q    Did the defendant actually meet you on that

24   date?

25   A    He did.  He actually arrived about 15 minutes

1    early.

2    Q      And where was that meeting?

3    A      We held the meeting at the Cracker Barrel.

4    I'm not sure if you're familiar with Pinellas

5    County, but it's down on 54th Avenue North right on

6    275.

7    Q      Before July 21st of 2008, did you also talk to

8    the defendant on the phone?

9    A      Yes.  On July 16th, I engaged in a controlled

10   phone call, recorded phone call, to him where we

11   discussed what was to take place at the meeting.

12   Q      And during that phone conversation on the 16th

13   of July, did you and the defendant discuss engaging

14   in the physical and sexual abuse of children?

15           MR. TRAGOS:  Objection, leading.

16           THE COURT:  Sustained.

17   BY MS. KAISER:

18   Q      What did you discuss on the July 16th phone

19   call?

20   A      We discussed engaging in the physical and

21   sexual abuse of the children.  Sexual abuse was to

22   include oral sex and fondling, and the physical

23   abuse was to include the use of certain implements

24   to strike the children.

25   Q      During that phone conversation, did the

1      defendant state any preference as to how the boys

2      were to be during the meeting with you or during the

3      session?

4      A      They were to be stripped, bent over a chair or

5      couch, and bound.

6      Q      If the defendant had succeeded in engaging in

7      sexual activity with the boys, would that have been

8      a violation of state law?

9              MR. TRAGOS:  Objection, speculation and

10     leading.

11             THE COURT:  Overruled.

12             THE WITNESS:  Yes.

13             MR. TRAGOS:  Also, Your Honor, we'd like to

14     renew our prior objection to that.

15             THE COURT:  Overruled.

16             THE WITNESS:  Yes.  The sexual abuse that was

17     to take place, the oral sex, being that my boys were

18     10 and 11 years of age, would have been a violation

19     of sexual battery on a child under the age of 12 in

20     the State of Florida, a capital felony.

21     BY MS. KAISER:

22     Q      Also, if the defendant had succeeded in

23     engaging in sexually sadistic abuse of the boys,

24     would that have been a violation of state law?

25             MR. TRAGOS:  Same objections, Your Honor.

```
1              THE COURT:  Overruled.

2              THE WITNESS:  Yes.  The sadomasochistic abuse

3       of somebody under the age of 16 in the State of

4       Florida is a violation of lewd and lascivious

5       battery.  That's a second degree felony.

6       BY MS. KAISER:

7       Q     What is sexual sadism?

8              MR. TRAGOS:  Objection, foundation.

9              THE COURT:  Overruled.

10             THE WITNESS:  Sexual sadism is the sexual

11      gratification through the infliction of pain or

12      harm.

13      BY MS. KAISER:

14      Q     Did you and the defendant ever discuss any

15      implements which were to be used at the meeting on

16      July 21st, 2008?

17      A     We did.  We had discussed the use of a razor

18      strap, which is a piece of leather with either

19      canvas or hemp backing held by a metal clip.  We had

20      discussed the use of a riding crop.  And we had

21      discussions --

22             MR. TRAGOS:  Object, Your Honor, date, time

23      and place.

24             THE COURT:  Overruled.

25             THE WITNESS:  And we had discussed the use of
```

1    a -- like a uniform belt, a German belt which I

2    believe he referred to as a Garrison belt.

3    BY MS. KAISER:

4    Q     Did the defendant show up at the predetermined

5    meeting location at the Cracker Barrel on July 21st

6    of 2008?

7    A     He did.

8    Q     Did he have any implements with him that he

9    had discussed with you in either the internet chats

10   or on the phone call?

11   A     Yes.  He had the riding crop, he had the razor

12   straps, he had the German military belt and he had

13   some latex gloves.

14   Q     Where did the defendant live at that time?

15   A     He lived at 12040 Mahogany Isle Lane in Ft.

16   Myers.

17   Q     And approximately how long a drive is that

18   from there to where you met at the Cracker Barrel?

19   A     Approximately two and a half hours, three

20   hours.

21   Q     After the -- was the defendant arrested on

22   July 21st of 2008?

23   A     He was.  After he was observed at the meeting

24   location, I arrived in an undercover vehicle,

25   engaged in a brief dialogue with him, viewed the

1    items that he was bringing.  I then gave the verbal

2    and visual cues to the arrest team to move in and

3    arrest him.

4    Q     On July 21st when you were at the

5    Cracker Barrel, did you have any discussions with

6    the defendant prior to his arrest?

7    A     No.  It was real general at that point.  I

8    transported him back to my office where I

9    interviewed him.

10   Q     Prior to his arrest, when he first got to the

11   Cracker Barrel, did he show you anything in his

12   vehicle?

13   A     Yes.  He showed me the items that he -- we had

14   discussed him bringing, the razor straps and the

15   military belt and the riding crop.

16   Q     And at that point in time, was the defendant

17   still under the impression that you were a father

18   who wanted to share your boys for sex?

19         MR. TRAGOS:  Objection, leading and

20   speculation.

21         THE COURT:  Sustained.  Rephrase it, please.

22   BY MS. KAISER:

23   Q     At the time when the defendant showed you

24   those razor straps and belts that were in his

25   vehicle, did he know you were law enforcement at

1     that point?

2             MR. TRAGOS:  Objection, speculation.

3             THE COURT:  Rephrase it, please, so you avoid

4     speculating on the defendant's knowledge.

5     BY MS. KAISER:

6     Q     Had you -- at the time of the defendant's

7     arrest, before his arrest when he was showing you

8     the implements he brought with him, had you

9     identified yourself to him as law enforcement?

10    A     I did not.

11    Q     At what point did you advise the defendant

12    that it was actually an undercover operation and he

13    was placed under arrest?

14    A     After he had shown me the items in the car,

15    that's when I made the takedown phrase.  I then gave

16    the visual cue in case the body mic had gone dead.

17    And I moved over to my vehicle and the arrest team

18    took him into custody.  When that was done, I walked

19    over and introduced myself and explained to him that

20    I wanted to talk to him.

21    Q     After the defendant was arrested, did he agree

22    to speak to you?

23    A     Yes.

24    Q     And where did that take place?

25    A     The interview with the defendant took place

1    back at the Sheriff's Administration Building

2    located on Ulmerton Road and Seminole Boulevard in

3    Largo.

4    Q    Was he advised of his rights?

5    A    He was.

6    Q    Did he agree to speak to you?

7    A    He did.

8    Q    Was that interview videotaped?

9    A    Yes.  I recorded the interview.

10   Q    Was a search warrant ever conducted at his

11   home?

12   A    Yes.  The search warrant was conducted with

13   the assistance of the Florida Department of Law

14   Enforcement in Ft. Myers.

15   Q    Did anyone from your office in Pinellas County

16   assist in that search?

17   A    Yes.  I sent Detective Brad Carrozza as a

18   representative from the sheriff's office to

19   Ft. Myers to work with the FDLE agents.

20        MS. KAISER:  Your Honor, may I approach the

21   witness?

22        THE COURT:  Yes, ma'am.

23   BY MS. KAISER:

24   Q    Corporal Romanosky, I'm showing you what's

25   been premarked for identification as Government's

1    Exhibits 1, 2, 3, 4, 5, 6, 7 and 8.  And if you

2    would, starting with Government's Exhibit Number 1,

3    if you could please take a look at that and tell me

4    if you recognize that exhibit.

5    A    Exhibit 1 is a printout of a screen shot that

6    I made of the defendant's user profile from the 2005

7    contact.

8    Q    Okay.  And also, if you could take a look at

9    Government's Exhibits 2 through 8.

10   A    Exhibits 2 through 8 are the instant message

11   chat conversations between myself and the defendant

12   from the 2005 contact.

13       MS. KAISER:  Your Honor, at this time I'd move

14   for admission of Government's Exhibit 1 through 8

15   into evidence.

16       THE COURT:  Is there any objection?

17       MR. TRAGOS:  May I voir dire, Your Honor?

18       THE COURT:  Yes, sir.

19              VOIR DIRE EXAMINATION

20   BY MR. TRAGOS:

21   Q    You copied these, correct, off the computer?

22   A    Yes, sir.

23   Q    Okay.  Are these the complete chats from

24   beginning to end?

25   A    Yes, sir.

1    Q      Nothing is left out?

2    A      Nothing is left out.

3           MR. TRAGOS:  No objection, Your Honor.

4           THE COURT:  Government's Exhibits 1 through 8

5    are now received.

6    (Whereupon, Government's Exhibit Numbers 1, 2, 3, 4,

7    5, 6, 7, 8 were received into evidence.)

8           MS. KAISER:  Your Honor, at this time I'd

9    request permission to publish them to the jury.

10          THE COURT:  All right.  Are you going to use

11   the ELMO?

12          MS. KAISER:  Yes, Your Honor.

13          THE COURT:  It may take a minute to warm up.

14   Is it on, ready to go?  All right.

15                   DIRECT EXAMINATION (Continued)

16   BY MS. KAISER:

17   Q      All right.  Corporal Romanosky, I've placed on

18   the overhead Government's Exhibit Number 1.  Can you

19   please tell the jury what we're looking at here.

20   A      What we're looking at here is a user profile

21   for the AOL screen name Captoes.

22   Q      All right.  Now, how did you determine Captoes

23   was actually the defendant, Charles Friedlander?

24   A      That information came during the 2008

25   investigation.  As I said, during some of the online

1    communication, I was able to elicit some information

2    from him.  I was able to later establish that -- AOL

3    records that indicated that it was the defendant.

4    Q     Now, what information is contained in this

5    profile?

6    A     In this profile you'll see the user's name.

7    That's Captoes.  The input information for his

8    location is mid Atlantic and southwest Florida.

9    Hobbies and interests include swimming, bike riding,

10   cooking, shoes, spending time with meaningful

11   people.  There's nothing entered under favorite

12   gadgets.  And personal quote is mandate, colon,

13   respect, courtesy and obedience.

14   Q     Now, who creates this document, this member

15   profile?  Who would have done that?

16   A     Well, the information that's input in each one

17   of those fields is done by the user.

18   Q     And that would be Captoes, and that would be

19   the defendant?

20   A     That's correct.

21   Q     And are these your initials up here in the top

22   right?

23   A     They are.

24         MS. KAISER:  At this time, Your Honor, I'd

25   like to publish the 2005 chats, starting with

1    Government's Exhibit Number 2.

2        THE COURT:  All right.

3        MS. KAISER:  For ease, Your Honor, I'd like to

4    have Agent Hagedorn read the portions for Captoes

5    and have Corporal Romanosky read his undercover

6    portion of DunedinSuperdad.

7        THE COURT:  That's fine.  Gentlemen, just read

8    slowly so the court reporter can keep up.

9        THE WITNESS:  Yes, sir.

10   BY MS. KAISER:

11   Q    I've placed Government's Exhibit Number 2 on

12   the overhead.  Can you -- can you see that?

13   A    Yes, ma'am.

14   Q    And do you also have your own copy?

15   A    I do.

16   Q    Is it easier for you to read from your own

17   copy?

18   A    Much.

19   Q    All right.  First before you start, can you

20   please identify to the jury what we're looking at

21   here in Government's Exhibit Number 2.

22   A    This is listed as the instant message chat

23   conversation from July 12th, 2005, and the initial

24   contact with the defendant by DunedinSuperdad, which

25   was my undercover profile at that time.

1    Q      Now, who's the first person that speaks on

2    this chat?

3    A      The first person to speak is Captoes at 4:02

4    PM.

5    Q      Now, why aren't you the first person to make

6    contact?

7    A      As I explained, when I conduct these

8    investigations, I don't need to -- I don't need to

9    send messages to people.  I just go in the chat room

10   and wait.  The only time I might ever initiate

11   contact with somebody is if we've received

12   complaints about a certain individual going into

13   chat rooms and making contact with kids, then I

14   might initiate contact with them to see if I can get

15   them to speak with an undercover profile.  But

16   probably a very high percentage of the time in these

17   cases I just sit in the chat room and just wait.

18   Q      And why is that?  Why don't you take a more

19   proactive role and start talking with other people

20   first?

21   A      I don't need to.  You know, I have people

22   requesting to speak to me just continually, you

23   know.  While I'm speaking to one, I might get three

24   or four more people wanting to speak to me.  It gets

25   so voluminous, I can't even keep up.  Many times my

1    instant message catcher will just back up and 114

2    speak to a few online and then log out.  I can't get

3    to them all.

4    Q    And what time of day did this chat begin?

5    A    This was July 12th, 2005 at 4:02 PM is when it

6    began.

7    Q    All right.  All right.  If you would, please,

8    publish it.

9         "CAPTOES:  Am an older divorced dad.  Raised

10   my son alone.

11        DUNEDINSUPERDAD:  Hey.  Good for you, man.  My

12   ex still in picture, unfortunately."

13   BY MS. KAISER:

14   Q    All right.  Just stop right there.  When we

15   see here -- when the jury sees on the overhead where

16   it says Captoes and then it has the time, is the

17   writing that's to the right of that written by

18   Captoes?

19   A    Yes.

20   Q    Okay.  And on the second line where it says

21   DunedinSuperdad, is that you?

22   A    That's correct.  That was my undercover

23   profile at the time.

24   Q    All right.  And the writing that's to the

25   right of that, where it says, hey, good for you,

1    man, my ex still in picture, unfortunately; is that

2    what you had written?

3    A    Yes.

4    Q    All right.  Go ahead.  Please proceed.

5         "CAPTOES:  I had total custody.  And that is

6    what he wanted, too.

7         DUNEDINSUPERDAD:  I would love full custody

8    but can't right now because of work.

9         CAPTOES:  Oh, I see.  Do you see your kids

10   often?

11        DUNEDINSUPERDAD:  Every other weekend and some

12   holidays.

13        CAPTOES:  Well, that's something.  What ages

14   are they?

15        DUNEDINSUPERDAD:  Daughter 14, son is 11.

16        CAPTOES:  Good.  Was very strict but loving.

17        DUNEDINSUPERDAD:  That's good.  I'm same way.

18        CAPTOES:  I have a very old razor strop which

19   was and is effective.

20        DUNEDINSUPERDAD:  Yeah.  I can see how that

21   would be.  My kids would definitely respond that

22   that -- to that.

23        CAPTOES:  Never raised a girl but my boy did

24   respond loudly.

25        DUNEDINSUPERDAD:  114 bet.  Mine would, too.

1          CAPTOES:  He would cry and yell, but did not

2    stop.

3          DUNEDINSUPERDAD:  Didn't stop what?

4          CAPTOES:  Did not stop spanking him.

5          DUNEDINSUPERDAD:  Hey, dad's got to do what a

6    dad's got to do, right?

7          CAPTOES:  Yes.  And he knew that.  Don't know

8    how that would work for you.

9          DUNEDINSUPERDAD:  Would work, I'm sure.  Our

10   boys sound a lot alike.

11         CAPTOES:  You have to be strict with them, I

12   feel.

13         DUNEDINSUPERDAD:  I agree wholeheartedly.  I'm

14   strict with both of them.

15         CAPTOES:  Guess you need to be.  What about

16   your wife?

17         DUNEDINSUPERDAD:  What about her?  Couldn't be

18   strict enough with her, laugh out loud.

19         CAPTOES:  Does your wife say okay to

20   strictness?

21         DUNEDINSUPERDAD:  Oh, yeah.  She all for it.

22   We were strict together.  Just didn't like each

23   other anymore, I guess.

24         CAPTOES:  That is not unusual.  I think dads

25   make better disciplinarians.

1              DUNEDINSUPERDAD:  I agree.  Much better.

2              CAPTOES:  I believe in severe discipline,

3       surely with boys.

4              DUNEDINSUPERDAD:  Yeah.  You have to be severe

5       with boys.  They can be stubborn.

6              CAPTOES:  Mine was.  And beating him was the

7       only way through to him.

8              DUNEDINSUPERDAD:  And he's probably better for

9       it.

10              CAPTOES:  He is.  And the strop always hangs

11       on a nail.

12              DUNEDINSUPERDAD:  He still gets it from time

13       to time, huh?

14              CAPTOES:  He's older and away but does get it

15       on occasion.

16              DUNEDINSUPERDAD:  Laugh out loud.  As long as

17       he knows it's done out of love.  I have to remind my

18       boy of that.

19              CAPTOES:  One always has to.

20              DUNEDINSUPERDAD:  Indeed.

21              CAPTOES:  He's too young to start

22       masturbating, I guess.

23              DUNEDINSUPERDAD:  No, not really.

24              CAPTOES:  Oh, that can really be something.  I

25       made my boy ask for permission.

1          DUNEDINSUPERDAD:  Really.  Sounds like that

2    worked.  Reward for punishment, right?

3          CAPTOES:  Yes.  He wanted to do it constantly,

4    but I stopped that.

5          DUNEDINSUPERDAD:  Yeah.  Can't have him doing

6    it all the time.

7          CAPTOES:  Right.  Demand permission was my

8    thinking.

9          DUNEDINSUPERDAD:  Absolutely."

10    BY MS. KAISER:

11    Q     Okay.  Just stop right there, if you would,

12    gentlemen.  Now, Corporal Romanosky, at 4:24 when

13    Captoes starts talking about his son masturbating,

14    or he says he's too young to start masturbating, I

15    guess, he's referring to your son?

16    A     That's correct.

17    Q     Your 11-year-old?

18    A     That's correct.

19    Q     Now, is that the first time that the

20    conversation became sexual or had any sexual

21    overtones?

22    A     Sexual --

23          MR. TRAGOS:  Objection, Your Honor, to the

24    form of the question.

25          THE COURT:  Overruled.

1              THE WITNESS:   Sexual in the words like

2       discussing a sexual act, the term strict is

3       sometimes referred to for physical abuse.

4       BY MS. KAISER:

5       Q      So throughout this conversation, who is the

6       one who brings up sexual activity?

7       A      The defendant.

8       Q      And why -- why is it that you didn't bring it

9       up?

10      A      Again, there's no need to.  When I go into a

11      chat room, or in this case I'm speaking with the

12      defendant, our training and my experience tells me

13      let them set the pace of the conversation.  They'll

14      go there.  I just have to keep up my end of the

15      conversation.

16      Q      In your experience in doing these type of

17      cases, is it typical in a sexual sadomasochistic

18      conversation to talk about discipline with sexual

19      activity?

20             MR. TRAGOS:   Objection, leading, irrelevant.

21             THE COURT:   Rephrase it, please.  Overruled on

22      the relevance objection.

23      BY MS. KAISER:

24      Q      In your experience as an undercover officer

25      investigating sexually sadistic cases, is it your

1    experience that --

2         THE COURT:  Ask a question, please.

3         MS. KAISER:  Yes.

4    BY MS. KAISER:

5    Q    That there's discussions of physical --

6         MR. TRAGOS:  Objection.

7         THE COURT:  Sustained.  Ms. Kaiser, ask a

8    non-leading question, please.

9    BY MS. KAISER:

10   Q    Corporal Romanosky, what is your experience in

11   discussing sexually sadistic activities?

12   A    That physical and sexual abuse go hand in

13   hand.

14   Q    And in this conversation, is that what you

15   understood?

16   A    Yes.

17   Q    All right.  Gentlemen, please continue.

18        "CAPTOES:  If he does it without it, he used

19   to get it hard.

20        DUNEDINSUPERDAD:  There you go."

21   BY MS. KAISER:

22   Q    Excuse me.  Corporal Romanosky, what did you

23   understand Captoes to mean at that point, if he does

24   it without it, he used to get it hard?

25        MR. TRAGOS:  Objection, relevance as to his

1    understanding.

2         THE COURT:  Overruled.

3         THE WITNESS:  If he masturbates without

4    permission, he gets beatings.

5    Q    Please proceed.

6         "DUNEDIN:  There you go.  How that go over?

7         CAPTOES:  Not that well, but it worked.

8         DUNEDINSUPERDAD:  Good deal.  I'm sure mine

9    will need the same motivation.

10        CAPTOES:  I also controlled mine totally.

11        DUNEDINSUPERDAD:  You hafta.

12        CAPTOES:  I would not let him make decisions.

13   They were mine to make.

14        DUNEDINSUPERDAD:  I agree.  Parents sometimes

15   need to do that.

16        CAPTOES:  You will learn that as a divorced

17   dad.

18        DUNEDINSUPERDAD:  That's true.  I'm sure I

19   will.  My wife and I are already well versed in

20   disciplining the kids, though.

21        CAPTOES:  But what happens is the dad handles

22   the boy better as he gets older.

23        DUNEDINSUPERDAD:  Really.  I can see that.

24        CAPTOES:  It ends up that boys want to be with

25   their dads much more.

1          DUNEDINSUPERDAD:  I know mine does.

2          CAPTOES:  And you do more things with them.

3          DUNEDINSUPERDAD:  Really?

4          CAPTOES:  Yes.  I did lots of things with my

5     boy, I know.  We went camping and fishing.

6          DUNEDINSUPERDAD:  That's cool.  We do the same

7     things.

8          CAPTOES:  That's great.

9          DUNEDINSUPERDAD:  You guys still close?

10         CAPTOES:  Very.

11         DUNEDINSUPERDAD:  That's great.  My son and I

12    are close, as well.

13         CAPTOES:  It's real nice.

14         DUNEDINSUPERDAD:  Yes, it is.

15         CAPTOES:  Though am older and hopefully wiser,

16    I am still in his life.

17         DUNEDINSUPERDAD:  Hey, wiser is better.

18         CAPTOES:  I believe he thinks so, too.

19         DUNEDINSUPERDAD:  Cool.

20         CAPTOES:  Hope to talk again with you if you'd

21    like.

22         DUNEDINSUPERDAD:  Absolutely.  We seem to have

23    same values.

24         CAPTOES:  You seem like a nice guy and our

25    values are surely similar.  I am between Ft. Myers

1    and Naples.

2         DUNEDINSUPERDAD:  Cool.  I'm in Dunedin just

3    west of Tampa.

4         CAPTOES:  That's great.  Maybe you all could

5    come down.  I'm on a lake and have a pool.  Live all

6    alone at this point in time.

7         DUNEDINSUPERDAD:  Sounds like fun.  We may

8    have to do that.  I live with buddy for now.  Still

9    getting on my feet.

10        CAPTOES:  That's fine.  You all can come down.

11   I am Charles.

12        DUNEDINSUPERDAD:  Charles, I'm Mike.  Thanks

13   for the invite.

14        CAPTOES:  Sure.  Talk soon, Mike, I hope.

15        DUNEDINSUPERDAD:  You bet.

16        CAPTOES:  Bye for now.

17        DUNEDINSUPERDAD:  Take care."

18   BY MS. KAISER:

19   Q    When was the next conversation you had with

20   the defendant back in July 2005?

21   A    July 13th, 2005.

22   Q    Is that the chat I put on the overhead as

23   Government's Exhibit Number 3?

24   A    Yes, ma'am.

25   Q    What time did that chat begin?

```
1      A      Three o'clock PM.

2      Q      Who initiated that chat?

3      A      The defendant.

4      Q      All right.

5             MS. KAISER:  At this time I'd like to publish

6      Government's Exhibit Number 3 in evidence.

7             THE COURT:  All right.

8             "CAPTOES:  Hi, Mike.  How are you today --

9             DUNEDINSUPERDAD:  Great, thanks.  How are you?

10            CAPTOES:  Fine.  Sat with three kids today

11     while dad was out for two hours.  Laid it on one of

12     them for foul language at age 12.

13            DUNEDINSUPERDAD:  That's good.  Language not

14     likely to be repeated now.

15            CAPTOES:  I hope not.  When his dad came home

16     and I told him, the kid got it again and harder.

17            DUNEDINSUPERDAD:  Ah.  Good for his dad.

18            CAPTOES:  He used a heavy strap and a paddle.

19            DUNEDINSUPERDAD:  Wow.  In private or in front

20     of you?

21            CAPTOES:  In front of me and the other kids.

22            DUNEDINSUPERDAD:  Outstanding.  Great way to

23     make a point.

24            CAPTOES:  I agree.  And the kid was crying and

25     screaming both.
```

1           DUNEDINSUPERDAD:   114 bet.   But he knows it

2    was for his own good.

3           CAPTOES:   He had big welts.   And my boy would

4    have, too.

5           DUNEDINSUPERDAD:   Mine, too.   We have a

6    behavior problem at fencing to address, me and him.

7           CAPTOES:   What kind of problem?

8           DUNEDINSUPERDAD:   Not doing what he was told

9    to do by the instructor.

10          CAPTOES:   What will you do about it?

11          DUNEDINSUPERDAD:   He will need to learn to

12   respect adults.   Any ideas?

13          CAPTOES:   Take the strap to him.   I would, as

14   you know.

15          DUNEDINSUPERDAD:   I think it will have to come

16   to that.

17          CAPTOES:   If you are around me enough you'll

18   do it often.

19          DUNEDINSUPERDAD:   Yeah.   Sounds like I got a

20   lot to learn as a dad.

21          CAPTOES:   Well, not all dads are like I am.   I

22   know I am strict and demanding and always a yes,

23   sir.

24          DUNEDINSUPERDAD:   That's the way it has to be.

25          CAPTOES:   For me always.   Have worked with a

1    bud or two and two other dads to point out what I

2    do.  One has a daughter, too.

3         DUNEDINSUPERDAD:  Wow.  Sounds like you have

4    valuable advice.

5         CAPTOES:  I did not give advice with her as

6    never raised a daughter.  I know how to handle boys.

7         DUNEDINSUPERDAD:  Yeah.  I'm firmer with my

8    boy but I have been firm with daughter, too.

9         CAPTOES:  He beats that little girl often as

10   she is a handful.

11        DUNEDINSUPERDAD:  Sometimes required.

12        CAPTOES:  According to him, yes, and he is a

13   big guy.

14        DUNEDINSUPERDAD:  Yeah.  I am, too.  But

15   teenagers can definitely be a handful and require

16   more discipline.

17        CAPTOES:  How right you are.  My boy was

18   disciplined many times a week at times.

19        DUNEDINSUPERDAD:  How did you avoid him being

20   chatty?  That is always a concern despite my telling

21   him to be quiet.

22        CAPTOES:  In what way?  Any disrespect to an

23   elder was pure hell for him.  Too chatty got the

24   strop.

25        DUNEDINSUPERDAD:  That's what I figured.  I

1    have not had that problem yet.  Was just concerned

2    that as he got older may tell others about such

3    regular discipline.

4         CAPTOES:  That's fine.  Many others get it,

5    too, at least among my friends.

6         DUNEDINSUPERDAD:  Yeah.  I'm not concerned

7    about friends.  Just others that may not understand

8    the importance of regular and strict discipline.

9         CAPTOES:  If they don't, the hell with them.

10   I run my home the way I want to and feel comfortable

11   with that.  You need to feel that way, too, Mike.

12        DUNEDINSUPERDAD:  You're right.  My business

13   with my kids is my business and no one else's.

14        CAPTOES:  Right.  Discipline is up to dad.

15        DUNEDINSUPERDAD:  Exactly.

16        CAPTOES:  I have taken my boy by the collar

17   and dragged him upstairs many a time.

18        DUNEDINSUPERDAD:  Sometimes it needs to be

19   done.

20        CAPTOES:  Oh, yes.  And I have no problem

21   doing it.  And neither should you have such a

22   problem.

23        DUNEDINSUPERDAD:  I definitely do not when it

24   needs to be done.

25        CAPTOES:  And you may have to start doing it

1    more often as I did.

2         DUNEDINSUPERDAD:  I think I might.  He's

3    getting older now.  I must keep control.

4         CAPTOES:  Once you start you will feel more

5    comfortable.

6         DUNEDINSUPERDAD:  I've started long ago.  Just

7    now I feel I must be more regular to keep in line.

8    Both children have been kept in line.

9         CAPTOES:  But now with divorce, etcetera, you

10   have to be twice as structured and strict.

11        DUNEDINSUPERDAD:  Exactly.

12        CAPTOES:  I still keep the razor strop hung on

13   a nail right close.

14        DUNEDINSUPERDAD:  That's a good thing.

15        CAPTOES:  And if you all came to visit and one

16   of your kids acted up, you could grab it and use it.

17        DUNEDINSUPERDAD:  That would be okay?

18        CAPTOES:  Absolutely.  Or you could tell me to

19   use it on them.

20        DUNEDINSUPERDAD:  Ah, that's not a bad idea.

21   Let them know that other adults don't appreciate bad

22   behavior, just like dad.

23        CAPTOES:  Exactly.  I have friends with kids

24   that I discipline often.

25        DUNEDINSUPERDAD:  Plus might give me some

1      parenting skills that I do not already possess.

2           CAPTOES:  Sure.  I'd be happy to teach you

3      anytime.

4           DUNEDINSUPERDAD:  Your skills would be

5      appreciated.

6           CAPTOES:  That's what dad buds are for, Mike.

7           DUNEDINSUPERDAD:  Thank you.  This new group

8      of dad friends is relatively new to me.  Have only

9      one friend in my area.

10          CAPTOES:  Does he have kids?

11          DUNEDINSUPERDAD:  Yes.

12          CAPTOES:  Does he discipline them hard?

13          DUNEDINSUPERDAD:  He keeps them in line.

14          CAPTOES:  How?

15          DUNEDINSUPERDAD:  Along the same lines as us.

16          CAPTOES:  That's good.  Are they your kids'

17     age?

18          DUNEDINSUPERDAD:  Close.  Boy is 10, girl 8.

19          CAPTOES:  Well, he needs to start and

20     continue.

21          DUNEDINSUPERDAD:  I don't think that will be a

22     problem.

23          CAPTOES:  Have a few dads that get together.

24     I am the oldest.

25          DUNEDINSUPERDAD:  Really.  Do they all share

1      our interests?

2           CAPTOES:  Yes, they do.  All are divorced.

3           DUNEDINSUPERDAD:  Wow.  Didn't know there were

4      so many of us dads with the same values.

5           CAPTOES:  Many more than you can imagine.

6           DUNEDINSUPERDAD:  I didn't know that.

7           CAPTOES:  Oh, yes.  You will learn, Mike.

8           DUNEDINSUPERDAD:  I hope so.  I thought I

9      might be alone with my set of values.

10          CAPTOES:  No.  Absolutely not.

11          DUNEDINSUPERDAD:  Thank you.  I feel much

12     better about things.

13          CAPTOES:  I'm glad you do.  Guess you'll turn

14     out to be one of us.

15          DUNEDINSUPERDAD:  I think so.

16          CAPTOES:  Some come over and bring the kids.

17     Some don't.

18          DUNEDINSUPERDAD:  That's good.  I think

19     discipline is important enough to see different

20     methods.

21          CAPTOES:  Two of the dads are nudists.

22          DUNEDINSUPERDAD:  That's good.  Kids should

23     not be embarrassed by their bodies.  Mine are still

24     shy about that.

25          CAPTOES:  I wandered around nude at home a

1    good deal and I made my son get used to it.  He

2    finally loved it.

3         DUNEDINSUPERDAD:  I can see that.  I imagine

4    he was curious at that age.

5         CAPTOES:  Very.  Asked many, many questions.

6    For example, I was cut and I chose not to have him

7    cut.  Well, he asked why he couldn't be like his

8    dad.

9         DUNEDINSUPERDAD:  What did you tell him?

10        CAPTOES:  That I made this choice for him and

11   that was the way it was and was going to be.  I said

12   that I had no choice myself."

13   BY MS. KAISER:

14   Q    If you would stop right there.  Corporal

15   Romanosky, what did you understand Captoes to mean

16   when he said that he was cut and he chose not to

17   have him cut?

18   A    My understanding is circumcision.

19   Q    All right.  Proceed.

20        "DUNEDINSUPERDAD:  Good for you.  Was he

21   curious about anything else?

22        CAPTOES:  Oh, he'd ask about anything and I

23   had to answer.  Does yours ask anything?  We will

24   all coach each other about how to answer.

25        DUNEDINSUPERDAD:  Not yet.  That's a good

1    idea.

2         CAPTOES:  Well, probably too early for him to

3    start masturbating.  When he does, the questions

4    will fly.

5         DUNEDINSUPERDAD:  Because I'm sure my boy will

6    either start asking questions soon or I at least

7    need to explain things to him so he doesn't hear

8    them on the street.

9         CAPTOES:  You are right.  It's better coming

10   from you.

11        DUNEDINSUPERDAD:  I think you're right.  Don't

12   want him to hear from someone that doesn't know

13   right answer.

14        CAPTOES:  Or the answer he needs to hear from

15   the wrong person.  My son walked in on me once while

16   I was jackin'.

17   BY MS. KAISER:

18   Q    Excuse me.  What did you understand that to

19   mean, Corporal Romanosky?

20   A    Masturbating.

21   Q    Please continue.

22        "DUNEDINSUPERDAD:  How you handle that?

23        CAPTOES:  He asked what I was doing and I told

24   him.  He asked when he could do it.  I said in time.

25        DUNEDINSUPERDAD:  How old was he when you

1      showed him?

2            CAPTOES:  13, I believe.

3            DUNEDINSUPERDAD:  That's not bad age.

4            CAPTOES:  No.  And he needed to be shown and

5      talked to.

6            DUNEDINSUPERDAD:  That is only appropriate way

7      to do it.  Can't just let him go off on their own.

8      Would be a disaster.

9            CAPTOES:  He still had to ask my permission

10     until he was 18.

11           DUNEDINSUPERDAD:  Experience must be shared,

12     right?

13           CAPTOES:  Certainly.  I discipline him many a

14     time for not asking permission.

15           DUNEDINSUPERDAD:  But, of course.

16           CAPTOES:  I've talked with a lot of dads who

17     asked about this.

18           DUNEDINSUPERDAD:  Really.  Glad to hear that.

19           CAPTOES:  When you need to, would help you

20     with it.

21           DUNEDINSUPERDAD:  Great.  That's a big relief.

22           CAPTOES:  Think you will ever want to try

23     being nude around your kids?

24           DUNEDINSUPERDAD:  Of course.  Daughter and I

25     are close."

1    BY MS. KAISER:

2    Q      Before you continue, let me just stop there.

3    Corporal Romanosky, what did you understand the

4    defendant to mean when he said, I disciplined him

5    many a time for not asking permission?

6    A      For not asking permission to masturbate.

7    Q      Proceed.

8           "CAPTOES:  Fine.  Has she seen you nude?

9           DUNEDINSUPERDAD:  Yes.

10          CAPTOES:  Does she ask anything?

11          DUNEDINSUPERDAD:  She's been inquisitive for

12    the last few years.

13          CAPTOES:  Do you answer her?

14          DUNEDINSUPERDAD:  Only responsible thing to

15    do.

16          CAPTOES:  Right.  I agree.  My son asked about

17    getting hard and I explained as best I could.

18          DUNEDINSUPERDAD:  Did he understand?

19          CAPTOES:  Not totally but he finally did.

20          DUNEDINSUPERDAD:  That's good.  Sometimes have

21    to keep explaining till they get it right.

22          CAPTOES:  Well, I tried to tell him that at

23    times you had no control over what happens.

24          DUNEDINSUPERDAD:  That's true.  Things just

25    happen.

1        CAPTOES:  We had plenty of hygiene lessons

2   with his foreskin.

3        DUNEDINSUPERDAD:  How did you educate him on

4   property hygiene?  Proper hygiene.  Sorry.  Can't

5   type today.

6        CAPTOES:  We had inspection every Saturday.  I

7   used alcohol if he was not clean enough and that

8   hurt.  He learned.

9        DUNEDINSUPERDAD:  Good idea.

10        CAPTOES:  And if that didn't work we had a

11   heavy session together.

12        DUNEDINSUPERDAD:  What?

13        CAPTOES:  I beat his butt hard.

14        DUNEDINSUPERDAD:  That would do it.

15        CAPTOES:  As I told you, he got it plenty

16   often.

17        DUNEDINSUPERDAD:  As they should.

18        CAPTOES:  I will help you begin to do it

19   often, Mike.

20        DUNEDINSUPERDAD:  Thank you.  Do you mind

21   giving me your first name?

22        CAPTOES:  Sorry.  It's Charles.

23        DUNEDINSUPERDAD:  That's cool.  You may have

24   told me yesterday and I forgot.  I apologize.

25        CAPTOES:  No problem.  You will be

1      disciplining your kids often before you know it.

2              DUNEDINSUPERDAD:  I hope to expand on my

3      current knowledge of discipline.  Plus I like being

4      very close to both my kids.

5              CAPTOES:  That is vital.  But as a dad not as

6      a buddy.

7              DUNEDINSUPERDAD:  Exactly.

8              CAPTOES:  Will be back in a little while.

9      Must do some laundry.

10             DUNEDINSUPERDAD:  Okay.  Talk to you later.

11             CAPTOES:  Bye for now.

12             DUNEDINSUPERDAD:  Bye."

13     BY MS. KAISER:

14     Q      When was the next internet chat you had with

15     the defendant, Corporal Romanosky?

16     A      July 15th of '05.

17     Q      Approximately what time of day did that chat

18     start?

19     A      3:06 PM.

20     Q      And who contacted who?

21     A      The defendant contacted my undercover profile.

22     Q      And those are your initials once again on the

23     chats?

24     A      Yes.

25             MS. KAISER:  If we could, at this time I'd

1      like to publish Government's Exhibit Number 4 to the

2      jury?

3              THE COURT:  Yes, ma'am.

4              "CAPTOES:  Hi, Mike.  How are you doing?

5              DUNEDINSUPERDAD:  Great.  How are you?  Long

6      day at work.  Hot out.

7              CAPTOES:  We have rain and more rain.  Kids

8      coming?

9              DUNEDINSUPERDAD:  Not this weekend,

10     unfortunately.

11             CAPTOES:  Oh.  So you have peace and quiet

12     then.

13             DUNEDINSUPERDAD:  Yeah.  It will be quiet this

14     weekend.  How about you?

15             CAPTOES:  Going to theater tonight and that

16     will be it.  Might have to sit with a friend's kid.

17     He is a handful at 14.

18             DUNEDINSUPERDAD:  Sounds like you'll have a

19     quiet weekend, too.

20             CAPTOES:  Depends on if I have to cope with

21     him.

22             DUNEDINSUPERDAD:  Well, I'm sure he will

23     behave.  If not you may have to give him a reminder.

24             CAPTOES:  I told his dad what I would do, and

25     he backs me totally.

1          DUNEDINSUPERDAD:  It's good to have support

2     like that.

3          CAPTOES:  Oh, yes, or I would not go over

4     there.

5          DUNEDINSUPERDAD:  True.  Have you watched this

6     boy before?

7          CAPTOES:  Yes.  And I beat his butt raw a few

8     times.

9          DUNEDINSUPERDAD:  Well, I'm sure that he now

10    knows where you stand.

11         CAPTOES:  I sure hope so.

12         DUNEDINSUPERDAD:  My ex called me last night

13    and told me that she is having some problems with my

14    daughter mouthing off and such.  Looks like I may

15    have to address that next weekend.

16         CAPTOES:  How old is your daughter?

17         DUNEDINSUPERDAD:  14.

18         CAPTOES:  Well, when I get back and you bring

19    her down to me I will show you what to do.

20         DUNEDINSUPERDAD:  I'm sure you will.  I'm sure

21    that she would likely be more comfortable the first

22    time somewhere up here, though.

23         CAPTOES:  Oh, I'm sure.  Well, you need to try

24    it first.

25         DUNEDINSUPERDAD:  I have disciplined her

```
 1    before.

 2           CAPTOES:  Hard?

 3           DUNEDINSUPERDAD:  Of course.

 4           CAPTOES:  Good man.  After my own heart.

 5           DUNEDINSUPERDAD:  Laugh out loud.  Of course.

 6           CAPTOES:  She probably needs it often.

 7           DUNEDINSUPERDAD:  Oh, yeah, teenagers do,

 8    believe me.  She's been a real handful but we've

 9    gotten real close with me keeping her in line.

10           CAPTOES:  That's great.  She probably plays

11    you with sweet talk, too.

12           DUNEDINSUPERDAD:  Yeah, of course.

13           CAPTOES:  Know that daughters can do that with

14    dads.

15           DUNEDINSUPERDAD:  Of course.  But she knows

16    that won't work with me.

17           CAPTOES:  That's good.  My son would not have

18    attempted it, as the strop was always by my chair.

19           DUNEDINSUPERDAD:  Good for you.  Always within

20    reach.

21           CAPTOES:  Yes.  And always would have it

22    there.

23           DUNEDINSUPERDAD:  Charles, I have to go.  I

24    may be on later.

25           CAPTOES:  Good.  Enjoy, Mike.
```

1          DUNEDINSUPERDAD:  Thank you."

2     BY MS. KAISER:

3     Q     Corporal Romanosky, what is a strop?

4     A     A razor strap.

5     Q     And what is -- what is a razor strap?

6     A     A razor strap is -- what I've learned is a

7     piece of leather backed with a piece of canvas or

8     hemp or some other sort of backing.  And it's

9     clasped with a metal clasp on one end.

10    Q     Did you have any other online conversations

11    with the defendant back in 2005?

12    A     Yes.  The next one was on July 20th of 2005.

13    Q     On July 20th, who contacted who?

14    A     At 2:46 I received an instant message from the

15    defendant.

16         MS. KAISER:  Your Honor, at this time I'd like

17    to publish Government's Exhibit Number 5.

18         THE COURT:  Yes, ma'am.

19         "CAPTOES:  Good afternoon.

20         DUNEDINSUPERDAD:  Hey.

21         CAPTOES:  Making your kids behave more these

22    days?

23         DUNEDINSUPERDAD:  I don't get them until this

24    weekend.

25         CAPTOES:  Oh.  You were a bit bothered about

1    them when last we chatted.

2         DUNEDINSUPERDAD:  Nothing I can't take care of

3    this weekend.

4         CAPTOES:  Very good.  They need lots of

5    structure, am sure.

6         DUNEDINSUPERDAD:  Yes, they do.

7         CAPTOES:  And you know how to handle it.

8         DUNEDINSUPERDAD:  Yes, I do.

9         CAPTOES:  I sat with the son of a friend of

10   mine while he went to visit his mother.  That was an

11   experience.  Doubt that he is sitting easily yet.

12        DUNEDINSUPERDAD:  Laugh out loud.  Gave you

13   some trouble, huh?

14        CAPTOES:  Yes, with his mouth and arrogance.

15   The razor strop landed on him many, many times.  And

16   the -- his dad used it, too.

17        DUNEDINSUPERDAD:  I bet he was a different

18   person by the time he left.

19        CAPTOES:  His dad sanctioned it.  As I said, I

20   would not sit without it.

21        DUNEDINSUPERDAD:  Good for you.

22        CAPTOES:  And would do it again if needed.

23        DUNEDINSUPERDAD:  Sometimes is.

24        CAPTOES:  It sure worked with my son.

25        DUNEDINSUPERDAD:  You bet.

1          CAPTOES:  And you may be persuaded to use it,

2     too.

3          DUNEDINSUPERDAD:  I agree.

4          CAPTOES:  So if you need help, let me know.

5          DUNEDINSUPERDAD:  Always interested in help.

6          CAPTOES:  I would be willing.

7          DUNEDINSUPERDAD:  Really?

8          CAPTOES:  Would you like that?

9          DUNEDINSUPERDAD:  Maybe.  What all did you

10    have in mind?  I can't have them getting hurt or

11    anything.  Don't want their mom to get suspicious.

12    You still there, Charles?

13          CAPTOES:  Not hurt and no suspicions.  My

14    feeling is that kids need structure.  And a little

15    sore butt is not inappropriate.

16          DUNEDINSUPERDAD:  True.

17          CAPTOES:  Some mothers don't believe in

18    discipline.  With those trying would be in vain.

19          DUNEDINSUPERDAD:  Mine does.  Just don't want

20    too much injury, school will report you.  Or heaven

21    forbid, a doctor be needed.

22          CAPTOES:  I agree.  Nothing that rasical.

23    Some dads use paddles, which are more dangerous.

24          DUNEDINSUPERDAD:  True.

25          CAPTOES:  I would not do that.  Leather is

1    soft and pliable.  But you have to be comfortable.

2          DUNEDINSUPERDAD:  I'm good with it.  You seem

3    decent.  Just wondering how you let boy know it was

4    done out of love is all.

5          CAPTOES:  Well, interesting.  My son knew I

6    loved him loads and there was no question.  At first

7    he asked if I loved him, and I said absolutely.

8          DUNEDINSUPERDAD:  Good for you.

9          CAPTOES:  And I always have and always will.

10   Sorry.  Phone rang."

11   BY MS. KAISER:

12   Q    When was the next time you had an internet

13   chat with the defendant?

14   A    July 21st of 2005.

15   Q    And who contacted who on that date?

16   A    I received an instant message from the

17   defendant at 3:08 PM.

18   Q    Did you respond?

19   A    Yes.  We had a very brief conversation.

20         MS. KAISER:  At this time I'd like to publish

21   Government's Exhibit Number 6.

22         THE COURT:  All right.

23         "CAPTOES:  Hope I wasn't too assertive

24   yesterday.

25         DUNEDINSUPERDAD:  No, not at all.

1          CAPTOES:  Oh, good.  I guess that is my

2     definite approach coming out.

3          DUNEDINSUPERDAD:  Laugh out loud.  No problem.

4          CAPTOES:  But I found with my son a definite

5     structured dad was a help.

6          DUNEDINSUPERDAD:  I agree.  But I believe that

7     affection is also an important part of the

8     upbringing.

9          CAPTOES:  I am the world's most affectionate

10    and passionate dad.

11         DUNEDINSUPERDAD:  That's good.

12         CAPTOES:  I still love my son totally.

13         DUNEDINSUPERDAD:  That's great.  I imagine it

14    can be hard to keep that close relationship after

15    they get older.

16         CAPTOES:  It has really stayed the same.

17         DUNEDINSUPERDAD:  That's great.  Hey, I hate

18    to run but I gotta go give daughter a ride to the

19    mall.

20         CAPTOES:  Okay.  Hope to see you later.

21         DUNEDINSUPERDAD:  Talk to you later."

22    BY MS. KAISER:

23    Q    Did you have any other conversations with the

24    defendant back in 2005, Corporal Romanosky?

25    A    The next contact with the defendant was on

1    July 25th of 2005.

2    Q     And who contacted who on that date?

3    A     I received an instant message from the

4    defendant at 4:47 PM.

5          MS. KAISER:  Your Honor, at this time I'd like

6    to publish Government's Exhibit Number 7.

7          THE COURT:  Yes, ma'am.

8          "CAPTOES:  Hi, Mike.

9          DUNEDINSUPERDAD:  Hey.  How's it going?

10         CAPTOES:  Fine.  Thanks.

11         DUNEDINSUPERDAD:  That's nice.  You have a

12    good weekend?

13         CAPTOES:  Great.  And you?

14         DUNEDINSUPERDAD:  Was good.  Thanks.

15         CAPTOES:  Have the kids?

16         DUNEDINSUPERDAD:  Yeah.

17         CAPTOES:  Did they behave?

18         DUNEDINSUPERDAD:  Yeah, they behaved, but

19    still had to address some misbehavior from before.

20         CAPTOES:  How did you address it?

21         DUNEDINSUPERDAD:  Hang on a second.  Phone.

22         CAPTOES:  Okay.

23         DUNEDINSUPERDAD:  Back.

24         CAPTOES:  How did you address the bad behavior

25    from before?

 1          DUNEDINSUPERDAD:  Had to take matters into my

 2     own hands.

 3          CAPTOES:  And?

 4          DUNEDINSUPERDAD:  Instant compliance.

 5          CAPTOES:  Meaning?

 6          DUNEDINSUPERDAD:  I'm sure they will behave

 7     better now.

 8          CAPTOES:  Did you use a belt?

 9          DUNEDINSUPERDAD:  Didn't have to.  Hand worked

10     just fine.

11          CAPTOES:  Good.  And that has to occur often.

12          DUNEDINSUPERDAD:  Yes.  Damn.  I have to go.

13     I'll be back later."

14     <u>BY MS. KAISER:</u>

15     Q     Corporal Romanosky when Captoes at 5:00 PM

16     said, good, that has to occur often, what did you

17     understand him to mean?

18          MR. TRAGOS:  Objection, speculation and

19     relevance.

20          THE COURT:  It is this witness's understanding

21     of what was written, so I will overrule it on that

22     basis.

23          THE WITNESS:  The physical abuse.

24          THE COURT:  Ms. Kaiser, it's nearly 4:00.

25     Would this be a good stopping point?

1          MS. KAISER:  Yes, Your Honor.

2          THE COURT:  All right.  Let's resume at 9:15

3     in the morning, members of the jury.  Please

4     remember not to discuss the case among yourselves or

5     allow it to be discussed in your presence.

6          COURTROOM SECURITY OFFICER:  Rise for the

7     jury.

8     (Jury out at 3:59 PM.)

9     (Hearing adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3     STATE OF FLORIDA          )

 4     COUNTY OF HILLSBOROUGH    )

 5        I, Linda Starr, RPR, Official Court Reporter for

 6     the United States District Court, Middle District,

 7     Tampa Division,

 8        DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 275 inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 13th day of September 2009.

19

20

21            _/s/ Linda Starr_____
              Linda Starr, RPR, Official Court Reporter
22

23

24

25
```