**IN THE UNITED DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA )
 )
 VS. )
 )  No. 8:08 CR 318
 )
CHARLES JACKSON FRIEDLANDER, )
 )
 Defendant )

**MOTION FOR COMPASSIONATE RELEASE**

The Defendant, Charles Jackson Friedlander, by his counsel, respectfully shows the Court

pursuant to the First Step Act of December 21, 2018, the Second Chance Act of 2008, 34 U.S.C.

60541, et seq., and the Second Chance Reauthorization Act of 2018, also enacted December 21,

2018, that:

1.    The Defendant on July 21, 2009 was sentenced to a term of 360 months.  He is now

in BOP custody at LSCI Butner, North Carolina.

2.     As of March 27, 2019, with BOP good time, he will have served just over 139

months.  He is 89 years old.

3.    Charles Friedlander has the following serious medical conditions, documented by

his BOP medical records, and by records of the Duke University Medical Center, where the BOP

has sent him for needed outside care:

- Brittle Type II Diabetes Mellitus, very difficult to control, with unpredictable sharp changes in blood glucose levels without an obvious cause, together with greater likelihood and frequency of ketoacidosis and/or severe hypoglycemia.
- Total Erectile Dysfunction at least since 2008, due to brittle diabetes
- Osteoarthritis
- Extreme Fatigue
- Chronic Kidney Disease-Stage 3
- GERD (Gastroesophageal Reflux Disease)
- Hypertension

- Prostate carcinoma/Prostate Hypertrophy
- Hearing loss (hearing aids)
- Sciatica
- Gout
- Multi basal cell carcinomas
- Vincent's Stomatitis in mouth/gums (Acute Infectious Gingivostomatitis)
- Elevated Cholesterol
- Right Branch Bundle Block, a delay/blockage along the pathway that electric impulses travel to make the heartbeat, in this case the right side of the ventricles.
- Diabetic Retinopathy, the most common cause of vision loss in diabetes, change to retinal blood vessels causing them to bleed or leak fluid, distorting vision. This is a leading cause of blindness.
- Severe Clinical Depression
- Elevated Anxiety Disorder
- Degenerative Back Disease

He has been wheelchair bound since 2012 and currently wears diapers due to limited control of his bladder. And suffice it to say he is way out of warranty. Since May 1, 2019 he has fallen almost daily.  That he has not broken a hip is remarkable, considering he is 89 years old. His BOP release date, on January 29, 2035, at age 104, is of course academic.

4.       Attached is a copy of a November 18, 2018 psychosexual evaluation of Charles Friedlander done by Dr. Joseph J. Plaud in Boston.  Dr. Plaud concluded that:

a.  Dr. Friedlander has not been a prior sexual offense recidivist, he has no contact-based victims; it is highly likely that years ago he engaged in sexualized fantasizing.  His clinical presentation is inconsistent with a paraphilia diagnosis.

b.  Dr. Friedlander is now 88 years old, now within an age cohort associated with the absolute lowest rates of sexual offense recidivism.

c.  Dr. Friedlander does not have in general an antisocial lifestyle orientation and given that he does not possess a paraphilia diagnosis, there is an insufficient foundation to conclude at this time that Dr. Friedlander would be in a band of sexual offense risk considered high or likely.

d.  Comparatively speaking, Dr. Friedlander's statistical risk analysis places him in a very low risk band in 2018.

    e.   There are unique interpersonal issues in Dr. Friedlander's social functioning, including what most accurately from a psychological perspective can be described as social inadequacies that formed a basis for his sexual offense adjudication.

    f.   Dr. Friedlander is in an age and risk-range, given his current health and medical issues in which terms of compassionate release is clearly in my professional judgment the best course of action concerning both public safety and the welfare of Dr. Friedlander.

It is worth noting that Dr. Plaud is a nationally known sex offender specialist who has on numerous occasions served as an expert for the Government, for the respondent, and for the Court, in proceedings under 18 U.S.C. 4248 in the District of Massachusetts and the Eastern District of North Carolina.

5.    The actuarial table in Section 8-46 of the General Statutes of North Carolina gives Charles Friedlander a life expectancy of 6.6 years, but that of course does not take into account his remarkable laundry list of serious health issues at 89.  Certainly, no agent in his right mind would sell him a life insurance policy now.

6.    Charles Friedlander clearly meets the BOP standards, set out in Policy Statements 5050.49 and 5050.50 for Compassionate Release.  He also meets the compassionate release criteria of 18 U.S.C 3580(c)(1)(A)(i) and Section 1B1.13, Federal Sentencing Guidelines

7.    Formal requests for compassionate release have been submitted by Charles Friedlander and/or his counsel to the BOP.  All administrative rights to appeal the failure of the BOP to bring a motion on the defendant's behalf have long been exhausted.

8.    If released from BOP custody, Charles Friedlander will be on supervised release for life.

9.    The release plan is for Charles Friedlander to live with William Hayden at 501 North Clinton Street-Apt. 3102, Chicago, Illinois 60654, where friends and family live, and can

3

assist him, very near an assisted living facility, to which he would likely eventually move. William Hayden is an accountant; will retire in January 2020 from a Company he has worked at for over 29 years and has been Charles Friedlander's financial and medical power of attorney since 2008. Charles Friedlander will have an adequate income and Social Security benefits, together with health insurance.

10.     To our knowledge there have been at least seven cases to date in which compassionate release was ordered under the First Step Act of December 21, 2018. The first case was <u>United States v. Cheatham</u>, No. 3:06 CR 95 (E.D. Tennessee).   In that case Steven Ray Cheatham was serving a sentence of 188 months for two-armed bank robberies in less than a week in 2006.   On January 30, 2019 Cheatham, then suffering from cancer, filed a motion similar to this one in this case, for compassionate release under the First Step Act of December 21, 2018.   Chief Judge Varlan in Knoxville the very next day, January 31, 2019, granted the motion and reduced Cheatham's sentence to time served.   Sadly, Cheatham died at FMC Butner, North Carolina, unaware he was a free man.   That is exactly what we of course do <u>not</u> want to happen in this case.

In <u>United States v. Evans</u>, No. 4:15 CR 15 (S.D. Texas) Dr. Richard Evans, a "pill mill" physician with cancer, was ordered released on March 13, 2019, only five days after the filing of a motion similar to this one.

In <u>United States v. Garcia</u>, No. 2:11 CR 935-6 (CD California), Wilfred Garcia was ordered released on March 22, 2019. A copy of the release order is attached and incorporated herein.

In <u>United States v. Brittner</u>, No. 9:16 CR 15 (D. Montana) Steve Alan Brittner was ordered released on May 1, 2019.  A copy of the release order is attached and incorporated herein.

In <u>United States v. Adams</u>, No. 4:09 CR 115 (N.D. Texas), Steven Ray Adams was ordered released on May 3, 2019. A copy of the release order is attached and incorporated herein.

4

In <u>United States v. Leggitt</u>, No. 4:12 CR 306 (E.D. Arkansas), Terry Wayne Leggitt was ordered released on March 6, 2019.  A copy of that release order is attached and incorporated herein.

In <u>United States v. McGraw</u>, No. 2:02 CR 18 (S.D. Indiana), McGraw was ordered released on May 9, 2019.  A copy of that release order is attached and incorporated herein.

In <u>United States v. Peterson</u>, 7:12 CR 15-1 BO (EDNC), Peterson was ordered released on June 4, 2019.  A copy of that release order is attached and incorporated herein.

In all but <u>Leggitt</u>, the Government and the BOP opposed release.

11.     On April 9, 2019 Charles Friedlander was told by his Unit Team at LSCI Butner that:

> Your age at sentencing was 78 and your current offense is 18 U.S.C. 2422(B) child enticement, which upon review of P.S. 5162.05 is listed in the categorization of offense.  Therefore, based on your age at sentencing and your current offense, you do not meet the criteria for a compassionate release/RIS.

Attached and incorporated herein is a copy of the April 9, 2019 notification.

Also attached and incorporated is a copy of the BOP Program Statement 5162.05 of March 16, 2009, referenced in the unit team notification. At Page 6 of P.S. 5162.05, 18 U.S.C. 2422 is listed, <u>but</u> described as "coercion into <u>interstate travel</u> for illegal sexual activity," emphasis added. That statute, 18 U.S.C. 2422, last amended July 27, 2006, in 18 U.S.C. 2422(a), makes it unlawful to persuade, induce, entice or coerce any individual to travel "in interstate as foreign commerce" etc.  Charles Friedlander was convicted of violating not that section of 18 U.S.C. 2422, but rather 18 U.S.C. 2422(b) which makes it unlawful to persuade, induce, entice or coerce any individual under 18, etc. There is no requirement that the minor travel in interstate commerce, unlike 18 U.S.C. 2422(a). The Congress could have inserted that requirement into 18 U.S.C. 2422(b) but did

not do so. Attached and incorporated herein is a copy of 18 U.S.C. 2422, both sections. Accordingly, it is our position that 18 U.S.C. 2422(b) is <u>not</u> included in the Categorization of Offenses set out in BOP P.S. 5162.05, and that Charles Friedlander thus <u>is</u> now eligible for compassionate release. Of course, the determination as to how long a sentence is to be served is one for this Court, not for the BOP. Decisions about sentencing "should not be left to employees of the same Department of Justice that conducts the prosecution," and the BOP "is not charged with applying 18 U.S.C. 3553(a)," <u>Setser v. United States</u>, 566 U.S. 231 at 240, 242 (2012).

**WHEREFORE**, pursuant to the First Step Act of December 21, 2018, Second Chance Act of 2008, 34. U.S.C. 60541 et seq, and the Second Chance Reauthorization Act of 2018, also enacted December 21, 2018, respectfully prays the Court:

1.     For compassionate release from BOP custody, to live in Chicago, Illinois under the supervision of the USPO for the Northern District of Illinois for the term of supervised release in the judgment herein; and

2.     For such other and further relief as the Court may deem just and equitable.

<div style="margin-left:40%">

Respectfully Submitted,
/s/Joseph E. Parrish
JOSEPH E. PARRISH
Florida Bar. No: 690058
**Parrish & Goodman, PLLC**
915 N. Franklin Street, Unit 2302
Tampa, Florida 33602
(813) 643-4529; (813) 315-6535 (fax)
Primary: jparrish@parrishgoodman.com
Secondary:  admin@parrishgoodman.com
*Counsel for Charles J. Friedlander*

         Of Counsel
*/s/ James B. Craven III*
James B. Craven III
NC State Bar 997
P.O. Box 1366
Durham, NC 27702

</div>

(919)688-8295
JBC64@mindspring.com  Attorney  for  the
*Counsel for Charles J. Friedlander*

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and

served via CM/ECF Portal to the Government counsel on this 27th day of June, 2019:

   Maria Chapa Lopez, Esquire
   United States Attorney
   400 North Tampa Street-Suite 3200
   Tampa, FL 33602

          */s/ Joseph E. Parrish*
          Attorney

# Applied Behavioral Consultants, LLC

## Joseph J. Plaud, Ph.D.

**Licensed Psychologist and Health Service Provider**
**Specializing in Forensic Psychological Services**

166 Boston Street, Unit 3
Boston, Massachusetts 02125-1142

Office: (617) 620-5218  Facsimile: (617) 830-0830
Email: plaud@forensicbehavior.com
Web: https://forensicbehavior.com

November 18, 2018

James B. Craven III, Esq.
Attorney at Law
Liberty Market Building
349 West Main Street
PO Box 1366
Durham, NC 27702

Dear Mr. Craven:

I have completed a psychosexual evaluation of Dr. Charles Friedlander, date of birth May 28, 1930, age 88. This evaluation of Dr. Friedlander began by the review of documents provided by your office. I then conducted a data-based evaluation of Dr. Friedlander at the Federal Correctional Institution (Low Security) in Butner, North Carolina on two occasions: May 22 and October 2, 2018. The purpose of the present assessment is to evaluate Dr. Friedlander's current psychosexual functioning and behavior, and provide for a risk assessment pertaining to sexual behavior.

Please note that in the course of conducting this evaluation of Dr. Friedlander, multiple sources of documentation were reviewed and analyzed, pertaining to Dr. Friedlander's history. These sources of documentation will not be referred to directly in the body of this report unless a specific relevancy is established between a particular source of information in the records to the professional determination of Dr. Friedlander's present risk level. Also note that the empirical and clinical information and professional conclusions detailed in this psychological and psychosexual evaluation report do not necessarily represent in its totality or in any significant part thereof my professional testimony in the event of an ensuing civil or criminal hearing or trial.

## Reason for Referral

Dr. Friedlander was referred for sexual assessment relating to his current psychosexual status in context of his July 21, 2009 conviction for the charge of Child Enticement. It is the primary purpose of this evaluation to address Dr. Friedlander's current risk for sexual recidivism in context of the empirical research in this area; the nature of his sexually offensive conduct; and his current status as an 88-year old man. Dr.

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 2

Friedlander voluntarily sought to participate in this assessment to assist in an analysis of his present risk given the factors in this case.

## Behavioral Observations and Mental Status

Dr. Friedlander was attentive, properly oriented, and very cooperative during all phases of the assessment. More specifically, during the clinical interview of Dr. Friedlander, I detected no evidence of a generalized organic basis for cognitive impairment at this time; although he did show repeated evidence of an inability to recall historical events, and his speech was at times circumstantial during the clinical interview. Dr. Friedlander was also pleasant and cooperative during the course of the clinical interview. Dr. Friedlander was an appropriately groomed Caucasian male in correctional detention, and appeared to be his stated age of 88.

## Professional Judgment Concerning Dr. Charles Friedlander's Present Psychosexual Functioning

Dr. Charles Friedlander voluntarily participated in a psychosexual evaluation. The evaluation included a clinical interview, a review of his records, comparative statistical risk analysis, and a review of the most recent scientific literature on sexual recidivism. Inspection and professional analysis of the data gathered and interpreted in this evaluation of Dr. Friedlander do not support the conclusion that in November, 2018 he is at significant or likely or even moderate – but rather very low – risk to re-engage in sexually abusive behavior. In my professional judgment, he should be afforded the opportunity to seek a placement outside of institutional incarceration given his current low sexual risk coupled with his current age and ongoing medical/health issues. In my professional judgment Dr. Friedlander is an appropriate candidate at this time for compassionate release; in 2018 he does not represent a risk to engage in either contact or non-contact sexual offending. As a clinical and forensic psychologist who has provided both evaluation and treatment services to sexual offenders (over 31 years), I find Dr. Friedlander's case to be atypical concerning sexual offender risk. An alternative placement to incarceration should in my professional judgment be identified and Dr. Friedlander allowed to reside in the community going forward in time.

Further, given the data in this case specific to Dr. Friedlander's developmental, sexual and criminal histories, in analyzing historical (static) and present-day (dynamic) risk factors, he does not present as an individual at high risk to recidivate in a sexual manner. The data generated in this evaluation of Dr. Friedlander point to a clinical conclusion that Dr. Friedlander is not driven by underlying sexual deviance. Further, the present evaluation of Dr. Friedlander reaches the professional conclusion that he would not be diagnosed clinically with any sexually-based mental disorder (or paraphilia), as noted below.

Given the data in this case I would also make the following professional observations and conclusions:

1.     Dr. Friedlander has not been a prior sexual offense recidivist, he has no contact-based victims; it is highly likely that years ago he engaged in sexualized fantasizing. His clinical presentation is inconsistent with a paraphilia diagnosis.

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 3

2.      Dr. Friedlander is now 88 years old, now within an age cohort associated with the absolute lowest rates of sexual offense recidivism.

3.      Dr. Friedlander does not have in general an antisocial lifestyle orientation, and given that he does not possess a paraphilia diagnosis, there is an insufficient foundation to conclude at this time that Dr. Friedlander would be in a band of sexual offense risk considered high or likely.

4.      Comparatively speaking, Dr. Friedlander's statistical risk analysis places him in a very low risk band in 2018.

5.      There are unique interpersonal issues in Dr. Friedlander's social functioning, including what most accurately from a psychological perspective can be described as social inadequacies that formed a basis for his sexual offense adjudication.

6.      Dr. Friedlander is in an age and risk-range, given his current health and medical issues in which terms of compassionate release is clearly in my professional judgment the best course of action concerning both public safety and the welfare of Dr. Friedlander.

Joseph J. Plaud, Ph.D.      Date: November 18, 2018
Executive Director
Applied Behavioral Consultants, LLC

## Appendix 1: Background Information Concerning Dr. Friedlander

## Family Background

Dr. Charles Jackson Friedlander was born on May 28, 1930 in New York, New York, to Madeline and Marcus Friedlander. He is the older of two children born to his parents. His sister Mary Ellen is two years younger than he. Dr. Friedlander was raised in New York. His father was in the banking industry in New York, and his mother was a homemaker whom Dr. Friedlander described as frequently absent from the family. Dr. Friedlander had a series of nannies whom he described as his primary caregivers the first eight years of his life. According to Dr. Friedlander his father did not want any children. Dr. Friedlander described a strained, practically non-existent relationship with his parents growing up. Dr. Friedlander stated during the clinical interview that his mother was diagnosed at one point with paranoid schizophrenia. Dr. Friedlander stated that there was no physical abuse in the family home. Dr. Friedlander described a more positive relationship with his paternal grandparents. Dr. Friedlander stated that he grew up in New York in a large home, but the home was divided and his sister grew up almost completely apart,

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

**Dr. Charles Friedlander**
**Psychosexual Evaluation Report**
**November 18, 2018**
**Page 4**

and he did not have a meaningful relationship with her until she was in her twenties. Dr. Friedlander stated that his sister was generally not a nice person, and at one point also was diagnosed with paranoid schizophrenia. She resided at McLean Hospital in Belmont, Massachusetts for over twenty years. His sister currently resides in Arlington, Massachusetts in an assisted living facility, and Dr. Friedlander maintains contact with his 85-year old sister, primarily by telephone. His father died in 2006 at the age of 102. His mother passed away in 1993 at the age of 85. Dr. Friedlander stated that he became a caregiver for both parents as they aged.

## Educational and Employment History

Dr. Friedlander attended both public and private schools in New York, and stated he preferred to remain in public school, did better socially and academically there, but was never given a choice. He graduated in 1948 from Fieldston in Riverdale, New York. He then attended Bradley University in Peoria, Illinois for two years, and then Washington and Lee University in Lexington, Virginia. He graduated in 1953 and majored in French. He then went to work for Sears, Roebuck and Company for three months, and then became a buyer for Thalhimer's, a department store, in Richmond, Virginia. He then went to work in Los Angeles, California for the I. Magnin store as a buyer. Dr. Friedlander stated that he did not enjoy residing in Los Angeles, and decided to open up his own store in Washington, DC, a men's store he called Charles Jackson, Limited. He operated the store for four years and then described himself as "psychologically drained," as he worked nonstop in order to maintain his clientele base. He then enrolled in a counseling graduate program at George Washington University. He obtained a Master of Science degree in counseling and psychology. He then transferred to the psychology department and in 1977 obtained a Ph.D. in social psychology at George Washington University.

In the 1960s before he received his masters degree, Dr. Friedlander went to work as a counselor in a high school in Loudoun County in Virginia. He also taught French. After four years he transferred to a high school closer to Washington, DC and stated that he led the counseling department, developing his own programming. He remained there for approximately sixteen years, ending there in 1986. He stayed employed while pursuing graduate studies. He became licensed as a psychologist in Virginia, and lived in Georgetown, having purchased a home in 1965. After 1986 Dr. Friedlander went into private practice, focusing on work with divorced parents, family psychology, and adolescent suicide prevention. He also offered psychotherapy services in French. He retired in 2006.

## Substance Abuse History

Dr. Friedlander started using alcohol at age 15, and reported that he drank with some frequency for an approximate three-year history, mostly because of social anxiety. After age 18 he described himself as a very light social drinker.

## Religious History

Dr. Friedlander was not raised religiously. His father was of German Roman Catholic ancestry, and his

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 5

mother was Jewish. When he was 14 years old Dr. Friedlander was confirmed in the Episcopal church, choosing this Christian denomination because of his social group of friends and peers. Upon occasion he attends both Jewish and Roman Catholic religious services at FCI -- Butner.

## Medical and Psychiatric History

Dr. Friedlander suffers from a host of medical issues at the present time, which include the following: Brittle Type II Diabetes, Osteoarthritis, Extreme Fatigue, Back Pain/Shoulder, Renal Failure, third stage, GERD, Hypertension, Prostate Carcinoma/Prostate Hypertrophy, Hearing Loss, Sciatica, Gout, Multi Basal Cell Carcinoma, Vincent Stomatitis in Mouth/Gums, Elevated Cholesterol, Bundle Branch Block, Diabetic Retinopathy, Severe Clinical Depression, Elevated Anxiety Disorder and Degenerative Back Disease. Dr. Friedlander has been bound to a wheelchair since 2012. He presently takes a number of medications to address these multiple medical conditions. Concerning a psychiatric history, Dr. Friedlander had individual psychiatric treatment beginning when he was 12 years old. He continued to receive such clinical services until his involvement with the governing/index federal offense, detailed below. During the second clinical interview in October, 2018 Dr. Friedlander reported that he has been experiencing more significant episodes of anxiety, what he described as being "jittery." Dr. Friedlander also reports experiencing periods of depression. He is prescribed both Effexor, XR 150 mg. and Buspar 10 mg. at this time by a nurse practitioner.

## Sexual Abuse History

Dr. Friedlander denied being the victim of sexual abuse during the clinical interview. Although he did note that on frequent occasions when he was young his mother would expose herself to him, that he did not like the experiences, and to this day does not now how to interpret his mother's intentions, whether they were sexual or not. Later in the clinical interview Dr. Friedlander stated that when he was 17 years old he went to a camp in Connecticut, when another male, a little older than he, sodomized him on at least one occasion, although he recalled several attempts, but has difficulties remembering the details.

## Sexual/Relationship History

Dr. Friedlander indicated that he was approximately 14 years old when he first started masturbating. Dr. Friedlander stated that his sexual orientation is bisexual. Dr. Friedlander stated that he was generally afraid of being around boys and girls his own age growing up. Dr. Friedlander reported approximately fifteen to sixteen sexual partners, three or four females and twelve men. He stated his last physical contact with another person was in 1980, and he began having erectile dysfunction, the onset of which he attributed to medical issues, primarily his diabetes.

Dr. Friedlander denied past contacts with prostitutes, as well as any excessive or obsessive patterns of behavior concerning watching sexually explicit movies or videos. Dr. Friedlander did not indicate that he was now easily ashamed about sexual matters. He stated he thought he had adequate information about human sexuality. Dr. Friedlander states that at the present time he has significant difficulties achieving and

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 6

maintaining a penile erection. He describes his current masturbatory practices as nonexistent. Dr. Friedlander denied any deviant sexual fantasy behaviors. The longest period of time he has resided with another person in an intimate relationship has been with a male for an approximate three-year period. He describes two significant live-in relationships. Dr. Friedlander has never been married and has no children.

## General Criminal History

There is no indication of either a juvenile or adult general criminal history concerning Dr. Friedlander.

## Instant/Governing Offense

According to records, on June 16, 2008 an undercover agent logged onto an AOL chat room as a 36-year old father who posed as a man wanting to engage in incest and also the physical abuse of children. His profile was written as a person with access to a female partner who also will engage in this activity as well as access to three children. Records continued to show Dr. Friedlander and the undercover agent engaged in an email exchange via the chat room discussing giving physical punishment to the children, including Dr. Friedlander using a 'razor strap' on his son from anywhere from 45 to 75 strikes at a given time. He chatted that he started hitting his son with a belt when he was about 8 years old. Dr. Friedlander also stated he had access to a friends' grandchildren and that they stayed with him from time to time. The next day the two spoke online again and the undercover agent introduced humiliating the children as well and Dr. Friedlander spoke again about access to his friend's grandchildren – boys who were 12 and 14 years old at the time, and he claimed to be "tearing them up daily." When the agent asked Dr. Friedlander where the assaults would take place, he emailed back he would use rooms he had specifically designed to "administer discipline" as well as his basement.

It was noted Dr. Friedlander began showing 'his sadistic and lascivious interest in physically abusing children" by telling the agent the children would totally stripped when he disciplined the children. As the days went on, the agent and Dr. Friedlander continued to talk via online chat about being discreet and watching each other inflict discipline on the children they talked about, and Dr. Friedlander offered to have the agent with his family and friends visit his home. Dr. Friedlander went on to state that most visitors brought their own children to his home. The chat continued to intensify by Dr. Friedlander admitting to being the most aggressive with the children and commenting such ideas as stating he was known to beat his son "daily, hard and long;" and that he would have to put oil and cream on the marks left on his son; and that his son was home schooled so he didn't have to worry about people seeing the marks. After ongoing dialogue online, on or about July 14, 2008 a date for the two of them to meet was set for July 21, 2008. It was noted that Dr. Friedlander began to introduce sexual acts on the children, and that he created another chat room called "family fun" which is used in cases like this to advertise an interest in engaging in incest within these type of chat rooms. On July 16, 2008 the agent had a phone call with Dr. Friedlander where Dr. Friedlander discussed again meeting to administer beatings on the agent's sons, and also engage in sexual acts with them which included oral sex. It was noted the agent continued to go online and monitor Dr. Friedlander chat room engagement for days leading up to July 21, 2008, and found him active in chat

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 7

rooms like "male for male starting early" and "fathers chatting." The planned meeting happened between the agent and Dr. Friedlander at a preplanned location. It was noted Dr. Friedlander arrived at the meeting and displayed tools he planned on using when disciplining the children which included: two leather razor straps, an English riding crop and a heavy leather "garrison" belt. It was noted that he "had a lascivious interest in the physical abuse of children and has attempted to gain access to a child for the purpose of acting out of his lascivious interests." Dr. Friedlander was arrested after the meeting and charged with Certain Use of a Computer Service Prohibited and Traveling to meet a minor. He was later convicted and received 30 years incarceration on July 21, 2009 for the charge of Child Enticement.

During the clinical interview Dr. Friedlander stated that he did talk to the agent online, but does not remember much of the conversations. He admitted to later driving to meet the individual at a Cracker Barrel Restaurant, but when he pulled into his parking spot he was arrested. Dr. Friedlander stated that the agent had asked him to bring with him the materials later confiscated, materials described above. Dr. Friedlander stated that the entire situation as described comprised a fantasy in its totality, that he never acted out concerning any such behavior, and he articulated that to the best of his memory, he thought he would go to a restaurant, and share a meal with someone who perhaps also shared some of these fantasies; not engage or attempt to engage in actual overt behavior in any of these sexual domains. Dr. Friedlander also noted that over the years he has forgotten elements of what is described in the record, but noted that it was just a fantasy.

## Institutional and Treatment History

Dr. Friedlander is not a behavioral problem at FCI – Butner, and is not involved in mental health counseling, noting that he wishes more mental health services were available to him. He does have contact with a nurse practitioner who has prescribed medications noted above.

## Appendix 2: Comparative and Statistical Risk Estimates Concerning Dr. Friedlander

The *Sexual Violence Risk – 20 (SVR-20)* provides for a research-based structured methodology designed to evaluate 20 factors or areas of functioning in those who have been either convicted or alleged to have committed a sexual offense. While several of the factors contained in the *SVR-20* are not in and of themselves significantly predictive of sexual offense recidivism, as a whole the *SVR-20* systematically addresses issues of potential relevance to sexual offense recidivism, as well as in the future planning of psychological or behavioral interventions to manage or reduce future risk.

Given that static or historic risk factors are unchangeable by definition, emphasis in the present structured risk assessment is given to dynamic or changeable/future issues as it is anticipated that Dr. Friedlander will resolve the case prior to trial. Utilizing the *SVR-20* coding manual, the factors detailed above were systematically examined regarding Dr. Friedlander. Several of the individual *SVR-20* factors have also shown significant relationship to how old the sexual offender is when he is to be released from confinement.

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 8

Risk assessments such as is being performed on Dr. Friedlander should not be conducted without an understanding of the significant relationship between how old the sexual offender is when he is to be released back into the community, and what we know about the rates of sexual offense recidivism as a function of this aging process. Barbaree et al. (2003) found the following base rates of sexual offense recidivism for sexual offenders who were released at different ages (21-30, 31-40, 41-50, 51+) as 17%, 11%, 8%, and 4% respectively.

Further, Barbaree et al. (2008) found that the following *SVR-20* risk factors diminished significantly with increased aging: Sexual Deviation, Major Mental Illness, High Density Offenses, Multiple Offense Types, Escalation in Frequency/Severity, Extreme Minimization/Denial of Offenses, and Attitudes that Support or Condone Offenses.

The conclusion that emerges from an analysis of the *SVR-20* factors in the present case is that given the above referenced anchor points, it is my professional judgment that Dr. Friedlander does not evidence any pattern of risk factors either in keeping with static (or historical) factors, or present-day dynamic (or changeable) factors. There is evidence for the potential for one historic risk factor in this case not consistent with significant sexual offense risk.

| *Psychosocial Adjustment* | *Sexual Offenses* | *Future Plans* |
|---|---|---|
| 1. Sexual Deviation: _No_/?/Yes | 12. High Density Offenses: _No_/?/Yes | 19. Lacks Realistic Plans: _No_/?/Yes |
| 2. Victim of Child Abuse: No/?/_Yes_ | 13. Multiple Offense Types: _No_/?/Yes | 20. Negative Attitude Toward Intervention: _No_/?/Yes |
| 3. Psychopathy: _No_/?/Yes | 14. Physical Harm to Victim(s): _No_/?/Yes | |
| 4. Major Mental Illness: _No_/?/Yes | | Other Considerations: Data on age at release and sexual offense recidivism are also factored into the present analysis of the *SVR-20* factors. |
| 5. Substance Use Problems: _No_/?/Yes | 15. Uses Weapons or Threats of Death: _No_/?/Yes | |
| 6. Suicidal/Homicidal Ideation: _No_/?/Yes | 16. Escalation in Frequency /Severity: _No_/?/Yes | |
| 7. Relationship Problems: _No_/?/Yes | 17. Extreme Minimization /Denial of Offenses: _No_/?/Yes | |
| 8. Employment Problems: _No_/?/Yes | 18. Attitudes that Support Or Condone Offenses: _No_/?/Yes | |
| 9. Past Nonsexual Violent Offenses: _No_/?/Yes | | |
| 10. Past Nonviolent Offenses: _No_/?/Yes | | |
| 11. Past Supervision Failure: _No_/?/Yes | | |

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 9

Calculation of comparative statistical risk to re-offend in a sexual manner was also computed utilizing the Static-99R. Dr. Friedlander's score on the Static-99 is as follows:

| Risk Factor | Yes = 1, No = 0 |
|---|---|
| 1. Age at Release? | -3 |
| 2. Ever lived with (no two year relationship)? | 0 |
| 3. Index non-sexual violence, any conviction? | 0 |
| 4. Prior non-sexual violence, any convictions? | 0 |
| 5. Prior sex offenses? (Score range is 0-3) | 0 |
| 6. Prior sentencing dates (excluding index)? | 0 |
| 7. Convictions for non-contact sex offenses? | 1 |
| 8. Any unrelated victims? | 0 |
| 9. Any stranger victims? | 0 |
| 10. Any male victims? | 0 |

Sum of Risk Factors for Dr. Friedlander as calculated above: -2

What does this score mean? First, to classify Dr. Friedlander in a range of categorical risk which ranges on the most updated coding forms from "very low risk" to "well above average" risk based upon this score tells us nothing of value or substance. The significance of Static-99R scores lies in the comparative group-based recidivism estimates associated with particular score-wise values. Unfortunately there has been a level of subjectivity introduced into the translation of score-wise values by the promulgation of several different comparison or reference groups for Static-99R, which have changed since the initial publications of both Static-99 and Static-99R. As such, it is most empirically sound to compare Dr. Friedlander's obtained score on the Static-99R with the Routine Corrections (RC) group, as follows:

### Static-99R Score-Wise Risk Estimates for Dr. Friedlander
### Based Upon the Routine Corrections (RC) Group

| | 5 Year Rate for | 95% Confidence Interval |
|---|---|---|
| Score on Static-99R: -2 | 1.3 | 1.0-1.8 |

In my professional opinion, if there is any doubt that the RC group is the most appropriate comparative risk analysis group to utilize in this assessment of Dr. Friedlander, the RC group has an approximate 15 percent greater AUC (Area Under the Curve) compared with the Preselected High Risk Need (PHRN) group (0.743

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

**Dr. Charles Friedlander**
**Psychosexual Evaluation Report**
**November 18, 2018**
**Page 10**

versus 0.647). The AUCs for the RC and PHRN Static-99R groups were obtained from the developers'
website itself: http://www.static99.org/pdfdocs/Supplemental_ Recidivism_Tables_Static 99R_Static
2002R.pdf. To calculate the AUC, one enters the score-wise number of recidivists and nonrecidivists into
the JROCFIT online statistical program for computing the AUC
(htttp://www.rad.jhmi.edu/jeng/javarad/roc/JROCFITi.html).

## Appendix 3: Diagnostic Analysis of Dr. Friedlander Pertaining to Sexual Disorders

From a psychodiagnostic perspective, based upon his sexual offense history in context of his overall sexual
history, the diagnosis of a sexually-based mental disorder is not indicated or given in this case. The
*Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* or *DSM-5* contains a diagnostic
section which is entitled Paraphilic Disorders. The paraphilias that are listed in the *DSM-5* include
voyeuristic disorder, exhibitionistic disorder, frotteuristic disorder, sexual masochism disorder, sexual
sadism disorder, pedophilic disorder, fetishistic disorder, transvestic disorder, and "catch-all" diagnostic
categories referred to unspecified and other specified paraphilic disorders. According to the *DSM-5*, "a
paraphilic disorder is a paraphilia that is currently causing distress or impairment to the individual or a
paraphilia whose satisfaction has entailed personal harm, or risk of harm, to others. A paraphilia is a
necessary but not a sufficient condition for having a paraphilic disorder, and a paraphilia by itself does not
necessarily justify or require clinical intervention" (page 686). In the *DSM-5*, "Criterion A specifies the
qualitative nature of the paraphilia (e.g., an erotic focus on children or on exposing the genitals to
strangers), and Criterion B specifies the negative consequences of the paraphilia (i.e., distress, impairment,
or harm to others)" (page 686).

As the *DSM-5* specifically notes: "In keeping with the distinction between paraphilias and paraphilic
disorders, the term *diagnosis* should be reserved for individuals who meet both Criteria A and B." In other
words, it is clinically possible to have a paraphilia, but not a paraphilic disorder using the diagnostic
criteria of the *DSM-5*. The *DSM-5* defines the following criteria for a diagnosis of pedophilic disorder
(302.2):

A.  Over a period of at least 6 months, recurrent, intense sexually arousing fantasies,
sexual urges, or behaviors involving sexual activity with a prepubescent child or
children (generally age 13 years or younger).

B.  The individual has acted on these urges, or the sexual urges or fantasies cause
marked distress or interpersonal difficulty.

C.  The individual is at least age 16 years and at least 5 years older than the child or
children in Criterion A.

Note:  Do not include an individual in late adolescence involved in an ongoing sexual
relationship with a 12- or 13-year-old.

Specify if:

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 11

       Exclusive type (attracted only to children)
       Nonexclusive type

Specify if:

       Sexually attracted to males
       Sexually attracted to females
       Sexually attracted to both

Specify if:

       Limited to incest

Note that the diagnostic criteria specify that Dr. Friedlander would have to demonstrate over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children, after age 16. It is my professional judgment that by his history Dr. Friedlander would not be so diagnosed given the diagnostic criteria and other interpersonal factors, described above, that more probably formed the psychological basis for his sexual offenses in this case.

Dr. Friedlander would also not be diagnosed with antisocial personality disorder or any personality disorder under the *DSM-5* diagnostic criteria. According to the *DSM-5*, the general criteria for personality disorders include "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. This pattern is manifested in two (or more) of the following areas: 1. Cognition; 2. Affectivity; 3. Interpersonal functioning; 4. Impulse control" (page 646). With regard to antisocial personality disorder, the essential feature is "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood" (page 659).

The *DSM-5* contains an introductory session titled "Cautionary Statement for Forensic Use of *DSM-5*" which specifies that "the use of *DSM-5* should be informed by an awareness of the risks and limitations of its use in forensic settings...there is a risk that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis...In most situations, the clinical diagnosis of a *DSM-5* mental disorder such as...pedophilic disorder does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard...It is precisely because impairments, abiliteis, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability" (page 25).

## Appendix 4: Information Sources

(1) Clinical interview
(2) Static-99R Actuarial Risk Analysis
(3) *SVR-20 Structured Clinical Guide for Sexual Violence Risk*

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

Dr. Charles Friedlander
Psychosexual Evaluation Report
November 18, 2018
Page 12

(4) Research-based factors on risk of sexual offending
(5) Record Review

## Appendix 5: Professional Qualifications of Clinical Psychology Examiner

Since 1988 I have conducted several hundred psychological, psychosexual, and psychophysiological assessments on suspected and convicted sexual offenders in inpatient, outpatient, and incarcerated settings. I am presently Executive Director of Applied Behavioral Consultants, LLC.  I have conducted both individual and group-based psychological and behavioral treatment regimens with sexual offenders, and I have designed and administered sexual offender treatment programs, such as STOP (the Specialized Treatment of Offenders Program) at the North Dakota Developmental Center. In addition to my clinical expertise in evaluations and treatment of sexual offenders, I have held several faculty appointments, including Northeastern and Friedlander Universities (the latter as a Visiting Scholar), am a member of numerous professional organizations, including a Fellow of the American Psychological Association, and have also been a Clinical Fellow of the Behavior Therapy and Research Society, and a Board Certified Behavior Analyst. I hold a Ph.D. in clinical psychology from the University of Maine, I completed my clinical internship at the University of Mississippi and Department of Veterans Affairs Medical Centers in Jackson, Mississippi, and I am a licensed psychologist and health service provider in the Commonwealth of Massachusetts and the State of New York. I have over 200 peer-reviewed publications and presentations, many of which focus on sexual behavior and sexual abuse (one of which received a research award), and serve on several journal editorial boards. Besides the Commonwealth of Massachusetts, I have testified as an expert clinical and forensic psychologist in multiple other states, as well as in the federal justice system.

*Dedicated to Providing Comprehensive, Technologically Advanced & Empirically Validated Clinical Services*

1

2

3

4

5

6

7

8

9                     UNITED STATES DISTRICT COURT

10                    CENTRAL DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,          )   CASE NO. CR 11-935-R-6
                                        )
13              Plaintiff,              )   ORDER GRANTING DEFENDANT'S
                                        )   MOTION FOR COMPASSIONATE
14        v.                            )   RELEASE
                                        )
15   WILFRED GARCIA,                    )
                                        )
16              Defendant.              )
                                        )
17                                      )

18        Before the Court is Defendant Wilfred Garcia's Motion for Compassionate Release, filed

19   on February 6, 2019. (Dkt. 1371). Following the Government's Position filed on March 4, 2019,

20   Defendant filed his Reply to Government Position on March 6, 2019.

21        Defendant moves this Court pursuant to 18 U.S.C. § 3582(C)(1)(A)(i). Specifically,

22   Defendant seeks an "order reducing his sentence to time served based on his terminal cancer"

23   based on amended provisions of this law under the First Step Act of 2018. The Government does

24   not contest the "terminal nature of defendant's condition," but nevertheless opposes Defendant's

25   Motion on the ground that "the end stage is not as imminent as defendant's motion might

26   suggest." Furthermore, the Government contends that Defendant's capacity to "harm others has

27   not necessarily been diminished by his leukemia and bone marrow transplant," apparently

28   disqualifying him from sentence reduction under the First Step Act. However, this Court remains

1    unpersuaded by the Government's arguments.

2        The relevant provision of the newly enacted First Step Act provides authorization for

3    sentence reductions by order of the district court "upon motion of the defendant after the

4    defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons

5    to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a

6    request by the warden of the defendant's facility, whichever is earlier." *See* First Step Act of

7    2018, Pub. L. 115-391, 132 Stat. 5194 (Dec. 21, 2018). Here, Defendant contends without

8    objection that all administrative rights to appeal the failure of the Bureau of Prisons to bring a

9    motion on his behalf have "long since been exhausted."[1] Thus, the Court retains authority under

10    18 U.S.C. § 3582(C)(1)(A)(i) to "reduce the term of imprisonment, after consideration of the

11    factors set forth in section 3553(a) to the extent they are applicable," upon a finding of

12    "extraordinary and compelling reasons warrant[ing] such a reduction[.]"

13        The Sentencing Guidelines clarify that "extraordinary and compelling" circumstances

14    potentially warranting sentence reduction include a situation in which "[t]he defendant is suffering

15    from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). *A*

16    *specific prognosis of life expectancy* (i.e., a probability of death within a specific time period) *is*

17    *not required.* Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis

18    (ALS), end-stage organ disease, and advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i)

19    (emphasis added). Moreover, the district court is instructed to contemplate "the defendant's

20    family circumstances . . . and whether the defendant is a danger to the safety of any other person

21    or to the community" in ordering sentence reduction under the Act. *Id.,* cmt. n.4.

22        The relevant factors weigh decidedly in Defendant's favor. Defendant has been diagnosed

23    with terminal Chronic Myelogenous Leukemia (CML), a disease that meets the Sentencing

24    Guidelines' non-exhaustive definition; his condition renders him in such poor health that he poses

25

26 _____

27      [1] *Accord* Decl. of James Craven, Dkt. 1371, Ex. A. Defendant details a long series of unsuccessful attempts, including "15 letters" sent by his counsel, James Craven, to the Bureau of Prisons requesting compassionate release, as well as correspondence to the Bureau of Prisons by Congressman Andy Barr of Kentucky on Defendant's behalf. (Dkt.

28    1371 at 2).

1  no reasonable nor substantial risk of danger to his family or the community.  Whereas Defendant's

2  condition was "briefly in remission" several years ago, the disease has recently "returned with a

3  vengeance" and his attending physician advises that he has mere months to live.  Defendant's

4  physicians and the warden responsible for his supervision during his term of incarceration support

5  his compassionate release given the return of his terminal illness, which entails "chronic intense

6  pain, little relieved by medication" at this advanced stage.  Furthermore, Defendant has a nine-

7  year-old daughter who suffers from a serious birth defect, and he has already served ninety-nine

8  months in prison (of a total of 180 months) for his felony drug offense.  Defendant, moreover, has

9  secured living arrangements for the period following his release, which have been approved by the

10  USPO in the Eastern District of Kentucky.

11          The Court finds that Defendant's sentence to date, particularly considering his age, illness,

12  and debilitating features of his condition, "is sufficient, but not greater than necessary," to satisfy

13  the requirements of 18 U.S.C § 3553(a) and accomplish federal sentencing objectives.

14  Accordingly, the Motion is GRANTED.

15          **IT IS HEREBY ORDERED** that Defendant's Motion for Compassionate Release is

16  GRANTED.

17          **IT IS FURTHER ORDERED** that Defendant's term of imprisonment is reduced to the

18  time he has already served.  Defendant shall be released from the custody of the Bureau of Prisons

19  as soon as possible.

20          **IT IS FURTHER ORDERED** that upon his release from the custody of the Federal

21  Bureau of Prisons, Defendant shall begin serving the five-year term of supervised release

22  previously imposed.  During the time of supervision, the determination of Defendant's residence

23  shall be approved by the Probation Office.

24

25  Dated: March 22, 2019

26                                                     HON. MANUEL L. REAL
                                                       UNITED STATES DISTRICT JUDGE
27

28  CC: BOP; USM; USPO

                                    3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:09-CR-115-O |
| | § | |
| STEVEN RAY ADAMS, | § | |
| DEFENDANT. | § | |

## ORDER

Pending before the Court is Defendant's Motion for Compassionate Release (ECF No. 1226). He asserts he has been diagnosed with a progressive form of ALS and has limited time to live. Attached to his motion are a number of medical records supporting both this diagnosis and prognosis. The United States opposes this motion (ECF No. 1232), arguing that it is premature until the Bureau of Prisons ("BOP") completes its review of this request. The parties appeared, through counsel, at a hearing on this matter on May 3, 2019 (ECF No. 1235). During this hearing, the parties presented additional information from recently received medical records indicating that Defendant's condition continues to deteriorate.

Based on the foregoing, Defendant carried his burden under 18 U.S.C. §3582, his Motion for Compassionate Release is **GRANTED**, and his sentence is reduced to time served. This decision does not affect any other term of Defendant's sentence and his supervised release officer shall put in place an appropriate plan of supervision. The BOP is accordingly ordered to release Defendant from custody, but this order is stayed until BOP processes it according to its standard protocol for compassionate releases.

Signed this 3rd day of May, 2019.

Reed O'Connor
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                    Case No. 4:12-cr-00306-06 KGB

TERRY WAYNE LEGGITT                                         DEFENDANT

## ORDER

Before the Court is defendant Terry Wayne Leggitt's motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Dkt. No. 910). In the motion, Mr. Leggitt states that he has conferred with the Assistant United States Attorney who prosecuted this case, and she has no objection to his request for compassionate release. For the following reasons, the Court grants Mr. Leggitt's motion (*Id.*).

Mr. Leggitt pleaded guilty to Conspiracy to Distribute Methamphetamine, a Class B Felony, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846 (Dkt. No. 782, at 1). The Court sentenced Mr. Leggitt to a term of 56 months of imprisonment in the custody of the United States Bureau of Prisons ("BOP") (*Id.*, at 2). Mr. Leggitt was also sentenced to four years of supervised release, substance abuse treatment, and a $100.00 special penalty assessment (*Id.*, at 3-5). Mr. Leggitt has a current release date of August 27, 2019. *See* BOP Inmate Locator, http://www.bop.gov/inmateloc/ (search by inmate number) (last visited April 29, 2019). Mr. Leggitt now moves the Court for compassionate release pursuant to Section 603(b)(1) of the First Step Act (Dkt. No. 910).

Section 603(b) of the First Step Act modified 18 U.S.C. § 3582(c)(1)(A), and that section now provides that the sentencing court may modify a sentence either upon a motion of the Director of the BOP "or upon motion of the defendant after [he] has fully exhausted all administrative rights

to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility . . . ." 18 U.S.C. § 3582(c)(1)(A). The Court may grant such a motion for compassionate release if, after considering the factors set forth in 18 U.S.C. § 3553(a), the Court finds that "extraordinary and compelling reasons warrant such a reduction . . . ." 18 U.S.C. § 3582(c)(1)(A)(i). In addition, the reduction must also be "consistent with applicable policy statements issued by the Sentencing Commission . . . ." 18 U.S.C. 3582(c)(1). The Sentencing Commission's policy statement regarding compassionate release is set forth in U.S. Sentencing Guidelines ("U.S.S.G") § 1B1.13, which recognizes that a medical condition of the defendant may qualify as an "extraordinary and compelling" reason:

    (A)    Medical Condition of the Defendant—

        (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory) . . . .

        (ii)    The defendant is—

            (I)    suffering from a serious physical or medical condition,

            (II)    suffering from a serious functional or cognitive impairment, or

            (III)    experiencing deteriorating physical or mental heath because of the aging process,

        that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, application note 1.

    Here, Mr. Leggitt avers that he has fully exhausted his administrative remedies available within the BOP pursuant to 18 U.S.C. § 3582(c)(1)(A). Mr. Leggitt also attaches to his motion copies of three letters sent to Kenneth Hyle, the Acting Assistant Director and General Counsel of the BOP, dated June 14, 2018, October 16, 2018, and January 2, 2019 (Dkt. No. 910-1, at 1-3). In

these letters, Mr. Leggitt's counsel argues that Mr. Leggitt is entitled to compassionate release and asks Mr. Hyle to agree to the request for compassionate release (*Id.*). There is no record evidence that Mr. Leggitt received any response from Mr. Hyle or any designee to his request for compassionate release. The United States does not raise an objection contending that Mr. Leggitt has failed to comply with the requirements of 18 U.S.C. § 3582(c)(1)(A) with respect to exhaustion. Further, Mr. Leggitt states that he has fully exhausted his administrative remedies available within the BOP. Based upon the record evidence before the Court, it appears that more than 30 days have passed without response since Mr. Leggitt filed the requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A) that are a part of the record in this case. For these reasons, the Court finds that Mr. Leggitt has complied with the requirements of 18 U.S.C. § 3582(c)(1)(A) with respect to exhaustion.

The Court also finds that Mr. Leggitt has demonstrated the existence of "extraordinary and compelling reasons" to support his motion pursuant to § 3582(c)(1)(A)(i). According to Mr. Leggitt's medical records, which are filed under seal, Mr. Leggitt has a history of laryngeal cancer, and he suffers from a variety of symptoms that arose because of that cancer and his treatment for the same, including malignant neoplasm of larynx (laryngeal cancer), a tracheostomy, sensitivity and pain at the trach site, burning throat pain, bloody secretions, and difficulty swallowing. Mr. Leggitt's medical records further indicate that he has recently suffered from coughing up blood and unexpected weight loss. Mr. Leggitt's medical records also indicate that he takes pain medication to manage the pain associated with his cancer and that he uses an artificial larynx to communicate. The Court agrees with the United States and Mr. Leggitt that this record evidence demonstrates that Mr. Leggitt suffers from a "serious physical or medical condition"—namely, laryngeal cancer and the symptoms associated with that cancer and the treatment of the same—

that substantially diminishes his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover.

Accordingly, after considering the record evidence and the factors set forth in 18 U.S.C. § 3553(a), the Court finds that Mr. Leggitt has demonstrated the existence of "extraordinary and compelling reasons" that render him eligible for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The Court therefore grants Mr. Leggitt's motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Dkt. No. 910). Mr. Leggitt's sentence of imprisonment is hereby modified to one of time served. All other conditions from the original judgment, including but not limited to the term of supervised release imposed to follow Mr. Leggitt's term of imprisonment, remain as initially imposed (Dkt. No. 782).

It is so ordered this 6th day of May 2019.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:02-cr-00018-LJM-CMM |
| | ) | |
| OSCAR B. MCGRAW, JR., | ) | -01 |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Oscar McGraw, Jr.'s Renewed Motion for Compassionate

Release, [Filing No. 81], filed pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step

Act of 2018, Pub. L. No. 115-391, § 603, 132 Stat. 5194, 5239, and the Court's Order dated March

1, 2019, which directed Mr. McGraw to renew his motion upon receipt of an updated medical

report, [Filing No. 79]. Mr. McGraw asks the Court to reduce his currently-imposed life sentence

and order that he be released on conditions to his sister's home in Montana. For the reasons set

forth below, the Court **GRANTS** Mr. McGraw's Motion.

## I.
### BACKGROUND

On August 28, 2003, Mr. McGraw was sentenced to life imprisonment after a jury found

him guilty of conspiracy to possess with intent to distribute methamphetamine. [Filing No. 1 at

8]; *see United States v. Gray*, 410 F.3d 338 (7th Cir. 2005) (describing Mr. McGraw's offense and

affirming his conviction); *United States v. Lenover*, 182 F. App'x 563, 568 (7th Cir. 2006)

(affirming Mr. McGraw's life sentence). In 2017 and 2018, the Court received letters from Mr.

McGraw's sister and counsel requesting a recommendation that the Bureau of Prisons ("BOP")

grant Mr. McGraw's request for compassionate release based upon his deteriorating physical

condition. [Filing No. 56; Filing No. 60.] Judge Larry J. McKinney made such a recommendation in April 2017, [Filing No. 58], as did the undersigned in July 2018, [Filing No. 61]. On both occasions, the Court made the recommendations without the benefit of medical records or the input of the Government; at the time, the sole authority to seek a compassionate-release sentence modification rested with the BOP.

That changed, however, with the passage of the First Step Act in late 2018, which now provides an avenue for a defendant to seek compassionate release from the Court after exhausting administrative remedies. *See* 18 U.S.C. § 3582(c)(1)(A). Pursuant to the newly-amended provision, Mr. McGraw, by counsel, filed his Motion for Compassionate Release on January 24, 2019. [Filing No. 64.] On February 12, 2019, the Court directed Mr. McGraw to supplement the record with medical documentation, [Filing No. 72], which Mr. McGraw did on February 14, 2019, [Filing No. 73].

On March 1, 2019, without objection, the Court directed that it would hold this matter in abeyance to allow for Mr. McGraw's BOP physician, Dr. Sara Beyer, to prepare a report. [Filing No. 79.] The Government has now filed Dr. Beyer's report and supporting medical documentation. [Filing No. 80; Filing No. 80-1; Filing No. 80-2.] The entirety of Dr. Beyer's report[1] need not be repeated here, though several of her findings, detailed below, are critical to the issue of compassionate release.

---

[1] Mr. McGraw did not heed the Court's direction to "specifically set[] forth the evidence that supports [his] contention that he meets the 'extraordinary and compelling' standard" for compassionate release. [Filing No. 79 at 2; Filing No. 79 at 3 ("The parties may *cite to the medical records* already on the docket at Filing No. 73 as well as the forthcoming medical report to *support their assertions*." (emphasis added).] Instead, he generally refers to various conditions without citation. [*See, e.g.*, Filing No. 81 at 1-2 (describing "serious medical conditions, documented by his BOP medical records and by records of the Duke University Medical Center"); Filing No. 86 (lacking a single specific citation to the record)]. Mr. McGraw submitted over 600 pages of

Mr. McGraw is 72 years old.  [*See* Filing No. 73-1 at 1.]   He currently requires a wheelchair, although he can walk for short distances.  [Filing No. 80-1 at 3.]  Mr. McGraw also requires a portable oxygen machine.  [Filing No. 80-1 at 3.]   He suffers from a number of conditions, including: "Type II Diabetes, insulin-dependent, with peripheral neuropathy; hyperlipidemia; emphysema; chronic kidney disease stage III; Hepatitis C type 1A (treatment completed and no sign of disease noted); and[] chronic pain."  [Filing No. 80-1 at 3.]  Many of these conditions, such as his diabetes and hypertension are fairly well managed or controlled through the medical treatment Mr. McGraw receives while incarcerated.  [Filing No. 80-1 at 3-4.]

Mr. McGraw has at times suffered from bouts of severe, uncontrollable diarrhea.  [Filing No. 80-1 at 4; Filing No. 80-2 at 13.]  Loperamide treatment has provided some improvement for the condition, though he continues to have issues.  [Filing No. 80-1 at 4; Filing No. 80-2 at 13.] Mr. McGraw suffers from chronic pain, but has refused fentanyl and Lyrica because he does not want to be "doped up on drugs," presumably due to the well-known side effects of such drugs. [Filing No. 80-1 at 5.]  He has also in the past suffered from swelling and ulcers, [Filing No. 80-1 at 5], and complained of bruising and scabs on his hands during a recent medical visit, [Filing No. 80-2 at 1].  Ultimately, Dr. Beyer opines that Mr. McGraw suffers from serious, chronic medical conditions, though he is able to function in the correctional facility with assistance.  [Filing No. 80-1 at 5-6.]  Dr. Beyer does not believe that Mr. McGraw suffers from a "terminal illness."  [Filing No. 80-1 at 6.]

---

medical records, [*see* attachments to Filing No. 73], and it is not the Court's responsibility to sift through them.

On March 14, 2019, after the Government filed Dr. Beyer's report, Mr. McGraw renewed his Motion for Compassionate Release as directed. [Filing No. 81.] That Motion is now fully briefed and ripe for decision.

## II.
### DISCUSSION

Mr. McGraw argues that the Court should order that he be released based upon his serious medical conditions, explaining that the U.S. Probation Office in Montana has approved Mr. McGraw's sister's home for placement. [Filing No. 81.] In response, the Government disputes Mr. McGraw's characterization of his medical conditions and argues that, regardless, compassionate release is not appropriate because Mr. McGraw poses a danger to the community and because the 18 U.S.C. § 3553(a) factors do not favor release. [Filing No. 85 at 8-9.]

18 U.S.C. § 3582(c) provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>     (i) extraordinary and compelling reasons warrant such a reduction . . .
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). Congress directed the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The Sentencing Commission has promulgated a policy statement regarding compassionate release under § 3581(c), contained in U.S.S.G. § 1B1.13 and the accompanying Application Notes. While that particular policy

statement has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release, courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction. *E.g.*, *United States v. Casey*, 2019 WL 1987311, at *1 (W.D. Va. 2019); *United States v. Gutierrez*, 2019 WL 1472320, at *2 (D.N.M. 2019); *United States v. Overcash*, 2019 WL 1472104, at *2-3 (W.D.N.C. 2019). There is no reason to believe, moreover, that the identity of the movant (either the defendant or the BOP) should have any impact on the factors the Court should consider.

As provided in section 1B1.13, consistent with the statutory directive in § 3582(c)(1)(A), the compassionate release analysis requires several findings. First, the Court must address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A), (3). Second, the Court must determine whether Mr. McGraw is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court must consider the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

**A. Extraordinary and Compelling Reasons**

The Government first argues that Mr. McGraw does not meet the medical criteria for compassionate release. The Application Notes to section 1B1.13 provide, in part:

> **1. Extraordinary and Compelling Reasons.**—. . . [E]xtraordinary and compelling reasons exist under any of the circumstances set forth below:
> **(A) Medical Condition of the Defendant.**—
> **(i)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> **(ii)** The defendant is—
> **(I)** suffering from a serious physical or medical condition,

> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> **(B) Age of the Defendant.**—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
> . . .
> **2. Foreseeability of Extraordinary and Compelling Reasons.**—For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

Dr. Beyer's report supports a finding that Mr. McGraw "suffer[s] from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 application note (1)(A)(ii)(I). Neither party contests Dr. Beyer's conclusion that Mr. McGraw suffers from "chronic and serious" conditions. [Filing No. 80-1 at 6.] That the conditions are chronic indicates that Mr. McGraw is not expected to recover from his conditions.

The Court does not credit, however, the Government's reliance upon Dr. Beyer's conclusion that Mr. McGraw's "medical condition has not substantially deteriorated to the point that [he] does not have the ability to function in a correctional facility." [Filing No. 80-1 at 6; see Filing No. 85 at 5.] For one, Dr. Beyer's statement does not reflect the standard set forth in the Application Notes. Note (1)(A)(ii) does not require that Mr. McGraw be unable to function in a correctional facility. Rather, it requires that he have a substantially diminished ability to provide self-care within the correctional facility environment. Mr. McGraw's severe and chronic pain is

unchallenged, apart from the Government's suggestion that Mr. McGraw has refused powerful medication because his pain does not warrant the medication. To the contrary, as explained in Mr. McGraw's reply and reflected in his statement to a medical provider about not wanting to be "doped up," Mr. McGraw has offered credible, valid reasons for his refusal to take the medications, including wanting to avoid their powerful and deleterious side effects. Additionally, though his diarrhea is "stabilized" (to use Dr. Beyer's word) such that Mr. McGraw is usually able to make it to a toilet, [Filing No. 80-1 at 4], treatment notes from December 2018 indicate that the issue remains far from resolved, [Filing No. 80-2 at 13].

Notwithstanding Dr. Beyer's assertion that "Mr. McGraw's current medical needs are being met by the medical providers at FCI Butner II and the other providers," [Filing No. 80-1 at 5], the Court finds it highly pertinent that Mr. McGraw's conditions require frequent monitoring, evaluation, and treatment. The same is true of the conditions Dr. Beyer describes as "controlled," "well-managed," or "stabilized"—these terms all indicate a need for active monitoring and treatment. Furthermore, Mr. McGraw is fully dependent on oxygen and a wheelchair. Taken all together, the Court finds that Mr. McGraw's chronic, serious conditions, including those that are mitigated when properly treated by medical professionals, demonstrate a substantially diminished ability to provide self-care from which he is not expected to recover. Extraordinary and compelling reasons therefore support a reduction in sentence.

**B. Danger to Any Other Person or to the Community**

The Government next argues that Mr. McGraw should not be released because he presents a danger to the community, largely incorporating by reference one of its previous briefs filed on the issue. [Filing No. 85 at 8 (citing Filing No. 69 at 4-5).] In that brief, the Government argued that Mr. McGraw's previous convictions, his leadership of the Diablos Motorcycle Gang, the facts

that led to his conviction, and his access to a telephone on release demonstrate that Mr. McGraw

would be a danger if released. [Filing No. 69 at 4-5.]

The Guideline provides that compassionate release is appropriate only where the

"defendant is not a danger to the safety of any other person or to the community, as provided in

18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Section 3142(g) is the provision outlining the factors

the Court must consider in determining whether a defendant should be detained pending trial. In

turn, § 3142(g) provides:

> **(g) Factors to be considered.**—The judicial officer shall, in determining whether
> there are conditions of release that will reasonably assure the appearance of the
> person as required and the safety of any other person and the community, take into
> account the available information concerning--
> > **(1)** the nature and circumstances of the offense charged, including whether
> > the offense is a crime of violence, a violation of section 1591, a Federal
> > crime of terrorism, or involves a minor victim or a controlled substance,
> > firearm, explosive, or destructive device;
> > **(2)** the weight of the evidence against the person;
> > **(3)** the history and characteristics of the person, including--
> > > **(A)** the person's character, physical and mental condition, family
> > > ties, employment, financial resources, length of residence in the
> > > community, community ties, past conduct, history relating to drug
> > > or alcohol abuse, criminal history, and record concerning
> > > appearance at court proceedings; and
> > > **(B)** whether, at the time of the current offense or arrest, the person
> > > was on probation, on parole, or on other release pending trial,
> > > sentencing, appeal, or completion of sentence for an offense under
> > > Federal, State, or local law; and
> > **(4)** the nature and seriousness of the danger to any person or the community
> > that would be posed by the person's release.

18 U.S.C. § 3142(g).

Mr. McGraw's frail condition—he is dependent upon oxygen and a wheelchair—

demonstrates that there are conditions the Court could impose to "reasonably assure . . . the safety

of any other person and the community." The Government expresses concerns about Mr. McGraw

conducting illegal business via telephone. The Court will order an updated version of the

8

conditions of supervised release to ensure that Mr. McGraw does not have contact with those

engaging in criminal activity and extend the term of supervision to life.  With probation's

oversight, this condition, along with the others imposed, will ensure the protection of the public.

The seriousness of Mr. McGraw's offense and criminal history are wholly outweighed by Mr.

McGraw's serious, deteriorating conditions and dependence upon oxygen and a wheelchair.  The

Court finds it significant that the U.S. Probation Office in Montana has approved Mr. McGraw's

sister's residence for placement on release, providing a place for oversight on release and further

allaying any concerns regarding any danger Mr. McGraw may pose to the community.  Pursuant

to § 3142(g), the Court finds that Mr. McGraw does not pose a danger to any other person or the

community under the conditions of release.

### C. Section 3553(a) Factors

Finally, the Government argues that the § 3553(a) factors do not favor early release, citing

primarily the seriousness of Mr. McGraw's offense and of his past conduct and the need for

deterrence. [Filing No. 85 at 9.]  Section 3553(a) provides:

> **(a) Factors to be considered in imposing a sentence.**—The court shall impose a
> sentence sufficient, but not greater than necessary, to comply with the purposes set
> forth in paragraph (2) of this subsection. The court, in determining the particular
> sentence to be imposed, shall consider—
>> **(1)** the nature and circumstances of the offense and the history and
>> characteristics of the defendant;
>> **(2)** the need for the sentence imposed—
>>> **(A)** to reflect the seriousness of the offense, to promote respect for
>>> the law, and to provide just punishment for the offense;
>>> **(B)** to afford adequate deterrence to criminal conduct;
>>> **(C)** to protect the public from further crimes of the defendant; and
>>> **(D)** to provide the defendant with needed educational or vocational
>>> training, medical care, or other correctional treatment in the most
>>> effective manner;
>> **(3)** the kinds of sentences available;
>> **(4)** the kinds of sentence[s] and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . . ;]

**(5)** any pertinent policy statement guidelines [issued by the Sentencing Commission . . . ;]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Ultimately, the Court agrees with the Government that Mr. McGraw's conduct in this case and in the past was very serious. But Mr. McGraw has been in custody since September 2002—nearly 17 years. That is a significant sanction. And the Court will impose lifetime supervision following release, which will continue to serve as a sanction and general deterrent, appropriately recognizing the seriousness of Mr. McGraw's conduct. But further incarceration is not needed to deter Mr. McGraw from further offenses; nor, for the reasons described above, is it necessary to protect the public from future crimes. Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2). The Court therefore concludes that the applicable § 3553(a) factors support Mr. McGraw's request for compassionate release.

## III.
### CONCLUSION

Pursuant to 18 U.S.C. § 3582(c), the court finds that extraordinary and compelling reasons warrant a reduction of Mr. McGraw's sentence, that Mr. McGraw does not pose a danger to any other person or the community under the conditions of release, that the § 3553(a) factors support a reduction, and that the reduction is consistent with the Sentencing Commission's policy

statements. Therefore, the Court **GRANTS** Mr. McGraw's Renewed Motion for Compassionate

Release [81], **ORDERS** that Mr. McGraw's sentence of imprisonment be reduced to **time served**,

and further **ORDERS** the BOP to release Mr. McGraw for placement at his sister's residence in

Ravalli County, Montana, to be supervised for life.

Mr. McGraw is responsible for arranging his own transportation to Montana, and he shall

report to the U.S. Probation Office within 72 hours of his arrival in Montana.

Finally, Mr. McGraw's conditions of supervised release have been updated pursuant to 7th

Circuit case law, and are imposed as follows:

1) You shall report to the probation office in the judicial district to which you are released within 72 hours of release from the custody of the Bureau of Prisons. **Justification:** *The Court is imposing this condition as an administrative requirement of supervision.*

2) You shall report to the probation officer in a manner and frequency directed by the court or probation officer. **Justification:** *The Court is imposing this condition as an administrative requirement of supervision.*

3) You shall permit a probation officer to visit you at a reasonable time at home, or another place where the officer may legitimately enter by right or consent, and shall permit confiscation of any contraband observed in plain view of the probation officer. **Justification:** *The Court is imposing this condition to assist the probation officer in monitoring the defendant for protection of the community.*

4) You shall not knowingly leave the judicial district without the permission of the court or probation officer. **Justification:** *The Court is imposing this condition as an administrative requirement of supervision.*

5) You shall answer truthfully the inquiries by the probation officer, subject to your 5th Amendment privilege. **Justification:** *The Court is imposing this condition as an administrative requirement of supervision.*

6) You shall not meet, communicate, or otherwise interact with a person you know to be engaged, or planning to be engaged, in criminal activity. You shall report any contact with persons you know to be convicted felons to your probation officer within 72 hours of the contact. **Justification:** *The*

11

*Court is imposing this condition to reduce the risk of recidivism and provide for public safety.*

7) You shall reside at a location approved by the probation officer and shall notify the probation officer at least 72 hours prior to any planned change in place or circumstances of residence or employment (including, but not limited to, changes in who lives there, job positions, job responsibilities). When prior notification is not possible, you shall notify the probation officer within 72 hours of the change. **Justification:** *The Court imposing this condition to assist the probation officer in monitoring the defendant for protection of the community.*

8) You shall not own, possess, or have access to a firearm, ammunition, destructive device or dangerous weapon. **Justification:** *The Court is imposing this condition to assist the probation officer in monitoring the defendant for protection of the community.*

9) You shall notify the probation officer within 72 hours of being arrested, charged, or questioned by a law enforcement officer. **Justification:** *The Court is imposing this condition to assist the probation officer in monitoring the defendant for protection of the community.*

10) You shall maintain lawful full time employment, unless excused by the probation officer for schooling, vocational training, or other reasons that prevent lawful employment. **Justification:** *The Court is imposing this condition to ensure the defendant maintains gainful employment and to reduce the risk of recidivism.*

11) You shall make a good faith effort to follow instructions of the probation officer necessary to ensure compliance with the conditions of supervision. **Justification:** *The Court is imposing this condition as an administrative requirement of supervision.*

12) You shall participate in a substance abuse or alcohol treatment program approved by the probation officer and abide by the rules and regulations of that program. The probation officer shall supervise your participation in the program (provider, location, modality, duration, intensity, etc.). The court authorizes the release of the presentence report and available evaluations to the treatment provider, as approved by the probation officer. **Justification:** *The Court is imposing this condition to address the defendant's history of methamphetamine abuse.*

13) You shall not use or possess any controlled substances prohibited by applicable state or federal law, unless authorized to do so by a valid prescription from a licensed medical practitioner. You shall follow the prescription instructions regarding frequency and dosage. **Justification:**

*The Court is imposing this condition to address the defendant's history of methamphetamine abuse.*

14) You shall not use or possess alcohol. **Justification:** *The Court is imposing this condition due to the defendant's history of methamphetamine abuse. It will also reduce the risk of recidivism and assist in his rehabilitation.*

15) You shall not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, Spice, glue, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption. **Justification:** *The Court is imposing this condition to address the defendant's history of methamphetamine abuse.*

16) You shall submit to substance abuse testing to determine if you have used a prohibited substance or to determine compliance with substance abuse treatment. Testing may include no more than 8 drug tests per month. You shall not attempt to obstruct or tamper with the testing methods. **Justification:** *The Court is imposing this condition to allow the probation officer to monitor the defendant's sobriety.*

17) You shall provide the probation officer access to any requested financial information and shall authorize the release of that information to the U.S. Attorney's Office for use in connection with the collection of any outstanding fines and/or restitution. **Justification:** *The Court is imposing this condition to assist the probation officer in verifying the legitimacy of the defendant's income, and to ensure the defendant is paying the maximum amount possible toward any fine.*

18) You shall submit to the search by the probation officer of your person, vehicle, office/business, residence, and property, including any computer systems and hardware or software systems, electronic devices, telephones, and Internet-enabled devices, including the data contained in any such items, whenever the probation officer has a reasonable suspicion that a violation of a condition of supervision or other unlawful conduct may have occurred or be underway involving you and that the area(s) to be searched may contain evidence of such violation or conduct. Other law enforcement may assist as necessary. You shall submit to the seizure of contraband found by the probation officer. You shall warn other occupants these locations may be subject to searches. **Justification:** *The Court is imposing this condition to assist the probation officer in monitoring the defendant for protection of the community.*

19) You shall not be a member of any gang or associate with individuals who are members. **Justification:** *The Court is imposing this condition to*

13

*assist the probation officer in monitoring the defendant for protection of the community.*

Date: 5/9/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Bradley A. Blackington
UNITED STATES ATTORNEY'S OFFICE
bradley.blackington@usdoj.gov

James B. Craven, III
jbc64@mindspring.com

U.S. Probation Office

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

MAY 01 2019

Clerk, U.S District Court
District Of Montana
Missoula

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CR 16–15–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| STEVE ALAN BRITTNER, | |
| Defendant. | |

Defendant Steve Alan Brittner filed a Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(C)(1)(A)(i) based on the "extraordinary and compelling" reason that he has terminal brain cancer.    (Doc. 79.)    The United States opposes the Motion.    (Doc. 82.)    For the reasons explained below, the Court grants the Motion.

## BACKGROUND

On September 13, 2016 the Court sentenced Brittner to 48 months in prison after he plead guilty to distribution of methamphetamine in violation of 21 U.S.C. § 846.    (Doc. 65.)    In January 2018, doctors diagnosed Brittner with a malignant brain tumor, and he underwent surgery in March 2018.    (Doc. 80 at 4.)    Brittner subsequently applied for compassionate release from the Bureau of Prisons (BOP) pursuant to 18 U.S.C. § 3583(c)(1)(A) and was denied.    (Doc. 83 at 1–2.)    In the

–1–

memorandum that accompanied his denial, the Assistant Director of the BOP indicated that his post-surgery cranial imagery did not reveal evidence of "tumor recurrence or progression." (*Id.* at 1.) The memo also indicated that Brittner had a life expectancy that exceeded his remaining term of incarceration. (*Id.*)

In October 2018, Brittner was evaluated by his oncologist for fatigue and weakness. (*Id.* at 4.) His prognosis at the time was "poor." (*Id.*) In November 2018, Brittner was evaluated again for weakness, fatigue, and worsening memory. (*Id.* at 6.) His prognosis was still "poor" and his oncologist discussed the possibility of hospice care. (*Id.*)

In December, the President signed the First Step Act into law. (Doc. 80 at 2.) As modified, 18 U.S.C. § 3582(c)(1)(A)(i) allows a sentencing court to modify a sentence when "extraordinary and compelling reasons warrant such a reduction." The United States Sentencing Guidelines provide that a terminal illness is one such "extraordinary and compelling" reason. U. S. Sentencing Guidelines Manual § 1B1.13 cmt. 1(A) (2018).

### DISCUSSION

This Court's duty is to impose a sentence that is "sufficient but not greater than necessary." 18 U.S.C. § 3553(a). This Court may reduce a term of imprisonment where "extraordinary and compelling" circumstances render a Court's previous sentence greater than necessary. *See* 18 U.S.C. § 3582(c)(1)(A).

-2-

In order to do so, an inmate must first exhaust his or her administrative remedies, and further demonstrate that he or she "is not a danger to the safety of any person or to the community," and that a reduced sentence "is consistent with the policy statement." *Id.*

The Sentencing Commission promulgated a policy statement that sets out the criteria for finding an "extraordinary and compelling" reason. U.S. Sentencing Manual § 1B1.13 (2018). One such circumstance occurs when the "defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." *Id.* at § 1B1.13 cmt. 1(A) (2018).

As a preliminary matter, the Court finds that jurisdiction is proper because Brittner has exhausted his administrative remedies. He applied for compassionate release and was denied first in late August 2018, and again at the end of October 2018. This constitutes a "final administrative decision." 28 C.F.R. § 571.63(d).

Brittner asks this Court to reduce his term of imprisonment because he has served three quarters of his incarceration, he has terminal brain cancer and would like to benefit from end-of-life care near his family, and he is not a danger to the community. (Doc. 80 at 3, 5–7.)

The Government argues that this Court should not reduce Brittner's sentence

-3-

because "he cannot show that he has a terminal illness, as defined under the guidelines, nor can he show that his ability of self-care has been substantially diminished." (Doc. 81 at 2.) The Government believes that Brittner does not have a "terminal illness" within the meaning of the guidelines because his medical records "do not indicate that the tumor has metastasized." (*Id.* at 5.)

The Government's argument is premised on a misreading of the statute. Brittner does not need to show that his tumor has metastasized for his condition to be "terminal." The guidelines provide a number of examples of medical conditions that would meet the standard for a "terminal illness." A "metastatic solid-tumor cancer" is merely one. Others include "amyotrophic lateral sclerosis, end-stage organ disease, and advanced dementia." U.S. Guidelines Manual § 1B1.13 cmt. 1(A) (2018). These examples are by no means an exhaustive list of medical conditions that could be characterized as "terminal." *See, e.g., Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); *United States v. Philip Morris USA Inc.*, 566 F.3d 105, 1115 (D.C. Cir. 2009) (explaining that including indicates a nonexhaustive list). The question is whether Brittner's condition is similar enough to the enumerated examples to fall within the guideline's definition.

Brittner was diagnosed with a brain tumor in January 2018, when he

-4-

presented with a new-onset seizure.   Brittner's course of treatment at FMC Butler included craniotomy and resection of a 7.9 cm. tumor in March 2018 followed by chemotherapy and radiation.   The post-surgical pathology identified the Defendant's tumor as a WHO Grade III left temporal anaplastic astrocytoma with IDH wild type and no 1p/19q co-deletion.   (Doc. 83 at 1.)

In 1993, the World Health Organization (WHO) adopted a classification system based on the assumption that each type of brain tumor results from a specific cell type.   Astrocytomas are graded according to the degree of their abnormality, with the most common grading system on a scale of I to IV.   WHO grade III anaplastic astrocytomas are now each divided into IDH-mutant or IDH-wildtype.   Am. Brain Tumor Ass'n, Glioblastoma and Malignant Astrocytoma 5 (2017).   The Defendant's diagnosis indicates he suffers from an IDH-wildtype tumor, without mutant IDH.   Grade III astrocytomas without mutant IDH are considered "pre-glioblastomas", having a poorer prognosis than IDH mutant tumors.   *Id.*   Furthermore, high-grade astrocytomas can be aggressive tumors, which, over time, usually recur, and when they do, may recur as a higher grade tumor.   *Id.* at 17.

According to the BOP, as of August 22, 2018, Brittner's life expectancy was "likely to exceed 18 months."   (Doc. 83 at 1.)   Prognosis, which is reported in terms of median overall survival, can be variable.   According to the American

–5–

Brain Tumor Association, median overall survival for adults with an anaplastic astrocytoma is about two to three years.   Am. Brain Tumor Ass'n, *supra* at 19. However, the literature indicates that the Defendant's specific tumor carries with it a much shorter median overall survival of 1.0 to 1.3 years, Louis Burt Nabors M.D. et al., *NCCN Guidelines Insights: Central Nervous System Cancers*, 15 J. of the Nat'l Comprehensive Cancer Network 11 (Version 1.2017), or 12 months, Natsuki Hattori et al., *World Health Organization Grade I–III Astrocytomas Consist of Genetically Distinct Tumor Lineages*, 107 Cancer Sci 8, 1161 (2016).

Of importance, the treatment options available to Brittner have been exhausted.   According to the last treatment note available to the Court, dated November 15, 2018, Brittner reported to his treating physician with subjective complaints of fatigue, worsening memory and intermittent weakness.   (Doc. 83 at 6.)   The plan on that date was to hold, or discontinue further therapy, and it was recommended to Brittner that he consider comfort measures, specifically hospice, which his treating oncologist "considered very reasonable due to worsening performance status."   (*Id.*)

It is clear from the nature of his disease and his worsening condition as documented above, that Brittner's prognosis is grim, his disease is terminal, and the length of his life can be measured most likely in weeks, as opposed to months.

Second, the Government argues that Brittner cannot show an "extraordinary

-6-

and compelling" circumstance because his medical records do not indicate an

inability to care for himself.    In finding this necessary, the Government reads a

conjunctive requirement into the guideline comment where none occurs.    The

statute provides that "extraordinary and compelling" reasons exist "under *any* of

the circumstances set for below."    U.S. Sentencing Guidelines Manual § 1B1.13

cmt. 1 (2018) (emphasis added).    A "[m]edical [c]ondition" is one example of an

"extraordinary or compelling" circumstance when a defendant satisfies *either*

subsection (i) or subsection (ii), but he or she need not satisfy both.[1]    That Brittner

failed to show under subsection (ii) that he is suffering from some set of symptoms

---

[1] The precise language provides:

(1)  Extraordinary and Compelling Reasons.   Provided the defendant meets the requirements of
subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set
forth below.

　(A)  Medical Condition of the Defendant

　　(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced
　　illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a
　　probability of death within a specific time period) is not required. Examples include
　　metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ
　　disease, and advanced dementia.

　　(ii) The defendant is
　　　(I)     suffering from a serious physical or medical condition,
　　　(II)    suffering from a serious functional or cognitive impairment, or
　　　(III)   experiencing deteriorating physical or mental health because of the aging
　　　　　   process,
　　that substantially diminishes the ability of the defendant to provide self-care within the
　　environment of a correctional facility and from which he or she is not expected to
　　recover.

"that substantially diminished [his] ability" to care for himself is irrelevant, as is

each of the other criteria listed in that subsection, so long as he can show that he

has a terminal illness in satisfaction of subsection (i).    As already discussed,

Brittner's condition is terminal, making him eligible to receive a reduced sentence.

Finally, the Court is convinced that Brittner poses no safety risk to the

community.    Brittner is in an advanced stage of cancer and is wheelchair bound.

(Doc. 80 at 6.)   He is fatigued, weak, and his memory continues to worsen.

(Doc. 80 at 4.)    When released, Brittner will be cared for in the home of his

fiancée and attended by his family members and hospice care.    His fiancée's

home has already been inspected by the United States Probation Office and

determined to be an appropriate environment for his release.    (Doc. 80 at 6.)

Finally, Brittner will remain under the supervision of the Probation Office and

subject to the terms of his supervised release.    (Id. at 7.)

Having concluded that Brittner's terminal illness constitutes a "extraordinary

and compelling" circumstance in accordance with the policy statement, and that he

poses no safety risk to his community, the Court concludes that a reduction is

proper under 18 U.S.C. § 3553(a).

IT IS ORDERED that Defendant Brittner's Motion to Reduce Sentence

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 79) is GRANTED.

IT IS FURTHER ORDERED that Defendant Steve Alan Brittner, United

-8-

States Marshals number 16253-046, is RELEASED from his term of imprisonment to his term of supervised release.   The United States shall take any appropriate steps to ensure the Bureau of Prisons executes this Order promptly and in compliance with 18 U.S.C. § 3624(d).

IT IS FURTHER ORDERED that the Clerk of Court shall provide a copy of this Order to the United States Marshals Service for the District of Montana, the United States Probation Office for the District of Montana, and the United States Bureau of Prisons.

DATED this 1ˢᵗ day of May, 2019.

Dana L. Christensen, Chief Judge
United States District Court

-9-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:12-CR-15-1BO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| DANIEL JACKSON PETERSON | ) | |

This cause is before the Court on defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [DE 49]. The government opposes release. [DE 56]. A hearing on the matter was held before the undersigned on May 30, 2019, at Raleigh, North Carolina. For the reasons that follow, defendant's motion is granted.

### BACKGROUND

Defendant, Peterson, is currently serving a term of 132 months' imprisonment after pleading guilty to possession with intent to distribute a quantity of cocaine base and discharging a firearm in furtherance of a drug trafficking offense in violation of 21 U.S.C. § 841 and 18 U.S.C. § 924(c). [DE 45]. Peterson was sentenced on November 27, 2013, and his current projected release date is May 1, 2022. *See* https://www.bop.gov/inmateloc/ (last visited May 31, 2019). Peterson has served approximately ninety-one months of his sentence, including good time credit. [DE 49].

Peterson is now eighty years old and, the parties agree, has multiple medical conditions, which include dementia, leg amputation below the right knee, chronic pain, glaucoma, gout, coronary artery disease, and aortic aneurysm. *See* [DE 56-1]; [DE 49-1]. Peterson is confined to a wheelchair, and, according to the Bureau of Prisons, he "is considered to be experiencing

deteriorating mental and physical health that substantially diminishes his ability to function in a correctional facility . . .." [DE 56-1].

<div align="center">DISCUSSION</div>

Subject to few exceptions, a sentence that has been imposed may not be modified. 18 U.S.C. § 3582(c). One exception to this general rule applies where a defendant qualifies for a reduction in his sentence due to certain age or health factors, often referred to as compassionate release. 18 U.S.C. § 3582(c)(1)(A). Prior to the passage of the First Step Act on December 21, 2018,[1] the discretion to file a motion for compassionate release under § 3582(c)(1)(A) rested entirely with the Director of the Bureau of Prisons. Section 603 of the First Step Act amended 18 U.S.C. § 3582(c)(1)(A) to provide that a defendant may request compassionate release from the sentencing court after exhausting his administrative remedies. Peterson's most recent request to the Director of the Bureau of Prisons for compassionate release was denied on May 1, 2019, and there is no dispute that Peterson has exhausted his administrative remedies as required.

Compassionate release may be available to defendants where (1) extraordinary and compelling circumstances warrant a reduction in sentence or (2) a defendant who is serving a life sentenced imposed under 18 U.S.C. § 3559(c) is at least seventy years old and has served at least thirty years in prison. 18 U.S.C. §§ 3582(c)(1)(A)(i)-(ii). A reduction under either section must be consistent with applicable policy statements issued by the United States Sentencing Commission. *Id.* at (c)(1)(A). Because Peterson is not serving a sentence imposed under § 3559(c), he must demonstrate that extraordinary and compelling circumstances support his release.

The commentary to section 1B1.13 of the United States Sentencing Commission's *Guidelines Manual* provides specific criteria for determining whether extraordinary and

---

[1] Pub. L. 115-391, 132 Stat. 5194.

<div align="center">2</div>

compelling circumstances are present. U.S.S.G. § 1B1.13, comment. n.1. These criteria generally concern the age, medical condition, or family circumstances of the defendant. In addition to considering whether extraordinary and compelling circumstances are present, in order to determine that a reduction in sentence is warranted a court must further consider the 18 U.S.C. § 3553(a) factors to the extent they are applicable and determine whether the defendant is a danger to the safety of another person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.

In this case, there is no genuine dispute that Peterson's age, medical conditions, and the amount of time he has served would satisfy the criteria for demonstrating extraordinary and compelling circumstances. *See* U.S.S.G. § 1B1.13 comment. n.1(A)(ii)(III) & n.1(B); *see also* Bureau of Prisons Program Statement 5050.50 § 4(b); [DE 49-1; 56; 56-1]. The dispute in this case concerns whether the § 3553(a) and § 3142(g) factors support a reduction in Peterson's sentence. To this end, the government offered the testimony of two Sampson County Sheriff's Deputies at the May 30, 2019, hearing, both of whom testified about the circumstances of Peterson's underlying offense conduct and their opinions that Peterson would be a danger to the community if released. Peterson was also present at the hearing and made a statement to the Court.

The Court has considered the relevant factors, as well as the testimony and statement offered at the hearing, and finds that a reduction in Peterson's sentence is appropriate. At the outset, the Court recognizes that Peterson was seventy-four years old at the time of sentencing, that his underlying offenses include a serious crime of violence, and that several of Peterson's current medical ailments were present at the time of sentencing. *But see* U.S.S.G. § 1B1.13 comment. n. 2.

Peterson's current state, however, presents a slight, if any, threat of dangerousness to any other person or the community. Peterson is now confined to a wheelchair or bed and suffers from

3

worsening dementia in addition to his numerous other health problems, including chronic pain. Having observed him at the hearing, the toll that almost seven years of incarceration has taken on Peterson, now eighty years old, is plain. There is no suggestion that Peterson maintains any ties to the drug community in which he previously operated. Peterson proffered that he will be living with his daughter upon his release from prison and that the United States Probation Office has approved her residence as suitable. Peterson will also serve a term of three years of supervised release; Peterson's supervised release conditions expressly prohibit him from possessing a firearm and he will be closely monitored by a United States Probation Officer during his term of supervision.

In other words, the nature and circumstances of Peterson's offense conduct, though serious, are mitigated by the characteristics of Peterson as he now comes before the Court. Peterson has demonstrated that his sentence served to date is sufficient in light of his age and medical conditions to deter him from further criminal conduct, protect the public, and promote respect for the law. Accordingly, an additional three years of custody is not necessary to satisfy the goals of sentencing.

<div align="center">CONCLUSION</div>

For the foregoing reasons, Peterson's motion for compassionate release [DE 49] is GRANTED. Peterson's sentence is hereby reduced to time served. All other provisions of the judgment entered November 27, 2013, remain in full force and effect.

SO ORDERED, this _4_ day of June, 2019.

Terrence W. Boyle
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE

<div align="center">4</div>

**U. S. Department of Justice**            **Inmate Request to Staff Member - RESPONSE**
**Federal Bureau of Prisons**                          **LSCI, Butner, North Carolina**

TO:     **Friedlander, Charles**
        Register No: 50328-018
        Unit: Wake A Unit


A review of your request of a Compassionate Release based on elderly condition was reviewed by Unit Team in accordance with Program Statement 5050.50. Per PS 5050.50 inmates requesting RIS based on other elderly will not be considered if they were age 60 or older at the time of sentence if their current conviction is listed in Program Statement 5162.05 Categorization of Offenses. Your age at sentencing was 78 and your current offense is USC 18:2422(B) Child Enticement; which upon review of PS 5162.05 is listed in the Categorization of Offense. Therefore, based on your age at sentencing and your current offense, you do not meet the criteria for a Compassionate Release/RIS.


I trust this addresses your concerns.

 **U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M  S T A T E M E N T
OPI:          OGC/LCI
NUMBER:   P5162.05
DATE:        March 16, 2009

# Categorization of Offenses

/s/
*Approved*: Harley G. Lappin
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

To assist in the implementation of various Federal Bureau of Prisons policies and programs. Section 3 of this Program Statement lists offenses the Bureau categorizes as crimes of violence as that term is used in various statutes. In addition, Section 4 lists offenses that in the Director's discretion shall preclude an inmate's receiving certain Bureau program benefits.

a. **Program Objective**. The expected result of this program is:

An inmate will be denied the benefits of certain programs if his or her offense is either a crime of violence or an offense identified at the discretion of the Director of the Bureau of Prisons.

b. **Summary of Changes**

*Policy Rescinded*

P5162.04        Categorization of Offenses (10/09/2007)

The March 16, 2009, reissuance of this policy updates the lists of statutory offenses. There are no other content changes.

## 2. APPLICATION

Criminal offenses are defined in many different titles of the United States Code, including Titles 7, 16, 18, 21, 26, 29, 30, and 46. The offenses contained in these titles that may be crimes of violence are listed in Section 3. Section 4 lists offenses that are not categorized as crimes of violence, but would nevertheless preclude an inmate's receiving certain Bureau program benefits at the Director's discretion.

Some Bureau policies or programs require a determination that an inmate committed a crime of violence, for example, the Program Statement on Inmate Discipline and Special Housing Units. Other policies or programs, such as early release pursuant to 18 U.S.C. § 3621(e) and placement in Intensive Confinement Centers, indicate that an inmate may be denied the benefits of such programs if he or she was convicted of an offense listed in either Section 3 or 4. When an inmate may be denied a program benefit under either Section 3 or 4, staff must carefully explain the basis for the denial. For example, if an inmate is convicted of an offense listed in Section 4, the inmate should be denied a program benefit because he or she committed an offense identified at the Director's discretion, rather than a crime of violence.

If a particular Code section in these titles is not listed in Section 3 or Section 4, and case management staff believe the crime might be violent, or might preclude an inmate's receiving certain Bureau program benefits, they shall contact legal staff at the institution or the Regional Counsel. Also, if a Judgment and Commitment Order (J&C) references a United States Code section that is not found in Titles 7, 16, 18, 21, 26, 30, 42, or 49, they should contact legal staff at the institution or the Regional Counsel to determine whether a recommendation should be made to change the policy to incorporate the offense in question.

Some of the Code sections may be listed in more than one section below; such duplication is indicated by an asterisk. In such cases, staff are to check subsequent sections of the Program Statement to determine whether the offense is a crime of violence or an offense that would otherwise preclude an inmate's receiving certain Bureau program benefits.

## 3. OFFENSES CATEGORIZED AS CRIMES OF VIOLENCE

a. **Criminal Offenses That are Crimes of Violence in *All Cases*.** Some Bureau policies or programs require a determination that an inmate committed a crime of violence, for example, the Program Statement on Inmate Discipline and Special Housing Units. Other policies or programs, such as early release pursuant to 18 U.S.C. § 3621(e), indicate that an inmate could be denied the benefits of such programs if he or she was convicted of an offense listed in either Section 3 or 4.

Any conviction for an offense listed below is categorized as a crime of violence.

**(1)  Title 18, United State Code Sections**

| | | |
|---|---|---|
| ◆ | **32** | destruction of aircraft |
| ◆ | **33** | destruction of motor vehicles or motor vehicle facilities |
| ◆ | **34** | penalty when death results |
| ◆ | **35(b)** | conveying false information that harms human life |
| ◆ | **36** | firing weapons into group of persons (VCCLEA addition) |
| ◆ | **37** | violence at international airports (VCCLEA addition) |
| ◆ | **43** | force, violence, and threats involving animal enterprises |
| ◆ | **81** | arson w/in maritime jurisdiction |
| ◆ | **111** | assaulting officers of the United States |
| ◆ | **112(a)** | assaulting foreign officials |
| ◆ | **113** | assaults w/in maritime jurisdictions |
| ◆ | **114** | maiming w/in maritime jurisdiction |
| ◆ | **115** | threatening family member of a federal official |
| ◆ | **116** | female genital mutilation |
| ◆ | **117** | domestic assault by an habitual offender |
| ◆ | **175** | biological weapons |
| ◆ | **229** | prohibited activities (chemical weapons) |
| ◆ | **231** | civil disorders |
| ◆ | **245** | federally protected activities |
| ◆ | **247** | damage to religious property; obstruction of persons in the free exercise of religious beliefs |
| ◆ | **248** | freedom of access to clinic entrances |
| ◆ | **351** | assassination of cabinet and congress members |
| ◆ | **373** | soliciting to commit a violent act |
| ◆ | **521(c)(2)** | criminal street gangs |
| ◆ | **753** | rescue of an inmate to prevent execution |
| ◆ | **832** | participation in nuclear and weapons of mass destruction threats to the United States |
| ◆ | **842** | explosive materials |
| ◆ | **844** | penalties |
| ◆ | **871** | threats against the President |
| ◆ | **875 (a), (b), (c)** | interstate communications |
| ◆ | **878** | threats against foreign officials |
| ◆ | **879** | threats against former presidents |
| ◆ | **922 (a)(2), (a)(3),(a)(4), (a)(5),(a)(7), (a)(8),(a)(9), (b)(2),(b)(3), (b)(4),(b)(5), (c),(d)(1),** | |

| | | |
|---|---|---|
| | **(d)(2),(d)(4),** | |
| | **(d)(8),(d)(9),** | |
| | **(g),(k),(n),** | |
| | **(o),(p),(q)(2),** | |
| | **(q)(3),(r),** | |
| | **(s)(1),(t)(1),** | |
| | **(u),(x)(1)(A),** | |
| | **(x)(2)(A), &** | |
| | **(z)(1)** | firearm violations |
| ♦ | **924(c)** | firearms used in violent or drug trafficking crimes |
| ♦ | **929** | use of restricted ammunition |
| ♦ | **930(a),(b), & (c)** | possession of firearms and dangerous weapons in Federal facilities |
| ♦ | **956** | conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country |
| ♦ | **970(a)** | damage of property owned by foreign governments |
| ♦ | **1091** | genocide |
| ♦ | **1111** | murder |
| ♦ | **1112** | manslaughter |
| ♦ | **1113** | attempt to commit murder or manslaughter |
| ♦ | **1114** | murder of officers |
| ♦ | **1116** | murder of foreign officials |
| ♦ | **1117** | (conspiracy to murder) |
| ♦ | **1118** | murder in correctional institution (VCCLEA addition) |
| ♦ | **1119** | foreign murder of US national (VCCLEA addition) |
| ♦ | **1120** | murder by escaped prisoner (VCCLEA addition) |
| ♦ | **1121** | murder by state or local officer (VCCLEA addition) |
| ♦ | **1201** | kidnapping |
| ♦ | **1203** | hostage taking |
| ♦ | **1204** | international parental kidnapping |
| ♦ | **1363** | buildings or property within special maritime and territorial jurisdiction |
| ♦ | **1364** | interference by foreign commerce by violence |
| ♦ | **1365** | tampering with consumer products *except* 1365(b),(c) |
| ♦ | **1366** | destruction of an energy facility |
| ♦ | **1368** | harming animals used in law enforcement |
| ♦ | **1369** | destruction of veterans' memorials |
| ♦ | **1512(a)** | killing witness or victim |
| ♦ | **1513** | retaliation against witness or victim |
| ♦ | **1531** | partial-birth abortions prohibited |
| ♦ | **1581** | peonage |
| ♦ | **1583** | enticement into slavery |
| ♦ | **1584** | sale into servitude |
| ♦ | **1585** | slave trading |
| ♦ | **1587** | possession of slaves aboard a vessel |

- **1588** transporting slaves
- **1589(1) & (2)** forced labor
- **1591** sex trafficking of children or by force, fraud, or coercion
- **1651** piracy
- **1652** citizens as pirates
- **1653** aliens as pirates
- **1655** assault on commander as pirates
- **1659** attack to plunder a vessel
- **1661** robbery ashore
- **1751** assassination of president or staff
- **1752(a)(5)** restricted building or grounds
- **1792** mutiny or riot
- **1841** protection of unborn children
- **1855** timber set afire
- **1859** surveys interrupted
- **1864** hazardous devices on federal lands
- **1958** use of interstate commerce in murder for hire
- **1959** violent crimes aiding racketeering
- **1991** entering train to commit crime
- **1992** wrecking trains
- **2101** riots
- **2111** special maritime jurisdiction
- **2113(d),(e)** bank robbery and incidental crimes
- **2114** assault of person carrying mail
- **2115** breaking into post office
- **2116** railway or steamboat post office
- **2118(a),(b), (c)** robberies and burglaries involving controlled substances
- **2119** crimes involving motor vehicles
- **2191** cruelty to seamen
- **2231(b)** assault or resistance
- **2232(a)** destruction of property to prevent seizure
- **2233** rescue of seized property
- **2241** aggravated sexual abuse
- **2242** sexual abuse
- **2243(a)** sexual abuse of a minor or ward
- **2244(a)&(c)** abusive sexual contact
- **2245** sexual abuse resulting in death (VCCLEA addition)
- **2251** sexual exploitation of children
- **2251A** selling or buying of children
- **2260(a)** production of sexually explicit depictions of a minor for importation into the United States
- **2261** interstate domestic violence (VCCLEA addition)
- **2261A** stalking

| | | |
|---|---|---|
| ◆ **2271** | conspiracy to destroy vessels | |
| ◆ **2272** | destruction of vessel by owner | |
| ◆ **2273** | destruction of vessel by nonowner | |
| ◆ **2275** | firing or tampering with vessels | |
| ◆ **2276** | breaking and entering vessels | |
| ◆ **2277(a)** | explosives or dangerous weapons aboard vessels | |
| ◆ **2280** | violence against maritime navigation (VCCLEA addition) | |
| ◆ **2281(NOT(A))** | violence against fixed platforms (VCCLEA addition) | |
| ◆ **2291(NOT (a)(8)-(9))** | destruction of vessel or maritime facility | |
| ◆ **2332** | penalties for homicide | |
| ◆ **2332a** | use of weapons of mass destruction (VCCLEA addition) | |
| ◆ **2340A** | torture | |
| ◆ **2383** | rebellion or insurrection | |
| ◆ **2384** | sedition conspiracy | |
| ◆ **2385** | advocating the overthrow of the government | |
| ◆ **2389** | recruiting for service against U.S. | |
| ◆ **2390** | enlistment to serve against U.S. | |
| ◆ **2421** | transportation for illegal sexual activity | |
| ✓◆ **2422** | coercion into interstate travel for illegal sexual activity | |
| ◆ **2423** | transportation of minors for illegal sexual activity | |

(2) **Title 21 United States Code Sections**

◆ **841(e)**      boobytraps on federal property
◆ **848(e)**      death penalty for criminal offenses
◆ **858**          endangering human life while manufacturing controlled substances

(3) **Title 26 United States Code Sections**

◆ **5861(a) thru (l)**      firearms

(4) **Title 42 United States Code Sections**

◆ **2000(e)(13)**      killing of officer while enforcing Equal Employment Act
◆ **2283(a)**          protection of nuclear inspectors
◆ **2284(a)**          sabotage of nuclear facilities
◆ **3631**              interference with housing

(5) **Title 49 United States Code Sections**

◆ **46502**      aircraft piracy
◆ **46504**      interference with flight crew members

- ♦ **46505**        carrying a weapon or explosive on an aircraft
- ♦ **46507**        false information and threats

b. * **Title 18, United States Code Section 2113(a).** Title 18, United States Code Section 2113(a) provides in part:

> **"Whoever, by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; . . . shall be fined under this title or imprisoned not more than twenty years, or both."**

This statute covers various offenses, including not only bank robbery but also embezzling bank funds, stealing bank property, and bank larceny.

With regard to the specific crime of bank robbery, the offense shall be considered a crime of violence, since the offense involves an explicit or implicit threat of force and thus has as an element the threatened use of physical force against the person or property of another. For offenses pursuant to § 2113(a) other than bank robbery, see Section 4.e. below.

c. **Conspiracy, Attempt, and Similar Offenses Which Involve an Underlying Offense**. The statutes listed in this section cover conspiracy offenses (see, e.g., 18 U.S.C. § 371) when an individual has planned with others to commit a particular crime. Other listed statutes cover attempted offenses, i.e. when an individual tried but did not succeed in committing the crime. In reviewing these types of offenses, it is necessary to examine the "underlying offense" (what the defendant was conspiring to do or attempting to do). If the underlying offense is categorized as violent pursuant to Section 3.a. of this Program Statement, e.g., murder, then the attempt or the conspiracy offense is also violent. The underlying offense will be included in the PSI and may be noted on the J&C.

Other statutes listed in this section do not criminalize behavior but set out penalties that result from violating other statutes.

**Example:** 18 U.S.C. § 924(a)(1)(B) provides that whoever

> **"knowingly violates subsection (a)(4),(f),(k),(r),(v), or (w) of section 922 . . . shall be fined under this title, imprisoned not more than five years, or both."**

The J&C may indicate the sentence was imposed pursuant to the penalty provisions of § 924(a)(1)(B) without indicating the conviction for the underlying offense. The PSI, however, notes the underlying conviction, "Transporting a Destructive Device in Interstate Commerce" [18 U.S.C. § 922(a)(4)]. In order to determine whether the offender's current offense is violent, staff should assess whether the underlying offense is violent in accordance with Section 3.a. of

this Program Statement; if the underlying offense is violent, then the offender should be deemed violent.

The following offenses **may** be violent depending on the underlying offense.

**Title 18, United States Code Sections**

- ♦ **\*241**      conspiracy to deprive civil rights **(if conspiracy)**
- ♦ **\*371**      conspiracy to commit offense/fraud against U.S.
- ♦ **\*372**      conspiracy to impede or injure officer
- ♦ **\*924**      penalties for firearms violations
- ♦ **\*1962**      racketeering
- ♦ **\*2118(d)**      robberies involving controlled substances

## 4. OFFENSES THAT AT THE DIRECTOR'S DISCRETION SHALL PRECLUDE AN INMATE'S RECEIVING CERTAIN BUREAU PROGRAM BENEFITS

For certain Bureau programs, such as early release pursuant to 18 U.S.C. § 3621(e) and placement in Intensive Confinement Centers, an inmate may be denied program benefits if he or she was convicted of an offense listed in either this section or Section 3. If an inmate is denied the benefit of such a program, staff must carefully describe the basis for the denial. For example, if an inmate is convicted of an offense listed in this section, the inmate shall be denied a program benefit because he or she committed an offense identified at the Director's discretion, rather than a crime of violence.

As an exercise of the discretion vested in the Director, an inmate serving a sentence for an offense that falls under the provisions described below shall be precluded from receiving certain Bureau program benefits.

Inmates whose current offense is a felony that:

- Has as an element, the actual, attempted, or threatened use of physical force against the person or property of another, or
- Involved the carrying, possession, or use of a firearm or other dangerous weapon or explosives (including any explosive material or explosive device), or
- By its nature or conduct, presents a serious potential risk of physical force against the person or property of another, or
- By its nature or conduct involves sexual abuse offenses committed upon children.

Thus, for an inmate to receive Bureau program benefits such as those mentioned above, he or she must not be convicted of an offense listed in this section or in Section 3.

a. **Criminal Offenses with an Enhanced Base Offense Level.** Convictions for an offense listed below may or may not satisfy the standard listed in the introductory portion of Section 4.

At the time of sentencing, the court makes a finding of whether an offense listed below involved the use of force, and this finding is reflected in the PSI section entitled "Offense Computation," subsection entitled "Base Offense Level." This subsection references a particular U.S. Sentencing Guideline provision that distinguishes between violations of the particular criminal code section that are committed with and without force.

**Example**: Title 18 United States Code Section 241, Conspiracy Against Rights provides:

> **"If two or more persons conspire to injure, oppress, threaten or intimidate any person . . . in the free exercise or enjoyment of any right or privilege. . . ."**

This crime may or may not be committed through the use of force or threatened use of force, since one can be oppressed through means other than force. Pursuant to U.S. Sentencing Guideline Section 2H2.1:

- If the crime involved obstructing an election or registration, and the obstruction occurred using force or threat of force against persons or property, the base offense level is 18, or
- If the obstruction occurred without the use or threatened use of force, such as forgery, fraud, theft, deceit, etc., the base offense level is 12.

If an offender was convicted of an offense listed below, case management staff must examine the base offense level to determine whether the offense would preclude the inmate from receiving certain Bureau program benefits. If the PSI does not include an explanation as to the reason for assigning a particular base offense level, case management staff may need to examine the particular Sentencing Guideline referenced.

Some of the offenses listed below may correspond to more than one Sentencing Guideline, only one of which includes a base level adjustment for the use or threatened use of force. Accordingly, it is possible that an examination of the Offense Computation section of the PSI may reveal no mention of the use or threatened use of force. When the PSI fails to explain the reason for assigning a particular base offense level, case management staff must examine the particular Sentencing Guideline referenced to determine whether the court found that the use of force was implicated in the offense.

Case management staff may contact institution legal staff or Regional Counsel if they have questions regarding this section. A list of offenses for which the Sentencing Guidelines base offense level is affected by the use or threatened use of force follows. At the Director's discretion, inmates with such an offense shall be precluded from receiving certain Bureau program benefits.

**Title 18, United States Code Sections**

♦ 241          conspiracy against rights **(for other than conspiracy)**
♦ 242          deprivation of rights under color of law

- **592**          putting troops at polls
- **593**          interference by armed forces
- **1791**         possessing contraband in prison
- **1952**         transporting items in aid of racketeering
- **2231(a)**      assault on persons executing search warrant
- **2381**         treason

b. **Criminal Offenses with a Specific Offense Characteristic Enhancement**. Convictions for an offense listed below, like those listed in Section 4.a., may or may not satisfy the standard listed in the introductory portion of Section 4.

At the time of sentencing, the court makes a finding of whether the offense involved the use or threatened use of force, and this finding is reflected in the PSI section entitled "Offense Computation," subsection entitled "Specific Offense Characteristics." This subsection references a particular U.S. Sentencing Guideline that provides for an increase in the Total Offense Level if the criminal violation was committed with force.

**Example**: Section 841 of Title 21, United States Code makes it a crime to manufacture, distribute, or possess with the intent to distribute drugs. Under the Sentencing Guidelines (§ 2D1.1 and § 2D1.11), the defendant could receive an increase in his or her base offense level because of a "Specific Offense Characteristic" (for example, if a dangerous weapon was possessed during commission of the offense), the court would increase the defendant's base offense level by two levels. This particular "Specific Offense Characteristic" (possession of a dangerous weapon during the commission of a drug offense) poses a serious potential risk that force may be used against persons or property. Specifically, as noted in the U.S. Sentencing Guidelines § 2D1.1., application note 3, the enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. Accordingly, an inmate who was convicted of manufacturing drugs, (21 U.S.C. § 841) and received a two-level enhancement for possession of a firearm has been convicted of an offense that will preclude the inmate from receiving certain Bureau program benefits.

In some cases, an inmate may be convicted of an offense listed in this section as well as 18 U.S.C. § 924(c)(1), use of a firearm during a crime of violence or drug trafficking crime. According to the U.S. Sentencing Guidelines, if a defendant receives a § 924(c)(1) conviction, the court may not assess a two-level "Specific Offense Characteristic" enhancement for possession of a firearm; however, in light of the Supreme Court ruling in *Bailey* v. *U.S.*, 116 S.Ct. 501 (1995), a number of § 924(c)(1) convictions have been vacated. In *Bailey*, the Court held that the term "use" connotes an active employment of the firearm. If any of the offenses listed in this section were accompanied by a § 924(c)(1) conviction that was subsequently vacated due to the *Bailey* decision, staff shall presume that the inmate would have received a two-level "Specific Offense Characteristic" enhancement for possession of a firearm unless there is a specific court order to the contrary. Thus, absent a court order specifically denying the application of a two point enhancement for possession of a firearm, the inmate will not receive certain Bureau program benefits.

Some of the offenses listed below may correspond to more than one Sentencing Guideline, only one of which includes a Specific Offense Characteristic for the use of force. Alternatively, the PSI may fail to adequately describe the Specific Offense Characteristic that underlies the increase in offense level. In either case, it is possible that an examination of the Offense Computation section of the PSI reveals no mention of the use of force. If this occurs, case management staff must examine the particular Sentencing Guideline referenced to determine whether the court found that the use of force was implicated in the offense.

**Example**: The PSI in the above scenario may state "SOC (specific offense characteristic) 2F1.1(4) increase 2 levels." If the Report does not further state "since the offense involved the conscious or reckless risk of serious bodily injury, increase by two levels pursuant to 2F1.1(4)," case management staff may have to examine Guideline 2F1.1(4) to determine that the only basis for this particular increase is a finding that the offense included the risk of bodily injury.

Case management staff may contact institution legal staff or Regional Counsel if they have questions regarding this section. Below is a list of offenses for which there could be a Specific Offense Characteristic enhancement for the use of force:

**(1)  Title 16, United States Code Sections**

| | |
|---|---|
| ♦ **773e(a)(2), (3),(4),(6)** | violation of Northern Pacific Halibut Act |
| ♦ **773g** | violation of Northern Pacific Halibut Act |
| ♦ **1857(a)(D), (E),(F),(H)** | violation of National Fishery Management Program |
| ♦ **1859** | violation of National Fishery Management Program |
| ♦ **2435(4),(5), (6),(7)** | violation of Antarctic Marine Living Resources Convention |
| ♦ **2438** | violation of Antarctic Marine Living Resources Convention |
| ♦ **3606** | violation of North Atlantic Salmon Fishing |
| ♦ **3637(a)(2),(3) (4),(6),(c)** | violation of Pacific Salmon Fishing |
| ♦ **5009(5),(6), (7),(8)** | violation of North Pacific Anadromous Stock Convention |
| ♦ **5010(b)** | violation of North Pacific Anadromous Stock Convention |

**(2)  Title 18, United States Code Sections**

| | |
|---|---|
| ♦ **755** | officer permitting escape |
| ♦ **757** | procures escape for prisoner of war |
| ♦ **874** | kickbacks from public works employees |
| ♦ **894** | extending credit through extortionate means |
| ♦ **1163** | embezzlement/theft from Indian organizations |

- **1503**      influencing or injuring officer or juror
- **1505**      obstruction of proceedings before departments or agencies
- **1511**      obstruction of state or local law enforcement
- **1516**      obstruction of a federal audit
- **1517**      obstructing financial examination
- **1951**      interference with commerce by threats/violence
- **2112**      robbery of personal property of United States

(3)  **Title 21, United States Code Sections**

- **841(NOT(e))**      controlled substance violation
- **\*846**      attempt and conspiracy

(4)  **Title 26, United States Code Sections**

- **7212**      attempt to interfere with revenue laws
- **7214**      unlawful acts by employees of the IRS

(5)  **Title 30, United States Code Sections**

  **1461(a)(3), (4),(5),(7)**      resisting officers for violations under Deep Seabed Mineral Resources Act
- **1463**      violations of Deep Seabed Mineral Resources Act

(6)  **Title 33, United States Code Section**

- **1232(b)(2)**      ports and waterways safety enforcement provisions

(7)  **Title 40, United States Code Section**

- **193f(a)**      security of Capitol grounds and buildings

(8)  **Title 42, United States Code Sections**

- **1973aa**      application of prohibition to other States
- **1973aa-1**      residence requirements for voting
- **1973aa-1a**      bilingual election requirements
- **1973aa-3**      penalty
- **1973bb**      enforcement of twenty-sixth amendment
- **1973gg-10**      criminal penalties
- **2283(b)**      protection of nuclear inspectors
- **9151(2), (3),(4),(5)**      violation of Ocean Thermal Energy Conversion Act

| ♦ **9152(d)** | violation of Ocean Thermal Energy Conversion Act |

**(9) Title 46, United States Code Section**

| ♦ **1903** | manufacture, distribution, or possession with intent to manufacture controlled substances |

**(10)  Title 49, United States Code Section**

| ♦ **46505(b)** | carrying a weapon on an aircraft |

**c.  Criminal Offenses That *May* Preclude an Inmate's Receiving Certain Bureau Program Benefits**.  In addition to Sections 4.a. and 4.b. above, an inmate may be precluded from receiving certain Bureau program benefits based on an offense listed in this section. For the offenses listed below, the Sentencing Guidelines may provide little insight into the court's findings. Accordingly, rather than simply examining the base offense level or the specific offense characteristics, case managers must carefully examine the entire Offense Computation section of the PSI and, if necessary, the Offense Conduct section to determine if the offense would preclude an inmate's receiving certain Bureau program benefits based on whether the offense satisfies the standard listed in the introductory portion of Section 4.

The following offenses **may** preclude an inmate's receiving certain Bureau program benefits based on a variety of factors.

**(1)  Title 7, United States Code Section**

| ♦ **473c-1** | offenses in relation to sampling of cotton |

**(2)  Title 16, United States Code Sections**

| ♦ **5106(e)(5), (6),(7),(9), (f)(2)** | violation of Atlantic Coast Fisheries Cooperative Management |

**(3)  Title 18, United States Code Sections**

| ♦ **700** | desecration of the flag of the United States |
| ♦ **751** | escape from federal prison |
| ♦ **752** | instigating/assisting escape from federal prison |
| ♦ **831** | prohibited acts involving nuclear materials |
| ♦ **876** | mailing threatening communications |
| ♦ **877** | mailing threatening communications from foreign country |

- ♦ **922(a)(1)**     engage in business of importing, manufacturing, or dealing in firearms or ammunition
- ♦ **1153**     offenses within Indian Country
- ♦ **1512(b)**     tampering with a witness/victim/informant
- ♦ **1708**     theft or receipt of stolen mail
- ♦ **1792**     mutiny and riot in prison
- ♦ **1956**     money laundering
- ♦ **2117**     breaking into carrier facilities
- ♦ **2152**     destruction of submarine and torpedo works
- ♦ **2153**     destruction of war materials
- ♦ **2154**     production of defective war material
- ♦ **2155**     destruction of national defense materials
- ♦ **2156**     production of defective national defense material
- ♦ **2192**     incitation of seamen to revolt
- ♦ **2193**     mutiny
- ♦ **2247**     repeat offenders
- ♦ **2387**     activities involving armed forces

**(4) Title 40, United States Code Sections**

- ♦ **193f(a),(b)**     security of Capitol grounds and buildings

d. **Conspiracy, Attempt, and Other Offenses Which Involve an Underlying Offense**. Some of the statutes listed in this section cover conspiracy offenses (see, e.g., 21 U.S.C. § 846) when an individual has planned with others to commit a particular crime. Other listed statutes cover attempted offenses (see, e.g., 21 U.S.C. §§ 846 and 963) when an individual tried but did not succeed in committing the crime. In reviewing these types of offenses, it is necessary to examine the "underlying offense" (what the defendant was conspiring to do or attempting to do). If the underlying offense would preclude the inmate from receiving certain Bureau program benefits based on any of the other portions of Section 4 of this policy, the conspiracy or the attempt offense shall also preclude the inmate from receiving the same benefits. The underlying offense will be included in the PSI and may be noted on the J&C.

**Example**: The Judgment and Commitment Order may indicate a conviction for "Attempt and Conspiracy" (21 U.S.C. § 846). The accompanying Presentence Investigation Report will reference the underlying crime, in many cases it will be "Possession with Intent to Distribute a Controlled Substance" (21 U.S.C. § 841). Staff should then review the underlying offense (in this case possession of controlled substance) to determine whether it satisfies the standard listed in the introductory portion of Section 4. As noted in the example in section b above, if the PSI indicates that the defendant received a 2-level increase for possessing a dangerous weapon, then the offense should preclude the inmate from receiving certain Bureau program benefits; if no such enhancement was given, the offense should not preclude the inmate from receiving such benefits.

(1) **Title 18, United States Code Sections**

| | |
|---|---|
| ♦ *241 | conspiracy to deprive civil rights **(if conspiracy)** |
| ♦ *371 | conspiracy to commit offense/fraud against U.S. |
| ♦ *372 | conspiracy to impede or injure officer |
| ♦ *924 | penalties for firearms violations |
| ♦ *1962 | racketeering |
| ♦ *2118(d) | robberies involving controlled substances |

(2) **Title 21, United States Code Sections**

| | |
|---|---|
| ♦ *846 | attempt and conspiracy |
| ♦ 848 | controlled substances violations as criminal enterprise |
| ♦ 963 | conspiracy or attempt to violate controlled substance laws |

e. **Special Circumstances**

♦ **Title 18, United States Code § 922(g).** All offenses under 18 U.S.C. § 922(g) shall preclude an inmate from receiving certain Bureau program benefits.

♦ ***Title 18, United States Code § 2113(a).** Excluding bank robbery (see Section 3.b. above), other offenses covered by 18 U.S.C. § 2113(a), (e.g., bank larceny, etc.), shall be reviewed similarly to offenses in Section 4.b. Defendants may receive a Specific Offense Characteristic enhancement that will result in an increase in the base offense level. Such enhancements provide for an increase in the defendant's base offense level if:

- A firearm was discharged,
- A firearm or other dangerous weapon was brandished, displayed, possessed, or used, or
- An express or implied threat of death was made (U.S.S.G. 2B3.2(b), Application Notes 2 and 6).

If a defendant received such an enhancement (or one of the other enhancements involving the use or threatened use of force), the offense shall preclude the inmate's receiving certain Bureau program benefits.

♦ **Title 18, United States Code § 2243.** A conviction for sexual abuse of a minor or ward shall preclude an inmate from receiving certain Bureau program benefits.

5. **OFFENSES COMMITTED BEFORE NOVEMBER 1, 1987**

The Sentencing Guidelines are generally not applicable for offenses committed before November 1, 1987. Accordingly, for offenses identified in Section 4 or offenses similar to those listed in Section 4 of this Program Statement that were committed before this date, case managers must

make a determination, based on the narrative description of the crime contained in the PSI, whether the offense involved:

- The use, attempted use, or threatened use of force;
- The use, carrying, or possession of a dangerous weapon;
- A serious potential risk that force might be used against the person or property of another; or
- Sexual abuse committed upon children.

Offenses listed in Section 3, Crimes of Violence, or offenses similar to those listed in Section 3, which were committed before November 1, 1987, shall be treated in the same manner as "new law" offenses.

## 6. CRIMES CODIFIED PURSUANT TO THE VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

The VCCLEA created a number of new Federal criminal offenses and enhanced penalties for several existing offenses. Some of the new offenses are included in the above lists, but the lists will be revised as needed after the U.S. Sentencing Commission drafts new guidelines. These lists will also be updated periodically to reflect statutory changes or at the Director's discretion.

## REFERENCES

*Program Statements*
P5110.15    Notification of Release to State and Local Law Enforcement Officials (8/30/00)
P5162.02    Definition of Term, Crimes of Violence (7/24/95)
P5322.12    Inmate Classification and Program Review (11/29/06)
P5330.11    Psychology Treatment Programs (3/16/09)
P5331.02    Early Release Procedures Under 18 U.S.C. 3621 (e) (3/16/09)
P5800.12    Receiving and Discharge Manual (12/31/97)
P5800.15    Correctional Systems Manual (1/1/09)
P5880.28    Sentence Computation Manual (CCCA of 1984) (2/21/92)
P5880.30    Sentence Computation Manual ("Old Law" Pre-CCCA 1984) (7/16/93)

*ACA Standards*
None.

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport and BOPDOCS.

**HISTORICAL AND STATUTORY NOTES**

**Prior Provisions**

A prior section 2421, Act June 25, 1948, c. 645, 62 Stat. 812; May 24, 1949, c. 139, § 47, 63 Stat. 96; Pub.L. 99–628, § 5(b)(1), Nov. 7, 1986, 100 Stat. 3511; Pub.L. 105–314, Title I, § 106, Oct. 30, 1998, 112 Stat. 2977, relating to transportation generally, was repealed by Pub.L. 114–22, Title III, § 303, May 29, 2015, 129 Stat. 255.

## § 2421A.   Promotion or facilitation of prostitution and reckless disregard of sex trafficking

(a) **In general.**—Whoever, using a facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, owns, manages, or operates an interactive computer service (as such term is defined in defined in [1] section 230(f) the Communications Act of 1934 (47 U.S.C. 230(f))), or conspires or attempts to do so, with the intent to promote or facilitate the prostitution of another person shall be fined under this title, imprisoned for not more than 10 years, or both.

(b) **Aggravated violation.**—Whoever, using a facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, owns, manages, or operates an interactive computer service (as such term is defined in defined in [1] section 230(f) the Communications Act of 1934 (47 U.S.C. 230(f))), or conspires or attempts to do so, with the intent to promote or facilitate the prostitution of another person and—

(1) promotes or facilitates the prostitution of 5 or more persons; or

(2) acts in reckless disregard of the fact that such conduct contributed to sex trafficking, in violation of 1591(a),[2]

shall be fined under this title, imprisoned for not more than 25 years, or both.

(c) **Civil recovery.**—Any person injured by reason of a violation of section 2421A(b) may recover damages and reasonable attorneys' fees in an action before any appropriate United States district court.

(d) **Mandatory restitution.**—Notwithstanding sections 3663 or 3663A [3] and in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any violation of subsection (b)(2). The scope and nature of such restitution shall be consistent with section 2327(b).

(e) **Affirmative defense.**—It shall be an affirmative defense to a charge of violating subsection (a), or subsection (b)(1) where the defendant proves, by a preponderance of the evidence, that the promotion or facilitation of prostitution is legal in the jurisdiction where the promotion or facilitation was targeted.

(Added Pub.L. 115–164, § 3(a), Apr. 11, 2018, 132 Stat. 1253.)

[1] So in original.
[2] So in original. Probably should be "section 1591(a)".
[3] So in original. Probably should be "section 3663 or 3663A".

**HISTORICAL AND STATUTORY NOTES**

**Savings Provisions**

For savings provisions of amendments made by Pub.L. 115–164, see Pub.L. 115–164, § 7, set out as a note under 47 U.S.C.A. § 230.

## § 2422.   Coercion and enticement

(a) Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(b) Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

(June 25, 1948, c. 645, 62 Stat. 812; Pub.L. 99–628, § 5(b)(1), Nov. 7, 1986, 100 Stat. 3511; Pub.L. 100–690, Title VII, § 7070, Nov. 18, 1988, 102 Stat. 4405; Pub.L. 104–104, Title V, § 508, Feb. 8, 1996, 110 Stat. 137; Pub.L. 105–314, Title I, § 102, Oct. 30, 1998, 112 Stat. 2975; Pub.L. 108–21, Title I, § 103(a)(2)(A), (B), (b)(2)(A), Apr. 30, 2003, 117 Stat. 652, 653; Pub.L. 109–248, Title II, § 203, July 27, 2006, 120 Stat. 613.)

## § 2423.   Transportation of minors

(a) **Transportation with intent to engage in criminal sexual activity.**—A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

(b) **Travel with intent to engage in illicit sexual conduct.**—A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

(c) **Engaging in illicit sexual conduct in foreign places.**—Any United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

(d) **Ancillary offenses.**—Whoever, for the purpose of commercial advantage or private financial gain, arranges, induces, procures, or facilitates the travel of a person knowing that such a person is traveling in interstate commerce or foreign commerce for the purpose of engaging in illicit sexual conduct shall be fined under this title, imprisoned not more than 30 years, or both.

(e) **Attempt and conspiracy.**—Whoever attempts or conspires to violate subsection (a), (b), (c), or (d) shall be punishable in the same manner as a completed violation of that subsection.

(f) **Definition.**—As used in this section, the term "illicit sexual conduct" means—

(1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter